LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York
By:    MATTHEW L. SCHWARTZ
         TOMOKO ONOZAWA
Assistant United States Attorneys
86 Chambers Street
New York, New York 10007
Tel.: (212) 637-1945
Fax: (212) 637-2750
E-mail:  matthew.schwartz@usdoj.gov

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| IN RE: | Chapter 11 |
| TRONOX INCORPORATED, *et al.*, | Case No. 09-10156 (ALG) |
| Debtors. | Jointly Administered |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TRONOX INCORPORATED, *et al.*,

             Plaintiffs,

        - against -                        Adv. Proc. No.  09-01198 (ALG)

ANADARKO PETROLEUM
CORPORATION, *et ano.*,

             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE UNITED STATES OF AMERICA,

             Plaintiff-Intervenor,

        - against -

TRONOX, INC., TRONOX WORLDWIDE LLC,
TRONOX LLC, KERR-McGEE
CORPORATION, and ANADARKO
PETROLEUM CORPORATION,

             Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPLAINT IN INTERVENTION

The United States of America ("United States"), by its attorney Lev L.

Dassin, Acting United States Attorney for the Southern District of New York, by

authority of the Attorney General of the United States, acting at the request of the

Administrator of the United States Environmental Protection Agency ("EPA"), for

its complaint-in-intervention alleges as follows

## NATURE OF THE ACTION

1.     This is an adversary proceeding brought by the United States

pursuant to Sections 3304 and 3306 of the Federal Debt Collection Procedures Act

("FDCPA"), 28 U.S.C. §§ 3304 and 3306, relating to fraudulent transfers by

Defendants against the United States.  Defendants Tronox, Inc., Tronox Worldwide

LLC, and Tronox, LLC (collectively "Tronox") owe a debt to the United States

because they are liable for past response costs for environmental cleanups at

numerous sites around the country pursuant to Section 107(a) of the

Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA"), 42 U.S.C. § 6701(a), *et seq.*, as well as for other environmental

liabilities to various federal agencies.  Various defendants and their predecessors

conveyed assets and liabilities without receiving reasonably equivalent value.  *See*

28 U.S.C. § 3304(b)(1)(B).  Defendant Kerr-McGee Corporation ("Kerr-McGee")

engaged in a corporate restructuring beginning in 2000 with the actual intent to

hinder, delay, or defraud the United States by shifting liabilities from Kerr-McGee

and certain of its subsidiaries to other Kerr-McGee subsidiaries, which eventually

2

became the Debtors in these cases.[1]/  28 U.S.C. § 3304(b)(1)(A).  Kerr-McGee also removed assets from Tronox and retained those assets for itself.  Kerr-McGee then caused Tronox to be separated from valuable assets related to the liabilities assumed by Tronox by spinning Tronox and its subsidiaries off as an independent company.  As a part of the spin off, Kerr-McGee caused Tronox to convey assets and incur obligations without receiving reasonably equivalent value.  *See* 28 U.S.C. § 3304(b)(1)(B).  Defendant Anadarko Petroleum Corporation ("Anadarko") is the successor to Kerr-McGee.

2.     In this action, the United States seeks:  (1) a judgment against Anadarko, pursuant to Section 3306(b) of the FDCPA, 28 U.S.C. § 3306(b), in an amount equal to Kerr-McGee's fraudulently transferred liabilities to Tronox; (2) an order, pursuant to Section 3306(a) of the FDCPA, 28 U.S.C. § 3306(a), voiding as fraudulent transfers of assets from Tronox to Kerr-McGee; and (3) an order that the assets fraudulently conveyed be applied to satisfy Debtors' liabilities to the United States.

---

[1]/     The Debtors in this case include: Tronox Luxenbourg S.ar.L; Tronox Incorporated; Cimarron Corporation; Southwest Refining Company, Inc.; Transworld Drilling Company; Triangle Refineries, Inc.; Triple S, Inc.; Triple S Environmental Management Corporation; Triple S Minerals Resources Corporation; Triple S Refining Corporation; Tronox LLC; Tronox Finance Corp.; Tronox Holdings, Inc.; Tronox Pigments (Savannah) Inc.; and Tronox Worldwide, LLC.

