**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| TRONOX INCORPORATED, *et al.*, | Case No. 09-10156 (ALG) |
| Debtors. | Jointly Administered |
| | |
| TRONOX INCORPORATED, TRONOX WORLDWIDE LLC f/k/a Kerr-McGee Chemical Worldwide LLC, and TRONOX LLC f/k/a Kerr-McGee Chemical LLC | |
| Plaintiffs, | |
| v. | Adversary Proceeding No. 09-01198 (ALG) |
| ANADARKO PETROLEUM CORPORATION and KERR-MCGEE CORPORATION, | |
| Defendants. | |
| | |
| THE UNITED STATES OF AMERICA, | |
| Plaintiff- Intervenor, | |
| v. | |
| TRONOX, INC., TRONOX WORLDWIDE LLC, TRONOX LLC, KERR-MCGEE CORPORATION and ANADARKO PETROLEUM CORPORATION, | |
| Defendants | |
| | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TRONOX INCORPORATED and its affiliated debtors, on behalf of the estates of TRONOX INCORPORATED, TRONOX | |

WORLDWIDE LLC f/k/a Kerr-McGee                    )
Chemical Worldwide LLC, TRONOX LLC               )
f/k/a Kerr-McGee Chemical LLC,                   )
CIMARRON CORPORATION,                            )
SOUTHWESTERN REFINING                            )
COMPANY, INC., TRANSWORLD                         )
DRILLING COMPANY, TRIANGLE                        )
REFINERIES, INC., TRIPLE S                        )
MINERALS RESOURCES                               )
CORPORATION, TRIPLE S REFINING                   )
CORPORATION, TRIPLE S, INC.,                     )
TRONOX FINANCE CORP, TRONOX                       )
HOLDINGS, INC. and TRONOX                         )
PIGMENTS (SAVANNAH) INC.                          )
                                                 )
                         Plaintiff,              )
                                                 )
            v.                                   )       Adversary Proceeding No. 09-01388 (ALG)
                                                 )
CREDIT SUISSE *et al.*,                          )
                                                 )
                         Defendants.             )
                                                 )

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS ADVERSARY COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 3

I.    The Complaint Expressly Challenges the Stipulations and Admissions of the DIP Order ...................................................................................... 5

II.    The Complaint Makes Factual Allegations Sufficient to Support Collapsing the Term Loan with the Transfer of the Loan Proceeds ..................... 7

    A.    Second Circuit Collapsing Doctrine Only Requires Allegation of Knowledge of the Structure of the Transaction ......................................... 8

    B.    The Cases the Defendants Rely Upon Are Factually Distinguishable ........................................................................ 12

III.    The Complaint Sufficiently Alleges Actual Fraudulent Transfers ..................... 13

IV.    The Complaint Sufficiently Alleges a Claim for Equitable Subordination ......... 18

V.    Section 546(e) Does Not Apply to the Transfers ................................................. 21

    A.    The "Safe Harbor" Provisions of the Bankruptcy Code Provide Exceptional Treatment for Counterparties to Specific Protected Financial Contracts, But Not to the Defendants. ...................................... 21

    B.    The Transfers Plaintiff Seeks to Avoid Are Not Transfers Made in Connection with a "Securities Contract" ................................................. 22

    C.    Section 546(e) Does Not Limit the Trustee's Power to Avoid Obligations ...................................................................................... 26

VI.    Count IV States a Valid Claim for Avoidance of Security Interests That Were Not Properly Perfected ............................................................................... 26

VII.    Count V States a Valid Claim for Recovery of Avoidable Preferences ............. 28

VIII.    Count VII Adequately Alleges a Claim for Disallowance Under Section 502(d) ................................................................................................ 29

CONCLUSION .................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc.*
*(In re Andrew Velez Constr., Inc.),*
    373 B.R. 262 (Bankr. S.D.N.Y. 2007)..............................................................15, 16

*Archer v. Cornerstone Bank, N.A. (In re Archer),*
    No. 03-41425, 2004 Bankr. LEXIS 473 (Bankr. D. Neb. Apr. 12, 2004)............................. 29

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)....................................................................................4, 5

*Bayou Accredit Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Group, LLC),*
    396 B.R. 810 (Bankr. S.D.N.Y. 2008)...........................................................15, 16

*Bell Atlantic v. Twombly,*
    550 U.S. 544 (2007)........................................................................................4, 5

*Brody v. Pecoraro,*
    250 N.Y. 56, 164 N.E. 741 (1928).....................................................................16

*Corning Glass Works v. Brennan,*
    417 U.S. 188 (1974).........................................................................................24

*Crowthers McCall Pattern Inc. v. Lewis,*
    129 B.R. 992 (S.D.N.Y. 1991)......................................................................11, 16

*Enron Corp. v. Credit Suisse First Boston Int'I (In re Enron corp.),*
    328 B.R. 58 (Bankr. S.D.N.Y. 2005).................................................................26

*Field Day, LLC v. County of Suffolk,*
    463 F.3d 167 (2d Cir. 2006)..............................................................................27

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.,*
    Nos. 88 CV 3931 & 03 CV 6413, 2006 U.S. Dist. LEXIS 7423
    (E.D.N.Y. Feb. 8, 2006)...................................................................................28

*Gentry v. Kovler*
*(In re Kovler),* 249 B.R. 238 (Bankr. S.D.N.Y. 2000),
    *citations corrected,* 329 B.R. 17 (Bankr. S.D.N.Y. 2005)...................................16

*Geron v. Schulman (In re Manshul Constr. Corp.),*
    2000 U.S. Dist. LEXIS 12576 (S.D.N.Y. Aug. 29, 2000)...................................16

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
    310 B.R. 500 (Bankr. S.D.N.Y. 2002) ........................................................................16, 17, 19

*Hayden v. County of Nassau*,
    180 F.3d 42 (2d Cir. 1999) ...........................................................................................27

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995) ...............................................................................8, 9, 10, 18

*HBE Leasing Corp. v. Frank*,
    61 F.3d 1054 (2d Cir. 1995) .....................................................................................15, 16

*In re Best Products Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1993) ............................................................................10

*In re Refco, Inc. Secs. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...........................................................................4

*In re Washkowiak*,
    62 B.R. 884 (Bankr. N.D. Ill. 1986) .............................................................................29

*In re Yellowstone Mountain Club, LLC*,
    2009 Bankr. LEXIS 1158 (Bankr. D. Mont. May 12, 2009) .........................................20

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
    263 B.R. 406 (S.D.N.Y. 2001) .....................................................................................25

*Kaiser Steel Corp. v. Charles Schwab & Co.*,
    913 F.2d 846 (10th Cir. 1990) .....................................................................................26

*Kleven v. Stewart (In re Myers)*,
    320 B.R. 667 (Bankr. N.D. Ind. 2005) ..........................................................................15

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991) ..........................................................................................27

*Kupetz v. Wolf*,
    845 F.2d 842 (9th Cir. 1988) ........................................................................................10

*Le Cafe Creme, Ltd. v. Le Roux (In re Le Cafe Creme, Ltd.)*,
    244 B.R. 221 (Bankr. S.D.N.Y. 2000) ..........................................................................16

*Louisiana Pub. Serv. Comm'n v. F.C.C.*,
    476 U.S 355 (1986) .......................................................................................................25

*Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. (In re S.M. Acquisition Co.)*,
    No. 05 C 7076, 2006 U.S. Dist. LEXIS 58960 (N.D. Ill. Aug. 7, 2006) ......................18

*McDermott Int'l, Inc. v. Wilander,*
  498 U.S. 337 (1991)................................................................................24

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,*
  910 F. Supp. 913 (S.D.N.Y. 1995) .......................................................10

*Midland Euro Exchange Inc. v. Swiss Finance Corp.*
  *(In re Midland Euro Exchange Inc.),*
  347 B.R. 708 (Bankr. C.D. Cal. 2006)...................................................15

*Moldo v. Matsco, Inc. (In re Cybernetic Servs., Inc.),*
  252 F.3d 1039 (9th Cir. 2001) ...............................................................28

*Murphy v. Meritor Sav. Bank (In re O'Day Corp),*
  126 B.R. 370 (Bankr. D. Mass. 1991) ...................................................11

*Nat'l Council on Comp. Ins., Inc. v. Caro & Graifman, P.C.,*
  No. 3:00-CV-1925, 2008 U.S. Dist. LEXIS 11694 (D. Conn. Feb. 15, 2008)..................14, 15

*Nat'l Peregrine, Inc. v. Capitol Fed. Sav. & Loan Ass'n of Denver*
  *(In re Peregrine Entm't, Ltd.),*
  116 B.R. 194 (Bankr. C.D. Cal. 1990)...................................................28

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),*
  361 B.R. 369 (Bankr. S.D.N.Y. 2007).....................................................16

