KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
David M. Friedman
David J. Mark
Ross G. Shank
1633 Broadway
New York, New York 10019
Telephone:     (212) 506-1700
Facsimile:      (212) 506-1800

*Attorneys for the Official Committee of Unsecured*
*Creditors of Tronox Incorporated, et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| TRONOX INCORPORATED, *et al.*, | Case No. 09-10156 (ALG) |
| Debtors. | Jointly Administered |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TRONOX INCORPORATED and its affiliated debtors, on behalf of the estates of TRONOX INCORPORATED, TRONOX WORLDWIDE LLC f/k/a Kerr-McGee Chemical Worldwide LLC, TRONOX LLC f/k/a Kerr-McGee Chemical LLC, CIMARRON CORPORATION, SOUTHWESTERN REFINING COMPANY, INC., TRANSWORLD DRILLING COMPANY, TRIANGLE REFINERIES, INC., TRIPLE S MINERALS RESOURCES CORPORATION, TRIPLE S REFINING CORPORATION, TRIPLE S, INC., TRONOX FINANCE CORP, TRONOX HOLDINGS, INC. and TRONOX PIGMENTS (SAVANNAH) INC. | |
| Plaintiff, | |

|                        |   |                                        |
|------------------------|---|----------------------------------------|
| v.                     | ) | Adversary Proceeding No. 09-01388      |
|                        | ) |                                        |
| CREDIT SUISSE et al.,  | ) |                                        |
|                        | ) |                                        |
|                        | ) |                                        |
|                        | ) |                                        |
| Defendants.            | ) |                                        |
|                        | ) |                                        |

## FIRST AMENDED ADVERSARY COMPLAINT

The Official Committee of Unsecured Creditors (the "Committee") of Tronox Incorporated and its affiliated debtors (the "Debtors"), on behalf of the estates of the Debtors identified herein (collectively, "Tronox") for its first amended complaint against Defendants (as identified in paragraph 28 below), alleges as follows:

## INTRODUCTION

1.    This adversary proceeding arises out of the same fraudulent scheme that gives rise to the Adversary Complaint commenced by certain of the Debtors against Anadarko Petroleum Corporation ("Anadarko") and New Kerr-McGee, as defined below, that was filed in this Court on May 12, 2009, as adversary proceeding number 09-01198.  In short, Old Kerr-McGee, as defined below, created massive actual and contingent environmental, tort, retiree, and other liabilities during its more than 70-year history (the "Legacy Liabilities") which were then dumped on Tronox so that New Kerr-McGee's senior executives could obtain windfall profits during a wave of lucrative consolidation in the oil and gas industry.  In the process, however, New Kerr-McGee left Tronox grossly undercapitalized and without sufficient assets to pay its existing debts and loaded down Tronox with additional debt, including the secured debt that is the subject of this proceeding, thereby setting Tronox on a path to an inevitable bankruptcy.

2.    By the late 1990s, the entity then known as Kerr-McGee Corporation ("Old Kerr-McGee") had accumulated massive Legacy Liabilities through its various far-flung businesses—

including treatment of wood products, production of rocket fuel, refining and marketing of

petroleum products, and the mining, milling and processing of nuclear materials—since it was

founded in 1929.

3.     Having enjoyed years of profits from the various businesses that created the

Legacy Liabilities, Old Kerr-McGee decided to jettison the toxic legacy resulting from those

businesses.  Old Kerr-McGee devised a two-step fraudulent scheme to escape its toxic past and

attempt to place its valuable oil and gas assets safely beyond the reach of the EPA, tort

claimants, and other creditors.  *First*, Old Kerr-McGee isolated the Legacy Liabilities by

transferring all of its valuable oil and gas assets out of the historical business and into a new

"clean" entity.  *Second*, Old Kerr-McGee severed the historical business containing the Legacy

Liabilities—achieving a "clean break" between its valuable oil and gas assets and the Legacy

Liabilities.

4.     Step One of the scheme was code-named "Project Focus."  To isolate the Legacy

Liabilities from the valuable oil and gas assets, Old Kerr-McGee created an entirely new

corporate structure that featured a new "clean" parent company—also called "Kerr-McGee

Corporation" ("New Kerr-McGee")—and a new "clean" subsidiary—Kerr-McGee Oil and Gas

Corporation (the "Oil and Gas Business")—into which all of the valuable oil and gas assets were

transferred.  Numerous liabilities created by those oil and gas assets, however, stayed behind

along with the liabilities of all of Old Kerr-McGee's other historical businesses.  Through these

corporate machinations, Old Kerr-McGee became a subsidiary of New Kerr-McGee and was

stripped of its most valuable assets.  All that remained in Old Kerr-McGee (which remained

under the control of New Kerr-McGee until April 1, 2006) was a small, cyclical chemical

business, a handful of discontinued businesses, and more than 70 years of Legacy Liabilities (the

3

"Chemical Business"). The majority of the Legacy Liabilities retained by the Chemical Business stemmed from business operations completely unrelated to the Chemical Business, including oil and gas operations.

5.      New Kerr-McGee initiated Step Two in spring 2005 when it commenced efforts to sell or spin-off the liability-laden Chemical Business. But potential purchasers balked. Numerous potential buyers refused even to bid on the Chemical Business burdened with the "poison pill" of Legacy Liabilities. One stated that the amount of Legacy Liabilities that New Kerr-McGee was attempting to put on the Chemical Business was "criminal." Another potential purchaser reduced its proposed $1.2 billion purchase price for the Chemical Business by $900 million if the Legacy Liabilities were included.

6.      New Kerr-McGee realized that it could never achieve its goal of a clean break from its Legacy Liabilities with an arm's-length buyer. So it elected to spin-off (the "Spin-Off") the Chemical Business as Tronox. The Spin-Off enabled New Kerr-McGee to unilaterally dictate the terms of the deal, avoid third-party due diligence, and eliminate standard representations and warranties regarding its massive Legacy Liabilities.

7.      The two-step scheme concluded with the completion of the Spin-Off on March 31, 2006. New Kerr-McGee not only offloaded the massive Legacy Liabilities, but also stripped $785 million out of the Chemical Business tax free on the way out the door. A crucial element of the Spin-Off was the secured debt facility that is the subject of this action. On November 28, 2005, Tronox incurred $200 million in secured debt but did not retain any of the proceeds of the borrowing. Rather, all of the proceeds of the borrowing were either up-streamed by the Debtors to New Kerr McGee or used to pay the fees and expenses of the borrowing.

4

8.     The scheme, moreover, paid additional dividends for New Kerr-McGee. Less than 90 days after New Kerr-McGee jettisoned the Legacy Liabilities, Anadarko offered to acquire New Kerr-McGee for $18 billion on June 22, 2006. The transaction was approved and New Kerr-McGee became a wholly owned subsidiary of Anadarko on August 10, 2006. A primary architect of the two-step scheme, New Kerr-McGee Chairman and Chief Executive Officer Luke R. Corbett, personally profited by more than $200 million from the Anadarko deal. New Kerr-McGee Senior Vice President and Chief Financial Officer Robert M. Wohleber, who also served as Chairman of the Board of Tronox until the completion of the Spin-Off, pocketed more than $20 million. New Kerr-McGee Senior Vice President and General Counsel Gregory F. Pilcher, another architect of the Spin-Off, walked away with more than $9 million. Other New Kerr-McGee senior executives also enjoyed windfalls.

9.     While the "clean break" from the Legacy Liabilities allowed New Kerr-McGee to complete an $18 billion sale with massive profits for its senior executives, Tronox was simply broke. Overburdened with the Legacy Liabilities and the additional debt acquired in the Spin-Off, stripped of essential cash, and grossly undercapitalized, Tronox was doomed to fail. Despite valiant efforts to survive, including significant personnel reductions, efforts to streamline its operations, and reductions in retiree benefits programs, Tronox was left with no choice but to file for bankruptcy protection on January 12, 2009.

## JURISDICTION AND VENUE AND STANDING

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b).

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The Committee brings this action on behalf of the estates of the Debtors identified

herein pursuant to the authority granted to it by the *Corrected Final Order (I) Authorizing*

*Debtors (A) To Obtain Postpetition Financing Under 11 U.S.C. §§ 105, 362, 363(b), 364(c)(1),*

*364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) To Utilize Cash Collateral Under 11 U.S.C. §*

*363 and (C) To Use Postpetition Financing to Purchase Receivables Portfolio and (II) Granting*

*Adequate Protection to Prepetition Secured Parties Under 11 U.S.C. §§ 361, 362, 363, and 364*

entered on February 9, 2009 [Docket No. 151].

## PARTIES AND OTHER KEY PARTICIPANTS

13.     The Committee is the statutory committee of unsecured creditors duly appointed

on January 21, 2009 in the Debtors' chapter 11 cases by the United States Trustee for the

Southern District of New York.

### The Debtors

14.     Tronox Incorporated is a Delaware corporation with its principal place of business

in Oklahoma City, Oklahoma.  Through its subsidiaries, Tronox has operations and facilities in

the United States, the Asia Pacific region, and Europe.  On January 12, 2009 (the "Petition

Date"), the Debtors, Tronox and 14 of its affiliated companies, filed for chapter 11 protection in

this Court.  The Debtors operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.     Tronox Worldwide LLC ("Tronox Worldwide"), one of the Debtors, is a

successor in interest to Old Kerr-McGee and, as a result of the Spin-Off, is a wholly owned

subsidiary of Tronox Incorporated.

16.     Tronox LLC, one of the Debtors, is a successor in interest to Old Kerr-McGee

and, as a result of the Spin-Off, is an indirect wholly owned subsidiary of Tronox Incorporated.

6

17.     Cimarron Corporation, one of the Debtors, is an indirect wholly owned subsidiary of Tronox Incorporated.

18.     Southwestern Refining Company, Inc., one of the Debtors, is an indirect wholly owned subsidiary of Tronox Incorporated.

19.     Transworld Drilling Company, one of the Debtors, is an indirect wholly owned subsidiary of Tronox Incorporated.

20.     Triangle Refineries, Inc., one of the Debtors, is an indirect wholly owned subsidiary of Tronox Incorporated.

21.     Triple S Minerals Resources Corporation, one of the Debtors, is an indirect wholly owned subsidiary of Tronox Incorporated.

22.     Triple S Refining Corporation, one of the Debtors, is an indirect wholly owned subsidiary of Tronox Incorporated.

