**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, *et al*., | ) | Case No. 09-10156 (ALG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| TRONOX INCORPORATED, TRONOX | ) | |
| WORLDWIDE LLC f/k/a Kerr-McGee | ) | |
| Chemical Worldwide LLC, and TRONOX LLC | ) | |
| f/k/a Kerr-McGee Chemical LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 09-1198 |
| | ) | |
| ANADARKO PETROLEUM CORPORATION | ) | |
| and KERR-McGEE CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

<u>**MEMORANDUM OF OPINION**</u>

APPEARANCES:

KIRKLAND & ELLIS LLP
Counsel to Plaintiffs Tronox Incorporated,
Tronox Worldwide LLC, and Tronox LLC
300 North LaSalle Street
Chicago, Illinois 60654
      By:    David J. Zott, Esq.
              Matthew T. Regan, Esq.
              Jeffrey J. Zeiger, Esq.

601 Lexington Avenue
New York, New York 10022-4611
      By:    Richard M. Cieri, Esq.
              Jonathan S. Henes, Esq.

WEIL, GOTSHAL & MANGES LLP
Counsel to Defendants Anadarko Petroleum Corporation
and Kerr-McGee Corporation
700 Louisiana, Suite 1600
Houston, Texas 77002
        By:    Melanie Gray, Esq.
              Lydia Protopapas, Esq.
              Jason W. Billeck, Esq.

767 Fifth Avenue
New York, New York 10153
        By:    Richard A. Rothman, Esq.
              Bruce S. Meyer, Esq.
              Lori L. Pines, Esq.

BINGHAM McCUTCHEN LLP
Counsel to Defendants Anadarko Petroleum Corporation
and Kerr-McGee Corporation
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
        By:    James J. Dragna, Esq.

2020 K Street, NW
Washington, DC 20006
        By:    Duke K. McCall, III, Esq.

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

### INTRODUCTION

Before the Court is a motion filed by Anadarko Petroleum Corporation

("Anadarko") and its wholly owned subsidiary, Kerr-McGee Corporation ("Kerr-McGee"

or "New Kerr-McGee") (collectively, "Defendants"), to dismiss the Adversary Complaint

(the "Complaint") of debtors Tronox Incorporated, Tronox Worldwide LLC f/k/a Kerr-

McGee Chemical Worldwide LLC, and Tronox LLC f/k/a Kerr-McGee Chemical LLC

(collectively, "Tronox" or "Plaintiffs") filed in the above-captioned adversary

proceeding.[1]  At the core of the Complaint is the allegation that Defendants imposed on

Tronox and its chemical business 70 years of legacy liabilities, including enormous

environmental obligations, and as a consequence rendered it insolvent and severely

undercapitalized.  The purpose of the transactions, it is alleged, was to immunize from

these legacy obligations Kerr-McGee's most valuable asset, its oil and gas business,

which defendant Anadarko acquired for $18 billion.  Defendants move to dismiss the

Complaint pursuant to F. R. Civ. P. 8(a)(2), 9(b) and 12(b)(6).  For the reasons set forth

below, the motion to dismiss is granted in part and denied in part.

## FACTS ALLEGED IN THE COMPLAINT

The following facts are alleged in the Complaint and are presented in the light

most favorable to Plaintiffs.  They must be and are assumed to be true for purposes of this

motion to dismiss.

### I.        The Parties

On January 12, 2009, Tronox and 14 of its affiliated companies (the "Debtors")

filed for Chapter 11 protection in this Court.  Debtors are operating their businesses and

managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the

Bankruptcy Code (the "Code").  Plaintiff Tronox Incorporated, one of the debtors, is a

Delaware corporation with its principal place of business in Oklahoma City.  Plaintiff

Tronox Worldwide, LLC, another one of the debtors, is a wholly owned subsidiary of

Tronox Incorporated and successor in interest to Old Kerr-McGee (as defined below).

---

[1] A second proceeding based on similar allegations is pending, brought by the United States for the
recovery of response costs for environmental cleanups at numerous sites around the country pursuant to the
Comprehensive Environmental Response, Compensation, and Liability Act, as well as for other
environmental liabilities to federal agencies.  That action has been consolidated with the instant adversary
proceeding for pretrial purposes; a motion to dismiss by the defendants in that action (the same defendants
as here) was stayed pending the decision herein and further order of this Court.  A third action against
certain lenders to Tronox was settled and dismissed.

Plaintiff Tronox LLC, another debtor, is an indirect wholly owned subsidiary of Tronox Incorporated.

Defendant Anadarko is a Delaware corporation headquarted in The Woodlands, Texas. On June 22, 2006, approximately three months after New Kerr-McGee completed the transaction that is challenged in the Complaint, Anadarko offered to acquire the oil and gas properties, New Kerr-McGee, for $18 billion, including $16.4 billion in cash. On August 10, 2006, the shareholders of New Kerr-McGee approved the offer, and Defendant New Kerr-McGee became a wholly owned subsidiary of Anadarko. Tronox was allegedly left behind, insolvent, undercapitalized and saddled with legacy obligations that it could not support.

## II.    The Legacy Obligations

Kerr-McGee was founded in 1929 as Anderson & Kerr Drilling Company in Oklahoma. According to the Complaint, by the late 1990s, the entity then known as Kerr-McGee Corporation ("Old Kerr-McGee") had accumulated massive actual and contingent environmental, tort, retiree, and other obligations (the "Legacy Obligations") in connection with many of its lines of business, including the treatment of wood products, production of rocket fuel, refining and marketing of petroleum products, and the mining, milling and processing of nuclear materials. By 2000, Old Kerr-McGee had terminated many of these historic operations and was left with two core businesses: (i) a large and thriving oil and gas exploration and production operation and (ii) a much smaller chemical business.

According to the Complaint, consolidation in the oil and gas industry increased the value of exploration and production companies in the late 1990s, but prospective

4

merger and acquisition entities were discouraged from dealing with Old Kerr-McGee as a

result of its Legacy Obligations.  By 1998, Old Kerr-McGee executives began exploring

transactions through which they could attempt to ring-fence the Legacy Obligations and

immunize the oil and gas properties.  One option included assigning all of the Legacy

Obligations to a dormant subsidiary in exchange for a promissory note issued by Old

Kerr-McGee.  In 1999, however, Old Kerr-McGee received notice from the United States

Environmental Protection Agency (the "EPA") that it was designated a potentially

responsible party (a "PRP") for the cleanup of a contaminated former wood treatment site

at Manville, New Jersey.  One of the letters from the EPA outlined the remedy the EPA

had selected for the Manville site, including the permanent relocation of residents,

excavation of contaminated material, and off-site thermal treatment and disposal.  The

letter further requested that Old Kerr-McGee state whether it would finance or perform

the remediation, which was estimated to cost $59,100,000.[2]  According to the Complaint,

the EPA letters caused grave concern at the Old Kerr-McGee Board of Directors level,

especially as there were other previously undisclosed wood treatment and agricultural

chemical sites that, like Manville, had likely generated environmental and tort

obligations.

It is alleged in the Complaint that Old Kerr-McGee accordingly devised, over

time, a plan to rid itself of the Legacy Obligations and to protect its oil and gas assets.

The first step, named "Project Focus," was to segregate the Legacy Obligations from the

valuable oil and gas assets by isolating the former in a subsidiary that primarily consisted

of the chemical business (the "Chemical Business").  To segregate the oil and gas assets,

---

[2] The Complaint asserts that the $59 million estimate was far too low and that in an action filed by the EPA and the State of New Jersey in 2008 against Tronox, as Old Kerr-McGee's successor in interest, these agencies asserted that they had already spent $280 million in remedial costs at Manville.

Old Kerr-McGee created a new corporate structure that included a new "clean" parent

company, New Kerr-McGee, and a new "clean" subsidiary, Kerr-McGee Oil and Gas

Corporation (the "Oil and Gas Business"), into which all of the oil and gas assets were

eventually placed.  That left many of the Legacy Obligations partially segregated, but still

with New Kerr-McGee in control and ultimately responsible for them.  The second step

was to sever the Chemical Business, along with the Legacy Obligations, from New Kerr-

McGee through either a sale or a spin-off.

In connection with the first step, Old Kerr-McGee concluded that the Chemical

Business was too small to take on all of the Legacy Obligations with any credibility.  In

an alleged effort to bolster the size of the Chemical Business, Old Kerr-McGee acquired

the titanium dioxide operations of Kemira Pigments Oy ("Kemira"), including plants in

Savannah, Georgia and Botlek, Netherlands.  The Complaint alleges on information and

belief that Old Kerr-McGee significantly overpaid for the Kemira facilities and failed to

conduct any meaningful due diligence that would have revealed operational and

environmental issues that have afflicted the Savannah plant since its purchase.  By

carrying the Kemira assets at an inflated acquisition cost, Old Kerr-McGee allegedly

intended to cover the imposition of many more Legacy Obligations on Tronox.[3]

### III.    Implementing Project Focus

In 2001, having pumped up the Chemical Business, Old Kerr-McGee commenced

Project Focus, the purpose of which was to segregate the oil and gas assets from the

---

[3] According to the Complaint, Old Kerr-McGee also failed to write down the value of the Kemira assets
appropriately.  Tronox states that as an independent public entity it was obligated to write down the value
of the Kemira assets by approximately $317 million as a consequence of the inflated price that New Kerr-
McGee had paid.  According to the Complaint, aside from their failure to provide any value to Tronox, the
distressed Kemira assets impeded Tronox's ability to engage in potentially beneficial strategic and financial
transactions following the spin-off.

Legacy Obligations.  On May 8, 2001, Old Kerr-McGee management presented the

Board with several options for separating Old Kerr-McGee's Oil and Gas Business from

the Chemical Business, including (i) a leveraged buy-out of the Chemical Business, with

Old Kerr-McGee retaining a minority equity share, (ii) a spin-off of either the Chemical

Business or the exploration and production business, or (iii) a Morris trust transaction

through which a spin-off would be coupled with a merger of the Chemical Business and a

third party.

On May 13, 2001, the Old Kerr-McGee Board of Directors approved the first step

in a series of corporate transactions by which a new "clean" holding company, New Kerr-

McGee, and a new "clean" subsidiary, holding the assets of the the Oil and Gas Business,

were created.  Old Kerr-McGee became a wholly owned subsidiary of New Kerr-McGee.

On December 31, 2002, Old Kerr-McGee caused "substantially all" of the valuable oil

and gas assets, worth billions of dollars, to be transferred into the new subsidiary.

Included in these assets were shares of Devon Energy Corporation stock worth more than

$200 million, and other assets, including the stock of various other companies.  In 2003,

New Kerr-McGee continued to transfer assets out of Old Kerr-McGee as Project Focus

progressed.  Nevertheless, although the oil and gas assets were segregated, the Complaint

claims that the Defendants imposed on Plaintiffs the Legacy Obligations that were the

result of the oil and gas operations, such as liabilities relating to petroleum terminals,

offshore drilling, and hundreds of service station sites with environmental clean-up

issues.  The Legacy Obligations imposed on Old Kerr-McGee thus did not primarily

relate to the titanium dioxide and other chemical operations.  Moreover, Project Focus

did not yet alter the actual business operations of the enterprise.  The Legacy Obligations

continued to be managed and funded at the parent company level, and New Kerr-McGee remained ultimately responsible for those obligations, at a cost of between $44 million and $157 million annually from 2000 through 2004 (net of reimbursements).

## IV.    Preparing for the Spin-Off

Old Kerr-McGee allegedly began planning the next step of its plan to protect the Oil and Gas Business from the Legacy Obligations no later than March 2001.  The Chemical Business, however, struggled from 1999 to 2004 as decreased demand and declining pigment prices contributed to sharply lowered profitability and cash flow. Implementation of the next step was thus delayed to allow time for the performance of the Chemical Business to improve before attempting a sale or spin-off.

The next step allegedly began in mid-2004 when New Kerr-McGee replaced certain key senior executives at the Chemical Business, such as its president, with personnel who knew little or nothing about the Legacy Obligations and could represent the Chemical Business in discussions with analysts and potential investors with little background regarding the true magnitude and scope of the problem.  Then, on February 23, 2005, when the Chemical Business had recovered and was in fact reaching the top of the business cycle, New Kerr-McGee announced that it had hired Lehman Brothers to consider alternatives for separating its oil and gas and chemical businesses.  On March 8, 2005, the Board of Directors authorized New Kerr-McGee to "divest" the Chemical Business through either a sale or spin-off.  In a press release dated March 8, 2005, New Kerr-McGee Chairman and CEO Luke Corbett stated: "For some time, the Board has been considering the separation of chemical, and current market conditions for this

industry now make it an ideal time to unlock this value for our stockholders." (Compl. ¶ 57).

