# Exhibit A

S-1/A 1 a2163087zs-1a.htm FORM S-1/A

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO COMBINED FINANCIAL STATEMENTS

As filed with the Securities and Exchange Commission on November 21, 2005

Registration No. 333-125574

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Amendment No. 6
# to
# FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

# TRONOX INCORPORATED
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 2810 | 20-2868245 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma 73102
(405) 270-1313
(Address, Including Zip Code, and Telephone Number,
Including Area Code, of Registrant's Principal Executive Offices)

Roger G. Addison, Esq.
Vice President, General Counsel and Secretary
Tronox Incorporated
123 Robert S. Kerr Avenue
Oklahoma City, Oklahoma 73102
(405) 270-1313
(Name, Address, Including Zip Code, and Telephone Number,
Including Area Code, of Agent For Service)

Copy To:

David B.H. Martin, Esq.
Covington & Burling                                J. Michael Chambers, Esq.

| 1201 Pennsylvania Avenue, N.W. | Akin Gump Strauss Hauer & Feld LLP |
| --- | --- |
| Washington, D.C. 20004 | 1111 Louisiana Street, 44th Floor |
| (202) 662-6000 | Houston, Texas 77002 |
|  | (713) 220-5800 |

**Approximate date of commencement of proposed sale to the public:**   As soon as practicable after the effective date of this Registration Statement.

If the securities being registered on this form are being offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434 under the Securities Act, please check the following box. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price(2) | Amount of Registration Fee |
| --- | --- | --- |
| Class A Common Stock, par value $0.01 per share, including the associated preferred share purchase rights(1) | $321,632,000 | $37,856(3) |

(1)   Preferred share purchase rights initially will trade together with the Class A common stock. The value attributable to the rights, if any, will be reflected in the market price of the Class A common stock.
(2)   Estimated solely for the purpose of calculating the amount of the registration fee pursuant to Rule 457(o). The proposed maximum aggregate offering price includes amounts attributable to shares that the underwriters have the option to purchase.
(3)   $35,310 of this amount was paid as a filing fee in connection with the initial filing of the registration statement on June 6, 2005. As a result, $2,546 is payable with this filing.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, or until this registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and is not soliciting offers to buy these securities in any state where the offer or sale is not permitted.

Subject to Completion, dated November 21, 2005

PROSPECTUS

## 17,480,000 Shares



### Class A Common Stock

We are offering 17,480,000 shares of our Class A common stock in this initial public offering. No public market currently exists for our Class A common stock.

This offering of our Class A common stock is conditioned upon the completion of a concurrent joint private offering by Tronox Worldwide LLC and Tronox Finance Corp. (which will be our wholly-owned subsidiaries at closing) of unsecured senior notes, and the concurrent entry by Tronox Worldwide LLC into a senior secured credit facility.

Our Class A common stock has been approved for listing on the New York Stock Exchange under the symbol "TRX," subject to official notice of issuance. We anticipate that the initial public offering price will be between $14.00 and $16.00 per share.

**Investing in our Class A common stock involves risks.
See "Risk Factors" beginning on page 16.**

|  | Per Share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discount | $ | $ |
| Proceeds to Tronox Incorporated (before expenses) | $ | $ |

We have granted the underwriters a 30-day option to purchase up to an additional 2,622,000 shares of Class A common stock from us on the same terms and conditions as set forth above if the underwriters sell more than 17,480,000 shares of our Class A common stock in this offering.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

The underwriters expect to deliver the shares on or about          , 2005.

# LEHMAN BROTHERS                                      JPMORGAN

**CITIGROUP**                                  **CREDIT SUISSE FIRST BOSTON**

| ABN AMRO INCORPORATED | CALYON SECURITIES (USA) INC. | FRIEDMAN BILLINGS RAMSEY |
|---|---|---|
| SCOTIA CAPITAL | SG CORPORATE & INVESTMENT BANKING | SUNTRUST ROBINSON HUMPHREY |

           , 2005

## PROSPECTUS SUMMARY

*This summary highlights the material information contained elsewhere in this prospectus but may not contain all of the information that is important to you. You should read the entire prospectus carefully, including the combined financial statements and related notes and the factors described in "Risk Factors," before making an investment decision.*

*Tronox Incorporated is currently an indirect wholly-owned subsidiary of Kerr-McGee Corporation and was formed on May 17, 2005 to hold Kerr-McGee Corporation's chemical business. Kerr-McGee's chemical business is operated by Tronox Worldwide LLC and its subsidiaries, including Tronox LLC (formerly Kerr-McGee Chemical LLC) and various European subsidiaries. In the past, Tronox Worldwide LLC, its subsidiaries and their predecessors engaged in, and as a result have liabilities associated with, other businesses, including businesses involving the treatment of forest products, the production of ammonium perchlorate, the refining and marketing of petroleum products, offshore contract drilling, coal mining and the mining, milling and processing of nuclear materials.*

