UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| IN RE: | : | Bankr. Case No. 09-10156 (ALG) |
|     TRONOX INCORPORATED, *et al.*, | : | (Jointly Administered) |
| | : | |
|              Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

| | | |
|---|---|---|
| TRONOX INCORPORATED, *et al.*, | | |
| | : | Adversary Proceeding |
|         Plaintiffs, | | No. 09-01198 (ALG) |
| | : | |
|     - against - | | |
| | : | |
| ANADARKO PETROLEUM CORPORATION and KERR-MCGEE CORPORATION, | : | |
| | | |
|         Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | : | **GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY AND FOR SANCTIONS, AND IN SUPPORT OF GOVERNMENT'S MOTION FOR A PROTECTIVE ORDER** |
|         Plaintiff-Intervenor, | : | |
|     - against - | : | |
| TRONOX, INC., *et al.*, | : | |
|         Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for United States of America
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel. (212) 637-2785

JOSEPH A. PANTOJA
ROBERT W. YALEN
TOMOKO ONOZAWA
Assistant United States Attorney

    - Of Counsel -

## TABLE OF CONTENTS

<u>Page</u>

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A.    The Government's Production of Paper Documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    1.    The Government Complied with the Initial
March 31, 2010 Discovery Deadline. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    2.    Defendants' Failed to Timely Arrange for
Inspection Prior to Filing the Motion to Compel. . . . . . . . . . . . . . . . . . . . . . . . . . 6

        a.    EPA Region 2's Documents at Lee's Summit and 290 Broadway. . . . . . . . 6

        b.    Army Corps of Engineers's Documents-330054. . . . . . . . . . . . . . . . . . . . 8

        c.    Forest Service's Documents in Colorado-101146-NYC. . . . . . . . . . . . . . 8

B.    The Motion to Compel, filed July 9, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    1.    The Motion as Originally Filed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    2.    The Parties' Negotiations Since the Filing of the July Motion . . . . . . . . . . . . . . 10

    3.    The Government's Objections to Defendants' Document
Requests and to Production from Non-Federal Claimants.. . . . . . . . . . . . . . . . . 10

    4.    Additional Productions by the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        a.    Hard Copy Paper Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        b.    Potential Supplemental Productions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        c.    Categories of Paper Documents for which the
Government Claimed an Undue Burden . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    5.    Defendants' Supplemental Brief, filed on November 22, 2010. . . . . . . . . . . . . . 14

C.    Electronic Documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

POINT I:        THE GOVERNMENT COMPLIED WITH
                ITS DISCOVERY OBLIGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A.      The Government Made Substantially All of Its Responsive
        Paper Documents Available for Inspection by November 1, 2010. . . . . . . . . . . . . . . . . 16

B.      The Government Was Not Required to Reduce its Original Files to
        Electronic Form or Reorganize Them According to the Document Requests. . . . . . . . . . 17

C.      The Parties Resolved the Scope, Manner, and Cost of Scanning the Material
        That the Government Had Made Available for Inspection Prior to July 2010. . . . . . . . . 20

D.      The Government Has Produced Substantially All of
        Its Responsive, Non-Duplicative Electronic Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

POINT II:       DEFENDANTS ARE NOT ENTITLED TO
                DOCUMENTS CONCERNING THE MULTI-PARTY
                NEGOTIATIONS IN THE BANKRUPTCY. . . . . . . . . . . . . . . . . . . . . . . . . . . 22

A.      The Document Requests Seeking Settlement-Related Documents Are Overbroad,
        Unduly  Burdensome, and Unlikely to Lead to Discovery of Admissible Evidence. . . . . 24

B.      The Requested Documents Are Privileged. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        1.      Documents Internal to the United States Are Protected Work Product. . . . . . . . . 26

        2.      Documents Internal to the United States
                Are Protected Attorney-Client Communications . . . . . . . . . . . . . . . . . . . . . . . . . 28

        3.      Bankruptcy-Related Negotiations Are Protected
                by the Common Interest Privilege and the
                Work Product Doctrine Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                a.      Common Interest Privilege. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                b.      Work Product Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

C.      Settlement-Related Documents Are Protected from
        Disclosure by the Strong Public Policy Favoring Settlement . . . . . . . . . . . . . . . . . . . . . 34

POINT III:      THE GOVERNMENT IS NOT REQUIRED TO PRODUCE
                DOCUMENTS THAT ARE EQUALLY ACCESSIBLE TO
                DEFENDANTS AND OTHERWISE UNDULY BURDENSOME
                FOR THE GOVERNMENT TO PRODUCE. . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ii

A.      Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.      Microfilm at the NRC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

C.      Documents Related to Uranium Mining . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        1.      Documents at the National Archives at
                Denver, CO (Rocky Mountain Region). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        2.      Documents in the Custody of the U.S. Department of Energy. . . . . . . . . . . . . 41

        3.      USGS Mineral Resources Data System (MRDS). . . . . . . . . . . . . . . . . . . . . . . . 41

D.      Underlying Cost Documentation for Costs Already Paid. . . . . . . . . . . . . . . . . . . . . . . 42

POINT IV:       DEFENDANTS' REQUEST FOR SANCTIONS
                IS WHOLLY INAPPROPRIATE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A.      Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B.      Defendants Are Not Entitled to Preclusion of
        Documents or Striking of the Government's Pleading. . . . . . . . . . . . . . . . . . . . . . . . . 44

C.      Defendants Are Not Entitled to Monetary Sanctions.. . . . . . . . . . . . . . . . . . . . . . . . . 48

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## Preliminary Statement

To date, the Government has made approximately 1,000 boxes of paper documents available for inspection and copying, and has produced approximately 1.25 million electronic documents. Defendant's motion to compel discovery and for sanctions is based on their mistaken interpretation of Rule 34 of the Federal Rules of Civil Procedure and is entirely without merit both on the facts and the law. Claiming irreparable harm to their ability to defend the adversary proceeding by the Government's alleged failure to comply with Defendants' requests for documents, Defendants seek an Order: (1) precluding the introduction into evidence any documents or other information produced by the Government after November 1st; (2) precluding any party from asserting any claim against or seeking to recover any amounts from Defendants with respect to environmental liabilities at sites for which the Government had not completed its production as of November 1st; (3) compelling the Government to produce all responsive documents by December 31, 2010; (4) conditionally striking the Complaint in Intervention in its entirety and precluding any party from seeking to recover from Defendants based on amounts allegedly owed to the Government, unless the Government completes its production of all responsive documents by December 31, 2010; and (5) awarding to Defendants their attorneys' fees and costs incurred in making their Motion. *See* Supp. Br. at 3-4.

The Government produced substantially all of its non-privileged, responsive paper documents by the applicable deadlines in the Amended and Second Amended Case Management Orders, by making those documents available for inspection as they were kept in the usual course of business. Defendants contend, however, that the Government should instead have reduced its responsive paper records to electronic form, and then labeled and organized those records according to Defendants' document requests; and that until that happens, Defendants are

being "forced to proceed without the Government's documents." Defendants' Supplement

Memorandum of Law ("Supp. Br.") at 3; *see also* Defendants' moving Memorandum of Law

("Br.") at 13, 17-20. That contention is belied by the plain language of Rule 34, which permits a

party to comply with a document demand by making responsive documents available for

inspection and copying; and by the express provision in the Amended Case Management Order,

to which Defendants had agreed, that the Government would be producing its documents in this

adversary proceeding by making them available for inspection and copying.

       Instead of inspecting the Government's records months ago – and copying or

scanning any that they wanted – prior to filing their motion, Defendants sent a lone attorney in

May and June to review only a portion of the Government's paper at two locations and did not

arrange for any of that material to be scanned. Having reportedly spent $68 million litigating the

adversary proceeding to date, Defendants' failure to inspect and scan all of the Government's

paper months ago constitutes unclean hands on their part. An additional example of Defendants'

mischaracterizations of the facts is their contention that "very little has changed in terms of the

Government's production of documents" since the filing of their motion in July 9. *See* Supp. Br.

at 3. In fact the parties reached agreement in September on the scope and cost of scanning the

large paper document collections that were made available for inspection in March. The only

remaining issue with respect to those paper document collections, which has been scanned or is

in the process of being scanned *by the Government*, is the alleged delay in the Governments'

delivery of the hard drives containing the scanned material. The Government is doing its best to

complete the scanning and process what has already been scanned. Defendants having failed to

scan the material themselves back in March and April, they cannot complain about the pace with

which the Government is managing those projects. Consistent with the lack of diligence they

have demonstrated since the beginning of the year, Defendants also have made no attempt to

inspect additional paper document collections that the Government made available for inspection

on October 25, 2010.

Contrary to Defendants assertions, the United States has also been diligent with

respect to its electronic document production. Defendants take issue with the fact that a hard

drive was not produced until November 9, *eight days* after the November 1 deadline in the

Second Amended Case Management Order. *See* Supp. Br. at 7; Docket No. 160 at 2. However,

the technical difficulties prevented that prevented that drive's inclusion in the Government's

October 29 production constitutes good cause for the slight delay.

In sum, the Government complied with its discovery obligations months before

the close of fact discovery on March 31, 2011. Accordingly, the Court should deny Defendants'

request for an order precluding the Government's documents or compelling the Government to

produce all of its documents by December 31. Because the Government in fact complied with its

discovery obligations, the Court should also deny Defendants request that the Complaint in

Intervention be stricken and their request for the costs of bringing their motion.

As discussed below, the Government is moving for a protective order based on

Defendants' improper demand for documents relating to the restructuring and the environmental

settlement in the underlying bankruptcy that are irrelevant to the issues in the adversary

proceeding, unduly burdensome to produce, and protected from disclosure on the grounds of

privilege and the public policy favoring settlements. Defendants also seek other documents from

the Government that are equally accessible to Defendants from public sources or third parties,

3

too expensive or burdensome for the Government to produce, or cumulative of documents already in Defendants' possession. For the reasons explained *infra*, Points II and III, the Court should enter a protective order with respect to these documents.

## BACKGROUND

A.    **The Government's Production of Paper Documents**

    1.    **The Government Complied with the Initial March 31, 2010 Discovery Deadline**

The Amended Case Management Order, to which Defendants consented, provided that the Government "would make substantially all of its hard copy documents available for inspection by March 31, 2010." *See* Docket No. 115 at 2. The Government has complied with this deadline, by making substantially all of its responsive paper documents available for inspection by March 31, 2010.[1] As early as December, 2009, the Government advised Defendants that it had at least 600 boxes of responsive documents that it would make available for inspection: (1) EPA Region 2's responsive documents relating to the Federal Creosote site in Manville, New Jersey, consisting of approximately 400 boxes stored at the U.S. National Archives and Records Administration ("NARA's") facility in Lee's Summit, Missouri, and a smaller cache of responsive paper relating to Manville that is stored at EPA Region 2's offices at 290 Broadway in Manhattan; (2) U.S. Army Corps of Engineers' ("ACE's") responsive documents relating to the Manville site, consisting of approximately 100 boxes located at ACE's New York, Baltimore and Kansas City Districts; (3) EPA Region 5's responsive documents relating to the Kerr-McGee Moss-American, Toledo Tie, West Chicago NPL, and Lindsay Light

---

[1] The status of the Government's production of electronic documents is addressed in Section C, *infra*.

