KIRKLAND & ELLIS LLP
David J. Zott, P.C. (*admitted pro hac vice*)
Jeffrey J. Zeiger  (*admitted pro hac vice*)
300 North LaSalle Street
Chicago, Illinois  60654-3406
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

Additional Counsel Listed On Signature Block

*Attorneys for Tronox Incorporated, Tronox
Worldwide LLC, and Tronox LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| TRONOX INCORPORATED, *et al.*, | Case No. 09-10156 (ALG) |
| Debtors. | Jointly Administered |
| TRONOX INCORPORATED, TRONOX WORLDWIDE LLC f/k/a Kerr-McGee Chemical Worldwide LLC, and TRONOX LLC f/k/a Kerr-McGee Chemical LLC, | |
| Plaintiffs, | |
| v. | Adversary Proceeding No. 09-01198 (ALG) |
| ANADARKO PETROLEUM CORPORATION, KERR-MCGEE CORPORATION, KERR-MCGEE OIL & GAS CORPORATION, KERR-MCGEE WORLDWIDE CORPORATION, KERR-MCGEE INVESTMENT CORPORATION, KERR-MCGEE CREDIT LLC, KERR-MCGEE SHARED SERVICES COMPANY LLC, and KERR-MCGEE STORED POWER COMPANY LLC, | |

| | |
|---|---|
| Defendants. | ) |
| ———————————————— | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) |
| | ) |
| TRONOX, INC., TRONOX WORLDWIDE | ) |
| LLC, TRONOX LLC, KERR-McGEE | ) |
| CORPORATION, and ANADARKO | ) |
| PETROLEUM CORPORATION, | ) |
| | ) |
| Defendants. | ) |
| ———————————————— | ) |

## SECOND AMENDED ADVERSARY COMPLAINT

Plaintiffs Tronox Incorporated, Tronox Worldwide LLC f/k/a Kerr-McGee Chemical

Worldwide LLC, and Tronox LLC f/k/a Kerr-McGee Chemical LLC (collectively, "Tronox"),

for their Adversary Complaint against Defendants Anadarko Petroleum Corporation

("Anadarko"), Kerr-McGee Corporation ("New Kerr-McGee"), Kerr-McGee Oil & Gas

Corporation, Kerr-McGee Worldwide Corporation, Kerr-McGee Investment Corporation, Kerr-

McGee Credit LLC, Kerr-McGee Shared Services Company LLC, and Kerr-McGee Stored

Power Company LLC (collectively the "New Kerr-McGee Subsidiaries"), allege as follows:

## INTRODUCTION

1.    This case is about a successful oil and gas exploration and production company,

Kerr-McGee Corporation, that created massive actual and contingent environmental, tort, retiree,

and other liabilities during its more than 70-year history (the "Legacy Liabilities") and then

dumped them on Tronox so that Kerr-McGee's senior executives could obtain windfall profits

during a wave of lucrative consolidation in the oil and gas industry.  In the process, however,

Kerr-McGee left Tronox grossly undercapitalized and without sufficient assets to pay its debts;

2

misled potential investors regarding the true magnitude of the Legacy Liabilities; loaded down Tronox with debt; forced Tronox to provide sweeping indemnities to New Kerr-McGee and substantially above-market benefits to retirees; defrauded creditors; and set Tronox on a path to an inevitable bankruptcy.

2.    By the late 1990s, the entity then known as Kerr-McGee Corporation ("Old Kerr-McGee") had accumulated massive Legacy Liabilities through its various far-flung businesses—including treatment of wood products, production of rocket fuel, refining and marketing of petroleum products, and the mining, milling and processing of nuclear materials—since it was founded in 1929.

3.    Having enjoyed years of profits from the various businesses that created the Legacy Liabilities, Old Kerr-McGee decided to jettison the toxic legacy resulting from those businesses because it was preventing Old Kerr-McGee from participating in potential transactions that would result in even greater profits for Old Kerr-McGee and its senior executives. Potential merger and acquisition partners were scared away by the "poison pill" of Legacy Liabilities. The need to evade the Legacy Liabilities was underscored when the U.S. Environmental Protection Agency ("EPA") notified Old Kerr-McGee in 1999 that it was allegedly responsible for hundreds of millions of dollars in cleanup costs at a former wood treatment plant in Manville, New Jersey. Old Kerr-McGee knew that Manville was just the tip of the iceberg and that it would face similar potential liability at numerous other sites like Manville.

4.    Old Kerr-McGee devised a two-step fraudulent scheme to escape its toxic past and attempt to place its valuable oil and gas assets safely beyond the reach of the EPA, tort claimants, and other creditors. *First*, Old Kerr-McGee would isolate the Legacy Liabilities by

3

transferring all of its valuable oil and gas assets out of the historical business and into a new "clean" entity. *Second*, Old Kerr-McGee then would sever the historical business containing the Legacy Liabilities—achieving a "clean break" between its valuable oil and gas assets and the Legacy Liabilities.

5.     Step One of the scheme was code-named "Project Focus." To isolate the Legacy Liabilities from the valuable oil and gas assets, Old Kerr-McGee created an entirely new corporate structure that featured a new "clean" parent company—also called "Kerr-McGee Corporation" ("New Kerr-McGee")—and a new "clean" subsidiary—Kerr-McGee Oil and Gas Corporation (the "Oil and Gas Business")—into which all of the valuable oil and gas assets were transferred. Numerous liabilities created by those oil and gas assets, however, stayed behind along with the liabilities of all of Old Kerr-McGee's other historical business. Through these corporate machinations, Old Kerr-McGee became a subsidiary of New Kerr-McGee and was stripped of its most valuable assets. All that remained in Old Kerr-McGee (which remained under the control of New Kerr-McGee until April 1, 2006) was a small, cyclical chemical business, a handful of discontinued businesses, and more than 70 years of Legacy Liabilities (the "Chemical Business"). The majority of the Legacy Liabilities retained by the Chemical Business stemmed from business operations completely unrelated to the Chemical Business, including oil and gas operations.

6.     New Kerr-McGee initiated Step Two in spring 2005 when it commenced efforts to sell or spin-off the liability-laden Chemical Business. But potential purchasers balked. Numerous potential buyers refused even to bid on the Chemical Business burdened with the "poison pill" of Legacy Liabilities. One stated that the amount of Legacy Liabilities that New Kerr-McGee was attempting to put on the Chemical Business was "criminal." Another potential

purchaser reduced its proposed $1.2 billion purchase price for the Chemical Business by $900 million if the Legacy Liabilities were included. These were legitimate concerns. During the sale process, EPA sent New Kerr-McGee a demand for $178.8 million for response costs incurred through December 2004 at Manville, one of numerous wood treatment sites where New Kerr-McGee knew it could have potential liability. There were also thousands of personal injury tort claims pending against New Kerr-McGee related to the wood treatment sites and other issues.

7.      New Kerr-McGee realized that it could never achieve its goal of a clean break from its Legacy Liabilities with an arm's-length buyer. So it elected to spin-off (the "Spin-Off") the Chemical Business as Tronox. A Spin-Off enabled New Kerr-McGee to unilaterally dictate the terms of the deal, avoid third-party due diligence, and eliminate standard representations and warranties regarding its massive Legacy Liabilities.

8.      The two-step scheme concluded with the completion of the Spin-Off on March 31, 2006. New Kerr-McGee not only offloaded the massive Legacy Liabilities, but also stripped $785 million out of the Chemical Business tax free on the way out the door.

9.      The scheme, however, paid additional dividends for New Kerr-McGee. Less than 90 days after New Kerr-McGee jettisoned the Legacy Liabilities, Anadarko offered to acquire New Kerr-McGee for $18 billion on June 22, 2006. The transaction was approved and New Kerr-McGee became a wholly owned subsidiary of Anadarko on August 10, 2006. A primary architect of the two-step scheme, New Kerr-McGee Chairman and Chief Executive Officer Luke R. Corbett, personally profited by more than $200 million from the Anadarko deal. New Kerr-McGee Senior Vice President and Chief Financial Officer Robert M. Wohleber, who also served as Chairman of the Board of Tronox until the completion of the Spin-Off, pocketed more than $20 million. New Kerr-McGee Senior Vice President and General Counsel Gregory F. Pilcher,

another architect of the Spin-Off, walked away with more than $9 million.  Other New Kerr-McGee senior executives also enjoyed windfalls.

10.    While the "clean break" from the Legacy Liabilities allowed New Kerr-McGee to complete an $18 billion sale with massive profits for its senior executives, Tronox was simply broke.  Overburdened with the Legacy Liabilities and debt, stripped of essential cash, and grossly undercapitalized, Tronox was doomed to fail.  Despite valiant efforts to survive, including significant personnel reductions, efforts to streamline its operations, and reductions in retiree benefits programs, Tronox was left with no choice but to file for bankruptcy protection on January 12, 2009.

11.    New Kerr-McGee knew that Tronox was doomed to fail from the moment of the Spin-Off:

- New Kerr-McGee rushed to complete the Spin-Off near the top of the chemical sector business cycle.  It knew that Tronox would never achieve the inflated projections that New Kerr-McGee had presented to the market under typical conditions.

- New Kerr-McGee concealed from potential investors the true extent of the Legacy Liabilities that it forced upon Tronox.

- New Kerr-McGee's investment banker for the Spin-Off—as well as for the Anadarko deal—was Lehman Brothers.  While Lehman Brothers was touting Tronox's virtues to the market, it was telling a different story internally.  On several occasions, Lehman Brothers' lead banker drew a picture of a potted flower on a white board.  The flower represented Tronox.  He also drew a weed growing out of the flower pot.  The weed represented the Legacy Liabilities.  The Lehman Brothers banker explained that the weed would choke the flower.

- New Kerr-McGee stripped all of Tronox's cash except for $40 million (which was less than the amount Tronox would have to spend in its first year to service its Legacy Liabilities and debt).  New Kerr-McGee told Tronox to cover cash shortfalls by selling its assets.

- Following extensive due diligence, a potential third-party buyer warned New Kerr-McGee that Tronox could never survive on its own.

- New Kerr-McGee switched a number of retired high level executives from the Tronox pension fund to the New Kerr-McGee pension fund, fearing that a Tronox bankruptcy would negatively impact their retirement payments.

- Anadarko agreed to an unusual provision in connection with the acquisition of New Kerr-McGee that indemnified New Kerr-McGee's officers and directors for acts and omissions prior to the acquisition, thereby purporting to shield the officers and directors from liability for their roles in the Spin-Off.

12.    Simply put, Tronox was destined to fail. New Kerr-McGee knew it. But Tronox's public investors and creditors did not.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b).

14.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

15.    Plaintiff Tronox Incorporated is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma. Tronox has operations and facilities in the United States, the Asia Pacific region, and Europe. On January 12, 2009, Tronox and 14 of its affiliated companies (the "Debtors") filed for chapter 11 protection in this Court. The Debtors operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

16.    Plaintiff Tronox Worldwide LLC, one of the Debtors, is a successor in interest to Old Kerr-McGee and, as a result of the Spin-Off, is a wholly owned subsidiary of Tronox Incorporated.

