Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
Lori L. Pines (LP 3005)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
Telephone:  (213) 680-6400
Facsimile:  (213) 680-6499

Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

*Counsel to Defendants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, *et al.*, | ) | Case No. 09-10156 (ALG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| TRONOX INCORPORATED, TRONOX WORLDWIDE LLC f/k/a Kerr-McGee Chemical Worldwide LLC, and TRONOX LLC f/k/a Kerr-McGee Chemical LLC, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Adv. Pro. No. 09-01198 (ALG) |
| ANADARKO PETROLEUM CORPORATION and KERR-MCGEE CORPORATION, KERR-MCGEE OIL & GAS CORPORATION, KERR-MCGEE WORLDWIDE CORPORATION, KERR-MCGEE INVESTMENT CORPORATION, KERR-MCGEE CREDIT LLC, KERR-MCGEE SHARED SERVICES COMPANY LLC, and KERR-MCGEE STORED POWER COMPANY LLC | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| v. | ) |
| | ) |
| TRONOX, INC., TRONOX WORLDWIDE LLC, | ) |
| TRONOX LLC, KERR-MCGEE CORPORATION | ) |
| and ANADARKO PETROLEUM CORPORATION, | ) |
| | ) |
| Defendants. | ) |

### NOTICE OF ANADARKO PETROLEUM CORPORATION AND KERR-MCGEE CORPORATION'S MOTION TO BIFURCATE TRIAL ON PLAINTIFFS' LIABILITY AND DAMAGE CLAIMS

PLEASE TAKE NOTICE that upon the annexed Motion, dated June 22, 2011 (the "Motion"), Anadarko Petroleum Corporation, Kerr-McGee Corporation, Kerr-McGee Oil & Gas Corporation, Kerr-McGee Worldwide Corporation, Kerr-McGee Investment Corporation, Kerr-McGee Credit LLC, Kerr-McGee Shared Services Company LLC, and Kerr-McGee Stored Power Company LLC (collectively, "Defendants"), will move for an order, pursuant to Federal Rules of Civil Procedure 42(b), bifurcating the trial on the liability and damage claims asserted by Plaintiffs Tronox Incorporated, Tronox Worldwide LLC and Tronox LLC, as more fully set forth in the Motion. A hearing will be held before the Honorable Allan L. Gropper, United States Bankruptcy Judge, in Room 617 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, at a date and time to be determined.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, set forth the legal and factual basis therefor, and shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's

filing system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), in accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and served in accordance with General Order M-242, and on (i) the chambers of the Honorable Allan L. Gropper, One Bowling Green, New York, New York 10004, Courtroom 617; (ii) Weil, Gotshal & Manges LLP, attorneys for the Defendants, 767 Fifth Avenue, New York, New York 10153 (Attn: Richard A. Rothman, Esq., Bruce S. Meyer, Esq., and Lori L. Pines, Esq.) and 700 Louisiana, Suite 1600, Houston, Texas, 77002 (Attn: Melanie Gray, Esq., Lydia Protopapas, Esq., and Jason W. Billeck, Esq.); (iii) Bingham McCutchen LLP, attorneys for the Defendants, 355 South Grand Avenue, Suite 4400, Los Angeles, California 90071 (Attn: James J. Dragna, Esq.), and 2020 K Street, NW, Washington, DC 20006 (Attn: Duke K. McCall III, Esq.); and (iv) the United States Attorneys Office, 86 Chambers Street, New York, New York 10007 (Attn: Joseph Pantoja, Esq.), so as to be filed and received at a date and time to be determined (the "Objection Deadline").

If no objections are timely filed and served with respect to the Motion, the Defendants may, on or after the Objection Deadline, submit to the Bankruptcy Court a proposed order bifurcating the trial on Plaintiffs' liability and damage claims, which may be entered with no further notice or opportunity to be heard to any party.

Houston, Texas
Dated: June 22, 2011

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
Lori L. Pines (LP 3005)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

  */s/ Lydia Protopapas*
Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California  90071
Telephone:  (213) 680-6400
Facsimile:  (213) 680-6499

*Counsel to Defendants*

Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
Lori L. Pines (LP 3005)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
Telephone: (213) 680-6400
Facsimile: (213) 680-6499

Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone: (202) 373-6000
Facsimile: (202) 373-6001

*Counsel to Defendants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, *et al.*, | ) | Case No. 09-10156 (ALG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| TRONOX INCORPORATED, TRONOX WORLDWIDE LLC f/k/a Kerr-McGee Chemical Worldwide LLC, and TRONOX LLC f/k/a Kerr-McGee Chemical LLC, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Adv. Pro. No. 09-01198 (ALG) |
| ANADARKO PETROLEUM CORPORATION and KERR-MCGEE CORPORATION, KERR-MCGEE OIL & GAS CORPORATION, KERR-MCGEE WORLDWIDE CORPORATION, KERR-MCGEE INVESTMENT CORPORATION, KERR-MCGEE CREDIT LLC, KERR-MCGEE SHARED SERVICES COMPANY LLC, and KERR-MCGEE STORED POWER COMPANY LLC | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| v. | ) |
| | ) |
| TRONOX, INC., TRONOX WORLDWIDE LLC, | ) |
| TRONOX LLC, KERR-MCGEE CORPORATION | ) |
| and ANADARKO PETROLEUM CORPORATION, | ) |
| | ) |
| Defendants. | ) |

### ANADARKO PETROLEUM CORPORATION AND
### KERR-MCGEE CORPORATION'S MOTION TO BIFURCATE TRIAL ON
### PLAINTIFFS' LIABILITY AND DAMAGE CLAIMS

Anadarko Petroleum Corporation ("Anadarko") and Kerr-McGee Corporation

("Kerr-McGee"),[1] Kerr-McGee Oil & Gas Corporation, Kerr-McGee Worldwide Corporation,

Kerr-McGee Investment Corporation, Kerr-McGee Credit LLC, Kerr-McGee Shared Services

Company LLC, and Kerr-McGee Stored Power Company LLC (collectively, "Defendants"),

defendants in the above-captioned Adversary Proceeding, file this motion to bifurcate, pursuant

to Federal Rule of Civil Procedure 42(b), seeking separate trials on the liability and damage

claims asserted by Plaintiffs Tronox Incorporated, Tronox Worldwide LLC and Tronox LLC

(collectively, "Plaintiffs" or "Tronox").

### PRELIMINARY STATEMENT

The trial on liability in this case promises to be both lengthy and complex. This

case stems from the 70-plus year history of Tronox's predecessors, the businesses they

conducted, the liabilities that resulted from those businesses, multiple internal reorganizations,

and Tronox's ultimate separation from Kerr-McGee. The case involves multiple parties, a

---

[1]     Defendant Kerr-McGee Corporation is defined as and referred to throughout this Motion as "Kerr-McGee."
The entity known as Kerr-McGee Corporation prior to August 1, 2001, is sometimes referred to as "Old Kerr-
McGee," to distinguish it from "Kerr-McGee," the Defendant and an entity that Anadarko acquired on August 10,
2006. Kerr-McGee was not formed until May 2001. Tronox Worldwide LLC is the successor by merger to Old
Kerr-McGee.

multitude of participants in various transactions, alleged fraudulent transfers worth billions of dollars, and an alleged fraudulent scheme that purportedly began over a decade ago. Many of the facts are highly contested and the evidence is vast and multifaceted. The case will require competing testimony from multiple fact and expert witnesses on numerous different topics.

