Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
Telephone:  (213) 680-6400
Facsimile:  (213) 680-6499

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

*Counsel to Defendants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| TRONOX INCORPORATED, *et al.*, | ) Case No. 09-10156 (ALG) |
| | ) |
| Debtors. | ) Jointly Administered |
| TRONOX INCORPORATED, TRONOX WORLDWIDE LLC f/k/a Kerr-McGee Chemical Worldwide LLC, and TRONOX LLC f/k/a Kerr-McGee Chemical LLC, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| ANADARKO PETROLEUM CORPORATION and KERR-MCGEE CORPORATION, KERR-MCGEE OIL & GAS CORPORATION, KERR-MCGEE WORLDWIDE CORPORATION, KERR-MCGEE INVESTMENT CORPORATION, KERR-MCGEE CREDIT LLC, KERR-MCGEE SHARED SERVICES COMPANY LLC, and KERR-MCGEE STORED POWER COMPANY LLC | ) Adv. Pro. No. 09-01198 (ALG) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| v. | ) |
| | ) |
| TRONOX, INC., TRONOX WORLDWIDE LLC, TRONOX LLC, KERR-MCGEE CORPORATION and ANADARKO PETROLEUM CORPORATION, | ) ) ) |
| | ) |
| Defendants. | ) |

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Adelphia Recovery Trust v. Bank of Am., N.A.,*
    390 B.R. 80 (S.D.N.Y. 2008) ...................................................................................................*passim*

*Arkwright Mut. Ins. Co. v. KLM Royal Dutch Airlines,*
    No. 94 Civ. 0174, 1995 WL 491490 (S.D.N.Y. Aug. 17, 1995) ........................................... 7

*ASARCO LLC v. Americas Mining Corp.,*
    404 B.R. 150 (S.D. Tex. 2009) .........................................................................................*passim*

*AT&T Corp. v. Microsoft Corp.,*
    290 F. Supp. 2d 409 (S.D.N.Y. 2003) ................................................................................. 7

*Bates v. Long Island RR Co.,*
    997 F.2d 1028 (2d Cir. 1993) ...................................................................................... 42, 46

*Bear, Stearns Sec. Corp. v. Gredd,*
    275 B.R. 190 (S.D.N.Y. 2002) .......................................................................................... 11

*Blue Planet Software, Inc. v. Games Int'l, LLC,*
    334 F. Supp. 2d 425 (S.D.N.Y. 2004) .......................................................................... 25, 50

*Breeden v. Kirkpatrick & Lockhart, LLP,*
    268 B.R. 704 (S.D.N.Y. 2001), *aff'd,* 336 F.2d 94 (2d Cir. 2003).................................... 42

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ......................................................................................................... 6

*Connor v. Ulrich,*
    153 F. Supp. 2d 199 (E.D.N.Y. 2001) .............................................................................. 32

*E.E.O.C. v. Waffle House, Inc.,*
    534 U.S. 279 (2002) ....................................................................................................... 51

*Eberhard v. Marcu,*
    530 F.3d 122 (2d Cir. 2008) ............................................................................................ 12

*Exxon Corp. v. Hunt,*
    475 U.S. 355 (1986) ....................................................................................................... 35

*Foxmeyer Corp. v. Gen. Elec. Capital Corp.,*
    296 B.R. 327 (Bankr. D. Del. 2003)....................................................................... 10, 11, 12

*Furlong v. Shalala,*
    156 F.3d 384 (2d Cir. 1998) ............................................................................................ 24

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Gonzalez v. Bratton*,
   147 F. Supp. 2d 180 (S.D.N.Y. 2001) ............................................................... 32

*Greenwich Life Settlements, Inc. v. ViaSource Funding Grp., LLC*,
   742 F. Supp. 2d 446 (S.D.N.Y. 2010) ............................................................... 51

*Harris v. Standard Accident & Ins. Co.*,
   297 F.2d 627 (2d Cir. 1961) ....................................................................... 31, 32

*Haws v. Luethje*,
   503 P.2d 871 (Okla. 1972) ............................................................................. 32

*In re Acequia, Inc.*,
   34 F.3d 800 (9th Cir. 1994) ...................................................................... *passim*

*In re Adler, Coleman Clearing Corp.*,
   247 B.R. 51 (Bankr. S.D.N.Y. 2001) ............................................................... 12

*In re Barker*,
   306 B.R. 339 (Bankr. E.D. Cal. 2004) ............................................................. 14

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*,
   238 B.R. 25 (Bankr. S.D.N.Y. 1999) .................................................... 11, 12, 16

*In re Best Prods. Co., Inc.*,
   168 B.R. 35 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995) ...................... *passim*

*In re CCT Commc'ns, Inc.*,
   420 B.R. 160 (Bankr. S.D.N.Y. 2009) ............................................................. 42

*In re Chase & Sanborn Corp.*,
   848 F.2d 1196 (11th Cir. 1988) ...................................................................... 11

*In re Chase*,
   328 B.R. 675 (Bankr. D. Vt. 2005) ................................................................. 13

*In re Chemtura Corp.*,
   439 B.R. 561 (Bankr. S.D.N.Y. 2010) ............................................ 14, 15, 23, 49

*In re Clifford*,
   255 B.R. 258 (D. Mass. 2000) ....................................................................... 14

*In re Crowthers McCall Pattern, Inc.*,
   120 B.R. 279 (Bankr. S.D.N.Y. 1990) ............................................................. 10

*In re Cybergenics Corp.*,
   226 F.3d 237 (3d Cir. 2000) .......................................................................... 10

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re Dow Corning Corp.*,
198 B.R. 214 (E.D. Mich. 1996) ........................................................................................ 49

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ...................................................................................... 15

*In re Fleming Packaging Corp.*,
351 B.R. 626 (Bankr. C.D. Ill. 2006) .................................................................................. 12

*In re Forklift LP Corp.*,
363 B.R. 388 (Bankr. D. Del. 2007) ........................................................................ 14, 23, 45

*In re Fornabaio*,
187 B.R. 780 (S.D. Fla. 1995) ............................................................................................ 11

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988) ................................................................................. 15

*In re Gomes*,
219 B.R. 286 (Bankr. D. Or. 1998) ..................................................................................... 12

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007) ................................................................................ 15

*In re Grove-Merritt*,
406 B.R. 778 (Bankr. S.D. Ohio 2009) .......................................................................... 11, 12

*In re Harstad*,
155 B.R. 500 (Bankr. D. Minn. 1993), *aff'd*, 4-90-869, 1994 WL 526013 (D. Minn. Jan. 20,
1994), *aff'd sub nom.*, *Harstad v. First Am. Bank*, 39 F.3d 898 (8th Cir. 1994)................................. 10

*In re Hill*,
342 B.R. 183 (D.N.J. 2006) ............................................................................................ 11, 12

*In re Idearc Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009) ............................................................................... 15

*In re Ionosphere Clubs, Inc.*,
85 F.3d 992 (2d Cir. 1996) .................................................................................................. 46

*In re Iridium Operating LLC*,
478 F.3d 452 (2d Cir. 2007) ...................................................................................... 23, 49, 51

*In re Johnson*,
28 B.R. 292 (Bankr. N.D. Ill. 1983) .................................................................................... 12

*In re JTS Corp.*,
617 F.3d 1102 (9th Cir. 2010) ....................................................................................... 27, 28

# TABLE OF AUTHORITIES
#### (continued)

**Page(s)**

*In re Leneve*,
341 B.R. 53 (Bankr. S.D. Fla. 2006) ........................................................................ 10, 30

*In re Liggett*,
118 B.R. 219 (Bankr. S.D.N.Y. 1990) ........................................................................ 10

*In re M. Blackburn Mitchell Inc.*,
164 B.R. 117 (Bankr. N.D. Cal. 1994) ........................................................................ 12

*In re Macmillan*,
204 B.R. 378 (Bankr. S.D.N.Y. 1997) ........................................................................ 51

*In re MCorp. Fin., Inc.*,
137 B.R. 219 (Bankr. S.D. Tex. 1992) ........................................................................ 15

*In re Murphy*,
331 B.R. 107 (Bankr. S.D.N.Y. 2005) ................................................................*passim*

*In re NETtel Corp., Inc.*,
364 B.R. 433 (Bankr. D.D.C. 2006) ........................................................................ 6, 10

*In re Nowicki*,
202 B.R. 729 (Bankr. N.D. Ill. 1996) ........................................................................ 11, 12

*In re Oaks Partners, Ltd.*,
135 B.R. 440 (Bankr. N.D. Ga. 1991) ........................................................................ 14

*In re PPI Enters. (U.S.) Inc.*,
324 F.3d 197 (3d Cir. 2003) ........................................................................ 14

*In re Prince*,
85 F.3d 314 (7th Cir. 1996) ........................................................................ 53

*In re R & W Enters.*,
181 B.R. 624 (Bankr. N.D. Fla. 1994) ........................................................................ 14

*In re Ramirez*,
No. 09-00066, 2010 WL 2181546 (Bankr. D.P.R. May 28, 2010) ...................................... 12

*In re SageCrest II, LLC*,
Nos. 3:10cv978, 3:10cv979, 2011 WL 134893 (D. Conn. Jan. 14, 2011) .......................... 49

*In re Sanford*,
979 F.2d 1511 (11th Cir. 1992) ........................................................................ 31

*In re Schultz*,
153 B.R. 170 (Bankr. S.D. Miss. 1993) ........................................................................ 14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Sept. 11th Litig.*,
   590 F. Supp. 2d 535 (S.D.N.Y. 2008) ........................................................................... 31

*In re Sharif*,
   446 B.R. 870 (Bankr. N.D. Ill. 2011) ............................................................................ 14

*In re Sheffield*,
   320 B.R. 423 (Bankr. N.D. Okla. 2004) .......................................................... 24, 25, 26, 30

*In re Sims*,
   278 B.R. 457 (Bankr. E.D. Tenn. 2002) ....................................................................... 14

*In re Stevens*,
   187 B.R. 48 (Bankr. S.D. Ga. 1995) ............................................................................. 14

*In re Talbot*,
   124 F.3d 1201 (10th Cir. 1997) ................................................................................... 14

*In re Tex. Gen. Petroleum Corp.*,
   52 F.3d 1330 (5th Cir. 1995) ....................................................................................... 22

*In re Tittle*,
   346 B.R. 684 (Bankr. E.D. Va. 2006) ........................................................................... 14

*In re TMT Trailer Ferry, Inc.*,
   390 U.S. 414 (1968) .............................................................................................. 23, 49

*In re TriGem Am. Corp.*,
   431 B.R. 855 (Bankr. C.D. Cal. 2010) .......................................................................... 10

*In re Tronox Inc.*,
   429 B.R. 73 (Bankr. S.D.N.Y. 2010) ................................................................. 32, 33, 36

*In re Valenti*,
   105 F.3d 55 (2d Cir. 1997) .......................................................................................... 14

*In re Villarie*,
   648 F.2d 810 (2d Cir. 1981) (per curiam) ...................................................................... 31

*In re Walat Farms, Inc.*,
   70 B.R. 330 (Bankr. E.D. Mich. 1987) .......................................................................... 15

*Jewell-Rung Agency, Inc. v. Haddad Org., Ltd.*,
   814 F. Supp. 337 (S.D.N.Y. 1993) ................................................................................. 7

*K.C. 1986 LP v. Reade Mfg.*,
   472 F.3d 1009 (8th Cir. 2007) ..................................................................................... 35

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Karetsos v. Cheung,*
670 F. Supp. 111 (S.D.N.Y. 1987) ..................................................................................... 7

*Kipperman v. Onex Corp.,*
411 B.R. 805 (N.D. Ga. 2009).................................................................................... *passim*

*Konstandinidis v. Chen,*
626 F.2d 933 (D.D.C. 1980)........................................................................................... 46

*Kosakow v. New Rochelle Radiology Assocs.,*
274 F.3d 706 (2d Cir. 2001) .......................................................................................... 46

*Kunica v. St. Jean Fin., Inc.,*
233 B.R. 46 (S.D.N.Y. 1999) ........................................................................................ 42

*Lockheed Martin Corp. v. U.S.,*
664 F. Supp. 2d 14 (D.D.C. 2009)................................................................................. 35

*Matter of P.A. Bergner & Co.,*
140 F.3d 1111 (7th Cir. 1998) ...................................................................................... 29

*MC Asset Recovery, LLC v. Southern Co.,*
Civ. A. No. 1:06-CV-0417, 2006 WL 5112612 (N.D. Ga. 2006) ........................... 25, 28, 29

*Mellon Bank, N.A., v. Dick Corp.,*
351 F.3d 290 (7th Cir. 2003) ........................................................................................ 24

*Moore v. Bay,*
284 U.S. 4 (1931) .......................................................................................................... 18

*Ohio Oil Co. v. Elliot,*
254 F.2d 832 (10th Cir. 1958) ...................................................................................... 31

*Point Prods. A.G. v. Sony Music Entm't, Inc.,*
215 F. Supp. 2d 336 (S.D.N.Y. 2002), *opinion amended on other grounds,* 93 CIV. 4001,
2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002) ................................................................. 7

*Rapid Settlements, Ltd. v. Green,*
294 S.W.3d 701 (Tex. App. 2009) ................................................................................ 51

*Rubin v. Mfrs. Hanover Trust Co.,*
661 F.2d 979 (2d Cir. 1981) .......................................................................................... 10

*Smith v. Am. Founders Fin. Corp.,*
365 B.R. 647 (S.D. Tex. 2007)...................................................................................... 11

*Stalnaker v. DLC, Ltd.,*
376 F.3d 819 (8th Cir. 2004), *aff'g, In re DLC, Ltd.,* 295 B.R. 593 (B.A.P. 8th Cir. 2003).... 25, 26, 30

## TABLE OF AUTHORITIES
### (continued)

*Transamerica Occidental Life Ins. Co. v. Rapid Settlements, Ltd.*,
284 S.W.3d 385 (Tex. App. 2008) ...................................................................................... 51

*Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*,
549 U.S. 443 (2007) ........................................................................................................... 31

*Underwriters at Lloyd's London v. OSCA, Inc.*,
No. 03-20398, 2006 WL 941794 (5th Cir. Apr. 12, 2006) ................................................. 31

*Vine Street, LLC v. Keeling*,
460 F. Supp. 2d 728 (E.D. Tex. 2006) ............................................................................... 35

*Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.)*,
735 F.2d 740 (2d Cir. 1984), *cert. denied*, 469 U.S. 1087 (1984) ..................................... 20

*Weatherly v. Flournoy*,
929 P.2d 296 (Okla. Civ. App. 1996) ................................................................................ 31

*Wellman v. Wellman*,
933 F.2d 215 (4th Cir. 1991) ........................................................................................ 7, 55

*Whiteford Plastics Co. v. Chase Nat'l Bank*,
179 F.2d 582 (2d Cir. 1950) .............................................................................................. 20

*Wight v. BankAmerica Corp.*,
219 F.3d 79 (2d Cir. 2000) ................................................................................................ 46

**STATUTES**

11 U.S.C. § 502 ............................................................................................................... *passim*

11 U.S.C. § 544 ............................................................................................................... *passim*

11 U.S.C. § 548 ............................................................................................................... *passim*

11 U.S.C. § 550 ............................................................................................................... *passim*

11 U.S.C. § 726 ............................................................................................................ 3, 14, 23

11 U.S.C. § 1129 ............................................................................................................. *passim*

28 U.S.C. § 157 ........................................................................................................................ 6

28 U.S.C. § 1334 ..................................................................................................................... 6

28 U.S.C. § 1746 ................................................................................................................... 38

28 U.S.C. § 2075 ................................................................................................................... 49

## TABLE OF AUTHORITIES
### (continued)

Page(s)

28 U.S.C. § 3306(a) ........................................................................................................ 37

42 U.S.C. § 9607(a) ........................................................................................................ 34

42 U.S.C. § 9614(b) ........................................................................................................ 35

OKLA. STAT. ANN. tit. 23, § 61 ...................................................................................... 31

OKLA. STAT. ANN. tit. 24, § 112 *et seq.* ........................................................................ 8

OKLA. STAT. ANN. tit. 24, § 119(A)(1) .............................................................. 18, 27, 28

OKLA. STAT. ANN. tit. 24, § 120(B) ................................................................................ 8

### OTHER AUTHORITIES

6 AM. JUR. 2d *Assignments* §§ 118, 145 (2008) .......................................................... 24

25 C.J.S. *Damages* § 22 (2011) .................................................................................... 32

5 COLLIER ON BANKRUPTCY ¶544.01 (15th ed. rev. 2009) ........................................... 12

7 COLLIER ON BANKRUPTCY ¶1129.03[4][a][ii] (15th ed. rev. 2007) ........................... 15

110th Cong. (2007) (statement of representative Henry Waxman, Chairman, H. Oversight &
    Gov't Reform) .......................................................................................................... 62

BLACK'S LAW DICTIONARY 1307 (6th ed. 1990) ........................................................... 47

### RULES

Fed. R. Bankr. P. 9019 ....................................................................................... 5, 23, 49

Fed. R. Bankr. P. 1001 ................................................................................................... 49

Fed. R. Bankr. P. 7056(a) ................................................................................................ 6

Fed. R. Civ. P. 56(a) .................................................................................................... 6, 7

# TABLE OF CONTENTS

**Page**

Preliminary Statement......................................................................................................2

Jurisdiction........................................................................................................................6

Statement of Facts.............................................................................................................6

Summary Judgment Standard Applicable to Defendants' Cross-Motion........................6

Argument...........................................................................................................................8

I.    Bankruptcy Code §§ 544, 548, 550(a) and Other Bankruptcy and Non-Bankruptcy Laws Limit Plaintiffs' Recovery to the Amounts Necessary to Satisfy Valid, Unpaid Tort and Environmental Claims ..................................................................................................8

    A.    Plaintiffs May Not Avoid a Transfer Under the Oklahoma UFTA, as Incorporated by § 544(b), That Exceeds the Value of Unpaid Tort and Environmental Claims ..........................................................................................8

    B.    Plaintiffs May Not Avoid and Recover a Transfer Under §§ 544, 548 and 550(a) That Exceeds Unpaid Tort and Environmental Claims by 1000%...................9

    C.    Other Laws Prohibit Plaintiffs From Recovering More Than The Value of The Tort and Environmental Claims ............................................................31

        i.    Tort Law Prevents The Tort Creditors From Recovering More Than The Value of Their Claims ..........................................................31

        ii.    Environmental Law Prevents The Environmental Creditors From Recovering More Than The Value of Their Claims ..............................33

II.   Nothing in the Plan or the Settlement Agreements Eliminates Plaintiffs' Burden of Complying with the "Benefit of the Estate" Requirement of Section 550(a) of the Bankruptcy Code ......................................................................................................37

    A.    The Value of Tort And Environmental Claims Has Not Been Determined For Any Purpose in This Adversary Proceeding, Including § 550(a), But Even if it Had Been, Plaintiffs Are Judicially and Equitably Estopped From Recovering More Than the Value of Such Claims..........................................................37

        i.    The Value of Tort and Environmental Claims Has Not Been Determined by the Plan for any Purpose Bearing on This Adversary Proceeding ......................................................................38

        ii.    Plaintiffs Are Judicially and Equitably Estopped From Recovering More Than the Value of Tort and Environmental Claims and From Precluding Defendants From Adjudicating the Value of Such Claims .......................................................................42

    B.    Denying Tort and Environmental Creditors More than the Value of Their Claims Will Neither Deny Them the "Benefit of Their Bargain" Nor Have A "Drastic Chilling Effect" on Future Reorganizations, But Will Instead Appropriately Result in Compliance With Bankruptcy, Oklahoma, Tort, Environmental and Other Laws...........................................................................................47

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|

C.    Defendants Are Not Seeking an After-the-Fact Determination of the Value of "Plan Consideration", They Are Seeking to Liquidate the Contingent Asset That Was the Plan Consideration ............................................................................ 51

D.    Determining The Extent And Nature of a "Benefit to The Estate" Turns On The Particular Facts And Circumstances of a Given Case, Not a Hypothesized Case .......... 54

III.    The States' Arguments Fail To Salvage Plaintiffs' Inability To Satisfy § 550(a) ........................ 56

IV.    The Tort Creditors' Arguments Fail To Salvage Plaintiffs' Inability To Satisfy § 550(a) ........... 59

V.    The Government Should Not be Paid Many Times the Value of Its Claims When It in Fact Bears Significant Responsibility for Those Claims ............................................................. 60

Conclusion ...................................................................................................................... 62

