Hearing Date: November 29, 2011 at 10:30 a.m. ET

KIRKLAND & ELLIS LLP
David J. Zott, P.C. *(admitted pro hac vice)*
Jeffrey J. Zeiger *(admitted pro hac vice)*
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel for the Anadarko Litigation Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, *et al.*, | ) | Case No. 09-10156 (ALG) |
| | ) | Jointly Administered |
| Reorganized Debtors. | ) | |
| | ) | |
| | ) | |
| TRONOX INCORPORATED, | ) | |
| TRONOX WORLDWIDE LLC | ) | |
| f/k/a Kerr-McGee Chemical Worldwide LLC, | ) | |
| and TRONOX LLC f/k/a Kerr-McGee | ) | |
| Chemical LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 09-01198 (ALG) |
| | ) | |
| ANADARKO PETROLEUM | ) | |
| CORPORATION *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

THE UNITED STATES OF AMERICA,                          )
                                                       )
                                                       )
                    Plaintiff-Intervenor,              )
                                                       )
                                                       )
         v.                                            )
                                                       )
                                                       )
TRONOX, INC.,                                          )
TRONOX WORLDWIDE LLC,                                  )
TRONOX LLC,                                            )
KERR-MCGEE CORPORATION, and                            )
ANADARKO PETROLEUM                                     )
CORPORATION,                                           )
                                                       )
                                                       )
                    Defendants.                        )
                                                       )

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING
<u>PLAINTIFF'S RECOVERY UNDER SECTION 550(a) OF THE BANKRUPTCY CODE</u>**

## TABLE OF CONTENTS

INTRODUCTION................................................................................................................1

I.    **Under § 550, Tronox's Ability To Recover The Value Of The Fraudulently Transferred Assets Is Not Capped.** .......................................................................3

    A.    Section 550 By Its Terms Does Not Cap Recovery At The Amount Of Creditors' Claims.......................................................................................4

    B.    Courts Uniformly Have Held That § 550 Does Not Cap Recoveries At The Amount Of Creditors' Claims...............................................................5

    C.    Recovery Of The Value Of The Fraudulently Transferred Oil And Gas Assets Easily Satisfies § 550(a)'s "Benefit Of The Estate" Requirement..............9

    D.    Defendants' New Theory Of Partial Avoidance Is Contrary To § 544(b)............11

    E.    Defendants' Arguments Based On Other Code Provisions Or State Law Misconstrue The Nature Of A Fraudulent Conveyance Action............................15

II.   **Defendants' "Windfall" Arguments Misunderstand The Nature And Purpose Of A Fraudulent Conveyance Action.**..........................................................17

III.  **By Operation Of The Plan, The Environmental And Tort Creditors' Claims Have Been Compromised, Released, And Allowed For The Agreed Plan Consideration.** ...........................................................................................24

    A.    Under The Plan And Global Settlement, The Environmental And Tort Creditors Exchanged Large But Unquantified Claims And Causes Of Action For A Potentially Large But Uncertain Recovery.....................................25

    B.    Defendants Seek To Rewrite The Confirmation Order And Plan To Deprive Creditors Of Their Bargain And Create An Irrational Agreement. .........26

    C.    The Parties Agreed Only To Reserve All Available Arguments About The Effect Of The Plan Documents, Not To Change Their Legal Effect....................28

IV.   **Defendants' Judicial Estoppel Argument is Wholly Without Merit.**.........................30

CONCLUSION ...................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80 (S.D.N.Y. 2008) ............................. 8

*ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009)........................... 9

*Coleman v. Cmty. Trust Bank*, 285 BR. 892 (Bankr. W.D. Va. 2002) ......................................... 14

*In re Acequia, Inc.*, 34 F.3d 800 (9th Cir. 1994)........................................................ passim

*In re Adelphia Recovery Trust*, 634 F.3d 678 (2d Cir. 2011) ....................................... 31, 34

*In re Board of Directors of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25 (Bankr. S.D.N.Y. 1999) .......... 8

*In re C.F. Foods, L.P.*, 265 B.R. 71 (Bankr. E.D. Pa. 2001) ....................................... 12

*In re Centennial Textiles, Inc.*, 220 B.R. 165 (Bankr. S.D.N.Y. 1998) ......................... 4

*In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991) ......................................... 23

*In re Coleman*, 426 F.3d 719 (4th Cir. 2005) ......................................... 14, 17

*In re Cybergenics Corp.*, 226 F.3d 237 (3d Cir. 2000)......................................... 12

*In re DLC, Ltd.*, 295 B.R. 593 (B.A.P. 8th Cir. 2003) ......................................... passim

*In re FBN Food Servs., Inc.*, 1995 WL 230958 (N.D. Ill. Apr. 17, 1995)......................... 5

*In re Forklift LP Corp.*, 363 B.R. 388 (Bankr. D. Del. 2007) ......................................... 29

*In re Foxmeyer Corp.*, 296 B.R. 327 (Bankr. D. Del. 2003) ......................................... 8

*In re Grove-Merritt*, 406 B.R. 778 (Bankr. S.D. Ohio 2009) ....................................... 4, 8

*In re Hill*, 342 B.R. 183 (Bankr. D. N.J. 2006)......................................... 4, 8

*In re JTS Corp.*, 617 F.3d 1102 (9th Cir. 2010)......................................... 4, 6, 7, 18

*In re Leonard*, 125 F.3d 543 (7th Cir. 1997) ......................................... 12

*In re Murphy*, 331 B.R. 107 (Bankr. S.D.N.Y. 2005)......................................... 13, 14

*In re Nowicki*, 202 B.R. 729 (Bankr. N.D. Ill. 1996)......................................... 8

*In re R.M.L., Inc.*, 92 F.3d 139 (3d Cir. 1996)......................................... 21

*In re Serrato*, 214 B.R. 219 (Bankr. N.D. Cal. 1997)......................................... 13

*In re Sheffield Steel Corp.*, 320 B.R. 423 (Bankr. N.D. Okla. 2004) ................................ 5, 7, 9

*In re Skyway Commc'ns Holding Corp.*, 389 B.R. 801 (Bankr. M.D. Fla. 2008) ...................... 16

*In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005) ........................................ 17

*In re Trans World Airlines*, 163 B.R. 964 (D. Del. 1994) .......................................... 15, 16

*Kipperman v. Onex Corp.*, 411 B.R. 805 (N.D. Ga. 2009) ........................................ passim

*Maitland v. Univ. of Minn.*, 43 F.3d 357 (8th Cir. 1994) ........................................... 33

*MC Asset Recovery, LLC v. S. Co.*, 2006 WL 5112612 (N.D. Ga. Dec. 11, 2006) .............. passim

*Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290 (7th Cir. 2003) ............................... 10, 11

*Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986) ...................... 23

*Moore v. Bay*, 284 U.S. 4 (1931) ............................................................ 12, 14, 15

*Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384 (2d Cir. 2011) ................................. 33

*Stalnaker v. DLC, Ltd.*, 376 F.3d 819 (8th Cir. 2004) ........................................... 5, 9, 16

*Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869 (2d Cir. 1991) ...................... 30

*United States v. Lucien*, 347 F.3d 45 (2d Cir. 2003) ............................................... 4

**Statutes**

11 U.S.C. § 544 ........................................................................... passim

11 U.S.C. § 548 ............................................................................... 13

11 U.S.C. § 550 ........................................................................... passim

Idaho Code § 55-916 .......................................................................... 6

Idaho Code § 55-918 (1979) ................................................................... 6

Idaho Code §§ 55-901 ......................................................................... 6

Uniform Fraudulent Transfer Act § 7(a)(1) .................................................... 13

**Treatises**

5 COLLIER ON BANKRUPTCY ¶ 544.07 (15th ed. 2009) ........................................ 12

## INTRODUCTION

Defendants made a calculated decision to fraudulently strip from Tronox substantially all of its assets, while leaving behind billions of dollars in legacy environmental, tort and retiree liabilities. When the inevitable occurred and Tronox filed for chapter 11, it brought this suit to recover the value of those fraudulently transferred assets for the benefit of its estate. Defendants' argument that Tronox's recovery must be capped at the amount of environmental and tort claims is contrary to the core purpose of fraudulent conveyance recoveries, and would rewrite Bankruptcy Code §§ 544(b) and 550(a), the law construing them, and the Confirmation Order and Plan.

First, every court to consider the question has held that § 550(a) does not cap recovery at the amount of creditors' claims. Defendants cite no contrary case, and Plaintiff is aware of none. Defendants seek to rewrite § 550(a)'s "benefit of the estate" requirement to read "benefit of specific creditors." But that is not what Congress said. And there can be no doubt that the prospect of recovery in this case already has benefited Tronox's *estate and all creditors* enormously by forging the settlement on which the Plan was based, permitting all creditors to receive their distributions under the Plan, and allowing Tronox to emerge from chapter 11. This *ex ante* benefit to the estate and all its creditors is all the law requires.

Second, because Defendants' argument for a claims cap under § 550(a) is flat wrong, they shift to a new theory of "partial avoidance" under § 544(b). That theory is contrary to the plain terms of § 544(b), the Supreme Court's seminal holding in *Moore v. Bay*, 80 years of unbroken law since *Moore v. Bay*, and the position Defendants took in this Court on the same issue just a few months ago.

