Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
Telephone:  (213) 680-6400
Facsimile:  (213) 680-6499

Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

*Counsel to Defendants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, *et al.*, | ) | Case No. 09-10156 (ALG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| TRONOX INCORPORATED, TRONOX WORLDWIDE LLC f/k/a Kerr-McGee Chemical Worldwide LLC, and TRONOX LLC f/k/a Kerr-McGee Chemical LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| | ) | Adv. Pro. No. 09-01198 (ALG) |
| ANADARKO PETROLEUM CORPORATION and KERR-MCGEE CORPORATION, KERR-MCGEE OIL & GAS CORPORATION, KERR-MCGEE WORLDWIDE CORPORATION, KERR-MCGEE INVESTMENT CORPORATION, KERR-MCGEE CREDIT LLC, KERR-MCGEE SHARED SERVICES COMPANY LLC, and KERR-MCGEE STORED POWER COMPANY LLC | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| v. | ) | |
| | ) | |
| TRONOX, INC., TRONOX WORLDWIDE LLC, TRONOX LLC, KERR-MCGEE CORPORATION and ANADARKO PETROLEUM CORPORATION, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*3V Capital Master Fund Ltd., et al., v. Official Comm. of Unsecured Creditors of Tousa, Inc., et al. (In re Tousa, Inc.),*
444 B.R. 613 (S.D. Fla. 2011) .................................................................................................... 6, 7

*Adelphia Recovery Trust v. Bank of America, N.A.,*
390 B.R. 80 (S.D.N.Y. 2008) ........................................................................................................ 7

*Barnett v. Hidalgo,*
478 Mich. 151 (2007) .................................................................................................................. 10

*Bear, Stearns Sec. Corp. v. Gredd,*
275 B.R. 190 (S.D.N.Y. 2002) ...................................................................................................... 6

*Begier v. I.R.S.,*
496 U.S. 53 (1990) ........................................................................................................................ 6

*BFP v. Resolution Trust Corp.,*
511 U.S. 531 (1994) .................................................................................................................. 6, 9

*Bonded Fin. Servs., Inc. v. European Am. Bank,*
838 F.2d 890 (7th Cir. 1988) ...................................................................................................... 17

*Callahan v. Petro Shopping Ctr. #72 (In re Lambert Oil Co., Inc.),*
347 B.R. 173 (W.D. Va. 2006) .................................................................................................... 17

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...................................................................................................................... 4

*Christy v. Alexander & Alexander of New York Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey),*
130 F.3d 52 (2d Cir. 1997) .......................................................................................................... 17

*Clark v. Sec. Pac. Bus. Credit, Inc. (In re Wes Dor, Inc.),*
996 F.2d 237 (10th Cir. 1993) ...................................................................................................... 9

*Coan v. Fleet Credit Card Servs., Inc. (In re Guerrera),*
225 B.R. 32 (Bankr. D. Conn. 1998) ............................................................................................ 4

*Contemporary Indus. Corp. v. Frost,*
564 F.3d 981 (8th Cir. 2009) ................................................................................................ 22, 23

*DG&G, Inc. v. FlexSol Packaging Corp.,*
576 F.3d 820 (8th Cir. 2009) ...................................................................................................... 10

# TABLE OF AUTHORITIES
## (continued)

<div align="right">Page(s)</div>

*Engel v. Teleprompter Corp.*,
  703 F.2d 127 (5th Cir. 1983) ................................................................................ 15, 16

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. De C.V., ING VP*,
  651 F.3d 329 (2d Cir. 2011) ........................................................................... 20, 21, 27

*Farid v. Smith*,
  850 F.2d 917 (2d Cir. 1988) ...................................................................................... 4

*Faulkner v. Kornman (In re The Heritage Org., L.L.C.)*,
  413 B.R. 438 (Bankr. N.D. Tex. 2009) ...................................................................... 14

*Fed. Commc'ns Comm. v. NextWave Personal Commc'ns (In re NextWave Personal Commc'ns, Inc.)*,
  200 F.3d 43 (2d Cir. 1999) ................................................................................... 9, 13

*Gache v. Town of Harrison, N.Y.*,
  813 F. Supp. 1037 (S.D.N.Y. 1993) ....................................................................... 4, 10

*Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*,
  402 F.3d 416 (3d Cir. 2005) ..................................................................................... 8

*Gowan v. The Patriot Group LLC (In re Dreier LLP)*,
  452 B.R. 391 (Bankr. S.D.N.Y. 2011) ....................................................................... 6

*Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*,
  408 B.R. 318 (Bankr. N.D. Cal. 2009) ................................................................... 15, 16

*Grundberg v. Upjohn Co.*,
  137 F.R.D. 365 (D. Utah 1991) ............................................................................... 10

*In re Owens Corning*,
  419 F.3d 195 (3d Cir. 2005) ..................................................................................... 8

*In re Trades Pub. Inc.*,
  10-21483 MBK, 2011 WL 5900945 (Bankr. D.N.J. Oct. 11, 2011) ................................. 6

*Kismet Prods., Inc. v. HCC Benefits Corp.*,
  No. 1:08-mc-00014, 2008 WL 1843987 (N.D. Ohio Apr. 22, 2008) ............................... 3

*Kittay v. Peter D. Leibowits Co., Inc. (In re Duke & Benedict, Inc.)*,
  265 B.R. 524 (Bankr. S.D.N.Y. 2001) .................................................................... 6, 10

*Kreppel v. Guttman Breast Diagnostic Inst., Inc.*,
  1999 U.S. Dist. LEXIS 19602 (S.D.N.Y. Dec. 17, 1999) ............................................. 10

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*LaRose Mkt., Inc. v. Sylvan Ctr., Inc.*,
530 N.W.2d 505 (Mich. 1995) ................................................................ 15, 16

*Lippe v. Bairnco Corp.*,
230 B.R. 906 (S.D.N.Y. 1999) ........................................................................ 7

*Lowschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*,
181 F.3d 505 (3d Cir. 1999) .................................................................... 22, 23

*Maytag Corp. v. Electrolux Home Prods., Inc.*,
448 F. Supp. 2d 1034 (N.D. Iowa 2006) ...................................................... 10

*McHale v. Boulder Capital LLC (In re 1031 Tax Group, LLC)*,
439 B.R. 47 (Bankr. S.D.N.Y. 2010) ........................................................... 17

*Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*,
426 B.R. 96 (Bankr. D. Del. 2010).............................................................. 14

*Oahar v. Jackson (In re Jackson)*,
459 F.3d 117 (1st Cir. 2006) ....................................................................... 13

*Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs. (In re 360networks (USA) Inc.)*,
338 B.R. 194 (Bankr. S.D.N.Y. 2005) ......................................................... 14

*Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*,
453 B.R. 201 (Bankr. S.D.N.Y. 2011) ......................................................... 21

*Official Comm. Of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc. (In re TOUSA, Inc.)*,
422 B.R. 783 (Bankr. S.D. Fla. 2009) ............................................................ 7

*Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*,
343 B.R. 444 (Bankr. S.D.N.Y. 2006) ........................................................... 8

*Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*,
287 B.R. 98 (Bankr. S.D.N.Y. 2002) ........................................................... 17

*Pereira v. Wells Fargo Bank, N.A. (In re Gonzalez)*,
342 B.R. 165 (Bankr. S.D.N.Y. 2006) ..................................................... 6, 10

*Pettigrew v. Citizens Trust Bank*,
229 B.R. 39 (N.D. Ga. 1998).......................................................................... 3

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
  2006 U.S. Dist. LEXIS 77970 (D.N.J. Oct. 26, 2006) ........................................................ 10

*Plassein Int'l Corp. v. B.A. Capital Co. L.P. (In re Plassein Int'l Corp.)*,
  366 B.R. 318 (Bankr. D. Del. 2007) ............................................................ 22, 23

*QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*,
  571 F.3d 545 (6th Cir. 2009) ...................................................................... 20, 22

*Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*,
  216 B.R. 371 (Bankr. S.D.N.Y. 1998) .................................................... 6, 7, 8, 15

*Rubin v. Mfrs. Hanover Trust Co.*,
  661 F.2d 979 (2d Cir. 1981) .......................................................................... 6, 7, 8, 9

*Salahuddin v. Goord*,
  467 F.3d 263 (2d Cir. 2006) ............................................................................ 3, 4

*Samaritan Health Ctr. v. Simplicity Health Care Plan*,
  459 F. Supp. 2d 786 (E.D. Wis. 2006) ............................................................ 10

*Schering Corp. v. Pfizer Inc.*,
  189 F.3d 218 (2d Cir. 1999) .......................................................................... 10

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc. (In re Stratton Oakmont, Inc.)*,
  234 B.R. 293 (Bankr. S.D.N.Y. 1999) ............................................................ 14

*Sensenich v. Molleur (In re Chase)*,
  328 B.R. 675 (Bankr. D. Vt. 2005) ............................................................ 10, 13

*Sherman v. Greenstone Farm Credit Servs., ACA*,
  No. 3:11–CV–0710–N, 2011 WL 2038573 (N.D. Tex. May 24, 2011) ................. 3

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*,
  337 B.R. 791 (Bankr. S.D.N.Y. 2005) .............................................................. 9

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distributors, Inc.)*,
  379 B.R. 5 (Bankr. E.D.N.Y. 2007) .............................................................. 14

*Tenneco Inc. v. Enter. Prods. Co.*,
  925 S.W.2d 640 (Tex. 1996) .................................................................... 15, 16

*Tower Auto. Mexico, S. de R.L. de C.V. v. Grupo Proeza, S.A. de C.V. (In re Tower Auto., Inc.)*,
  356 B.R. 598 (Bankr. S.D.N.Y. 2006) .............................................................. 8

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*,
  429 B.R. 73 (Bankr. S.D.N.Y. 2010) ............................................................. 5, 14

*Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*,
  860 F.2d 515 (2d Cir. 1988) ........................................................................... 8

*United States v. Bestfoods*,
  524 U.S. 51 (1998) ......................................................................................... 15

**STATUTES**

11 U.S.C. § 101 ................................................................................................ passim

11 U.S.C. § 544 ........................................................................................... 6, 7, 14, 18

11 U.S.C. § 546 ................................................................................................ passim

11 U.S.C. § 546(e) ........................................................................................... passim

11 U.S.C. § 548 ................................................................................................ passim

11 U.S.C. § 550(a) ...................................................................................... 2, 4, 14, 17

11 U.S.C. § 561(a) ........................................................................................... passim

11 U.S.C. § 741 ................................................................................................ passim

28 U.S.C. § 157 ................................................................................................ 3

28 U.S.C. § 1334 .............................................................................................. 3

OKLA. STAT. ANN. tit. 24, § 116 ..................................................................... 5, 7, 13

OKLA. STAT. ANN. tit. 24, § 117 ..................................................................... 4, 7

