**Hearing Date: May 1, 2012 2:30pm**

Kenneth N. Klee (KK 5910)
David M. Stern (*pro hac vice*)
KLEE, TUCHIN, BOGDANOFF
& STERN LLP
1999 Avenue of the Stars
39th Floor
Los Angeles, CA 90067
Telephone: (310) 407-4000
Facsimile: (310) 407-9090

Melanie Gray (*pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Thomas R. Lotterman (*pro hac vice*)
Duke K. McCall, III (*pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone: (202) 373-6000
Facsimile: (202) 373-6001

James J. Dragna (*pro hac vice*)
BINGHAM MCCUTCHEN LLP
335 South Grand Avenue
Suite 4400
Los Angeles, California 90071
Telephone: (213) 680-6400
Facsimile: (213) 680-6499

*Counsel to Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** ) | Chapter 11 |
| ) | |
| **TRONOX INCORPORATED,** *et al.*, ) | Case No. 09-10156 (ALG) |
| ) | |
| **Debtors.** ) | Jointly Administered |
| ) | |
| **TRONOX INCORPORATED, TRONOX** ) | |
| **WORLDWIDE LLC f/k/a Kerr-McGee Chemical** ) | Adv. Pro. No. 09-01198 (ALG) |
| **Worldwide LLC, and TRONOX LLC f/k/a Kerr-** ) | |
| **McGee Chemical LLC,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **DEFENDANTS' CONSOLIDATED** |
| ) | **REPLY IN SUPPORT OF (1) THEIR** |
| **ANADARKO PETROLEUM CORPORATION and** ) | **MOTION TO EXCLUDE THE** |
| **KERR-MCGEE CORPORATION, KERR-MCGEE** ) | **TESTIMONY OF DR. NEIL M. RAM** |
| **OIL & GAS CORPORATION, KERR-MCGEE** ) | **UNDER FEDERAL RULE OF** |
| **WORLDWIDE CORPORATION, KERR-MCGEE** ) | **EVIDENCE 702 AND (2) THEIR** |
| **INVESTMENT CORPORATION, KERR-MCGEE** ) | **MOTION** *IN LIMINE* **AND MOTION** |
| **CREDIT LLC, KERR-MCGEE SHARED SERVICES** ) | **FOR RELIEF UNDER FRCP 36(a)(6)** |
| **COMPANY LLC, AND KERR-MCGEE STORED** ) | |
| **POWER COMPANY LLC** ) | |
| ) | |
| **Defendants.** ) | |
| **THE UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff-Intervenor,** ) | |
| **v.** ) | |
| ) | |
| **TRONOX, INC., TRONOX WORLDWIDE LLC,** ) | |
| **TRONOX LLC, KERR-MCGEE CORPORATION and** ) | |
| **ANADARKO PETROLEUM CORPORATION,** ) | |
| ) | |
| **Defendants.** ) | |

# I.
# INTRODUCTION

In two motions, Defendants move to exclude basically all of Dr. Neil Ram's testimony

about Tronox's contingent environmental liabilities at the time of its IPO in November 2005—

his opinion on the 372 sites he evaluated and his speculation about 2,200 Uncosted Sites he did

not.  Defendants also seek relief under Rule 36(a)(6) because Plaintiff Litigation Trust responded

to Defendants' Requests for Admission about the Uncosted Sites with indefensible objections.

Plaintiff's opposition is misdirected.  It is dismissive of evidence that Dr. Ram does not

understand the basics of discounting, calling it "nit picking" about a "minor" issue (Opp. 20

n.19).  It also focuses on strawman arguments Defendants have not made.  Plaintiff claims that

Defendants propose a "strict prohibition against considering any information from after the

transfer date in a solvency analysis" (Opp. 4) supposedly because "it is never appropriate to

consider information from after the valuation date" (Opp. 6).  That is not Defendants' position:

while hindsight is clearly barred in a retrospective valuation, some information from after the

valuation date might not be hindsight and thus may be relevant if it tends to show what people

knew or anticipated on the valuation date (FRE 702 Mot. 4–5).

