Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
Telephone:  (213) 680-6400
Facsimile:  (213) 680-6499

Kenneth N. Klee (KK 5910)
David M. Stern (*admitted pro hac vice*)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Telephone: (310) 407-4000
Facsimile: (310) 407-9090

*Counsel to Defendants*

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, *et al.*, | ) | Case No. 09-10156 (ALG) |
| | ) | |
| _____ Debtors. | ) | Jointly Administered |
| TRONOX INCORPORATED, TRONOX WORLDWIDE LLC f/k/a Kerr-McGee Chemical Worldwide LLC, and TRONOX LLC f/k/a Kerr-McGee Chemical LLC, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| ANADARKO PETROLEUM CORPORATION and KERR-MCGEE CORPORATION, KERR-MCGEE OIL & GAS CORPORATION, KERR-MCGEE WORLDWIDE CORPORATION, KERR-MCGEE INVESTMENT CORPORATION, KERR-MCGEE CREDIT LLC, KERR-MCGEE SHARED SERVICES COMPANY LLC, and KERR-MCGEE STORED POWER COMPANY LLC | ) ) ) ) ) ) ) | Adv. Pro. No. 09-01198 (ALG) |
| | ) | |
| _____ Defendants. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| v. | ) | |
| | ) | |
| TRONOX, INC., TRONOX WORLDWIDE LLC, TRONOX LLC, KERR-MCGEE CORPORATION and ANADARKO PETROLEUM CORPORATION, | ) ) ) ) | |
| | ) | |
| _____ Defendants. | ) | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT.............................................................................................................................3

I.  Whether Or Not § 546(e) Is An Affirmative Defense, Defendants Have Preserved Their Ability To Raise Such Defense As A Failure to State A Claim Under Fed. R. Civ. P. 12(h)(2) ............................................................................................................................3

II.  Where Plaintiffs Possess All Facts Relevant To A Defense And Have Ample Opportunity To Respond, A Generalized Pleading Is Sufficient To Satisfy The Purpose Of Rule 8(c) In Preventing Unfair Surprise ...............................................................................................9

III.  The Proposed Amendment Overwhelmingly Satisfies Rule 15(a)'s Liberal Pleading Requirements ...................................................................................................................13

    A.  The Proposed Amendment Is Not Sought In Bad Faith Or For A Dilatory Purpose ....................................................................................................................14

    B.  The Proposed Amendment Will Not Unduly Prejudice Plaintiffs ....................................16

        (i)  The Proposed Amendment Will Not Require Plaintiffs To Expend Significant Resources To Conduct Discovery And Prepare For Trial................................................................................................17

        (ii)  Plaintiffs Have Not Demonstrated That The Proposed Amendment Will Significantly Delay Resolution Of The Dispute .......21

        (iii)  Defendants' Potential For Success On The Merits Of § 546(e) Is Not A Legally Cognizable Form Of Undue Prejudice..........................24

    C.  Defendants Have Not Unduly Delayed In Seeking The Amendment.............................25

    D.  The Proposed Amendment Would Not Be Futile .........................................................29

IV.  To The Extent Rule 16(b) Applies, Defendants Have Satisfied It ................................................29

    A.  The Proposed Amendment Is Not Subject To The Requirements Of Rule 16(b)...........29

    B.  Plaintiffs Misconstrue The Requirements Of Rule 16(b) .................................................31

    C.  Defendants Were Diligent In Seeking The Proposed Amendment..................................32

        (i)  Defendants Did Not Assert § 546(e) At "The Last Possible Moment" .......................................................................................................34

        (ii)  Defendants Were Not Required To Foretell A Significant Change In Law........................................................................................35

        (iii)  The Impact of Enron Is Far-Reaching .................................................36

        (iv)  The Timing Of The Proposed Amendment Does Not Evidence Lacking Diligence................................................................................37

        (v)  The Facts and Circumstances Surrounding The Proposed Amendment Are Not Analogous To The Adelphia Decision ...............39

i

## TABLE OF CONTENTS
### (continued)

Page

V.  The Project Focus And IPO Transfers Are Protected By § 546(e) of the Bankruptcy Code........41

(i)  The IPO And Project Focus Transfers Were Settlement Payments.................................................................................47

(ii)  The IPO And Project Focus Transfers Were Made In Connection With A Securities Contract....................................................50

(iii)  Collapsing The IPO and Project Focus Is Improper, However, If Collapsed, The Collapsed Transfers Must Be Treated As Such For Purposes of § 546(e)........................................................53

(iv)  The Project Focus And IPO Transfers Were Made By, To, Or For The Benefit Of, A Financial Institution Or Financial Participant..............................................................................55

CONCLUSION................................................................................59

US_ACTIVE:\43970445\10\15337.0004

# TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*,
   97CIV.4978, 2001 WL 1631412 (S.D.N.Y. Dec. 18, 2001) ............................................... 28

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*,
   87 F. Supp. 2d 281 (S.D.N.Y. 2000) ...................................................... 14, 17, 20

*Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp.)*,
   452 B.R. 484 (Bankr. S.D.N.Y. 2011) ..................................................... *passim*

*Alexandre v. Town of Hempstead*,
   275 F.R.D. 94 (E.D.N.Y. 2011) ........................................................... 28

*Arnold v. KPMG LLP*,
   334 F. App'x 349 (2d Cir. 2009) .......................................................... 14

*ASARCO LLC v. Americas Mining Corp.*,
   396 B.R. 278 (S.D. Tex. 2008) ............................................................ 46

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ......................................................................... 5

*Astor Holdings Inc. v. Roski*,
   325 F. Supp. 2d 251 (S.D.N.Y. 2003) .................................................... 23

*Barth v. Kaye*,
   178 F.R.D. 371 (N.D.N.Y. 1998) .......................................................... 6

*Block v. First Blood Assocs.*,
   988 F.2d 344 (2d Cir. 1993) ........................................................... *passim*

*Bradbury v. GMAC Mortg., LLC*,
   780 F. Supp. 2d 114 (D. Me. 2011) ....................................................... 9

*Brandt v. B.A. Capital Co., LP (In re Plassein Int'l Corp.)*,
   590 F.3d 252 (3d Cir. 2009) ...................................................... 42, 43, 45

*Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*,
   195 B.R. 971 (Bankr. D. Mass. 1996) ............................................. 44, 46, 48

*Brathwaite v. St. John's Episcopal Hosp.*,
   CV-85-4192, 1987 WL 25911 (E.D.N.Y. Nov. 18, 1987) ............................... 28

*Brown v. Crawford Cnty.*,
   960 F.2d 1002 (11th Cir. 1992) ........................................................... 6

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Buckley v. Goldman, Sachs & Co.*,
   No. Civ.A.02-CV-11497, 2005 WL 1206865 (D. Mass. May 20, 2005) ............................................ 46

*Castro v. City of New York*,
   No. 06-CV-2253, 2010 WL 889865 (E.D.N.Y. Mar. 6, 2010).......................................................... 31

*Cimino v. Glaze*,
   228 F.R.D. 169 (W.D.N.Y. 2005) ................................................................................................ 28

*City of New York v. Grp. Health Inc.*,
   649 F.3d 151 (2d Cir. 2011) ............................................................................................... 14, 25

*Colon ex rel. Molina v. BIC USA, Inc.*,
   136 F. Supp. 2d 196 (S.D.N.Y. 2000) ......................................................................................... 12

*Commander Oil Corp. v. Barlo Equip. Corp.*,
   215 F.3d 321 (2d Cir. 2000) ..................................................................................................... 28

*Contemporary Indus. Corp. v. Frost*,
   564 F.3d 981 (8th Cir. 2009).......................................................................................... 42, 42, 45

*Curry v. City of Syracuse*,
   316 F.3d 324 (2d Cir. 2003) ................................................................................................... 9, 23

*Curtis v. Citibank, N.A.*,
   97CIV.1065, 1998 WL 3354 (S.D.N.Y. Jan. 5, 1998) ...................................................................... 14

*Daiwa Special Asset Corp. v. Desnick*,
   No. 00 CIV. 3856, 2002 WL 1997922 (S.D.N.Y. Aug. 29, 2002).................................................... 12

*Duling v. Gristede's Operating Corp.*,
   265 F.R.D. 91 (S.D.N.Y. 2010)................................................................................. 14, 20, 22, 26

*Duncan v. Coll. of New Rochelle*,
   174 F.R.D. 48 (S.D.N.Y. 1997)................................................................................................... 20

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
   651 F.3d 329 (2d Cir. 2011) ..........................................................................................*passim*

*Estate of Ratcliffe v. Pradera Realty Co.*,
   No. 05 Civ. 10272, 2007 WL 3084977 (S.D.N.Y. Oct. 19, 2007) ..................................................... 32

*Evans v. Syracuse City Sch. Dist.*,
   704 F.2d 44 (2d Cir. 1983) ....................................................................................................... 26

*Foman v. Davis*,
   371 U.S. 178 (1962) .................................................................................................. 14, 17, 24

iv

## TABLE OF AUTHORITIES
### (continued)

Page

*Gallegos v. Brandeis Sch.*,
189 F.R.D. 256 (E.D.N.Y. 1999) ........................................................................ 29

*Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*,
450 B.R. 414 (Bankr. S.D.N.Y. 2011) ................................................................ 46

*George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.*,
148 F.3d 136 (2d Cir. 1998) .............................................................................. 5

*Gibbs v. Se. Inv. Corp.*,
705 F. Supp. 738 (D. Conn. 1989) ..................................................................... 6

*Gortat v. Capala Bros., Inc.*,
No. 07 Civ. 3629, 2011 WL 6945186 (E.D.N.Y. Dec. 30, 2011) .......................... 27, 33, 36

*Grant v. Citibank (S.D.), N.A.*,
No. 10 Civ. 2955, 2010 WL 5187757 (S.D.N.Y. Dec. 6, 2010) ......................... 31

*Grochowski v. Phx. Constr.*,
318 F.3d 80 (2d Cir. 2003) .............................................................................. 32, 36

*Herbert Const. Co., Inc. v. Titan Indem. Co.*,
No. 94 CIV. 1261, 1996 WL 254859 (S.D.N.Y. May 15, 1996) .......................... 14, 25, 26

*Herron v. Herron*,
255 F.2d 589 (5th Cir. 1958) ........................................................................... 6

*Holmes v. Grubman*,
568 F.3d 329 (2d Cir. 2009) ............................................................................. 31, 32

*In re 1301 Conn. Ave. Assocs.*,
126 B.R. 823 (Bankr. D.D.C. 1991) .................................................................. 23

*In re Adbox, Inc.*,
488 F.3d 836 (9th Cir. 2007) ............................................................................ 9

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Assoc.*,
878 F.2d 742 (3d Cir. 1989) ............................................................................. 44

*In re Dynegy Holdings, LLC et al.*,
No. 11-38111, Dkt. No. 539 (Bankr. S.D.N.Y. Mar. 20, 2012) .......................... 46

*In re Lancelot Investors Fund, L.P.*,
No. 08 B 28225, 2012 WL 761593 (Bankr. N.D. Ill. Mar. 8, 2012) ...................... 36, 43, 49

*In re Laurel Valley Oil Co.*,
No. 05-64330, 2009 WL 1758741 (Bankr. N.D. Ohio June 16, 2009) ................. 8

v

# TABLE OF AUTHORITIES
### (continued)

Page

*In re Libby Int'l, Inc.*,
247 B.R. 463 (8th Cir. B.A.P. 2000) ................................................................... 9

*In re MarketXT Holdings Corp.*,
336 B.R. 39 (Bankr. S.D.N.Y. 2006) .......................................................... 15, 17

*In re Plassein Int'l*,
366 B.R. 318 (D. Del. 2008) ................................................................................ 55

*In re Quebecor World (USA) Inc.*,
453 B.R. 201 (S.D.N.Y. 2011) ....................................................................*passim*

*In re Singh*,
434 B.R. 298 (Bankr. E.D.N.Y. 2010) ............................................................. 23

*Int'l Ventures, Inc. v. Block Props, VII (In re Int'l Ventures, Inc.)*,
207 B.R. 618 (Bankr. E.D. Ark. 1997) ............................................................. 9

*Issa v. CompUSA*,
354 F.3d 1174 (10th Cir. 2003) .......................................................................... 5

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
263 B.R. 406 (S.D.N.Y. 2001) ..................................................................... 42, 46

*John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*,
22 F.3d 458 (2d Cir. 1994) ................................................................................ 28

*Jones v. Bock*,
549 U.S. 199 (2007) ............................................................................................. 7

*Kaiser Steel Corp. v. Charles Schwab & Co.*,
913 F.2d 846 (10th Cir. 1990) ..................................................................... 42, 44

*Kassner v. 2nd Ave. Delicatessen, Inc.*,
496 F.3d 229 (2d Cir. 2007) .............................................................................. 31

*Kelly v. A1 Tech.*,
09 Civ. 962, 2010 U.S. Dist. LEXIS 37807 (S.D.N.Y. Apr. 8, 2010) ................. 23

*Kingsville Dodge, LLC v. Almy*,
No. CCB-07-154, 2007 WL 2332699 (D. Md. July 30, 2007) ............................ 23

*Kleinknecht v. Gettysburg Coll.*,
989 F.2d 1360 (3d Cir. 1993) ............................................................................ 23

*Kontrick v. Ryan*,
540 U.S. 443 (2004) ......................................................................................... 4, 7

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Lawrence v. Starbucks Corp.*,
   08 Civ. 3734, 2009 U.S. Dist. LEXIS 114909 (S.D.N.Y. Dec. 10, 2009) .......................................... 33

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*,
   318 F.3d 148 (2d Cir. 2003) ................................................................................................................. 6

*Lehman Bros. Holdings Inc. v. JP Morgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*,
   No. 10-0326,6 --- B.R. ----, 2012 WL 1355659 (Bankr. S.D.N.Y. Apr. 19, 2012) ...................... *passim*

*Leonhard v. United States*,
   633 F.2d 599 (2d Cir. 1980) ................................................................................................................. 6

*Livingston v. Piskor*,
   215 F.R.D. 84 (W.D.N.Y. 2003) .............................................................................................. 27, 33, 36

*Loranger Mfg. Corp. v. PNC Bank, NA (In re Loranger Mfg. Corp.)*,
   324 B.R. 575 (Bankr. W.D. Pa.2005) ................................................................................................. 55

*LPR, SRL v. Challenger Overseas, LLC*,
   No. 99 Civ. 8883, 2000 WL 973748 (S.D.N.Y. July 13, 2000) .......................................................... 12

*Martin v. Snyder*,
   329 F.3d 919 (7th Cir. 2003) ................................................................................................................ 6

*Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*,
   426 B.R. 488 (Bankr. D. Del. 2010) .............................................................................................. 54, 55

*Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*,
   No. 11-10160, 2012 WL 748652 (D. Del. Mar. 7, 2012) ................................................................... 49

*Middle Atl. Utils. Co. v. S.M.W. Dev. Grp.*,
   392 F.2d 380 (2d Cir. 1968) ............................................................................................................... 22

*Monahan v. N.Y.C. Dep't of Corr.*,
   214 F.3d 275 (2d Cir. 2000) ...................................................................................................... 13, 14, 23

*Moodie v. Fed. Reserve Bank of N.Y.*,
   861 F. Supp. 10 (S.D.N.Y. 1994) .......................................................................................................... 7

*Munford v. Valuation Research Corp. (Matter of Munford, Inc.)*,
   98 F.3d 604 (11th Cir. 1996) ........................................................................................................ 45, 46

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.*,
   No. 08-CV-5023, 2010 WL 1257803 (E.D.N.Y. Mar. 26, 2010) .................................................. 31, 32

*Off. Comm. of Unsec'd Creds. of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A.
   (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721 (Bankr. S.D.N.Y. 2008) ......................................... 53

## TABLE OF AUTHORITIES
### (continued)

Page

*Off. Comm. of Unsec'd Creds. of Norstan Apparel Shops, Inc. v. Lattman*
  *(In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68 (E.D.N.Y. 2007) ............................................. 42, 46

*Oxaal v. Internet Pictures Corp.*,
  No. 00CV1863, 2002 WL 485704 (N.D.N.Y. Mar. 27, 2002) ........................................................... 36

*Palmer v. Garuti*,
  No. 3:06-CV-795, 2009 WL 413129 (D. Conn. Feb. 17, 2009) ........................................................ 23

*Pani v. Empire Blue Cross Blue Shield*,
  152 F.3d 67 (2d Cir. 1998) .................................................................................................................. 6

*Pereira v. Cogan*,
  No. 00 CIV. 619, 2002 WL 31496224 (S.D.N.Y. Nov. 8, 2002) ...................................................... 26

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*,
  440 B.R. 243 (Bankr. S.D.N.Y. 2010) ................................................................................................ 8

*Pointer v. Am. Oil Co.*,
  295 F. Supp. 573 (S.D. Ind. 1968) ...................................................................................................... 5

*QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*,
  571 F.3d 545 (6th Cir. 2009) ........................................................................................................ 43, 45

*Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med. Benefit Plan*,
  11 F.3d 1567 (10th Cir. 1993) ............................................................................................................. 8

*Ricciuti v. N.Y.C. Transit Auth.*,
  941 F.2d 119 (2d Cir. 1991) .............................................................................................................. 14

*Richardson Greenshields Sec., Inc. v. Lau*,
  825 F.2d 647 (2d Cir. 1987) .................................................................................................... 25, 28, 29

*Rose v. Amsouth Bank of Fla.*,
  391 F.3d 63 (2d Cir. 2004) ................................................................................................................ 23

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) .................................................................................................................. 5

*Saks v. Franklin Covey Co.*,
  316 F.3d 337 (2d Cir. 2003) ................................................................................................................ 7

*Salahuddin v. Jones*,
  992 F.2d 447 (2d Cir. 1993) ................................................................................................................ 6

*Samad Bros., Inc. v. Bokara Rug Co., Inc.*,
  No. 09 Civ. 5843, 2010 WL 2835754 (S.D.N.Y. June 30, 2010) ...................................................... 31

viii

## TABLE OF AUTHORITIES
### (continued)

Page

Schneider v. O'Neal,
   145 F. Supp. 120 (E.D. Ark. 1956) ..................................................................... 7

Sigmund v. Martinez,
   06 CIV. 1043, 2006 WL 2016263 (S.D.N.Y. July 13, 2006) ................................ 7

Slavin v. Benson,
   493 F. Supp. 32 (S.D.N.Y. 1980) ..................................................................... 29

Specialty Minerals, Inc. v. Pluess–Staufer AG,
   395 F. Supp. 2d 109 (S.D.N.Y. 2005) .............................................................. 13

Spell v. McDaniel,
   591 F. Supp. 1090 (E.D.N.C. 1984) ................................................................... 5

Standard Fire Ins. Co. v. Donnelly,
   689 F. Supp. 2d 696 (D. Vt. 2010) ................................................................... 16

State Teachers Ret. Bd. v. Fluor Corp.,
   654 F.2d 843 (2d Cir. 1981 ) ....................................................................... 25, 29

Steinberg v. Columbia Pictures Indus., Inc.,
   663 F. Supp. 706 (S.D.N.Y. 1987) ................................................................... 23

Sultan v. Lincoln Nat'l Corp.,
   No. 03-5190, 2006 WL 1806463 (D.N.J. June 30, 2006) .................................. 23

T&N PLC v. Fred S. James & Co. of N.Y., Inc.,
   No. 89 Civ. 7688, 1991 WL 190581 (S.D.N.Y. Sept. 16, 1991) ......................... 29

Taylor v. Fla. State Fair Auth.,
   875 F. Supp. 812 (M.D. Fla. 1995) ................................................................... 29

Trs. of the ALA-Lithographic Pension Plan v. Crestwood Printing Corp.,
   127 F. Supp. 2d 475 (S.D.N.Y. 2001) ................................................................ 9

U.S. for & on Behalf of Mar. Admin. v. Cont'l Ill. Nat. Bank & Trust Co. of Chi.,
   889 F.2d 1248 (2d Cir. 1989) ........................................................................... 20

United States v. Int'l Bus. Mach.,
   66 F.R.D. 223 (S.D.N.Y. 1975) ........................................................................ 22

United States v. Wapinski Real Estate,
   No. 99 C 100, 2000 WL 28271 (N.D. Ill. Jan. 10, 2000) .................................... 9

Van Voorhis v. District of Columbia,
   240 F. Supp. 822 (D.D.C. 1965) ........................................................................ 7

ix

## TABLE OF AUTHORITIES
### (continued)

Page

*W.E. Hedger Transp. Corp. v. Ira S. Bushey & Sons, Inc.*,
  186 F.2d 236 (2d Cir. 1951) .......................................................................................... 6

*Walsh v. Toledo Hosp. (In re Fin. Mgmt. Scis., Inc.)*,
  261 B.R. 150 (Bankr. W.D. Pa. 2001) .......................................................................... 42

*Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Res., Inc.)*,
  198 B.R. 352 (Bankr. D. Colo. 1996) ...................................................................... 49, 50

*Williams v. Ashland Eng'g Co.*,
  45 F.3d 588 (1st Cir. 1995) ........................................................................................... 9

*Wolf v. Reliance Standard Life Ins. Co.*,
  71 F.3d 444 (1st Cir. 1995) ........................................................................................... 7

*Zahn v. Yucaipa Capital Fund*,
  218 B.R. 656 (D.R.I. 1998) ......................................................................................... 46

*Zahra v. Town of Southold,*
  48 F.3d 674 (2d Cir. 1995) ......................................................................................... 20

## STATUTES

11 U.S.C. § 101(22A) ...................................................................................... *passim*

11 U.S.C. § 101(49)(A) ............................................................................... 50, 51, 56

11 U.S.C. § 546(e) ........................................................................................ *passim*

11 U.S.C. § 561(a)(1) ......................................................................................... 20

11 U.S.C. § 741(7)(A) ................................................................................. 50, 56, 58

11 U.S.C. § 741(8) ..................................................................................... 37, 43, 46

Bankruptcy Abuse Prevention and Consumer Proctection Act of 2005,
  Pub. L. No. 109-8, § 907(o) (2005) ............................................................................ 41

Financial Netting Improvements Act of 2006, Pub. L. No. 109-390, § 5(b) (2006) ............................ 41, 42