**JURISDICTION AND VENUE**

3.      On January 12, 2009, Debtors filed a voluntary petition for relief

under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the

"Bankruptcy Code").  Tronox continues to operate its business and manage its

property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the

Bankruptcy Code.

4.      The Court has jurisdiction over this adversary proceeding pursuant to

28 U.S.C. §§ 1331, 1334(b), and 1345.

5.      Pursuant to 28 U.S.C. § 157 and the Standing Order of Referral of

Cases to Bankruptcy Court Judges of the District Court for the Southern District of

New York, dated July 10, 1984 (Ward, Acting C.J.), this Court may exercise subject

matter jurisdiction.

**DEFENDANTS**

6.      Defendant Tronox, Inc. is a Delaware corporation with its principal

place of business located at One Leadership Square, Suite 300, 211 N. Robinson

Avenue in Oklahoma City, Oklahoma.

7.      Tronox, Inc. was created on May 17, 2005.

8.      Tronox, Inc. is an "insider" within the meaning of 28 U.S.C.

§ 3301(5)(B) with respect to Tronox Worldwide LLC, Tronox LLC, and Kerr-McGee

Corporation.

9.      Defendant Tronox, LLC, formerly known as Kerr-McGee Chemical

LLC, is a Delaware corporation with its principal place of business located at One

Leadership Square, Suite 300, 211 N. Robinson Avenue in Oklahoma City, Oklahoma.

10.     Tronox, LLC is an "insider" within the meaning of 28 U.S.C. § 3301(5)(B) with respect to Tronox, Inc., Tronox Worldwide LLC, and Kerr-McGee Corporation.

11.     Defendant Tronox Worldwide LLC, Inc., formerly known as Kerr-McGee Chemical Worldwide, LLC, is a Delaware corporation with its principal place of business located at One Leadership Square, Suite 300, 211 N. Robinson Avenue in Oklahoma City, Oklahoma.

12.     Tronox Worldwide LLC is an "insider" within the meaning of 28 U.S.C. § 3301(5)(B) with respect to Tronox, Inc., Tronox LLC, and Kerr-McGee Corporation.

13.     Tronox, Inc. was a wholly-owned indirect subsidiary of Defendant Kerr-McGee Corporation.

14.     Tronox, Inc. was formed to hold Kerr-McGee Corporation's chemical businesses.

15.     Defendant Kerr-McGee Corporation was the indirect parent of Kerr-McGee Chemical Worldwide, LLC and Kerr-McGee Chemical, LLC.

16.     Defendant Kerr-McGee Corporation is an "insider" within the meaning of 28 U.S.C. § 3301(5)(B) with respect to Tronox, Inc., Tronox LLC, and Tronox Worldwide LLC.

17.     Defendant Kerr-McGee Corporation is a wholly owned subsidiary of

5

Defendant Anadarko Petroleum Corporation.

18.    Defendant Anadarko Petroleum Corporation is a Delaware

Corporation with its principal place of business at 1201 Lake Robbins Drive in The

Woodlands, Texas.

19.    Upon information and belief, Anadarko Petroleum Corporation is a

successor in interest to Kerr-McGee Corporation.

## GENERAL ALLEGATIONS

### Kerr-McGee Corporate History

20.    The original Kerr-McGee Corporation ("Old Kerr-McGee") was founded

in 1929 as an oil and gas exploration company.

21.    Between 1945 and the 1970s, Old Kerr-McGee acquired various

businesses in the oil and gas, mining, forest products, nuclear, and chemical

industries.

22.    Upon information and belief, by 2000, Old Kerr-McGee had

discontinued many of its historic operations, including forest products, uranium

exploration, mining and processing, and coal mining ("Legacy Businesses"), and had

two main operating businesses: the oil and gas exploration and production business

("Oil & Gas Business") and the chemicals business ("Chemical Business").

23.    Upon information and belief, Old Kerr-McGee remained responsible for

significant residual environmental, tort, workers' compensation, and post-

employment pension, medical and other benefit liabilities related to the Legacy

Businesses ("legacy liabilities").