*O'Connell v. Shallo (In re Die Fliedermaus LLC),*
  323 B.R. 101 (Bankr. S.D.N.Y. 2005)......................................................29

*O'Connell v. Arthur Andersen, LLP (In re AlphaStar Ins. Group, Ltd.),*
  383 B.R. 231 (Bankr. S.D.N.Y. 2008) .........................................18, 19, 20

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.*
  *(In re Sunbeam Corp.),*
  284 B.R. 355 (Bankr. S.D.N.Y. 2002) ..............................................13, 20

*Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A.*
  *(In re M. Fabrikant & Sons, Inc.),*
  394 B.R. 721 (Bankr. S.D.N.Y. 2008) ................................................12, 18

*Orr v. Kinderhill,*
  991 F.2d 31 (2d Cir. 1993).......................................................................11

*Pension Committee of the Univ. of Montreal Pension Plan v. Banc of Am. Secs. LLC,*
  568 F.3d 374 (2d Cir. 2009)........................................................................5

*Picard v. Taylor (In re Park S. Secs., LLC),*
  326 B.R. 505 (Bankr. S.D.N.Y. 2005) ...............................................16, 17

*Rescuecom Corp. v. Google Inc.*,
    562 F.3d 123 (2d Cir. 2009)................................................................3

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)................................................................4

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*,
    748 F.2d 774 (2d Cir.1984)................................................................4

*Scantek Med. Inc. v. Sabella*,
    583 F. Supp. 2d 477 (S.D.N.Y. 2008)................................................3

*Secs. Investor Protection Corp. v. Stratton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y. 1999)............................................16

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*,
    281 B.R. 506 (Bankr. E.D.N.Y. 2002)......................................19, 20

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp International)*,
    403 F.3d 43 (2d Cir. 2005)..............................................................16

*Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs.)*,
    322 B.R. 440 (Bankr. N.D. Okla. 2003) .....................................29, 30

*Silverman v. KPMG LLP (In re Allou Distributors, Inc.)*,
    395 B.R. 246 (Bankr. E.D.N.Y. 2008)..............................................4

*United States v. Gleneagles Inv. Corp.*,
    565 F. Supp. 556 (M.D. Pa. 1983) ............................................11, 12

*United States v. Tabor Court Realty Corp.*,
    803 F.2d 1288 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987)...................10, 11

*Valvanis v. Milgroom*,
    529 F. Supp. 2d 1190 (D. Haw. 2007) ............................................15

*Wanland & Assocs. v. Nortel Networks Ltd. (In re NorVergence, Inc.)*,
    384 B.R. 315, 352 (Bankr. D.N.J. 2008) ..........................................4

*Wieboldt Stores, Inc. v. Schottenstein*,
    94 B.R. 488 (N.D. Ill. 1988) ..........................................................11

## STATUTES & RULES

11 U.S.C. § 362(a)(4)......................................................................27

11 U.S.C. § 502(d).........................................................................29

11 U.S.C. § 544(a)(1)......................................................................27

11 U.S.C. § 544(b) ................................................................................14

11 U.S.C. § 546(e) ..............................................................21, 22, 25, 26

11 U.S.C. § 547 ...................................................................................28

11 U.S.C. § 548(a) .............................................................14, 15, 17, 21

11 U.S.C. § 548(c) ...................................................................14, 15, 17

11 U.S.C. § 550(a) ...............................................................................28

11 U.S.C. § 551 ...................................................................................28

11 U.S.C. § 561 ...................................................................................21

11 U.S.C. § 741(7) .................................................................21, 22, 23

11 U.S.C. § 761(4) ...............................................................................22

Financial Netting Improvements Act of 2006,
    Pub. L. No. 109-390, 120 Stat. 2692 (2006).........................21, 22, 23, 25

Federal Rule of Civil Procedure 8(a)(2) ..................................................4

Federal Rule of Civil Procedure 9(b)..............................................13, 18

Federal Rule of Civil Procedure 12(b)(6) ................................................4

N.Y. DEBT. & CRED. LAW § 276 (2009) ......................................15, 16, 17

OKLA. STAT. tit. 24, § 116 (2009) ..........................................................14

OKLA. STAT. tit. 24, § 120 (2009) ..........................................................14

**OTHER AUTHORITIES**

5 COLLIER ON BANKRUPTCY ¶ 548.10 at 548-81 (15th ed. 2009).................14

7 COLLIER ON BANKRUPTCY ¶ 362.03[6] (15th ed. 2009) ..........................27

H.R. REP. NO. 109-31 (2005)..................................................................23

H.R. REP. NO. 97-420 (1982)..................................................................21

UNIFORM COMMERCIAL CODE § 9-109 and comment 8................................28

Vern Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 VAND. L.
    REV. 713, 745-46 (1985)...............................................................29

The Official Committee of Unsecured Creditors (the "Committee") of Tronox

Incorporated and its affiliated debtors (the "Debtors"), on behalf of the estates of the Debtors

identified herein (collectively, "Tronox" or the "Tronox Estates"), by and through its counsel,

Kasowitz, Benson, Torres & Friedman LLP, hereby submits this *Memorandum of Law in*

*Opposition to Defendants' Motion to Dismiss Adversary Complaint* (the "Motion"). The

Committee respectfully states as follows:

## PRELIMINARY STATEMENT

This Motion represents a typical knee-jerk reaction by the Defendants.[1] The Motion is

premised on a red–herring, which Defendants raise and then seek to knock down. The red-

herring is Defendants' false contention that the Complaint is predicated on alleging that each of

the Defendants had knowledge of New Kerr-McGee's fraudulent scheme. As discussed in detail

below, none of the Committee's claims are predicated on such knowledge.[2]

Count I of the Complaint alleges that Tronox made the Transfers and incurred the

Obligations at issue here with the actual intent to defraud the creditors of the Tronox Estates.

Defendants do not dispute the sufficiency of that allegation. Rather, Defendants argue, contrary

to the plain and unambiguous language of the relevant statutory provisions and without support

in the case-law, that the Committee was required to allege that the Defendant transferees had

knowledge of the transferors' fraudulent intent. However, as discussed at length below,

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Complaint. The
moving Defendants are identified in Note 1 to the Motion and the Joinder of UBS A.G. in the Prepetition
Lenders' Motion to Dismiss the Complaint, dated Sept. 25, 2009 [Adv. Proc. No. 09-1388, Docket No. 20].

[2]   Although not relevant to any issue herein, Defendants' false suggestion that the Committee expended "hundreds
of thousands of dollars in legal fees," Motion at 1-2, in an effort to obtain discovery of Defendants' role in Kerr-
McGee's fraud, requires a brief response. As Defendants are well aware, the Committee did not obtain pre-
Complaint discovery from the Defendants. Defendants are also well aware that the extensions of time to file the
Complaint referred to in Note 2 to the Motion were agreed to by the Committee and the Defendants in order to
facilitate unsuccessful settlement discussions, not to provide additional time for discovery.

1

Defendants' professed lack of knowledge is, at most, an affirmative defense that Defendants are required to plead and prove.[3]

Counts II and III of the Complaint allege that the Transfers and Obligations were constructively fraudulent. These claims are based on the undisputed facts that (a) Tronox Worldwide borrowed $200 million from the Pre-Petition Lenders, which funds were then (b) *immediately* transferred to New Kerr-McGee to enable Tronox Incorporated to acquire a portion of the stock of Tronox Worldwide from New Kerr-McGee. There is also no dispute that these transactions were planned in advance by New Kerr-McGee and that each of the participating lenders were well aware of the use to which their funds were to be put. In a strange twist, Defendants argue that in order to plead this constructive fraudulent transfer claim, the Committee is required to plead that the transfers were made with the actual intent to defraud creditors *and* that the Defendants had actual knowledge of such a scheme. As discussed below, there is no basis for hoisting such a pleading obligation on the Committee. The cases cited by the Defendants plainly show that the Committee need only allege that the two legs of the transaction described above were pre-planned and that the Pre-Petition Lenders were aware of the use to which their funds would be put, both of which allegations are made and neither of which is disputed.

The attempts to dismiss the remaining counts of the complaint are similarly unavailing for the reasons discussed below. The Committee has properly alleged that certain of Defendants' liens were not properly perfected (Count IV), that the payments received by the Defendants during the 90 days preceding the filing of the chapter 11 petitions were preferential (Count V),

---

[3] Defendants' desperation may be due to their inability to establish a good faith defense. To establish such a defense, Defendants will be required to prove that the Debtors received reasonably equivalent value for the Transfers and Obligations at issue. Since, as discussed below, New Kerr-McGee received all of the value provided by the Defendants, the good faith defense will not avail them.

that the allegations of the Complaint are a proper basis to equitably subordinate the Defendants' claims (Count VI) and that Defendants' claims should be disallowed under section 502(d) of the Bankruptcy Code (Count VII).