23.     Triple S, Inc., one of the Debtors, is an indirect wholly owned subsidiary of Tronox Incorporated.

24.     Tronox Finance Corp., one of the Debtors, is an indirect wholly owned subsidiary of Tronox Incorporated.

25.     Tronox Holdings Inc., one of the Debtors, is an indirect wholly owned subsidiary of Tronox Incorporated.

26.     Tronox Pigments (Savannah) Inc., one of the Debtors, is an indirect wholly owned subsidiary of Tronox Incorporated.

**The Pre-Petition Lenders**

27.     In connection with the Spin-Off, on November 28, 2005, the Debtors entered into a secured debt facility (the "Secured Debt Facility"). The Secured Debt Facility is memorialized

7

in a credit agreement dated as of November 28, 2005 by and among Tronox Incorporated, Tronox Worldwide as borrower, the several lenders from time to time parties thereto, Lehman Brothers Inc. and Credit Suisse as Arrangers and Bookrunners, ABN Amro Bank N.V. as Syndication Agent, JPMorgan Chase Bank, N.A. and Citicorp USA, Inc. as Co-Documentation Agents and Lehman Commercial Paper, Inc. as Administrative Agent (collectively, the "Pre-Petition Lenders"). The obligations of Tronox Worldwide under the Secured Debt Facility (the "Obligations") have been guaranteed by the following Debtors: Tronox Incorporated, Tronox LLC, Cimarron Corporation, Southwestern Refining Company, Transworld Drilling Company, Triangle Refineries, Inc., Triple S Minerals Resources Corporation, Triple S Refining Corporation, Triple S, Inc., Tronox Finance Corp., Tronox Holdings Inc. and Tronox Pigments (Savannah) Inc. (the "Guarantors"; Tronox Worldwide and the Guarantors are referred to collectively as Tronox or the "Tronox Entities")) and are secured, with limited exceptions, by substantially all of the assets of the Tronox Entities (the "Security Interests"). Pursuant to the Secured Debt Facility, Tronox Worldwide nominally borrowed $200 million from the Pre-Petition Lenders on November 28, 2005 (the "Loan Proceeds") and, as part of the Spin-Off, those funds were transferred to New Kerr-McGee. The transfer of the Loan Proceeds was disclosed to each of the Pre-Petition Lenders that funded the Secured Debt Facility. Such transfer was also disclosed in public filings by Tronox with the Securities Exchange Commission and elsewhere.

28.     Upon information and belief, the following are Pre-Petition Lenders, each of whom are a defendant herein, (except as specifically stated in this paragraph 28 to the contrary):

A.     Upon information and belief, Defendant ABN AMRO Bank, N.V. ("ABN AMRO") is a banking association organized under the laws of the Netherlands with offices located, among other places, in the State of New York and the State

of Illinois.  ABN AMRO is being sued individually and in its capacity as Syndication Agent.

B.       Upon information and belief, Defendant AIB Debt Management Ltd. is a corporation organized under the laws of Ireland.

C.       Upon information and belief, Defendant Allied Irish Banks is a banking association organized under the laws of Ireland, with branch offices located in New York, New York and the Cayman Islands.

D.       Upon information and belief, Defendant Baker Street CLO II Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

E.       Upon information and belief, Defendant Baker Street Funding CLO 2005-I Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

F.       Upon information and belief, Defendant The Bank of Nova Scotia (a/k/a Scotiabank) is a banking association organized under the laws of Canada, with a branch office located in the State of New York.

G.       Upon information and belief, Defendant Black Diamond CLO 2005-1 Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

H.       Upon information and belief, Defendant Black Diamond CLO 2005-2 Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

I.       Upon information and belief, Defendant Celerity CLO Limited is an investment company organized under the laws of the State of Delaware, with its principal place of business located in Los Angeles, California.

J.       Upon information and belief, Defendant Citibank, N.A. ("Citibank") is a national banking association with its principal place of business located in the State of New York.  Citibank is being sued individually and in its capacity as Documentation Agent.

K.       Upon information and belief, Defendant Citicorp USA, Inc. ("Citicorp") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.  Citicorp is being sued individually and in its capacity as Documentation Agent.

L.       Upon information and belief, Defendant Commerzbank AG is a banking association organized under the laws of Germany with offices located, among other places, in the State of New York and the Cayman Islands.

M.   [Deleted]

N.   Upon information and belief, Defendant Credit Suisse, Cayman Islands Branch ("CS Cayman") is a banking association organized under the laws of the Cayman Islands, with an office in New York, New York.  CS Cayman is being sued individually and in its capacity as Arranger and Bookrunner.

O.   Upon information and belief, Defendant Darien Loan Funding Company is an investment company, with its principal place of business located in Los Angeles, California.

P.   Upon information and belief, Defendant DK Acquisition Partners, L.P. is an investment company organized under the laws of the State of New York, with its principal place of business located in New York, New York.

Q.   Upon information and belief, Defendant Farallon Capital Institutional Partners, L.P. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.

R.   Upon information and belief, Defendant Farallon Capital Institutional Partners II, L.P. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.

S.   Upon information and belief, Defendant Farallon Capital Institutional Partners III, L.P. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.

T.   Upon information and belief, Defendant Farallon Capital Offshore Investors, Inc. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.

U.   Upon information and belief, Defendant Farallon Capital Offshore Investors II, L.P. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.

V.   Upon information and belief, Defendant Farallon Capital Partners, L.P. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in San Francisco, California.

W.   Upon information and belief, Defendant First 2004-II CLO, Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in Los Angeles, California.

X.   Upon information and belief, Defendant First 2004-I CLO, Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in Los Angeles, California.

Y.      Upon information and belief, Defendant Fortis Capital Corp. is an investment company organized under the laws of the State of Connecticut, with its principal place of business located in the State of New York.

Z.      Upon information and belief, Defendant GMAM Group Pension Trust I is a trust formed pursuant to the laws of the State of New York for the benefit of certain employee benefit plans of General Motors Corporation.

AA.     Upon information and belief, Defendant Grand Central Asset Trust, Wave Series is an investment company organized under the laws of the State of Delaware, with its principal place of business located in Chicago, Illinois.

BB.     Upon information and belief, Defendant Highbridge International LLC is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

CC.     Upon information and belief, Defendant J.P. Morgan Securities, Inc. ("JPM") is an investment company organized under the laws of the State of Delaware, with its principal place of business located in New York, New York.  JPM is being sued individually and in its capacity as Documentation Agent.

DD.     Upon information and belief, Defendant JP Morgan Chase Bank N.A. ("Chase") is a national banking association, with its principal place of business located in New York, New York.  Chase is being sued individually and in its capacity as Documentation Agent.

EE.     Upon information and belief, Defendant Kelts LLC is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

FF.     Upon information and belief, Defendant Knighthead Master Fund, L.P. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

GG.     Upon information and belief, Lehman Brothers Inc. ("LBI") is a corporation organized under the laws of the State of New York, with its principal place of business located in New York, New York.  LBI is the subject of a proceeding under the Securities Investor Protection Act of 1970 in the Southern District of New York (the "LBI SIPA Case").  In accordance with orders entered in the LBI SIPA Case, on or about May 29, 2009, the Committee filed proofs of claim on behalf of the Tronox Entities in the LBI SIPA Case.  LBI is not a defendant in this action.

HH.     Upon information and belief, Lehman Commercial Paper, Inc. ("LCPI") is a corporation organized under the laws of the State of New York, with its principal place of business located in the State of New York. LCPI is a debtor in bankruptcy cases in the Southern District of New York and the Plaintiff's claims

against LCPI are subject to the automatic stay in effect in LCPI's bankruptcy case.  LCPI is not a defendant in this action

II.    [Deleted]

JJ.    Upon information and belief, Defendant Oak Hill Credit Partners II, Limited is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

KK.    Upon information and belief, Defendant Oak Hill Credit Partners III, Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

LL.    Upon information and belief, Defendant Oak Hill Credit Partners IV, Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

MM.    Upon information and belief, Defendant Oak Hill Credit Partners V, Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

NN.    Upon information and belief, Defendant OHA Park Avenue CLO I, Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

OO.    Upon information and belief, Defendant Park Avenue Loan Trust is an investment company organized under the laws of the State of California, with its principal place of business located in Los Angeles, California.

PP.    Upon information and belief, Defendant Redwood SPC is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of New Jersey.

QQ.    Upon information and belief, Defendant The Royal Bank of Scotland, plc is a banking association organized under the laws of the United Kingdom, with a branch office located in the State of Connecticut.

RR.    Upon information and belief, Defendant Scotiabanc Inc. is a banking association organized under the laws of the State of Delaware, with its principal place of business located in Atlanta, Georgia.

SS.    Upon information and belief, Defendant SMBC MVI SPC is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of Connecticut.

TT.    Upon information and belief, Defendant Societe Generale, S.A. is a banking association organized under the laws of France with a branch office located in the State of New York.

12

UU.    Upon information and belief, Defendant Stone Tower CLO V Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

VV.    Upon information and belief, Defendant Stone Tower Credit Funding I Ltd. is an investment company organized under the laws of the State of Delaware, with its principal place of business located in the State of New York.

WW.    Upon information and belief, Defendant SunTrust Banks, Inc. is a national banking association with offices located, among other places, in the State of Georgia.

XX.    Upon information and belief, Defendant UBS AG, Stamford Branch is a banking association organized under the laws of Switzerland, with a branch office located in the State of Connecticut.

YY.    Upon information and belief, Defendant United Overseas Bank is a banking association organized under the laws of Singapore, with a branch office located in New York, New York.

ZZ.    Upon information and belief, Defendant Wave CBNA Loan Funding, LLC is an investment company organized under the laws of the State of Delaware, with its principal place of business located in Chicago, Illinois.

AAA.    Upon information and belief, Defendant Calyon Crédit Agricole CIB (a/k/a Calyon) is a banking association organized under the laws of France, with a branch office located in the State of New York.

BBB.    Upon information and belief, Defendant Calyon Crédit Agricole CIB (a/k/a Calyon New York Branch) is a banking association organized under the laws of France, with an office in New York, New York.

CCC.    Upon information and belief, Defendant Calyon Securities (USA) Inc. is an investment company organized under the laws of the State of New York with its principal place of business located in New York, New York.

DDD.    Upon information and belief, Defendant Eagle Loan Trust is an investment company organized under the laws of the State of Delaware with its principal place of business located in New York, New York.

EEE.    Upon information and belief, Defendant Loan Funding I LLC is an investment company organized under the laws of the State of Delaware with its principal place of business located in New York, New York.