The Complaint alleges that during the spin-off process, New Kerr-McGee and Lehman consistently overstated the outlook for the Chemical Business and minimized the magnitude of the Legacy Obligations. Nevertheless, potential purchasers voiced concerns about the Legacy Obligations and questioned why they had all been transferred to the Chemical Business. Then, on April 15, 2005, while the Chemical Business executives were promoting the sale of the Chemical Business to potential purchasers, the EPA sent New Kerr-McGee a demand for $178,800,000 in clean-up costs incurred at Manville through 2004, plus interest. The letter increased concern among potential purchasers.[4]

The Complaint alleges that New Kerr-McGee nevertheless proceeded with its plan to isolate the Legacy Obligations in the Chemical Business. In early April 2005, in-house counsel for New Kerr-McGee circulated drafts of an Assignment and Assumption Agreement that was intended to "finish off" Project Focus.[5] An April 10, 2005 draft of the agreement did not include an indemnity, but then New Kerr-McGee received the EPA demand referred to above. The next draft, dated three days after the EPA demand, included, for the first time, an indemnification provision that required the Chemical Business to indemnify New Kerr-McGee for any losses relating to or arising out of the

---

[4] Between late April and early May 2005, a number of potential purchasers informed New Kerr-McGee or Lehman that they were not interested in purchasing the Chemical Business if it were responsible for the Legacy Obligations. One of the prospective purchasers conveyed a $1.2 billion bid if the Legacy Obligations were not included, but only a $300 million bid if the Legacy Obligations were included; i.e., the purchaser appeared to put a price tag of $900 million on the Legacy Obligations.

[5] The Complaint alleges that the Assignment and Assumption Agreement was first drafted, but not executed, in late November 2004. It was intended to "state definitively which assets had been stripped from and which potential liabilities had been left in the Chemical Business." (Compl. ¶ 50).

Legacy Obligations.  In addition, the name of the agreement was changed to

"Assignment, Assumption and Indemnity Agreement."

New Kerr-McGee caused the Assignment, Assumption and Indemnity Agreement

to be executed between the Chemical Business and the Oil and Gas Business in May

2005.  The Chemical Business received no consideration for the assets "assigned," the

liability obligations "assumed," or the indemnity.  To eliminate the risk that the Chemical

Business potentially could seek contribution from New Kerr-McGee for the Legacy

Obligations even following a sale or spin-off, New Kerr-McGee also backdated the

Assignment, Assumption and Indemnity Agreement so that it was purportedly made

effective as of December 31, 2002.

Subsequent to the execution of the backdated agreement, and in an alleged effort

to confirm that there had been an earlier transfer out of the oil and gas assets, New Kerr-

McGee caused an "Assignment Agreement" to be executed between the Chemical

Business and the subsidiary of New Kerr-McGee that controlled the Oil and Gas

Business.  Under the Assignment Agreement, the Chemical Business irrevocably

transferred, conveyed, assigned and delivered to the Oil and Gas Business "all properties,

real, personal, corporeal or incorporeal, absolute or contingent, and any and all rights,

benefits and privileges, whether known or unknown, express or implied, absolute or

contingent and whether due or to become due, arising out of" New Kerr-McGee's oil and

gas exploration, production and development business.  (Compl. ¶ 70).  The Chemical

Business did not receive any consideration therefor.  Although it was executed in the

summer of 2005, the Assignment Agreement was also backdated so that it had a

purported effective date of December 31, 2002.  New Kerr-McGee subsequently

10

continued to cause assets worth billions of dollars to be conveyed to the Oil and Gas

Business pursuant to the Assignment Agreement throughout the remainder of 2005.[6]

　　　　Although several prospective purchasers of the Chemical Business had already

lost interest in the Chemical Business because of the Legacy Obligations, New Kerr-

McGee continued negotiations throughout the summer of 2005 with one prospective

purchaser, Apollo Investment Corporation ("Apollo").  Apollo's initial bid was $1.6

billion for the Chemical Business, provided the sale excluded all liabilities related to

wood treatment facilities, including Manville.  As negotiations went forward, New Kerr-

McGee offered Apollo a $400 million indemnity if it assumed the Legacy Obligations.

However, it is alleged that New Kerr-McGee ultimately decided it needed a "cleaner"

separation from the Legacy Obligations, and that it would pursue a spin-off to achieve

that objective.  New Kerr-McGee embarked on a potential spin-off of the Chemical

Business even though Lehman had compared the Apollo bid to a potential spin-off in a

presentation it made to New Kerr-McGee on July 8, 2005, and had concluded that the

Apollo bid would provide more than $500 million in additional after-tax cash proceeds

than a spin-off.

　　　　The Complaint alleges that a spin-off was pursued even though it was known that

the Chemical Business had insufficient assets to satisfy the Legacy Obligations.  It was

also known by New Kerr-McGee and its financial advisor, Lehman Brothers, that one of

the risks of a spin-off was that the "[s]eparation from Legacy Liabilities" would be

"[c]omplicated under [a] bankruptcy scenario."  (Compl. ¶ 84).  Nevertheless, on

---

[6] The Assignment, Assumption and Indemnity Agreement and the Assignment Agreement are hereafter
called the "Assignment Agreements."  Defendants have put them in the record on this motion as Exhibits C
and D to the Affidavit of Lydia Protopapas, Esq. in Support of the Defendants' Motion to Dismiss the
Complaint.  (Dkt. No. 46).

September 12, 2005, New Kerr-McGee incorporated Tronox, the entity it would later designate as the holding company for the Chemical Business and the Legacy Obligations. Also in September 2005, New Kerr-McGee began preparing a "Master Separation Agreement" and ancillary agreements for the spin-off. Although New Kerr-McGee had hired an attorney in mid-September 2005 to represent the interests of the Chemical Business in the spin-off, New Kerr-McGee limited the attorney's participation, disregarded his substantive comments and excluded him from meetings after he raised concerns on his client's behalf.

On October 6, 2005, the New Kerr-McGee Board of Directors approved the separation of the Chemical Business through a spin-off. First, a minority stake in the Chemical Business would be sold through an initial offering of a Class A common stock of Tronox to the public (the "IPO"). Nevertheless, New Kerr-McGee would continue to maintain control through ownership of a Class B common stock, which New Kerr-McGee would not distribute to its stockholders until later. Further, New Kerr-McGee purported to provide Tronox with a limited indemnity, expiring in 2012, of up to $100 million, covering 50 percent of certain environmental costs actually paid above the amount reserved for specified sites for a seven-year period; however, the Complaint alleges that the indemnity was illusory, as New Kerr-McGee knew that the Chemical Business would not have sufficient cash flow to spend the reserved amounts and thus trigger the indemnification.[7] Finally, Plaintiffs have alleged New Kerr-McGee (i) required Tronox to assume $550 million in debt in connection with the spin-off, the

---

[7] Defendants agree in their motion to dismiss that there was no indemnity but a "'reimbursement' right." (Mot. 9, n.7). From the spin-off to the date of the Complaint, Tronox claims, it has spent more than $118 million to satisfy residual legacy obligations, but New Kerr-McGee has only contributed approximately $4 million under the "indemnity."

proceeds of which went exclusively to New Kerr-McGee, thus burdening Tronox with

$30 million per year in interest expense; (ii) retained all cash from the Chemical Business

in excess of $40 million, leaving Tronox with less cash than it would need just to service

the Legacy Obligations and the debt related to the spin-off in the first year following the

spin-off; and (iii) required Tronox to provide a broad indemnification for the Legacy

Obligations to New Kerr-McGee.[8]

### V.    New Kerr-McGee Misleads Potential Investors

The Complaint further alleges that New Kerr-McGee knowingly misled potential

investors in connection with the spin-off.  Despite Lehman's fear that the Legacy

Obligations would eventually choke Tronox and Apollo's warning that Tronox could not

survive as a stand-alone company, New Kerr-McGee's projections failed to disclose

Tronox's chances of surviving as an independent company saddled with the Legacy

Obligations.  New Kerr-McGee also materially understated the Legacy Obligations by

applying a threshold for taking reserves that was materially higher than permitted under

generally accepted accounting principles and industry practice.  As a result of its flawed

methodology for setting reserves, the environmental and tort reserves contained in the

Form S-1 Registration Statement (the "Registration Statement") and elsewhere were

materially understated.  New Kerr-McGee also failed to disclose many wood treatment

sites similar to Manville despite having knowledge of them at the time of the spin-off.[9]

These sites were referred to internally as the "secret sites."[10]

---

[8] The impact of this indemnification obligation on the alleged illusory indemnification that New Kerr-McGee gave to Tronox is not clear from the Complaint.

[9] The Complaint alleges that New Kerr-McGee's disclosures regarding these liabilities in the Registration Statement were materially misleading.  For instance, New Kerr-McGee's disclosure in the Registration Statement of lawsuits relating to former wood treatment sites reads as follows:

## VI.    New Kerr-McGee Completes the Spin-Off

As alleged in the Complaint, New Kerr-McGee remained in control of Tronox until completion of the spin-off by virtue of its majority ownership of Tronox and the New Kerr-McGee officers who served on and controlled Tronox's Board of Directors. The substance of the spin-off was documented in the following two principal agreements between Tronox and New Kerr-McGee:

1.    Pursuant to a Master Separation Agreement (the "MSA"), dated November 28, 2005, New Kerr-McGee caused 100 percent of its ownership interest in Kerr-McGee Chemical Worldwide LLC, which later changed its name to Tronox Worldwide LLC, to be conveyed to Tronox Incorporated, the newly formed corporate parent for the Chemical Business.  In addition, the MSA eliminated certain intercompany debt and provided

---

Between 1999 and 2001, KM Chemical was named in 22 lawsuits in three states (Mississippi, Louisiana and Pennsylvania) in connection with former forest products operations located in those states (in Columbus, Mississippi; Bossier City, Louisiana; and Avoca, Pennsylvania).  The lawsuits sought recovery under a variety of common law and statutory legal theories for personal injuries and property damages allegedly caused by exposure to and/or release of creosote and other substances used in the wood-treatment process.  KM Chemical has executed settlement agreements that are expected to resolve substantially all of the Louisiana, Pennsylvania and Mississippi lawsuits described above.  Resolution of the remaining cases is not expected to have a material adverse effect on the Company.

This disclosure omitted that the settlements aggregated approximately $70 million in the years preceding the spin-off, that nearly 11,000 additional claims related to wood treatment sites had been filed at the time of the spin-off, and that potential liability was significant.  Instead, New Kerr-McGee disclosed only the following: "'The company has not provided a reserve for these lawsuits because at this time it cannot reasonably determine the probability of a loss, and the amount of loss, if any, cannot be reasonably estimated.  The company believes that the ultimate resolution of the forest products litigation will not have a material adverse effect on the company's financial condition or results of operations.'"  (Compl. ¶ 101).

[10] In 2002, Old Kerr-McGee had allegedly conducted a "confidential" internal investigation of these sites and made secret visits, learning of approximately ten additional wood treatment sites.  New Kerr-McGee had knowledge at the time of the spin-off that at least several of these sites were under investigation by the EPA, and that these sites could generate liability similar to that previously asserted at Manville.  New Kerr-McGee considered conducting an investigation before the spin-off of additional sites, including approximately 260 undisclosed agricultural chemical sites, five undisclosed former chemical manufacturing sites, two undisclosed former fertilizer-manufacturing sites, and several other undisclosed sites, but no such investigation took place and no disclosure was made.  It is alleged that, at one point, two senior members of the New Kerr-McGee environmental group were disciplined for raising concerns regarding the accuracy of its environmental reserves.

Tronox with the illusory indemnity described above. In return, New Kerr-McGee received 22,889,431 shares of Class B common stock in Tronox Incorporated and approximately $787.8 million, consisting of (a) $224.7 million in net proceeds from the IPO of Tronox's Class A common stock; (b) $537.1 million in net proceeds from the $550 million in debt that Tronox was required to incur in connection with the spin-off; and (c) approximately $26 million in cash, which represented all of Tronox's cash in excess of $40 million (the "Cash Transfers"). In addition, Tronox was required to indemnify New Kerr-McGee and other Kerr-McGee entities for the Legacy Obligations.

2. Under an Employee Benefits Agreement, Tronox assumed liability for employee benefits for the employees of the chemical, refining, coal, nuclear, and offshore contract drilling businesses. According to the Complaint, Tronox was also required to sponsor employee benefit plans for these employees, including a defined benefit plan and retiree medical and life insurance plans that were above market.[11]

On the same day the foregoing agreements were executed, the IPO of the Tronox Class A common stock was completed, raising $224.7 million. New Kerr-McGee also received 22,889,431 shares of Class B common stock. The spin-off was not finally consummated until March 31, 2006, when New Kerr-McGee distributed its shares of Class B common stock to New Kerr-McGee shareholders.

The Complaint alleges that when Tronox was spun-off it was "insolvent and severely undercapitalized" even though it was "near the top of its business cycle." (Compl. ¶ 113). Burdened with debt and undisclosed Legacy Obligations, it is alleged that Tronox was destined to fail. It is also claimed that several individuals inside New

---

[11] There were also a Registration Rights Agreement, a Transitional License Agreement, a Tax Sharing Agreement, and a Transition Services Agreement.