*This prospectus describes Tronox Incorporated as if it held the subsidiaries that will be transferred to it prior to closing for all historical periods presented. For more information, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" and note 1 to the audited combined financial statements included elsewhere in this prospectus. Unless the context otherwise requires, any references in this prospectus to "we," "our," "us" and "Tronox" refer to Tronox Incorporated and its consolidated subsidiaries as in effect on the closing date of this offering. Any references in this prospectus to "Kerr-McGee" refer to Kerr-McGee Corporation and its consolidated subsidiaries, other than us. Any references in this prospectus to "Tronox Worldwide" refer to Tronox Worldwide LLC (formerly Kerr-McGee Chemical Worldwide LLC).*

### Our Company

**Overview**

Tronox is one of the leading global producers and marketers of titanium dioxide. Titanium dioxide is a white pigment used in a wide range of products for its exceptional ability to impart whiteness, brightness and opacity. We market titanium dioxide pigment, which represented more than 90% of our net sales in 2004, under the brand name TRONOX®. We are the world's third largest producer and marketer of titanium dioxide based on reported industry capacity by the leading titanium dioxide producers, and we have an estimated 13% market share of the $9 billion global market in 2004 based on reported industry sales. Our world-class, high-performance pigment products are critical components of everyday consumer applications, such as coatings, plastics and paper, as well as specialty products, such as inks, foods and cosmetics. In addition to titanium dioxide, we produce electrolytic manganese dioxide, sodium chlorate and boron-based and other specialty chemicals. In 2004, we had net sales of $1.3 billion and a net loss of $127.6 million. For the first nine months of 2005, we had net sales of $1.0 billion and net income of $12.6 million.

The chart below summarizes our 2004 net sales by business segment:

**2004 Net Sales by Business Segment**



Pigment Segment 93%

Electrolytic and Other Chemical Products Segment 7%

1

result we will be, subject to significant liabilities associated with those other businesses. See "*Risk Factors—Risks Related to Our Business and Industry—We will be subject to significant liabilities that are in addition to those associated with our primary business. These liabilities could adversely affect our financial condition and results of operations and we could suffer losses as a result of these liabilities even if our primary business performs well.*"

After completion of this offering, investors in this offering will own all of our outstanding Class A common stock. Kerr-McGee will not own any of our Class A common stock but will indirectly own all of our outstanding Class B common stock, which will represent 88.7% of the combined voting power of all outstanding classes of our common stock (assuming no exercise by the underwriters of their option to purchase additional shares). See "*Principal Stockholder.*" As a result, Kerr-McGee will be able to control the vote on all matters submitted to our stockholders, including the election of directors. See "*Risk Factors—Risks Related to Our Relationship with Kerr-McGee—As long as Kerr-McGee owns shares of our common stock representing a majority of the voting power of our common stock, it will control us and the influence of our other stockholders over significant corporate actions will be limited.*"

Kerr-McGee has advised us that, subject to the terms of its agreement with the underwriters (as discussed in "*Underwriting—Lock-Up Agreements*"), following completion of this offering it intends to distribute all of the shares of our Class B common stock that it owns to its stockholders (the "Distribution"). Kerr-McGee expects to accomplish the Distribution through a spin-off, split-off or a combination of both transactions. A spin-off would take the form of a pro rata distribution by Kerr-McGee of its shares of our Class B common stock to holders of Kerr-McGee's common stock. A split-off would be an exchange offer pursuant to which holders of shares of common stock of Kerr-McGee would be invited to exchange those shares for our Class B common stock that Kerr-McGee then holds. However, Kerr-McGee is not required to complete the Distribution. Kerr-McGee has the sole discretion to decide if and when the Distribution will occur and to determine the form, the structure and all other terms of any transactions to effect the Distribution. For a more detailed discussion of the Distribution, please see "*Arrangements between Kerr-McGee and Our Company*" and "*Risk Factors—Risks Related to Our Relationship with Kerr-McGee—The Distribution may not occur, and we may not achieve the expected benefits of the Distribution.*"