4

sites, consisting of approximately 170 boxes stored at EPA Region 5's offices in Chicago;[2] (4)

EPA Region 10's responsive documents relating to the Soda Springs site, consisting of

approximately 20 boxes located at the EPA's offices in Seattle; and (5) the Forest Services's

responsive documents relating to the Riley Pass, White King/Lucky Lass, and Mansfield Canyon

sites; consisting of approximately 125 boxes stored at the Forest Services's offices in Golden,

Colorado.  *See* Declaration of Joseph A. Pantoja, dated December 15, 2010 ("Pantoja Decl."),

Ex. 1, at 1 (January 15, 2010 email).

On January 15, 2010, the Government provided Defendants with a spreadsheet

approximating the volume of this material by site and identifying the Agency in possession of the

documents.  *Id*.[3]  In order to streamline the process and facilitate Defendants' inspection of the

produced documents, in January, February, and March, and April, 2010, the Government, though

not required by the Amended Case Management Order, also provided Defendants with indices or

descriptions of the responsive documents at Lee's Summit, 290 Broadway, EPA Region 5, EPA

Region 10, and the Forest Service's offices in Colorado.  *See, e.g*., Pantoja Decl., Ex. 1 at 4, 9,

10, 20, 31, 36, 43 (various emails January - April, 2010).

---

[2]  This material is not at issue in the pending motion.

[3]  There were also additional but smaller caches of responsive documents relating to
various sites in EPA Regions 1, 4, 5, 7 and 8, for which the Government provided Defendants
with indices or other descriptions.  Defendants made selections from these indices and
descriptions, and they have already received electronic copies of the requested documents.  *See,
e.g*., Pantoja Decl., Ex. 1 at 10, 14, 20, 31, 33, 66, 144.  Accordingly, those documents are not at
issue on this motion.

2.      **Defendants' Failed to Timely Arrange for
Inspection Prior to Filing the Motion to Compel**

a.      **EPA Region 2's Documents at Lee's Summit and 290 Broadway**

On February 9, 2010, the Government provided Defendants with file inventory

sheets describing EPA Region 2's documents stored at Lee's Summit and invited Defendants to

make arrangements for an inspection of that material.  *See* Pantoja Decl., Ex. 1 at 9.  The

Government had already determined that the material was responsive to Defendants' document

requests, and EPA staff proceeded to prepare that material with different colored sheets for the

purpose of preserving privilege and confidentiality designations during the inspection and

copying.  *See* Pantoja Decl. at ¶ 7.  It was not until March 31, almost two months later, that

Defendants forwarded to the Government their selection of the Lee's Summit material that they

wanted to inspect and copy, which consisted of approximately 311 boxes.  *See id.*, Ex. 1 at 37.

However, Defendants were unwilling to pay for NARA's $10-per-box fee for pulling the boxes

(a total of $3,110), despite the fact that federal agencies, including the EPA, must  pay similar

fees to access NARA's boxes, *see id.*, Ex. 1 at 43 (April 7, 2010 email); and despite the

Government's suggestion that they proceed with inspections of the material at Lee's Summit

(and the other large caches of documents) with a full reservation of rights with respect to costs or

other issues, *see id.*, Ex. 1 at 79 (May 14, 2010 email).

After the Government agreed to pull the boxes at the Government's expense, *see*

Pantoja Decl., Ex. 1 at 81 (May 18, 2010 email), Defendants *reduced* the number of the Lee's

Summit boxes they wanted to inspect to 34 and did not inspect those boxes until May 20 and 21,

2010, *see id*. at 84-87; Defs. Br. at 10.[4]  The Government reviewed and prepared all that material

for an inspection based on the expectation that Defendants would send a team of lawyers and a

vendor to the locations so that they could inspect and copy as many of the boxes as possible.  *See*

Pantoja Decl. at ¶ 10.  Ultimately, Defendants sent just one lawyer and made no arrangements for

copying even the relatively few boxes they had selected.  *See* Pantoja Decl. at ¶ 10 and Ex. 1 at

88.

       After visiting Lee's Summit, Defendants claimed an inability to select what they

wanted to inspect and copy from the balance of the Lee's Summit material on the ground that

there were too many boxes that were not sufficiently described in the Government's indices, and

that the Government should narrow the number of boxes being made available to just those

boxes relating to the Sevenson, the main contractor at the Manville site.  *See* Defs. Br. at 14.

However, since March, the Government had explained to Defendants that virtually all of the

boxes at Lee's Summit were responsive to their request for material related to the Sevenson

contract.  *See* Pantoja Decl., Ex. 1 at 40, 43.[5]  The Government and Defendants continued a

dialogue on how to narrow the scope of any production from Lee's Summit, but Defendants were

unable to narrow the scope of the boxes to be inspected; and Defendants never requested another

visit to Lee's Summit.  *See* Pantoja Decl. at ¶ 11.

---

   [4]  During that visit, Defendants' attorney, Jason Glass, received a CD with an electronic copy of files in the Record Center, since that material had already been reduced to electronic form.

   [5]  Sevenson was the main contractor at the Manville site.  The material at Lee's Summit consists of documents that had been generated by the Army Corps of Engineers, including all the cost and contractor documents and back-up documentation for costs incurred at the Site, which were stored after the Manville Site was demobilized.  *See* Pantoja Decl. at ¶ 11 n.3.

In March 2010, the Government also provided Defendants with a description of the responsive documents at EPA Region 2's offices at 290 Broadway in Manhattan, with instructions on how to arrange for an inspection of that material. *See* Pantoja Decl., Ex. 1 at 35. EPA staff pre-staged that material using the same color-coded scheme that was used at Lee's Summit. *See* Pantoja Decl. at ¶ 12. Defendants did not inspect that material until June 2010, more than two months later. *See* Defs. Br. at 10; Pantoja Decl. at ¶ 12. Again, for purposes of the inspection at 290 Broadway, Defendants sent just one attorney and did not arrange to copy any material at that location. *Id.*

### b.    Army Corps of Engineers's Documents

On March 30, 2010, the Government reminded Defendants that they had yet to arrange for an inspection of the responsive documents concerning the Manville site at ACE's New York, Kansas City, and Baltimore Districts. *See* Pantoja Decl., Ex. 1 at 36. After consultation with DOJ and EPA, ACE staff spent weeks pre-staging that material using a color-coded scheme similar to the one used by the EPA. *See* Pantoja Decl. at ¶ 13. However, Defendants never attempted to arrange for an inspection of the material at any of those locations. *Id.*

### c.    Forest Service's Documents in Colorado

On March 30, 2010, the Government advised Defendants that the Forest Service's responsive documents were available for inspection in Golden, Colorado. *See* Pantoja Decl., Ex. 1 at 36. Prior to this date, the Forest Service had spent many weeks assembling documents from document repositories around the country and relocating them at one central location to

8

accommodate Defendants' anticipated inspection and copying of that material.  Defendants never

attempted to arrange for an inspection of those documents.  *See* Pantoja Decl. at ¶ 14.

**B.      The Motion to Compel, filed July 9, 2010**

      **1.      The Motion as Originally Filed**

      On July 9, 2010, Defendants filed a motion to compel (the "July Motion"),

disputing the adequacy of the Government's productions and the usefulness of the indices that

were provided.[6]  With respect to the documents that had been made available for inspection prior

to that date, which constituted substantially all of the Government's responsive paper documents,

Defendants alleged that the Government had made a "document dump" by  providing Defendants

with access to only *potentially* responsive documents at Lee's Summit and 290 Broadway, rather

than documents that were known to be responsive.  Defs. Br. at 8-14.  Defendants also criticized

the Government for producing few or no documents in response to certain document requests,

including those requests seeking documents regarding the mining sites, and the investigation and

prosecution of any individuals for fraud involving the clean-up costs at Manville.  *See* Def. Br. at

1-2.  Defendants did not address the Government's production of electronic documents, except to

suggest that the volume of the Government's production as of July 9 was relatively small and

allegedly contained "many unresponsive documents."  *See* Def. Br. at 8, 10.

---

[6] Defendants complain that some of the handwritten indices were illegible and flagged
one such index as a "particularly stark example."  *See* McCall Decl. Ex. G at 4 n.1 and
attachment.  That contention is without merit.  The vast majority of the indices provided to
Defendants were typed.  The allegedly illegible index relating to the Moss American site was
emailed to Defendants on February 23, 2010, *see* Pantoja Decl., Ex. 1 at 10-13; and within three
days, Defendants made selections from that index and other indices without any suggestion of
difficulty in doing so, *see id*., Ex. 1 at 14-18.

2.    **The Parties' Negotiations Since the Filing of the July Motion**

Understanding that the impetus behind the motion to compel was the parties' disagreement with respect to how to handle the large caches of paper that the Government had made available for inspection since December, 2009, the Government engaged Defendants in discussions on how to narrow the scope and share the cost of scanning these responsive materials.  *See* Pantoja Decl. at ¶ 16 and Ex. 1 at 92, 95, 99, 150.  Ultimately, the parties resolved their dispute with respect to the Government's then-known caches of paper documents, both large and small, essentially mooting the July Motion insofar as it related to how and which documents would be produced and how the associated costs would be shared.  Specifically, the Government agreed to pay half the cost of scanning documents Defendants selected from the following collections:  (1) EPA Region 2's Manville-related documents stored at the Lee's Summit facility in Kansas City, Missouri (400 boxes); (2) EPA Region 2's Manville-related documents stored at its office at 290 Broadway; (3) ACE's Manville-related documents stored at its New York (4 boxes), Kansas City (90 boxes), and Baltimore Districts (9 boxes); (4) EPA Region 9's documents related to the Henderson, NV site (3 boxes); (5) EPA Region 10's boxes related to the Soda Springs site (20 boxes); and (6) the Forest Services documents concerning the Riley Pass, White King/Lucky Lass, and Mansfield Canyon sites (125 boxes).  *See* Pantoja Decl. at ¶ 17 and Ex. 1 at 150, 159, 160, 161, 475 (selecting categories for scanning at 290 Broadway and 38 boxes and portion of 5 additional boxes at ACE's Kansas City District).