17.    Plaintiff Tronox LLC, one of the Debtors, is a successor in interest to Old Kerr-McGee and, as a result of the Spin-Off, is an indirect wholly owned subsidiary of Tronox Incorporated.

18.     Defendant Anadarko is a Delaware corporation headquartered in The Woodlands, Texas. On June 22, 2006, Anadarko offered to acquire New Kerr-McGee for $18 billion, including $16.4 billion in cash. On August 10, 2006, the shareholders of New Kerr-McGee approved the offer, and New Kerr-McGee became a wholly owned subsidiary of Anadarko. Accordingly, Anadarko is a successor in interest to New Kerr-McGee.

19.     Defendant Kerr-McGee Corporation (*i.e.*, New Kerr-McGee) is a wholly owned subsidiary of Defendant Anadarko, and is also a successor to Old Kerr-McGee.

20.     Defendant Kerr-McGee Worldwide Corporation is a wholly owned subsidiary, directly or indirectly, of Defendant Kerr-McGee Corporation and the current owner of certain of the assets fraudulently transferred from Plaintiffs.

21.     Defendant Kerr-McGee Oil & Gas Corporation is a wholly owned subsidiary, directly or indirectly, of Defendant Kerr-McGee Corporation and the current owner of certain of the assets fraudulently transferred from Plaintiffs.

22.     Defendant Kerr-McGee Investment Corporation is a wholly owned subsidiary, directly or indirectly, of Defendant Kerr-McGee Corporation and is the current owner of certain of the assets fraudulently transferred from Plaintiffs.

23.     Defendant Kerr-McGee Credit LLC is a wholly owned subsidiary, directly or indirectly, of Defendant Kerr-McGee Corporation and the current owner of certain of the assets fraudulently transferred from Plaintiffs.

24.     Defendant Kerr-McGee Shared Services Company LLC is a wholly owned subsidiary, directly or indirectly, of Defendant Kerr-McGee Corporation and the current owner of certain of the assets fraudulently transferred from Plaintiffs.

25.     Defendant Kerr-McGee Stored Power Company LLC is a wholly owned

subsidiary, directly or indirectly, of Defendant Kerr-McGee Corporation and the current owner

of certain of the assets fraudulently transferred from Plaintiffs.

## BACKGROUND

**I.    Old Kerr-McGee Creates Massive Legacy Liabilities Through Far-Flung Businesses During Its More Than 70-Year History.**

26.     Old Kerr-McGee was founded in 1929 as Anderson & Kerr Drilling Company

near Oklahoma City, Oklahoma.  As the company grew its oil and gas exploration activities and

drilling operations, it moved into downstream operations with the purchase of its first refinery in

1945.

27.     Old Kerr-McGee continued to expand in the 1950s into various other energy-

related businesses.  In 1952, Old Kerr-McGee entered the uranium industry when it acquired

mining properties in Arizona.  Shortly thereafter, it constructed the country's largest uranium-

processing mill.  Also in the 1950s, Old Kerr-McGee expanded its retail operations into owning

and operating service stations, and further expanded its refining operations.

28.     In the early 1960s, Old Kerr-McGee entered the forestry business through a series

of asset purchases, and acquired several fertilizer-marketing companies.

29.     In 1967, Old Kerr-McGee completed a merger with American Potash and

Chemical Corporation, and began to manufacture and market a variety of ammonium perchlorate

chemicals (such as fertilizers, potash, and sodium chlorate), boron, titanium dioxide, and

manganese.  That same year, Old Kerr-McGee started construction of its first coal mine shaft in

Stigler, Oklahoma.

30.    In the 1970s, Old Kerr-McGee became involved in various aspects of the nuclear industry, including exploration, mining, milling, and conversion of uranium oxide into uranium hexafluoride, pelletizing of these materials, and fabrication of fuel elements.

31.    By 2000, Old Kerr-McGee had exited most of these historic business operations (collectively, the "Legacy Businesses") and was left with two core operating businesses:  (a) oil and gas exploration and production and (b) chemicals.  Although it had discontinued the Legacy Businesses, Old Kerr-McGee remained responsible for the Legacy Liabilities.  The overwhelming majority of the Legacy Liabilities—including some that are the direct result of oil and gas operations—are not related to the titanium dioxide and other operations that became Tronox.

**II.    Old Kerr-McGee Decides To Jettison Its Legacy Liabilities In The Late 1990s.**

32.    In the late 1990s, consolidation in the oil and gas industry increased valuations of exploration and production companies like Old Kerr-McGee.  Old Kerr-McGee, however, was left on the sidelines because potential merger and acquisition partners were scared away by the Legacy Liabilities.

33.    Old Kerr-McGee's executives, however, were not going to let this opportunity for windfall profits pass them by.

34.    No later than 1998, Old Kerr-McGee began considering various transactions through which it could evade its Legacy Liabilities.  One transaction involved assigning all of the Legacy Liabilities to a dormant subsidiary, Edgebrook Development Corporation, in exchange for a promissory note issued by Old Kerr-McGee equal to the total costs of the Legacy Liabilities.

35.    Old Kerr-McGee decided it needed a cleaner break from the Legacy Liabilities

than the Edgebrook transaction would provide.  This conclusion was underscored by the EPA's

notices to Old Kerr-McGee in 1999 that it was a potentially responsible party for the clean-up of

a former wood treatment site at Manville, New Jersey.  Given the scope of the potential liabilities

at Manville and other similar wood treatment sites (as well as its numerous other legacy

environmental sites), Old Kerr-McGee concluded that any transaction that required it to provide

sufficient value to another entity to cover the costs of the Legacy Liabilities was now off the

table.  The Legacy Liabilities were simply too big.

36.    Specifically, on April 30, 1999, EPA published a proposed plan describing

remedial alternatives for the Federal Creosote Superfund Site at Manville, New Jersey.

37.    Two months later, on July 6, 1999, EPA sent a letter to Old Kerr-McGee stating

that "EPA has documented the release and threatened release of hazardous substances into the

environment" at Manville, that the site "is currently the location of a residential community of

single-family homes, and is bordered by various commercial and residential areas," and that

"hazardous substances have been detected at the Site in homes, soils and groundwater."  The

letter also stated that EPA has "reason to believe that, for purposes of Section 107(a) of

CERCLA, 42 U.S.C. § 9607(a), Kerr-McGee is a potentially responsible party ("PRP") with

respect to the Site."

38.    On October 18, 1999, EPA sent another letter to Old Kerr-McGee stating that it

had selected a remedy for Manville that included permanent relocation of residents, excavation

of source material, and off-site thermal treatment and disposal.  EPA estimated the cost of the

remedy at $59,100,000.  EPA also warned that because the site "consists of residential housing

and is directly affecting this community, it is particularly important that this remedial action be

conducted on an expedited basis." EPA requested that Old Kerr-McGee determine whether it would voluntarily finance or perform the proposed remediation.

39.     The April 1999 public notice and the July and October 1999 EPA letters caused significant concern within Old Kerr-McGee, including among its Board of Directors. Old Kerr-McGee launched an investigation into the Manville site, including title searches to analyze any connection between an alleged predecessor company and the site, the identity of other potentially responsible parties, and the nature and extent of Old Kerr-McGee's potential exposure. Old Kerr-McGee also met with EPA to try to obtain information on any other potentially responsible parties, the scope of the remediation project, and whether a final remedy had been selected for the site. Old Kerr-McGee management frequently updated the company's Board of Directors regarding this investigation.

40.     Old Kerr-McGee had reason to be concerned. The potential liability at Manville was significant in its own right. According to a cost recovery lawsuit that EPA and the State of New Jersey filed in 2008 against Tronox as Old Kerr-McGee's alleged successor in interest, these governmental entities have spent approximately $280 million in clean-up costs at Manville. The bigger problem for Old Kerr-McGee was that Manville was simply the tip of the iceberg. Old Kerr-McGee knew that it was associated with numerous other previously undisclosed wood treatment and agricultural chemical sites that, like Manville, posed the specter of substantial environmental and tort liabilities.

## III.    Old Kerr-McGee Devises A Two-Step Scheme To Avoid Responsibility For Legacy Liabilities.

41.     For Old Kerr-McGee's Board and management, Manville was a pointed reminder that they would not be able to tap into the lucrative oil and gas merger market while saddled with the Legacy Liabilities. Accordingly, Old Kerr-McGee developed a scheme to jettison the

12

Legacy Liabilities and shield its valuable oil and gas assets from EPA, tort claimants, and other creditors.

42.    The scheme involved two steps. *First*, Old Kerr-McGee would isolate its Legacy Liabilities in a subsidiary that included the Chemical Business while the valuable oil and gas assets were segregated in a separate "clean" subsidiary. *Second*, Old Kerr-McGee would achieve a "clean break" from the Legacy Liabilities by severing the Chemical Business either through an arm's-length transaction or a spin-off.

43.    On information and belief, Old Kerr-McGee, however, concluded that the Chemical Business was too small to take on all of the Legacy Liabilities. Undeterred, Old Kerr-McGee set out to increase the apparent size of the Chemical Business—at almost any cost.

44.    On January 11, 2000, the Old Kerr-McGee Board of Directors approved the acquisition of certain titanium dioxide operations of Kemira Pigments Oy ("Kemira"). These included plants in Savannah, Georgia and Botlek, Netherlands. The Savannah acquisition closed effective April 1, 2000, and the Botlek acquisition closed effective May 1, 2000. The total acquisition price was approximately $400 million.

45.    On information and belief, in its haste to expand the Chemical Business so it could sever the Legacy Liabilities, Old Kerr-McGee significantly overpaid for the Kemira facilities in Savannah and Botlek. Old Kerr-McGee failed to do any meaningful due diligence that would have revealed the significant operational and environmental issues that have plagued the Savannah plant since its purchase. It simply did not care. In fact, when Old Kerr-McGee's legal and environmental advisors raised concerns regarding environmental issues at the Savannah Plant, they were told by Old Kerr-McGee to stop attempting to "sabotage" the deal.

46.     In truth, Kemira was willing to give away the Savannah plant if a buyer would pay $250 million for Botlek. The $400 million purchase price was literally off the chart that Kemira had prepared for payment of incentive bonuses to key employees involved in the sale.

47.     On information and belief, the true value of Kemira did not matter to Old Kerr-McGee. By carrying the asset at the artificially inflated purchase price, Old Kerr-McGee could foist that many more Legacy Liabilities on Tronox. Even after it became clear that Old Kerr-McGee had substantially overpaid, it failed to write down the book value of the Kemira assets. Tronox wrote down the Kemira assets by approximately $317 million based primarily on the inflated price that New Kerr-McGee paid for these assets.

48.     The troubled Kemira assets not only failed to provide much value to Tronox, but limited its ability to engage in potentially beneficial strategic or financial transactions following the Spin-Off.