Determining damages in this case will also be complicated. In assessing damages, the Court must, at a minimum, determine (i) whether any recovery will provide a "benefit to the estate" of each Plaintiff-transferor within the meaning of § 550(a) of the Bankruptcy Code and the extent to which any recovery under such section is limited to the amount necessary to fully satisfy the deficiency claims of the environmental and tort claimants to whom such recovery will be paid; (ii) the value of any property found to have been fraudulently transferred on the date of such transfer; (iii) whether the value of that property has increased or decreased since the date of the transfer; (iv) the value of any improvements made by Defendants to the transferred property and any profits realized by Defendants from the improved property; (v) if Defendants are found to be good faith transferees, the value of any consideration paid by Defendants in exchange for the property transferred to them; (vi) even if Defendants are not found to be good faith transferees, the value of Defendants' Section 502(h) Claim; (vii) whether Defendants' recovery on their Section 502(h) Claim will be the percentage recovery realized by Class 3 creditors on the effective date of the Plan or whether Defendants' recovery will be diluted by the inclusion of their Section 502(h) Claim in the Class 3 claims pool; (viii) whether equitable subordination and/or equitable disallowance of Defendants' Section 502(h) claim is appropriate; and (ix) if equitable subordination is appropriate, whether Defendants nonetheless may be entitled to a recovery on the their Section 502(h) Claim given that equity holders received a recovery under the Plan.

If separate trials are held on the liability and damage issues, both the Court and the parties will be able to focus first on the complicated issues of liability and then, if necessary, on the complicated issues of damages. Bifurcation of the liability and damage issues will relieve the Court of the burdensome damage determinations unless and until it is established that a damages trial is in fact necessary. If there is no finding of liability, there will be no need to try damages. Indeed, the efficiency and convenience gained by avoiding a lengthy and costly trial on damage issues significantly outweigh any inconvenience and cost imposed by separate trials. Moreover, because the liability and damage issues do not involve significantly overlapping or intertwined issues of law and fact, bifurcation is both practical and convenient, will conserve judicial resources and will result in more expeditious and efficient trial proceedings.

Finally, even if there is a finding of liability, bifurcation will nonetheless conserve significant time and resources for both the Court and the parties because the separate trials will be more focused and streamlined. Indeed, not only will Plaintiffs *not* be prejudiced by bifurcation, they will benefit from separate trials because they will be able to refocus their damages strategy before any trial thereon.

In light of these and the other considerations discussed herein, it is difficult to ascertain a good reason *not* to bifurcate the liability and damage issues in this case.

## BACKGROUND

**A.** **Plaintiffs' Chapter 11 Cases and Plan of Reorganization**

On January 12, 2009, Tronox, Incorporated and its affiliated debtors and debtors in possession each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").

On November 30, 2010, the Court entered its findings of fact, conclusions of law and order confirming the First Amended Joint Plan of Reorganization of Tronox Incorporated, *et al*. Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"). *See* Main Case, Dkt. No. 2567. The Plan provides for, among other things, the creation of a litigation trust, and the contribution of the rights and interests in this litigation to such trust.[2]

On February 14, 2011, the Plan became effective and was consummated. *See* Main Case, Dkt. No. 2827.

**B.      Plaintiffs' Fraudulent Transfer Action**

**1.      Procedural History**

On May 12, 2009, Plaintiffs commenced this litigation against Defendants by filing a complaint (the "Original Complaint") asserting eleven claims for relief, including actual and constructive fraudulent transfer, civil conspiracy, aiding and abetting fraudulent transfer, breach of fiduciary duty and unjust enrichment.[3]  Defendants moved to dismiss the Original Complaint in its entirety, and on March 31, 2010, the Court issued its Memorandum of Opinion, followed by its April 30, 2010 order, dismissing eight of the eleven claims as well as Plaintiffs' request for punitive damages.[4]

Plaintiffs filed an Amended Adversary Complaint on April 28, 2010 [Dkt. No. 123],[5] which was further amended by the Second Amended Adversary Complaint, dated

---

[2]      *See* Plan at 28.

[3]      *See* Dkt. No. 1.

[4]      *See* Memorandum of Opinion [Dkt. No. 117]; Order Denying in Part and Granting in Part Defendants' Motion to Dismiss Plaintiffs' Adversary Complaint [Dkt. No. 125] (dismissing, without prejudice, Plaintiffs' claims for (i) civil conspiracy; (ii) aiding and abetting fraudulent conveyance; (iii) breach of fiduciary duty as a promoter; (iv) equitable subordination pursuant to Bankruptcy Code § 510(c); (v) equitable disallowance; (vi) disallowance pursuant to Bankruptcy Code § 502(e)(1)(B); and (vii) disallowance pursuant to Bankruptcy Code § 502(d), and dismissing, with prejudice, Plaintiffs' (i) claims for unjust enrichment and (ii) request for punitive damages).

[5]      An unredacted version of the Amended Adversary Complaint was filed on May 7, 2010.  *See* Dkt. No. 128.

February 7, 2011 (the "Complaint") [Dkt. No. 223]. The Complaint asserted claims for (i) actual fraudulent transfer; (ii) constructive fraudulent transfer; (iii) constructive fraudulent transfer regarding payments purportedly made for Defendants' benefit during the two years preceding Plaintiffs' bankruptcy filing; (iv) breach of fiduciary duty; (v) civil conspiracy; and (vi) aiding and abetting breach of fiduciary duty.

On May 26, 2010, Defendants moved to dismiss Plaintiffs' breach of fiduciary duty, civil conspiracy and aiding and abetting breach of fiduciary duty claims. The Court issued its Memorandum of Opinion on May 11, 2011, followed by its May 27, 2011 order dismissing, with no right to replead, Plaintiffs' civil conspiracy and aiding and abetting breach of fiduciary duty claims.[6] Accordingly, the four remaining claims against Defendants are: (i) actual fraudulent transfer (Count I); (ii) constructive fraudulent transfer (Count II); (iii) constructive fraudulent transfer regarding payments purportedly made for Defendants' benefit during the two years preceding Plaintiffs' bankruptcy filing (Count III); and (iv) breach of fiduciary duty (Count IV).

### 2.      Plaintiffs' Allegations

The Complaint alleges that, no later than 1998, Old Kerr-McGee began orchestrating a two-part scheme designed to evade liabilities incurred over the course of Tronox's 70-year history, while shielding certain oil and gas assets from Tronox's creditors. *See* Compl. ¶¶ 26-42. Plaintiffs allege that step one of this scheme involved the internal reorganization known as "Project Focus," pursuant to which "'billion of dollars" worth of oil and gas assets were transferred from Tronox's predecessors to Kerr-McGee between 2002 and 2005. *Id*. at ¶ 49, 51, 57-61. Plaintiffs allege that step two of the scheme was completed in March 2006

---

[6]      *See* Memorandum of Opinion [Dkt. No. 229]; Order Denying in Part and Granting in Part Defendants' Motion to Dismiss Counts IV, V, and VI of the Second Amended Adversary Complaint [Dkt. No. 233].

when Tronox was spun off from Kerr-McGee, following the November 28, 2005 initial public offering of Tronox's Class A common stock (the "IPO"). *Id*. at ¶¶ 120, 123. As a result, Plaintiffs allege, Tronox incurred obligations and transferred assets to Kerr-McGee totaling more than $900 million. *Id*. at ¶¶ 126-27, 142, 162.