**DEFENDANTS' (I) RESPONSE TO (A) PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING PLAINTIFFS' RECOVERY UNDER SECTION 550(a)
OF THE BANKRUPTCY CODE, (B) JOINDER OF THE UNITED STATES OF AMERICA
IN THE LITIGATION TRUST'S MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING THE LITIGATION TRUST'S RECOVERY UNDER SECTION 550(a) OF THE
BANKRUPTCY CODE, (C) STATEMENT OF THE STATE OF NEVADA IN SUPPORT OF
THE LITIGATION TRUST'S MOTION FOR PARTIAL SUMMARY JUDGMENT,
(D) STATEMENT IN SUPPORT OF THE LITIGATION TRUST'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND UNITED STATES' JOINDER IN MOTION, AND
(E) STATEMENT OF THE TRONOX INCORPORATED TORT CLAIMS TRUST IN
SUPPORT OF THE ANADARKO LITIGATION TRUST'S MOTION FOR PARTIAL
SUMMARY JUDGMENT REGARDING THE LITIGATION TRUST'S RECOVERY UNDER
SECTION 550(a) OF THE BANKRUPTCY CODE; AND (II) CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT LIMITING PLAINTIFFS' POTENTIAL DAMAGE AWARD
PURSUANT TO SECTIONS 544, 548 AND 550(a) OF THE BANKRUPTCY CODE**

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

Anadarko Petroleum Corporation, Kerr-McGee Corporation, Kerr-McGee Oil & Gas
Corporation, Kerr-McGee Worldwide Corporation, Kerr-McGee Investment Corporation, Kerr-McGee
Credit LLC, Kerr-McGee Shared Services Company LLC and Kerr-McGee Stored Power Company LLC
(collectively, the "Defendants"), Defendants in the above-captioned Adversary Proceeding, file this
(I) Response (the "Response") to (A) Plaintiffs' Motion for Partial Summary Judgment Regarding
Plaintiffs' Recovery Under Section 550(a) of the Bankruptcy Code ("Motion"), (B) Joinder of the United
States of America in the Litigation Trust's Motion for Partial Summary Judgment Regarding the
Litigation Trust's Recovery Under Section 550(a) of the Bankruptcy Code ("Joinder"), (C) Statement of
the State of Nevada in Support of the Litigation Trust's Motion for Partial Summary Judgment Regarding
the Litigation Trust's Recovery under § 550(a) of the Bankruptcy Code (the "Nevada Statement"),
(D) Statement in Support of the Litigation Trust's Motion for Partial Summary Judgment and United
States' Joinder in Motion (the "State Statement" and together with the Nevada Statement, the
"Statements"), and (E) Statement of the Tronox Incorporated Tort Claims Trust in Support of the
Anadarko Litigation Trust's Motion for Partial Summary Judgment Regarding the Litigation Trust's
Recovery Under Section 550(a) of the Bankruptcy Code (the "Tort Statement"); and (II) Cross-Motion for

Partial Summary Judgment Limiting Plaintiffs' Potential Damage Award Pursuant to Sections 544, 548 and 550(a) of the Bankruptcy Code (the "Cross-Motion") and respectfully represent as follows:

## PRELIMINARY STATEMENT

Plaintiffs have done a fine job of obfuscating what is plain: they may not profit from an avoidance recovery which has no nexus to the value of the estates' underlying claims and which massively, patently and unmistakably outstrips the value of those claims by *at least*    REDACTED    . No court has ever sanctioned such a result and this Court should not be the first. Despite their efforts to contort the law, Plaintiffs cannot alter the most fundamental of bankruptcy precepts: that creditors are not entitled to be made more than whole and that avoidance actions are intended to restore creditors to their pre-transfer positions—not to punish Defendants and provide Plaintiffs and their contingency fee attorneys with a windfall larger than the GDP of many nations. This is not Las Vegas. It is bankruptcy.

The magnitude of Plaintiffs' requested windfall is not in dispute: Plaintiffs seek in excess of REDACTED, yet they themselves value tort and environmental claims at REDACTED and their audited financial statements reflect that over REDACTED has already been distributed on account of those claims.[1] Accordingly, the maximum possible deficiency in this case is REDACTED *based on Plaintiffs' own inflated claim estimates.*[2] Despite this, Plaintiffs now seek at least REDACTED—*over ten times the maximum value of any unpaid tort and environmental claims.*

Plaintiffs' position essentially amounts to this: because they filed for bankruptcy, they are entitled to a REDACTED windfall—a windfall to which they clearly would not have been entitled had

---

[1]    SOF at ¶¶ 24, 30, 36, 40.

[2]    SOF at ¶¶ 24, 30, 36. While Plaintiffs have valued tort and environmental claims as of November 28, 2005, rather than the January 12, 2009 petition date, certain of the largest claims included in Plaintiffs' 2005 valuation are not represented by a proof of claim and therefore may not be included in a 2009 valuation. As such, Plaintiffs' own claim estimates may decrease. Moreover, even *if* the estimated claim amounts actually increased during the relevant three-year period, any such increase cannot possibly be material enough to change what is obvious: that Plaintiffs are seeking a massive windfall. Particularly where, as here, Plaintiffs' environmental expert has freely relied on post-2005 information in formulating his 2005 valuation conclusions, there is little reason to believe that Plaintiffs' 2009 claim estimates will increase significantly, if at all.

they not filed for bankruptcy. Indeed, Plaintiffs could not have recovered more than the value of tort and environmental claims outside of bankruptcy—the Oklahoma UFTA, tort and environmental laws expressly prohibit as much—yet Plaintiffs now submit that they may use the Bankruptcy Code's fraudulent conveyance provisions to profit from these bankruptcy cases and to do what governing laws explicitly prohibit. Plaintiffs' REDACTED request constitutes almost               REDACTED

REDACTED  yet, unlike Plaintiffs, who seek a recovery based on the happenstance of their bankruptcies, Defendants did not create their market value based on happenstance. Rather, the efforts of 4,500 employees and enormous non-human resources are deployed every day to bring this value to bear. Plaintiffs would have this Court arbitrarily and capriciously reassign this colossal value to them so that they can (i) pay tort claimants many times the value of their claims; and (ii) make charitable contributions to Superfund so that it can pay claims _totally unrelated to these estates_—after, of course, Plaintiffs' attorneys take their cut. The senseless obliteration of value is not an objective sought to be promoted by the Bankruptcy Code.

Plaintiffs' position not only makes a mockery of the bankruptcy process, it violates two of its most settled and fundamental principles. First, fraudulent conveyance laws have a singular purpose unrelated to Plaintiffs' avarice: they exist to protect creditors from the harm occasioned by an illegal transfer. That harm is measured by the value of creditor claims. Once those claims are paid in full, the purpose sought to be effectuated by the law ceases to exist and there is no basis for further recovery. Indeed, the Oklahoma UFTA affirmatively prohibits the avoidance—not merely the recovery—of a transfer in excess of the amount "necessary to satisfy . . . creditor[] claim[s]." Second, no creditor is entitled to be made more than whole. This principle permeates every chapter of the Bankruptcy Code and is repeated over and over again throughout its provisions: §§ 502(b), 502(j), 550(a), 726, 1129(a)(7), 1129(a)(10), 1129(b) and 1325(a)(5), to name a few. The FDCPA, tort and environmental laws, each of which is expressly incorporated into the Bankruptcy Code via § 502(b), also limit creditor recoveries to the value of their underlying claims.

Moreover, Plaintiffs submitted not one, but two, declarations in support of confirmation wherein they categorically and unconditionally stated that *no creditor would recover more than the full value of its claims* under the Plan.[3]  This Court relied on Plaintiffs' representations in approving at least three separate requirements for confirmation and, absent those representations, this Court could not have approved the Plan.   Only four months after the Effective Date, however, Plaintiffs filed their expert reports which announced their intent to seek over ten times the value of the very claims they had just assured the Court would not be paid more than in full.  Any recovery in excess of the value of unpaid tort and environmental claims will expressly contravene Plaintiffs' prior representations to this Court and wreak havoc on the distribution scheme envisioned by Congress.

Furthermore, Plaintiffs' assertion that their recovery may not be capped because creditors agreed to "bargain away" the limitations of § 550(a) and such "bargain" should not now be "upset" is nothing short of disgraceful.  First, Plaintiffs submitted two declarations *under penalty of perjury* stating that no creditor would recover more than the full value of its claims.  Second, the Confirmation Order unequivocally reserved Defendants' right to urge the limitations of § 550(a) in connection with this litigation.   Third, the confirmation hearing transcript recounts Plaintiffs' own acknowledgment of Defendants' post-confirmation right to contest the value and validity of tort and environmental claims and further describes how the reservation of rights included in the Confirmation Order was intended to allow Defendants to do precisely that.  Fourth, the confirmation hearing transcript recounts this Court's explicit acknowledgment of Defendants' post-confirmation right to contest the value and validity of tort and environmental claims.  Fifth, Defendants again reserved their § 550 rights when they complied with the public notice and comment process prescribed by CERCLA.  Finally, the government affirmatively relied on the existence of Anadarko's reservation of rights in urging that Defendants had no basis for objecting

---

[3]      SOF at ¶ 37.

to the environmental settlement.  Having procured that approval, the government now disclaims the existence of any such rights.

Moreover, even if none of that were the case, and Plaintiffs' and the government's disingenuousness were momentarily ignored, their purported "bargain" still would fail to override the limitations of § 550(a) and other applicable laws.  Just as the Debtors were subject to the limitations of § 550(a) at the time they assigned their litigation rights to creditors, those creditors are now subject to those same limitations because, as the Debtors' assignees, they could not have acquired any greater rights than those held by their assignors.  Further, Defendants' rights may not be eviscerated by a settlement agreement in which they took no part, by which they are not bound and which was negotiated by parties who had an economic incentive to undermine their rights.  In addition, because a bankruptcy rule cannot abridge a substantive right created by the Bankruptcy Code, the terms of a settlement approved under Bankruptcy Rule 9019 may not override the substantive limitations of § 550(a).  Similarly, because (i) the FDCPA, CERCLA and tort laws, which limit creditor recoveries to the value of their claims, are incorporated into the Bankruptcy Code under § 502(b), and (ii) the terms of any settlement approved under Bankruptcy Rule 9019 cannot abridge a substantive right created by the Bankruptcy Code, the settlement agreements may not override the Bankruptcy Code's incorporation of state law limitations on Plaintiffs' recovery.  Finally, because Plaintiffs (a) declared under oath that no creditor would be paid more than in full under the Plan, and (b) acknowledged Defendants' reserved rights to contest the value and validity of creditor claims in open court, Plaintiffs are now judicially and equitably estopped from asserting that their purported "bargain" entitles creditors to more than a full recovery or that Defendants are precluded from adjudicating the value of creditor claims.  For these and the additional reasons discussed herein, the Court should enforce the limitations of § 550(a) without regard to Plaintiffs', the government's, the States' and the Tort Claimants' alleged "bargain."

### JURISDICTION

1.       This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

### STATEMENT OF FACTS

2.       The facts relevant to this Response and Cross-Motion are set forth in the Statement of Undisputed Material Facts in Support of the Cross-Motion for Partial Summary Judgment Limiting Plaintiffs' Potential Damage Award Pursuant to Sections 544, 548 and 550(a) of the Bankruptcy Code (the "SOF"), which is attached hereto as Exhibit A and incorporated herein for all purposes.

### SUMMARY JUDGMENT STANDARD APPLICABLE TO DEFENDANTS' CROSS-MOTION

3.       Rule 56(a), which is made applicable to this proceeding by Rule 7056(a) of the Federal Rules of Bankruptcy Procedure, provides that a "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."[4]  Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of any part of a claim on which he bears the burden of proof.[5]  Plaintiffs bear the burden of demonstrating that any fraudulent transfer recovery will "benefit their estates" under § 550(a) of the Bankruptcy Code.[6]  If there is no genuine issue of material fact as to whether Plaintiffs can demonstrate a benefit that entitles them to recover more than the value of unpaid tort and environmental claims, it is appropriate for the Court to limit Plaintiffs' recovery on summary

---

[4]       Fed. R. Civ. P. 56(a).

[5]       *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof.").

[6]       *In re NETtel Corp., Inc.*, 364 B.R. 433, 441 n.2 (Bankr. D.D.C. 2006) (plaintiff bears the burden of proof to show that a recovery under § 550(a) "*will* benefit the estate," not merely that it "*could* benefit the estate.") (emphasis in original).

judgment.[7]  Whether and to what extent any amount recovered under § 550(a) of the Bankruptcy Code will benefit the estate "depends on a case-by-case, fact-specific analysis."[8]  Where, however, the facts bearing on that analysis are not in dispute, the Court may decide the matter based on the contents of the Plan and the record of the case.[9]

4.    The issue presented in this Cross-Motion is whether, based on the specific record of this case, Plaintiffs may avoid and/or recover    REDACTED    [10] or any other amount which exceeds the valid, unpaid tort and environmental claims of any Plaintiff-transferor.  Defendants submit that Plaintiffs are, as a matter of law, unable to discharge their burden under Bankruptcy Code §§ 544, 548 and 550(a) of demonstrating that any amounts in excess of the sums necessary to satisfy the valid, unpaid claims of tort and environmental creditors will benefit their estates.  Accordingly, Defendants seek partial summary judgment under Rule 56(a) denying any recovery in excess of such amounts.

---

[7]    Limitations on the amount of a recovery are properly imposed through partial summary judgment.  *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336, 340 (S.D.N.Y. 2002) (a *motion in limine* requesting the court to limit debtor's recovery to provable pre-petition damages is properly treated as a motion for partial summary judgment on damages) *opinion amended on other grounds*, 93 CIV. 4001, 2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002).  Indeed, courts routinely decide motions for summary judgment limiting the amount of recovery that may be awarded at trial.  *See Jewell-Rung Agency, Inc. v. Haddad Org., Ltd.*, 814 F. Supp. 337, 339 (S.D.N.Y. 1993) ("Courts have granted motions for summary judgment to limit damages while leaving issues of liability for trial.") (citations omitted); *see also AT&T Corp. v. Microsoft Corp.*, 290 F. Supp. 2d 409, 418 (S.D.N.Y. 2003) (granting partial summary judgment on damages and limiting plaintiff's potential monetary recovery); *Arkwright Mut. Ins. Co. v. KLM Royal Dutch Airlines*, No. 94 Civ. 0174, 1995 WL 491490 (S.D.N.Y. Aug. 17, 1995) (granting partial summary judgment to limit the defendants' liability); *Karetsos v. Cheung*, 670 F. Supp. 111, 114–15 (S.D.N.Y. 1987) (denying motion for summary judgment as to liability, but granting motion to limit damages).

[8]    *Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir. 1991); *see also In re Acequia, Inc.*, 34 F.3d 800, 812 (9th Cir. 1994) ("We therefore hold that, *on the unique facts of this case*, Acequia's section 544(b) fraudulent conveyance actions will 'benefit the estate' within the meaning of section 550(a).") (emphasis added); *Kipperman v. Onex Corp.*, 411 B.R. 805, 876 (N.D. Ga. 2009) ("Whether the recovery of an avoidance [action] will benefit the estate is determined on a case-by-case basis.").

[9]    *See Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 95 (S.D.N.Y. 2008) (concluding, on a motion to dismiss, that an avoidance recovery would not benefit the estate based on the terms of the confirmed plan and the record of the case).

[10]    SOF at ¶ 40.

## ARGUMENT

I.     **Bankruptcy Code §§ 544, 548, 550(a) and Other Bankruptcy and Non-Bankruptcy Laws Limit Plaintiffs' Recovery to the Amounts Necessary to Satisfy Valid, Unpaid Tort and Environmental Claims**

5.     Three relevant provisions of the Bankruptcy Code govern the avoidance of transfers and the recovery of transferred property: §§ 544, 548 and 550, respectively.

A.     **Plaintiffs May Not Avoid a Transfer Under the Oklahoma UFTA, as Incorporated by § 544(b), That Exceeds the Value of Unpaid Tort and Environmental Claims**

6.     Section 544(b) of the Bankruptcy Code provides that a "trustee may avoid any transfer . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title."[11] In accordance with this provision, the trustee stands in the shoes of an unsecured creditor and can "avoid any transfer" which such creditor could avoid under state law. In the instant case, the applicable state law is Oklahoma law. Oklahoma has adopted the Uniform Fraudulent Transfer Act (the "UFTA").[12] Under Oklahoma's UFTA, a fraudulent transfer may be avoided only "to the extent necessary to satisfy the creditor's claim."[13] Pursuant to this provision, Oklahoma law expressly limits avoidance of a transfer to the amounts necessary to satisfy unpaid creditor claims (*i.e.*, it permits partial avoidance).[14]

7.     Like § 544(b), § 548(a) of the Bankruptcy Code permits the avoidance of certain qualifying transfers, but only if they were made "within 2 years" before the date of the filing of the petition.[15]

---

[11]   11 U.S.C. § 544(b).

[12]   OKLA. STAT. ANN. tit. 24, § 112 *et seq.*

[13]   *Id.* at § 119(A)(1). Like the Bankruptcy Code, Oklahoma's UFTA distinguishes between "avoidance" and "recovery". Significantly, under such statute, a creditor cannot avoid *or* recover any more than "the amount necessary to satisfy the creditor's claim." *See id.* at §§ 119(A)(1) and 120(B).

[14]   *Id.* at § 119(A)(1).

[15]   11 U.S.C. § 548(a)(1).

8.      Plaintiffs have filed their Complaint under both §§ 544 and 548 of the
Bankruptcy Code. Even so, all of the challenged transfers for which Plaintiffs seek damages occurred
more than two years prior to the January 12, 2009 petition date[16] and, as such, Plaintiffs' claims are now
grounded in § 544(b) and the Oklahoma UFTA. While Plaintiffs argue that all of an avoided transfer is
"recoverable" under § 550(a) irrespective of the value of the estate's underlying claims, they fail to
address how they may recover a transfer which cannot first be avoided under the Oklahoma UFTA.
Indeed, the Oklahoma UFTA expressly prohibits avoidance except as "necessary to satisfy . . . creditor[]
claim[s]."[17] Because avoidance is a precondition to recovery,[18] and Oklahoma law expressly prohibits
avoidance in an amount that exceeds the value of creditor claims, Plaintiffs cannot possibly rely on
§ 550(a) as a means of recovering amounts that exceed creditor claims. In short, Plaintiffs cannot
recover in an unlimited amount under § 550(a) because the Oklahoma UFTA affirmatively prevents
them from first avoiding any transfer in an unlimited amount.

9.      Even if, however, the Oklahoma UFTA were not fatal to Plaintiffs' efforts to
recover    REDACTED    in excess of the value of unpaid creditor claims, § 550(a), together with
§§ 544 and 548, are.

**B.     Plaintiffs May Not Avoid and Recover a Transfer Under §§ 544, 548 and 550(a)
That Exceeds Unpaid Tort and Environmental Claims by 1000%**

10.      Section 550(a) of the Bankruptcy Code provides that "to the extent a transfer is
avoided under sections 544 . . . [and] 548", a trustee may "recover, for the benefit of the estate, the
property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). Under
this provision, a trustee may not recover an avoided transfer—whether partially or wholly avoided—

---

[16]    SOF at ¶ 38.

[17]    tit. 24, § 119(A)(1).

[18]    Section 550(a) applies only "to the extent that a transfer is avoided" and therefore there can be no recovery unless and until
there has been an avoidance. 11 U.S.C. § 550(a).

unless the recovery benefits the estate.[19]  Because Plaintiffs bear the burden of proof under § 550(a),

they must demonstrate how their estates will benefit from a recovery in the Anadarko Litigation.[20]

          11.     Plaintiffs have not and cannot meet their burden under § 550(a) given the very

clear purpose of the statute.  In particular, fraudulent transfer laws are remedial, not punitive, in nature

and they exist for the purpose of "promot[ing] payment to creditors".[21]  Two corollaries flow from this

most basic tenet:  the first is that a transfer may only be avoided and recovered for the benefit of

creditors;[22] the second is that avoidance and recovery are intended to restore the estate and its creditors

to the positions they would have been in had the transfer not occurred.[23]  Because fraudulent transfer

laws exist to protect creditors and restore them to their pre-transfer positions, the trustee's right to avoid

and recover a fraudulent transfer derives solely from the harm suffered by those creditors as a result of

---

[19]    11 U.S.C. § 550(a); *see also In re Harstad*, 155 B.R. 500, 511 (Bankr. D. Minn. 1993), *aff'd*, 4-90-869, 1994 WL 526013 (D. Minn. Jan. 20, 1994), *aff'd sub nom., Harstad v. First Am. Bank*, 39 F.3d 898 (8th Cir. 1994) ("Congress carefully articulated its desire in section 550, artfully making sure it was the estate, i.e. creditors, and not the debtor who benefits from any [avoidance] recovery."); *In re Cybergenics Corp.*, 226 F.3d 237, 243-44 (3d Cir. 2000) ("The power to avoid the debtor's prepetition transfers and obligations" are for the purpose of "maximize[ing] the bankruptcy estate for the benefit of creditors"); *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 988-91 (2d Cir. 1981) (concluding that there can be no avoidance and recovery where a transaction has not significantly affected the estate and its creditors).