Third, Defendants' repeated refrain that it would be an inequitable "windfall" for Tronox to recover the value of what was fraudulently transferred from it misunderstands the law of

1

fraudulent conveyance and the role of bankruptcy courts. Recovery of the fraudulently transferred assets is precisely what § 550 mandates, and it fulfills the core purpose of fraudulent transfer actions: to restore the estate to its pre-transfer position. It is the responsibility of bankruptcy courts to enforce Code provisions as written, and not rewrite them based on a litigant's subjective notions of fairness. If equity had any role, however, it would strongly favor the involuntary victims of Defendants' massive fraudulent conveyance—including individuals who are sick or have died from exposure to Kerr-McGee's operations or products, the Navajo Nation, the United States, and more than 20 non-federal entities—not the perpetrators. While Tronox certainly seeks to recover billions of dollars from Defendants, that is because Defendants took billions of dollars of assets from Tronox. In any event, Defendants' calculation of the purported windfall is patently incorrect. Most notably, it confuses the maximum amount that Tronox could recover if it wins with what was actually transferred to the trusts: a contingent asset representing the possibility of a large recovery, discounted by the numerous obstacles to receiving that, or any, recovery.

Fourth, even if the law were otherwise and § 550 did cap recovery at the allowed amount of creditor claims, it would make no difference here. The environmental and tort creditors agreed to exchange large but unquantified environmental and tort claims for consideration including a potentially large but uncertain litigation recovery. In approving the Global Settlement and Plan, this Court necessarily concluded that this was a fair and reasonable exchange. By operation of the Confirmation Order and Plan, that exchange has already occurred, the environmental and tort claims were allowed for the agreed consideration, and that consideration was distributed. Defendants' contrary argument—that a second trial on the allowability and value of each environmental and tort claim would be required if Tronox wins—

2

would defeat the very exchange underlying the Plan and Confirmation Order, and result in a one-sided settlement that no rational creditor would ever make, much less the creditors who held all the cards in Tronox's chapter 11 case.

Fifth, the reservation of rights in the Confirmation Order and Plan simply reserved all parties' rights to make all available arguments about the effect, if any, of the Plan documents on recovery in this case. It did not alter the legal effect of the Confirmation Order and Plan by negating the core exchange on which they are predicated.

Finally, evidencing the weakness of their legal position, Defendants make a last ditch "judicial estoppel" argument that is wholly without merit. Apart from being contrary to the reservation of rights that Defendants repeatedly invoke, Plaintiff has been crystal clear and entirely consistent about the recovery it seeks in this litigation from the day it filed its complaint through the entire confirmation process. The Plaintiff's declarations in support of Plan confirmation are no exception.

I.     **Under § 550, Tronox's Ability To Recover The Value Of The Fraudulently Transferred Assets Is Not Capped.**

Defendants repeatedly have conceded that "[s]ection 550(a) of the Bankruptcy Code governs the remedies available to the Debtors if they prevail in their fraudulent transfer action against Anadarko." (Anadarko's Obj. to Plan [Case No. 09-10156, Dkt. 2398] ¶ 43; Defs.' Mot. to Bifurcate [Dkt. 239] at 12)[1] The plain terms of § 550(a) do not cap recovery for fraudulent transfers at the amount of creditor claims. Every court to address the issue has held there is no cap. Faced with this law, Defendants now attempt to switch to a theory of partial avoidance under § 544(b). That theory is equally unavailing, and also contrary to the law.

---

[1]     Defendants do not dispute that recovery on Tronox's fiduciary duty claim is not implicated by these cross motions. (Pl.'s Br. at 6 n.6)

A.    **Section 550 By Its Terms Does Not Cap Recovery At The Amount Of Creditors' Claims.**

"[S]tatutory interpretation begins with the language of the statute, and the ordinary meaning of the language accurately expresses the legislative purpose." *United States v. Lucien*, 347 F.3d 45, 51 (2d Cir. 2003) (internal quotation and citation omitted). Section 550(a) provides that "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). As Defendants' cases recognize, this codifies the core purpose of fraudulent transfer law: to restore the estate to the position it occupied before the transfer occurred. *In re JTS Corp.*, 617 F.3d 1102, 1116 (9th Cir. 2010) ("the intent of § 550 [is] to restore the bankrupt estate to the financial condition it enjoyed prior to the transfer"); *In re Centennial Textiles, Inc.*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."); *In re Grove-Merritt*, 406 B.R. 778, 811 (Bankr. S.D. Ohio 2009) ("The purpose of [§ 550] is 'to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred.'") (citation omitted); *In re Hill*, 342 B.R. 183, 204 (Bankr. D. N.J. 2006) (same). This is all that Tronox seeks—to recover the value of oil and gas assets fraudulently transferred from Tronox to Kerr-McGee.

Faced with the statute's plain language, Defendants seek to rewrite § 550(a) to say that "a transfer may only be avoided and recovered for the benefit of creditors" and "as necessary to remedy the harm to creditors occasioned by the transfer." (Defs.' Resp. to Pl's Mot. for Partial Summ. J. and Cross-Mot. for Summ. J. [Dkt. 268] ("Opp'n Br.") ¶ 11)  But that is not what Congress said.  Not surprisingly, every court to construe the language that Congress actually used has held that § 550(a) does not limit recovery to the amount of creditor claims.

4

**B.      Courts Uniformly Have Held That § 550 Does Not Cap Recoveries At The Amount Of Creditors' Claims.**

As discussed in Plaintiff's opening brief, numerous courts have squarely addressed whether § 550(a) caps recoveries at the amount of creditor claims.  (Pl.'s Br. at 7-10)  Each has held that it does not, including:

- *In re Acequia, Inc.*, 34 F.3d 800, 809, 811 (9th Cir. 1994) (holding that the lower court "erred by imposing a 'cap' on Acequia's section 544(b) recovery" and rejecting its "implicit determination" that a recovery under §550(a) in excess of unsecured claims would not "benefit the estate");

- *In re DLC, Ltd.*, 295 B.R. 593, 606-07 (B.A.P. 8th Cir. 2003) (rejecting argument that a trustee may "recover only the amount necessary to satisfy the creditor's claim" and holding that "the trustee may recover the entire fraudulent transfer under §550(a)"), *aff'd, Stalnaker v. DLC, Ltd.*, 376 F.3d 819 (8th Cir. 2004);

- *Kipperman v. Onex Corp.*, 411 B.R. 805, 874-77 (N.D. Ga. 2009) (holding that recovery under section 550(a) was not capped at either "total allowable claims for all unsecured creditors" or "total allowable claims for all creditors who opted into the [Litigation] Trust");

- *MC Asset Recovery, LLC v. S. Co.*, 2006 WL 5112612, at *5 (N.D. Ga. Dec. 11, 2006) ("a trustee who brings an action to avoid and recover a fraudulent transfer may avoid and recover it in its entirety, even when the value of the transfer exceeds the value of all allowed claims by unsecured creditors");

- *In re FBN Food Servs., Inc.*, 1995 WL 230958, at *3 (N.D. Ill. Apr. 17, 1995) ("Because section 550(a) contemplates full recovery of a transfer provided that the action will benefit at least one creditor, the amount of creditor claims does not limit the trustee's right of recovery in avoidance actions."); and

- *In re Sheffield Steel Corp.*, 320 B.R. 423, 446-47 (Bankr. N.D. Okla. 2004) (rejecting argument that § 550(a) capped the debtor's recovery at the percentage of proceeds allocated to unsecured creditors and holding that "the only statutory limitation on recovery is found in Section 550(a), which provides that avoided transfers may be recovered 'for the benefit of the estate'").

Despite a 62-page cross motion larded with 246 footnotes, Defendants have not cited a single case holding that § 550(a) caps recovery.  Nor has Plaintiff's research identified any.  Instead, Defendants resort to mischaracterizing the express holdings of Plaintiff's cases and misconstruing the few cases Defendants cite.  Thus, Defendants argue that the leading case on

5

§ 550(a), *Acequia*, "holds only that § 544(b) itself imposes no limit on a trustee's right to invoke state law avoidance powers; it does not say that where state law itself limits avoidance to the amount of creditor claims, that this limitation is not enforceable in bankruptcy." (Opp'n Br. ¶ 32) Not so. The § 544(b) claim in *Acequia* was based on the Idaho Uniform Fraudulent Conveyance Act, which contained the same limitation as the Oklahoma Uniform Fraudulent Transfer Act that a transfer may be avoided only "to the extent necessary to satisfy [the creditor's] claim." *Acequia*, 34 F.3d at 807; Idaho Code § 55-918 (1979) (attached as Exhibit A).[2] The Ninth Circuit nonetheless followed the ruling of "several courts" that "under section 544(b) '[a] transaction that is voidable by a single, actual unsecured creditor may be avoided in its entirety, regardless of the size of the creditor's claim.'" *Acequia*, 34 F.3d at 809-10. Accordingly, it held: "we conclude that the magistrate judge erred by 'capping' Acequia's recovery under section 544(b) at the amount of unsecured claims against the bankrupt estate." *Id.* at 811. The Ninth Circuit further held that, given the breadth of § 550(a)'s "benefit of the estate" language, Acequia could recover the entire amount of the fraudulent transfers even though it exceeded all unsecured creditor claims. *Id.*

Inexplicably, Defendants cite a subsequent Ninth Circuit case, *In re JTS Corp.*, for the proposition that "the Ninth Circuit would likely recognize" a theory of partial avoidance under § 544(b) where state law limits recovery "to the extent necessary to satisfy the creditor's claim." (Opp'n Br. ¶ 33) To the contrary, the Ninth Circuit in *JTS* unequivocally reaffirmed its holding in *Acequia*: "In *Acequia*, we held that it was improper to limit a trustee's recovery under § 544(b) and § 550(a) based on the total amount of unsecured claims against the bankrupt estate." 617

---

[2]    In 1987, the Idaho Uniform Fraudulent Conveyance Act was superseded by the Uniform Fraudulent Transfer Act. *See* Idaho Code §§ 55-901 *et seq.* The UFTA continued to limit avoidance "to the extent necessary to satisfy the creditor's claim." *See* Idaho Code § 55-916.