**RULES**

FED. R. EVID. 801(d)(2)(B) .............................................................................. 10

FED. R. BANKR. P. 7056(a) ............................................................................... 3

FED. R. CIV. P. 56(a) ........................................................................................ 3, 4

BANKR. S.D.N.Y. R. 7056-1 ............................................................................ 2

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

**OTHER AUTHORITIES**

1 CHARLES R.P. KEATING, ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE
CORPORATIONS, § 25 (2012) ................................................................................................. 8

BLACK'S LAW DICTIONARY 1342 (5th ed. 1979) ...................................................................... 15

10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE
AND PROCEDURE (3D ED. 1998) ............................................................................................ 4

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

JURISDICTION ........................................................................................................................... 3

STATEMENT OF FACTS ............................................................................................................ 3

SUMMARY JUDGMENT STANDARD ...................................................................................... 3

ARGUMENT ................................................................................................................................ 5

I.      All Constructive Fraudulent Transfer Claims Involving Transfers Made By Tronox LLC
        Should Be Dismissed .......................................................................................................... 5

        A.      Plaintiffs Erroneously Treat Tronox Inc., Tronox Worldwide And Tronox LLC
                As A Single, Consolidated Entity For Purposes Of Determining REV ............................ 5

        B.      Section 548 Of The Bankruptcy Code And The Oklahoma UFTA Require REV
                To Be Evaluated For Each Debtor Transferor Without Substantive Consolidation .......... 6

        C.      When Properly Evaluated As A Separate Debtor, There Is No Genuine Issue Of
                Material Fact As To Whether Tronox LLC Received REV ............................................... 9

        D.      Defendants' Evidence Reflects That Tronox LLC Received Value Far In Excess
                Of Fair Market Value And Plaintiffs' Evidence Confirms This Conclusion .................. 10

        E.      Where There Is No Disputed Issue Of Material Fact That Tronox LLC Received
                Far More Value Than It Gave, The "Totality Of The Circumstances" Test May
                Not Be Used To Reach A Contrary REV Conclusion .................................................... 13

II.     Anadarko Is Not A Subsequent Transferee ....................................................................... 14

III.    Section 546(e) Of The Bankruptcy Code Bars Plaintiffs From Prosecuting Actual
        Fraudulent Transfers Alleged In Count I And Constructive Fraudulent Transfers Alleged
        In Counts II And III ........................................................................................................... 18

        A.      The IPO Transfers Cannot Be Avoided Because They Were Settlement Payments
                And/Or Transfers Made In Connection With A Securities Contract That Were
                By, To Or For The Benefit Of, A Financial Institution Or Financial Participant ........... 19

                (i)      Payments Made To Defendant, New Kerr-McGee, In Connection
                         With The IPO Were "Settlement Payments" ......................................... 20

                (ii)     The IPO Transfers Were Made By, To Or For The Benefit Of,
                         "Financial Institutions" And/Or "Financial Participants" ..................... 22

                (iii)    The IPO Transfers May Not Be Avoided Because They Were
                         Made By, To Or For The Benefit Of, A Financial Institution Or
                         Financial Participant In Connection With A Securities Contract ......... 25

        B.      The Collapsed Project Focus And IPO Transfers May Not Be Avoided Under
                § 546(e) ........................................................................................................................ 26

                (i)      The Transfers Occurring Pursuant To A "Collapsed" Transaction
                         May Not Be Avoided Because They Are "Settlement Payments" ........ 27

i

**TABLE OF CONTENTS**
**(continued)**

Page

(ii) The Transfers Occurring Pursuant To A "Collapsed" Transaction Were Made By, To Or For The Benefit Of, A "Financial Institution" Or "Financial Participant" ..................................................28

(iii) The Collapsed Transfers Cannot Be Avoided Because They Were Made By, To Or For the Benefit Of, A Financial Institution Or Financial Participant In Connection With A Securities Contract ..........................................................................29

C. The Project Focus Transfers May Not Be Avoided Under § 546(e)..............................30

(i) The Project Focus Transfers Were Settlement Payments .....................30

(ii) The Project Focus Transfers Were Made By, To Or for The Benefit Of, A "Financial Participant" ....................................................30

(iii) The Project Focus Transfers Were Made By, To Or For The Benefit Of, A Financial Participant In Connection With A Securities Contract ..............................................................................31

CONCLUSION.................................................................................................................32

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT SEEKING DISMISSAL
OF (I) CONSTRUCTIVE FRAUDULENT TRANSFER CLAIMS INVOLVING TRANSFERS
MADE BY TRONOX LLC; (II) ANADARKO PETROLEUM CORPORATION AS A
SUBSEQUENT TRANSFEREE WITH RESPECT TO ALL ALLEGED FRAUDULENT
TRANSFERS; AND (III) ALL ACTUAL AND CONSTRUCTIVE FRAUDULENT
TRANSFER CLAIMS PROTECTED BY SECTION 546(e) OF THE BANKRUPTCY CODE**

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

Anadarko Petroleum Corporation, Kerr-McGee Corporation, Kerr-McGee Oil & Gas
Corporation, Kerr-McGee Worldwide Corporation, Kerr-McGee Investment Corporation, Kerr-McGee
Credit LLC, Kerr-McGee Shared Services Company LLC and Kerr-McGee Stored Power Company LLC
(collectively, the "Defendants"), file this Motion (the "Motion") for Partial Summary Judgment Seeking
Dismissal of (i) Constructive Fraudulent Transfer Claims in Counts II and III of Plaintiffs' Amended
Adversary Complaint (the "Complaint") involving transfers made by Tronox LLC; (ii) Anadarko
Petroleum Corporation as a Subsequent Transferee with Respect to Any and All Alleged Fraudulent
Transfers; and (iii) all actual and constructive fraudulent transfer claims protected by Section 546(e) of
the Bankruptcy Code and respectfully represent:

## PRELIMINARY STATEMENT

Defendants move for summary judgment on three discrete legal issues.  First, Defendants
seek summary judgment on all constructive fraudulent transfer claims relating to transfers made by
Tronox LLC because the undisputed evidence demonstrates that Tronox LLC received consideration of at
least     Redacted     more than it gave to any Defendant.   Consideration of the "totality of the
circumstances" may not be used to reach a contrary reasonably equivalent value ("REV") conclusion.
Moreover, any attempt by Plaintiffs to argue that REV may be considered on a consolidated basis, rather
than an entity-by-entity basis, contradicts long-established precedents and controlling law.  Accordingly,
summary judgment is appropriate.

Second, Defendants are entitled to summary judgment dismissing Anadarko as a
subsequent transferee of all allegedly fraudulently transfers.  Despite the voluminous evidentiary record,

there is no evidence that any alleged initial transferee ever conveyed the property that was the subject of the initial transfers to Anadarko. Anadarko's purchase of New Kerr-McGee's[1] equity interest did not result in the transfer of any asset which was the subject of an initial transfer. Rather, the initial transferees continued to retain such property despite Anadarko's acquisition of New Kerr-McGee's equity interest. Indeed, because Anadarko did not receive a subsequent transfer, it cannot be a subsequent transferee under Bankruptcy Code section 550(a)(2). Accordingly, summary judgment is appropriate.

Third, Defendants submit that the transfers made in connection with Project Focus and the IPO (whether collapsed or not) satisfy the requirements of § 546(e) in multiple ways, any one of which is sufficient to prevent the avoidance of such transfers.[2] In particular, the transfers made in connection with Project Focus and the IPO (i) constitute settlement payments made by, to, or for the benefit of, a financial institution and/or a financial participant, and/or (ii) were transfers made by, to or for the benefit of, a financial institution and/or a financial participant in connection with a securities contract.

---

[1]    New Kerr-McGee refers to Kerr-McGee Corporation, Anadarko's wholly owned subsidiary, which is an entity that was incorporated on May 11, 2001 and that became the parent company of all other Kerr-McGee affiliates on August 1, 2001. New Kerr-McGee is distinct from the entity named Kerr-McGee Corporation that existed on and before May 11, 2001 that Plaintiffs often refer to as "Old KM" and that is now known as Tronox Worldwide.

[2]    Although Defendants submit that they are entitled to seek summary judgment pursuant to § 546(e) of the Bankruptcy Code, Plaintiffs contend that such provision is an affirmative defense that Defendants have failed to timely plead. While Defendants do not agree with Plaintiffs' position, they intend to follow the Court's suggestion made at the February 23, 2012 Rule 7056-1 pre-motion conference (the "Pre-Motion Conference") that Defendants promptly file a motion addressing (i) whether § 546(e) is an affirmative defense, (ii) if § 546(e) is an affirmative defense, whether Defendants have preserved such defense, (iii) if Defendants have not preserved such defense, whether leave to amend their answer is warranted, and (iv) any related issue (the "Section 546(e) Motion"). In order to avoid any argument about whether Defendants have timely filed all dispositive motions by the deadline to which the parties have agreed, Defendants are including their request for summary judgment relief under § 546(e) herein. Defendants request that the Court carry their § 546(e) summary judgment arguments until the Court rules on Defendants' Section 546(e) Motion.

## JURISDICTION

1.    This Court[3] has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  The fraudulent transfer claims that are the subject of this Motion are listed as core proceedings under 28 U.S.C. § 157(b)(2)(H).[4]

## STATEMENT OF FACTS

2.    The facts relevant to this Motion are set forth in the Statement of Undisputed Material Facts in Support of the Motion (the "SOF"), which is attached hereto as Exhibit A and incorporated herein for all purposes.

## SUMMARY JUDGMENT STANDARD

3.    Rule 56(a), made applicable to this proceeding by Rule 7056(a) of the Federal Rules of Bankruptcy Procedure, provides that a "party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought."[5]  "[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law."[6]  When the non-movant bears the burden of proof at trial:

> the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its

---

[3]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the SOF (as defined below).

[4]    As indicated at the Pre-Motion Conference, Defendants have not consented, and do not consent, to this Court's issuance of final orders and judgments on the fraudulent transfer claims.  By filing this Motion for Partial Summary Judgment, Defendants do not waive their right to require a final determination by an Article III Court, and consent should not be implied as a result of the filing and/or prosecution of this Motion.  Consistent with the District Court's Amended Standing Order of Reference re: Title 11 dated January 31, 2012, this Court is authorized to submit proposed findings of fact and conclusions of law on a non-consenting party's motion for summary judgment for the District Court's review.  *See Sherman v. Greenstone Farm Credit Servs., ACA*, No. 3:11–CV–0710–N, 2011 WL 2038573, at *2 (N.D. Tex. May 24, 2011); *Kismet Prods., Inc. v. HCC Benefits Corp.*, No. 1:08-mc-00014, 2008 WL 1843987, at *2 (N.D. Ohio Apr. 22, 2008); *Pettigrew v. Citizens Trust Bank*, 229 B.R. 39, 40 (N.D. Ga. 1998).

[5]    FED. R. CIV. P. 56(a).