Plaintiff also mischaracterizes Defendants' primary Rule 702 objection.  Defendants do

not contend that experts performing retrospective valuation should be disqualified if they know

about events and discoveries from after the valuation date (Opp. 11 n.13).  Nor do Defendants

contend that valuation experts cannot rely upon their judgment.  Rather, Defendants' basic

contention is that, the more a retrospective valuation relies upon judgment calls, the heavier the

burden of proving that hindsight did not factor into those judgments.

Plaintiff has not carried its very heavy burden here.  Dr. Ram selected a valuation

methodology that relies wholly upon his judgment to predict the most likely post-IPO

1

remediation scenario for each site. *See* Exh. A to 4/17/12 Decl. of Thomas R. Lotterman (Ram Deposition Trans. pp. 219, 222) (hereinafter "Ram Trans."). Then he and his team learned as much as possible about what actually happened at those sites after the IPO. *See* Ram Trans. pp. 107–110, 131–143, 163–166. Given those choices, Dr. Ram should have taken provable measures to ensure that hindsight had no influence on his judgment. Instead, he just asked his team to hop into "time machines," forget what they had learned, and cite only pre-IPO documents. *See* Ram Trans. pp. 162–163. Those instructions were not heeded, and Plaintiff has not shown otherwise. Taken together, Dr. Ram's decisions establish that he did not reliably apply the fundamental principles of retrospective valuation. No amount of qualifications or man-hours spent on the project (Opp. 1–2) can make up for that shortcoming. Nor does it matter that Dr. Ram's low-end estimate for 70 Schedule 2.5(a) Sites is, according to Plaintiff, "only" $123 million above Defendants' (Opp. 4). (Plaintiff fails to mention that his estimate for 157 Non-Schedule 2.5(a) Sites is 21 times greater.) "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).

Defendant's Rule 702 motion is not only well grounded in the law; it is procedurally appropriate as well. The Court must rule on Defendants' Rule 702 objection sometime. And there is much to be gained if the Court grants the motion before trial begins.

## II.
## ARGUMENT

### A.    The Court Can And Should Resolve Defendants' Rule 702 Objection Now.

Plaintiff asks the Court to deny Defendants' Rule 702 motion on the ground that objections to expert testimony are inappropriate in a bench trial (Opp. 1, 3, 4). Plaintiff's premise is false. Although courts prefer to resolve Rule 702 objections after a bench trial, the

"reliability determinations" required by the rule "must still be made at some point." *Metavante Corp. v. Emigrant Sav. Bk.*, 619 F.3d 748, 760 (7th Cir. 2010). *See Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002). The only question is when.

Now is the ideal time because significant resources will be saved if Dr. Ram's testimony is excluded. Plaintiff counters that the preference for resolving Rule 702 objections after a bench trial would, in effect, be a nullity if the efficiency gains from excluding one expert were enough to warrant resolving a Rule 702 objection before trial (Opp. 5–6). But Dr. Ram's testimony is at the heart of Plaintiff's case. Excluding it is tantamount to resolving some of Plaintiff's claims on the merits and would shave days or weeks off trial. Without it, Plaintiff's balance-sheet insolvency theory is unsupported, so witnesses who rely on Dr. Ram's analysis either need not testify or must focus their opinions on contemporaneous evidence of Tronox's solvency, as the precedents prefer. *See In re Iridium Operating LLC*, 373 B.R. 283, 291 (Bankr. S.D.N.Y 2007) ("[P]ublic markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed after the fact and from an advocate's point of view"). If efficiency ever warrants resolving a Rule 702 objection before a bench trial, this is the case. But if the Court concludes that efficiency does not warrant resolving Defendants' objection now, the Court should resolve it after Dr. Ram testifies—not deny it now, as Plaintiff urges (Opp. 1).