H.R. Rep. No. 648 (2006) ............................................................................................ 42

## RULES

FED. R. CIV. P. 8(c) ........................................................................................ *passim*

FED. R. CIV. P. 12(b)(6) ..................................................................................... 4, 5

x

**TABLE OF AUTHORITIES**
(continued)

FED. R. CIV. P. 12(c) ................................................................................................ 8, 18

FED. R. CIV. P. 12(f) .................................................................................................. 12, 13

FED. R. CIV. P. 12(h)(2) ........................................................................................... *passim*

FED. R. CIV. P. 15(a) ................................................................................................ *passim*

FED. R. CIV. P. 16(b) ............................................................................................... *passim*

## COURT DOCUMENTS

Defs.' Mot. For An Order Confirming That Defs. Have Preserved The Defense Codified By
   Section 546(e) Of The Bankr. Code Or, In The Alternative, For Leave To Amend Their
   Answer To The Second Amended Adversary Complaint To Include Such Defense,
   Dkt. No. 310 (Nov. 20, 2010) ................................................................................ *passim*

Defs.' Mot. For Partial Summary Judgment Seeking Dismissal Of (I) Constructive Fraudulent
   Transfers Made By Tronox LLC; (II) Anadarko Petrol. Corp. As Subsequent Transferee With
   Respect To All Alleged Fraudulent Transfers; And (III) All Actual And Constructive
   Fraudulent Transfer Claims Protected By Section 546(e) Of The Bankr. Code, Dkt. No. 356
   (Apr. 16, 2012) ....................................................................................................... *passim*

Defs.' Reply To Pls.' Opp'n To Defs.' Mot. For Partial Summary Judgment Seeking Dismissal
   Of (I) Constructive Fraudulent Transfers Made By Tronox LLC; (II) Anadarko Petrol. Corp.
   As Subsequent Transferee With Respect To All Alleged Fraudulent Transfers; And (III) All
   Actual And Constructive Fraudulent Transfer Claims Protected By Section 546(e) Of The
   Bankr. Code, Dkt. No. 356 (Apr. 16, 2012) ............................................................ 49, 53

Fifth Amended Case Management Order, Dkt. No. 331 (Mar. 28, 2012) ........................... 30, 35

Findings Of Fact, Conclusions Of Law And Order Confirming The First Amended Joint Plan Of
   Reorganization Of Tronox Inc., *Et Al.* Pursuant To Chapter 11 Of The Bankr. Code,
   Main Case Dkt. No. 2567 (Nov. 20, 2010) ............................................................. 34

Fourth Amended Case Management Order, Dkt. No. 230 (May 13, 2011) ......................... 30

Jan. 18, 2011 Hr'g Tr., Main Case Dkt. No. 2733 ........................................................ 15

July 19, 2011 Hr'g Tr., Dkt. No. 254 ......................................................................... 15, 31, 35

July 21, 2010 Hr'g Tr., Dkt. No. 154 ......................................................................... 15

Mar. 22, 2012 Hr'g Tr., Dkt. No. 327 ........................................................................ 10, 16, 23, 35

Mot. For Admission *Pro Hac Vice* Of Sabin Willett To Represent Anadarko Petrol. Corp. *Et Al.*,
   Dkt. No. 203 (Feb. 22, 2012) ................................................................................ 37

US_ACTIVE:\43970445\10\15337 0004

## TABLE OF AUTHORITIES
### (continued)

Page

Nov. 14, 2011 Hr'g Tr., Dkt. No. 286.................................................................................... 30, 35

Order Approving The (A) Execution Versions Of The Environmental Response Trust And
    Anadarko Litigation Trust Agreements And (B) First Amendment To Consent Decree And
    Environmental Settlement Agreement, Main Case Dkt. No. 2812 (Feb. 14, 2011)........................... 25

Pls.' Opp'n To Defs.' Mot. For An Order Confirming That Defs Have Preserved The Defense
    Codified By Section 546(e) Of The Bankr. Code Or, In The Alternative, For Leave To
    Amend Their Answer To The Second Amended Adversary Complaint To Include Such
    Defense,  Dkt. No. 340 (Mar. 7, 2012)...................................................................................*passim*

Pls.' Reply In Supp. Of Its Mot. For Partial Summary Judgment Regarding Pls.' Recovery Under
    Section 550(a) Of The Bankr. Code, Dkt. No. 272 (Oct. 31, 2011).................................................... 25

Pls.' Resp. To Defs.' Undisputed Statement of Facts, Dkt. No. 329 (Mar. 26, 2012).............................. 55

### OTHER AUTHORITIES

Andrew M. Leblanc et al., *In Re Enron: Second Circuit Expands "Settlement Payment"
    Exemption To The Redemption Of Commercial Paper (And Beyond?),*
    7 PRATT'S J. OF BANKR. L. 621 (2011)................................................................................. 27

5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE
    § 1356 (3d ed. 2004)............................................................................................................... 5

    § 1357 (3d ed. 2004)............................................................................................................ 5, 6

5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE
    § 1392 (3d ed. 2004)............................................................................................................ 4, 8

Christopher W. Frost, *The Continued Expansion of Section 546(e): Has the Safe Harbor
    Swallowed the Rule?,* 31 BANKR. L. LETTER 1 (2011)........................................................... 36, 41, 44

7 COLLIER ON BANKRUPTCY ¶ 546.LH[5] (16th ed. rev. 2011)................................................................ 42

Jonathan S. Feldman et al., *Recent Developments in Section 546(e) of the Bankruptcy Code,*
    21 J. BANKR. L. & PRAC. 2  (2012)...................................................................................... 37

Oscar N. Pinkas & David A. Pisciotta*, To Boldly Go Where No Court Has Gone Before: Enron
    and the Application of § 546(e)*, 30-8 AM. BANKR. INST. J. 28 (2011)........................................... 27, 41

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR AN ORDER CONFIRMING THAT DEFENDANTS HAVE PRESERVED
THE DEFENSE CODIFIED BY SECTION 546(e) OF THE BANKRUPTCY CODE OR,
IN THE ALTERNATIVE, FOR LEAVE TO AMEND THEIR ANSWER TO THE SECOND
AMENDED ADVERSARY COMPLAINT TO INCLUDE SUCH DEFENSE**

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

Anadarko Petroleum Corporation, Kerr-McGee Corporation, Kerr-McGee Oil & Gas
Corporation, Kerr-McGee Worldwide Corporation, Kerr-McGee Investment Corporation, Kerr-McGee
Credit LLC, Kerr-McGee Shared Services Company LLC and Kerr-McGee Stored Power Company LLC
(collectively, the "Defendants"), file this Reply (the "Reply") to Plaintiffs' Opposition (the "Response")
to Defendants' Motion for an Order Confirming that Defendants Have Preserved the Defense Codified by
Section 546(e) of the Bankruptcy Code or, in the Alternative, for Leave to Amend Their Answer to the
Second Amended Adversary Complaint to Include Such Defense (the "Motion") and respectfully
represent:

## PRELIMINARY STATEMENT

Defendants have preserved the § 546(e) defense under Rule 12(h)(2) and Rule 8(c)
without the need for an amendment. Defendants may assert the defense as a failure to state a claim
because the defense appears on the face of the complaint and the documents integral to it. Section 546(e)
is routinely invoked as a failure to state a claim and therefore Defendants may raise the defense in that
context notwithstanding whether it was pled in the Answer.[1] Similarly, Rule 8(c) does not mechanically
bar an affirmative defense not pled in an answer. Whether a non-movant has had fair notice, and an
adequate opportunity to respond, must factor into any waiver analysis. Plaintiffs were not unfairly
surprised by the § 546(e) defense, nor will they have an inadequate opportunity to respond to it because
the defense: (i) was addressed by Plaintiffs' in the Response and may be further addressed at trial;

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion or, if not
defined therein, in the Summary Judgment Motion.

(ii) requires review of only a handful of documents which have long been available to Plaintiffs; (iii) implicates a straightforward, purely legal inquiry; (iv) raises no new facts or transactions not known to Plaintiffs; (v) requires no new discovery; and (vi) was asserted three months before a trial that will last for many months.   Because Rule 8(c)'s objective of preventing unfair surprise has been satisfied, the Court should honor the rule's competing objective of assuring that claims are adjudicated on the merits rather than mere pleading technicalities.

Alternatively, Defendants' request to amend the Answer should be granted.   Plaintiffs bear the burden under Rule 15(a), yet they have not shown that the proposed amendment should be denied.   In fact, they fail to even address, let alone demonstrate, that the amendment was sought in bad faith or for a dilatory purpose.

Plaintiffs also fail to establish that they will be "unduly prejudiced" by the amendment. No new discovery is needed to adjudicate the defense; however, even if that were not the case, Plaintiffs declined Defendants' offer to provide them with discovery.   Regardless, Plaintiffs have not demonstrated that the amendment will cause them to suffer the "undue prejudice" required by the Second Circuit— namely, the expenditure of "*significant* resources conducting discovery and preparing for trial."   Nor have they demonstrated that the amendment will significantly delay the resolution of this dispute.   Indeed, granting the amendment may actually expedite the resolution of the parties' dispute.   While Plaintiffs allege that tort and environmental claimants might not enjoy the fruits of a win through an adjudication on the merits, this is not a legally cognizable form of "undue prejudice."   Accordingly, Plaintiffs have failed to satisfy their burden.

In addition, because Plaintiffs have failed to establish that Defendants' reliance on § 546(e) is "frivolous" or "clearly meritless," they have not discharged their burden of demonstrating the futility of the amendment.   All factors therefore weigh in favor of allowing the amendment.

Plaintiffs' Rule 16(b) argument should also be rejected.  Rule 16(b) applies only to amendments sought after a court-approved deadline.  Here, Defendants sought the amendment at a time when the parties were (and had been for almost a year) operating under the terms of an agreement that had not been entered by the Court.  Although a previous Court-approved scheduling order contained an amendment deadline tied to the close of fact discovery, large-scale discovery continued for almost a year after that deadline.  Regardless of whether Rule 16(b) applies, however, Defendants satisfy its requirements because a Second Circuit decision rendering the defense viable was issued after the Answer deadline, and Defendants thereafter moved with reasonable diligence in acting upon such decision.

Because Plaintiffs challenged the merits of the § 546(e) defense in their Response (rather than in their response to the Summary Judgment Motion), Defendants have responded below. Section 546(e) prevents plaintiffs from avoiding settlement payments or transfers made in connection with a securities contract that were made by, to, or for the benefit of, a financial participant or financial institution.  *Enron* mandates a plain language reading of the statute.  In accordance with that plain language reading, and the broad meaning afforded the term "settlement payment," the Project Focus and the IPO transfers were "settlement payments," and/or were made "in connection with a securities contract."  Defendants also presented unrefuted evidence that the IPO transfers were made by wire transfer, which necessarily satisfies the financial institution requirement of § 546(e).  Defendants presented further unrefuted evidence reflecting that various transfers were made by, to, or for the benefit of, financial participants.  As a consequence, Defendants qualify for safe harbor protection based on a straightforward, plain language reading of the statute.

## ARGUMENT

I.    **Whether Or Not § 546(e) Is An Affirmative Defense, Defendants Have Preserved Their Ability To Raise Such Defense As A Failure to State A Claim Under FED. R. CIV. P. 12(h)(2)**

1.    Defendants argued in the Motion that, even if, as Plaintiffs allege, § 546(e) is an affirmative defense that was not pled in the Answer, Defendants nonetheless may assert the defense as a

"failure to state a claim upon which relief may be granted."[2]   Although Rule 8(c) generally provides for the waiver of an affirmative defense not pled in an answer, Rule 12(h)(2) governs the waiver of any defense based on a failure to state a claim.[3]   Unlike other defenses, the defense of failure to state a claim may be raised in a pre-answer Rule 12(b)(6) motion, in a post-answer Rule 12(c) motion for judgment on the pleadings, or at trial.[4]   As the Supreme Court explained in *Kontrick v. Ryan*, "[o]rdinarily, under the Bankruptcy Rules, as under the Civil Rules, a defense is lost if it is not included in the answer or amended answer . . . *unless it is protected by Rules 12(h)(2)* or (h)(3) . . . which *prolong the life of certain defenses* . . . [such that] the issue [may] be raised at . . . the trial on the merits."[5]   Accordingly, the Supreme Court has expressly recognized that an affirmative defense must ordinarily be asserted in an answer, *unless* the defense qualifies for treatment as a failure to state a claim under Rule 12(h)(2).

2.   Despite this, Plaintiffs urge that Defendants are precluded from asserting a defense of failure to state a claim predicated on § 546(e), because (i) "§ 546(e) is an affirmative defense based on information outside the *prima facie* case—not an attack on the sufficiency of [Plaintiffs'] claims;" (ii) Defendants are not arguing that Plaintiffs have "failed to state a claim," but that "even if Plaintiff[s] ha[ve] stated a claim, it should be overcome by the . . . exemption set forth in § 546(e);" and (iii) Rule 12(h)(2) applies only to the insufficiency of a pleading, whereas "§ 546(e) is not a defense based on the insufficiency of the pleadings" but "an affirmative defense that must be raised in the

---

[2]   Motion at ¶¶ 11-14.

[3]   *See* Motion at ¶ 12 (quoting 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1392 (3d ed. 1998) as stating, "Rule 12(h)(2) expressly preserves [certain] defenses against waiver during the pleading, motion, discovery, and trial stages of the action.  These [include] . . . failure to state a claim for relief . . . . [This defense] ha[s] been singled out by the rulemakers for special treatment because [it is] obviously of greater importance than [other] defenses . . . [it is] more closely enmeshed with the substantive merits of the lawsuit . . . [and] therefore deserve[s] greater consideration in terms of [its] preservation beyond the embryonic stage of the litigation").

[4]   FED. R. CIV. P. 12(h)(2); FED. R. CIV. P. 8(c).

[5]   *Kontrick v. Ryan*, 540 U.S. 443, 458-59 (2004) (emphasis added) (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1347 (2d ed. 1990)).

answer . . . "[6] Plaintiffs misunderstand both the nature of the defense of failure to state a claim and Defendants' arguments.

        3.      The defense of failure to state a claim is designed to test the "sufficiency of the statement of the claim for relief,"[7] including to "test the law of a claim,"[8] and whether, as a legal matter, the plaintiff is entitled to relief even if the allegations of the complaint are true.[9] Plaintiffs' contentions proceed on the erroneous notion that the insufficiency of a complaint may only be established by negating an element of Plaintiffs' *prima facie* case, not by demonstrating the applicability of an affirmative defense. However, courts and commentators, including Wright & Miller, disagree:

> As the case law makes clear, [a] complaint also is subject to dismissal under Rule 12(b)(6) when its allegations indicate the existence of an affirmative defense that will bar the award of any remedy; but for this to occur, the applicability of the defense has to be clearly indicated and must appear on the face of the pleading[10] [or documents integral to it].[11]
>
> * * *
>
> In a situation involving the barring effect of an affirmative defense, the [elements of the] claim [are] stated adequately, . . . but . . . the contents of the complaint include matters of avoidance that effectively vitiate the

---

[6]     Response at 5-6.

[7]     5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1356 (3d ed. 2004).

[8]     *Spell v. McDaniel*, 591 F. Supp. 1090, 1099 n.1 (E.D.N.C. 1984); *see also Issa v. CompUSA*, 354 F.3d 1174, 1177-78 (10th Cir. 2003) (stating that the purpose is to assess the legal sufficiency of the complaint as a matter of law); *Pointer v. Am. Oil Co.*, 295 F. Supp. 573, 576 (S.D. Ind. 1968) (stating that the purpose is to determine whether the complaint states a redressable claim).

[9]     *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir. 1998).

[10]    5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004) (citations omitted).

[11]    *Id.* (citations omitted) (in determining the defense of failure to state a claim, a court may consider the complaint, "matters incorporated by reference to or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint"); *see also Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (court will consider public disclosure documents filed with the SEC, and documents that plaintiffs either possessed or knew about and upon which they relied in bringing suit).

pleader's ability to recover on the claim. In both situations the complaint is . . . essentially self-defeating [as] . . . the plaintiff's own allegations show that a defense exists that legally defeats the claim for relief.

\* \* \*

[While a] statute of limitations . . . is the most common . . . affirmative defense [that] appears on the face of the pleading, . . . [o]ther affirmative defenses that have been considered on a motion to dismiss . . . include . . . assumption of the risk, contributory negligence, . . . estoppel, . . . illegality, . . . immunity from suit, . . . laches, a claim of privilege, . . . release, . . . res judicata and . . . the statute of frauds.[12]

4.    In accordance with the foregoing, the fact that Rule 8(c) provides for the waiver of an unpled affirmative defense will not prevent the defense from being asserted as a failure to state a claim under Rule 12(h)(2). For example, in *Gibbs v. Southeastern Investment Corp.*,[13] the court found that where the unconstitutionality of a statute was first raised at the close of the plaintiff's case, the defendant:

---

[12]    5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed. 2004) (citations omitted); *see also LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) (even though statute of limitations is an affirmative defense, it may properly be considered as a defense of failure to state a claim if the determination can be made on the face of the complaint); *Martin v. Snyder*, 329 F.3d 919, 921 (7th Cir. 2003) (immunity defense may properly be considered on a motion to dismiss for failure to state a claim); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74-75 (2d Cir. 1998) (stating that although res judicata is ordinarily an affirmative defense that must be raised in an answer, the court nonetheless has the power to dismiss the complaint for failure to state a claim on grounds of res judicata so long as all relevant documents are before it); *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) ("The failure of a defendant to raise res judicata in [an] answer does not deprive a court of the power to dismiss a claim on that ground."); *Brown v. Crawford Cnty.*, 960 F.2d 1002, 1010, 1012 (11th Cir. 1992) (affirmative defense of immunity may be decided on a motion to dismiss so long as the facts appear on the face of the complaint); *Leonhard v. U.S.*, 633 F.2d 599, 609 n.11 (2d Cir. 1980) (where limitations defense appears on the face of the complaint, it may be treated as a failure to state a claim); *Herron v. Herron*, 255 F.2d 589, 593 (5th Cir. 1958) (statute of limitations may be an affirmative defense if it is not susceptible to resolution on the face of the pleadings or it may be the defense of failure to state a claim if it is); *W.E. Hedger Transp. Corp. v. Ira S. Bushey & Sons, Inc.*, 186 F.2d 236, 237 (2d Cir. 1951) (where the facts of the affirmative defense of res judicata appear on the face of the complaint, it may be treated on a motion to dismiss for failure to state a claim); *Barth v. Kaye*, 178 F.R.D. 371, 379 (N.D.N.Y. 1998) (stating that the court has the power to dismiss a complaint for failure to state a claim on grounds of res judicata, even though it is an affirmative defense, so long as all relevant documents are before the court).

[13]    705 F. Supp. 738, 740 (D. Conn. 1989).

[p]reserved the question of the constitutionality of the Act only insofar as it presents a defense of failure to state a claim upon which relief can be granted, which defense may be raised at any time until disposition on the merits.  Fed. R. Civ. P. 12(h)(2) . . . In order to prevail at this stage of the litigation, defendant must show that the challenged provisions of the Act are unconstitutional on their face (i.e., void *ab initio* and without the necessity of inquiry into application to defendant's property value, etc.) . . . .[14]

Many other courts have similarly held that an unpled affirmative defense will not preclude the defense from being determined as a defense of failure to state a claim.[15]

5.    This conclusion not only comports with the plain language of Rule 12(h)(2), but also with the Supreme Court's 2004 and 2007 decisions in *Kontrick* and *Jones v. Bock*, respectively.[16]  In *Kontrick,* the Supreme Court recognized that an affirmative defense may be "protected" and "prolonged" by Rule 12(h)(2) while in *Jones*, it held that even though the failure to exhaust remedies is an affirmative defense, "that is not to say that [the defense] cannot be a basis for dismissal for failure to state a claim."[17] Both of these decisions therefore clarify that an affirmative defense may be used as the basis for prosecuting a defense of failure to state a claim under the time limits set forth in Rule 12(h)(2).[18]

---

[14]    *Id.*

[15]    *See, e.g., Moodie v. Fed. Reserve Bank of N.Y.*, 861 F. Supp. 10, 12-13 (S.D.N.Y. 1994) (defendant's failure to raise an election of remedies defense in its answer did not result in a waiver because the defense could be determined on the pleadings in the context of a failure to state a claim upon which relief may be granted); *Schneider v. O'Neal*, 145 F. Supp. 120, 128-29 (E.D. Ark. 1956) (holding that illegality defense which was first asserted at the conclusion of the trial was not waived because the defense could be determined on the face of the pleadings and was therefore in the nature of a defense of failure to state a claim), *aff'd in part, rev'd in part on other grounds*, 243 F.2d 914 (8th Cir. 1957); *Van Voorhis v. District of Columbia*, 240 F. Supp. 822, 824 (D.D.C. 1965) (holding that since the defense of failure to state a claim cannot be waived under Rule 12(h)(2), the government would be permitted to assert an immunity defense on that basis; *see also* Motion at ¶ 14 n.29 (citing eight additional cases).

[16]    *Kontrick*, 540 U.S. at 458-59; *Jones v. Bock*, 549 U.S. 199 (2007).

[17]    *Kontrick*, 540 U.S. at 458-59; *Jones*, 549 U.S. at 216.