6

24.    On July 6, 1999, EPA sent Old Kerr-McGee and Kerr-McGee Chemical Corporation LLC a Notice of Potential Liability for the Federal Creosote Superfund Site in Manville, New Jersey ("Manville Site").

25.    On October 18, 1999, EPA sent Old Kerr-McGee and Kerr-McGee Chemical Corporation LLC an invitation to voluntarily finance or perform the cleanup at the Manville Site.  The letter informed Old Kerr-McGee and Kerr-McGee Chemical LLC that the remedial work for the first phase of the cleanup at the Manville Site was estimated as $59,100,000.

27.    EPA sent another letter to Old Kerr-McGee on October 26, 2000 informing the company that a remedy had been selected for the second phase of cleanup at the Manville Site at an estimated cost of $28,500,000.

28.    In 2001, Old Kerr-McGee began implementation of a corporate reorganization called "Project Focus."

29.    Upon information and belief, Old Kerr-McGee engaged in a series of internal mergers, stock and asset transfers, and corporate name changes that resulted in Old Kerr-McGee becoming a subsidiary of a new parent that was named "Kerr-McGee Corporation."

30.    Upon information and belief, Old Kerr-McGee retained the Legacy Businesses along with any and all liabilities of those businesses.

31.    On August 1, 2001 Old Kerr-McGee changed its name to "Kerr-McGee Operating Company" ("KMOC").

32.    On August 1, 2001, an entity affiliated with KMOC named "Kerr-

McGee Holdco, Inc.," changed its name to "Kerr-McGee Corporation," hereinafter "Kerr-McGee."

33.    Kerr-McGee directly owned 100% of the stock of KMOC as of August 1, 2001.

34.    As of August 1, 2001, Kerr-McGee indirectly owned all of KMOC's subsidiaries, including Kerr-McGee Chemical LLC.

35.    Upon information and belief, in 2002, Kerr-McGee Chemical Worldwide ("KMC Worldwide") was a subsidiary of KMOC.

36.    On December 31, 2002, KMOC merged into KMC Worldwide.

37.    Upon information and belief, Kerr-McGee Chemical LLC remained a subsidiary of KMC Worldwide.

38.    KMC Worldwide and Kerr-McGee Oil & Gas Corporation entered into an Assignment, Assumption, and Indemnity Agreement ("AAI Agreement"), effective as of December 31, 2002.

39.    Under the AAI Agreement, KMC Worldwide was the "Assignor," and Kerr-McGee Oil & Gas Corporation was the "Assignee."

40.    The AAI Agreement acknowledges that "as a result of various mergers, acquisitions, internal asset transfers and corporate reorganizations, Assignor may have primary, secondary or residual liabilities and obligations arising out of the oil and gas exploration, production and development business currently conducted by Assignee (the "E&P Business")."

41.    Upon information and belief, "E&P Business" refers to Old Kerr-McGee's

8

historic oil and gas exploration and production businesses.

42.    The stated purpose of the AAI Agreement was the Assignor's (KMC Worldwide's) desire "to assign and Assignee['s] desire to assume those liabilities and obligations that arise out of the E&P Business."

43.    The AAI Agreement specifically excluded the "Assumed Liabilities." The "Assumed Liabilities" were defined in the AAI Agreement as "(i) the matters identified on Schedule 1 hereto and (ii) all obligations, liabilities and commitments of Oryx Energy Company ("Oryx") or any affiliates immediately prior to the effective time of Oryx's merger with Kerr-McGee Corporation, which later came to be known as Kerr-McGee Operating Corporation and was subsequently merged into Assignor."

44.    The "Schedule 1" matters include sixty-five "non-litigation liabilities" that include remediation of various oil and gas wells and gas plants.  The "Schedule 1" matters also include twenty one various "litigations" without further description.

45.    The AAI Agreement further states that "E&P Business" does not include the "contract drilling business or the crude oil and associate feed stock refining and petroleum manufacturing and marketing business previously conducted by Assignor, its Affiliates, or predecessors."