Also without basis is Defendants' nonsensical argument that the Complaint is barred by the DIP Order. The releases granted by the Debtors in the DIP Order are expressly subject to the Committee's right to challenge those releases by filing a Complaint that disputes the stipulations and releases made by Tronox. That is precisely what the Committee has done by asserting that the Prepetition Debt, as defined in the DIP Order, is subject to avoidance and/or subordination and that it does not constitute the legal and binding obligation of the Debtors in accordance with its terms. Nothing in the DIP Order required the Committee to expressly refer to the DIP Order or use any magical language.

Defendants' argument that the Committee's claims are barred by section 546(e) of the Bankruptcy Code on the ground that they constitute "transfers" made in connection with a "securities contract" as defined in that section is similarly without basis. Section 546(e) deals with narrowly defined types of agreement used by the securities industry and does not include within its scope the commercial loan agreement at issue here.

In sum, the Complaint is well pleaded and the Motion should be denied in its entirety.

## ARGUMENT

When reviewing a motion to dismiss for failure to state a claim, "a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009); *see also Scantek Med. Inc. v. Sabella*, 583 F. Supp. 2d 477, 488 (S.D.N.Y. 2008) ("The standard of review on a motion to dismiss is heavily weighted in favor of the pleader."). Accordingly, "Rule 12(b)(6) requires the

3

court 'to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Silverman v. KPMG LLP (In re Allou Distributors, Inc.)*, 395 B.R. 246, 257 (Bankr. E.D.N.Y. 2008) (*quoting Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984)); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("[A] ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact."). Further, "[i]t is elementary that, on a motion to dismiss the complaint must be read as a whole"—"defendants cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder." *In re Refco, Inc. Secs. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007) (citations and internal quotation marks omitted).

These settled standards were not altered by *Twombly* and *Iqbal*, where the Supreme Court provided guidance on the "plausibility standard" under Federal Rule of Civil Procedure 8(a)(2). *See, e.g., Wanland & Assocs. v. Nortel Networks Ltd. (In re NorVergence, Inc.)*, 384 B.R. 315, 352 (Bankr. D.N.J. 2008) ("It is clear that the *Twombly* decision did not affect the well-settled standard that . . . the reviewing court must accept all of the factual allegations contained within the complaint as true."). Under these cases, a complaint that states a "plausible claim for relief" cannot be dismissed. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). To state a plausible claim for relief, a complaint must "permit the court to infer more than the mere possibility of misconduct." *Id.*; *see also Bell Atlantic v. Twombly*, 550 U.S. 544, 557 (2007) (the complaint's allegations must be "suggestive" of, not merely consistent with, illegal conduct). The plausibility standard annunciated in *Twombly* and *Iqbal*, however, "does not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 544; *Iqbal*, 129 S. Ct. at 1949. All *Twombly* and *Iqbal* require is that "the plaintiff pleads factual content that allows the court to

4

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129

S.Ct. at 1947. This is a "context specific task that requires the reviewing court to draw on its

judicial experience and common sense." *Id*. at 1950. Moreover, "a well-pleaded complaint may

proceed even if it strikes a savvy judge that the actual proof of [facts necessary for relief] is

improbable, and that recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556; *see also*

*Pension Committee of the Univ. of Montreal Pension Plan v. Banc of Am. Secs. LLC*, 568 F.3d

374, 382 (2d Cir. 2009) (holding that claim was plausible under *Iqbal* and *Twombly* and

"whether the Plaintiffs will be able to prove the allegations set forth in the complaint is quite

another matter").

## I.    The Complaint Expressly Challenges the Stipulations and Admissions of the DIP Order

The Defendants assert that the Complaint does not "expressly challenge" the releases

contained in paragraph 4 of the *Court's Corrected Final Order (i) Authorizing Debtors (a) to*

*Obtain Postpetition Financing Under 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(3),*

*364(d)(1) and 364(e), (b) to Utilize Cash Collateral Under 11 U.S.C. § 363 and (c) to Use*

*Postpetition Financing to Purchase Receivable Portfolio and (ii) Granting Adequate Protection*

*to Prepetition Secured Parties Under 11 U.S.C. §§ 361, 362, 363 and 364*, dated February 9,

2009 [Docket No. 151] (the "DIP Order"), which, Defendants argue, "dispose of all the claims

asserted by the Committee." Motion at 11. This contention is absurd. The Complaint does

**"expressly challenge"** the stipulations and admissions contained in the DIP Order. For example,

one of the DIP Order's stipulations which the Defendants argue has not been challenged by the

Complaint states that "no portion of the Prepetition Debt is subject to avoidance,

recharacterization, recovery or subordination under the Bankruptcy Code or applicable

nonbankruptcy law." Motion at 10 (citing DIP Order ¶ 4). It is hard to imagine a more direct,

5

express challenge to "the surrender of the avoidance power," Motion at 11, than a Complaint explicitly seeking, among other things, "to avoid the Transfers, Obligations and Security Interests to the Pre-Petition Lenders and recover the Transfers for the benefit of the Tronox estates." Complaint ¶ 138.

Moreover, if the Defendants are arguing that a provision of the DIP Order requires the Complaint to invoke certain magic words to enable the Committee to commence an adversary proceeding, that is not only contrary to what the Order provides but would be contrary to a standing order of this Court. Pursuant to General Order No. M-274 -- the Bankruptcy Court for the Southern District of New York's Guidelines for Financing Requests (the "Financing Guidelines"), the Committee may bring "any appropriate proceedings as representative of the estate" despite a "stipulation as to the validity, perfection, enforceability, priority and non-avoidability of a prepetition lender's claim and liens" unless an "extraordinary provision" is conspicuously disclosed and separately justified. *See* Financing Guidelines at II.A.3(a). No such justification was offered, *see Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Superpriority Priming Postpetition Secured Financing and Utilize Cash Collateral; (B) Authorizing the Debtors to Repay Their Receivables Securitization Facility; (C) Granting Adequate Protection to Prepetition Secured Lenders; and (D) Scheduling Final Hearing* (the "DIP Motion"), dated January 12, 2009 [Docket No. 4], nor was the imposition of such an extraordinary hurdle considered at the hearing on the DIP Motion. *See* Final DIP Hr'g Tr., Feb. 6, 2009. As is the standard in this District, the DIP Order contemplated that the Committee would conduct an investigation of the Pre-Petition Lenders' claims and liens and bring any appropriate proceedings. That is what the Committee has done.

6

II.    **The Complaint Makes Factual Allegations Sufficient to Support Collapsing the
Term Loan with the Transfer of the Loan Proceeds**

Counts II and III of the Complaint are constructive fraudulent transfer claims which

allege in substance that on November 28, 2005, Tronox Incorporated, a newly organized empty

shell, acquired Tronox Worldwide LLC, then known as Kerr-McGee Chemical Worldwide LLC

("Tronox Worldwide") from New Kerr-McGee for approximately $787 million in cash and

certain of its class B stock (Complaint ¶ 115).  Tronox Incorporated obtained the necessary cash

from several sources.  *Id.* The source at issue in this litigation is the $200 million borrowed by

**Tronox Worldwide,** i.e., the target of the acquisition, from the initial Pre-Petition Lenders

(Complaint ¶ 27).  In connection with the loan, Tronox Worldwide, as well as the other Debtors,

gave the Pre-Petition Lenders a lien on substantially all of its assets.  In addition to alleging that

these transactions were each fully disclosed, the Complaint also alleged that the transactions

were part of an integrated plan approved by the board of directors of New Kerr-McGee

(Complaint ¶ 92) and were embodied in a Master Separation Agreement (Complaint ¶ 115).

Thus, this transaction was a classic LBO in which the target financed its own acquisition for no

benefit to the target.

Defendants argue that the allegations that the Defendants received constructively

fraudulent transfers, underlying Counts II and III of the Complaint, are insufficient because of a

purported failure to allege "knowledge of the alleged fraudulent scheme." Motion at 13.  This

argument is wrong.  Defendants have mischaracterized the Second Circuit's standard for

determining that multiple steps constitute a single transaction.  This standard requires knowledge

of the structure of the transaction that renders the transfers constructively fraudulent as opposed

to knowledge of the circumstances of any actual fraud, which need not be alleged to avoid a

constructively fraudulent transfer.  Since there is no dispute that the initial Pre-Petition Lenders

knew that Tronox Worldwide would make no use of the proceeds of the loan but instead would immediately cause the proceeds to be transferred to New Kerr McGee to finance Tronox Wordwide's own acquisition by Tronox Incorporated, this standard is readily satisfied here.