FFF.    Upon information and belief, Defendant Mac Capital, Ltd. is an investment company organized under the laws of the State of Delaware with its principal place of business located in New York, New York.

13

GGG.  Upon information and belief, Defendant Stanfield Azure CLO, Ltd. is an investment company organized under the laws of the State of Delaware with its principal place of business located in New York, New York.

HHH.  Upon information and belief, Defendant Stanfield Bristol CLO, Ltd. is an investment company organized under the laws of the State of Delaware with its principal place of business located in New York, New York.

III.  Upon information and belief, Defendant XL RE Ltd. is an investment company organized under the laws of the State of Delaware with its principal place of business located in New York, New York.

## **BACKGROUND**

I.  **Old Kerr-McGee Creates Massive Legacy Liabilities Through Far-Flung Businesses During Its More Than 70-Year History.**

29.    Old Kerr-McGee was founded in 1929 as Anderson & Kerr Drilling Company near Oklahoma City, Oklahoma. As the company grew its oil and gas exploration activities and drilling operations, it moved into downstream operations with the purchase of its first refinery in 1945.

30.    Old Kerr-McGee continued to expand in the 1950s into various other energy-related businesses. In 1952, Old Kerr-McGee entered the uranium industry when it acquired mining properties in Arizona. Shortly thereafter, it constructed the country's largest uranium-processing mill. Also in the 1950s, Old Kerr-McGee expanded its retail operations into owning and operating service stations, and further expanded its refining operations.

31.    In the early 1960s, Old Kerr-McGee entered the forestry business through a series of asset purchases, and acquired several fertilizer-marketing companies.

32.    In 1967, Old Kerr-McGee completed a merger with American Potash and Chemical Corporation, and began to manufacture and market a variety of ammonium perchlorate chemicals (such as fertilizers, potash, and sodium chlorate), boron, titanium dioxide, and

14

manganese. That same year, Old Kerr-McGee started construction of its first coal mine shaft in Stigler, Oklahoma.

33.    In the 1970s, Old Kerr-McGee became involved in various aspects of the nuclear industry, including exploration, mining, milling, and conversion of uranium oxide into uranium hexafluoride, pelletizing of these materials, and fabrication of fuel elements.

34.    By 2000, Old Kerr-McGee had exited most of these historic business operations (collectively, the "Legacy Businesses") and was left with two core operating businesses: (a) oil and gas exploration and production and (b) chemicals. Although it had discontinued the Legacy Businesses, Old Kerr-McGee remained responsible for the Legacy Liabilities. The overwhelming majority of the Legacy Liabilities—including some that are the direct result of oil and gas operations—are not related to the titanium dioxide and other operations that became Tronox.

## II.    Old Kerr-McGee Decides To Jettison Its Legacy Liabilities In The Late 1990s.

35.    In the late 1990s, consolidation in the oil and gas industry increased valuations of exploration and production companies like Old Kerr-McGee. Old Kerr-McGee, however, was left on the sidelines because potential merger and acquisition partners were scared away by the Legacy Liabilities.

36.    Old Kerr-McGee's executives, however, were not going to let this opportunity for windfall profits pass them by.

37.    No later than 1998, Old Kerr-McGee began considering various transactions through which it could evade its Legacy Liabilities. One transaction involved assigning all of the Legacy Liabilities to a dormant subsidiary, Edgebrook Development Corporation, in exchange

15

for a promissory note issued by Old Kerr-McGee equal to the total costs of the Legacy Liabilities.

38.      Old Kerr-McGee decided it needed a cleaner break from the Legacy Liabilities than the Edgebrook transaction would provide.  This conclusion was underscored by the EPA's notices to Old Kerr-McGee in 1999 that it was a potentially responsible party for the clean-up of a former wood treatment site at Manville, New Jersey.  Given the scope of the potential liabilities at Manville and other similar wood treatment sites (as well as its numerous other legacy environmental sites), Old Kerr-McGee concluded that any transaction that required it to provide sufficient value to another entity to cover the costs of the Legacy Liabilities was now off the table.  The Legacy Liabilities were simply too big.

39.      Specifically, on April 30, 1999, the EPA published a proposed plan describing remedial alternatives for the Federal Creosote Superfund Site at Manville, New Jersey.

40.      Two months later, on July 6, 1999, the EPA sent a letter to Old Kerr-McGee stating that the "EPA has documented the release and threatened release of hazardous substances into the environment" at Manville, that the site "is currently the location of a residential community of single-family homes, and is bordered by various commercial and residential areas," and that "hazardous substances have been detected at the Site in homes, soils and groundwater."  The letter also stated that the EPA has "reason to believe that, for purposes of Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Kerr-McGee is a potentially responsible party ("PRP") with respect to the Site."

41.      On October 18, 1999, the EPA sent another letter to Old Kerr-McGee stating that it had selected a remedy for Manville that included permanent relocation of residents, excavation of source material, and off-site thermal treatment and disposal.  The EPA estimated the cost of

16

the remedy at $59,100,000. The EPA also warned that because the site "consists of residential housing and is directly affecting this community, it is particularly important that this remedial action be conducted on an expedited basis." The EPA requested that Old Kerr-McGee determine whether it would voluntarily finance or perform the proposed remediation.

42.    The April 1999 public notice and the July and October 1999 EPA letters caused significant concern within Old Kerr-McGee, including among its Board of Directors. Old Kerr-McGee launched an investigation into the Manville site, including title searches to analyze any connection between an alleged predecessor company and the site, the identity of other potentially responsible parties, and the nature and extent of Old Kerr-McGee's potential exposure. Old Kerr-McGee also met with the EPA to try to obtain information on any other potentially responsible parties, the scope of the remediation project, and whether a final remedy had been selected for the site. Old Kerr-McGee management frequently updated the company's Board of Directors regarding this investigation.

43.    Old Kerr-McGee had reason to be concerned. The potential liability at Manville was significant in its own right. According to a cost recovery lawsuit that the EPA and the State of New Jersey filed in 2008 against Tronox as Old Kerr-McGee's alleged successor in interest, these governmental entities have spent approximately $280 million in clean-up costs at Manville. The bigger problem for Old Kerr-McGee was that Manville was simply the tip of the iceberg. Old Kerr-McGee knew that it was associated with numerous other previously undisclosed wood treatment and agricultural chemical sites that, like Manville, posed the specter of substantial environmental and tort liabilities.

III.    **Old Kerr-McGee Devises A Two-Step Scheme To Avoid Responsibility For Legacy Liabilities.**

44.    For Old Kerr-McGee's Board and management, Manville was a pointed reminder that they would not be able to tap into the lucrative oil and gas merger market while saddled with the Legacy Liabilities. Accordingly, Old Kerr-McGee developed a scheme to jettison the Legacy Liabilities and shield its valuable oil and gas assets from the EPA, tort claimants, and other creditors.

45.    The scheme involved two steps. *First*, Old Kerr-McGee would isolate its Legacy Liabilities in a subsidiary that included the Chemical Business while the valuable oil and gas assets were segregated in a separate "clean" subsidiary. *Second*, Old Kerr-McGee would achieve a "clean break" from the Legacy Liabilities by severing the Chemical Business either through an arm's-length transaction or a spin-off.

46.    On information and belief, Old Kerr-McGee, however, concluded that the Chemical Business was too small to take on all of the Legacy Liabilities. Undeterred, Old Kerr-McGee set out to increase the apparent size of the Chemical Business—at almost any cost.

47.    On January 11, 2000, the Old Kerr-McGee Board of Directors approved the acquisition of certain titanium dioxide operations of Kemira Pigments Oy ("Kemira"). These included plants in Savannah, Georgia and Botlek, Netherlands. The Savannah acquisition closed effective April 1, 2000, and the Botlek acquisition closed effective May 1, 2000. The total acquisition price was approximately $400 million.

48.    On information and belief, in its haste to expand the Chemical Business so it could sever the Legacy Liabilities, Old Kerr-McGee significantly overpaid for the Kemira facilities in Savannah and Botlek. Old Kerr-McGee failed to do any meaningful due diligence that would have revealed the significant operational and environmental issues that have plagued

18

the Savannah plant since its purchase. It simply did not care. In fact, when Old Kerr-McGee's legal and environmental advisors raised concerns regarding environmental issues at the Savannah Plant, they were told by Old Kerr-McGee to stop attempting to "sabotage" the deal.

49.     In truth, Kemira was willing to give away the Savannah plant if a buyer would pay $250 million for Botlek. The $400 million purchase price was literally off the chart that Kemira had prepared for payment of incentive bonuses to key employees involved in the sale.

50.     On information and belief, the true value of Kemira did not matter to Old Kerr-McGee. By carrying the asset at the artificially inflated purchase price, Old Kerr-McGee could foist that many more Legacy Liabilities on Tronox. Even after it became clear that Old Kerr-McGee had substantially overpaid, it failed to write down the book value of the Kemira assets. Tronox wrote down the Kemira assets by approximately $317 million based primarily on the inflated price that New Kerr-McGee paid for these assets.

51.     The troubled Kemira assets not only failed to provide much value to Tronox, but limited its ability to engage in potentially beneficial strategic or financial transactions following the Spin-Off.

## IV.    Step One: Isolate The Legacy Liabilities Through Project Focus.

52.     In 2001, Old Kerr-McGee launched "Project Focus" as Step One of its scheme to eliminate the Legacy Liabilities. Old Kerr-McGee's oil and gas assets and its Legacy Liabilities traditionally had been commingled throughout the company. Old Kerr-McGee claimed that "Project Focus" was designed to create a clear delineation between its oil and gas and chemical operations. The real focus, however, was on segregating the Legacy Liabilities from the oil and gas assets as the first step to avoiding responsibility altogether for these potentially massive historic liabilities.

53.    At the same time Old Kerr-McGee was launching Project Focus, it had already started to plan Step Two of the scheme. At a March 13, 2001 Board meeting, Old Kerr-McGee Chairman and CEO Luke Corbett announced that Old Kerr-McGee was reviewing alternatives for various non-core businesses in the company's portfolio. On May 8, 2001, Old Kerr-McGee management presented the Board with several options for separating Old Kerr-McGee's chemical subsidiary from its oil and gas operations, including (a) a leveraged buy-out of the chemical business (with Old Kerr-McGee retaining a minority equity stake), (b) a spin-off of either the chemical business or the exploration and production business, or (c) a Morris trust transaction through which a spin-off would be coupled with a merger of the chemical business and a third party. Discussions among Old Kerr-McGee and its advisors regarding the best way to achieve Step Two of the scheme continued throughout Project Focus.