15

Kerr-McGee had reached the same conclusion. Fearing that a future Tronox bankruptcy would affect the retiree benefits of a number of high level, highly compensated executives, New Kerr-McGee switched them from the Tronox Pension Fund to the Kerr-McGee Pension Fund shortly before the spin-off was completed. Other New Kerr-McGee employees who had been assigned to Tronox in connection with the spin-off allegedly refused the transfer because of Tronox's financial condition.

### VII.    New Kerr-McGee Acquired After the Spin-Off

On June 22, 2006, less than three months after the completion of the Tronox spin-off, Anadarko offered to acquire New Kerr-McGee for $16.4 billion in cash and the assumption of $1.6 billion of New Kerr-McGee's debt. The purchase price was a 40 percent premium above New Kerr-McGee's current stock price. New Kerr-McGee shareholders approved the offer on August 10, 2006, and New Kerr-McGee Corporation became a wholly owned subsidiary of Anadarko.

It is alleged that the Anadarko transaction resulted in handsome profits for the senior executives of New Kerr-McGee. Chairman and Chief Executive Officer Luke Corbett, one of the principal designers of the spin-off, Chief Financial Officer Robert M. Wohleber, who also served as Chairman of the Board of Tronox until the completion of the spin-off, and General Counsel Gregory F. Pilcher, another architect of the spin-off, purportedly made over $225 million in personal profits. As part of its acquisition of New Kerr-McGee, Anadarko also indemnified New Kerr-McGee's officers and directors for acts and omissions occurring before the acquisition date, including their activities in connection with the spin-off.

The Complaint asserts that Anadarko has acknowledged that it might have responsibility for the Legacy Obligations in the event of Tronox's failure. In its 2006 and 2007 Annual Reports, following the acquisition of New Kerr-McGee, Anadarko disclosed:

> Kerr-McGee could be subject to joint and several liability for certain costs of cleaning up hazardous substance contamination attributable to the facilities and operations conveyed to Tronox if Tronox becomes insolvent or otherwise unable to pay for certain remediation costs. As a result of the merger, we will be responsible to provide reimbursements to Tronox pursuant to the MSA, and we may be subject to potential joint and several liability, as the successor to Kerr-McGee, if Tronox is unable to perform certain remediation obligations.

(Compl. ¶ 119). Similar disclosures were allegedly made in Anadarko's 2008 Annual Report.

## VIII.    Tronox Files Under Chapter 11

The Complaint alleges that the full scale of the Legacy Obligations has become less contingent and more fixed each year since the spin-off. The Legacy Obligations and debt have also negatively impacted the terms on which Tronox has been able to raise capital and have prevented Tronox from participating in mergers or acquisitions in the chemical sector. Since it became an independent company on April 1, 2006, Tronox has had only one profitable quarter as the result of proceeds received from a litigation settlement. The impact of the Legacy Obligations on Tronox, combined with an inevitable, cyclical market downturn, left it no choice but to file for Chapter 11 protection.

## IX.    The Claims for Relief

The Complaint sets forth eleven claims for relief: (1) actual fraudulent transfers under the Oklahoma Uniform Fraudulent Transfer Act (the "Oklahoma UFTA"); (2)

constructive fraudulent transfers under the Oklahoma UFTA; (3) constructive fraudulent

transfers under §§ 548 and 550(a) of the Bankruptcy Code; (4) civil conspiracy; (5)

aiding and abetting a fraudulent conveyance; (6) breach of fiduciary duty as a promoter;

(7) unjust enrichment; (8) equitable subordination; (9) equitable disallowance of claims;

(10) disallowance of claims pursuant to § 502(d) of the Bankruptcy Code; and (11)

disallowance of contingent indemnity claims pursuant to § 502(e)(1)(B) of the Code.

Plaintiffs demand compensatory damages in an amount to be proven at trial, including

interest, plus punitive damages and costs and expenses, including attorneys and expert

fees.

<u>**DISCUSSION**</u>

I.      **Standard of Review**

     **A.  Generally**

     A motion to dismiss under Rule 12(b)(6), made applicable by Federal Rule of

Bankruptcy Procedure 7012(b), is "designed to test the legal sufficiency of the complaint,

and thus does not require the Court to examine the evidence at issue." *DeJesus v. Sears,

Roebuck Co.,* 87 F.3d 65, 69 (2d Cir. 1996), *cert. denied*, 519 U.S. 1007 (1996); *see also

Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d

Cir. 1984).  On a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a

court must accept as true all of the factual allegations set out in plaintiff's complaint,

draw inferences from those allegations in the light most favorable to plaintiff, and

construe the complaint liberally."  *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127

(2d Cir. 2009).  "It is elementary that, on a motion to dismiss, a complaint must be read

as a whole…."  *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir.

1985), citing *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957). Further, "defendants 'cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder.'" *In re Refco, Inc. Secs. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007), quoting *In re Philip Svcs. Corp. Secs. Litig.*, 383 F. Supp. 2d 463, 476 (S.D.N.Y. 2004).

Rule 8(a)(2) provides that a complaint need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." In accordance with the liberal pleading standards of Rule 8(a)(2), "a plaintiff must disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.'" *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000), quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). However, Rule 9(b) requires that in allegations of fraud, "the circumstances constituting the fraud must be stated with particularity." *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 58 F. Supp. 2d 228, 236 (S.D.N.Y. 1999), citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir. 1994). Rule 9(b), made applicable by Federal Rule of Bankruptcy Procedure 7009, applies to all claims based on purported fraud. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

### B. Twombly/Iqbal

Each of the claims for relief will be analyzed with respect to the foregoing pleading standards in the following portions of this opinion. In addition, Defendants' motion also asserts that the Complaint should be dismissed outright for failure to satisfy the pleading requirements imposed by two recent Supreme Court cases, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). In

19

*Twombly*, the Supreme Court held that while most claims for relief need not include detailed factual allegations, a plaintiff must incorporate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. To survive a Rule 12(b)(6) motion to dismiss, "Factual allegations must be enough to raise a right to relief above the speculative level…on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (emphasis omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563; *accord Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

*Iqbal* then requires a two-step approach in deciding whether a complaint contains sufficient plausible factual allegations to withstand a motion to dismiss for failure to state a claim. *See Iqbal*, 129 S. Ct. at 1949-50; *see also Weston v. Optima Commc'ns Sys., Inc.*, No. 09 Civ. 3732(DC), 2009 WL 3200653, at *2 (S.D.N.Y. Oct. 7, 2009); *S. Ill. Laborers' and Employers Health and Welfare Fund v. Pfizer, Inc.*, No. 08 CV 5175(KMW), 2009 WL 3151807, at *3 (S.D.N.Y. Sept. 30, 2009). First, the Court must accept as true factual allegations but discount legal conclusions clothed in factual garb. *Iqbal*, 129 S. Ct. at 1949-50 ("First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions…."); *see also Boykin v. Keycorp*, 521 F.3d 202, 204 (2d Cir. 2008); *McHale v. Citibank (In re 1031 Tax Group, LLC)*, 420 B.R. 178, 190 (Bankr. S.D.N.Y. 2009) (A court must discount "legal conclusions clothed in factual garb."). Second, once non-conclusory factual allegations have been identified, "the court must determine if these well-pleaded factual allegations 'plausibly suggest an entitlement to relief.'" *Iqbal*, 129 S. Ct. at 1951. "Determining

whether a complaint states a plausible claim for relief will…be a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense."

*Iqbal*, 129 S. Ct. at 1950; *see also Twombly*, 550 U.S. at 563; *Roth v. Jennings*, 489 F.3d

at 510. "The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct.

at 1949, quoting *Twombly*, 550 U.S. at 557.

Turning to the case at hand, the Complaint alleges specific events and

circumstances that, assumed to be true, raise a reasonable inference of actionable

conduct. Plaintiffs' allegations do not consist of legal conclusions that must be

disregarded under the first step in *Iqbal*. Plaintiffs allege in the Complaint, *inter alia*, the

segregation of valuable oil and gas assets, imposition of massive Legacy Obligations on a

Chemical Business that was thereby rendered insolvent or without adequate capital, non-

disclosure of the magnitude of the Legacy Obligations, and a final split of the good from

the bad assets. These claims are supported by detailed factual allegations and not by a

simple recitation of the contours of the elements of a cause of action. Defendants

repeatedly mock the fact that Plaintiffs have charged the Defendants with having devised

a "scheme," but the fact that the Complaint uses an umbrella title to describe Defendants'

alleged actions does not justify ignoring the collective underlying factual assertions.

Since the allegations of the Complaint must be taken as true, Defendants cannot

reasonably assert that the allegations are not plausible on their face. The allegation that

Old Kerr-McGee set out to separate its oil and gas business from its chemical business is

certainly plausible—indeed, Defendants do not deny that they split the businesses,

allegedly to "unlock value." In any event, there is nothing unlawful about a spin-off of

assets. *See*, *e.g., Aviall, Inc. v. Ryder System, Inc.*, 913 F. Supp. 826, 832 (S.D.N.Y.

1996). The real issue is whether Defendants did anything wrong in pursuit of their

"scheme" and can be held liable on the claims asserted. Defendants have moved to

dismiss each of these claims, and each of their points will be analyzed below. Beyond

the motion to dismiss stage, Plaintiffs will have to prove the elements of the claims

asserted. Suffice it to say at this point that the real issues in this case will likely involve

whether Plaintiffs will be able to prove, *inter alia*, that Defendants intended to hinder,

delay or defraud creditors; or that their "scheme" left Tronox insolvent or with an

unreasonably small capital compared to its liabilities. Issues of this nature are intensely

factual and likely to be hotly contested. However, this case cannot be cut off at its

inception on the theory that the facts asserted and claims made are not plausible—they

are, in fact, wholly plausible if taken as true, as they must be.

Nor can the Court accept Defendants' contention that the market collapse of 2008

is a more "plausible" explanation for the Tronox failure than the matters described in the

Complaint. Defendants spend many pages asserting that Tronox failed because of "a

profound, worldwide financial crisis" in 2008 and that a "more likely explanation" is that

"New Kerr-McGee engaged in a common business transaction: a corporate restructuring

and 'spin-off' of one of its lines of business. Then, after three years of success as an

independent, publicly-traded company with billions in sales, Tronox Inc. faced rising

manufacturing costs…." (Mot. 13 and 17-18). Although the reasons for the Debtors'

Chapter 11 filings in 2009 may have probative value on the issue of their solvency in

2005-2006, when the spin-off took place, they are not the central issue in this case,

notwithstanding Plaintiffs' assertion in response that "Defendants' fraudulent scheme led to the Plaintiffs' bankruptcy."  (Opp. to Mot. 16).

It is also quite irrelevant whether Defendants' scenario has "greater plausibility," as Defendants assert.  (Mot. 18).  For pleading purposes, a defendant's rebuttal of a plaintiff's contentions with its own does not entitle the defendant to dismissal of an action.  As *Iqbal* made clear, "[t]he plausibility standard is not akin to a 'probability requirement….'"  129 S. Ct. at 1949, quoting *Twombly*, 550 U.S. at 556.  The relative strength of the parties' explanations is not a question to be decided at the pleading stage unless the plaintiff's version is so remote as to be implausible.  Plaintiffs in this proceeding have satisfied this burden in their detailed and explicit catalogue of plausible facts.

## II.    Intentional Fraudulent Conveyance (Count I)

Count I of the Complaint seeks relief as a consequence of the imposition on Tronox and its affiliates (the "Tronox Entities") of the Legacy Obligations of a 70-year old business and claims that Defendants thereby intended to hinder, delay or defraud creditors within the meaning of the Oklahoma UFTA.  Section 116 of the Oklahoma UFTA, Okla. Stat. tit. 24, § 116, which is made applicable in this case through § 544(b) of the Bankruptcy Code, provides that an estate representative may avoid an intentional fraudulent conveyance if (1) "the debtor made the transfer or incurred the obligation" (2) "with actual intent to hinder, delay, or defraud any creditor of the debtor."[12]

---

[12] 11 U.S.C. § 544(b) permits the estate representative to utilize "applicable law" to avoid conveyances if there remains at least one unsecured creditor who was a creditor at the time of the transfer.  Defendants do not challenge the assertion in the Complaint that this requirement has been satisfied in this case.