Prior to the completion of this offering, we will enter into agreements with Kerr-McGee that, regardless of whether the Distribution occurs, will govern the separation of our businesses and various interim and ongoing relationships, including agreements with respect to the provision of interim services by Kerr-McGee to us. Under the terms of these agreements, we are entitled to the ongoing assistance of Kerr-McGee only for a limited period of time. See "*Arrangements between Kerr-McGee and Our Company.*" All of the agreements relating to our separation from Kerr-McGee have been made in the context of a parent-subsidiary relationship and have been entered into in the overall context of our separation from Kerr-McGee. The terms of these agreements may be less favorable to us than if they had been negotiated with unaffiliated third parties. See "*Risk Factors—Risks Related to Our Relationship with Kerr-McGee—Our separation agreements with Kerr-McGee may be less favorable to us than if they had been negotiated with unaffiliated third parties*" and "*Arrangements between Kerr-McGee and Our Company.*"

We believe that our separation from Kerr-McGee will enable us to realize the following benefits:

- *Focused management attention.*   Our separation from Kerr-McGee will allow us to focus managerial attention solely on our business, resulting in stream-lined decision-making, more efficient deployment of resources, increased operational flexibility and enhanced responsiveness to our customers and markets.

- *Incentives for our employees to be more directly linked to our performance.*   Our separation from Kerr-McGee will enable us to offer our employees compensation more directly linked to the performance of our business.

5

transfer restrictions and foreign currency exchange regulations in the jurisdictions in which our subsidiaries operate. Our subsidiaries are separate and distinct legal entities. Any right that we have to receive any assets of or distributions from any subsidiary upon its bankruptcy, dissolution, liquidation or reorganization, or to realize proceeds from the sale of the assets of any subsidiary, will be junior to the claims of that subsidiary's creditors, including trade creditors.

*Various factors may hinder the declaration and payment of dividends.*

The payment of dividends is subject to the terms of our concurrent financing transactions, as well as to the discretion of our board of directors, and various factors may cause the board to determine not to pay dividends. Such factors include our financial condition, our earnings and cash flows, our capital requirements, contractual restrictions and such other factors as our board of directors may consider relevant. See "*Dividend Policy*." In addition, our assets consist primarily of investments in our operating subsidiaries. Our cash flow and ability to pay dividends depend upon cash dividends and distributions or other transfers from our subsidiaries. See "—*We are a holding company and depend on the performance of our subsidiaries and their ability to make distributions to us.*"

### Risks Related to Our Relationship with Kerr-McGee

*Our historical financial information may not be representative of our results as a stand-alone company and, therefore, may not be reliable as an indicator of our future financial results.*

The historical financial information we have included in this prospectus has been derived from Kerr-McGee's accounting records. We believe that the assumptions underlying the combined financial statements are reasonable. However, the historical combined financial statements may not reflect what our results of operations, financial position and cash flows would have been had we been a stand-alone company during the periods presented or what our results of operations, financial position and cash flows will be in the future.

In particular, the historical combined financial statements reflect allocations for corporate functions historically provided by Kerr-McGee, including general corporate expenses and employee benefits. These allocations were based on what Kerr-McGee considered to be reasonable reflections of the historical utilization levels of these services required in support of our business and may be less than the expenses we will incur in the future as a stand-alone company. For example, we currently estimate that general annual corporate expenses will increase by approximately $20.0 to $25.0 million when we become a stand-alone company. In addition, we have not made adjustments to our historical financial information to reflect changes that may occur in our cost structure, financing and operations as a result of our separation from Kerr-McGee, including changes resulting from no longer being a member of a consolidated group for tax purposes. These changes potentially include increased costs associated with reduced economies of scale.

For additional information about our past financial performance and the basis of the presentation of the historical combined financial statements, please see "*Selected Historical Combined Financial Data*," "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" and the combined financial statements and notes to the combined financial statements included elsewhere in this prospectus.

*As long as Kerr-McGee owns shares of our common stock representing a majority of the voting power of our common stock, it will control us and the influence of our other stockholders over significant corporate actions will be limited.*

Upon the closing of this offering, Kerr-McGee will own all of our Class B common stock, which will represent a majority of the combined voting power of all outstanding classes of our common stock. As a result, Kerr-McGee will be entitled to nominate a majority of our board of directors and will have the ability to control the vote in any election of directors. Kerr-McGee will also have control over our

24

decisions to enter into significant corporate transactions and, in its capacity as our majority stockholder, will have the ability to prevent any transactions that it does not believe are in Kerr-McGee's best interest. As a result, Kerr-McGee will be able to control, directly or indirectly and subject to applicable law, all matters affecting us, including the following:

- any determination with respect to our business direction and policies, including the appointment and removal of officers;

- any determinations with respect to mergers, business combinations or dispositions of assets;

- our capital structure;

- compensation, option programs and other human resources policy decisions;

- changes to other agreements that may adversely affect us; and

- the payment of dividends on our common stock.