3.    **The Government's Objections to Defendants' Document
      Requests and to Production from Non-Federal Claimants**

Due in part to the many overly broad document requests and the need to ensure a manageable discovery effort, in September 2009, and February 2010, the Government timely

10

objected to the Defendants' first and second set of document requests, respectively, to the extent

they called for the production of information in the possession, custody or control of entities

other than the federal agencies that are asserting affirmative environmental claims in the

underlying bankruptcy, *i.e.*, the EPA, the Nuclear Regulatory Commission ("NRC"), the USDA

through the United States Forest Service, the United States Department of the Interior, acting

through the Fish and Wildlife Service ("DOI"), and the United States Department of Commerce,

acting through the National Oceanic and Atmospheric Administration ("NOAA"), and the United

States Department of Defense, including the United States Army, the United States Navy, and the

United States Air Force ("DOD") (collectively, the "Federal Claimants").  *See* McCall Decl. Ex.

D at 2-3; *id.* Ex. E at 2-3.

Notwithstanding this objection, during the meet and confer sessions in late May

and early June, 2010, Defendants requested that the Government produce documents in the

possession, custody or control of entities other than the Federal Claimants.  *See* Pantoja Decl. at

¶ 22.  After further discussions with Defendants, the Government agreed to inquire about

responsive documents at specific agencies other than the Federal Claimants, including the

Internal Revenue Service ("IRS") and the U.S. Government Accountability Office ("GAO").

After many discussions, the Defendants recently opted to request the documents they sought

directly from the IRS, with the guidance from the Government.  *See* Pantoja Decl., Ex. 1 at 492

(December 8, 2010 email).  Defendants were able to obtain responsive, non-privileged

documents from the GAO, which was produced to Defendants electronically.  *See* Pantoja Decl.

at ¶ 22.

11

4.      **Additional Productions by the Government**

a.      **Hard Copy Paper Documents**

By letter dated On October 25, 2010, the Government informed Defendants that it was making available for inspection additional collections of responsive paper documents in eight separate locations, and provided Defendants with indices of those collections.  *See* Pantoja Decl., Ex. 1 at 163-473 ("October 25 letter").  The indices describe:  (1) documents in the custody of EPA Region 4 relating to the following sites:  Meridian, MS; Columbus, MS; Savannah, GA; Hamilton, MS; *see* October 25 letter at Ex. 2;  (2) documents in the custody of EPA Region 6 related to various sites, *id*. at Ex. 3; (3) documents in the offices of the Forest Service in Golden, CO, related to the White King/Lucky Lass Site, *id.* at Exs. 4, 5; (4) documents related to uranium mining sites in the custody of the Bureau of Land Management's offices in Phoenix, AZ, *id*. at Ex. 6, and Albuquerque, NM, *id*. at Ex. 7; (5) documents related to uranium mining sites in the custody of the Bureau of Indian Affairs's offices in Gallup, NM, *id*. at Ex. 8; and (6) documents in the custody of the Nuclear Regulatory Commission at the Federal Records Center in Suitland, MD, related to various sites, *id*. at Ex. 9.  The October 25 letter also included a more detailed version of an index that Defendants had received in March, 2010, for documents related to the Lindsay Light Site, from which Defendants had previously selected documents for inspection and copying.  *See id*. at Ex. 10.  As explained in the October 25 letter, the indices of the paper collections were provided to assist Defendants in determining how to allocate their litigation resources.

### b.    Potential Supplemental Productions

By letters dated October 25 and November 12, 2010, the Government advised

Defendants that it was considering whether documents related to the Welsbach & General Gas

Mantle Co. site, in the area of Gloucester City and Camden, Camden County, NJ, were

responsive to Defendants' document requests.  *See* October 25 letter at 3; Pantoja Decl., Ex. 1 at

483 ("November 12 letter").  The Government also expressly reserved its right to further

supplement its production.  *See* October 25 letter at 3; November 12 letter at 2.  Many of the sites

underlying the Government's claims remain open and are active, and continue to generative

responsive paper and electronic records.  Consequently, the Government will need to supplement

its productions from time to time, and will do so diligently.

### c.    Categories of Paper Documents for which the
Government Claimed an Undue Burden

In its October 25 and November 12 letters, the Government also advised – and in

some instances, reminded – Defendants that there were certain categories of documents that were

too burdensome or otherwise unreasonable for the Government to produce, specifically:  (1) a

collection of microfilm kept at the NRC in White Flint, MD, consisting of microfilm images of

paper documents for which the NRC was no longer the official custodian;[7] (2) potentially

responsive documents that it had recently located relating to uranium mining that were publicly

available at the National Archives in Denver, CO, and available online at the United States

Geological Survey's website; (3) voluminous documents relating to uranium mining in the

---

[7]  During the meet and confers with Defendants during the Summer, the Government
specifically advised Defendants that it expected them to subpoena the current custodian of the
official records that were formerly in the possession of the NRC.  *See* Pantoja Decl. at ¶ 25 n.4.

13

custody of the Department of Energy that are generally summarized in the Navajo Uranium Atlas

that was already produced electronically; and (4) the underlying cost documentation for costs that

were already paid by Defendants, such as the underlying cost documentation for the White

King/Lucky Lass Site.[8] *See* October 25 letter at 3; November 12 letter at 3-4.

###    5.    Defendants' Supplemental Brief, filed on November 22, 2010

On November 22, 2010, Defendants filed a supplemental brief in support of their

motion to compel. Specifically, Defendants argue that the Government: (1) "has yet to produce

the overwhelming majority of paper documents responsive to Defendants' RFPs, including large

volumes of documents Defendants previously reviewed and specifically requested copies of

months ago;" (2) "has yet to produce more than 300,000 electronic documents it has identified as

responsive;" (3) "continues to identify new and seemingly large collections of paper documents;"

(4) "has yet to produce key documents regarding the most central issues in this case, including

but not limited to: a) Tronox's alleged environmental liabilities; and b) the Government's

valuations of Tronox's alleged allocable share of the costs to address such environmental

liabilities;" and (5) refuses to produce certain caches of documents on the grounds "that they are

protected by the common interest privilege, that they constitute settlement-related documents,

and/or that it is simply too burdensome for the Government to make such productions." Supp.

Br. at 2. Defendants also complain that much of the Government's electronic production was in

a hard drive that was not produced until November 9, *i.e.*, eight days after the November 1, 2010

---

[8] This was consistent with Defendants' assurances during numerous telephone
conferences since December, 2009, that they were not interested in receiving documents that
were duplicative of what they already had in their possession. *See* Pantoja Decl. at ¶ 25 n.5.

deadline for the substantial completion of its document production, and that the hard drive

contained mostly unresponsive information. *Id*. at 7-8.

## C.    Electronic Documents

The October 25 letter also included an index of the Government's database of

responsive electronically stored information from dozens of federal custodians relating to the

environmental liabilities, which totaled approximately 1.2 million documents as of that date.

*See* October 25 letter at Ex. 1.  For each custodial agency, the electronic documents were

collected by the most knowledgeable attorneys and staff at the agency, after which counsel

reviewed the documents for privileged or sensitive information requiring a designation pursuant

to the Agreed Protective Order in this matter.  *See* Pantoja Decl. at ¶ 27.   Based on further

searches, as of December 14, the database contained approximately 1.45 million documents.  *Id*.

The Government produced approximately 140,000 of those documents prior to

October 25, 2010.  *See* Pantoja Decl. at ¶ 28.  On October 29, the Government produced another

240,000 documents; and on November 9, the Government produced a hard drive containing

871,000 documents, including 688,000 documents that were on a hard drive that Sevenson had

voluntarily provided to the Department of Justice during its investigation of a kick-back scheme

at the Manville site ("Sevenson drive").  *See* Pantoja Decl., Ex. 1 at 482, 493 (October 29 and

November 9 letters).[9]  Accordingly, to date, the Government has produced approximately 1.25

million electronic documents.  Of the remaining approximately 200,000 documents in the

---

[9]  Technical difficulties prevented the Government from including the Sevenson drive in
the production that was made on October 29.  *See* Pantoja Decl. at ¶ 29.  Although the drive
could not be produced by November 1, 2010, the Government gave Defendants notice as to the
nature of the drive's contents and the related difficulties in isolating certain content on the drive.
*Id*.  This drive was produced on November 9, 2010.  *See  id.* at ¶ 29.

15

database, approximately 100,000 documents will be produced shortly.  *See* Pantoja Decl. at ¶ 28.

The balance of approximately 100,000 documents  have either been withheld as privileged,

withheld at Defendants' request, or await privilege review.  *Id.*

**ARGUMENT**

**POINT I**

**THE GOVERNMENT COMPLIED WITH ITS DISCOVERY OBLIGATIONS**

**A.      The Government Made Substantially All of Its Responsive
          Paper Documents Available for Inspection by November 1, 2010**

The Government complied with its discovery obligations and Rule 34 of the

Federal Rules of Civil Procedure by making available for inspection and copying by Defendants

substantially all of its responsive paper documents by March 31, 2010, as supplemented by the

paper collections made available to Defendants in October, 2010.  Although Rule 34 did not

require the Government to provide Defendants with indices for its paper collections, the

Government provided indices for most of these collections to facilitate Defendants' inspection of

the documents.  Defendants, complaining that the indices were not detailed enough or otherwise

inadequate, insisted that the Government should bear the cost of reducing its paper collection to

electronic form, label the production to correspond to their document requests, and/or provide

even more detailed indices from which Defendants could make selections for scanning. This

argument is mooted by the parties' subsequent discussions and agreement that the parties would

split the costs of scanning documents selected by Defendants for those documents made available

for inspection prior to the July Motion.  The Government intends to produce these documents on

or before January 7, 2011.  Defendants' own delay in inspecting and designating documents is

the salient cause of any delay in their receipt of these documents in scanned form.

16

With respect to the paper document collections that were made available for inspection after the filing of the July Motion, Defendants assert an alleged deficiency with the Government making documents available for inspection as permitted by Rule 34, rather than incurring all of the expense of providing paper documents in an electronic format.  On October 25, 2010, the Government provided Defendants with eight indices detailing the additional responsive paper document collections that it had identified as of that date and was making available for inspection by Defendants.  *See* October 25 letter at 2 and Exs. 2-10.  The October 25 letter also included a more detailed version of an index that Defendants had received in March, 2010, related to the Lindsay Light Site, from which Defendants had previously made selections for copying.  *See id*. at Ex. 10.  To date, Defendants have never contacted the Government to make arrangements to inspect and scan that additional material, with or without a reservation of rights regarding related costs.