**IV.    Step One:  Isolate The Legacy Liabilities Through Project Focus.**

49.     In 2001, Old Kerr-McGee launched "Project Focus" as Step One of its scheme to eliminate the Legacy Liabilities. Old Kerr-McGee's oil and gas assets and its Legacy Liabilities traditionally had been commingled throughout the company. Old Kerr-McGee claimed that "Project Focus" was designed to create a clear delineation between its oil and gas and chemical operations. The real focus, however, was on segregating the Legacy Liabilities from the oil and gas assets as the first step to avoiding responsibility altogether for these potentially massive historic liabilities.

50.     At the same time Old Kerr-McGee was launching Project Focus, it had already started to plan Step Two of the scheme. At a March 13, 2001 Board meeting, Old Kerr-McGee Chairman and CEO Luke Corbett announced that Old Kerr-McGee was reviewing alternatives

14

for various non-core businesses in the company's portfolio. On May 8, 2001, Old Kerr-McGee management presented the Board with several options for separating Old Kerr-McGee's chemical subsidiary from its oil and gas operations, including (a) a leveraged buy-out of the chemical business (with Old Kerr-McGee retaining a minority equity stake), (b) a spin-off of either the chemical business or the exploration and production business, or (c) a Morris trust transaction through which a spin-off would be coupled with a merger of the chemical business and a third party. Discussions among Old Kerr-McGee and its advisors regarding the best way to achieve Step Two of the scheme continued throughout Project Focus.

51.    Before they could be severed, the Legacy Liabilities first needed to be isolated in the Chemical Business through Project Focus. On May 13, 2001, the Old Kerr-McGee Board of Directors approved the first move in a massive corporate shell game, creating a new "clean" holding company—New Kerr-McGee—and a new "clean" subsidiary—the Oil and Gas Business. Old Kerr-McGee became a wholly owned subsidiary of New Kerr-McGee.

52.    All the while, Anadarko was lurking. Anadarko commenced its own analysis as to how it might acquire New Kerr-McGee without the dreaded Legacy Liabilities. No later than January 2002, Anadarko retained Merrill Lynch to analyze potential transactions (including some nearly identical to those discussed at the May 2001 Kerr-McGee Board Meeting) to separate the Chemical Business and Legacy Liabilities if Anadarko acquired them along with New Kerr-McGee's prized oil and gas assets. Anadarko was attempting to find a way to separate the Chemical Business and Legacy Liabilities through "*a clean, certain exit … which minimizes any environmental liability exposure* and which is at a price which both internally and from a market perspective is perceived to be fair and acceptable." Merrill Lynch reached the same conclusion as Kerr-McGee: a transaction would not be possible until New Kerr-McGee shed the

15

Legacy Liabilities. Unlike New Kerr-McGee, however, Merrill Lynch candidly stated that a

"Spin-off/IPO" transaction was "unlikely to be viable" as the "Size / growth profile would make

[the Chemical Business] highly unattractive as a standalone public entity."

53.     In January 2002, Anadarko pressed ahead with its due diligence regarding the

Legacy Liabilities in anticipation of a potential acquisition of New Kerr-McGee. Anadarko's

due diligence team quickly confirmed that the Legacy Liabilities were a poison pill to any

acquisition, even with Anadarko's strong balance sheet. Specifically, with respect to the Legacy

Liabilities, Anadarko's due diligence team concluded:

- *The present value of Kerr-McGee's future environmental spending was "$BILLIONS"*;

- Kerr-McGee was "spending in excess of $150 MILLION DOLLARS PER YEAR with potential of *$2-3 BILLION yet to spend*";

- The "clean up spending for KM [is] already over $1 BILLION DOLLARS with *no end in sight for at least 30 more years*";

- "The remediation reserve never goes down below $200MM";

- Environmental spending "eats up most of their free cashflow and limits their ability to grow the stock";

- Kerr-McGee had "over 500 active pollution sites and based on additional findings we estimate there are over 1,000 sites with KM ownership," including 61 federal regulated superfund type sites and 461 state regulated cleanup sites; and

- From Anadarko's perspective, it concluded that it could not risk that "[a]ll the liability would transfer to APC."

54.     Anadarko found other problems with New Kerr-McGee's environmental reserves

as well. The reserves were only "sufficient to fund two years of remediation at current levels."

New Kerr-McGee used a different standard for taking environmental reserves than Anadarko's

more prudent approach. Anadarko reserved for the "total life of remediation projects" while

Kerr-McGee reserved for only a few years. On average, Anadarko was spending approximately

$5 million per year for environmental remediation and had total environmental reserves of $67 million—more than *13 times* its average annual remediation costs. In comparison, New Kerr-McGee was spending approximately $115 million per year for environmental remediation but only had reserves of $227 million—*less than twice* New Kerr-McGee's average annual remediation costs.

55.    Bottom line: Anadarko concluded that the Legacy Liabilities would be "very difficult to transfer to other companies even if the [chemical] asset is sold" and "[a]ny sale of chemical assets would probably require ongoing management of remediation liabilities by Anadarko personnel." As Anadarko later explained, the Chemical Business and the Legacy Liabilities were "the deal killer for APC. Too much liability."

56.    So Anadarko waited. By early February 2002, Anadarko decided that it would not proceed with an acquisition of New Kerr-McGee at that time due to the Legacy Liabilities. Instead, on information and belief, Anadarko informed New Kerr-McGee that if New Kerr-McGee was able to separate the Legacy Liabilities and the Chemical Business from its valuable oil and gas assets, Anadarko would be ready to pounce on a Kerr-McGee acquisition.

57.    New Kerr-McGee had all the motivation it needed. New Kerr-McGee forged ahead with Project Focus, which involved numerous internal transactions that effectively isolated the Legacy Liabilities in the Chemical Business. On December 31, 2002, Old Kerr-McGee's Board (which included New Kerr-McGee Chairman and CEO Luke Corbett) approved by unanimous written consent numerous transactions that lacked any independent economic substance or legitimate business purpose, but instead were simply a means to strip the oil and gas assets from Old Kerr-McGee and isolate in the Chemical Business the Legacy Liabilities that Old Kerr-McGee created during its more than 70-year history.

58.    As confirmed in Supplemental Bond Indentures dated December 31, 2002, New

Kerr-McGee caused "substantially all" of the valuable oil and gas assets to be distributed to New

Kerr-McGee, the New Kerr-McGee Subsidiaries, or other New Kerr-McGee entities.  The

Legacy Liabilities, including many that were directly related to the oil and gas assets that had

been transferred, were left behind in the stripped-down Chemical Business.  For example, the

Chemical Business was saddled with Legacy Liabilities related to petroleum terminals, offshore

drilling and hundreds of service station sites with environmental clean-up issues even though

they were clearly related to oil and gas activities.

59.    The assets transferred out of the Chemical Business and into New Kerr-McGee

and the New Kerr-McGee Subsidiaries or other New Kerr-McGee entities were worth billions of

dollars at the time they were transferred.  The shares of Devon Energy Corporation stock that

were transferred out of the Chemical Business alone were worth more than $200 million.  No

consideration was provided to the Chemical Business for the Devon Energy stock or other assets

transferred.

60.    Additional asset transfers out of the Chemical Business and into New Kerr-

McGee, the New Kerr-McGee Subsidiaries, or other New Kerr-McGee entities, all of which

were dated December 31, 2002, included 5000 shares of KM Yemen Ltd., 1000 shares of KM

West Africa Investment Ltd., 5000 shares of KM du Maroc Ltd., 5000 shares of KM Hazar Ltd.,

5000 shares of KM Eire Exploration Ltd., 5000 shares of KM Benin Ltd., 1000 shares of KM

Astrid Ltd., 1000 shares of KM Anton Ltd., 5000 shares of KM Americas Ltd., 1000 shares of

KM Olonga Ltd., 1000 shares of KM Mediterranean Exploration Ltd., 5000 shares of

Sunningdale Abu Dhabi Ltd., 5000 shares of KM Atlantic Exploration and Production Ltd., 5000

shares of KM Bahamas Ltd., 120,000 shares of KM International Insurance Ltd., 1000 shares of

KM Offshore Canada Ltd., 4,099,994 shares of KM (Thailand) Ltd., 1000 membership interests

in KM Credit LLC, 1000 preference shares of ADA Funding Ltd., 1000 shares of KM Stored

Power Company LLC, 1000 membership interests in KM Stored Power Corporation, 100% of

the membership interests in KM Foundation Corporation, 1000 shares of KM Insurance Co.,

1000 shares of KM Investment Corporation, 1000 shares of Benedum-Trees Oil Company, 1000

shares of KM Oil & Gas Corp., 1000 shares of KM Natural Gas, Inc., 2,000,000 membership

interests in US Avestor LLC, 1% general partnership interest in Sun Pennsylvania Limited

Partnership, 1,000 shares of Sun Offshore Gathering, 1000 Shares of Oryx Gas Marketing Co.,

1000 shares of Oryx Pipe Line Co., 1000 shares of Oryx Energy Payroll Co., 1000 shares of

Oryx Services Co., 1000 shares of Oryx Crude Trading & Transportation Inc., and 100 shares of

Kerr-McGee LP.

61.    New Kerr-McGee continued to strip assets from the Chemical Business

throughout 2003 and 2004 as Project Focus continued.  In late November 2004, New Kerr-

McGee began drafting an Assignment and Assumption Agreement that would state definitively

which assets had been stripped from and which potential liabilities had been left in the Chemical

Business.  The agreement was designed to "finish off" Project Focus.  The Assignment and

Assumption Agreement was not executed—and Project Focus did not conclude—until mid-2005

at the earliest.

62.    Despite all of the intercompany maneuvers, Project Focus did not alter the actual

business operations of New Kerr-McGee or its employees.  In particular, although the Chemical

Business was saddled with significant Legacy Liabilities, those liabilities continued to be

managed and funded at the parent company level, and New Kerr-McGee remained the ultimate

guarantor of those obligations.  New Kerr-McGee knew that its small chemical unit did not have

19

sufficient assets to manage the Legacy Liabilities, which had cost New Kerr-McGee between

$44 million and $157 million annually from 2000 through 2004 (net of reimbursement).

## V.    Step Two: Sever The Legacy Liabilities.

### A.    New Kerr-McGee Delays Step Two Until Market Conditions Are Optimal And Chemical Executives With Knowledge Of Legacy Liabilities Are Replaced.

63.    Old Kerr-McGee began planning Step Two of the scheme no later than March

2001.

64.    On information and belief, implementation of Step Two was delayed to allow

time for the Chemical Business' performance to improve before attempting a sale or spin-off.

The Chemical Business had struggled from 1999 to 2004 as decreased demand contributed to

sharply lower profitability and cash flow.  The price of pigment also declined significantly as a

result of events such as September 11th, the 2001 recession, the outbreak of the SARS

respiratory pandemic, and the war in Iraq.