These transfers and obligations were allegedly made and incurred with the actual intent to hinder, delay, or defraud Tronox's creditors, for less than reasonably equivalent value, and at a time when Tronox was insolvent or undercapitalized. *Id*. at ¶¶ 145, 151, 154-56, 162-66. In addition, Plaintiffs allege that Kerr-McGee breached its fiduciary duties to Plaintiffs, their minority shareholders and their creditors in connection with the transfers and incurrence of obligations. *Id*. at ¶¶ 170-79. Plaintiffs seek (i) to avoid transfers that are allegedly actually and constructively fraudulent and to recover the property or value of the property transferred to Defendants and (ii) to recover compensatory damages for Defendants' alleged breaches of their fiduciary duties. *Id*. at ¶¶ 149, 160, 168, 184.

## ARGUMENT

## I. BIFURCATION STANDARD

Rule 42(b) of the Federal Rules of Civil Procedure, which is made applicable to this proceeding pursuant to Rule 7042 of the Federal Rules of Bankruptcy Procedure, grants the court broad discretion to order separate trials of any claims or issues it deems appropriate.[7] Rule 42(b) provides, in relevant part, that:

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. . . .

---

[7] *Monaghan v. SZS 33 Assocs., L.P.*, 827 F. Supp 233, 244 (S.D.N.Y. 1993); *see also DiCicco v. Willow Grove Bank*, 2004 WL 2150980, *3 (E.D. Pa., September 21, 2004) ("Rule 42(b) is sweeping in its terms and allows the court, in its discretion, to grant a separate trial of any kind of issue in any kind of case") (citations omitted); *In re Master Key Antitrust Litig.*, 528 F.2d 5, 14 (2d Cir. 1975) (noting that the decision to order separate trials on liability and damages is "firmly within the discretion of the trial court under Fed.R.Civ.P. 42(b).").

Fed. R. Civ. P. 42(b).  The conditions articulated in Rule 42(b) are set out in the alternative such

that the presence of any one is sufficient grounds for bifurcation.[8]

Rule 42(b) does not give rise to a bright-line test for determining when bifurcation

is appropriate.  Instead, courts must consider the facts and circumstances of each particular case.[9]

When determining whether to order separate trials in a particular case, courts consider factors

such as (1) whether the issues are distinct from one another or are inextricably intertwined;

(2) the degree to which the documentary and testimonial evidence overlap; (3) the extent to

which resources will be conserved by separating complex issues; (4) whether the non-moving

party will be prejudiced by the bifurcation; and (5) the potential for resolution of separate issues

after bifurcation.[10]  Where, as here, separation may avoid a lengthy and complex trial, the issues

---

[8]     *Ismail v. Cohen*, 706 F. Supp. 243, 251 (S.D.N.Y. 1989), *rev'd in part on other grounds*, 899 F.2d 183 (2d Cir. 1990).

[9]     *Monaghan*, 827 F. Supp at 245 ("Rule 42(b) requires factual and legal analyses on a case-by-case basis of the record generated by each particular request for bifurcation.") (citations omitted).

[10]     *See*, *e.g.*, *Monaghan*, 827 F. Supp at 244 (listing the considerations as whether, among other things, (1) the issues are distinct from one another; (2) the posture of discovery on the issues favors a single trial or bifurcation; (3) the documentary and testimonial evidence on the issues are different; and (4) the non-moving party will not be prejudiced by the bifurcation); *Union Carbide Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 837 (S.D.N.Y. 1998) (listing the considerations as, among others (1) the risk of substantive prejudice; (2) the likelihood that resources will be conserved; (3) the likelihood that resources would be wasted as a result of repeating the presentation of the same evidence in separate proceedings; and (4) the potential that any remaining issues might be resolved); *Ismail*, 706 F. Supp. at 251 ("In a complex case with complex issues, justice is often best served if issues are separated.") (citations omitted); *Guidi v. Inter-Continental Hotels Corp.*, 2003 WL 1846864, *2 (S.D.N.Y. Apr. 8, 2003) (stating that the possibility of eliminating a lengthy portion of the case is "without a doubt, 'conducive to expedition and economy.'"); *Angelo v Armstrong World Indus.*, 11 F.3d 957, 964 (10th Cir. 1993) (stating that "[b]ifurcation is not an abuse of discretion if such interests favor separation of issues and the issues are clearly separable"); *Cherdak v. Stride Rite Corp.*, 396 F. Supp.2d 602, 604 (D. Md. 2005) (in a bench trial, the court ordered separate trials on liability and damages in a patent infringement case after finding that (i) the damages calculations were complex and would require "considerably more than 'a simple math problem'" and (ii) the legal and factual issues involved in calculating damages were not relevant to the determination of liability); *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993) (stating that "[b]ifurcation . . . provide[s a] powerful legal tool[] which, by effectively isolating the issues to be resolved, avoid[s] lengthy and perhaps needless litigation" and that bifurcation "aids Congress' purpose by encouraging settlement discussions and speeding up remedial action.").

are distinct and separable, there is minimal overlap between the issues and evidence, and the opposing party will not be prejudiced, bifurcation is appropriate.[11]

## II. BIFURCATION OF LIABILITY AND DAMAGES WILL PROMOTE EFFICIENCY AND CONSERVE RESOURCES

### A. The Trial on Liability Will Be Lengthy and Complex and There is No Need to Determine the Independently Complex and Unrelated Damage Issues Unless and Until There Has Been a Finding of Liability

Tronox asserts claims against Defendants for actual fraudulent transfer (Count I) and constructive fraudulent transfer (Counts II and III), and seeks to avoid such transfers and recover the transferred property or the value thereof pursuant to § 550(a) of the Bankruptcy Code. Compl. ¶¶ 141-68. Tronox also asserts a claim for breach of fiduciary duty (Count IV) and seeks compensatory damages in an undetermined amount. Compl. ¶¶ 169-84.