[20]    *In re NETtel Corp.*, 364 B.R. at 441 n.2 (holding that plaintiff bears the burden of demonstrating that a recovery *"will* benefit the estate," not merely that it *"could* benefit the estate.") (emphasis in original).

[21]    *See In re Best Prods. Co., Inc.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("Fraudulent transfer laws are intended to promote payment to creditors; that is, the statutes are remedial, rather than punitive."), *aff'd*, 68 F.3d 26 (2d Cir. 1995).

[22]    *In re Liggett*, 118 B.R. 219, 222 (Bankr. S.D.N.Y. 1990) ("[I]t is well settled in the Second Circuit, that avoiding powers may be exercised by a debtor in possession only for the benefit of creditors, and not for the benefit of the debtor itself."); *In re Crowthers McCall Pattern, Inc.* 120 B.R. 279, 288 (Bankr. S.D.N.Y. 1990) ("It is settled that even were the obligation avoided, that avoidance would be only for the benefit of creditors and the obligation would still stand ahead of equity."); *In re Leneve*, 341 B.R. 53, 56 (Bankr. S.D. Fla. 2006) (stating that the purpose of both state and federal fraudulent transfer laws is to "preserve assets of the estate for the benefit of creditors.") (citation omitted); *In re TriGem Am. Corp.*, 431 B.R. 855, 865 (Bankr. C.D. Cal. 2010) ("[T]he touchstone of every avoidance action" is a diminution of expected recovery "[f]rom the standpoint of [the] debtor's creditors.").

[23]    *In re Best Prods.*, 168 B.R. at 57 (stating that "[f]raudulent transfer laws are intended to promote payment to creditors" and "when the fraudulent transfer is avoided, the parties are restored to their previous positions."); *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 173 (S.D. Tex. 2009) ("[O]ne tenet seems consistent regardless of the jurisdiction from which it emanates: the court should award the amount of damages necessary to make the debtor's estate/creditors whole and any damages awarded should put the estate back in the financial condition in which it would have been at the time.  Put another way, 'only net amounts diverted from, that is damages consequently suffered by the creditor body of, a debtor may be recovered via a fraudulent conveyance action.'") (quoting *Foxmeyer Corp. v. Gen. Elec. Capital Corp.*, 296 B.R. 327, 342 (Bankr. D. Del. 2003)).

the transfer.[24]  A transfer can therefore only be avoided and recovered as necessary to remedy the harm

to creditors occasioned by the transfer.[25]  While Plaintiffs seek to justify their unlimited recovery by de-

linking the harm to creditors from the amount of the recovery that may be sought, any separation of the

two ignores the paramount purpose for which the law exists.

> 12.    As aptly described by Judge Brozman in *Hopewell*:

> The ability to avoid preferential and fraudulent transfers to ensure
> equality of distribution of proceeds of the estate is one of the most
> fundamental tenets of our bankruptcy system . . . However, where an
> estate is solvent, that is, where there are sufficient funds to pay all
> creditors in full, the goals of maximizing the estate for the benefit of all
> creditors and dividing up that estate so as to achieve equality among
> class members is much less strongly implicated.

> *There is no need to recover assets* in order to ensure equality of
> distribution *when there is a large enough roast in the oven to feed all the
> hungry mouths.*[26]

Indeed, the very purpose of avoidance laws ceases to exist once all creditors have been paid in full

because the goals of "promot[ing] payment to [them]"[27] and "ensur[ing] equality of distribution [amongst

---

[24]    *See, e.g., Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) ("[O]nly asset transfers that may have actually harmed creditors may be avoided."); *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1201 (11th Cir. 1988) ("Trustees are allowed to avoid certain transfers as fraudulent because these transfers harm the creditors . . .") (citations omitted); *Smith v. Am. Founders Fin. Corp.*, 365 B.R. 647, 672 (S.D. Tex. 2007) (stating that courts should "keep the equitable purposes behind fraudulent-transfer law in mind," namely "significant[] harm [to] innocent creditors") (internal quotation marks omitted); *In re Fornabaio*, 187 B.R. 780, 782 (S.D. Fla. 1995) (finding that a transfer that did not affect the rights of creditors could not be avoided).

[25]    *See, e.g., In re Murphy*, 331 B.R. 107, 126 (Bankr. S.D.N.Y. 2005) (avoiding a transfer as fraudulent "only to the extent necessary to satisfy allowed prepetition and administrative creditor claims, *i.e.*, those *legally* harmed by the transfer."); *In re Grove-Merritt*, 406 B.R. 778, 811 (Bankr. S.D. Ohio 2009) ("A fraudulent transfer should be avoided only to the extent creditors were harmed.") (citation omitted); *In re Hill*, 342 B.R. 183, 204 (D.N.J. 2006) (holding that a transfer can be avoided "only to the extent creditors were harmed") (citing *In re Murphy*, 331 B.R. at 122-23); *Foxmeyer Corp.*, 296 B.R. at 342 (concluding that "only net amounts diverted from, that is damages consequently suffered by the creditor body of, a debtor may be recovered via a fraudulent conveyance action."); *In re Nowicki*, 202 B.R. 729, 736 (Bankr. N.D. Ill. 1996) ("[A] careful reading of [fraudulent transfer law] indicates that a fraudulent transfer is only voidable . . . to the extent necessary to satisfy the claims of creditors.").

[26]    *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 55 (Bankr. S.D.N.Y. 1999) (emphasis added).

[27]    *In re Best Prods. Co.*, 168 B.R. at 57.

---

them],"[28] have necessarily been effectuated. "So strong is this principle" that even when a transfer is avoided and recovered, the transfer remains valid and binding as between the transferee and transferor because the only purpose of the law is to protect creditors (not the parties to the transfer) from any harm resulting from the transfer.[29] Once any harm to creditors resulting from a transfer has been remedied by full payment of their claims, the purpose of the fraudulent transfer laws is satisfied and no further recovery is warranted.[30] Consistent with this purpose, courts affirmatively prohibit application of the laws in any manner that would result in a windfall to creditors.[31] Indeed, fraudulent transfer laws are intended to *prevent* a windfall to select creditors by permitting all claimants "to share ratably in the proceeds of the estate"[32]—not, as Plaintiffs contend, to *create* a windfall to select creditors by allowing

---

[28]    *In re Bd. of Dirs. of Hopewell*, 238 B.R. at 55; *see also In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 114 (Bankr. S.D.N.Y. 2001) ("The statutory purpose of [§ 548 is] to permit all creditors to share ratably in the proceeds of the estate, notwithstanding pre-bankruptcy transfers that tend to unfairly favor one creditor over another."); *In re Ramirez*, Bankr. No. 09-00066, 2010 WL 2181546, at *3 (Bankr. D. P.R. May 28, 2010) (stating that the trustee's avoidance powers "'exist to implement the goal of every insolvency statute, which is the equal distribution of a debtor's assets among its general nonpriority creditors.'") (citing 5 COLLIER ON BANKRUPTCY ¶ 544.01 (15th ed. rev. 2009)); *In re Fleming Packaging Corp.*, 351 B.R. 626, 643 (Bankr. C.D. Ill. 2006) ("[T]he broad purpose behind the avoiding powers is to ensure the equal distribution of the debtor's assets among similarly situated creditors, in accordance with the priorities of the Code, regardless of how individual creditors were actually treated in the period before bankruptcy."); *In re Gomes*, 219 B.R. 286, 297 (Bankr. D. Or. 1998) ("[T]he avoidance provisions of the Bankruptcy Code were designed to promote the equal distribution scheme of the Bankruptcy Code, their purpose is a public good, *i.e.*, the maximization of estate assets for the highest possible distribution to similarly situated creditors."); *In re M. Blackburn Mitchell Inc.*, 164 B.R. 117, 122 (Bankr. N.D. Cal. 1994) (noting that a trustee's ability to avoid transfers promotes bankruptcy law's basic principle of ensuring equal distribution of a debtor's property among its creditors).

[29]    *In re Bd. of Dirs. of Hopewell*, 238 B.R. at 55; *see also In re Best Prods. Co.*, 168 B.R. at 57 ("Because the fraudulent transfer is voidable by creditors only, it is not remarkable that, as between the parties to the transfer, the law regards the transfer as real and binding."); *Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) (holding that "fraudulent conveyances are binding on all non-creditors, including the transferor himself.").

[30]    *In re Bd. of Dirs. of Hopewell*, 238 B.R. at 55; *In re Murphy*, 331 B.R. at 126; *In re Grove-Merritt*, 406 B.R. at 811; *In re Hill*, 342 B.R. at 204; *Foxmeyer Corp.*, 296 B.R. at 342; *In re Nowicki*, 202 B.R. at 736.

[31]    *See, e.g.*, *In re Murphy*, 331 B.R. at 125 ("Congress could not have intended Section 548 to . . . allow debtors . . . to reap 'a windfall merely by reason of the happenstance of bankruptcy'"); *In re Johnson*, 28 B.R. 292, 298 (Bankr. N.D. Ill. 1983) ("Section 544 was not designed to provide a windfall for creditors who, absent the bankruptcy filing and the trustee's (debtor's) status as a hypothetical lien creditor could not recover the property they seek.").

[32]    *In re Adler*, 247 B.R. at 114.

---

them to recover 1000% of their claims while all of the estates' other creditors recover only 100% of their claims.[33]

13.     Indeed, Plaintiffs would have this Court construe § 550(a) to permit a REDACTED REDACTED recovery for tort and environmental creditors even though their own inflated claim estimates reflect only REDACTED in unpaid claims.[34] Plaintiffs think it is irrelevant that their requested recovery unmistakably and undeniably exceeds the value of unpaid claims by a factor of ten and that no other creditor can or will benefit from such excess recovery because the Plan provides for the distribution of the recovery to tort and environmental creditors alone.  Plaintiffs' position not only renders § 550(a) meaningless, it ignores the remedial, non-punitive, nature of the fraudulent conveyance laws and the fact that their purpose is to restore creditors to their pre-transfer positions by compensating them for any harm resulting from a transfer and permitting them to share ratably in the debtor's estate.  Plaintiffs do not seek to (i) restore creditors to their pre-transfer positions, (ii) compensate them for any harm occasioned by a transfer, or (iii) permit them to share ratably in the debtor's estate; rather, they unabashedly seek to employ the avoidance laws to (a) place tort and environmental creditors in the far more favorable position of recovering        REDACTED        in excess of the value of their claims, and (b) promote unequal creditor distributions by permitting class 4 and 5 creditors a 1000% recovery even though all other creditors have recovered only 100%.[35]  No court has ever sanctioned use of the avoidance laws to promote windfall payments to, and inequality of distribution among, creditors. Plaintiffs' blatant efforts to subvert the laws in this fashion should be rejected.

---

[33]   *In re Chase*, 328 B.R. 675, 681 (Bankr. D. Vt. 2005) (applying fraudulent transfer law to "avoid a windfall to the creditor" who was favored by a pre-bankruptcy transfer).

[34]   SOF at ¶¶ 24, 30, 36, 40.

[35]   The fact that all non-tort and environmental claimants have been paid in full is conceded by Plaintiffs themselves. *See* Motion at 23, stating "[i]t would be especially irrational [for] . . . environmental and tort creditors [to] be capped at approximately the same level of recovery as all other creditors [*i.e.*, a full recovery] who did not take similar risks [of recovering on a contingent asset]."

14.    No less importantly, Plaintiffs' position does violence to the fundamental precept of bankruptcy law that "creditors cannot receive more than what they are owed."[36]  This principle is so basic to the bankruptcy laws that it permeates every chapter of the Code and is repeated over and over again throughout its provisions, including §§ 502(b), 502(j), 726, 1129(a)(7), 1129(b) and 1325(a)(5).[37]  For example, § 502 not only establishes a comprehensive framework for determining the maximum value of a creditor's claim,[38] it also provides a mechanism for recovering any amounts paid to a creditor in excess of the value of its claim.[39]  Similarly, § 726, which applies in chapter 11 by virtue of the requirements of § 1129(a)(7), affirmatively and unambiguously prohibits creditors from retaining funds in excess of the value of their claims.[40]  Moreover, § 1129(b) (pursuant to which the Plan in this

---

[36]    *ASARCO LLC*, 404 B.R. at 175; *see also In re Chemtura Corp.*, 439 B.R. 561, 595-96 (Bankr. S.D.N.Y. 2010) (holding that "creditors simply can't be paid more than in full" whether under a settlement or otherwise); *In re Forklift LP Corp.*, 363 B.R. 388, 394 (Bankr. D. Del. 2007) (limiting the recovery of tort and environmental creditors to the value of their claims so as to assure that the Plan did not contravene the provisions of the Bankruptcy Code); *In re Schultz*, 153 B.R. 170, 173 n.7 (Bankr. S.D. Miss. 1993) ("a creditor may not be paid more than the amount of its claim.") (citing *In re Oaks Partners, Ltd.*, 135 B.R. 440, 449 (Bankr. N.D. Ga. 1991) ("First and foremost, a creditor is not entitled to be paid more than its claim. . . .")).

[37]    *See* 11 U.S.C. § 502(b) (imposing limitations on the amount a creditor may recover); § 502(j) (recognizing a trustee's authority to recover payments in excess of a creditor's claim); § 726 (granting the trustee authority to distribute property of the estate only in satisfaction of allowed claims, and requiring the return of any excess funds); § 1129(a)(7) (incorporating the limitations of § 726 into the provisions of chapter 11 through the "best interest of creditors" test); § 1129(b) (preventing senior creditors from recovering more than the amount of their claims); *In re Valenti*, 105 F.3d 55, 64 (2d Cir. 1997) (providing that a creditor may not receive more than the allowed amount of its claim under § 1325(a)(5)).

[38]    *See, e.g., In re PPI Enters. (U.S.) Inc.*, 324 F.3d 197, 207 (3d Cir. 2003) (holding that a creditor is not entitled to recover more than its allowed claim amount under § 502(b), even if that amount is less than the creditor would be entitled to under state law and there are funds available for payment); *In re Tittle*, 346 B.R. 684, 689 (Bankr. E.D. Va. 2006) ("[T]he claim is neither enforceable against the debtor personally, nor against the debtor's property to the extent the claim as capped by § 502(b)(6)(A) is paid in full.").

[39]    *See, e.g., In re Sims*, 278 B.R. 457, 476 (Bankr. E.D. Tenn. 2002) (noting that § 502(j) recognizes a trustee's inherent authority to recover overpayments); *In re Stevens*, 187 B.R. 48, 51–52 (Bankr. S.D. Ga. 1995) (noting that a "trustee's power to recover overpayment is inherent in the overall scheme of a trustee's fiduciary duties.") (*aff'd in part, rev'd in part on other grounds* 130 F.3d 1027 (11th Cir. 1997)); *In re Talbot*, 124 F.3d 1201, 1209–10 (10th Cir. 1997) (holding that the IRS must disgorge amounts received in excess of the value of its secured claim); *In re Barker*, 306 B.R. 339, 351 (Bankr. E.D. Cal. 2004) (holding that creditor must disgorge payment received from chapter 7 estate in excess of allowed claim amount); *In re Clifford*, 255 B.R. 258, 266-67 (D. Mass. 2000) (holding that creditor must disgorge funds received in excess of the allowed amount of its claim).

[40]    *See, e.g., In re Sharif*, 446 B.R. 870, 885 (Bankr. N.D. Ill. 2011) (holding that no creditor is entitled to excess funds remaining after trustee has satisfied all allowed claims pursuant to § 726); *In re R & W Enters.*, 181 B.R. 624, 637-38 (Bankr. N.D. Fla. 1994) (holding that a creditor's right to payment in chapter 7 proceeding is governed by § 726 and creditor must disgorge disbursements received in excess of its allowed claim amount); *In re Barker*, 306 B.R. at 352 (requiring creditor to disgorge payment received from chapter 7 estate in excess of allowed claim amount).

case was confirmed)[41] requires a finding that no creditor is being paid more than in full.[42]  In satisfying that very requirement, Plaintiffs submitted not one, but two, proffers wherein they categorically and unconditionally stated that _no creditor would receive more than the value of its claim_ under the Plan.[43] In contrast to Plaintiffs' newfound position that they may in fact recover many times the value of class 4 and 5 claims, each of the foregoing provisions of the Bankruptcy Code separately and independently prohibits such excess recovery.[44]

15.    Consistent with this conclusion, courts from this jurisdiction have expressly held that an avoidance recovery may not exceed the value of unpaid creditor claims and that transfers may only be avoided to the extent of unpaid creditor claims.  For example, in _In re Murphy_, the trustee sought to avoid and recover real property seized by the state in a tax forfeiture proceeding.[45]  The property was valued at over $1 million while the value of all creditor claims was approximately

---

[41]    _See_ Confirmation Order at ¶¶ 20, 67, 73-76, 94.

[42]    _See In re MCorp. Fin., Inc._, 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) (holding that a plan is not fair and equitable to equity holders, as required by 1129(b), if it "includes a provision which establishes no upper limit on the amount that junior creditors of the [d]ebtors (who are senior to the rejecting equity class) may receive [from litigation proceeds]."); _In re Chemtura Corp._, 439 B.R. at 592 (holding that the "fair and equitable" requirement, set forth in § 1129(b), prevents a court from paying "creditors more than full compensation for their allowed claims"); _In re Exide Techs._, 303 B.R. 48, 61 (Bankr. D. Del. 2003) ("[A] corollary of the absolute priority rule [of § 1129(b)] is that a senior class cannot receive more than full compensation for its claims."); _In re Granite Broad. Corp._, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims" under a chapter 11 plan.); _In re Idearc Inc._, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009) (holding that "senior classes cannot receive more than a one hundred percent (100%) recovery for their claims" under a chapter 11 plan); _In re Walat Farms, Inc._, 70 B.R. 330, 335 (Bankr. E.D. Mich. 1987) (stating that paying a creditor more than the amount of its claim "would do violence to the 'fair and equitable' standard" set forth in § 1129(b)); _In re Future Energy Corp._, 83 B.R. 470, 495 n.39 (Bankr. S.D. Ohio 1988) ("Clearly, overpayment of senior creditors is violative of the fair and equitable standard."); 7 COLLIER ON BANKRUPTCY ¶1129.03[4][a][ii] (15th ed. rev. 2007) ("The second major component of the 'fair and equitable' requirement is that no creditor . . . be paid a 'premium' over the allowed amount of its claim.  Once the participant receives or retains property equal to its claim, it may receive no more.").

[43]    Plaintiffs' CEO stated: "I understand that _no class of creditors is recovering more than in full_ under the Plan on account of its Claims." SOF at ¶ 37 (emphasis added).  Tronox's financial advisor further stated: "Tronox's Global Settlement is premised on a fair allocation of value among creditors where _none is being paid in full_." _Id._ (emphasis added).  The Court confirmed the Plan based on these representations. _Id._

[44]    As more fully discussed below, tort and environmental laws, as incorporated by § 502(b) of the Bankruptcy Code, also expressly prohibit creditors from recovering more than the full value of their claims.

[45]    _In re Murphy_, 331 B.R. at 114.

$700,000.[46]   The defendant sought to limit the recovery to the amount necessary to pay all administrative and unsecured claims.[47]   The trustee argued that the existence of a surplus over and above the amount of creditor claims was not a basis for limiting the recovery and the debtor also urged that she, rather than the transferee, should be entitled to retain any surplus.[48]   The court rejected the trustee and debtor's positions and, instead, held that "the measure of avoidance damages under Sections 548 and 550 [is limited] to the amount necessary to make creditors of the debtor's estate whole" and that any surplus remaining after payment of creditor claims should be retained by the transferee, not the debtor.[49]

16.   In reaching this conclusion, the court first analyzed the plain language of § 550, which states that a trustee may only recover "*to the extent that a transfer is avoided.*"[50]   The court interpreted this language to mean that (i) avoidance under § 548 may be partial, and (ii) recovery under § 550(a) may be allowed only to the extent there is a benefit to creditors.[51]   With these two premises in mind, the court then evaluated § 548 and the rule that federal courts must respect state interests so long as those interests do not conflict with federal interests.[52]   Like Judge Brozman in *Hopewell*, Judge Hardin recognized in *Murphy* that if a transfer is avoided under federal or state law, the legal relationship between the transferor and transferee remains intact because the laws are only intended to protect creditors.[53]   Because that legal relationship, which is defined by state law, is not displaced when a transfer is avoided, the Bankruptcy Code's fraudulent transfer provisions do not conflict with state

---

[46]   *Id.*

[47]   *Id.* at 121.