6

F.3d at 1113. Far from endorsing a theory of partial avoidance, the *JTS* court held that the fraudulent transfer "was void under § 544(b)" and California law. *Id.* at 1115. Because the defendant was a good faith transferee, the court agreed that the estate's recovery under § 550 should be reduced by the consideration defendant paid for the transferred assets. Citing to *Acequia*, the court held "[t]his conclusion effectuates the intent of § 550 to restore the bankrupt estate to the financial condition it enjoyed prior to the transfer." *Id.* at 1116.

Indeed, the courts have uniformly confirmed *Acequia*'s holding that recovery under § 550(a) is not capped at the amount of creditor claims. *See MC Asset Recovery*, 2006 WL 5112612, at *5 (noting that all courts "have found that a trustee who brings an action to avoid and recover a fraudulent transfer may avoid and recover it in its entirety, even when the value of the transfer exceeds the value of all allowed claims of unsecured creditors") (citing *Acequia, DLC*, and *Sheffield Steel*); *id.* at *5 n.11 ("*In re Acequia* has been repeatedly cited for the proposition that a trustee may recover for the benefit of the estate even when all unsecured creditors have already been paid, and has never been overruled or even seriously questioned by a court in its own, or in any other, jurisdiction."); *Kipperman*, 411 B.R. at 878 ("Section 550 does not 'cap' Plaintiff's recovery . . . to the amount of the unsecured creditors' claims."). While Defendants unsuccessfully attempt to distinguish these cases on the ground that a recovery in excess of creditor claims in this case is not "for the benefit of the estate" (*see infra* at 10), even they admit that these cases "refused to limit the trustee's recovery to the value of unsecured claims." (Opp'n Br. ¶¶ 31, 34, 36)

Given this uniform body of law, it is not surprising that Defendants cannot cite a single case that caps recovery under § 550(a) or that casts doubt on the uniform law rejecting a cap. The cases Defendants do cite they misconstrue. For example, Defendants claim that *Adelphia*

7

*Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80 (S.D.N.Y. 2008), "holds that once the estate's creditors have been paid in full, they cannot benefit from any further recovery." (Opp'n Br. ¶ 22) To the contrary, *Adelphia* held that a litigation trust lacked standing because, under the terms of the plans at issue, the creditors of the transferor debtor could not possibly benefit from the recoveries. 390 B.R. at 95, 97 ("none of the payouts to [the transferor] Debtors' creditors included shares in the [litigation trust] according to the terms of the Joint Plans, so there is no apparent benefit that the creditors would accrue from the [trust's] recovery."). The Court neither capped recovery under § 550(a) nor addressed the uniform law holding that recovery is not capped.

Similarly, Defendants cite *In re Board of Directors of Hopewell International Insurance Ltd.*, 238 B.R. 25 (Bankr. S.D.N.Y. 1999), for the proposition that, once a creditor has been paid in full, "the purpose of the fraudulent transfer laws is satisfied and no further recovery is warranted." (Opp'n Br. ¶ 12) But *Hopewell* is not a fraudulent transfer case at all. It concerned a petition ancillary to a foreign proceeding under now repealed § 304. Among the factors governing issuance of an injunction under that provision was the "prevention of preferential or fraudulent dispositions of property" of the estate. 238 B.R. at 55. The bankruptcy court concluded that this factor was not at issue because the debtor was "solvent" with "sufficient funds to pay all creditors in full."[3] *Id.*

---

[3]    As discussed below, *In re Murphy*, 331 B.R. 107 (Bankr. S.D.N.Y. 2005), is a partial avoidance case that conflicts with binding Supreme Court precedent and decades of settled law. (*See infra* at 13-15) None of Defendants' remaining cases even addresses limiting avoidance or recovery based on the amount of creditor claims. In both *Grove-Merritt* and *Hill*, the courts simply analyzed whether to re-convey the fraudulently transferred property or award its value under § 550. *Grove-Merritt*, 406 B.R. at 811-12 (awarding the value of the debtor's equity in the transferred property); *In re Hill*, 342 B.R. at 204-05 (awarding the value of the transferor's waiver of a claim for equitable distribution). *In re Foxmeyer Corp.*, 296 B.R. 327 (Bankr. D. Del. 2003), held that the trustee could not recover a transfer of dividends because the debtor was not the transferor and, therefore, the debtor's creditors were not harmed by the transfer. *Id.* at 335, 342. Finally, in *In re Nowicki*, 202 B.R. 729 (Bankr. N.D. Ill. 1996), the court merely noted that, *under Illinois law*, a fraudulent transfer is voidable "only to the extent necessary to satisfy the claims of creditors." *Id.* at 736.

8

Nor does *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150 (S.D. Tex. 2009), support Defendants' theory of partial avoidance and recovery. There, the court entered judgment voiding the entire fraudulent conveyance of the debtor's stock plus money damages for lost dividends. *Id.* at 181. This recovery was valued at $8.6 billion, even though defendants had paid reasonably equivalent value for the stock. *Id.* at 171-72, 174. The court expressly "f[ound] that the return of this property plus the money damages will benefit the estate." *Id.* at 176. In turn, the court left "the arguments over the judgment's effects on the bankruptcy action to the Bankruptcy Court . . . ." *Id.* Like Defendants' other cases, the court neither capped recovery under § 550, nor discussed the numerous cases rejecting one.

### C.    Recovery Of The Value Of The Fraudulently Transferred Oil And Gas Assets Easily Satisfies § 550(a)'s "Benefit Of The Estate" Requirement.

Here, recovery of the value of the fraudulent transfers is clearly "for the benefit of the estate" within the meaning of § 550(a). "Courts construe the 'benefit of the estate' requirement broadly," and have found the requirement satisfied "even though the unsecured creditors had received full distributions under a plan of reorganization." *Acequia*, 34 F.3d at 811. Indeed, "[i]n virtually every case, recovery of any property benefits the estate." *Stalnaker v. DLC, Ltd.*, 376 F.3d 819, 823 (8th Cir. 2004). As Defendants concede, indirect benefits suffice, including "enhancing the value of the equity distributed to prepetition creditors." (Opp'n Br. ¶¶ 30, 34, citing *Sheffield Steel* and *MC Asset Recovery*).

Defendants attempt to distinguish these cases by arguing that, under the terms of the Plan, because "any avoidance recovery will be distributed solely to class 4 and 5 creditors, the estates cannot benefit in any manner other than by the payment of such creditors' claims." (Opp'n Br. ¶ 35; *see also* ¶¶ 30-31) Defendants' argument has two glaring flaws. First, the allocation of

9

litigation proceeds to the environmental and tort creditors directly benefits creditors. This alone satisfies § 550(a).

Second, and more fundamentally, Defendants completely ignore that other creditors, including noteholders, trade creditors, and all other general unsecured creditors, already have benefited from the potential litigation recovery. Defendants' repeated refrain that "no other creditor can or will benefit" from the litigation recovery (Opp'n Br. ¶ 13) is simply wrong. Here, just as in *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290 (7th Cir. 2003), Tronox used the prospect of a recovery from this action for the benefit of all creditors during the chapter 11 process. *Id.* at 293. It was the prospect of recovery that enabled Tronox to negotiate the Global Settlement, which became "the cornerstone of the Plan." (Pl's SUF [Dkt. 258] ¶ 6)[4] In fact, general unsecured creditors have benefited enormously from the prospect of recovery here. In exchange for the litigation proceeds and other consideration, environmental and tort creditors agreed to allocate the new equity in Tronox to general unsecured creditors *and those creditors took ownership of Tronox free and clear of the crushing burden of the legacy liabilities.* Thus, the prospect of recovery already has "enhanc[ed] the value of the equity distributed to prepetition creditors." (Opp'n Br. ¶ 34)

Despite the palpable benefit to the estate and *all creditors* from the potential recovery here, Defendants argue that the Court must engage in a second, *ex post* benefit analysis "to determine whether an actual benefit will result from the *recovery* (as opposed to the *settlement*)." (Opp'n Br. ¶ 28) This is precisely the theory that cases like *Mellon Bank* and *Kipperman* reject. As the Seventh Circuit held in *Mellon Bank*, "[h]aving put the *prospect* of preference recoveries to work for the benefit of all creditors (including unsecured creditors) *ex ante* . . . the bankruptcy

---

[4]    Defendants failed to respond to Plaintiff's statement of undisputed facts. Accordingly, all of the facts set forth therein are deemed admitted. *See* L.R. 7056-1(d).