[6]    *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citations omitted).

opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings.  If the movant makes this showing in either manner, the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact.[7]

4.    Like the movant, the non-movant cannot rest on allegations in the pleadings and must point to specific evidence to carry its burden on summary judgment.[8]  If, after drawing all reasonable inferences in favor of the non-moving party and reading the record in a light most favorable to him, no reasonable trier of fact could find in his favor, summary judgment is appropriate.[9]  Indeed, entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of any part of a claim on which he bears the burden of proof.[10]

5.    As demonstrated below, Defendants both "point to evidence that negates [Plaintiffs'] claim" that Tronox LLC received less than REV in connection with the transfers challenged by Plaintiffs and Defendants also "identify those portions of [Plaintiffs'] evidence that demonstrate the absence of a genuine issue of material fact" concerning Tronox LLC's receipt of REV.  Accordingly, Defendants are entitled to partial summary judgment under Rule 56(a) on all of Plaintiffs' constructive fraudulent transfer claims involving transfers made by Tronox LLC.

6.    Defendants also "point to evidence that (i) negates [Plaintiffs'] claim" that Anadarko is a "subsequent transferee" under Bankruptcy Code § 550(a)(2); and (ii) establishes that there

---

[7]    *Id*. at 272-73 (citations omitted); *see also Farid v. Smith,* 850 F.2d 917, 924 (2d Cir. 1988); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2727, at 471-75 (3d ed. 1998).

[8]    *Salahuddin*, 467 F.3d at 272-73 (citations omitted).

[9]    *Gache v. Town of Harrison, N.Y.*, 813 F. Supp. 1037, 1040 (S.D.N.Y. 1993) (citing *Murray v. Nat'l Broad. Co.*, 844 F.2d 988, 992 (2d Cir. 1988), *cert. denied*, 488 U.S. 955 (1988)).

[10]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Coan v. Fleet Credit Card Servs., Inc. (In re Guerrera)*, 225 B.R. 32, 35 (Bankr. D. Conn. 1998) ("The trustee has the burden of proving, *inter alia*, a lack of 'reasonably equivalent value.'") (citing *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997); *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 993 (2d Cir. 1981)).

is no genuine issue of material fact concerning whether the Project Focus and IPO transfers (whether collapsed or not) are subject to the safe harbor provisions of § 546(e) of the Bankruptcy Code.

## ARGUMENT

### I.    All Constructive Fraudulent Transfer Claims Involving Transfers Made By Tronox LLC Should Be Dismissed

7.    Counts II and III of the Complaint assert constructive fraudulent transfer claims under § 548(a)(1)(B) of the Bankruptcy Code and §§ 116 and 117 of the Oklahoma UFTA.  Both counts require Plaintiffs to demonstrate that Tronox LLC received less than REV in exchange for the challenged transfers of its interests in property.[11]  While the parties disagree over the appropriate dates for valuing the transfers made by Tronox LLC, Defendants submit that even if Plaintiffs are permitted to value all such transfers as of the November 28, 2005 IPO Date (rather than the actual 2002 Project Focus Date), the result is the same:  namely, there is no evidence in the record that raises a genuine issue of material fact concerning whether Tronox LLC received REV in connection with the challenged transfers.

### A.    Plaintiffs Erroneously Treat Tronox Inc., Tronox Worldwide And Tronox LLC As A Single, Consolidated Entity For Purposes Of Determining REV

8.    Plaintiffs and their expert seek to obscure the fact that Tronox LLC received REV by improperly analyzing whether Tronox Incorporated ("Tronox Inc."), Tronox Worldwide LLC ("Tronox Worldwide") and Tronox LLC (*i.e.*, all three Plaintiffs, collectively, the "Consolidated Debtors") jointly received REV on a consolidated, rather than individual entity, basis (the "Consolidated Approach").[12]  Both the Complaint and the Williams Report erroneously employ the Consolidated

---

[11]    11 U.S.C. § 548; OKLA. STAT. ANN. tit. 24, § 116.

[12]    In the introductory paragraph of the Adversary Complaint, Plaintiffs define Tronox Inc., Tronox Worldwide, and Tronox LLC collectively as "Tronox."  SOF ¶ 8.  Later, in ¶ 142 of the Complaint, Plaintiffs define the "Tronox Entities" to mean Tronox Inc., Tronox Worldwide, Tronox LLC and "their affiliates and predecessors."  SOF ¶ 15.  In Count II, Plaintiffs allege that "[t]he *Tronox Entities* did not receive reasonably equivalent value from New Kerr-McGee [or New Kerr-McGee subsidiaries] or [. . .] in exchange for the Transfers and Obligations."  SOF ¶ 17 (emphasis added).  In Count III, Plaintiffs allege that *Tronox* did not receive REV from Anadarko and New Kerr-McGee in exchange for payments it made or became obligated to make for Anadarko's and New Kerr-McGee's benefit within two years of Tronox's bankruptcy filing.

Approach to (i) aggregate the transfers made and obligations incurred by the Consolidated Debtors;[13] and (ii) compare the aggregated value of the transfers made and consideration received by the Consolidated Debtors rather than the values given and received by the three separate debtors.    Redacted

[14]

B.    **Section 548 Of The Bankruptcy Code And The Oklahoma UFTA Require REV To Be Evaluated For Each Debtor Transferor Without Substantive Consolidation**

9.    The Consolidated Approach is improper and erroneous as a matter of law.[15] Sections 544 and 548 of the Bankruptcy Code, and by incorporation, the Oklahoma UFTA, permit the trustee to avoid only the "transfer . . . of an interest **of the debtor** in property"[16] and to compare "the fair

---

SOF ¶ 19.
      SOF ¶ 40.

[13]    SOF ¶¶ 15-19, 42.

[14]    SOF ¶¶ 40, 42.

    Redacted

[15]    *See, e.g., Rubin,* 661 F.2d at 991-93 (holding that "the court must attempt to measure the economic benefit, if any, that accrued to *each bankrupt* [and determine] . . . whether that benefit was 'disproportionately small' when compared to the size of the security that *that bankrupt gave*") (emphasis added); *Kittay v. Peter D. Leibowits Co., Inc. (In re Duke & Benedict, Inc.),* 265 B.R. 524, 531 (Bankr. S.D.N.Y. 2001) (holding that in evaluating REV "a court must determine the 'interest of the debtor' that was transferred. In other words, the measuring test does not examine the value of the property that was conveyed, but the value of the *debtor's interest* in the property conveyed.") (emphasis in original); *3V Capital Master Fund Ltd., et al., v. Official Comm. of Unsecured Creditors of Tousa, Inc., et al. (In re Tousa, Inc.)* 444 B.R. 613, 651 (S.D. Fla. 2011) ("[r]easonably equivalent value must be measured in terms of the value of the *debtor's interest in the property conveyed.*") (emphasis in original); *In re Trades Pub. Inc.,* 10-21483 MBK, 2011 WL 5900945, *7 (Bankr. D.N.J. Oct. 11, 2011) ("The Court must analyze reasonably equivalent value in terms of the value of the debtor's interest in the property conveyed."); *Pereira v. Wells Fargo Bank, N.A. (In re Gonzalez),* 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006) ("In evaluating [fair market value], courts compare the payments made by the debtor with the fair market value of the benefit received."); *see also BFP v. Resolution Trust Corp.,* 511 U.S. 531, 535 (1994) (finding that in order to avoid a transfer under § 548, *the debtor's interest in property* must be transferred) (emphasis added).

[16]    Although the Bankruptcy Code does not define the term "interest of the debtor in property," the Supreme Court has held that the meaning of the term used in the avoidance provisions is coextensive with the meaning of the term used in § 541(a). *Begier v. I.R.S.,* 496 U.S. 53, 66-67 (1990). Although the *Begier* court specifically addressed the language of § 547, courts have nonetheless applied the holding to the identical language found in § 548. *See, e.g., Bear, Stearns Sec. Corp. v. Gredd,* 275 B.R. 190, 194 (S.D.N.Y. 2002); *Gowan v. The Patriot Group LLC (In re Dreier LLP),* 452 B.R. 391, 415 (Bankr. S.D.N.Y. 2011); *see also Regency Holdings*

market value of the interests **of the debtor** in property with the fair market value of the benefit received"

by the debtor.[17]   Because sections 544 and 548 require the court to determine whether "the debtor"

received REV and each of the Plaintiffs is a distinct and independent "debtor," each must be considered

separately.[18]  It is for precisely this reason that a trustee may not avoid fraudulent transfers of an affiliated

debtor's interests in property.[19]

        10.      The independent treatment of affiliated debtors and their respective estates not

only comports with the plain language of the statute, it also flows naturally from the separate property

rights such entities enjoy under non-bankruptcy law.[20]  As explained by Judge Bernstein:

> As a rule, parent and subsidiary corporations are separate entities, having
> separate assets and liabilities.  The parent's ownership of all of the shares
> of the subsidiary does not make the subsidiary's assets the parent's.
> Hence, the parent's creditors have no claim to the subsidiary's assets,
> and *vice versa.*  A party seeking to overcome the presumption of

---

*(Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 375 (Bankr. S.D.N.Y. 1998) (holding that "property that would not have been property of the estate [under § 541(a)] cannot be recovered" in an avoidance action).  Section 544(b) of the Bankruptcy Code and §§ 116 and 117 of the Oklahoma UFTA use the same "interest of the debtor in property" terminology as § 548.  In particular, § 544(b) authorizes the trustee to avoid any transfer of *an interest of the debtor in property* . . . voidable under applicable law" while the Oklahoma UFTA requires a "*debtor's* (1) *transfer of an interest in property.*"  OKLA. STAT. ANN. tit. 24, § 116 (emphasis added).

[17]    *See* n.15 *supra* and n.19 *infra.*

[18]    *Official Comm. Of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783, 861 (Bankr. S.D. Fla. 2009) *quashed in part on other grounds*, 444 B.R. 613 (S.D. Fla. 2011) (holding that § 548 "requires consideration of whether 'the debtor' was insolvent and, because each of the Conveying Subsidiaries is a separate and distinct 'debtor,' each must be considered separately.").

[19]    *See Lippe v. Bairnco Corp.*, 230 B.R. 906, 914 (S.D.N.Y. 1999) ("plaintiffs seek to void not the transfer of Keene's property, but the transfer of *Bairnco*'s property . . .  [but because] Keene did not own or have any interest in [Bairnco's property] . . . Keene lacks standing to challenge the conveyance"); *see also Rubin*, 661 F.2d at 993 (same); *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 95 (S.D.N.Y. 2008) (finding that trustee of one debtor's estate could not prosecute an avoidance action for the benefit of an affiliated debtor's estate because creditors of the affiliated debtor's estate did not hold any economic interest in the debtor's estate).