**B.      Dr. Ram Did Not Reliably Apply The Prohibition Against Hindsight.**

Dr. Ram admits that it is inappropriate to use hindsight when valuing liabilities as of a date in the past. *See* Ram Trans. p. 161. Yet, he not only learned as much as possible about post-IPO developments at all sites, he also used a valuation methodology that masks the information that influenced his conclusions. Together, those decisions cast grave doubt on the reliability and intellectual integrity of his application of the prohibition against hindsight.

3

Dr. Ram claims that he tried to cite only documents and information known or knowable

on that date. *See* Ram Trans. p. 161. Yet he clearly formed judgments without paying attention

to the date of the information he relied upon. His rebuttal report exemplifies his haphazard

approach: it changed several citations in his original report, replacing citations of post-IPO

documents with citations of pre-IPO documents, but left the underlying information in his

analysis unchanged. *See* Ram Trans. pp. 175–176. Would he still have relied upon a fact in a

2005 document if he had not known that the fact was critical in a 2009 document? That Dr. Ram

tried (and failed) to limit his *citations* to pre-IPO documents (Opp. 12 & n.14) says nothing about

the reliability of his approach to forming *judgments*. If anything, by attempting to cite only pre-

IPO documents, Dr. Ram covered his tracks, making the application of his methodology even

less reliable.

There are several problems with Plaintiff's response that Defendants failed to identify

sites where hindsight "materially impacted" Dr. Ram's cost estimate (Opp. 9). Defendants do

not have that obligation; the propounding party has to prove reliability. *See Daubert*, 509 U.S. at

592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175–176 (1987)). Moreover, Rule 702

focuses on methodology, not conclusions. *See id.* at 595. Conclusions are not even probative of

the reliability of an expert's application of methodologies; thus Dr. Ram is not absolved simply

because, for some sites, he and Defendants' expert derived similar estimates (Opp. 11).

Plaintiff argues that Dr. Ram's application of the prohibition against hindsight was

reliable because he says so (Opp. 9 & n.10). Few experts will admit to being unreliable, though.

An expert's *ipse dixit* is never enough to establish compliance with any requirement of Rule 702,

contrary to Plaintiff's suggestion that it is sometimes allowed (Opp. 9 & n.10). *See Rural Water

Dist. No. 4 v. City of Eudora*, 604 F. Supp. 2d 1298, 1314 (D. Kan. 2009) ("[T]here is no

4

requirement that an expert's methods be perfect, but whether those conclusions are reliable should be based on more than the *ipse dixit* of the expert."); *Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F. Supp. 2d 413, 417 (W.D.N.Y. 2005); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 527 (W.D. Pa. 2003); *see also Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("[T]he expert's findings [must be] based on sound science, and this will require some objective, independent validation of the expert's methodology.").

Another problem with Dr. Ram's "time machine" is that he was neither confident nor consistent in defining what impermissible hindsight is (FRE 702 Mot. 9). Plaintiff disagrees, citing a cherry-picked instance when Dr. Ram came close to getting it right while ignoring the other times when he was way off (Opp. 12). Mostly, he drew *ad hoc* lines. As Plaintiff acknowledges (Opp. 14), whether information unknown on the valuation date was knowable or unknowable on that date is a complicated question of reasonableness—*e.g.*, whether it was reasonable not to look, whether a reasonable search would have turned up the information, what someone with the information would have reasonably expected to happen. Dr. Ram's confused answers indicate that reasonableness was not a concept he employed.

**C.    Hindsight Is Impermissible When Retrospectively Valuing Liabilities.**

Plaintiff also argues that Dr. Ram did not even need to avoid hindsight and limit the information and documents he considered (Opp. 6–8). According to Plaintiff, "there is no limitation on information that can be used to determine liabilities for a balance sheet solvency test" (Opp. 8). That view is not the law, but even if it were, it would be a double-edged sword that provides another reason for excluding Dr. Ram's testimony. Expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue" and must be based on "sufficient facts or data." Fed. R. Evid. 702(a), (b). An expert who strives to ignore legally

5

relevant facts fails both requirements.  *See, e.g.*, *MTX Communic. Corp. v. LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289, 292–293 (S.D.N.Y. 2001).