[18]    While Plaintiffs cite *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) for the proposition that "[a] general assertion that the plaintiff's complaint fails to state a claim is insufficient to protect the plaintiff from being ambushed with an affirmative defense," that decision, and the two cases on which it relies, are limited to the belated assertion of an ERISA preemption defense.  *See Wolf v. Reliance Standard Life Ins. Co.*, 71 F.3d

Accordingly, even if, as Plaintiffs urge, § 546(e) *is* an affirmative defense, because it is regularly and properly invoked as a failure to state a claim upon which relief may be granted,[19] Rule 12(h)(2) permits Defendants to assert § 546(e) in a post-answer Rule 12(c) motion for judgment on the pleadings or at trial.[20] Any other conclusion would condition Rule 12(h)(2)'s applicability on compliance with Rule 8(c) in contravention to the rulemakers' intent to single out the defense of failure to state a claim "for special treatment" and "preserv[e] [it] beyond the embryonic stage of the litigation."[21]

---

444, 449 n.9, 450 (1st Cir. 1995) (applying a judge-made "totality of the circumstances" test for determining "when a failure to state a claim [defense] . . . is sufficient to preserve the affirmative defense of ERISA preemption" and denying a preemption-based defense of failure to state a claim where the defendant raised it five days before trial and conceded that it did not wish to proceed with a motion to dismiss, but merely to change the choice of law to ERISA); *Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med. Benefit Plan*, 11 F.3d 1567, 1572 (10th Cir. 1993) (finding that where a defendant had not pled the defense of preemption in its answer and did not assert the defense of failure to state a claim based on such preemption until after the trial had concluded, the defense was untimely and the reviewing court would not consider it for the first time on appeal). These cases are inapposite and, as the Second Circuit has made clear, a complaint may be dismissed for failure to state a claim even where the underlying affirmative defense has not been pled. *See supra* n.12. Moreover, even if the Second Circuit had not so ruled, the Supreme Court—in two rulings that post-date *Saks v. Covey*—has. Accordingly, Plaintiffs' reliance is misplaced.

[19]    *See* Motion at ¶ 14 n.28 citing nine cases adjudicating § 546(e) as a defense of failure to state a claim upon which relief may be granted, including four cases granting the defendants' respective motions; *see also Lehman Bros. Holdings Inc. v. JP Morgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)* ("Lehman Brothers"), No. 10-03266 --- B.R. ---- 2012 WL 1355659 (Bankr. S.D.N.Y. Apr. 19, 2012) (adjudicating a section 546(e) claim on a motion to dismiss for failure to state a claim and granting the motion to dismiss the fraudulent transfer claims).

[20]    The Motion requests that the Summary Judgment Motion be treated as a Rule 12(c) motion for judgment on the pleadings in the event that the Motion's alternative request to amend the Answer is denied by the Court. *See* Motion at ¶ 14 n.31. Defendants now request, in the further alternative, that the Summary Judgment Motion be treated as a request "at trial" for dismissal based on the defense of failure to state a claim if (i) the Court determines that § 546(e) is an affirmative defense, (ii) the Court denies Defendants' request to amend the Answer to include such defense, and (iii) the Summary Judgment Motion cannot be resolved as a Rule 12(c) motion within the time frame contemplated by such rule.

[21]    5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1392  (3d ed. 2004). While Plaintiffs argue that § 546(e) is "uniformly recognize[d]" as an affirmative defense (Response at 4), the cases on which Plaintiffs rely for this proposition are both sparse and inconclusive. In particular, Plaintiffs cite *Adelphia* and *Laurel Valley*; however, neither case actually determined the matter because each of the defendants conceded the issue. *See, e.g., Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp.)* ("Adelphia"), 452 B.R. 484, 488 (Bankr. S.D.N.Y. 2011) (recounting defense counsel's letter stating that he was "preparing . . . to add an *affirmative defense* under Bankruptcy Code Section 546(e))" (emphasis added); *In re Laurel Valley Oil Co.* ("Laurel Valley"), No. 05-64330, 2009 WL 1758741, at *2 (Bankr. N.D. Ohio June 16, 2009) (stating that defendant "does not appear to dispute that the provision is a [*sic*] an affirmative

II.    **Where Plaintiffs Possess All Facts Relevant To A Defense And Have Ample Opportunity To Respond, A Generalized Pleading Is Sufficient To Satisfy The Purpose Of Rule 8(c) In Preventing Unfair Surprise**

6.    Defendants also argued in the Motion that because the purpose of Rule 8(c) is to prevent unfair surprise, the reality of whether a plaintiff has notice of an omitted defense and an adequate opportunity to respond, should be considered before finding a waiver.[22]    Plaintiffs do not argue that they did not have knowledge of the facts forming the basis of the § 546(e) defense or that they will not have an

---

defense"). The only other case cited by Plaintiffs is *Madoff,* which characterized the defense as an affirmative defense, but also recognized that the defense might be treated otherwise if "clearly established on the face of the Complaint." *See Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec., LLC*) ("*Madoff*"), 440 B.R. 243, 266 (Bankr. S.D.N.Y. 2010). While none of the foregoing cases actually analyzes the proper characterization of the § 546(e) defense, other cases involving analogous avoidance defenses do. For example, multiple cases hold that the earmarking defense—which excuses a third party who advances funds to the debtor in order to allow the debtor to use the funds to pay another creditor—is not an affirmative defense. *See, e.g., In re Adbox, Inc.*, 488 F.3d 836, 842 (9th Cir. 2007) (finding that the earmarking doctrine is not an affirmative defense, but a challenge to the trustee's claim that particular funds are part of the bankruptcy estate); *In re Libby Int'l, Inc.*, 247 B.R. 463, 467 (8th Cir. B.A.P. 2000) (earmarking doctrine is not an affirmative defense, but is instead derived from an element of plaintiff's proof requiring that an interest of the debtor be transferred); *Int'l Ventures, Inc. v. Block Props, VII (In re Int'l Ventures, Inc.)*, 207 B.R. 618, 620 (Bankr. E.D. Ark. 1997) (same). Regardless of whether the § 546(e) defense is or is not an affirmative defense, however, Defendants have not waived their defense of failure to state a claim for the reasons stated herein and in the Motion.

[22]    *See* Motion at ¶ 15 n.34-35 (citing *Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003) (purpose of Rule 8(c) in assuring adequate notice and an opportunity to respond was served where plaintiff was permitted to file a sureply to a summary judgment reply brief in which defendant first raised the affirmative defense of collateral estoppel); *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1350-52 (11th Cir. 2007) (finding that the reality of whether plaintiff had notice of an unpled defense must be considered before finding a waiver); *Aucoin v. RSW Holdings, LLC*, 476 F. Supp. 2d 608, 612 (M.D. La. 2007) (technical failure to comply with Rule 8(c) is not fatal where the defense is raised in a manner that does not result in unfair surprise); *Cline v. Hanby*, No. 2:05 0885, 2006 WL 3692647, at *9 (S.D. W. Va. Dec. 13, 2006) (stating the "Fourth Circuit has . . . recognized that if an affirmative defense is raised in a manner that does not result in unfair surprise to the opposing party, failure to comply with Rule 8(c) will not result in a waiver of the defense") (citation omitted); *In re Glenn*, 108 B.R. 70, 73 (Bankr. W.D. Pa. 1989) (citing 2A Moore's Federal Practice, ¶ 8.27[3] at 186 (1989)) (pleading omission "need not result in a waiver when the policy behind the rule is not violated")); *see also United States v. Wapinski Real Estate*, No. 99 C 100, 2000 WL 28271, at *10 (N.D. Ill. Jan. 10, 2000) ("So long as the opposing party has a fair opportunity to respond to the point, there is no real harm to that party in permitting an unpleaded defense to be argued"); *Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 593 (1st Cir. 1995) ("Rule 8(c)'s core purpose [is] to act as a safeguard against surprise and unfair prejudice . . . [w]here . . . a plaintiff clearly anticipates that an issue will be litigated, and is not unfairly prejudiced when the defendant actually raises it, a mere failure to plead the defense will not constitute a waiver."); *Bradbury v. GMAC Mortg., LLC*, 780 F. Supp. 2d 114, 116 (D. Me. 2011) (same); *Trs. of the ALA-Lithographic Pension Plan v. Crestwood Printing Corp.*, 127 F. Supp. 2d 475, 478-79 (S.D.N.Y. 2001) ("where Rule 8(c)'s core purpose of safeguarding against unfair surprise and unfair prejudice has been vindicated, failure to plead a defense will not constitute a waiver") (citation omitted).

adequate opportunity to respond.   Nor do they address any of the authorities holding that these
considerations should inform any Rule 8(c) waiver determination.[23]  Instead, Plaintiffs address only the
purported inadequacy of the "generic language" of the Answer stating that "Plaintiffs' claims are
barred . . . to the extent that any of the alleged transfers were authorized by law."[24]  Plaintiffs complain
that "no reasonable plaintiff would be put on notice that such a vague phrase was intended to invoke
section 546(e)" and that this "perfunctory language . . .  does not in any way provide Plaintiff[s] with
notice of a § 546(e) defense."[25]   However, Defendants have never argued that the quoted language,
standing alone, "provid[ed] Plaintiff[s] with notice of a § 546(e) defense."   Rather, Defendants argued
that "Plaintiffs' knowledge of all matters pertinent to the safe harbor defense, _combined with_
the . . . [language of] the twelfth defense listed in the Answer . . . _collectively_ warrant the conclusion that
Plaintiffs cannot be unfairly surprised by Defendants' reliance on § 546(e) of the Bankruptcy Code."[26]

      7.    Ignoring the compound nature of Defendants' arguments, Plaintiffs now attack
the language of the "boilerplate defense" without ever stating that they have been unfairly surprised by, or
will have an inadequate opportunity to respond to, the defense.  Indeed, Plaintiffs cannot credibly assert
as much because they: (i) have already responded to Defendants' § 546(e) summary judgment motion (the
"Summary Judgment Motion");[27] (ii) have had, and will have, many more months to prepare and present
their position on the defense at the multi-month trial of the Adversary Proceeding;[28] (iii) possess (and

---

[23]   _See_ cases cited _supra_ n.22; Motion at ¶ 15 nn.34-35.

[24]   Response at 6-7.

[25]   _Id._ at 7-8.

[26]   _See_ Motion at ¶ 16 (emphasis added).

[27]   Response at 17-29; Dkt. No. 307.

[28]   Because the Court has indicated that it will not likely rule on the Summary Judgment Motion prior to the start of trial, Plaintiffs will be able to present their case at trial.  _See_ Mar. 22, 2012 Hr'g Tr., Dkt. No. 327, at 55:7-10, 57:13-15 ("But as I said, I'm not sure I'll be able to give you a reasoned answer on those issues before trial on

have long possessed) the few pages of documents pertinent to the defense; and (iv) have been offered

further discovery if they believe it is necessary[29] (despite Defendants' belief that it is not).  Given these

circumstances and the fact that § 546(e) implicates only a straightforward "plain language" legal

inquiry,[30] Plaintiffs cannot credibly claim that they have been "unfairly surprised" by the defense.  It is

perhaps for this reason that Plaintiffs ignore the manifold authorities cited in the Motion which hold that

an adequate response time will preclude a waiver finding even when an affirmative defense is not first

asserted until the filing of a pre-trial motion, pre-trial order, summary judgment reply brief, limine motion

or elsewhere.[31]

        8.     While Plaintiffs further urge that *Colon v. BIC USA, Inc.* and *LPR, SRL v.*

*Challenger Overseas* "relied on specific statements in the defendants' answers to conclude that [there

was] sufficient notice," these cases in fact permitted the assertion of preemption and contractual venue

---

this schedule."); *id.* at 59:18-20 ("Even if I find that the amendment is too late, you can make your - - you can make your record during the course of the trial.").

[29] *See* Motion at ¶ 28 n.74 (agreeing to provide discovery on an expedited basis if the Court believes it necessary). In addition, on April 9, 2012, Plaintiffs' counsel, Mr. Jeffrey Zeiger, inquired of Defendants' counsel whether she intended to argue the § 546(e) issue at the scheduled May 8, 2012 hearing on the Summary Judgment Motion.  In response, Defendants' counsel stated, "we would like to argue the applicability of the 546(e) defense at the May 8th hearing on the summary judgment motion.  If you would prefer to defer a hearing on the substance of the 546(e) defense until after the court has ruled on the motion to confirm/motion to amend, however, we are certainly willing to accommodate your preference.  In the meantime, please let us know if you believe you will be needing any discovery on the 546(e) issue."  Declaration of Lydia Protopapas dated April 23, 2012 ("Protopapas Decl.") Ex. 1, E-mail correspondence between Lydia Protopapas and Jeffrey J. Zeiger, including e-mail exchanges dated Apr. 12, 2012 and Apr. 23, 2012.  Eleven days later, Plaintiffs replied that they did wish to defer the hearing but would not be seeking any discovery.  *See id.*  The fact that Plaintiffs have declined such discovery is not surprising given that any additional documents relevant to the inquiry would be those reflecting the "financial participant" status of the various transferees and transferors who made the transfers that are the subject of this lawsuit.  Indeed, the discovery that Plaintiffs complain they will be "unable" to take can only bolster Defendants' case, not improve Plaintiffs'.

[30] *In re Quebecor World (USA) Inc.* ("*Quebecor*"), 453 B.R. 201, 206, 215 (S.D.N.Y. 2011) (noting that after *Enron*, the 546(e) test is "easy-to-apply" and "has become simple and all-encompassing and does not lend itself easily to the formulation of nuanced exceptions"); *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.* ("*Enron*"), 651 F.3d 329, 335 (2d Cir. 2011) (holding courts should look to § 546(e)'s plain language rather than its legislative history in determining whether § 546(e) protects a transfer from avoidance).

[31] *See* Motion at ¶¶ 15 n.35, 19 nn.44-46 (citing cases).

defenses that were not expressly referenced in the relevant answers.[32] Just as those cases found that imprecise references to "federal and industry standards" and the "bill of lading" containing a venue selection provision were sufficient, Defendants' reference to the transfers "being authorized by law" was sufficient—when viewed in the context of this case—to notify Plaintiffs of the very finite universe of possible defenses to their fraudulent transfer claims, including § 546(e).

9.    Finally, while Plaintiffs criticize Defendants for failing to cite cases involving an unpled § 546(e) defense (of which there appears to be only one such case, which was cited by Defendants for its finding that an unpled § 546(e) defense would "doubtful[ly]" cause "unfair surprise"),[33] Plaintiffs themselves rely on cases that not only do not involve § 546(e), they do not even involve Rule 8(c).[34] Indeed, Plaintiffs cite four cases for the proposition that an affirmative defense may not be pled in "conclusory terms," that "the mere recitation of legal buzzwords . . . will not suffice" and that a defendant may not "fail[] to allege facts supporting [its] defenses."[35] Yet these statements were made in conjunction with Rule 12(f) rulings addressing whether defenses *that had been pled* were sufficient to withstand the plaintiffs' motions to strike[36]—not Rule 8(c) rulings addressing whether an allegedly *unpled defense*

---

[32]    Motion at ¶ 15 (citing *Colon ex rel. Molina v. BIC USA, Inc.*, 136 F. Supp. 2d 196, 200 (S.D.N.Y. 2000); *LPR, SRL v. Challenger Overseas, LLC,* No. 99 Civ. 8883, 2000 WL 973748, at *6 (S.D.N.Y. July 13, 2000)).

[33]    Response at 7; Motion at ¶ 18 n.43 (citing *Adelphia*, 452 B.R. at 490).

[34]    Response at 8.

[35]    *Id.*

[36]    *Id.* (citing to *In re Beacon Assocs. Litig.*, No. 09 Civ. 777, 2011 WL 3586129, at *4 (S.D.N.Y. Aug. 11, 2011) (granting a motion pursuant to Rule 12(f) to strike defendants' estoppel, laches and unclean hands affirmative defenses); *Saratoga Harness Racing, Inc. v. Veneglia*, No. 94-CV-1400, 1997 WL 135946, at *6 (N.D.N.Y. Mar. 18, 1997) (granting a motion pursuant to Rule 12(f) to strike defendants' equitable affirmative defenses, but affording defendant leave to replead waiver, estoppel and laches); and *Telectronics Proprietary, Ltd. v. Medtronics, Inc.*, 687 F. Supp. 832, 840-42 (S.D.N.Y. 1988) (ruling on a motion pursuant to, *inter alia*, Rule 12(f) to strike defendants' affirmative defense of estoppel)). Similarly, in *Daiwa Special Asset Corp. v. Desnick*, No. 00 CIV. 3856, 2002 WL 1997922, at *12 (S.D.N.Y. Aug. 29, 2002), the court granted plaintiff's summary judgment motion on defendant's affirmative defenses because, *inter alia*, equitable defenses such as estoppel and laches "have no place in an action at law" and "an unclean hands defense requires a finding of bad faith."

should be waived. The standards applicable to these two determinations are entirely distinct.[37] Accordingly, Plaintiffs' cases are facially inapposite.

10.    In short, the defense embodied in § 546(e) should not be waived without regard to whether its assertion will in fact cause the "unfair surprise" sought to be redressed by Rule 8(c). In the instant case, Plaintiffs cannot allege unfair surprise because they have long had knowledge of the facts giving rise to the defense; the few documents pertinent to the defense are, and have long been, available to Plaintiffs; Plaintiffs have had, and will have, ample opportunity to respond to the defense; and the defense involves a straightforward, largely legal determination. Because the policy of Rule 8(c) in preventing unfair surprise has been satisfied, the rule's competing policy of facilitating a determination on the merits, rather than mere pleading technicalities, should be heeded and no waiver should be found.[38]

## III.    The Proposed Amendment Overwhelmingly Satisfies Rule 15(a)'s Liberal Pleading Requirements

11.    To the extent the Court finds the § 546(e) defense has not been preserved, the Motion seeks alternative relief permitting Defendants to amend the Answer pursuant to Rule 15(a)(2) to include it.[39] In construing Rule 15(a)'s requirement that relief be "freely granted" when "justice so requires," the Supreme Court has stated that the policy of promoting a decision on the merits necessitates

---

[37]    Under Rule 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). "The standard for striking an affirmative defense is three-pronged: (1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense." *Specialty Minerals, Inc. v. Pluess–Staufer AG*, 395 F. Supp. 2d 109, 111 (S.D.N.Y. 2005). This standard is irrelevant to whether an unpled affirmative defense will unfairly surprise a plaintiff under Rule 8(c).

[38]    *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000) (stating that the dual purposes served by the Rule 8(c) pleading requirements are to: (i) "provid[e] the opposing party with notice of the claim or defense to be litigated" and thereby prevent unfair surprise; and (ii) facilitate a decision on the merits rather than "mere technicalities") (citation omitted).

[39]    For purposes of the relief sought in sections II and III of the Motion and sections III and IV of this Reply, Defendants assume that they must amend their Answer in order to assert § 546(e) as an affirmative defense. *See, e.g.*, Motion at ¶ 21 n.47.

a presumption in favor of permitting amendments.[40]   The Second Circuit has further added that amendments should be "liberally granted"[41] and "rare[ly]" denied, particularly where, as here, a defendant has never before sought to add a new defense.[42]   The Second Circuit has also clarified that "[t]he rule in this circuit is to allow" a defendant to amend its answer to add a new defense "in the absence of a showing by the nonmovant of prejudice or bad faith."[43]   In accordance with this holding, Plaintiffs bear the burden of demonstrating that Defendants have requested the amendment in "bad faith" and that its assertion will "unduly prejudice" them.[44]   Plaintiffs have failed on both counts.

### A.    The Proposed Amendment Is Not Sought In Bad Faith Or For A Dilatory Purpose

12.    While the propriety of an amendment is uniformly evaluated by reference to a four-factor test assessing whether the amendment: (i) is made in bad faith or is sought for a dilatory purpose; (ii) would unduly prejudice the opposing party; (iii) has been unduly delayed; or (iv) would be futile,[45] Plaintiffs do not even address the bad faith/dilatory purpose factor in their discussion of Rule 15(a).[46]   This omission speaks volumes.  Indeed, there is not a scintilla of evidence that Defendants

---

[40]    *Foman v. Davis*, 371 U.S. 178, 181-82 (1962); *see also Sigmund v. Martinez*, 06 CIV. 1043, 2006 WL 2016263, at *1-2 (S.D.N.Y. July 13, 2006) (recognizing that *Foman* "emphasiz[ed] the presumption in favor of granting leave"); *Curtis v. Citibank*, N.A., 97CIV.1065, 1998 WL 3354, at *2 (S.D.N.Y. Jan. 5, 1998) (stating "there is a well-recognized presumption in favor of the liberal amendment of pleadings in order to allow for the resolution of cases on their merits").

[41]    *Arnold v. KPMG LLP*, 334 F. App'x 349, 352 (2d Cir. 2009).

[42]    *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).

[43]    *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993).

[44]    *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 157 (2d Cir. 2011); *see also Herbert Const. Co., Inc. v. Titan Indem. Co.*, No. 94 CIV. 1261, 1996 WL 254859, at *2 (S.D.N.Y. May 15, 1996) (stating the non-movant "bears the burden of showing why the motion should be denied"); Motion at ¶ 25 n.66 (citing cases stating that the non-movant bears the burden of demonstrating undue prejudice).

[45]    *Monahan*, 214 F.3d at 283 (discussing four factors courts consider in applying Rule 15(a)); *see also A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 87 F. Supp. 2d 281, 297-98 (S.D.N.Y. 2000) (same); *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 96 (S.D.N.Y. 2010) (same).

[46]    *See* Response at 14-19 (discussing only three prongs of the four-prong test, including (i) undue delay, (ii) undue prejudice and (iii) futility, but omitting any discussion whatsoever of bad faith or dilatory purpose).

are now acting, or have ever acted, in bad faith or for the purpose of delaying these proceedings. As the

Motion recounts—without a single response from Plaintiffs—Defendants (i) agreed to accommodate

Plaintiffs' three separate requests to extend the discovery and trial schedule in this case by 18 months;

(ii) have not themselves sought repeated extensions of the CMO deadlines or a prior amendment to add a

new defense; (iii) did not oppose Plaintiffs' motion to amend their Complaint notwithstanding that all

information pertinent to the amendment was available to Plaintiffs from the outset of this litigation; and

(iv) have timely complied with all court orders and deadlines.[47]

13. Moreover, Defendants have cooperated with Plaintiffs and made significant

compromises in an effort to resolve their disputes with minimal court involvement—as evidenced by the

Court's frequent praise for the parties' professionalism and cooperation.[48] The foregoing facts and

circumstances are not the hallmarks of a defendant who has acted in bad faith or with dilatoriness. Much

to the contrary, they evidence that Defendants have at all times acted in good faith, have never sought

delay, and have both cooperated with Plaintiffs in general and in the specific instances when *Plaintiffs*

have sought delay. Plaintiffs have not addressed, let alone contested, any of the foregoing, nor have they

suggested why Defendants would suddenly abandon their longstanding pattern of good faith in order to

propose a bad faith or dilatory amendment.[49]

---

[47] *See* Motion at 23, including relevant citations.