46.    The AAI Agreement defines the "contract drilling business" as "the contract drilling operations and activities conducted by Assignor, its Affiliates or predecessors as an offshore drilling contractor, including, without limitation, the activities of Transworld Drilling Company, Transworld Perfuracoas Maritimas

9

Limitada, Transworld Drilling Company (Nigeria) Limited, Transocean Drilling Company, Limited, and affiliated companies of each that performed the services of an offshore drilling contractor."

47.    The AAI Agreement defines the "refining and petroleum product manufacturing and marketing businesses" as including "the refining, manufacturing, and marketing activities and operations conducted by Assignor, its Affiliates, or predecessors, including, without limitation, Kerr-McGee Refining Corporation, and affiliated companies, Southwestern Refining Company, Inc., Triangle Refineries, Inc. and affiliated companies, Cato Oil & Grease Company and affiliated companies, Triple S, Inc. and affiliated companies, and including, without limitation, the activities and operations conducted at the facilities known as Dubach, Louisiana, and Calhoun, Louisiana processing plants."

48.    The effect of the AAI Agreement was to ensure that the liabilities associated with certain oil and gas operations remained with KMC Worldwide when the merger described below in Paragraph 49 occurred.

49.    As stated above, on December 31, 2002, KMOC was merged into its subsidiary, KMC Worldwide.  The effect of this merger was to leave KMC Worldwide with the liabilities of Old Kerr-McGee's Legacy Businesses, many of which appear to have little to do with chemical operations.

50.    At the conclusion of Project Focus, Kerr-McGee Oil and Gas and KMC Worldwide became subsidiaries of the newly-created parent, Kerr-McGee Corporation.

10

51.    Upon information and belief, Kerr-McGee continued to fund and manage the liabilities related to the Legacy Businesses at the parent company level because assets that generated the cash flow needed to support the liabilities from the Legacy Businesses were transferred to other subsidiaries of Kerr-McGee.  The Chemical Business lacked sufficient independent cash flow to service the liabilities of the Legacy Businesses.

52.    Upon information and belief, between approximately 2002 and 2005, Kerr-McGee continued to extract cash from the Chemical Business, including selling assets of the Legacy Businesses and retaining the proceeds rather than giving the proceeds to the Chemical Business to service the legacy liabilities.

## Tronox Spin Off

53.    Tronox, Inc. was created on May 17, 2005, in preparation for the transfer of certain Kerr-McGee entities which included almost all of the Chemical Business.

54.     In 2005, Kerr-McGee was exploring either a sale of the Chemical Business or spinning the Chemical Business off as an independent company ("Spin Off").

55.    On April 15, 2005, Kerr-McGee and Kerr-McGee Chemical LLC received a letter from  EPA demanding $179 million in reimbursement costs for the cleanup at the Manville Site.

56.    Prior to the Spin Off, the Chemical Business participated in Kerr-McGee's centralized cash management system and relied on Kerr-McGee to provide

necessary cash financing.

57.    Kerr-McGee solicited bids for the Chemical Business during 2005.

58.    Kerr-McGee required assumption of the liabilities from the Legacy Businesses as a term of any acquisition of the Chemical Business.  Many potential purchasers appear to have been unwilling to assume the Legacy Business liabilities.

59.    At least one company, Apollo Investment Corporation, Inc. ("Apollo") did negotiate with Kerr-McGee for the purchase of the Chemical Business throughout 2005.

60.    Apollo conducted extensive due diligence to determine the extent of the Chemical Business liabilities, including liabilities from the Legacy Businesses.

61.    Upon information and belief, Kerr-McGee offered Apollo $400 million in environmental indemnities if Apollo agreed to assume the liabilities of the Legacy Businesses.

62.    Ultimately, Kerr-McGee decided to Spin Off the Chemical Business rather than sell it to Apollo.

63.     "New-Co Chemical, Inc." was incorporated on May 17, 2005.

64.    New-Co Chemical, Inc. was formed in preparation for the contribution and transfer by Kerr-McGee of substantially all of its chemical businesses.