### A.    Second Circuit Collapsing Doctrine Only Requires Allegation of Knowledge of the Structure of the Transaction

The leading Second Circuit case concerning the circumstances in which it is appropriate to treat a loan and the use of the proceeds of the loan as a single transaction for fraudulent transfer purposes is *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995).[4]  That case, like this one, involved a lender who made a secured loan of funds that were immediately transferred by the borrower to a third party in a transaction for which the borrower did not receive fair consideration.  The district court had found that the lender "had received the mortgage as part of a single transaction in which the mortgage proceeds were improperly transferred to her son."  48 F.3d  at 630.  The precise issue in *HBE Leasing* was whether the lender was aware of the purpose to which her funds were to be used.  As that case makes clear, the only knowledge element necessary to support collapsing is that the defendant "knew or should have known" how the proceeds would be used. Thus, in the second paragraph of the opinion, the Court summarizes its holding as follows:

> We affirm the avoidance of one of [defendant's] mortgages on the ground that she knew or should have known that it was part of a single transaction from which [the borrower] received no benefit.

48 F.3d at 629.  This element is satisfied here since Tronox Worldwide and the other Tronox operating entities clearly received no benefit from the use of the proceeds.[5]

---

[4]   *HBE Leasing* was decided under New York law.  However, that Court's citation of bankruptcy cases and cases decided under the Uniform Fraudulent Transfer Act make clear that its analysis is not limited to New York law.

[5]   Whether Tronox Incorporated received a benefit depends on the value of the assets received, an issue that cannot be resolved on a motion to dismiss.

Defendants nevertheless contend that the Complaint's allegations fail to satisfy the requirements in the Second Circuit for establishing that a transaction involving multiple steps constitutes a single transaction for purposes of a claim of constructive fraudulent transfer. Motion at 14. In support of their argument, Defendants quote the following statement from *HBE Leasing*:

> The initial transfer of the debtor's property to the first transferee is constructively fraudulent if two conditions are satisfied. First . . . the consideration received from the first transferee must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors. . . . Second . . . the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent.

48 F.3d 623, 635 (2d Cir. 1995). As made clear by the Court's use of the term "scheme" throughout the decision, the Second Circuit is using that term to refer to both legs of the transaction sought to be avoided as a fraudulent transfer. Nevertheless, the Defendants have leapt to the conclusion that Plaintiffs must explain "why Defendants should have known about the alleged fraud." Motion at 15 (referring to New Kerr-McGee's fraud that is the subject of Count I of the Complaint). This is clearly not what the Second Circuit said or meant. For instance when summarizing the earlier LBO cases, the Court described the "scheme" as follows:

> The paradigmatic scheme is similar to that alleged here: one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing.

48 F.3d at 635. Thus, the "paradigmatic scheme" does not require actual fraudulent intent by the defendant. Similarly, after reviewing the cases, the Court further summarized its analysis as follows:

> In deciding whether to collapse the transaction and impose liability on particular defendants, the courts have looked frequently to the knowledge of the defendants

9

of the structure of the entire transaction and to whether its components were part
of a single scheme.

48 F.3d at 636 (*quoting In re Best Products Co.*, 168 B.R. 35, 56-57 (Bankr. S.D.N.Y. 1993)). [6]

The Court then held that "constructive knowledge" of the "scheme" was sufficient, citing
*United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302-03 (3d Cir. 1986), *cert. denied*,
483 U.S. 1005 (1987), and quoting the following language from that seminal decision: "lenders
'knew or should have known' that monies would not be retained by debtor." 48 F.3d at 636.

It is therefore clear that what the Second Circuit meant by knowledge of the "scheme"
was knowledge of the structure of the transaction and its component parts. And, as
acknowledged by the Defendants, this is precisely what the Complaint alleges: "Potential
lenders were fully informed that the proceeds of the debt financing would be transferred to New
Kerr-McGee and would not remain with Tronox." Complaint ¶ 95. Moreover, any other
conclusion would lead to the absurd result that a plaintiff must allege an actual fraudulent
transfer in order to allege a constructive fraudulent transfer whenever a complaint alleges that
two or more steps were part of an integrated transaction.[7]

The cases endorsed by *HBE Leasing* similarly only require knowledge of the structure of
the transaction to support collapsing. *See, e.g., United States v. Tabor Court Realty Corp.*, 803

---

[6]   Yet another example is the Court's statement citing *Kupetz v. Wolf*, 845 F.2d 842 (9th Cir. 1988), for the
proposition that "the transferee of the leg to be avoided must have actual or constructive knowledge of the entire
scheme that renders her exchange with the debtor insolvent." *Kupetz* declined to avoid transfers to shareholders
made as part of an LBO on the ground that the shareholders had no knowledge that the buyout was to be
leveraged. 845 F.2d at 848 (discussion of "knowledge of leveraging"). Here, of course the lenders had that
precise knowledge.

[7]   *Cf. MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 936 (S.D.N.Y.
1995) ("Courts interpreting the constructive fraud provisions of New York's Debtor and Creditor Law have
repeatedly stated that the standards apply without regard to the actual intent of the transferor or transferee. The
objective test established by the legislature for determining constructive fraud would thus be unjustifiably
altered if the Court were to impose an additional scienter requirement. **The distinctive features of an LBO as
compared to other transactions provide no basis for deviating from the existing standard.**") (emphasis
added).

F.2d 1288, 1302-03 (3d Cir. 1986), *cert. denied*, 483 U.S. 1005 (1987) (finding adequate facts in

the record to support conclusion that "funds 'merely passed through the borrowers'" and that

"for purposes of determining [the lender's] knowledge of the use of the proceeds under [the

Uniform Fraudulent Conveyance Act], there was one integral transaction"); *Wieboldt Stores, Inc.*

*v. Schottenstein*, 94 B.R. 488, 502-03 (N.D. Ill. 1988) ("[T]he formal structure of the transaction

alone cannot shield the LBO lenders . . . from Wieboldt's fraudulent conveyance claims.  These

parties were aware that the consideration they received for their financing commitments . . .

consisted of Wieboldt assets and not the assets of WSI or any other financial intermediary.");

*Crowthers McCall Pattern Inc. v. Lewis*, 129 B.R. 992, 997 (S.D.N.Y. 1991) (collapsing LBO

transfers into one transaction on basis of the allegation that "the conveyances were not in good

faith in that Bankers Trust knew that the $35 million they were providing was being used for the

purchase of the stock of TLC Pattern and that Crowthers was receiving nothing in return for its

repayment of the bridge loans").

Similar is *Orr v. Kinderhill*, 991 F.2d 31 (2d Cir. 1993), where an insolvent corporation

transferred real estate to a subsidiary which was then spun-off to the parent's shareholders.  The

Court held that both transactions "were elements of a single restructuring plan adopted by [the

parent's] board of directors," 991 F.2d at 36, and as such "constituted a single integrated

transaction." *Id.* at 35.  Similarly, here, there is no dispute that the loan financing and the Spin-

Off were part of a single integrated transaction that was part of a plan adopted by the New Kerr-

McGee board and was known to the lenders. *See, e.g., Murphy v. Meritor Sav. Bank (In re*

*O'Day Corp)*, 126 B.R. 370, 394 (Bankr. D. Mass. 1991); *see also United States v. Gleneagles*

*Inv. Corp.*, 565 F. Supp. 556, 575 (M.D. Pa. 1983) ("The . . . loan proceeds which were lent

immediately by the borrowing companies . . . were merely passed through the borrowers . . . and cannot be deemed consideration received by the borrowing companies.").

## B.    The Cases the Defendants Rely Upon Are Factually Distinguishable

The Spin-Off and the financings under the Secured Debt Facility are in substance a single transaction.  As set forth in the Complaint and summarized above, the Secured Debt Facility and the Master Separation Agreement that effected the transfer of the loan proceeds from the nominal borrower to New Kerr-McGee were executed on the same day.  Thus, as was disclosed to the Pre-Petition Lenders, the loan was made and the proceeds up-streamed in what was effectively a single transaction.

Defendants place considerable reliance on two bankruptcy court decisions from this district where the precise issue was whether plaintiffs had sufficiently alleged that multiple transactions, widely separated in time were, in fact, part of a single integrated transaction.  In *Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721 (Bankr. S.D.N.Y. 2008), the complaint sought to recover $175.3 million in "net" transfers made in numerous loan transactions over a four year period on the basis of allegations that in other numerous transactions the debtors had reconveyed the loan proceeds to various affiliates without consideration.  394 B.R. at 734.  Indeed, the multiple transactions in *Fabrikant* were apparently so complex that the complaint was found wanting for failing to "identify any specific transfer, transferor, transferee, or date of transfer."  *Id.*  As a result, the court held that a mere conclusory allegation that the lender had knowledge that "a substantial portion, if not virtually all, of the funding . . . would be transferred [to affiliates]," lacking factual support or plausibility, was an insufficient basis to collapse the four years worth of transactions into a single transaction for analysis under the fraudulent transfer laws.  *Id.* at 737.