54.    Before they could be severed, the Legacy Liabilities first needed to be isolated in the Chemical Business through Project Focus. On May 13, 2001, the Old Kerr-McGee Board of Directors approved the first move in a massive corporate shell game, creating a new "clean" holding company—New Kerr-McGee—and a new "clean" subsidiary—the Oil and Gas Business. Old Kerr-McGee became a wholly owned subsidiary of New Kerr-McGee.

55.    Project Focus continued in December 2002 with numerous internal transactions that effectively isolated the Legacy Liabilities in the Chemical Business. On December 31, 2002, Old Kerr-McGee's Board (which included New Kerr-McGee Chairman and CEO Luke Corbett) approved by unanimous written consent numerous transactions that lacked any independent economic substance or legitimate business purpose, but instead were simply a means to strip the oil and gas assets from Old Kerr-McGee and isolate in the Chemical Business the Legacy Liabilities that Old Kerr-McGee created during its more than 70-year history.

20

56.    As confirmed in Supplemental Bond Indentures dated December 31, 2002, New Kerr-McGee caused "substantially all" of the valuable oil and gas assets to be distributed to the Oil and Gas Business.  The Legacy Liabilities, including many that were directly related to the oil and gas assets that had been transferred, were left behind in the stripped-down Chemical Business.  For example, the Chemical Business was saddled with Legacy Liabilities related to petroleum terminals, offshore drilling and hundreds of service station sites with environmental clean-up issues even though they were clearly related to oil and gas activities.

57.    The assets transferred out of the Chemical Business and into the Oil and Gas Business or other New Kerr-McGee entities were worth billions of dollars at the time they were transferred.

58.    New Kerr-McGee continued to strip assets from the Chemical Business throughout 2003 and 2004 as Project Focus continued.  In late November 2004, New Kerr-McGee began drafting an Assignment and Assumption Agreement that would state definitively which assets had been stripped from and which potential liabilities had been left in the Chemical Business.  The agreement was designed to "finish off" Project Focus.  The Assignment and Assumption Agreement was not executed—and Project Focus did not conclude—until mid-2005 at the earliest.

59.    Despite all of the intercompany maneuvers, Project Focus did not alter the actual business operations of New Kerr-McGee or its employees.  In particular, although the Chemical Business was saddled with significant Legacy Liabilities, those liabilities continued to be managed and funded at the parent company level, and New Kerr-McGee remained the ultimate guarantor of those obligations.  New Kerr-McGee knew that its small chemical unit did not have

sufficient assets to manage the Legacy Liabilities, which had cost New Kerr-McGee between

$44 million and $157 million annually from 2000 through 2004 (net of reimbursement).

## V.    Step Two:  Sever The Legacy Liabilities.

### A.    New Kerr-McGee Delays Step Two Until Market Conditions Are Optimal And Chemical Executives With Knowledge Of Legacy Liabilities Are Replaced.

60.    Old Kerr-McGee began planning Step Two of the scheme no later than March 2001.

61.    On information and belief, implementation of Step Two was delayed to allow time for the Chemical Business' performance to improve before attempting a sale or spin-off. The Chemical Business had struggled from 1999 to 2004 as decreased demand contributed to sharply lower profitability and cash flow.  The price of pigment also declined significantly as a result of events such as September 11th, the 2001 recession, the outbreak of the SARS respiratory pandemic, and the war in Iraq.

62.    On information and belief, New Kerr-McGee also wanted those individuals representing the Chemical Business in discussions with analysts and potential investors to have little knowledge regarding the true magnitude and scope of the Legacy Liabilities.  Beginning in mid-2004, New Kerr-McGee replaced certain key senior executives of the Chemical Business with people who knew little or nothing about the Legacy Liabilities.  For example, Tom Adams was named President of the Chemical Business in September 2004.  As a former oil and gas executive, he had no experience with the Chemical Business, had no knowledge of the Legacy Liabilities, and had never heard of Project Focus.  Similarly, one week before presentations to potential purchasers began in spring 2005, New Kerr-McGee designated an individual whose

knowledge of the legacy environmental issues was limited to one particular project to make the environmental presentation to potential purchasers.

**B.    Prospective Purchasers Express Concern Regarding The Legacy Liabilities, Especially After the EPA Demands $179 Million For Manville.**

63.    Although it had been long planned, Step Two began in earnest in early 2005 when New Kerr-McGee concluded that the Chemical Business was reaching the top of the business cycle.

64.    On February 23, 2005, New Kerr-McGee announced that it had hired Lehman Brothers to consider alternatives for separating the Chemical Business and that the Board of Directors would formally consider the issue at its meeting on March 8.

65.    On March 8, 2005, the New Kerr-McGee Board of Directors authorized New Kerr-McGee to separate the Chemical Business through either a sale or spin-off. In a March 8 press release, New Kerr-McGee Chairman and CEO Luke Corbett stated: "For some time, the Board has been considering the separation of chemical, and current market conditions for this industry now make it an ideal time to unlock this value for our stockholders." Corbett similarly explained in a letter to employees that "[i]t's clear to us that, with the inorganic chemical and energy markets being as strong as they are today, the timing now is ideal to consider this separation."

66.    In transaction materials for the sale or spin-off, Lehman and New Kerr-McGee consistently painted an overly optimistic view of the Chemical Business and deliberately understated the magnitude of the Legacy Liabilities. Employees of the Chemical Business expressly warned Lehman not to oversell the potential of the Chemical Business because the industry was at the top of the business cycle and "[h]istory shows there will be a downside ... we just don't know when." The management presentations prepared by Lehman for prospective

purchasers include only a few slides regarding the Legacy Liabilities buried in an approximately 80-slide presentation. Only one line in the entire presentation even referred to the Manville site.

67. New Kerr-McGee could not bury Manville forever. On April 15, 2005, at the very moment Chemical Business executives were touting the business to potential purchasers, New Kerr-McGee received a demand from the EPA for $178,800,000 in clean-up costs that the EPA had incurred at Manville through 2004 plus interest.

68. Even before the EPA demand, potential purchasers were expressing concerns about the Legacy Liabilities and questioning why the Chemical Business had been saddled with all of them—even those created by oil and gas operations or otherwise not remotely related to the operations of the Chemical Business. One potential purchaser said the magnitude of the Legacy Liabilities being placed on Tronox was "criminal." The EPA demand fueled these concerns among potential purchasers.

69. In late April-early May 2005, numerous potential purchasers informed New Kerr-McGee or Lehman that they were not interested in acquiring the Chemical Business with the Legacy Liabilities. Several explicitly refused to assume the Legacy Liabilities. Another prospective purchaser conveyed a $1.2 billion bid if the Legacy Liabilities were not included, but only a $300 million bid if they were included. This prospective purchaser viewed the inclusion of the Legacy Liabilities as a $900 million swing, and refused to go further in any discussions.

70. New Kerr-McGee knew the Legacy Liabilities all but eliminated any possibility of an arm's-length sale of the Chemical Business to a third party on terms that would allow New Kerr-McGee's senior executives to obtain massive windfall profits in a subsequent transaction.

C.    **New Kerr-McGee Backdates An "Assignment, Assumption And Indemnity Agreement" In Response To The EPA Manville Demand.**

71.    In early April 2005, in-house counsel for New Kerr-McGee circulated a draft of the Assignment and Assumption Agreement that was designed to "finish off" Project Focus. The April 10 draft of the Assignment and Assumption Agreement did not include an indemnity provision.

72.    When it received the $179 million EPA demand for Manville on April 15, 2005, New Kerr-McGee realized that it had not completely isolated its Legacy Liabilities in the Chemical Business. Even following a sale or spin-off, the Chemical Business potentially could seek contribution from New Kerr-McGee for the Legacy Liabilities. To eliminate that risk, New Kerr-McGee needed an indemnity retroactive to December 31, 2002 (when certain of the Project Focus transactions were purportedly consummated) to ensure that the $179 million Manville demand would be included within its scope.

73.    On information and belief, New Kerr-McGee decided only after it received the $179 million EPA demand to include an indemnity in the Assignment and Assumption Agreement.

74.    A draft of the Assignment and Assumption Agreement dated three days after New Kerr-McGee received the EPA demand included—for the first time—an indemnification provision that required the Chemical Business to indemnify New Kerr-McGee for any losses relating to or arising out of the Legacy Liabilities. The Chemical Business did not receive any consideration for providing the indemnity. The name of the agreement was subsequently changed to the "Assignment, Assumption and Indemnity Agreement."

75.    On information and belief, New Kerr-McGee caused the Assignment, Assumption and Indemnity Agreement to be executed between the Chemical Business and Oil and Gas

Business in May 2005.  Although executed in May 2005, the agreement was backdated so that it was purportedly effective as of December 31, 2002.

76.    When executed, the Assignment, Assumption and Indemnity Agreement had little economic significance because the Chemical Business, Oil and Gas Business, and other Kerr-McGee entities that received indemnification were all wholly owned subsidiaries of New Kerr-McGee.  The indemnity would have a profound impact, however, if Step Two were completed and the Chemical Business was no longer a subsidiary of New Kerr-McGee.

77.    Even after the execution of the backdated Assignment, Assumption and Indemnity Agreement, on information and belief, New Kerr-McGee wanted to confirm that it had stripped the Chemical Business of all potentially valuable assets.

78.    Accordingly, New Kerr-McGee caused an Assignment Agreement to be executed between the Chemical Business and the Oil and Gas Business.  Under the Assignment Agreement, the Chemical Business irrevocably transferred, conveyed, assigned and delivered to the Oil and Gas Business "all properties, real, personal, corporeal or incorporeal, absolute or contingent, and any and all rights, benefits and privileges, whether known or unknown, express or implied, absolute or contingent and whether due or to become due, arising out of" New Kerr-McGee's oil and gas exploration, production and development business.  The Chemical Business did not receive any consideration under the Assignment Agreement.

79.    On information and belief, although the Assignment Agreement was executed in summer 2005, it also was backdated so that it purported to be effective as of December 31, 2002.

80.    New Kerr-McGee continued to cause certain assets to be conveyed to the Oil and Gas Business pursuant to the backdated Assignment Agreement throughout the remainder of 2005, including after the IPO in November 2005.