### A.  Transfers Made or Obligations Incurred

As previously noted, allegations of fraud must be pled with particularity under Rule 9(b).  It is well accepted that "[t]he party asserting an intentional fraudulent transfer claim must 'specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, [and] the consideration paid.'"  *In re Fabrikant & Sons, Inc.*, 394 B.R. 721, 733 (Bankr. S.D.N.Y. 2008), quoting *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002).  This requirement fulfills the purpose of Rule 9(b), which is "to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties."  *In re Everfresh Beverages, Inc.*, 238 B.R. 558, 581 (Bankr. S.D.N.Y 1999), citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

Defendants argue that the intentional fraudulent conveyance claim in the Complaint is not pled with sufficient particularity because Plaintiffs' definition of the "Transfers" made and the "Obligations" incurred aggregates numerous transfers and obligations that occurred over several years.  Defendants in particular challenge the fact that the Complaint often refers to the oil and gas assets and proceeds from Tronox's secured and unsecured loans and IPO collectively as the "Transfers," and that Plaintiffs collectively refer to the liabilities and debt, including the Legacy Obligations and the $550 million in debt that Tronox incurred at the time of the spin-off as the "Obligations." Defendants rely on *Fed. Nat'l Mortg. Assoc. v. Olympia Mortg. Corp.*, 2006 WL 2802092, at *9 (E.D.N.Y. Sept. 28, 2006), dismissing a complaint because it "aggregate[d] the transfers into lump sums," and *Alnwick v. European Micro Holdings,*

*Inc.*, 281 F. Supp. 2d 629, 646 (E.D.N.Y. 2003), dismissing a claim that the transfer was "on or about 2001."

The detailed allegations of this Complaint herein bear no resemblance to the bare-bones assertions in the cases cited by Defendants. Plaintiffs do not merely label transfers and obligations without providing any further detail. On the contrary, the Complaint contains numerous facts and allegations that deconstruct the specific transfers made and the specific obligations taken on so that the Defendants can clearly understand the components of the defined terms employed throughout the Complaint. For example, with respect to the oil and gas transfers, the Complaint alleges that Old Kerr-McGee, a wholly owned subsidiary of New Kerr-McGee at the time, transferred substantially all of the oil and gas assets out of the Chemical Business and into a newly formed Oil & Gas Business, including shares of Devon Energy Corporation, worth more than $200 million, and 36 other specifically identified assets. The oil and gas assets are further described in the 2005 Assignment Agreements that were backdated to December 31, 2002. Plaintiffs allege that the Chemical Business continued to make transfers of exploration and production assets to New Kerr-McGee's Oil and Gas Business under the Assignment Agreement in the second half of 2005 and after the IPO in November 2005. The Complaint alleges that the oil and gas assets were worth billions of dollars, as demonstrated by the sale of those assets to Anadarko for $16.4 billion in cash and $1.6 billion of assumed debt, and that the transferor received no consideration for them.

Respecting the Cash Transfers, the Complaint alleges that on November 28, 2005, New Kerr-McGee transferred to itself 22,889,431 shares of Class B common stock in Tronox Incorporated and approximately $787.8 million consisting of (a) $224.7 million

in net proceeds from the IPO of Tronox's Class A common stock; (b) $537.1 million in

net proceeds from the $550 million in debt that Tronox was required to incur in

connection with the spin-off; and (c) approximately $26 million in cash.  Thus, for the oil

and gas transfers as well as the Cash Transfers, the Complaint alleges the dates, parties,

and the property involved.

The Legacy Obligations are also identified with sufficient detail.  They include

massive actual and contingent environmental, tort, and retiree liabilities that were

incurred during Kerr-McGee Corporation's more than 70-year history, including

liabilities relating to the treatment of wood products, production of rocket fuel, refining

and marketing of petroleum products, and the mining, milling and processing of nuclear

materials.  As one relatively small example, under the Employee Benefits Agreement,

Tronox assumed liability for employee benefits for employees of discontinued chemical,

refining, coal, nuclear, and offshore contract drilling businesses who never worked in the

chemical business.  Defendants do not contend that the definition of Legacy Obligations

is so indefinite that the contracts that imposed them on Tronox would be invalid as a

matter of contract law, nor could they, as they wrote the Assignment Agreements

themselves.  There is no suggestion that these detailed agreements were not adequate to

transfer the assets and impose the obligations, and Defendants, in any event, have been

afforded sufficient information to prepare an effective answer or defense.  *See Am.*

*Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec.*, 351 F. Supp. 2d 79, 106-07 (S.D.N.Y.

2004), stating that Rule 9(b) requires a complaint to describe the specific injury, describe

the legal theories upon which it bases its claims, and suffice "to allow each defendant to

prepare an effective answer or defense."  As the Court said in *Wieboldt Stores, Inc. v.*

*Schottenstein*, 94 B.R. 488, 498 (N.D. Ill. 1998),  "Although the size and complexity of this case renders pleading difficult, [plaintiff] has included enough information in its complaint and has stated its claims with sufficient clarity to advise each defendant or group of defendants of the claims made against them."

Defendants finally argue that the actual fraudulent conveyance claim under Oklahoma law is not pled with particularity because Plaintiffs improperly aggregate the "transferors."  Defendants take particular issue with the use of the term "Tronox Entities" because they include multiple entities.  *See In re Fabrikant & Sons, Inc.*, 394 B.R. at 734. The entities included within the term "Tronox Entities," however, are individually identified, and the Complaint adequately identifies each transfer made and obligation incurred and the particular entity in the line of succession that was involved.

Defendants, moreover, err when they examine the paragraphs of the Complaint in isolation rather than as a whole.  *See Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d at 562.  When read in its entirety, the Complaint contains sufficient information to ascertain the identity of the entity that made the alleged transfers or incurred the obligations, as well as the relationship that entity now has with one of the parties to this dispute.  Defendants' motion to dismiss on the ground that the transfers are not pled in accordance with Rule 9(b) is therefore denied.

## B.  Fraudulent Intent

Rule 9(b) also requires that the fraudulent intent that must be established under § 116 of the Oklahoma UFTA be pled with specificity.[13]  *In re Sharp. Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005).  "Although *scienter* may be pled generally, the pleader must still

---

[13] Plaintiffs must plead that the alleged intentional fraudulent transfers in the Complaint were made "with actual intent to hinder delay, or defraud any creditor of the debtor."  Okla. Stat. tit. 24, § 116.

'allege facts that give rise to a strong inference of fraudulent intent.'" *In re White Metal Rolling and Stamping Corp.*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998), quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). A strong inference of fraudulent intent may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 428. Since it is difficult to prove intent, the courts allow plaintiffs to demonstrate intent by pleading the existence of one or more "badges of fraud." *See Sharp.*, 403 F.3d at 56; Okla. Stat. tit. 24, § 116(b).

Defendants argue that the actual fraudulent conveyance claim under the Oklahoma UFTA must be dismissed for failure to adequately allege intent because the Complaint does not "state which badges of fraud, if any, [Plaintiffs] rely upon to support their claims." As an initial matter, Defendants' argument rests on the flawed contention that badges of fraud must be pled to satisfy Rule 9(b). While courts often allow parties to rely on badges of fraud because of the difficulty of proving intent, this is not a requirement. *See Sharp*, 403 F.3d at 56 ("Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is *allowed* to rely on badges of fraud to support his case….") (internal quotes omitted) (emphasis added); *see also In re Adler*, 372 B.R. 572, 581 (Bankr. E.D.N.Y. 2007); *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y 2005) (stating that "[w]hile badges of fraud are not a prerequisite to a finding of actual fraudulent intent, their existence does help to 'focus the inquiry on the circumstances that suggest a *conveyance* was made with fraudulent intent, *viz.* with the purpose of placing a debtor's assets out of the reach of creditors.'" (quoting *Sharp*, 403

F.3d at 784)) (emphasis in original).  Thus, the focus is not on whether Plaintiffs have pled badges of fraud, but rather, whether Plaintiffs have sufficiently alleged "a knowing intent on the part of the defendant to damage creditors." *Actrade*, 337 B.R. at 809.  This is adequately alleged in the Complaint.  The facts alleged in the Complaint that describe New Kerr-McGee's participation in the acts complained of, the property involved, and the effect that they had on the Chemical Business and its creditors give rise to a sufficient inference of intent to "hinder, delay or defraud" creditors to survive dismissal under Rule 9(b).

In any event, even though the Complaint does not expressly label certain alleged facts as badges of fraud, the Complaint does set forth allegations that, if proved, would constitute badges of fraud.  The following constitute badges of fraud as defined by the Oklahoma UFTA:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and, (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Okla. Stat. tit. 24, § 116(b).  Here, the Complaint specifically alleges the existence of at least four badges of fraud: (1) that the transfers made or obligations incurred were to or for the benefit of an insider (New Kerr-McGee when it was the controlling parent of the Tronox Entities); (2) that Old Kerr-McGee had been threatened with suit before the

transfers were made and obligations incurred, including the EPA's designation of Kerr-McGee as a PRP and subsequent demand for $179 million for the cleanup of Manville alone; (3) that New Kerr-McGee took many steps to conceal the magnitude of the Legacy Obligations, such as installing uninformed officers, concealing potential liabilities, consistently painting an unduly optimistic view of the Chemical Business, and backdating critical documents; and (4) that Tronox was insolvent and with an unreasonably small capital as a consequence of the transfers made and obligations incurred.

While the foregoing badges of fraud are obviously not sufficient to prove intent, Plaintiffs are not required to do so at this stage of the proceedings. *See Wieboldt*, 94 B.R. at 498, noting that "[p]leadings are not intended to supplant the process of discovery; nor is [a plaintiff] required to plead the evidence it plans to present to support its claims." As stated above, Plaintiffs must only establish a strong inference of fraudulent intent. *In re White Metal Rolling and Stamping Corp.*, 222 B.R. at 428. "The existence of several badges of fraud can constitute clear and convincing evidence of actual intent." *In re Actrade Fin. Techs. Ltd.*, 337 B.R. at 809, citing 4 L. King, Collier on Bankruptcy ¶ 548.04[2] (15th ed. 1983). Defendants' motion to dismiss Count I for failure to plead intent with specificity is denied.

### III.    Constructive Fraudulent Conveyance under the Oklahoma UFTA (Count II)

Count II of the Complaint seeks avoidance and recovery of the transfers made and the obligations incurred as constructive fraudulent conveyances under §§ 116 and 117 of the Oklahoma UFTA. Under the Oklahoma UFTA, a claim for avoidance of a constructive fraudulent conveyance is based not on fraudulent intent, but on a debtor's (1) transfer of an interest in property or incurrence of an obligation; (2) receipt of less than a

reasonably equivalent value in exchange therefor; and (3) at the time the debtor (a) was

insolvent or became insolvent as a result, (b) was engaged or about to engage in business

or a transaction for which any remaining property was an unreasonably small capital, or

(c) intended to incur or believed that it would incur debts that would be beyond its ability

to pay as such debts matured.  *See* Okla. Stat. tit. 24, §§ 116, 117.[14]  Since a claim based

on constructive fraudulent conveyance need not include any allegations of fraud, the

overwhelming weight of authority is that the heightened pleading requirements of Rule

9(b) are inapplicable.  *See Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 307 (Bankr. S.D.N.Y.

2005); *Spanierman Gallery, PSP v. Love*, 320 F. Supp. 2d 108, 113-14 (S.D.N.Y. 2004);

*Intuition Consol. Group, Inc. v. Dick Davis Publ'g Co.*, No. 03 Civ. 5063, 2004 WL

594651, at *3 (S.D.N.Y. Mar. 25, 2004); *In re White Metal*, 222 B.R. at 428-29; *Bank of

Montreal v. Bresner*, No. 92 Civ. 0875, 1992 WL 296438, at *3 (S.D.N.Y. Oct. 8, 1992);

*China Res. Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc.*, 788 F. Supp. 815, 819 (D. Del.

1992); *Secs. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319 (Bankr.

S.D.N.Y. 1999).  Instead, constructive fraudulent transfers are subject to the more lenient

pleading standard of Rule 8(a)(2) and need only give the defendant "sufficient notice to

prepare an answer, frame discovery and defend against the charges."  *In re White Metal*,

222 B.R. at 429.

---

[14] In *In re Solomon*, 299 B.R. 626, 632-33 (B.A.P. 10th Cir. 2003), the Court discusses as "the key distinction between § 116(A)(2) and 117" the fact that § 116(A)(2) "determines transfers that are fraudulent to present *and* future creditors while § 117 determines transfers that are fraudulent to present creditors only."  It concludes that "the language of § 117(A) parallels the constructive fraud provision of § 548 (a)(1)(B)(I) and (ii)(I)."  *Solomon*, 299 B.R. at 626.  Section 544(b) permits the estate representative to prosecute claims on behalf of the bankruptcy estate.

### A.  Qualifying Transfers or Obligations

Defendants first contend that the Complaint does not adequately describe the property transferred or the obligations incurred, the dates, and parties.  *See In re Motorwerks, Inc.*, 371 B.R. 281, 293-94 (Bankr. S.D. Ohio 2007); *In re Global Link Telecom Corp.*, 327 B.R. 711, 718 (Bankr. D. Del. 2005).  Since the transfers and obligations set forth in the actual fraudulent conveyance claim, Count I, are the same as those in the constructive fraudulent conveyance claim under Count II, the finding above that the allegations are sufficiently alleged for Rule 9(b) purposes is also a finding that they meet the less demanding Rule 8(a)(2) pleading standard for constructive fraudulent conveyances.  *See In re Fabrikant & Sons, Inc.*, 394 B.R. at 735.  Defendants' motion to dismiss Count II for failure to plead qualifying transfers is thus denied.