*The interim services provided to us by Kerr-McGee may not be sufficient to meet our needs, and we may not be able to replace these services after our agreements with Kerr-McGee expire.*

Historically, Kerr-McGee performed various corporate functions on our behalf, including the following:

- accounting services;

- tax services;

- employee benefits management;

- financial services;

- legal services;

- risk and claims management;

- information management and technology services;

- real estate management;

- travel services; and

- office administration services.

Following the completion of this offering, Kerr-McGee will have no obligation to provide any services on our behalf other than as provided in our transition services agreement with Kerr-McGee. See "*Arrangements between Kerr-McGee and Our Company—Transition Services Agreement*." We are in the process of creating our own, or engaging third parties to provide, systems and business functions to replace many of the systems and business functions Kerr-McGee provides us. However, we may not be successful in implementing these systems and business functions or in transitioning data from Kerr-McGee's systems to ours. If we do not have in place our own systems and business functions or if we do not have agreements with other providers of these services when our transition services agreement with Kerr-McGee expires, we may not be able to effectively operate our business and our profitability may be affected adversely.

*We will qualify for, and intend to rely on, exemptions from the New York Stock Exchange corporate governance requirements.*

Upon the closing of this offering, Kerr-McGee will continue to control a majority of the voting power of our outstanding common stock. As a result, we are a "controlled company" within the meaning of the New York Stock Exchange corporate governance standards. Under the New York Stock

*Company—Tax Sharing Agreement—Tax Limitations on Additional Issuances of Our Stock and Other Transactions.*"

***The Distribution may not occur, and we may not achieve the expected benefits of the Distribution.***

Kerr-McGee has advised us that, subject to the terms of its agreement with the underwriters (as discussed in "*Underwriting—Lock-Up Agreements*"), following completion of this offering it intends to distribute all of our Class B common stock that it owns to its stockholders. However, Kerr-McGee is not required to complete the Distribution and may decide in its sole discretion not to effect the Distribution. If the Distribution does not occur, or even if it does occur, we may not obtain the benefits we expect as a result of our separation from Kerr-McGee. In addition, until the Distribution occurs, the risks relating to Kerr-McGee's control of us and the potential conflicts of interest between Kerr-McGee and us will continue to be relevant to our stockholders. See "*—As long as Kerr-McGee owns shares of our common stock representing a majority of the voting power of our common stock, it will control us and the influence of our other stockholders over significant corporate actions will be limited.*" and "*—Our executive officers and directors may have conflicts of interest because of their ownership of common stock of, and other ties to, Kerr-McGee.*"

***Our executive officers and directors may have conflicts of interest because of their ownership of common stock of, and other ties to, Kerr-McGee.***

Two of our directors are officers of Kerr-McGee. These directors will have fiduciary duties to both companies and may have conflicts of interest on matters affecting both us and Kerr-McGee, which, in some circumstances, may have interests adverse to our interests. In addition, all of our executive officers and the majority of our directors own common stock of Kerr-McGee or options to purchase common stock of Kerr-McGee. Ownership of such common stock or options could create, or appear to create, potential conflicts of interest when directors and officers are faced with decisions that could have different implications for Kerr-McGee and us.

***Our separation agreements with Kerr-McGee may be less favorable to us than if they had been negotiated with unaffiliated third parties.***

We will enter into our separation agreements with Kerr-McGee while we are a wholly-owned subsidiary of Kerr-McGee. If these agreements were negotiated with unaffiliated third parties, they might be more favorable to us. Pursuant to our agreements with Kerr-McGee, we will agree to indemnify Kerr-McGee for, among other matters, liabilities related to the current and past businesses operated by our subsidiaries and their predecessors, subject to limited exceptions for which Kerr-McGee has expressly assumed liability. See "*Arrangements Between Kerr-McGee and Our Company*" for a description of these obligations. The allocation of assets and liabilities between Kerr-McGee and us may not reflect the allocation that would have been reached by two unaffiliated parties.

**Risks Related to This Offering**

***There is no existing market for our Class A common stock, and an active trading market may not develop or the price of our Class A common stock may decline.***

Prior to this offering, there has been no public market for our Class A common stock and there can be no assurance that an active trading market will develop and continue upon completion of this offering. You may be unable to resell your shares at or above the initial public offering price, which will be determined by negotiations between the underwriters and us and may not be indicative of the market price for our Class A common stock after the initial public offering. Factors that could affect our market price include the following:

- variations in our actual or anticipated operating results;

27