**B.      The Government Was Not Required to Reduce its Original Files to Electronic Form or Reorganize Them According to the Document Requests**

By making its original, responsive documents available for inspection, and providing Defendants with indices and descriptions of the paper collections, the Government went beyond what is required by Rule 34.  Defendants argue that this process is insufficient to comply with Rule 34, citing *S.E.C. v. Collins & Aikman Corp*., 256 F.R.D. 403 (S.D.N.Y. 2009), and that the Government instead is required to reduce its original files to electronic form and "produce documents labeled and sorted in a manner corresponding to the RFPs."  Defs. Br. at 13, 17-20; Supp. Br. at 2, 6.

Defendants' reliance on *Collins* is misplaced because it is inapposite.  *See* Def. Br. at 17-20.  In that case, the SEC chose to produce its responsive paper *through electronic*

17

*databases* containing 1.7 million pages. *See Collins*, 256 F.R.D. at 407 ("the SEC produced 1.7

million documents (10.6 million pages) maintained in thirty-six separate Concordance databases

- many of which use different metadata protocols."). *Collins* does not stand for the proposition

that Rule 34 requires a party to incur the time and expense of reducing its hard copy paper

documents to electronic form, and then organize them according to the discovery requests, as

Defendants demand here. *See* Defs. Br. at 17-20. To the contrary, Rule 34 only "require[s] that

the documents be made available for inspection and copying." *See Lumbermans Mutual*

*Casualty Co. v. Holiday Vehicle Leasing, Inc.*, 212 F.R.D. 139, 143 n.16 (S.D.N.Y. 2002); *see*

*also* Fed. R. Civ. P. 34(a)(1) ("A party may serve on any other party a request within the scope of

Rule 26(b) . . . to produce and permit the requesting party or its representative to inspect, copy,

test, or sample the following items in the responding party's possession, custody, or control").

"While producing parties frequently opt to copy requested documents for their adversaries at

their own expense, they do so out of convenience, a desire to keep control of the originals, and an

expectation of reciprocal treatment." *See Lumbermans Mutual*, 212 F.R.D. at 143 n.16.

   Nor does Rule 34 require that documents be labeled according to discovery

requests where, as here, they are already identified as being responsive and are being made

available for inspection "as they are kept in the usual course of business." *See* Fed. R. Civ. P.

34(E)(i). "The most obvious means of complying with the requirement of [Rule 34] to produce

documents as they are kept in the usual course of business is to permit the requesting party to

inspect the documents where they are maintained, and in the manner in which they are organized

by the producing party." *Pass & Seymour, Inc. v. Hubbell Inc.*, 255 F.R.D. 331, 336 (N.D.N.Y.

2008); *Morgan v. City of New York*, No. 00 Civ. 9172 (LMM) (DFE), 2002 WL 1808233, at *4

(S.D.N.Y. Aug. 6, 2002) ("a party may produce documents as they are kept in the regular course

of business or may organize them and label them to correspond with the categories in the

request."); *American Express Travel Related Services Co. v. Allegis Group, Inc.*, No. 00 Civ.

5781 (LTS) (FM), 2001 WL 1661917, at *4 (Dec. 28, 2001) ("Rule 34 of the Federal Rules of

Civil Procedure permits a party to produce documents 'as they are kept in the usual course of

business' and [defendant] represents that it has produced the documents in this manner.")

(quoting Rule 34).  Indeed, the *Collins* court cited favorably to the *Pass & Seymour* decision,

which further demonstrates that Defendants have misconstrued *Collins*.  *See Collins*, 256 F.R.D.

at 409 n.32.

        Defendants' argument -- again relying on *Collins* -- that the option to produce

documents "as they are kept in the usual course of business" was not available to the

Government is without merit.  *See* Def. Br. at 17-20.  In *Collins*, the Court made clear that the

ultimate consideration is that the documents "not be maintained in a haphazard fashion."  *See*

*Collins*, 256 F.R.D. at 411.  In *Collins*, the SEC chose to reduce 1.7 million pages to electronic

form but then failed to organize the electronic production where necessary to make the

production useful.  *See Collins*, 256 F.R.D. at 413 ("[I]t is no surprise that the complete

collection is maintained as it was collected - in large disorderly databases.").  "It logically

follows that when production occurs by means other than permitting the demanding party access

to the original records as they are organized and maintained by the responding party, such as by

instead choosing to copy the documents and produce the duplicates, they must be organized in

such a way that the system utilized by the producing party is replicated; in other words, the

documents should be produced, organized and labeled and, if appropriate, indexed just as they

19

are maintained by the producing party." *Pass & Seymour*, 255 F.R.D. at 336.  Here, by contrast, the Government provided Defendants with access to the EPA's original files at the Lee's Summit storage facility and its regional offices, the Forest Services' original files in Colorado, and ACE's original files in its District offices, all as they are kept in the usual course of business, and provided detailed indices of most of these collections.

### C.    The Parties Resolved the Scope, Manner, and Cost of Scanning the Material That the Government Had Made Available for Inspection Prior to July 2010

With respect to the paper document collections that the Government had made available for inspection prior to July 2010, in September the parties achieved a consensual resolution of how and which documents would be scanned and how to share the related costs.  To the extent that Defendants complain that they have yet to receive the documents that were selected for scanning, *see* Supp. Br. at 14, they are largely to blame for that delay.  Defendants, had they been diligent, could have inspected and scanned the Government's documents as early as March 2010, when the Government made the documents available for inspection.  Defendants never attempted to arrange inspections of the paper held by EPA Region 10, the Forest Service, or ACE's New York and Baltimore Districts; and they saw fit to send one single attorney to inspect only a small portion of the March 2010 production at Lee's Summit and 290 Broadway, again without arranging for any of that material to be copied.  It was not until the end of October that Defendants inspected the 90 boxes at ACE's Kansas City District, and not until November 2 that Defendants confirmed their selection of 38 boxes to be scanned from that location.  *See* Pantoja Decl., Ex. 1 at 160, 474.

Due to the size of some of the scanning projects, and the resulting budgetary, technical and logistical issues; the Government has not yet delivered the documents that were

20

scanned.  *See* Pantoja Decl. at ¶ 18.  The Government advised Defendants that, due to the volume

of the ACE Kansas City documents, it might take some time for the Government to obtain

funding for the project.  *See* November 12 letter.  After receiving budgetary approval internally,

and a bidding process through U.S. Government Printing Office, a vendor was selected to scan

those documents; but that project is not expected to be completed before December 30, 2010.

*See* Pantoja Decl. at ¶ 19.

The Lee's Summit, Forest Service and EPA Region 10 documents that were

scanned are now with the Government's outside contractor and will be sent to Defendants on a

hard drive on or before January 7, 2011.  *See* Pantoja Decl. at ¶ 20.  The 290 Broadway

documents were scanned only recently and, after being processed and bates-stamped, will also be

ready on or before January 7, 2011.  *Id.* at ¶ 20.  The ACE Baltimore documents are currently

being scanned in-house at the U.S. Attorney's Office because two initial attempts to have the

material scanned by an outside vendor were unsuccessful.  *Id.* at ¶ 20.

## D.    The Government Has Produced Substantially All of Its Responsive, Non-Duplicative Electronic Records

The Government's October 25 letter included as Exhibit 1 a table describing

approximately 1.2 million responsive electronic documents by specific bates-stamp ranges.  As

of October 25, the Government anticipated that all of the material reflected on Exhibit 1,

including the contents of the Sevenson drive, would be produced by November 1, 2010.  *Id.* at

¶ 29.  Despite the Government's good faith efforts, technical difficulties prevented the

Government from including the copy of the Sevenson hard drive in the production that was made

on October 29.  *Id.*; 2d Am. Case Management Order at ¶ 7(a) ("The United States . . . shall,

*absent good cause shown*, substantially complete its document production . . . by November 1,

21

2010.") (emphasis added).  After giving Defendants notice regarding the nature of the drive's

contents and the related difficulties in isolating certain content on the drive, the Government

produced the drive on November 9, 2010.  *See* Pantoja Decl. at ¶ 29.

Contrary to Defendants assertion, *see* Supp. Br. at 7-8 and 11, the entire Sevenson

drive, irrespective of its contents, is responsive to Defendants' Document Request No. 56, which

sought the following:

> All documents and communications concerning any state or federal
> civil or criminal investigation, inspection, evaluation, examination
> or analysis concerning the inspection, investigation or response
> activities taken or proposed to be taken at the Manville Site,
> including investigations, inspections, evaluations, examinations, or
> analyses conducted by, or involving, the DOJ, the EPA or the
> Internal Revenue Service.

*See* McCall Decl., Ex. B.  That is because the drive was voluntarily and specifically submitted by

Sevenson to the Department of Justice in connection with the investigation into the clean-up

costs at Manville.  Accordingly, the Government has produced substantially all responsive

electronic records.

## POINT II

## DEFENDANTS ARE NOT ENTITLED TO DOCUMENTS CONCERNING THE MULTI-PARTY NEGOTIATIONS IN THE BANKRUPTCY

Defendants seek the following documents:

> All documents and communications . . . concerning any claims or
> causes of action Tronox or any governmental entity or agency
> might assert, pursue, or possess against Anadarko, Tronox, and/or
> Kerr-McGee . . . ." ;

> "All documents and communications concerning any agreement or
> potential agreement between Tronox and any entity or person
> concerning the pursuit or prosecution of any potential claims or
> causes of action against Anadarko or Kerr-McGee . . . ."; and

22

> "All documents and communications . . . concerning settling or
> resolving any or all of Tronox's Liabilities, including its
> environmental liabilities and Legacy Liabilities . . . ."

*See* Doc. Requests No. 32-34.  In September 2009, the Government timely objected to these

requests, advising that it would only produce responsive documents that were not protected from

disclosure.  *See* Declaration of Duke K. McCall, III, dated November 22, 2010 ("McCall Decl."),

Ex. D at 32-35.  Defendants' Second Request for Production of Document included five requests

seeking documents relating to the negotiation of various restructuring-related bankruptcy filings:

> All documents and communications (between any person, party, or entity)
> concerning the Plan Support Agreement filed by the Debtors on or about
> December 20, 2009, including all negotiations, discussions, approvals,
> versions, analysis, evaluations, or reviews of the Plan Support Agreement
> and all iterations and drafts of the Plan Support Agreement.

> All documents and communications (between any person, party, or entity)
> concerning the Plan Term Sheet filed by the Debtors on or about
> December 20, 2009, including all negotiations, discussions, approvals,
> versions, analysis, evaluations, or reviews of the Term Sheet and all
> iterations and drafts of the Term Sheet.

> All documents and communications (between any person, party, or entity)
> concerning the  Replacement DIP Agreement filed by the Debtors on or
> about December 20, 2009, including all negotiations, discussions,
> approvals, versions, analysis, evaluations, or reviews of  the Replacement
> DIP Agreement and all iterations and drafts of the Replacement DIP
> Agreement.