65.    On information and belief, New Kerr-McGee also wanted those individuals

representing the Chemical Business in discussions with analysts and potential investors to have

little knowledge regarding the true magnitude and scope of the Legacy Liabilities.  Beginning in

mid-2004, New Kerr-McGee replaced certain key senior executives of the Chemical Business

with people who knew little or nothing about the Legacy Liabilities.  For example, Tom Adams

was named President of the Chemical Business in September 2004.  As a former oil and gas

executive, he had no experience with the Chemical Business, had no knowledge of the Legacy

Liabilities, and had never heard of Project Focus.  Similarly, one week before presentations to

potential purchasers began in spring 2005, New Kerr-McGee designated an individual whose

knowledge of the legacy environmental issues was limited to one particular project to make the environmental presentation to potential purchasers.

**B.      Prospective Purchasers Express Concern Regarding The Legacy Liabilities, Especially After EPA Demands $179 Million For Manville.**

66.     Although it had been long planned, Step Two began in earnest in early 2005 when New Kerr-McGee concluded that the Chemical Business was reaching the top of the business cycle.

67.     On February 23, 2005, New Kerr-McGee announced that it had hired Lehman Brothers to consider alternatives for separating the Chemical Business and that the Board of Directors would formally consider the issue at its meeting on March 8.

68.     On March 8, 2005, the New Kerr-McGee Board of Directors authorized New Kerr-McGee to separate the Chemical Business through either a sale or spin-off.  In a March 8 press release, New Kerr-McGee Chairman and CEO Luke Corbett stated:  "For some time, the Board has been considering the separation of chemical, and current market conditions for this industry now make it an ideal time to unlock this value for our stockholders."  Corbett similarly explained in a letter to employees that "[i]t's clear to us that, with the inorganic chemical and energy markets being as strong as they are today, the timing now is ideal to consider this separation."

69.     In transaction materials for the sale or spin-off, Lehman and New Kerr-McGee consistently painted an overly optimistic view of the Chemical Business and deliberately understated the magnitude of the Legacy Liabilities.  Employees of the Chemical Business expressly warned Lehman not to oversell the potential of the Chemical Business because the industry was at the top of the business cycle and "[h]istory shows there will be a downside … we just don't know when."  The management presentations prepared by Lehman for prospective

21

purchasers include only a few slides regarding the Legacy Liabilities buried in an approximately 80-slide presentation. Only one line in the entire presentation even referred to the Manville site.

70.    New Kerr-McGee could not bury Manville forever. On April 15, 2005, at the very moment Chemical Business executives were touting the business to potential purchasers, New Kerr-McGee received a demand from the EPA for $178,800,000 in clean-up costs that EPA had incurred at Manville through 2004 plus interest.

71.    Even before the EPA demand, potential purchasers were expressing concerns about the Legacy Liabilities and questioning why the Chemical Business had been saddled with all of them—even those created by oil and gas operations or otherwise not remotely related to the operations of the Chemical Business. One potential purchaser said the magnitude of the Legacy Liabilities being placed on Tronox was "criminal." The EPA demand fueled these concerns among potential purchasers.

72.    In late April-early May 2005, numerous potential purchasers informed New Kerr-McGee or Lehman that they were not interested in acquiring the Chemical Business with the Legacy Liabilities. Several explicitly refused to assume the Legacy Liabilities. Another prospective purchaser conveyed a $1.2 billion bid if the Legacy Liabilities were not included, but only a $300 million bid if they were included. This prospective purchaser viewed the inclusion of the Legacy Liabilities as a $900 million swing, and refused to go further in any discussions.

73.    New Kerr-McGee knew the Legacy Liabilities all but eliminated any possibility of an arm's-length sale of the Chemical Business to a third party on terms that would allow New Kerr-McGee's senior executives to obtain massive windfall profits in a subsequent transaction.

**C.    New Kerr-McGee Backdates An "Assignment, Assumption And Indemnity Agreement" In Response To The EPA Manville Demand.**

74.    In early April 2005, in-house counsel for New Kerr-McGee circulated a draft of the Assignment and Assumption Agreement that was designed to "finish off" Project Focus. The April 10 draft of the Assignment and Assumption Agreement did not include an indemnity provision.

75.    When it received the $179 million EPA demand for Manville on April 15, 2005, New Kerr-McGee realized that it had not completely isolated its Legacy Liabilities in the Chemical Business. Even following a sale or spin-off, the Chemical Business potentially could seek contribution from New Kerr-McGee for the Legacy Liabilities. To eliminate that risk, New Kerr-McGee needed an indemnity retroactive to December 31, 2002 (when certain of the Project Focus transactions were purportedly consummated) to ensure that the $179 million Manville demand would be included within its scope.

76.    On information and belief, New Kerr-McGee decided only after it received the $179 million EPA demand to include an indemnity in the Assignment and Assumption Agreement.

77.    A draft of the Assignment and Assumption Agreement dated three days after New Kerr-McGee received the EPA demand included—for the first time—an indemnification provision that required the Chemical Business to indemnify New Kerr-McGee for any losses relating to or arising out of the Legacy Liabilities. The Chemical Business did not receive any consideration for providing the indemnity. The name of the agreement was subsequently changed to the "Assignment, Assumption and Indemnity Agreement."

78.    On information and belief, New Kerr-McGee caused the Assignment, Assumption and Indemnity Agreement to be executed between the Chemical Business and Oil and Gas

Business in May 2005.  Although executed in May 2005, the agreement was backdated so that it was purportedly effective as of December 31, 2002.

79.    When executed, the Assignment, Assumption and Indemnity Agreement had little economic significance because the Chemical Business, Oil and Gas Business, and other Kerr-McGee entities that received indemnification were all wholly owned subsidiaries of New Kerr-McGee.  The indemnity would have a profound impact, however, if Step Two were completed and the Chemical Business was no longer a subsidiary of New Kerr-McGee.

80.    Even after the execution of the backdated Assignment, Assumption and Indemnity Agreement, on information and belief, New Kerr-McGee wanted to confirm that it had stripped the Chemical Business of all potentially valuable assets.

81.    Accordingly, New Kerr-McGee caused an Assignment Agreement to be executed between the Chemical Business and the Oil and Gas Business.  Under the Assignment Agreement, the Chemical Business irrevocably transferred, conveyed, assigned and delivered to the Oil and Gas Business "all properties, real, personal, corporeal or incorporeal, absolute or contingent, and any and all rights, benefits and privileges, whether known or unknown, express or implied, absolute or contingent and whether due or to become due, arising out of" New Kerr-McGee's oil and gas exploration, production and development business.  The Chemical Business did not receive any consideration under the Assignment Agreement.

82.    On information and belief, although the Assignment Agreement was executed in summer 2005, it also was backdated so that it purported to be effective as of December 31, 2002.

83.    New Kerr-McGee continued to cause certain assets to be conveyed to the Oil and Gas Business pursuant to the backdated Assignment Agreement throughout the remainder of

2005, including after the IPO in November 2005. The assets transferred from the Chemical

Business to the Oil and Gas Business were worth billions of dollars.

**D.    New Kerr-McGee Offers A $400 Million Indemnity To Apollo To Take The
Environmental Liabilities.**

84.    While the Legacy Liabilities scared away numerous potential purchasers, New

Kerr-McGee had detailed negotiations with Apollo Investment Corporation ("Apollo") regarding

the purchase of the Chemical Business throughout summer 2005. As those discussions matured,

however, they further confirmed that New Kerr-McGee would be required to provide

unacceptable concessions and indemnities for an informed third party to assume the Legacy

Liabilities.

85.    Apollo's initial bid of $1.6 billion for the Chemical Business excluded all

liabilities related to wood treatment facilities, including Manville. New Kerr-McGee, however,

needed a "cleaner" separation from the Legacy Liabilities than Apollo's initial bid would

provide. By mid-August 2005, New Kerr-McGee had offered Apollo an approximately $400

million indemnity to take all of the Legacy Liabilities, including the wood treatment facilities.

86.    Ultimately, New Kerr-McGee decided against the sale to Apollo with its costly

indemnity obligation. Instead, New Kerr-McGee pursued a new tact that would allow it to have

its cake and eat it too: a spin-off. A spin-off would enable New Kerr-McGee to avoid its Legacy

Liability obligations without the overhang of an expensive indemnity obligation.

**E.    New Kerr-McGee Chooses A Spin-Off And Unilaterally Dictates The Terms
Of Its Clean Separation From Legacy Liabilities.**

87.    While negotiating with Apollo, New Kerr-McGee was analyzing a potential spin-

off of the Chemical Business as a means to complete Step Two of its scheme.

88.     On July 8, 2005, Lehman made a presentation to New Kerr-McGee comparing the Apollo bid to a potential spin-off. Based on Lehman's analysis, the Apollo bid would provide more than $500 million in additional after-tax cash proceeds to New Kerr-McGee than a spin-off. But the Apollo deal did not allow New Kerr-McGee to offload the Legacy Liabilities, including what Lehman termed "Unidentified Liabilities" that no knowledgeable, arm's-length purchaser would accept without, at a minimum, hundreds of millions of dollars in indemnities.

89.     By late summer 2005, another obstacle to an arm's-length sale emerged: the Chemical Business' performance had peaked and was beginning to decline. On August 1, 2005, Apollo notified New Kerr-McGee that there had been a "significant shortfall" in the performance of the Chemical Business. Apollo concluded that EBITDA in the second half of 2005 would decrease by $19 million versus budget and approximately $60 million in 2006. Apollo warned that "[c]learly a 'miss' of this magnitude puts pressure on the overall transaction, including our approach to the financing markets (which was already complex given the nature of the environmental liabilities we anticipated having to get the markets comfortable with)."

90.     The decline in performance not only meant that New Kerr-McGee had limited time to complete the separation at or near the top of the business cycle, but any third party purchaser of the Chemical Business would require additional concessions to close the transaction.

91.     Shortly thereafter, New Kerr-McGee determined that a spin-off of the Chemical Business was the cheapest—and perhaps only—way for it to achieve a clean separation from the Legacy Liabilities. A spin-off would allow New Kerr-McGee to:

- Dump the Chemical Business and the Legacy Liabilities before the Chemical Business' performance further declined;

26

- Avoid disclosure of the magnitude of Legacy Liabilities that would result from third-party due diligence;

- Avoid making significant representations and warranties regarding the Chemical Business' assets, liabilities, business, and operations—in particular, the Legacy Liabilities;

- Avoid expensive indemnities for the environmental and tort liabilities that Apollo or any other arm's-length buyer would demand; and

- Remove all remaining impediments to a subsequent transaction that would allow New Kerr-McGee senior executives to obtain massive windfall profits.

92.    On September 12, 2005, New Kerr-McGee incorporated the entity it planned to use for the Spin-Off—Tronox—by filing an Amended and Restated Certificate of Incorporation with the Delaware Secretary of State.