#### 1. Determining Liability on Actual and Constructive Fraudulent Transfer Claims (Counts I, II and III)

To prove its fraudulent transfer claims, Tronox must demonstrate that (i) the alleged transfers and obligations were made or incurred "with actual intent to hinder, delay, or defraud" creditors[12] and (ii) Tronox (a) received less than reasonably equivalent value ("REV")

---

[11]     *See, e.g., Monaghan*, 827 F. Supp. at 256 (noting that bifurcation may be appropriate where the issues of liability and damages are separable because time and resources would be saved by foregoing a consuming trial on damages if there is no finding of liability); *Union Carbide*, 28 F. Supp. 2d  at 837 (ordering bifurcation where the judge described the trial on liability as lengthy and complex); *Wechsler v. Hunt Health Sys.*, 2003 WL 21878815, *7 (S.D.N.Y. Aug. 8, 2003) citing *Sogmose Realties, Inc. v. Twentieth Century-Fox Film Corp.*, 15 F.R.D. 496, 497 (S.D.N.Y. 1954) (stating that "bifurcation is most frequently ordered when the resolution of one claim or issue may obviate the need for trial of other, more complicated issues"); *Amato v. City of Saratoga Springs, New York*, 170 F.3d 311, 316 (2d Cir. 1999) (separate trials "may be appropriate where . . . litigation of the first issue might eliminate the need to litigate the second issue"); *Guidi*, 2003 WL 1846864, at *2 (finding bifurcation appropriate where "the degree of witness overlap between the two issues is extremely minimal").

[12]     *See* Okla. Stat. tit. 24, § 116, which is made applicable to this case through § 544(b) of the Bankruptcy Code.

for the transfers and obligations, and (b) was insolvent or undercapitalized at the time of the transfers or incurrence of obligations.[13]

While these elements may be very simply stated, Plaintiffs' fraudulent transfer action is not a simple case. Rather, this is a very complex case involving multiple parties, a multitude of participants, alleged transfers worth billions of dollars, and an alleged fraudulent scheme that purportedly began over a decade ago. Despite the dismissal of seven of Plaintiffs' original claims, there remain over 40 pages of allegations applicable to the remaining four counts of the Complaint. The parties have subpoenaed 45 third parties, a total of 11 sets of requests for production have been propounded and more than 15.6 million pages of documents have been produced. The parties have thus far taken a combined total of 58 depositions[14] (and expect to take 6 additional depositions), and have designated 14 expert witnesses. Fact discovery is scheduled to close on June 24, 2011 and will be ongoing until such date, unless delayed further. While the trial date in this case has been extended multiple times at Plaintiffs' request, it is currently scheduled to commence on April 4, 2012—approximately three years after the Complaint was first filed.

Plaintiffs' actual fraudulent transfer claim will require proof of Defendants' motive and intent to commit the purported fraudulent transfers, including evidence bearing on the many potential badges of fraud.[15] Plaintiffs' constructive fraudulent transfer claim will

---

[13]     *See* Okla. Stat. tit. 24, §§ 116, 117.

[14]     Pursuant to the Deposition Protocol Stipulation and Order [Dkt. No. 115], if both parties deposed one witness for more than one hour, each such deposition has been counted twice for purposes of determining the total number of depositions taken by each party. In addition, where multiple 30(b)(6) representatives were deposed on behalf of one corporate deponent, each representative's deposition has been counted toward the total number of depositions.

[15]     *In re White Metal Rolling and Stamping Corp.*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998); *In re Sharp. Int'l Corp.,* 403 F.3d 43, 56 (2d Cir. 2005); Okla. Stat. tit. 24, § 116(b) (indicating that the following constitute badges of fraud: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the

require application of the many solvency and adequacy of capital tests, as well as an evaluation

of various financial ratios, market data, actions of market participants, and many, many other

factors.[16]  The evidence will also require the valuation of the many forms of consideration given

by Kerr-McGee in each of the challenged transfers, including any indirect benefits received or

conferred as part of each transfer.[17]  Each of Plaintiffs' fraudulent transfer claims also involves

many defenses to liability.[18]

      Accordingly, determining liability as to Plaintiffs' fraudulent transfer claims will

be a complicated and lengthy, multi-part undertaking, even absent any consideration of the issue

of damages.

---

property transferred after the transfer; (3) the transfer or obligation was not disclosed or was concealed; (4) before
the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer
was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8)
the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset
transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after
the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a
substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who
transferred the assets to an insider of the debtor).

[16]     *See, e.g.*, *In re Iridium Operating LLC*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007); *VFB LLC v. Campbell
Soup Co.*, 482 F.3d 624, 633-34 (3d Cir. 2007).

[17]     *See, e.g.*, *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646-648 (3d Cir. 1991) (finding
reasonably equivalent value where the transferor obtained indirect benefits from an LBO in the form of enhanced
credit availability and access to resources of related companies); *In re TOUSA, Inc.*, 444 B.R. 613, 657 (S.D. Fla.
2011) (applying "well-established case law" holding that courts must consider both direct and indirect benefits in
many forms in determining whether a transfer was made for reasonably equivalent value); *MFS/Sun Life Trust-High
Yield Series v. Van Dusen Airport Serv. Co*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995) (noting that indirect benefits
include new corporate relationships, a new management team, tax benefits and the availability of additional credit if
new business opportunities for the target emerge); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin.
Technologies, Ltd.)*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005) (noting that a determination of reasonably
equivalent value must include an assessment of "the economic benefit that the debtor indirectly received from the
entire transaction," compared to "the value of the property the debtor transferred") (citations omitted).

[18]     For example, a defendant may defeat an actual fraudulent transfer claim by showing that fair value was
given by the transferee to the transferor in exchange for the transfer of assets.  Okla. Stat. tit. 24, § 120(A).
Defendants have also asserted 21 other affirmative defenses in their Answer to the Complaint.  *See* Defendants'
Answer to Plaintiffs' Second Amended Adversary Complaint [Dkt. No. 235].

## 2. Determining Damages on Actual and Constructive Fraudulent Transfer Claims (Counts I, II and III)

The damages analysis in a fraudulent transfer action involves very distinct inquiries from those involved in determining liability.  Section 550 of the Bankruptcy Code governs Plaintiffs' recovery in the event a transfer is avoided.  That provision states that once a transfer is avoided, "the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property."  11 U.S.C. § 550(a).  Accordingly, when assessing damages under § 550(a), the Court must determine (i) whether a recovery will "benefit the estate";[19] (ii) the value of the property on the date of the transfer;[20] (iii) whether the transferred property has increased or decreased in value since the transfer date;[21] (iv) the value of any improvements made to the property by Defendants and any profit realized by Defendants from the property;[22] (v) the value of any consideration given by Defendants who are good faith transferees in exchange for the property that was fraudulently transferred to them;[23] (vi) the value of Defendants' Section 502(h) Claim;[24] (vii) whether Defendants' recovery on its

---

[19]  See 11 U.S.C. § 550(a).  Courts generally interpret "benefit to the estate" to mean the amount necessary to make creditors whole.  See, e.g., In re Best Prods. Co., 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) (stating that "[f]raudulent transfer laws are intended to promote payment to creditors."); Adelphia Recovery Trust v. Bank of Am., N.A., 390 B.R. 80, 82 (S.D.N.Y. 2008) (stating that "a transaction can be avoided under section 544(b) only to the extent the avoidance benefits unsecured creditors.") (citations omitted); In re Murphy, 331 B.R. 107, 126 (Bankr. S.D.N.Y. 2005) (holding that "the trustee in this case has the right to avoid the transfer of the [p]roperty as fraudulent but only to the extent necessary to satisfy allowed prepetition and administrative creditor claims, i.e., those legally harmed by the transfer.") (emphasis in original).