[48]   *Id.*

[49]   *Id.* at 122.

[50]   *Id.* at 121.

[51]   *Id.* at 121-22.

[52]   *Id.* at 122-26.

[53]   *Id.* at 124-26.

law.[54] Not only is there no conflict between the two bodies of law, the court in fact found that state and federal fraudulent transfer laws are entirely consistent in their objectives of protecting creditors from the harm resulting from a fraudulent transfer.[55] Because the sole purpose of both federal and state laws is to protect creditors from the harm resulting from a fraudulent transfer, under either law, a transfer can be avoided only "to the extent necessary to satisfy allowed prepetition and administrative creditor claims, *i.e.*, those *legally* harmed by the transfer."[56] The court found this holding to be consistent with its observation that, "Congress could not have intended Section 548 to . . . allow debtors . . . to reap 'a windfall merely by reason of the happenstance of bankruptcy'".[57] Rather, the law is intended to protect creditors, and once their claims have been paid in full, it serves no further purpose and permits no further recovery.[58]

17. Predictably, Plaintiffs argue that *Murphy* is "both inapposite and wrong" because the court's limitation on the trustee's avoiding powers was merely attributable to the need to respect the state's conflicting interest in its ability to collect unpaid taxes.[59] Not only did the court find no such conflict, it in fact found a common interest between federal and state laws in their mutual goal of protecting creditors from the harm of a fraudulent transfer.[60] Nowhere does the opinion suggest that its holding was limited by a conflict of laws or the unusual circumstances of the case.[61] Rather, the

---

[54]    *Id.* at 122-26.

[55]    *Id.*

[56]    *Id.* at 126 (emphasis in original).

[57]    *Id.* at 125.

[58]    *Id.* at 125-26.

[59]    *See* Motion at 11-12.

[60]    *Id.* at 124-26.

[61]    While Judge Hardin does refer to the case as "extremely unusual," he does so only because it was a chapter 7 case involving a surplus of funds. *In re Murphy*, 331 B.R. at 121. Contrary to Plaintiffs' suggestion, this observation hardly limits the court's holding.

decision's thorough and compelling analysis of the language and purpose of fraudulent transfer laws is entirely consistent with the prevailing law in this jurisdiction and is broadly applicable to this and other cases. Moreover, even if *Murphy's* analysis of § 548 were driven by its concern for state law, that concern would not limit the holding in the instant case because Oklahoma state law (as incorporated by § 544(b)) affirmatively limits avoidance to the amounts necessary to satisfy creditor claims.[62]

18.    Plaintiffs also suggest that the theory of partial avoidance (rather than partial recovery) expounded in *Murphy* "squarely conflicts" with the Supreme Court's ruling in *Moore v. Bay*, its progeny and §§ 544 and 550.[63] To the contrary, *Moore v. Bay* merely holds that the property a trustee recovers after avoiding a fraudulent transfer under state law is available to satisfy the claims of all creditors of the estate.[64] This holding does not imply, as Plaintiffs suggest, that a trustee may avoid and recover the entire transfer where the value of the transferred property exceeds the amount of the claims against the estate. Indeed, the *Moore v. Bay* court expressly stated that the "rights of the trustee by subrogation are to be enforced for the *benefit of the estate*."[65] In accordance with this limitation, a trustee cannot avoid or recover a transfer in an amount that exceeds the value of the claims held by creditors on whose collective behalf he acts. Nothing in *Moore v. Bay* suggests otherwise.[66]

19.    Finally, Plaintiffs suggest that *Murphy* is inapplicable because it addresses avoidance under § 548 rather than recovery under § 550(a). Because §§ 548 and 550 work in concert, and Judge Hardin expressly premised his discussion on both, the opinion directly controls whether plaintiffs may recover more than the value of unpaid creditor claims. Even if, however, Judge Hardin

---

[62]    *See* OKLA. STAT. ANN. tit. 24, § 119(A)(1) (providing that a fraudulent transfer is to be avoided only "to the extent necessary to satisfy the creditor's claim.").

[63]    Motion at 12.

[64]    *Moore v. Bay*, 284 U.S. 4, 5 (1931).

[65]    *Id.* (emphasis added).

[66]    It is unclear why Plaintiffs cite non-controlling case law that rejects the notion of partial avoidance when courts in this jurisdiction clearly endorse it. *See* Motion at 13 (citing *In re Coleman*, 426 F.3d 719, 725-26 (4th Cir. 2005)).

had only discussed avoidance, the decision necessarily controls a recoverability analysis as well. This is because a transfer must be avoided before it can be recovered,[67] so any limitation on a trustee's avoidance powers will necessarily limit his recovery powers. Indeed, a limitation on a trustee's avoidance powers is even more restrictive than a limitation on his recovery powers because an avoidance limitation may preclude not only recovery of an avoided transfer, but also prosecution of the avoidance action in the first place. Because the theory of partial avoidance is even more restrictive than the theory of partial recovery, any limitations on the avoidability of a transfer will necessarily carry through to the amounts recoverable on that avoided transfer.

20.    Consistent with *Murphy*, the *Adelphia* district court also held that a transfer cannot be avoided where there are no creditors who will benefit from recovery of the avoided transfer.[68] In *Adelphia*, even though all creditors of the transferor debtors' estates had been paid in full, the trustee sought to avoid a transfer and to recover proceeds to satisfy unpaid creditors of another debtor's estate. The trustee argued that he should be permitted to proceed because: (i) § 550(a)'s "benefit" requirement did not limit his ability to *avoid* a transfer under §§ 544 and 548, and in any event, (ii) the transferor debtors' estates would indirectly benefit from a recovery under § 550(a) because it would (a) enhance the estates' financial stability, (b) permit payment of intercompany claims that survived confirmation, and (c) allow for the payment of outstanding veil piercing claims. The defendants, in turn, argued that: (I) a transfer cannot be avoided under §§ 544 and 548 in excess of the amounts that can be recovered for the "benefit of the estate" under § 550(a); and (II) because all creditors had been paid in full, avoidance and recovery would not benefit the estate. In making these arguments, defendants relied on two Second Circuit cases—*Whiteford Plastics*[69] and *In re Vintero*[70] in support of their position.

---

[67]    *See* 11 U.S.C. § 550(a) providing that it applies "*to the extent a transfer is avoided . . .*"

[68]    *Adelphia*, 390 B.R. at 93-97.

[69]    *Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582 (2d Cir. 1950) (prohibiting debtor from commencing an avoidance action that did not benefit creditors).

21.     While the *Adelphia* court recognized that *Whiteford Plastics* and *Vintero* interpreted § 544's pre-Code predecessor provision, the court nonetheless found that the Second Circuit opinions accorded with bankruptcy decisions from this circuit, the statute's legislative history and multiple other authorities.[71] In reliance on those authorities (including Judge Hardin's decision in *Murphy*), the *Adelphia* court concluded that §§ 544 and 548 permit avoidance only to the limited extent necessary to benefit creditors by compensating them for any harm resulting from a transfer.[72] The court therefore prohibited the trustee's avoidance action on the ground that there were no creditors who could directly or indirectly benefit from a recovery because:  (i) all creditors of the transferor debtors had already been paid in full, (ii) the intercompany claims were resolved under the plan and were no longer outstanding, and (iii) the veil piercing claims had been disallowed.[73]

22.     Despite this clearly controlling precedent, Plaintiffs now argue that *Adelphia* merely stands for the proposition that a trustee cannot recover under § 550(a) for the benefit of another debtor's estate.[74] *Adelphia* is not so narrow.  It holds that once the estate's creditors have been paid in full, they cannot benefit from any further recovery.[75] This is so regardless of whether the trustee is proposing to use the excess recovery to satisfy the claims of another estate's creditors or whether the trustee is proposing to (i) use the excess recovery to pay the same estate's creditors many times the value of their claim, or (ii) donate the excess recovery to Superfund.  The principle is the same:  once any

---

[70]    *Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.)*, 735 F.2d 740 (2d Cir. 1984), cert. denied, 469 U.S. 1087 (1984) (permitting debtor to avoid a lien only to the extent it benefited creditors).

[71]    *Adelphia*, 390 B.R. at 94.

[72]    *Id.*

[73]    *Id.* at 95-97.

[74]    Motion at 10-11.

[75]    *Adelphia*, 390 B.R. at 97 (indicating that it is impossible for the creditors of the obligor debtors, who have already been paid in full, to benefit from a recovery in the case).

harm to creditors has been remedied by full payment of their claims, no further benefit can accrue and no further recovery may be had. The identity of the potential recipient of the excess recovery is irrelevant because an excess recovery is not permitted *at all*.

23.    Plaintiffs also suggest that *Adelphia* is distinguishable from the present case because class 4 and 5 creditors have not been paid in full and "no one claimed at confirmation that Tronox's environmental and tort creditors would be paid in full ... absent a recovery in this litigation".[76] This statement is both incorrect and irrelevant. First, whether class 4 and 5 creditors have been paid in full is a disputed fact. Defendants objected to both the Plan and Disclosure Statement on the ground that they should not be bound by the Debtors' estimates of the value of tort and environmental claims and such objections were resolved by reservations of rights included in both the Disclosure Statement and Confirmation Order.[77] Accordingly, Defendants have expressly retained the right to argue that tort and environmental creditors have already received full payment of their claims by virtue of the    REDACTED    distributed to them under the Plan.[78] Second, even if tort and environmental claims have not been paid in full, *Adelphia's* holding is no less applicable: namely, Plaintiffs may only avoid a transfer to the extent necessary to benefit such creditors by compensating them for any injury resulting from a transfer. Nothing further is permitted under the fraudulent transfer laws. Accordingly, even if class 4 and 5 creditors have not been paid in full, *Adelphia* prohibits Plaintiffs from recovering any amount in excess of the deficiency needed to achieve full compensation.

---

[76]    Motion at 11.

[77]    Defendants objected to the Disclosure Statement on the ground that it lacked adequate disclosures regarding both the value of the environmental and tort claims and the consideration being distributed to them under the Plan. SOF ¶ 4. In response to this objection, Plaintiffs included the following language in the Disclosure Statement: "Nothing herein shall prejudice the right of Tronox or any other party in interest to assert any and all objections to, or defenses, with respect to, any Environmental Claims" and "Tort Claims". *Id.* at ¶ 6, 22, 28. At confirmation, Defendants again raised concerns about the claim values arguing that they should not be bound by the estimated value of the tort and environmental claims being settled under the Plan. *Id.* at ¶ 4. In response, Plaintiffs included express language in the Confirmation Order reserving Defendants' rights. *Id.* at ¶ 9.

[78]    *Id.* at ¶ 6, 9. Defendants have not yet filed their expert reports valuing the tort and environmental claims and, as such, they are not yet taking a position concerning the value of such claims. Their claim valuations will, however, be substantially lower than the amounts included in Plaintiffs' reports.

24.     Finally, Plaintiffs seek to avoid *Adelphia* by urging that it does not directly address § 550(a)'s benefit to the estate requirement or the "novel recovery cap proposed by Defendants."[79]  Plaintiffs' characterization of a fraudulent conveyance "recovery cap" as "novel" is hardly surprising given their disregard of the many cases *from this very jurisdiction* which plainly limit such recovery to the amounts necessary to pay creditor claims.  More importantly, while *Adelphia* does limit a trustee's ability to *avoid* a transfer rather than *recover* an avoided transfer, the result is the same: since avoidance necessarily precedes recovery, any limitation on avoidance powers necessarily limits recovery powers.  Accordingly, Plaintiffs' efforts to distinguish *Adelphia* are unavailing.

25.     As in this jurisdiction, other courts have also found that the purpose of awarding a recovery under § 550(a) is to make creditors whole.  For example, in *ASARCO LLC*,[80] the plaintiffs sought to recover stock in a subsidiary that had been transferred to the debtors' parent company.  The defendant argued that the requested recovery should be limited to the amount necessary to make creditors whole.  After determining that the transfers were in fact avoidable, the court then found that it must award damages consistent with the purpose of § 550(a), which is to "protect unsecured creditors and, as far as possible, [] *make them whole*."[81]  This determination was made pre-confirmation at a time when the court did not yet know the value of creditor claims, whether creditors would be paid in full absent a recovery or how the litigation proceeds would be distributed.  Accordingly, the court held that it was not in a position to limit the recovery to the amount of creditor claims since it could not yet determine the extent to which the recovery would actually benefit those creditors.[82]  Instead, the court

---

[79]    Motion at 10.

[80]    *ASARCO LLC*, 404 B.R. at 175.

[81]    *Id.* at 161 (emphasis added) (citing *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1336 (5th Cir. 1995) ("The proceeds recovered in avoidance actions should not benefit the reorganized debtor; rather, the proceeds should benefit the unsecured creditors."); *see also In re Best Prods. Co.*, 168 B.R. at 57 ("Fraudulent transfer laws are intended to promote payment to creditors; that is, the statutes are remedial, rather than punitive.").

[82]    *ASARCO LLC*, 404 B.R. at 162.

ordered that the recovered property be distributed under a plan approved by the bankruptcy court,[83] but cautioned that the Bankruptcy Code does not allow creditors to be paid more than they are owed.[84]

26.    Despite the plain and unambiguous meaning of these cases, Plaintiffs submit that (i) because the transfer of litigation proceeds in excess of the value of tort and environmental claims "benefited" creditors and enabled creditor "consent" to the Plan, Plaintiffs have now satisfied § 550(a) and are entitled to an unlimited recovery; and (ii) non-controlling decisions from outside this jurisdiction permit them an unlimited recovery.  Both of these contentions are erroneous.

27.    With respect to their first contention, Plaintiffs cannot meet the benefit requirement of § 550(a) by demonstrating that creditors consented to an illegal settlement which violates the provisions of the Bankruptcy Code.  Any settlement approved under Rule 9019 must comply with the provisions of the Bankruptcy Code[85] and must be construed in a manner that is consistent with its provisions.[86]   Where, as here, Plaintiffs urge an interpretation of the settlements that violates both § 550(a) and other Code provisions limiting creditors to a full recovery, creditor consent to such agreements will not satisfy Plaintiffs' burden under § 550(a).  None of the cases on which Plaintiffs rely suggest a contrary result.[87]

---

[83]   *Id.* at 163.

[84]   *Id.* at 175 (stating that "creditors cannot receive more than what they are owed") (citing 11 U.S.C. §§ 726, 1129(b)); *Id.* at 176 (stating that "[s]hould a plan give creditors more than the law allows, the plan cannot be confirmed.").

[85]   *Protective Comm. for Indep. Stockholders of In re TMT Trailer Ferry, Inc.*, 390 U.S. 414, 424-25 (1968) (a settlement presented for approval as part of a plan may only be approved if it meets the requirements of § 1129 of the Bankruptcy Code); *In re Iridium Operating LLC*, 478 F.3d 452, 461-62 (2d Cir. 2007) (a pre-plan settlement under Rule 9019 must comply with the requirements of the Bankruptcy Code, including the requirement of § 1129(b), which limits creditor recoveries to the value of their claims); *In re Chemtura Corp.*, 439 B.R. at 592, 595-96 (finding that a settlement must comply with § 1129(b)'s prohibition on paying "creditors more than full compensation for their allowed claims.").

[86]   *In re Forklift LP*, 363 B.R. at 394 ("When multiple interpretations of a plan are possible, courts should favor an interpretation that is consistent with the Bankruptcy Code over one that contravenes it.").

[87]   Indeed, none of Plaintiffs' "consent" cases involved consent to an agreement which permitted creditors to recover more than the value of their claims; each of the courts referencing consent in their "benefit" analysis properly considered whether the potential recovery would exceed the value of creditor claims; and, in addition, none of the courts found a "benefit" based on consent alone. *See, e.g., In re Sheffield*, 320 B.R. 423, 447-48 (Bankr. N.D. Okla. 2004) (finding a benefit to the estate where, in exchange for the ability to indirectly benefit from a portion of a $19.3 million avoidance recovery, a secured lender not only consented to the plan, but also agreed to:  (i) reduce its claims from approximately $110 million to

28.    Plaintiffs' further reliance on the "benefit" to creditors resulting from the transfer to them of avoidance proceeds also fails to satisfy their § 550(a) burden. Plaintiffs suggest that the "benefit" conferred on creditors when potential litigation proceeds are transferred to them under a plan (as so regularly occurs in chapter 11) (i) *de facto* satisfies the requirements of § 550(a); (ii) relieves the Court of any need to determine whether an actual benefit will result from the *recovery* (as opposed to the *settlement*) because such "benefit" can merely be inferred from the assignment of the potential proceeds to the creditors under the plan; and (iii) permits the litigation trustee to seek an unlimited recovery without regard to whether the beneficiary creditors have any unpaid claims because it is enough that the potential recovery was transferred to them under a plan. If this circular position were the law, every beneficiary of an avoidance action could discharge its § 550(a) burden by simply showing that it is the beneficiary of the avoidance recovery. Plaintiffs' position not only renders § 550(a) meaningless, it begs the question of *how* the estates will benefit from a recovery.[88]

---

$30 million, (ii) permit a portion of its collateral to be used to cover the costs of the avoidance litigation, and (iii) allow unsecured creditors to recover $1.5 million in cash); *Mellon Bank, N.A., v. Dick Corp.*, 351 F.3d 290, 293 (7th Cir. 2003) (finding a benefit to the estate where, in exchange for the right to receive the first $30 million of any avoidance recovery, a secured creditor, whose debt exceeded the potential avoidance recovery, not only consented to the plan, but also (i) forbeared from exercising its foreclosure remedies, (ii) permitted a sale of the debtor's encumbered assets (which sale resulted in a distribution to unsecured creditors), and (iii) provided postpetition financing). Neither such case involved the court's finding of a "benefit to the estate" based on consent alone (let alone consent to an agreement that violated the Code), and both courts found a benefit only after concluding that the avoidance recovery would not exceed the value of creditor claims. Similarly, in *Kipperman*, 411 B.R. at 874-76, the court found that a $20-$25 million avoidance recovery would not exceed an estimated $56.6 million in creditor claims.

Further, all of Plaintiffs' "consent" cases are distinguishable on the ground that none of them involved consent to a settlement which expressly reserved the defendant's § 550(a) rights. If, as Plaintiffs suggest, it was creditor consent to the "prospect of recovery in this litigation that . . . resulted in a confirmable Plan for the benefit of the estate" (Motion at 14), it was not the prospect of an unlimited recovery which facilitated such confirmation because Defendants' right to cap such recoveries was expressly reserved in the Confirmation Order. Indeed, because creditors in this case consented to the Plan on the express understanding that Defendants intended to seek to limit their recoveries, such consent could not have been secured by the potential for an *unlimited* recovery.

[88]    Apart from being legally incorrect, Plaintiffs' position also violates the principle that an assignee (*i.e.*, the litigation trustee) cannot acquire greater rights than those held by the assignor (*i.e.*, the Debtor), who was very clearly subject to the limitations of § 550(a) at the time it transferred its rights in the Anadarko Litigation. *See Blue Planet Software, Inc. v. Games Int'l, LLC*, 334 F. Supp. 2d 425, 433 (S.D.N.Y. 2004) ("An assignee generally may not acquire more rights than were possessed by the assignor and 'simply stands in the shoes of the assignor.'") (quoting *Furlong v. Shalala*, 156 F.3d 384, 392 (2d Cir. 1998); 6 AM. JUR. 2d *Assignments* §§ 118, 145 (2008)). Plaintiffs may not eliminate the proscriptions of § 550(a) and thereby augment their rights by merely transferring an avoidance action under a plan.