10

judge did not need to use them *ex post* a second time [after damages were awarded], for still another benefit to the estate; there was no further benefit to be had." 351 F.3d at 293 (emphasis in original); *Kipperman*, 411 B.R. at 877-78 (where prospect of litigation recovery "facilitated the confirmation of the Plan," court rejected defendants' argument that "this alleged benefit cannot serve as a 'benefit' under section 550 because it has already been realized" and refused to "cap" plaintiff's recovery under § 550).

Finally, because even Defendants concede (as they must) that recovering the transferred assets in order to enhance the value of equity distributed to pre-petition creditors would be "for the benefit of the estate," Defendants are effectively arguing that Tronox should have waited until after it completed the litigation and recovered the value of the assets to negotiate and propose a plan. By instead putting the prospect of recovery to work to forge a plan and pay creditors sooner, Defendants claim that Tronox has forfeited a large portion of the estates' potential recovery. The Ninth Circuit in *Acequia* rejected a virtually identical argument: "if confirmation and payment precluded application of section 544(b), debtors undoubtedly would delay filing plans of reorganization until completing all potential litigation, a result that would contravene the Bankruptcy Code's goal of a quick and equitable reorganization." 34 F.3d at 808.

**D.    Defendants' New Theory Of Partial Avoidance Is Contrary To § 544(b).**

Because §550(a), in accordance with its terms and the uniform body of law construing it, does not cap fraudulent transfer recoveries at the allowed amount of creditor claims, Defendants about face and press a new theory of "partial avoidance" under § 544(b). Defendants theorize that, because § 544(b) employs underlying state avoidance law, limitations on avoidance under the UFTA are incorporated into § 544(b). (Opp'n Br. ¶¶ 6, 8) Defendants cite no case law in support of this theory. Nor could they. This argument flies in the face of *Moore v. Bay*, 284

11

U.S. 4 (1931), 80 years of unbroken precedent, and the position Defendants took on the same issue just three months ago.

The law is clear: "Once the trustee has proven his case, the trustee, pursuant to *Moore v. Bay*, . . . may . . . avoid the entire transfer (even if the creditor upon whom the trustee relies could avoid it only in part)." *DLC*, 295 B.R. at 602; *see also* 5 COLLIER ON BANKRUPTCY ¶ 544.07[4] (15th ed. 2009) (*Moore v. Bay* "allowed the trustee to avoid a transfer entirely without regard to the size of the claim of the creditor whose rights and powers the trustee is asserting, with the recovery to be retained for the benefit of the entire estate.").

Congress incorporated *Moore v. Bay*'s holding into the Bankruptcy Code and it remains the law today. *See, e.g., In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) ("[O]nce avoidable pursuant to [Section 544(b)], the transfer is avoided in its entirety for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim.") (citing *Moore v. Bay*); *In re Leonard*, 125 F.3d 543, 544-45 (7th Cir. 1997) ("Even if he cannot point to creditors whose claims total more than the value of the [transferred property], the Trustee can avoid the transaction entirely.") (citing *Moore v. Bay*); *In re C.F. Foods, L.P.*, 265 B.R. 71, 86 (Bankr. E.D. Pa. 2001) ("When enacting the Bankruptcy Code of 1978, the Committee Report for § 544 stated that Congress's intent was to retain the controversial rule of . . . *Moore v. Bay* . . . , which held that a trustee could avoid an entire transfer under § 544(b) without regard to the size of the claim of the unsecured creditor whose rights and powers the trustee was asserting."). Defendants' partial avoidance theory—under which state law would limit avoidance under section 544(b) "to the extent necessary to satisfy the creditor's claim"—plainly conflicts with the holdings of *Moore v. Bay* and its progeny that a creditor can avoid the *entire* fraudulent transfer regardless of the size of the creditor's claim.

12

Thus, it is not surprising that courts have expressly rejected Defendants' argument that state law limits the extent of avoidance under § 544(b). *See MC Asset Recovery*, 2006 WL 5112612, at *5 ("§ 544(b) does not concomitantly limit the amount of [a voidable] transfer to 'the extent necessary to satisfy the creditor's claim,' as under state law.") (citing U.F.T.A. § 7(a)(1)); *see also id.* at *4 ("a trustee in a bankruptcy proceeding may avoid a transfer not merely to the extent necessary to satisfy the creditor's claim, as under state law, but rather may avoid the entire transfer for the 'benefit of the estate.'") (citation omitted); *In re DLC*, 295 B.R. at 606 ("[A]lthough state law limits a creditor's recovery in a fraudulent conveyance action to the amount necessary to satisfy the creditor's claim, this is not controlling in bankruptcy.") (citing *In re Serrato*, 214 B.R. 219, 231 (Bankr. N.D. Cal. 1997)).

The only case cited by Defendants that adopts a theory of partial recovery—*In re Murphy* —is both inapposite and wrong. *Murphy* involved the "extremely unusual" situation of a tax forfeiture valid under state law that nonetheless constituted a fraudulent conveyance under federal law. 331 B.R. at 121. The forfeited property was worth $1 million, but creditor claims totaled $700,000. The debtor had failed to pay any property taxes for the entire period she owned the property. *Id.* at 114. The court framed "the issue [as] who has the right to the surplus funds as between debtors and defendant" taxing authority. *Id.* at 121. In deference to the state's strong interest in enforcing its tax laws, the court sided with the state over the scofflaw debtor. To reach this result, the Court adopted a theory of partial avoidance under § 548 (not § 544(b) at issue here). *Id.* at 122 ("In my view the answer to the present issue lies in Section 548."). In so holding, the Court was heavily influenced by the fact that the property conveyance was perfectly lawful under state law and did not "legally harm" the debtor. *Id.* at 125-26. The court concluded

13

that the debtor should not "reap 'a windfall merely by reason of the happenstance of bankruptcy' when debtors cannot claim to have been legally harmed by the transfer." *Id* at 125.

While the result the court sought in *Murphy* is understandable, its theory of partial avoidance cannot be squared with the law. *Murphy* does not even cite the Supreme Court's binding decision in *Moore v. Bay* or any of the innumerable decisions that have followed it in the ensuing decades. Indeed, the court relied in part on the bankruptcy court's decision in *Coleman v. Community Trust Bank*, 285 BR. 892 (Bankr. W.D. Va. 2002), for its partial avoidance theory. *Murphy*, 331 B.R. at 123. But the Fourth Circuit subsequently reversed the bankruptcy court on precisely this ground: "Debtor first argues that the bankruptcy court erred in ruling that her avoidance of the deeds of trust was effective only to the extent necessary to pay the creditors and administrative expenses of her estate. We agree." *In re Coleman*, 426 F.3d 719, 724 (4th Cir. 2005). The Fourth Circuit held that "the plain language of § 544" "unambiguously conferred" on debtor the right "to nullify the grant of the deeds." *Id.* at 726. In any event, the equitable considerations that drove the *Murphy* court are wholly absent here. No compelling state law policy is at issue. And, unlike the debtors in *Murphy*, Tronox and its creditors were legally (and grievously) harmed by the fraudulent transfers. That Tronox failed and filed for bankruptcy after Kerr-McGee stripped it of substantially all of its assets while leaving it with billions in legacy liabilities was not a mere "happenstance." (Opp'n Br. at 3) It was inevitable.

Finally, Defendants' newly-minted theory of *partial avoidance* directly conflicts with what they told the Court on this same issue just a few months ago—that under *Moore v. Bay*, a voidable transfer can be *avoided in its entirety*. In the briefing on Defendants' motion to bifurcate, Defendants accused Plaintiff of "egregiously misconstru[ing]" *Moore v. Bay* as a recovery case, not an avoidance case. (Bifurcation Reply Br. [Dkt. 250] at 7) They explained

14

that "*Moore simply holds that a voidable transfer can be 'avoided' in its entirety . . . .*" (*Id.* (emphasis added)) Defendants' view that *Moore v. Bay* prohibits partial avoidance was correct. But because their cap theory is dead on arrival under § 550, Defendants reverse course and now argue that *Moore v. Bay* does not support avoidance in its entirety and is simply a recovery case: "*Moore v. Bay* merely holds that the property a trustee *recovers after avoiding* a fraudulent transfer under state law is available to satisfy the claims of all creditors of the estate. *This holding does not imply,* as Plaintiffs suggest, *that a trustee may avoid and recover the entire transfer . . . .*" (Opp'n Br. ¶ 18)

That Defendants have been forced to embrace a new theory of partial avoidance under § 544(b) that (i) they renounced a few months ago, and (ii) is contrary to binding Supreme Court precedent, the plain terms of § 544(b), its legislative history, and 80 years of uniform law merely underscores the legal bankruptcy of their position.