[20]    *In re Regency Holdings (Cayman), Inc.*, 216 B.R. at 375 (acknowledging the "rule" that separate corporate entities have separate assets and liabilities).

separateness must pierce the corporate veil, or prove that the two entities
should be substantively consolidated.[21]

This Court has similarly stated that "[i]t is a basic principle of bankruptcy law that each separate

individual or corporate entity must file a separate bankruptcy petition and . . . each entity [must be]

treated separately unless grounds for substantive consolidation are demonstrated."[22]  In the instant case,

the Plaintiffs' bankruptcy estates were not substantively consolidated,[23] no evidence was presented

supporting the extraordinary remedy of substantive consolidation,[24] and the Complaint does not allege

alter ego or corporate veil piercing.  As such, there is no basis for treating the Plaintiffs as anything other

than separate and distinct legal entities for purposes of evaluating REV.

　　　　　11.　　This conclusion comports with principles of corporate independence and

controlling precedent.  For example, in interpreting the Bankruptcy Act's precursor to § 548(b), the

Second Circuit in *Rubin* held that the statute's emphasis on the term "debtor" requires that the elements of

---

[21]　*Id.*; *see also* 1 CHARLES R.P. KEATING, ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, § 25 (2012) ("It is generally accepted that the corporation is an entity distinct from its shareholders[,] with rights and liabilities [which are] not the same . . . .").

[22]　*Tower Auto. Mexico, S. de R.L. de C.V. v. Grupo Proeza, S.A. de C.V. (In re Tower Auto., Inc.)*, 356 B.R. 598, 603 (Bankr. S.D.N.Y. 2006) (citing *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 58 (2d Cir. 1992)).

[23]　SOF ¶ 5 (providing for only a "deemed substantive consolidation" of the debtors' estates so that "all assets and liabilities of the Tronox Debtors shall be treated as though they were merged into the Estate of Tronox Incorporated for all purposes associated with voting, Confirmation and Distributions," but providing that such "[d]eemed substantive consolidation shall not affect the legal and organizational structure of Reorganized Tronox or its separate corporate existence or that of its subsidiaries and affiliates"); *see also In re Owens Corning*, 419 F.3d 195, 199, 216 (3d Cir. 2005) (noting that a "deemed consolidation" does not result in substantive consolidation, but is instead merely a "pretend consolidation," in which certain interests are merged, "but in fact they remain separate"); *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 423-24 (3d Cir. 2005) (concluding that the debtors' "deemed consolidation" was not an actual substantive consolidation).

[24]　Substantive consolidation "is a remedy that is used 'sparingly' and with caution."  *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 462-63 (Bankr. S.D.N.Y. 2006) (quoting *Union Sav. Bank v. Augie/Restivo Baking Co., (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988)).  The proponent of substantive consolidation must demonstrate that (i) "creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit;'" or (ii) "the affairs of the debtors are so entangled that consolidation will benefit all creditors."  *Augie/Restivo*, 860 F.2d at 518.  Substantive consolidation "is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights."  *Id.* (citing *Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.)*, 432 F.2d 1060, 1062 (2d Cir. 1970)).

a fraudulent transfer claim be evaluated with reference to the debtor alone, not its affiliates.[25]  Insolvency, for instance, "hinges on the financial position of the debtor, not on that of related entities" such that the trustee must demonstrate that the individual debtor is insolvent or insufficiently capitalized, not "that as a whole the [multi-entity] enterprise was in that condition."[26]  Likewise, "fair consideration" (the Bankruptcy Act equivalent of REV), focuses on transfers made and consideration received by the debtor, not the debtor's affiliates.[27]  Accordingly, the question of whether Tronox LLC received REV must be answered by reference to the value Tronox LLC transferred and received, not the value the Consolidated Debtors transferred and received.

   **C.    When Properly Evaluated As A Separate Debtor, There Is No Genuine Issue Of Material Fact As To Whether Tronox LLC Received REV**

   12.    The Supreme Court has stated that because REV has a "meaning similar to fair market value," an REV analysis requires a comparison of the fair market value of the property interests transferred and received by the debtor.[28]  Similarly, the Second Circuit has stated "[i]t is uncontested that the question of reasonably equivalent value is determined by the value of the consideration exchanged between the parties at the time of the conveyance which is challenged."[29]  Although this inquiry may be "a question of fact,"[30] summary judgment is nonetheless appropriate where the value received by the

---

[25]    *Rubin*, 661 F.2d at 995.

[26]    *Id*.

[27]    *Id*. at 991; *see also Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005) (holding that "the issue of fair value in this fraudulent conveyance case must be analyzed from the perspective of cash that was paid out of [the debtor] and into [the debtor,]" rather than transfers to or from the debtor's affiliates).

[28]    *BFP*, 511 U.S. at 545.

[29]    *Fed. Commc'ns Comm. v. NextWave Personal Commc'ns (In re NextWave Personal Commc'ns, Inc.)*, 200 F.3d 43, 56 (2d Cir. 1999) (internal citations and quotation marks omitted).

[30]    *Clark v. Sec. Pac. Bus. Credit, Inc. (In re Wes Dor, Inc.)*, 996 F.2d 237, 242 (10th Cir. 1993).

debtor is particularly high or low.[31]  Value that is "obviously close to fair market value" is presumptively

equal to REV.[32]

    **D.**    **Defendants' Evidence Reflects That Tronox LLC Received Value Far In Excess Of Fair Market Value And Plaintiffs' Evidence Confirms This Conclusion**

    13.    The Balcombe Report, the Balcombe Declaration and the Williams Report (all of

which are admissible summary judgment evidence),[33]                Redacted

                                In particular, the expert

analysis contained in the Balcombe Report reflects that,            Redacted

                                [34]   In addition, as a rebuttal to the Williams Report, the

---

[31]    *See*, *e.g.*, *Kittay*, 265 B.R. at 532 (dismissing constructive fraudulent transfer claim on summary judgment because debtor received at least fair market value); *Gonzalez*, 342 B.R. at 173-74 (same)**.**

[32]    *Sensenich v. Molleur (In re Chase)*, 328 B.R. 675, 682 (Bankr. D. Vt. 2005).

[33]    This Court may rely on the Balcombe Report as admissible evidence because it is verified by the Balcombe Declaration.  *See Gache v. Town/Vill. of Harrison*, 813 F. Supp. 1037, 1052 (S.D.N.Y. 1993) (holding than an expert report verified by a sworn affidavit constituted admissible evidence); *Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006) (holding that a sworn affidavit permitted the court to consider an expert report as evidence on a motion for summary judgment); *DG&G, Inc. v. FlexSol Packaging Corp.*, 576 F.3d 820, 826 (8th Cir. 2009) (same).  The Williams Report and the Williams Rebuttal are also admissible summary judgment evidence because they are admissions by a party-opponent under FED. R. EVID. 801(d)(2)(B).  *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 238 (2d Cir. 1999) (holding that statements in expert reports are party admissions and that, "[a]dmissions by a party opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system . . . [and, as such], [t]he Advisory Committee . . . recommends 'generous treatment of this avenue to admissibility.'") (internal citations omitted); *Kreppel v. Guttman Breast Diagnostic Inst., Inc.*, 1999 U.S. Dist. LEXIS 19602 at *2-*4 (S.D.N.Y. Dec. 17, 1999) (holding that an expert report qualified as a party admission under FED. R. EVID. 801(d)(2)(B)); *Samaritan Health Ctr. v. Simplicity Health Care Plan*, 459 F. Supp. 2d 786, 799 (E.D. Wis. 2006) (holding that an expert's damages report qualified as a party admission under FED. R. EVID. 801(d)(2)(B) when offered by a party-opponent on summary judgment); *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 2006 U.S. Dist. LEXIS 77970, at *13-14 (D.N.J. Oct. 26, 2006) ("As a general rule, if a third party uses a[n] [expert] report that has been prepared at its request in such a way as to manifest a belief in the truth of assertions contained therein, it may be found to have adopted the assertions if they are offered by a party-opponent.") (internal citations omitted); *Barnett v. Hidalgo*, 478 Mich. 151, 162 (2007) (holding that an expert report qualified as a party admission under a state law analog to FED. R. EVID. 801(d)(2)(B) and therefore could be relied upon by a party opponent); *Grundberg v. Upjohn Co.*, 137 F.R.D. 365, 369 (D. Utah 1991) (holding that an expert report qualified as a party admission under FED. R. EVID. 801(d)(2)(B)).

[34]    SOF ¶ 49.

Balcombe Report                                    Redacted

                    35

        14.        More importantly, the Williams Report itself reflects that        Redacted

                                                                Although Williams

erroneously applies                                    Redacted

        36    This conclusory statement finds no support in the Williams Report and is, in fact, flatly

contradicted by it.  Indeed, the Williams Report recounts the value of the transfers made and received by

Tronox LLC as follows:                        Redacted

                                37                        Redacted

                38                        Redacted

                39                        Redacted

Applying this appreciation rate to the value of the assets transferred by Tronox LLC in December 2002

---

35    SOF ¶ 51.

36    SOF ¶ 42 (emphasis in original).

37    SOF ¶ 43.

38    SOF ¶ 43.

39    SOF ¶ 44.

results in a November 28, 2005                    Redacted                            Exhibit 8 of the Williams Report

then reflects that,                                              Redacted

[40]    Accordingly,                    Redacted

[41]

15.    In his Response to the Balcombe Report, Williams                    Redacted

[42]    Redacted

[43]  even if, for purposes of this Motion,

Tronox LLC is credited with the entire        Redacted        transfer, Tronox LLC *still* would have received

approximately        Redacted        more than it gave.[44]    Accordingly, even construing this disputed fact in

Plaintiffs' favor, the Williams Report and Rebuttal reflect that Tronox LLC received        Redacted

---

[40]    SOF ¶ 45.                                        Redacted

*See* Williams Rebuttal at p. 42, n.57.

[41]    Calculation:                                    Redacted

[42]    SOF ¶ 53.

[43]    SOF ¶ 54.  As noted above, § 548 and the Oklahoma UFTA require Plaintiffs to identify a property interest of Tronox LLC in these funds.  Identification of a transfer, some undetermined portion of which may have been property of Tronox LLC, does not satisfy this requirement.

[44]    Calculation:                                    Redacted

E.    **Where There Is No Disputed Issue Of Material Fact That Tronox LLC Received Far More Value Than It Gave, The "Totality Of The Circumstances" Test May Not Be Used To Reach A Contrary REV Conclusion**

16.    Plaintiffs have no admissible evidence that Tronox LLC did not receive REV for its transfers.                                    Redacted

[45]                          Redacted                        the presence or absence of good faith is not an essential element to be considered in determining REV.[46]  The honesty of a transferee's intention is, instead, an element of proving an actual fraudulent transfer claim and/or a good faith defense under § 548(c).[47]  In assessing constructive fraudulent transfers, courts primarily look to concrete factors, not the transferee's state of mind.[48]  Where, as here, the objective factors clearly reflect that Tronox LLC received REV and there is no genuine issue of material fact with respect to such determination, summary judgment is appropriate.  Accordingly, Defendants seek the dismissal of all constructive fraudulent transfer claims involving transfers made by Tronox LLC.

---

[45]    SOF ¶ 53.