The *sine qua non* of retrospective valuation is the prohibition against hindsight, *i.e.* information neither known on the valuation date nor reasonably knowable then.  In resisting that truth, Plaintiff fails to distinguish between two separate but related concepts:  hindsight and the date of documents.  Documents dated *before* a valuation date are always relevant because they contain no hindsight.  Documents dated *after* a valuation date are often irrelevant because they often contain hindsight—but not always.  Sometimes, documents from a "short" or "reasonable" time after the valuation date are relevant because they explain facts that were known or knowable on the valuation date (FRE 702 Mot. 5). *See In re Iridium*, 373 B.R. at 346 ("While there is case law supporting the contention that a significant business failure may indicate insolvency *a short time prior to* filing of the bankruptcy petition, there is no case law that supports extending that finding over a four-year prepetition period… .  The failure of a business, even a monumental failure, does not alone prove the insolvency of the business in the months and years prior to its demise.") (emphasis added) (citations omitted).

So, it is no revelation that courts "may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date" (Opp. 6 (quoting *In re Mama D'Angelo*, 55 F.3d 552, 556 (10th Cir. 1995)).  The real question is, what information in post-transfer documents tends to shed light on a fair and accurate assessment of an asset or liability?  Not hindsight.  Post-transfer documents may be relevant if they reveal a "current awareness" of facts known on the transfer date or a "current discovery" of facts knowable then.  *Mama D'Angelo*, 55 F.3d at 556.  Like most courts, Plaintiff's lead case simply "recognizes that actual post-transfer events may confirm a value that

6

was determined by information known or knowable at the time of the transfer." *In re Commer. Fin. Servs.*, 350 B.R. 520, 541 n.18 (Bankr. N.D. Okla. 2005) (citing *Mama D'Angelo*).

Defendants cited a range of retrospective-valuation decisions barring hindsight and directing courts to police the date of documents (FRE 702 Mot. 4–5). Plaintiff writes them off as "cases outside the context of solvency determinations," as if there was something special about solvency analyses that warranted consideration of hindsight (Opp. 7–8 & n.8). There is not. Bankruptcy courts have rejected Plaintiff's distinction in solvency cases. *See In re Iridium*, 373 B.R. at 345–346 (noting, in a solvency context, that "[c]ourts in this jurisdiction may consider postpetition events to some extent under certain circumstances, but reject the use of improper hindsight analysis in valuing a company's pre-bankruptcy assets"). More generally, the reason for performing a retrospective valuation has no effect on the information that can be considered; the value of an asset or liability as of a date in the past does not depend on whether, years later, the asset or liability is being valued for a solvency analysis or, say, for tax purposes.

Plaintiff contends that *In re W.R. Grace*, 281 B.R. 852 (Bankr. D. Del. 2002) "recognized that there should be no limitation on the information that a party can rely on in analyzing liabilities under a balance sheet solvency test" (Opp. 7). Plaintiff supports that contention, not with the holding or dictum of that case, but with a quote from a summary of the plaintiffs' contentions (Opp. 7 (citing *W.R. Grace*, 281 B.R. at 856)). *W.R. Grace* involved a unique question about the extent of a debtor's liability for asbestos claims when "the harmful nature of asbestos in general and W.R. Grace's asbestos liability in particular were nationally known and had been so for decades." *Id.* at 856. Here, by contrast, both Tronox's environmental liability and its extent are at issue. Insofar as *W.R. Grace* could bear on this case, it suffices to note that

7

the opinion is an outlier.  *See* Aczel, *The Solvency of Mass Tort Defendants:  A "Reasonable"*

*Approach to Valuing Future Claims*, 20 EMORY BANKR. DEV. J. 531, 581 (2004).