[48] July 19, 2011 Hr'g Tr., Dkt. No. 254, at 65:15-17 ("And I thank you all for the obvious amount of preparation that has been done so far and also for leaving me out of almost all of it."); Jan. 18, 2011 Hr'g Tr., Main Case Dkt. No. 2733, at 39:9-13 ("I'm delighted to hear from all that there's been substantial progress and I think that this case has been progressing in a very professional manner, particularly in light of the fact that there are motions to dismiss pending and has not held up discovery."); July 21, 2010 Hr'g Tr., Dkt. No. 154, at 35:2-3 ("These are large cases and they're being handled very professionally as far as I can tell.").

[49] Plaintiffs' Rule 16(b) discussion does state that "Defendants raised the late [§ 546(e)] defense tactically in an attempt to find some kind of claim-dispositive issue to gain negotiating leverage" (Response at 13), however, as discussed below, this theory has no basis whatsoever in fact and is entirely unsubstantiated. *See In re MarketXT Holdings Corp*., 336 B.R. 39, 65 (Bankr. S.D.N.Y. 2006) ("[T]he Defendants' unsubstantiated assertion that the Trustee has a dilatory motive in requesting this amendment is not sufficient to support a finding of bad faith."). Apart from their unsupportable "tactical attempt to gain leverage" theory, Plaintiffs make no allegations and do

14.    Similarly, Plaintiffs have not alleged that the proposed amendment will cause any delay.  As this Court recognized at the March 22, 2012 pre-motion conference on the Summary Judgment Motion, no person was then, or is now, asserting that there will be any delay resulting from the amendment.[50]  Rather, the trial will commence as planned and all other matters will proceed in accordance with the existing timetable.

15.    In short, Plaintiffs have not even addressed, let alone established, that Defendants have proposed the § 546(e) amendment in bad faith or for a dilatory purpose.  As such, Plaintiffs have failed to discharge this aspect of their burden under Rule 15(a).

**B.    The Proposed Amendment Will Not Unduly Prejudice Plaintiffs**

16.    Similarly, Plaintiffs have failed to discharge their burden of demonstrating that they will be unduly prejudiced by the proposed amendment.[51]  The sum and substance of Plaintiffs' undue prejudice argument is this:  (i) discovery has closed, yet they need, but will be unable to obtain, discovery on the § 546(e) defense; and (ii) if Defendants succeed on the § 546(e) defense, tort and environmental creditors will be prejudiced by an unexpected reduction in, or elimination of, their recovery.[52]  The former ground is unavailing and the latter ground is not legally cognizable at all.  To establish "undue

---

not refute any portion of Defendants' discussion reflecting the absence of bad faith or a dilatory purpose under Rule 15(a).

[50]    The pre-motion conference was not recorded and for this reason, no citation is included; *see also* Mar. 22, 2012 H'rg Tr. at 59:20-22 (stating, in response to the Court's comment that "I hope it [the Motion] [is] not going to extend this trial out," Plaintiffs' counsel replied "No.").

[51]    *See supra* n.44*; see also Standard Fire Ins. Co. v. Donnelly*, 689 F. Supp. 2d 696, 700 (D. Vt. 2010) ("[T]he non-movant on a motion to amend 'carries the burden of demonstrating that *substantial* prejudice would result were the proposed amendment to be granted.'  Moreover, '[a]ny prejudice which the nonmovant demonstrates must be balanced against . . . any prejudice to the movant which would result from a denial of the motion.'") (emphasis in original) (citations omitted).

[52]    Response at 16-17.

prejudice,"[53] the Second Circuit requires Plaintiffs to demonstrate that the proposed amendment will: (1) require them to expend *significant* additional resources to conduct discovery and prepare for trial; (2) *significantly* delay the resolution of the dispute; or (3) prevent Plaintiffs from bringing a timely action in another jurisdiction.[54]  As the third factor is irrelevant to this action,[55] Plaintiffs have only two means of establishing "undue prejudice" in the instant case, neither of which they have satisfied.

### (i)     The Proposed Amendment Will Not Require Plaintiffs To Expend Significant Resources To Conduct Discovery And Prepare For Trial

17.     Plaintiffs say nothing about the effect of the proposed amendment on their trial preparations,[56] nor do they allege that the amendment will require them to expend any (let alone significant) resources conducting discovery.  Rather, Plaintiffs allege only that (i) they "will have no ability to conduct discovery on any issue relating to § 546(e)," [including] "whether [a] specific Defendant[] qualify[ies] as a financial participant based on the value of [its] derivative contracts;" (ii) that the "public filings . . . do not separately state the value of derivative contracts by entity or individual defendants" and (iii) there has been "absolutely *no* discovery on this issue because it is not relevant to any

---

[53]   *A.V. by Versace, Inc.*, 87 F. Supp. 2d at 299 ("[P]rejudice alone is insufficient to justify a denial of leave to amend; rather, the necessary showing is *"undue* prejudice to the opposing party." (quoting *Foman*, 371 U.S. at 182)).

[54]   *In re MarketXT Holdings Corp.*, 336 B.R. at 65; *Block*, 988 F.2d at 350.

[55]   *See* Motion at ¶ 32 (explaining that the third factor applies only to the untimely assertion of a limitations defense).

[56]   As such, all related assertions made in the Motion stand unrefuted, including that (i) the § 546(e) defense will not impose any "unique difficulty" on Plaintiffs' preparation for trial; (ii) the issues raised by § 546(e) are not factually complex and do not implicate any new parties or transactions; (iii) the defense is closely related to the original claims; (iv) Plaintiffs have been provided the opportunity to conduct discovery and will have had a sufficient time to respond to the defense by the time of trial; and (v) § 546(e) is the first new defense ever asserted by Defendants.  Motion at ¶¶ 24, 27-29.  Moreover, since the filing of the Motion, Plaintiffs have responded to the § 546(e) arguments made in the Summary Judgment Motion, and accordingly, there is even less reason to believe that Plaintiffs will not be fully prepared to try the defense.

other issue in the case . . . ."[57]  These allegations are either incorrect or irrelevant to the required showings

that must be made by Plaintiffs.

18.    First, although Defendants believe that the information relevant to § 546(e) has

long been available to Plaintiffs,[58] Defendants have nonetheless offered to provide Plaintiffs with any

additional discovery they believe pertinent to the § 546(e) defense.[59]  Plaintiffs have declined this offer.

Given this, Plaintiffs cannot credibly state that they "will have no ability to conduct discovery on any

issue relating to § 546(e)."  Plaintiffs cannot "lay low," refusing discovery—despite ample time for it—

and then assert "undue prejudice" based on their purported "inability" to conduct discovery.[60]

19.    Second, although Plaintiffs are "able" to conduct discovery, the proposed

amendment will not in fact require them to expend significant resources doing so because Plaintiffs

already have all or substantially all the information they need.[61]  Under § 546(e), settlement payments and

transfers made in connection with a securities contract qualify for safe harbor treatment if they are made

by, to, or for the benefit of, a financial institution or financial participant.  Plaintiffs have long had in their

possession the single page document that Defendants attached to the Motion reflecting that the IPO

---

[57]    Response at 16 (emphasis in original).

[58]    For example, certain audit work papers which provide detailed information supporting the derivative contract values included in the public filings have been produced in this litigation.

[59]    *See supra* n.29.

[60]    This is implicitly recognized in the Second Circuit's test for undue prejudice, which assumes that Plaintiffs will in fact attempt to conduct discovery on any new issue warranting it.  Indeed, a conclusory allegation to the effect that Plaintiffs are "unable" to conduct discovery does not suffice for purposes of demonstrating that an amendment will (i) require Plaintiffs to expend significant additional resources conducting the discovery and preparing for trial, or (ii) significantly delay resolution of the matter.

[61]    Defendants believe that all relevant information is either in the pleadings, the public record or documents already produced by the parties.  *See, e.g.*, Defendants' Undisputed Statement of Facts ("SOF") ¶¶ 12-14, 16, 19, 23-24, 27-28, 31-33, 42.  Indeed, if the Court denies Defendants' request to amend the Answer, Defendants have alternatively asked that the Motion be treated as a motion to dismiss under Rule 12(c) or a request for dismissal "at trial" and Defendants are prepared to proceed only on the evidence admissible for those purposes. *See supra* n.20; *see also* Motion at ¶ 14 n.31.

transfers were made via wire transfer by one financial institution to another.[62]  Moreover, irrespective of

that document, Plaintiffs have surely determined in their almost four years of discovery into the IPO that

the relevant transfers were made by wire transfer.  Nothing more is needed to establish this prong of the

safe harbor defense and the status of the IPO transferor and transferee as "financial participants" is not

necessary to the analysis.[63]

          20.    Similarly, the evidence necessary to establish that the Project Focus transfers

were made by, to, or for the benefit of, a financial participant may be readily determined from information

which has long been available to Plaintiffs.  As Defendants' interrogatory responses reflect,[64] Kerr-

McGee Operating Company ("KMOC," n/k/a Plaintiff, Tronox Worldwide)[65] was the transferor of the

most valuable assets conveyed pursuant to Project Focus, including the equity interests of entities that

owned oil and gas exploration and production assets.    The public record clearly reflects that

KMOC/Tronox Worldwide was a "financial participant" because it was a party to "securities contracts,"[66]

known as "Debt Exchangeable For Common Stock" ("DECS"), of a sufficient value to so qualify it.[67]

The terms and existence of the DECS have been described in public SEC filings and related financial

statements since 1999 when the DECS were issued by the entity then known as Kerr-McGee Corporation

---

[62]   SOF ¶ 33.

[63]   Defendants also satisfy the "financial participant" requirements of § 101(22A) for the reasons set forth in Section V, *infra*.

[64]   *See* Dkt. No. 356, at Ex. 1, Revised Annex A.

[65]   Tronox Worldwide is sometimes referred to as "KMOC," "Old Kerr-McGee" or "Old KM."  New Kerr-McGee generally refers to Kerr-McGee Corporation, Anadarko's current wholly-owned subsidiary.  New Kerr-McGee was incorporated on May 11, 2001 and became the parent company of all then-existing Kerr-McGee entities on August 1, 2001.  New Kerr-McGee is a separate and legally distinct entity from Tronox Worldwide and its predecessors, including the Tronox Worldwide predecessor that operated under the name "Kerr-McGee Corporation" from November 1, 1965 until August 1, 2001 and was the issuer of the DECS.

[66]   *See* Bankruptcy Code § 561(a)(1).

[67]   *See* Bankruptcy Code § 101(22A).  Plaintiffs are also well aware of these contracts.  *See* SOF, App'x B at 47-48, Ex. 6.

(n/k/a Tronox Worldwide and f/k/a KMOC).[68]    Accordingly, Plaintiffs are incorrect in their blanket

assertion that "the public filings . . . do not separately state the value of . . . contracts by entity or

individual defendants."[69]    The DECS, without more, are sufficient to qualify KMOC/Tronox Worldwide

as a financial participant and that information is in the public filings.[70]

        21.    Third, even if some additional discovery is necessary to adjudicate § 546(e), such

additional discovery would not "unduly prejudice" Plaintiffs because it would be *de minimis*.    As the

*Adelphia* court commented, a § 546(e) inquiry is "in substance a legal one" which requires minimal

discovery—in that case, five pages of documents.[71]    Moreover, irrespective of the volume of required

discovery, courts have repeatedly held that the need for new discovery alone is not sufficient to constitute

"undue prejudice."[72]    Here, Plaintiffs have failed to offer any other basis for a finding of undue prejudice,

---

[68]    *See* Protopapas Decl. Ex. 4, Second Supplemental Indenture between Kerr-McGee Corporation and Citibank,
N.A. dated August 2, 1999; Kerr-McGee Corporation 2002 Form 10-K, filed Mar. 27, 2003, at Item 7.

[69]    Response at 16.

[70]    Defendants also satisfy the "financial participant" requirements of § 101(22A) for the additional reasons set
forth in Section V, *infra*.

[71]    *Adelphia*, 452 B.R. at 488, 490 (stating that defense counsel produced only five pages of documents and six
lines of text relevant to the safe harbor defense and that "[g]etting one's arms around such a small quantity of
documents would plainly not take very long").

[72]    *U.S. for & on Behalf of Mar. Admin. v. Cont'l Ill. Nat. Bank & Trust Co. of Chi.*, 889 F.2d 1248, 1255 (2d Cir.
1989) ("[T]he adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant
denial of a motion to amend a pleading."); *Duling*, 265 F.R.D. at 100-01 (stating that "[t]he burden of further
discovery . . . is not a satisfactory basis to deny [a] motion to amend" and "the need for new discovery is not
sufficient to constitute undue prejudice on its own") (citations omitted); *Duncan v. Coll. of New Rochelle*, 174
F.R.D. 48, 50 (S.D.N.Y. 1997) (finding no undue prejudice where the additional discovery necessitated by the
amendment would be minimal); *A.V. by Versace, Inc.*, 87 F. Supp. 2d at 299 (same).    While Plaintiffs cite
*Zahra v. Town of Southold*, 48 F.3d 674, 678, 685-86 (2d Cir. 1995) for the proposition that they should not be
required to engage in "burdensome discovery" mere months before trial, that inapposite case involved a
plaintiff's efforts to add three new allegations to his § 1983 action—all of which required new discovery on
complex issues regarding different departments within defendant's organization and the motivation of the
defendant and its employees—two-and-a-half years after plaintiff filed his complaint.    Such "burdensome
discovery" is not analogous to the discovery, if any, that would be required in the instant case.

and therefore the need for additional discovery will not alone suffice.[73]   This conclusion is especially

warranted here because:  (i) the volume of any potential discovery will be minimal both in absolute terms

and when compared to the more than ten million pages of documents already produced in this prodigious

case; (ii) discovery is, and has been, ongoing despite the purported June 24, 2011 "close" of fact

discovery;[74] (iii) Plaintiffs have not even alleged, let alone established, that the discovery will delay

resolution of this controversy; and (iv) Defendants stand ready and willing to provide any pertinent

discovery requested by Plaintiffs on an expedited basis.

          22.      In short, Plaintiffs have not met their burden of demonstrating that the proposed

amendment will require them to expend significant additional resources to conduct discovery and prepare

for trial because:  (a) Plaintiffs say nothing about the effect of the proposed amendment on their trial

preparations, (b) Plaintiffs do not allege that the amendment will require them to expend any (let alone

significant) resources conducting discovery because they in fact allege that they cannot conduct any

discovery at all; (c) Plaintiffs do not actually need any discovery because the evidence establishing

Defendants' § 546(e) defense is already available to them; and (d) even if *some* additional discovery is

needed, the inconsequential volume of that discovery will not require Plaintiffs to expend "significant"

additional resources in either a relative or absolute sense of the term.  Because Plaintiffs have failed to

discharge their burden under the first prong of the Second Circuit's two-part test, there is no basis for a

finding of "undue prejudice."

        **(ii)**      **Plaintiffs Have Not Demonstrated That The Proposed Amendment
Will Significantly Delay Resolution Of The Dispute**

          23.      Plaintiffs also fail to discharge their burden under the second prong of the Second

Circuit's two-part test for undue prejudice.  In particular, Plaintiffs fail to even allege, let alone

---

[73]   As discussed below, the risk of the defendant actually prevailing on the defense is not a cognizable form of
"undue prejudice" for at least eight distinct reasons.

[74]   *See* Ex. A, attached hereto; Motion at Ex. A.

demonstrate, that the proposed amendment will significantly delay this proceeding.[75]  Defendants timely

filed the Summary Judgment Motion on the agreed deadline for dispositive motions and the briefing on

that motion is now complete.[76]  The motion will therefore not delay these proceedings and may be

decided as and when the Court determines.  Moreover, as Defendants recounted in the Motion, (i) they are

not requesting an extension of the CMO, nor is one necessary given that the § 546(e) defense requires

little or no new discovery; (ii) the proposed amendment may in fact significantly expedite and streamline

this action by disposing of Plaintiffs' most complicated and protracted claims; and (iii) even if some delay

were to be occasioned by the amendment (which all parties agree, it will not),[77] neither that delay nor the

need to supplement legal briefing is a sufficient basis for a finding of prejudice.[78]  Plaintiffs do not dispute

these assertions, nor make any contrary contentions.  Accordingly, Plaintiffs have not met their burden of

demonstrating that the proposed amendment will delay, let alone significantly delay, this proceeding.

Because Plaintiffs have failed to discharge their burden under the second prong of the Second Circuit's

two-part test, there is no basis for a finding of "undue prejudice."

            24.        In short, Plaintiffs have failed to establish "undue prejudice" on either ground

recognized by the Second Circuit.  Moreover, because the Second Circuit has held that "the longer the

period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of

---

[75]    Response at 16-17.

[76]    By electing to brief their § 546(e) arguments in their Response to this Motion rather than their earlier filed
response to the Summary Judgment Motion, Plaintiffs were afforded a total of 42 days (rather than only 30
days) to formulate their response to the defense.  As such, Plaintiffs have had ample response time.

[77]    Mar. 22, 2012 H'rg Tr. at 59:20-22 (stating, in response to the Court's comment that "I hope it [the Motion] [is]
not going to extend this trial out," Plaintiffs' counsel replied "No.").

[78]    *United States v. Int'l Bus. Mach.*, 66 F.R.D. 223, 231 (S.D.N.Y. 1975) (holding that even a "potential extension
of trial time . . . does not rise to the level of legal prejudice"); *Duling,* 265 F.R.D at 101 (stating "the need to
supplement the briefing of a motion is generally not enough to constitute prejudice"); *Middle Atl. Utils. Co. v.
S.M.W. Dev. Grp.*, 392 F.2d 380, 386 (2d Cir. 1968) (holding that "[t]he burden of further . . . motions" is not
unduly prejudicial).

prejudice,"[79] it follows that with a shorter delay, the required showing of prejudice is greater. Here, the period between the filing of the Answer and the assertion of the § 546(e) defense was a short eight months, yet Plaintiffs have failed to make *any* showing of prejudice, let alone a commensurately more compelling one. Accordingly, Plaintiffs have failed to discharge their heightened burden.

25.    Plaintiffs have also failed to respond to the many cases cited by Defendants holding that a plaintiff will not be unduly prejudiced by an affirmative defense that is first raised on summary judgment so long as the plaintiff is afforded sufficient time to respond to the motion.[80] Indeed, courts have routinely found that where a plaintiff has adequate notice and opportunity to respond to a defense which is first asserted in a summary judgment motion, the purpose of Rule 8(c) in preventing

---

[79]    *Block*, 988 F.2d at 350 (internal quotation marks omitted).

[80]    *See Curry*, 316 F.3d at 331 (the purpose of Rule 8(c) in assuring adequate notice and opportunity to respond was satisfied where plaintiff was permitted to file a sur-reply to the summary judgment reply brief which first raised the collateral estoppel defense); *Monahan*, 214 F.3d at 284 (officers were not unduly prejudiced by the district court's decision to allow the city to assert *res judicata* defense for the first time at the summary judgment stage of the proceedings); *Rose v. Amsouth Bank of Fla.*, 391 F.3d 63, 65 (2d Cir. 2004) (holding that the district court properly considered the merits of an estoppel defense first asserted at summary judgment where plaintiffs had an opportunity to respond substantively and did not formally object in pleadings); *In re Singh*, 434 B.R. 298, 305 (Bankr. E.D.N.Y. 2010) (stating that "[i]t is well established in this Circuit that an affirmative defense may be asserted even at summary judgment where the party opposing the affirmative defense has the opportunity to respond effectively to that defense, and has otherwise suffered no prejudice"); *Steinberg v. Columbia Pictures Indus., Inc.*, 663 F. Supp. 706, 715 (S.D.N.Y. 1987) ("[A]bsent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion for summary judgment for the first time.") (citation omitted); *In re 1301 Conn. Ave. Assocs.*, 126 B.R. 823, 826-27 (Bankr. D.D.C. 1991) (permitting defendant to raise an affirmative defense for the first time during oral argument on its summary judgment motion where the case relied upon for the applicability of the defense was decided one month after the answer was filed, the issues implicated were primarily legal and the plaintiff had been given the opportunity to brief the issue); *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1374 (3d Cir. 1993) (an immunity defense raised by the defendant for the first time on summary judgment was not waived where the plaintiff had sufficient opportunity to respond); *Kingsville Dodge, LLC v. Almy*, No. CCB-07-154, 2007 WL 2332699, at *3-4 (D. Md. July 30, 2007) (permitting an affirmative defense to be raised for the first time on summary judgment); *Palmer v. Garuti*, No. 3:06-CV-795, 2009 WL 413129, at *7-8 (D. Conn. Feb. 17, 2009) (permitting good faith defense to be raised for the first time on summary judgment where both parties had the opportunity to brief the issue and address it in oral argument); *Sultan v. Lincoln Nat'l Corp.*, No. 03-5190, 2006 WL 1806463, at *13 (D.N.J. June 30, 2006) (permitting defendant to assert preemption defense for the first time on summary judgment where the issue presented was largely legal); *Astor Holdings Inc. v. Roski*, 325 F. Supp. 2d 251, 260-61 (S.D.N.Y. 2003) (where a party "had an opportunity to respond, and has in fact responded, to [the affirmative defenses] . . . they will be considered on their merits"); *Kelly v. A1 Tech.*, 09 Civ. 962, 2010 U.S. Dist. LEXIS 37807, at *57-60 (S.D.N.Y. Apr. 8, 2010) (affirmative defense would be considered where it was raised on summary judgment and opposing party filed a responsive submission).

unfair surprise is satisfied and the amendment should be permitted under the liberal amendment policy of Rule 15(a)(2).  Plaintiffs have not refuted Defendants' contention or the cases on which they rely, nor have Plaintiffs asserted that they were afforded an inadequate opportunity to respond to the Summary Judgment Motion.  Accordingly, Plaintiffs have yet again failed to establish any "undue prejudice" resulting from the proposed amendment.

> (iii)    **Defendants' Potential For Success On The Merits Of § 546(e) Is Not A Legally Cognizable Form Of Undue Prejudice**

26.    As explained *supra*, the Second Circuit recognizes only two applicable forms of undue prejudice resulting from a proposed amendment—the expenditure of significant additional resources to conduct discovery and prepare for trial or significant delay to the resolution of the dispute. Plaintiffs have established neither.  Instead, Plaintiffs contend that tort and environmental creditors (most of whom are non-parties to the suit) will be prejudiced if Defendants succeed on their § 546(e) defense because their potential recovery will be reduced by a defense which had not yet been asserted at the time they settled their claims.  Plaintiffs' argument fails on many levels.