65.     On September 12, 2005, New-Co Chemical, Inc. changed its name to "Tronox Incorporated."

66.    The Spin Off of Tronox, Inc. from Kerr-McGee was accomplished in two steps.  First, Tronox's Class A stock was offered at an initial public offering ("IPO")

12

where approximately 17.5 million shares of Tronox Inc. Class A shares were offered to the public. The IPO was completed on November 28, 2005. Second, the remaining Class B shares, approximately 22.9 million, that were held by Kerr-McGee were distributed to Kerr-McGee stockholders in March 2006.

67.   The terms of the Spin Off were governed by the Master Separation Agreement ("MSA") between Tronox and Kerr-McGee.

68.   Upon information and belief, the terms of the MSA were primarily dictated by Kerr-McGee.

69.   The net proceeds from the IPO of approximately $224.7 million were distributed to Kerr-McGee per the terms of the MSA.

70.    Tronox, through its wholly owned subsidiaries, issued $350 million in aggregate principal amount of 9.5% senior unsecured notes due in 2012 and borrowed $200 million under a six year senior secured credit facility.

71.   Pursuant to the terms of the MSA, Tronox distributed the net proceeds of the debt described in Paragraph 70 in the amount of approximately $537.1 million to Kerr-McGee.

72.   At the time of the Spin Off, Tronox had "environmental reserves" set aside for certain sites to pay for environmental remediation costs.

73.   Pursuant to the terms of the MSA, Kerr-McGee agreed to reimburse Tronox for a portion of environmental remediation costs that Tronox incurred or will incur for seven years after the IPO.

74.   Under the MSA, Kerr-McGee's reimbursement obligation extends both

13

to sites where Tronox established a reserve, and those sites where it had not.

75.   For sites where a reserve had been established, Kerr-McGee was only required to reimburse Tronox for 50% of the remediation costs incurred and paid in excess of the reserve amount after meeting a threshold amount of $200,000.

76.   For sites where no reserve had been established, 50% of the amount of remediation costs incurred and paid, minus a $200,000 minimum threshold amount, are reimbursable to Tronox, net of any amounts recovered or estimated to be recovered from third parties.

77.   Under the terms of the MSA, Kerr-McGee's aggregate reimbursement obligation to Tronox cannot exceed $100 million, and Kerr-McGee is not obligated to reimburse Tronox for expenditures made after November 28, 2012.

78.   On August 28, 2008, the United States sued Tronox, LLC for reimbursement of approximately $283 million plus interest in costs incurred by EPA at the Manville Site in the U.S. District Court for the District of New Jersey, Civil Action No. 3:08-cv-04368.

79.   Tronox filed for bankruptcy on January 12, 2009.

80.   In its First Day Motions, Tronox included the Declaration of Gary Barton, then Senior Director at Alvarez & Marshall, restructuring consultants hired by Tronox in July 2008, and presently Tronox's Chief Restructuring Officer.

81.   In his Declaration, Mr. Barton cites the financial burden of the liabilities from the Legacy Businesses as a contributing factor in Tronox's financial decline and ultimate insolvency.

14

## Federal Debt Collection Procedures Act

82.    28 U.S.C. Ch. 176 — Federal Debt Collection Procedure, 28 U.S.C.

§ 3001, *et seq.*, includes Subchapter D — Fraudulent Transfers, at 28 U.S.C. § 3301,

*et seq.*

83.    28 U.S.C. § 3304(b)(1) provides that:

> a transfer made or obligation incurred by a debtor is fraudulent as
> to a debt to the United States, whether such debt arises before or
> after the transfer is made or the obligation is incurred, if the
> debtor makes the transfer or incurs the obligation —
>
> (A) with actual intent to hinder, delay, or defraud a creditor, or
>
> (B)   without receiving a reasonably equivalent value in exchange
> for the transfer or obligation if the debtor —
>
>> (i)  was engaged or was about to engage in a business or a
>> transaction for which the remaining assets of the debtor were
>> unreasonably small in relation to the business or transaction; or
>>
>> (ii)  intended to incur, or believed or reasonably should have
>> believed that [the debtor] would incur, debts beyond [its] his ability
>> to pay as they became due.

84.    A "debtor" means, as provided by 28 U.S.C. § 3002(4), "a person who is

liable for a debt or against whom there is a claim for a debt."