12

In *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.
(In re Sunbeam Corp.)*, 284 B.R. 355 (Bankr. S.D.N.Y. 2002), the transactions sought to be
collapsed were similarly functionally separate, featuring transactions that lacked temporal unity,
involving a separate bank facility, note offering and several discrete acquisitions. *Sunbeam*, 284
B.R. at 371-72. Significantly, the Sunbeam financing, as the plaintiff acknowledged, was put to
various uses, such as refinancing existing indebtedness, paying related fees and expenses, and
servicing ongoing working capital needs. *Id*. The fact that the acquisitions toward which a
portion of the loan proceeds were ultimately put turned out to be poor business decisions could
not justify collapsing all of the transactions where the loan and acquisitions were not,
functionally, part of the same transaction.

In sum, where there is no dispute that two steps are part of the same "transaction", as is
the case here, the only knowledge of the defendants that must be pled is defendants' knowledge
of the use to which their funds would be put. It is undisputed that the Complaint alleges facts
supporting such an allegation.

## III.    The Complaint Sufficiently Alleges Actual Fraudulent Transfers

Count I of the Complaint alleges that the Tronox Entities incurred the Obligations to the
Defendants and granted them the Security Interests, while under the control of New Kerr-McGee
with the actual intent to defraud the current and future creditors of the Tronox Debtors.
Complaint ¶¶ 130-138. The Motion does not take issue with the allegations concerning New
Kerr-McGee's fraud or with the allegation that the Obligations were made and the Security
Interests were granted with the actual intent to defraud creditors. Nevertheless, the Motion seeks
dismissal of Count I of the Complaint on the ground that it fails to plead Defendants' knowledge
of New Kerr-McGee's fraud with sufficient particularity to satisfy Federal Rule of Civil
Procedure 9(b). Because it is not necessary to plead the defendants' knowledge of the

13

transferor's actual intent to defraud in order to state a claim for actual fraud under the Uniform

Fraudulent Transfer Act (the "UFTA"), Defendants contentions are without any merit.[8]

Oklahoma's enactment of the UFTA provides that "[a] transfer [is] made or an obligation

is incurred . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to

hinder, delay, or defraud any creditor of the debtor." OKLA. STAT. tit. 24, § 116 (2009).

This provision, which is essentially equivalent to section 548(a) (1) of the Bankruptcy Code,

does not require allegation or proof of the state of knowledge of the transferee. A separate

section of the statute, OKLA. STAT. tit. 24, § 120, provides an affirmative defense that a transferee

may assert and prove: "A transfer or obligation is not voidable . . . . against a person who took in

good faith and for a reasonably equivalent value. " Again, an analog to this provision may be

found in section 548(c) of the Bankruptcy Code. It is therefore clear as a matter of statutory

construction that a complaint need not allege the defendant's state of mind under either the

UFTA or the Bankruptcy Code. Rather, the defendant's good faith is an affirmative defense that

must be pled and proven by the defendant. *See e.g.,* 5 COLLIER ON BANKRUPTCY ¶ 548.10 at

548-81 (15th ed. 2009) ("The party that seeks to be established as a good faith transferee or

obligee within this saving clause has the burden of proof (risk of non-persuasion) thereon.")

(footnote omitted).[9]

Numerous cases support this analysis. *Nat'l Council on Comp. Ins., Inc. v. Caro &*

*Graifman, P.C.*, No. 3:00-CV-1925, 2008 U.S. Dist. LEXIS 11694 (D. Conn. Feb. 15, 2008)

---

[8]  The Motion is premised on the assumption that the applicable statute is the Oklahoma UFTA. However, the
Committee stands in the shoes of the Debtors' unsecured creditors and can assert the claims applicable to any of
those creditors. *See* 11 U.S.C. § 544(b) (A trustee may avoid "any transfer of an interest of the debtor in
property or any obligation incurred by the debtors that is voidable under applicable law."). Accordingly, the
Committee may assert claims by creditors with rights under other applicable law. *See Plaintiffs' Opposition to
Defendants' Motion to Dismiss* dated Sept. 1, 2009 [Adv. Proc. No. 09-01198, Docket No. 55] at 38 n.13.

[9]  Because the Tronox Entities did not receive reasonably equivalent value for the Transfers and Obligations, this
defense will not be available to the Defendants.

("Under the [Fraudulent Transfer Act], the transferee's intent is irrelevant to the statutory finding

of an intentional fraudulent transfer, which is based instead solely on the transferor's intent as

determined pursuant to the factors set forth in [the UFTA]") (citations omitted); *Valvanis v.*

*Milgroom*, 529 F. Supp. 2d 1190, 1199 (D. Haw. 2007) ("The intent of the transferee, therefore,

is not a necessary element of a HUFTA claim. The transferee's knowledge, however, becomes

relevant in determining the available defenses to a HUFTA claim."); *Midland Euro Exchange*

*Inc. v. Swiss Finance Corp. (In re Midland Euro Exchange Inc.)*, 347 B.R. 708, 714-715 (Bankr.

C.D. Cal. 2006) (noting that defendant's knowledge of the debtor's intent to defraud creditors is

not a part of the elements of a fraudulent transfer claim); *Kleven v. Stewart (In re Myers)*, 320

B.R. 667, 671 (Bankr. N.D. Ind. 2005) ("Under the Indiana UFTA, the intent of the transferee is

not relevant. It is the debtor/transferor who must act with the intent to hinder, delay or defraud

for a transfer to be avoidable as actually fraudulent.").

Unable to set forth cases under the UFTA that support their novel formulation of the

elements of an intentional fraudulent transfer claim, Defendants attempt to draw support from

cases involving New York's enactment of the Uniform Fraudulent Conveyance Act. Aside from

being completely irrelevant when cases in jurisdictions adopting the UFTA plainly reject the

Defendants' argument, the Defendants' reliance on the New York cases cannot withstand serious

examination. The most recent case in this district to address this issue under the Bankruptcy

Code and New York law is Judge Hardin's decision in *Bayou Accredited Fund, LLC v. Redwood*

*Growth Partners, L.P. (In re Bayou Group, LLC)*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008):

> Since [Section 548 of the Bankruptcy Code] by its express terms applies only if
> "the debtor . . . made such transfer with intent to hinder, delay, or defraud," **it is**
> **only the debtor's intent that is relevant.** *See, e.g.,* [*Sharp Int'l Corp. v. State St.*
> *Bank & Trust Co. (In re] Sharp International[)]*, 403 F.3d 43, 56 [(2d Cir. 2005)]
> (applying N.Y. Debt. & Cred. Law § 276); *HBE Leasing Corp. v. Frank*, 61 F.3d
> 1054, 1059 n.5 (2d Cir. 1995) (same); *Andrew Velez Constr., Inc. v. Consol.*

15

> *Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 269
> (Bankr. S.D.N.Y. 2007) and cases cited therein; *Picard v. Taylor (In re Park S.
> Secs., LLC)*, 326 B.R. 505, 517 (Bankr. S.D.N.Y. 2005). **The intent of the
> transferee is not relevant except under the "good faith" defense of Section
> 548(c).** In this sense Section 548 serves the same policy function as Section 547,
> which allows the trustee to avoid preferential payments made within ninety days
> of the bankruptcy to perfectly innocent creditors who were legally entitled to be
> paid. Both sections represent an equitable determination by Congress that under
> limited circumstances creditors must share equally in the insolvency, or, in the
> case of Section 548, the fraud. Section 548 is not a punitive provision designed to
> punish the transferee, but is instead an equitable provision that places the
> transferee in the same position as other similarly situated creditors who did not
> receive fraudulent conveyances.