26

**D.    New Kerr-McGee Offers A $400 Million Indemnity To Apollo To Take The Environmental Liabilities.**

81.    While the Legacy Liabilities scared away numerous potential purchasers, New Kerr-McGee had detailed negotiations with Apollo Investment Corporation ("Apollo") regarding the purchase of the Chemical Business throughout summer 2005. As those discussions matured, however, they further confirmed that New Kerr-McGee would be required to provide unacceptable concessions and indemnities for an informed third party to assume the Legacy Liabilities.

82.    Apollo's initial bid of $1.6 billion for the Chemical Business excluded all liabilities related to wood treatment facilities, including Manville. New Kerr-McGee, however, needed a "cleaner" separation from the Legacy Liabilities than Apollo's initial bid would provide. By mid-August 2005, New Kerr-McGee had offered Apollo an approximately $400 million indemnity to take all of the Legacy Liabilities, including the wood treatment facilities.

83.    Ultimately, New Kerr-McGee decided against the sale to Apollo with its costly indemnity obligation. Instead, New Kerr-McGee pursued a new tact that would allow it to have its cake and eat it too: a spin-off. A spin-off would enable New Kerr-McGee to avoid its Legacy Liability obligations without the overhang of an expensive indemnity obligation.

**E.    New Kerr-McGee Chooses A Spin-Off And Unilaterally Dictates The Terms Of Its Clean Separation From Legacy Liabilities.**

84.    While negotiating with Apollo, New Kerr-McGee was analyzing a potential spin-off of the Chemical Business as a means to complete Step Two of its scheme.

85.    On July 8, 2005, Lehman made a presentation to New Kerr-McGee comparing the Apollo bid to a potential spin-off. Based on Lehman's analysis, the Apollo bid would provide more than $500 million in additional after-tax cash proceeds to New Kerr-McGee than a spin-

off. But the Apollo deal did not allow New Kerr-McGee to offload the Legacy Liabilities, including what Lehman termed "Unidentified Liabilities" that no knowledgeable, arm's-length purchaser would accept without, at a minimum, hundreds of millions of dollars in indemnities.

86.    By late summer 2005, another obstacle to an arm's-length sale emerged: the Chemical Business' performance had peaked and was beginning to decline. On August 1, 2005, Apollo notified New Kerr-McGee that there had been a "significant shortfall" in the performance of the Chemical Business. Apollo concluded that EBITDA in the second half of 2005 would decrease by $19 million versus budget and approximately $60 million in 2006. Apollo warned that "[c]learly a 'miss' of this magnitude puts pressure on the overall transaction, including our approach to the financing markets (which was already complex given the nature of the environmental liabilities we anticipated having to get the markets comfortable with)."

87.    The decline in performance not only meant that New Kerr-McGee had limited time to complete the separation at or near the top of the business cycle, but any third party purchaser of the Chemical Business would require additional concessions to close the transaction.

88.    Shortly thereafter, New Kerr-McGee determined that a spin-off of the Chemical Business was the cheapest—and perhaps only—way for it to achieve a clean separation from the Legacy Liabilities. A spin-off would allow New Kerr-McGee to:

- Dump the Chemical Business and the Legacy Liabilities before the Chemical Business' performance further declined;

- Avoid disclosure of the magnitude of Legacy Liabilities that would result from third-party due diligence;

- Avoid making significant representations and warranties regarding the Chemical Business' assets, liabilities, business, and operations—in particular, the Legacy Liabilities;

- Avoid expensive indemnities for the environmental and tort liabilities that Apollo or any other arm's-length buyer would demand; and

- Remove all remaining impediments to a subsequent transaction that would allow New Kerr-McGee senior executives to obtain massive windfall profits.

89.    On September 6, 2005, Lehman Brothers presented to New Kerr-McGee a proposal to arrange the debt portion of the chemical business spin-off that with, a few modifications, was accepted by New Kerr-McGee. The proposal contemplated $550 million of funded debt plus a $250 million revolver to be undrawn at closing. The proposal further contemplated that $200 million of the funded debt would take the form of bank financing to be secured by assets of the Chemical Business. The proposal contemplated that all of the net proceeds of the financing plus the proceeds of an equity offering would be used to pay a dividend to New Kerr-McGee.

90.    On September 12, 2005, New Kerr-McGee incorporated the entity it planned to use for the Spin-Off—Tronox—by filing an Amended and Restated Certificate of Incorporation with the Delaware Secretary of State.

91.    Also, in September 2005, New Kerr-McGee began preparing the Master Separation Agreement and ancillary agreements for the Spin-Off. Attempting to create an appearance of propriety, New Kerr-McGee retained an attorney in mid-September 2005 ostensibly to represent the interests of the Chemical Business in the separation from New Kerr-McGee. In truth, New Kerr-McGee did not accept any substantive comments from the attorney it hired purportedly to represent the Chemical Business. After he raised issues regarding the Spin-Off following a meeting with New Kerr-McGee executives, New Kerr-McGee refused to allow him to attend any additional meetings.

92.    On October 6, 2005, the New Kerr-McGee Board of Directors approved the separation of the Chemical Business through a two-part Spin-Off. First, New Kerr-McGee would sell a minority stake in the Chemical Business through an initial public offering of the Class A common stock of Tronox (the "IPO"). Following the IPO, New Kerr-McGee would maintain a controlling interest in Tronox through ownership of Tronox's Class B common stock, which New Kerr-McGee then would distribute to its stockholders in spring 2006 (the "Distribution") to complete the Spin-Off. The New Kerr-McGee Board also resolved that Tronox incur up to $600 million in debt and that the proceeds of the IPO and the debt issuance be used to fund a distribution to New Kerr-McGee.

93.    From its negotiations with potential purchasers, New Kerr-McGee knew that the Legacy Liabilities were at least a $400 million to $900 million problem. New Kerr-McGee also knew that the Chemical Business did not have sufficient assets as a stand-alone entity to support the ongoing maintenance of those Legacy Liabilities. Indeed, New Kerr-McGee and its financial advisor, Lehman Brothers, warned that one of the risks of a spin-off was that the "[s]eparation from legacy liabilities" would be "[c]omplicated under [a] bankruptcy scenario."

94.    Nevertheless, in a unilateral decision, New Kerr-McGee determined that it would provide Tronox with an indemnity for only up to $100 million for environmental Legacy Liabilities. Even then, the indemnification was purely illusory. New Kerr-McGee would indemnify Tronox only for 50 percent of certain environmental costs actually paid above the amount reserved for specified sites for a seven-year period following the Spin-Off. New Kerr-McGee knew that the Chemical Business would not have sufficient cash flow to spend the reserved amounts and thus qualify for indemnification. The indemnity was simply a mirage that was never intended to assist Tronox in covering the more than $100 million in Legacy Liability

payments Tronox has made since the Spin-Off, or the hundreds of millions of dollars in Legacy Liabilities that it continues to face.

95.     In another unilateral decision, New Kerr-McGee further determined that it would require Tronox to assume $550 million in debt with the Spin-Off—the proceeds of which would go exclusively to New Kerr-McGee—that would saddle Tronox with more than $30 million per year in interest expense. Potential lenders were fully informed that the proceeds of the debt financing would be transferred to New Kerr-McGee and would not remain with Tronox.

96.     In another unilateral decision, New Kerr-McGee determined that it would strip out all cash from the Chemical Business in excess of $40 million, leaving Tronox with less cash than the amount Tronox would be required to spend in the first year following the Spin-Off just to service the Legacy Liabilities and debt it was forced to assume through the Spin-Off.

97.     In another unilateral decision, New Kerr-McGee further determined that it would require Tronox to provide a broad indemnification for the Legacy Liabilities to New Kerr-McGee.

98.     In another unilateral decision, the terms imposed on Tronox provided New Kerr-McGee with so much control that it was tantamount to New Kerr-McGee running Tronox's environmental program. Indeed, even projects, plans, activities and negotiations that had been approved by New Kerr-McGee and commenced as of the date of the Spin-Off needed to be re-approved following the Spin-Off. Based on the terms of the Spin-Off, one Tronox senior manager believed that he could not change the method by which Tronox would take environmental reserves or the company risked losing the indemnity. These constraints were designed to prevent Tronox from ever being able to collect on the $100 million paper indemnity.

F.   **New Kerr-McGee Provides Misleading Information Regarding Tronox To Potential Investors In Connection With The Spin-Off.**

99.   In November 2005, the future Tronox management team made a series of road show presentations to potential investors in connection with the IPO. These presentations were prepared by New Kerr-McGee and its investment banker, Lehman Brothers.

100.   On several occasions while internally preparing for these presentations, a Lehman Brothers banker (who was responsible for marketing the IPO to the public) drew a picture of a potted flower on a white board. He said that the flower represented Tronox. He then drew a weed growing from the flower pot, which he said represented the Legacy Liabilities. The Lehman Brothers banker concluded that the weed would choke the flower.

101.   Apollo had reached the same conclusion. Following extensive due diligence, Apollo had warned New Kerr-McGee that Tronox should not go public because it could not survive as a stand-alone company. Apollo's due diligence teams had concluded that New Kerr-McGee was attempting to offload hundreds of millions of dollars of legacy environmental and tort claims through the sale process.

102.   New Kerr-McGee needed to make sure that other potential investors did not reach the same conclusion. Thus, even though New Kerr-McGee knew that the Chemical Business was cyclical and beginning to slip from the top of the business cycle, its projections ignored downside scenarios and failed to consider whether Tronox could survive the inevitable downturn in the business cycle while saddled with the massive Legacy Liabilities.

103.   Even under their unrealistic projections, New Kerr-McGee and its advisors knew that Tronox would be unable to service the Legacy Liabilities and debt. They proposed that Tronox could cover anticipated cash shortfalls by selling certain Tronox assets. In particular, New Kerr-McGee suggested that Tronox could raise more than $150 million in cash by selling

32

land in Nevada during the first three years following the Spin-Off. This suggestion, however, was unrealistic when made and these sales never materialized.

104.    New Kerr-McGee also materially understated the Legacy Liabilities that it dumped on Tronox through the Spin-Off. In particular, New Kerr-McGee's methodology for setting its environmental and tort reserves was deeply flawed, and inconsistent with generally accepted accounting principles and industry practice. New Kerr-McGee ignored known information in setting reserves and applied a threshold for taking a reserve that was materially higher than what was appropriate under GAAP. As a result, the environmental and tort reserves set forth in the Form S-1 Registration Statement ("Registration Statement") and elsewhere were materially understated.