### B.  Reasonably Equivalent Value

Defendants next argue that the Complaint fails to adequately allege under Okla. Stat. tit. 24, §§ 116(A)(2), 117(A) that the debtors received in return less than reasonably equivalent value, and that Plaintiffs' allegations with respect to value are hopelessly vague and conclusory.

With respect to the oil and gas transfers, the Complaint alleges that the oil and gas assets were sold to Anadarko shortly after the spin-off for $16.4 billion in cash and $1.6 billion of assumed debt.  The Complaint further alleges that the dollar value of the Cash Transfers was $785 million.  It is specifically alleged that no consideration was provided to the Chemical Business for the assets that were transferred, and that in addition, New Kerr-McGee imposed on the Chemical Business massive Legacy Obligations that,

together with the new debt incurred in the spin-off (the proceeds of which were transferred to New Kerr-McGee), left Tronox insolvent and with inadequate capital.

These allegations state a claim. The Complaint does not merely mimic the elements of the statute governing constructive fraudulent conveyances, but it alleges numerous supporting facts that identify the property transferred and obligations incurred. The issues are complex because some of the transfers were liabilities imposed on the remaining business, and some of the transfers were assets conveyed "out." For instance, the oil and gas properties, cash, and an indemnity were transferred out of the Chemical Business. Conversely, an allegedly illusory indemnity and 100 percent of New Kerr-McGee's interest in Tronox Worldwide LLC were transferred into Tronox, and the Chemical Business was left with massive Legacy Obligations. In any event, for purposes of this motion, the Court finds that the Complaint adequately pleads the element of reasonably equivalent value.

Aside from attacking the adequacy of allegations regarding reasonably equivalent value, Defendants also dispute their truth, arguing that the allegations are contradicted by documents referenced in the Complaint. They cite *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007), where the Court stated, "Where a plaintiff's conclusory allegations are clearly contradicted by documentary evidence incorporated into the pleadings by reference…the court is not required to accept them." Plaintiffs' allegations, however, are not conclusory. Moreover, Defendants cannot rely at this stage on SEC and other reports that are not incorporated in or necessary to the Complaint. Only in limited circumstances may a court consider documents other than the complaint itself in ruling on a motion under Rule 12(b)(6). First, a court may rely on such documents if

they are either "attached to the complaint or incorporated in it by reference." *Roth v. Jennings*, 489 F.3d at 509. Second, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral* to the complaint may be considered by the court in ruling on such a motion." *Id.* at 509, quoting *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (emphasis added). Here, the SEC filings referenced by Defendants are not a part of the Complaint, nor are they documents upon which the Complaint solely relies, nor are they integral to the Complaint. On the contrary, the Complaint appears to repudiate them by claiming they are false. At this stage, Defendants' analysis of documents that are disavowed by the Plaintiffs provides no basis to summarily dismiss Count II of the Complaint.

On the present record, questions of fact exist on the question of reasonably equivalent value, but they cannot be determined on a motion to dismiss. "Whether [a] transfer is for reasonably equivalent value in every case is largely a question of fact…." *See Clark v. Sec. Pac. Business Credit, Inc.* (*In re Wes Dor, Inc.*), 996 F.2d 237, 242 (10th Cir. 1993) (internal citations omitted); *In re Solomon*, 299 B.R. at 236 (Oklahoma UFTA case); *see also American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 105 (S.D.N.Y. 2004); *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 466 (S.D.N.Y. 2001); *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 307-08 (S.D.N.Y. 2001). These factual issues cannot be determined on this motion to dismiss.

### C. Insolvency

Moving to the element of insolvency, Defendants argue that the Complaint alleges no facts demonstrating that Plaintiffs were insolvent or became insolvent as a result of the transactions complained of, or that they were engaged in or about to engage in business or a transaction for which any property remaining was an unreasonably small capital, or that they intended to incur or believed that they would incur debts that would be beyond their ability to pay as such debts matured. Okla. Stat. tit. 24, §§ 116(A), 117(A). This contention is without any basis whatsoever. The Complaint makes numerous allegations regarding Tronox's lack of viability, insolvency and absence of a viable capital base, including the specific contention that the Cash Transfers left Tronox with insufficient cash during the first year to service the Legacy Obligations and the other debt it was forced to assume in the spin-off.

Defendants also attack the adequacy of the allegations relating to insolvency by challenging their veracity. They cite *Lippe v. Bairnco Corp.*, 230 B.R. 906, 915 (S.D.N.Y. 1999), in which a fraudulent conveyance claim was dismissed for conclusory allegations of insolvency that were contradicted by publicly filed annual reports. Defendants point to various SEC filings, which they say contradict the Complaint's allegations of insolvency. Defendants' argument fails for several reasons. First, in *Lippe*, the Court found that allegations of insolvency were conclusory, as well as contradicted by other allegations within the complaint itself. Here, the allegations of insolvency are not conclusory, nor are they contradicted by other allegations in the Complaint. Second, as discussed above, the documents on which Defendants rely (and which Plaintiffs repudiate) are not incorporated in the Complaint and cannot be used on

that basis.  Defendants will have an opportunity to demonstrate that Tronox was able to

effect a public offering of stock and to borrow tens of millions of dollars from a group of

lenders when it was spun-off, and to argue that it was solvent and adequately capitalized.

Plaintiffs will be able to counter with charges of false disclosures and omissions.  In any

event, insolvency is ordinarily a question of fact that requires a trial.  *See In re Solomon*,

299 B.R. at 639-40 (Oklahoma UFTA case);[15] *see also* Lawson *v. Ford Motor Co. (In re*

*Roblin Indus.)*, 78 F.3d 30, 35 (2d Cir. 1996).  Plaintiffs' allegations with respect to the

issue of solvency are far from conclusory, and they are accordingly entitled to the

assumption of truth for purposes of this motion.

      Accordingly, the insolvency prong of the constructive fraudulent conveyance

claim is pled adequately in accordance with Rule 8(a)(2).  The motion to dismiss Count II

is denied.

### IV.      Statute of Limitations on Counts I and II

      Oklahoma's statute of limitations for fraudulent transfers is set forth at Okla. Stat.

tit. 24, § 121.  Claims made pursuant to the actual fraud provisions of § 116(A)(1) of the

Oklahoma UFTA must be brought "within four (4) years after the transfer was made or

the obligation was incurred or, if later, within one (1) year after the transfer or obligation

was or could reasonably have been discovered…."  Okla. Stat. tit. 24, § 121(1).  Claims

made pursuant to the constructive fraud provisions in §§ 116(A)(2) and 117(A) of the

Oklahoma UFTA must be brought "within four (4) years after the transfer was made or

the obligation was incurred."  Okla. Stat. tit. 24, § 121(2).  Therefore, the relevant time

bar for both constructive and actual claims is four years, with an exception for transfers

---

[15] As *Solomon* notes, contingent liabilities such as those for environmental obligations "must be reduced to present value for determining whether debtor is insolvent" and the trier of fact must "determine the likelihood that the contingency will occur."  299 B.R. at 639, n.55.

made with actual fraudulent intent that were not reasonably discoverable, in which case

the applicable period is one year after the claimant discovered the transfer or could

reasonably have done so.

Section 118 of the Oklahoma UFTA also establishes the following "tests for

determining when transfer is made or obligation incurred."  Okla. Stat. tit. 24, § 118.  For

the purposes of the Oklahoma UFTA, a transfer is made "with respect to an asset that is

not real property or that is a fixture, when the transfer is so far perfected that a creditor on

a simple contract cannot acquire a judicial lien otherwise than in accordance with the

provisions of the Uniform Fraudulent Transfer Act that is superior to the interest of the

transferee."  Okla. Stat. tit. 24, § 118(1)(b).  Subsection 118(3) then provides that "If

applicable law does not permit the transfer to be perfected as provided for in paragraph 1

of this section, the transfer is made when it becomes effective between the debtor and the

transferee."  An obligation is incurred "if evidenced by a writing, when the writing

executed by the obligor is delivered to or for the benefit of the obligee."  Okla. Stat. tit.

24, § 118(5)(b).

Defendants contend that since the scheme alleged by the Plaintiffs commenced

before January 12, 2005, which is four years prior to the date of the Chapter 11 petitions

(January 12, 2009), the Complaint should be dismissed as time-barred.[16]  They invoke the

principle that where a complaint on its face may be determined to be outside the

applicable limitations period, it should be summarily dismissed.  *See McKenna v. Wright*,

386 F.3d 432, 436 (2d Cir. 2004) (holding that because the application of a statute of

limitations is an affirmative defense, a motion to dismiss on such grounds may be granted

---

[16] Section 108(a) of the Bankruptcy Code preserves for the benefit of a trustee or debtor in possession all
claims that were not time-barred on the date of commencement of the bankruptcy case.  Section 546(a) then
gives the trustee or debtor in possession two years to commence an avoidance suit.

only "if the defense appears on the face of the complaint") (internal citation omitted).  On

a motion to dismiss on statute of limitations grounds, the well-pleaded allegations of the

Complaint must be taken as true, and a court cannot grant a motion to dismiss based on a

statute of limitations where there is a factual question involved.  *See Mandarino v.*

*Mandarino*, 180 Fed. Appx. 258, 261, 2006 WL 1308076, at *3 (2d Cir. May 11, 2006)

(reversing statute of limitations dismissal and holding that "the District Court should not

have resolved the fact-specific equitable tolling issue"); *Abbatiello v. Monsanto*

*Company*, 522 F. Supp. 2d 524, 530 (S.D.N.Y. 2007).

On the well-pleaded allegations of the Complaint, the fraudulent conveyance

claims are not time-barred.  According to the Complaint, the Legacy Obligations were

not imposed on Plaintiffs until the spin-off was effected and Plaintiffs alone had

responsibility for obligations they could not bear.  Even if one looks to an earlier date, the

execution of the Assignment Agreements in the spring and summer of 2005, the

Complaint was timely.  Even though the Assignment Agreements were backdated

approximately 24 months to December 2002, parties to a contract cannot make it

retroactively binding to the detriment of third persons.  *See Debreceni v. Outlet Co.*, 784

F.2d 13, 18-19 (1st Cir. 1986).  Section 118(5)(b) of the Oklahoma UFTA provides that if

an obligation is evidenced by a writing, the date of the incurrence of the obligation is

"when the writing executed by the obligor is delivered to or for the benefit of the

obligee."  This occurred well within the four-year statute of limitations.

Defendants would apparently measure the running of the statute of limitations

from the date each asset relating to the oil and gas business was moved to a separate

subsidiary, focusing only on the transfer of properties out of Old Kerr-McGee.  The

Complaint, however, alleges that the contracts that "perfected" the transfers were not

signed until mid-2005, at the earliest. *See* Okla. Stat. tit. 24, § 118(1)(b). Moreover, it is

unrealistic to speak of the "perfection" of a transfer of assets between two subsidiaries of

the same corporation. As the Complaint asserts, the Legacy Obligations, which are the

core liabilities of which Plaintiffs complain, were still serviced by New Kerr-McGee in

2005, and it was well into 2006 before Tronox was spun-off, Defendants surrendered

their control of Tronox, and the oil and gas properties were deemed sufficiently divorced

from the obligations imposed on Tronox that a purchaser for such assets was willing to

buy them. As the Defendants insist, a corporation forms separate subsidiaries for many

entirely legitimate reasons. The Complaint adequately alleges that it is only when the

spin-off was complete and the Legacy Obligations were imposed on the Plaintiffs,

rendering them insolvent and undercapitalized, that an actionable fraudulent transfer

occurred.

Defendants rely on *Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 255

(S.D.N.Y. 2006), a New York case construing the Uniform Fraudulent Conveyance Act,

that held that "it would be illogical and contrary to the spirit of the law to treat a series of

transfers as one transaction for the purpose of determining when the statute of limitations

was triggered." The Complaint, however, does not treat "a series of transfers as one

transaction…" for statute of limitations purposes. Assuming that the actionable act was a

transfer, the Complaint is fundamentally based on the assertion that the actionable

transfer was the spin-off, which left the Legacy Obligations in Tronox and the other

Plaintiffs. The term "transfer" is defined broadly in the Oklahoma UFTA, as well as in

the Bankruptcy Code. Under the Oklahoma UFTA, it encompasses any mode, "direct or

indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."  Okla. Stat. tit. 24, § 113.  *Mills* concerned a relatively simple situation where a series of similar transfers were made *seriatim*.  Here, as alleged in the Complaint, the actionable transfer took place and obligation was incurred when New Kerr-McGee was finally spun out of the group and deemed sufficiently free of environmental and other liabilities that Anadarko was willing to pay billions in its acquisition.

Since Defendants' motion to dismiss Counts I and II of the Complaint on statute of limitations grounds must be denied, there is no need to reach Plaintiffs' contention that the Complaint was timely because Plaintiffs can be subrogated to the rights of the United States as a creditor or should receive the benefit of the doctrine of equitable tolling of the statute.