> All documents and communications (between any person, party, or entity)
> concerning the  Equity Committee Agreement filed by the Debtors on or
> about December 20, 2009, including  all negotiations, discussions,
> approvals, versions, analysis, evaluations, or reviews of  the Equity
> Committee Agreement and all iterations and drafts of the Equity
> Committee  Agreement.

> All documents and communications (between any person, party, or entity)
> concerning the  Global Settlement, as defined by the Debtors in
> Emergency Motion for Interim and Final  Orders (A) Authorizing (I)

23

Replacement Postpetition Secured Financing, (II) Use of Cash  Collateral
and (III) Repayment of Existing Postpetition Financing and Prepetition
Secured  Financing; (B) Authorizing Entry Into Plan Support Agreement;
(C) Authorizing Entry Into  Equity Commitment Agreement; and (D)
Scheduling a Final, including all negotiations,  discussions, approvals,
versions, analysis, evaluations, or reviews of the Global  Settlement and all
iterations and drafts of the documents, filings, and agreements
comprising, concerning, or  relating to the Global Settlement.

*See* McCall Decl., Ex. A (Request Nos. 163-167).  In February, 2010, the Government timely

objected to those requests as well, indicating that it would not be producing any documents in

those categories on account of, *inter alia*, privilege and undue burden.  *See* McCall Decl., Ex. E

at 93-97.  For the reasons explained below, each of these eight requests is improper, and

Defendants are not entitled to the requested documents.[10]

A.      **The Document Requests Seeking Settlement-Related Documents Are Overbroad,
        Unduly  Burdensome, and Unlikely to Lead to Discovery of Admissible Evidence**

As a preliminary matter, the eight requests in question are overbroad and unlikely

to lead to the discovery of admissible evidence.  *See* Fed. R. Civ. P. 26(b)(1); id. 26(b)(2)(C)(i),

---

[10]  For several reasons, the Government did not provide Defendants with privilege logs
for the documents at issue.  Pursuant to the privilege protocol stipulated by the parties in the
adversary proceeding, the parties agreed to dispense with communication-specific logs, at least
initially, in favor of a categorical approach.  *See* Pantoja Declaration Ex. 2 at 4; *see also* Pantoja
Decl., Ex. 3 (letter acknowledging that Government agreed to protocol).  Only after a party
challenges a proffered category of documents and confers about any disagreement regarding the
category may it demand a log of the specific documents at issue.  *See* Pantoja Decl., Ex. 2 at 4.
However, the protocol specifically provides that "there is no need to log privileged
communications that occurred after Tronox filed its Chapter 11 cases (January 12, 2009)."  *Id*. at
5.  This exception would cover the documents at issue because most, if not all, of the
restructuring- and settlement-related documents would post-date the filing of the bankruptcy.
Nevertheless, to accommodate Defendants' request for more specificity, and because the
Government has not yet received privileged logs from any other party, on October 25, the
Government requested samples of category-based privilege logs, but they were not received until
November 10.  In any event, the parties had continued their telephonic discussions regarding the
withholding issue, *see* Pantoja Decl., Ex. 1 at 490 (November 15, 2010 email), which ended
abruptly when Defendants filed their supplemental papers on the motion to compel on November
22, *i.e*., before the Government could provide additional information.

(iii); id. 26(c).  The restructuring negotiations concerned Tronox's liabilities and solvency in

2009 and 2010, not Tronox's liabilities and solvency at the time of the spin off in November

2005, which is the relevant time frame for the Anadarko litigation.  *See, e.g.*, Am. Compl.  83,

89, 100-03, 119-121; Pantoja Decl. at ¶ 32.  As made clear in the bankruptcy filings and

conferences with the Court, the negotiations also included many topics irrelevant to the

fraudulent conveyance litigation even aside from the time-frame issue, including, *e.g.*, questions

relating to the going-forward value of a Reorganized Tronox, the contemplated sale of Tronox's

assets before the parties agreed upon the structure of a standalone reorganization, the terms of

certain debt and equity financing arrangements between Debtors and certain creditors, and

negotiations relating to the terms of proposed stipulations and orders, the plan term sheet, the

plan disclosure statement, and the plan itself.  *See, e.g.*, Amended Disclosure Statement, Joint

Plan of Reorganization of Tronox.  As the Court is well aware, the negotiations also involved key

stakeholders with no relationship to the events alleged in the fraudulent conveyance litigation,

including the Official Committee of Equity Security Holders ("Equity Committee")  and the Ad

Hoc Noteholders' Committee.

Document Requests Nos. 32, 33, 34, and 163-167 are also unduly burdensome

because the regular course of negotiations has generated thousands of internal emails and other

documents concerning the restructuring, including analyses and briefing memoranda, that were

created by and/or exchanged between DOJ and its client agencies.  *See* Fed. R. Civ. P. Fed. R.

Civ. P. 26(b)(2)(C)(i), (iii); id. 26(c); Pantoja Decl. at ¶ 33.  The complex and exhaustive

negotiations among DOJ and Tronox, the Official Committee of Unsecured Creditors, the Equity

Committee, the Ad Hoc Noteholders' Committee, representatives of the Tort Claimants and other

key parties have likewise generated thousands of emails and draft documents, and included the

voluminous exchange of analyses, company records and financial data from 2009 to 2010. *Id*.

Unsurprisingly, thousands of emails and other restructuring-related documents have been

exchanged among DOJ and representatives of twenty-two states, the Navajo Nation, the local

governmental entities in Chicago and West Chicago, Illinois, and the environmental response

trustees that were signatories to the proposed Consent Decree and Settlement Agreement filed

with the Court in November. *Id*. It would be particularly burdensome to produce these

documents given their likely minimal, if any, relevance to the issues in this adversary proceeding,

which focus on the liabilities and value of Tronox as of November 2005. *See id,; see, e.g*., Am.

Compl. 83, 89, 100-03, 119-121.

**B.      The Requested Documents Are Privileged**

     **1.      Documents Internal to the United States Are Protected Work Product**

     The attorney work product doctrine exempts from disclosure "mental impressions,

conclusions, opinions, or legal theories of a party's attorney or its representative (including the

other party's attorney, consultant, surety, indemnitor, insurer, or agent)," *see* Fed. R. Civ. P.

26(b)(3), prepared "in anticipation of litigation," *A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138,

146 (2d Cir. 1994). Without such protection, an entity would have to choose between protecting

its litigation prospects by "scrimp[ing] on candor and completeness," or prejudicing its litigation

prospects, by disclosing "assessment of its strengths and weakness . . . to litigation adversaries."

*United States v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998).

     Under the doctrine, the "anticipation of litigation" element is satisfied where, "in

light of the nature of the document and the factual situation in the particular case, the document

can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id*. at

1202.  Notably, there is no requirement that a protected document be prepared "primarily or

exclusively to assist in litigation." *Id*. at 1198.  Yet, "documents that are prepared in the ordinary

course of business or that would have been created in essentially the same form irrespective of . .

. litigation" are unprotected. *Id*. at 1202.  In sum, "[w]here a document was created because of

anticipated litigation, and would not have been prepared in substantially similar form but for the

prospect of that litigation, it falls within Rule 26(b)(3)." *Id*. at 1195.

   Here, the restructuring documents satisfy the "anticipation of litigation"

requirement because they were prepared or obtained because of, and in an effort to settle, the

claims asserted in the Government proof of claim.  Moreover, even if litigation was not actively

underway on that proof of claim, there is no requirement that litigation exist at the time a

protected document is created.  As this Court has held, "[a] document is prepared in anticipation

of litigation if there is the threat of some adversary proceeding." *In re Grand Jury Proceedings*,

No. M-11-89 (LAP), 2001 WL 1167497, at *13 (S.D.N.Y. Oct. 3, 2001); *see also Rexford v.

Olczak*, 176 F.R.D. 90, 91 (W.D.N.Y. 1997) (courts look to whether, at the time the materials

were created, the party asserting the privilege believed that "litigation was likely and whether that

belief was reasonable") (quotation omitted); *Gulf Islands Leasing, Inc. v. Bombardier Capital,

Inc.*, 215 F.R.D. 466, 475 (S.D.N.Y. 2003) (same).  Thus, documents may be considered work

product when created with the reasonable belief of future litigation. *See, e.g., Upjohn Co. v.

U.S.*, 449 U.S. 383, 388, 397 (1981); *A.I.A. Holdings, S.A. v. Lehman Bros.*, No. 97 Civ. 4978,

2002 WL 31556382, at *6-*7 (S.D.N.Y. Nov. 15, 2002).

Here, the Government is asserting work product protection over documents created because of the litigation, including those that reflect Government attorneys' analysis, thoughts, opinions, mental impressions and/or advice regarding the legal implications of certain decisions relating to the prospect or conduct of litigation concerning the environmental sites at issue in both the bankruptcy and the adversary proceeding. *See* Pantoja Decl. at ¶ 34. As there can be no serious dispute that the Government reasonably believed that litigation would follow with respect to the environmental sites underlying the claims in the bankruptcy and the adversary proceeding, these documents are protected by the attorney work product doctrine. *See Prebena Wire Bending Mach. Co. v. Transit Worldwide Corp.*, No. 97 Civ. 9336 (KMW) (HBP), 1999 WL 1063216, at *4 (S.D.N.Y. Nov. 23, 1999) ("Since Universal has submitted unrebutted evidence that it had a subjective belief that litigation would follow and that its subjective belief was reasonable, . . . [the] emails are protected by the attorney work-product doctrine."); *see also In re Grand Jury Proceedings*, 2001 WL 1167497, at *14 ("[A] document may be protected even if it was 'created prior to the event giving rise to litigation' because '[i]n many instances, the expected litigation is quite concrete, notwithstanding that the events giving rise to it have not yet occurred.'"). Accordingly, the Government has properly relied upon the attorney work product doctrine to withhold these documents in response to Document Requests Nos. 32, 33, 34, and 163-167.

##### 2. Documents Internal to the United States Are Protected Attorney-Client Communications

In defining the attorney-client privilege, the Second Circuit has explained that "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client,

28

(6) are at his insistence permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, AFL-CIO, 119 F.3d 210, 214 (2d Cir. 1997) (quotation marks omitted).  The attorney-client privilege is designed "to encourage full and frank communication between attorneys and their clients," and thereby encourage "the observance of law and administration of justice."  *Upjohn Co*, 449 U.S. at 389.  "[T]he traditional rationale for the privilege applies with special force in the government context," *In re Grand Jury Investig.*, 399 F.3d 527, 534 (2d Cir. 2005), because public officials need "candid legal advice" to "understand and respect constitutional, judicial and statutory limitations," *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007).