93.    Also, in September 2005, New Kerr-McGee began preparing the Master Separation Agreement and ancillary agreements for the Spin-Off.  Attempting to create an appearance of propriety, New Kerr-McGee retained an attorney in mid-September 2005 ostensibly to represent the interests of the Chemical Business in the separation from New Kerr-McGee.  In truth, New Kerr-McGee did not accept any substantive comments from the attorney it hired purportedly to represent the Chemical Business.  After he raised issues regarding the Spin-Off following a meeting with New Kerr-McGee executives, New Kerr-McGee refused to allow him to attend any additional meetings.

94.    On October 6, 2005, the New Kerr-McGee Board of Directors approved the separation of the Chemical Business through a two-part Spin-Off.  First, New Kerr-McGee would sell a minority stake in the Chemical Business through an initial public offering of the Class A common stock of Tronox (the "IPO").  Following the IPO, New Kerr-McGee would maintain a controlling interest in Tronox through ownership of Tronox's Class B common stock,

which New Kerr-McGee then would distribute to its stockholders in spring 2006 (the "Distribution") to complete the Spin-Off.

95.     From its negotiations with potential purchasers, New Kerr-McGee knew that the Legacy Liabilities were at least a $400 million to $900 million problem. New Kerr-McGee also knew that the Chemical Business did not have sufficient assets as a stand-alone entity to support the ongoing maintenance of those Legacy Liabilities. Indeed, New Kerr-McGee and its financial advisor, Lehman Brothers, warned that one of the risks of a spin-off was that the "[s]eparation from legacy liabilities" would be "[c]omplicated under [a] bankruptcy scenario."

96.     Nevertheless, in a unilateral decision, New Kerr-McGee determined that it would provide Tronox with an indemnity for only up to $100 million for environmental Legacy Liabilities. Even then, the indemnification was purely illusory. New Kerr-McGee would indemnify Tronox only for 50 percent of certain environmental costs actually paid above the amount reserved for specified sites for a seven-year period following the Spin-Off. New Kerr-McGee knew that the Chemical Business would not have sufficient cash flow to spend the reserved amounts and thus qualify for indemnification. The indemnity was simply a mirage that was never intended to assist Tronox in covering the more than $100 million in Legacy Liability payments Tronox has made since the Spin-Off, or the hundreds of millions of dollars in Legacy Liabilities that it continues to face.

97.     In another unilateral decision, New Kerr-McGee further determined that it would require Tronox to assume $550 million in debt with the Spin-Off—the proceeds of which would go exclusively to New Kerr-McGee—that would saddle Tronox with more than $30 million per year in interest expense.

98.    In another unilateral decision, New Kerr-McGee determined that it would strip out all cash from the Chemical Business in excess of $40 million, leaving Tronox with less cash than the amount Tronox would be required to spend in the first year following the Spin-Off just to service the Legacy Liabilities and debt it was forced to assume through the Spin-Off.

99.    In another unilateral decision, New Kerr-McGee further determined that it would require Tronox to provide a broad indemnification for the Legacy Liabilities to New Kerr-McGee.

100.    In another unilateral decision, the terms imposed on Tronox provided New Kerr-McGee with so much control that it was tantamount to New Kerr-McGee running Tronox's environmental program.  Indeed, even projects, plans, activities and negotiations that had been approved by New Kerr-McGee and commenced as of the date of the Spin-Off needed to be re-approved following the Spin-Off.  Based on the terms of the Spin-Off, one Tronox senior manager believed that he could not change the method by which Tronox would take environmental reserves or the company risked losing the indemnity.  These constraints were designed to prevent Tronox from ever being able to collect on the $100 million paper indemnity.

F.    **New Kerr-McGee Provided Misleading Information Regarding Tronox To Potential Investors In Connection With The Spin-Off.**

101.    In November 2005, the future Tronox management team made a series of road show presentations to potential investors in connection with the IPO.  These presentations were prepared by New Kerr-McGee and its investment banker, Lehman Brothers.

102.    On several occasions while internally preparing for these presentations, a Lehman Brothers banker (who was responsible for marketing the IPO to the public) drew a picture of a potted flower on a white board.  He said that the flower represented Tronox.  He then drew a

weed growing from the flower pot, which he said represented the Legacy Liabilities. The
Lehman Brothers banker concluded that the weed would choke the flower.

103.    Apollo had reached the same conclusion. Following extensive due diligence,
Apollo had warned New Kerr-McGee that Tronox should not go public because it could not
survive as a stand-alone company. Apollo's due diligence teams had concluded that New Kerr-
McGee was attempting to offload hundreds of millions of dollars of legacy environmental and
tort claims through the sale process.

104.    New Kerr-McGee needed to make sure that other potential investors did not reach
the same conclusion. Thus, even though New Kerr-McGee knew that the Chemical Business
was cyclical and beginning to slip from the top of the business cycle, its projections ignored
downside scenarios and failed to consider whether Tronox could survive the inevitable downturn
in the business cycle while saddled with the massive Legacy Liabilities.

105.    Even under their unrealistic projections, New Kerr-McGee and its advisors knew
that Tronox would be unable to service the Legacy Liabilities and debt. They proposed that
Tronox could cover anticipated cash shortfalls by selling certain Tronox assets. In particular,
New Kerr-McGee suggested that Tronox could raise more than $150 million in cash by selling
land in Nevada during the first three years following the Spin-Off. This suggestion, however,
was unrealistic when made and these sales never materialized.

106.    New Kerr-McGee also materially understated the Legacy Liabilities that it
dumped on Tronox through the Spin-Off. In particular, New Kerr-McGee's methodology for
setting its environmental and tort reserves was deeply flawed, and inconsistent with generally
accepted accounting principles and industry practice. New Kerr-McGee ignored known
information in setting reserves and applied a threshold for taking a reserve that was materially

higher than what was appropriate under GAAP. As a result, the environmental and tort reserves

set forth in the Form S-1 Registration Statement ("Registration Statement") and elsewhere were

materially understated.

107.    For example, New Kerr-McGee failed to disclose numerous additional wood

treatment sites where a Kerr-McGee entity potentially may be responsible for substantial clean-

up costs just like at Manville even though New Kerr-McGee was aware of these sites at the time

of the Spin-Off. Old Kerr-McGee and New Kerr-McGee referred to these sites internally as the

"secret sites." In 2002, Old Kerr-McGee undertook a "confidential" investigation of these sites

by examining corporate records, published historical information about the wood treatment

industry, and public property ownership records. Old Kerr-McGee employees also made secret

visits to the sites and were told they should not disclose the purpose of their visit. Through this

investigation, Old Kerr-McGee identified approximately ten additional wood treatment sites

where it potentially could have liability akin to that asserted by EPA at Manville. Based on these

visits, New Kerr-McGee knew at the time of the Spin-Off that at least several of these sites were

under investigation for potential remediation.

108.    New Kerr-McGee considered doing a similar investigation shortly before the

Spin-Off regarding approximately 260 undisclosed agricultural chemical sites, five undisclosed

former chemical manufacturing sites, two undisclosed former fertilizer manufacturing sites, and

several other undisclosed sites. That investigation never occurred and these sites were never

disclosed in connection with the Spin-Off. In fact, Tronox only recently discovered these sites in

preparation for this litigation when it found an August 2005 New Kerr-McGee memorandum

listing these sites.

109.    New Kerr-McGee went to great lengths to ensure that the true magnitude of the

Legacy Liabilities was never properly disclosed.  At one point, two senior members of the New

Kerr-McGee environmental group raised concerns regarding the accuracy of its environmental

reserves.  Instead of being rewarded for their diligence, they were both disciplined.

110.    New Kerr-McGee and its advisors controlled the content of the Registration

Statement.  Counsel for New Kerr-McGee's underwriters for the IPO, Akin Gump Strauss Hauer

& Feld LLP, raised concerns regarding the sufficiency of disclosures of risk factors in the

Registration Statement.  Akin Gump proposed certain changes to the disclosures and could not

understand New Kerr-McGee's "reluctance to make them."

111.    New Kerr-McGee's disclosures in the Registration Statement regarding tort

liabilities also were materially misleading.  For example, New Kerr-McGee provided the

following disclosure in the Registration Statement regarding lawsuits related to former wood

treatment sites:

> Between 1999 and 2001, KM Chemical was named in 22 lawsuits
> in three states (Mississippi, Louisiana and Pennsylvania) in
> connection with former forest products operations located in those
> states (in Columbus, Mississippi; Bossier City, Louisiana; and
> Avoca, Pennsylvania).  The lawsuits sought recovery under a
> variety of common law and statutory legal theories for personal
> injuries and property damages allegedly caused by exposure to
> and/or release of creosote and other substances used in the wood-
> treatment process.  KM Chemical has executed settlement
> agreements that are expected to resolve substantially all of the
> Louisiana, Pennsylvania and Mississippi lawsuits described above.
> Resolution of the remaining cases is not expected to have a
> material adverse effect on the company.

112.    New Kerr-McGee failed to disclose that it had settled these wood treatment

claims for approximately $70 million in the years immediately preceding the Spin-Off.  This

omission was particularly significant in light of the nearly 11,000 additional claims related to

wood treatment sites that had been filed at the time of the Spin-Off. Instead of disclosing that these claims were similar to the ones resolved for $70 million several years before the Spin-Off, New Kerr-McGee disclosed: "The company has not provided a reserve for these lawsuits because at this time it cannot reasonably determine the probability of a loss, and the amount of loss, if any, cannot be reasonably estimated. The company believes that the ultimate resolution of the forest products litigation will not have a material adverse effect on the company's financial condition or results of operations."

113.    Based on this same information, Apollo's due diligence team from the law firm of Morgan Lewis & Bockius concluded that New Kerr-McGee "may be significantly under-reserved for these cases" and the "total potential exposure could be well over $500 million."

114.    New Kerr-McGee's auditors, Ernst & Young ("E&Y"), also questioned the sufficiency of the tort disclosures in the Registration Statement. Shortly after the IPO, Tronox (still controlled by New Kerr-McGee) settled certain wood treatment tort claims in mid-December 2005. During a meeting in the first week of January 2006, E&Y challenged a New Kerr-McGee executive regarding the accuracy of the Registration Statement in light of these tort settlements.

115.    Within three months of acquiring New Kerr-McGee, Anadarko realized that New Kerr-McGee had placed limitations on what it reserved: "KMG used a different environmental reserve valuation than APC. KMG and Tronox valued their reserve at 3 years while APC reserve is an estimate to closure."

116.    On information and belief, New Kerr-McGee could not have subscribed the IPO if it had disclosed the true nature and extent of the Legacy Liabilities. So New Kerr-McGee simply did not disclose them.

**G.    New Kerr-McGee Completes Step Two Of Its Scheme By Spinning Off
Tronox In March 2006.**

117.    To effectuate the Spin-Off, New Kerr-McGee required Tronox to enter into a

number of agreements with New Kerr-McGee including: (a) a Master Separation Agreement; (b)

a Registration Rights Agreement; (c) a Transitional License Agreement; (d) a Tax Sharing

Agreement; (e) an Employee Benefits Agreement; and (f) a Transition Services Agreement

(collectively, the "Separation Agreements").  The Separation Agreements bound Tronox and

various of its subsidiaries to commercially unreasonable separation obligations (the "Separation

Obligations") that were made without arm's-length negotiation and without payment to Tronox

of reasonably equivalent value.