[20]  See, e.g., In re McLaughlin, 183 B.R. 171, 177 (W.D. Wis. 1995) (stating that the proper measure of damages under § 550 is "the market price at the time of transfer") (citations omitted).

[21]  See, e.g., Integra Realty Resources, Inc., 354 F.3d 1246, 1266-67 (10th Cir. 2004) (discussing cases in which fraudulently transferred property had appreciated or depreciated since the transfer date in an effort to discern a general rule as to the date on which to value the transferred property).

[22]  See 11 U.S.C. § 550(e).

[23]  See 11 U.S.C. § 548(c); Okla. Stat. tit. 24, § 120(D).  When the court awards the value of the property, the value awarded is generally the fair market value of the property at the time of the transfer, minus any consideration paid by a good faith transferee.  In re Colonial Realty Co., 226 B.R. 513, 525 (Bankr. D. Conn. 1998).

Section 502(h) Claim will be the percentage recovery realized by Class 3 creditors on the effective date of the Plan or whether Defendants' recovery will be diluted by the inclusion of Defendants' Section 502(h) Claim in the Class 3 claims pool;[25] and (viii) whether equitable subordination and/or equitable disallowance of Defendants' Section 502(h) claim is appropriate.[26] Each of these determinations will involve complex and contested issues of law and fact that are largely distinct from those relevant to a determination of liability.

> ### a.  Determining the Extent to Which a Recovery will "Benefit the Estate"

Any recovery to which Tronox may be entitled if it prevails on its fraudulent transfer claims will be limited to the amount that will accrue for the benefit of each Plaintiff-transferor's estate.[27] In order to "benefit the estate," Defendants submit that damages in this case will be limited to the amount necessary to pay the creditors of each estate to whom any recovery in this action will be paid[28] (*i.e.*, creditors holding valid unpaid Class 4 (Tort Claims) and Class 5 (Environmental Claims)).[29] While the Court will likely be required to value certain environmental and tort claims in connection with the liability phase of this case, the purpose of this valuation will differ from the valuation required for purposes of determining damages under

---

[24]  *See* 11 U.S.C. § 502(h).

[25]  *See* Plan at 28-29.

[26]  *See id.* at 29, n.4.

[27]  *See* 11 U.S.C. § 550(a).

[28]  *See, e.g., Best Prods. Co.*, 168 B.R. at 57; *Adelphia Recovery Trust*, 390 B.R. at 82; *In re Murphy*, 331 B.R. at 126.

[29]  *See* Plan at 21-22, 28 (stating that any proceeds of this litigation will be distributed to creditors in Class 4 (Tort Claims) and Class 5 (Environmental Claims)).

§ 550 of the Bankruptcy Code.[30]  In particular, Class 4 and Class 5 claims will need to be valued in the liability phase of the case as of the relevant transfer dates (to the extent the claims existed on such dates) so that the Court can determine whether the existence of those claims rendered a particular Plaintiff-transferor insolvent on such dates.[31]  In contrast, Class 4 and Class 5 claims will need to be valued in the damages phase of the case as of the petition date so that the Court can determine the extent to which any recovery in this action may be used to satisfy the unpaid claims of creditors and thereby "benefit the estate" within the meaning of § 550(a) of the Bankruptcy Code.[32]  In valuing the environmental and tort claims during the liability phase of the case, the Court will also need to determine whether contingent Class 4 and Class 5 claims were "known or knowable" as of the date of the transfer such that they should be included in the solvency determination.[33]  Conversely, in valuing the environmental claims during the damages phase of the case, the Court will need to determine whether future response costs are "claims"

---

[30]       It is important to note that the Court has never determined the values of these claims for any purpose during the course of the bankruptcy proceedings.  Indeed, valuing Class 4 and Class 5 claims will require more than a simple review of the proofs of claims filed against the Plaintiff-transferors.  Rather, valuing these claims will require an extensive undertaking that involves valuing both contingent and non-contingent, unliquidated, and unmatured liabilities for which (i) over 11,500 Class 4 claims were filed and (ii) 122 Class 5 claims were filed covering many different sites.  *See* Disclosure Statement Regarding the First Amended Joint Plan of Reorganization of Tronox Incorporated, *Et Al.* Pursuant to Chapter 11 of the Bankruptcy Code [Main Case, Dkt. No. 2196, Exh. B] at 30.

[31]       *See, e.g., Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657, 659-61 (7th Cir. 1992) (determining debtor's solvency as of the date of the challenged transfer); *In re WRT Energy Corp.*, 282 B.R. 343, 368 (W.D. La. 2001) ("The relevant solvency valuation date for avoidance purposes is the date of the challenged transfer.") (citations omitted).

[32]       *See, e.g., Adelphia Recovery Trust*, 390 B.R. at 94 (noting that trustee's recovery under § 550 was limited to amounts "necessary to satisfy allowed prepetition and administrative creditor claims . . . .") (quotation omitted); *see also* 11 U.S.C. § 502(b) ("[T]he court . . . shall determine the amount of [a] claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount . . . ."); *In re Trace Int'l Holdings, Inc.* 284 B.R. 32, 38 (Bankr. S.D.N.Y. 2002) (noting that the court determines the amount of a creditor's claim against the estate as of the petition date).

[33]       *In re Commercial Fin. Servs.*, 350 B.R. 520, 541 (Bankr. N.D. Okla. 2005) ("For the purpose of a solvency analysis . . . assets and liabilities must be valued based upon information *known or knowable as* of the date of the challenged transfer.") (citations omitted) (emphasis in original); *see also Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*, 2000 WL 178278, at *8 (S.D.N.Y. Feb. 16, 2000) (finding that it was improper to consider subsequent events that were unforeseeable by the debtor at the time of the transfer when valuing the debtor's assets and liabilities).

within the meaning of § 101(5) of the Bankruptcy Code such that they should be included in the determining the outer limit of damages under § 550(a) of the Bankruptcy Code.[34] Each of these separate inquiries is distinct and highly complex.

Moreover, in calculating damages, the Court will not only need to determine the aggregate amount of valid Class 4 and Class 5 claims as of the petition date, it will also need to determine the amount by which such claims have already been satisfied as a consequence of the consideration previously distributed to such classes under the Plan. This inquiry will involve valuing the assets (including the land, insurance and other consideration) already distributed to the applicable trusts created to satisfy the Class 4 and Class 5 claims. These complex determinations are not relevant to the liability determinations that are required by this action and may be avoided entirely absent a finding of liability.

Finally, while Defendants submit that damages should be capped at the value of unpaid Class 4 and Class 5 claims against each Plaintiff-transferor, the Plan actually provides that excess funds will be distributed to "Superfund" to satisfy claims unrelated to the chapter 11 estates.[35] Defendants objected to this provision in conjunction with the confirmation proceedings and reserved their right to challenge, *inter alia*, whether payments to Superfund provide a "benefit to the estate" within the meaning of § 550(a) of the Bankruptcy Code.[36]

---

[34]     *See*, *e.g.*, *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1002-05 (2d Cir. 1991) (analyzing whether environmental claims were sufficiently mature prior to the petition date to give rise to a "claim" within the meaning of § 101(5) of the Bankruptcy Code); *Revere Copper & Brass v. Acushnet Co. (In re Revere Copper & Brass)*, 172 B.R. 192, 197-98 (S.D.N.Y. 1994) (same); *see also* Adam P. Strochak *et al.*, *Collier Monograph: Environmental Issues in Bankruptcy Cases*, §§ 6[1], 6[2][b] (2009) (analyzing the issue of whether an environmental obligation constitutes a "claim" within the meaning of § 101(5) of the Bankruptcy Code and, if so, when such "claim" arises).