29.    In short, neither the transfer of avoidance proceeds under a plan, nor consent to a Plan settlement which Plaintiffs are seeking to have interpreted in a manner that violates the Code, are sufficient to carry Plaintiffs' § 550(a) burden. Accordingly, Plaintiffs have not, and cannot, satisfy their burden of demonstrating that a recovery in excess of the value of any valid, unpaid class 4 and 5 claims will benefit their estates.[89]

30.    Moreover, none of the non-controlling cases on which Plaintiffs rely changes this conclusion. Indeed, none of Plaintiffs' cases supports their efforts to recover many times the value of their claims, and each of them presents facts entirely inapposite to those pending before the Court.[90] For example, in *Sheffield*,[91] the plan provided that: (i) 20% of any avoidance recovery would be distributed to general unsecured creditors; (ii) the remaining 80% of any recovery would be retained by the reorganized debtors; and (iii) 100% of the equity in the reorganized debtors would be distributed to secured noteholders. Defendants argued that the estates would not benefit from an avoidance recovery that exceeded the 20% allocated to general unsecured creditors.[92] In rejecting this argument, the court held that because the noteholders were to receive 100% of the reorganized debtors' equity and that equity value would be enhanced by the reorganized debtors' receipt of the other 80% of the avoidance recovery, the estate's noteholders would in fact benefit from such recovery.[93] In short, the court permitted the recovery because although general unsecured creditors would not benefit from a recovery

---

[89]    If indeed a plaintiff could rely on mere "consent" to a plan and the "transfer of proceeds" under that plan, the provisions of § 550(a) would be meaningless because, as in the instant case, Plaintiffs could seek an unlimited recovery without regard to whether there are *any* unpaid creditor claims (in contravention to *Adelphia*). Similarly, such a rule would permit a plaintiff to seek a trillion dollar recovery even though there is only one dollar in unpaid creditor claims. Section 550(a) prevents such anomalous results by prohibiting a recovery in excess of the amounts necessary to benefit the estate and requiring a plaintiff to affirmatively demonstrate how *all* of its requested recovery will benefit the estate.

[90]    *In re Sheffield Steel Corp.*, 320 B.R. 423 (Bankr. N.D. Okla. 2004); *Stalnaker v. DLC, Ltd.*, 376 F.3d 819 (8th Cir. 2004), *affirming In re DLC, Ltd.*, 295 B.R. 593 (B.A.P. 8th Cir. 2003); *In re Acequia*, 34 F.3d at 812; *MC Asset Recovery, LLC v. Southern Co.*, Civ. A. No. 1:06-CV-0417, 2006 WL 5112612 (N.D. Ga. 2006); *Kipperman*, 411 B.R. 805.

[91]    *Sheffield*, 320 B.R. at 446-48.

[92]    *Id.* at 446-47.

[93]    *Id.*

in excess of the 20% allocated to them, *other creditors of the estate* (*i.e.*, the noteholders)[94] would. Unlike in *Sheffield*, any recovery in this case that exceeds the value of tort and environmental claims will not benefit any other creditors *because the recovery will be distributed exclusively to them*. Moreover, *Sheffield* is unlike the pending case because the *Sheffield* plaintiff was not seeking to recover more than the value of creditor claims.

31.     As in *Sheffield*, the court in *Stalnaker* refused to limit the trustee's recovery to the value of unsecured claims, but only because there were additional administrative claimants who could also benefit from the recovery.[95] Unlike in *Stalnaker*, there are no other creditors in this case—administrative, unsecured or otherwise—who can benefit from a recovery that exceeds the value of class 4 and 5 claims. As such, *Stalnaker* is inapposite.

32.     Plaintiffs also mistakenly rely on the Ninth Circuit's *Acequia*[96] decision for the proposition that avoidances and recoveries may not be capped under §§ 544 and 550. Plaintiffs read too much into this case. *Acequia* holds only that § 544(b) itself imposes no limit on a trustee's right to invoke state law avoidance powers; it does not say that where state law itself limits avoidance to the amount of creditor claims, that this limitation is not enforceable in bankruptcy.[97] Indeed, unlike in the instant case, the *Acequia* defendant *conceded* that the transfer could be avoided entirely even though the value thereof exceeded the amount of all creditor claims.[98] In the instant case, Defendants do not concede as much because state law itself limits Plaintiffs' ability to avoid a transfer in any amount that

---

[94]     *Id.* at 447.

[95]     *Stalnaker v. DLC, Ltd.*, 376 F.3d at 823-24.

[96]     *Acequia*, 34 F.3d at 812.

[97]     *Id.* at 809.

[98]     *Id.* at 810.

exceeds creditor claims[99] and that limitation is enforceable in bankruptcy. Indeed, the Ninth Circuit's most recent reading of *Acequia* suggests precisely this result.[100]

33.    In *In re JTS Corp.*,[101] the plaintiffs sought to avoid a transfer under California's fraudulent transfer laws, as incorporated under § 544(b).[102] The defendant argued that, under state law, it was a good faith transferee and, as a consequence, the plaintiffs could only partially avoid the transfer to the extent of the difference in value between the transferred property and the consideration given by the defendant.[103] The plaintiff argued that state law limitations on avoidance were inapplicable to avoidance under § 544(b).[104] The Ninth Circuit disagreed with the plaintiff, concluding that state law limitations on avoidance are preserved under § 544(b) and therefore §§ 544(b) and 550(a) did not require full avoidance of the transfer.[105] Because Oklahoma law expressly limits avoidance "to the extent necessary to satisfy the creditor's claim",[106] the Ninth Circuit would likely recognize such limitation under its holding in *JTS*.

---

[99]    OKLA. STAT. ANN. tit. 24, § 119(A)(1).

[100]   While *Acequia* does also state, under § 550(a), that where a reorganized debtor may use an avoidance recovery to (i) "reimburse the bankruptcy estate for the costs of pursuing fraudulent conveyance litigation;" and (ii) "secure performance of [the reorganized debtor's] post-confirmation obligations," the recovery need not be capped at the value of unsecured claims, but may instead exceed the value of those claims as necessary to realize those additional benefits. *Id.* at 812. Unlike in *Acequia*, (a) Plaintiffs' estates have not retained an interest in any potential recovery; and (b) Plaintiffs are not seeking to use an excess recovery to satisfy the costs of prosecuting this litigation, but are instead seeking to utilize such excess recovery to pay creditors many times the value of their claims. Even if, however, Plaintiffs were seeking to utilize an excess recovery to pay the costs of prosecuting this litigation, the value of that additional benefit cannot possibly approximate the REDACTED recovery they are requesting. Accordingly, *Acequia* is also unavailing for this reason.

[101]   *In re JTS Corp.*, 617 F.3d 1102 (9th Cir. 2010).

[102]   *Id.* at 1107, 1109.

[103]   *Id.* at 1108.

[104]   *Id.* at 1110.

[105]   *Id.* at 1114-16.

[106]   OKLA. STAT. ANN. tit. 24, § 119(A)(1).

---

34.    Plaintiffs' reliance on *MC Asset Recovery*[107] is also misplaced.  In that case, the debtors distributed cash, avoidance proceeds and equity in the reorganized debtors to their creditors.[108] Following confirmation, the avoidance defendant argued that because the value of the equity distributed under the plan had increased by an amount sufficient to make creditors whole, the reorganized debtors could no longer pursue a recovery in excess of the value of unpaid creditor claims.[109]  The court rejected this argument on the ground that even if creditor claims had been paid in full as a result of post-confirmation increases in the debtors' stock price (which was disputed), because that post-confirmation stock price could likewise decrease on any given day and thereby result in creditors receiving less than a full recovery, the defendant could not limit the recovery on that basis alone.[110]  Accordingly, the court held that (i) the plaintiffs' ability to pursue an avoidance recovery should not depend on the happenstance of its fluctuating stock price on any given day; and (ii) because the recovery would benefit the estates by enhancing the value of the equity distributed to prepetition creditors, the reorganized debtors could pursue their recovery without regard to defendant's allegation that claims had been paid in full.[111]

35.    Unlike in *MC Asset Recovery*, in the instant case, (i) an avoidance recovery will not enhance Reorganized Tronox's equity value and thereby benefit the creditors to whom stock was distributed under the Plan because (a) if there is an avoidance recovery, it will not be distributed to Reorganized Tronox, and, in any event, (b) because class 4 and 5 creditors did not, and will not, receive

---

[107]    *MC Asset Recovery*, 2006 WL 5112612.

[108]    *Id.* at *1.

[109]    *Id.* at *2, 4.

[110]    In particular, the court agreed that the reorganized debtors' ability to pursue a recovery "should not depend on the fluctuation of the stock market" and disagreed with defendant's position that a recovery could not be pursued merely because the Plan distribution "exceeded the creditors' claims *at any point* following distribution of such stocks and warrants, even temporarily." *Id.* at *3 n.5 (emphasis in original).

[111]    *Id.* at *3, 7.

stock in Reorganized Tronox, they cannot benefit from Tronox's enhanced equity value; and additionally, (ii) Defendants are not arbitrarily seeking to limit Plaintiffs' recovery based on the happenstance of its post-confirmation stock price, but are instead seeking to liquidate a contingent asset (*i.e.*, the Anadarko Litigation) distributed under the Plan in accordance with the limitations of applicable law and their expressly reserved rights.[112]    Where, as here, the Plan provides that any avoidance recovery will be distributed solely to class 4 and 5 creditors, the estates cannot benefit in any manner other than by the payment of such creditors' claims.    Nothing in *MC Asset Recovery* provides otherwise and Plaintiffs' suggestion that the opinion sanctions their efforts to recover ten times the value of their claims is spurious.[113]

        36.    Plaintiffs' reliance on *Kipperman* is also misplaced.[114]    In *Kipperman*, creditors holding $56.6 million in claims were eligible to receive a $20-$25 million avoidance recovery even though creditors holding only $14.3 million in claims had affirmatively elected to opt-in to the pool of creditors to whom the recovery would be distributed.[115]    The court refused to limit the recovery to the value of the claims held by the opt-in creditors because *all* unsecured creditors could potentially benefit from the recovery,[116] if, for example, their disputed claims later became allowed and they then elected to

---

[112]    SOF at ¶¶ 6, 9.

[113]    While Plaintiffs also rely on *Matter of P.A. Bergner & Co.*, 140 F.3d 1111, 1118 (7th Cir. 1998), in support of their assertion that they may recover more than the value of their claims, that case holds nothing of the sort.    Rather, *Bergner* merely states that where a plan provides that creditors will receive 100% of the reorganized debtors' equity and that equity value will be enhanced by the reorganized debtors' receipt of the proceeds of an avoidance recovery, a "benefit to the estate" may be found.    In the instant case, the reorganized debtors have not retained an interest in the Anadarko Litigation and the case is therefore inapposite.

[114]    *Kipperman*, 411 B.R. 805.

[115]    *Id.* at 874-76.

[116]    *Id.* at 876.    While the *Kipperman* plaintiff sought to recover both a state law fraudulent transfer claim as well as a $600-plus million FDCPA claim, because the defendants' summary judgment motion addressed only plaintiff's state law claim, the court's § 550 analysis did not consider plaintiff's FDCPA claims.    *Id.*    Rather, the court merely noted that the plaintiff "may have difficulties proving" the FDCPA claims because they were based on transfers which the court had already largely dismissed.    *Id.* at 825-26.    The court's election to discount the FDCPA claims as baseless appears to have been well-founded as all $600-plus million of plaintiff's FDCPA and state law claims were ultimately settled for $9.25 million, resulting in a 28% recovery for creditors after payment of litigation costs and other fees.    *See* Motion to Approve

opt-in to the class of creditors to whom the recovery would be distributed.[117]  Unlike in this case, where the Plaintiffs are urging that they should be awarded a   REDACTED   windfall, the court in *Kipperman* was not faced with such facts.

   37. In short, *Sheffield, Stalnaker, Acequia, MC Asset Recovery* and *Kipperman* are readily distinguishable from the facts of this case, but even if they were not, none of them supports Plaintiffs' efforts to recover a REDACTED windfall.  Indeed, Plaintiffs point to no authority authorizing a recovery that massively exceeded the value of the estates' underlying claims.  In the instant case, it is obvious *from Plaintiffs' own claim estimates* that only a small fraction—*if any*—of their requested recovery can possibly be used to pay unsatisfied claims.  Permitting such an outcome would (i) contravene the provisions of the Oklahoma UFTA and (ii) eviscerate the purpose of the fraudulent transfer laws, which is to (a) restore creditors to the positions they were in before the transfers occurred[118] and (b) compensate them for any harm occasioned by the transfers.[119]  If Plaintiffs are successful in their avoidance action, creditors will be restored to their pre-transfer positions by full payment of their claims.  Nothing more is intended or permitted by the Bankruptcy Code and Plaintiffs' attempt to adulterate the statute by recovering a REDACTED windfall should be resoundingly rejected.

---

Settlement with IML and to Discharge Trustee Upon Completion of Settlement and Distribution to Trust Beneficiaries (Bankr. D. Del. March 23, 2011) [Case No. 03-11402, Dkt. No. 1799] at 5, Exh. D.

[117] *See* Debtors' Fifth Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Bankr. D. Del. Sept. 17, 2003) [Case No. 03-11402, Dkt. No. 478] at 29 ("Each holder of a Disputed Class 9 Claim . . . that becomes . . . an Allowed Class 9 Claim that desires to become a Trust Beneficiary shall make such election by causing the election to be included in the Final Order Allowing all or any portion of such Disputed Claims.").

[118] *See, e.g., In re Best Prods.*, 168 B.R. at 57; *ASARCO LLC*, 404 B.R. at 173.

[119] *In re Leneve*, 341 B.R. at 56 (stating that the purpose of both state and federal fraudulent transfer laws is to "preserve assets of the estate for the benefit of creditors.").

C. **Other Laws Prohibit Plaintiffs From Recovering More Than The Value of The Tort and Environmental Claims**

38. To determine the validity and enforceability of a claim in bankruptcy, § 502(b) directs the court to apply governing state or federal law.[120] If the claim is not enforceable under applicable non-bankruptcy law, it is not enforceable in bankruptcy.[121] As such, tort and environmental claims must be enforceable under applicable tort and environmental laws to be enforceable in bankruptcy. Correspondingly, if tort and environmental laws limit the value of a tort or environmental claim, that limitation is enforceable in bankruptcy. Because both tort and environmental laws affirmatively prohibit tort and environmental creditors from recovering more than the value of their claims, Plaintiffs are now prohibited from recovering the excess amounts they seek. Any contrary result would violate § 502(b) and the tort and environmental laws it incorporates.

i. **Tort Law Prevents The Tort Creditors From Recovering More Than The Value of Their Claims**

39. Tort laws limit the amount that tort creditors may recover to that which is necessary to remedy their harm.[122] Tort damages are not intended to place an injured party in a better position than that which it was in before the injury occurred,[123] nor are they intended to punish a

---

[120] *In re Sanford*, 979 F.2d 1511, 1513 (11th Cir. 1992) (holding that a court must analyze a claim under non-bankruptcy law in order to determine whether it is allowable under § 502(b)).

[121] *See id.* (holding that a claim is not "allowable" if it is not enforceable under applicable non-bankruptcy law); *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-52 (2007) (recognizing that "state law governs the substance of claims" and courts "generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed"); *In re Villarie*, 648 F.2d 810, 812 (2d Cir. 1981) (*per curiam*) (holding that a debt that was not enforceable under state law was not allowable in bankruptcy).

[122] *Harris v. Standard Accident & Ins. Co.*, 297 F.2d 627, 631 (2d Cir. 1961); *see also In re Sept. 11th Litig.*, 590 F. Supp. 2d 535, 543 (S.D.N.Y. 2008) ("When a party commits a tort that results in damage . . . the wronged party may recover damages for injuries which flow directly from that tort and are its natural and probable consequences."); *Weatherly v. Flournoy*, 929 P.2d 296, 300 (Okla. Civ. App. 1996) (quoting OKLA. STAT. ANN. tit. 23, § 61) (stating that "[t]he measure for damages, for which a tortfeasor may be liable, 'is the amount which will compensate for all detriment proximately caused thereby . . .'").

[123] *See Underwriters at Lloyd's London v. OSCA, Inc.*, No. 03-20398, 2006 WL 941794, at *11 (5th Cir. Apr. 12, 2006) (holding that tort damages should put the plaintiff in "as good a position as before . . . , but not a superior position") (quotation omitted); *Ohio Oil Co. v. Elliot*, 254 F.2d 832, 835 (10th Cir. 1958) ("The philosophy of the law is to fully and fairly compensate an injured person for his losses, not to place him in a better position than he would have held had it not been for the injury.").

tortfeasor for its actions[124]—particularly where, as here, this Court has disallowed punitive damages in this case.[125]  Rather, tort damages are intended to compensate an injured party for its harm.[126]  As such, an injured party is only permitted a single recovery measured by the harm suffered.[127]  Indeed, permitting any greater recovery would be "violative of the axiom that the law gives no more than full renumeration for damages sustained and [would] contradict[] . . . public policy."[128]

40.    The Plan provides that each Tort Claimant will receive, among other consideration, a *pro rata* share of 12% of any proceeds from this litigation in full and final satisfaction of its Claims.[129]  If the allocated share of proceeds ultimately exceeds the amount necessary to pay the Tort Claims in full, such excess will be distributed *pro rata* to the Tort Claimants.[130]  Despite the fact that tort law, as incorporated by § 502(b) of the Bankruptcy Code, expressly prohibits a recovery in excess of the value of the Tort Claims, Plaintiffs seek precisely this result.  A simple calculation illustrates this point.

41.    Plaintiffs' expert values all present and future Tort Claims as of November 28, 2005 at  REDACTED [131] (a figure Defendants believe is *highly* inflated).  As of December 31, 2010,

---

[124]    *See, e.g.*, *Connor v. Ulrich*, 153 F. Supp. 2d 199, 205 (E.D.N.Y. 2001) ("These damages are intended to fully compensate the plaintiff for those respective injuries, and an award of prejudgment interest under these circumstances would be punitive rather than compensatory.") (citations omitted).

[125]    *In re Tronox Inc.*, 429 B.R. 73, 111-12 (Bankr. S.D.N.Y. 2010) (dismissing Plaintiffs' punitive damage claim with prejudice).

[126]    *Harris*, 297 F.2d at 631 ("The purpose of tort damages is to compensate an injured person for a loss suffered and only for that.") (citations omitted).

[127]    *See, e.g.*, *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 208 (S.D.N.Y. 2001) ("The basic principle for awarding compensatory damages is that an injury can be compensated only once."); *see also* 25 C.J.S. *Damages* § 22 (2011) ("Plaintiff may . . . obtain only one recovery for his or her injury.") (citation omitted).

[128]    *Haws v. Luethje*, 503 P.2d 871, 876 (Okla. 1972).

[129]    SOF at ¶ 14.

[130]    Plan at 21-22, 27-29 (describing the treatment of Tort Claims under the Plan).

[131]    Martin Report at 30.

---

$17.6 million (plus certain unliquidated insurance assets), had been distributed on account of the Tort Claims.[132]  Thus, *based on Plaintiffs' own estimates*, tort creditors need only receive an additional REDACTED [133] to be fully compensated for their alleged injuries.   Nonetheless, Plaintiffs seek to recover *at least* REDACTED [134]—an amount that is *over five times* the value of the unpaid tort claims based on Plaintiffs' own overstated claim estimates.   Permitting the tort claimants to receive an approximately REDACTED dollar windfall[135] would (i) run afoul of the purpose of tort remedies (which is to compensate for plaintiffs' injuries); (ii) contravene the requirements of § 502(b) of the Bankruptcy Code which incorporates the limitations of applicable tort law; (iii) render § 550(a) of the Bankruptcy Code superfluous; (iv) improperly punish Defendants in contravention to the purpose of fraudulent conveyance laws and this Court's order disallowing punitive damages in this case;[136] and (v) directly contradict the proffers made by Plaintiffs in support of Plan confirmation wherein they stated that no creditor would receive more than a full recovery.[137]  For each and every one of the foregoing reasons, Plaintiffs should not be permitted to recover more than the value of the Tort Claims.

> ii.    **Environmental Law Prevents The Environmental Creditors From Recovering More Than The Value of Their Claims**

42.    Environmental law prohibits environmental creditors from recovering more than the value of their claims.   Liability for the Environmental Claims is governed primarily by CERCLA.   CERCLA imposes liability on (i) the current owner or operator of any facility, (ii) the former owner or operator of a facility if hazardous substances were disposed during its ownership or operation,

---

[132]    *See* SOF at ¶ 35.

[133]    This figure was calculated by subtracting REDACTED from REDACTED .

[134]    *See id.* at ¶ 40 (reflecting that Plaintiffs seek a recovery of approximately REDACTED).   Twelve percent of this requested recovery is REDACTED .

[135]    This figure was calculated by subtracting REDACTED from REDACTED

[136]    *See In re Tronox*, 429 B.R. at 111-12.

[137]    SOF at ¶ 37.