E.    **Defendants' Arguments Based On Other Code Provisions Or State Law Misconstrue The Nature Of A Fraudulent Conveyance Action.**

Finally, in an attempt to bootstrap their way to a cap, Defendants raise numerous arguments claiming that an individual creditor would not be able to recover more than the claim's value under other Code provisions, or under applicable state or federal law. (Opp'n Br. ¶¶ 38-46) These arguments all proceed from a fatal flaw—that a benefit to the estate is equivalent to a benefit to creditors—and misconstrue the nature and purpose of a fraudulent conveyance action under §§ 544 and 550. Those sections create an independent, federal cause of action to avoid fraudulent transfers, and to recover the transferred property or its value for the benefit of the estate. As the district court explained in *In re Trans World Airlines*, 163 B.R. 964, 972 (D. Del. 1994), "Section 550(a) requires a benefit to the 'estate', not to creditors. 'Estate' is a broader term than 'creditors.' There is no requirement that an avoidance action recovery be

15

distributed (or 'committed') in whole or in part to creditors." The court emphasized: "[T]he estate is the focus of § 550(a), not individual creditors. How, in any particular case, a recovery is used and whether any of it is distributed to creditors is a function of the conduct of the case and the negotiations of the plan of reorganization." *Id.* at 973; *see also In re Skyway Commc'ns Holding Corp.*, 389 B.R. 801, 808 (Bankr. M.D. Fla. 2008) ("The term 'estate' is broader than the term 'creditors.'").

Similarly, in *Stalnaker*, the Eighth Circuit rejected the defendant's argument that a fraudulent conveyance recovery would not benefit the estate under § 550 because "all creditors' claims settled." 376 F.3d at 823. The court held that the "bankruptcy 'estate' is not synonymous with the concept of a pool of assets to be gathered for the sole benefit of unsecured creditors." *Id.* Rather, the court found:

> "Estate" is a statutory term that Congress uses to denote the asset side of the bankruptcy balance sheet. 11 U.S.C. § 541 defines what constitutes property of the estate and what can be credited to the asset account. In virtually every case, recovery of any property benefits the estate. In fact, section 541(a)(3) specifically includes in the estate property recovered under section 550. Creditors are on the opposite side of the balance sheet.

*Id.* (quoting *In re DLC, Ltd.*, 295 B.R. 593, 607 (8th Cir. B.A.P. 2003)).

In sum, § 544 permits Tronox to avoid the transfer of the oil and gas assets to Kerr-McGee in its entirety. Section 550 permits Tronox to recover the value of the transferred oil and gas assets for the benefit of the estate. Tronox already has put the prospect of this recovery to work for the benefit of the estate, and of *all* its creditors. That is all that § 550 requires. For this reason, every court to address the issue has rejected Defendants' argument that § 550 caps recovery at the amount of creditors' claims. This Court should do the same.

16

II.    **Defendants' "Windfall" Arguments Misunderstand The Nature And Purpose Of A Fraudulent Conveyance Action.**

With no legal support for their position, Defendants argue at length that the result mandated by §§ 544 and 550 would be unfair and inequitable because it would result in a REDACTED REDACTED windfall." (Opp'n Br. at 2, 30, 55)  Defendants are wrong on the law, the equities and the math.

First, while the equities strongly favor Tronox, Defendants' repeated pleas for the Court to exercise its "equitable" powers to limit Tronox's right to recover fail as a matter of law. "[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code," and therefore "the equitable powers that a bankruptcy court possesses 'are not a license . . . to disregard the clear language and meaning of the bankruptcy statutes and rules.'" *Coleman*, 426 F.3d at 726 (citation omitted); *see also In re Smart World Techs., LLC*, 423 F.3d 166, 184 (2d Cir. 2005) ("The equitable power conferred . . . by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing. This language suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective.").  Because the plain terms of §§ 544 and 550 mandate Tronox's full recovery of the fraudulent transfers at issue, the Court's equitable powers are not implicated. *Coleman*, 426 F.3d at 727 (rejecting argument that court should use its equitable powers to limit avoidance to the amount of creditor claims to prevent an alleged "windfall" because the plain language of § 544 "unambiguously conferred" on the debtor the right to avoid the fraudulent transfer).

Second, it is simply not a windfall for Tronox to recover the value of the assets fraudulently transferred from it.  That is the result mandated by § 550, and it accomplishes the

17

core purpose of federal fraudulent transfer law: "to restore the bankrupt estate to the financial condition it enjoyed prior to the transfer." *In re JTS Corp.*, 617 F.3d at 1116; *supra* at 4. While Tronox certainly seeks to recover billions of dollars from Defendants, that is because Defendants fraudulently removed billions of dollars of assets from Tronox. Defendants seem to miss the irony in dubbing as "avarice" Tronox's attempt to recover the value of what New Kerr-McGee fraudulently stole from it. (Opp'n Br. at 3)

Indeed, New Kerr-McGee determined that it would remain in compliance with its indentures following Project Focus because it (i) was removing          REDACTED

                                                 (*E.g.*, Gordon Dep. Ex. 18 at TRX-10-00955 (attached
as Exhibit B))                                    REDACTED

                                                 (Gordon Dep. Ex. 17 at KM-TRX033391471
(attached as Exhibit C))                          REDACTED

                                                                        (Ex. B,
Gordon Dep. Ex. 18 at TRX-10-00955); (ii)           REDACTED

                                                                              (*id.*
at TRX-10-00961); and (iii)              REDACTED

18

REDACTED

(*id.* at TRX-10-00964).

REDACTED

New Kerr-McGee left behind 75 years of legacy liabilities with only a single-product cyclical chemical company to satisfy them. But even that was not enough for New Kerr-McGee. Just before spinning off Tronox, Kerr-McGee helped itself to more: upstreaming another $750 million in proceeds from Tronox's IPO and debt offerings, and then, for good measure, stripping Tronox of all its cash over $40 million. New Kerr-McGee did all this without a thought to Tronox's creditors—including tort victims who are sick and dying from exposure to Kerr-McGee's operations and products, Native Americans whose lands have been ravaged by Kerr-McGee's historic mining activities, and the taxpayers who ultimately would have to pick up the tab for Kerr-McGee's sordid environmental legacy without the proceeds from this lawsuit. (*See, e.g.,* Powell Dep. at 10-11, 22-25, 82-85 (attached as Ex. D)

(                              REDACTED


Charley Dep. at 34 (attached as Exhibit E) (describing the "piles and tons of radioactive waste" and other uranium contamination on Navajo land that Kerr-McGee left behind from its mining operations)) Indeed, New Kerr-McGee's CEO admitted at deposition          REDACTED


(*See*
L. Corbett Dep. at 410 (attached as Exhibit F))

Third, Defendants' calculation of the purported          REDACTED          is patently incorrect. For the value of the potential litigation recovery, Defendants use the damages

19

calculations prepared by Professor Jack Williams based on Kerr-McGee's own valuation of the fraudulently transferred oil and gas assets. (Defs.' SUF [Dkt. 268] ¶¶ 38-40) Tronox believes Professor Williams' valuation is correct.  But that is not what was transferred to the environmental and tort creditors under the Plan.  Instead, they received a contingent asset—the possibility of a large recovery (or no recovery) in this litigation.  The possibility of a large recovery must be discounted by the numerous risks and obstacles to that recovery, including those posed by dispositive motions, motions to exclude expert testimony and other evidence, failures of proof, changes in the law, uncertainty in the amount of the judgment, challenges in collecting a judgment, appeals, delay, and innumerable other obstacles that a well-funded adversary, two law firms, and a bevy of professional witnesses can interpose.  Conversely, Defendants have long maintained that this lawsuit is "baseless" and "specious" (Defs.' Resp. to Pl's Mot. to Extend All Deadlines in CMO [Dkt. 217] ¶ 2), but that does not mean it had zero value at plan confirmation either.  As discussed *infra* at 25-26, both the parties in reaching the Global Settlement and the Court in approving it determined that the value at confirmation of the potential litigation recovery and other consideration transferred to the environmental and tort trusts was a fair exchange for the environmental and tort claims that environmental and tort creditors traded for them.  In short, there is no "windfall."

Courts have repeatedly held, in rejecting the same windfall argument Defendants make here, that plan consideration—including contingent litigation assets—must be assessed at the time of plan confirmation, not based on subsequent events.  In *Kipperman*, defendants argued that the "the Plan would not be 'fair and equitable'" and would violate the "absolute priority rule" because the litigation recovery could exceed creditor claims while equity recovered nothing:

20

> [T]he absolute priority rule. . . only govern[s] whether a bankruptcy court should confirm a plan based on the valuation of the assets under the plan at the time of confirmation; [it] do[es] not require, or even suggest, a district court in a subsequent piece of litigation to go back and re-assess equity among the parties based on subsequent events.

411 B.R. at 876; *MC Asset Recovery*, 2006 WL 5112612, at *6 & n.12 (rejecting argument that avoidance action should be dismissed where post-confirmation increases in stock valuation meant creditors had been paid in full because "whether the creditors have now been 'satisfied in full' post-confirmation is irrelevant" as "the debtor's claims against [defendant] were fixed as of the Petition date.").