[46]    OKLA. STAT. ANN. tit. 24, § 116(B) (listing considerations to be taken into account in calculating REV, but omitting any mention of bad faith); *NextWave*, 200 F.3d at 56 (stating that "the question of [REV] is determined by the value of the consideration exchanged" and omitting any reference to bad faith).  While some courts have considered the "totality of the circumstances" in assessing REV, Defendants have found no cases where a court has concluded that there was lacking REV even though the transferor received six times more value than it gave.  In addition, even if the "totality of the circumstances" may, at times, be considered, they should not be used to supplant "an objective test [that is] both reliable and sufficient."  *See Sensenich*, 328 B.R. at 682.

[47]    *See, e.g.*, 11 U.S.C. §§ 548(a)(1)(A) and § 548(c); OKLA. STAT. ANN. tit. 24, § 116(A)(1); *Oahar v. Jackson (In re Jackson)*, 459 F.3d 117, 121-22 (1st Cir. 2006) ("Under the constructive fraud provision in the . . . UFTA, the court is required to assess objective factors, not actual intent . . . The elements of constructive fraud aim at assessing the injury to the creditor, not the intent of the debtor, including whether a transferee provided 'reasonably equivalent value'"); *see also* 11 U.S.C. § 548(a)(1)(B) (omitting any mention of intent, with the exception of certain employment contracts and transfers made where the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured"); OKLA. STAT. ANN. tit. 24, § 116(A)(2) (same).

[48]    *Id.*

## II.    Anadarko Is Not A Subsequent Transferee

17.    Section 550(a) allows a trustee to recover transfers avoided under §§ 544 and 548 from either "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made;[49] or (2) any immediate or mediate transferee of such initial transferee" (also known as a "subsequent transferee").[50]    The undisputed evidence in this case establishes that Anadarko is not a subsequent transferee and therefore summary judgment should be granted.

18.    Anadarko is not an "immediate or mediate transferee of [any] initial transferee" who is named as a Defendant in the Complaint.    Indeed, none of the assets that were the subject of the initial Project Focus and/or IPO transfers were later transferred to Anadarko.    While Plaintiffs allege that Anadarko's subsequent purchase of New Kerr-McGee's stock (an asset that was not the subject of an initial transfer) "benefited" Anadarko and permitted it to "exercise[] dominion and control over the fraudulently conveyed assets,"[51] these allegations do not render Anadarko a subsequent transferee under the plain language of § 550(a)(2) or applicable law.

19.    Cases interpreting § 550(a)(2) require that there be a subsequent transfer before there can be a subsequent transferee.[52]    The term "transferee" is not defined in the Bankruptcy Code,[53]

---

[49]    Because Plaintiffs do not allege that Anadarko was an initial transferee and this Court has dismissed Plaintiffs' allegation that Anadarko was an "entity for whose benefit the initial transfer was made" (*see Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 110 (Bankr. S.D.N.Y. 2010)), Plaintiffs' only remaining allegation is that Anadarko is a subsequent transferee under § 550(a)(2).

[50]    11 U.S.C. § 550(a).    A "mediate" or "immediate" transferee is often referred to as a subsequent transferee. *See, e.g.*, *Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 201 (Bankr. S.D.N.Y. 2005).

[51]    SOF ¶ 20; *see* Complaint ¶¶ 148, 159, 167.

[52]    *See Faulkner v. Kornman (In re The Heritage Org., L.L.C.)*, 413 B.R. 438, 494-97 (Bankr. N.D. Tex. 2009) (in order for there to be a subsequent transferee, there must be a subsequent transfer); *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 96, 102 (Bankr. D. Del. 2010) (requiring that "the initial transfer [must] later [be] made to . . . the subsequent or mediate transferee"); *see also Silverman v. K.E.R.U. Realty Corp. (In re Allou Distributors, Inc.)*, 379 B.R. 5, 32 (Bankr. E.D.N.Y. 2007) (requiring that a complaint against a subsequent transferee contain the "necessary vital statistics—the who, when, and how much—of the [subsequent] transfers").

however, Black's Law Dictionary defines a "transferee" as a person "to whom a transfer is made."[54]  A "transfer" is defined in § 101(54) of the Bankruptcy Code as "each mode . . . of disposing of or parting with . . . property or . . . an interest in property."[55]  In accordance with this definition, courts find that when a transfer occurs, it will necessarily change the rights of the transferor with respect to the transferred property.[56]  Under corporate independence principles, however, a parent and its subsidiary are "separate entities, having separate assets and liabilities" and "[t]he parent's ownership of . . . the subsidiary does not make the subsidiary's assets the parent's."[57]  Given this, the purchaser of stock in a corporation does not purchase the assets or physical properties of the target corporation, but only the equity interest of that corporation.[58]  The assets of the acquired corporation are retained by the corporation irrespective of the fact that the ownership of its equity interest has changed.[59]  Accordingly, when Anadarko purchased the stock of New Kerr-McGee, it did not purchase the assets and properties of each of the Defendants who were the initial transferees of the allegedly fraudulent transfers; rather, each of the Defendants retained

---

[53]  *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc. (In re Stratton Oakmont, Inc.)*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999) ("The Bankruptcy Code does not define the word 'transferee' . . . .").

[54]  BLACK'S LAW DICTIONARY 1342 (5th ed. 1979).

[55]  11 U.S.C. § 101(54)(D).  The same provision also states that a "transfer" means "(A) the creation of a lien; (B) the retention of title as a security interest; [or] (C) the foreclosure of a debtor's equity of redemption." 11 U.S.C. § 101(54).

[56]  *See Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318, 338 (Bankr. N.D. Cal. 2009) ("The hallmark of a 'transfer' is a change in the rights of the transferor with respect to the property after the transaction.").

[57]  *In re Regency Holdings (Cayman), Inc.*, 216 B.R. at 375 (citations omitted); *see also*, *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("[A] parent corporation . . . is not liable for the acts of its subsidiaries.").

[58]  *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 645 (Tex. 1996) ("The purchaser of stock in a corporation does not purchase any portion of the corporation's assets, nor is a sale of all the stock of a corporation a sale of the physical properties of the corporation."); *LaRose Mkt., Inc. v. Sylvan Ctr., Inc.*, 530 N.W.2d 505, 508 (Mich. 1995) ("[A] corporate lessor's stock sale, standing alone, does not constitute a 'sale' of corporate real estate . . . ."); *see also Engel v. Teleprompter Corp.*, 703 F.2d 127, 134 (5th Cir. 1983) ("[T]ransfer of the stock of a parent corporation does not affect the ownership of assets held by a subsidiary.").

[59]  *Tenneco Inc.*, 925 S.W.2d at 645.

those properties.  Indeed, Anadarko continues to own only the stock of New Kerr-McGee.  As such, Anadarko is not an "immediate or mediate transferee of [any] initial transferee" because in fact none of the assets and properties that were the subject of the initial transfers were transferred to it.

20.    This conclusion is readily apparent when viewed in the context of the specific transfers challenged by Plaintiffs.  In particular, Plaintiffs challenge the transfers made pursuant to Project Focus, an internal reorganization of Kerr-McGee's corporate structure that was consummated on December 31, 2002.[60]  As part of Project Focus, the predecessors of Tronox Worldwide and Tronox LLC transferred the stock of several of their subsidiaries and certain other assets to various Defendants (excluding Anadarko).[61]  These transfers did not include the stock of New Kerr-McGee.[62]  On August 10, 2006, Anadarko acquired the stock of New Kerr-McGee for approximately $19 billion.[63]  Because Anadarko did not purchase any of New Kerr-McGee's assets (or any of the subsidiary stock interests and other assets transferred by Tronox Worldwide and Tronox LLC pursuant to Project Focus), none of the assets that were the subject of the allegedly fraudulent transfers were transferred to, or became the property of, Anadarko on August 10, 2006.[64]  Consistent with this conclusion, the Kerr-McGee Defendants did not "transfer" any of their property within the meaning of § 101(54)(D) at the time of the Anadarko acquisition because they did not "dispos[e] of or part[] with"[65] any interest in the allegedly

---

[60]    SOF ¶ 23.

[61]    SOF ¶¶ 23-24.

[62]    SOF ¶ 23.

[63]    SOF ¶ 37.

[64]    *Tenneco*, 925 S.W.2d at 645 ("The purchaser of stock in a corporation does not purchase any portion of the corporation's assets . . .); *LaRose Mkt., Inc.*, 530 N.W.2d at 508 (same); *Engel*, 703 F.2d at 134 (same).

[65]    11 U.S.C. § 101(54)(D).

fraudulently transferred property, nor were their rights in those assets affected by the transaction.[66]  Direct

and/or indirect ownership of the stock of a corporation that is an initial transferee of an allegedly

fraudulent transfer simply does not render the shareholder a subsequent transferee under § 550(a)(2).[67]

21.     Ultimately, Plaintiffs seek to recover from both New Kerr-McGee and Anadarko

on the basis that they both possess the assets transferred by Plaintiffs' predecessors pursuant to Project

Focus.[68]  Common sense, however, dictates that they cannot *both* have the same assets.  Under corporate

law, the assets transferred by Plaintiffs to the Kerr-McGee Defendants remain the assets of those entities,

no matter who owns the stock of New Kerr-McGee.  Accordingly, this court should dismiss Anadarko

from all claims asserted in Counts I, II and III of the Complaint.[69]

---

[66]    *Greenspan,* 408 B.R. at 338 (citing *Towers v. United States (In re Feiler)*, 218 B.R. 957 (Bankr. N.D. Cal. 1998), *aff'd* 218 F.3d 948 (9th Cir. 2000) ("The hallmark of a 'transfer' is a change in the rights of the transferor with respect to the property after the transaction.").

[67]    This conclusion is supported by *ASARCO LLC v. Americas Mining Corp.* wherein the debtor brought claims against its direct, but not ultimate, parent company alleging that the direct parent was the initial transferee of fraudulently transferred stock.  404 B.R. 150, 155 (S.D. Tex. 2009).  The debtor properly declined to name its ultimate parent company as a defendant in the action because the property that was the subject of the initial transfer had not been subsequently transferred to it.  Under Plaintiffs' theory, ASARCO's ultimate parent would have been liable to the debtor merely by virtue of its ownership of the direct parent's stock, yet, in that case, the ultimate parent was (appropriately) not named as a defendant at all.

[68]    While Plaintiffs also challenge certain cash transfers made to New Kerr-McGee at the time of the IPO (*i.e.*, IPO proceeds and the proceeds of Plaintiffs' bond and credit agreement borrowings), the public record clearly reflects that New Kerr-McGee immediately used all such proceeds to pay down its own indebtedness.  SOF ¶ 34.  Accordingly, at the time of Anadarko's acquisition, New Kerr-McGee no longer held the cash that was transferred to it in the IPO and Anadarko therefore could not have been a subsequent transferee of such property.