**D.    The Expected Value Method Is Superior To The Most Likely Value Method, Which Dr. Ram Did Not Reliably Apply.**

Dr. Ram's testimony should be excluded for two more reasons:  he failed to apply the

Expected Value method and did not reliably apply the Most Likely Value method he selected

instead.  Plaintiff contends that the Most Likely Value method is appropriate in this case and that

Dr. Ram had sound reasons for selecting it (Opp. 15–19).  Those contentions lack merit.

According to the guidance that all parties and their experts invoke, the Expected Value

method produces the most "robust[]" and "comprehensive[]" estimate for contingent

environmental liabilities.  Exh. B to 3/16/12 Decl. of Thomas R. Lotterman (ASTM E2137-01,

§ 5.2.2 & Figure 1) (hereinafter "ASTM E2137-01").  Many publications confirm that it is the

gold standard.[1]  Alternative methodologies exist, but may be used only "[w]hen an expected

value approach is not practical or appropriate."  *See* ASTM E2137-01 §§ 5.4.2 & 5.4.3.

---

[1]    *See* Walsh & Gravel, *Quantifying Environmental Liabilities in the Bankruptcy Context*,
PRATT'S JOURNAL OF BANKRUPTCY LAW 99, 102–105 (Feb./Mar. 2009) (noting that
"probabilistic analysis and development of an expected value is the ASTM International …
preferred methodology for estimating future environmental obligations"); Konar & White,
*Proposed New ASTM Standards for Estimating Environmental Liabilities Signal a Preference
for the Use of Decision Analysis and Expected Cost Analysis*, STRATEGIC ENVIRONMENTAL
MANAGEMENT vol. 1, issue 3, p. 192 (1999) ("[T]he expected value approach is the preferred
method."); *id.* at 194 ("[I]t is quite clear that ASTM prefers the expected cost analysis based on a
decision-analysis evaluation for estimating future environmental costs and liabilities"); *see also*
Chan, Brusseau, & Koch, *Lessons Learned:  Using Decision Analysis to Estimate Toxic Tort
Liabilities*, 20 NAT. RESOURCES & ENVIRONMENT 48 (Winter 2006) ("People have often chosen
to confront uncertainty with rough, 'shoot from the hip' techniques such as using a midpoint
between a high and low estimate, focusing on the most likely outcome to the exclusion of other
important possibilities or simply relying on instincts. … Decision analysis is an effective
strategic management tool developed for this purpose, emphasizing a complete risk profile of
possible outcomes and their expected value weighted by relative likelihood.").

This is not an occasion when an alternative is appropriate.  Disagreeing, Plaintiff repeats

Dr. Ram's defense of the Most Likely Value method as being appropriate here "because the

information available did not allow him to assign reliable and meaningful probabilities and cost

estimates for alternatives other than the most likely scenario" (Opp. 16).  That position is at odds

with the guidance.  The Expected Value method requires more *effort* than the Most Likely Value

method, but not necessarily more or better *information* (Opp. 17).  *See* ASTM E2137-01 § 5.2.2.

Granted, a cost estimator "should take into account the … quality of the information available or

obtainable when selecting the cost and liability estimation approach to be used."  ASTM

E2137-01 § 5.2.3.  Yet the guidance clarifies that general admonition, specifically directing an

estimator with little or poor quality information to other methodologies—but not the Most Likely

Value method.  *See* ASTM E2137-01 § 5.4.3 (recommending the Range of Values method

"instead of the MLV approach if probabilities or rankings for various outcomes cannot be

determined"); ASTM E2137-01 § 5.4.4 (recommending the Known Minimum Value method

when "the outcome and cost uncertainties are so great that it is premature to assign a range of

values or a most likely value"); *see also* ASTM E2137-01 § 5.2.1  ("When the uncertainties are

great, it may not be possible to make a reasonable cost estimate.").