27.    First, the Second Circuit does not recognize a reduction in plaintiff's potential recovery as a basis for "undue prejudice."[81]  Second, and even more specifically, the "inability to enjoy a victory as to the Safe Harbor Defense . . . is not cognizable prejudice under Rule 15(a)"[82] and is in fact inimical to Rule 15(a)'s purpose of facilitating an adjudication on the merits.[83]  Third, "prejudice" to non-parties to a suit is not a basis for finding "undue prejudice" under Rule 15(a).  Fourth, at the time tort and environmental claimants entered into their settlement agreements, Defendants had not yet filed the Answer and therefore such non-parties could not possibly have known what defenses would or would not

---

[81]    *Block*, 988 F.2d at 351.

[82]    *Adelphia*, 452 B.R. at 491.

[83]    *See Foman*, 371 U.S. at 181-82.  It goes without saying that a defendant cannot be precluded from adding a meritorious defense (because it would prejudice the non-movant) and also an unmeritorious defense (because it would be futile).

be asserted by Defendants.[84]   Fifth, Plaintiffs erroneously assume that Defendants' defenses may be

undermined by an agreement to which they were not a party and in which they did not participate.  Sixth,

Plaintiffs' argument conflicts with their prior statement that tort and environmental creditors were in fact

assuming the risks inherent in the litigation and were therefore entitled to both the upside and downside of

the litigation.[85]   Seventh, Plaintiffs assume, without support, that tort and environmental creditors did not

consider the possibility that Defendants would assert a § 546(e) defense and that they relied on the

Answer not being amended to add new affirmative defenses, even though the pleading amendment

deadline had not yet passed.  Eighth, Plaintiffs erroneously assume that tort and environmental creditors

bargained away the risk that the Second Circuit might later issue an opinion unfavorable to their claims.

For all of these reasons, Plaintiffs have failed to meet their burden of demonstrating that Defendants'

potential success on the merits of the safe harbor defense constitutes a cognizable form of "undue

prejudice."   As such, Plaintiffs have failed to demonstrate any form of "undue prejudice" warranting

denial of the proposed amendment.

### C.    Defendants Have Not Unduly Delayed In Seeking The Amendment

28.    As recounted *supra*, "[t]he rule in our circuit is to allow . . . [an]

amend[ment] . . . *unless the non-movant demonstrates prejudice or bad faith.*"[86]  Because Plaintiffs have

---

[84]    *See* Answer, Dkt. No. 235 (June 10, 2011); Order Approving The (A) Execution Versions Of The Environmental Response Trust And Anadarko Litigation Trust Agreements And (B) First Amendment To Consent Decree And Environmental Settlement Agreement, Main Case Dkt. No. 2812 (Feb. 14, 2011).

[85]    *See, e.g.*, Plaintiff's Reply In Support Of Its Motion For Partial Summary Judgment Regarding Plaintiff's Recovery Under Section 550(a) Of The Bankruptcy Code, Dkt. No. 272, at 2 ("Most notably, [Defendants' calculation of the value of the windfall to Trust Plaintiffs] confuses the maximum amount that Tronox could recover if it wins with what was actually transferred to the trusts; a contingent asset representing the possibility of a large recovery, discounted by the numerous obstacles to receiving that, or any, recovery . . . .   The environmental and tort creditors agreed to exchange large but unquantified environmental and tort claims for consideration including a potentially large but uncertain litigation recovery.").

[86]    *Grp. Health Inc.*, 649 F.3d at 157 (emphasis added); *see also Herbert Const.*, 1996 WL 254859, at *2; *Block*, 988 F.2d at 350; *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 653 n.6 (2d Cir. 1987) (stating that "we know of no case where delay alone was deemed sufficient grounds to deny a Rule 15(a) motion to amend") (internal quotation omitted); *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (same).

failed to make either of these showings, the amendment should be allowed under Rule 15(a) without more. Despite this being the case, Plaintiffs nonetheless contend that Defendants "have no good reason for their substantial delay in moving to amend their pleadings . . . [as] their only excuse came . . . eight months before the motion to amend."[87]

29.    First, because Plaintiffs have made no showing of bad faith or undue delay even a "vague" or "thin" reason will justify the delay.[88]  As the Motion recounts, however, there is more than a "thin" reason for the delay.  Three weeks after Defendants filed their Answer, the Second Circuit issued a landmark decision which changed the law applicable to § 546(e) in manifold respects germane to this litigation.[89]  As recognized in the dissent and later opinions, the decision was "extraordinarily broad"[90]

---

[87]    Response at 15.

[88]    *Duling*, 265 F.R.D. at 98 (citing *Town of New Windsor v. Tesa Tuck, Inc.*, 919 F. Supp. 662, 677 (S.D.N.Y. 1996); *Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 235 (2d Cir. 1995)).  Plaintiffs appear to suggest—albeit very indirectly—that Defendants must in fact provide a "compelling reason" for their eight-month delay.  The cases on which Plaintiffs rely, however, make plain that this heightened standard applies only where an amendment is sought *days before trial*.  *See, e.g.*, *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47-48 (2d Cir. 1983) (motion to add res judicata defense six days before trial would be denied where defendant had known of the defense for three years and gave no valid reason for the delay, the delay was prejudicial to plaintiff and granting the amendment would threaten the administration of Title VII cases which permit compensation of counsel only if plaintiff prevails—"[u]*nder these circumstances*, in order to justify the amendment, defendant had the burden of showing a compelling reason for the delay") (emphasis added); *Pereira v. Cogan*, No. 00 CIV. 619, 2002 WL 31496224, at *3-4 (S.D.N.Y. Nov. 8, 2002) (denying motion to add defense of offset five days before trial where no reason was given for the delay, the defense would require additional discovery, would delay trial, and appeared to be made in bad faith; and further explaining that the burden to provide a compelling reason for the delay was triggered by the fact that the movant made his request for an amendment five days before trial); *Herbert Const.*, 1996 WL 254859, at *3-4 (denying motion to add overpayment and estoppel defenses where the movant sought to add the defenses almost a month after it filed its trial brief and joint pretrial order, where plaintiff would have insufficient time to take discovery and respond to the defenses and the defendant offered no reason for the delay).  These cases have no relation to the facts before the Court.  Defendants have sought to assert a purely legal defense implicating little to no discovery *months,* not days, before trial; Plaintiffs have already responded to the defense and will have yet more time to formulate their trial response; the amendment will not delay or extend any deadline in the case; Defendants' delay was justified by a groundbreaking Second Circuit opinion which radically changed the scope and interpretation of the defense; and there is no evidence that the amendment is sought in bad faith.  Indeed, because Plaintiffs have made no showing of bad faith or undue prejudice, Defendants are required, *if anything*, to advance only a "vague" or "thin" reason for the delay, not a compelling one.  *See Duling*, 265 F.R.D. at 98 (citations omitted).

[89]    *See infra* Section V; Motion at ¶¶ 33-36.

[90]    *Enron*, 651 F.3d at 347 (Koeltl, J, dissenting).

and "far reaching."[91]  Indeed, Plaintiffs' Rule 15(a) analysis does not refute the manner in which *Enron*

significantly changed the law.[92]  Rather, Plaintiffs merely assert that although the decision was issued

after the Answer deadline, it does not justify Defendants' delay because Defendants took another eight

months before they actually moved to amend the Answer.  While Plaintiffs do not specify what period of

delay would have been justified following the issuance of the decision, courts from this circuit have.

      30.    In *Livingston v. Piskor*, the court found that a seven-and-a-half month delay

following the issuance of an opinion which made a new defense viable was not "undue" because it

"necessarily took some time for counsel to learn of, obtain a copy of, and read [the opinion]; to determine

which pending cases might be affected by that decision; to attempt to find out whether [it was applicable]

to plaintiff['s] [case]; and to prepare and submit motion papers in this case."[93]  Similarly, in *Gortat v.*

*Capala Bros., Inc.*, the court found no undue delay where an amendment was sought approximately eight

months after the issuance of a Supreme Court decision which made a new claim available to the movant.[94]

In accordance with *Piskor* and *Gortat*, Defendants' eight-month delay was not "undue" given that it

necessarily took counsel some time to learn of and act upon both the decision and the law and

---

[91]    *Quebecor*, 453 B.R. at 214 (footnote omitted); *see also* Andrew M. Leblanc et al., *In Re: Enron: Second Circuit Expands "Settlement Payment" Exemption To The Redemption Of Commercial Paper (And Beyond?)*, 7 PRATT'S J. OF BANKR. L. 621, 621-22 (2011) (in addressing "an issue of first impression among the circuits," *Enron*, "expands on previous appellate decisions broadly construing the scope of the § 546(e) exemption," and "has significant implications for bankruptcy cases nationwide"); Oscar N. Pinkas & David A. Pisciotta, *To Boldly Go Where No Court Has Gone Before: Enron and the Application of § 546(e)*, 30-8 AM. BANKR. INST. J. 28, 86 (2011) (observing that "[f]ew and far between are the decisions that have immediate and enormous direct financial impact on bankruptcy cases, and *Enron* is such a decision. . . . As the first circuit court to address the issue, the Second Circuit stands alone," and noting that  "the ripple effect of *Enron* is already clear.  Lower courts have already begun applying *Enron's* expansive holding . . . [l]itigation that had been pored over included discovery and expert testimony, and tried over the course of months, now, by virtue of *Enron* and its 'easy-to-apply formulation' require[s] a relatively straightforward decision").

[92]    *See* Response at 12-13.  Because Plaintiffs do discuss *Enron* in their Rule 16(b) discussion, Defendants address those arguments below.

[93]    215 F.R.D. 84, 85 (W.D.N.Y. 2003).

[94]    No. 07 Civ. 3629, 2011 WL 6945186, at *10 (E.D.N.Y. Dec. 30, 2011).

commentary resulting in its wake.[95]  Moreover, during this same eight-month period, Defendants were not proceeding apathetically or lackadaisically.  Rather, they were vigorously and actively litigating the case, including abiding by the manifold and significant expert and other deadlines operative at the time.

31.    Second, an eight-month delay should not be characterized as "undue" because the Second Circuit regularly approves amendments after multiple years, not mere months, of delay.[96]  Indeed, despite their obvious efforts,[97] Plaintiffs have managed to uncover only one case in which the Second Circuit upheld the denial of an amendment involving a delay of less than eight months.  That case, however, was grounded on the fact that (i) the movant failed to timely assert the defense despite having openly discussed it with the court and the plaintiff prior to the expiration of the deadline, (ii) a summary judgment motion had already disposed of the movant's defenses and (iii) the court believed the amendment would have been futile.[98]  This one inapposite case, whose precedential value has been questioned,[99] does not overcome the Second Circuit's own recognition of the fact that it has regularly and repeatedly approved amendments after many years of delay.[100]  This recognition comports with the Second Circuit's similarly well-established view that mere delay, even substantial delay, is not a

---

[95]    *See supra* n.91.

[96]    *See, e.g.*, *Richardson*, 825 F.2d at 653 n.6 (recounting cases where amendments were permitted three, four and five years after the filing of the answer) (citations omitted); *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir. 2000) (permitting amendment of answer to assert additional affirmative defense after seven-year delay); *Brathwaite v. St. John's Episcopal Hosp.*, CV-85-4192, 1987 WL 25911, at *2 (E.D.N.Y. Nov. 18, 1987) (granting leave to amend after an unexplained thirteen-and-a-half month delay); *Cimino v. Glaze*, 228 F.R.D. 169, 170-72 (W.D.N.Y. 2005) (granting leave to amend after a delay of over a year-and-a-half); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 97CIV.4978, 2001 WL 1631412, at *2-3 (S.D.N.Y. Dec. 18, 2001) (granting the defendants leave to amend their answer after a delay of over two years).

[97]    Response at 15 n.12.

[98]    *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994).

[99]    *See Alexandre v. Town of Hempstead*, 275 F.R.D. 94, 98 (E.D.N.Y. 2011) (pointing out that the decision does not state that "such an outcome [*i.e.*, denial of leave to amend] was required under the circumstances").

[100]    *See supra* n.96.

09-01198-mew    Doc 374    Filed 04/26/12    Entered 04/26/12 22:17:26    Main Document
Pg 42 of 73

sufficient basis to deny leave to amend,[101] particularly where, as here, Plaintiffs have failed to demonstrate either undue prejudice or bad faith.

32.    In short, because *Enron* dramatically changed the law applicable to § 546(e), and the eight-month period between the issuance of the opinion and the time when Defendants asserted the defense was not "undue," this factor favors granting the amendment.

## D.    The Proposed Amendment Would Not Be Futile

33.    Finally, allowing Defendants' proposed amendment would not be futile because their assertion of the § 546(e) defense is neither "frivolous on its face" nor "clearly meritless."[102]    As discussed in the Summary Judgment Motion and in Section V, *infra*, not only is the defense not frivolous, it is entirely justified on the merits.    For this reason, Plaintiffs have not satisfied their burden of establishing that the amendment would be futile.

34.    In short, all factors weigh heavily in favor of allowing the amendment and, in accordance with the Supreme Court's presumption in favor of such amendments, the Motion should be granted.

## IV.    To The Extent Rule 16(b) Applies, Defendants Have Satisfied It

### A.    The Proposed Amendment Is Not Subject To The Requirements Of Rule 16(b)

35.    Defendants asserted in the Summary Judgment Motion that Rule 16(b) is inapplicable to their proposed amendment because the Fifth CMO had not been entered at the time the

---

[101]    *Richardson*, 825 F.2d at 653 n.6 (stating "we know of no case where delay alone was deemed sufficient grounds to deny a Rule 15(a) motion to amend") (quotation omitted); *see also Fluor Corp.,* 654 F.2d at 856 (same).

[102]    *Taylor v. Fla. State Fair Auth.*, 875 F. Supp. 812, 815 (M.D. Fla. 1995) (holding that to be "futile," an amendment must be "clearly insufficient or frivolous on its face" (citing *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980)); *T&N PLC v. Fred S. James & Co. of N.Y., Inc.*, No. 89 Civ. 7688, 1991 WL 190581, at *2 (S.D.N.Y. Sept. 16, 1991) ("[T]he court need not finally determine the merits of a proposed claim or defense, but merely satisfy itself that it is colorable and not frivolous.") (quotation omitted); *Slavin v. Benson*, 493 F. Supp. 32, 33 (S.D.N.Y. 1980) (granting leave to amend where defense was not "clearly meritless"); *Gallegos v. Brandeis Sch.*, 189 F.R.D. 256, 259 (E.D.N.Y. 1999) (holding that an amendment is not futile "even where the possibility of relief is remote").

US_ACTIVE:\43970445\10\15337 0004

Motion was filed and Rule 16(b) applies only to requests to amend a *court-approved* scheduling order.[103] While Plaintiffs respond that the pleading amendment deadline contained in the Fourth CMO remained in effect until March 28, 2012 when the Fifth CMO was entered,[104] Plaintiffs nonetheless admit that the parties were not in fact operating under the deadlines imposed by the Fourth CMO in February 2012.[105] Indeed, if the Fourth CMO did in fact remain in effect, then both parties missed a multitude of deadlines imposed by it.[106]  Contrary to this being the case, the parties were not operating under the terms of the Fourth CMO at the time the Motion was filed, but were instead operating under the terms of a Fifth CMO which had not yet been entered by the Court.

36.      Moreover, because the pleading amendment deadline ties to the close of fact discovery and massive amounts of fact discovery have taken place since that date, it is also unclear whether Defendants' proposed amendment is in fact "untimely."[107]  Nevertheless, if the Court determines that the requirements of Rule 16(b) do apply, Defendants have satisfied such requirements.

---

[103]   Motion at ¶ 39.

[104]   Response at 10 n.8.

[105]   Motion at ¶ 39; Nov. 14, 2011 Hr'g Tr., Dkt. No. 286, at 8:17-21.

[106]   *See* Fourth CMO at ¶ 8(d) (setting the deadline for Defendants to serve expert reports on September 26, 2011 even though Defendants in fact filed multiple such reports in October and November 2011); *id.* at ¶ 8(e) (setting the deadline for Plaintiffs to serve rebuttal expert reports on November 3, 2011 even though Plaintiffs in fact filed multiple such reports in December 2011); *id.* at ¶ 9(a) (setting the deadline for dispositive motions on January 20, 2012 even though Defendants actually filed the Summary Judgment Motion on February 24, 2012); *id.* at ¶ 10(a) (setting the deadline for the parties to exchange witness lists on February 17, 2012 even though the parties actually exchanged those lists on February 24, 2012); *id.* at ¶ 10(b) (setting the deadline for the parties to exchange exhibit lists on March 3, 2012 even though the parties actually exchanged those lists on March 9, 2012).

[107]   The pleading amendment deadline is determined by reference to the purported June 24, 2011 "close" of fact discovery, yet millions of documents have been produced, and many fact depositions have occurred, since that date.  *See* Response at 9 n.7; Motion at ¶ 8, Ex. A (identifying over one million documents that were produced after June 24, 2011); *see also* Ex. A, attached hereto (listing the six depositions that have taken place since June 24, 2011).  Plaintiffs respond that such continued document discovery is irrelevant because the documents produced by Plaintiffs (i) were made available prior to the deadline, (ii) did not exist prior to the deadline, (iii) were reproductions of previously produced documents, and/or (iv) were subsequently redesignated as non-privileged.  Response at 9 n.7.  Whether Plaintiffs made all relevant documents available prior to the "close" of fact discovery has long been contested by Defendants.  *See* Protopapas Decl. Ex. 2 at 1 n.1, Letter from Jason

B.       **Plaintiffs Misconstrue The Requirements Of Rule 16(b)**

37.       Plaintiffs state that "determining whether 'good cause' exists [under Rule 16(b)] is [based on] a defendant's diligence in bringing the amendment."[108]  Plaintiffs, however, omit any reference to the proper balancing of this diligence standard with the Rule 15(a) standard discussed above.[109]  The Second Circuit has described the interplay between Rule 16(b) and Rule 15(a) as follows:

---

W. Billeck to Seth A. Gastwirth dated Oct. 24, 2011 (recounting that Plaintiffs initially informed Defendants that they did not have indices corresponding to a 184-page list identifying thousands of document box numbers (such list did not provide any details regarding the contents of such boxes), but later recanted that statement and began producing such documents with the relevant indices on July 19, 2011 (*i.e.*, after the "close" of fact discovery)); *see also* Protopapas Decl. Ex. 3, Letter from Jason W. Billeck to Jeffrey J. Zeiger dated Apr. 7, 2011; Motion at Ex. A.  Moreover, many documents included in the productions related to Plaintiffs' financial restatement did in fact exist prior to the "close" of discovery, but were not produced until after the deadline. *See, e.g.*, Tronox, Inc. Environmental Liabilities for Fiscal Year-Ends 2007 and 2008 Work Plan, TRX-ERM0000186; Tronox, Inc. Tort Claim Liabilities for Fiscal Year-Ends 2007 and 2008 Work Plan, TRX-ERM0000334; Jan. 31, 2011 Accuval Fair Value of Assets Contributed to Litigation Trust Report, TRX-ADV21255433.  Additionally, the documents listed in Ex. A to the Motion *do not* include redesignated or previously produced documents.  *See* Motion at Ex. A n.1 (specifically stating that "Defendants did not include . . . redesignated documents in these estimates").  Moreover, the important point is not whether Plaintiffs are to blame for the post-deadline discovery, but only that such discovery has taken place and that the pleading amendment deadline is tied to it.  Plaintiffs alternatively argue that because Defendants are not relying on any post-deadline discovery in seeking to amend the Answer, the existence of such discovery does not favor an amendment.  Plaintiffs' argument is beside the point.  Defendants' only contention is that because the pleading amendment deadline is tied to the close of fact discovery and fact discovery has continued well beyond such deadline, the pleading amendment "deadline" should not be rigorously enforced under the facts of this case.

[108]    Response at 10 (citing *Adelphia*, 452 B.R. at 491).

[109]    *See Holmes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009) (stating that courts considering whether to grant leave to amend must balance the Rule 15(a) standard against the requirements of Rule 16(b)); *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (in applying Rule 16(b), courts may consider factors other than diligence, including whether the non-moving party will suffer prejudice if the scheduling order is modified); *Adelphia*, 452 B.R. at 495 (explaining that "the interests embodied in Rules 15(a)(2) and 16(b) must be *balanced*") (emphasis in original) (citations omitted); *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-CV-5023, 2010 WL 1257803, at *10 (E.D.N.Y. Mar. 26, 2010) (explaining that "in deciding whether to grant leave to amend, a court is not required to consider Rule 16(b) in isolation . . . 'both Rules should be considered simultaneously' and the factors balanced") (citations omitted); *Castro v. City of New York*, No. 06-CV-2253, 2010 WL 889865, at *1 (E.D.N.Y. Mar. 6, 2010) ("Although the discussion in the case law of the interplay between Rules 16(b)(4) and 15(a)(2) is somewhat muddled . . . the Second Circuit Court of Appeals has clearly stated that . . . a court must exercise its discretion by blending together its Rule 16(b)(4) and 15(a)(2) analyses."); *see also Samad Bros., Inc. v. Bokara Rug Co., Inc.*, No. 09 Civ. 5843, 2010 WL 2835754, at *2 (S.D.N.Y. June 30, 2010) ("[I]n deciding whether "good cause" exists, a court may consider, *inter alia*, the moving party's diligence and whether permitting the amendment will prejudice the defendant.") (citations omitted); *Grant v. Citibank (S.D.), N.A.*, No. 10 Civ. 2955, 2010 WL 5187757, at *8 (S.D.N.Y. Dec. 6, 2010)

Where, as here, a scheduling order governs amendments to the [pleadings] . . . 'the lenient standard under Rule 15(a), which provides leave to amend "shall be freely given," must be balanced against the requirement under Rule 16(b) that the Court's scheduling order "shall not be modified except upon a showing of good cause.'"[110]

As one court commented, "[a]fter *Holmes*, it would appear plain that decisions on untimely motions for leave to amend will be fact driven, and that trial courts will not be compelled to conclude, as a matter of law, either that Rule 15(a) concerns . . . or Rule 16(b) concerns . . . necessarily must prevail."[111]   Thus, while a court may deny leave to amend "if the Rule 16(b) concerns are serious enough," *courts may also grant leave in cases where the movant has not been diligent but nonetheless satisfies the requirements of Rule 15(a)*.[112]   In accordance with the foregoing, any consideration of Defendants' diligence must be viewed in conjunction with the considerations pertinent to Rule 15(a).