85.    A "debt" means, as provided by 28 U.S.C. § 3002(3) in pertinent part,

"an amount that is owing to the United States on account of a . . . penalty,

restitution, damages, interest . . . reimbursement, recovery of a cost incurred by the

United States, or other source of indebtedness to the United States."

86.    A "person," as provided by 28 U.S.C. § 3002(10), means a natural

person, corporation, partnership, association, trust, or estate.

87.    A "creditor" is defined by 28 U.S.C. § 3301(4) as a "person who has a claim."

88.    A "claim" is defined by 28 U.S.C. § 3301(3) as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

89.    The remedies available to the United States against a fraudulent transfer are set forth in 28 U.S.C. § 3306, and include an avoidance of the transfer, a direct remedy against the transferred asset or any substitute assets of the transferee, or any other relief as the circumstances may require.

90.    The United States has claims for environmental liabilities for various sites of environmental contamination around the country on behalf of the EPA, the Department of Interior, the U.S. Forest Service, the National Oceanic and Atmospheric Administration, and the Nuclear Regulatory Commission.

### FIRST CLAIM FOR RELIEF
**(Declaratory Judgment Claim Re: Automatic Stay)**

91.    Paragraphs 1 through 90 are realleged and incorporated herein.

92.    Sections 363(a)(1) of the Bankruptcy Code provides that the filing of a petition in bankruptcy operates as a stay of:

> (1) the commencement or continuation . . . of a judicial proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

16

11 U.S.C. § 362(a)(1).

93.    Section 362(b)(4) of the Bankruptcy Code specifies that the automatic

stay does not apply to the "commencement or continuation of an action or

proceeding by a governmental unit . . . to enforce such governmental unit's . . .

police or regulatory power, including the enforcement of a judgment other than a

money judgment."  11 U.S.C. § 362(b)(4).

94.    The United States' enforcement of laws enacted to prohibit fraudulent

transfers that hinder, delay or defraud the United States in its efforts to collect a

debt owed to it is a classic exercise of police and regulatory authority.  Likewise, the

United States' enforcement of environmental laws enacted to protect public health

and safety is a classic exercise of police and regulatory power.  In this action, the

United States seeks to recover those assets and void those transfers that were

undertaken to impede the United States' enforcement of the environmental laws in

relation to environmental cleanups at various sites around the country.

95.    The United States has the statutory authority to seek recovery of costs

incurred for environmental response actions pursuant to Section 107 of CERCLA,

42 U.S.C. §9607(a).

96.    The United States seeks a declaratory judgment pursuant to the

Declaratory Judgment Act, 28 U.S.C. §2201(a), and a judicial order that the police

and regulatory exception to the automatic stay in Section 362(b)(4) of the

Bankruptcy Code, 11 U.S.C. § 362(b)(4), applies to the United States' enforcement

authority to recover any and all fraudulently transferred assets as well as any other

fraudulent transfers pursuant to the FDCPA, 28 U.S.C. § 3306.

## SECOND CLAIM FOR RELIEF
### (FDCPA:  Fraudulent Transfers Pursuant to 28 U.S.C. § 3304(b)(1)(A))

97.    Paragraphs 1 through 96 are realleged and incorporated herein by reference.

98.    At the time of Defendant Kerr-McGee's corporate restructuring, known as "Project Focus," Defendant Kerr-McGee and/or its subsidiaries were liable to the United States for environmental liabilities at the sites of former and then-present operations.  As a direct result of that restructuring, federal agencies, including EPA, have incurred and will continue to incur costs to address those liabilities.

99.    Through the corporate restructuring, known as "Project Focus," and/or subsequent transfers among and between Defendant Kerr-McGee and its subsidiaries, Defendant Kerr-McGee isolated in the Chemical Business the liabilities for which it or its predecessors, or other non-chemical subsidiaries, or their predecessors ("legacy liabilities"), were liable.

100.    Upon information and belief, Defendant Kerr-McGee sold or retained assets which had been held by the Legacy Businesses, Tronox and its subsidiaries, or their predecessors, depriving the Chemical Business of those assets.