396 B.R. at 826-827 (emphasis added).

Judge Hardin also pointed out that decisions which suggested that New York's actual

fraud provision, N.Y. DEBT. & CRED. LAW § 276 (2009), required a different result – including

one of his own decisions – were simply wrong:

> The defendants point to a prior decision of this Court, *Gentry v. Kovler (In re Kovler)*, 249
> B.R. 238 (Bankr. S.D.N.Y. 2000), *citations corrected*, 329 B.R. 17 (Bankr. S.D.N.Y.
> 2005), as authority that under N.Y. Debt. & Cred. Law § 276 a plaintiff must prove that
> both the transferor and the transferee acted with "actual intent." *Kovler's* statement of the
> law was corrected and updated in the 2005 citation above. **The original *Kovler* decision
> is one of several cases which mistakenly suggest that under Section 276 a plaintiff
> must prove the malicious intent of both the transferor and the transferee (with some
> citing *Kovler* for that proposition).** *See, e.g., Andrew Velez Constr., Inc. v. Consol.
> Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 276 (Bankr.
> S.D.N.Y. 2007); *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361
> B.R. 369, 396 (Bankr. S.D.N.Y. 2007); *Picard v. Taylor (In re Park S. Secs., LLC)*, 326
> B.R. 505, 517 (Bankr. S.D.N.Y. 2005); *Gredd v. Bear, Stearns Sec. Corp. (In re
> Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002). **These cases are
> in direct conflict with governing decisions in this Circuit holding that only the intent
> of the transferor is relevant under Section 276.** *See, e.g., Sharp International*, 403 F.3d
> 43, 56; *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995); *Geron v.
> Schulman (In re Manshul Constr. Corp.)*, 2000 U.S. Dist. LEXIS 12576 at *129 (S.D.N.Y.
> Aug. 29, 2000); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 999 (S.D.N.Y.
> 1991); *Le Cafe Creme, Ltd. v. Le Roux (In re Le Cafe Creme, Ltd.)*, 244 B.R. 221, 239
> (Bankr. S.D.N.Y. 2000); *Secs. Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234
> B.R. 293, 318 (Bankr. S.D.N.Y. 1999); *Brody v. Pecoraro*, 250 N.Y. 56, 61, 164 N.E. 741
> (1928) (Cardozo, J.). The statute itself makes this clear. Section 276 is concerned only
> with a "conveyance made . . . with intent," and only a transferor can be said to have
> "made" a conveyance. There is no reference in this provision to the transferee or the
> transferee's intent.

16

*Id* at n.5 (emphasis added).

It should be emphasized that even those cases which adopted an incorrect interpretation of New York law were careful to distinguish the governing standard under the Bankruptcy Code. *See e.g.*, *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002) ("[A]lthough NY D&CL section 276 requires a showing that the transferee must have participated or acquiesced in the transferor's fraudulent act, section 548(a)(1)(A) contains no such requirement. Instead, section 548(c) designates the transferee's good faith as an *affirmative* defense which may be raised and proved by the transferee at trial.") (citations omitted) (emphasis in original); *Picard v. Taylor (In re Park S. Secs., LLC)*, 326 B.R. 505 (Bankr. S.D.N.Y 2005) ("Section 548(a)(1)(A) of the Bankruptcy Code and section 276 of the New York Debtor-Creditor Law, incorporated by Bankruptcy Code section 544(b), provide that a trustee may avoid transfers of an interest of the debtor in property made with actual intent to hinder, delay, or defraud creditors. The 'intent' that must be established under section 548(a) is the **debtor's** actual fraudulent intent; under section 276 of the N.Y. D.C.L., however, the Trustee must establish both the debtor's **and** the transferee's actual fraudulent intent.") (emphasis in original).

Accordingly, none of the cases cited by the Defendants at pages 20-21 of their Motion support dismissal of Count I of the Complaint. At most they support the proposition that a few bankruptcy cases have interpreted New York law as requiring a complaint to plead the defendant's state of mind. However, even if that dubious proposition were correct – and it is not,

that would provide no support for dismissal of the Complaint since it is not based on New York law.[10]

## IV.    The Complaint Sufficiently Alleges a Claim for Equitable Subordination

Count VI of the complaint seeks to equitably subordinate the claims of the Defendants to the claims of other creditors.

Defendants incorrectly suggest that a claim for equitable subordination is necessarily subject to the heightened pleading requirement of Rule 9(b). Motion at 19. Although it is possible for an equitable subordination claim to be based on claims of fraud, that is not necessarily the case and, as the only case Defendants cite on this point acknowledges, "non-fraudulent inequitable conduct need not be plead with specificity in support of an equitable subordination claim." *O'Connell v. Arthur Andersen, LLP (In re AlphaStar Ins. Group, Ltd.)*, 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008) (*quoting Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. (In re S.M. Acquisition Co.)*, No. 05 C 7076, 2006 U.S. Dist. LEXIS 58960, n.3 (N.D. Ill. Aug. 7, 2006)). Therefore, based on the Complaint's sufficient allegations of constructive fraudulent transfer alone, dismissal of the equitable subordination claim is not warranted.

Moreover, the Defendants resort to bootstrapping, contending that the equitable subordination claim cannot survive without sufficiently alleged fraudulent transfer claims. As

---

[10]  *HBE Leasing*, 48 F.3d 623, cited by Defendants in this section of the brief, was not an intentional fraud case. As discussed in Point II above, the only knowledge requirement imposed in *HBE Leasing* is the knowledge necessary to determine whether multiple transfers were part of a single transaction. Similarly, *In re Fabrikant*, 394 B.R. 721, also concerned the issue of the knowledge required to collapse separate transactions.

By citing cases that allege claims under both New York's version of the Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code as if the cases were only construing section 548 and then pointing to Oklahoma authority noting the similarity between Oklahoma's UFTA and section 548, Defendants have attempted an unconscionable sleight of hand.

shown above, Plaintiff *has* adequately alleged fraudulent transfer claims.  As a result, as the

Defendant's own cases have found, an equitable subordination claim is generally intertwined

with fraudulent transfer claims and dismissal at this stage of the proceedings would not be

prudent. *AlphaStar*, 383 B.R. at 276.

       The Defendants also contend that even if the Complaint adequately alleges fraudulent

transfer claims, the Complaint's allegations fail to state a claim for equitable subordination

because of a supposed failure to allege "knowledge of the purported fraudulent scheme."  Motion

at 22.  This also is wrong.  First, in support of their equitable subordination claim Plaintiff

alleges that "[o]n information and belief, certain of the Pre-Petition Lenders had knowledge of

the fraudulent scheme alleged herein."  Complaint ¶ 170.  Defendants do not contend that New

Kerr-McGee's fraudulent scheme is not alleged with sufficient particularity.  Defendants also

agree that knowledge need only be averred generally.  Motion at 21.  The allegation in the

Complaint is therefore sufficiently pleaded.  Defendants nevertheless complain that the

Complaint does not provide sufficient facts to support that inference of knowledge.  However,

the Complaint alleges that Lehman Brothers, who acted as the administrative agent for the Pre-

Petition Lenders (Complaint ¶ 18) also acted as New Kerr-McGee's financial advisor in

connection with the Spin-Off and was a participant in the fraud (Complaint ¶¶ 65-66, 85, 89, 93,

99-100).

       Second, adequately alleged fraudulent transfer claims are intertwined with an equitable

subordination claim.  *See, e.g., Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund
Ltd.)*, 310 B.R. 500, 513 (Bankr. S.D.N.Y. 2002) (an equitable subordination claim should be

allowed to go forward so as to "consider all claims in the interest of prudence and judicial

economy") (citations omitted).  The cases cited by Defendants to suggest that "mere knowledge

19

alone would not constitute inequitable conduct sufficient to state a claim for equitable subordination," Motion at 22, hold that the court will not reach a claim for equitable subordination in the absence of at least a sufficiently alleged claim for fraudulent transfer. *See, e.g., Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 281 B.R. 506, 524 (Bankr. E.D.N.Y. 2002) ("It is likewise unnecessary to reach the issue of whether State Street's claims against Sharp (which would arise if State Street were required to return the Payment) should be equitably subordinated to the claims of Sharp's other creditors, because Sharp's claims for recovery of the Payment are dismissed."). Even *Sunbeam*, which Defendants quote at length for the standards for an equitable subordination claim, notes that a creditor's receipt of a fraudulent transfer undermines the rationale for requiring a "higher level of proof" to equitably subordinate a creditor's claim. *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 363-364 (Bankr. S.D.N.Y. 2002) ("A higher level of proof is required to equitably subordinate the claim of a party that is neither an insider of the debtor, nor a fiduciary to the debtor or other creditors. . . . because, absent receipt of a preference or fraudulent transfer, a creditor may ordinarily improve its position in relation to other creditors.") (citations omitted). *See also AlphaStar, supra* at 276.

Finally, the Defendants are misguided to suggest that the Complaint fails to allege an injury that would justify equitable subordination where a fraudulent transfer gave Defendants a $200 million priority claim at the expense of all unsecured creditors. *See In re Yellowstone Mountain Club, LLC*, 2009 Bankr. LEXIS 1158, at *17 (Bankr. D. Mont. May 12, 2009).

## V. Section 546(e) Does Not Apply to the Transfers

### A. The "Safe Harbor" Provisions of the Bankruptcy Code Provide Exceptional Treatment for Counterparties to Specific Protected Financial Contracts, But Not to the Defendants.

Defendants contend that each of the fraudulent transfer claims alleged in the complaint is barred by section 546(e) of the Bankruptcy Code. There is no plausible basis for Defendants' extremely overbroad reading of that provision.