105.    For example, New Kerr-McGee failed to disclose numerous additional wood treatment sites where a Kerr-McGee entity potentially may be responsible for substantial clean-up costs just like at Manville even though New Kerr-McGee was aware of these sites at the time of the Spin-Off. Old Kerr-McGee and New Kerr-McGee referred to these sites internally as the "secret sites." In 2002, Old Kerr-McGee undertook a "confidential" investigation of these sites by examining corporate records, published historical information about the wood treatment industry, and public property ownership records. Old Kerr-McGee employees also made secret visits to the sites and were told they should not disclose the purpose of their visit. Through this investigation, Old Kerr-McGee identified approximately ten additional wood treatment sites where it potentially could have liability akin to that asserted by the EPA at Manville. Based on these visits, New Kerr-McGee knew at the time of the Spin-Off that at least several of these sites were under investigation for potential remediation.

106.   New Kerr-McGee considered doing a similar investigation shortly before the Spin-Off regarding approximately 260 undisclosed agricultural chemical sites, five undisclosed former chemical manufacturing sites, two undisclosed former fertilizer manufacturing sites, and several other undisclosed sites. That investigation never occurred and these sites were never disclosed in connection with the Spin-Off. In fact, Tronox only recently discovered these sites in preparation for this litigation when it found an August 2005 New Kerr-McGee memorandum listing these sites.

107.   New Kerr-McGee went to great lengths to ensure that the true magnitude of the Legacy Liabilities was never properly disclosed. At one point, two senior members of the New Kerr-McGee environmental group raised concerns regarding the accuracy of its environmental reserves. Instead of being rewarded for their diligence, they were both disciplined.

108.   New Kerr-McGee and its advisors controlled the content of the Registration Statement. Counsel for New Kerr-McGee's underwriters for the IPO, Akin Gump Strauss Hauer & Feld LLP, raised concerns regarding the sufficiency of disclosures of risk factors in the Registration Statement. Akin Gump proposed certain changes to the disclosures and could not understand New Kerr-McGee's "reluctance to make them."

109.   New Kerr-McGee's disclosures in the Registration Statement regarding tort liabilities also were materially misleading. For example, New Kerr-McGee provided the following disclosure in the Registration Statement regarding lawsuits related to former wood treatment sites:

> Between 1999 and 2001, KM Chemical was named in 22 lawsuits
> in three states (Mississippi, Louisiana and Pennsylvania) in
> connection with former forest products operations located in those
> states (in Columbus, Mississippi; Bossier City, Louisiana; and
> Avoca, Pennsylvania). The lawsuits sought recovery under a
> variety of common law and statutory legal theories for personal

> injuries and property damages allegedly caused by exposure to
> and/or release of creosote and other substances used in the wood-
> treatment process. KM Chemical has executed settlement
> agreements that are expected to resolve substantially all of the
> Louisiana, Pennsylvania and Mississippi lawsuits described above.
> Resolution of the remaining cases is not expected to have a
> material adverse effect on the company.

110.    New Kerr-McGee failed to disclose that it had settled these wood treatment

claims for approximately $70 million in the years immediately preceding the Spin-Off. This

omission was particularly significant in light of the nearly 11,000 additional claims related to

wood treatment sites that had been filed at the time of the Spin-Off. Instead of disclosing that

these claims were similar to the ones resolved for $70 million several years before the Spin-Off,

New Kerr-McGee disclosed: "The company has not provided a reserve for these lawsuits

because at this time it cannot reasonably determine the probability of a loss, and the amount of

loss, if any, cannot be reasonably estimated. The company believes that the ultimate resolution

of the forest products litigation will not have a material adverse effect on the company's

financial condition or results of operations."

111.    Based on this same information, Apollo's due diligence team from the law firm of

Morgan Lewis & Bockius concluded that New Kerr-McGee "may be significantly under-

reserved for these cases and the "total potential exposure could be well over $500 million."

112.    New Kerr-McGee's auditors, Ernst & Young ("E&Y"), also questioned the

sufficiency of the tort disclosures in the Registration Statement. Shortly after the IPO, Tronox

(still controlled by New Kerr-McGee) settled certain wood treatment tort claims in mid-

December 2005. During a meeting in the first week of January 2006, E&Y challenged a New

Kerr-McGee executive regarding the accuracy of the Registration Statement in light of these tort

settlements.

113. On information and belief, New Kerr-McGee could not have subscribed the IPO if it had disclosed the true nature and extent of the Legacy Liabilities. So New Kerr-McGee simply did not disclose them.

**G.   New Kerr-McGee Completes Step Two Of Its Scheme By Spinning Off Tronox In March 2006.**

114. To effectuate the Spin-Off, New Kerr-McGee required Tronox to enter into a number of agreements with New Kerr-McGee including: (a) a Master Separation Agreement; (b) a Registration Rights Agreement; (c) a Transitional License Agreement; (d) a Tax Sharing Agreement; (e) an Employee Benefits Agreement; and (f) a Transition Services Agreement (collectively, the "Separation Agreements"). The Separation Agreements bound Tronox and various of its subsidiaries to commercially unreasonable separation obligations (the "Separation Obligations") that were made without arm's-length negotiation and without payment to Tronox of reasonably equivalent value.

115. Pursuant to the Master Separation Agreement (the "MSA"), on November 28, 2005, New Kerr-McGee caused 100 percent of its ownership interests in Kerr-McGee Chemical Worldwide LLC (which became known as Tronox Worldwide LLC) to be transferred, assigned and conveyed to Tronox Incorporated, eliminated certain intercompany debt, and provided an indemnity of up to $100 million for certain environmental Legacy Liabilities. In return, New Kerr-McGee received 22,889,431 shares of class B common stock in Tronox Incorporated and approximately $787.8 million consisting of (a) $224.7 million in net proceeds from the IPO of Tronox's class A common stock; (b) $537.1 million in net proceeds from the Secured Debt Facility and $350 million in unsecured debt that Tronox was required to incur in connection with the Spin-Off; and (c) approximately $26 million in cash (which represented all of Tronox's cash

in excess of $40 million). In addition, Tronox was required to indemnify New Kerr-McGee and other Kerr-McGee entities for the Legacy Liabilities.

116.    Under the Employee Benefits Agreement (the "EBA"), Tronox assumed liability for employee benefits for employees of discontinued chemical, refining, coal, nuclear, and offshore contract drilling businesses who never worked for Tronox or a titanium dioxide business. Tronox was also required to sponsor various employee benefit plans for these employees, including a defined benefit plan and retiree medical and life insurance plans, that were grossly above market.

117.    On November 28, 2005, Tronox completed the IPO of its Class A Common Stock. New Kerr-McGee, however, continued to exert control over Tronox through its majority ownership of Tronox and the New Kerr-McGee officers who served on Tronox's Board of Directors, including as Chairman of the Board. The Spin-Off was completed on March 31, 2006 when New Kerr-McGee distributed its shares of Class B Common Stock to New Kerr-McGee shareholders.

118.    On April 1, 2006, Tronox became an independent company. New Kerr-McGee's two-step scheme to isolate and sever the Legacy Liabilities was complete.

**H.    In The Spin-Off, Tronox Assumes Liabilities And Distributes Cash To New Kerr-McGee Far In Excess Of The Value Of The Assets It Received.**

119.    Tronox received less than reasonably equivalent value in the Spin-Off. The Legacy Liabilities that Tronox assumed and for which it indemnified the Kerr-McGee entities, the proceeds from the IPO and debt that Tronox distributed to New Kerr-McGee, and the cash that New Kerr-McGee stripped from Tronox far exceeded the value of the assets and the paper indemnity that Tronox received from New Kerr-McGee.

120.    In particular, New Kerr-McGee received approximately $785 million in proceeds from the IPO, the debt that New Kerr-McGee forced Tronox to incur, and the cash that it stripped from Tronox. In addition, Tronox assumed and indemnified the Kerr-McGee entities for Legacy Liabilities that New Kerr-McGee itself had valued at a minimum of $400 million during its negotiations with Apollo, and that another arm's-length potential purchaser concluded were at least $900 million.

121.    In return, Tronox received New Kerr-McGee's interests in its Chemical Business. New Kerr-McGee also agreed to convert any intercompany debt that Tronox owed to New Kerr-McGee (net of any debt that Kerr-McGee Corporation owed to Tronox) into equity in Tronox. Finally, New Kerr-McGee gave Tronox an illusory indemnity structured so Tronox would never be able to recover more than a fraction of its $100 million face amount. Indeed, while Tronox has spent more than $118 million to satisfy the residual Legacy Liability obligations since the Spin-Off, New Kerr-McGee has only contributed approximately $4 million under the indemnity that will expire in November 2012.

122.    In short, Tronox was spun-off as an insolvent and severely undercapitalized company near the top of its business cycle. Burdened with massive debt and huge undisclosed Legacy Liabilities, Tronox was destined to fail.

123.    Certain individuals inside New Kerr-McGee had reached the same conclusion. Shortly before the Spin-Off occurred, New Kerr-McGee switched a number of high level, highly compensated executives from the Tronox Pension Fund to the Kerr-McGee Pension Fund, fearing that a future Tronox bankruptcy would limit retiree benefits to these individuals. Other New Kerr-McGee employees who were assigned to Tronox in connection with the Spin-Off simply refused to go because of Tronox's bleak prospects.

**VI.    Without The Overhang Of Legacy Liabilities, New Kerr-McGee Sold For $18 Billion Three Months After The Spin-Off Was Completed.**

124.    Less than three months after New Kerr-McGee completed the Spin-Off, it succeeded in its goal of profiting from the lucrative market for oil and gas companies. On June 22, 2006, Anadarko offered to acquire New Kerr-McGee for $16.4 billion in cash and agreed to assume $1.6 billion of New Kerr-McGee's debt. The purchase price represented a 40 percent premium to New Kerr-McGee's stock price.

125.    The shareholders of New Kerr-McGee voted to approve the offer on August 10, 2006, and New Kerr-McGee Corporation became a wholly owned subsidiary of Anadarko.

126.    New Kerr-McGee senior executives, including its Chairman and Chief Executive Officer Luke Corbett (a primary architect of the Spin-Off), Chief Financial Officer Robert M. Wohleber (who also served as Chairman of the Board of Tronox until the completion of the Spin-Off), and General Counsel Gregory F. Pilcher (another architect of the Spin-Off) personally pocketed over $225 million between them from the Spin-Off. Other New Kerr-McGee executives enjoyed similar windfalls.