## V.    Constructive Fraudulent Conveyance Under § 548 of the Code (Count III)

Count III seeks avoidance and recovery of certain payments made on account of the Legacy Obligations as constructive fraudulent conveyances pursuant to § 548(a)(1)(B) of the Bankruptcy Code.  The Plaintiff in a constructive fraudulent conveyance claim under § 548(a)(1)(B) of the Bankruptcy Code must establish the same elements as those for the same claim under §§ 116 and 117 of the Oklahoma UFTA, discussed above.  *See* Okla. Stat. tit. 24, §§ 116, 117; 11 U.S.C. § 548(a)(1)(B); *see In re Solomon*, 299 B.R. 626, 633 (B.A.P. 10th Cir. 2003) ("[T]he Oklahoma UFTA and § 548 are identical, and cases construing the elements under § 548 are persuasive interpretations for the UFTA.").  The key difference between the two statutes is that under the

Bankruptcy Code, the "look back" period for avoiding transfers is two years before the filing of the bankruptcy petition, compared to a four-year limitations period under the Oklahoma version of the UFTA. *Compare* § 548(a)(1) *with* Okla. Stat. tit. 24, § 121(A)(2). Accordingly, in Count III, Plaintiffs seek to avoid only payments made during the period from January 12, 2007 to January 12, 2009, which they describe as: (1) all payments related to the Legacy Obligations, in an amount to be determined at trial, (2) all pension benefit payments made and payment obligations incurred in excess of the payments and obligations that would have accrued absent the agreements imposed on it by New Kerr-McGee, in an amount to be determined at trial, (3) all other post-employment benefits payments made and payment obligations incurred in excess of the payments and obligations that would have accrued absent the agreements imposed on it by New Kerr-McGee, in an amount to be determined at trial, and (4) all pension benefits paid or payable to retirees for the years in which they worked at New Kerr-McGee, in an amount to be determined at trial.

Defendants nonetheless argue that Count III is time barred, relying on *In re Le Café Crème, Ltd.*, 244 B.R. 221, 234 (Bankr. S.D.N.Y. 2000). There, this Court held that a fraudulent transfer claim is time barred when payments are made pursuant to an "indivisible" contract executed outside of the limitations period, even when such payments are made within the applicable limitations period. The Court in *Le Café Crème* explained the difference between a "divisable" and "indivisible" contract as follows:

> If the contracted for performance is an entire indivisible unit, courts have held that the payment obligations is deemed to arise upon completion of performance. *If the contracted for performance is inherently divisable or of an on-going requirement nature, courts have held that the debt is incurred incrementally upon receipt of services.* (citations omitted). From these cases, it appears that the courts, in line with business practices, look

> to see the nature of the contract and of the debt in determining when a debt arises. A contract is divisible if the 'performance by each party is divided into two or more parts' and such performance is the 'agreed upon exchange for a corresponding part of the other party.' (quoting Restatement (Second) of Contracts § 265 Comments a, d (1979)). If it is so divisable or if the debt arises in quantum meruit, a debtor is likely to be viewed as having made payment for each of the benefit [sic] conferred. But if the contracted for performance is an indivisible unit or if the debt lies in contract, then full payment of a debt is to be considered as a payment of the full contractual obligations rather than payment for a series of partial performances.

*Le Café Crème*, 244 B.R. at 234 (emphasis added). Defendants contend that the payments alleged are not divisible from the agreements referenced in the Complaint, especially the Assignment Agreements, both of which were executed more than two years prior to the date of Plaintiffs' bankruptcy petitions.

Defendants' position has some logic. As discussed above in connection with the statute of limitations issue, the 2006 spin-off and the 2005 Assignment Agreements were both executed more than two years before the filing of the Chapter 11 petitions. Nevertheless, on the allegations of the Complaint, which govern on this motion to dismiss, Count III should not be summarily dismissed. As Plaintiffs argue, *Le Café Crème* has not been followed in a number of jurisdictions, and numerous courts have explicitly disagreed with it.[17] In any event, it is unnecessary to determine whether *Le Café Crème* is sound precedent on this issue, as it is inapposite to the facts of the case at bar. The agreement in *Le Café Crème* "required payment of installments on a prescribed schedule," and the Court held that the payments were indivisable from the underlying

---

[17] *See In re Omega Door Co.*, 399 B.R. 295, 303 n.3, 304 (B.A.P. 6th Cir. 2009) (trustee could avoid installment payments under § 544(b) made within reachback period although underlying contract was signed outside of reachback period); *In re Emergency Monitoring Techs., Inc.*, 366 B.R. 476, 503 (W.D. Pa. 2007) ("[T]he Court holds that, if it were necessary…then the Court would reject such holding in *Le Café Crème*."); *In re NM Holdings*, 407 B.R. 232, 267-68 (Bankr. E.D. Mich. 2009)(declining to apply the relevant portion of *In re Le Café Crème*, characterizing it as "contrary to the unambiguous language of 11 U.S.C. § 544(b)").

agreement. *Id.* at 232. Here, Plaintiffs have asserted in the Complaint that although the payments they allege are *related* to or required under various underlying agreements, the dates and amounts of the payments were not installments wholly *determined* by those agreements, and the payments appear divisable from the underlying agreements. For purposes of this motion, Plaintiffs have adequately distinguished *Le Café Crème*, and there is no basis to extend its holding to this case.

Defendants also argue that the transfers challenged in Count III are not pled adequately under F.R. Civ. P. 8(a)(2), as the Complaint does not identify each transfer complained of—*e.g.*, each payment to each former employee and the applicable date. As discussed above, the pleading standard under Rule 8(a)(2) requires a plaintiff to provide "sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.'" *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000), quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). A constructive fraudulent conveyance claim is sufficient under Rule 8(a)(2) even if it alleges an aggregate monetary amount for multiple transfers during a multi-year period without a breakdown of individual transfers. *See In re Saba Enterprises, Inc.*, 2009 WL 3049651, at *9 (Bankr. S.D.N.Y. Sept. 18, 2009). Count III of the Complaint alleges that in the two years before the filing of the petitions on January 12, 2009, Plaintiffs spent more than $118 million to satisfy the Legacy Obligations, were insolvent, and received less than reasonably equivalent value in exchange. These allegations are supported by the detailed facts set forth in the Complaint. Based on the foregoing, Count III of the Complaint adequately states a claim

for relief under § 548(a)(1)(B) of the Bankruptcy Code, and Defendants' motion to

dismiss Count III is denied.

### VI.    Civil Conspiracy and Aiding and Abetting a Fraudulent Conveyance (Counts IV and V)

Counts IV and V of the Complaint seek damages against Defendants on a claim

for civil conspiracy and aiding and abetting a fraudulent conveyance, respectively.  In

support of the conspiracy claim, Plaintiffs assert that, "On information and belief,

Anadarko conspired with New Kerr-McGee to effectuate the fraudulent conveyance of

the Transfers and Obligations through the Spin-Off…thereby harming Tronox and its

creditors."  (Compl. ¶ 157).  They rely on Oklahoma common law that recognizes a claim

for civil conspiracy.  *See Allen v. Ramsey*, 41 P.2d 658, 665 (Okla. 1935) ("When the

parties to [an agreement to do wrong] act in furtherance of the illegal combination,

resulting in injury to a third person, the conspiracy becomes actionable, and the

conspirators are liable to the injured party for damages proximately flowing from their

illegal conduct.").  With respect to the aiding and abetting claim, Plaintiffs allege that,

"On information and belief, Anadarko knowingly provided substantial assistance to New

Kerr-McGee in the fraudulent conveyance of the transfers and obligations…thereby

harming Tronox and its creditors."  (Compl. ¶ 163).  Plaintiffs rely on Oklahoma law that

recognizes a cause of action for aiding and abetting a tort.  *See*, *e.g.*, *In re Sheffield Steel

Corp.*, 320 B.R. 405, 420 (Bankr. N.D. Okla. 2004) (holding that a plaintiff damaged by

unlawful or tortious action can bring claim against a third-party who aided and abetted

the unlawful act).

The first problem with Plaintiffs' position is that their only basis for the assertion

of a fraudulent conveyance claim under the Oklahoma UFTA derives from § 544(b) of

the Bankruptcy Code, which provides that a trustee, or a party standing in the position of a trustee (such as a debtor in possession) "may *avoid* any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." (emphasis added).  Courts that have considered the question whether a claim for damages may be pursued under § 544(b) have concluded that it "only permits the trustee to avoid a fraudulent transfer" regardless of whether "any state law recognizes such a claim."  *See In re Fedders North America, Inc.*, 405 B.R. 527, 548 (Bankr. D. Del. 2009); *see also In re Hamilton Taft & Co.*, 176 B.R. 895 (Bankr. N.D. Cal. 1995), *aff'd*, 196 B.R. 532 (N.D. Cal. 1995), *aff'd*, 114 F.3d 991 (9th Cir. 1997); *In re Canyon Systems Corp.*, 343 B.R. 615, 656 (Bankr. S.D. Ohio 2006) (stating that it is "flatly wrong" to argue that a trustee is given power to bring a claim for damages under § 544(b)); *Kleven v. Stewart (In re Myers)*, 320 B.R. 667, 669 (Bankr. N.D. Ind. 2005).  In support of the principle that a claim for damages cannot be brought under the rubric of § 544(b), courts also rely on the language of § 550 of the Bankruptcy Code, providing that the remedy in an avoidance case is limited to return of the property transferred or its value.  To allow recovery of damages "could lead to a result that expands remedies beyond § 550" in a way that would "circumvent or undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer."  *Fedders*, 405 B.R. at 548-49, quoting *In re Brentwood Lexford Partners LLC*, 292 B.R. 255 (Bankr. N.D. Tex. 2003) (internal quotations omitted).

In their brief in opposition to the motion to dismiss, Plaintiffs assert that their claims for civil conspiracy and aiding and abetting were not solely grounded on their fraudulent conveyance claims, but also on the claims in the Complaint for unjust

enrichment and breach of fiduciary duty.  As discussed below, the claims in the

Complaint for unjust enrichment must be dismissed, but Plaintiffs might be able to state a

claim for aiding and abetting a breach of fiduciary duty, which has been recognized in

many cases as an independent wrong.  *See Allied Capital Corp. v. GC-Sun Holdings*,

*L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006); *In re Fedders*, 405 B.R. at 543; *Whitney v.

Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986) (New York law); *see also In re

Sharp. Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005); *ASARCO LLC v. Americas Mining

Corp.*, 396 B.R. 278 (S.D. Tex. 2008).  Count IV of the Complaint, however, alleges only

that Anadarko and Kerr-McGee "conspired…to effectuate the fraudulent conveyance."

(Compl. ¶ 157).  Count V of the Complaint, entitled "Aiding and Abetting Fraudulent

Conveyance," likewise alleges that Anadarko "provided substantial assistance…in the

fraudulent conveyance of the Transfers and Obligations" and "benefited from the

fraudulent conveyance of the Transfers and Obligations."  (Compl. ¶ 163-64).  Neither

Count IV nor Count V mentions, let alone asserts, a claim for aiding or abetting or civil

conspiracy in connection with a breach of fiduciary duty.  "[I]t is long-standing precedent

in this circuit that parties cannot amend their pleadings through issues raised solely in

their briefs." *Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*,

485 F. Supp. 2d 387, 393 (S.D.N.Y. 2007).  Plaintiffs may move to amend their

Complaint, but Counts IV and V in their present form must be dismissed.

### VII.    Breach of Fiduciary Duty as a Promoter (Count VI)

Count VI seeks compensatory and punitive damages against Defendants on a

claim for breach of fiduciary duty as a promoter.  Under New York choice of law rules,

which we must apply in the first instance, *see Colgate Palmolive Co. v. S.S. Dart

*Canada*, 724 F.2d 313, 316 (2d Cir. 1983), the law of the state of incorporation governs

on a breach of fiduciary duty claim of this nature.  *See 380544 Canada, Inc. v. Aspen*

*Tech., Inc.*, 544 F. Supp. 2d 199, 233 (S.D.N.Y. 2008).  As all of the Kerr-McGee entities

(including the Plaintiffs) have been formed under Delaware law, Delaware law governs

the substantive allegations of Count VI.

The Complaint asserts that New Kerr-McGee breached its fiduciary duties to

Tronox by failing to act in good faith because New Kerr-McGee failed to disclose to

Tronox, its creditors, and its shareholders all material facts regarding Tronox, including

the true nature and scope of the Legacy Obligations.  Moreover, as discussed above, the

Complaint details allegations that Tronox was insolvent or without adequate capital from

the time of its inception.  The Complaint thus extensively describes New Kerr-McGee's

alleged breaches of fiduciary duties, and that Tronox was insolvent or undercapitalized as

a consequence.