Documents reflecting communications to, from or among DOJ attorneys and/or their client agencies, which reflect the legal advice, analysis or opinions provided by those attorneys to their clients, have properly been withheld under the attorney-client privilege because in the governmental context, the client may be the agency itself, and the attorney may be an agency lawyer.  *See, e.g.*, *In re Lindsey*, 148 F.3d 1100, 1104 (D.C. Cir. 1998).  These communications were confidential in nature, and the confidentiality of these documents have been maintained.  *See* Pantoja Decl. at ¶ 35 ("These documents were prepared and exchanged by numerous Government attorneys. with the joint expectation that they would be held in confidence, and these documents have in fact been held in confidence.").  Accordingly, the prerequisites for protection under the attorney-client privilege have been met.

29

3.      **Bankruptcy-Related Negotiations Are Protected by the
        Common Interest Privilege and the Work Product Doctrine**

a.      **Common Interest Privilege**

Any communications or documents between the United States and Tronox concerning the Anadarko litigation, or between the United States and any of the Governmental entities participating in the settlement concerning either the restructuring or the Anadarko litigation, that were intended and expected to remain confidential from third parties are protected from disclosure under the common interest rule, which is actually "an extension of the attorney-client privilege and not an independent basis for privilege." *Pem-America, Inc. v. Sunham Home Fashions, LLC*, No. 03 Civ. 1377, 2007 WL 3226156, at *2 (S.D.N.Y. Oct. 31, 2007) (citing *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989)). "[I]t is an exception to the general rule that the privilege is waived when confidential information is communicated to a third party.  If the third party and the client share a common legal interest, the rule applies and the privilege is not waived."  *In re Federal Trade Commission*, No. M18-304, 2001 WL 396522, at *2 (S.D.N.Y. April 19, 2001).  "It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Schwimmer*, 892 F.2d at 243.  The rule may be invoked whether or not an action has been commenced, *e.g., Vacco v. Harrah's Operating Co.*, No. 1:07-CV-0663, 2008 WL 4793719, at *8 (N.D.N.Y. Oct. 29, 2008) (citing *Schwimmer*, 892 F.2d at 243-44), and may also cover non-parties after an action has been commenced, *e.g., Lugosch v. Congel*, 219 F.R.D. 220, 238-39 (N.D.N.Y. 2003).

As with any privilege, those seeking its protection bear the burden of establishing its applicability.  *Id*. at 244.  This requires a showing of "actual cooperation toward a common

30

legal goal." *In re Rivastigmine Patent Litigation*, No. 05 MD 1661, 2005 WL 2319005, at *4

(S.D.N.Y. Sep. 22, 2005).  A written collaboration agreement, while not required, provides

strong proof of such actual cooperation.  *See, e.g., id.* (citing *United States v. United

Technologies*, 979 F. Supp. 108, 110 (D. Conn. 1997)).  Here, with respect to the Anadarko

litigation, the United States and Tronox entered into such an agreement.  *See* Pantoja Decl. Ex. 4.

Although this agreement was not formally extended to the United States' cooperation with state

and local government claimants and tort claimants in the bankruptcy, those entities equally share

a common interest in a successful result in the Anadarko litigation.  Moreover, even aside from

the litigation, the United States and the other governmental entities have worked closely

throughout this bankruptcy with the common interest of obtaining a significant recovery from

Tronox on account of its environmental liabilities.[11]

   Although some courts in this circuit have articulated a requirement that the

common interest be "identical" and not merely "similar," *see, e.g., Johnson Matthey, Inc. v.

Research Corp.*, No. 01CIV.8115, 2002 WL 1728566, at *5-6 (S.D.N.Y. July 24, 2002) (citing

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC*, No. 01 Civ. 9291, 2002 WL 1334821, at

*3 (S.D.N.Y. June 19, 2002)), that requirement has been called into question, *see Eugenia VI

Venture Holdings, Ltd. v. Chabra*, No. 05 Civ. 5277, 2006 WL 1096825, at *2 (S.D.N.Y. Apr.

25, 2006) (questioning the origins and validity of the "identical not merely similar" requirement),

and other courts have simply focused on whether the parties had interests in common without

exploring whether they were identical.  *See, e.g., Kingsway Financial Services, Inc. v.*

---

[11]  Indeed, the Court commended the Government during a hearing for taking the
initiative and the lead in getting various parties in the bankruptcy to work together regarding the
Plan Support Agreement.

*PricewaterhouseCoopers LLP*, No. 03 Civ. 5560, 2008 WL 4452134, at *7-8 (S.D.N.Y. Oct. 2,

2008); *Lugosch v. Congel*, 219 F.R.D. 220, 236-39 and 241-42 (N.D.N.Y. 2003). Thus, the fact

that the parties asserting the rule have some diverging interests does not eradicate, but rather only

limits, the scope of the protection it affords. *See In re Rivastigmine*, 2005 WL 2319005, at *4.

Even prior to Tronox and the Government formalizing the joint interest in an

agreement, their mutual interest in the overall outcome of the litigation was manifest, as is the

interest of the Governments in the outcome of the settlement negotiations. It serves the purpose

of the common interest rule to permit the parties to the settlement agreement to obtain its

protection notwithstanding that they may disagree about a collateral matter. Here, the asserted

basis for the privilege is that the parties' counsel were directly involved in the communications

on legal strategy between the parties to the various agreements filed in the bankruptcy, and that

the parties expected that the communications would remain confidential. *See HSH Nordbank AG*

*New York Branch v. Swerdlow*, 259 F.R.D. 64, 72 (S.D.N.Y. 2009) ("When viewed in

conjunction with the fact that the relevant communications involve development of the

appropriate legal strategy for obtaining relief, and that the parties privy to the communication

understood the communication to be confidential on account of attorney-client privilege, these

facts bring the communications at issue squarely within the common interest doctrine."). The

common interest is fortified by the fact that many of the bankruptcy-related agreements,

including the environmental settlement agreement, will require the continued cooperation of the

various parties to these agreements.

Given these principles, the documents requested in Document Requests 32-34 and

163-167, which include communications between the United States and any other party with

whom it shared a common legal interest, including, the states, the Navajo Nation, and other municipal governments, and Tronox and the tort claimants with respect to the Anadarko Litigation, are entitled to the protections afforded by the common interest rule, at least with respect those  matters where there interests did not diverge, including consultation on restructuring or settlement-related issues.

### b.    Work Product Doctrine

The existence of a common interest sufficient to invoke the protections of the common interest rule with respect to attorney-client communications typically also serves to extend work-product protection to work product shared among the parties who have that common interest. *See, e.g., Kingsway*, 2008 WL 4452134, at *10; *Lugosch*, 219 F.R.D. at 241-42.  Even if the common interest rule does not protect client confidences here, any documents reflecting communications between the United States, Tronox, the Official Committee of Unsecured Creditors, the Equity Committee, the Ad Hoc Noteholders' Committee, representatives of the Tort Claimants, representatives of twenty-two states, the Navajo Nation, the local governmental entities in Chicago and West Chicago, Illinois, and other key parties concerning the conduct of this litigation or the underlying bankruptcy necessarily constitute work product.  *See* Pantoja Decl. at ¶ 39.  This is because voluntary disclosure of work product to third parties does not constitute a waiver of work-product protection unless the disclosure "substantially increases the opportunity for potential adversaries to obtain the information." *Magee v. Paul Revere Life Ins. Co*., 172 F.R.D. 627, 641 (E.D.N.Y. 1997) (quoting *In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982*, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982)); *accord, e.g., In re Crazy Eddie Sec. Litig.*, 131 F.R.D. 374, 379 (E.D.N.Y.

33

1990) ("[T]he [work-product] privilege protects information 'against opposing parties, rather than against all others outside a particular confidential relationship'.... Counsel may therefore share work product ... with those having similar interests in fully preparing litigation against a common adversary."); *Cellco Partnership d/b/a Verizon Wireless v. Nextel Communication, Inc.*, No. M8-85, 2004 WL 1542259, at *1 (S.D.N.Y. July 9, 2004). Thus, "[t]he exchange of work product among attorneys with identical litigation perspectives should not render such tangible information vulnerable to pre-trial discovery." *Lugosch*, 219 F.R.D. at 240 (citing *Transmirra Prod. Corp. v. Monsanto Chem. Co.*, 26 F.R.D. 572, 578 (S.D.N.Y. 1960)) (internal quotations omitted).

C.    **Settlement-Related Documents Are Protected from Disclosure by the Strong Public Policy Favoring Settlement**

Documents in which the United States discusses settlement are likewise protected from disclosure. "The policy of the federal rules is to encourage the compromise and settlement of disputes." *Matsushita Electronics Corp. v. Loral Corp.*, No. 92 Civ. 5461 (SAS), 1995 WL 527640, at *3 (S.D.N.Y. Sep. 7, 1995) (internal quotation marks omitted).[12] *See generally American Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 580-81 (2d Cir. 1990) (Appendix) (discussing policy underlying Fed. R. Evid. 408). Consistent with this policy, even if the communications between the United States, Tronox, the Official Committee of Unsecured Creditors, the Equity Committee, the Ad Hoc Noteholders' Committee, representatives of the Tort Claimants, representatives of twenty-two states, the

---

[12]    The Advisory Committee's Note to Rule 408 of the Federal Rules of Evidence explains that a "consistently impressive ground [for exclusion of settlement materials] is promotion of the public policy favoring the compromise and settlement of disputes." Fed. R. Evid. 408, Advisory Committee Note.

Navajo Nation, the local governmental entities in Chicago and West Chicago, Illinois, and other key parties regarding the environmental settlement are not protected by the common-interest privilege or the work product doctrine or other applicable privilege, they should be withheld because the settlement, although signed, it is still awaiting approval; and various parties have reserved the right to withdraw from it. Indeed, negotiations continue as to significant features of the deal, including the trust agreements.

The case law shows that at least until the negotiations end, Defendants cannot require the Government to produce even relevant documents without a showing of good cause. Here, where the requests are overbroad and have the slightest, if any, relevance, Defendants cannot make that showing. As explained in *Matsushita Electronics*:

> Settlement discussions are typically undertaken with the understanding that they will remain confidential, particularly when their disclosure may impact on ongoing or prospective business arrangements. Accordingly, there is no reason to question defendants' representation that the discussions about which MEC seeks to learn were conducted on a confidential basis. It is equally reasonable to infer that disclosure of the substance of those talks would be likely to put a serious crimp in future discussions of this sort, since candor would likely give way to extreme caution in making disclosures that are often vital to the success of such negotiations. Under these circumstances it is reasonable to require that the discovering party, as the price for obtaining such potentially disruptive disclosure, make a fairly compelling showing that it needs the information.