118.    Pursuant to the Master Separation Agreement (the "MSA"), on November 28,

2005, New Kerr-McGee caused 100 percent of its ownership interests in Kerr-McGee Chemical

Worldwide LLC (which became known as Tronox Worldwide LLC) to be transferred, assigned

and conveyed to Tronox Incorporated, eliminated certain intercompany debt, and provided an

indemnity of up to $100 million for certain environmental Legacy Liabilities.  In return, New

Kerr-McGee received 22,889,431 shares of class B common stock in Tronox Incorporated and

approximately $787.8 million consisting of (a) $224.7 million in net proceeds from the IPO of

Tronox's class A common stock; (b) $537.1 million in net proceeds from the $550 million in

debt that Tronox was required to incur in connection with the Spin-Off; and (c) approximately

$26 million in cash (which represented all of Tronox's cash in excess of $40 million).  In

addition, Tronox was required to indemnify New Kerr-McGee and other Kerr-McGee entities for

the Legacy Liabilities.

119.    Under the Employee Benefits Agreement (the "EBA"), Tronox assumed liability

for employee benefits for employees of discontinued chemical, refining, coal, nuclear, and

offshore contract drilling businesses who never worked for Tronox or a titanium dioxide business. Tronox was also required to sponsor various employee benefit plans for these employees, including a defined benefit plan and retiree medical and life insurance plans, that were grossly above market.

120.    On November 28, 2005, Tronox completed the IPO of its Class A Common Stock. New Kerr-McGee, however, continued to exert control over Tronox through its majority ownership of Tronox and the New Kerr-McGee officers who served on Tronox's Board of Directors, including as Chairman of the Board.

121.    Between November 28, 2005 and March 31, 2006, Tronox had minority shareholders to whom New Kerr-McGee owed fiduciary duties. In addition, because Tronox was insolvent at least during the same period, New Kerr-McGee owed fiduciary duties to Tronox's creditors. New Kerr-McGee further continued to owe fiduciary duties to Tronox as a corporate promoter. By early 2006, however, it was clear that one of the fundamental premises underlying the projections that New Kerr-McGee used to support the Spin-Off—that Tronox would obtain approximately $150 million in proceeds from land sales in Henderson, Nevada during the first three years of its existence—was deeply flawed. Under the original land sale contract, sales involving approximately half of the total acreage had been scheduled to close in July, October and November 2005. But none had closed due to outstanding environmental, zoning and/or permitting issues that were conditions to the sales. These conditions had not been met at the time of the Spin-Off, thus preventing the closings from occurring. The buyer ultimately walked away from the deal in January 2007. At the time of the Spin-Off, New Kerr-McGee knew that without the revenues from the land sales (which were in jeopardy), Tronox would struggle to have positive cash flow during the first three years of its existence even under

the inflated projections used to support the Spin-Off. Although it was clear that one of the fundamental premises underlying Tronox's purported ability to survive as a standalone entity was untenable, New Kerr-McGee failed to stop the Spin-Off or take any action to protect Tronox's minority shareholders or creditors.

122.    Instead, New Kerr-McGee pressed ahead with final preparations for the Spin-Off. At a March 8, 2006 meeting, New Kerr-McGee approved the completion of the Spin-Off through the distribution of Tronox's Class B Common Stock to New Kerr-McGee's shareholders. New Kerr-McGee recognized that Tronox would become a company outside of New Kerr-McGee's control group upon the completion of the Spin-Off. Accordingly, New Kerr-McGee also approved the further transfer of defined benefit and retiree-related liabilities from New Kerr-McGee to Tronox upon the distribution date.

123.    The Spin-Off was completed on March 31, 2006 when New Kerr-McGee distributed its shares of Class B Common Stock to New Kerr-McGee shareholders.

124.    On April 1, 2006, Tronox became an independent company. New Kerr-McGee's two-step scheme to isolate and sever the Legacy Liabilities was complete.

**H.    In The Spin-Off, Tronox Assumed Liabilities And Distributed Cash To New Kerr-McGee Far In Excess Of The Value Of The Assets It Received.**

125.    Tronox received less than reasonably equivalent value in the Spin-Off. The Legacy Liabilities that Tronox assumed and for which it indemnified the Kerr-McGee entities, the proceeds from the IPO and debt that Tronox distributed to New Kerr-McGee, and the cash that New Kerr-McGee stripped from Tronox far exceeded the value of the assets and the paper indemnity that Tronox received from New Kerr-McGee.

126.    In particular, New Kerr-McGee received approximately $785 million in proceeds from the IPO, the debt that New Kerr-McGee forced Tronox to incur, and the cash that it

stripped from Tronox. In addition, Tronox assumed and indemnified the Kerr-McGee entities

for Legacy Liabilities that New Kerr-McGee itself had valued at a minimum of $400 million

during its negotiations with Apollo, and that another arm's-length potential purchaser concluded

were at least $900 million.

127.    In return, Tronox received New Kerr-McGee's interests in its Chemical Business.

New Kerr-McGee also agreed to convert any intercompany debt that Tronox owed to New Kerr-

McGee (net of any debt that Kerr-McGee Corporation owed to Tronox) into equity in Tronox.

Finally, New Kerr-McGee gave Tronox an illusory indemnity structured so Tronox would never

be able to recover more than a fraction of its $100 million face amount. Indeed, while Tronox

has spent more than $118 million to satisfy the residual Legacy Liability obligations since the

Spin-Off, New Kerr-McGee has only contributed approximately $4 million under the indemnity

that will expire in November 2012.

128.    In short, Tronox was spun-off as an insolvent and severely undercapitalized

company near the top of its business cycle. Burdened with massive debt and huge undisclosed

Legacy Liabilities, Tronox was destined to fail.

129.    Certain individuals inside New Kerr-McGee had reached the same conclusion.

Shortly before the Spin-Off occurred, New Kerr-McGee switched a number of high level, highly

compensated executives from the Tronox Pension Fund to the Kerr-McGee Pension Fund,

fearing that a future Tronox bankruptcy would limit retiree benefits to these individuals. Other

New Kerr-McGee employees who were assigned to Tronox in connection with the Spin-Off

simply refused to go because of Tronox's bleak prospects.

VI.    **Without The Overhang Of Legacy Liabilities, New Kerr-McGee Sold For $18 Billion Three Months After The Spin-Off Was Completed.**

130.    Less than three months after New Kerr-McGee completed the Spin-Off, it succeeded in its goal of profiting from the lucrative market for oil and gas companies.  New Kerr-McGee, purged of the Legacy Liabilities that had prevented Anadarko from acquiring it earlier, moved forward quickly on a sale to Anadarko.  On June 22, 2006, Anadarko offered to acquire New Kerr-McGee for $16.4 billion in cash and agreed to assume $1.6 billion of New Kerr-McGee's debt.  The purchase price represented a 40 percent premium to New Kerr-McGee's stock price.

131.    The shareholders of New Kerr-McGee voted to approve the offer on August 10, 2006, and New Kerr-McGee Corporation became a wholly owned subsidiary of Anadarko.

132.    New Kerr-McGee senior executives, including its Chairman and Chief Executive Officer Luke Corbett (a primary architect of the Spin-Off), Chief Financial Officer Robert M. Wohleber (who also served as Chairman of the Board of Tronox until the completion of the Spin-Off), and General Counsel Gregory F. Pilcher (another architect of the Spin-Off) personally pocketed over $225 million between them from the Spin-Off.  Other New Kerr-McGee executives enjoyed similar windfalls.

133.    In an unusual provision, Anadarko purported to immunize New Kerr-McGee's officers and directors from liability for their roles in the Spin-Off.  Specifically, as part of its acquisition of New Kerr-McGee, Anadarko agreed to indemnify New Kerr-McGee's officers and directors for acts and omissions occurring before the acquisition date.

134.    Since acquiring New Kerr-McGee, Anadarko has admitted its potential responsibility for the Legacy Liabilities in the event Tronox should fail.  By late 2006, Anadarko had concluded that if Tronox could not negotiate a resolution with the United States regarding

Manville, it could "place a significant financial strain on Tronox" and recognized that "[i]f

Tronox goes under APC gets all the remediation sites back." Anadarko has taken a similar

position publicly. In both its 2006 and 2007 Annual Reports, Anadarko stated: "Kerr-McGee

could be subject to joint and several liability for certain costs of cleaning up hazardous substance

contamination attributable to the facilities and operations conveyed to Tronox if Tronox becomes

insolvent or otherwise unable to pay for certain remediation costs. As a result of the merger, we

will be responsible to provide reimbursements to Tronox pursuant to the MSA, and we may be

subject to potential joint and several liability, as the successor to Kerr-McGee, if Tronox is

unable to perform certain remediation obligations."

135.    In its 2008 Annual Report, Anadarko similarly stated:

> **We may incur substantial environmental and other costs
> arising from Kerr-McGee's former chemical business.**
>
> Prior to its acquisition by the Company, Kerr-McGee through an
> initial public offering, spun off its chemical manufacturing
> business to a newly created and separate company, Tronox
> Incorporated (Tronox). Under the terms of a Master Separation
> Agreement (MSA), Kerr-McGee agreed to reimburse Tronox for
> certain qualifying environmental remediation costs, subject to
> certain limitations and conditions and up to a maximum aggregate
> reimbursement of $100 million. However, Kerr-McGee could be
> subject to liability for certain costs of cleaning up hazardous
> substance contamination attributable to the facilities and operations
> conveyed to Tronox if Tronox becomes insolvent or otherwise
> unable to pay for certain remediation costs. As a result of the
> acquisition of Kerr-McGee, we will be responsible to provide
> reimbursements to Tronox pursuant to the MSA, and we may be
> subject to potential liability, as the successor-in-interest to Kerr-
> McGee, if Tronox is unable to perform certain remediation
> obligations.
>
> On January 12, 2009, Tronox and certain of its subsidiaries filed
> voluntary petitions to restructure under Chapter 11 of the United
> States Bankruptcy Code. As a result of this filing, third parties may
> seek to impose liability upon Kerr-McGee that is otherwise
> attributable to Tronox due to Kerr-McGee's status as the former

39

parent of Kerr-McGee Chemical Worldwide LLC, a predecessor-
in-interest to Tronox. In addition, based on the information
contained in the Tronox bankruptcy filings, it is also possible that
third parties may pursue other claims against Kerr-McGee
associated with the separation of Kerr-McGee's former chemical
business and the initial public offering of Tronox. Currently, we
are unable to estimate the amount of these potential liabilities.

## VII.    Tronox Was Forced to File For Chapter 11 When It Was Unable To Shoulder The Legacy Liabilities And Other Burdens Imposed At The Spin-Off.