[35]     *See* Plan at 26.

[36]     *See* Objection of Anadarko Petroleum Corporation and Kerr-McGee Corporation to the Proposed First Amended Joint Plan of Reorganization of Tronox Incorporated, et al., Pursuant to Chapter 11 of the Bankruptcy Code [Main Case, Dkt. No. 2398] at ¶¶ 42-45; Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporated *et al*. Pursuant to Chapter 11 of the Bankruptcy Code

Accordingly, if the Court ever reaches the issue of damages, this issue will require resolution. Bifurcation will allow the Court to determine this issue and the many related valuation issues, if necessary, *after* there has been a finding of liability.

### b. Determining the Value of the Transferred Property

Plaintiffs allege that Kerr-McGee caused "billions of dollars" worth of exploration and production assets, including shares and partnership interests in oil and gas entities, to be transferred to Defendants as part of Project Focus[37] and forced Tronox to pay or become obligated to pay over $900 million in connection with the IPO.[38] If Plaintiffs prevail on their claims, the Court will be required to determine (i) the value of the transferred property at the time of the transfer (the majority of which occurred almost a decade ago); (ii) whether that value has increased or decreased as of the date of any judgment; (iii) whether Defendants have expended sums improving the value of the property and, if so, the value of those improvements and any profits realized by Defendants from the property; and (iv) whether Defendants are entitled to a credit for such improvements as good faith transferees under § 550(e) of the Bankruptcy Code.

The foregoing determinations will require a valuation of the transferred oil and gas properties (including complicated and sophisticated analyses of production reserves) as of

---

[Main Case, Dkt. No. 2567] at ¶ 191 ("All parties reserve the right to make any available arguments, and assert any available claims and available defenses concerning the effect, if any, of the Plan Documents on the determination of liability or measure of damages (including, to the extent relevant, the value of the Tort Claims and the Environmental Claims) in the Anadarko Litigation, including under section 550 of the Bankruptcy Code.").

[37]    Compl. ¶¶ 58-60; *see also* Plaintiffs' Responses to Defendants' Fourth Set of Interrogatories, Sept. 16, 2010, Exhibit A at 8 (stating that the combined value of the Project Focus-related assets and/or liabilities is "greater than $6 billion.").

[38]    Compl. ¶¶ 126-27 (stating that Kerr-McGee "received approximately $785 million in proceeds from the IPO, the debt that [Kerr-McGee] forced Tronox to incur, and the cash that it stripped from Tronox" and that "Tronox has spent more than $118 million to satisfy the residual Legacy Liability obligations since the Spin-Off [and Kerr-McGee] has only contributed approximately $4 million."); Compl. ¶ 162 (stating that Tronox made or became obligated to make payments related to the Legacy Liabilities, pension benefits and other post-employment benefits).

the transfer date—whether in 2002 (the time when Defendants believe the oil and gas transfers were effectuated) or 2005 (the time when Plaintiffs allege the oil and gas transfers were effectuated).[39] Each of the IPO-related transfers will also need to be valued as of 2005. Thereafter, the Court will be required to evaluate whether the transferred oil and gas and other assets (to the extent they are even still held by Defendants) have appreciated or depreciated, whether Defendants are good faith transferees and have expended monies improving those properties and, if so, the value of those improvements and any profits realized by Defendants from the properties.

These determinations are entirely distinct from the liability determinations required by this case. Furthermore, the process of valuing these assets will involve the evaluation of massive amounts of evidence and expert testimony that may be unnecessary absent a finding of liability. Bifurcation of the liability and damages issues will relieve the Court and the parties of this unnecessary burden during the initial phase of the trial.

### c. Determining the Value of Defendants' Offsets

### (1) The Good Faith Transferee Lien

If the Court determines that Tronox is entitled to a recovery under § 550(a), and Kerr-McGee is found to be a good faith transferee, it will be entitled to a lien on the recovered property equal to (i) the value of the consideration given in exchange for the property;[40] and (ii) the lesser of (a) the cost of any improvements made after the transfer, minus any profit realized by or accruing to Kerr-McGee, or (b) any increase in the property value due to such

---

[39]     *See* Plaintiffs' Responses to Defendants' Fourth Set of Interrogatories, Sept. 16, 2010, Exhibit A (indicating that the Project Focus-related transfers were effective in 2005); Compl. ¶ 61 (stating that the Project Focus transfers continued throughout 2003 and 2004, and concluded in "mid-2005 at the earliest").

[40]     *See* 11 U.S.C. § 548(c); Okla. Stat. tit. 24, § 120(D).

improvements.[41]  Courts generally find good faith where the transferee acted without actual or constructive knowledge of any fraudulent scheme.[42]  Accordingly, if Kerr-McGee establishes itself as a good faith transferee, the Court will be required to (i) measure the value of consideration Kerr-McGee gave to Tronox in connection with the Project Focus and IPO-related transfers, (ii) measure the lesser of (a) the value of any improvements made by Kerr-McGee to the "billions of dollars" of transferred property, minus any profit realized by Kerr-McGee from the "billions of dollars" of property or (b) the increase in the value of the property as a result of the improvements, and then (iii) offset the damages assessed against Defendants by such amount.

Valuing the consideration given by Kerr-McGee in exchange for assets worth "billions of dollars" will require significant judicial resources because of the varied and diverse set of assets (including, indemnities, contribution rights, releases from various forms of intercompany and public debt, insurance, real property, pension assets, transition support services, tax indemnities, a publicly traded business and many, many other direct and indirect benefits).  Although there is admittedly some overlap in valuing the consideration given by Kerr-McGee for the property transferred to it and the REV determination required by Plaintiffs' constructive fraudulent transfer claim, this overlap does not diminish the benefits of bifurcation because the REV findings from the liability trial can be used in any subsequent damages trial and the parties will not be required to re-litigate this issue.  As courts have often held, the existence of some evidentiary overlap in the liability and damage issues will not defeat bifurcation.[43]

---

[41]     *See* 11 U.S.C. § 550(e).

[42]     *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995).

[43]     *See, e.g., Guidi*, 2003 WL 1846864, at *2 (finding bifurcation appropriate where "the degree of witness overlap between the two issues is extremely minimal"); *LNC Invs., Inc. v. First Fid. Bank, N.A.,* 2000 WL 422399, *1 (S.D.N.Y. Apr. 12, 2000) (finding bifurcation appropriate even though some proof of damages would be necessary to show that the defendants' conduct caused plaintiffs' harm); *In re Lake George Tort Claims*, 2010 WL

18

Indeed, while there is some overlap between the REV determinations and valuing the consideration given by Kerr-McGee for the property transferred to it, there is no overlap between the REV determination and valuing the improvements made by Kerr-McGee to the property transferred to it, valuing the profits realized by Kerr-McGee from that property, or measuring the increase in value to the property as a result of the improvements. Bifurcation will allow the Court to avoid these determinations unless and until there has been a finding of liability.