(iii) any person who arranged for the disposal of hazardous substances, and (iv) any person who accepted hazardous substances for transport for treatment or disposal (collectively, "potentially liable parties" or "PRPs").[138]  CERCLA is a remedial statute and a PRP may be liable under its provisions only for response costs which have been incurred by the government or a private party.[139]  Those amounts include:

> (A)     costs of removal or remedial action *incurred by* the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

> (B)     other necessary costs of response *incurred by* any other person consistent with the national contingency plan;

> (C)     damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

> (D)     costs of any health assessment or health effects study carried out under section 9604(i) of this title (collectively, the "Response Costs").[140]

43.     In accordance with this provision, a person may only be liable for Response Costs for which a person is a PRP.  Because Tronox may only be a PRP for sites associated with the Environmental Claims, the government has no basis for recovering any amounts that exceed the value of the Environmental Claims or are unrelated to the Environmental Claims.[141]  Rather, once the Environmental Claims are satisfied in full, CERCLA § 114(b) expressly prohibits a claimant—including the government—from any further recovery.[142]  This limitation on any CERCLA recovery is expressly intended to prohibit a person from "receiv[ing] a windfall from its environmental cleanup."[143]

---

[138]   42 U.S.C. § 9607(a); CERCLA § 107(a).

[139]   *Id.*

[140]   *Id.* (emphasis added).

[141]   *Id.*

[142]   42 U.S.C. § 9614(b); CERCLA § 114(b) ("Any person who receives compensation for removal costs or damages or claims pursuant to this chapter *shall be precluded from recovering compensation* for the same removal costs or damages or claims *pursuant to any other State or Federal law . . .*") (emphasis added); *Exxon Corp. v. Hunt*, 475 U.S. 355, 370 (1986)

44.     The Plan provides for the creation of multiple Environmental Response Trusts to conduct and fund environmental activities related to the sites underlying the Environmental Claims.[144] The trusts will receive, among other consideration, 88% of any proceeds from this litigation, which will be allocated among holders of Environmental Claims in full satisfaction of their claims.[145] Any funds remaining in the Environmental Response Trusts upon completion of environmental activities and reimbursement of costs will be distributed to the "Superfund" created by CERCLA.[146] Despite the fact that CERCLA §§ 107(a) and 114(b), as incorporated by § 502(b) of the Bankruptcy Code, expressly prohibit the recovery of amounts in excess of the Environmental Claims and the distribution of such excess amounts to Superfund, Plaintiffs seek precisely this result. A simple calculation illustrates this point.

45.     Plaintiffs' expert values the Environmental Claims between REDACTED to REDACTED [147] (figures which Defendants believe are *highly* inflated). Consideration in the amount of $394.3 million (plus certain insurance assets) has already been paid on account of the Environmental Claims.[148] Thus, according to Plaintiffs' own estimates, an additional REDACTED,[149] at the most, is all

---

("Congress has already banned double compensation in § 114(b) . . . ."); *Vine Street, LLC v. Keeling*, 460 F. Supp. 2d 728, 757 (E.D. Tex. 2006) ("Section 114(b) makes clear that a CERCLA plaintiff cannot recover the same response costs twice.") (citations omitted); *K.C. 1986 LP v. Reade Mfg.*, 472 F.3d 1009, 1017 (8th Cir. 2007) ("Importantly, CERCLA articulates a policy against double recovery."). In accordance with these authorities, once the Environmental Claims have been satisfied in full, CERCLA expressly prohibits the government from seeking an excess recovery (*i.e.*, a "double recovery") under its provisions or those of any other law.

[143]  *Lockheed Martin Corp. v. U.S.*, 664 F. Supp. 2d 14, 19 (D.D.C. 2009) (stating that § 114(b) prohibits a windfall recovery where: (1) the plaintiff seeks to recover costs that it has already recovered as part of a settlement with another responsible party; (2) the plaintiff seeks to recover costs that it has already recovered under a state law equivalent of CERCLA; and (3) the *plaintiff seeks to recover costs that it has not actually incurred* because its insurer has paid for the costs directly) (emphasis added).

[144]  SOF at ¶ 15.

[145]  *Id.*

[146]  *Id.*

[147]  *Id.* at ¶ 30.

[148]  *Id.* at ¶ 33.

that is needed to fully satisfy the Environmental Claims. Despite this, Plaintiffs seek to recover *at least*

REDACTED    [150] on account of the Environmental Claims—an amount that is *over ten times* the

value of the unpaid Environmental Claims based on Plaintiffs' own overstated estimates.

      46.    CERCLA §§ 107(a) and 114(b) expressly prohibit Plaintiffs from recovering

more than 100% of the Response Costs, yet Plaintiffs seek to recover more than 1000% of such amount.

Because there is no basis under CERCLA or any other law for recovering *over ten times* the value of the

Environmental Claims, Plaintiffs should not be permitted to recover a REDACTED dollar windfall,[151]

nor to gratuitously fill the coffers of Superfund with that windfall. Rather, if Plaintiffs are successful in

their avoidance action, they may recover the amounts necessary to satisfy any valid, unpaid

Environmental Claims of a Plaintiff transferor's estate, but no more. Any contrary result would (i) run

afoul of CERCLA; (ii) contravene the requirements of § 502(b) of the Bankruptcy Code which

incorporates CERCLA; (iii) render § 550(a) of the Bankruptcy Code superfluous; (iv) improperly punish

Defendants in contravention to the purpose of fraudulent conveyance laws and this Court's order

disallowing punitive damages in this case;[152] and (v) directly contradict the proffers made by Plaintiffs

in support of Plan confirmation wherein they stated that no creditor would receive more than a full

recovery.[153] For each of the foregoing reasons, Plaintiffs should not be permitted to recover more than

the value of the Environmental Claims.[154]

---

[149]   This figure was calculated by subtracting REDACTED from REDACTED.

[150]   Eighty-eight percent of Plaintiffs' estimated REDACTED damages request equals REDACTED.

[151]   This figure is calculated by subtracting REDACTED from REDACTED.

[152]   *In re Tronox Inc.*, 429 B.R. at 111-12.

[153]   SOF at ¶ 37.

[154]   Like tort and environmental laws, the Federal Debt Collection Procedures Act (the "FDCPA") limits the government's recovery to the amounts "necessary to satisfy [a] *debt* to the United States" (28 U.S.C. § 3306(a) (emphasis added)), and prohibits such recovery from "exceed[ing] the judgment on a debt." *Id.* at § 3307(b). As such, the FDCPA does not permit the government to recover amounts that do not qualify as debts (*i.e.*, incurred costs) owed to it. *See id.* at § 3002(3)(B)

II.     **Nothing in the Plan or the Settlement Agreements Eliminates Plaintiffs' Burden of Complying with the "Benefit of the Estate" Requirement of Section 550(a) of the Bankruptcy Code**

47.     In seeking to avoid the limitations of §§ 544, 548 and 550(a) of the Bankruptcy Code, Plaintiffs assert various and inconsistent arguments, each of which fails to excuse them from demonstrating their entitlement to the    REDACTED    they seek to recover.

A.      **The Value of Tort And Environmental Claims Has Not Been Determined For Any Purpose in This Adversary Proceeding, Including § 550(a), But Even if it Had Been, Plaintiffs Are Judicially and Equitably Estopped From Recovering More Than the Value of Such Claims**

48.     Plaintiffs assert that it is now impossible for tort and environmental creditors to recover more than the full value of their claims because the value of those claims has already been established by the value of the litigation recovery—whatever it may ultimately be—which they agreed to accept under the pertinent settlement agreements.[155]  As such, they urge that even if § 550(a) does cap recoveries at the allowed amount of unpaid creditor claims, those claims need not be valued as of the 2009 petition date or otherwise found to be valid for purposes of determining a claims cap because such claims have already been "Allowed" in the amount of any litigation recovery.[156]  Plaintiffs' assertion directly contravenes the Plan, the declarations they filed in support of the Plan, statements made by both them and this Court at the November 17, 2010 confirmation hearing and the Confirmation Order. Moreover, even if the value of the tort and environmental claims had already been "Allowed" in an amount that exceeds their actual value, Plaintiffs are nonetheless judicially and equitably estopped from recovering such excess value.

---

(stating that the term "debt" is defined as "an amount that is owing to the United States on account of a . . . recovery of a cost *incurred* by the United States . . .")  (emphasis added).  Just as tort and environmental laws prohibit Plaintiffs from recovering more than the value of their claims, the FDCPA likewise prohibits the government from recovering more than the value of its claims.  The happenstance of Plaintiffs' bankruptcy does not alter this result.

[155]    Motion at 16.

[156]    *Id.* at 16-19.

> **i.**    **The Value of Tort and Environmental Claims Has Not Been Determined by the Plan for any Purpose Bearing on This Adversary Proceeding**

49.    In connection with confirmation, Plaintiffs' CEO and chief financial advisor submitted two separate proffers—both of which were filed under penalty of perjury—which plainly state that neither the Plan nor the global settlement provides for any creditor to recover more than the value of its claims.[157]  These declarations were filed under 28 U.S.C. § 1746 and the Court expressly relied on them in approving at least three separate requirements for confirmation,[158] including particularly, § 1129(b).

50.    The Court also expressly referenced the Debtors' proffered position in its Confirmation Hearing comments.  In particular, the Court recognized that even though the Debtors' proffers stated their position that no creditor was being paid in full due to the large value of the Environmental Claims, Anadarko was not bound by that position and would be free to contest the value of those claims.  As explained by the Court: "the debtors' proffers state this position . . . [that creditors are not being paid in full]" "and the *debtors' position which is not binding or preclusive of any right of any other party **or definitely Anadarko**.  Debtors'* position that the environmental liabilities are so enormous that the debtors remain hopelessly insolvent as of today."[159]  Accordingly, Plaintiffs' newly minted position that the Plan and settlements permit them to recover more than the value of their claims and that Anadarko is precluded from contesting as much is contradicted (i) by their own proffers made

---

[157]    SOF at ¶ 37.

[158]    *Id.*; Confirmation Order at 27 (finding that the best interests requirement of § 1129(a)(7) was satisfied based on the "liquidation analysis attached . . . to the Disclosure Statement" (which analysis reflects that creditors are not being paid in full) "and the other evidence related thereto in support of the Plan that was proffered or adduced at or prior to, or *in declarations* in connection with, the Confirmation Hearing"); *id.* at 29 (finding that the feasibility requirement of § 1129(a)(11) was satisfied based on "[t]he evidence supporting the Plan proffered or adduced by Tronox at, or prior to, *or in declarations* filed in connection with, the Confirmation Hearing"); *id.* at 30 (finding that the Plan satisfied the "fair and equitable" requirement of § 1129(b), including the absolute priority rule, based on "[t]he evidence supporting the Plan proffered or adduced by Tronox at, or prior to, *or in declarations* filed in connection with, the Confirmation Hearing") (emphasis added); *see also* Confirmation Order at 31 (stating that "[b]ased upon . . . all evidence and arguments made, *proffered or adduced* at the Confirmation Hearing, the Plan satisfies the requirements for confirmation . . .").

[159]    SOF at ¶ 32.

---

in support of the very agreements which purport to allow them to recover more than in full; and (ii) by the Court's own statements concerning Anadarko's ability to contest the value of any claims paid under the Plan.

51.    Moreover, Defendants objected on multiple grounds to the Plan (including certain specific Plan Documents).[160] In particular, Defendants objected to the Plan on the ground that:

> Because section 550 of the Bankruptcy Code permits recovery of only those amounts that will accrue for the 'benefit of the estate,' the Debtors should not be allowed to increase their recovery in the Adversary Proceeding by paying obligations under the Plan that are unrelated to Tronox's liabilities and that do not 'benefit the estate.'
>
> . . .
>
> Section 550(a) of the Bankruptcy Code governs the remedies available to the Debtors if they prevail in their fraudulent conveyance action against Anadarko. Pursuant to that provision, the Debtors cannot recover more than the amount that will accrue for the 'benefit of the estate'. As such, any calculation of damages against Anadarko in the Anadarko Litigation must be limited only to those amounts necessary to 'benefit the estate' irrespective of the fact that the Debtors now seek to permit payments to be used by the Superfund for sites that are entirely unrelated to Tronox's obligations. *Anadarko hereby objects to the extent the Plan is intended to circumvent the limitations of section 550(a) of the Bankruptcy Code by increasing the measure of damages otherwise applicable to the Anadarko Litigation.*[161]

52.    Similarly, in accordance with the public notice and comment process contemplated by applicable environmental laws, Defendants submitted comments to the environmental settlement stating that they:

> reserve their rights to assert all available arguments, claims or defenses concerning the Proposed Settlement, including, but not limited to, all available arguments, claims or defenses concerning the effect, if any of the Proposed Settlement on [them]. In particular, [Defendants] specifically reserve the right to assert all available arguments, and assert

---

[160]    SOF at ¶ 4, 10.

[161]    Plan Obj. at 3, 22 (emphasis added). Defendants also objected to the Tort Claims Distribution Procedures on the ground that: (i) they "appear to be a deliberate attempt to inflate . . . toxic tort liabilities in connection with the Anadarko Litigation"; (ii) "the Scheduled Values appear to be substantially higher than amounts typically paid for such types of claims"; and (iii) "[t]he Tort Claim Procedures do not provide adequate direction for the Tort Claims Trustee to evaluate the eligibility of Holders of Tort Claims." Plan Obj. at 29-30.

all available claims and defenses concerning the effect, if any, of the Proposed Settlement on the determination of liability or measure of damages (including . . . the value of the claims being resolved pursuant to the Proposed Settlement) in the Anadarko Litigation, *including under Section 550 of the Bankruptcy Code.*[162]

53.    After lengthy negotiations, each of these (and multiple other) objections were consensually and cooperatively resolved by the inclusion of modifying language in the various controlling documents as well as announcements and statements made at the hearings approving same. Indeed, the confirmation order unambiguously states, "All parties reserve the right to make any available arguments, and assert any available claims and available defenses concerning the effect, if any, of the Plan Documents on the determination of liability or measure of damages (*including*, to the extent relevant, *the value of the Tort Claims and the Environmental Claims*) in the Anadarko Litigation, *including under section 550 of the Bankruptcy Code.*"[163] The Plan also provides that "*Nothing herein or in any documents executed in connection herewith . . . shall prejudice the rights of . . . Anadarko . . . with respect to the Anadarko Litigation* . . . and any and all matters not expressly addressed herein . . ."[164]

54.    This language was negotiated in conjunction with confirmation of the Plan and as Plaintiffs' counsel described at the confirmation hearing:

> Let me just touch on Anadarko and where we are because we made an enormous amount of progress. . . . The last issue . . . relates to the governmental settlement and how that relates to the Anadarko litigation, and if the environmental settlement in any way precludes Anadarko from making any arguments in the Anadarko litigation, *which I don't believe it does*. . . . And one of the issues that's making this difficult is because the settlement, obviously, is settling the tort claims and the . . . environmental claims, but . . . *the amount of the liability that underlies those claims is such a big part of the Anadarko litigation that we're*

---

[162]    SOF at ¶ 7; *In re Tronox Incorporated, et al.*, D.J. Ref. 90-11-3-09688, Comments on the Notice of Lodging of Consent Decree and Environmental Settlement Under Comprehensive Environmental Response, Compensation and Liability Act, and the Resource Conservation and Recovery Act at 2 (emphasis added).

[163]    Confirmation Order at ¶191 (emphasis added).

[164]    Plan at 29 n.4 (emphasis added).

*trying to figure out a way to actually state that Anadarko's not actually
objecting to those claims that have been settled, <u>but that they do have the
right to, obviously, contest whether there's liability on any of the sites or
with respect to any of the tort claims when they get to the Anadarko
litigation on liability and damages</u>.*[165]

55.    Plaintiffs' counsel then went on to explain that:

when the litigation [comes] before Your Honor, and Anadarko steps up
to say, Your Honor, these sites, you know, wherever they may be, we
don't believe that . . . Tronox had any liability for them, despite agreeing
to a settlement for them, and we don't think we have any liability for
them.  They want to be able to make those arguments.  And I think the
government is okay with that and realizes those are the types of
arguments that are going to be made.[166]

These statements were made by the very same counsel who is now urging that Anadarko has no right to

seek a damages determination relating to the validity and value of the claims as of the 2009 petition date

because such issues have already been pre-determined by the Plan and settlement agreements.  Plaintiffs'

assertion is not only disingenuous, it is flatly contravened by their own representations to this Court.

56.    In short, Plaintiffs' position that tort and environmental creditors may now

recover more than the value of their claims and that Defendants are not at liberty to challenge the

validity and value of those claims is flatly contradicted by the proffers they made in support of the Plan,

this Court's expressly articulated understanding of Defendants' rights, the Confirmation Order and

Plaintiffs' own statements made to this Court.

ii.    **Plaintiffs Are Judicially and Equitably Estopped From Recovering
More Than the Value of Tort and Environmental Claims and From
Precluding Defendants From Adjudicating the Value of Such Claims**

57.    Even if the Bankruptcy Code, Oklahoma law and every other applicable law—

tort, environmental and FDCPA—did not prohibit Plaintiffs from recovering more than the value of

their claims, the judicial estoppel doctrine does.  "Judicial estoppel lies when a party, after assuming a

---

[165]    11/17/10 Hr'g Tr. at 18-19 (emphasis added).

[166]    *Id.* at 20-21.

certain legal position in a proceeding, attempts to assume a contrary position."[167]  The judicial estoppel doctrine serves two objectives to:  (i) preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions; and (ii) protect judicial integrity by avoiding the risk of inconsistent results in two proceedings.[168]  Application of the doctrine requires only two showings:  that a party advanced an inconsistent position in a prior proceeding and that the inconsistent position was adopted by the court in some manner.[169]

58.    These two requirements are readily satisfied in the instant case.  In particular, Plaintiffs advanced at least three separate positions in a prior proceeding (*i.e.*, the main bankruptcy case) that are inconsistent with the positions they are now advancing in this Adversary Proceeding.[170]  First, Plaintiffs currently assert that they may recover more than the value of their claims because they bargained for such excess value.[171]  Second, Plaintiffs alternatively assert that because the Plan has "Allowed" tort and environmental claims at the value of whatever any recovery in this litigation turns out to be, the value of such recovery can never exceed the value of tort and environmental claims no matter how large Plaintiffs' recovery.[172]  Third, Plaintiffs presently assert that Defendants are now precluded from seeking to adjudicate the validity and value of tort and environmental claims for purposes of applying § 550(a) because their validity and value have already been determined by the

---

[167]  *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 57 (S.D.N.Y. 1999).

[168]  *Bates v. Long Island RR Co.*, 997 F.2d 1028, 1037-38 (2d Cir. 1993).

[169]  *Kunica*, 233 B.R. at 57.

[170]  *See, e.g., In re CCT Commc'ns, Inc.*, 420 B.R. 160, 169 (Bankr. S.D.N.Y. 2009) (stating that judicial estoppel applies where a person has previously taken a position in the main bankruptcy case that is inconsistent with a position later taken in an adversary proceeding); *Breeden v. Kirkpatrick & Lockhart, LLP*, 268 B.R. 704, 711 n.5 (S.D.N.Y. 2001), *aff'd* 336 F.2d 94 (2d Cir. 2003) (applying judicial estoppel where the trustee took a position in a prior contested matter that was inconsistent with a position later taken in another contested matter).

[171]  Motion at 19-20.

[172]  *Id*. at 17-19.

Plan.[173]  Each of these positions is inconsistent with those previously taken by Plaintiffs in the main bankruptcy case.

59.    In particular, Plaintiffs' current position that tort and environmental creditors may recover more than the value of their claims is facially inconsistent with their declarations that no creditor would be paid more than in full under the Plan.[174]

60.    In addition, Plaintiffs' current position that the Plan has "Allowed" tort and environmental claims at the value of whatever any recovery in this litigation turns out to be, is facially inconsistent with the terms of the tort and environmental settlements, neither of which provide for the "Allowance" of a claim based upon whether, or to what extent, there is a recovery in this litigation.[175] Rather, the validity and value of tort and environmental claims are determined by processes designed to determine the merits of such claims, not the merits of this litigation.[176]  Indeed, Plaintiffs have themselves assessed the validity and value of tort and environmental claims at REDACTED without

---

[173]    *Id.*

[174]    SOF at ¶ 37.