The other side of Defendants' windfall equation—the valuation of the environmental and tort claims—is equally flawed. Defendants use estimates from Tronox's environmental and tort experts that were prepared to determine whether Tronox was solvent in November 2005. These solvency estimates reflect only a portion of the total liabilities because they are limited to information known or knowable to Kerr-McGee as of November 2005 and do not even include costs for all environmental sites. *In re R.M.L., Inc.*, 92 F.3d 139, 155 (3d Cir. 1996). Under Defendants' flawed claims cap theory, however, the value of the claims also would have to be measured a second time purportedly based on information known as of the petition date.[5] (Opp'n Br. ¶ 48; Mot. to Bifurcate [Dkt. 239] at 14) Defendants acknowledge that this is "a very different analysis," based on "a different standard" and "different information." (7/19/11 Hr'g Tr. [Dkt. 254] 30, 32-33, 38) Among other things, a subsequent claims valuation would not be limited to information known or knowable to Kerr-McGee as of November 2005 or any other date. In this case, that makes a big difference.

---

[5]   Plaintiff does not believe that there would be any limitation regarding the information the Court could consider in a subsequent estimation proceeding or that valuation would be as of the petition date. These issues, however, are not relevant for purposes of this motion and Plaintiff simply reserves its rights should they ever become relevant.

21

Facts unknown as of November 2005, but that have since come to light, would greatly increase the value of the estimates.  For example,                    REDACTED

(Ex. D, Powell Dep. at 108-11; Powell Dep. Ex. 27 (attached as Exhibit I))                    REDACTED

(Ex. D, Powell Dep. at 110-19)

Because          REDACTED          had not occurred as of November 2005, they were not included in the claims histories that Tronox's tort expert relied on to estimate tort claims for solvency purposes.                    REDACTED

.  (Denise Neumann Martin Rpt. at 17 & n.10 (attached as Exhibit G); Powell Dep. Ex. 26 (attached as Exhibit H); Ex. I, Powell Dep. Ex. 27)                    REDACTED

(Ex. D, Powell Dep. at 13-15; Tollison Dep. at 16-17 (attached as Exhibit J))

Nor would the environmental and tort creditors be bound by Tronox's estimates.  The tort creditors assert that their claims are worth in excess of $2 billion.  (Statement of Tronox Tort Claims Trust [Dkt. 266] at 3; Pl.'s SUF [Dkt. 258] ¶ 3)  The environmental creditors have

22

asserted non-duplicative proofs of claims totaling over $4.9 billion, plus additional unliquidated amounts. (Pl.'s SUF [Dkt. 258] ¶ 2)

Moreover, in return for the agreed consideration that included the entire recovery from this lawsuit, the environmental creditors released Tronox not only from their claims under the Bankruptcy Code, but from non-dischargeable injunctive obligations. As the Second Circuit recognized in *In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991), these non-dischargeable clean up obligations can represent the lion's share of a debtor's potential environmental liability. *Id.* at 1008 ("We recognize that most environmental injunctions will fall on the non-'claim' side of the line," *i.e.*, will not be dischargeable). Of course, it was precisely these complex valuation issues that the settlement compromised for the agreed consideration. The environmental creditors also agreed to take less than the full amount in cash of their expected administrative claims and the trusts agreed to take title to contaminated properties that the Reorganized Debtors did not want, avoiding litigation over abandonment and related issues. *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474 U.S. 494 (1986).

Fourth, even if Defendants' windfall arguments were otherwise correct, it would not matter. In rejecting similar arguments, courts repeatedly have held that any "surplus" recovery over all creditor claims should be awarded to the estate for the benefit of creditors, not to the wrongdoer. As *Acequia* aptly put it: "Moreover, even if the recovery did constitute a 'windfall,' Acequia has a greater equitable claim to the transferred funds than does [transferee] Clinton, the wrongdoer. We think it better to err on Acequia's side." 34 F.3d at 812; *accord MC Asset Recovery*, 2006 WL 5112612, at *6 (rejecting windfall argument and holding that "equity does not favor protecting [transferee defendant] Southern Co. from these creditors"); *Kipperman*, 411

23

B.R. at 875-76 (potential recovery in excess of creditor claims would not violate the "fair and equitable" requirement or absolute priority rule for a cram down plan).[6]

In any event, Defendants' windfall arguments obscure the real issue that the Court needs to decide on these motions: whether § 550 caps Tronox's recovery at the amount of its environmental and tort creditors' unpaid claims, and therefore an additional trial is required to value claims that already have been settled, released and allowed for the agreed consideration. As discussed above, the answer to that question is no.

**III.    By Operation Of The Plan, The Environmental And Tort Creditors' Claims Have Been Compromised, Released, And Allowed For The Agreed Plan Consideration.**

If this Court concludes—as every other court to address the question has—that § 550 does not cap Plaintiff's recovery at the amount of creditor claims, there is no need to reach Plaintiff's alternative ground regarding the legal effect of the Confirmation Order and Plan. Even if this Court concludes that § 550 includes a claims cap, however, there would still be no need to have a second trial to determine the allowability and value of these claims. That is because, by operation of the Confirmation Order and Plan, the environmental and tort creditors cannot be paid more than the amount for which their claims *already* have been compromised, allowed, and paid.    Defendants' contrary argument in their cross-motion would rewrite the Confirmation Order and Plan, deprive the creditors of the benefit of their bargain, and result in a different agreement that no rational creditor in the position of the environmental and tort

---

[6]    Similarly misguided is Defendants' repeated refrain that a portion of the recovery here theoretically could be used by the environmental trusts to fund the Superfund trust. (Opp'n Br. ¶¶ 3, 20, 35, 36, 39, 43, 57, 57) How a creditor ultimately chooses to spend the value of fraudulent transfers recovered from a defendant simply has no bearing on the amount of that defendant's liability. Moreover, Superfund likely will bear the burden if any Tronox sites that are underfunded or unfunded under the environmental settlement require significant remediation.   In any event, it is pure speculation that any distribution will ever be made to Superfund. Defendants acknowledge a distribution could be made to Superfund only after the environmental trusts complete remediation at (i) Tronox sites in the same state; (ii) Tronox sites in other states; and (iii) non-owned sites where Tronox may be liable. (SUF ¶ 15)

24

creditors would ever make. Simply put, Defendants' arguments amount to a frontal assault on the Confirmation Order and Plan, and the so-called "illegal settlement" on which they are predicated. (Opp'n Br. ¶ 27) While long on rhetoric, Defendants' arguments have no support in law or logic.

**A.    Under The Plan And Global Settlement, The Environmental And Tort Creditors Exchanged Large But Unquantified Claims And Causes Of Action For A Potentially Large But Uncertain Recovery.**

Under the Global Settlement, Tronox's environmental and tort creditors agreed to exchange large but unquantified environmental and tort liabilities for a package of consideration that included a potentially large but uncertain recovery in this case. In addition to releasing their claims (including $300-500 million in administrative claims) (*see* Disclosure Statement [Case No. 09-10156, Ex. B to Dkt. 2196] ("Disc. Stmt.") at 7), the environmental creditors also provided covenants not to sue with respect to non-dischargeable remediation obligations (*see* Environmental Claims Settlement Agreement § XVI). As the Court found in the Confirmation Order, the core benefits of this exchange included, among other things, "avoiding expensive and lengthy estimation or other proceedings with respect to the amount and priority of Environmental and Tort Claims," and avoiding "protracted litigation . . . with respect to the amount and priority" of those claims. (Confirmation Order [Dkt. 2567] ("Conf. Order") ¶ 38) After submissions by multiple parties and a confirmation hearing, the Court concluded that the Global Settlement was "fair and equitable" and "in the best interests of Tronox, its Estates and all holders of Claims and Equity Interests." (*Id.* ¶¶ 37–38, 40) In doing so, the Court necessarily concluded that the Environmental and Tort Creditors' exchange of claims and liabilities for the litigation proceeds and other consideration was fair and traded reasonably equivalent value. (*Id.*; *see also* 5/11/11 Mem. Op. [Dkt. 229] at 4 (finding that Environmental Settlement Agreement "formed the lynchpin of the Debtors' Plan, allowing the reorganized Debtors to liquidate billions of dollars of

25

claims for alleged environmental remediation by establishing an environmental remediation trust"))

Nor can there be any serious dispute that, by operation of the Plan and Confirmation Order, the environmental and tort claims already have been (or, in the case of the tort claims, are in the process of being) allowed in the amount of the agreed consideration. Defendants do not dispute that (i) only allowed claims can be paid; (ii) the agreed consideration—including the right to 88% of the proceeds from this litigation—already has been transferred to the environmental trusts "on account of allowed claims of the Governments"; and (iii) the right to 12% of the proceeds from this litigation already has been transferred to the Tort Claims Trust to be distributed to claims that are allowed in accordance with the self-executing Tort Claims Trust Distribution Procedures. (*See* Pl.'s Br. at 17; Pl.'s SUF [Dkt. 258] ¶ 8; Defs.' SUF [Dkt. 268] ¶¶ 14, 15) Defendants simply ignore the Plan's express terms, which defined an "Allowed" Claim to include those allowed "pursuant to the Plan" or "pursuant to any contract . . . or other agreement entered into in connection" with the Plan (such as the Environmental Settlement Agreement), or "through the Tort Claims Trust Distribution Procedures." (Plan, Article I.A.4)