[69]    The "dominion and control" test articulated in *Bonded Fin. Servs., Inc. v. European Am. Bank,* 838 F.2d 890 (7th Cir. 1988), and adopted as the "mere conduit test" in this Circuit, does not govern the pending issue because it applies only to transferee determinations made under § 550(a)(1), not (a)(2).  *See Christy v. Alexander & Alexander of New York Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 58 (2d Cir. 1997) ("We join these other circuits in adopting the 'mere conduit' test *for determining who is an initial transferee under § 550(a)(1).*") (footnote omitted) (emphasis added).  The inapplicability of the mere conduit doctrine is reinforced by the fact that it is intended to *limit*, not enlarge, the liability of intermediaries who *do* in fact receive a transfer, but who cannot fairly be held accountable due to their lacking dominion and control over the property transferred to them. The doctrine has therefore been widely applied to relieve escrow agents and other financial intermediaries who are "mere conduits" of fraudulently transferred property.  *See, e.g.*, *McHale v. Boulder Capital LLC (In re 1031 Tax Group, LLC)*, 439 B.R. 47, 69 (Bankr. S.D.N.Y. 2010) (holding that an entity acting as a "financial intermediary" is a mere conduit and not an initial transferee); *Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 287 B.R. 98, 106 (Bankr. S.D.N.Y. 2002) (holding that an escrow agent was a "mere conduit" because it "never had control

III.     **Section 546(e) Of The Bankruptcy Code Bars Plaintiffs From Prosecuting Actual Fraudulent Transfers Alleged In Count I And Constructive Fraudulent Transfers Alleged In Counts II And III**

22.     Counts I and II of the Complaint assert actual and constructive fraudulent transfer claims under § 544 of the Bankruptcy Code and §§ 116 and 117 of the Oklahoma UFTA.  Count III of the Complaint asserts constructive fraudulent transfer claims under § 548 of the Bankruptcy Code.  Section 546(e) of the Bankruptcy Code bars Plaintiffs from avoiding all transfers made in connection with Project Focus and the IPO.  Because there is no genuine issue of material fact concerning whether § 546(e) bars Counts I, II, and III of the Complaint, Defendants are entitled to summary judgment dismissing those claims.

23.     Section 546(e), which provides a limitation on avoidance, states in pertinent part:

> Notwithstanding sections 544 . . . [and] 548(a)(1)(B) . . . of this title, the trustee may not avoid a transfer that is a . . . *settlement payment*, as defined in section 101 or 741 of this title, *made by or to (or for the benefit of)* a . . . *financial institution* [or] *financial participant . . . or that is a transfer made by or to (or for the benefit of)* a . . . *financial institution* [or] *financial participant in connection with a securities contract*, as defined in section 741(7) . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.[70]

Accordingly, § 546(e) of the Bankruptcy Code prevents a trustee from avoiding (1) a transfer[71] (2) made by, to or for the benefit of, a "financial institution," or "financial participant," that (3) either (i) is a

---

over the dividend payments or the right to use them"); *Callahan v. Petro Shopping Ctr. #72 (In re Lambert Oil Co., Inc.)*, 347 B.R. 173, 181 (W.D. Va. 2006) (stating that an initial transferee is "an entity that *receives a transfer* and that first exercises dominion and control over the property transferred") (citing *Bowers v. Atlanta Motor Speedway, Inc. (In re Se. Hotel Props. Ltd. P'ship)*, 99 F.3d 151, 156 (4th Cir. 1996)) (emphasis added). The "mere conduit" doctrine of *Bonded* does not apply where, as here, a party has never in fact "receive[d] the transfer."  *In re Lambert Oil Co.*, 347 B.R. at 181.

[70]     11 U.S.C. § 546(e) (emphasis added).  Although § 546(e) does not bar actual fraudulent transfer claims brought pursuant to § 548(a)(1)(A), it does bar actual fraudulent transfer claims brought pursuant to § 544 of the Bankruptcy Code.

[71]     Because the existence of "transfers" is not in dispute, Defendants omit any discussion of same.

"settlement payment" or (ii) is made "in connection with a securities[72] contract." The transfers made in connection with Project Focus and the IPO satisfy the requirements of § 546(e) in multiple ways, any one of which is sufficient to prevent the avoidance of such transfers. In particular, the transfers made in connection with Project Focus and the IPO (i) constitute settlement payments made by, to or for the benefit of, a financial institution and/or a financial participant, and/or (ii) were transfers made by, to or for the benefit of, a financial institution and/or a financial participant in connection with a securities contract.[73]

24.    Moreover, if this Court adopts Plaintiffs' disputed theory that all Project Focus and IPO transfers should be collapsed and treated as a single, integrated transaction, the "collapsed transaction" would qualify for protection under § 546(e) because: the collapsed Project Focus/IPO transfers constitute (i) settlement payments and/or (ii) transfers made in connection with a securities contract that were made by, to or for the benefit of, a financial institution and/or financial participant.

A.    **The IPO Transfers Cannot Be Avoided Because They Were Settlement Payments And/Or Transfers Made In Connection With A Securities Contract That Were By, To Or For The Benefit Of, A Financial Institution Or Financial Participant**

25.    On November 28, 2005, Tronox Inc., New Kerr-McGee and Kerr-McGee Worldwide entered into the Master Separation Agreement ("MSA"),[74] setting forth the terms of the Tronox-Kerr-McGee separation. Pursuant to the MSA, (i) Kerr-McGee Worldwide contributed its

---

[72]    The term "security," which is pertinent to several definitions relevant to § 546(e), includes, *inter alia*, any note, stock, treasury stock, bond, debenture, collateral trust certificate, pre-organization certificate of subscription, transferable share, voting-trust certificate, certificate of deposit, investment contract, interest of a limited partner in a limited partnership, other claims or interests commonly known as a "security" and a certificate of interest or participation in, or right to subscribe to, a security. 11 U.S.C. § 101(49).

[73]    Application of the terms and definitions referenced and cross-referenced in § 546(e) of the Bankruptcy Code to the transfers and transactions that are the subject of Project Focus, the IPO and Spinoff is solely for purposes of establishing that the challenged transfers and transactions cannot be avoided as fraudulent transfers under the Bankruptcy Code. Defendants do not contend that that these terms and definitions have any application outside the context of Defendants' arguments under such provisions of the Bankruptcy Code.

[74]    SOF ¶ 27. The MSA included certain other ancillary agreements, including but not limited to, the Transition Services Agreement, the Transitional License Agreement, the Registration Rights Agreement, the Tax Sharing Agreement and the Employee Benefits Agreement.

---

membership interest in Tronox Worldwide to Tronox Inc.; (ii) the 10,000 shares of Tronox Inc. stock held by Kerr-McGee Worldwide at the time it contributed the membership interests in Tronox Worldwide to Tronox Inc. were converted into shares of Class B Common Stock of Tronox Inc.; and (iii) Tronox Inc. sold shares of its Class A Common Stock to the general public through the IPO.[75]  On March 30, 2006, New Kerr-McGee distributed the Tronox Class B Common Stock to its stockholders.[76]

> **(i)**     **Payments Made To Defendant, New Kerr-McGee, In Connection With The IPO Were "Settlement Payments"**

26.     Under both the Bankruptcy Code's definition and interpretative case law, the meaning of the term "settlement payment" is "extremely broad."[77]  The Bankruptcy Code defines a settlement payment as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."[78]  After acknowledging that the Code's definition is "rather circular[]," the Second Circuit has clarified that the meaning of "settlement payment" is:  "the transfer of cash or securities made to complete [a] securities transaction."[79]  The Second Circuit has further clarified that a settlement payment need not involve the "purchase or sale" of a security,[80] and that a court need not consider the legislative history of § 546(e) in interpreting the definition of "settlement payment," but must instead "look[] to the statute's plain language."[81]

---

[75]    SOF ¶¶ 28, 31.

[76]    SOF ¶ 32.

[77]    *QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 549 (6th Cir. 2009) (quotation omitted).

[78]    11 U.S.C. § 741(8).

[79]    *Enron Creditors Recovery Corp. v. Alfa, S.A.B. De C.V., ING VP*, 651 F.3d 329, 334 (2d Cir. 2011) (quotations omitted).

[80]    *Id.* at 338 ("[W]e decline to impose a purchase or sale requirement on § 741(8).").

[81]    *Id.* at 339.

27.     As Judge Peck recently commented, the Second Circuit's test for determining the meaning of a "settlement payment" has "become quite simple and all-encompassing and does not lend itself easily to the formulation of nuanced exceptions."[82]  Indeed, "[a]s a result of the guidance provided by the *Enron* decision, the Court no longer needs to evaluate conflicting testimony regarding usage of the term 'settlement payment' . . . within the securities industry or to decide [how] the prepetition transfers . . . should be characterized . . . [because] [t]hat distinction, to the extent it once had significance, no longer matters . . . [so long as there is] a transfer of cash [or securities] to complete a securities transaction. . . ."[83]

28.     In accordance with this "all-encompassing" definition, transfers made in connection with the IPO/Spinoff qualify as "settlement payments" because they were transfers of cash or securities made to complete a securities transaction.[84]  First, the challenged IPO transfers made to New Kerr-McGee[85] involved "cash" proceeds of the IPO and related loan and note borrowings.[86]  Second, these cash transfers were made in order to complete a securities transaction.[87]  As noted *supra*, Bankruptcy Code § 101(49)(A) defines "security" to include "stock" and any "other claim or interest commonly known as security."  The cash transferred to New Kerr-McGee was made in order to complete (i) Kerr-McGee Worldwide's transfer of its equity interests in Tronox Worldwide to Tronox Inc.;[88] (ii) the public offering of Tronox Inc.'s Class A stock; (iii) the conversion of Tronox Inc.'s remaining stock into

---

[82]    *Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 453 B.R. 201, 206 (Bankr. S.D.N.Y. 2011).

[83]    *Id*. at 203-04.

[84]    *Id*. at 204; *Enron Creditors Recovery Corp.,* 651 F.3d at 334, 339.

[85]    SOF ¶ 31.

[86]    SOF ¶ 31.

[87]    *Enron Creditors Recovery Corp.*, 651 F.3d at 334, 339.

[88]    SOF ¶ 28.

Class B shares and the distribution of such shares to New Kerr-McGee; and (iv) New Kerr-McGee's

distribution of a dividend of its Class B stock in Tronox Inc. to its own shareholders.[89]  As such, the

challenged transfers were transfers of cash made to complete "a securities transaction."[90]

> **(ii)** **The IPO Transfers Were Made By, To Or For The Benefit Of, "Financial Institutions" And/Or "Financial Participants"**

29.     Sections 101(22) and 101(22A) of the Bankruptcy Code, respectively, define (i) a

"financial institution" as, *inter alia*, "an entity that is a commercial or savings bank;" and (ii) a "financial

participant" as:

> an entity that, at the time it enters into a securities contract . . .  or at the time of the date
> of the filing of the petition, has one or more agreements or transactions described in
> paragraph (1), (2), (3), (4), (5), or (6) of section 561(a)[91]. . . of a total gross dollar value of
> not less than $1,000,000,000 in notional or actual principal amount outstanding . . . at
> such time or on any day during the 15-month period preceding the date of the filing of the
> petition, or has gross mark-to-market positions of not less than $100,000,000 . . . [during
> the same period].[92]

30.     The plain language of Bankruptcy Code § 546(e) makes clear that the settlement

payment need only be made by, to (or for the benefit of) a financial institution or financial participant and

need not be made by *and* to a financial institution nor by *and* to a financial participant.  Similarly, the

settlement payment may be made *either* by or to (or for the benefit of) a financial institution *or* a financial

participant.   These disjunctive requirements are readily met by multiple alternatives under the

circumstances of the IPO.