Like the Expected Value method, the Most Likely Value method requires enough

information to determine the relative likelihood of potential outcomes.  Because the Most Likely

Value method assigns costs only for one potential outcome (the most likely), that methodology is

essentially a shortcut for times when the probability of the most likely outcome is "significantly

greater" than the probability of the others.  *See* ASTM E2137-01 § 5.4.2.  The Most Likely

Value method thus is reserved for times when the evaluator is convinced that reducing effort will

not appreciably change the results the Expected Value method would generate.  The "cost" of

9

performing the evaluation is the main reason for selecting the Most Likely Value method over

the Expected Value method. *See id.*; *see also* ASTM E2137-01 § 4.2.4 (explaining that a less

robust methodology may be appropriate when "the cost of obtaining information or the time

required to gather it outweighs improvement in the quality of the estimate").

Even if information quality was a sufficient reason for selecting the Most Likely Value

method over the Expected Value method, that might justify selection it for a small portion of the

hundreds of sites at issue in this case but never for the sites listed on Schedule 2.5(a) to the

Master Separation Agreement, for which Kerr-McGee had established reserves as of the IPO and

for which the data as of November 2005 were voluminous. Yet Dr. Ram used the Most Likely

Value method by default, even for Schedule 2.5(a) Sites. He could not have selected that

methodology just because of information quality, as Plaintiff now argues.

Dr. Ram's mistaken belief that information quality is a sufficient reason for rejecting the

Expected Value method reveals that he did not reliably apply the Most Likely Value method.

Plaintiff argues that Dr. Ram reliably applied it because he identified the most likely remediation

outcome for each site he evaluated (Opp. 15 n.16). But that is not all there is to the Most Likely

Value method. Before using that methodology at any site, Dr. Ram had to determine whether the

most likely outcome "has a probability of occurrence that is significantly greater than the

others." ASTM E2137-01 § 5.4.2. There is no indication in Dr. Ram's report or deposition

testimony that he took that necessary step; there is, for instance, no estimate of the probability he

assigned to each site's most likely outcome. Dr. Ram, in fact, testified that he declined to decide

whether the most likely outcome was significantly more likely than others because he believed

that doing so would have forced him to do use the Expected Value method to account for them.

*See* Ram Trans. pp. 221–222.

10

Plaintiff claims that Dr. Ram will testify at trial that he actually did determine "that the likelihood of selected outcomes (representing the MLV) was significantly greater than any other scenario, grouping, or cluster of outcomes" (Opp. 15 n.16). As hard as that is to believe, such testimony, if true, would blunt some of Defendants' criticism about the reliability of Dr. Ram's application of the Most Likely Value method. Yet even so, it may be too little, too late. *See Capacchione v. Charlotte-Mecklenburg Schools*, 57 F. Supp. 2d 228, 278 (W.D.N.C. 1999) (an expert's "willingness to prop up baseless excuses in an effort to cover up her errors raises serious doubts about her scientific objectivity and creates suspicions as to the rest of her report").

**E.       The Court Should Exclude Mention Of The Uncosted Sites At Trial.**

Apart from excluding Dr. Ram's opinion about the sites he evaluated, the Court also should bar Plaintiff from speculating about Tronox's contingent environmental liabilities at the sites he did not evaluate. Although Dr. Ram stated that his estimate for the 372 sites he evaluated is "conservative" in light of the 2,200 Uncosted Sites, he also conceded that he had no information about the Uncosted Sites (*In Limine* Mot. 5–7). Speculation is not expert opinion, and it is hard to imagine a plainer violation of the Rule 702 requirement that an expert opinion be based on "sufficient facts and data." Fed. R. Evid. 702(b).

In defending the admissibility of Dr. Ram's speculation, Plaintiff engages in speculation of its own. While admitting that Tronox "likely" has no liability for some fraction of the Uncosted Sites, Plaintiff argues that Tronox must be liable for the rest, however many that may be (Opp. 21). As Plaintiff sees it, since the Uncosted Sites "could never reduce Tronox's total liability," Tronox "could only face additional liability from" those sites (Opp. 21). That is a classic false dichotomy. There is a third possibility Plaintiff overlooks: the Uncosted Sites could have no effect whatsoever on Tronox's total liability.