### C.     Defendants Were Diligent In Seeking The Proposed Amendment

38.     Defendants have shown "good cause" to amend the Answer.  The proposed amendment is based on a post-Answer change in law that radically expanded the scope of § 546(e) in a manner that was not known or knowable to Defendants prior to the Answer deadline.[113]   Defendants'

---

(noting the absence of prejudice to the non-moving party in connection with the court's consideration of the Rule 16(b) requirements); *Estate of Ratcliffe v. Pradera Realty Co.*, No. 05 Civ. 10272, 2007 WL 3084977, at *4 (S.D.N.Y. Oct. 19, 2007) (same).

[110]   *Holmes*, 568 F.3d at 334-35 (quoting *Grochowski v. Phx. Constr.*, 318 F.3d 80, 86 (2d Cir. 2003)).

[111]   *Adelphia*, 452 B.R. at 495 n.39.

[112]   *Id.* at 495, 496 n.42 (observing that "the Court [of Appeals] left open the possibility that amendments could be permitted even where a plaintiff had not been diligent in seeking an amendment, inasmuch as both Rules should be considered simultaneously and the factors balanced" (citations omitted)); *see also Nycomed*, 2010 WL 1257803, at *11 (considering Rule 16(b) and stating "the Second Circuit has not abrogated the principle that delay alone, in the absence of bad faith or prejudice, is usually not sufficient reason for denying a motion to amend").

[113]   *See supra* n.91; *infra* n.131 and Section V.

failure to raise § 546(e) prior to the Answer deadline was therefore not the result of lacking diligence. Similarly, any post-Answer delay in discovering, analyzing and asserting the defense was brief—approximately eight months—a period which other courts have found does not warrant the denial of an amendment based on a change in law.[114]   Moreover, such delay reflects the realities of Defendants being named in a multifaceted, dynamic and complex piece of litigation.   Indeed, during the relevant eight-month period, Defendants were actively engaged in (i) motion practice, including competing summary judgment motions, (ii) ongoing fact discovery involving millions of pages of documents and continuing depositions, (iii) expert discovery, including the initial, response, rebuttal and surrebuttal reports of approximately 17 experts and (iv)  approximately ten expert depositions—*among many other matters*.[115]   Moreover, once Defendants became aware of the extraordinary implications of *Enron*, they *immediately* notified the Court and Plaintiffs of the defense, and *within days*, Defendants had memorialized their position in a timely filed Summary Judgment Motion.[116]

        39.      Even if, however, the Court determines that Defendants were not sufficiently diligent to satisfy the requirements of Rule 16(b), the required balancing of Rules 15(a) and 16(b) should nonetheless tip the determination decidedly in favor of granting the amendment.   This is because Plaintiffs will suffer no prejudice from the proposed amendment, the amendment will not delay this proceeding, there has been no bad faith on the part of Defendants and the amendment would not be futile. Where, as here, the Rule 15(a) standard is so readily satisfied, an amendment may be granted even if a

---

[114]   *Gortat*, 2011 WL 6945186, at *10 (finding that even though plaintiffs' request to amend their complaint was filed approximately eight months after the issuance of the Supreme Court decision on which they based their request, there was no undue delay); *Livingston*, 215 F.R.D. at 85 (seven-and-a-half month delay after issuance of Supreme Court decision which made defense viable was not undue).

[115]   *See* Motion at Ex. A (identifying document productions made after June 24, 2011); Ex. A, attached hereto (identifying expert reports produced between June 24, 2011 and February 10, 2012, and depositions of expert witnesses taken between December 13, 2011 and February 17, 2012).

[116]   *See Lawrence v. Starbucks Corp.*, 08 Civ. 3734, 2009 U.S. Dist. LEXIS 114909, at *9-10 (S.D.N.Y. Dec. 10, 2009) (stating that "good cause" was shown where plaintiffs, after discovering new relevant information, acted quickly to amend the complaint).

movant has not been diligent at all.[117]  Because Defendants' actions were not in fact lacking in diligence, *and* the Rule 15(a) factors weigh heavily in favor of the amendment, Defendants submit the "good cause" standard has been met.

(i)      <b>Defendants Did Not Assert § 546(e) At "The Last Possible Moment"</b>

40.    Despite this, Plaintiffs contend that "Defendants have been anything but diligent . . . [and] waited until literally the last possible moment before raising the § 546(e) defense."[118] Plaintiffs then cite a litany of irrelevant opportunities during which Defendants purportedly could have raised § 546(e), but did not.[119]  For example, Plaintiffs complain that Defendants failed to "reference § 546 at any point during Tronox's reorganization proceedings,"[120] but then ignore the fact that Defendants' Answer was not due until seven months *after* Tronox confirmed its plan of reorganization.[121] Plaintiffs cannot assert a lack of diligence based on Defendants' failure to raise a defense months before the relevant deadline.  For the same reason, Plaintiffs cannot demonstrate a lack of diligence based on Defendants' failure to assert the defense in their motions to dismiss.[122]

41.    Plaintiffs further complain that Defendants did not raise § 546(e) before the official close of discovery,[123] yet they ignore the fact that the proposed amendment was asserted at a time

---

[117]   *See supra* n.112.

[118]   Response at 10.

[119]   *Id*. at 10-11.

[120]   *Id.* at 11.

[121]   *See* Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporated, *Et Al.* Pursuant to Chapter 11 of the Bankruptcy Code, Main Case Dkt. No. 2567 (Nov. 30, 2010); *see also* Motion at ¶ 4 (stating that the Answer deadline was June 10, 2011).

[122]   *See* Motion at ¶¶ 1-2 (citing Dkt. Nos. 125 and 131 which reflect that such motions were filed long before Defendants' Answer deadline and before the Second Circuit's decision in *Enron*).

[123]   Response at 11.

when discovery was in fact ongoing.[124]  Plaintiffs then reference several other irrelevant "opportunities" which have no bearing on whether Defendants were diligent in asserting the defense.[125]  Moreover, Defendants did not wait until the "last possible moment" to raise § 546(e), but instead raised it approximately three months before the start of a trial that will be conducted over many, many months.[126]  Such timing is by no means "the last possible moment."

> **(ii)    Defendants Were Not Required To Foretell A Significant Change In Law**

42.    Plaintiffs assert that where (i) a party "bas[es] a proposed amendment on information that the party knew, or should have known, in advance of the deadline"[127] and (ii) "Defendants . . . concede that all of the facts . . . were knowable to them prior to filing their Answer," Defendants cannot meet the Rule 16(b) diligence standard.[128]  Contrary to Plaintiffs' suggestion, Defendants have made no such "concession."  Moreover, at the time Defendants filed their Answer, they were not aware of the "fact" that the Second Circuit would soon be issuing a decision which would significantly expand the scope of § 546(e).  As such, Defendants could not have acted on such information before the Answer deadline.  Where, as here, a change in law is a recognized basis for

---

[124]    *See supra* n.107 and accompanying text; *see also* Motion at ¶ 28, Ex. A.

[125]    *See* Response at 11 (listing (i) Defendants' cross-motion for partial summary judgment (Dkt. No. 268), which was filed in response to the Court's suggestion that such motion be filed on the single issue of § 550(a) (*see* July 19, 2011 H'rg Tr., Dkt. No. 254, at 12:12-13, 51:7-14); (ii) a pretrial conference in which Defendants stated they may file "one or more" summary judgment motions, but never discussed what the substance of those motions might be (Nov. 14, 2011 Hr'g Tr. at 12:3-8); and (iii) Defendants' first letter requesting a Rule 7056-1 pre-motion conference which was followed one week later by Defendants' second Rule 7056-1 letter wherein they asserted the § 546(e) defense (Dkt. Nos. 299 and 301)).  The only example provided by Plaintiffs that implicates Defendants' diligence at all is "the eight months between the time Defendants filed their Answer . . . and first gave notice of their intent to argue . . . § 546(e)."  Response at 11.  As discussed in the Motion, and herein, this delay does not warrant denial of the amendment.

[126]    *See* Fifth CMO (indicating that the trial is scheduled to begin May 15, 2012); Mar. 22, 2012 Hr'g Tr., at 46:14-47:20 (reflecting that trial is currently calendared through August 2012 and is expected to continue for months thereafter).

[127]    Response at 11 (citations omitted) (quoting *Adelphia*, 452 B.R. at 492).

[128]    *Id.* at 12.

seeking an amendment,[129] and Defendants have sought an amendment on that ground, Plaintiffs err in

stating that Defendants "knew or should have known of" a yet unmaterialized legal development.

### (iii)    The Impact of *Enron* Is Far-Reaching

43.    Plaintiffs also assert that *Enron* merely expanded the scope of § 546(e) to include

"payments made to redeem commercial paper prior to maturity," but did not otherwise affect existing

law.[130]    Plaintiffs' narrow reading of the decision contravenes the uniform view of courts and

commentators concerning *Enron's* extremely broad application.[131] Plaintiffs further suggest that the

decision cannot represent a significant change in the law because it merely "'look[ed] to the statute's

plain language,' . . . [which] has not changed."[132]  On the contrary, the requirement that courts look only

to the plain language of § 546(e), rather than to its legislative history, is precisely what so significantly

expanded the law.  As explained in *Quebecor*:

The *Enron* opinion . . . blunts the effectiveness of many of the Committee's legal arguments in

opposition to the Motion.  Of particular importance in deciding the Motion is the clarity and consistency

that has been given to the term 'settlement payment.'  The gloss to the meaning provided by the Court of

---

[129]    *See Grochowski*, 318 F.3d at 86 (recognizing that plaintiffs could seek an amendment based on a change in law, but denying that amendment on other grounds); *Oxaal v. Internet Pictures Corp.*, No. 00CV1863, 2002 WL 485704, at *1-2 (N.D.N.Y. Mar. 27, 2002) (granting defendants leave to amend their answer based on a change in law resulting from an opinion issued by the Second Circuit several months after the deadline for pleading amendments); *Livingston*, 215 F.R.D. at 85 (permitting amendment based on a change in law occurring after an answer deadline); *Gortat*, 2011 WL 6945186, at *10 (same).

[130]    Response at 12.

[131]    *See supra* n.91; *see also Enron*, 651 F.3d at 346 (Koeltl, J., dissenting) (stating that the majority's "holding . . . is indeed extraordinarily broad"); *Quebecor*, 453 B.R. at 203 (stating the "matter before the Court is an example of litigation that, as Judge Koeltl anticipated in his [*Enron*] dissent, is threatened due to the broad impact of this controlling precedent"); *id.* at 214 (stating that "the impact of the [*Enron*] decision on avoidance actions may be quite far reaching"); *In re Lancelot Investors Fund, L.P.*, No. 08 B 28225, 2012 WL 761593, at *9 (Bankr. N.D. Ill. Mar. 8, 2012) (recognizing that prior decisions "may not be strong precedent given the Second Circuit's recent broad interpretation of the safe harbor provision in *Enron*"); Christopher W. Frost, *The Continued Expansion of Section 546(e):  Has the Safe Harbor Swallowed the Rule?*, 31 BANKR. L. LETTER 1, 4 (2011) (noting that "[t]he *Enron* decision takes an already expansive defense to avoidance actions and expands it even further"); *infra* Section V (analyzing the multiple ways in which *Enron* expanded the scope of § 546(e)).

[132]    Response at 13.

---

Appeals [no longer] depend[s] upon an examination and interpretation of the legislative history . . . as advocated by the Committee.[133]

44.    Plaintiffs further argue that the Second Circuit's decision is unremarkable insofar as it merely adopted the definition of "settlement payment" already employed by the Third, Sixth and Eighth Circuits.[134]   On the contrary, the Second Circuit adopted the basic definition of "settlement payment" employed by other circuits, but then dramatically expanded it by finding that (i) "the phrase 'commonly used in the securities trade,' only modifies the last clause of the [definition] in § 741(8)" and (ii) "a 'settlement payment' does not require a purchase or sale of a security, only the transfer of cash or securities."[135]   *Enron* is therefore not merely a continuation of previous precedent, but a dramatic expansion of it.

### (iv)    The Timing Of The Proposed Amendment Does Not Evidence Lacking Diligence

45.    Plaintiffs contend that "[a]ttorney inadvertence does not constitute good cause under Rule 16(b)," but even if it did, because Defendants are represented by knowledgeable bankruptcy counsel, they have no excuse for the delay and therefore cannot meet the standard of Rule 16(b).[136] Plaintiffs misstate the relevant legal issue.   Defendants are not relying on "attorney inadvertence" as the

---

[133]   453 B.R. at 214-15 (citations omitted); *see also* Jonathan S. Feldman et al., *Recent Developments in Section 546(e) of the Bankruptcy Code*, 21 J. BANKR. L. & PRAC. 2, Art. 4, III.2 (2012) (stating "[t]he Second Circuit's wholesale rejection in *Enron* of any reference to the legislative history of § 546(e) strongly undercuts [a lower court's prior decision relying on] . . . that same legislative history as a means to conclude that the safe harbor [does] not apply broadly to all types of securities transactions").

[134]   Response at 12-13.

[135]   Motion at ¶ 35 (citing *Enron*, 651 F.3d at 335-38).

[136]   *See* Response at 14.  Plaintiffs further suggest that because Defendants are represented by Sabin Willett (who was on the brief in the *Enron* case), they should have discovered the *Enron* decision earlier than they did.  *Id.* However, Mr. Willett's *pro hac vice* motion clearly reflects that he was not involved in this matter until February 2012.  *See* Motion For Admission *Pro Hac Vice* Of Sabin Willett To Represent Anadarko Petroleum Corporation et al., Dkt. No. 302 (Feb. 22, 2012) (requesting admission to represent Defendants shortly after Mr. Willett began participating in this case).

basis for any failure to include § 546(e) in their Answer. Rather, they are relying on a change in the law that occurred after the Answer deadline. A change in the law occurring after a court-ordered deadline cannot, by definition, be the result of attorney inadvertence. Any inadvertent delay occurring *after* a court-ordered deadline has already passed—*and which had no bearing on the deadline being missed in the first place*—should be evaluated under the "undue delay" standard of Rule 15(a). Indeed, once the failure to abide by a court-approved deadline has been justified by a "good cause" showing (*i.e.*, an unforeseeable change in law), Defendants should not be required to make yet a second showing of "good cause" in order to further justify their post-deadline delay in asserting that change of law. Rather, the considerations of Rule 15(a) should inform the question of whether Defendants have "unduly delayed." In accordance with the decisions of two courts from this circuit, Defendants submit that an eight-month delay in discovering and acting upon a decision which renders a defense viable is not "undue,"[137] particularly where, as here, there is no prejudice to the non-movant.

46.    Moreover, while Plaintiffs cite no authority supporting their proposed imposition of a dual showing of good cause under Rule 16(b)—first for not asserting the defense before the deadline and then for delaying in asserting the defense after the deadline—there is ample authority supporting the Rule 15(a) and Rule 16(b) balancing approach suggested by Defendants.[138]   Indeed, *Adelphia* held that where: (i) the defendant's "failure to comply with the scheduling orders did not result from ignorance or excusable neglect," but instead from "a tactical choice—and an offensive one at that" (*i.e.*, there was bad faith under Rule 15(a)); (ii) the movant's knowing non-compliance with the scheduling order constituted lacking diligence (*i.e.*, there was no diligence under Rule 16(b)); (iii) the non-movant would be moderately prejudiced by the amendment (*i.e.*, there was some prejudice under Rule 15(a)), and (iv) the amendment was sought four years after the deadline (*i.e.*, there was undue delay under Rule 15(a)), leave

---

[137]   *See supra* n.114.

[138]   *See supra* n.109.

would be denied.[139]  In accordance with this approach, and that espoused by the Second Circuit, the Court should balance Rule 16(b) against Rule 15(a) in determining whether Defendants' eight-month delay in asserting a defense based on a post-Answer change in law was "undue."[140]  Because all Rule 15(a) factors weigh heavily in favor of permitting the amendment and Defendants have otherwise shown that there was "good cause" for their failure to assert the defense prior to the amendment deadline, the proposed amendment should be allowed.

> **(v)    The Facts and Circumstances Surrounding The Proposed Amendment Are Not Analogous To The *Adelphia* Decision**

47.    In seeking to analogize the circumstances of this case to those of *Adelphia*, Plaintiffs go so far as to contend that Defendants raised § 546(e) "less than a week before making a counter-offer in mediation [and that this] suggests . . . Defendants raised the late defense tactically . . . to gain negotiating leverage."[141]  Plaintiffs then argue that, like in *Adelphia,* where defendant's intentional decision to belatedly assert the defense supported a finding of lacking "good cause," Defendants' intentional decision to belatedly assert the defense likewise supports a finding of lacking "good cause."[142]  The problem with Plaintiffs' argument is that Defendants did not intentionally delay their assertion of the safe harbor defense.  Indeed, the only support for Plaintiffs' allegation is their own illogical and self-serving conjecture.

48.    To begin with, Plaintiffs offer no explanation as to why Defendants would "lay low" at the mediation, not raise the defense, and then suddenly elect to raise it *after* the mediation session

---

[139]    *Adelphia*, 452 B.R. at 498.

[140]    If, however, the Court elects to evaluate any post-deadline delay exclusively under Rule 16(b), Defendants also submit that there is "good cause" for their delay for the reasons stated above and in the Motion.

[141]    Response at 13.  Plaintiffs' reference to confidential mediation negotiations is highly improper.  While Defendants herein respond to Plaintiffs' incorrect and unfounded allegations, they do not discuss their views concerning Plaintiffs' mediation conduct.

[142]    *Id.* at 13-14 (quoting *Adelphia*, 452 B.R. at 498).

had concluded.  Surely, Defendants would have had enough sense to raise the defense *at* the mediation if their objective was to "gain negotiating leverage."  Similarly, Plaintiffs do not explain how one "gains negotiating leverage" by asserting a new defense right before tendering your opponent another settlement offer.  Surely, Defendants would have timed their assertion of the defense differently from the manner alleged by Plaintiffs if their objective was to gain "negotiating leverage."

49.    Apart from being illogical, Plaintiffs' allegation is false.  There is not a single shred of support for the proposition that Defendants intentionally withheld or delayed the assertion of § 546(e) in a "tactical" effort to gain "negotiating leverage."  Rather, Defendants have at all times conducted themselves in good faith and Plaintiffs' unsubstantiated speculation does not alter this reality.  As such, Plaintiffs' attempt to shoehorn the facts of this case into those of *Adelphia*—where the defendant *admitted* it had intentionally not raised the defense—must be rejected.[143]

50.    Despite Plaintiffs' analogizing efforts, this case is simply not like *Adelphia*.  Apart from the *Adelphia* defendant's admission that it intentionally flouted the court's scheduling order, the *Adelphia* defendant also (i) sought the amendment four years—not eight months—after the deadline, (ii) did not assert that its pleading failure was based on a change in law, (iii) did not plead the defense of failure to state a claim, (iv) asserted a sham jurisdictional argument, and (v) did not even attempt to articulate "good cause" for its pleading failure.[144]  None of these circumstances is present here.

---

[143]    Plaintiffs further suggest that Defendants engaged in *Adelphia*-like gamesmanship by attempting to "characterize § 546(e) as something other than an affirmative defense" and as a defense that "can be preserved [under] Rule 12(h)(2)."  Response at 13 n.11.  While there is a good faith basis for asserting that it is not an affirmative defense (and cases supporting this conclusion are cited in this Reply), the Motion in fact took no position on the issue.  Further, Defendants' alternative argument that § 546(e) is properly heard as a motion for failure to state a claim is supported by a litany of cases which Plaintiffs have been unable to refute.  Accordingly, Plaintiffs' suggestion that Defendants' arguments are so outlandish as to support the denial of an amendment should be rejected.  *Adelphia* does not stand for the proposition that a litigant may be penalized for making legal arguments, it stands for the proposition that a litigant may be penalized for making absurd jurisdictional arguments devoid of any legal support.  Defendants' arguments hardly qualify.

[144]    *Adelphia* 452 B.R. at 492-93.

51.    In short, none of the arguments advanced by Plaintiffs alters the conclusion that there is "good cause" to amend the Answer.

**V.    The Project Focus And IPO Transfers Are Protected By § 546(e) of the Bankruptcy Code**

52.    Plaintiffs have not established that the proposed amendment would be "futile" because they have not demonstrated that the § 546(e) defense is either "frivolous" or "clearly meritless." The merit of the defense is not only established by the arguments made by Defendants in the Summary Judgment Motion, but also by those now made by Plaintiffs in the Response.   Indeed, rather than acknowledge the sweeping change in law resulting from *Enron*, Plaintiffs cling to outdated and obsolete decisions whose limitations on § 546(e) affirmatively conflict with, and have been superseded by, *Enron*. To understand the import and substance of both *Enron* and the precursors on which Plaintiffs mistakenly rely, it is necessary to briefly review those decisions and the underlying statutory provision they interpret.

53.    The safe harbor provision has been expanded almost continuously since its enactment in 1982, with *Enron* representing its zenith.[145]   The present formulation of the statute protects transfers that are either "settlement payments" or made "in connection with a securities contract," so long as those transfers are made "by, to or for the benefit of" either a "financial institution" or a "financial participant."   A provision protecting transfers made by or to a "financial participant" was added in 2005,[146] and a provision protecting transfers made "in connection with a securities contract" was added as part of the Financial Netting Improvements Act of 2006[147] in order to "clarify and expand the[] scope" of

---

[145]    *See* Pinkas & Pisciotta, *supra* n.91, at 28 (stating that *Enron* "stands alone" because it "went further" than other circuits which had construed § 546(e) broadly and that "in only a few months since the decision was rendered, lender recoveries and unsecured creditor distributions will be diminished by literally billions of dollars"); Frost, *supra* n.131, at 4 (stating that *Enron* "takes an already expansive defense to avoidance actions and expands it even further").