101.    Defendant Kerr-McGee spun off Tronox and its subsidiaries, which had been created to hold Kerr-McGee's Chemical Business with assets and resources that were grossly inadequate to service the legacy liabilities and the liabilities of the Chemical Business.

102.    To the best of the United States' knowledge, information, and belief, based on a reasonable inquiry under the circumstances, Defendant Kerr-McGee made the transfers described in Paragraphs 28 through 76 "with actual intent to hinder, delay, or defraud a creditor," within the meaning of 28 U.S.C. § 3304(b)(1)(A).

103.    The transfers described in Paragraphs 28 through 76 were "fraudulent as to a debt to the United States" pursuant to 28 U.S.C. § 3304(b)(1)(A).

104.    Accordingly, the transfers at issue should be set aside and declared void to the extent necessary to satisfy Tronox's debt to the United States.

## THIRD CLAIM FOR RELIEF
### (FDCPA: Fraudulent Transfers Pursuant to 28 U.S.C. § 3304(b)(1)(B)

105.    Paragraphs 1 through 104 are realleged and incorporated herein by reference.

106.    Upon information and belief, Tronox and its subsidiaries and/or predecessors received less than a reasonably equivalent value in exchange for the obligations incurred by assuming the liabilities of the Legacy Businesses, and (i) was engaged, or was about to engage, in a business or a transaction for which Tronox's remaining assets were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond Tronox's ability to pay as they became due.

107.    Upon information and belief, Tronox and its subsidiaries and/or predecessors received less than a reasonably equivalent value in exchange for the

obligations incurred by assuming the liabilities of the Chemical Business, and (i) was engaged, or was about to engage, in a business or a transaction for which Tronox's remaining assets were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond Tronox's ability to pay as they became due.

108.    The transfers described in Paragraphs 28 through 76 were "fraudulent as to a debt to the United States" pursuant to 28 U.S.C. § 3304(b)(1)(B) because such transfers required Tronox and its subsidiaries, and their predecessors to incur liabilities and debts that left Tronox and its subsidiaries unable to pay their debts to the United States.

109.    Accordingly, the transfers at issue should be set aside and declared void to the extent necessary to satisfy Debtors' debt to the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully requests that this Court:

1.    Enter a judgment declaring that the filing of this complaint does not violate 11 U.S.C. § 363(a)(1);

2.    Enter a judgment declaring that the transfers described in Paragraphs 28 to 76 were fraudulent as to debts to the United States pursuant to 28 U.S.C. §§ 3304(b)(1)(A) and/or 3304(b)(1)(B);

3.    Enter a judgment voiding the transfers described in Paragraphs 28 to 76  to the extent necessary to satisfy any debt to the United States pursuant to 28

U.S.C. § 3306(a)(1);

4.      Enter a judgment granting any other remedies under the FDCPA,

including, *inter alia*, attachment, receivership, and/or sequestration of any

fraudulently conveyed property pursuant to 28 U.S.C. § 3306(a)(2); and

5.      Grant any other relief the circumstances may require, pursuant to 28

U.S.C. § 3306(a)(3), or as the Court deems appropriate.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated:    New York, New York
          May 21, 2009

Respectfully submitted,

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York

By:    /s/ Matthew L. Schwartz
       MATTHEW L. SCHWARTZ
       TOMOKO ONOZAWA
       Assistant United States Attorneys
       86 Chambers Street
       New York, New York 10007
       Tel.: (212) 637-1945
       Fax: (212) 637-2750
       E-mail: matthew.schwartz@usdoj.gov
               tomoko.onozawa@usdoj.gov


       /s John C. Cruden
       JOHN C. CRUDEN
       Acting Assistant Attorney General
       Environment and Natural Resources Division
       U.S. Department of Justice

       /s/ Katherine M. Kane
       KATHERINE M. KANE
       Senior Attorney
       Environmental Enforcement Section
       Environment and Natural Resources Division
       U.S. Department of Justice
       Ben Franklin Station, P.O. Box 7611
       Washington, D.C.  20044
       Tel.: (202) 514-4133
       Fax: (202) 616-2427
       E-mail: katherine.kane@usdoj.gov