The purpose of section 546(e), as most recently amended by the Financial Netting Improvements Act of 2006 (the "FNIA"), Pub. L. No. 109-390, 120 Stat. 2692 (2006), is to minimize the risk that the insolvency of a securities or commodity firm would spread and disrupt the complex system of accounts and guarantees called the "clearance and settlement system." H.R. REP. NO. 97-420, at 1 (1982). The key mechanism adopted by Congress to minimize this risk was to permit, notwithstanding the otherwise applicable restrictions of the Bankruptcy Code, the "closing out" of open contractual obligations of the debtor. *See, e.g.*, 11 U.S.C. § 561 (allowing a non-debtor party to various protected financial agreements to terminate, liquidate or accelerate, or to offset net termination values, payment amounts or other transfer obligations). Sections 546(e), (f) and (g) operate in unison with other safe harbor provisions of the Bankruptcy Code to limit the power of the trustee to avoid as preferential or fraudulent otherwise eligible payments made in connection with protected financial contracts or transactions. The FNIA amended section 546(e) to include the avoidance of "transfers" in connection with a "securities contract", a "commodity contract" or a "forward contract":

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to *(or for the benefit of)* a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, *or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial*

21

> *institution, financial participant, or securities clearing agency, in connection with*
> *a securities contract, as defined in section 741(7), commodity contract, as defined*
> *in section 761(4), or forward contract,* that is made before the commencement of
> the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) (FNIA amendments italicized).

In moving to dismiss the avoidance claims based on the language recently added to section 546(e) by the FNIA, the Defendants assert, without a shred of statutory or case law support, that the "obligations and liens Plaintiff seeks to avoid are transfers 'in connection with a securities contract' and made to and 'for the benefit of' parties" protected by section 546(e)." Motion at 9-10. As explained below, section 546(e) does not apply to the obligations and liens resulting from the Secured Debt Facility because, for among other reasons, such obligations and liens were not transferred in connection with a "securities contract" as defined by section 741 of the Bankruptcy Code.

**B.     The Transfers Plaintiff Seeks to Avoid Are Not Transfers Made in Connection with a "Securities Contract"**

The Master Separation Agreement is not a "securities contract." According to the Defendants, the Master Separation Agreement is a "securities contract," and any and all transfers somehow "connected" to the Master Separation Agreement, whether or not pursuant to formally discrete contracts between entities not even a party to the Master Separation Agreement (such as the Defendants), are therefore protected from avoidance by section 546(e). The Defendants reach this untenable position by arguing first that "(i) the transfer of the membership interests in Tronox Worldwide LLC ('Worldwide') to Tronox Incorporated, (ii) the IPO of shares in Tronox, (iii) the conversion of 10,000 shares of Tronox stock held by Worldwide into shares of Tronox Class B Common Stock to be transferred to New Kerr-McGee and (iv) the distribution of shares of Tronox Class B Common Stock to holders of New Kerr-McGee Common Stock" (collectively, the "Shareholder Transfers") constitute a "securities contract" within the meaning

22

of Subclause (i) of Section 741(7) ("Subclause (i)").[11] *See* Motion at 25. The Defendants then

bootstrap this mischaracterization of the Shareholder Transfers by applying it to the Master

Separation Agreement.

The inquiry into the correct scope of the safe harbors must be answered by interpretation

of the relevant statutory language, using applicable methods of statutory construction including,

to the extent appropriate, legislative history. Indeed, Congress, in enacting the FNIA, explained

that protected contracts need to be distinguished from other commercial transactions by reference

to securities industry usage and understanding. Thus, the statutory language, as interpreted by

reference to securities and commodities industry usage is the applicable and controlling basis

upon which to determine the scope of transactions and agreements intended to be governed by

the safe harbor provisions applicable to "securities contracts", "swap agreements," "repurchase

agreements," and "forward contracts." The FNIA legislative record repeatedly warns against

over-expansive application of the safe harbor provisions beyond those specific financial

contracts targeted for preferential treatment. The report of the Committee on the Judiciary

recommending the enactment of the FNIA, H.R. REP. NO. 109-31 (2005) (the "House Report"),

explains, for example, that "the inclusion of 'margin loans' in the definition [of securities

contract] is intended to encompass only those loans commonly known in the securities industry

as "margin loan," . . . . 'Margin loans' do not include, however, other loans that happen to be

secured by securities collateral." House Report at 119 (emphasis added). Similarly, the House

---

[11] Subclause (i) provides as follows: (7) "securities contract" (A) means (i) a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, any interest in a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein (including an interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option, and including any repurchase or reverse repurchase transaction on any such security, certificate of deposit, mortgage loan, interest, group or index, or option (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in section 101); 11 U.S.C. § 741 (7) (A) (i).

Report explains that what constitutes a "swap agreement" must be circumscribed by industry understanding. The Report states that the new definition of swap agreement: [s]hould not be interpreted to permit parties to document non-swaps as swap transactions. Traditional commercial arrangements such as commercial, residential or consumer loans, cannot be treated as . . . swaps . . . under . . . the Bankruptcy Code simply because the parties purport to document or label the transactions as "swap agreements." *Id.* at 122 (emphasis added).

Such comments from the legislative record echo the official views of the U.S. Treasury Department regarding proposals for amendment of the safe harbor provisions developed by the President's Working Group on Financial Markets that were later enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. As explained by the Treasury Department, **"in the definitions of the types of instruments to which these provisions might apply, we were careful to exclude transactions that are in substance commercial loans**. We do not want to create a situation where what is actually a loan receives special treatment just because the documentation calls the transaction a swap." Treasury Dep't Statement (emphasis added).

Even in the absence of such a specific legislative record directing that the safe harbor definitions be interpreted by reference to usage in the securities industry, generally applicable rules of statutory construction require that where Congress has used technical words or terms of art, reference must be made to the trade or industry in which the term was used at the time of the enactment of the statute. *See, e.g., McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) (in determining the interpretation of the term "seaman" as included in the Jones Act, 46 U.S.C. App. § 688, the Court used the term as it had been used by other admiralty courts); *Corning Glass Works v. Brennan*, 417 U.S. 188, 201-02 (1974) (". . . [W]here Congress has used

24

technical words or terms of art, 'it [is] proper to explain them by reference to the art or science to which they [are] appropriate.'"); *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S 355, 372 (1986) ("technical terms of art should be interpreted by reference to the trade or industry to which they apply"). These principles are called into play by the safe harbor provisions and particularly by section 741 which includes many terms and phrases, i.e., "margin loan," "securities collar," "total return swap," and "settlement payment," having no common or ordinary meanings outside of the securities industry.

Clearly, an agreement providing for the spin-off of a business, such as the Master Separation Agreement is not what is commonly known in the securities industry as a "securities contract." Moreover, and dispositively, no party to the Master Separation Agreement either sells or purchases a security pursuant to its terms. Thus, the Master Separation Agreement does not even fall within the literal terms of Subclause (i) as "a contract for the purchase, sale, or loan of a security." Understandably, the Defendants have been unable to produce caselaw supporting their misconstruction of section 546(e).

In sum, in construing section 546(e) so as to determine the extent to which it limits the avoiding powers of a trustee, courts have observed that it is necessary to decide which "Congressional intent should prevail and which other vital legislative policy much yield." *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406 (S.D.N.Y. 2001). This inquiry is simple with respect to this Motion since neither the text nor the legislative history of the FNIA give the slightest support to the notion that precluding the avoidance of the Debtors' fraudulently incurred Obligations and Security Interests in favor of the Pre-Petition Lenders would advance any of the policies underlying section 546(e).

### C.    Section 546(e) Does Not Limit the Trustee's Power to Avoid Obligations

Although the arguments stated above are dispositive, it is significant that there is nothing in the language of section 546(e) to suggest that the section restricts a trustee's power to avoid "obligations". By its terms, section 546(e) is exclusively applicable to the trustee's power to avoid a "transfer" and does not limit the trustee's power to avoid obligations. This omission is significant. The avoidance of transfers and obligations is not interchangeable as each has distinct remedies and legal consequences under the Bankruptcy Code. If a trustee avoids an obligation, the obligation is rendered unenforceable, the claim based on the obligation is disallowed and the assets available for distribution to other creditors with non-avoidable claims are automatically increased. Thus the avoidance of an obligation is self-effectuating and there is no need to "unwind" a settled transaction. This distinction is of particular significance to section 546(e), the purpose of which is to minimize instability "caused by the reversal of settled securities transactions." *Enron Corp. v. Credit Suisse First Boston Int'I (In re Enron corp.)*, 328 B.R. 58, 66 (Bankr. S.D.N.Y. 2005) (*quoting Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 848 (10th Cir. 1990).