**VII.   Tronox Was Forced to File For Chapter 11 When It Was Unable To Shoulder The Legacy Liabilities And Other Burdens Imposed At The Spin-Off.**

127.    Tronox was quickly overwhelmed by the Legacy Liabilities and the $550 million in debt that it was forced to assume through the Spin-Off, leaving Tronox twice as leveraged as its peers. The Legacy Liabilities and debt have negatively impacted the cost and terms on which Tronox has been able to raise capital. They also have prevented Tronox from taking advantage of favorable market conditions by participating in mergers or acquisitions in the chemical sector. By transferring the poison pill of Legacy Liabilities to Tronox, New Kerr-McGee freed itself to be sold for $18 billion while rendering Tronox effectively unsaleable. The overhang of these

Legacy Liabilities made it impossible for Tronox to survive the inevitable downturn in the chemical sector and left it no choice but to file for chapter 11.

128.    In fact, since it became an independent company on April 1, 2006, Tronox has only had one profitable quarter—and that quarter was profitable only as a result of proceeds received from a litigation settlement.

129.    As Lehman warned New Kerr-McGee nearly four years ago, "Separation from legacy liabilities" would be "[c]omplicated under [a] bankruptcy scenario." The inevitable day of reckoning is here.

## CLAIMS FOR RELIEF

### COUNT I
### Actual Fraudulent Incurrence of the Obligations and Related Transfers

130.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 129 as though set forth fully herein.

131.    Through its two-step fraudulent scheme, and as detailed above, New Kerr-McGee caused the Tronox Entities to incur the Obligations and grant the Security Interests to the Pre-Petition Lenders pursuant to the Secured Debt Facility by which the Tronox Entities incurred $200 million in secured debt that was up-streamed by the Debtors to New Kerr McGee.

132.    At the time the Obligations were incurred and the Security Interests were granted, New Kerr-McGee was the parent of the Tronox Entities. As a result, New Kerr-McGee was in a position to, and in fact did, control and dominate the Tronox Entities.

133.    The Tronox Entities incurred the Obligations and granted the Security Interests with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Tronox Entities.

40

134.    On information and belief, the Tronox Entities made the following transfers (the

"Transfers") to Lehman Commercial Paper, Inc. and/or to Credit Suisse, in their capacity as

administrative agents (the "Administrative Agents") for the benefit of the Pre-Petition Lenders

on account of the Obligations:

| DATE | AMOUNT | PURPOSE |
|---|---|---|
| 12/31/05 | $297,260.27 | interest from 11/28/05 to 12/04/05 |
| 3/6/06 | $3,264,309.04 | interest from 12/5/05 to 3/6/06 |
| 3/31/06 | $544,518.26 | $500,000  principal payment and interest on $10MM from 3/6/06 to 3/31/06 |
| 6/6/06 | $3,193,102.78 | interest on $190MM from 3/6/06 to 6/6/06 |
| 6/30/06 | $661,598.58 | $500,000 principal payment and interest on $9.5MM from 3/30/06 to 6/30/06 |
| 9/6/06 | $3,248,047.22 | interest on $190MM |
| 9/29/06 | $664,909.06 | $500,000 principal payment plus interest on $9MM from 6/30/06 to 9/29/06 |
| 12/5/06 | $3,101,474.58 | interest on $190MM from 9/6/06 to12/5/06 |
| 12/29/06 | $8,647,542.55 | $8.5MM principal payment plus interest on $8.5MM from 9/29/06 to 12/29/06 |
| 3/5/07 | $3,248,266.25 | interest on $190MM from 12/5/06 to 3/5/07 |
| 3/30/07 | $527,159.09 | principal payment of $479,797.98 plus interest on $10MM from 2/5/07 to 3/30/07 |
| 4/7/07 | $11,217,455.66 | $11.1MM principal payment plus interest on $20MM from 3/5/07 to 4/5/07 |
| 6/5/07 | $2,896,309.33 | interest on $168.9MM from 3/5/07 to 6/5/07 |
| 6/29/07 | $615,087.18 | $451,696.71 principal payment plus interest on $9,250,202.02 from 3/30/07 to 6/29/07 |
| 8/6/07 | $1,919,267.00 | interest on $168.9MM from 6/5/07 to 8/6/07 |
| 9/6/07 | $957,006.17 | interest on $168.9MM from 8/6/07 to 9/6/07 |
| 9/28/07 | $30,929,742.38 | $30.3MM principal payment plus interest on $143.9MM from 9/6/07 to 9/28/07 |
| 9/28/07 | $603,848.60 | $451,696.71 principal payment plus interest on $9,068,506.31 from 6/29/07 to 9/28/07 |
| 10/26/07 | $20,456,794.53 | $20MM principal payment plus interest on $88.6MM from 9/28/07 to 10/26/07 |

| DATE | AMOUNT | PURPOSE |
|---|---|---|
| 11/30/07 | $424,176.67 | interest on $68.6MM from 10/26/07 to 11/30/07 |
| 12/6/07 | $452,798.49 | interest on $25MM from 9/6/07 to 12/6/07 |
| 12/28/07 | $423,284.60 | interest on $25MM from 9/28/07 to 12/28/07 |
| 12/28/07 | $337,740.67 | interest on $68.6MM from 11/30/07 to 12/28/07 |
| 12/31/07 | $474,411.10 | principal payment of $323,706.89 plus interest on $8,616,808.60 from 9/28/07 to 12/31/07 |
| 1/4/08 | $87,903.28 | interest on $68.8MM from 12/28/07 to 1/4/08 |
| 1/11/08 | $35,000.00 | interest on $30MM from 1/4/08 to 1/11/08 |
| 1/18/08 | $34,125.00 | interest on $30MM from 1/11/08 to 1/18/08 |
| 2/1/08 | $67,200.00 | interest on $30MM from 1/18/08 to 2/1/08 |
| 2/8/08 | $2,027,883.33 | principal payment of $2MM plus interest on $30MM from 2/1/08 to 2/8/08 |
| 3/4/08 | $435,215.00 | interest on $38.6MM from 1/4/08 to 3/4/08 |
| 3/6/08 | $448,368.06 | interest on $25MM from 12/6/07 to 3/6/08 |
| 3/7/08 | $135,022.22 | interest on $28MM from 2/8/08 to 3/7/08 |
| 3/28/08 | $452,326.39 | interest on $25MM from 12/28/07 to 3/28/08 |
| 3/31/08 | $646,443.78 | $318,604.85 principal payment plus interest on $8,293,101.71 from 12/31/07 to 3/31/08 and interest on $38.6MM from 3/4/08 to 3/31/08 |
| 4/7/08 | $146,595.56 | interest on $28MM from 3/7/08 to 4/7/08 |
| 5/8/08 | $138,638.89 | interest on $28MM from 4/7/08 to 5/8/08 |
| 6/6/08 | $384,666.67 | interest on $25MM from 3/6/08 to 6/908 |
| 6/9/08 | $143,313.33 | interest on $28MM from 5/8/08 to 6/9/08 |
| 6/27/08 | $366,930.56 | interest on $25MM from 3/28/08 to 6/27/08 |
| 6/30/08 | $369,236.11 | interest on $25MM from 3/31/08 to 6/30/08 |
| 6/30/08 | $97,183.33 | interest on $28MM from 6/9/08 to 6/30/08 |
| 6/30/08 | $637,248.18 | principal payment of $318,604.85 and interest on $21,574,496.86 from 3/31/08 to 6/30/08 |
| 6/30/08 | $3,200,000.00 | principal payment |
| 7/2/08 | $8,758,898.96 | principal payment |
| 7/7/08 | $439,567.16 | principal payment of $436,141.41 plus interest on that amount from 6/30/08 to 7/6/08 of $508.99 and interest on $8,758,898.95 from 6/30/08 to 7/1/08 |
| 7/31/08 | $190,130.30 | interest on $24.8MM and on $12,060,848.64 from 6/30/08 to 7/30/08 |
| 8/5/08 | $920,578.65 | $919,752.15 in principal and $826.50 in interest |

42

| DATE | AMOUNT | PURPOSE |
|---|---|---|
| 8/12/08 | $69,810.24 | principal payment of $69,660.00 and $150.24 interest |
| 8/29/08 | $62,238.52 | interest on $12,060,846.64 from 7/31/08 to 8/05/08, on $11,141,096.49 from 8/5/08 to 8/12/08 and on $11,071,436.49 from 8/12/08 to 8/29/08 |
| 9/5/08 | $4,401,716.52 | principal payment of $4,395,759.05 plus interest of $5,957.47 from 8/29/08 to 9/5/08 |
| 9/8/08 | $440,916.67 | interest on $25MM from 6/6/08 to 9/7/08 |
| 9/29/08 | $463,986.11 | interest on $25MM from 6/27/08 to 9/28/08 |
| 9/29/08 | $3,221,393.39 | principal payment of $3,202,174.11 plus interest of $19,219.28 |
| 9/29/08 | $455,916.67 | interest on $25MM from 6/30/08 to 9/29/08 |
| 9/30/08 | $286,324.13 | principal payment of $264,803.85 and interest on $3,473,503.35 from 8/29/08 to 9/28/08 |
| 10/31/08 | $462,657.78 | interest from 7/31/08 to 10/31/08 on $24,800,000 |
| 12/8/08 | $462,583.33 | interest from 8/8/08 to 12/8/08 on $25MM |

135.    In addition to the foregoing Transfers, the Tronox Entities made additional Transfers to the Pre-Petition Lenders on account of various fees and expenses.

136.    As a result of the Transfers, Obligations and Security Interests, the Tronox Entities and their creditors have been harmed.

137.    The Tronox Entities have multiple unsecured creditors as to whom the Transfers, Obligations and Security Interests are voidable under applicable law and who hold an unsecured claim allowable under 11 U.S.C. § 502, including federal government entities, tort claimants, tax creditors, bond holders, and trade creditors.

138.    Under 11 U.S.C. § 544(b), 11 U.S.C. § 550, Oklahoma's Uniform Fraudulent Transfer Act, including but not limited to OKLA. STAT. ANN. tit. 24, § 116 (2009), and/or other applicable law, the Tronox Entities are entitled to avoid the Transfers, Obligations and Security Interests to the Defendants and recover the Transfers for the benefit of the Tronox estates.

## COUNT II
### Constructive Fraudulent Transfers of the Obligations and Transfers

139.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 138 as though set forth fully herein.

140.    The Tronox Entities did not receive reasonably equivalent value from the Pre-Petition Lenders in exchange for the Transfers, Obligations and Security Interests.