There is no dispute that the promoters of a corporate entity have a fiduciary duty

to the corporation.  Under Delaware law, "There is, of course, a fiduciary relationship

between the promoters of a corporation and the corporation itself.  Those who undertake

to form a new corporation, to procure for it the capital through which it may carry out the

purpose or purposes for which it was formed, are necessarily charged with the duty to act

in good faith in dealing with it."  *See Gladstone v. Bennett*, 38 Del. Ch. 391, 398, 153

A.2d 577, 582 (Del. Ch. 1959); *see also San Juan Uranium Corp. v. Wolfe*, 241 F.2d 121,

123 (10th Cir. 1957).  Nevertheless, New Kerr-McGee asserts that it was the shareholder

of the Plaintiff corporations and free to deal with its subsidiaries in its own interests and

without any fiduciary duties to them.  It states, citing *Anadarko Petroleum Corp. v.*

*Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. 1988), "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." Defendants appear to concede that when a subsidiary enters "the zone of insolvency," directors may owe fiduciary duties to a corporation's creditors, *see Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 791 (Del. Ch. 1992), but Defendants insist that the Complaint does not adequately plead insolvency.

In fact, Delaware law has evolved materially since the cases that both Defendants and Plaintiffs cite in their papers. In *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007), the Delaware Supreme Court held for the first time that the directors of an insolvent corporation have duties to creditors that may be enforceable in a derivative action on behalf of the corporation. Although it rejected the holding of several earlier Chancery cases that these duties arise when the corporation is operating "in the vicinity of insolvency," this does not help Defendants, as there are adequate allegations in the Complaint as to Tronox's actual insolvency from inception. *See Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 195 (Del. Ch. 2006) ("If a plaintiff seeks to state a claim premised on the notion that a corporation was insolvent and that the directors of the corporation were therefore obligated to consider the corporation's creditors, as an object of their fiduciary beneficence, the plaintiff must plead facts supporting an inference that the corporation was in fact insolvent at the relevant time."). These duties may impose obligations, such as the duty of loyalty, on the directors of a controlled subsidiary to protect the interests of that subsidiary's creditors, notwithstanding the general obligation that these directors have to the parent as

shareholder. *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 473-74, 481-82 (Bankr. S.D.N.Y. 2006).

No case has been cited by the parties as to whether a controlling shareholder can breach its fiduciary duties by promoting, for its own benefit, a patently insolvent corporation. Certainly, the promoters of a company do not guarantee its ultimate success. Nevertheless, on this motion to dismiss and the detailed allegations of the Complaint regarding insolvency, it would be premature to dismiss the claim on the ground that the Delaware courts would not recognize it. *See KSC Recovery v. First Boston Corp. (In re Kaiser Merger Litig.)*, 168 B.R. 991, 998 (D. Colo. 1994).

Defendants nevertheless argue that Count VI is barred by Oklahoma's statute of limitations. Both parties look to Oklahoma law,[18] but there is a conflict as to the applicable statutory provision. Defendants contend that the governing statute is Oklahoma's two-year statute of limitations governing actions for "injury to the rights of another, not arising on contract, and not hereinafter enumerated," and actions "for relief on the ground of fraud– the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud." Okla. Stat. tit. 12, § 95(A)(3); *see Slover v. Equitable Variable Life Ins. Co.*, 443 F. Supp. 2d 1272, 1282-83 (N.D. Okla. 2006) and *F.D.I.C. v. UMIC*, 136 F.3d 1375, 1380 (10th Cir. 1998); *see also Resolution Trust Corp. v. Grant*, 901 P.2d 807 (Okla. 1995).

---

[18] Under New York choice of law rules, when the plaintiff is not a New York resident, the applicable statute of limitations is the shorter of (1) New York's period of limitations or (2) the statute of limitations in the state where the cause of action accrued. *See* N.Y. C.P.L.R. 202. There seems to be no dispute that the claim arose in Oklahoma. New York's three-year statute of limitations is longer than Oklahoma's two-year statute and the same as Oklahoma's three-year statute. *See* N.Y. C.P.L.R. 213, 214(4). Thus, the Oklahoma statute applies to the instant case.

Plaintiffs rely on a separate line of authority that applies to a breach of fiduciary

duty claim the three-year limitations period of Okla. Stat. tit. 12, § 95(A)(2) for "An

action upon a contract express or implied not in writing; an action upon a liability created

by statute other than a forfeiture or penalty." *See Resolution Trust Corp. v. Greer*, 911

P.2d 257 (Okla. 1995); *Huffman v. Cohen*, 2009 WL 1227648, at *6 (N.D. Okla. Apr. 29,

2009) (applying Oklahoma's three-year period under § 95(A)(2) to a breach of fiduciary

duty claim); *see also Hughes v. Reed*, 46 F.2d 435, 440 (10th Cir. 1931) (cited in *Greer*

as using a three-year statute).

A review of the above authority demonstrates that the cases on which Defendants

rely all simply assumed, without any analysis, that the applicable statute is the two-year

period of Okla. Stat. tit. 12, § 95(A)(3). The only substantive analysis of the statute of

limitations issue in a cause of action for breach of a common law fiduciary duty is in

*Greer*, which held that a three-year period could also be appropriate. There the

Oklahoma Supreme Court held that the common law duty allegedly breached by the

defendant corporate directors:

> lies either in contract imposed by law or in trust created by operation of
> law. The former is *promise-based*; the latter is rested on a *relational duty*
> created by the ancient rules of chancery jurisprudence. Actions to enforce
> implied-in-law contracts are governed by a three-year limitation. If
> fraudulent conduct is alleged in a breach-of-trust action, the applicable
> limitation is two years. But if not, the exact limitation period that governs
> is not firmly settled by extant jurisprudence.

*Greer*, 911 P.2d at 261-62 (alterations in original) (internal citations omitted).

The Greer analysis also explains the apparent inconsistency in the cases. In

*UMIC* and *Slover*, the statute was two years as the claims in both cases were

clearly grounded on fraud, with breach of fiduciary duty thrown in as an apparent

afterthought. In *Greer*, the action was barred by any of the statutory periods and

no further explanation was in order.  In *Huffman v. Cohen*, the most recent case, the Court used a three-year statute as there were no apparent or controlling claims of common law fraud.

Application of the principles set forth in *Greer* to the facts alleged in the Complaint leads to the following conclusions.  To the extent Count VI is premised on fraud, a two-year statute of limitations would result in the claim being untimely on any theory, unless Plaintiffs can plead with greater particularity that they could not reasonably have discovered the fraud within two years of the Chapter 11 filing.[19]  Two years prior to the Chapter 11 filing was January 12, 2007, which was after the spin-off had been consummated and after Defendants had distributed their Class B shares and no longer had control of Tronox.  The three-year Oklahoma statute of limitations would allow the Plaintiffs to complain of events subsequent to January 12, 2006, a date after the spin-off had been effected on November 28, 2005, but a date when, the complaint alleges, Defendants still dominated and controlled Tronox by virtue of their control of the Class B shares.  Use of a three-year statute would be appropriate under the rule, recognized in Oklahoma, that the longer period is used when there is doubt as to the appropriate time limit.  *See Hughes*, 46 F.2d at 440; *see also Williams v. Lee Way Motor Freight, Inc.*, 688 P.2d 1294, 1297 (Okla. 1984); *FDIC v. Grant*, 8 F. Supp. 2d 1275, 1298 (N.D. Okla. 1997).

However, even a three-year limitations period helps Plaintiffs only if their further argument of tolling is accepted.  Thus, Plaintiffs do not contend that New

---

[19] Under Oklahoma law "the question of when or if a plaintiff discovered or should have discovered the alleged wrongdoing is one of fact."  *Resolution Trust Corp. v. Grant*, 901 P.2d 807, 813 (Okla. 1995).

Kerr-McGee's fiduciary duties as a promoter continued past November 28, 2005,

and the completion of the IPO, which is more than three years prior to the filing

of the Chapter 11 cases. Rather, Plaintiffs rely on a line of authority that tolls a

limitations period while a company is under the control of the putative

defendants. Plaintiffs assert that Tronox was not an independent entity, was

adversely dominated by New Kerr-McGee, and had no ability to bring a cause of

action against its controlling parent until after New Kerr-McGee distributed its

shares of Tronox Class B Common Stock on March 31, 2006. *See Resolution*

*Trust Corp. v. Interstate Federal Corp.*, 762 F. Supp. 905, 909 (D. Kan. 1991) (in

which the Court held that adverse domination doctrine tolled the Kansas

limitations period in an action against the plaintiff's parent company so long as

the plaintiff was dominated by the "wrongdoers"); *see also In re Adelphia*

*Commc'n Corp.*, 365 B.R. 24, 59 (Bankr. S.D.N.Y. 2007) (in which the Court

extended the adverse domination doctrine to toll the Pennsylvania limitations

period on claims against banks charged with aiding and abetting former

management's breaches of fiduciary duties). Plaintiffs conclude from this rule

that their breach of fiduciary duty claim did not accrue until April 1, 2006, when

the Class B common stock held by New Kerr-McGee was distributed and Tronox

became an independent company.

The leading Oklahoma case on the doctrine of adverse domination,

*Resolution Trust Corp. v. Grant*, 901 P.2d 807 (Okla. 1995), accepted the doctrine

but imposed two limitations that are relevant. First, the Oklahoma Supreme Court

limited the doctrine to suits by a wronged corporation against its officers and

directors—those who dominated and controlled it.  Second, it limited the tolling

to situations involving "fraudulent conduct" exercised while the wronged

corporation was controlled by a majority of allegedly culpable directors and

officers.[20]

Strict application of both of these limitations to the facts alleged in the

Complaint would lead to the conclusion that tolling is available only where the

directors and officers are sued and only where fraud is alleged—leading to the

imposition of a two-year limitations period from the date of reasonable discovery.

However, neither of these conclusions comports with the reasoning of the

Oklahoma Supreme Court in *Grant*.  Thus, that Court's reason for extending the

doctrine to suits by a corporation against its officers, which was "the corporation's

inability to institute suit to protect itself," 901 P.2d at 818, applies equally to suits

against a controlling shareholder.  As noted above, the duty of a controlling

shareholder has been held to be similar to the duty of a director.  *See United*

*States v. Byrum*, 408 U.S. 125, 137 (U.S. 1972); *see also KSC Recovery v. First*

*Boston Corp. (In re Kaiser Merger Litig.)*, 168 B.R. at 998.  It would be counter-

intuitive to require that a breach of duty claim be brought against an individual

director rather than the controlling shareholder that the director served and

benefited.

Second, although the doctrine of adverse domination was not extended to

"cases involving conduct less culpable than fraud," *Id.* at 875, the Oklahoma

Supreme Court in *Grant* did not necessarily restrict the rule to common law fraud.

---

[20] A third limitation was imposed by *Greer*, that the doctrine cannot be relied on by creditors of the
corporation rather than the corporation itself.  *Resolution Trust Corp. v. Greer*, 911 P.2d 257, 264 (Okla.
1995).  This limitation is not relevant as Plaintiffs are suing on behalf of the corporate entities.

53

As support for its limitation on the adverse domination doctrine, the Court said that extending the "doctrine to cases involving conduct less culpable than fraud would be to eliminate the statute of limitations in director-liability actions." *Id.* It supported "this reasoning" by reference to "recent legislative enactments allowing the insertion of liability-limiting clauses in bylaws and certificates of incorporation," citing Okla. Stat. tit. 18, § 381.26, providing that corporations can adopt provisions eliminating the liability of directors for negligent breaches of the duty of care, but not for breach of the duty of loyalty.[21]  Here, of course, the Complaint complains of a breach of the duty of loyalty.  Although breach of the duty of loyalty is described in the Complaint in terms of fraud, it need not be grounded in common law fraud in order to state a claim.  *See Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. at 474.  Thus, it would not be appropriate at this point to find that the Oklahoma courts would not permit a suit against a controlling corporation for a breach of fiduciary duty that is akin to the breach of the duty of loyalty, and to apply a three-year statute of limitations and the doctrine of adverse domination. As noted above, *Huffman v. Cohen*, 2009 WL 1227648 at *6, the most recent Oklahoma case, applied a three-year statute in a breach of fiduciary duty case.

Based on the foregoing, it is clear that Plaintiff's relatively bare-bones allegations in Count VI are inadequate.  Plaintiffs also have not adequately pled the elements of fraudulent concealment, particularly their due diligence in uncovering the wrongful conduct and taking action to obtain redress, and they have not clearly specified the breach of duty.  On the other hand, it is not clear

---

[21] Delaware has adopted a similar provision.  8 Del. C. § 102(b)(7).

that Plaintiffs could not state a claim based on a breach of fiduciary duty and

particularly the duty of loyalty.  Plaintiff will be given an opportunity to attempt

to bring their allegations within the purview of Oklahoma law, if they are so

advised.  Count VI is dismissed with leave to amend.