*Id*. at *3-*4; *accord Primetime 24 Joint Venture v. Echostar Communications Corp*., No. 98 Civ. 6738 (RMB)(MHD), 2000 WL 97680, at *4 (S.D.N.Y. Jan. 28, 2000) ("This concern with protecting the negotiation process is equally reflective of the concerns that animate the work-product rule, by giving attorneys and parties a zone of presumptive privacy in which to prepare for and handle ongoing litigation."); *SEC v. Thrasher*, No. 92 Civ. 6987 (JFK), 1995 WL

35

552719, at *1 (S.D.N.Y. Sept. 18, 1995) (denying request for settlement records absent "compelling showing of need for the inforamtion"); *Morse/Diesel Inc. v. Trinity Industries, Inc.*, 142 F.R.D. 80, 83-84 (S.D.N.Y. 1992) (absent "particularized showing" of their relation to admissible evidence, documents concerning settlement are presumed irrelevant and need not be produced); *but cf. In re Initial Public Offering Securities Litigation*, No. 21 MC 92 (SAS); 2004 WL 60290, at *5 (S.D.N.Y. Jan. 12, 2004) (recognizing caselaw requiring a heightened showing for production of settlement material as a matter of public policy, but requiring production absent a request for protective order).

Accordingly, the United States has a sound basis for asserting that the settlement records here are properly withheld from disclosure.

## POINT III

### THE GOVERNMENT IS NOT REQUIRED TO PRODUCE DOCUMENTS THAT ARE EQUALLY ACCESSIBLE TO DEFENDANTS AND OTHERWISE UNDULY BURDENSOME FOR THE GOVERNMENT TO PRODUCE

**A.     Legal Standard**

The Federal Rules of Civil Procedure contemplate that the usual discovery obligations may prove particularly burdensome in some circumstances, and they provide an avenue for relief.  They give the court broad authority "on motion or on its own" to fashion protective orders to minimize the burden of discovery if "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  *See* Fed. R. Civ. P.  26(b)(2)(C); Fed. R. Civ. P. 26(c) (protective orders).

36

B.    **Microfilm at the NRC**

In its letter dated November 12, 2010, the Government advised Defendants that

NRC is not an appropriate source for records regarding the West Chicago site.  *See* November 12

letter at 3.  As explained by the NRC, when Illinois became an NRC "agreement state" and

assumed regulatory authority over the West Chicago site in 1987, agreement-state staff members

shipped all of NRC's official record (paper) documents regarding West Chicago to the Illinois

state officials in charge of regulating the site.  *See* Declaration of Sean Croston ("Croston Decl.")

at ¶ 5.  Consequently, NRC did not retain any paper or electronic copies of these records and is

no longer the custodian of the official records.  *Id*. at ¶¶ 6-13.  Using a rough electronic system

for searching the availability of microfiche records relating to the West Chicago site, it appears

that NRC may have 2,825 microfiche documents regarding the West Chicago site from 1970

until 1990, when NRC handed over jurisdiction to Illinois.  *Id*. at ¶ 7.  These unofficial,

microfiche copies are NRC's only remaining documents regarding the West Chicago site.  *Id*.

It would be unduly burdensome to require the NRC to produce its unofficial

microfiche records. The microfiche files for nuclear materials sites like West Chicago were not

filed by docket number.  *Id*. at ¶ 8.  Instead, they are intermingled with the records for all of the

hundreds or possibly thousands of other materials sites that NRC regulated at one time or

another.  *Id*. at ¶¶ 8-10.  NRC estimates that it has tens of thousands of individual microfiche

slides, if not more.  *Id*. at ¶ 8.  Each of these slides has approximately 364 pages archived within

them, in a grid system.  *Id*.  The NRC's West Chicago microfiche documents are intermingled

throughout these millions of microfiche pages.  *Id*.  NRC staff has attempted to find specific

documents from its microfiche library, and it takes an inordinate amount of time to retrieve even

37

a single document. *Id*. at ¶ 11.   In sum, while it is theoretically possible to retrieve these

microfiche documents for West Chicago, it would be very burdensome.  *Id*. at ¶ 12.  As proposed

previously, if defendants are in fact interested in the information contained in what was formerly

the NRC's official records, it would be much more efficient to obtain the official paper copies

from the State of Illinois.  *Id*.  Alternatively, most of the documents that NRC ever had regarding

West Chicago are publicly available at NRC's website.  *Id.* at ¶ 13 (providing instructions on

how to search NRC's website), and thus equally available to Defendants.

**C.**     **Documents Related to Uranium Mining[13]**

      **1.**     **Documents at the National Archives at
Denver, CO (Rocky Mountain Region)**

      The National Archives and Records Administration (NARA) Facility in Denver,

CO, is open to the public and contains the archival records of nearly eighty Federal agencies.

These records are arranged by Record Group (a body of records from an individual agency or

bureau).  *See* Pantoja Decl. at ¶ 43.  Record Group 434, the General Records of the Department

of Energy (1915 - 2007), contains 419 cubic feet of documents, including historical records from

the Atomic Energy Commission and the Department of Energy Grand Junction Office, including,

but not limited to, uranium ore receipts.  *Id*.  nformation about the entries in Record Group 434

can be found at  (http://www.archives.gov/research/guide-fed-records/groups/434.html#434.4),

---

[13]   Notwithstanding Defendants' statement that they "hotly dispute the alleged ownership
and operation" of the mine sites that are the subject of the Complaint in Intervention, Supp. Br. at
20; KerrMcGee has publicly touted its ownership and operation of mines at many of the locations
relevant here, including the Lukachukai mines in Arizona, the Ambrosia Lake mines in New
Mexico, and the Powder River Basin, Wyoming.  *See* Pantoja Declaration, Ex. 5 (excerpts of
Historical Highlights (1929-1966), KM-TRX0511205 - KM-TRX0511214).

NARA's Archival Research Catalog, and additional indexes and finding aids are available at the NARA Facility. *Id*.

While the Government has not conducted an exhaustive review of the records located at the NARA facility, the United States believes that the relevant information in these records is summarized in documents that have already been produced electronically, including the Tabulation of Uranium Ore Produced Under AEC Program, 1948 - 1970, and the Abandoned Uranium Mines and the Navajo Nation AUM Screening Assessment Report and Atlas with Geospatial Data and its associated reference documents. *See* Pantoja Decl. at ¶ 44.

It would be unduly burdensome for the Government to scan the voluminous information publicly available at the NARA Facility, when the information is just as accessible to Defendants as it is to the United States, and when the United States believes that the relevant portions of such information have been summarized and produced electronically.

Defendants rely on *Convolve, Inc. v. Compaq Computer Corp.,* 643 F. Supp. 2d 336 (S.D.N.Y 2008) in arguing that the government is obligated to produce publicly available information. This reliance is misplaced. In *Convolve*, the document in question was a single thesis, available in Plaintiff Massachusetts Institute of Technology's library and on its website, not boxes upon boxes of documents. Moreover, in ordering the production of the thesis, the court in *Convolve* noted that although it was "no longer tenable," due to a prior court order to Plaintiffs ordering production of all responsive documents, "an objection on burden grounds may have been viable as an original matter[.]" *Conlove*, 643 F. Supp. 2d 336, 342.

Defendants also rely on *Raytheon Aircraft Corp. v. United States,* No. 05-2328-JWL-DJW, 2006 WL 2570545 (D. Kan. Sept. 5, 2006). Defendants correctly note that the court

found that "the United States is far more likely than Raytheon to know which public repositories may possess the documents and information Raytheon seek." *Raytheon*, 2006 WL 2570545 at *7. However, Defendants fail to note that in *Raytheon*,, "[t]he question for the Court to resolve [was] whether the United states should *identify* documents it knows to exist within public repositories ..." (emphasis added). *Id.* Accordingly, the court did not compel the United States to scan and produce any documents electronically, rather the court "grant[ed] Raytheon's request for an order compelling the United States to disclose the location of responsive documents it knows to exist within any public repositories." *Id.* Here, the United States has disclosed that responsive documents are located within Record Group 434 at the NARA Facility in Denver, CO.

Contrary to Defendants' contentions, parties are not required to produce documents that are publicly available and/or equally available to all parties. *See e.g.*, *Bey, et al., v. City of New York*, No. 99 Civ. 3893(LMM)(REL), 2010 WL 3910231 at *11-12 (S.D.N.Y. Sept. 21, 2010) (finding Defendant City of New York not required to produce court records publicly available in court archives and equally available to all parties); *SEC v. Strauss,* No. 09 Civ. 4150 (RMB) (HBP), 2009 WL 3459204, at *11 (S.D.N.Y. Oct. 28, 2009) (finding Plaintiff SEC not required to share access to a database of work papers maintained by Deloitte & Touche when Defendant "can obtain the same access to the material that the SEC has by arranging with D & T's third-party service provider to have an identical database created and paying for monthly access and its own key fobs," regardless of the fact that Defendant "will, presumably, be required to serve a Rule 45 subpoena on D & T in order to obtain access to the database"); *SEC v. Samuel H. Sloan & Co.*, 369 F. Supp. 994, 995 (S.D.N.Y. 1973) (denying a motion to compel a hearing transcript that all parties had the opportunity to purchase, emphasizing that "[t]he purpose of

40

discovery is to enable a party to discover and inspect material information which by reason of an opponent's control, would otherwise be unavailable for judicial scrutiny.").

**2.      Documents in the Custody of the U.S. Department of Energy**

The Government believes that there may be some documents relating to uranium mining that have not been made available to the public in the NARA Facility in Denver, CO, including but not limited to post-1970 uranium ore production information, which are in the custody of the Department of Energy. *See* Pantoja Decl. at ¶ 45. The Government is continuing to work with records managers at the Department of Energy to determine what, if any, documents in the possession of DOE are responsive to the Requests for Production, the volume of those documents, and whether or not these documents are privileged. *Id*.

**3.      USGS Mineral Resources Data System (MRDS)**

The US Geological Survey (USGS) Mineral Resources Data System (MRDS) is a publicly available, on-line database that describes and maps metallic and nonmetallic mineral resources throughout the world. *See* USGS website at http://tin.er.usgs.gov/mrds/. Included in the database are deposit name, location (latitude and longitude), commodity, deposit description, geologic characteristics, production, reserves, resources, and references. *See* Pantoja Decl. at ¶ 46. The MRDS can be accessed and searched by site name, state, commodity, operation type, and/or ID number at: http://tin.er.usgs.gov/mrds/. *See id*. The entire database can be downloaded at http://tin.er.usgs.gov/mrds/mrds.zip. *See id*.

It would be unduly burdensome for the United States to produce the underlying documents associated with the database, as the database contains information on mines, mine

41

prospects and occurrences, and processing plants all over the world, when the publicly available database provides the data in a searchable and downloadable format.