136.    Tronox was quickly overwhelmed by the Legacy Liabilities and the $550 million in debt that it was forced to assume through the Spin-Off, leaving Tronox twice as levered as its peers. The Legacy Liabilities and debt have negatively impacted the cost and terms on which Tronox has been able to raise capital. They also have prevented Tronox from taking advantage of favorable market conditions by participating in mergers or acquisitions in the chemical sector. By transferring the poison pill of Legacy Liabilities to Tronox, New Kerr-McGee freed itself to be sold for $18 billion while rendering Tronox effectively unsaleable. The overhang of these Legacy Liabilities made it impossible for Tronox to survive the inevitable downturn in the chemical sector and left it no choice but to file for chapter 11.

137.    In fact, since it became an independent company on April 1, 2006, Tronox has only had one profitable quarter—and that quarter was profitable only as a result of proceeds received from a litigation settlement.

138.    As Tronox became dangerously close to running out of liquidity before debtor-in-possession ("DIP") financing could be secured in late 2008, Tronox contacted Anadarko. While Anadarko is not in the business of lending money, Anadarko and its wholly owned subsidiary, New Kerr-McGee, were responsible for Tronox's predicament. Tronox asked Anadarko—and any other potential source of funding that it could identify—if it would provide DIP financing.

139.    Anadarko was willing to provide DIP financing to Tronox but only on extremely

onerous financial terms.  Aware of the massive liability it faced related to the Spin-Off,

Anadarko also insisted on one more condition:  waiver of claims asserted in this adversary

proceeding.  In short, having bled Tronox dry, Anadarko would provide life support only if

Tronox released the very misconduct that had put Tronox on death's doorstep in the first place.

140.    As Lehman warned New Kerr-McGee nearly four years ago, "Separation from

legacy liabilities" would be "[c]omplicated under [a] bankruptcy scenario."  The inevitable day

of reckoning is here.

## CLAIMS FOR RELIEF

### COUNT I
### Actual Fraudulent Transfer

141.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1

through 140 as though set forth fully herein.

142.    Through its two-step fraudulent scheme, and as detailed above, New Kerr-McGee

transferred valuable assets from Tronox, Tronox Worldwide LLC, Tronox LLC and their

affiliates and predecessors (the "Tronox Entities"), including valuable oil and gas assets and

proceeds from Tronox's secured and unsecured loans and IPO (the "Transfers"), while

simultaneously transferring to and causing the Tronox Entities to assume liabilities and debt,

including the Legacy Liabilities and $550 million in secured and unsecured loans (the

"Obligations").

143.    The Transfers and Obligations were made to or for the benefit of New Kerr-

McGee and New Kerr-McGee Subsidiaries.

144.    At the time the Transfers and Obligations were undertaken, New Kerr-McGee was the parent of the Tronox Entities.  As a result, New Kerr-McGee was in a position to, and in fact did, control and dominate the Tronox Entities.

145.    The Tronox Entities made the Transfers and incurred the Obligations with the actual intent to hinder, delay, or defraud the creditors or future creditors of the Tronox Entities.

146.    As a result of the Transfers and Obligations, the Tronox Entities and their creditors have been harmed.

147.    Tronox has multiple unsecured creditors as to whom the Transfers and Obligations are voidable under applicable law and who hold an unsecured claim allowable under 11 U.S.C. § 502, including federal government entities, tort claimants, tax creditors, bond holders, and trade creditors.

148.    Anadarko benefited from the fraudulent conveyance of the Transfers and Obligations and/or exercised dominion and control over the fraudulently conveyed assets.

149.    Under 11 U.S.C. § 544(b) and § 550(a), Oklahoma's Uniform Fraudulent Transfer Act, including but not limited to 24 Okla. St. Ann. tit. 24, § 116, and/or other applicable law, Tronox is entitled to avoid the Transfers and Obligations and to recover the property or value of the property transferred to Anadarko, New Kerr-McGee, New Kerr-McGee Subsidiaires, their affiliates, or third parties for the benefit of Anadarko, New Kerr-McGee, or New Kerr-McGee Subsidiaries with interest.

## COUNT II
### Constructive Fraudulent Transfer

150.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 149 as though set forth fully herein.

151.    The Tronox Entities did not receive reasonably equivalent value from New Kerr-McGee or New Kerr-McGee Subsidiaries in exchange for the Transfers and Obligations.

152.    Each of the Transfers and Obligations was made to or for the benefit of New Kerr-McGee or New Kerr-McGee Subsidiaries.

153.    At the time the Transfers and Obligations were undertaken, New Kerr-McGee was the parent of the Tronox Entities.  As a result, New Kerr-McGee was in a position to, and in fact did, control and dominate the Tronox Entities.

154.    The Tronox Entities made the Transfers and incurred the Obligations when they were engaged or about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

155.    The Tronox Entities were insolvent at the time or became insolvent as a result of the Transfers and Obligations.

156.    At the time of the Transfers and Obligations, the Tronox Entities intended to incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.

157.    As a result of the Transfers and Obligations, the Tronox Entities and their creditors have been harmed.

158.    Tronox has multiple unsecured creditors as to whom the Transfers and Obligations are voidable under applicable law and who hold an unsecured claim allowable under 11 U.S.C. § 502, including federal government entities, tort claimants, tax creditors, bond holders, and trade creditors.

159.    Anadarko benefited from the fraudulent conveyance of the Transfers and Obligations and/or exercised dominion and control over the fraudulently conveyed assets.

160.    Under 11 U.S.C. § 544(b) and § 550(a), Oklahoma's Uniform Fraudulent Transfer

Act, including but not limited to 24 Okla. St. Ann. tit. 24, §§ 116 and 117, and/or other

applicable law, Tronox is entitled to avoid the Transfers and Obligations and to recover the

property or value of the property transferred to Anadarko, New Kerr-McGee, New Kerr-McGee

Subsidiaries, their affiliates, or third parties for the benefit of Anadarko, New Kerr-McGee, or

New Kerr-McGee Subsidiaries together with interest.

## COUNT III
### Constructive Fraudulent Transfer Regarding
### Payments Made For Anadarko's Or New Kerr-McGee's
### Benefit During The Two Years Preceding The Bankruptcy Filing

161.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1

through 160 as though set forth fully herein.

162.    Tronox did not receive reasonably equivalent value from Anadarko, New Kerr-

McGee, or New Kerr-McGee Subsidiaries in exchange for payments it made or became

obligated to make for Anadarko's and New Kerr-McGee's benefit within two years of Tronox's

bankruptcy filing, including:

(a)    All payments related to the Legacy Liabilities, in an amount to be
determined at trial;

(b)    All pension benefit payments made and payment obligations incurred in
excess of the payments and obligations that would have accrued absent the
agreements imposed on it by New Kerr-McGee, in an amount to be
determined at trial;

(c)    All other post-employment benefits ("OPEB") payments made and
payment obligations incurred in excess of the payments and obligations
that would have accrued absent the agreements imposed on it by New
Kerr-McGee, in an amount to be determined at trial; and

(d)    All pension benefits or OPEB paid or payable to retirees for the years in
which they worked at New Kerr-McGee, in an amount to be determined at
trial.

163.    At the time the above-mentioned transfers were made, Tronox was engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

164.    Tronox was insolvent at the time or became insolvent as a result of the above-mentioned transfers.

165.    At the time the above-mentioned transfers were made, Tronox intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.

166.    As a result of the Transfers and Obligations, the Tronox Entities and their creditors have been harmed.

167.    Anadarko benefited from the fraudulent conveyance of the Transfers and Obligations and/or exercised dominion and control over the fraudulently conveyed assets.

168.    Under 11 U.S.C. § 548 and 11 U.S.C. § 550(a), Tronox is entitled to avoid these transfers and to recover the property or value of the property transferred to Anadarko, New Kerr-McGee, New Kerr-McGee Subsidiaries, their affiliates, or third parties for the benefit of Anadarko, New Kerr-McGee, or New Kerr-McGee Subsidiaries together with interest.

## COUNT IV
### Breach of Fiduciary Duty

169.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 168 as though set forth fully herein.

170.    New Kerr-McGee breached its fiduciary duties to Tronox, Tronox's minority shareholders and Tronox's creditors in at least three distinct ways.

171.    First, New Kerr-McGee breached its fiduciary duties to Tronox and Tronox's minority shareholders from the IPO of Tronox's Class A Common Stock on November 28, 2005 through the completion of the Spin-Off on March 31, 2006. During this period, New Kerr-McGee was the majority shareholder of Tronox and members of Tronox's Board of Directors, including the Chairman of the Board, were officers of New Kerr-McGee. The owners of Tronox's Class A Common Stock were minority shareholders of Tronox.

172.    New Kerr-McGee breached its fiduciary duties, including its duty of loyalty, as a majority shareholder of Tronox by engaging in and completing a transaction—the Spin-Off— that lacked intrinsic fairness, involved gross overreaching, was in bad faith and/or was otherwise unfair to Tronox and its minority shareholders. New Kerr-McGee also engaged in self-dealing in completing the Spin-Off. In doing so, New Kerr-McGee caused Tronox to accept onerous liabilities, including defined benefit and other retiree-related liabilities that were transferred to Tronox as of March 31, 2006, and engage in other actions that caused New Kerr-McGee to receive value at the expense of Tronox and Tronox's minority shareholders. In addition, New Kerr-McGee breached its fiduciary duties to Tronox by failing to stop the Spin-Off at any time before its completion on March 31, 2006, especially when it became clear that a fundamental premise of Tronox's purported viability—$150 million in proceeds from land sales during

46

Tronox's first three years of its existence—was untenable. Instead, New Kerr-McGee approved the completion of the Spin-Off on March 8, 2006.

173. Second, New Kerr-McGee breached its fiduciary duties, including its duty of loyalty, to Tronox and Tronox's creditors as the parent of an insolvent company. No later than the time of the IPO, Tronox was insolvent or became insolvent as a result of the transfers made and obligations incurred in connection with the IPO. Tronox has remained insolvent ever since.

174. As set forth above, New Kerr-McGee failed to act in good faith and enriched itself at the expense of Tronox and its creditors by failing to stop the Spin-Off at any time before its completion on March 31, 2006. New Kerr-McGee completed the Spin-Off when it knew or should have known Tronox could never survive as an independent company.

175. Third, New Kerr-McGee breached the fiduciary duties that it owed to Tronox as the corporate promoter of Tronox.

176. New Kerr-McGee was a corporate promoter of Tronox. It caused "New-Co Chemical Inc." to be incorporated on May 17, 2005 by filing a certificate of incorporation with the Secretary of State of the State of Delaware. New Kerr-McGee then filed an Amended and Restated Certificate of Incorporation for Tronox Incorporated on September 12, 2005 with the Secretary of State of the State of Delaware.

177. New Kerr-McGee's activities as a corporate promoter of Tronox also included, among other things, obtaining or causing Tronox to obtain a revolving credit facility, soliciting investors to purchase Tronox's Class A Common Stock, and arranging for the distribution of Tronox's Class B Common Stock on March 31, 2006.