### (2)     The Section 502(h) Claim

Moreover, irrespective of whether Kerr-McGee is found to be a good faith transferee, the Plan provides that Defendants are entitled "to discount and/or otherwise reduce any judgment in the Anadarko Litigation by the amount of any Allowed Anadarko Section 502(h) Claim multiplied by the percentage recovery to Allowed Class 3 General Unsecured Claims."[44] As such, the value of the consideration given by Kerr-McGee in connection with each set of allegedly fraudulent transfers will necessarily have to be determined in any damages phase of this case.[45]

The amount recoverable on Defendants' Section 502(h) Claim will also require the Court to determine whether the recovery should be calculated by multiplying such claim amount by the recovery to Class 3 creditors (i) as of the effective date of Tronox's Plan (*i.e.*, based on a claims pool that excludes the Section 502(h) Claim) or (ii) based on a diluted claims

---

1930583, at *1 (N.D.N.Y. May 10, 2010) (granting motion to bifurcate the trial "although several of Plaintiffs' witnesses will testify on the issues of both liability and damages").

[44]     Plan at 28-29.

[45]     *See* 11 U.S.C. § 502(h); *Best Prods. Co.*, 168 B.R. at 58 (holding that the purpose of fraudulent transfer law is to place the parties in the positions they were before the transfer, "whether the [transferee] was guilty of actual or constructive fraud," and that requires avoiding the transfer and giving the transferee a section 502(h) claim for the consideration paid). As stated above, any overlap between the determinations related to REV on Plaintiffs' constructive fraudulent transfer claim and the value of consideration implicated by the damages assessment will be minimal and, thus, will not diminish the benefits of bifurcation. *See, e.g., Guidi*, 2003 WL 1846864, at *2; *LNC Invs., Inc.*, 2000 WL 422399, at *1); *Lake George Tort Claims*, 2010 WL 1930583, at *1.

pool that includes the Section 502(h) Claim.[46]  The damages analysis will thus require the Court

to decide whether the recovery on Defendants' Section 502(h) claim will be the same as the

amounts recovered by other Class 3 claimants on the Plan's effective date or some lesser amount.

Defendants submit that bifurcation permits the Court to avoid determining the

issues related to Defendants' Section 502(h) claim unless and until has been a finding of liability.

### d.  Determining Whether Equitable Subordination or Equitable Disallowance is Appropriate

Plaintiffs reserved the right to seek subordination or disallowance of Defendants'

Section 502(h) Claim.[47]  Accordingly, before damages can be assessed in this case, the Court

must determine (i) whether equitable subordination of the Section 502(h) Claim is appropriate,

and, if so, the extent to which subordination is necessary to offset any harm to creditors, and (ii)

whether equitable disallowance is a cognizable remedy and, if so, whether it should be applied

under the facts and circumstances of this case.  If the Court determines that equitable

subordination is appropriate and necessary to offset harm to creditors, it will then be required to

consider whether Defendants may nonetheless be entitled to a recovery on their equitably

subordinated claim given that equity holders actually received a distribution under the Plan.

While the evidence presented on liability may aide the Court in its findings

regarding equitable subordination and/or equitable disallowance,[48] that evidence will not dispose

of whether and to what extent Defendants may recover on any equitably subordinated claim.  As

---

[46]    *See* Plan at 29 (stating that the parties expressly reserve this issue for determination after confirmation of the Plan).

[47]    *Id*. at 29, n. 4.

[48]    Courts have held that inequitable conduct includes (i) undercapitalization; (ii) fraud, mismanagement or breach of fiduciary duty; and (iii) use of the debtor as a mere instrumentality or alter ego. *In re MarketXT Holdings Corp.*, 361 B.R. 369, 385 (Bankr. S.D.N.Y. 2007) (citing *Benjamin v. Diamond (In re Mobile Steele Co.)*, 563 F.2d 692 (5th Cir. 1988)).

such, judicial resources will be preserved by bifurcation because, absent a finding of liability, there will be no need to determine the appropriateness of subordination, whether disallowance is a cognizable remedy, nor the effect of such remedies.

### 3. Determining Liability and Damages on Breach of Fiduciary Duty Claim (Count IV)

In addition to their actual and constructive fraudulent transfer claims, Plaintiffs also allege that Defendants owed them fiduciary duties and breached those duties in three different capacities—as a majority shareholder, as the parent of an insolvent company and as a corporate promoter. Compl. ¶¶170-79. To establish liability on this claim under Delaware law,[49] Plaintiffs must prove (i) the existence of a fiduciary duty, (ii) breach of that fiduciary duty, and (iii) harm directly caused by the breach.[50] If there is no causal link between the injury claimed and the conduct which constituted the alleged breach, there can be no liability for the breach of fiduciary duty.[51]

As with the actual and constructive fraudulent transfer claims, determining liability on the breach of fiduciary duty claim will require a complex trial involving large amounts of documentary and other evidence. Moreover, if Plaintiffs prevail on both their fraudulent transfer and breach of fiduciary duty claims, the Court will have to undertake the difficult exercise of apportioning damages among claims that are based on the same alleged

---

[49]     Delaware law governs the substantive breach of fiduciary duty claims as a result of the incorporation of each of the Plaintiffs in that state. *Tronox Inc. v. Anadarko Petroleum Corp.*, 429 B.R. 73, 104 (Bankr. S.D.N.Y. 2010).

[50]     *Legatski v. Bethany Forest Assoc., Inc.*, 2006 WL 1229689, at *3 (Del. Super. Ct. Apr. 28, 2006); *Kurtzman v. Bergstol*, 40 A.D.3d 588, 590 (2d Dept. 2007).

[51]     *See, e.g., Triton Constr. Co. v. Eastern Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *29-30 & n.179 (Del. Ch. May 18, 2009) (rejecting requested damages where plaintiff failed to show that they "resulted from" or "flow[ed] from" the breach); *Boyer v. Wilmington Materials, Inc*., 754 A.2d 881, 907 (Del. Ch. 1999) (denying recovery where "causal relationship" between breach and the allegedly wrongful conduct, which was "neither a product of a breach of fiduciary duty nor representative of a profit earned at [the company's] expense," was missing).

misconduct.[52]  There will be no need to address this difficult apportionment issue absent a finding of liability.  As such, Defendants submit that the liability and damage issues should be bifurcated.

As the foregoing discussion demonstrates, any determination of damages in this action will be complex and will require resolution of multiple distinct issues that are unrelated to liability.  Bifurcation will save significant time and resources by delaying what may ultimately prove to be needless litigation on damages.  Indeed, the efficiency and convenience gained by potentially avoiding a lengthy and costly trial involving many distinct damage issues significantly outweigh any inconvenience and cost that may result from having two separate trials.  Because the issues bearing on liability (i) are based on facts deriving from millions of pages of documents and testimony from dozens of fact and expert witnesses and (ii) involve many complex issues, there is no need to further complicate the liability phase of the trial with yet another complex set of distinct and unrelated damage issues.  Separate trials will conserve resources and promote efficiency and economy by streamlining the trial proceedings and permitting the Court and the parties to address all of the legal and factual issues related to damages after the Court has determined that a damages trial is in fact necessary.