[175]    The Tort Claims Trust Distribution Procedures provide that a claim will be "Allowed" once it is (a) liquidated in the chapter 11 cases and "Allowed" by Final Order of the Court or (b) liquidated pursuant to the trust distribution procedures which require the filing of a Trust Claim Form, a review and assessment by the trustee of the value and validity of the claim, and if such trustee's assessment is disputed by the claimant, then there will be a private review process, arbitration and/or adjudication in the tort system. *See* Tort Claims Trust Distribution Procedures Art. II "Allowance of Claims" and Art. III "Liquidation and Allowance (Disallowance)." Moreover, the Confirmation Order provides that all Tort Claims are "deemed objected to and shall be channeled to the Tort Claims Trust for allowance or disallowance in accordance with the Tort Claims Trust Distribution Procedures." Confirmation Order at ¶184. The environmental settlement, similarly provides that the trustees will submit budgets reflecting the costs of environmental activities required for a site covered by the trust, the designated "Lead Agency" will approve or disapprove the budget after consultation with other agencies, and all requests for funds will be made in accordance with the approved budget and will certify that the funds will be used only for Environmental Actions. *See, e.g.,* the Multistate Environmental Response Trust at 18, 21. Upon completion of all environmental activities at sites covered by a particular trust, any remaining funds may be distributed to other trusts so that they may perform environmental activities at other owned and non-owned Tronox sites. Plan at 26. Upon completion of all such activities, any remaining funds will be distributed as a charitable contribution to Superfund. *Id.*

[176]    *See id*; Tort Claims Trust Distribution Procedures Art. II "Allowance of Claims" and Art. III "Liquidation and Allowance (Disallowance)"; Confirmation Order at ¶ 184. Plaintiffs' position suggests the anomalous result that if there is no recovery in this action, then tort and environmental claims will be "Disallowed"—even though Plaintiffs have already distributed over REDACTED on account of those claims. Moreover, if in fact the value of creditor claims was to be determined by reference to the value of a potential litigation recovery, then Anadarko would not have had any rights left to reserve under § 550(a) and the reservation provisions of the Confirmation Order would have been superfluous from the outset. While Plaintiffs urge precisely this result, this was not the intent of the parties in including such provision.

reference to any recovery herein.[177]    Because claim values are determined by the merits of the underlying claims and Plaintiffs have valued such claims at REDACTED their current position that they may now recover over REDACTED to satisfy such claims, is inconsistent with their confirmation hearing declarations stating that no creditor would recover more than in full.[178]

61.    Moreover, Plaintiffs' position that Defendants are precluded from seeking a determination concerning the value and validity of tort and environmental claims is inconsistent with (i) the Plan, which states that "Nothing [in the Plan] or in any documents executed in connection herewith . . . shall prejudice the rights of . . . Anadarko . . . ";[179] (ii) the Confirmation Order, which reserves Defendants' rights relating to the "*value of the Tort Claims and Environmental Claims . . . including under section 550 of the Bankruptcy Code*"[180]; and (iii) the positions taken by Plaintiffs at the confirmation hearing where they stated that: (x) "[nothing in the] environmental settlement in any way precludes Anadarko from making any arguments in the Anadarko litigation . . . [and Defendants] do have the right to, *obviously,* contest whether there's liability on any of the sites or with respect to any of the tort claims when they get to the Anadarko litigation . . ."[181]; and (y) "when the litigation [comes] before Your Honor, and Anadarko steps up to say, Your Honor, these sites, you know, wherever they may be, we don't believe that . . . Tronox had any liability for them . . . They want to be able to make those arguments. And . . . those are the types of arguments that are going to be made."[182]

62.    The second requirement for judicial estoppel—that Plaintiffs' prior positions must have been adopted by the court—is also readily satisfied. With respect to Plaintiffs' prior position

---

[177]    SOF at ¶¶ 24, 30.

[178]    *Id.* at ¶ 37.

[179]    Plan at 29 n.4.

[180]    Confirmation Order at ¶191 (emphasis added).

[181]    11/17/10 Hr'g Tr. at 19:5-7; 19:19-22 (emphasis added).

[182]    *Id.* at 20:25-21:8.

that "no class of creditors is recovering more than in full under the Plan,"[183] the Court entered a Confirmation Order which expressly relied on that representation in finding that the Plan met the requirements of § 1129, including § 1129(b).[184]   As one Delaware bankruptcy court has held, where a debtor has filed a memorandum of law stating that the plan complies with the requirements of § 1129 by providing for the full payment of all administrative claims, the debtor will be judicially estopped from later seeking to construe the Plan in a manner that results in less than full payment of an administrative claim.[185]

63.    With respect to Plaintiffs' prior position that Defendants retained the post-confirmation right to contest the value and validity of creditor claims, the Court not only confirmed a Plan that included a reservation of Defendants' rights, the Court also stated at the confirmation hearing that even though the Debtors believed their Environmental Claims were so large as to preclude creditors from recovering in full under the Plan, their position concerning the value of those claims was not binding on Anadarko and did not preclude Anadarko from taking a contrary position.[186]   Accordingly, the second requirement for judicial estoppel is satisfied with respect to all of Plaintiffs' prior positions.

64.    Consistent with the Second Circuit's admonition that "[j]udicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits",[187] the doctrine prevents Plaintiffs from doing precisely that.  As further explained by the bankruptcy court in *Kipperman*—the

---

[183]    SOF at ¶ 37.

[184]    *Id.*; n.41 *supra.*

[185]    *In re Forklift LP*, 363 B.R. at 394 (holding that plaintiff would be judicially estopped from arguing that a plan provision should be interpreted to contravene § 1129's requirement that all administrative claims be paid in full).

[186]    SOF at ¶¶ 6, 32; 11/17/10 Hr'g Tr. at 72:19-23 (stating "the debtors' position which is obviously not binding or preclusive of any right of any other party or definitely Anadarko.  Debtors' position that the environmental liabilities are so enormous that the debtors remain hopelessly insolvent as of today.").

[187]    *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000).

case on which Plaintiffs so heavily rely—the "integrity of the plan" would be "impact[ed]" by plaintiff's asserted [post-confirmation] right to a "600 million dollar recovery *or a[ny] recovery significantly in excess of the dollar amount of the claims of the beneficiaries of the liquidation trust.*"[188] In accordance with these concerns, this Court should apply judicial estoppel to protect the "integrity of the Plan" and the process by which it came to be confirmed.[189]

**B.    Denying Tort and Environmental Creditors More than the Value of Their Claims Will Neither Deny Them the "Benefit of Their Bargain" Nor Have A "Drastic Chilling Effect" on Future Reorganizations, But Will Instead Appropriately Result in Compliance With Bankruptcy, Oklahoma, Tort, Environmental and Other Laws**

65.    Plaintiffs alternatively urge that even if § 550(a) does cap damages at the actual value of creditor claims, such cap should not apply in the instant case because tort and environmental creditors bargained for more than the value of their claims pursuant to the Court-approved settlements and any *ex post* order denying such an excess recovery will (i) deprive them of the "benefit of their bargain" and (ii) have a "dramatic chilling effect" on future reorganizations.  Both such claims are specious.

66.    First, the record in this case is clear: all of Defendants' rights were repeatedly reserved and all parties recognized as much.  As Black's aptly describes, "the reservation of a point of law is the act of the . . . court in setting it aside for future consideration. . ."[190]  This was precisely what

---

[188]    4/13/07 Hr'g Tr. [D. Del. Case No. 03-11402 Dkt. No. 1767], at 33:25-34:4 (stating that the court was "troubled by the effect that the 600 million dollar recovery or a recovery significantly in excess of the dollar amount of the claims of the beneficiaries of the liquidation trust [would have] . . . [and that such recovery] would impact the integrity of the plan.").

[189]    Plaintiffs should also be equitably estopped from asserting the positions they are now taking. Unlike judicial estoppel, which is designed to protect judicial integrity, equitable estoppel is designed "to ensure fairness in the relationship between parties." *Bates v. Long Island RR*, 997 F.2d at 1037 (citing *Konstandinidis v. Chen*, 626 F.2d 933, 937 (D.D.C. 1980)). In reliance on (i) the reservation of rights included in the Confirmation Order; (ii) Plaintiffs' representations in open court concerning the reserved nature of Defendants' rights; and (iii) Plaintiffs' declarations, Defendants withdrew their Plan objections, agreed to defer the parties' disputes to a later day and allowed for the Plan's consensual confirmation. Given this, Plaintiffs should now be equitably estopped from urging that Defendants' reservation of rights is in fact meaningless, and that creditors may now recover **REDACTED** in excess of the value of their claims. *See, e.g., Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, (2d Cir. 2001) (stating that the doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct) (citing *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996)).

[190]    BLACK'S LAW DICTIONARY 1307 (6th ed. 1990).

was intended when Defendants agreed to settle and withdraw their manifold objections to the Plan in exchange for a reservation of rights. Had Defendants known that Plaintiffs would—less than nine months after the fact—take the position that a "reservation of rights" in fact means a "waiver of rights," Defendants surely would not have been so accommodating of the Plaintiffs' confirmation efforts.

67.    Moreover, while the government joins the Plaintiffs in suggesting (i) that they "bargained for" a recovery in excess of the value of environmental claims; (ii) that their "potential upside" was part of the deal; (iii) that denying them such an excess recovery would result in a "material change" to the settlement; and (iv) that any damage limitation would "rewrite [their] deal" and constitute a "back-end limitation" on the government's recovery,[191] these claims are entirely concocted. Although the government and Plaintiffs now feign outrage at the potential upset of their "bargain," they are—and have always been—abundantly aware of § 550(a)'s limitations on their alleged damages. This is because Defendants filed a Plan objection wherein they recounted in no uncertain terms the impropriety of the open-ended regime created by their proposal to distribute any excess recovery to Superfund and all of Defendants' rights related thereto were reserved.[192] Defendants also submitted "comments" pursuant to CERCLA's public notice and comment process wherein they reiterated that same objection under § 550 and again reserved all of their rights.[193]

68.    Further, the government itself stated in its motion to approve the environmental settlement that, "to the extent the Anadarko Defendants are concerned that any provisions regarding the cash payments or allocations in the Settlement Agreement will prejudice their rights in the Anadarko

---

[191]    Motion at 19; Joinder at 2-3.

[192]    Plan Obj. at 3, 21-22.; *see also id.* at 22 stating, "[t]he Plan should . . . be clarified to provide that (i) the Plan provision providing for payment of excess trust funds to the Superfund will not be construed to increase the measure of damages available under section 550 of the Bankruptcy Code and/or (ii) the Environmental Response Trust funds must be used solely to conduct and fund environmental activities related to the Environmental Trust Sites and the United Sates' claims against the Debtors."; Confirmation Order at ¶191.

[193]    SOF at ¶ 7.

Litigation, the Confirmation Order makes clear that [such rights are reserved]."[194]  Having procured this Court's approval of the settlement based on its acknowledgment of Anadarko's rights, the government now disclaims the existence of any such rights and contrives indignation at the potential "upset" of its "bargain".

69.    Similarly, Plaintiffs and the government's suggestion that an *ex post* order denying them the benefit of their bargain would have serious "policy implications" for future reorganizations is preposterous.  If, as Plaintiffs urge, the Court were to treat Defendants' reservation of rights as a waiver of rights, it would undermine any and all incentive a defendant would have to cooperate and accommodate debtors during the plan confirmation process.  Rather, parties such as Defendants would be compelled to litigate each and every one of their concerns at confirmation and thereby delay the debtor's emergence from chapter 11.  Such a result would not promote any bankruptcy "policy" condoned by Congress.  Accordingly, to the extent there are any "policy considerations," they favor Defendants, not Plaintiffs.

70.    Second, Plaintiffs' position that a settlement approved under Rule 9019 may override the limitations of § 550(a) and other laws flatly contravenes the most elementary of bankruptcy principles—namely, that a bankruptcy rule cannot abridge or modify a substantive right created by the Bankruptcy Code.[195]  Both the Supreme Court and the Second Circuit have expressly held that a Rule 9019 settlement approved as part of a plan must meet the requirements of the Bankruptcy Code, including the "fair and equitable" requirement, which limits creditors to the allowed amounts of their

---

[194]    *See* United States' Motion to Approve the Consent Decree and Environmental Settlement Agreement Among the Debtors, the Environmental Response Trust Trustees, the United States, and Certain State and Local Environmental Agencies [Main Case Dkt. No. 2692] at 24-25 (citing the reservation language included in ¶191 of the Confirmation Order).

[195]    *See* 28 U.S.C. § 2075 ("The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under title 11.  *Such rules shall not abridge, enlarge, or modify any substantive right . . .*") (emphasis added); Fed. R. Bankr. P. 1001 advisory comm. note (1983) ("[P]rocedural rules promulgated pursuant to 28 U.S.C. § 2075 [must] be consistent with the bankruptcy statute, both titles 11 and 28 U.S.C."); *In re Dow Corning Corp.*, 198 B.R. 214, 246 (E.D. Mich. 1996) ("Rule 9019, being merely a rule, can do no more than establish a procedural mechanism for exercising a statutory power.") (internal quotations omitted).

claims.[196]  Indeed, the Second Circuit has stated that "whether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement is "fair and equitable" under Rule 9019 . . . and will often be the dispositive factor."[197]  In accordance with these authorities, a Rule 9019 settlement may neither contain terms that contravene the substantive requirements of the Bankruptcy Code[198] nor permit creditors to recover more than the value of their claims.[199]  Accordingly, Plaintiffs' suggestion that the settlements approved in this case may create a right to recover amounts greater than those otherwise permitted by § 550(a) and other provisions of the Bankruptcy Code contravene directly controlling precedents.

71.    Third, for the reasons discussed above, even if the tort and environmental creditors "bargained for" an excess recovery, that bargain cannot override § 502(b), which incorporates applicable tort, environmental and other laws which limit creditor recoveries to the value of their respective claims.  Because the limitations of governing law cannot be "bargained away," Plaintiffs' argument fails.

72.    Fourth, as assignees of the Debtors' rights to any recovery in the Adversary Proceeding, class 4 and 5 creditors could not have received any greater rights than those to which their

---

[196]    *In re TMT Trailer Ferry*, 390 U.S. at 424-25 (a settlement presented for approval as part of a plan may only be approved if it meets the requirements of § 1129(b)); *In re Iridium Operating LLC*, 478 F.3d at 461-62 (a settlement under Rule 9019 must comply with § 1129(b)'s requirement that creditor recoveries be limited to the value of their claims and a court may not approve a settlement that contravenes this requirement); *see also In re Chemtura Corp.*, 439 B.R. at 595-96 ("if, as a premise of the Settlement . . . creditors were paid more than in full, any such settlement would fail under *Iridium* . . . [because] creditors simply can't be paid more than in full.").

[197]    *In re Iridium Operating LLC*, 478 F.3d at 464.

[198]    *See, e.g., In re SageCrest II, LLC*, Nos. 3:10cv978, 3:10cv979, 2011 WL 134893, at *4 n.2 (D. Conn. Jan. 14, 2011) (finding that where litigants had only challenged the conduct taken pursuant to the Rule 9019 settlement—not the settlement itself—the settlement did not "run afoul" of 28 U.S.C. § 2075 because the agreement itself was consistent with the substantive requirements of the Bankruptcy Code).

[199]    *In re TMT Trailer Ferry*, 390 U.S. at 424-25; *In re Iridium Operating LLC*, 478 F.3d at 464; *In re Chemtura Corp.*, 439 B.R. at 595-96.

assignors (the Debtors) were entitled.[200]  Because the Debtors were subject to the limitations of §§ 544, 548 and 550(a) at the time they assigned their rights in the Anadarko Litigation, class 4 and 5 creditors are now subject to those same limitations.  Indeed, the rights associated with an avoidance action may not be augmented—and the requirements of § 550(a) nullified—by merely assigning them under a chapter 11 plan.  As this Court commented at the confirmation hearing, "it would seem to me that the debtors' point would be that the company's rights, vis-à-vis that litigation, are now lodged in the plaintiffs . . . but subject to all of Anadarko's defenses, as if the debtors were still plaintiffs, or something like that."[201]  The Debtors' counsel agreed with the Court's statement.[202]

73.    Fifth, Plaintiffs' position that they may simply sit down to the negotiating table with select creditors and ink out a settlement that allows them to recover from Defendants more than the value of their claims is groundless.  Defendants' rights may not be eviscerated by an agreement in which they took no part and by which they are not bound.[203]  Allowing the liability of party A to be determined by negotiations between parties B and C, both of whom have an economic incentive to undermine A's rights, offends fundamental notions of equity and fairness.  Moreover, any such holding would encourage collusion among the debtor and select creditors.[204]

---

[200]    *See Blue Planet Software, Inc. v. Games*, 334 F. Supp. 2d at 433 ("An assignee generally may not acquire more rights than were possessed by the assignor and 'simply stands in the shoes of the assignor.'") (internal citations omitted).

[201]    11/17/10 Hr'g Tr. at 19:24-20:4.

[202]    *Id.*

[203]    *Cf. E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."); *Greenwich Life Settlements, Inc. v. ViaSource Funding Grp., LLC*, 742 F. Supp. 2d 446, 454-55 (S.D.N.Y. 2010) (noting that *res judicata* under a settlement agreement does not bind a party who was not a party to the lawsuit or in privity with a party to the lawsuit); *In re Macmillan*, 204 B.R. 378, 402 (Bankr. S.D.N.Y. 1997) ("No liability is placed upon a stranger to an agreement . . . ."); *Rapid Settlements, Ltd. v. Green*, 294 S.W.3d 701, 707 (Tex. App. 2009) (holding that structured settlement obligee was not bound by arbitration award directing it to make structured settlement payments to a third party where obligee was not party to the arbitration agreement); *Transamerica Occidental Life Ins. Co. v. Rapid Settlements, Ltd.*, 284 S.W.3d 385, 393 (Tex. App. 2008) (holding that a nonparty to an arbitration agreement is not bound by the agreement, an arbitration award against it, or a court's judgment confirming the award).

[204]    *See, e.g., In re Iridium Operating LLC*, 478 F.3d at 464 (holding that courts should be cognizant of the risks of improper collusion in settlements).

74.    For all of the foregoing reasons, this Court should apply §§ 544, 548, 550(a) of the Bankruptcy Code—as well as principles of Oklahoma, tort, environmental and other laws—to limit any damages to the amount of valid, unpaid tort and environmental claims of any Plaintiff transferor's estate without regard to any purported "bargain" among Plaintiffs and their creditors.

### C.    Defendants Are Not Seeking an After-the-Fact Determination of the Value of "Plan Consideration", They Are Seeking to Liquidate the Contingent Asset That Was the Plan Consideration

75.    Plaintiffs and the government also seek to avoid the limitations of section 550(a) by arguing that the "benefit" resulting from the distribution of an avoidance recovery to unsecured creditors must be measured by the value of the consideration payable to them on the confirmation date, not some subsequent date when the litigation recovery is actually liquidated.[205] Plaintiffs and the government improperly conflate the concepts of valuing "plan consideration" (*i.e.*, assets of the estate) with claims (*i.e.*, liabilities of the estate) that will be paid with that consideration.  In the instant case, the Anadarko Litigation (a contingent asset of the estate) was never valued for purposes of determining the confirmability of the Plan under § 1129.[206]  Even so, the claims that were to be paid with any recovery from that asset (*i.e.*, the tort and environmental claims) were valued in a very rough and inexact fashion.[207]    Defendants specifically objected to the claim valuations contained in the Disclosure Statement[208] and, in response, the Debtors agreed to provide that no person would be bound

---

[205]    Motion at 20-21; Joinder at 3-5.

[206]    *See* Defendants' Disclosure Statement Objection [Main Case Dkt. No. 1822] at 15 stating, "the Disclosure Statement contains no information regarding (i) the value Tronox expects to recover in the Anadarko Litigation or (ii) the costs associated with prosecuting any such recovery . . . Tronox should at least be required to disclose an expected range of recoveries in the Anadarko Litigation, as well as the amount and source of funding for the costs associated with prosecuting that litigation." Despite Defendants' objection, this supplemental disclosure was never made.

[207]    *See* Disclosure Statement at 11 indicating a large range of potential values for tort claims ($500 million to $1 billion) and environmental claims ($1.4 to $5.2 billion).

[208]    *See* Disclosure Statement Objection [Main Case Dkt. No. 1822] at 16 stating, "Creditors should also know the aggregate value of Class 5 claims.  In its current formulation, the Disclosure Statement indicates that the aggregate value is $1.4 to $5.2 billion.  This $3.8 billion range of values is so large as to effectively preclude creditors from evaluating the recovery to Class 5 claimants.  Accordingly, the Disclosure Statement should contain a more concrete estimate, or at least a substantially narrower estimate, of the aggregate value of Class 5 claims."

by such estimates.[209]    Accordingly, neither the Anadarko Litigation nor the claims to be satisfied with any proceeds of that litigation were valued at the time of confirmation.