**B.    Defendants Seek To Rewrite The Confirmation Order And Plan To Deprive Creditors Of Their Bargain And Create An Irrational Agreement.**

Despite the express terms and operation of the Confirmation Order and Plan, Defendants argue that if Tronox wins this case and recovers the value of the oil and gas assets fraudulently transferred from it, the Court would be required to: (i) determine the "allowability" of each environmental and tort claim under § 502, including whether each proof of claim was "timely filed" or is "time barred" and whether "there [is] a causation element for the tort claims and the like" (7/19/11 Hr'g Tr. [Dkt. 254] at 38; *see also* Bifurcation Reply Br. [Dkt. 250] at 6); (ii) determine the amount of the allowed claims as of the petition date utilizing "a very different

analysis" than the valuation of those claims for solvency (7/19/11 Hr'g Tr. [Dkt. 254] at 38); and

(iii) reduce Tronox's recovery in the litigation to the amount resulting from these complex

calculations (Bifurcation Reply Br. [Dkt. 250] at 5–6).[7]

In other words, Defendants seek to require the parties to litigate precisely what they

already have settled through the Confirmation Order and Plan. This would completely rewrite

the Confirmation Order and Plan by negating the core exchange that underlies them—large but

unquantified environmental and tort claims for a large but uncertain litigation recovery. It also

would result in a one-sided and irrational deal that the environmental and tort creditors never did,

and never would, accept. (*See* U.S. Joinder [Dkt. 259] at 1–2; Nevada Joinder [Dkt. 263] at 3–4;

Governmental Entities' Joinder [Dkt. 264] at 2–3; Tort Claims Trust Joinder [Dkt. 266] at 4) If

Plaintiff loses—a prospect that Defendants maintain is almost certain—these creditors would

have surrendered their claims for a relative pittance. But if Plaintiff runs the gauntlet and wins,

the environmental and tort creditors would have their recovery capped (following a second trial)

at essentially what other creditors already have received. (Opp'n Br. at 13 (noting that "all other

creditors have recovered only 100%")) Of course, it was precisely *because* the environmental

and tort creditors were willing to accept the risk of a contingent asset that other creditors could

obtain a near 100% recovery. No rational unsecured creditor would leave non-contingent assets

to other creditors and accept the risk of a contingent recovery if the best it could do is receive the

same amount as those other unsecured creditors—especially when it *held all the cards in the

bankruptcy.* (*See* Disc. Stmt. at 7 ("absent a settlement [with Tronox's environmental creditors],

---

[7]   Defendants' argument that a separate trial is required on the allowability of the tort claims would eradicate the
Tort Claims Trust Distribution Procedures, which set forth detailed and self-executing procedures for allowing
tort claims. Defendants' citation to a provision of the Multistate Environmental Response Trust detailing the
procedures for submitting and approving remediation budgets for distributions to particular sites has nothing to
do with the allowance of the environmental claims through the Plan and Confirmation Order. (Opp'n Br. ¶ 60
n.175)

Tronox could not secure financing to pay the [environmental creditors'] administrative claims in full to emerge from bankruptcy."))

### C. The Parties Agreed Only To Reserve All Available Arguments About The Effect Of The Plan Documents, Not To Change Their Legal Effect.

Defendants' response to the clear terms and effect of the Confirmation Order and Plan is to invoke the reservation of rights in the Confirmation Order. (Opp'n Br. ¶¶ 53, 66) By its plain terms, however, the parties simply reserved the right to make any "available arguments" about "the effect, if any, of the Plan documents on the determination of liability or measure of damages" in this case. (Conf. Order ¶ 191) They did not agree to alter the legal effect of the Confirmation Order or Plan Documents.

The reservation of rights resolved Defendants' objections to the Plan. Defendants had objected "to the extent the Plan is intended to circumvent the limitations of section 550(a) of the Bankruptcy Code by increasing the measure of damages *otherwise applicable* to the Anadarko Litigation."[8] (Obj. ¶ 44 (emphasis added)) In particular, Defendants objected that the Environmental Response Trust should not be able to transfer funds that ultimately are not spent, if any, to Superfund. (*Id.* ¶ 45) During the Confirmation Hearing, the Debtors represented in response to the Court's inquiry that, in connection with the environmental and tort settlements, there were no "objections to the transfer of rights . . . and the consideration that's going along with the rights from the debtors." Neither Defendants' counsel, nor anyone else, disagreed. (11/17/10 Hr'g Tr. at 20) At no point in either their Plan Objection or at the Confirmation Hearing did Defendants suggest that the value of the contingent recovery in this case exceeded the environmental and tort claims being surrendered.

---

[8]    Of course, no one is seeking to "circumvent the limitations of § 550(a) of the Bankruptcy Code." All Plaintiff seeks are the damages that are mandated by the express terms of § 550(a)—no more and no less.

After Debtors presented the Plan and supporting evidence through proffers and declarations, the Court recessed for four hours while the parties attempted to resolve Anadarko's Plan Objection. (*Id.* at 75) The result of that negotiation was the reservation of rights in the Order:

> All parties reserve the right to make any available arguments, and assert any available claims and available defenses concerning the effect, if any, of the Plan Documents on the determination of liability or measure of damages (including, to the extent relevant, the value of the Tort Claims and the Environmental Claims) in the Anadarko Litigation, including under section 550 of the Bankruptcy Code.

(Conf. Order ¶ 191)  Immediately thereafter, Debtors' counsel explained the reservation of rights:

> where we ended up . . . is just a whole bunch of reservations of rights by both parties to be able to make any arguments they want in connection with the Anadarko litigation.  No matter how good those arguments are or bad, they just wanted the right to say anything they wanted to say.

(11/17/10 Hr'g Tr. at 75)  Neither Defendants' counsel, nor anyone else, objected to this characterization.[9]

In short, the parties reserved all available arguments about the effect, if any, of the Plan documents on recovery in this case, including their arguments based on § 550.  They are making those arguments now.  The parties did not agree, however, to alter the legal effect of the Confirmation Order or the Plan Documents, much less to rewrite the Confirmation Order and Plan by negating the core exchange of unquantified claims for an uncertain litigation recovery on which they are based.

---

[9]    The reservation of rights in the Confirmation Order is consistent with the reservation in the Plan. (*Compare* Conf. Order ¶ 191 *with* Plan, Article IV.C.5 n.4)  But to the extent there is any inconsistency, the Confirmation Order controls and supersedes the Plan. (Conf. Order ¶ 168 ("If there is any direct conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall control."); *In re Forklift LP Corp.*, 363 B.R. 388, 396 (Bankr. D. Del. 2007) ("when the plan and the confirmation order contradict, the confirmation order prevails.") (internal quotations omitted).)

For the same reasons, Defendants' repeated refrain that they have the "right to contest the value and validity of tort and environmental claims" in connection with this litigation is a red herring. (Opp'n Br. at 4, 40, 44)  Plaintiff has never asserted otherwise.  Plaintiff has no doubt that Defendants will submit lengthy expert reports asserting that the environmental and tort claims have little or no value, and therefore Tronox was solvent at the time of the fraudulent transfers.  But should Tronox prevail on its actual or constructive fraudulent transfer claims, and recover the value of the fraudulently transferred oil and gas assets under § 550, Defendants are not entitled to a second trial on the "allowability" of the environmental and tort claims for purposes of capping Tronox's recovery.  Those claims already have been compromised, allowed and exchanged for the recovery in this case.  Indeed, if the legal effect of the Confirmation Order and Plan were open to challenge, the environmental and tort creditors could likewise re-litigate the terms of the Confirmation Order and Plan if Plaintiff loses this case.  But that is equally foreclosed.[10]

## IV.    Defendants' Judicial Estoppel Argument is Wholly Without Merit.

As a last-ditch effort to achieve a "claims cap" that Congress did not provide in § 550, that courts uniformly have held does not exist, and that would rewrite the terms of the Confirmation Order and Plan, Defendants now seek to estop Plaintiff from asserting that its right

---

[10]  For the same reasons, Defendants miss the point in arguing that their rights cannot be prejudiced by a settlement in which they took no part.  The Confirmation Order—not the Global Settlement—binds every party in interest, including Defendants.  That Order was entered after notice and full due process. (Conf. Order at 1–5; 11 U.S.C. § 1147(a) ("the provisions of a confirmed plan bind the debtor . . . and any creditor . . . whether or not the claim or interest of such creditor . . . is impaired under the plan and whether or not such creditor . . . has accepted the plan"); *Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991) ("any attempt by the parties or those in privity with them to relitigate any of the matters that were raised or *could have been raised* [in a confirmation order] is barred under the doctrine *res judicata*") (internal quotations omitted)).

to recover is not capped at the amount of creditor claims.[11]  (Opp'n Br. at 41–44)  This too fails for multiple independent reasons.