---

[89]    SOF ¶¶ 28-30.

[90]    *See, e.g.*, *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 989 (8th Cir. 2009) (payments made to former
shareholders in exchange for their privately held stock are exempt "settlement payments"); *In re QSI Holdings,
Inc.*, 571 F.3d at 550 (payments made to shareholders for leveraged buyout of privately held securities are
settlement payments); *Lowschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir.
1999) (same); *Plassein Int'l Corp. v. B.A. Capital Co. L.P. (In re Plassein Int'l Corp.)*, 366 B.R. 318, 322
(Bankr. D. Del. 2007) (payments to shareholders for purchase of stock interests are "settlement payments").

[91]    Bankruptcy Code § 561(a)(1) through (6) includes:   (1) securities contracts, as defined in section 741(7);
(2) commodity contracts, as defined in section 761(4); (3) forward contracts; (4) repurchase agreements;
(5) swap agreements; or (6) master netting agreements. 11 U.S.C. § 561(a).

[92]    11 U.S.C. § 101(22A).

31.      First, the use of wire transfers results in a "financial institution" being on both the sending and receiving ends of all transfers (although only one end is sufficient).  Thus, if a plaintiff transfers cash via wire transfer to a transferee, the transfer is made both by and to a financial institution and is sufficient to meet the requirements of § 546(e).[93]  The statute does not require that the sending and/or receiving financial institution have a beneficial interest in the funds; rather, it is sufficient if the financial institution is merely an intermediary.[94]  In the instant case, the parties used wire transfers to effect the distribution of cash proceeds transferred pursuant to the IPO[95] and therefore the transfers were made by and/or to a "financial institution" within the meaning of § 101(22)(A) of the Bankruptcy Code.

32.      Second, and alternatively, New Kerr-McGee was the recipient of the IPO transfers[96] and it qualifies as a "financial participant."  A "financial participant" is any entity that (A) at the time it enters into a securities contract, or (B) on the petition date or on any day during the 15-month period preceding the petition date, has one or more agreements defined in section 561(a) with either (i) a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding or (ii) gross mark-to-market positions of not less than $100,000,000.[97]

---

[93]    *In re Plassein Int'l Corp.*, 366 B.R. at 323 (stating that the requirement that a settlement payment be made by or to a "financial institution" is satisfied when a payment is made by wire transfer because a wire transfer must be made through a financial institution).

[94]    *See Contemporary Indus. Corp.*, 564 F.3d at 987 (holding that § 546(e) "plainly and unambiguously" applies where parties use a bank to complete a transfer of funds, despite the bank holding no beneficial interest in the transfer); *In re Resorts Int'l, Inc.*, 181 F.3d at 516 (applying § 546(e)'s "plain language" to find that the transfer to a bank satisfied the requirement that the transfer be made to a "financial institution" despite the fact that the bank acted only as an intermediary and had no beneficial interest in the transferred funds).

[95]    SOF ¶ 33.

[96]    SOF ¶¶ 31, 33.

[97]    11 U.S.C. § 101(22A).

33.    New Kerr-McGee was a financial participant on, *inter alia*, (i) November 28, 2005 (the date on which it entered into the MSA, which is a "securities contract")[98] because it had one or more agreements defined in Bankruptcy Code § 561(a) with a total gross dollar value of between $3.9 billion and $8.3 billion (which amounts which are "not less than $1,000,000,000") in notional or actual principal amount outstanding;[99] and (ii) December 31, 2007 and December 31, 2008 (which dates are both within 15 months of the January 12, 2009 petition date), because it had one or more agreements defined in Bankruptcy Code § 561(a) with a total gross dollar value of between $4.4 billion and $5.4 billion (which amounts are "not less than $1,000,000,000") in notional or actual principal amount outstanding.[100]

---

[98] Bankruptcy Code § 741(7) defines a "securities contract" as, *inter alia*, "a contract for the . . . sale . . . of a security . . ." or "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(i), (vii).

[99] The $8.3 billion figure is derived from Kerr-McGee Corp. Form 10-Q filed November 9, 2005. SOF ¶ 38. Adding the total fix price swaps, costless collars and basis swaps of natural gas hedges disclosed in the statement yields a notional amount of $3,797,699,034. Kerr-McGee Corp. Quarterly Report Form 10-Q filed November 9, 2005 at Item 2. The fixed price swaps and costless collars of crude oil hedges disclosed in the statement total a notional value of $3,577,034. *Id.* Kerr-McGee also disclosed an interest rate swap with a notional value of $916,000,000. *Id.* The $3.9 billion figure is derived from Kerr-McGee Corp. Form 10-K filed March 15, 2006. SOF ¶ 38. Adding the total fix price swaps, costless collars and basis swaps of natural gas hedges disclosed in the statement yields a notional amount of $1,635,132,366. Kerr-McGee Corp. Form 10-K filed March 15, 2006 at KM-TRX01920506. The fixed price swaps and costless collars of crude oil hedges disclosed in the statement total a notional value of $1,794,295,740. *Id.* at KM-TRX01920505. Kerr-McGee also disclosed an interest rate swap with a notional value of $457,000,000. *Id.* at KM-TRX01920507. The notional values in these (and other public statements calculated in this Motion) that do not appear directly in the public statements were determined by very simple calculations applied to the data in the statements. The notional values were calculated by multiplying the average contract price by the average daily volume, and then adding up the numbers from all subcategories. Where the statement disclosed a range of average contract price, the average of such range was used in the calculation, and where the statement disclosed a ceiling sold, floor purchased and floor sold price, the floor sold price was used in the calculation.

[100] The $4.4 billion figure is derived from Anadarko Petroleum Corp. Form 10-K filed February 29, 2008. SOF ¶ 39. Adding the total three-way collar and basis swaps of natural gas hedges disclosed in the statement yields a notional amount of $2,191,952,750. Anadarko Petroleum Corp. 2007 Annual Report Form 10-K filed February 29, 2008 at Item 10. The notional value of three-way collar swaps of crude oil was $2,170,925,000. *Id.* The $5.4 billion figure is derived from Anadarko Petroleum Corp. Form 10-K filed February 25, 2009. SOF ¶ 39. Adding the total three-way collar and basis swaps of natural gas hedges disclosed in the statement yields a notional amount of $456,542,000. Anadarko Petroleum Corp. 2008 Annual Report Form 10-K filed February 25, 2008 at Item 8. The notional value of three-way collar swaps of crude oil was $945,612,800. *Id.* Anadarko also disclosed an interest rate swap with a notional value of $4,000,000,000. *Id.* at 45.

34.     In short, because the IPO transfers qualify as "settlement payments" (*i.e.*, transfers of cash made to complete a securities transaction) that were made by, to or for the benefit of, a financial institution and/or a financial participant, the IPO transfers may not be avoided under § 546(e).

>     **(iii)    The IPO Transfers May Not Be Avoided Because They Were Made By, To Or For The Benefit Of, A Financial Institution Or Financial Participant In Connection With A Securities Contract**

35.     Alternatively, even if the IPO transfers are not "settlement payments," the transfers would nonetheless not be avoidable under § 546(e) because they were made by, to or for the benefit of, a financial institution or financial participant "in connection with a securities contract."

36.     Bankruptcy Code § 101(49) defines the term "security" to include stock.  Section 741(7)(A), in turn, states that a "securities contract" includes, *inter alia*:

> i.      a contract for the purchase, sale, or loan of a security. . . ;
>
> v.      any extension of credit for the clearance or settlement of securities transactions . . . ;
>
> vii.    any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph . . . ;
>
> viii.   any combination of the agreements or transactions referred to in this subparagraph . . . ;
>
> x.      a master agreement that provides for an agreement or transaction referred to in [Section 741(7)(A)(i-ix)]; or
>
> xi.     any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph.[101]

37.     The Financial Netting Improvements Act of 2006 ("<u>FNIA</u>") added the phrase "in connection with a securities contract" to the types of transfers protected under § 546(e) and also greatly expanded the definition of "securities contract" found in § 741(7).  The stated purpose of this expanded definition was to "provide important liquidity to the securities markets" given that "they involve financial intermediaries—stockbrokers, financial institutions, financial participants or securities clearing

---

[101]    11 U.S.C. § 741(7).

agencies—that often hedge their risk on these transactions through other market transactions" and, "[a]s such, these transactions implicate the systemic risk concerns that are addressed by the safe harbors."[102]

38.    The MSA qualifies as a "securities contract" under several subsections of § 741(7)(A), including, without limitation, that (i) it is a contract for the sale of securities; (ii) involves the extension of credit to Plaintiffs so as to enable Tronox Inc. to complete a securities transaction involving its purchase of New Kerr-McGee's equity interest in Tronox Worldwide; (iii) is a master agreement that provides for an agreement or transaction referred to in the preceding two subsections; (iv) is an agreement or transaction similar to the agreements or transactions referred to in the preceding subsections of this paragraph; (v) is a combination of agreements or transactions referred to in the preceding subsections of this paragraph; and/or (vi) involves an arrangement or credit enhancement resulting from Plaintiffs' release from various debt obligations in connection with the IPO and from the extension of new credit to Plaintiffs in connection with the IPO.[103]    Accordingly, the MSA is a "securities contract" under § 741(7)(A).

39.    For the reasons discussed above, the IPO transfers were made to a "financial institution" and New Kerr-McGee is a "financial participant."  Accordingly, the IPO transfers were made by, to or for the benefit of, a financial institution and/or financial participant "in connection with a securities contract" and are therefore subject to the protections of § 546(e).

**B.    The Collapsed Project Focus And IPO Transfers May Not Be Avoided Under § 546(e)**

40.    Defendants dispute the propriety of Plaintiffs' efforts to collapse the Project Focus and IPO transfers.[104]  If, however, Plaintiffs manage to successfully urge that these two sets of

---

[102]    H.R. Rep. No. 109-648, at 4 (2006).

[103]    *See* 11 U.S.C. § 741(7)(A) (i), (v), (vii), (viii) (x), (xi).