11

**F.    The Court Should Grant Defendants Relief Under Rule 36(a)(6).**

Defendants deserve relief under Rule 36(a)(6).  Plaintiff maintains that it can simultaneously allege that Tronox is liable at thousands of sites, refuse to produce evidence about that liability, and object to Defendants' Requests for Admission about the absence of such evidence.  Plaintiff does not address the bind its inequitable position puts Defendants in.  Instead, focusing only on the time and expense it would need to answer the requests, Plaintiff contends that "the same information can be obtained—at no expense—through a few questions at trial" and suggests that Defendants should "simply ask Dr. Ram if he knows" about the information at issue in the Requests for Admission (Opp. 23).  Finding out that a party's expert is not aware of a fact is no substitute for an admission from the party itself.  And forcing Defendants to establish such at trial defeats the whole purpose of Requests for Admission.  It also prejudices Defendants as they prepare demonstratives and evidence for trial.

As for Plaintiff's argument that the Court should order Plaintiff to answer the Requests for Admission before deeming them admitted (Opp. 22), that offer comes far too late.  Defendants need to know, before trial begins on May 15, 2012, that Plaintiff's refusal to answer the Requests for Admission deems them admitted.  The federal rules allow no other option.

**III.**
**CONCLUSION**

Under Rule 702, the Court should exclude Dr. Ram's testimony about Tronox's

contingent environmental liabilities.  The Court also should grant Defendants' motion *in limine*

as to the Uncosted Sites and Defendants' Rule 36(a)(6) motion.

April 17, 2012                                                        Respectfully submitted,

*/s/ Thomas R. Lotterman*

Kenneth N. Klee                    Melanie Gray                      Thomas R. Lotterman
  (KK 5910)                          (*pro hac vice*)                  (*pro hac vice*)
David M. Stern                     Lydia Protopapas                 Duke K. McCall, III
  (*pro hac vice*)                   (LP 8089)                         (*pro hac vice*)
KLEE, TUCHIN, BOGDANOFF &          Jason W. Billeck                 BINGHAM MCCUTCHEN LLP
STERN LLP                            (*pro hac vice*)                2020 K Street, NW
1999 Avenue of the Stars           WEIL, GOTSHAL & MANGES LLP       Washington, DC 20006
39th Floor                         700 Louisiana, Suite 1600        Telephone:  (202) 373-6000
Los Angeles, CA 90067              Houston, Texas 77002             Facsimile:  (202) 373-6001
Telephone: (310) 407-4000          Telephone:  (713) 546-5000
Facsimile: (310) 407-9090          Facsimile:  (713) 224-9511

                                   Richard A. Rothman               James J. Dragna
                                     (RR 0507)                        (*pro hac vice*)
                                   Bruce S. Meyer                   BINGHAM MCCUTCHEN LLP
                                     (BM 3506)                      335 South Grand Avenue
                                   WEIL, GOTSHAL & MANGES LLP       Suite 4400
                                   767 Fifth Avenue                 Los Angeles, California 90071
                                   New York, New York 10153         Telephone:  (213) 680-6400
                                   Telephone:  (212) 310-8000       Facsimile:  (213) 680-6499
                                   Facsimile:  (212) 310-8007

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 17, 2012, a true and correct copy of the

foregoing was served on the following counsel of record by ECF and/or as indicated below:

**Via email jeffrey.zeiger@kirkland.com and jzeiger@kirkland.com**

Jeffrey J. Zeiger
Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654

**Via email joseph.pantoja@usdoj.gov**

Joseph A. Pantoja
Assistant United States Attorney
86 Chambers Street
New York, NY 10007


*/s/ Thomas R. Lotterman*_____
Thomas R. Lotterman