[146]    Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 907(o) (2005).

[147]    Pub. L. No. 109-390, § 5(b) (2006).

the safe harbor.[148]  Also in 2006, Congress added the provision protecting transfers made "for the benefit

of" a financial participant or financial institution.[149]  Because these three significant enlargements to the

statute were not added until 2006, the decisions issued prior to this date address a substantially narrower

formulation of § 546(e).

        54.    In keeping with Congress's ongoing expansion of the statute, many cases

interpreting § 546(e) have also accorded it relatively broad application, albeit not like *Enron*.  For

example, the Tenth Circuit was the first to conclude that a "settlement payment" should be broadly

interpreted to mean a transfer that "complet[es] [] a securities transaction."[150]  Multiple other courts later

followed suit.[151]  The Tenth Circuit (and courts following it), however, required an examination of the

legislative purpose of the statute in order to assure that, absent application of the safe harbor protection,

the qualifying settlement payment would in fact have a harmful "ripple effect" on the nation's securities

markets.[152]  Notwithstanding this longstanding and widespread practice, *Enron* rejected this approach,

---

[148]  7 COLLIER ON BANKRUPTCY ¶ 546.LH[5] (16th ed. rev. 2011).

[149]  Pub. L. No. 109-390, § 5(b)(1); *see also* H.R. Rep. No. 648, at 4 (2006) (explaining that "in connection with a securities contract" was added to "provide important liquidity to the securities markets").

[150]  *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 849 (10th Cir. 1990) (quotation omitted).

[151]  *See, e.g.*, *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th Cir. 2009) (interpreting a settlement payment as "the transfer of cash or securities made to complete [a] securities transaction" (quoting *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 515 (3d Cir. 1999)); *Brandt v. B.A. Capital Co., LP (In re Plassein Int'l Corp.)*, 590 F.3d 252, 258 (3d Cir. 2009); *Walsh v. The Toledo Hosp. (In re Fin. Mgmt. Scis., Inc.)*, 261 B.R. 150, 154 (Bankr. W.D. Pa. 2001) ("In general, any transfer of cash or securities made to complete a securities transaction is considered a settlement payment by the securities industry.").

[152]  *Kaiser Steel*, 913 F.2d at 849 (discussing the "danger of a 'ripple effect,' on the entire market") (citations omitted); *Official Comm. of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68, 76 (E.D.N.Y. 2007) (holding that "settlement payment" must be interpreted in "light of [the] purpose" of "prevent[ing] the 'ripple effect' created by 'the insolvency of one commodity or security firm from spreading to other firms and possibly threatening the collapse of the affected industry'") (quotation omitted); *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 477 (S.D.N.Y. 2001) (stating that in interpreting "settlement payment," courts should consider that by enacting § 546(e), Congress sought to prevent a "ripple effect" in the securities industry).

advocating a "plain language" interpretation of the statute without regard to its legislative history.[153]  No

other court had previously reached this conclusion and in fact all had found to the contrary.  Accordingly,

this is the first important respect in which *Enron* changed the law.

      55.    Moreover, while the Tenth Circuit and multiple other courts defined a

"settlement payment" as a transfer that "complet[es] [] a securities transaction," *Enron* expanded this

definition in at least two important ways.  In particular, *Enron* found that the phrase "commonly used in

the securities trade" modified only the last clause of the definition of "settlement payment," not all of it.[154]

This finding contravened the holdings of three prior circuit courts, all of which had reached the opposite

conclusion.[155]  Notwithstanding this, the law of the Second Circuit now provides that most settlement

payments (save and except for one that is described by the last clause of the definition) will qualify for

safe harbor treatment regardless of whether or not they are "commonly used in the securities trade."[156]

      56.    *Enron* also found that a "settlement payment" does not require the purchase or

sale of securities, but only the transfer of cash or securities.[157]  More specifically, *Enron* concluded that

the settlement payment definition of a transfer that "completes a securities transaction," need not be a

---

[153]  *See Enron*, 651 F.3d at 339 ("Because we reach this conclusion by looking to the statute's plain language, we decline to address Enron's arguments regarding legislative history . . . .") (citation omitted); *see also Lehman Brothers*, 2012 WL 1355659, at *17 (stating that *Enron* and *Quebecor* stand "for the proposition that the language of the safe harbors is to be strictly interpreted even when the outcome may be prejudicial to the interests of the estate and its creditors"); *In re Lancelot Investors Fund*, 2012 WL 761593, at *10 (applying *Enron*'s plain language approach and rejecting the plaintiff's argument that a defendant must prove "that avoidance would cause market instability" for § 546(e) to apply).

[154]  *Enron*, 651 F.3d at 335-36.

[155]  *QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 550 (6th Cir. 2009) (applying § 546(e) to a private leveraged buyout ("LBO") transaction, but interpreting the phrase "commonly used in the securities trade" to modify the entirety of the settlement payment definition, not merely the last phrase of the definition); *Contemporary Indus. Corp.*, 564 F.3d at 985-88 (same); *In re Plassein Int'l Corp.*, 590 F.3d at 257-59 (relying on prior Third Circuit precedent to find that § 546(e) applied to a private LBO transaction, but interpreting the phrase "commonly used in the securities trade" to modify the entirety of the settlement payment definition (citing *In re Resorts Int'l*, 181 F.3d at 509)).

[156]  *See* 11 U.S.C. § 741(8).

[157]  *Enron*, 651 F.3d at 338.

transfer for the *purchase or sale of a security* that "completes a securities transaction," but instead may involve only the transfer of *cash or securities* that "completes a securities transaction."[158]  This finding contravened the holdings of multiple courts which had impliedly required that there not only be a transfer that "completes a securities transaction," but a transfer made in connection with the purchase or sale of a security.[159]  Notwithstanding this, the law of the Second Circuit now permits safe harbor protection even if a settlement payment does not involve the purchase or sale of a security.  Accordingly, while pre-*Enron* courts technically employed the same definition of "settlement payment" (*i.e.*, a transfer that completes a securities transaction), *Enron's* interpretation of that definition significantly expanded its meaning and application.  As aptly summarized by one commentator, "[g]iven that the Court has eliminated [multiple] requirement[s] . . . it would seem that any payment on an obligation that is evidenced by a 'security' . . . would be a settlement payment."[160]

57.      *Enron* further expanded the safe harbor doctrine by its liberal interpretation of the "financial institution" prong of § 546(e).  In one of the earlier decisions interpreting the requirement that transfers be made by, or to a "financial institution," the Eleventh Circuit held that § 546(e) does not apply to circumstances where a financial institution acts as a mere conduit of transferred funds, and does not

---

[158]  *Id.* at 339.

[159]  *Kaiser Steel*, 913 F.2d at 849 (citing the New York Stock Exchange, *Language of Investing Glossary* 30 (1981) to define settlement payment as the "[c]onclusion of a securities transaction when a customer pays a broker/dealer for securities purchased or delivers securities sold and receives from the broker the proceeds of a sale"); *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)* ("*Healthco*"), 195 B.R. 971, 983 (Bankr. D. Mass. 1996) (stating that Congress's intent in enacting § 546(e) was to "protect ordinary course of business transfers related to the purchase or sale of securities") (footnote omitted); *see also Enron*, 651 F.3d at 341 (Koeltl, J., dissenting) ("The existence of a purchase or sale requirement also finds support in case law.") (citations omitted); *In re Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Assoc.*, 878 F.2d 742, 751 (3d Cir. 1989) ("[T]he transfer of record ownership of securities is an integral element in the securities settlement process.").

[160]  Frost, *supra* n.131, at 5; *see also Enron*, 651 F.3d at 339 (recognizing that the decision permits the safe harbor defense to be applied beyond the confines of the traditional transactions to which it has previously been applied).

itself take a "beneficial interest" in those funds.[161]  In keeping with the three circuit courts which later

rejected this position,[162] *Enron* found that the plain language of the statute does not require a financial

institution to take a "beneficial interest" in the transferred funds.[163]  Rather, the safe harbor protections

apply even when a financial institution acts as a mere conduit of the transferred funds.

58.    Finally, *Enron* was the first court to expand the scope of § 546(e) by permitting

an early note redemption payment to be treated as a "settlement payment."[164]  While this latter point is not

directly relevant to the pending facts, it nonetheless demonstrates the Second Circuit's remarkable

willingness to broaden the scope of the safe harbor defense in substantial and unprecedented ways.

Indeed, of the at least five holdings[165] which collectively and dramatically expanded the law, four had

never been decided by another court.  This expansion of the law appears even more remarkable when

considering that the Second Circuit had never before issued a ruling on any aspect of § 546(e), nor were

there any decisions from this or any other jurisdiction espousing the approach adopted by the Second

Circuit.

---

[161]  *Munford v. Valuation Research Corp. (Matter of Munford, Inc.)* ("*Munford*"), 98 F.3d 604, 610 (11th Cir. 1996) (holding that although "a section 546(e) financial institution was presumptively involved in this transaction . . . [t]he bank never acquired a beneficial interest in either the funds or the shares" and thus § 546(e) did not apply).

[162]  *In re Plassein Int'l*, 590 F.3d at 257-59 (holding that § 546(e) applied even though the relevant financial institution acted as a mere conduit of the transferred funds); *In re QSI Holdings*, 571 F.3d at 549-50 (same); *Contemporary Indus. Corp.*, 564 F.3d at 986 (same).

[163]  *See Enron*, 651 F.3d at 339 (rejecting the trustee's argument that financial institutions must take a "beneficial interest" in the transferred funds because it was "inconsistent with [the] language" of § 546(e)).

[164]  *See id.* at 341 (Koeltl, J., dissenting) (stating that whether an issuer's redemption of commercial paper qualifies as a settlement payment was a question "of first impression in the courts of appeals").

[165]  As explained *supra*, *Enron* created a fivefold expansion in the scope of § 546(e) by eliminating: (i) the need to consider whether a transfer implicates Congress's intent to protect the securities markets; (ii) any requirement that a "settlement payment" (a) involve the purchase or sale of a security or (b) be "commonly used in the securities trade;" (iii) the requirement that a financial institution take a beneficial interest in the transferred funds; and (iv) any bar on its application to an early note redemption.

59.     Despite the obvious importance of *Enron* as the only controlling precedent bearing on the proper scope and application of § 546(e), Plaintiffs nonetheless ground their Response on everything but *Enron*.  Indeed, Plaintiffs doggedly cite pre-*Enron* cases[166] whose rulings either have been effectively superseded by *Enron*[167] and/or are based on the very legislative history which *Enron* holds is irrelevant to a proper "plain language" reading of the statute.[168]  None of these authorities is availing for the reasons described herein and in the Summary Judgment Motion.

60.     Defendants now turn to the specific arguments made by Plaintiffs concerning the IPO and Project Focus Transfers.[169]

---

[166]  *See, e.g.*, Response at 18-19, 23, 28 (citing *Buckley v. Goldman, Sachs & Co.*, No. Civ.A.02-CV-11497, 2005 WL 1206865 (D. Mass. May 20, 2005); *Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*, 450 B.R. 414 (Bankr. S.D.N.Y. 2011)); *id.* at 20 (citing *Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 675 (D.R.I. 1998); *In re Adler, Coleman Clearing*, 263 B.R. at 478; *In re Norstan Apparel Shops*, 367 B.R. at 76).

[167]  *See Munford*, 98 F.3d at 610 (holding that § 546(e) did not apply because although a financial institution was involved in the challenged transfer, it "never acquired a beneficial interest in either the funds or the shares"); *Healthco*, 195 B.R. at 981-82 (relying on *Munford* to hold a "stockbroker, financial institution or securities clearing agency" must acquire a beneficial interest in transferred assets for § 546(e) to apply).

[168]  *See In re MacMenamin's Grill*, 450 B.R. at 425 (holding that § 546(e) did not apply because the "legislative history, including the history of the 2006 Amendment, makes it clear that Congress intended section 546(e) to address risks that the movants have failed to show conclusively are implicated by the avoidance of the transaction at issue here"); *Buckley*, 2005 WL 1206865, at *7 (denying a motion to dismiss based on § 546(e) because Congress's purpose of "protect[ing] the operation of the security industry's clearance and settlement system . . . is not furthered in any meaningful sense by bringing an LBO like the one at issue in this case under the exemption of § 546(e)"); *In re Norstan Apparel Shops*, 367 B.R. at 76 (interpreting §§ 546(e) and 741(8) "in the context of the legislative history of these provisions"); *In re Adler, Coleman Clearing*, 263 B.R. at 482 (holding that § 546(e) did not apply because there was no evidence that reversing the challenged transfers would have a "'ripple effect' on other brokers and participants in the system that concerned Congress when it enacted § 546(e)") (citation omitted); *Zahn*, 218 B.R. at 676 (concluding that "it appears unlikely that Congress intended the term 'settlement payment' to cover the present transfers").

[169]  As an initial matter, Plaintiffs assert that the "error" of Defendants' position is demonstrated by the fact that the defendants in *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008) and *Dynegy Holdings* did not assert a § 546(e) defense.  Response at 19 n.13.  *ASARCO*, however, was decided before *Enron* and in the Fifth Circuit, which lacks any controlling § 546(e) precedent.  Indeed, the *ASARCO* defendant's failure to assert the defense demonstrates Defendants' precise point—namely, that the defense became infinitely more viable following the Second Circuit's issuance of the *Enron* opinion.  While the *Dynegy* bankruptcy was filed after *Enron* (*i.e.*, on November 7, 2011), because the bulk of the examiner's report is devoted to a discussion of actual fraudulent transfer claims under § 548, the defendant's assertion of a § 546(e) defense would not be applicable to the majority of the matters addressed by the examiner.  *See* Corrected Preliminary Response of Dynegy Inc. to the Report of Susheel Kirpalani, Examiner, *In re Dynegy Holdings, LLC et al.*, No. 11-38111, Dkt. No. 539 (Bankr. S.D.N.Y. Mar. 20, 2012).

### (i)    The IPO And Project Focus Transfers Were Settlement Payments

61.    Contrary to Plaintiffs' assertion, the challenged transfers meet the requirements of § 546(e) in several ways, any one of which is sufficient to qualify for safe harbor protection.[170]  For one, both the IPO and the Project Focus Transfers qualify as settlement payments.[171]  As explained in *Enron,* the "extremely broad" definition of a settlement payment encompasses any "transfer of cash or securities made to complete [a] securities transaction."[172]  Plaintiffs advance several unavailing arguments in support of a contrary conclusion.

62.    First, Plaintiffs state that the Bankruptcy Code definition of a "settlement payment" is "circular" and "frustratingly self-referential."[173]  While this may have been true pre-*Enron*, the Second Circuit has now clarified the Bankruptcy Code's definition of "settlement payment" and has provided a concise, non-circular definition.[174]  Moreover, even if that were not the case, it is unclear how the mere existence of a circular definition would defeat a finding that the IPO transfers were "settlement payments."  Second, Plaintiffs allege that Defendants have ignored that a settlement payment must be viewed "in the context of the securities industry."[175]  While this showing is not in fact required by *Enron*, but was instead stipulated by the parties,[176] it is again unclear how such a requirement would alter the

---

[170]    *See* Summary Judgment Motion at ¶¶ 23-24 (explaining that the Project Focus and IPO Transfers (i) were settlement payments made by, to, or for the benefit of, a financial institution and/or a financial participant, and/or (ii) were made by, to, or for the benefit of, a financial institution and/or a financial participant in connection with a securities contract).

[171]    Summary Judgment Motion at ¶¶ 26-28, 45.

[172]    *Enron*, 651 F.3d at 334 (citations and internal quotation marks omitted).

[173]    Response at 20.

[174]    *See Enron*, 651 F.3d at 334 (holding that a settlement payment is "the transfer of cash or securities made to complete [a] securities transaction").

[175]    Response at 20.

[176]    *Enron*, 651 F.3d at 334 (stating that "[t]he parties . . . agree that courts should interpret [settlement payment] in the context of the securities industry") (quotations omitted).

definition of a "settlement payment" when in fact the definition already mandates that the transfer be made "to complete a *securities* transaction."[177]  Where, as here, securities were transferred in connection with Project Focus and the IPO, Defendants satisfy the settlement payment definition regardless of whether it includes a superfluous qualifier relating to it being in "the context of the securities industry."

63.    Third, Plaintiffs assert that a "one-time internal transfer of $760 million . . . made [by Tronox] to New Kerr-McGee as part of the separation process"[178] does not qualify as a settlement payment because inter-affiliate cash transfers "pose[] absolutely no risk of a 'ripple effect' to the securities markets."[179] Plaintiffs suggest that this inter-affiliate "settlement payment" ban is supported by the 1996 *Healthco* decision which purportedly held that a cash payment made by a subsidiary to its parent company could not be characterized as a settlement payment.[180]  *Healthco*, however, did not involve a payment by a subsidiary to its parent company *at all*.  Rather, *Healthco* involved a debtor's payment to a third party in settlement of a proxy contest that was being waged by that third party against the debtor. The *Healthco* court found that the debtor's payment was not a "settlement payment" because it was not guaranteed by a "securities clearing agency" and therefore did not implicate the stability of the securities markets sought to be promoted by Congress.[181]  *Healthco* is inapposite for two reasons:  (i)  the decision did not in fact involve an inter-affiliate transfer and therefore does not support the proposition that an inter-affiliate transfer may not be a "settlement payment;" and (ii) it contravenes *Enron's* required "plain language" reading of the statute by improperly considering whether a transfer implicates the stability of

---

[177]    *Id.* (emphasis added) (quotations omitted) (holding that a settlement payment is "the transfer of cash or securities made to complete [a] securities transaction").

[178]    Response at 24.

[179]    *Id.* at 23.

[180]    *See id.* (citing *Healthco*, 195 B.R. at 983).

[181]    *Healthco*, 195 B.R. at 983.

the market.  As the *Healthco* court itself acknowledged, it took a narrower view of § 546(e) than even the

Tenth Circuit in its 1990 opinion in *Kaiser Steel*.[182]  This narrow approach is clearly *not* the approach

taken by the Second Circuit in *Enron*.  Given the foregoing, *Healthco* has no application to the pending

dispute.

> 64.    Fourth, Plaintiffs suggest that the Project Focus transfers cannot be characterized

as "settlement payments" because a recent Delaware decision has held that "one-way" dividend payments

may not qualify for safe harbor protection.[183]  *Appleseed,* is inapposite, however, as the Project Focus

Transfers were not "one-way" payments.  Rather, the Project Focus Transfers completed a securities

transaction wherein KMOC (n/k/a Tronox Worldwide) transferred equity interests (*i.e.*, "securities") in

various entities who owned oil and gas assets,[184] and in exchange, was released from its obligations for

approximately $2 billion dollars of debt,[185] among other valuable consideration.[186]

> 65.    Plaintiffs further suggest that *In re Integra Realty Resources, Inc.*[187] supports the

notion that the IPO transfers were not settlement payments because § 546(e) does not apply where

(i) there was a "transfer of stock through a spin-off for no consideration" or (ii) "there was not really an

---

[182]   *Id.* at 983 ("I therefore part company with the *Kaiser Steel* court on this point as well.")

[183]   *Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)* ("*Appleseed*"), No. 11-10160, 2012 WL 748652, at *8 (D. Del. Mar. 7, 2012).  *Appleseed* is the *only* post-*Enron* case on which Plaintiffs rely and it is from another district.

[184]   *See* SOF App'x A, Declaration of David L. Siddall Authenticating Documents and Certifying Records of Regularly Conducted Business Activity (attaching various stock certificate transfers associated with Project Focus); Summary Judgment Reply at Ex. 1 (listing various transfers made as part of Project Focus).

[185]   *See* Summary Judgment Motion at ¶ 43; SOF App'x B at Ex. 4; Kerr-McGee Corporation 2002 Form 10-K filed Mar. 27, 2003, at Ex. 4.3, 4.4, 4.7.

[186]   SOF App'x C at 41.  This Court need not find that such consideration was reasonably equivalent for § 546(e) to apply.  *See In re Lancelot Investors Fund*, 2012 WL 761593, at *11 (applying § 546(e) and stating, "[t]he problem for the Trustee is that Congress decided to protect . . . transfers where the consideration is not reasonably equivalent").

[187]   *Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 198 B.R. 352 (Bankr. D. Colo. 1996).

exchange and . . . no consideration was given . . . for the exchange."[188]   *Integra* is similarly unavailing,

however, as the IPO was clearly not a "spin-off for no consideration" nor was it "not really an

exchange."[189]   Moreover, even if it were, *Enron* draws no distinctions between transfers made with or

without consideration.  Accordingly, because the IPO and Project Focus Transfers were "transfers of cash

or securities made to complete a securities transaction," they qualify as settlement payments.

**(ii)     The IPO And Project Focus Transfers Were Made In Connection
With A Securities Contract**

66.     Defendants also argued in the Summary Judgment Motion that the IPO and

Project Focus Transfers were made "in connection with a securities contract." [190]  With respect to the IPO,

Defendants explained that the transfers were made pursuant to the MSA, which provided for, *inter alia*:

the "transfer of the Membership Interests [in Tronox Worldwide] . . . in exchange for (i) the conversion of

the Existing Stock into 22,889,431 shares of Tronox Class B Common Stock . . . , [and] (ii) the payment

of the net proceeds of the Initial Public Offering."[191] Because an agreement providing for the transfer of

membership interests for cash is a "securities contract" under Bankruptcy Code § 741(7)(A),[192] the IPO

transfers were made "in connection with a securities contract."

---

[188]   Response at 21.

[189]   *Compare In re Integra Realty Res.*, 198 B.R. at 360 (holding that a "distribution of dividends" was "not really an exchange"), *with* Response Ex. 3, at 1, Master Separation Agreement ("MSA") (explaining that New Kerr-McGee agreed to provide "reimbursement of certain environmental costs," contribute its equity in Tronox entities, and cancel intercompany debt, among other consideration, in exchange for the IPO proceeds).

[190]   Although the *Enron* court applied its plain language approach in the context of the "settlement payment" prong of § 546(e), courts must take the same approach when determining whether a transfer is made in connection with a securities contract.  *See Lehman Brothers*, 2012 WL 1355659, at *18 (holding that although it dealt with whether certain transfers were made in connection with a securities contract, the court would, "[c]onsistent with its approach in *Quebecor* . . . strictly construe the plain meaning of section 546(e)").