### VI.    Count IV States a Valid Claim for Avoidance of Security Interests That Were Not Properly Perfected

Count IV of the Complaint seeks to avoid the transfers of certain Security Interests, granted by Tronox to the Administrative Agent in (a) federally registered trademarks, patents and copyrights that have not been recorded in the U.S. Patent and Trademark Office or the U.S. Copyright Office and (b) deposit accounts that were not perfected prior to the filing of the chapter 11 petitions. *See* Complaint ¶¶ 155-162. Defendants do not attack the sufficiency of Count IV's allegations. Instead, Defendants, in effect, inappropriately seek summary judgment on the issue of perfection of the Security Interests, even submitting documentary evidence not

26

referred to or made part of the Complaint.[12]  On this basis alone, the Motion to dismiss Count IV

should be denied.

One set of documents Defendants have inappropriately requested that the Court consider

are copies of alleged control agreements that Defendants contend contradict the allegation in the

Complaint that the control agreements contemplated by the Guarantee and Collateral Agreement,

dated as of November 28, 2005, were never entered into.  *See* Motion at 27, Ex. F; Complaint

¶¶ 156-157.  However, even if it were appropriate to consider documents not incorporated in the

Complaint, on their face, these agreements were entered into on or after April 27, 2009,

subsequent to the Debtors' January 12, 2009 Petition Date and are, therefore, avoidable under

section 544(a) of the Bankruptcy Code which gives the trustee the power of a judgment creditor

as of the "commencement of the case."  11 U.S.C. § 544(a)(1); *see also* 7 COLLIER ON

BANKRUPTCY ¶ 362.03[6] (15th ed. 2009) (Under the automatic stay provided by section

362(a)(4), "a creditor may not perfect a lien previously taken.").

Defendants have similarly attached to the Motion copies of UCC filings covering certain

of Tronox's intellectual property.  Motion at 27.  Consideration of these UCC filings is not only

inappropriate on a motion to dismiss but these documents are also irrelevant because the

Complaint does not allege that the UCC filings, of which the Defendants seek judicial notice, do

not exist.  Instead, the Complaint alleges that "Security Interests granted by Tronox to the

Administrative Agent against the federally registered trademarks, patents and copyrights of

---

[12]  On a motion to dismiss, the Court should take into account only the complaint and documents relied upon
therein.  *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) ("In considering a motion to
dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint,
documents attached to the complaint as exhibits and documents incorporated by reference in the complaint.")
(*quoting Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)).  The Defendants are not able to cite a
case for the proposition that the Court should look beyond the Complaint's allegations seeking to avoid an
improperly perfected security interest and their analogy to situations involving a review of securities filings
where a claim of nondisclosure has been made, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991),
is unavailing.

Tronox [set forth in the Complaint] *have not been recorded in the U.S. Patent and Trademark Office or the U.S. Copyright Office.*" Complaint ¶ 159 (emphasis added).  The Defendants' contention that there is no need to make a proper filing with the Patent and Trademark Office in order to perfect a security interest in patents and trademarks is incorrect.  *Cf. Nat'l Peregrine, Inc. v. Capitol Fed. Sav. & Loan Ass'n of Denver (In re Peregrine Entm't, Ltd.)*, 116 B.R. 194, 203-07 (Bankr. C.D. Cal. 1990) (holding that priority and perfection for copyrights registered with the Copyright Office are determined under the Copyright Act).  Defendants have cited no controlling authority to the contrary, and at least one of the cases the Defendants do cite acknowledges the split of authority on this issue.  *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, Nos. 88 CV 3931 & 03 CV 6413, 2006 U.S. Dist. LEXIS 7423, at *14 n.8 (E.D.N.Y. Feb. 8, 2006).[13]

## VII.    Count V States a Valid Claim for Recovery of Avoidable Preferences

Count V of the Complaint seeks to recover preferential payments made to the Defendants within 90 days of the Petition Date.  See 11 U.S.C. §§ 547, 550(a) & 551.  (Defendants argue that these Transfers are immune from recovery as preferences because the Defendants are "fully secured creditors", citing the Complaint itself for this proposition.  Motion at 28 (citing Complaint ¶ 27).  Such an allegation is not made in paragraph 27 or, for that matter, anywhere in the Complaint.  Paragraph 27 does acknowledge that the credit agreement, from which the

---

[13]    In a footnote, the *Glasser* court opined that "[s]ince the revised Article 9 of the UCC was enacted in 2001, courts have held that Section 261 of the Patent Act does not displace the Uniform Commercial Code in providing a mechanism for perfecting security interests in patents."  2006 U.S. Dist. LEXIS 7423, at *14 n.8.  Contradictorily, the *Glasser* court selected a case decided under the pre-Amended version of Article 9 to illustrate this purported trend, *Moldo v. Matsco, Inc. (In re Cybernetic Servs., Inc.)*, 252 F.3d 1039, 1045-49 (9th Cir. 2001).  In any event, revised Article 9 differed from the prior law, in pertinent part, only to the extent an advisory note made the criticism that "some (erroneously) read the former section to suggest that Article 9 sometimes deferred to federal law even when federal law did not preempt Article 9."  Rev. UCC § 9-109 and comment 8.  But the issue of preemption is determined by federal, not state, law, and must refer to the federal scheme governing the particular property that is intended to serve as collateral so revision of the UCC could not possibly undermine cases finding that federal law required federal filings to effectively perfect a security interest.

obligations and liens the Complaint seeks to avoid and recover arise, is a secured debt facility.

However, not only is there no allegation or evidence to support the Defendants contention that

they are "fully" secured but payments to a secured creditor can be recovered as preferential if the

secured creditor's lien is avoided. *See, e.g.*, *In re Washkowiak*, 62 B.R. 884, 887 (Bankr. N.D.

Ill. 1986) ("If the lien can be avoided, [the defendant], in effect, retroactively becomes unsecured

and payments to a nonpriority unsecured creditor on the eve of bankruptcy are almost inevitably

voidable as preferences."); *see also Archer v. Cornerstone Bank, N.A. (In re Archer)*, No. 03-

41425, 2004 Bankr. LEXIS 473, at *6-7 (Bankr. D. Neb. Apr. 12, 2004) ("Because the effect of

a preferential transfer is determined as of the petition date, a secured creditor whose lien has

been avoided is treated as an unsecured creditor in the administration of the estate.") (citing Vern

Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 VAND. L. REV. 713, 745-

46 (1985)).

## VIII.   Count VII Adequately Alleges a Claim for Disallowance Under Section 502(d)

The Defendants final contention, that there is no basis to seek disallowance of their

claims[14] in the Debtors' bankruptcy cases, is without merit.  Under section 502(d), the claims of

transferees of avoidable transfers are subject to disallowance.  11 U.S.C. § 502(d).  Contrary to

the Defendants' assertion that the Complaint fails to allege "why such a remedy should be

granted," the allegations of Count VII include an allegation that the Pre-Petition Lenders are

recipients of avoidable transfers which is more than enough to overcome a motion to dismiss.

*See Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs.)*, 322 B.R. 440,

---

[14]   Defendants correctly assume that paragraph 177 of the Complaint should be read to identify the Pre-Petition
Lenders as the claimant whose claims Count VII seeks to disallow pursuant to section 502(d).  The inadvertent
drafting error identifying Anadarko and New Kerr-McGee as claimants can be corrected by amendment. *See,
e.g.*, *O'Connell v. Shallo (In re Die Fliedermaus LLC)*, 323 B.R. 101, 105 (Bankr. S.D.N.Y. 2005) (denying
motion to dismiss "an obvious scrivener's error which can be amended").

452 (Bankr. N.D. Okla. 2003) ("Because it is possible that the Plaintiffs' Section 502(d) claim

may become 'cognizable' after the fraudulent transfer claims are prosecuted to conclusion, the

Section 502(d) claim is legitimately joined with the Plaintiffs' other claims against the Chase

Entities and is not subject to dismissal for failure to state a claim.").  Indeed it is difficult to

imagine what more the Committee could have alleged in the Complaint which was filed at the

end of an investigatory period shortened by the terms of the DIP Order and extended briefly to

allow negotiation--not discovery, which had not yet begun when the Complaint was filed.

## CONCLUSION

For all the foregoing reasons, the Court should deny the Defendants' Motion to Dismiss the Complaint in its entirety.

Dated: New York, New York
      October 30, 2009

              KASOWITZ, BENSON, TORRES
                & FRIEDMAN LLP

              By _/s/ David J. Mark_____
              David M. Friedman
              David J. Mark
              Ross G. Shank
              1633 Broadway
              New York, New York 10019
              Telephone:  (212) 506-1700
              Facsimile:  (212) 506-1800
              dfriedman@kasowitz.com
              dmark@kasowitz.com
              rshank@kaswoitz.com

              *Attorneys for Official Committee of*
              *Unsecured Creditors of Tronox*
              *Incorporated, et al.*