141.    Each of the Transfers, Obligations and Security Interests was made to or for the benefit of the Pre-Petition Lenders.

142.    The Tronox Entities made the Transfers, incurred the Obligations, and granted the Security Interests when they were engaged or about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

143.    The Tronox Entities were insolvent at the time or became insolvent as a result of the Transfers, Obligations and Security Interests.

144.    At the time of the Transfers, Obligations and Security Interests, the Tronox Entities intended to incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.

145.    As a result of the Transfers, Obligations and Security Interests, the Tronox Entities and their creditors have been harmed.

146.    The Tronox Entities have multiple unsecured creditors as to whom the Transfers, Obligations and Security Interests are voidable under applicable law and who hold an unsecured claim allowable under 11 U.S.C. § 502, including federal government entities, tort claimants, tax creditors, bond holders, and trade creditors.

147.    Under 11 U.S.C. § 544(b) and § 550(a), Oklahoma's Uniform Fraudulent Transfer Act, including but not limited to OKLA. STAT. ANN. tit. 24, §§ 116 and 117 (2009), and/or other

applicable law, the Tronox entities are entitled to avoid the Transfers, Obligations and Security

Interests and to recover the property or value of the property transferred to the Defendants for the

benefit of the Tronox estates together with interest.

### COUNT III
### Constructive Fraudulent Transfer Regarding
### Payments Made for Pre-Petition Lenders'
### Benefit During the Two Years Preceding the Bankruptcy Filing

148.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1

through 147 as though set forth fully herein.

149.   The Tronox Entities did not receive reasonably equivalent value from the Pre-

Petition Lenders in exchange for payments they made or became obligated to make for the Pre-

Petition Lenders' benefit within two years of Tronox's bankruptcy filing, including all payments

of principal, interest and fees with respect to the Obligations.

150.   At the time the above-mentioned transfers were made, the Tronox Entities were

engaged or about to engage in a business or transaction for which their remaining assets were

unreasonably small in relation to the business or transaction.

151.   The Tronox Entities were insolvent at the time or became insolvent as a result of

the above-mentioned transfers.

152.   At the time the above-mentioned transfers were made, the Tronox Entities

intended to incur, or believed or reasonably should have believed they would incur, debts beyond

their ability to pay as they became due.

153.   As a result of the Transfers, Obligations and Security Interests, the Tronox

Entities and their creditors have been harmed.

154.   Under 11 U.S.C. § 548 and 11 U.S.C. § 550(a), the Tronox Entities are entitled to

avoid these transfers and to recover the property or value of the property transferred to the

Defendants, their affiliates, or third parties for the benefit of the Tronox estates together with interest.

### COUNT IV
### Avoidance of Unperfected Security Interests

155.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 154 as though set forth fully herein.

156.    In order to secure the Obligations, the parties to the Secured Debt Facility entered into the Guarantee and Collateral Agreement, dated as of November 28, 2005 (as subsequently amended, the "Guarantee and Collateral Agreement").

157.    The Guarantee and Collateral Agreement contemplates the right of the Administrative Agent to obtain control agreements on certain "Deposit Accounts" (as such term is defined in the Guarantee and Collateral Agreement).  On information and belief, such control agreement were never entered into.

158.    Lehman Commercial Paper Inc., the prior Administrative Agent, recorded fixture filings with respect to Tronox property located in Clark County, Nevada and Monroe County, Mississippi (the "Fixture Filings").  Subsequently, Credit Suisse has replaced Lehman Commercial Paper, Inc. as Administrative Agent.  However, the Fixture Filings have not been assigned to Credit Suisse.

159.    The Security Interests granted by Tronox to the Administrative Agent against the federally registered trademarks, patents and copyrights of Tronox listed below have not been recorded in the U.S. Patent and Trademark Office or the U.S. Copyright Office:

## Unrecorded Trademarks

| Mark | Serial No./ Filing Date | Reg. No./ Reg. Date | Int. Class | Owner | Status | Recorded Security Interests |
|------|------|------|------|------|------|------|
| TW and design | 72281329 Sept. 27, 1967 | 862535 Dec. 24, 1968 | 37 | Transworld Drilling Company | Registered | None |

## Unrecorded Patents

| Patent | Application Number/ Publication Date | Patent Number/ Issue Date | Status | Owner | Recorded Security Interests |
|------|------|------|------|------|------|
| Injector assembly, chemical reactor and chemical process | 11799875 Nov. 6, 2008 | | Pending | Tronox LLC | None |
| Making co-precipitated mixed oxide treated titanium dioxide pigments | 11799876 Nov. 6, 2008 | | Pending | Tronox LLC | None |
| Methods of controlling the particle of titanium dioxide produced by the chloride process | 12067091 Oct. 23, 2008 | | Pending | Tronox LLC | None |
| Fluid mixing apparatus and method | 11915010 Sept. 11, 2008 | | Pending | Tronox LLC | None |
| Surface treated pigment | 11598309 May 15, 2008 | | Pending | Tronox LLC | None |
| Process for manufacturing titanium dioxide pigment | 11983345 May 15, 2008 | | Pending | Tronox LLC | None |
| Process for making pigmentary titanium dioxide | 11522702 Mar. 20, 2008 | | Pending | Tronox LLC | None |

47

| Patent | Application Number/ Publication Date | Patent Number/ Issue Date | Status | Owner | Recorded Security Interests |
|---|---|---|---|---|---|
| Waste solids handling | 11412816 Nov. 15, 2007 | | Pending | Tronox LLC | None |
| Scour medium for titanium dioxide production | 11234996 Mar. 29, 2007 | | Pending | Tronox LLC | None |
| Nonpolar thermoplastic compositions including inorganic particulates | 11229292 Mar. 22, 2007 | | Pending | Tronox LLC | None |
| Process for manufacturing nonpolar thermoplastic materials containing inorganic particulates | 11229291 Mar. 22, 2007 | | Pending | Tronox LLC | None |

Unrecorded Copyrights

| Copyright | Reg. No./Reg. Date | Owner | Recorded Security Interests |
|---|---|---|---|
| GENIE2K/NUTRANL & 2 other titles | V3559D909 Dec. 11, 2007 | Tronox Worldwide, LLC | None |

160.     The foregoing Security Interests are subject to avoidance by a creditor that extended credit to Tronox and obtained a judicial lien therefor on the Petition Date.

161.     The Defendants are the initial transferees of the foregoing Security Interests, subsequent transferees of such Security Interests and/or the entities for whose benefit the Security Interests were transferred.

162.     Under 11 U.S.C. §544, 11 U.S.C. §548, 11 U.S.C. § 550(a) and 11 U.S.C. §551, the Tronox Entities are entitled to avoid these transfers and to recover and preserve the property

48

or value of the property transferred to the Defendants, their affiliates, or third parties for the benefit of the Tronox estates.

## COUNT V
## Avoidance of Preferences

163.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 162 as though set forth fully herein.

164.    On or within the 90 days before the Petition Date, the Tronox Entities made Transfers as follows (the "Preferential Transfers"):

| DATE | AMOUNT | PURPOSE |
|------|--------|---------|
| 10/31/08 | $462,657.78 | interest from 7/31/08 to 10/31/08 on $24,800,000 |
| 12/8/08 | $462,583.33 | interest from 8/8/08 to 12/8/08 on $25MM |

165.    The Preferential Transfers were made to the administrative agents for the benefit of the Pre-Petition Lenders on account of the Obligations.

166.    The Tronox Entities were insolvent at a time that the Preferential Transfers were made and such Transfers enabled the Pre-Petition Lenders to receive more than the Pre-Petition Lenders would receive if each of these bankruptcy cases were a case under chapter 7 of the Bankruptcy Code, the Preferential Transfers had not been made and the Pre-Petition Lenders received payment of the debt in accordance with the provisions of the Bankruptcy Code.

167.    Under 11 U.S.C. §547, 11 U.S.C. § 550(a) and 11 U.S.C. §551, the Tronox Entities are entitled to avoid the Preferential Transfers and to recover and preserve the property or value of the property transferred to the Defendants, their affiliates, or third parties for the benefit of the Tronox estates.

## COUNT VI
### Equitable Subordination

168.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 167 as though set forth fully herein.

169.    Some or all of the Defendants likely will file proofs of claims in these chapter 11 cases.

170.    Each of the Pre-Petition Lenders either funded the Secured Debt Facility with the knowledge that the Loan Proceeds would be immediately transferred to New Kerr-McGee or is a successor in interest of such a Pre-Petition Lender.  On information and belief, certain of the Pre-Petition Lenders had knowledge of the fraudulent scheme described herein.

171.    The Pre-Petition Lenders acted inequitably to benefit themselves as creditors of the Tronox entities to the disadvantage of all other creditors.

172.    The inequitable conduct of the Pre-Petition Lenders resulted in injury to the other creditors of the Tronox Entities.

173.    Equitable subordination of the Defendants' claims and liens is consistent with the provisions of the Bankruptcy Code.

174.    By reason of the foregoing, any and all claims asserted by the Defendants should be equitably subordinated for purposes of distribution pursuant to 11 U.S.C. § 510(c), and the Defendants should not be permitted to receive any distributions on any claims asserted or to be asserted by the Defendants in these chapter 11 cases until payment in full with interest is made to all non-defendant creditors of Tronox.

## COUNT VII
### Disallowance of Claims
### <u>Pursuant to Section 502(d) of the Bankruptcy Code</u>

175.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 174 as though set forth fully herein.

176.    Defendants are transferees of transfers avoidable under section 544 and/or 548 of the Bankruptcy Code as described above.

177.    To the extent any of the Defendants assert any claim, those claims should be disallowed pursuant to section 502(d) of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE, the Committee prays for relief and judgment as follows:

Avoiding all Obligations incurred by the Tronox Entities to the Defendants, all Transfers made by the Tronox Entities to the Defendants and all Security Interests granted by the Tronox Entities to the Defendants;

Awarding Tronox reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

Equitably subordinating any and all claims asserted by the Defendants;

Disallowing any and all claims asserted by the Defendants; and

Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
November 6, 2009

Respectfully submitted,

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
By  /s/ David J. Mark
David M. Friedman
David J. Mark
Ross G. Shank
1633 Broadway
New York, New York 10019
Telephone:   (212) 506-1700
Facsimile:   (212) 506-1800
E-mail: dfriedman@kasowitz.com
E-mail: dmark@kasowitz.com
E-mail: rshank@kasowitz.com

*Attorneys for Official Committee of
Unsecured Creditors of Tronox
Incorporated, et al.*