### VIII.    Unjust Enrichment (Count VII)

Count VII of the Complaint seeks relief against Defendants on an unjust

enrichment claim.  The Complaint asserts that "Anadarko and New Kerr-McGee

benefited directly from the Transfers and Obligations" and that to allow Defendants to

retain such benefits "would violate fundamental principles of justice, equity, and good

conscience."  (Compl. ¶ 178-79).  The parties do not dispute that New York law applies

to Plaintiffs' unjust enrichment claim, as New York law governs the MSA, which is the

master agreement that effectuated the spin-off.[22]

Under New York law, matters that are governed by a contract generally cannot be

the subject of unjust enrichment claims.  As the New York Court of Appeals said in *IDT*

*Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 907 N.E.2d 268, 879

N.Y.S.2d 355 (2009), "Where the parties executed a valid and enforceable written

contract governing a particular subject matter, recovery on a theory of unjust enrichment

for events arising out of that subject matter is ordinarily precluded." *See also Clark-*

*Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 516 N.E.2d 190, 521 N.Y.S.2d

653 (1987); *Matarese v. Moore-McCormack Lines*, 158 F.2d 631, 634 (2d Cir. 1947)

("The doctrine of unjust enrichment or recovery in quasi-contract obviously does not deal

with situation in which the party to be charged has by word or deed legally consented to

---

[22] There is also no contention that any other law other than New York's would provide a different result.
*See In re Lois/USA, Inc.*, 264 B.R. 69, 106 (Bankr. S.D.N.Y. 2001).

assume a duty toward the party seeking to charge him."); *In re MarketXT Holdings Corp.*, 376 B.R. 390, 422 (Bankr. S.D.N.Y. 2007) ("Unjust enrichment is a remedy that the law creates in the absence of any agreement.") (internal citations omitted).

As discussed above, Plaintiffs themselves assert that the transfers at issue herein were governed by the 2005 Assignment Agreements and the 2005 MSA. Plaintiffs fail to provide substantial support for their contention that the MSA does not govern the parties' "rights and obligations" and thus does not preclude the unjust enrichment claim, especially as Plaintiffs rely heavily on the agreements in connection with the statute of limitations issues. In light of the existence of express contracts governing the matters in question, Plaintiffs may not invoke quasi-contract law and the theory of unjust enrichment. Count VII is therefore dismissed.

### IX.    Equitable Subordination and Disallowance of Claims (Count VIII-XI)

Plaintiffs seek equitable subordination under § 510(c) of the Bankruptcy Code (Count VIII), equitable disallowance (Count IX), and disallowance under §§ 502(d) (Count X) and 502(e)(1)(B) (Count XI) of the Code of any claims that may be filed by Defendants. However, it was premature for Plaintiffs to raise the issue at a time when Defendants had not yet filed proofs of claim. The great weight of authority is that "Section 510(c) does not permit subordination absent an allowed claim." *In re Fox Hill Office Investors, Ltd.*, 101 B.R. 1007, 1022 (Bankr. W.D. Mo. 1989); *see also In re Enron Corp.*, 379 B.R. 425, 438 (S.D.N.Y. 2007) (holding "disallowance of a claim under the terms of section 502(d) is completely contingent on the refusal or failure to return the avoidable transfer by the recipient of that avoidable transfer"); *In re Atl. Computer Systems*, 173 B.R. 858, 862

(S.D.N.Y. 1994) (holding that 502(d) requires "some sort of determination of the

claimant's liability before its claims are disallowed, and in the event of an adverse

determination, the provision of some opportunity to turn over the property."

(citing 3 Collier on Bankruptcy, ¶ 502.04 (15th ed. 1993))); *In re The Brown

Schools*, 368 B.R. 394, 414 (Bankr. D. Del. 2007); *In re Alliance Leasing Corp.*,

2007 WL 5595446, at *9 (Bankr. M.D. Tenn. July 3, 2007).  If either Defendant

files a proof of claim, the issues of subordination and disallowance can be raised.

Counts VIII, IX, X and XI are accordingly dismissed without prejudice to renewal

in the event Defendants file proofs of claim.

### X.    Anadarko As a Party

Plaintiffs have named Anadarko as a Defendant on Counts I, II, and III of the

Complaint (the fraudulent conveyance claims).  In response to Defendants' contention

that Anadarko is not a proper defendant on those claims, Plaintiffs contend briefly that

Anadarko is a proper defendant as the "entity for whose benefit [the] transfer was made."

(Opp. to Mot. 49).  Section 550 of the Bankruptcy Code makes an entity for whose

benefit a conveyance was made equally liable with the initial transferee.  Section 120 of

the Oklahoma UFTA has a similar provision.

In any event, Plaintiffs' speculation that negotiations between New Kerr-McGee

and Anadarko may have commenced before the distribution of the Class B shares in 2006

does not suffice as a claim against Anadarko.  There is no authority to support the

proposition that an unknown, unidentified third party, merely a prospective subsequent

transferee at the time of the fraudulent conveyance, can also be the party for whose

benefit the transfer was made.  *See In re Bullion Reserve of North Am.*, 922 F.2d 544, 547

(9th Cir. 1991) ("A subsequent transferee cannot be an entity for whose benefit the initial

transfer was made, even if the subsequent transferee actually receives a benefit from the

initial transfer."); *see also Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 895

(7th Cir. 1988); *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R.

293, 314 (Bankr. S.D.N.Y. 1999); *In re Richmond Produce Co.*, 118 B.R. 753, 760

(Bankr. N.D. Cal. 1990).

Plaintiffs are on stronger ground when they assert that Anadarko, as the party that

acquired the Oil and Gas Business, is a subsequent transferee of the assets.  The UFTA

provides for recovery against "*any* subsequent transferee other than a good faith

transferee…."  Okla. Stat. tit. 24, § 120(B) (emphasis added).  Similarly, § 550(a) of the

Bankruptcy Code provides that recovery of fraudulently transferred assets may be sought

from "(1) the initial transferee of such transfer or the entity for whose benefit such

transfer was made," or "(2) *any* immediate or mediate transferee of such initial

transferee."  11 U.S.C. § 550(a) (emphasis added).  Under § 550(b)(1), a trustee may not

recover an otherwise avoidable transfer from a subsequent transferee "that takes for

value, including satisfaction or securing a present antecedent debt in good faith, and

without knowledge of the voidability of the transfer avoided."

An immediate or mediate transferee is a subsequent transferee that exercises legal

dominion over the relevant assets.  *See Sec. Investor Protection Corp. v. Stratton

Oakmont*, 234 B.R. at 313 n.9, holding that "an initial transferee is the person who has

dominion and control over the subject of the initial transfer to the extent that he or she

may dispose of it as he or she pleases," and that such interpretation "applies not only to

initial transferee but to subsequent transferees as well," citing *Bonded Financial Services,*

*Inc. v. European American Bank*, 838 F.2d at 894; *see also In re 360networks (USA) Inc.*, 338 B.R. 194, 201-02 (Bankr. S.D.N.Y. 2005). In the present case, Anadarko acquired New Kerr-McGee shortly after the spin-off. As the parent and purchaser of New Kerr-McGee, Anadarko had dominion and control over the relevant assets. Defendants cite *Bonded Fin. Serv.* for the proposition that a third party who subsequently receives fraudulently transferred funds should not be held liable where it gave value and was not in a position to monitor the *bona fides* of the initial transfer. Defendants are correct and, as noted above, Anadarko may have defenses that are broader than those available to New Kerr-McGee. However, it cannot assert those at this time as good faith is primarily a question of fact. *See In re Tiger Petroleum Co.*, 319 B.R. 225, 235 (Bankr. N.D. Okla. 2004). For purposes of this motion to dismiss, the Complaint adequately pleads that Anadarko is a subsequent transferee and a proper defendant to the fraudulent conveyance claims.

## XI.    Punitive Damages

Plaintiffs have appended a demand for punitive damages to their claims in Counts I, II, IV, V and VI. The Court has dismissed the claims based on civil conspiracy (Count IV), aiding and abetting a fraudulent conveyance (Count V) and breach of fiduciary duty as a promoter (Count VI), leaving only the intentional fraudulent conveyance claims as predicate for punitive damages (Counts I).[23]

---

[23] While the Complaint demands punitive damages in the counts alleging constructive fraudulent conveyance, Plaintiffs have not responded to Defendants' argument, which is correct, that punitive damages are unavailable in connection with these claims. *See In re Best Prods. Co., Inc.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("Fraudulent transfer laws are intended to promote payment to creditors; that is, the statutes are remedial, rather than punitive."); *In re Centennial Textiles*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.").

With respect to the demand for punitive damages on the actual fraudulent transfer claim (Count I), Plaintiffs first argue that such damages are available under Federal law. Plaintiffs, however, do not cite a single case providing for the recovery of punitive damages under the Bankruptcy Code.  Moreover, the Code has a specific provision regarding remedies available to a plaintiff in an avoidance case.  Section 550(a) of the Bankruptcy Code provides for the recovery of fraudulently transferred property or the value thereof in connection with avoidance actions, but does not provide for the recovery of punitive damages.  Persuasive authority holds that § 550 bars punitive damages notwithstanding their possible availability under state law.  As the Court said in *In re Lexington Oil and Gas Ltd.*, 2010 WL 431401, at *18 (Bankr. E.D. Okla. Jan. 27, 2010), *quoting Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*, 292 B.R. 255 (Bankr.N.D.Tex.2003), Bankruptcy Code "Section 550 does not provide for the recovery of exemplary damages.... [T]he court cannot invoke state law remedies to circumvent or undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer…."  *Accord, In re Fedders North America, Inc.*, 405 B.R. at 548.

In addition, Plaintiffs have no direct support for the proposition that punitive damage claims are recoverable under the Oklahoma UFTA.  The Oklahoma UFTA does not explicitly address the issue, and Plaintiffs do not cite any decision interpreting Oklahoma law that allows punitive damages for fraudulent transfer claims.  Plaintiffs contend that punitive damages should be allowed because other states have allowed punitive damages under their UFTA provisions, and the Oklahoma UFTA instructs that it should be applied uniformly among the states.  This argument does not help Plaintiffs because while some states have allowed punitive damages under their respective versions

of the UFTA, other states have not.[24]  Moreover, as the Oklahoma Supreme Court

recently held, punitive damages are ordinarily granted in order to deter or punish tortious

conduct.  *See Wilspec Techs., Inc. v. Dunan Holding Group Co.*, 204 P.3d 69, 75 (Okla.

2009).  The Oklahoma statute on punitive damages allows punitive damages "[i]n an

action for breach of an obligation not arising from contract."  Okla. Stat. tit. 23, § 9.1.

Although Plaintiffs contend that their fraudulent conveyance claim does not arise from

contract, Oklahoma authority is to the contrary.  *See F.D.I.C. v. Hinch*, 879 F. Supp.

1099, 1108-09 (N.D. Okla. 1995) (stating that the "weight of authority suggests that"

fraudulent transfer claims "should be analyzed as a contract action" in deciding the

applicable statute of limitations under Federal law).[25]

        In light of the foregoing, the request for punitive damages in connection with

Plaintiffs' fraudulent conveyance claim is insufficient and should be stricken.[26]

---

[24] *See Volk Constr. Co. v. Wilmescherr Drusch Roofing Co.*, 58 S.W.3d 897, 900 n.3 (Mo. Ct. App. 2001), noting that Missouri and Ohio allow punitive damages for actual fraudulent transfer claims, but Connecticut does not.

[25] There are several cases outside of Oklahoma also holding that a fraudulent conveyance case does not sound in tort.  *See United States v. Franklin Nat'l Bank*, 376 F. Supp. 378, 384 (E.D.N.Y. 1973) (holding that "the right upon which an action to set aside a fraudulent conveyance is based is not the right to recover damages sustained from the wrongful action of the grantee, but rather the right of the creditor to protect and preserve his interest in the debtor's property.  This right would appear to be founded in equity, not in tort."); *Beta Real Corp. v. Graham*, 839 So.2d 890, 891-92 (Fla. Dist. Ct. App. 2003); *F.D.I.C. v. Martinez Almodovar*, 671 f. Supp. 851, 871 (D.P.R. 1987).

[26] There is no need to decide whether Plaintiffs can claim punitive damages on Count VI, breach of fiduciary duty as a promoter, in light of the dismissal of this count.  Plaintiffs are not precluded from including a claim for punitive damages if they replead; however, it is noted that to the extent Plaintiffs seek damages grounded in tort, the two year statute of limitations of Okla. Stat. tit. 12, § 95(A)(3) would appear applicable, a time period that would likely bar their claim altogether.

## <u>CONCLUSION</u>

Counts IV, V, VI, VII, VIII, IX, X, and XI and the request for punitive damages in the Complaint are dismissed, Counts VIII through XI without prejudice to renewal if Defendants file proofs of claim.  The motion to dismiss Counts I, II, and III is denied. Plaintiffs are granted leave to replead Counts IV, V and VI.  Plaintiffs are directed to settle an order on five days' notice.

Dated: New York, New York
      March 31, 2010

                        */s/ Allan L. Gropper*_____
                        UNITED STATES BANKRUPTCY JUDGE