**D.    Underlying Cost Documentation for Costs Already Paid**

The Government understands that Defendants are in possession of the underlying cost documentation for costs already paid by Defendants at certain sites, including cost documentation for the White King/Lucky Lass site.  To the extent there is no issue with respect to liability at the sites at issue, since the costs have been paid, and Defendants themselves would know what costs they had paid, the Government's production of such cost documentation would not only be redundant but unduly burdensome as much of this material goes back many years. Defendants have repeatedly confirmed their preference not to receive documents that are duplicative of what they already possess.

**POINT IV**

**DEFENDANTS' REQUEST FOR SANCTIONS IS WHOLLY INAPPROPRIATE**

Defendants seek an order: (1) precluding the introduction into evidence of any documents or other information produced by the Government after November 1, 2010; (2) precluding any party from asserting any claim against or seeking to recover any amounts from Defendants with respect to environmental liabilities at sites for which the Government had not completed its production as of November 1, 2010; (3) compelling the Government to produce all responsive documents by December 31, 2010; (4) conditionally striking the Complaint in Intervention in its entirety and precluding any party from seeking to recover from Defendants based on amounts allegedly owed to the Government, unless the Government completes its production of all responsive documents by December 31, 2010; and (5) awarding to Defendants

42

their attorneys' fees and costs incurred in making their Motion. *See* Supp. Br. at 3-4. The

Government having complied with its discovery obligations under Rule 34 and Amended and

Second Amended Case Management Orders, Defendants' requests for sanctions are entirely

without merit.

## A.    Legal Standard

A district court has broad discretion to determine an appropriate sanction for

discovery violations based on the facts of the particular case. *See Residential Funding Corp.*,

306 F.3d at 101; *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (internal

citations omitted); *Arista Records, LLC*, 633 F. Supp. 2d at 141 (citing *West v. Goodyear Tire &*

*Rubber Co.*, 167 F.3d 776, 779-80 (2d Cir. 1999); *Fujitsu Ltd.*, 247 F.3d at 436). An appropriate

sanction is one that will: (1) deter parties from violating discovery obligations; (2) place the risk

of an erroneous judgment on the party that wrongfully created the risk; and (3) restore the

prejudiced party to the same position that it would have been in absent the discovery violation by

an opposing party. *West*, 167 F.3d at 779 (quoting *Kronisch v. United States*, 150 F.3d 112, 126

(2d Cir. 1998)). A court should always impose the least harsh sanction that will accomplish

these goals. *See Passlogix*, *Inc. v. 2FA Tech. LLC*, 708 F.Supp.2d 378, 420 (S.D.N.Y. 2010)

(citing *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Securities*, 685 F.

Supp. 2d 456, 468-70 (S.D.N.Y. 2010)).

"[P]reclusion is a harsh remedy that 'should be imposed only in rare situations.'"

*Presser v. Key Food Stores Co-op, Inc.*, No. CV 2001-8059 (ILG) (MDG), 2006 WL 2038508, at

*1 (E.D.N.Y. July 19, 2006) (quoting *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71

(2d Cir. 1988)). Similarly, the sanction of striking a pleading is generally found to be warranted

when there are repeated violations of the discovery process by the litigant over a significant

period of time after being warned about the consequences of non-compliance.  *See, e.g.,Frame v.*

*S-H, Inc.*, 967 F.2d 194, 202-03 (5th Cir. 1992) (striking defendant's pleadings appropriate where

defendant engaged in repeated and manifold discovery abuses, including willful destruction and

alteration of documents after beginning of suit).

Under Rule 37, preclusion is improper is any violation was substantially justified

or harmless.  Substantial justification means "justification to a degree that could satisfy a

reasonable person that parties could differ as to whether the party was required to comply with

the disclosure request."  *Kara Holding Corp. v. Getty Petroleum Mktg., Inc*., No. 99 Civ. 0275,

2004 WL 1811427, at *24 (S.D.N.Y. Aug.12, 2004) (quoting *Henrietta D. v. Guiliani*, No. 95

Civ. 0641, 2001 WL 1602114, at *5 (E.D.N.Y. Dec. 11, 2001)).  A failure is harmless when the

party entitled to the disclosure is not prejudiced.  *See Kara Holding Corp*., 2004 WL 1811427, at

*24.

**B.    Defendants Are Not Entitled to Preclusion of
Documents or Striking of the Government's Pleading**

Even assuming *arguendo* that the Government somehow failed to comply with its

discovery obligations in this matter as of November 1, 2010, Defendants vague and conclusory

assertions of prejudice are insufficient to justify sanctions.  As a preliminary matter, Defendants'

statement that their "ability to defend against any claim based on environmental liabilities at sites

for which the Government has not completed its production as of November 1st has been

irretrievably compromised," is wholly speculative and unsubstantiated.  Nor could it be

otherwise.  Having failed to inspect most of the documents at issue, Defendants can only speak to

a potential for prejudice.  In any event, as explained, *supra*, Points I, II, and III, the manner and

44

pace of the Government's productions were factually and legally justified under the circumstances. The Government's extensive dialogue with Defendants concerning discovery issues, and the Government's flexibility and willingness to negotiate a consensual resolution of as many issues as possible, belie Defendants suggestion of bad faith on the Government's part, which has not previously been found by this Court to have been in violation of any discovery obligation.

Accordingly, on this record, even assuming the Government had been less than diligent in complying with discovery – which is not the case – a sanction of preclusion or striking of its pleading would be excessive and otherwise inappropriate. *See Presser*, 2006 WL 2038508, at *1 ("Prejudice is an important factor in determining the propriety of preclusion as a discovery sanction.") (citing *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 269 (2d Cir.1999))*; Ebewo v. Martinez*, 309 F. Supp. 2d 600, 606 (S.D.N.Y. 2004) ("Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution."); *Morua v. Compania Dominicana de Aviacion C. Por. A.*, No. 85 Civ. 7494, 1990 WL 52104, at *2 (S.D.N.Y. April 19, 1990) (finding dismissal under Rule 37 inappropriate for party's failure to comply with discovery requests where offending party delivered partial responses to request in attempt to comply with court's orders); *Ehret v. New York City Dep't of Social Servs.*, 102 F.R.D. 90, 92 (E.D.N.Y. 1984) ("[Plaintiffs'] behavior ... did not rise to the level of presenting a complete or near complete barrier to effective discovery or otherwise threatening the judicial system. Accordingly, there is no basis for striking of plaintiffs' pleadings as a Rule 37 sanction.").

Although a court may impose sanctions even if a discovery violation did not prejudice the other parties, the absence of prejudice generally militates toward the imposition of a less harsh sanction. *See Passlogix*, *Inc.*, 708 F.Supp.2d at 421 ("Preclusion is a harsh sanction preserved for exceptional cases where a [ ... ] party's failure to provide the requested discovery results in prejudice to the requesting party.").  Where the discovery violation involves withholding of evidence, the absence of prejudice can be shown by demonstrating, for example, that the other parties were able to obtain the same evidence from another source, *see Passlogix, Inc.*, 708 F.Supp.2d at 417 (citing *Pension*, 685 F.Supp.2d at 467-68; *Ispat Inland, Inc. v. Kemper Envtl., Ltd.*, 2006 WL 3478339, at *3 (S.D.N.Y. Nov.30, 2006)), or that during discovery they never attempted to obtain the evidence, *see, e.g., Klezmer ex rel. Desyatnik v. Buynak*, 227 F.R.D. 43, 52 (E.D.N.Y.2005) (declining to give adverse inference jury instruction for spoliation of evidence where movant failed to seek the evidence during discovery) (collecting cases).

Here, Defendants consistently failed inspect and copy the responsive paper documents that the Government had made available at the beginning of the year.  They could have copied all of that material at any time, with or without a reservation of rights as to costs. *See generally* Point I.A-D, *supra.*  Regarding the documents as to which the Government claims an undue burden, much of the material is publicly available or available from third-parties.  *See generally* Point III, *supra.*  These circumstances militate against Defendants' request for sanctions, including their request for an order directing that the Government produce all of its responsive records by December 31, 2010, because Defendants unquestionably bear responsibility for any delay in Defendants' actual possession of the documents they seek.  In any

46

event, Defendants fail to appreciate that many of the sites underlying the Government's claims are still active.  Because the universe of responsive paper and electronic records will continue to grow into the foreseeable future, Defendants' request for an absolute deadline for the production of the Government's responsive records – as opposed to requiring production of substantially all responsive records as of a certain date – is unrealistic and exceedingly unfair, especially when the fact discovery deadline is not until March 31, 2011.

The cases cited by Defendants are inapposite.  The November 1, 2010 deadline at issue here was part of a consensual case management schedule that was so-ordered by the Court, and not a Rule 37(a) order compelling discovery after a party had already been found remiss with respect to its discovery obligations.  Thus, unlike the cases relied upon by Defendants, see Supp. Br. at 12-13, there is no prior history here of the Government flouting discovery-related orders. See, e.g.,Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1366 (2d Cir. 1991) ("Ekco was subject to an unequivocal order of the court requiring it to produce a witness for deposition, and to produce documents relating to that deposition. The court's order was issued at a hearing during which the scope of required discovery was fully discussed, and Ekco's objections to that discovery were explicitly rejected. *The order itself was necessitated only by Ekco's inexcusable refusal to comply voluntarily with proper party-initiated discovery*."); *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp*., 602 F2d 1062, 1068 (2d Cir. 1979) (affirming sanctions where "plaintiff, through its undeniable fault, has frozen this litigation in the discovery phase for nearly four years"); *Evans v. Port Authority of New York and New Jersey*, 201 F.R.D. 96, 98 (S.D.N.Y. 2001) ("The first effort that even charitably might be called a partial response was his tender of the list of 38 potential witnesses for plaintiff in April 2001, six months after the

47

answers were due and three months after the date by which responses were ordered by the Court.").

**C.    Defendants Are Not Entitled to Monetary Sanctions**

In light of the Government's compliance with its discovery obligations by the applicable deadlines in this case, Defendants' motion lacks merit.  Consequently, Defendants request for sanctions, including monetary sanctions, should be denied in its entirety.  *See, e.g., Edmonds v. Seavey*, 2009 WL 11285526, at *4 (S.D.N.Y. May 5, 2009) ("the plaintiff's motion for sanctions in connection with the failure to turn over the documents prior to their review by counsel is meritless, since they were produced within the time required").

**CONCLUSION**

For the foregoing reasons, Defendants motion to compel discovery and for sanctions should be denied in its entirety, and the Government's motion for a protective order should be granted in its entirety.

Dated:        New York, New York
              December 15, 2010

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for Defendants

    /s/ Joseph A. Pantoja
By:    JOSEPH A. PANTOJA
       Assistant United States Attorney
       86 Chambers Street, 3rd Floor
       New York, New York 10007
       Tel.: (212) 637-2785
       Fax:  (212) 637-2750
       Email: joseph.pantoja@usdoj.gov

48