178.    New Kerr-McGee's activities as a corporate promoter began no later than May
2005 with the incorporation of Tronox and continued up through and including March 31, 2006
when it distributed its majority ownership in Tronox to existing New Kerr-McGee shareholders.

179.    New Kerr-McGee breached its fiduciary duties to Tronox as a promoter by failing
to act in good faith by creating and promoting Tronox when it knew or should have known that
Tronox could never survive as an independent company.  In addition, New Kerr-McGee failed to
disclose to Tronox, its future bondholders, and its future shareholders all material facts regarding
Tronox, including but not limited to the true nature and scope of the Legacy Liabilities that were
being foisted upon Tronox and the unreasonable assumptions underlying the projections
regarding Tronox's future performance.

180.    New Kerr-McGee's breaches of its fiduciary duties proximately caused
substantial harm to Tronox in an amount to be determined at trial.

181.    Tronox did not discover, and could not have discovered in the exercise of
reasonable diligence, the facts of New Kerr-McGee's fiduciary breaches until April 1, 2006 at
the earliest.  Until April 1, 2006, Tronox was under the control of New Kerr-McGee, which
designed and oversaw the Spin-Off.  Several of Tronox's senior executives, including its CEO
and CFO, were appointed shortly before the Spin-Off and had very little knowledge regarding
the scope of the Legacy Liabilities.  Tronox could not have discovered New Kerr-McGee's
fiduciary breaches until it was spun-off as an independent company outside of New Kerr-
McGee's control.

182.    Because New Kerr-McGee executives served as Directors of Tronox and New
Kerr-McGee owned the majority of Tronox through March 31, 2006, New Kerr-McGee
adversely dominated Tronox until April 1, 2006.  Tronox could not have initiated this action

until, at the earliest, April 1, 2006, after New Kerr-McGee distributed its majority ownership stake and after the New Kerr-McGee executives resigned from the Tronox Board.

183.    Tronox did not discover, and could not have discovered through reasonable diligence, the facts of New Kerr-McGee's breaches until April 1, 2006 at the earliest because of New Kerr-McGee's fraudulent concealment.  New Kerr-McGee hid the facts of its breaches from Tronox, Tronox's minority shareholders, and Tronox's creditors.  New Kerr-McGee consistently concealed the true nature of its plan, including by appointing individuals with very little knowledge regarding the scope of the Legacy Liabilities to key positions in Tronox and failing to inform them of the extent of the Legacy Liabilities.  Thus, Tronox could not have initiated this action before April 1, 2006, because of, among other reasons, New Kerr-McGee's fraudulent concealment.

184.    Tronox seeks compensatory damages against New Kerr-McGee for all damages sustained as a result of its wrongdoing, in an amount to be proven at trial, including interest thereon.

## COUNT V
## Civil Conspiracy

185.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 184 as though set forth fully herein.

186.    Anadarko had decided no later than 2001 that it wanted to acquire New Kerr-McGee's valuable oil and gas assets.  Anadarko considered acquiring the Chemical Business and Legacy Liabilities as part of New Kerr-McGee to obtain the oil and gas assets.  It retained a financial advisor, Merrill Lynch, to analyze potential transactions through which Anadarko could separate the Chemical Business and Legacy Liabilities after it acquired everything.  The financial advisor concluded that while a sale was possible, there would be few potential strategic buyers

and financial buyers would place a low value on the Chemical Business with the Legacy

Liabilities included. Merrill Lynch, however, concluded that a Spin-Off/IPO was not a viable

strategy because the assets and liabilities that would become Tronox were "highly unattractive as

a standalone public entity."

187.    Anadarko's due diligence also confirmed that the future spending related to the

legacy environmental liabilities could be between $2 and $3 billion and there was no end in sight

for at least the next 30 years. Anadarko also concluded that New Kerr-McGee's stated

environmental reserves only covered a fraction of these expected costs.

188.    Accordingly, Anadarko concluded that the Legacy Liabilities were a "poison pill"

to any acquisition before they were separated from the oil and gas assets. On information and

belief, Anadarko informed New Kerr-McGee that it would be interested in acquiring its valuable

assets if New Kerr-McGee separated them from the Legacy Liabilities.

189.    On information and belief, Anadarko remained interested in acquiring New Kerr-

McGee's oil and gas assets from 2002 through early 2006 and continued to inform New Kerr-

McGee or its investment banker, Lehman, of such interest.

190.    As acknowledged in New Kerr-McGee's proxy statement regarding Anadarko's

acquisition of New Kerr-McGee, Anadarko's CEO, James Hackett, contacted New Kerr-

McGee's CEO, Luke Corbett, before the New Kerr-McGee Board met on March 8, 2006 to

approve the completion of the Spin-Off. On information and belief, the purpose of Mr. Hackett's

call to Mr. Corbett was to discuss Anadarko's acquisition of New Kerr-McGee.

191.    Within a week after the Spin-Off was completed and the poison pill of the Legacy

Liabilities eliminated, Lehman contacted New Kerr-McGee on April 5, 2006 to formally indicate

Anadarko's interest in acquiring New Kerr-McGee. Following additional discussions, Anadarko

offered to acquire New Kerr-McGee for $18 billion less than three months after the Spin-Off.

Given the size and complexity of the deal and Anadarko's previous interest in acquiring the oil

and gas assets once they were purged of the Legacy Liabilities, it is exceedingly unlikely if not

impossible that Anadarko and New Kerr-McGee did not begin planning the acquisition prior to

the Spin-Off.

192.   On information and belief, Anadarko and New Kerr-McGee agreed prior to the

completion of the Spin-Off that Anadarko would purchase New Kerr-McGee only after it shed

its Legacy Liabilities through the Spin-Off.

193.   On information and belief, Anadarko conspired with New Kerr-McGee to breach

New Kerr-McGee's fiduciary duties by engaging in and completing the Spin-Off.  By agreeing

to purchase New Kerr-McGee once it shed the Legacy Liabilities, Anadarko knowingly and

intentionally furthered the conspiracy by providing New Kerr-McGee with monetary incentive to

complete the Spin-Off, thereby harming Tronox and its creditors.  After the IPO but before the

completion of the Spin-Off, New Kerr-McGee breached its fiduciary duties by, among other

things, failing to stop the Spin-Off, in part, because of the active conspiracy with Anadarko.

194.   On information and belief, Lehman Brothers facilitated Anadarko's and New

Kerr-McGee's arrangement.  Lehman Brothers simultaneously served as New Kerr-McGee's

financial advisor in connection with both the Spin-Off and Anadarko's acquisition of New Kerr-

McGee.

195.   Tronox did not discover, and could not have discovered in the exercise of

reasonable diligence, the facts of Anadarko's role in the conspiracy until February 1, 2007 at the

earliest.  Among other things, the information necessary to discover Anadarko's role was not in

the possession of Tronox, but rather in the possession of Anadarko and New Kerr-McGee.

196.    Because New Kerr-McGee executives served as Directors of Tronox and New

Kerr-McGee owned the majority of Tronox through March 31, 2006, New Kerr-McGee

adversely dominated Tronox until April 1, 2006.  Tronox could not have initiated this action

while New Kerr-McGee adversely dominated Tronox.

197.    Tronox seeks compensatory damages against New Kerr-McGee and Anadarko for

all damages sustained as a result of their wrongdoing, in an amount to be proven at trial,

including interest thereon.

## COUNT VI
### Aiding And Abetting Breach of Fiduciary Duty

198.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1

through 197 as though set forth fully herein.

199.    On information and belief, Anadarko and New Kerr-McGee agreed prior to the

completion of the Spin-Off that Anadarko would purchase New Kerr-McGee only after it shed

its Legacy Liabilities through the Spin-Off.

200.    On information and belief, Anadarko knowingly provided substantial assistance to

New Kerr-McGee in its breaches of its fiduciary duties by, among other things, agreeing to

purchase New Kerr-McGee once it shed the Legacy Liabilities and by providing New Kerr-

McGee with monetary incentive to complete the Spin-Off, thereby harming Tronox and its

creditors.  Through its due diligence and investigation of New Kerr-McGee in 2002, Anadarko

had acquired substantial knowledge of the Legacy Liabilities and understood that Tronox would

be unable to survive as a standalone entity.

201.    Tronox did not discover, and could not have discovered in the exercise of

reasonable diligence, the facts of Anadarko's aiding and abetting New Kerr-McGee's breach of

its fiduciary duties until February 1, 2007 at the earliest.  Among other things, the information

necessary to discover Anadarko's role was not in the possession of Tronox, but rather in the possession of Anadarko and New Kerr-McGee.

202.    Because New Kerr-McGee executives served as Directors of Tronox and New Kerr-McGee owned the majority of Tronox through March 31, 2006, New Kerr-McGee adversely dominated Tronox until April 1, 2006.  Tronox could not have initiated this action while New Kerr-McGee adversely dominated Tronox.

203.    Tronox seeks compensatory damages against Anadarko for all damages sustained as a result of its wrongdoing, in an amount to be proven at trial, including interest thereon.

## PRAYER FOR RELIEF

WHEREFORE, Tronox prays for relief and judgment as follows:

1.    Awarding compensatory damages in favor of Tronox against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proved at trial, including interest thereon;

2.    Awarding Tronox reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

3.    Such other and further relief as the Court may deem just and proper.

Chicago, Illinois
Dated: February 7, 2011

Respectfully submitted,

/s/  David J. Zott, P.C.
_____

David J. Zott, P.C. (*admitted pro hac vice*)
Jeffrey J. Zeiger (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654-3406
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

Richard M. Cieri
Jonathan S. Henes
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

*Attorneys for Tronox Incorporated,*
*Tronox Worldwide LLC, and*
*Tronox LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 7, 2011, a true and correct copy of the foregoing **SECOND AMENDED ADVERSARY COMPLAINT** was served on the following counsel of record as indicated below.

*Via overnight mail and email*

jason.billeck@weil.com
Melanie Gray *(admitted pro hac vice)*
Lydia Protopapas (LP 8089)
Jason W. Billeck *(admitted pro hac vice)*
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002

*Via email rtrust@cravath.com*

Robert Trust
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019-7475

*Via email david.crichlow@pillsburylaw.com*

David A. Crichlow
Craig A. Barbarosh
Karen B. Dine
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, New York 10036

*Via email dfriedman@kasowitz.com*

David M. Friedman
David J. Mark
Ross G. Shank
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019

*Via email joseph.pantoja@usdoj.gov*

Robert William Yalen
Assistant U.S. Attorney
Southern District of New York
86 Chambers Street
New York, New York 10007

*Via email richard.rothman@weil.com*

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
Lori L. Pines (LP 3005)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

*Via email duke.mccall@bingham.com*

Duke K. McCall, III *(admitted pro hac vice)*
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006

*/s/ Jeffrey J. Zeiger____*
Jeffrey J. Zeiger