Moreover, even if there is a finding of liability on one of Plaintiffs' claims (*i.e.*, a finding of liability on actual or constructive fraudulent transfer, but not breach of fiduciary duty, or vice-versa), bifurcation will nonetheless promote efficiency because damage determinations will be made on only that one claim rather than on all claims as would be required in a single trial on both liability and damages.  Indeed, irrespective of whether there is a finding of liability,

---

[52]  *See ASARCO LLC v. Am. Mining Corp.*, 404 B.R. 150, 161-64, 166-68, 169 (S.D. Tex. 2009) (discussing plaintiff's claims for actual fraudulent transfer, aiding and abetting breach of fiduciary duty and civil conspiracy, and determining damages for each separate claim despite the fact that each claim involved the same conduct).

bifurcation will result in more focused and streamlined trials on the issues of liability and damages. Furthermore, the parties may be better positioned to pursue meaningful settlement discussions if liability and damage issues are tried at different times. As such, bifurcation will still prove beneficial, even in the unlikely event that there is a finding of liability.[53]

**B.    The Liability and Damage Issues Do Not Involve Intertwined Issues of Law and Fact**

Courts in this jurisdiction have held that bifurcation is warranted where two issues are wholly distinct and not intertwined.[54] Here, the legal and factual issues and evidence relating to damages and liability are largely independent of one another.[55] A determination on liability is limited to an assessment of whether transfers made to Defendants were actually or constructively fraudulent and/or whether Defendants breached their fiduciary duties. Conversely, a determination on damages turns on an assessment of (i) the extent to which a recovery will benefit the estate; (ii) the value of any property found to have been fraudulently transferred; (iii) whether the value of the property has increased or decreased since the date of the transfer; (iv)

---

[53]    *See, e.g., Monaghan*, 827 F. Supp. at 245 (finding "in the event that liability is found, judicial economy may still be served either by the trial of the damages issue proceeding in an expeditious manner, or by the parties arriving at a settlement agreement in the face of the determination of liability"); *Alcan Aluminum Corp.*, 990 F.2d at 720 (stating that bifurcation "aids Congress' purpose by encouraging settlement discussions and speeding up remedial action.").

[54]    *Guidi*, 2003 WL 1846864 at *2 (ordering bifurcation where the "liability testimony and damages testimony are not so intertwined as to make bifurcation impracticable or even inconvenient"); *Union Carbide*, 28 F. Supp. 2d at 837 (ordering bifurcation where "[t]here is little likelihood of repetition or waste of resources because the damages issues do not appear to be inextricably interwoven with the liability issues or to require repetition of the evidence presented during the liability phase"); *Vichare v. ABBAC, Inc.*, 106 F.3d 457, 466 (2d Cir. 1996) (finding bifurcation appropriate where "the evidence offered on two different issues will be wholly distinct."); *Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir. 1984) (affirming bifurcation in a bench trial involving breach of fiduciary duty claims after finding that liability and damages involved different types of evidence—the liability evidence concerned the prudence of a bank loan while the damages evidence involved the amount of money eventually lost on account of the loan); *Armstrong World Indus.*, 11 F.3d at 964 (stating that "[b]ifurcation is not an abuse of discretion if such interests favor separation of issues and the issues are clearly separable").

[55]    As noted above, there is some overlap between the analyses related to REV and Defendants' Section 502(h) claim. The overlap between these issues is minimal, however, and will not eviscerate the benefits of bifurcation. *See, e.g., Guidi*, 2003 WL 1846864, at *2; *LNC Invs., Inc.*, 2000 WL 422399, at *1; *Lake George Tort Claims*, 2010 WL 1930583, at *1.

the value of any improvements made by Defendants to the transferred property; (v) whether

Defendants are entitled to any offsets as good faith transferees; (vi) the value of Defendants'

Section 502(h) Claim; (vii) whether Defendants' recovery on their Section 502(h) Claim will be

the percentage recovery realized by Class 3 creditors on the effective date of the Plan or whether

such recovery will be diluted by the inclusion of Defendants' Section 502(h) Claim in the Class 3

claims pool; and (viii) the propriety of equitable subordination or disallowance of the Section

502(h) Claim. These damage determinations have no bearing on the issue of liability. Thus,

"[i]t is clearly convenient to await consideration of relief where a finding of liability is a *sine qua*

*non* for such damages or other awards."[56]

## III.    BIFURCATION IS NOT UNFAIR OR PREJUDICIAL TO PLAINTIFFS

Plaintiffs will not be prejudiced if this Court orders separate trials on liability and

damages. As discussed above, there is no significant overlap between the liability and damages

issues and Plaintiffs will not be required to try any portion of their case twice. To the extent

there is minimal overlap between the evidence, the parties will be able to rely on any evidence

from the liability trial during the damages trial. Moreover, bifurcation may ultimately obviate

the need for Plaintiffs to try the many complicated issues related to damages. Indeed, bifurcation

will be beneficial to Plaintiffs because they will be able to focus first on the already complex

issues of liability and then, only if necessary, on damages.[57] Furthermore, bifurcation will allow

Plaintiffs to refocus their strategy before trying any subsequent phase of this case.[58] Any burden

---

[56]     *Evans v. Connecticut*, 168 F.R.D. 118, 120 (D. Conn. 1996).

[57]     *See Desmare v. State*, 2007 WL 5231690, at *9 (D.N.M. Aug. 14, 2007) (finding that separation of issues might actually be more beneficial to plaintiff by allowing it "concentrate on one claim at a time").

[58]     *Id*. (noting that bifurcation would give the Plaintiffs an opportunity to refocus their strategy before conducting the second trial and/or an opportunity to re-evaluate their case, and to determine whether they wish to continue investing significant resources into it).

that separate trials may impose on Plaintiffs is therefore far outweighed by the benefit of separate

trials on liability and damages.  As such, Defendants submit that bifurcation is warranted.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court order

separate trials on Plaintiffs' liability and damage claims.

Houston, Texas
Dated: June 22, 2011


Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
Lori L. Pines (LP 3005)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007


Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

 */s/ Lydia Protopapas*
Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California  90071
Telephone:  (213) 680-6400
Facsimile:  (213) 680-6499

*Counsel to Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Defendants' Motion to Bifurcate Trial on Plaintiffs' Liability and Damage Claims** was served on the following counsel of record on June 22, 2011, as indicated below:

***Via email jonathan.henes@kirkland.com***
Jonathan S. Henes
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022

***Via email jeffrey.zeiger@kirkland.com***
Jeffrey J. Zeiger
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654

***Via email joseph.pantoja@usdoj.gov
and robert.yalen@usdoj.gov***
Joseph Pantoja
Robert Yalen
Assistant U.S. Attorney
SOUTHERN DISTRICT OF NEW YORK
86 Chambers Street
New York, New York 10007


Houston, Texas
Dated: June 22, 2011

*/s/ Rene Olvera*
Rene Olvera