76.    Despite this, Plaintiffs and the government now urge that because plan consideration (*i.e.*, the litigation) must be valued at the time of confirmation for purposes of § 1129, Defendants are now precluded from seeking to value tort and environmental claims under § 550(a) because such valuation may diminish the value of the contingent asset that was transferred on the confirmation date.  This, they assert, violates a "core bankruptcy principle" which requires measuring the value of "plan consideration . . . at the date of confirmation—not some later date."[210]  Contrary to this suggestion, Defendants are not seeking to value "plan consideration" (*i.e.*, the litigation claim itself), they are seeking to liquidate the contingent asset that was the plan consideration.    As Plaintiffs themselves recognize, a litigation claim is a "contingent asset" that may "ultimately prove[] to be worth more or less."[211]  The fact that Defendants are now asserting arguments under § 550(a) which may reduce the value of Plaintiffs' contingent asset does not violate a "core bankruptcy principle".    As with any fraudulent conveyance action, its value will depend on the strength and weaknesses of the underlying claims and defenses.  The fact that those strengths and weaknesses are being determined now rather than at the time of confirmation does not violate a "core bankruptcy principle" nor does it constitute an impermissible after-the-fact attempt to re-value plan consideration.    Rather, it merely suggests that the litigation is progressing and that § 550(a) imposes limitations on the amounts sought to be recovered by Plaintiffs.    Indeed, if Plaintiffs' position were correct, Defendants would not be

---

[209]    Disclosure Statement at 7 n.7; 11 at n.10.

[210]    Motion at 21.

[211]    *Id.*

permitted to assert any post-confirmation argument or defense that would diminish the value of the litigation claim as it stood on the confirmation date. Such a position is absurd.[212]

77.    Despite this, Plaintiffs seek to further their contention by citing two cases which merely state that:  (i) "for purposes of the absolute priority rule" plan assets must be valued "at the time of confirmation;"[213] and (ii) when stock is being distributed under a plan, the court must determine the value of the stock as of the confirmation date.[214]  These unremarkable holdings are entirely irrelevant to whether Plaintiffs' recovery is capped under § 550(a).  While Plan assets may be valued at the time of confirmation for purposes of the absolute priority rule, Defendants are not seeking to value plan assets or to apply the absolute priority rule.  Similarly, because Tronox stock was not distributed to class 4 and 5 creditors under the Plan, there is no need to assess the value of that stock as of the confirmation date or any other date.

78.    Plaintiffs and the government also urge that because the Court would "reject any request that it now scrutinize the current market values of Tronox's stock in order to determine, after the fact, whether the stock received by [creditors] . . . was 'too much' relative to their claim amounts", this Court should likewise reject Defendants' efforts to value tort and environmental claims in order to determine whether they received "too much" under the Plan.[215]  This analogy is inapposite.  Unlike stock—which is not a contingent asset that must be liquidated post-confirmation in order to ascertain its value—the Anadarko litigation is a contingent asset that must be liquidated post-confirmation in order to

---

[212]    The government devotes half of its five-page Joinder to arguing that Defendants should have, but did not, object at the time of confirmation to whether the plan consideration "would result in overpayment of the United States", whether "the Governments were receiving non-cash consideration with too great a value" and that Defendants' "current request, long after confirmation . . . to estimate the value of the creditors' claims" is now foreclosed.  Joinder at 3-5.  The government's arguments are subject to the same infirmities as Plaintiffs and also to the fact that:  (i) Defendants did in fact object to whether the plan consideration "would result in an overpayment to the United States" (*see* Plan Obj. at 3, 21-22); and (ii) Defendants did in fact object to the Debtors' failure to properly value creditor claims.  Disclosure Statement Obj. at 16.  Both objections were resolved by reservations of rights included in the Plan and Disclosure Statement.

[213]    Motion at 21 (citing *Kipperman*).

[214]    *Id.* (citing *In re Prince*, 85 F.3d 314, 321 (7th Cir. 1996)).

[215]    Joinder at 4; Motion at 21, 23.

---

ascertain its value. Tronox's stock had a fixed, definite and determinable confirmation date value. The Anadarko Litigation did not. Defendants' post-confirmation efforts to liquidate this contingent litigation asset in accordance with the limitations of Bankruptcy Code § 550(a) is not analogous to the post-confirmation valuation of a non-contingent asset such as stock.[216] Accordingly, Plaintiffs' and the government's arguments should be rejected out of hand and the limitations of § 550(a) enforced.

**D.    Determining The Extent And Nature of a "Benefit to The Estate" Turns On The Particular Facts And Circumstances of a Given Case, Not a Hypothesized Case**

79.    Plaintiffs also submit that because they could have confirmed an alternative plan which apportioned potential litigation proceeds to both general unsecured creditors as well as environmental and tort creditors and thereby increase the potential "benefit to the estate" resulting from an avoidance recovery, § 550(a) should not now preclude them from recovering the "full value" of their claims merely because they elected to confirm a Plan which does not provide for distributions to more claimants.[217] Their contention fails.

80.    First, the "benefit to the estate" analysis required by § 550(a) depends on the particular facts and circumstances of a given case,[218] not a hypothesized case with different facts and circumstances which could have been, might have been, but wasn't. Plaintiffs chose to confirm this Plan—a Plan in which Defendants had no input and did not influence—and Plaintiffs are now bound thereby.

81.    Second, even if Plaintiffs had confirmed a different plan which provided for the distribution of a potential avoidance recovery to a broader class of creditors, Plaintiffs' argument wrongly assumes that there would now be more unpaid claims to satisfy. This is not the case. As of the

---

[216]    The fact that Plaintiffs cite one non-controlling case which failed to grasp this rather elementary distinction is of no import. *See Kipperman*, 411 B.R. at 876 (failing to distinguish between contingent litigation claims requiring post-confirmation resolution and non-contingent stock interests distributed under a plan and finding it "helpful" to analogize the two entirely different forms of assets).

[217]    Motion at 22.

[218]    *Wellman*, 933 F.3d at 218; *In re Acequia*, 34 F.3d at 812; *Kipperman*, 411 B.R. at 876.

---

effective date, the Debtors had sufficient assets to satisfy all non-class 4 and 5 creditors in full, to place

more than REDACTED in the tort and environmental trusts[219] and to make a distribution to equity. Even

if the Plan consideration had been allocated and distributed differently, the unsatisfied deficiency claims

of unsecured creditors would be the same as they are today even though the particular mix of unpaid

creditors might be different. This is because the total plan consideration and the total claims against the

estate would be the same irrespective of how the plan consideration happened to have been allocated.

Moreover, this conclusion would not change even if the Plan consideration consisted entirely of equity

in the Reorganized Debtor because, even then, creditors would only be entitled to a 100% recovery on

their claims based on the value of the reorganized debtor's equity measured on the confirmation date.

Accordingly, the amount of the potential "benefit" accruing to the estates from an avoidance recovery

would largely be the same even if a different plan had been confirmed. Regardless, evaluating any

"benefit to the estate" accruing from a potential fraudulent conveyance recovery must turn on an

assessment of the confirmed Plan, not a hypothetical plan.

III.    **The States' Arguments Fail To Salvage Plaintiffs' Inability To Satisfy § 550(a)**

82.    Approximately 20 days after Plaintiffs filed the Motion, the State of Nevada

("Nevada") and other state, non-federal governmental and sovereign entities (collectively, the "Other

States" and together with Nevada, the "States") filed Statements[220] in support of the Motion. Like the

Motion and Joinder, however, the Statements fail to advance any basis for allowing Plaintiffs a REDACTED

REDACTED windfall.

83.    Nevada argues (i) that limiting damages to the actual value of Environmental

Claims would eliminate one of the benefits of the settlement, which was to avoid costly and lengthy

---

[219]    SOF at ¶ 36.

[220]    *See* Dkt. Nos. 263-64.

estimation hearings;[221] and further (ii) that Anadarko is now "estopped" from objecting to Nevada's "Allowed" claim because it failed to (a) dispute the consideration provided under the settlement; (b) contest "the fact that Anadarko would be precluded from objecting to Nevada's claim" and (c) request that the Court "hold estimation proceedings".[222]  The Other States further urge that (i) no damages cap can be read into the settlement because the language of the agreement provides for the Debtors' transfer of "*any* litigation recovery" and "*all* of their right[s] . . . in the Anadarko litigation";[223] (ii) the transfer of the Debtors' rights under the settlement satisfies the "benefit" requirements of § 550(a) and thereby warrants an unlimited recovery;[224] (iii) capping any recovery would deny the States their "bargained for" rights;[225] (iv) estimating environmental costs is difficult and estimates "routinely prove to be too low";[226] and (v) an uncapped recovery would "restore financial resources" that Tronox would have otherwise had.[227]  Each of these contentions fails.

84.     In urging that their illegal "bargain" should not be "upset", the States, like the government, ignore the documented record of this case and simply invent a new one.  In their fanciful world, Defendants did not:  (i) reserve their § 550 rights in the settlement order; (ii) object to the Plan on the ground that the settlement sought to evade the protections of § 550; (iii) object to the Debtors' failure to value environmental claims and the litigation itself; and (iv) submit "comments" to the settlement reserving their § 550 rights; nor did Plaintiffs submit proffers stating that no creditor would recover more than in full or explain in open court how the settlement would not prejudice Defendants' rights.  Contrary

---

[221]    Nevada Statement at 3.

[222]    *Id.* at 4.

[223]    State Statement at 2-3 (emphasis in original).

[224]    *Id.* at 3.

[225]    *Id.* at 3-4.

[226]    *Id.* at 3.

[227]    *Id.*

to this fantasy land, all of these things occurred and the record clearly reflects them. What the record does not reflect is that the States in fact bargained for a recovery in excess of the value of their claims. Indeed, the governing trust agreements seek to limit the States' recovery. For example, the Nevada Environmental Response Trust Agreement[228] provides that, after all environmental work is completed in Nevada, any funds remaining in Nevada trust accounts will be transferred: first, to environmental trust accounts held in another state; second, for the benefit of specified sites listed in the trust agreement; third, to certain non-owned sites requiring additional funding and fourth, as a charitable contribution to Superfund.[229] Accordingly, the States' claim that they "bargained for" an excess recovery is rebutted by the language of their own settlement documents.[230]

85.    The Other States' further contention that no damages cap can be read into the settlement because the language provides for the Debtors' transfer of "*any* litigation recovery" and "*all* of their right[s] . . . in the Anadarko litigation"[231] is senseless. The fact that "any and all" of the Debtors' rights were transferred does not mean that those rights were not subject to the limitations of § 550 both before and after the transfer. Moreover, the transfer of the Debtors' rights under the settlement does not satisfy the "benefit" requirements of § 550(a) nor warrant an unlimited recovery. Consent to an agreement that violates § 550(a) may not satisfy a litigant's § 550(a) burden, nor does such consent warrant an unlimited recovery. Additionally, the fact that estimating environmental claims may be "expensive and lengthy" or result in cost estimates that are "too low" is not a basis for ignoring bankruptcy, Oklahoma and a host of other applicable laws, not to mention Defendants' reserved rights.

---

[228]    Nevada Environmental Response Trust Agreement (Main Case Dkt. No. 2723).

[229]    *See id.* at section 2.4.3. Section 2.4.3 of the Environmental Response Trust Agreement (Multistate) also mirrors the terms of the Nevada Environmental Response Trust Agreement. *See* Main Case Dkt. No. 2723.

[230]    Moreover, as noted *supra*, even if the States had bargained for an excess recovery, such bargain cannot override the limitations of bankruptcy, Oklahoma, tort and environmental laws—all of which prohibit such excess recovery—nor can it override the fact that Plaintiffs, as assignees under the Plan, acquired their rights subject to the limitations of § 550(a).

[231]    State Statement at 2-3.

86.    Further, the contention that an uncapped recovery would "restore financial resources that Tronox would have had but for the fraud" is especially spurious.  Despite their fondness of assuming Plaintiffs' unproven "fraud" allegations, those allegations are (and will remain) unproven.  Even if, however, there were a "fraud", the only purpose of "restoring financial resources to the transferor" is to permit the transferor to remedy any harm to creditors resulting from the transfer, not to simply "restore financial resources" for the sake of restoring financial resources.

87.    Even more importantly, Tronox would not have had        REDACTED        in resources but for any "fraud".  The mere allegation highlights the speciousness of Plaintiffs' efforts to recover    REDACTED    in exploration and production ("E&P") assets despite the fact that Tronox is, and always has been, a *chemical company*.  The idea that Tronox paid Kerr-McGee roughly $800 million for its chemical business, and then became entitled to *all of the value of Kerr-McGee*—in excess of REDACTED REDACTED—as it existed on the date of the disposition is baseless.  If Tronox and its creditors are entitled to *all of the value of both the chemical and E&P assets*, then what would be left to pay the creditors of Kerr-McGee's much, much larger E&P business?  Nothing.  That is Plaintiffs' position.  They are entitled to *all of the assets* of Kerr-McGee (without any of the corresponding liabilities) as it stood in late 2005 (plus appreciation) even though all of Plaintiffs' creditors have already been paid in full or will be with the recovery of an additional    REDACTED    (by their inflated estimates).  Contrary to this position, Kerr-McGee would have never accepted a mere $800 million for all of its chemical and E&P assets and Tronox would never have existed—except as a standalone company *comprised exclusively of chemical assets*.  Accordingly, the States' suggestion that    REDACTED    in E&P assets must be returned to Tronox so as to "restore financial resources that Tronox would have had but for the fraud" is groundless.

88.    For all of the foregoing reasons, the States' contentions should be rejected and this Court should prevent recovery of Plaintiffs' requested windfall.

**IV.    The Tort Creditors' Arguments Fail To Salvage Plaintiffs' Inability To Satisfy § 550(a)**

89.    On September 26, 2011, the Tort Creditors filed the Tort Statement wherein they assert that Tort Claims are valued at "more than an estimated $2 billion in damages"; that absent a recovery in this litigation, they will recover less than 1% of the value of their claims; and that it would be "fundamentally unfair and contrary to the agreement reached among . . . stakeholders . . . to now limit [their] recovery to an amount that approximates the recovery received by other creditors [*i.e.*, 100%] that did not take the risks . . . [of receiving] a contingent asset."[232] The Tort Claimants' argument that "we bargained for more than a full recovery" fails for the same reasons as those of the Plaintiffs, the government and the States. Moreover, Tort Claims are not valued at $2 billion because even if there were proofs of claims in such amount, the Confirmation Order expressly provides that "[e]xcept for Tort Claims previously allowed by an order of this Court, all Tort Claims are deemed objected to and shall be channeled to the Tort Claims Trust for allowance or disallowance in accordance with the Tort Claims Trust Distribution Procedures."[233] Indeed, Plaintiffs themselves have estimated the value of all present and future Tort Claims as of November 28, 2005 at REDACTED .[234] This highly inflated number could not have materially increased (if at all) as of the petition date, and therefore the Tort Claimants' allegation that there are $2 billion worth of Tort Claims and that they will recover only 1% of the value of their claims absent a recovery herein is entirely unfounded. Finally, their contention that it would be unfair to permit them only a 100% recovery is baseless given that all laws prohibit a recovery in excess of such amount, and that the laws are intended to promote equality—not inequality—of distribution among creditors. Accordingly, the Tort Creditors' contentions should be rejected and this Court should prohibit recovery of Plaintiffs' requested windfall.

---

[232]    Tort Statement at 2-4.

[233]    SOF at ¶ 21; Confirmation Order at ¶184.

[234]    SOF at ¶ 24.

V.    **The Government Should Not be Paid Many Times the Value of Its Claims When It in Fact Bears Significant Responsibility for Those Claims**

90.    While the government characterizes the environmental settlement as being in exchange for "... the legacy of a century of pollution by Kerr-McGee Corporation and other predecessor companies,"[235] it fails to mention that much of the subject "pollution" was done *at its behest*.[236] For example, Tronox's Henderson facility was founded as a magnesium manufacturing complex constructed at the request of the federal government to support the Allied war effort during World War II.[237] Henderson, Nevada, which was then a barren patch of empty desert, was selected for development because of its proximity to Lake Mead for water, the Hoover Dam for power, and Gabbs, Nevada for magnesite deposits.[238] The complex eventually became the world's largest magnesium plant.[239] When demand for magnesium dropped, the plant was closed[240] and the Henderson complex was deeded to the State of Nevada as war surplus.[241]

91.    During approximately the same time period, the U.S. Navy owned an ammonium perchlorate producing plant, as well as other associated production equipment at Henderson.[242] The plant was later purchased by a predecessor to Kerr-McGee Chemical LLC (n/k/a Plaintiff Tronox LLC) and in 2000, Kerr-McGee Chemical initiated litigation against the government for

---

[235]    Joinder at 2.

[236]    The Nevada Joinder also conveniently omits this undisputable fact.

[237]    Basic Remediation Company Environmental Briefing for Kerr-McGee Chemical LLC (TRX-ENVTL 1706411-492) (hereinafter "Environmental Briefing"); The Basic Management Inc. Story, Basic Magnesium and Henderson, http://www.landwellco.com/index.php?option=com_content&view=article&id=67&Itemid=123 (*see* Exhibit D).

[238]    *Id.*

[239]    *Id.*

[240]    *Id.*

[241]    Environmental Briefing (TRX-ENVTL 1706413).

[242]    Tronox Inc., Quarterly Report (Form 10-Q) (Aug. 14, 2006) at 17-18.

its pollution of the Henderson site.[243]  The litigation was settled in 2006[244] with the government agreeing to (i) pay $20.5 million for perchlorate-related response costs and (ii) 21% of any future perchlorate costs incurred after January 1, 2011.[245]  Accordingly, the origin of environmental issues at the Henderson site rests squarely with the government itself.

92.    The same goes for many uranium mining sites.  As representative Waxman testified at a 2007 hearing on the Health and Environmental Impacts of Uranium Contamination in the Navajo Nation: "*The primary responsibility for this tragedy rests with the Federal Government*, which holds the Navajo lands in trust for the tribes.  Our Government leased the land for uranium mining, [and] purchased the uranium yellowcake produced from the mines to supply our nuclear weapons stockpile. . . . The Federal Government's responsibility dates back to the late 1940's when mining began under the Truman administration . . . It is the Federal Government's responsibility to see that this contamination is fully remediated [as] . . . [f]or many years, the U.S. Government was the sole customer for this uranium."[246]

93.    As these and many other examples demonstrate, the government is on very thin ground when it denounces a third party's alleged "century of pollution" and asserts the insufficiency of the hundreds of millions of dollars *being paid to it* to satisfy claims for which it bears significant responsibility.

---

[243]    *Id.*

[244]    *Id.*

[245]    *Id.*

[246]    *Environmental and Health Impact of Uranium Mining on Navajo Lands*, 110th Cong. (2007) (statement of representative Henry Waxman, Chairman, H. Oversight & Gov't Reform) (emphasis added).

## CONCLUSION

WHEREFORE, Defendants request that the Court grant the Cross-Motion, deny the Motion and grant any and all other relief which the Court deems just and appropriate.

Houston, Texas
Dated:  September 30, 2011

                                      _/s/ Lydia Protopapas_

| | |
|---|---|
| Richard A. Rothman (RR 0507) | Melanie Gray (*admitted pro hac vice*) |
| Bruce S. Meyer (BM 3506) | Lydia Protopapas (LP 8089) |
| Lori L. Pines (LP 3005) | Jason W. Billeck (*admitted pro hac vice*) |
| WEIL, GOTSHAL & MANGES LLP | WEIL, GOTSHAL & MANGES LLP |
| 767 Fifth Avenue | 700 Louisiana, Suite 1600 |
| New York, New York 10153 | Houston, Texas  77002 |
| Telephone:  (212) 310-8000 | Telephone:  (713) 546-5000 |
| Facsimile:  (212) 310-8007 | Facsimile:  (713) 224-9511 |
| | |
| Thomas R. Lotterman (*admitted pro hac vice*) | James J. Dragna (*admitted pro hac vice*) |
| Duke K. McCall, III (*admitted pro hac vice*) | BINGHAM MCCUTCHEN LLP |
| BINGHAM MCCUTCHEN LLP | 355 South Grand Avenue, Suite 4400 |
| 2020 K Street, NW | Los Angeles, California  90071 |
| Washington, DC 20006 | Telephone:  (213) 680-6400 |
| Telephone:  (202) 373-6000 | Facsimile:  (213) 680-6499 |
| Facsimile:  (202) 373-6001 | *Counsel to Defendants* |