As an initial matter, Defendants' judicial estoppel theory squarely conflicts with the reservation of rights upon which Defendants rely so heavily in their cross-motion.  The reservation protects the right of "all parties"—including Plaintiff—to argue about the effect of the Plan Documents on liability or damages in this case "*including under Section 550 of the Bankruptcy Code.*" (Conf. Order ¶ 191 (emphasis added))  When they agreed to this reservation, Defendants were fully aware of Plaintiff's damages theory and had the declarations that they now assail.  In short, Plaintiff is simply asserting arguments that Defendants expressly agreed it could make with full knowledge of the facts that Defendants now claim give rise to an estoppel.

In any event, Defendants' judicial estoppel argument is wrong.  Among other things, judicial estoppel requires that "a party's later position is 'clearly inconsistent' with its earlier position" and that "the party's former position has been adopted in some way by the court in the earlier proceeding." *In re Adelphia Recovery Trust*, 634 F.3d 678, 695–96 (2d Cir. 2011). Neither of these requirements is satisfied here.  For Plaintiff to be estopped, Tronox would have had to clearly convey to the Court during the confirmation process that its recovery from this litigation would be capped in the amount of unpaid environmental and tort claims and the Court would have had to adopt that position.  Tronox has never taken the position that its recovery is capped—because it is not—and this Court never adopted such a position.

---

[11]  Read literally, Defendants argue that Plaintiff should be estopped "from recovering more than the value of Tort and Environmental Claims and from precluding Defendants from adjudicating the value of such claims." (Opp'n Br. at p. 41)  But Plaintiff is not contending that the tort and environmental creditors will recover more than the value of their claims (although that is certainly permitted by § 550).  Instead, they will recover the exact amount for which their claims have been settled and allowed.  Nor has Plaintiff ever asserted that Defendants are precluded from contesting the validity or amount of the environmental and tort claims in this litigation.  Defendants' estoppel argument fails for these reasons as well.

31

Ignoring the nature of the Plan and Global Settlement, Defendants myopically focus on two statements from Tronox's declarations stating the declarants' belief that no class of creditors is "recovering more than in full under the Plan on account of its Claims." (Wanlass Decl. [Case No. 09-10156, Dkt. 2500] ¶ 38; *see also* Snyder Decl. [Case No. 09-10156, Dkt. 2501] ¶ 24) But there is nothing inconsistent between those statements and Plaintiff's summary judgment motion. As these declarations, Tronox's Disclosure Statement, and the Plan and Global Settlement make clear, Tronox's environmental and tort creditors surrendered large but unquantified claims for consideration that included the possibility of a large but uncertain litigation recovery.[12]  That potentially large yet uncertain consideration was a key component of the distribution these creditors received. Indeed, Tronox made clear in its Plan filings that the Anadarko Litigation "is a valuable, albeit, contingent asset" (Disc. Stmt. at 32), and that "any potential recovery is speculative" (Conf. Br. [Case No. 09-10156, Dkt. 2482] at 44).   All parties knew that neither Tronox nor anyone else had prepared a formal valuation of either the environmental and tort claims or the expected value of the litigation.  Defendants could have requested that the value of the claims or litigation be estimated.  They never did.

The parties in agreeing to the Global Settlement, and the Court in approving it, necessarily concluded that this was a fair and reasonable exchange based on unquantified values, and thus these (and other) creditors were not getting paid more than the value of their claims. (Conf. Order ¶¶ 37, 40 (specifically finding that the Global Creditor Settlement "does not violate

---

[12]  *See* Conf. Br. [Case No. 09-10156, Dkt. 2482] at 49 ("The Global Settlement resolves a series of complex and contentious issues presented by these Chapter 11 Cases, including issues related to the estimation of the size and priority of the extensive Claims filed against these estates (including the thousands of Environmental and Tort Claims) and/or the precise amount of distributable value available to satisfy those Claims (including the extent of proceeds recoverable from the Anadarko Litigation, if any)."); Snyder Decl. [Case No. 09-10156, Dkt. 2501] ¶ 23 (same); Wanlass Decl. [Case No. 09-10156, Dkt. 2500] ¶ 43 ("The resolution of Tronox's massive legacy environmental and tort liabilities is a key component of the Global Settlement . . . . One of the many benefits of the Global Settlement is avoiding the time and expense of necessary to determine Tronox's environmental claims").

32

the absolute priority rule")) That is all the Debtors were, and all they could have been, conveying in these declarations. This fair exchange has occurred and the contingent asset already has been transferred to the trusts. It is legally "irrelevant" whether that contingent asset will ultimately prove to be worth more or less than the claims for which it was exchanged. *MC Asset Recovery*, 2006 WL 5112612, at *6 ("the court finds that the question of whether the creditors have now been 'satisfied in full' post-confirmation is irrelevant to the court's present determination" of whether Plaintiff's recovery is capped).

Defendants' citation to a hearing transcript from the *Kipperman* bankruptcy court is equally unavailing. (Opp'n Br. ¶ 46) The bankruptcy court denied defendant's motion to reopen the bankruptcy in order to cap the trustee's recovery, holding that "it would be an inappropriate interference by this Court in pending litigation in" federal district court where the recovery litigation was proceeding. (4/13/07 Hr'g Tr. [D. Del. Case No. 03-11402, Dkt. 1767] at 32:4-6; 34:5-35:22) The district court subsequently granted summary judgment against defendants' cap defense, and also granted summary judgment against a virtually identical judicial estoppel argument. *Kipperman*, 411 B.R. at 878-79, 888. In *Kipperman*, the defendant argued that the trustee should be estopped from recovering amounts in excess of the value of creditor claims because it previously had estimated that those recoveries would be less than the creditors' claims. The court refused to estop the trustee because the positions were not inconsistent: "The amount of the Debtors' potential claims in the disclosure was an estimate . . . . The court finds that judicial estoppel does not 'cap' the Trustee's recovery." *Id.* at 879.[13]

---

[13] As with their judicial estoppel argument, the equitable estoppel argument Defendants raise in a footnote fails, among other reasons, because Plaintiff has not taken any inconsistent positions. (Opp'n Bro. ¶ 64 n.189) *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 395-96 (2d Cir. 2011) (quoting *Maitland v. Univ. of Minn.*, 43 F.3d 357, 364 (8th Cir. 1994) (Both judicial and equitable estoppel require that "'the party who is to be estopped ... must have asserted a fact or claim, or made a promise, that another party relied on, that a court relied on, or that a court adjudicated' and then later attempted to take a contradictory stance in that or another proceeding.")

Finally, judicial estoppel requires a third element that Defendants simply ignore and cannot meet: the party to be estopped must "derive an unfair advantage against the party seeking estoppel." *Adelphia*, 634 F.3d at 696 (also noting "[t]he third requirement is sometimes couched in terms of 'unfair detriment [to] the opposing party' rather than advantage to the party to be estopped.") There is no unfair advantage here. Tronox has made clear since it filed its complaint in May 2009 that it is seeking to recover the value of the oil and gas assets fraudulently removed from its estate. (Compl. [Dkt. 1] ¶¶ 127, 133) Since then, Defendants have been fully aware of the approximate value of those assets. Indeed, Anadarko paid Kerr-McGee shareholders nearly $20 billion for essentially these same assets just a few months after the transfers became effective. (*Id.* ¶ 115) Defendants and their phalanx of lawyers were fully capable of assessing the strength of their § 550 "benefit of the estate" argument prior to confirmation. And Defendants knew that all parties were reserving their arguments about the legal effect of the Plan. (Opp'n Br. at 44) For Defendants to argue that Tronox should now be estopped from pursuing the central claim in this case is absurd.[14]

## CONCLUSION

If Tronox prevails in this litigation, it is entitled under § 544(b) to avoid the fraudulent transfers of its oil and gas assets in their entirety. It is entitled to recover the value of those assets under § 550(a) for the benefit of its estate. Accordingly, Tronox's motion for partial summary judgment should be granted, and Defendants' cross motion should be denied.

---

[14] Defendants' argument that Kerr-McGee's pollution was done at the "behest" of the government is wrong factually and wholly irrelevant to the question of whether there is a cap under § 550(a). (Opp'n Br. ¶ 90) Tronox will address any relevant issues regarding the United States' role at any of Kerr-McGee's sites at trial.

Date:  October 31, 2011

Respectfully submitted,

/s/  David J. Zott, P.C.

David J. Zott, P.C. *(admitted pro hac vice)*
Jeffrey J. Zeiger *(admitted pro hac vice)*
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
david.zott@kirkland.com
jeffrey.zeiger@kirkland.com

*Counsel for the Anadarko Litigation Trust*

35

## CERTIFICATE OF SERVICE

I, Jeffrey J. Zeiger, hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746, that on this 31st day of October 2011, I caused a true and correct copy of the foregoing Plaintiff's Reply in Support of its Motion for Partial Summary Judgment and Opposition to Defendants' Motion for Partial Summary Judgment Regarding Plaintiff's Recovery Under Section 550(a) of the Bankruptcy Code to be served upon the following:

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

Melanie Gray
Jason W. Billeck
Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, TX 77002

*Counsel for Defendants*

**VIA ELECTRONIC MAIL**

Robert William Yalen
Assistant United States Attorney
86 Chambers Street
New York, NY 10007

*Counsel for the United States of America*

            /s/ Jeffrey J. Zeiger
_____

36