[104]    Each and every reference to collapsed transfers and/or transactions made herein should be deemed to be followed by Defendants' objection to such collapsing and their express reservation of all rights with respect thereto.

transfers should be treated as one, integrated transaction, the transfers made pursuant to such integrated transaction are shielded from avoidance by § 546(e). Plaintiffs posit that all transfers occurring on December 31, 2002 pursuant to Project Focus, including the transfers of stock in E&P subsidiaries, should be treated as having occurred on November 28, 2005, when the IPO transfers occurred.[105] Pursuant to this theory, all Project Focus transfers (consisting primarily of stock transfers in various subsidiaries),[106] the cash transferred pursuant to the IPO and the transfer of New Kerr-McGee's equity interest in Tronox Worldwide should be treated as one transaction.[107]

### (i) The Transfers Occurring Pursuant To A "Collapsed" Transaction May Not Be Avoided Because They Are "Settlement Payments"

41.      As discussed above, a "settlement payment" is broadly defined as "the transfer of cash or securities made to complete [a] securities transaction."[108]  The collapsed Project Focus/IPO transfers qualify as "settlement payments" because they are transfers of cash and securities made to complete a securities transaction.  As more thoroughly set forth *supra*, the IPO transfers consisted of cash payments made to complete a "securities transaction" involving, *inter alia*, the sale of equity interests in Tronox Worldwide to Tronox Inc.[109]  Similarly, the Project Focus transfers involved transfers of securities (*i.e.*, stock[110]) in Tronox Worldwide's subsidiaries to one or more Defendants which, if collapsed, were made to complete not only the same "securities transaction" that was the subject of the IPO, but also an independent "securities transaction" in the form of the Project Focus equity transfers.[111]

---

[105]    SOF ¶¶ 12, 13, 14, 42.

[106]    SOF ¶¶ 23-24.

[107]    SOF ¶¶ 12, 13, 14, 28, 31, 33

[108]    *Enron Creditors Recovery Corp*, 651 F.3d at 334 (quotations omitted).

[109]    SOF ¶ 28.

[110]    As described *supra,* the definition of "security" includes "stock" under Bankruptcy Code § 101(49)(ii).

[111]    SOF ¶¶ 23-24.

As such, the collapsed transfers were transfers of cash and securities made to complete a "securities transaction."

> **(ii)    The Transfers Occurring Pursuant To A "Collapsed" Transaction Were Made By, To Or For The Benefit Of, A "Financial Institution" Or "Financial Participant"**

42.    As explained *supra*, the collapsed transfers need only be made "by, to or for the benefit of," a "financial institution" or a "financial participant."  Collapsing the Project Focus and IPO transfers does not change the conclusion that: (i) the IPO transfers were made by and to a "financial institution" and (ii)  New Kerr-McGee was a financial participant as of multiple operative dates, including November 28, 2005, December 31, 2007 and December 31, 2008.  Because Plaintiffs seek to treat Project Focus and the IPO as a single, integrated transaction, the Project Focus transfers would also qualify— based on the foregoing—as having been made by, to or for the benefit of, a financial institution or financial participant.  In addition, the Project Focus transfers independently meet those requirements because they were (i) made by Tronox Worldwide's legal predecessor (*i.e.*, Kerr-McGee Operating Corporation)[112] and it was a "financial participant" on the date of the transfers by virtue of it having one or more agreements defined in Bankruptcy Code § 561(a) with gross mark-to-market positions of not less than $100,000,000,[113] and (ii) under Plaintiffs' theory of the case, the transfers were made "for the benefit of" New Kerr-McGee,[114]  which was also a financial participant for the reasons explained above. Moreover, because Plaintiffs' theory of the case is predicated on the consolidated treatment of all Defendants as a single entity,[115] rather than individual corporate entities, a finding that any one entity is a "financial participant" suffices for purposes of satisfying the "financial participant" requirement of

---

[112]    SOF ¶¶ 23-24.

[113]    SOF ¶ 24.

[114]    SOF ¶¶ 16, 19.

[115]    SOF ¶¶ 12, 13, 14, 41.

§ 546(e).  Accordingly, all collapsed Project Focus and IPO transfers are protected from avoidance under

§ 546(e) because the transfers qualify as "settlement payments" (*i.e.*, transfers of cash and securities made

to complete a securities transaction) that were made by, to or for the benefit of, a financial institution

and/or a financial participant.

<div style="margin-left: 2em;">

(iii)    **The Collapsed Transfers Cannot Be Avoided Because They Were Made By, To Or For the Benefit Of, A Financial Institution Or Financial Participant In Connection With A Securities Contract**

</div>

43.    Alternatively, even if the collapsed transfers do not qualify as "settlement

payments," the transfers would nonetheless not be avoidable under § 546(e) because they were made by,

to or for the benefit of, a financial institution or financial participant "in connection with a securities

contract."  As discussed above, the MSA was a "securities contract."  Similarly, transfers made pursuant

to Project Focus qualify as having been made "in connection with a securities contract" because, under

Plaintiffs' theory, they were made in connection with the single, integrated IPO/Project Focus transaction.

In addition, the Project Focus transfers independently satisfy the requirement that transfers be made "in

connection with a securities contract" because Bankruptcy Code § 101(49) defines the term "security" to

include stock and other interests commonly known as a security; Bankruptcy Code § 741(7)(A), in turn,

states that a "securities contract" includes, *inter alia*, (a) a contract for the purchase or sale of a security;

(b) any extension of credit for the clearance or settlement of securities transactions or any agreement or

transaction similar to such extension of credit for the clearance or settlement of securities; and/or (c) any

arrangement or credit enhancement related to any agreement or transaction referred to in this

subparagraph or any agreement or transaction similar to such arrangement or credit enhancement.[116]

Because Project Focus involved the conveyance of stock and other equity interests (*i.e.*, commonly

known forms of securities) and the release of Tronox Worldwide from substantial indebtedness, Project

Focus involved, *inter alia*, (i) an extension of credit for the clearance or settlement of securities

---

[116]    11 U.S.C. § 741(7)(A)(i), (v), (vii) and (xi).

transactions or *an agreement or transaction similar to such extension of credit for the clearance or settlement of securities;* and/or (ii) an arrangement or credit enhancement related to an agreement or transaction referred to in this subparagraph *or an agreement or transaction similar to such arrangement or credit enhancement.* Accordingly, the collapsed transfers are excepted from avoidance under § 546(e) because they were transfers made by, to or for the benefit of, a financial institution or financial participant in connection with a securities contract.

**C.**     **The Project Focus Transfers May Not Be Avoided Under § 546(e)**[117]

44.     If, on the other hand, the Project Focus transfers are not collapsed with the IPO transfers, the requirements of § 546(e) may still be satisfied.

**(i)**     **The Project Focus Transfers Were Settlement Payments**

45.     The Project Focus transfers were "settlement payments" because they involved transfers of securities (*i.e.*, stock) in Tronox Worldwide's subsidiaries which were made to complete the "securities transaction" effectuated by the Project Focus stock transfers. As such, the Project Focus transfers are settlement payments.

**(ii)**     **The Project Focus Transfers Were Made By, To Or for The Benefit Of, A "Financial Participant"**

46.     The Project Focus transfers were largely made by Kerr-McGee Operating Corporation, now named Tronox Worldwide, which was a "financial participant" as of December 31, 2002 by virtue of it having one or more agreements defined in Bankruptcy Code § 561(a) with gross mark-to-market positions of not less than $100,000,000.[118] Moreover, under Plaintiffs' theory

---

[117]     As previously discussed, Project Focus was an internal corporate reorganization consummated by New Kerr-McGee on December 31, 2002. Application of the terms and definitions referenced and cross-referenced in § 546(e) of the Bankruptcy Code to such internal reorganization is solely for the purpose of establishing that the transfers effected by Project Focus cannot be avoided as fraudulent transfers under the Bankruptcy Code. Defendants do not contend that these terms and definitions have any application outside the context of Defendants' arguments under such provisions of the Bankruptcy Code.

[118]     SOF ¶ 24.

of the case, the Project Focus transfers were made "for the benefit of" New Kerr-McGee,[119] which also was a financial participant on December 31, 2002 because it had one or more agreements defined in Bankruptcy Code § 561(a) with a total gross dollar value of $1.8 billion (which amount is not less than $1,000,000,000) in notional or actual principal amount outstanding.[120]    Accordingly, the Project Focus transfers may not be avoided under § 546(e) because the transfers qualify as "settlement payments" that were made by, to or for the benefit of, a financial participant.

> **(iii)    The Project Focus Transfers Were Made By, To Or For The Benefit Of, A Financial Participant In Connection With A Securities Contract**

47.    Alternatively, and for the reasons stated in Section B.(iii) of this section, the Project Focus transfers were made "in connection with a securities contract" and are therefore subject to the safe harbor provisions.

48.    Based on the foregoing, Defendants submit that the Project Focus and IPO transfers are subject to the protections of Bankruptcy Code § 546(e) irrespective of whether they are considered separately (as Defendants urge) or on a collapsed basis (as Plaintiffs urge).

---

[119]    SOF ¶¶ 16, 18, 19.

[120]    The $1.8 billion figure is derived from Kerr-McGee Corp. Form 10-K filed March 27, 2003.  SOF ¶ 38. Adding the total fix price swaps, costless collars and basis swaps of natural gas hedges disclosed in the statement yields a notional amount of $569,328,386.  Kerr-McGee Corp. 2002 Annual Report Form 10-K filed March 27, 2003 at Item 7.  The fixed price swaps and costless collars of crude oil hedges disclosed in the statement total a notional value of $660,135,095.  *Id.*  Kerr-McGee also disclosed an interest rate swap with a notional value of $350,000,000.  *Id.*  Kerr-McGee also had hedges relating to foreign currency totaling a notional value of $201,000,000.  *Id.*

## CONCLUSION

WHEREFORE, Defendants request that the Court grant this Motion, and any and all other relief which the Court deems just and appropriate.

Houston, Texas
Dated:  February 24, 2012

_/s/  Lydia Protopapas_

| | |
|---|---|
| Richard A. Rothman (RR 0507) | Melanie Gray (*admitted pro hac vice*) |
| Bruce S. Meyer (BM 3506) | Lydia Protopapas (LP 8089) |
| WEIL, GOTSHAL & MANGES LLP | Jason W. Billeck (*admitted pro hac vice*) |
| 767 Fifth Avenue | WEIL, GOTSHAL & MANGES LLP |
| New York, New York 10153 | 700 Louisiana, Suite 1600 |
| Telephone:  (212) 310-8000 | Houston, Texas  77002 |
| Facsimile:  (212) 310-8007 | Telephone:  (713) 546-5000 |
| | Facsimile:  (713) 224-9511 |

| | |
|---|---|
| Thomas R. Lotterman (*admitted pro hac vice*) | James J. Dragna (*admitted pro hac vice*) |
| Duke K. McCall, III (*admitted pro hac vice*) | BINGHAM MCCUTCHEN LLP |
| BINGHAM MCCUTCHEN LLP | 355 South Grand Avenue, Suite 4400 |
| 2020 K Street, NW | Los Angeles, California  90071 |
| Washington, DC 20006 | Telephone:  (213) 680-6400 |
| Telephone:  (202) 373-6000 | Facsimile:  (213) 680-6499 |
| Facsimile:  (202) 373-6001 | *Counsel to Defendants* |