[191]   *See* MSA at § 2.1

[192]   Summary Judgment Motion at ¶ 38; 11 U.S.C. § 741(7)(A); *see also* 11 U.S.C. § 101(49)(A) (listing, non-exhaustively, various types of securities, including "stock," "interest of a limited partner in a limited partnership" and "other claim or interest commonly known as a 'security'"); *Lehman Brothers*, 2012 WL 1355659, at *19 ("The plain language of section 741(7) is very broad in its application and encompasses

67.    In response, Plaintiffs state that the "MSA is plainly not a 'securities contract' [because] . . . [r]ather than setting forth the 'purchase, sale or loan of a security' . . . the MSA expressly states that New Kerr-McGee will cause its ownership interests to be 'assign[ed], transfer[red] and convey[ed] to Tronox' . . . [while] . . . [t]he agreement to sell securities to underwriters for the IPO is actually contained in a *separate* Underwriting Agreement."[193]  Plaintiffs' argument is refuted by the very language they purport to quote from the MSA, namely that Kerr-McGee Worldwide's [194] "ownership interests [*i.e.*, "securities"][195] [will] be assigned, transferred and conveyed to Tronox [Inc.]."[196]  Where an agreement provides for the transfer of the equity interests in a subsidiary of a public company (*i.e.*, Tronox Worldwide), there can be no doubt that the agreement (*i.e.*, the MSA) qualifies as a "securities contract" and that transfers made pursuant to it are "in connection with a securities contract."  This conclusion is not altered merely because there was a related underwriting agreement which provided for the public sale of entirely different equity securities in Tronox Inc.  Plaintiffs have not sued Defendants for transfers made under the underwriting agreement, and their efforts to divert the proper inquiry of

---

virtually any contract for the purchase or sale of securities, any extension of credit for the clearance or settlement of securities transactions, and a wide array of related contracts, including security agreements and guarantee agreements.").

[193]    Response at 26 (emphasis in original).

[194]    Pursuant to the MSA, Kerr-McGee Worldwide transferred 100% of its membership interests in Tronox Worldwide LLC to Tronox Inc. while New Kerr-McGee, as Kerr-McGee Worldwide's parent, was obligated to cause Kerr-McGee Worldwide to make that transfer.  *See* MSA at § 2.1.

[195]    *See* 11 U.S.C. § 101(49)(A) (listing, non-exhaustively, various types of securities, including a "stock," "interest of a limited partner in a limited partnership" and "other claim or interest commonly known as a 'security'").

[196]    Response at 26 (quoting MSA at 2); *see also* MSA at § 2.1 (providing for the "transfer of the Membership Interests [in Tronox Worldwide] . . . in exchange for (i) the conversion of the Existing Stock into 22,889,431 shares of Tronox Class B Common Stock . . . , [and] (ii) the payment of the net proceeds of the Initial Public Offering"); *id.* at § 3.1 (requiring Tronox and New Kerr-McGee to take all steps necessary to consummate the IPO and both parties to comply with their obligations under the Underwriting Agreement whereby Tronox agreed to sell 17,480,000 shares of Tronox Class A Common Stock and grant an option for the Underwriters to purchase an additional 2,622,000 shares of Tronox Class A Common Stock); *id.* at § 3.4 (requiring that Tronox and New Kerr-McGee take steps necessary to convert existing stock into Tronox Class B Common Stock).

whether the MSA—the agreement pursuant to which the challenged transfers were made—qualifies as a securities contract should therefore be rejected.

68.    Plaintiffs also contend that the MSA is not a "securities contract" because § 546(e) "was never intended to address a spin-off agreement like the MSA" and "the disputed transactions are so far removed from Congress' professed intent of protecting the financial markets that it would create an absurd result."[197] *Enron*, *Quebecor* and *Lehman Brothers*, however, *mandate* the plain language reading of § 546(e) that Plaintiffs now spurn, regardless of whether the "outcome [is] prejudicial to the interests of the estate and its creditors."[198]    Indeed, while Plaintiffs criticize Defendants for "parrot[ing] back the terms of the statute,"[199] that is precisely the approach required by a plain language reading of the statute.    Moreover, Plaintiffs' suggestion that a contract must be "arm's-length" and "involve third parties" before qualifying for treatment as a "securities contract"[200] is spurious.    Nowhere does the definition of "securities contract" include such a limitation nor have Plaintiffs cited any case law suggesting as much.

69.    Plaintiffs further contend that the Project Focus Transfers were not made "in connection with a securities contract" because "Defendants do not identify a single contract that related to the Project Focus Transfers that they claim is a 'securities contract.'"[201]    However, as Plaintiffs are well aware, the Project Focus Transfers are evidenced by a series of documents included in the Project Focus

---

[197]    Response at 25.

[198]    *Lehman Brothers*, 2012 WL 1355659, at *17; *see also Enron*, 651 F.3d at 339 (holding that courts need not look to legislative history but must "look[] to the statute's plain language"); *Quebecor*, 453 B.R. at 213 (holding that after *Enron*, "courts construing section 546(e) need not examine its legislative history in light of its unambiguous plain language").

[199]    Response at 26.

[200]    *Id.* at 25-26.

[201]    *Id.* at 24.

closing binder which include numerous stock transfer and other equity transfer instruments.[202]  Because these documents qualify as "securities contracts" and the Project Focus Transfers were undertaken pursuant to them, such transfers were made "in connection with a securities contract."  Moreover, because a securities contract "very broad[ly]"[203] includes any "security agreement or arrangement or other credit enhancement related to any agreement [referred to in §741((7)]," and Tronox Worldwide (f/k/a KMOC) was granted a "credit enhancement" by being released from approximately $2 billion of indebtedness in connection with Project Focus, the Project Focus Transfers were undertaken "in connection with a securities contract."[204]

> (iii)    **Collapsing The IPO and Project Focus Is Improper, However, If Collapsed, The Collapsed Transfers Must Be Treated As Such For Purposes of § 546(e)**

70.    Project Focus and the IPO were two separate and distinct transactions which should not be collapsed into a single integrated transaction.[205]  If, however, the Court elects to do so, Plaintiffs should not be permitted to selectively collapse for purposes beneficial to them while rejecting collapsing for purposes of applying § 546(e).  Relying on *Mervyn's*, Plaintiffs respond that, "as a general

---

[202]    SOF at ¶¶ 22-25 (discussing Project Focus and its implementation, including the numerous written stock transfers and the vote approving Project Focus by Kerr-McGee's Board of Directors on September 10, 2002); *see also* SOF App'x A, Declaration of David L. Siddall Authenticating Documents and Certifying Records of Regularly Conducted Business Activity (attaching various stock certificate transfers associated with Project Focus); Summary Judgment Reply at Ex. 1 (listing various transfers made as part of Project Focus).

[203]    *Lehman Brothers*, 2012 WL 1355659, at *19.

[204]    *See* Summary Judgment Motion at ¶ 43.

[205]    *See*, e.g., *Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 731 (Bankr. S.D.N.Y. 2008) (holding that collapsing only applies where "consideration received . . . [is] reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors" and the transferee has actual or constructive knowledge of the entire scheme") (citations and quotations omitted).

rule, section 546(e) does not apply to 'collapsed' transactions."[206]   Contrary to Plaintiffs' suggestion,

*Mervyn's* does not hold that § 546(e) *cannot* apply to a collapsed transaction, but merely that collapsing

often (or "generally") does not apply because the doctrine is most frequently employed in actual

fraudulent transfer cases which do not implicate § 546(e).[207]   Stated differently, because collapsing is

more common in actual fraudulent transfer cases, and § 546(e) is frequently not a defense to such actions,

"as a general rule, section 546(e) does not apply to 'collapsed' transactions."   Where, however, § 546(e)

*is* applicable to an actual fraudulent transfer case, and collapsing otherwise applies, then it also applies to

§ 546(e).[208]   Indeed, *Mervyn's* itself viewed the transfers *on a collapsed basis* in determining the

applicability of the defense.   In particular, the court stated, the defendant's "attempt to have this Court

apply section 546(e) to a single conveyance within the entire transaction is not persuasive."[209]

Accordingly, *Mervyn's* does not support Plaintiffs' contention that they may selectively employ

collapsing when it benefits them and ignore it for purposes of applying § 546(e).   Rather, if Plaintiffs are

successful in collapsing Project Focus and the IPO, then all transfers made pursuant to the collapsed

transactions should be treated as transfers made in connection with the MSA (*i.e.*, a securities contract),

and as "settlement payments" (*i.e.*, transfers of cash and securities made to complete the underlying

transfers of stock in the chemical company and the stock of the various oil and gas exploration and

production subsidiaries).[210]

---

[206]   *See* Response at 22 (arguing that "collapsed transactions" cannot be analyzed under § 546(e) (citing *Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)* ("*Mervyn's*"), 426 B.R. 488, 500 (Bankr. D. Del. 2010)).

[207]   Section 546(e) is not a defense to an actual fraudulent transfer claim under § 548(a)(1)(A), but is a defense to an actual fraudulent transfer claim brought under the Uniform Fraudulent Transfer Act and § 544.

[208]   *Mervyn's*, 426 B.R. at 500 (explaining that although the Third Circuit in *Plassein International Corp.* declined to collapse the relevant transfers, it did so because there were no allegations of bad faith; the court then recognized that because such allegations were present in *Mervyn's*, a different result may follow).

[209]   *Id.*

[210]   Summary Judgment Motion at ¶¶ 40-43.

      **(iv)**      **The Project Focus And IPO Transfers Were Made By, To, Or For The Benefit Of, A Financial Institution Or Financial Participant[211]**

      71.     Plaintiffs have failed to rebut Defendants' showing that both the Project Focus and IPO transfers were made by, to, or for the benefit of, a financial institution or financial participant. While Plaintiffs assert that "Defendants do not cite a source for th[e] factual claim" that the IPO proceeds were transferred via wire transfer,[212] Defendants did in fact cite such a source and Plaintiffs specifically acknowledged as much in their Response to Defendants' Undisputed Statement of Facts.[213]  In response to the uniform authority providing that use of a wire transfer satisfies the "financial institution" requirement, Plaintiffs merely assert that such precedents do not apply to transfers made between affiliates.[214]  Such a distinction is without a difference, however, as no authority supports Plaintiffs' position and the corporate affiliations of transferees and transferors are irrelevant under the plain language of the statute.[215]  Because there is no dispute that the IPO proceeds were transferred via wire, Defendants have established that the IPO transfers were made "by or to a financial institution" as a matter of law.

---

[211]  Defendants need only show that the transfers were made by, to, *or* for the benefit of a financial participant *or* financial institution.  For several of the transfers, Defendants have pointed to evidence establishing both financial participant and financial institution options on both sides of the transfer.

[212]  Response at 27.

[213]  *See* SOF at ¶ 33 (identifying an email, attached to the Declaration of David L. Siddall Authenticating Documents and Certifying Records of Regularly Conducted Business Activity, that was in Plaintiffs' possession and that documented the wire transfer of the IPO proceeds).  Plaintiffs acknowledged the evidence in their Response to Defendants' Undisputed Statement of Facts in Support of their Motion for Partial Summary Judgment, by stating that terms used in the email were "[d]isputed, because 'net proceeds' and 'borrowings' are vague and undefined," but failing to contest the substance of the factual assertion contained therein.  Dkt. No. 329, at ¶ 33.

[214]  *See* Response at 27 (arguing that a wire transfer "among affiliated entities is [not] sufficient to satisfy the 'financial institution' requirement").

[215]  *In re Plassein Int'l*, 366 B.R. 318, 323 (D. Del. 2008) (holding that the "financial institution" requirement is satisfied as a matter of law "when a leveraged buyout payment is made by wire transfer" (citing *In re Resorts Int'l*, 181 F.3d at 515)); *Loranger Mfg. Corp. v. PNC Bank, NA (In re Loranger Mfg. Corp.)*, 324 B.R. 575, 585 (Bankr. W.D. Pa.2005) (holding that a wire transfer facilitated by a bank satisfied § 546(e)'s financial institution requirement); *see also Enron*, 651 F.3d at 338 (holding that a "financial intermediary" need not take a "beneficial interest" in the transferred property to qualify as a financial institution under § 546(e)).

72.     Defendants also argued that the Project Focus Transfers were made by, to, or for

the benefit of, a "financial participant."   In particular, KMOC (n/k/a Plaintiff Tronox Worldwide) (the

primary transferor of assets in Project Focus) was a party to and the issuer of notes, known as DECS,

which were first issued by KMOC (then known as "Kerr McGee Corporation" and n/k/a Tronox

Worldwide) in August 1999.[216]   The indenture governing these notes and the notes themselves[217] were

"securities contracts" under § 741(7)(A)(i), (vii) and (xi)[218] and therefore the value of these contracts may

be counted in determining whether Tronox Worldwide qualifies as a financial participant.[219]   Tronox

Worldwide transferred the obligations associated with the DECS on December 31, 2002,[220] as evidenced

by the fact that Kerr-McGee Worldwide assumed (and thereby became the transferee of) such obligations

on that same date.[221]   Because the notes were secured by 9,954,00 shares of Devon Stock[222] with a value

of at least $457 million[223] on December 31, 2002 (the date of the Project Focus Transfers), the DECS

---

[216]   The DECS agreement is attached as an exhibit to Kerr-McGee Corporation's 1999 10-K.  *See* Protopapas Decl. Ex. 4, Second Supplemental Indenture between Kerr-McGee Corporation and Citibank, N.A. dated August 2, 1999.

[217]   The definition of "security" under Bankruptcy Code § 101(49)(A)(i) and (ii) includes both notes and stock.

[218]   Bankruptcy Code §§ 741(7)(A)(i), (vii) and (xi) provide that a "securities contract" includes a contract for the purchase, sale or loan of a security and other interests; any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph; and any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph.

[219]   Pursuant to § 101(22A), the value of a party's securities contracts, and other contracts listed in § 561(a), may be aggregated to determine whether that party qualifies as a financial participant.

[220]   *See* SOF ¶ 24(c); *see also* SOF App'x B at 46-47; SOF App'x C at 57-58.

[221]   *See* SOF App'x B at 46-47; SOF App'x C at 57-58.

[222]   As the DECS were exchangeable for Devon Stock, their value was tied to the value of that stock.  Moreover, because the value of a securities contract is "aggregated across counterparties" for purposes of determining a party's status as a financial participant under Bankruptcy Code § 101(22A), the value of the DECS to all noteholders qualifies Tronox Worldwide as a financial participant.

[223]   The SOF mistakenly stated that the value of the Devon Stock on December 31, 2002 was $437 million due to a typographical error, SOF at ¶ 24(c) n.33, however, Kerr-McGee Corporation's 2002 10-K states the value was actually $457 million.  Kerr-McGee Corporation 2002 Form 10-K, filed Mar. 27, 2003, at Item 7a.

09-01198-mew    Doc 374    Filed 04/26/12    Entered 04/26/12 22:17:26    Main Document
Pg 70 of 73

qualified Tronox Worldwide, the primary transferor of the Project Focus Transfers, as well as Kerr-McGee Worldwide, the primary transferee of the Project Focus Transfers, as a financial participant.[224] The information relevant to the DECS is in the public record and, as such, Plaintiffs' criticism that Defendants "only provide[d] a summary of the total amount of certain collars and hedges,"[225] is unfounded.

73.    Even if Tronox Worldwide does not qualify for treatment as a "financial participant," however, other relevant entities do, including (i) New Kerr-McGee, who was, according to Plaintiffs, an entity "for whose benefit transfers were made;" and (ii) other affiliates of New Kerr-McGee, which were either direct transferees of the challenged transfers or, according to Plaintiffs, entities "for whose benefit [those] transfers were made."[226]  In particular, New Kerr-McGee's public filings reflect that it was a party to numerous securities contracts[227] worth at least $1 billion in principal value during the time periods relevant to determining whether it was a "financial participant."[228]  For example, at the time New Kerr-McGee entered into the MSA, its public filings reflect that it was party to a $4.25 billion term loan agreement, the proceeds of which were used to finance New Kerr-McGee's repurchase of its own

---

[224]    SOF ¶ 24(c) ("KMOC [Tronox Worldwide] transferred its equity interests in Devon Energy Corporation to KM Investment . . . ."); SOF App'x B at 46-47.

[225]    Response at 28.

[226]    As explained in the Summary Judgment Motion at ¶ 46, § 546(e) protects transfers made "for the benefit of" a financial participant and Plaintiffs themselves allege that the transfers were made for the benefit of New Kerr-McGee and its subsidiaries.  *See* Second Amended Adversary Complaint, Dkt. No. 223, at ¶ 143 ("The Transfers and Obligations were made to or for the benefit of New Kerr-McGee and New Kerr-McGee Subsidiaries."); *id.* at ¶ 152 ("Each of the Transfers and Obligations was made to or for the benefit of New Kerr-McGee or New Kerr-McGee Subsidiaries.").

[227]    Pursuant to §§ 101(22A) and 561(a)(1), "securities contracts" are one of several types of contracts the value of which may be counted in qualifying a party as a financial participant.

[228]    *See* 11 U.S.C. § 101(22A).

stock (*i.e.*, a "security").[229]  Additionally, New Kerr-McGee and certain of its subsidiaries were parties to

various agreements to purchase, sell and exchange "securities" for billions of dollars, as well as other

similar qualifying agreements.[230]  Because these various agreements qualify as "securities contracts," and

their values meet the thresholds required by § 101(22A), they qualify the parties thereto as "financial

participants."  As such, Defendants satisfy the financial participant requirement in this manner as well.

74.    The public filings also demonstrate that New Kerr-McGee and its subsidiaries

were parties to derivatives and other contracts which qualified them as financial participants.[231]  While

Plaintiffs assert that Defendants are "ignor[ing]" the corporate form by relying on public filings of entities

to whom transfers were not made,[232] the reality is that Defendants are merely following the plain language

of the statute which protects not only financial participants who are transferees and transferors, but also

entities for whose benefit transfers are made.  As Plaintiffs themselves allege that New Kerr-McGee and

---

[229]    *See* Protopapas Decl. Ex. 5 at 22, 41, $5,500,000,000 Credit Agreement between Kerr-McGee Corporation and JPMorgan Chase Bank, N.A. *et al.* dated May 18, 2005 (stating "[t]he proceeds of the Term Loans shall be used" by New Kerr-McGee to finance a "tender offer of up to approximately [$4 billion] . . . in respect of a portion of its outstanding common stock").  This agreement qualifies as a "securities contract" because it is an "extension of credit for the clearance or settlement of securities transactions."  *See* 11 U.S.C. § 741(7)(A)(v).  It also qualifies under several other provisions of § 741(7)(A)'s broad definition.  *See id.* at § 741(7)(A)(i), (vii), (viii) & (xi).

[230]    *See, e.g.*, Kerr-McGee Corporation 2005 10-K, filed Mar. 15, 2006, at Items 1 & 2 (explaining that "[o]n November 17, 2005, we completed the sale of all remaining North Sea operations through the sale of the stock of Kerr-McGee (G.B.) Ltd., the company's wholly-owned subsidiary, and other affiliated entities to a subsidiary of A.P Moller – Maersk A/S for a cash purchase price of $2.95 billion"); *id.* at Item 7 (explaining that in April 2005, New Kerr-McGee entered into a $4 billion tender offer for its own stock); *id.* at Ex. 10.42, § 2.1.1 (attaching a January 23, 2006 merger agreement, whereby Kerr-McGee Oil & Gas Corporation agreed to assign its interests in certain Gulf of Mexico properties to an affiliated entity with which a subsidiary of W&T Offshore, Inc. would merge; Kerr-McGee Oil & Gas Corporation's membership interests in its affiliated entity were then converted into the right to receive $1.34 billion from W&T Offshore, Inc.); *see also* Protopapas Decl. Ex. 6 at
REDACTED

[231]    *See* Summary Judgment Motion at ¶ 33 n.99 (explaining that the notional value of Kerr-McGee Corporation's qualifying contracts was $8.3 billion on September 30, 2005 and was $3.9 billion on December 31, 2005); *id.* at ¶ 33 n.100 (explaining that the notional value of Anadarko's qualifying contracts was $4.4 billion on December 31, 2007 and $5.4 billion on December 31, 2008); *id.* at ¶ 46 n.120 (explaining that notional value of Kerr-McGee Corporation's qualifying contracts was $1.8 billion on December 31, 2002).

[232]    Response at 28-29.

its subsidiaries were entities "for whose benefit transfers were made," such entities' status as financial participants satisfies the requirements of § 546(e). In short, there is no genuine issue of material fact that Defendants satisfy the "financial institution" and "financial participant" requirements of § 546(e) with respect to both the Project Focus and IPO Transfers.

### CONCLUSION

WHEREFORE, Defendants request that the Court grant this Motion, that portion of the Summary Judgment Motion pertaining to the defense of § 546(e), and any and all other relief which the Court deems just and appropriate.

Houston, Texas
Dated: April 26, 2012

/s/ Lydia T. Protopapas

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone: (202) 373-6000
Facsimile: (202) 373-6001

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
Telephone: (213) 680-6400
Facsimile: (213) 680-6499
*Counsel to Defendants*

Kenneth N. Klee (KK 5910)
David M. Stern (*admitted pro hac vice*)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067-6049
Telephone: (310) 407-4000
Facsimile: (310) 407-9090

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 26, 2012, a true and correct copy of the foregoing

***Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for an Order Confirming that***

***Defendants Have Preserved the Defense Codified By Section 546(e) of the Bankruptcy Code or, in the***

***Alternative, for Leave to Amend Their Answer to the Second Amended Adversary Complaint to Include***

***Such Defense*** was served on the following counsel of record as indicated below.

***Via email david.zott@kirkland.com***
David J. Zott
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654

***Via email jeffrey.zeiger@kirkland.com***
***and jzeiger@kirkland.com***
Jeffrey J. Zeiger
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654

***Via email joseph.pantoja@usdoj.gov and***
***robert.yalen@usdoj.gov***
Joseph Pantoja
Robert Yalen
Assistant U.S. Attorney
SOUTHERN DISTRICT OF NEW YORK
86 Chambers Street
New York, New York 10007

Houston, Texas
Dated: April 26, 2012

  /s/  Rene Olvera
Rene Olvera