Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
Telephone:  (213) 680-6400
Facsimile:  (213) 680-6499

Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

Kenneth N. Klee (KK 5910)
David M. Stern (*admitted pro hac vice*)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Telephone: (310) 407-4000
Facsimile: (310) 407-9090

*Counsel to Defendants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, *et al.*, | ) | Case No. 09-10156 (ALG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| TRONOX INCORPORATED, TRONOX WORLDWIDE LLC f/k/a Kerr-McGee Chemical Worldwide LLC, and TRONOX LLC f/k/a Kerr-McGee Chemical LLC, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| ANADARKO PETROLEUM CORPORATION and KERR-MCGEE CORPORATION, KERR-MCGEE OIL & GAS CORPORATION, KERR-MCGEE WORLDWIDE CORPORATION, KERR-MCGEE INVESTMENT CORPORATION, KERR-MCGEE CREDIT LLC, KERR-MCGEE SHARED SERVICES COMPANY LLC, and KERR-MCGEE STORED POWER COMPANY LLC, | ) ) ) ) ) ) ) | Adv. Pro. No. 09-01198 (ALG) |
| | ) | |
| Defendants. | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| v. | ) | |
| | ) | |
| TRONOX, INC., TRONOX WORLDWIDE LLC, TRONOX LLC, KERR-MCGEE CORPORATION and ANADARKO PETROLEUM CORPORATION, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' BRIEF ON CERTAIN OBJECTIONS TO
DESIGNATIONS FROM THE VIDEOTAPED DEPOSITION OF ROGER ADDISON**

TO THE HONORABLE ALLAN L. GROPPER,
UNITED STATES BANKRUPTCY JUDGE:

Plaintiffs have indicated that they intend to play the video deposition of Roger Addison

("Addison") at trial. Addison served as Tronox, Inc.'s General Counsel from the time of the IPO

in 2005 until November 2007. In November 2007, Addison voluntarily retired from the role of

Tronox's General Counsel but remained with Tronox for a period of time as a consultant.

Plaintiffs have designated approximately 375 pages of Addison's deposition testimony

for submission to the Court. Of this testimony, Plaintiffs seek to play approximately two hours

worth of video testimony live at trial. A considerable amount of the "testimony" Plaintiffs

submitted to the Court (equating to many hours), as well as much of the testimony that they seek

to play live in the courtroom, should be excluded because it is inadmissible speculation about

topics on which Addison himself admits he has zero personal knowledge. Instead of simply

relying on the testimony of the witnesses who do have personal knowledge on these topics,

Plaintiffs seek to create a misleading record by effectively having Tronox's attorneys testify

through their questions to Tronox's former General Counsel—who has no personal knowledge

about those documents or their contents—as to what they would like to argue is the meaning or

import of certain documents.

As to certain issues where Addison *can* offer competent testimony—for example,

statements made by Plaintiffs former management team—Plaintiffs lodge hearsay objections.

The Federal Rules of Evidence, however, do not support Plaintiffs' objections and, in fact,

specifically permit Addison's testimony on these issues.

Ruling on these objections prior to playing the video live in the Court will avoid the

cumbersome and wasteful process of stopping the deposition video each time an objection is

lodged, proceeding with arguments on those objections mid-trial, obtaining a ruling from the Court, and re-editing the video in the courtroom on-the-fly based on the Court's ruling. There is no need for such a wasteful process when such matters are more efficiently handled in advance of trial.

## **BACKGROUND**

Addison served as Tronox's General Counsel from just before the IPO in September 2005[1] until November 2007, when he voluntarily retired.[2] After his retirement, Tronox engaged Addison to stay on with the company as a consultant for a period of approximately six months.[3] In his role as a consultant, Addison reported to Tronox's current general counsel, Michael Foster.[4] From 1977 until Tronox's IPO, Addison was employed as an in-house counsel with Kerr-McGee.[5] While at Kerr-McGee, Addison devoted "most of [his] attention to [the] Chemical Business since 1988."[6] In fact, from 2001 until the 2005 IPO, Addison served as the division counsel for the Chemical Division.[7]

*After* Plaintiffs filed their complaint in this lawsuit, Plaintiffs' counsel interviewed Addison regarding the allegations they had made against Kerr-McGee and Anadarko.[8] Addison told Tronox's counsel that, based on his years as Tronox's General Counsel and as a Kerr-McGee in-house lawyer where he devoted most of his attention to the Chemical Division, the

---

[1]    R. Addison Dep., 16:13-19, July 13, 2010, attached as Ex. A.

[2]    *Id.* at 38:25-39:16.

[3]    *Id.* at 42:8-17.

[4]    *Id.* at 42:18-20.

[5]    *Id.* at 15:3-6; 16:2-7.

[6]    *Id.* at 22:19-23:11.

[7]    *Id.* at 18:2-6; 29:15-30:5.

[8]    *Id.* at 49:14-21; 50:1-23.

2

allegations and claims asserted in the complaint were inconsistent with the truthful facts that he

personally witnessed.[9] Counsel for Plaintiffs then warned Addison that "[y]ou're either with us

or you're against us."[10]

After issuing this warning, Tronox deposed Addison over a three-day period for

approximately 500 pages of examination. Plaintiffs spent the bulk of his deposition questioning

him on the contents of documents about which Addison testified he has no personal knowledge.

As a result, a substantial amount of Addison's testimony being proffered by Plaintiffs is pure

speculation on topics about which Addison is not competent to testify.

In particular, Plaintiffs elicited testimony from Addison about three different sets of

documents of which he admittedly has no personal knowledge and had never even seen before

his deposition. These documents are categorized and referred to in this motion as (1) the

Lehman Documents; (2) the Simpson Thacher Documents; and (3) the B.J. Montgomery

Document. Further, Plaintiffs repeatedly questioned Addison about the specifics and details of

an internal reorganization undertaken by Kerr-McGee in 2002 after Kerr-McGee's acquisition of

a company named HS Resources, even though Addison testified that he had "very, very little

involvement" with Project Focus and did not spend much time on it.[11]

The egregiousness of Plaintiffs' effort to use Addison to testify about these documents

becomes apparent when the Court considers that Plaintiffs deposed the individuals who actually

drafted, prepared, and/or have personal knowledge about the documents. For instance, Plaintiffs

deposed Chris Watson, formerly of Lehman Brothers, about the Lehman Documents over a

period of three days. Likewise, Plaintiff deposed Peter Gordon from Simpson Thacher about the

---

[9]    *Id.* at 50:1-19.

[10]   *Id.* at 51:3-24.

[11]   *Id.* at 285:14-23.

3

Simpson Thacher Documents. And Plaintiffs deposed B.J. Montgomery regarding his document. Thus, Plaintiffs have the testimony of the individuals with actual personal knowledge about all of the subject categories and topics. Therefore, there is no evidentiary value in the testimony from Tronox's own former General Counsel on topics and documents about which he admitted he has no personal knowledge.[12]

Plaintiffs' also make various meritless objections to the testimony of Addison designated by Defendants, one of which warrants mention here. Specifically, Plaintiffs object to Addison's testimony about what two officers or executives of one of the Tronox Plaintiff entities told him about the rationale for acquiring certain chemical businesses. Plaintiffs' hearsay objections to that testimony should be overruled because the statements were made by officers or management of Plaintiffs while acting within the scope of their broad authority. As a result, under Federal Rule of Evidence 801(d)(2)(D) their statements to Addison, who was a primary in-house lawyer that worked on these acquisitions with Plaintiffs' management, are "opposing party statements," not hearsay.

I.    **ADDISON'S TESTIMONY ABOUT THE LEHMAN, SIMPSON THACHER, AND B. J. MONTGOMERY DOCUMENTS, AND THE DETAILS OF PROJECT FOCUS, IS INADMISSIBLE BECAUSE HE LACKS THE PERSONAL KNOWLEDGE ABOUT THOSE TOPICS THAT FEDERAL RULE OF EVIDENCE 602 REQUIRES.[13]**

Under Federal Rule of Evidence 602, a witness may testify to a matter *only* if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.[14] Thus, where a witness lacks personal knowledge, he is not competent to testify to the

---

[12]    A complete list of Defendants' objections to Plaintiffs' proffered deposition testimony of Addison has been filed with the Court separately.

[13]    Defendants also object to much of this same testimony on the basis of lack of foundation and speculation.

[14]    FED. R. EVID. 602; *D.M. Rothman & Co., Inc. v. Korea Commercial Bank of New York*, 411 F.3d 90, 97 (2d Cir. 2005) ("[U]nder the Federal Rules of Evidence witnesses may testify only as to matters within their

4

matter.[15]  Similarly, when the witness lacks personal knowledge about a document, he is not

competent to testify about the document.[16]  Such is the case with the Lehman Documents, the

Simpson Thacher Documents, and the B.J. Montgomery Document because Addison specifically

and expressly testified he has no personal knowledge about those documents and had never even

seen them before his deposition.

## A.    The Lehman Documents: Addison Exhibits 14, 15, and 16

Addison Exhibits 14, 15, and 16 are Lehman Brothers pitch books relating to a Project

Titan, dated September 2000, January 2001, and April 2001, respectively.[17]  Plaintiffs designated

considerable testimony from Addison regarding these documents and their substance (*i.e.*,

Project Titan).  Addison, however, unequivocally testified that he never saw those exhibits until

his deposition, and that he has no personal knowledge whatsoever regarding them or their

contents:

> Q:    You recognize these to be what Tronox's counsel
> represented to you to be Lehman Brother documents from –
> Addison 14, September 7, 2000; Addison 15, January 1st,
> 2001; and Addison 16, April 16, 2001; correct?
>
> A:    Yes.[18]

---

personal knowledge."); *Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004) (citing FRE 602 and stating, "[i]t is
one of the most basic requirements of the law of evidence that a witness's report may be admitted only where
grounds exist for 'a finding that the witness has personal knowledge of the matter.'").

[15]   FED. R. EVID. 602; *D.M. Rothman*, 411 F.3d at 97; *Brown*, 355 F.3d at 90.

[16]   FED. R. EVID. 602; *D.M. Rothman*, 411 F.3d at 97; *Brown*, 355 F.3d at 90; *Kern v. Levolor Lorentzen, Inc.*, 899
F.2d 772, 780-81 (9th Cir. 1990) (former employer's personnel manager was not competent to testify in
wrongful termination action about letter that was written to former employee before manager worked for
company); *Belber v. Lipson*, 905 F.2d 549, 552 (1st Cir. 1990) (physician who has no personal knowledge of
records allegedly prepared by original treating physician was not competent to testify that records were
business records).

[17]   *See* Addison Exs. 14, 15, and 16, filed separately with the Court.

[18]   R. Addison Dep., 790:20-25, July 15, 2010, attached as <u>Ex. C</u>.

5

*    *    *

Q:    *We can sort of short circuit this.  You have no personal
knowledge about anything regarding exhibits –*

A:    *I never saw them before today.*

Q:    *—Addison 14, 15, and 16; correct?*

A:    *Was it Tuesday?  I have never seen them before, that I
know, that I recall.*

Q:    *As a result of the—so you had no— you have no personal
knowledge regarding Adams [sic] 14, 15, or 16 in any way
whatsoever other than that you saw them for the first time
on Tuesday of this week; correct?*

A:    *That's what I'm testifying, yes.*[19]

Despite Addison's complete lack of knowledge of the Lehman Documents (Addison
Exhibits 14-16), Plaintiffs questioned him extensively (for over 30 pages) about them and the
substance of their contents in an attempt to establish, based on the mere reading of selectively
excerpted portions of the Lehman Documents, that Lehman Brothers provided certain advice,
representations, or statements related to Kerr-McGee:

Q.    Lehman Brothers was also telling Kerr-McGee in January of
2001 that a, quote/unquote, pure play E&P should trade at a
higher multiple than Kerr-McGee today.

Do you see that?

A.    Yes.[20]

*    *    *

Q.    If you look at the third bullet, in January of 2001 Lehman
Brothers was telling Kerr-McGee that the legacy liabilities
with chemicals and discontinued operations was a structural

---

[19]    *Id.* at 792:15-793:3 (emphasis added) (objections omitted).

[20]    R. Addison Dep., 244:8-13, July 13, 2010, attached as Ex. A.

6

consideration that Kerr-McGee needed to think about; correct?

A.    Well, in PowerPoint speak I think that's what the bullet [p]oint suggests, yes.[21]

*    *    *

Q.    If you look at slide I-11, executive summary range of strategic alternatives. It ends with Bates number 893 –

A.    Yes.

Q.    -- you'll notice that Lehman Brothers was telling Kerr-McGee that after looking at a number of strategic alternatives, they narrowed the list down to three options; right?

A.    That is what it says.[22]

Addison's testimony about what presentations, advice, or representations Lehman did or did not give to Kerr-McGee should be excluded because Addison has no personal knowledge of anything about Exhibits 14, 15, and 16 or their substance, rendering his testimony inadmissible.[23] In fact, Addison admitted that his "testimony" relating to these documents consisted of nothing more than Plaintiffs' counsel reading words on the documents and asking Addison if those were the words written:

Q:    So any time Tronox's counsel asked you in any of his questions based on these documents that Lehman Brothers was recommending or pointing out or highlighting or concluding certain things, you were merely reading what he was pointing you to in these documents; correct?

---

[21]    *Id.* at 245:20-246:2.

[22]    *Id.* at 258:19-259:2.

[23]    FED. R. EVID. 602; *D.M. Rothman,* 411 F.3d at 97; *Brown,* 355 F.3d at 90; *Kern,* 899 F.2d at 780-81; *Belber,* 905 F.2d at 552. In addition to the fact that Addison had no personal knowledge on the topics, much of the testimony Plaintiffs seek to admit also is inadmissible because it is speculation and lacks foundation.

7

A:   Yeah.  Essentially, yes.  He was pointing out certain
sections and reading them and asking me if that's what I
saw or what it said and I would agree what it was.[24]

There is no basis to allow Tronox's former General Counsel, who has no personal

knowledge about the Lehman Documents, to speculate about them, especially when the

individuals who do have personal knowledge about the documents have been deposed.[25]

Specifically, Plaintiffs have deposed Chris Watson, formerly of Lehman Brothers, as well as

Kerr-McGree former executives, who have personal knowledge regarding the Lehman

Documents and their contents.  Plaintiffs even have designated for submission to the Court

testimony from these depositions.  As a result, precluding Addison from speculating about the

Lehman Documents will not prevent testimony on them; it will merely ensure that testimony

about the documents comes from the people with personal knowledge about them.

**B.** **The Simpson Thacher Documents:  Addison Exhibits 13, 18, and 22**

Addison Exhibits 13, 18, and 22 are draft memoranda from the Simpson Thacher &

Bartlett LLP law firm.[26]  Plaintiffs designated considerable testimony from Addison regarding

these documents and their substance.  Again, Addison testified that he never saw Exhibits 13, 18,

or 22 until his deposition, and that he has no personal knowledge whatsoever about them:

Q:   I just want to be sure.  Your testimony—when I referred to
"your testimony," *your testimony in this deposition*
*regarding these documents was not based on your*
*personal knowledge* but it was instead based on you reading
the selected excerpts of the Exhibits Addison 13, 22 and 18
that Tronox's counsel pointed out to you?

---

[24]   R. Addison Dep., 793:4-16, July 15, 2010 (objections omitted), attached as <u>Ex. C.</u>

[25]   FED. R. EVID. 602; *D.M. Rothman*, 411 F.3d at 97; *Brown*, 355 F.3d at 90; *Kern*, 899 F.2d at 780-81; *Belber*,
905 F.2d at 552.

[26]   *See* Addison Exs. 13, 18, and 22, filed separately with the Court.

8

A:   *Yes*, I testified and I still believe *I had never seen these documents before.*[27]

Despite his complete lack of knowledge of Addison Exhibits 13, 18, and 22, during his deposition Plaintiffs questioned Addison about them extensively, mostly by characterizing or mischaracterizing what was on the page and having Addison agree with what was written on the pages of the document. For instance, Plaintiffs asked Addison to compare Exhibit 13 to a different exhibit—Exhibit 11—and draw conclusions based on Exhibit 13. Specifically, Plaintiffs asked Addison to compare a task discussed in Exhibit 13 (which he had never before seen) with a task discussed in Exhibit 11 and conclude—with no prior knowledge of Exhibit 13—that an action item listed in Exhibit 11 was actually derived from Exhibit 13:

> Q:   (BY MR. KASSOF):  And if you go to -- under  1-B-2 on [Exhibit 13] *that you didn't get* in 2001, the movement of allocation of assets or liabilities, you see that the entry says "Verify that no assets or liabilities currently held by Spinco need to be moved to Kerr-McGee and vice versa."  Do you see that?
>
> MR. BILLECK:  Object to the form.
>
> A:   *This is what it says*, yes.[28]
>
> \*      \*      \*
>
> Q:   *And no one told you, at the time that you got this, that this task that was identified in Project Focus in 2002 actually was first derived to be a task under a proposed spinoff of Project Titan*, the Chemical operations; correct?
>
> MR. BILLECK:  Objection, form.
>
> A:   I certainly never heard of it.  *No one explained that to me.*[29]

---

[27]   R. Addison Dep., 797:1-13, July 15, 2010 (emphasis added) (objections omitted), attached as <u>Ex. C</u>.

[28]   R. Addison Dep., 228:8-16, July 13, 2010 (emphasis added), attached as <u>Ex. A</u>.

[29]   *Id.* at 228:24-229:6.

9

Similarly, with regard to Addison Exhibit 18, Plaintiffs attempted to use Addison's reading of words on a never-before-seen document as affirmative testimony about that document's meaning:

> Q:    And then the next bullet [on Exhibit 18] says -- has a reference to how to effectuate a straight spinoff of Titan, the Chemical business, and how to effectuate that; right?
>
> MR. BILLECK:  Objection, form.
>
> A:    That's what it seems to show, yes.[30]

But Addison's testimony about the Simpson Thacher Documents and what, if anything, they mean or are referring to should not be allowed because he has no personal knowledge of the documents or their contents.  As Addison admitted, he was merely reading specific words on the page of a document he has no personal knowledge about and that he had never seen before his deposition:

> Q:    With respect to these Exhibits 13, 22 and 18, you had *no personal knowledge* regarding these documents or their contents prior to your testimony in this lawsuit this week; correct?
>
> A:    That is *correct*.
>
> Q:    And your *testimony* in this lawsuit was based *not on personal knowledge* but instead on reading the excerpted portions of the documents that Tronox's counsel pointed you to; correct?
>
> A:    I think, yes.[31]

Again, there is no basis to allow Tronox's former General Counsel, who has no personal knowledge about these documents, to speculate regarding them when the individuals with

---

[30]    *Id.* at 287:2-8.

[31]    R. Addison Dep., 796:12-25, July 15, 2010 (emphasis added) (objection omitted), attached as Ex. C.

10

personal knowledge also have been deposed.[32]  Specifically, Plaintiffs deposed Peter Gordon

from Simpson Thacher, as well as Kerr-McGee former executives, who have personal

knowledge regarding the Simpson Thacher Documents and their contents.  Plaintiffs even have

designated for submission to the Court testimony from those depositions. As a result, preventing

Addison from speculating about the Simpson Thacher Documents will not prevent testimony

about them; it will merely ensure that testimony about the Simpson Thacher Documents comes

from people with personal knowledge of them and who are competent to testify on the topic.

**C.      The B. J. Montgomery Document:  Addison Exhibit 30**

Addison Exhibit 30 is an unsigned memo or letter from B.J. Montgomery to Peter Nickels

titled "Re: Summary of Kerr McGee Claims."[33]  Again, Addison testified that he never saw

Exhibit 30 until his deposition, and that he has no personal knowledge of it:

> Q:     Okay.  Let's look at Exhibit 30.
>
>        Do you have it?
>
> A:     Yes, I do.
>
> Q:     Do you recognize this to be an unsigned -- it appears to be a
>        letter of some sort by B. J. Montgomery.
>
> A:     This appears to be an e-mail or something from -- to Peter
>        Nichols from B. J. Montgomery.
>
> Q:     *And prior to your deposition in this lawsuit this week, you
>        had never seen Addison Exhibit 30; correct?*
>
> A:     Even though I was heavily involved in the arbitration claim,
>        [to] which [it] relates, *I don't recall ever having seen this
>        before this deposition.*

---

[32]    FED. R. EVID. 602; *D.M. Rothman*, 411 F.3d at 97; *Brown*, 355 F.3d at 90; *Kern*, 899 F.2d at 780-81; *Belber*, 905 F.2d at 552.

[33]    *See* Addison Exhibit 30, filed separately with the Court.

11

> Q:    And you have **no personal knowledge** of whether
>       B. J. Montgomery actually drafted this document or not?
>
> A:    No, I don't know that he did or not.
>
> Q:    You have **no personal knowledge** as to whether or not these
>       were the opinions or conclusions or beliefs held by
>       B. J. Montgomery; correct?
>
> A:    I don't think he ever confirmed to it personally and I don't
>       recall ever speaking with him about this.[34]
>
> *    *    *
>
> Q:    So **you do not have any personal knowledge** as to whether
>       B. J. Montgomery holds the opinions or conclusions
>       contained in Addison Exhibit 30; correct?
>
> A:    I'm going to say yes.[35]

Despite his complete lack of knowledge of Addison Exhibit 30, during his deposition

Plaintiffs extensively questioned Addison about it. For example:

> Q:    And he said: "I met with Rob Roberts, Bob Scanlon and
>       Graham Harcourt to get a feel for how the place was being
>       operated. I specifically asked about any problems with
>       OSHA. Roberts and Scanlon told me that OSHA pretty
>       much left them alone. There were two Hispanics named
>       Santiago and Sanchez as OSHA reps in the area. I spent a
>       lot of time walking around the chloride plant that week and
>       noted that either Kemira was lying or Santiago and Sanchez
>       must be blind."
>
>       Do you see that?
>
> MR. BILLECK: Objection to form.
>
> THE WITNESS: Yes. **I see that language**.
>
> Q:    And this is the -- Mr. Montgomery indicating to Mr. Nickles
>       what he noticed before closing; true?
>
> MR. BILLECK: Objection to form.

---

[34]    R. Addison Dep., 798:14-799:16, July 15, 2010 (emphasis added), attached as <u>Ex. C</u>.

[35]    *Id.* at 800:4-8.

12

A:     Yes. *It certainly appears to say that.*[36]

\*         \*         \*

Q:     Another point that Mr. Montgomery noted to Mr. Nickles that Kerr-McGee identified prior to closing; correct?

MR. BILLECK: Objection to form.

A:     That's what this says. Yes.[37]

Such testimony amounts to nothing more than a witness reading from a document of which he has no personal knowledge. As a result, Addison's testimony about the B.J. Montgomery Document should not be allowed because he has no personal knowledge of the document, and his testimony regarding what point Mr. Montgomery noted, or did not note, to Mr. Nickles is pure speculation.[38]

Further, Plaintiffs have deposed both Mr. Nickles and Mr. Montgomery in this lawsuit— the alleged sender and recipient of the document. Indeed, Plaintiffs have designated testimony for submission in this trial from the depositions of both Mr. Nickles and Mr. Montgomery. There is no basis to allow Tronox's former General Counsel, who has no personal knowledge on the B.J. Montgomery Document, to speculate about it when the individuals who do have personal knowledge also have been deposed.[39] Preventing Addison from speculating on the B.J. Montgomery Document will not prevent testimony on the document; it will merely ensure that the testimony comes from people with personal knowledge who are competent to testify on the topic.

---

[36]    R. Addison Dep., 357:5-22, July 14, 2010 (emphasis added), attached as Ex. B.

[37]    *Id.* at 359:12-16.

[38]    FED. R. EVID. 602; *D.M. Rothman*, 411 F.3d at 97; *Brown*, 355 F.3d at 90; *Kern*, 899 F.2d at 780-81; *Belber*, 905 F.2d at 552.

[39]    FED. R. EVID. 602; *D.M. Rothman*, 411 F.3d at 97; *Brown*, 355 F.3d at 90; *Kern*, 899 F.2d at 780-81; *Belber*, 905 F.2d at 552.

US_ACTIVE:\43978892\13\15337.0006

**D.**    **The Specific Details Regarding Project Focus**

Plaintiffs spent considerable time questioning Addison about specific aspects of the 2002 internal reorganization at Kerr-McGee that was referred to as Project Focus.  Specifically, Plaintiffs repeatedly asked Addison about the specifics of Project Focus, to which Addison would oblige Plaintiffs' counsel by generally saying he had no reason to disagree with the "questions" from Plaintiffs' counsel:

> Q.    Right.  And it's all consistent with the work that was undertaken at Kerr-McGee in 2002 under Project Focus; right?
>
> A.    I have no reason to disagree.[40]
>
> *        *        *
>
> Q.    Okay.  That's also consistent with the work that Kerr-McGee did in – under Project Focus; right?
>
> A.    You know, I really don't know.  It makes sense, though.[41]

But as Addison testified, he had very little involvement in Project Focus and did not really spend any time on it:

> Q.    And we're in – just again to orient ourselves on the time line, we're in July 2002, which is smack dab in the middle of Project Focus, right, which lasted from January 2002 through – well, at least the closing – I'll put that in quotes – was December 31, 2002, right?
>
> A.    I think so.
>
> Q.    And this is –
>
> A.    *You keep asking me about Project Focus.  My recollection is, I had – even though I got these memos, I had very, very little involvement.*  It was primarily Dwayne Morris.

---

[40]    R. Addison Dep., 217:8-11, July 13, 2010, attached as Ex. A.

[41]    *Id.* at 217:20-23.

14

> This was the time I was moving from business transactions to the Chemical Division assistant general counsel and was tasked with trying to sell some assets there. ***I'd get copied in on this stuff but did not spend much time or investment or intellectual curiosity at all in it.***[42]

Addison cannot be used by Plaintiffs' counsel as a mouth piece to agree with their questions when he admits he lacks personal knowledge upon which to basis his answers. Again, Plaintiffs have deposed individuals who actually were involved with and knowledgeable about Project Focus, including Peter Gordon from Simpson Thatcher. As a result, Defendants' objections to the testimony Plaintiffs' designated from Addison regarding the specific details of Project Focus should be sustained and the testimony excluded.

## II.    PLAINTIFFS' OBJECTIONS TO ADDISON'S TESTIMONY ABOUT WHAT PETE WOODWARD AND JOE FLAKE TOLD HIM SHOULD BE OVERRULED BECAUSE THEY ARE STATEMENTS OF AN OPPOSING PARTY.

Claiming hearsay, Plaintiffs object to Addison's testimony about what two executives or management of Plaintiffs - Pete Woodward and Joe Flake - told him about the rationale for making certain acquisitions. For example, Plaintiffs object to the following testimony as hearsay:

> Q.    Did Pete Woodward explain to you why he was a proponent of the Kemira acquisition?
>
> A.    Yeah. He and Joe Flake were both proponents. I'm not sure I can keep them separate. It's almost like they were jointly for it, very much so.
>
> Q.    Why did you understand Mr. Woodward and Mr. Flake to be big proponents jointly in favor of completing the Kemira acquisition?
>
> A.    They were very high on the potential of its titanium dioxide, TiO2 business, and this would increase their market share and give them economies of scale. I think

---

[42]    *Id.* at 285:6-23. (emphasis added).

US_ACTIVE:\43978892\13\15337.0006

>   they thought it would be very, very good for Kerr-McGee
>   Chemical.
>
>   I think they would become second or third largest and able
>   to better compete with DUPONT, who was the largest.[43]

Plaintiffs broadly objected as hearsay to this testimony of Plaintiffs' former General Counsel

explaining what Plaintiffs' former management and executives said as to why they so strongly

wanted to acquire Kemira. But an opposing party's statement is never hearsay.[44]

    Under Federal Rule of Evidence 801(d)(2)(D), a statement is an "opposing party's

statement," and not hearsay, if it is offered against an opposing party and was made by the

party's agent or employee on a matter within the scope of that relationship and while it existed.[45]

Woodward's and Flake's statements to Addison fall well within the scope of Rule 801(d)(2)(D).

First, both Woodward and Flake were part of Plaintiffs' management team. Specifically, from

1997 through September 17, 2004, Woodward was President of Plaintiff Kerr-McGee Chemical

LLC (k/n/a Tronox LLC) and Kerr-McGee Chemical Worldwide LLC (n/k/a Tronox WorldWide

LLC)[46] And Flake was head of Kerr-McGee's Chemical business development.[47] Thus, the

statements Woodward and Flake made to Addison were made by agents of Plaintiffs in the

course and scope of their duties as Plaintiffs' management in acquiring the Kemira chemical

plants. As a result, these are statements of an opposing party and, therefore, not hearsay.[48]

---

[43]   *Id.* at. 96:15-97:6; *see also id.* at 94:24-95:9 ("My understanding--this is from discussions with Pete Woodward and Joe Flake . . . .").

[44]   FED. R. EVID. 801(d)(2).

[45]   FED. R. EVID. 801(d)(2)(D).

[46]   R. Addison Dep. Ex. 2, Witness Statement of W.P. "Pete" Woodward, attached as <u>Ex. D</u>; *see also* R. Addison Dep. 82:4-11, July 13, 2010, attached as <u>Ex. A</u> (testifying that Woodward's title was vice president of Kerr-McGee for chemical operations).

[47]   R. Addison Dep. 89:15-17, July 13, 2010, attached as <u>Ex. A</u>.

[48]   FED. R. EVID. 801(d)(2)(D). Plaintiffs' also object to testimony where Addison detailed statements made by Tom Adams. Adams was Tronox Inc.'s President and made the statements in the course and scope of his

16

## CONCLUSION

Federal Rule of Evidence 602 provides that a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Here, Addison admitted in deposition that he has absolutely no personal knowledge of the Lehman, Simpson Thacher, or B.J. Montgomery Documents and very, very little knowledge about Project Focus. Therefore, his testimony based on those topics and documents should be excluded.

Finally, both Woodward and Flake were part of Plaintiffs' management team when they made the statements about which Addison testified. Their statements were well within the scope of the broad authority of Woodward and Flake so, under Federal Rule of Evidence 801(d)(2), they are not hearsay. Plaintiffs' hearsay objections to Addison's testimony about what he was told or learned from Woodward and Flake should be overruled.

For these reasons, Defendants respectfully request that the Court (i) sustain Defendants' objections to the testimony of Addison submitted by Plaintiffs; (ii) overrule the objections Plaintiffs lodged to the testimony from Addison submitted by Defendants; (iii) and award Defendants any and all other relief that the Court deems just and appropriate.

---

duties as Tronox Inc.'s President, wherein he explained certain aspects of the negotiation of the Master Separation Agreement. R. Addison Dep. 683-684, July 15, 2010, attached as Ex. C.

17

Houston, Texas
Dated: May 16, 2012

/s/ Jason W. Billeck

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas  77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone:  (202) 373-6000
Facsimile:  (202) 373-6001

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California  90071
Telephone:  (213) 680-6400
Facsimile:  (213) 680-6499

*Counsel to Defendants*

18

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Defendants' Brief on Certain Objections to Designations from the Videotaped Deposition of Roger Addison** was served on the following counsel of record on May 16, 2012, as indicated below:

*Via email david.zott@kirkland.com*
David J. Zott
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654

*Via email jeffrey.zeiger@kirkland.com*
Jeffrey J. Zeiger
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654

*Via email jonathan.henes@kirkland.com*
Jonathan S. Henes
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022

*Via email joseph.pantoja@usdoj.gov*
*and robert.yalen@usdoj.gov*
Joseph Pantoja
Robert Yalen
Assistant U.S. Attorney
SOUTHERN DISTRICT OF NEW YORK
86 Chambers Street
New York, New York 10007

Houston, Texas
Dated: May 16, 2012

*/s/ Jason Billeck*
Jason Billeck

# EXHIBIT A

CONFIDENTIAL

Page 1

1   UNITED STATES BANKRUPTCY COURT
    SOUTHERN DISTRICT OF NEW YORK
2
    IN RE:
3   TRONOX INCORPORATED, et al., )Chapter 11
        Debtors.              )No. 09-10156
4   _____)Jointly Administered
                                )
5   TRONOX INCORPORATED, TRONOX )
    WORLDWIDE LLC, f/k/a        )
6   KERR-McGEE CHEMICAL WORLDWIDE)Adversary Proceeding
    LLC and TRONOX LLC, f/k/a  )No. 09-01198 (ALG)
7   KERR-McGEE CHEMICAL LLC,    )
        Plaintiffs,            )
8        vs.                   )
    ANADARKO PETROLEUM          )
9   CORPORATION and KERR-McGEE  )
    CORPORATION,                )
10      Defendants.            )
    _____)
11  THE UNITED STATES OF AMERICA,)
        Plaintiff-Intervenor,  )
12       vs.                   )
    TRONOX INC., TRONOX WORLDWIDE)
13  LLC, TRONOX LLC, KERR-McGEE )
    CORPORATION and ANADARKO    )
14  PETROLEUM CORPORATION,      )
        Defendants.            )
15  _____)

16

17

18              CONFIDENTIAL

19              VOLUME I

20   VIDEOTAPED DEPOSITION OF ROGER ADDISON

21            JULY 13, 2010

22      IN OKLAHOMA CITY, OKLAHOMA

23

24

25  REPORTED BY:  SHERRI GRUBBS, CSR, RPR, RMR, RDR, CRR

CONFIDENTIAL

## Page 2

JULY 13, 2010

9:18 a.m.

Confidential videotaped discovery deposition of ROGER ADDISON, held at the Hilton Skirvin Hotel, Oklahoma City, Oklahoma, pursuant to subpoena before Sherri Grubbs, CSR, RPR, RMR, RDR, CRR.

## Page 3

APPEARANCES

WEIL GOTSHAL & MANGES, LLP
Attorneys for Anadarko Petroleum Corporation and
Kerr-McGee Corporation
700 Louisiana, Suite 1600
Houston, Texas 77002
BY: JASON W. BILLECK, ESQ.

WEIL GOTSHAL & MANGES, LLP
Attorneys for Anadarko Petroleum Corporation and
Kerr-McGee Corporation
767 Fifth Avenue
New York, New York 10153-0119

BY: JESSIE B. MISHKIN, ESQ.

KIRKLAND & ELLIS, LLP
Attorneys for Tronox
300 North LaSalle
Chicago, Illinois 60654

BY: ANDREW A. KASSOF, ESQ.
DAVID H. DeCELLES, ESQ.
JEFFREY FREEMAN, ESQ. (via telephone)

KASOWITZ BENSON TORRES & FRIEDMAN, LLP
Attorneys for the Unsecured Creditors Committee
1633 Broadway
New York, New York 10019

BY: ROSS G. SHANK, ESQ.

PILLSBURY WINTHROP SHAW PITTMAN, LLP
Attorneys for Official Committee of Equity Security
Holders
1540 Broadway
New York, New York 10036
BY: DAVID A. CRICHLOW, ESQ. (via telephone)
BRANDON JOHNSON, ESQ. (via telephone)
KAREN DINE, ESQ. (via telephone)

## Page 4

APPEARANCES
(continued)

U.S. DEPARTMENT OF JUSTICE
Attorneys for the United States
ENRD Mailroom, Room 2121
601 D Street, N.W.
Washington, D.C. 20004

BY: KATHERINE M. KANE

FELLERS SNIDER
Attorneys for the witness
100 North Broadway
Suite 1700
Oklahoma City, Oklahoma 73102

BY: JAY P. WALTERS, ESQ.
KEVIN R. DONELSON, ESQ.

Also present:
Jennifer Edwards, Anadarko
Robert Rusch, videographer

## Page 5

CONTENTS

PAGE

ROGER ADDISON
EXAMINATION BY MR. BILLECK ........................10
EXAMINATION BY MR. KASSOF .......................203
ADDISON EXHIBIT NO. 1 marked .....................21
ADDISON EXHIBIT NO. 2 marked .....................81
ADDISON EXHIBIT NO. 3 marked ....................104
ADDISON EXHIBIT NO. 4 marked ....................157
ADDISON EXHIBIT NO. 5 marked ....................163
ADDISON EXHIBIT NO. 6 marked ....................178
ADDISON EXHIBIT NO. 7 marked ....................186
ADDISON EXHIBIT NO. 8 marked ....................198
ADDISON EXHIBIT NO. 9 marked ....................201
ADDISON EXHIBIT NO. 10 marked ...................205
ADDISON EXHIBIT NO. 11 marked ...................209
ADDISON EXHIBIT NO. 12 marked ...................211
ADDISON EXHIBIT NO. 13 marked ...................222
ADDISON EXHIBIT NO. 14 marked ...................237
ADDISON EXHIBIT NO. 15 marked ...................243
ADDISON EXHIBIT NO. 16 marked ...................256
ADDISON EXHIBIT NO. 17 marked ...................271
ADDISON EXHIBIT NO. 18 marked ...................282
ADDISON EXHIBIT NO. 19 marked ...................290
ADDISON EXHIBIT NO. 20 marked ...................292

2 (Pages 2 to 5)

CONFIDENTIAL

|  | Page 6 |
|--|--------|
| | CONTENTS |

1
2
3   ADDISON EXHIBIT NO. 21 marked .......................293
4   ADDISON EXHIBIT NO. 22 marked .......................295
5   WITNESS SIGNATURE PAGE .............................305
6   REPORTER CERTIFICATE PAGE .........................307
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 7**

1       VIDEOGRAPHER: This is the start of tape          09:18
2   labeled number 1 of the videotaped deposition of      09:18
3   Roger Addison in the matter of Tronox, Incorporated,  09:18
4   et al., versus Anadarko -- Anadarko Petroleum          09:18
5   Corporation in the United States Bankruptcy Court of  09:18
6   the Southern District of New York, Chapter 11; Case   09:19
7   No. 09-10156.                                          09:19
8       This deposition is being held at the              09:19
9   Skirvin Hotel in Oklahoma City, Oklahoma. Today is    09:19
10   July the 13th, 2010. The time is now 9:18 a.m.        09:19
11       My name is Robert Rusch from TSG Reporting,       09:19
12   Incorporated, and I'm the legal video specialist.     09:19
13   The court reporter is Sherri Grubbs, in association   09:19
14   with TSG Reporting, as well.                          09:19
15       At this time, Counsel will identify              09:19
16   themselves for the record. Following, the court       09:19
17   reporter will swear in the witness.                   09:19
18       MR. WALTERS: Jay Walters and Kevin               09:19
19   Donelson for the witness, Roger Addison.              09:19
20       MR. BILLECK: Jason Billeck and Jessie            09:19
21   Mishkin from Weil, Gotshal & Manges on behalf of      09:19
22   Kerr-McGee and Anadarko.                              09:19
23       MS. EDWARDS: Jennifer Edwards with               09:19
24   Anadarko and Kerr-McGee Corporation.                  09:19
25       MS. KANE: Katherine Kane, U.S. Department         09:19

**Page 8**

1   of Justice, Environmental Enforcement, on behalf of   09:19
2   the United States.                                    09:19
3       MR. SHANK: Ross Shank, Kasowitz, Benson,          09:19
4   Torres & Friedman, Committee of Unsecured Creditors.  09:19
5       MR. DeCELLES: David DeCelles, Kirkland &          09:20
6   Ellis on behalf of Tronox.                            09:20
7       MR. KASSOF: Andrew Kassof from Kirkland &         09:20
8   Ellis on behalf of Tronox.                            09:20
9       On the phone?                                     09:20
10       MR. CRICHLOW: David Crichlow,                    09:20
11   Winthrop, Shaw, Pittman on behalf of the Official     09:20
12   Committee of Equity Security Holders.                 09:20
13       MR. FREEMAN: Jeff Freeman, Kirkland &            09:20
14   Ellis on behalf of Tronox.                            09:20
15       MR. BILLECK: Is that all?                        09:20
16       REPORTER: Would you raise your right hand,       09:20
17   please.                                               09:20
18       (Witness duly sworn).                            09:20
19       MR. WALTERS: If I could just real                09:20
20   quickly -- Jay Walters on behalf of the witness -- we 09:20
21   were presented with a privileged protocol in the     09:20
22   case, and I'd talked to Counsel before the            09:20
23   deposition. We're new to this matter, and it seems    09:20
24   rather complex, and we don't understand all of the    09:20
25   contours.                                             09:20

**Page 9**

1       We do understand that Mr. Addison served in       09:20
2   a legal capacity with both the debtor in possession   09:21
3   and the Defendant; and as such, we are going to rely  09:21
4   on you parties who hold the privilege to assert the   09:21
5   privilege when it becomes -- when or if it becomes     09:21
6   necessary.                                             09:21
7       Mr. Addison intends to answer all of the          09:21
8   questions. So we're going to rely on you for that.     09:21
9       MR. BILLECK: Just so we're clear on the           09:21
10   record, I've seen the Creditors Committee has agreed  09:21
11   to the privileged protocol with respect to the joint  09:21
12   privilege documents. And my understanding is the      09:21
13   Equity Committee said they had, as well, before we    09:21
14   got on the record.                                    09:21
15       I just want to make clear on the record the      09:21
16   Equity Committee has agreed to the privilege protocol 09:21
17   for the production and discussion of joint privilege  09:21
18   documents in the deposition; correct?                 09:21
19       MR. CRICHLOW: This is correct. I will be         09:21
20   forwarding all of the parties in interest a signed    09:21
21   letter that will be similar to Mr. Ross' letter that  09:21
22   went to you a couple of days ago.                      09:22
23       My secretary has it in hand, but I want to        09:22
24   state for the record, the Equity Committee has        09:22
25   agreed, with no reservations, to the amended          09:22

3 (Pages 6 to 9)

CONFIDENTIAL

## Page 14

1  A. Yes.                                          09:26
2  Q. What degree or degrees did you receive?       09:26
3  A. It was politic science, a bachelor of -- I     09:26
4  can't remember if it's arts or science, but it's  09:26
5  political science.                               09:26
6  Q. Okay. And what year did you say you            09:26
7  graduated from the University of Chicago?         09:26
8  A. University --                                 09:26
9  Q. I'm sorry.                                     09:26
10 A. I thought you said University of Chicago.      09:26
11 Q. No, University --                             09:27
12 A. It's University of Colorado.                   09:27
13 Q. Colorado, yes.                                 09:27
14 A. Yes, 1973.                                     09:27
15 Q. And then did you attend law school?           09:27
16 A. Yes.                                           09:27
17 Q. When did you graduate from law school?        09:27
18 A. 1977.                                          09:27
19 Q. And where did you attend law school?          09:27
20 A. University of Oklahoma in Norman.              09:27
21 Q. Upon graduation from law school, please       09:27
22 tell me your employment history.                 09:27
23 A. Within a week or so after graduation, I        09:27
24 started full-time at Kerr-McGee Corporation as an 09:27
25 in-house lawyer, subject to passing the bar, I    09:27

## Page 15

1  believe June 1st of 1977, and I was there for my   09:27
2  entire career.                                    09:27
3  Q. So from 1977 until the IPO of Tronox, you      09:27
4  served in various capacities as an in-house lawyer at 09:27
5  Kerr-McGee?                                        09:28
6  A. That is correct.                                09:28
7  Q. And then after the IPO of Tronox, you           09:28
8  served as a general counsel of Tronox; correct?    09:28
9  A. That's correct. I'm sorry. When -- when         09:28
10 there was the IPO of Tronox and Tronox was eventually 09:28
11 spun off, yes, I -- I went with the entity Tronox and 09:28
12 worked for them as an employee.                    09:28
13 Q. And so after the IPO of Tronox in November      09:28
14 of 2005, you were no longer a Kerr-McGee employee; 09:28
15 correct?                                           09:28
16      MR. KASSOF: Object to the form.               09:28
17      MR. WALTERS: That's all right. When he        09:28
18 objects, he's just preserving an objection to the  09:28
19 question.                                          09:28
20      WITNESS: Okay.                                09:28
21      MR. WALTERS: If there's a claim of            09:28
22 privilege, we'll stop. But otherwise, if he objects, 09:28
23 you just go ahead and answer the question.         09:28
24      Q. (BY MR. BILLECK): And I'll just rephrase  09:28
25 it. I'm not certain of the objection, so we'll try 09:28

## Page 16

1  it again.                                          09:28
2      Were you an employee of Kerr-McGee after       09:28
3  the IPO of Tronox in November of 2005?             09:28
4  A. My understanding is, I was a Kerr-McGee         09:29
5  employee until November 28th, 2005. On that day, I 09:29
6  became an employee of Tronox, Incorporated, or one of 09:29
7  its operating subs.                                09:29
8  Q. Were you ever again an employee of             09:29
9  Kerr-McGee on or after November 28th, 2005, to the 09:29
10 present?                                           09:29
11 A. No.                                             09:29
12 Q. What position did you hold -- well, let me      09:29
13 ask you this: Do you recall when you became general 09:29
14 counsel of Tronox?                                 09:29
15 A. I believe it was sometime in the September     09:29
16 2005 time frame.                                   09:29
17 Q. Okay.                                           09:29
18 A. It may have been early October, but I           09:29
19 believe it was mid to late September.              09:29
20 Q. Prior to becoming general counsel of           09:29
21 Tronox, what position or title did you hold at -- as 09:30
22 a Kerr-McGee employee?                             09:30
23 A. Immediately prior, I think my title, which     09:30
24 was sort of long, was assistant general counsel/vice 09:30
25 president for chemical affairs or something very   09:30

## Page 17

1  similar to that. It was a non- -- well, never mind. 09:30
2  Q. In that position, were you primarily the       09:30
3  legal counsel for the Chemical Division of         09:30
4  Kerr-McGee?                                        09:30
5  A. That's hard to answer, if you want to know     09:30
6  the truth. I was designated as a division counsel  09:30
7  for chemical and, yes, involved in many of the     09:30
8  business matters but with some exceptions to -- I'm 09:31
9  going to say primarily in litigation and           09:31
10 environmental areas.                               09:31
11 Q. Okay. When I say "the chemical business,"      09:31
12 frequently I'll use that as a shorthand for the    09:31
13 entities that ultimately became Tronox.            09:31
14      Is that consistent with your understanding?  09:31
15 A. No.                                             09:31
16 Q. Okay. What do you understand the chemical      09:31
17 business to be at Kerr-McGee?                       09:31
18 A. At the time I was involved, it was the         09:31
19 titanium dioxide business and the -- I think they  09:31
20 called it the electrolytic chemicals business at   09:31
21 Henderson, Nevada, and I think there was a little bit 09:31
22 in Hamilton, Mississippi.                          09:31
23 Q. Okay.                                           09:32
24 A. And I think there may have been some           09:32
25 leftover residual one called battery-type materials 09:32

5 (Pages 14 to 17)

CONFIDENTIAL

Page 18

1    at DeSoto Springs, Idaho.    09:32
2        Q.  How long did you serve in the role as    09:32
3    divisional counsel for the Chemical Division?    09:32
4        A.  I guess about three years.  I think it    09:32
5    started in, I want to say, 2001, late in the year.    09:32
6    I -- I don't remember exactly.    09:32
7        Q.  Okay.  That's fine.    09:32
8            What position did you hold immediately    09:32
9    before you became division counsel to the Kerr-McGee    09:32
10    Chemical Division?    09:32
11        A.  I think I was -- had a title of assistant    09:32
12    general counsel for business transactions.  Maybe it    09:32
13    was associate general counsel.    09:32
14        Q.  And do you recall when you took that    09:33
15    position?    09:33
16        A.  I believe it was around September of 1999.    09:33
17        Q.  Do you recall what led to you taking on the    09:33
18    title of -- did you say head of business    09:33
19    transactions?    09:33
20        A.  Yes.  The existing head of business    09:33
21    transactions was promoted to general counsel, and so    09:33
22    there was a vacancy.    09:33
23        Q.  And who was that that was promoted to    09:33
24    general counsel?    09:33
25        A.  A man named Greg Pilcher.    09:33

Page 19

1        Q.  So when Mr. Pilcher was promoted to general    09:33
2    counsel, you were, I assume, promoted into his    09:33
3    previously held position within the Kerr-McGee legal    09:33
4    department?    09:33
5        A.  Yes.    09:33
6        Q.  At the time you became a the -- general    09:34
7    counsel for Tronox in September of 2005, at that    09:34
8    point in time you were an officer of the Tronox,    09:34
9    Incorporated, entity; correct?    09:34
10        A.  I didn't hear you.  Were or were not?    09:34
11        Q.  Were.  I'll reask it.    09:34
12        A.  I -- I was not a Kerr-McGee Corporation    09:34
13    corporate officer.  I was a -- I believe a division    09:34
14    officer.  You know, I don't know if I was an officer    09:34
15    of Kerr-McGee Chemical, LLC or not.  I'm sure you    09:34
16    guys have a chart that shows.  I had the title of    09:34
17    division counsel, but -- but...    09:34
18        Q.  You may have misunderstood my question.    09:34
19        A.  Okay.    09:34
20        Q.  I think based on the way you're answering    09:34
21    it, I think I was trying to ask something different,    09:34
22    so let me try again.    09:34
23            At the point in time you became general    09:34
24    counsel of Tronox --    09:34
25        A.  Yes.    09:34

Page 20

1        Q.  -- were you an officer of the Tronox    09:34
2    organization?    09:34
3        A.  I'm going to say no.    09:35
4        Q.  Okay.    09:35
5        A.  But -- but when you use the phrase "Tronox    09:35
6    organization," I don't know what that means.    09:35
7        Q.  We'll use Tronox to refer to Tronox,    09:35
8    Incorporated, and the subsidiaries underneath Tronox    09:35
9    that were spun off.    09:35
10            Were you an officer of any of those    09:35
11    corporations at the time you became general counsel    09:35
12    of Tronox?    09:35
13        A.  I don't know.  I think -- I just really    09:35
14    don't recall.    09:35
15        Q.  Okay.  We'll try to find something and show    09:35
16    it to you --    09:35
17        A.  Okay.    09:35
18        Q.  And see if it can --    09:35
19        A.  Okay.    09:35
20        Q.  -- refresh your recollection a little bit.    09:35
21            At the time you became general counsel at    09:35
22    Tronox, how many years' experience did you have as an    09:36
23    in-house lawyer at Kerr-McGee?    09:36
24        A.  I guess about 20- -- 28 years or so; 27,    09:36
25    28.  From '77 to 2- -- 2005.    09:36

Page 21

1        Q.  Okay.    09:36
2        MR. BILLECK:  I'll mark this as Addison 1.    09:36
3            (Addison Exhibit No. 1 marked).    09:36
4        Q.  (BY MR. BILLECK):  Mr. Addison, do you have    09:37
5    what's been marked as Exhibit 1?    09:37
6        A.  Yes.    09:37
7        Q.  Do you recognize Exhibit 1?    09:37
8        A.  I'm not sure I do or not.    09:37
9        Q.  The title of it is, "The Witness Statement    09:37
10    of Roger Addison."  Correct?    09:37
11        A.  Yes, yes, I mean, I do recognize that.    09:37
12        MR. KASSOF:  I'm sorry.  I have the wrong    09:37
13    exhibit.    09:37
14        MR. BILLECK:  Oh, did we give you the    09:37
15    wrong --    09:37
16        MR. KASSOF:  No.  I've got the wrong one.    09:37
17        WITNESS:  He got the wrong one.    09:37
18        MR. BILLECK:  Oh, he got the wrong one.    09:37
19    You're correct.    09:37
20        Q.  (BY MR. BILLECK):  And if you look on the    09:37
21    very last page of Exhibit 1 --    09:38
22        A.  Uh-huh.    09:38
23        Q.  -- I believe it is page 18, do you see your    09:38
24    signature?    09:38
25        A.  Yes.    09:38

6  (Pages 18 to 21)

CONFIDENTIAL

Page 22

1    Q.  Is that your signature?            09:38
2    A.  It appears to be, yes.            09:38
3    Q.  This document appears to be a witness    09:38
4  statement that you submitted in connection with an    09:38
5  arbitration by Kerr-McGee Chemical Worldwide, LLC and    09:38
6  Kerr-McGee Chemical, LLC against Kemira Pigments    09:38
7  OY and Kemira OYj, correct?            09:38
8    A.  That's what it states, yes.            09:38
9    Q.  Do you remember an arbitration that was    09:38
10  initiated against these Kemira -- and I'm going to    09:38
11  refer to Kemira. I'll refer to these organizations    09:38
12  that are on the first page.            09:38
13    Do you remember the arbitration that was    09:39
14  commenced against Kemira?            09:39
15    A.  Yes.            09:39
16    Q.  If you look on the first page of -- page    09:39
17  number 2 of your witness statement.            09:39
18    A.  Yes.            09:39
19    Q.  The third paragraph says, "I worked on    09:39
20  legal matters involving both Kerr-McGee's Oil and Gas    09:39
21  and Chemical Divisions, devoting most of my attention    09:39
22  to Chemical business since 1988"; correct?    09:39
23    A.  That is what it states there, yes.    09:39
24    Q.  If you look on the very last page of your    09:39
25  witness statement, the last line says, "The contents    09:39

Page 23

1  of this statement are true to the best of my    09:39
2  information and belief"; correct?            09:39
3    A.  It does state that, yes.            09:39
4    Q.  I assume then that it's true that you had    09:39
5  worked on legal matters involving both Kerr-McGee's    09:39
6  Oil and Gas and Chemical Divisions, devoting most of    09:39
7  your attention to the Chemical's business since 1988?    09:39
8    A.  I think that is correct, yes. It was not    09:40
9  exclusive Chemical, but --            09:40
10    Q.  Sure.            09:40
11    A.  -- primarily.            09:40
12    Q.  Right, right.            09:40
13    And as a result, at the time of the IPO of    09:40
14  Tronox, you had devoted most of your legal work to    09:40
15  the attention of the Chemicals business for almost 20    09:40
16  years; is that correct, 1988 --            09:40
17    A.  Seventeen, 18, yeah.            09:40
18    Q.  Okay. Based on the 25-plus years you had    09:40
19  as an in-house lawyer at Kerr-McGee and the 17, 18    09:40
20  years you had devoting your attention to the    09:40
21  Chemicals business, did you believe at the time that    09:40
22  you were elected to be the general counsel of Tronox    09:40
23  that you were prepared and competent and equipped to    09:40
24  fulfill the duties associated with that role?    09:41
25    A.  Yes, I -- I believe so.            09:41

Page 24

1    Q.  At the time you became general counsel of    09:41
2  Tronox, and Tronox went through the IPO process, did    09:41
3  you have any direct reports to you as the general    09:41
4  counsel of Tronox?            09:41
5    A.  I -- I think, yes. It's -- it's a --    09:41
6  timing is difficult to answer. Clearly, after the    09:41
7  IPO I did.            09:41
8    Q.  Okay. Let's just talk about after the IPO.    09:41
9    In connection with the IPO, once Tronox was    09:41
10  IPO'd in November of 2005 --            09:41
11    A.  Yes. We're talking about November 28th and    09:41
12  forward?            09:41
13    Q.  Yes, sir.            09:41
14    A.  Yes, yes.            09:41
15    Q.  Did you have any direct reports at that    09:41
16  point as a general counsel of Tronox?            09:41
17    A.  Yes.            09:41
18    Q.  And who were your direct reports?    09:41
19    A.  I think it was six attorneys; Michael    09:41
20  Foster, there was a Bill Miller, Dwayne Morris, Tony    09:42
21  Ellington, Myron Cunningham, Don Shandy. I guess I    09:42
22  had a secretary, slash, assistant, who was a direct    09:42
23  report, Earla Brady.            09:42
24    Q.  Okay.            09:42
25    A.  And there were some paralegals, but I    09:42

Page 25

1  didn't consider them direct reports.            09:42
2    Q.  Were each of the six attorneys you just    09:42
3  identified former employees of Kerr-McGee prior to    09:42
4  the IPO of Tronox in November of 2005?            09:42
5    A.  Yes, I believe so.            09:42
6    Q.  And at that point in time, do you recall    09:42
7  who your -- I'm sorry. Let me be clear about the    09:42
8  time.            09:42
9    A.  Okay.            09:42
10    Q.  Prior to the IPO and prior to becoming    09:43
11  general counsel of Tronox, when you were divisional    09:43
12  counsel for the chemicals division, do you recall who    09:43
13  your actual employer was?            09:43
14    A.  I'm trying to think what the paycheck said.    09:43
15    Q.  Okay.            09:43
16    A.  I'm pretty sure it said "Kerr-McGee." I    09:43
17  think it was "Kerr-McGee Worldwide Corporation -- or    09:43
18  Kerr-McGee Worldwide, LLC" or it could have been --    09:43
19  you probably know.            09:43
20    I -- I can't remember. It -- it was not    09:43
21  Kerr-McGee Chemical. It said "Kerr-McGee" -- I think    09:43
22  it said "Kerr-McGee Worldwide, LLC."            09:43
23    Q.  I'll ask you to see if it refreshes your    09:43
24  recollection.            09:43
25    Do you recall a company that was referred    09:43

7  (Pages 22 to 25)

CONFIDENTIAL

## Page 38

1    Q. (BY MR. BILLECK): When you say you agreed    10:02
2    with it completely, your -- I want to make sure I'm    10:02
3    clear, you say you completely agreed with the    10:02
4    decision that these would be the individuals who    10:02
5    would transition from Kerr-McGee Shared Services to    10:02
6    Tronox, Inc. as in-house lawyers to support you?    10:02
7    A. I think what I meant to say was, I did not    10:02
8    object to anyone on the list being there.    10:02
9    Q. Were you comfortable and believed that this    10:02
10   was a qualified group of in-house lawyers that were    10:02
11   prepared and competent to support you as the in-house    10:02
12   lawyers for Tronox, Inc.?    10:02
13   A. Yes.    10:03
14   Q. And, you know, to be more direct, I guess    10:03
15   one of the questions I'm asking, you didn't feel like    10:03
16   you were given the bottom-tiered performers at    10:03
17   Kerr-McGee Shared Services legal department and stuck    10:03
18   with people that were not competent, qualified, and    10:03
19   experienced to support you and perform the roles    10:03
20   necessary as in-house lawyers for Tronox, Inc.?    10:03
21   A. That is correct. They were all good    10:03
22   attorneys.    10:03
23   Q. During your tenure as the general counsel    10:04
24   after the IPO, did the -- actually, strike that.    10:04
25   Do you recall when you ultimately retired    10:04

## Page 39

1    from Tronox?    10:04
2    A. Yes.    10:04
3    Q. When was that?    10:04
4    A. My last day of work -- I resigned on    10:04
5    November 29th, 2009.    10:04
6    Q. 2009?    10:04
7    A. Did I say that? I meant to say 2007.    10:04
8    Sorry.    10:04
9    Q. Okay. I just want to make sure.    10:04
10   So it was November -- your last day of work    10:04
11   as general counsel of Tronox was November 29th, 2007;    10:04
12   correct?    10:04
13   A. Correct.    10:04
14   Q. Were you fired or involuntarily terminated    10:04
15   from your position as general counsel?    10:04
16   A. No.    10:04
17   Q. You, of your own accord, decided that you    10:05
18   would like to retire at that point in time.    10:05
19   A. That is correct.    10:05
20   Q. What led you to the conclusion that you    10:05
21   were ready to retire in November of 2007?    10:05
22   A. The primary reason was, I was just tired, I    10:05
23   was burned out or something.    10:05
24   Q. Okay. You had just reached that point in    10:05
25   your career.    10:05

## Page 40

1    How long had you been practicing law as an    10:05
2    in-house lawyer at the point that you retired?    10:05
3    A. Almost 31 years.    10:05
4    Q. And at that point you decided that you had    10:05
5    done it long enough and were just tired of practicing    10:05
6    law as an in-house lawyer and ready to do something    10:05
7    else?    10:05
8    A. Yes.    10:05
9    Q. Was there anything else that motivated your    10:05
10   decision to retire from Tronox?    10:05
11   A. I'll say yes, there were attributing    10:06
12   factors.    10:06
13   Q. Did you retire from Tronox in 2007 because    10:06
14   you believed that Tronox was doomed for failure and    10:06
15   bankruptcy?    10:06
16   A. No.    10:06
17   Q. In 2007, when you retired, did you believe    10:06
18   that Tronox was an insolvent company that was doomed    10:06
19   for failure?    10:06
20   MR. KASSOF: Object to the form of the    10:06
21   question. Lacks foundation.    10:06
22   WITNESS: I did not.    10:06
23   Q. (BY MR. BILLECK): At any point while you    10:06
24   were the general counsel of Tronox, did you believe    10:06
25   that it was a -- strike that.    10:06

## Page 41

1    At any point during the time that you were    10:06
2    general counsel of Tronox, did you believe that    10:06
3    Tronox was not a viable business?    10:06
4    A. No.    10:06
5    Q. So during your time as general counsel of    10:06
6    Tronox, you always believed that Tronox was a viable    10:06
7    business?    10:07
8    I'm just saying it inversely because I    10:07
9    think the record is a little --    10:07
10   A. Well, I'm not sure what you mean by    10:07
11   "viable."    10:07
12   Q. Okay. Let me ask it another way, then.    10:07
13   Did you believe at any time, either before    10:07
14   you became general counsel of Tronox or while you    10:07
15   were general counsel of Tronox, that Tronox was, at    10:07
16   the time of the IPO or subsequent to there, while you    10:07
17   were general counsel of Tronox, doomed for failure?    10:07
18   MR. KASSOF: Object to the form, only    10:07
19   because you put in a couple of different timetables.    10:07
20   Q. (BY MR. BILLECK): Let's be more clear.    10:07
21   A. Okay.    10:07
22   Q. From the time you became general counsel of    10:07
23   Tronox in September of 2005 to the time that you    10:07
24   retired in September of 2007, during that time, did    10:07
25   you believe that Tronox was an insolvent company that    10:07

11 (Pages 38 to 41)

CONFIDENTIAL

Page 42

1  was doomed for failure?                          10:08
2     MR. KASSOF: Objection. Lacks foundation.      10:08
3  Object to the form.                              10:08
4     WITNESS: Do I get to answer that?             10:08
5     MR. WALTERS: Yeah.                            10:08
6     WITNESS: No, I did not. I never thought       10:08
7  it was doomed for failure.                       10:08
8     Q. (BY MR. BILLECK): When you retired from    10:08
9  Tronox officially in November of 2007, did Tronox ask   10:08
10 you to stay on as a consultant for a period of time?   10:08
11    A. Yes.                                       10:08
12    Q. And did you agree to do that?              10:08
13    A. Yes.                                       10:08
14    Q. And how long did you act as a consultant   10:08
15 for Tronox after you were -- your retirement?    10:09
16    A. For a period of -- right at about six      10:09
17 months.                                          10:09
18    Q. Who did you report to during that time     10:09
19 period, if anyone?                               10:09
20    A. Technically, Mike Foster.                  10:09
21    Q. Okay. Do you know who was the president    10:09
22 and CEO of Tronox at the time of the IPO?        10:09
23    A. The title -- president and CEO?            10:09
24    Q. You're certainly free to correct me on the   10:09
25 title.                                           10:09

Page 43

1     A. What title did you ask, presidency or      10:09
2  German CEO -- or what did you ask again, I'm sorry?   10:09
3     Q. Let's try it a different way.              10:10
4     A. Okay.                                      10:10
5     Q. What was Mr. Adam, Tom Adams' title at the   10:10
6  time of the IPO of Tronox?                       10:10
7     A. I guess he was president.                  10:10
8     Q. President of Tronox?                       10:10
9     A. Yes.                                       10:10
10    Q. Were you generally familiar with Mr. Adams   10:10
11 and his reputation at Kerr-McGee prior to the IPO of   10:10
12 Tronox?                                          10:10
13    A. Yes.                                       10:10
14    Q. And prior to the IPO of Tronox, what was   10:10
15 Mr. Adams' reputation inside of the Kerr-McGee   10:10
16 organization?                                    10:10
17    A. He was a very smart, excellent employee    10:10
18 that had come over from something called Oryx, and   10:10
19 that he just had a high reputation of being an   10:10
20 excellent, smart employee.                       10:10
21    Q. Did you believe that Mr. Adams was         10:11
22 competent and qualified to serve as the president of   10:11
23 Tronox, Inc. after the IPO?                      10:11
24    A. Yes, I believe so. He had a number of      10:11
25 months as head of the Chemical Division and being   10:11

Page 44

1  groomed. I think he learned the business quite well.   10:11
2     Q. And then after the IPO, did you have       10:11
3  occasion to work with Mr. Adams at Tronox?       10:11
4     A. Oh, yes.                                   10:11
5     Q. And in your firsthand witnessing of his    10:11
6  performance as the president of Tronox, how would you   10:11
7  describe his performance?                        10:11
8     A. Very good.                                 10:12
9     Q. Did you think that Mr. Adams competently   10:12
10 and professionally satisfied and fulfilled the   10:12
11 obligations and duties that he had as the president   10:12
12 of Tronox?                                       10:12
13    A. Yes, I've always thought so.               10:12
14    Q. Did you ever think Mr. Adams was not       10:12
15 competent or qualified or failed to fulfill his   10:12
16 duties as the president of Tronox after the IPO?   10:12
17    A. I got a little confused there, but I always   10:12
18 thought he did a fine job.                       10:12
19    Q. Okay. What about Mary Mikkelson? Did you   10:12
20 have any familiarity with Mary Mikkelson prior to the   10:12
21 IPO of Tronox?                                   10:12
22    A. Yes.                                       10:12
23    Q. And what was Mary Mikkelson's reputation   10:12
24 inside of Kerr-McGee, from your perspective, prior to   10:12
25 the IPO of Tronox?                               10:13

Page 45

1     A. As a very sharp cracker-jack               10:13
2  accountant/CPA-type financial-officer type.      10:13
3     Q. And in connection with the IPO of Tronox,   10:13
4  Mary Mikkelson became the CFO of Tronox; correct?   10:13
5     A. Yes.                                       10:13
6     Q. Did you believe that Ms. Mikkelson was     10:13
7  competent and qualified to fulfill and perform the   10:13
8  duties as CFO of Tronox?                         10:13
9     A. Yes.                                       10:13
10    Q. Did you have occasion to work with         10:13
11 Ms. Mikkelson after the IPO of Tronox?           10:13
12    A. Yes.                                       10:13
13    Q. Describe to me how you viewed              10:13
14 Ms. Mikkelson's performance in the fulfillment of her   10:13
15 duties as the CFO of Tronox.                     10:13
16    A. Very well. She was one of the most         10:13
17 professional and competent people I've ever met.   10:13
18    Q. Did you view Ms. Mikkelson as an honest   10:14
19 person?                                          10:14
20    A. Yes.                                       10:14
21    Q. Did you ever witness her in any way to try   10:14
22 to misrepresent or mislead Tronox investors, Tronox's   10:14
23 banks, Tronox's auditors?                        10:14
24    A. No.                                        10:14
25    Q. Did you ever see Mr. Adams -- did you ever   10:14

12  (Pages 42 to 45)

CONFIDENTIAL

Page 46

| | | |
|---|---|---|
| 1 | witness or think Mr. Adams had misled, | 10:14 |
| 2 | misrepresented, or was being less than honest with | 10:14 |
| 3 | Tronox's investors, banks, Ernst & Young, in | 10:14 |
| 4 | connection with performing his duties as the | 10:14 |
| 5 | president of Tronox? | 10:14 |
| 6 | A. No. | 10:14 |
| 7 | Q. You know Ms. Mikkelson and Mr. Adams have | 10:14 |
| 8 | been sued in a class action security lawsuit, do you | 10:15 |
| 9 | not? | 10:15 |
| 10 | A. That is my understanding, yes. | 10:15 |
| 11 | Q. You are not a defendant and have not been | 10:15 |
| 12 | sued in any lawsuit regarding your role either as an | 10:15 |
| 13 | employee of Kerr-McGee Shared Services or as a | 10:15 |
| 14 | general counsel for Tronox; correct? | 10:15 |
| 15 | A. Not as far as I know. | 10:15 |
| 16 | Q. As the general counsel of Tronox, who did | 10:15 |
| 17 | you report to? | 10:15 |
| 18 | A. Tom Adams. | 10:15 |
| 19 | Q. Just a little more background on sort of | 10:15 |
| 20 | the deposition. | 10:15 |
| 21 | Did you do anything to prepare for your | 10:15 |
| 22 | deposition today or -- | 10:15 |
| 23 | A. Yes. | 10:15 |
| 24 | Q. What did you do? | 10:15 |
| 25 | A. I hired counsel. | 10:16 |

Page 47

| | | |
|---|---|---|
| 1 | Q. Okay. And that is counsel you have with | 10:16 |
| 2 | you here today? | 10:16 |
| 3 | A. That is correct. | 10:16 |
| 4 | Q. Did you review any documents? | 10:16 |
| 5 | A. Documents? Yeah, I did. I mean, I had a | 10:16 |
| 6 | copy of the petition and the adversary complaint, and | 10:16 |
| 7 | I reread that. | 10:16 |
| 8 | Q. Okay. Did you talk with anyone other than | 10:16 |
| 9 | your counsel to get ready for the deposition today, | 10:16 |
| 10 | as far as substantively prepare for your testimony? | 10:16 |
| 11 | A. I -- I -- I have spoken with you in the | 10:16 |
| 12 | past informally, and I've spoken with this other | 10:16 |
| 13 | counsel, Kirkland Ellis, I think a Jeffrey Zeiger, I | 10:16 |
| 14 | spoke with him informally some months ago, but that | 10:16 |
| 15 | wasn't, I don't think, really in association with | 10:16 |
| 16 | this. It was just deep background or something. | 10:16 |
| 17 | Q. Okay, right. So the meetings -- the | 10:16 |
| 18 | informal meetings you've had with the Kirkland & | 10:16 |
| 19 | Ellis law firm and with Weil Gotshal, your deposition | 10:17 |
| 20 | hadn't even been noticed at that point; correct? | 10:17 |
| 21 | A. That is correct. | 10:17 |
| 22 | Q. And you didn't view that as a preparation | 10:17 |
| 23 | for your deposition, either the meeting with Kirkland | 10:17 |
| 24 | or with Weil Gotshal? | 10:17 |
| 25 | A. That is correct. | 10:17 |

Page 48

| | | |
|---|---|---|
| 1 | Q. Other than the meeting -- informal meeting | 10:17 |
| 2 | you had with Mr. Zeiger, was there anyone else that | 10:17 |
| 3 | attended on behalf of Kirkland & Ellis? | 10:17 |
| 4 | A. Yes. | 10:17 |
| 5 | Q. Who was that? I can probably help you. | 10:17 |
| 6 | A. David Zott, I believe. | 10:17 |
| 7 | Q. Okay. | 10:17 |
| 8 | A. Is that -- well -- is that correct? I | 10:17 |
| 9 | don't think that was his name. | 10:17 |
| 10 | Q. That is a name that could be correct, so | 10:17 |
| 11 | I'll assume that -- | 10:17 |
| 12 | A. Okay. | 10:17 |
| 13 | Q. -- it is. | 10:17 |
| 14 | Did you talk with anyone from Kirkland & | 10:17 |
| 15 | Ellis substantively about the case since that | 10:17 |
| 16 | informal meeting? | 10:17 |
| 17 | A. I was sitting in on -- on a -- on a phone | 10:18 |
| 18 | call that my counsel had with Mr. Zeiger yesterday | 10:18 |
| 19 | regarding some procedural issues, but I don't think | 10:18 |
| 20 | it was substantive. | 10:18 |
| 21 | Q. Okay. And what did that phone call deal | 10:18 |
| 22 | with? | 10:18 |
| 23 | A. Privilege issues. | 10:18 |
| 24 | Q. And I think, as you explained to me when we | 10:18 |
| 25 | met informally before, you are taking very seriously | 10:18 |

Page 49

| | | |
|---|---|---|
| 1 | your confidentiality and privilege obligations to | 10:18 |
| 2 | make sure you didn't improperly disclose something | 10:18 |
| 3 | you weren't supposed to disclose. | 10:18 |
| 4 | Is that what the substance of that | 10:18 |
| 5 | conversation was? | 10:18 |
| 6 | A. That is correct. Being counsel, I was very | 10:18 |
| 7 | concerned -- with protecting my clients' confidences, | 10:18 |
| 8 | privileged material. | 10:18 |
| 9 | Q. And you've taken the steps you believe | 10:18 |
| 10 | necessary to fulfill that obligation; correct? | 10:18 |
| 11 | A. I certainly believe so. You all heard the | 10:18 |
| 12 | opening statement by my counsel where we've agreed | 10:18 |
| 13 | that basically there's been a general waiver of this. | 10:18 |
| 14 | Q. You referenced a complaint filed in this | 10:19 |
| 15 | lawsuit. | 10:19 |
| 16 | Did you receive a copy of it at some point | 10:19 |
| 17 | after it was filed? | 10:19 |
| 18 | A. Yes. | 10:19 |
| 19 | Q. Were you consulted in any way regarding the | 10:19 |
| 20 | complaint prior to it being filed? | 10:19 |
| 21 | A. No. | 10:19 |
| 22 | Q. Did you receive the complaint and review it | 10:19 |
| 23 | before you spoke with the lawyers for Kirkland & | 10:19 |
| 24 | Ellis or the lawyers for -- I'm sorry. Not the | 10:19 |
| 25 | lawyers for Kirkland & Ellis. Let me rephrase that. | 10:19 |

13 (Pages 46 to 49)

CONFIDENTIAL

Page 50

```
1          Did you receive and review the complaint     10:19
2  before you had your informal meeting with the lawyers  10:19
3  from Kirkland & Ellis and with lawyers for Anadarko   10:19
4  and Kerr-McGee?                                10:19
5     A.  Yes.                              10:19
6     Q.  What was your initial reaction when you      10:19
7  received the complaint and read it to the allegations  10:19
8  and claims contained in the complaint?            10:19
9     A.  I'm going to say, I was surprised.         10:19
10    Q.  What do you mean "surprised"?            10:20
11    A.  You asked what my reaction was. That's      10:20
12  what it was. It just didn't seem like -- this        10:20
13  doesn't sound like what happened to me.          10:20
14    Q.  So by "surprised," you meant, based on your  10:20
15  years as an in-house lawyer at both Kerr-McGee and as  10:20
16  the general counsel of Tronox, the allegations and   10:20
17  claims in the complaint were inconsistent with what   10:20
18  you personally witnessed occurring?             10:20
19    A.  That's a big mouthful, but I would say yes.   10:20
20    Q.  Did you generally express that opinion to    10:20
21  Mr. Zeiger and Mr. Zott when you informally met with  10:21
22  them?                                  10:21
23    A.  I believe I did.                      10:21
24    Q.  What was their reaction?                10:21
25    A.  They indicated they -- they thought the     10:21
```

Page 51

```
1  allegations in the complaint were accurate and that   10:21
2  they could prove it.                         10:21
3     Q.  Did they attempt to persuade you of their    10:21
4  opinions and beliefs?                        10:21
5     A.  I'm not sure I know how to answer that.      10:21
6  The final comment said, "You're either with us or      10:21
7  against us."                              10:21
8     Q.  Either Mr. Zott or Mr. Zeiger said to you,   10:21
9  "You're either with us or you're against us"?         10:21
10    A.  Yes.                             10:21
11    Q.  What was your response?                10:21
12    A.  I don't think I responded.              10:21
13    Q.  Do you view yourself as either with or      10:22
14  against either Tronox or Kerr-McGee or Anadarko in    10:22
15  this case?                              10:22
16    A.  No.                             10:22
17    Q.  How do you view yourself?              10:22
18    A.  Neutral, just try and tell the truth and    10:22
19  state the facts as I know them.               10:22
20    Q.  How did you view or how did you interpret   10:22
21  the statement "You're either with us or you're       10:22
22  against us"?                             10:22
23    A.  I don't know how to answer that. I just --  10:22
24  the comment surprised me, I'll just say that.        10:22
25    Q.  Back to the question before. What did you   10:22
```

Page 52

```
1  mean by "surprised you"?                      10:22
2     A.  I don't know how to answer that, I guess.   10:23
3  You know, I really don't know how to answer that      10:23
4  other than to say -- no, I don't know what to say.     10:23
5     Q.  You're familiar with an individual named    10:23
6  Robert Gibney; is that correct?                 10:23
7     A.  Yes.                             10:23
8     Q.  You're aware that after you retired from    10:23
9  Tronox, Mr. Adams was fired by Tronox; correct?      10:23
10    A.  Yes, I heard that.                    10:23
11    Q.  And after your retirement from Tronox, do   10:23
12  you understand that Tronox also fired Mary Mikkelson?  10:23
13    A.  Yes.                             10:23
14    Q.  And do you understand that Mr. Gibney still  10:23
15  works for Tronox?                         10:23
16    A.  Yes.                             10:24
17    Q.  I want to ask you about something. Let me   10:24
18  ask this. Have you seen the depositions from       10:24
19  Mr. Adams, Ms. Mikkelson, or Mr. Gibney?          10:24
20    A.  No.                             10:24
21    Q.  In the deposition of Mr. Gibney, he said    10:24
22  that at some point after the IPO you made the        10:24
23  statement that "Some day there'd be a lawsuit against  10:24
24  Kerr-McGee by Tronox and that Luke Corbett and Bob   10:24
25  Wohleber would lie on the stand in that lawsuit,"      10:24
```

Page 53

```
1  effectively saying they would commit perjury.        10:24
2          Did you ever make that statement?        10:24
3     A.  I can't imagine my -- me ever saying that,   10:24
4  no.                                   10:24
5     Q.  Do you believe that Mr. Corbett would      10:24
6  commit perjury in a lawsuit?                   10:24
7          When I say Mr. Corbett, Luke Corbett.     10:24
8          Do you have any basis to believe that     10:24
9  Mr. Luke Corbett would commit perjury in this        10:24
10  lawsuit?                               10:24
11    A.  No, I have no basis for that.            10:24
12    Q.  Do you have any basis or belief that       10:25
13  Mr. Wohleber, Bob Wohleber, would commit perjury or  10:25
14  lie on the stand in this lawsuit?               10:25
15    A.  I don't know either of those gentlemen very  10:25
16  well, but I have no basis for thinking they would do  10:25
17  any of that, commit perjury.                  10:25
18    Q.  In the time that you worked at Kerr-McGee,  10:25
19  I know you may not have interacted with them on a     10:25
20  daily basis, but did you ever see Mr. Wohleber or     10:25
21  Mr. Corbett conduct themselves in an unethical or     10:25
22  dishonest fashion?                         10:25
23    A.  Never.                           10:25
24    Q.  All right. Let's talk about -- do you      10:25
25  remember the acquisition by Kerr-McGee Chemical     10:25
```

14  (Pages 50 to 53)

CONFIDENTIAL

Page 82

1    Exhibit 2 prior to today?                         11:21
2        A. I don't recall. It wouldn't surprise me if  11:21
3    I had. I just don't recall.                       11:21
4        Q. At the time of the Kemira acquisition, what 11:21
5    was Mr. Woodward's position or title inside of    11:21
6    Kerr-McGee?                                        11:22
7        A. It's complicated title. They always had    11:22
8    funny titles. I think it was senior vice president 11:22
9    of Kerr-McGee for chemical operations. He was a   11:22
10   Kerr-McGee corporation employee in charge of chemical 11:22
11   group.                                             11:22
12           He was not a Kerr-McGee Chemical employee. 11:22
13   He was a Kerr-McGee Corporation employee.          11:22
14       Q. But his primary responsibilities were for   11:22
15   the operations of Kerr-McGee -- of the Chemical    11:22
16   Division of Kerr-McGee; correct?                   11:22
17       A. Yes.                                        11:22
18       Q. Did you believe Mr. Woodward to be          11:22
19   competent and qualified in that role?              11:22
20       A. Yes.                                        11:22
21       Q. We talked earlier about some of the timing  11:22
22   limitations or due diligence limitations placed on 11:22
23   the Kemira transaction. Do you recall that?        11:22
24       A. Yes.                                        11:22
25       Q. If you look on page 6 of Mr. Woodward's     11:23

Page 83

1    witness statement, at the top there's a statement  11:23
2    that says -- actually, look on page 5 to see -- the 11:23
3    section is entitled "Limitations imposed by Kemira on 11:23
4    the due diligence process"; correct?              11:23
5        A. That's what the style says, yes.            11:23
6        Q. And in talking about those limitations,     11:23
7    Mr. Woodward says, "While such restrictions are not 11:23
8    unusual in the business world, they do inhibit a  11:23
9    purchaser's ability to develop its own insights into 11:23
10   the business that is being purchased.              11:23
11          "These kinds of restrictions forces the     11:23
12   buyer to rely on the accuracy of the seller's      11:23
13   information and, therefore, require that strong     11:23
14   contractual warranties, representations,           11:23
15   indemnifications be included in the purchase       11:23
16   agreement"; is that correct?                       11:23
17       A. Yeah, that appears to be a quote from the   11:23
18   witness statement, yes.                            11:23
19       Q. And that is consistent with your            11:23
20   understanding -- well, strike that.                11:23
21          Is that consistent with your understanding  11:23
22   in the business world that these types of limitations 11:23
23   are not unusual, but that they require the sell- -- 11:23
24   the purchaser to obtain strong contractual         11:24
25   warranties, representations, and indemnifications in 11:24

Page 84

1    the purchase agreement?                            11:24
2        A. Yeah. I mean, it depends on the deal. I     11:24
3    will say yes. But if you cannot -- representations  11:24
4    and warranties can substitute for due diligence.    11:24
5          Ideally, you get the maximum of both, but    11:24
6    you can't always negotiate that.                   11:24
7        Q. Was it your opinion -- or is it your        11:24
8    opinion that Kemi- -- that Kemira intentionally --  11:24
9    not intentionally. Strike that.                    11:24
10          Was it your opinion that Kemira did not     11:24
11   provide honest, truthful, and full representations  11:25
12   and warranties regarding the plant equipment and its 11:25
13   compliance with laws in the purchase agreement?     11:25
14       A. You said a mouthful, but I --                11:25
15       Q. You can restate it.                          11:25
16       A. Kerr -- Kerr-McGee believed that Kemira     11:25
17   breached its representations and warranties in that 11:25
18   regard, that they were incorrect as to their       11:25
19   compliance with the law. They were not in compliance 11:25
20   with law, as represented.                          11:25
21       Q. And that the plant equipment was not as     11:25
22   represented by Kemira, as well; correct?           11:25
23       A. Correct.                                    11:25
24       Q. And you said Kerr-McGee believed those      11:25
25   things. You also believed those things, did you not? 11:25

Page 85

1        A. Yes, but not personal knowledge. I mean, I  11:25
2    was told that. I didn't go out and personally      11:25
3    inspect girders and pipes and things --            11:25
4        Q. Right.                                      11:26
5        A. But, yeah -- but, yeah, our guys told us    11:26
6    that the thing had some problems that were sort of 11:26
7    hidden. And I believed them. I had no reason not  11:26
8    to.                                                11:26
9        Q. Who were the guys that told you some things 11:26
10   were hidden, if you recall?                        11:26
11       A. Those are my words and they sound funny     11:26
12   when they're repeated to me, but I guess engineers. 11:26
13   There was an additional due diligence period between 11:26
14   contract signing and closing, and I think they sent 11:26
15   some people down there at that time to -- "down     11:26
16   there."                                            11:26
17          There were two plants involved. This        11:26
18   primarily relates to the Savannah, Georgia, plant. I 11:26
19   believe, some process engineers and people that    11:26
20   worked at our Hamilton plant that knew about the   11:26
21   equipment and stuff went down there and looked at it. 11:26
22       Q. And after the transaction closed, they      11:26
23   discovered that the plant and equipment was not as  11:26
24   represented?                                        11:26
25       MR. KASSOF: Objection. Misstates the           11:27

22  (Pages 82 to 85)

CONFIDENTIAL

### Page 86

1  testimony. Object to the form.                    11:27
2      WITNESS: Certainly after the closing, I        11:27
3  know they were discovering problems that -- I don't  11:27
4  recall were latent defects, nothing obvious. But we  11:27
5  started investigating, and they were finding        11:27
6  problems. I'm not an engineer. I don't really know  11:27
7  how it happened, but there were structural problems. 11:27
8      Q. (BY MR. BILLECK): Let me just ask it this    11:27
9  way: Were there material defects and problems with   11:27
10 the Kemira plant that you and Kerr-McGee knew about  11:27
11 in advance of closing the purchase agreement that you 11:27
12 merely ignored or did not care about?               11:27
13     MR. KASSOF: Object to the form of the           11:27
14 question. Compound.                                 11:27
15     WITNESS: I don't recall being aware of any      11:27
16 big problems prior to the closing.                  11:27
17     Let me qualify it. It seems like there's        11:28
18 one little blurb that happened the night before     11:28
19 closing and I think it was mentioned in this witness 11:28
20 statement. I can't recall now exactly what it was,  11:28
21 but I think it was a qualifier on asbestos or        11:28
22 something.                                          11:28
23     Q. (BY MR. BILLECK): You're welcome to look at  11:28
24 the witness statement to refresh your recollection as 11:28
25 you refer to it, but could it have been the issue   11:28

### Page 87

1  that came up on the night of closing related to the  11:28
2  date by which Kemira would fully remedy the problems 11:28
3  referenced in the OSHA complaint?                   11:28
4      A. It -- it could have been. I don't            11:28
5  remember. I almost think it was something else, but  11:28
6  I just don't recall.                                11:28
7      Q. Okay. If that's what it says in the          11:28
8  witness statement, you would have no reason to       11:28
9  believe that's inaccurate; correct?                 11:28
10     A. If this is an accurate representation of     11:28
11 the witness statement I signed, I remember carefully 11:28
12 reviewing it and thinking it was perfectly accurate  11:29
13 when I signed it, so, yes.                          11:29
14     Q. And after looking at it here today, I think  11:29
15 you said -- you can tell me -- do you have any reason 11:29
16 to believe that this is not an accurate copy of the  11:29
17 witness statement you signed?                       11:29
18     A. I mean, I have no reason to believe that     11:29
19 it's not accurate, but it's not like I've initialed  11:29
20 every single page or something, but, you know...    11:29
21     MR. WALTERS: And I'm sorry. Just for            11:29
22 clarification, we're talking about Exhibit 1 now, his 11:29
23 witness statement?                                  11:29
24     MR. BILLECK: His witness statement, yes.        11:29
25     WITNESS: Okay.                                  11:29

### Page 88

1      MR. WALTERS: The witness was looking --         11:29
2      WITNESS: I was at the --                        11:29
3      MR. WALTERS: -- at Mr. Woodward's.              11:29
4      WITNESS: He's right.                            11:29
5      MR. BILLECK: I apologize for the                11:29
6  confusion.                                          11:29
7      WITNESS: Okay. But you're right. No --          11:29
8  if this, in fact, is my -- a copy, a true and        11:29
9  accurate copy of my original witness statement, I    11:29
10 reviewed it very carefully before I signed it. And I 11:29
11 then and now still feel comfortable it was accurate.  11:29
12     Q. (BY MR. BILLECK): And sitting here today,    11:29
13 you have no basis to believe that is not a true and   11:29
14 accurate copy of the witness statement you submitted; 11:29
15 correct?                                            11:29
16     A. That is correct.                             11:30
17     Q. Let's mark this -- actually, we don't need   11:30
18 to mark it. It's marked as Adams Exhibit 2. This is  11:30
19 a copy -- a current copy of the complaint filed in   11:30
20 the lawsuit.                                        11:30
21     A. Okay.                                        11:30
22     Q. Will you turn to page 12?                    11:30
23     A. Okay.                                        11:30
24     Q. Let me ask this: Mr. Woodward was involved  11:30
25 in connection with the Kemira acquisition, was he    11:30

### Page 89

1  not?                                               11:30
2      A. Pete Woodward, yes, yes.                     11:30
3      Q. Did he have a substantial involvement or    11:30
4  limited involvement?                                11:30
5      A. I would say very substantial.               11:30
6      Q. Was Mr. Woodward, as the individual in      11:30
7  charge of the Chemical Division at Kerr-McGee, a     11:30
8  proponent of completing the Kemira acquisition?     11:31
9      A. I believe, yes.                              11:31
10     Q. Was there anyone else that you can recall    11:31
11 that was a proponent or in favor of completing the  11:31
12 Kemira acquisition?                                 11:31
13     A. Yes.                                         11:31
14     Q. Who else?                                    11:31
15     A. Certainly a gentleman named Joe Flake, who  11:31
16 was Chemical's head of business development or       11:31
17 something at that time, and -- I mean, I heard no one 11:31
18 who was against it. I heard no objection voiced     11:31
19 against it from anyone.                             11:31
20     Q. What about -- do you know an individual     11:31
21 named Bobby Brown?                                  11:31
22     A. Oh, yes.                                     11:31
23     Q. Do you recall if Mr. Brown was in favor of  11:31
24 completing the Kemira acquisition at the time?      11:31
25     A. I'm not even sure he knew about it. He      11:31

23 (Pages 86 to 89)

CONFIDENTIAL

Page 94

1   question. I'm not sure how it's going to read.                    11:37
2       When you talk about "they may have paid                        11:37
3   more for the asset or left money on the table," that              11:37
4   is a conclusion that was reached after the deal                   11:37
5   closed, or was that something that was known before               11:37
6   the Kemira deal closed?                                           11:37
7       MR. KASSOP: Object -- objection.                              11:37
8   Foundation. You're asking him personally or the                   11:38
9   company?                                                          11:38
10      MR. BILLECK: I'm asking him, to the best                      11:38
11  of his knowledge.                                                 11:38
12      WITNESS: No, I -- I don't know. I don't                       11:38
13  have any personal knowledge of that.                              11:38
14      Q. (BY MR. BILLECK): Did you ever hear anyone                 11:38
15  in advance of the Kemira transaction closing say or               11:38
16  do anything to give you the impression that                       11:38
17  Kerr-McGee was intentionally overpaying for the                   11:38
18  assets of Kemira?                                                 11:38
19      A. Overpaying, no.                                            11:38
20      Q. Do you believe the purpose of the Kemira                   11:38
21  transaction was to allow Kerr-McGee to foist legacy               11:38
22  liabilities onto Kerr-McGee Chemical?                             11:38
23      A. No.                                                        11:39
24      Q. What did you understand to be the driver                   11:39
25  for Kerr-McGee to want to acquire additional chemical             11:39

Page 95

1   assets?                                                           11:39
2       A. My understanding -- this is from                           11:39
3   discussions with Pete Woodward and Joe Flake -- were              11:39
4   that -- I have no personal knowledge of this, but                 11:39
5   that the Kerr-McGee board in the late '90s time frame             11:39
6   thought it would be appropriate to have the overall               11:39
7   business be one-third chemical and two-thirds oil and             11:39
8   gas because they tended to naturally hedge                        11:39
9   themselves.                                                       11:39
10      When oil and gas prices were up, chemical                     11:39
11  was sometimes down. When oil and gas prices were                  11:39
12  down, chemical was up. And that's why they                        11:39
13  authorized buying the Bayer or Byer Chemical thing in             11:40
14  '98, and it sold them up to the one-third weight, and             11:40
15  so they wanted to get some more assets.                           11:40
16      And -- and Kemira's TiO2 assets fit the                       11:40
17  bill. It was too hard to build the brand new ones                 11:40
18  because of environmental permitting or something,                 11:40
19  they called them, plants. So it was easier to buy                 11:40
20  existing assets.                                                  11:40
21      Q. Had the one-third chemical/two-thirds oil                  11:40
22  and gas hedging strategy gotten out of whack, meaning             11:40
23  they weren't two-thirds/one-third at some point prior             11:40
24  to the Kemira acquisition?                                        11:40
25      A. No. Well, maybe. I don't know. I                          11:40

Page 96

1   don't -- I know afterwards it seemed to get out of                11:40
2   balance, but I'm not sure about before.                          11:40
3       Q. Well, prior to the Kemira acquisition, did                 11:40
4   Kerr-McGee acquire a company called Oryx?                         11:40
5       A. Yes.                                                       11:41
6       Q. Was Oryx an oil and gas company?                           11:41
7       A. Yes.                                                       11:41
8       Q. Do you recall if the acquisition of Oryx                   11:41
9   may have disturbed the two-thirds/one-thirds balance             11:41
10  desired for the hedging of the markets?                          11:41
11      A. I think it may well have. I don't remember                 11:41
12  ever giving it much consideration. I think Oryx was               11:41
13  a big company, it was a big merger, but I don't                   11:41
14  remember the relative values.                                    11:41
15      Q. Did Pete Woodward explain to you why he was               11:41
16  a proponent of the Kemira acquisition?                           11:41
17      A. Yeah. He and Joe Flake were both                          11:41
18  proponents. I'm not sure I can keep them separate.                11:41
19  It's almost like they were jointly for it, very much             11:41
20  so.                                                               11:42
21      Q. Why did you understand Mr. Woodward and                    11:42
22  Mr. Flake to be big proponents jointly in favor of                11:42
23  completing the Kemira acquisition?                               11:42
24      A. They were very high on the potential of its               11:42
25  titanium dioxide, TiO2 business, and this would                   11:42

Page 97

1   increase their market share and give them economies              11:42
2   of scale. I think they thought it would be very,                 11:42
3   very good for Kerr-McGee Chemical.                               11:42
4       I think they would become second or third                   11:42
5   largest and able to better compete with DUPONT, who              11:42
6   was the largest.                                                 11:42
7       Q. Did you view their basis for wanting to                   11:42
8   complete the Kemira acquisition as good faith efforts            11:42
9   to better and to improve the Chemical company?                  11:43
10      A. Yes, I did.                                               11:43
11      Q. Do you recall whether or not there was                   11:43
12  anything particular or unique with respect to the                11:43
13  technology that the Kemira facilities employed that             11:43
14  made it particularly valuable to Kerr-McGee?                    11:43
15      A. Yes.                                                      11:43
16      Q. What was that?                                           11:43
17      A. I was told it was based on Kerr-McGee's                  11:43
18  base technology for producing TiO2 pigment.                      11:43
19      Q. When you say "it was based," what is the                 11:43
20  "it" you're referring to, the two plants that were              11:43
21  being acquired?                                                  11:43
22      A. I'm sorry. Two plants are being acquired,                11:43
23  both made titanium dioxide. Clearly, the one in                 11:43
24  Botlek, the Netherlands, was based on Kerr-McGee's              11:43
25  proprietary license technology.                                 11:43

25 (Pages 94 to 97)

CONFIDENTIAL

### Page 214

1  next page, page 3 of the exhibit, do you see it says    03:31
2  "movement or allocation of assets and liabilities"?    03:31
3  Do you see that heading?    03:31
4      A.  Okay.  Roman numeral 1 at the very top,    03:31
5  yes.    03:31
6      Q.  Yes.    03:31
7      A.  Yes.    03:31
8      Q.  And that's consistent with some of the work    03:31
9  that was done on Project Focus; right?  There were a    03:31
10  movement -- there was a movement and an allocation of    03:31
11  assets and liabilities between Kerr-McGee Oil & Gas    03:31
12  and what was at the time Kerr-McGee Chemical    03:31
13  Worldwide; correct?    03:31
14      A.  I think that is correct to some extent,    03:32
15  yes.    03:32
16      Q.  And, in fact, we even saw the assignment,    03:32
17  assumption and indemnity agreement and the assignment    03:32
18  agreement, both of which were backdated to be as --    03:32
19  effective as of December 31, 2002; right?    03:32
20      MR. BILLECK:  Objection, form.    03:32
21      WITNESS:  There was such a document and it    03:32
22  was dated as of December 31st, 2002.    03:32
23      Q.  (BY MR. KASSOF):  We'll come back to that    03:32
24  document, but it wasn't -- it wasn't written as of    03:32
25  December 2002; correct?    03:32

### Page 215

1      A.  No, I believe it was written in April or    03:32
2  May of 2005.    03:32
3      Q.  Right.  Then the assignment, assumption and    03:32
4  indemnity agreement was backdated to be effective    03:32
5  December 31, 2002, consistent with the Project Focus    03:32
6  closing date; right?    03:32
7      MR. BILLECK:  Objection, form.    03:32
8      WITNESS:  Yes, that, I think, is correct.    03:32
9      Q.  (BY MR. KASSOF):  And movement and    03:32
10  allocation of assets and liabilities, the description    03:32
11  in Addison Exhibit 11, that's consistent with the    03:33
12  work that was done and agreed to in connection with    03:33
13  the assignment agreement and the assignment,    03:33
14  assumption and indemnity agreement; correct?    03:33
15      A.  I'm not certain.  I believe probably yes,    03:33
16  but I don't recall -- what you're calling Addison    03:33
17  Agreement 11, I do not yet recall what was done about    03:33
18  movement and allocation of assets and liabilities.    03:33
19      Q.  Let's look at it.  Under the first one, A,    03:33
20  it talks about preparing a comprehensive chart,    03:33
21  right, showing all existing corporations, companies    03:33
22  and partnerships?    03:33
23      A.  Yes.    03:33
24      Q.  And indicating the ownership interest in    03:33
25  such entities.    03:33

### Page 216

1      Do you see that?    03:33
2      A.  Yes.    03:33
3      Q.  Do you know who was assigned that work at    03:33
4  Kerr-McGee under Project Focus?    03:33
5      A.  No, but probably someone in the tax    03:33
6  department.    03:33
7      Q.  And then the second one, 1-B, talks about    03:33
8  identifying all business assets, including assets and    03:34
9  legal entities which will comprise each of the new    03:34
10  intermediate holding companies of Kerr-McGee at the    03:34
11  time of the reorganization.  Do you see that?    03:34
12      A.  Uh-huh.    03:34
13      Q.  Do you know who was assigned that task at    03:34
14  Kerr-McGee?    03:34
15      A.  I do not recall, no.    03:34
16      Q.  And then B-1 talks about determining    03:34
17  whether items reflected on the Kerr-McGee operating    03:34
18  corporation balance sheet are to be held at that    03:34
19  level, that company's level, or allocated among its    03:34
20  direct and indirect subsidiaries.    03:34
21      A.  Uh-huh.    03:34
22      Q.  Identify and allocate corporate level under    03:34
23  shared assets and liabilities among the entities;    03:34
24  right?    03:34
25      Then underneath it lists a whole host of    03:34

### Page 217

1  different liabilities and assets that would need to    03:34
2  be allocated consistent with the heading "moved or    03:34
3  allocated" under Project Focus; correct?    03:34
4      MR. BILLECK:  Objection, form.    03:34
5      WITNESS:  It does appear to list a number    03:34
6  of things that might be allocated among different    03:34
7  entities.    03:35
8      Q.  (BY MR. KASSOF):  Right.  And it's all    03:35
9  consistent with the work that was undertaken at    03:35
10  Kerr-McGee in 2002 under Project Focus; right?    03:35
11      A.  I have no reason to disagree.    03:35
12      Q.  And under 1-B 2, "verify that no assets or    03:35
13  liabilities currently held by a direct or indirect    03:35
14  subsidiary of a Kerr-McGee operating corporation    03:35
15  needs to be moved to another subsidiary."  Do you see    03:35
16  that?    03:35
17      A.  Uh-huh.    03:35
18      Q.  That's correct?  You see that; right, sir?    03:35
19      A.  I see that, yes.    03:35
20      Q.  Okay.  That's also consistent with the work    03:35
21  that Kerr-McGee did in -- under Project Focus; right?    03:35
22      A.  You know, I really don't know.  It makes    03:36
23  sense, though.    03:36
24      Q.  It especially makes sense since there was    03:36
25  an assignment, assumption and indemnity agreement    03:36

55 (Pages 214 to 217)

CONFIDENTIAL

Page 226

1    A. Okay.    03:45
2    Q. If you look at heading 1, it says "Movement    03:45
3    or allocation of assets and liabilities"; right?    03:45
4    A. Yes, it does.    03:45
5    Q. And that's the same heading in the Project    03:45
6    Focus, Exhibit 11 document, 11 months later; right?    03:45
7    A. It looks like it, yes.    03:45
8    Q. And if you look at 1-A in both documents,    03:45
9    the Project Titan checklist and the Project Focus    03:45
10    checklist, Simpson Thacher basically put the exact    03:45
11    same description for the work to be done; correct?    03:45
12    A. Looks like it to me, yes.    03:45
13    Q. And you've got no reason to believe you    03:46
14    ever got this Project Titan spinoff checklist;    03:46
15    correct?    03:46
16    A. I have no reason to believe that, and I    03:46
17    don't remember ever receiving it.    03:46
18    Q. And when you got that Project Focus    03:46
19    checklist that was forwarded from Simpson Thacher, no    03:46
20    one ever told you that there was this other Project    03:46
21    Titan checklist floating around from 11 months    03:46
22    earlier; true?    03:46
23    A. I sure don't recall, so I think that's    03:46
24    true.    03:46
25    Q. And if you look at 1-B, why don't we start    03:46

Page 227

1    with the work that was shown to you in Project Focus    03:46
2    of Exhibit 11, and then you look back at 1-B, which    03:46
3    is the work described by Simpson Thacher under the    03:46
4    Project Titan spinoff, it's almost the same except    03:46
5    you'll notice that the reference to "spin company"    03:46
6    and" spinoff" was deleted from the version that you    03:46
7    got in Project Focus in 2002.    03:46
8    Do you see that, sir?    03:47
9    A. Tell me exactly where. I see a Spinco in    03:47
10    capital B paragraph.    03:47
11    Q. You're looking under 1-B on Exhibit 13,    03:47
12    which is the Project Titan spinoff document; correct?    03:47
13    A. Yes.    03:47
14    Q. If you look at 1-B on the Project Focus    03:47
15    reorganization document, which is the one that you    03:47
16    got from 2002, you'll notice that the references to    03:47
17    Spinco and spinoff were deleted from that entry;    03:47
18    correct?    03:47
19    MR. BILLECK: Objection, form.    03:47
20    WITNESS: Correct.    03:47
21    Q. (BY MR. KASSOF: And then if you look under    03:47
22    1-B-1, "Movement or allocation of assets," where it    03:47
23    talks about determining the allocations among the    03:47
24    various businesses, if you start chronologically with    03:47
25    the Project Titan spinoff document, you'll see lots    03:47

Page 228

1    of lists of items that we talked about earlier that    03:47
2    was identical to the work to be done under Project    03:47
3    Focus reorganization; correct?    03:47
4    MR. BILLECK: Objection, form.    03:48
5    WITNESS: They look very similar. I've not    03:48
6    read each -- every A through whatever it is, Q, R, S,    03:48
7    compared them, but they look very similar.    03:48
8    Q. (BY MR. KASSOF: And if you go to -- under    03:48
9    1-B-2 on the Project Titan spinoff document that you    03:48
10    didn't get in 2001, the movement of allocation of    03:48
11    assets or liabilities, you see that the entry says    03:48
12    "Verify that no assets or liabilities currently held    03:48
13    by Spinco need to be moved to Kerr-McGee and vice    03:48
14    versa." Do you see that?    03:48
15    MR. BILLECK: Object to the form.    03:48
16    WITNESS: This is what it says, yes.    03:48
17    Q. (BY MR. KASSOF: All right. Then if you    03:48
18    look at -- go back to the Project Focus, Exhibit 11    03:48
19    checklist, you see that again? It's almost identical    03:48
20    in the tasks, except from -- except for the fact that    03:48
21    the version that you got in 2002 for Project Focus    03:48
22    deletes the reference to "Spinco"; correct?    03:48
23    A. Yes. It refers to KMOC instead.    03:49
24    Q. And no one told you, at the time that you    03:49
25    got this, that this task that was identified in    03:49

Page 229

1    Project Focus in 2002 actually was first derived to    03:49
2    be a task under a proposed spinoff of Project Titan,    03:49
3    the Chemical operations; correct?    03:49
4    MR. BILLECK: Objection, form.    03:49
5    WITNESS: I certainly never heard of it.    03:49
6    No one explained that to me.    03:49
7    Q. (BY MR. KASSOF: Then if you look at 1-D,    03:49
8    "determine tax liability allocations," that's how    03:49
9    it's described under the Project Focus checklist in    03:49
10    2002.    03:49
11    A. Uh-huh.    03:49
12    Q. It's almost the exact same thing as what's    03:49
13    described a year earlier by Simpson Thacher in    03:49
14    connection with the Project Titan spinoff analysis;    03:49
15    correct?    03:49
16    A. This looks a little different than the    03:49
17    other tab, but there's some similarity there.    03:49
18    Q. Then you go to heading 2, "potential    03:50
19    impediments to movement, allocation of assets and    03:50
20    liabilities," that's what it says on Exhibit 13, the    03:50
21    Project Titan spinoff document in 2001; right, sir?    03:50
22    A. I'm looking. It appears to be the same,    03:50
23    yeah.    03:50
24    Q. Okay. When you say "it appears to be the    03:50
25    same," you mean that it's the exact same language    03:50

58 (Pages 226 to 229)

CONFIDENTIAL

**Page 242**

1  A. The way you keep saying that, I think  04:06
2  you're going to try and surprise me with something,  04:06
3  but I don't recall ever hearing about Titan or any of  04:06
4  this stuff, no.  04:06
5  Q. To kill all the suspense, I'm going to tell  04:06
6  you now that I don't have a document that says that  04:06
7  you were in any way in the loop on any of this stuff,  04:06
8  okay?  04:06
9  A. Okay, good, because I never heard any of  04:06
10  this.  04:06
11  Q. And then if you look at page 2-19, it says  04:06
12  "Project Titan two-step spinoff transaction," do you  04:06
13  see that, sir?  04:06
14  A. Yes.  04:06
15  Q. Have you ever heard anybody talk about a  04:07
16  spinoff of the Chemical Division as a two-step  04:07
17  spinoff transaction at Kerr-McGee?  04:07
18  A. No. I've heard of "dual track," but I've  04:07
19  not heard of two-step.  04:07
20  Q. Would you agree with me that in August of  04:07
21  2000 Lehman Brothers was describing a possible IPO  04:07
22  and spinoff of the Chemical Division as a two-step  04:07
23  transaction —  04:07
24      MR. BILLECK: Objection, form.  04:07
25  Q. (BY MR. KASSOF): — correct?  04:07

**Page 243**

1  A. That's certainly what this slide suggests.  04:07
2  that's what it states.  04:07
3  Q. I'm going to mark as Exhibit 15 the second  04:07
4  Lehman presentation we have dated January 5, 2001.  04:07
5  It's a presentation from Lehman Brothers to  04:08
6  Kerr-McGee titled "Update on Project Titan."  04:08
7      (Addison Exhibit No. 15 marked).  04:08
8  Q. (BY MR. KASSOF): Do you have that, sir?  04:08
9  A. I do, yes.  04:08
10  Q. I take it, consistent with your testimony  04:08
11  earlier, you don't recall ever seeing this while you  04:08
12  were working on Project Focus or working in  04:08
13  connection with the spinoff at Kerr-McGee; correct?  04:08
14  A. Let me try and quickly look at it.  04:08
15  Q. Please do.  04:08
16  A. If the cover sheet date is correct, I don't  04:08
17  think I've seen this or anything like that.  04:08
18  Q. All right. And if you can ask you to look  04:08
19  at page Roman numeral 1-1 of the January 5th, 2001  04:09
20  Lehman presentation, do you see that?  04:09
21      At the top it says "executive summary,  04:09
22  strategic alternative considerations." Are you with  04:09
23  me?  04:09
24  A. Yes. Page 973?  04:09
25  Q. Yes, sir.  04:09

**Page 244**

1  A. Yes, I see it.  04:09
2  Q. If you look under "market considerations,"  04:09
3  you see that in January of 2001 Lehman Brothers was  04:09
4  advising Kerr-McGee that investors continue to  04:09
5  penalize Kerr-McGee for its chemicals exposure.  04:09
6      Do you see that?  04:09
7  A. Yes.  04:09
8  Q. Lehman Brothers was also telling Kerr-McGee  04:09
9  in January of 2001 that a, quote/unquote, pure play  04:09
10  E&P should trade at a higher multiple than Kerr-McGee  04:09
11  today.  04:09
12      Do you see that?  04:09
13  A. Yes.  04:09
14  Q. First question: Were you aware that Lehman  04:09
15  Brothers, Kerr-McGee's outside investment banker, was  04:09
16  advising it that it was being penalized in the  04:09
17  marketplace by investors for its chemical exposure as  04:10
18  early as January of 2001?  04:10
19  A. Certainly not that early. Somewhere along  04:10
20  the line this became kind of the company mantra. The  04:10
21  outside investors were saying we would be more  04:10
22  valuable as a pure play oil and gas company, and it  04:10
23  wasn't getting full value for the chemical business,  04:10
24  but I think that was far later than January 2001.  04:10
25  Q. Right. The company mantra that it would be  04:10

**Page 245**

1  a pure play E&P business and that it was being  04:10
2  penalized in the marketplace for its chemical  04:10
3  exposures, that's consistent with everything you were  04:10
4  hearing during the dual-track process in 2005;  04:10
5  correct?  04:10
6  A. When you say "everything," that covers an  04:10
7  awful lot of stuff.  04:10
8  Q. Sure.  04:10
9  A. I think that generally is correct.  04:10
10  Q. And you had no idea that the notion of a  04:10
11  pure play E&P business that would trade at a higher  04:11
12  value than the combined Oil and Gas and Chemical  04:11
13  Operations of Kerr-McGee was being proposed by Lehman  04:11
14  Brothers all the way back in January of 2001?  04:11
15  A. I had no idea.  04:11
16  Q. If you look at page Roman numeral 1-2 of  04:11
17  the January 2001 presentation under "structural  04:11
18  considerations," do you see that?  04:11
19  A. Yes.  04:11
20  Q. If you look at the third bullet, in January  04:11
21  of 2001 Lehman Brothers was telling Kerr-McGee that  04:11
22  the legacy liabilities with chemicals and  04:11
23  discontinued operations was a structural  04:11
24  consideration that Kerr-McGee needed to think about;  04:11
25  correct?  04:11

62 (Pages 242 to 245)

CONFIDENTIAL

Page 246

```
1        A.  Well, in PowerPoint speak I think that's      04:11
2    what the bullet joint suggests, yes.                  04:12
3        Q.  That's what you would read that to mean       04:12
4    looking at the document; right?                       04:12
5        A.  It's something to consider, yes.              04:12
6        Q.  And in January of 2001 Lehman Brothers is     04:12
7    telling Kerr-McGee to consider and think about, in    04:12
8    your strategic alternatives for the Chemical          04:12
9    Division, the legacy liabilities with chemicals and   04:12
10   discontinued operations; correct?                     04:12
11       A.  Yes.                                  04:12
12       Q.  Then if you look at -- let's go to page       04:12
13   Roman numeral I-10 of the January 2001               04:12
14   presentation --                            04:12
15       A.  Yes.                                 04:12
16       Q.  -- there's a discussion of a summary of      04:12
17   alternatives.  On the right-hand side of the chart is 04:12
18   something called a "straight splitoff or spinoff."    04:12
19   Do you see that?                            04:12
20       A.  Hang on a second.  I may have the wrong      04:12
21   page.  You said it was -- oh, on the right side?      04:13
22       Q.  Yes, sir.                            04:13
23       A.  I misunderstood.                     04:13
24           Yes, I see that.                     04:13
25       Q.  And if you look under "issues and            04:13
```

Page 247

```
1    considerations," do you see that, third row down?     04:13
2        A.  Oh, oh, okay.  Yes, I do see it.            04:13
3        Q.  One of the issues and considerations that    04:13
4    Lehman Brothers was flagging for Kerr-McGee in 2001   04:13
5    was that the legacy environmental issues could        04:13
6    possibly be left with Titan -- that's left with the   04:13
7    Chemical business -- should Kerr-McGee choose to spin 04:13
8    off the E&P business instead.                         04:13
9        Do you see that?                              04:13
10           MR. BILLECK:  Objection, form.              04:13
11           WITNESS:  I see that.  That's what it seems   04:13
12   to suggest.                                  04:13
13       Q.  (BY MR. KASSOF)  And did you know, at the     04:13
14   time that you were working on Project Focus, that     04:13
15   Lehman Brothers, long before then, a year before      04:13
16   exactly, was talking about strategic alternatives and 04:13
17   spinoffs for Kerr-McGee that would allow Kerr-McGee   04:13
18   to possibly leave the legacy environmental issues     04:14
19   with the chemical business and not the E&P business?  04:14
20           MR. BILLECK:  Objection.                   04:14
21       Q.  (BY MR. KASSOF)  Were you aware of that?     04:14
22           MR. BILLECK:  Objection, form.              04:14
23           WITNESS:  I was not aware of that.          04:14
24       Q.  (BY MR. KASSOF)  And did you know that that   04:14
25   was known to Kerr-McGee at the time that you were     04:14
```

Page 248

```
1    doing -- and others were working on Project Focus?    04:14
2           MR. BILLECK:  Objection, form.              04:14
3           WITNESS:  No, I did not know that.          04:14
4        Q.  (BY MR. KASSOF)  If you look at the very      04:14
5    next page -- right now we're talking about on I-10    04:14
6    discussions about a straight spinoff or splitoff      04:14
7    option; right?                              04:14
8           Then if you look at the I-11 of the January   04:14
9    2001 presentation, can you look down at the issues    04:14
10   and considerations, do you see that?                 04:14
11       A.  I see the heading.  Which column?           04:14
12       Q.  On the executive summary on the left-hand    04:15
13   side, sir.                                 04:15
14       A.  All right.                           04:15
15       Q.  Again, we're under the IPO splitoff or       04:15
16   spinoff option; right?                           04:15
17       A.  Uh-huh.                             04:15
18       Q.  In fact, before we even get to the issues,   04:15
19   if you look under the advantages, the second row?     04:15
20       A.  Yes.                                04:15
21       Q.  You see the third bullet says that one of    04:15
22   the advantages of this spinoff, back in January of    04:15
23   2001, would be that it would provide a complete       04:15
24   separation, evidencing strategic clarity.            04:15
25           Do you see that?                        04:15
```

Page 249

```
1        A.  I see those words, yes.                    04:15
2        Q.  Then underneath it, where it talks about     04:15
3    issues and considerations, Lehman Brothers, as early  04:15
4    as January of 2001, is raising as an issue and        04:15
5    consideration, quote, what is the Titan story for     04:15
6    investors?                                  04:15
7           Do you see that?                        04:15
8        A.  No.  What do you mean?  What is the          04:15
9    Titan --                                   04:15
10       Q.  Third bullet down under the IPO splitoff --  04:15
11       A.  There it is.  I'm sorry.  I was looking at   04:15
12   the wrong line.                             04:15
13       Q.  Do you see that?                        04:15
14       A.  Yes.                                04:15
15       Q.  So in January of 2001, when there's all     04:15
16   this talk about a splitoff or spinoff, one of the     04:16
17   issues or considerations that Lehman Brothers flagged 04:16
18   for Kerr-McGee was, as a question, what is the Titan  04:16
19   story for investors?  Do you see that?               04:16
20           MR. BILLECK:  Objection, form.             04:16
21           WITNESS:  Yes, I see that.                 04:16
22       Q.  (BY MR. KASSOF)  They put "story" in         04:16
23   quotes; right?                              04:16
24       A.  It's in quotation marks, correct.           04:16
25       Q.  Meaning, as a person looking at this         04:16
```

63 (Pages 246 to 249)

CONFIDENTIAL

### Page 258

1    WITNESS: When you say back to back,          04:26
2  they're, what, four, five months apart, but, yes, I    04:26
3  guess you can say that's back to back.          04:26
4    Q. (BY MR. KASSOF): Right.          04:26
5    This theme that investors were penalizing      04:26
6  Kerr-McGee for its chemical exposure and that a pure    04:26
7  play E&P business would trade at a higher multiple,    04:26
8  that's the same theme as you mentioned earlier that    04:27
9  would be consistent with the mantra that Kerr-McGee    04:27
10 was touting in 2005; true?          04:27
11   A. It appears to be, yes.          04:27
12   Q. And every time you heard that mantra, you    04:27
13 had no idea that it was told to Kerr-McGee as a    04:27
14 consideration for them to assess all the way back in    04:27
15 2001; right?          04:27
16   MR. BILLECK: Objection, form.          04:27
17   WITNESS: I'm very surprised that those    04:27
18 words were used in that time frame.          04:27
19   Q. (BY MR. KASSOF): If you look at slide 1-11,    04:27
20 executive summary range of strategic alternatives.    04:27
21 It ends with Bates number 893 —          04:27
22   A. Yes.          04:27
23   Q. — you'll notice that Lehman Brothers was    04:27
24 telling Kerr-McGee that after looking at a number of    04:27
25 strategic alternatives, they narrowed the list down    04:28

### Page 259

1  to three options; right?          04:28
2    A. That is what it says.          04:28
3    Q. And one of the ones that they eliminated    04:28
4  was the tracking stock alternative; true?          04:28
5    MR. BILLECK: Objection, form.          04:28
6    WITNESS: I mean, it's on this chart, but    04:28
7  it's down there under —          04:28
8    Q. (BY MR. KASSOF): If you look at slide 1-12,    04:28
9  which is the next slide —          04:28
10   A. Oh, okay.          04:28
11   Q. — I think it will be clear to you that the    04:28
12 tracking stock alternative was eliminated as one of    04:28
13 the proposed strategic options?          04:28
14   A. Okay. Do you want me to look at 1-12 or —    04:28
15   Q. Either one.          04:28
16   A. Okay. Let me look at 1-12.          04:28
17   Yes, I agree, it looks like they deleted    04:28
18 the tracking stock on page 1-12.          04:28
19   Q. The option Lehman Brothers told    04:28
20 Kerr-McGee — the strategic alternative for the    04:28
21 Chemical Division that would still allow the oil and    04:28
22 gas assets to be attached to the legacy liabilities    04:28
23 was eliminated by Lehman Brothers as an alternative    04:28
24 as of April 2001; right?          04:28
25   MR. BILLECK: Objection, form.          04:29

### Page 260

1    Q. (BY MR. KASSOF): That's what it appears to    04:29
2  you, doesn't it, sir?          04:29
3    A. I'm sorry. I got distracted by the spinoff    04:29
4  Kronos. I don't know how that got in there. I just    04:29
5  got confused. I'm sorry.          04:29
6    Q. Do you want me to reask my question?    04:29
7    A. Would you, please?          04:29
8    Q. Sure.          04:29
9    A. I apologize.          04:29
10   Q. The tracking stock alternative that Lehman    04:29
11 Brothers highlighted for Kerr-McGee as having one of    04:29
12 the negatives that the oil and gas assets would still    04:29
13 be attached to the legacy liabilities but not be    04:29
14 isolated from the legacy liabilities, that was    04:29
15 eliminated by Lehman Brothers as one of the possible    04:29
16 strategic alternatives for Kerr-McGee to pursue as of    04:29
17 April 2001; correct?          04:29
18   MR. BILLECK: Objection, form.          04:29
19   WITNESS: That certainly appears to be what    04:29
20 the conclusion is on this page.          04:29
21   Q. (BY MR. KASSOF): And spinoff options were    04:29
22 still on the table as of April 2001; correct?    04:29
23   A. Yes, there are two spinoff options    04:30
24 mentioned.          04:30
25   I would like to mention something that this    04:30

### Page 261

1  page jogged my memory on.          04:30
2    Q. Sure.          04:30
3    A. I may be totally wrong. My testimony    04:30
4  earlier — speaking at one time I thought Kerr-McGee    04:30
5  was looking at Kronos, and it was unsuccessful    04:30
6  because of environmental issues or something. I see    04:30
7  the word Kronos here on this page 1-12 and I — it    04:30
8  seems like in association with Kronos, I once heard    04:30
9  the time Project Titan perhaps.          04:30
10   Remember I said Project Apollo was the    04:30
11 Kemira acquisition and Project Hawk was the HS? You    04:31
12 know somewhere I vaguely recall, tied in with a look    04:31
13 at purchasing Kronos, they may have called it Titan    04:31
14 or something.          04:31
15   Maybe I shouldn't even have said that, but    04:31
16 I testified earlier I'd never heard Titan. It just    04:31
17 dawned on me I may have heard it in association with    04:31
18 looking at Kronos.          04:31
19   Q. But certainly not in association with a    04:31
20 possible spinoff of the Chemical operation as of    04:31
21 April of 2001; correct?          04:31
22   A. Correct.          04:31
23   Q. If you can turn to page 1-19, there's an    04:31
24 executive summary provided by Lehman Brothers in this    04:31
25 April 2001 presentation.          04:31

66 (Pages 258 to 261)

CONFIDENTIAL

### Page 282

1    what I've said earlier, that they kept talking about    05:09
2    this pure play oil and gas company, and that it would    05:09
3    be after the proposed spinoff or sale of Chemical,    05:09
4    which later became Tronox.    05:09
5        I don't recall emphasis being on separating    05:09
6    the legacy liabilities from the oil and gas entity,    05:09
7    but it was sort of understood and a given that that's    05:10
8    what was occurring. It was also a function of that    05:10
9    assignment and assumption agreement, slash,    05:10
10   assignment assumption and indemnity agreement, the    05:10
11   reciprocal agreements.    05:10
12       So when you say, was I aware of any    05:10
13   discussion of that, to the extent I just mentioned,    05:10
14   yes, in the 2005 time frame, starting sometime in mid    05:10
15   March, I guess I did hear that.    05:10
16   Q.  And you referenced the assignment and    05:10
17   assumption and the indemnity agreement and the    05:10
18   conversations about separating out the oil and gas    05:10
19   assets from the legacy liabilities in 2005, because    05:10
20   that would be consistent with the desire to have    05:10
21   those oil and gas assets clean from the legacy    05:10
22   liabilities; correct?    05:10
23   A.  I'm going to say yes.    05:10
24       (Addison Exhibit No. 18 marked).    05:11
25   Q.  (BY MR. KASSOF)  Mr. Addison, I'm marking,    05:11

### Page 283

1    as Addison Exhibit 18, a memorandum. It's identified    05:11
2    on the top as a draft of July 12, 2002 from Simpson    05:11
3    Thacher & Bartlett. The Bates number at the bottom    05:11
4    is KMTRX566713.    05:11
5        Do you have that, sir?    05:11
6    A.  I see that, yes.    05:11
7    Q.  All right. You see that the recipients of    05:11
8    this memorandum were Mr. Pilcher and Mr. Wohleber and    05:12
9    Mr. Reichenberger; right?    05:12
10   A.  Yes, those are listed under the "to"    05:12
11   heading.    05:12
12   Q.  You're not identified; correct?    05:12
13   A.  Do not appear to be, no.    05:12
14   Q.  And you have no reason to believe that you    05:12
15   ever got this memo either; true?    05:12
16   A.  Let me look.    05:12
17       I need to mention that the memo itself    05:12
18   doesn't look at all familiar, neither do the -- or    05:13
19   the exhibits. But in the far back are a number of    05:13
20   charts showing new entities, things like that, which    05:13
21   seem vaguely familiar as Project Focus was at one    05:13
22   time explained to me or something.    05:13
23       I mean, should I hold these up for the    05:13
24   camera? I don't know what they really even say here.    05:13
25   Maybe I'll look at this page number. Some of this    05:13

### Page 284

1    stuff looks familiar.    05:13
2    Q.  Well, let me help you out.    05:13
3    A.  Okay.    05:13
4    Q.  Let me help you out.    05:13
5    A.  But I don't remember ever seeing the memo.    05:13
6    Q.  You've got -- attached to this memo is a    05:13
7    step-by-step plan, revised transaction plan, with a    05:13
8    number of organizational charts; is that right?    05:13
9        MR. BILLECK:  Objection, form.    05:13
10   Q.  (BY MR. KASSOF)  Is that correct, sir? Is    05:13
11   that how you see it? Is that how you read it?    05:13
12   A.  You know, I didn't even look at all those    05:13
13   pages. I just recognized, I think, some of the    05:13
14   revised transaction step plan sheets that are in    05:14
15   annex B.    05:14
16   Q.  Right. And you'll recall, when we looked    05:14
17   back at both the Project Titan spinoff checklist that    05:14
18   Simpson Thacher put together in 2001 and the Project    05:14
19   Focus reorganization checklist that Simpson Thacher    05:14
20   put together, which you saw in 2005, there was an    05:14
21   identification of putting together detailed steps to    05:14
22   effectuate this reorganization; correct?    05:14
23       MR. BILLECK:  Objection, form.    05:14
24       WITNESS:  Yes.    05:14
25   Q.  (BY MR. KASSOF)  And on this memoranda is a    05:14

### Page 285

1    chart listing various steps of a revised transaction    05:13
2    step plan under a memo by Simpson Thacher in July of    05:14
3    2002; right?    05:14
4    A.  Yeah, the revised transaction step plan    05:14
5    appears to be annex B to the memo.    05:14
6    Q.  And we're in -- just again to orient    05:15
7    ourselves on the time line, we're in July 2002, which    05:15
8    is smack dab in the middle of Project Focus, right,    05:15
9    which lasted from January of 2002 through -- well, at    05:15
10   least the closing -- I'll put that in quotes -- was    05:15
11   December 31, 2002; right?    05:15
12   A.  I think so.    05:15
13   Q.  And this is --    05:15
14   A.  You keep asking me about Project Focus. My    05:15
15   recollection is, I had very, very little involvement. It was    05:15
16   memos, I had very, very little involvement. It was    05:15
17   primarily Dwayne Morris.    05:15
18       This was the time I was moving from    05:15
19   business transactions to the Chemical Division    05:15
20   assistant general counsel and was tasked with trying    05:15
21   to sell some assets there. I'd get copied in on this    05:15
22   stuff but did not spend much time or investment or    05:15
23   intellectual curiosity at all in it.    05:15
24   Q.  My question was a little more focused.    05:16
25   A.  Okay.    05:16

72 (Pages 282 to 285)

CONFIDENTIAL

Page 286

1    Q. I said, Project Focus kicked off in January    05:16
2    of 2002, which we saw; right?    05:16
3    A. Yes.    05:16
4    Q. You know, from the backdating of the    05:16
5    assignment, assumption and indemnity agreement, that    05:16
6    it purported to close on December 31, 2002; right?    05:16
7    A. Yes, it was supposed to be effective    05:16
8    December 31, 2002.    05:16
9    Q. This memo I just put in front of you as    05:16
10    Addison Exhibit 18 is dated July 12, 2002; right?    05:16
11    A. Yes.    05:16
12    Q. Right in the middle of Project Focus?    05:16
13    A. That's correct.    05:16
14    Q. And if you look at the first paragraph,    05:16
15    what Simpson Thacher is describing is an analysis    05:16
16    that they did of debt covenants and restrictions that    05:16
17    were imposed on the consummation of certain specified    05:16
18    corporate transactions following the completion of    05:16
19    Project Focus. Do you see that?    05:16
20    A. Yes.    05:16
21    Q. And the first bullet talks about Project    05:16
22    Focus will include steps 1 through 11; right?    05:16
23    A. That's what it says, yes.    05:17
24    Q. It says that's attached as annex B, which    05:17
25    we looked at earlier; right?    05:17

Page 287

1    A. Yes.    05:17
2    Q. And then the next bullet says -- has a    05:17
3    reference to how to effectuate a straight spinoff of    05:17
4    Titan, the Chemical business, and how to effectuate    05:17
5    that; right?    05:17
6    MR. BILLECK: Objection, form.    05:17
7    THE WITNESS: That's what it seems to show,    05:17
8    yes.    05:17
9    Q. (BY MR. KASSOF): So during the middle of    05:17
10    Project Focus, Simpson Thacher & Bartlett is    05:17
11    providing a memorandum to certain people at    05:17
12    Kerr-McGee -- not you -- describing the steps of    05:17
13    Project Focus and also how to, upon completion of    05:17
14    Project Focus, effectuate a straight spinoff of the    05:17
15    chemical operations; true?    05:17
16    MR. BILLECK: Objection, form.    05:17
17    Q. (BY MR. KASSOF): Is that what it appears to    05:17
18    be to you, sir?    05:17
19    A. Yes.    05:17
20    Q. And if you look at the -- do you see that    05:17
21    Project Focus is described as having 11 steps in that    05:18
22    first bullet by Simpson Thacher?    05:18
23    A. Yes.    05:18
24    Q. If you look after step 11, and the page on    05:18
25    the document ends in Bates number 736, do you see    05:18

Page 288

1    that?    05:18
2    A. Let me get there. I do see it.    05:18
3    Q. There is a note, and it's in bold, that    05:18
4    says, confirm that KMOGC is a, quote, clean corporate    05:18
5    entity for purposes of holding company structure.    05:18
6    Do you see that?    05:18
7    A. Yes.    05:18
8    Q. That is a note that Simpson Thacher    05:18
9    Bartlett put on this memo to Mr. Pilcher,    05:18
10    Mr. Wohleber, and Mr. Reichenberger; right?    05:18
11    MR. BILLECK: Objection to form.    05:18
12    Q. (BY MR. KASSOF): That's the way it appears    05:18
13    to you, sir?    05:18
14    A. That's what it appears to say, yes.    05:18
15    Q. And the confirmation that's requested by    05:18
16    Simpson Thacher that Kerr-McGee Oil & Gas Corporation    05:18
17    is quote/unquote clean at the end of Project Focus is    05:18
18    entirely consistent with the note that we just looked    05:19
19    at on the Project Focus checklist that said that    05:19
20    Simpson Thacher wants to know if Kerr-McGee Oil & Gas    05:19
21    Corporation is quote/unquote clean from the legacy    05:19
22    liabilities; right?    05:19
23    MR. BILLECK: Objection, form.    05:19
24    Q. (BY MR. KASSOF): Is that how it appears to    05:19
25    you, sir?    05:19

Page 289

1    A. They do seem related, yes.    05:19
2    Q. Simpson Thacher is emphasizing this in    05:19
3    March of 2002 and again in July of 2002; right?    05:19
4    They are emphasizing the need to confirm    05:19
5    that the oil and gas corporation is quote/unquote    05:19
6    clean from the environmental legacy liabilities;    05:19
7    right?    05:19
8    MR. BILLECK: Objection, form.    05:19
9    Q. (BY MR. KASSOF): Right, sir? Is that how    05:19
10    it appears to you?    05:19
11    A. It appears, yes. I'm just -- the    05:20
12    handwritten note from the unidentified person is on    05:20
13    something dated -- well, it's undated, but appears to    05:20
14    be as of March 22nd, and this Simpson Thacher thing    05:20
15    is a few months later, in July.    05:20
16    Q. One of the people who received the memo in    05:20
17    July was Mr. Pilcher; right?    05:20
18    MR. BILLECK: Objection, form.    05:20
19    THE WITNESS: Yes, he's the principal    05:20
20    recipient.    05:20
21    Q. (BY MR. KASSOF): So that takes us midway    05:20
22    through 2002. Project Focus continues throughout the    05:20
23    rest of 2002 at least, right, to your knowledge?    05:21
24    A. You know, I don't remember. I don't even    05:21
25    recall. I was consumed with other things.    05:21

73 (Pages 286 to 289)

CONFIDENTIAL

Page 302

1    sorts of references to Spinco and spinoff and          05:36
2    movement of assets and liabilities in connection with          05:36
3    a spinoff; true?          05:36
4        MR. BILLECK: Object to the form.          05:36
5        WITNESS: I'm flipping through the          05:36
6    document. I mean, there's a responsible parties          05:36
7    column on virtually every page that does make          05:36
8    repeated mention to a Spinco.          05:36
9        Q. (BY MR. KASSOF): That's in the 2003 version          05:37
10   and the 2001 version, but it's deleted from the 2002          05:37
11   Project Focus version; right?          05:37
12       MR. BILLECK: Objection, form.          05:37
13       WITNESS: I think you're correct. Let me          05:37
14   just make a quick -- I don't recall ever seeing          05:37
15   Spinco in the Project Focus version, which is -- just          05:37
16   to be clear, it's in Exhibit 11. It's in the other          05:37
17   two. Yes, Exhibit 11. Project Focus.          05:37
18       Q. (BY MR. KASSOF): Sir, when you testified in          05:37
19   response to questions from Anadarko and Kerr-McGee's          05:37
20   counsel about Project Focus, did you have any idea          05:37
21   that both before and after Project Focus, Simpson          05:37
22   Thacher was advising Kerr-McGee about steps to be          05:37
23   taken to effectuate a spinoff of the Chemical          05:37
24   operations?          05:37
25       MR. BILLECK: Objection, form.          05:37

Page 303

1        WITNESS: I had absolutely no idea.          05:37
2        Q. (BY MR. KASSOF): And the first time you're          05:37
3    hearing anything about Simpson Thacher providing the          05:37
4    very similar analysis in both 2001 and then again          05:38
5    after 2002, in Project Focus, right immediately in          05:38
6    2003, is right now sitting here answering my          05:38
7    questions; fair?          05:38
8        MR. BILLECK: Objection, form.          05:38
9        WITNESS: That is correct.          05:38
10       Q. (BY MR. KASSOF): Before right now, you had          05:38
11   absolutely no idea that Project Focus did, in fact,          05:38
12   have everything to do about the steps to be taken in          05:38
13   connection with a spinoff of the Chemical business;          05:38
14   true?          05:38
15       MR. BILLECK: Objection, form.          05:38
16       WITNESS: That's correct.          05:38
17       Q. (BY MR. KASSOF): And you agree with my          05:38
18   characterization based on the documents that you are          05:38
19   seeing for the first time here today under oath;          05:38
20   right?          05:38
21       MR. BILLECK: Objection, form.          05:38
22       WITNESS: Yes, but it also fits with the          05:38
23   memo Mr. Pilcher did about the legitimate business          05:39
24   purposes, also. I mean --          05:39
25       Q. (BY MR. KASSOF): Which is entirely          05:39

Page 304

1    consistent with the advice that Lehman Brothers gave          05:39
2    to Kerr-McGee about coming up with a valid business          05:39
3    purpose when you want to perform a spinoff company --          05:39
4    a spinoff of the Chemical business to leave the          05:39
5    legacy liabilities behind and have them totally          05:39
6    unattached to the oil and gas assets; true?          05:39
7        MR. BILLECK: Objection, form.          05:39
8        WITNESS: I think that's correct, yes.          05:39
9        MR. KASSOF: Why don't we break for the          05:39
10   evening and pick up in the morning?          05:39
11       MR. WALTERS: Nine o'clock?          05:39
12       MR. BILLECK: Sounds good.          05:39
13       MR. WALTERS: We'll be here.          05:39
14       VIDEOGRAPHER: Going off the record. The          05:39
15   time is now 5:38 p.m.          05:39
16       (DEPOSITION CONCLUDED)          05:39
17
18
19
20
21
22
23
24
25

Page 305

1    STATE OF OKLAHOMA        )
                              )SS
2    COUNTY OF _____        )
3
4    CORRECTIONS NOTED _____
5    NO CORRECTIONS NOTED _____
6
7        I, ROGER ADDISON, do hereby state under oath
8    that I have read the above and foregoing deposition
9    in its entirety and that the same is a full, true and
10   correct transcription of my testimony so given at
11   said time and place, except for the corrections
12   noted.
13
14
15   _____
16   ROGER ADDISON
17
18       Subscribed and sworn to before me, the
19   Notary Public in and for the State of Oklahoma, by
20   said witness on this the _____ day of _____,
21   2010.
22
23   _____
24   NOTARY PUBLIC
25   My Commission Expires: _____

77 (Pages 302 to 305)

CONFIDENTIAL

Page 306

**ERRATA SHEET**
DEPOSITION OF ROGER ADDISON
REPORTER:  Sherri S. Grubbs, CSR, RPR, RMR, RDR, CRR
DATE DEPOSITION TAKEN: July 13, 2010

| Page | Line | Correction |
|------|------|------------|

Page 307

1
2
3    **C E R T I F I C A T E**
4
5    STATE OF OKLAHOMA )
6              ) SS
7    COUNTY OF OKLAHOMA)
8
9              I, SHERRI S. GRUBBS, Certified Shorthand
10   Reporter within and for the State of Oklahoma, do
11   hereby certify that the above-named ROGER ADDISON was
12   by me first duly sworn to testify the truth, the
13   whole truth, and nothing but the truth, in the case
14   aforesaid; that the above and foregoing deposition
15   was by me taken in shorthand and thereafter
16   transcribed; that the same was taken on July 13,
17   2010, in Oklahoma City, Oklahoma, pursuant to
18   agreement, and under the stipulations hereinbefore
19   set out; and that I am not an attorney for nor
20   relative of any of said parties or otherwise
21   interested in the event of said action.
22            IN WITNESS WHEREOF, I have hereunto set my
23   hand and official seal this 14th day of July, 2010.


              SHERRI GRUBBS, CSR, RPR, RMR, RDR
              State of Oklahoma CSR No. 1232

78  (Pages 306 to 307)

# EXHIBIT B

Page 308

1                    IN THE UNITED STATES BANKRUPTCY COURT

2                    FOR THE SOUTHERN DISTRICT OF OKLAHOMA

3

IN RE:                          ) Chapter 11
4    TRONOX INCORPORATED, et al.,    ) No. 09-10156
          Debtors.                   ) Jointly Administered
5    ─────────────────────────────── )
TRONOX INCORPORATED, TRONOX         )
6    WORLDWIDE LLC, f/k/a KERR-MCGEE )
CHEMICAL WORLDWIDE LLC, and         )
7    TRONOX LLC, f/k/a KERR-MCGEE    )
CHEMICAL, LLC,                      )
8              Plaintiffs,           ) Adversary Proceeding
     -vs-                            ) No. 09-01198 (ALG)
9    ANADARKO PETROLEUM CORPORATION  )
and KERR-MCGEE CORPORATION,         )
10             Defendants.           )
     ─────────────────────────────── )
11   THE UNITED STATES OF AMERICA,   )
               Plaintiff-Intervenor, )
12   -vs-                            )
     TRONOX INC., TRONOX WORLDWIDE   )
13   LLC, TRONOX LLC, KERR-MCGEE     )
     CORPORATION, and ANADARKO       )
14   PETROLEUM CORPORATION,          )
               Defendants.           )
15

16

17         VIDEOTAPED DEPOSITION OF ROGER ADDISON, VOLUME II

18              TAKEN ON BEHALF OF THE TRONOX

19                 IN OKLAHOMA CITY, OKLAHOMA

20                    ON JULY 14, 2010

21

22

23                    TSG REPORTING, INC.
                      NEW YORK, NEW YORK
24         REPORTED BY:  LORI A. JOHNSTON, CSR, RPR, CLR

25         TSG JOB NO.:  31426

## Page 309

```
 1              A P P E A R A N C E S
 2
 3   FOR TRONOX:
 4        Andrew A. Kassof
          David H. DeCelles
 5        Attorneys at Law
          Kirkland & Ellis LLP
 6        300 North LaSalle
          Chicago, IL  60654
 7
     FOR ANADARKO PETROLEUM CORPORATION:
 8
 9        Jason W. Billeck
          Attorney at Law
10        Weil Gotshal & Manges LLP
          700 Louisiana
11        Suite 1600
          Houston, TX  77002
12             -and-
          Jessie B. Mishkin
13        Attorney at Law
          Weil Gotshal & Manges
14        767 Fifth Avenue
          New York, NY  10153-0119
15             -and-
          Duke K. McCall, III
16        Attorney at Law
          Bingham McCutchen LLP
17        2020 K Street, NW
          Washington, DC  20006-1806
18             -and-
          Jennifer Edwards
19        Senior Attorney
          Anadarko Petroleum Company
20        1201 Lake Robbins Drive
          The Woodlands, TX  77380
21   FOR UNITED STATES DEPARTMENT OF JUSTICE:
22        Katherine M. Kane
          Trial Attorney
23        US Department of Justice
          ENRD Mailroom, Room 2121
24        601 D Street, NW
          Washington, D.C.  20004
25
```

## Page 310

```
 1   FOR UNSECURED CREDITORS COMMITTEE:
 2        Ross G. Shank
          Attorney at Law
 3        Kasowitz, Benson, Torres & Friedman
          1633 Broadway
 4        New York, NY  10019-1800
 5   FOR THE WITNESS:
 6        Kevin Donelson
          Jay Walters
 7        Attorneys at Law
          Fellers Snider Blankenship Bailey & Tippens
 8        1700 Chase Tower
          100 North Broadway
 9        Oklahoma City, OK  73102
10   ALSO PRESENT:
11        Robert Rusch, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 311

```
 1                 I N D E X
 2                               Page
 3   Roger Addison
     CONTINUED DIRECT EXAMINATION by MR. KASSOF  316:8
 4
               EXHIBITS
 5
     For Deposition:
 6
     Exhibit 1   witness statement of Roger
 7     Addison from the Komir arbitration
       Previously Marked              349:20
 8
     Exhibit 23  E-mail from Roger Addison to
 9     John Reichenberger, Bill Laython, Justin
       Byrne, May 9, 2005
10     For Identification            321:9
     Exhibit 24  email from Roger Addison to Bill Laython and
11     Justin Byrne Por Identification  323:20
12
     Exhibit 25  string of e-mails dated July
13     15 to July 18, 2005
       For Identification            339:13
14
     Exhibit 26  e-mail dated April 6th, 2005
15     For Identification            342:6
     Exhibit 27  letter from the EPA on April
16     8th, 2005, associated with Manville
       For Identification            342:8
17
     Exhibit 28  subsequent draft of the
18     assignment and assumption agreement dated
       April 18th
19     For Identification            342:12
20
     Exhibit 29  offer from Kerr-McGee
21     Corporation regarding Savannah and Botlek
       facilities
22     For Identification            348:21
     Exhibit 30  memorandum that Mr.Montgomery
23     sent to Peter Nickles
       For Identification            355:9
24   Exhibit 31  e-mail from B.J. Montgomery to
25
```

## Page 312

```
 1        Peter Nickles
          For Identification         363:21
 2
     Exhibit 32  e-mail from Mr.Homburg dated
 3     December 27th, 1999, to Mr.Reichenberger and
       Mr. Addison
 4     For Identification            369:8
 5   Exhibit 33  summary of a meeting with the
       Georgia Environmental Protection Department
 6     dated
       For Identification            370:18
 7
     Exhibit 34  e-mail sent to Joe Flake
 8     copied to Harold Homburg and John
       Reichenberger on December 27, 1999, by Roger
 9     Addison
       For Identification            374:11
10
     Exhibit 35  e-mail from Mr.Pilcher to
11     Roger Addison, dated June 24th, 2005,
       attaching a summary of Apollo management bid
12     For Identification            378:13
13   Exhibit 36  e-mail from Roger Addison to
       Mr.Pilcher on June 24th, 2005
14     For Identification            378:15
15   Exhibit 37  e-mail string between Roger
       Addison and Mr.Pilcher starting and ending on
16     September 10th, 2005
       For Identification            389:19
17
     Exhibit 38  e-mail, April 15th, 2005, from
18     Morgan Lewis
       For Identification            396:14
19
     Exhibit 39  July 28th, 2005, e-mail from
20     Roger Addison to Mr.Reichenberger, Garrison,
       and Mr. Cubbage
21   Exhibit 40  cover e-mail from Roger        398:12
       Addison to T.L.  Cubbage
22     For Identification            401:13
23
     Exhibit 41  memorandum from Mr. Cubbage to
24     Roger Addison, dated July 28th, 2005  404:01
25
```

2  (Pages 309 to 312)

TSG Reporting 877-702-9580

Page 313

```
 1
 2   Exhibit 43   administrative order on
         consent from the United States Environmental
 3       Protection Agency, dated March 31, 2000
         For Identification          417:21
 4   Exhibit 44   e-mail that Roger Addison sent
         to Mary Mikkelson on or about January 22nd,
 5       2005
         For Identification          437:17
 6
 7   Exhibit 45   e-mail string
         For Identification          441:13
 8   Exhibit 46   e-mail that appears to be
         dated July 6, 2006
 9       For Identification          449:13
10   Exhibit 47   Covington & Burling memorandum
         For Identification          463:3
11
     Exhibit 48   letter from the United States
12       Environmental Protection Agency to Kerr-McGee
         Corporation
13       For Identification          467:11
14   Exhibit 49   letter from the EPA, dated
         July 6, 1999, to Kerr-McGee Corporation
15       For Identification          468:2
16   Exhibit 52   July 25th, 2002 Covington &
         Burling memo
17       For Identification          485:3
18   Exhibit 53   memorandum by Covington &
         Burling dated September 13th, 2000
19       For Identification          487:24
20   Exhibit 54   May 10th, 2005, memorandum by
         Covington & Burling
21       For Identification          493:3
22   Exhibit 55   Covington & Burling memo dated
         November 22nd, 2002
23       For Identification          501:12
24   Exhibit 56   March 11, 2003 memo from
         Covington & Burling
25       For Identification          502:23
```

Page 314

```
 1   Exhibit 57   February 5th, 2003 memorandum
         For Identification          504:1
 2
 3   Exhibit 58   July 16th, 2002, memo by Sam
         Haywood to Elliot Schulder
 4       For Identification          509:3

 5   Exhibit 60   memo, dated July 7th, 2005
         For Identification          521:7
 6   Exhibit 61   e-mail from Michael Chambers
         at Akin Gump to Addison, Byrne, and Mikkelson
 7       For Identification          330:17
 8   Exhibit 62   e-mail exchange
         For Identification          535:9
 9
10   Exhibit 63   e-mail string
         For Identification          543:9
11   Exhibit 64   e-mail train that begins on
         October 13th, 2005, and goes through October
12       17th,
         For Identification          549:22
13
14   Exhibit 65   e-mail string again that went
         from Mr Chambers up through Ms.Roberts, to
15       Roger Addison
         For Identification          551:8
16   Exhibit 66   cover e-mail from Melody Walke
         to individuals, including Roger Addison
17       For Identification          562:6
18   Exhibit 67   EPA unilateral administrative
         order for removal options at West Chicago
19       For Identification          566:14
20   Exhibit 68   memorandum from Lawrence Young
         to Greg Pilcher, dated November 19th, 1998
21       For Identification          570:10
22   Exhibit 69   memorandum attaching a
         presentation, which I believe is by Arthur
23       Andersen
         For Identification          576:7
24
25   Exhibit 70   e-mail from Addison to
         Mr.Owens dated September 27th, 2007   584:15
```

Page 315

```
 1
 2   Exhibit 71   e-mail exchange between
         Addison and James Crumpley, copied to Mary
 3       Mikkelson
         For Identification          587:15
 4   Exhibit 72   e-mail from Mr.Crumpley to
         Mary Mikkelson
 5       For Identification          588:21
 6   Exhibit 73   e-mail from Ms.Mikkelson to
         James Crumpley and others at the McKinney
 7       Stringer
         For Identification          590:23
 8
     Exhibit 74   e-mail exchange with the Bates
 9       numbers TRX-TAMM-118999 through '9000
         For Identification          593:18
10
     Exhibit 37   Adams  compilation of a number of
11       presentations
         Previously Marked          426:18
12
     Exhibit 43   Adams  Adams Exhibit 43
13       Previously Marked          419:12
14   Exhibit 76   Adams  purchase and sale of real
         property agreement was for four parcels of
15       land in Henderson, Nevada
         Previously Marked          425:18
16
17
18
19
20
21
22
23
24
25
```

Page 316

```
 1   THE VIDEOGRAPHER: Going back on the record.   08:52:0
 2   The time is now 9:11 a.m.
 3       ROGER ADDISON          08:52:09
 4   Of lawful age, having been first duly sworn, deposes   08:52:09
 5   says in reply to the questions propounded as follows:
 6       CONTINUED DIRECT EXAMINATION          08:52:0
 7   BY MR. KASSOF:          08:52:09
 8   Q   Good morning, Mr. Addison.          09:12:59
 9   A   Good morning.          09:12:59
10   Q   You understand you're still under oath;   09:13:01
11   correct, sir?
12   A   Yes, I do.          09:13:03
13   Q   All right.  Yesterday, we talked about the   09:13:05
14   assignment assumption and indemnity agreement.  Do you
15   remember that?
16   A   Are you talking about the one that tied in with   09:13:16
17   Project Focus and related back to, I think, the date of
18   December 31st, 2002?  That agreement?  Yes.
19   Q   Absolutely correct.          09:13:25
20       Can you hand -- can you put in front of you   09:13:27
21   what we marked previously as Exhibit 5?
22   A   I'll find it.  Yeah.          09:13:30
23   Q   This one.  (Indicating).          09:13:31
24   A   Thank you.          09:13:31
25   Q   And you testified earlier you were not the   09:13:33
```

3  (Pages 313 to 316)

## Page 357

1  2000."
2      That was before the closing; right?    10:06:45
3      MR. BILLECK: Objection to form.    10:06:47
4      THE WITNESS: Yes. They hadn't closed by then.    10:06:50
5      Q  (By Mr. Kassof) And he said: "I met with Rob    10:06:52
6  Roberts, Bob Scanlon and Graham Harcourt to get a feel for
7  how the place was being operated. I specifically asked
8  about any problems with OSHA. Roberts and Scanlon told me
9  that OSHA pretty much left them alone. There were two
10  Hispanics named Santiago and Sanchez as OSHA reps in the
11  area. I spent a lot of time walking around the chloride
12  plant that week and noted that either Kemira was lying or
13  Santiago and Sanchez must be blind."
14      Do you see that?    10:07:14
15      MR. BILLECK: Objection to form.    10:07:15
16      THE WITNESS: Yes. I see that language.    10:07:17
17      Q  (By Mr. Kassof) And this is the --    10:07:19
18  Mr. Montgomery indicating to Mr. Nickles what he noticed
19  before closing; true?
20      MR. BILLECK: Objection to form.    10:07:27
21      THE WITNESS: Yes. It certainly appears to say    10:07:29
22  that.
23      Q  (By Mr. Kassof) And then the next paragraph    10:07:31
24  says -- he goes on to talk about other visits that he took
25  prior to closing. Do you see the first sentence?

## Page 358

1      A  Are you -- are you just continuing on?    10:07:41
2      Q  Yes, sir.    10:07:42
3      A  The sentence beginning "I was never told"?    10:07:44
4      Q  No. No. I'm sorry. Next paragraph. I had    10:07:47
5  John Magyard --
6      A  Executive --    10:07:49
7      Q  -- and David Marshall with me on subsequent    10:07:52
8  visits prior to closing. Do you see that?
9      A  Okay. Yes. I see that.    10:07:54
10      Q  And if you skip a little bit down, he writes,    10:07:55
11  quote, "We soon found the chloride plant was operating
12  totally out of control and maintenance at the facility was
13  haphazard at best."
14      Do you see that?    10:08:05
15      MR. BILLECK: Objection to form.    10:08:06
16      THE WITNESS: Yes.    10:08:07
17      Q  (By Mr. Kassof) Indicating from Mr. Montgomery    10:08:09
18  to Mr. Nickles of something that he identified with the
19  chloride plant prior to closing; true?
20      MR. BILLECK: Object to the form.    10:08:16
21      THE WITNESS: That's what it says.    10:08:18
22      Q  (By Mr. Kassof) And Mr. Montgomery goes on to    10:08:21
23  talk about oxidation reactions that he was noting with
24  respect to the plant. Do you see that, sir?    10:08:28
25      MR. BILLECK: Objection to form.

## Page 359

1      THE WITNESS: Are you referring to the sentence    10:08:29
2  that says: "We also determined that the oxidation
3  reactions..."
4      Q  (By Mr. Kassof) Yes.    10:08:35
5      A  Yes.    10:08:35
6      Q  And do you see, then, the two sentences later,    10:08:36
7  he says, quote, "This was a dangerous condition to anyone
8  working in that area."
9      Do you see that?    10:08:42
10      MR. BILLECK: Object to the form.    10:08:42
11      THE WITNESS: Yes, I see that.    10:08:43
12      Q  (By Mr. Kassof) Another point that    10:08:44
13  Mr. Montgomery noted to Mr. Nickles that Kerr-McGee
14  identified prior to closing; correct?
15      MR. BILLECK: Object to the form.    10:08:51
16      THE WITNESS: That's what this says. Yes.    10:08:53
17      Q  (By Mr. Kassof) Then he goes on to say: "I    10:08:54
18  told John Magyard that we had to rectify the problems with
19  the oxidizers or we could never make that plant work
20  safely."
21      Do you see that?    10:09:03
22      MR. BILLECK: Objection to form.    10:09:04
23      THE WITNESS: Yes. "The plant safely." But,    10:09:06
24  essentially, that's what it says.
25      Q  (By Mr. Kassof) And it goes on to say: "John    10:09:09

## Page 360

1  spent his time in March trying to determine how we could
2  rectify the oxidizer problems as well as the vent system
3  design flaws. The complexity of the problem was enormous."
4      Do you see that?    10:09:21
5      A  Yes.    10:09:22
6      Q  All identified as information that    10:09:23
7  Mr. Montgomery found at the Savannah plant prior to
8  closing; correct?
9      MR. BILLECK: Object to the form.    10:09:29
10      THE WITNESS: Yes.    10:09:29
11      Q  (By Mr. Kassof) He goes on to say: "We kept    10:09:31
12  making notes of things we found, and the list was getting
13  longer. I advised John Talpos by phone in late March,
14  prior to closing, that there were a lot more problems than
15  we had seen in the original tour of Savannah."
16      Do you see that, sir?    10:09:45
17      A  Yes.    10:09:45
18      MR. DONELSON: Object to the form.    10:09:46
19      Q  (By Mr. Kassof) No reason to dispute that;    10:09:48
20  right?
21      A  No. That's what it says.    10:09:49
22      Q  And who is John Talpos?    10:09:55
23      A  At that time, he was a contractor or a    10:09:59
24  consultant in a fairly high level within chemical to fill a
25  position that was vacant. So he was probably -- though he

14  (Pages 357 to 360)

Page 593

1  individuals as senior management?
2       MR. BILLECK: Objection to form.    17:21:38
3       THE WITNESS: I -- I don't know. I think they    17:21:42
4  would assume that they were senior management, but I don't
5  know who they considered senior management.
6       Q  (By Mr. Kassof) And Ms. Mikkelson said that    17:21:48
7  those are the folks -- or she checked with senior
8  management first, Kerr-McGee senior management, before she
9  could go and send to Tronox's -- the lawyer that had been
10  purportedly hired to represent Tronox's interests, she had
11  to check with Kerr-McGee senior management before she could
12  go and send a document that the own lawyers had asked for;
13  correct?
14       MR. BILLECK: Objection to form.    17:22:15
15       THE WITNESS: Appears yes. It may have meant    17:22:29
16  just her boss, but I don't know.
17       Q  (By Mr. Kassof) One more document, Mr. Addison.    17:24:34
18  I've marked as Addison Exhibit 74 an e-mail exchange with
19  the Bates numbers TRX-TAMM-118999 through '9000. And if
20  you would look, sir, this is an e-mail string on which you
21  are at the very bottom.
22       A  Okay. Okay.    17:25:52
23       Q  Have you read this e-mail string?    17:25:55
24       A  Yes.    17:25:55
25       Q  All right. And if you would look at the bottom    17:25:59

Page 594

1  e-mail, that's an e-mail that Mary Mikkelson sent to you;
2  right?
3       A  Yes.    17:26:06
4       Q  No reason to believe you didn't get that;    17:26:09
5  correct?
6       A  Correct.    17:26:11
7       Q  And in it, she's talking about how one of the    17:26:15
8  points in the MSA was that there needed to be a provision
9  regarding the amount of cash that would be left in Tronox
10  at the IPO date, which I understand to be $40 million. Do
11  you see that?
12       A  Yes.    17:26:27
13       Q  And then you went and forwarded that comment to    17:26:31
14  Andrew Muratore; right?
15       A  Yes.    17:26:35
16       Q  Andrew Muratore was a lawyer at Covington &    17:26:38
17  Burling; correct?
18       A  Yes.    17:26:40
19       Q  And he then forwarded this string on even more,    17:26:43
20  and then it came back to you. Do you see that? On October
21  18th, 2005 at 9:59 a.m.?
22       A  Correct.    17:26:50
23       Q  And the e-mail that was sent to you said: "It    17:26:53
24  was agreed this morning between Tronox and Kerr-McGee that
25  $55 million in cash would be left in the Tronox entities at

Page 595

1  the IPO date."
2       Do you see that?    17:27:00
3       A  Yes.    17:27:01
4       Q  And then 37 minutes later, Ms. Poos corrects    17:27:04
5  the e-mail and says: "It was agreed this morning that 40
6  million in cash would be left in the Tronox entities."
7       Do you see that?    17:27:11
8       A  Yes.    17:27:11
9       Q  And then the e-mail gets forwarded --    17:27:14
10  Ms. Mikkelson responds to the e-mail, quote, she giveth and
11  she taketh away. Do you see that?
12       A  Yes.    17:27:24
13       Q  And that -- that comment that the $15 million    17:27:28
14  was lost in that 37-minute span was consistent with your
15  recollection that Kerr-McGee Corporation was dictating the
16  amount of money that would be left in Tronox at the time of
17  the spin; correct?
18       MR. BILLECK: Objection to form.    17:27:48
19       THE WITNESS: Yes.    17:27:50
20       MR. KASSOF: I'm done with this line of    17:27:51
21  questioning, if you want to take a break for the evening.
22       MR. WALTERS: Sounds good.    17:27:55
23       THE VIDEOGRAPHER: Going off the record. The    17:27:57
24  time is now 5:26 p.m.
25       (Deposition concluded at 5:26 p.m. and witness excused.)    17:28:03

Page 596

1            ERRATA SHEET
2       WITNESS: Roger Addison, Volume 2
3       CASE STYLE: In Re: Tronox
4       REPORTER: Lori A. Johnston, CSR, RPR, CLR
5  PAGE  LINE      CORRECTION AND REASON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

73  (Pages 593 to 596)

Page 597

JURAT

1
2    I, Roger Addison, do hereby state under oath that I
3    have read the above and foregoing deposition in its
4    entirety and that the same is a full, true, and correct
5    transcription of my testimony so given at said time and
6    place, except for the corrections noted.
7
8
9    _____
10
11
12    Subscribed and sworn to before me, the undersigned
13    Notary Public in and for the State of Oklahoma, on this,
14    the _____ day of _____, 2010.
15
16
17
_____
NOTARY PUBLIC
18
19
20
21    My Commission Expires: _____
22    My Commission Number: _____
23
24
25    Reported by:  Lori A. Johnston, CSR, RPR, CLR

Page 598

CERTIFICATE

1
2    STATE OF OKLAHOMA )
                            ) SS:
3    COUNTY OF OKLAHOMA )
4
5    I, Lori A. Johnston, a Certified Shorthand Reporter
6    for the State of Oklahoma, certify that Roger Addison was
7    by me sworn to testify the truth; that the deposition was
8    taken by me in stenotype and thereafter transcribed by
9    computer and is a true and correct transcript of the
10   testimony of the witness; that the deposition was taken by
11   me on July 14, 2010, at 9:02 a.m., at 100 Park Avenue,
12   Oklahoma City, Oklahoma; and that I am not an attorney for
13   or relative of either party or otherwise interested in this
14   action.
15   Witness my hand and seal of office on this 15th day
16   of July, 2010.
17
18
19
_____
20   Lori A. Johnston, CSR, RPR, CLR
     CSR # 01726 NCRA # 053265
21
22
23
24
25

74  (Pages 597 to 598)

# EXHIBIT C

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 599

| | |
|---|---|
| 1 | IN THE UNITED STATES BANKRUPTCY COURT |
| 2 | FOR THE SOUTHERN DISTRICT OF OKLAHOMA |
| 3 | |

| | | |
|---|---|---|
| | IN RE: | ) Chapter 11 |
| 4 | TRONOX INCORPORATED, et al., | ) No. 09-10156 . |
| | Debtors. | ) Jointly |
| 5 | Administered | |
| | | ) |
| 6 | TRONOX INCORPORATED, TRONOX | ) |
| | WORLDWIDE LLC, f/k/a KERR-MCGEE | ) |
| 7 | CHEMICAL WORLDWIDE LLC, and | ) |
| | TRONOX LLC, f/k/a KERR-MCGEE | ) |
| 8 | CHEMICAL, LLC, | ) |
| | Plaintiffs, | ) Adversary |
| 9 | Proceeding | |
| | -vs- | ) No. 09-01198 (ALG) |
| 10 | ANADARKO PETROLEUM CORPORATION | ) |
| | and KERR-MCGEE CORPORATION, | ) |
| 11 | Defendants. | ) |
| | | ) |
| 12 | THE UNITED STATES OF AMERICA, | ) |
| | Plaintiff-Intervenor, | ) |
| 13 | -vs- | ) |
| | TRONOX INC., TRONOX WORLDWIDE | ) |
| 14 | LLC, TRONOX LLC, KERR-MCGEE | ) |
| | CORPORATION, and ANADARKO | ) |
| 15 | PETROLEUM CORPORATION, | ) |
| | Defendants. | ) |
| 16 | | |

| | |
|---|---|
| 17 | CONFIDENTIAL - SUBJECT TO A PROTECTIVE ORDER |
| 18 | VIDEOTAPED DEPOSITION OF ROGER ADDISON, VOLUME III |
| 19 | TAKEN ON BEHALF OF TRONOX |
| 20 | IN OKLAHOMA CITY, OKLAHOMA |
| 21 | ON JULY 15, 2010 |
| 22 | TSG REPORTING, INC. |
| | NEW YORK, NEW YORK |
| 23 | www.tsgreporting.com |
| 24 | REPORTED BY:  KIM GLOVER, CSR, RPR, RMR, CLR |
| 25 | TSG JOB NO. 31427 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 600

```
1              APPEARANCES
2   FOR TRONOX:
3       ANDREW A. KASSOF
        DAVID H. DECELLES
4       Attorney at Law
        Kirkland & Ellis LLP
5       300 North LaSalle
        Chicago, IL 60654
6
    FOR ANADARKO PETROLEUM CORPORATION:
7
        JASON W. BILLECK
8       Attorney at Law
        Weil Gotshal & Manges LLP
9       700 Louisiana
        Suite 1600
        Houston, TX 77002
10
11      JESSIE B. MISHKIN
        Attorney at Law
12      Weil Gotshal & Manges LLP
        767 Fifth Avenue
13      New York, New York 10153
        DUKE K. MCCALL, III
14      Attorney at Law
        Bingham McCutchen LLP
15      2020 K Street NW
        Washington, DC 20006
16
17      JENNIFER EDWARDS
        Senior Attorney
18      Anadarko Petroleum
        1201 Lake Robbins Drive
        The Woodlands, TX 77380
19
20  FOR UNITED STATES DEPARTMENT OF JUSTICE:
        (Appearing by phone)
21      KATHERINE M. KANE
        Trial Attorney
22      ENRD Mailroom, Room 2121
        601 D Street, NW
23      Washington, D.C. 20004
24
25
```

Page 601

```
1   FOR UNSECURED CREDITORS COMMITTEE:
2       ROSS G. SHANK
        Attorney at Law
3       Kasowitz, Benson, Torres & Friedman
        1633 Broadway
4       New York, NY 10019
5   FOR THE WITNESS:
6       Kevin Donelson
        Attorney at Law
7       Fellers Snider Blankenship Bailey &
        Tippens
8       1700 Chase Tower
        100 North Broadway
9       Oklahoma City, OK 73102
10
11  FOR THE EQUITY COMMITTEE:
12      DAVID A. CRICHLOW
        Attorney at Law
13      Pillsbury Winthrop Shaw Pittman
        1540 Broadway
14      New York, New York 10036
15  VIDEOGRAPHER:
16      ROBERT RUSCH
17
18
19
20
21
22
23
24
25
```

Page 602

```
1           EXHIBITS
2   For Tronox:
3   Exhibit 75   presentation given to
    underwriters with a cover e-mail dating
4   September of 2005
5   For Identification        613:4
6   Exhibit 76   e-mail from Kareem Hamady
    For Identification        616:5
7
    Exhibit 77   e-mail exchange
8   For Identification        623:8
    Exhibit 78   e-mail again from Mr. Hamady
9   For Identification        632:9
10
    Exhibit 79   e-mail string       643:24
11  For Identification
12  Exhibit 80   presentation that you and Tom
    Adams gave to Anadarko on September 26,
13  2007
    For Identification        655:20
14
    Exhibit 81   e-mail from you to Jon Flake and
15  Pete Woodward in connection with the
    integrali
16  For Identification        692:11
17  Exhibit 82   e-mail that Tom Adams sent to
    you and to others on September 27th
18  For Identification        697:20
19  Exhibit 83   e-mail string
    For Identification        700:10
20
    Exhibit 84   e-mail from Akin Gump and Mike
21  Chambers
    For Identification        716:3
22
    Exhibit 85   Lehman Brothers document
23  For Identification        743:14
24  Exhibit 86   e-mail
    For Identification        751:10
25
```

Page 603

```
1   Exhibit 87   e-mail from Neal Covage
    For Identification        764:2
2
3   Exhibit 88   e-mail from a Samuel Boxerman
    For Identification        784:3
4
5   Exhibit 89   cover memo with an attached
6   assignment agreement
7   For Identification        837:10
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2  (Pages 600 to 603)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 604

| | |
|---|---|
| 1 | PROCEEDINGS                    08:41:21 |
| 2 | THE VIDEOGRAPHER: The time       08:41:21 |
| 3 | is now 8:39 a.m. |
| 4 | CONTINUED DIRECT EXAMINATION     08:41:25 |
| 5 | BY MR. KASSOF:                   08:41:25 |
| 6 | Q    Morning, Mr. Addison.       08:41:26 |
| 7 |                                  08:41:26 |
| 8 | Q    You understand you're still under   08:41:27 |
| 9 | oath? |
| 10 | A    Yes, sir.                   08:41:30 |
| 11 | Q    I have marked the -- or what I   08:41:31 |
| 12 | have put before you is what's been previously |
| 13 | marked in this case as Adams Exhibit 37. There's |
| 14 | a tab one of Exhibit 37 Adams and it is the |
| 15 | April 2005 managing presentation. I think we |
| 16 | were talking about this a little bit earlier. |
| 17 | Do you recall that? |
| 18 | A    Yes.                        08:41:50 |
| 19 | Q    All right. And this presentation   08:41:52 |
| 20 | was presented to potential buyers in the sale |
| 21 | process by Kerr-McGee management in April of |
| 22 | 2005? |
| 23 | A    When you said Kerr McGee       08:42:07 |
| 24 | management, it was prospective Tronox |
| 25 | management, but yes, it was Kerr McGee employees |

Page 605

| | |
|---|---|
| 1 | that presented it. |
| 2 | Q    Well, but in April 2005 --    08:42:17 |
| 3 | A    Yes, they were currently       08:42:19 |
| 4 | employees. |
| 5 | Q    All right. So in April 2005   08:42:20 |
| 6 | Kerr-McGee employees presented a management |
| 7 | presentation to potential buyers in the sale |
| 8 | process of Kerr-McGee; correct? |
| 9 | A    Yes.                         08:42:29 |
| 10 | Q    These were third parties who   08:42:29 |
| 11 | would have an opportunity to conduct due |
| 12 | diligence in the arms length process? |
| 13 | A    Yes.                         08:42:37 |
| 14 | Q    And they were third parties who   08:42:40 |
| 15 | Kerr McGee gave a presentation in the hopes that |
| 16 | they could generate interest in acquiring the |
| 17 | chemical division; is that fair? |
| 18 | A    That was my understanding of the   08:42:52 |
| 19 | presentation. |
| 20 | Q    And you helped present the Legacy   08:42:58 |
| 21 | side -- Legacy site and legal portion of the |
| 22 | presentation; is that right? |
| 23 | A    I know I did the legal portion.   08:43:07 |
| 24 | The Legacy site I think was perhaps Pat Corbett, |
| 25 | but I may have commented on it also. |

Page 606

| | |
|---|---|
| 1 | Q    All right. Fair enough. If you   08:43:13 |
| 2 | look at page 3 of the April 2005 presentation in |
| 3 | the agenda, you will see that you're correct, |
| 4 | both you and Pat Corbett are listed in the |
| 5 | Legacy sites and legal section of the |
| 6 | presentation. |
| 7 | A    Yes.                         08:43:28 |
| 8 | Q    And if I can ask you to turn to   08:43:31 |
| 9 | the beginning of the Legacy sites and legal |
| 10 | presentation which starts at slide number 111. |
| 11 | Slide 111 is the cover page to this portion of |
| 12 | the presentation; correct? |
| 13 | A    It appears to be, yes.        08:43:48 |
| 14 | Q    All right. And if you look,    08:43:52 |
| 15 | there are a total of ten slides presented to the |
| 16 | potential buyers in the sale process on Legacy |
| 17 | issues; correct? |
| 18 | A    I'm counting, but it appears to   08:44:20 |
| 19 | be, yes. |
| 20 | Q    And in the April 2005          08:44:22 |
| 21 | presentation to potential buyers included in |
| 22 | these slides were slides with details on |
| 23 | specific Legacy sites and liabilities; correct? |
| 24 | A    I'm trying to refresh my memory.   08:44:47 |
| 25 | Yes. It appears -- well, I'm not sure they name |

Page 607

| | |
|---|---|
| 1 | sites by site, but -- with the -- what the |
| 2 | slides are showing me, they talk about topic or |
| 3 | type of product or business. |
| 4 | Q    They also talk about sites, too.   08:45:05 |
| 5 | In addition -- you are correct about that and |
| 6 | they also talk about sites, too. If you look at |
| 7 | slides 114 through 119, for example, you see at |
| 8 | the top there is a reference "site location." |
| 9 | A    Yes, I see that.             08:45:22 |
| 10 | Q    All right. And that's the case   08:45:23 |
| 11 | for 114 through slide 119 of the presentation; |
| 12 | correct? With the last one just saying numerous |
| 13 | sites? |
| 14 | A    That appears to be correct.   08:45:41 |
| 15 | Q    All right. And in particular, if   08:45:43 |
| 16 | you look at slide 114 presented to potential |
| 17 | buyers in April of 2005 by management was a |
| 18 | slide on Thorium Manufacturing with respect to |
| 19 | the west Chicago site; correct? |
| 20 | A    Are you speaking of slide 114?   08:46:04 |
| 21 | You just said Thorium Manufacturing? This |
| 22 | speaks of processing Thorium Manufacturing, yes. |
| 23 | I'm not trying to be pretentious but I'm just |
| 24 | trying to clarify what you're asking. |
| 25 | Q    What I'm asking you is the -- to   08:46:21 |

3 (Pages 604 to 607)

TSG Reporting 877-702-9580

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 680

1  environmental costs, the 200,000 figure rather
2  than the 100,000, yes.
3      Q    (By Mr. Kassof) Right. And what      10:36:27
4  you understood the MSA provided was that Tronox
5  would not be entitled to reimbursement of
6  amounts of certain environmental remediation
7  costs from Kerr-McGee unless the amount on a
8  site by site basis exceeded the reserve amount
9  that was specified in the document by more than
10  $200,000; correct?
11          MR. BILLECK: Object to the            10:36:58
12  form.
13          THE WITNESS: That's what             10:37:07
14  Section 2.5 of the Master Separation Agreement
15  on page 10 appear to say, yes.
16      Q    (By Mr. Kassof) And how you         10:37:12
17  understood it; correct?
18      A    I would say yes.                     10:37:21
19      Q    And what you were telling           10:37:23
20  Mr. Crumpley back in your attachment --
21  Mr. Muratori and then Mr. Crumpley, which you
22  forwarded to Mr. Crumpley on September 19th,
23  2005, was that you were not at all certain that
24  any amount over the reserve amount made any
25  sense to ask; correct?

Page 681

1          MR. BILLECK: Objection to            10:37:41
2  form.
3          THE WITNESS: That appears            10:37:42
4  to be what I'm saying.
5      Q    (By Mr. Kassof) And, in fact,       10:37:44
6  you said that having $100,000 over the reserve
7  amount, in your words, didn't appear to make
8  sense; correct?
9      A    That is how I read this, yes.       10:37:58
10      Q    And not only was the $100,000 not   10:38:04
11  eliminated from the final version of the MSA,
12  but it became $200,000; correct?
13          MR. BILLECK: Object to the           10:38:14
14  form.
15          THE WITNESS: It certainly            10:38:15
16  appears to be 200,000 in the final version, yes.
17      Q    (By Mr. Kassof) And Kerr-McGee      10:38:20
18  mandated that $200,000 amount; correct?
19      A    I would certainly think yes.        10:38:41
20      Q    Do you recall Mr. Crumpley          10:38:42
21  agreeing with you or disagreeing with you on
22  this section, whether he agreed with you that
23  there should not be any amount over the reserve
24  amount before Tronox could access its
25  reimbursement from Kerr-McGee?

Page 682

1      A    No. As I mentioned yesterday, I      10:39:03
2  didn't even remember working with Mr. Crumpley
3  until you showed me an e-mail. Obviously I
4  have, but I don't recall any conversations with
5  him or discussions. Obviously I had them. I
6  just don't recall them.
7      Q    Sitting here today, you can't        10:39:17
8  identify any conversations from Mr. Crumpley or
9  anyone at his firm in which Mr. Crumpley or
10  anyone at his firm advocated for better terms in
11  the MSA for Tronox. Is that fair?
12      A    I remember dealing extensively      10:39:42
13  with Mr. Crumpley on a totally unrelated matter.
14  It had nothing to do with this. I don't -- he's
15  a thorough attorney. If I sent him comments, he
16  probably commented back, but I don't remember
17  anything from James Crumpley.
18      Q    So the answer to my question is,    10:40:00
19  correct, you don't -- sitting here today, you
20  can't identify anything that Mr. Crumpley or
21  anyone in his firm sent to you advocating -- or
22  anyone else advocating on behalf of Tronox
23  interest in the MSA. Is that fair?
24      A    At that time, correct. That is      10:40:24
25  correct.

Page 683

1      Q    And you certainly cannot identify    10:40:26
2  anything sitting here today that Mr. Crumpley or
3  anyone at his firm wanted, advocated at his firm
4  MSA on behalf of Tronox that made its way into
5  the final version of the MSA. Is that fair?
6      A    No. That's not.                      10:40:44
7      Q    Can you identify something that      10:40:45
8  Mr. Crumpley or someone from his firm wanted
9  that made its way into the MSA sitting here
10  today?
11      A    I was told anecdotally sometime     10:40:58
12  that Martin Stringer got the 100 million dollar
13  reimbursement provision in there. That was not
14  originally in there.
15      Q    You agree with me, sir, that        10:41:24
16  Martin Stringer could not have advocated for the
17  $100,000 reimbursement provision --
18      A    100 million dollars. I'm sorry.     10:41:39
19      Q    All right. Martin Stringer could    10:41:43
20  not have advocated for the 100 million dollar
21  reimbursement provision before he was retained
22  to work on the case; correct?
23          MR. BILLECK: Object to the           10:41:53
24  form.
25          THE WITNESS: I can't                 10:41:58

22  (Pages 680 to 683)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 684

1  imagine how he could or how he would even know
2  to have a comment or opinion, so yes.
3      Q    (By Mr. Kassof) All right. And          10:42:03
4  you are not saying that you have first hand
5  specific knowledge that Mr. Stringer came up
6  with the 100 million dollar reimbursement
7  provision; correct?
8      A    No. I'm just telling you what I         10:42:19
9  remember, what I was told after the fact by Tom
10 Adams.
11     Q    And if Mr. Stringer was retained         10:42:26
12 actually after the 100 million dollars was put
13 into the MSA drafts by Kerr-McGee, you would
14 have no reason to dispute that; true?
15     A    Could you please say that again?         10:42:43
16     Q    Sure. You would have -- if I            10:42:44
17 said to you that Mr. Stringer was actually
18 retained after the 100 million dollar provision
19 was put into the MSA by Kerr-McGee, you would
20 have no factual basis to dispute that. Is that
21 fair?
22          MR. BILLECK: Object to the              10:43:00
23 form.
24          THE WITNESS: Correct.                   10:43:02
25 Because I remember it was already in there. I'm

Page 685

1  just telling you what I was told.
2      Q    (By Mr. Kassof) And if we look          10:43:11
3  at No. 12 of your comments, to Mr. Crumpley in
4  September of 2005, Exhibit 71 --
5      A    All right.                              10:43:23
6      Q    If you look, there is a section         10:43:25
7  in the -- which made its way into the final MSA,
8  2.5H dealing with a release and covenant not to
9  sue. You can look at the final version if you
10 like.
11     A    All right.                              10:43:43
12     Q    And if you look at the last             10:43:45
13 sentence, one of the things that you said that
14 there should be an exception or carve out for
15 claims by Tronox against the parent meaning
16 Kerr-McGee for claims arising out of allegations
17 of fraud; correct?
18     A    Okay. Which comment again? I'm          10:44:03
19 not supposed to be marking on this document but
20 I'm on No. 10.
21     Q    No. 12. 2.5H. If I can ask you          10:44:12
22 to look at your comments to Mr. Crumpley.
23     A    Okay.                                   10:44:15
24     Q    In paragraph 12 of your comments        10:44:16
25 to Mr. Crumpley --

Page 686

1      A    Yes.                                    10:44:18
2      Q    -- you identify for both               10:44:21
3  Mr. Muratori and then you forwarded it to
4  Mr. Crumpley your view that there should be a
5  carve out in the release and covenant not to sue
6  provided to Kerr-McGee by Tronox for claims
7  arising out of allegations of fraud against
8  Kerr-McGee; correct?
9      A    I believe that's what it says,          10:45:03
10 yes.
11     Q    And because you thought that            10:45:06
12 having a carve out for claims arising out of
13 allegations of fraud would have been
14 appropriate; correct? That's why you
15 recommended it?
16     A    Appropriate or inappropriate?           10:45:15
17     Q    Would have been appropriate,            10:45:18
18 appropriate to have a carve out for claims
19 arising out of allegations of fraud.
20     A    Based on this language and at the       10:45:33
21 time, apparently yes.
22     Q    All right. If you can look at           10:45:36
23 Section 2.5H of the final executed MSA.
24     A    Uh-huh.                                 10:45:45
25     Q    You will note that in this              10:45:47

Page 687

1  section there is no carve out for claims arising
2  out of allegations of fraud; correct?
3      A    Let me look at the whole thing.         10:46:20
4         In subparagraph H, it does not          10:46:22
5  appear that there is one.
6      Q    That proposal that you made in          10:46:26
7  September 2005 was rejected by Kerr-McGee;
8  correct?
9          MR. BILLECK: Object to the              10:46:32
10 form.
11         THE WITNESS: I don't know              10:46:41
12 that they rejected it, but that follows.
13     Q    (By Mr. Kassof) And it                  10:46:44
14 especially follows since Mr. Pilcher received
15 your comments also on September 19, 2005; true?
16 If you look at your e-mail.
17     A    I'm trying to -- okay. He is on         10:47:01
18 the copy. Yes.
19     Q    This is another example where          10:47:05
20 Kerr-McGee, as you put it, was calling the shots
21 on the MSA; right?
22     A    Did I use the phrase "calling the       10:47:19
23 shots"?
24     Q    You sure did.                           10:47:22
25     A    Okay. Then I'll say yes.                10:47:43

23  (Pages 684 to 687)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 788

1  defenses for both the liability and amount of
2  the remedy sought by the EPA against Tronox in
3  connection with Manville?
4      MR. KASSOF: Okay. I'll          13:50:40
5  allow it.
6      Q    (By Mr. Billeck) And in fact,    13:50:42
7  Tronox's counsel submitted to an arbitrator
8  Tronox's position that Tronox had strong and
9  viable defenses both as to the liability and to
10  the amount of remedy the EPA was seeking from
11  Tronox in connection with the Manville site as
12  late as the 4th quarter of 2006; correct?
13     A    Yes.                    13:51:05
14     Q    And you would not have allowed    13:51:06
15  counsel for Tronox to send such a statement to
16  an arbitrator or mediator unless you believed it
17  to be true and correct; correct?
18     A    That's correct. Yes.       13:51:17
19     Q    Okay. And this is -- this isn't    13:51:31
20  a memory test, but I just -- I'm curious on
21  there. As you sit here today, can you identify
22  any specific oil and gas asset or liability or
23  chemical division asset or liability that were
24  transferred between and among the oil and gas
25  E & P division and the chemical division in    13:51:57

Page 789

1  connection with either the assignment assumption
2  and indemnity agreement, the assignment
3  agreement, and Project Focus?
4      A    I seem to recall Bill Lathan,    13:52:27
5  inhouse attorney in the oil and gas division,
6  somewhere immediately before or immediately soon
7  after the IPO saying either they discovered some
8  minor oil and gas property they should have
9  gotten and didn't or that they -- some minor
10  chemical related or Tronox related thing they
11  somehow retained but certainly nothing
12  significant.
13     Q    And that's the only thing you can    13:52:52
14  remember as you sit here today?
15     Like I said, it's not a memory    13:52:57
16  test. I don't want you to guess or speculate.
17     A    I want to make sure I understand    13:53:01
18  what you're saying also because there is a big
19  schedule I think on that assignment assumption
20  and indemnity agreement, but I think it was
21  listing things that already had gone or were
22  supposed to have gone.
23     As I said, we discussed this    13:53:11
24  yesterday. It was a clean-up document. Here's
25  what we have done and anything else we may have

Page 790

1  missed. And then I think Bill Lathan came back
2  and said, "I think we missed one." But I can't
3  remember which way it went.
4      There might be something else but    13:53:23
5  I do not remember as of today.
6      Q    Okay. And you don't remember    13:53:26
7  what the -- I think you said smaller immaterial
8  assets or liabilities that may have been
9  transferred that you recall what they were;
10  correct?
11     MR. KASSOF: Object to the    13:53:36
12  form.
13     THE WITNESS: No, I really    13:53:44
14  don't.
15     Q    (By Mr. Billeck) Okay. Will you    13:53:45
16  pull out Addison Exhibit 14, 15, and 16?
17     A    I think I had those.    13:54:19
18     Q    Ready?                13:54:20
19     A    Yeah.                 13:54:20
20     Q    You recognize these to be what    13:54:23
21  Tronox's counsel represented to you to be Lehman
22  Brother documents from -- Addison 14, September
23  7, 2000; Addison 15, January 1st, 2001; and
24  Addison 16, April 16, 2001; correct?
25     A    Yes.                  13:54:42

Page 791

1      Q    And you have testified that you    13:54:43
2  had never seen these documents before your
3  deposition yesterday -- or I'm sorry -- your
4  deposition on Tuesday of this week; correct?
5      A    Are these the ones talking about    13:54:57
6  the possible spin-off of chemical, right, or
7  something? They called it Titan. Wasn't that
8  it?
9      Q    In part.             13:55:07
10     A    Yes.                 13:55:07
11     Q    Okay.                13:55:08
12     A    Never recalled -- I don't think I    13:55:10
13  -- I'm certain I never saw these until I was
14  showed them during this deposition.
15     Q    Okay. Terrific. And as a    13:55:16
16  result, you have no personal knowledge, do you,
17  about who or if anyone at Kerr-McGee ever
18  received or reviewed these documents; correct?
19     A    No, I have no personal knowledge.    13:55:32
20     Q    You have no personal knowledge as    13:55:36
21  to whether Lehman Brothers even presented these
22  documents to Kerr-McGee; correct?
23     A    No, I have no idea.       13:55:43
24     Q    And you have no personal    13:55:44
25  knowledge regarding whether Lehman Brothers was

49  (Pages 788 to 791)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 792

1    providing to Kerr-McGee the advice,
2    representations of statements in Exhibits 14,
3    15, or 16 to Kerr-McGee; correct?
4        A    Could you please ask that again?    13:56:01
5        Q    Sure. You have no personal    13:56:02
6    knowledge as to whether or not in the time
7    period of 2000, 2001, 2002, or 2003 Lehman
8    Brothers was actually providing the advice,
9    representations or statements in Exhibits 14,
10   15, or 16 to Kerr-McGee; correct?
11            MR. KASSOF: Object to the    13:56:20
12   form.
13            THE WITNESS: That's    13:56:21
14   correct. I don't know.
15       Q    (By Mr. Billeck) We can sort of    13:56:27
16   short circuit this. You have no personal
17   knowledge about anything regarding exhibits --
18       A    I never saw them before today.    13:56:32
19       Q    -- Addison 14, 15 and 16;    13:56:34
20   correct?
21       A    Was it Tuesday? I have never    13:56:37
22   seen them before, that I know, that I recall.
23       Q    As a result of the -- so you had    13:56:40
24   no -- you have no personal knowledge regarding
25   Adams 14, 15, or 16 in any way whatsoever other

Page 793

1    than that you saw them for the first time on
2    Tuesday of this week; correct?
3        A    That's what I'm testifying, yes.    13:56:54
4        Q    So any time Tronox's counsel    13:56:58
5    asked you in any of his questions based on these
6    documents that Lehman Brothers was recommending
7    or pointing out or highlighting or concluding
8    certain things, you were merely reading what he
9    was pointing you to in these documents; correct?
10           MR. KASSOF: Object to the    13:57:16
11   form of the question.
12           THE WITNESS: Yeah.    13:57:22
13   Essentially, yes. He was pointing out certain
14   sections and reading them and asking me if
15   that's what I saw or what it said and I would
16   agree what it was.
17       Q    (By Mr. Billeck) And you were    13:57:33
18   merely agreeing that something was contained or
19   not contained in the documents? That was all
20   you were agreeing to; correct?
21           MR. KASSOF: Object to the    13:57:38
22   form of the question. What testimony are you
23   talking about?
24       Q    (By Mr. Billeck) I'm talking    13:57:40
25   about all testimony that you gave regarding the

Page 794

1    contents of Exhibits 14, 15 and 16.
2            MR. KASSOF: Object to the    13:57:48
3    form of the question.
4        Q    (By Mr. Billeck) With respect to    13:57:51
5    this testimony, you were merely --
6        A    I can't remember every single    13:57:55
7    question he asked. So can I ask you to perhaps
8    rephrase yours in light of that?
9        Q    You bet. The testimony you gave    13:58:14
10   regarding Exhibits 14, 15 and 16, was not based
11   on your personal knowledge but instead was based
12   on your reading selected excerpts that Tronox's
13   counsel pointed out to you for the first time on
14   Tuesday of this week; correct?
15           MR. KASSOF: Object to the    13:58:34
16   form.
17           THE WITNESS: Yeah. I'm not    13:58:37
18   trying to be difficult here. I mean, it was my
19   personal knowledge that I was, in fact, sitting
20   at this table looking at these documents.
21       Q    (By Mr. Billeck) But outside of    13:58:47
22   that, you had no other personal knowledge?
23       A    That is correct.    13:58:50
24       Q    And when you say you were sitting    13:58:51
25   at this table and looking at these documents,

Page 795

1    you are referring to sitting at this table here
2    at your deposition this week to look at these
3    documents?
4        A    Yes. Today, yesterday or the day    13:59:02
5    before, yes.
6        Q    Can you pull out Exhibit 18 --    13:59:17
7    actually hang on one second. Exhibit 18. And I
8    would like to short circuit this, if possible.
9    If we could get 18 and 13 and 22.
10       A    I believe I have those three    13:59:59
11   exhibits. You got yours?
12           MR. KASSOF: I'll be good.    14:00:06
13       Q    (By Mr. Billeck) And again these    14:00:06
14   are documents that you testified yesterday that
15   you had never seen prior to your deposition on
16   Tuesday of this week; correct?
17       A    I get confused. I testified    14:00:30
18   yesterday or Tuesday that I hadn't seen them
19   prior to Tuesday.
20       Q    I'm sorry?    14:00:34
21       A    I think I testified Tuesday I    14:00:36
22   hadn't seen them prior to Tuesday.
23       Q    That's right. So the first time    14:00:39
24   you ever saw Addison Exhibits 13, 22 or 18 was
25   in your deposition in this lawsuit; correct?

50 (Pages 792 to 795)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 796

1    A    Certainly as to 22 and 13. Let    14:00:55
2 me doublecheck 18. I don't remember seeing
3 this. Did we discuss Addison 18 in here?
4    Q    We did.    14:01:12
5    A    We did?    14:01:27
6    Q    And my questions are similar to    14:01:29
7 the questions that we did with the Lehman
8 parties.
9         You had seen these documents that    14:01:36
10 were Exhibits 14, 15 and 16?
11    A    Uh-huh.    14:01:39
12    Q    With respect to these Exhibits    14:01:40
13 13, 22 and 18, you had no personal knowledge
14 regarding these documents or their contents
15 prior to your testimony in this lawsuit this
16 week; correct?
17    A    That is correct.    14:02:02
18    Q    And your testimony in this    14:02:04
19 lawsuit was based not on personal knowledge but
20 instead on reading the excerpted portions of the
21 documents that Tronox's counsel pointed you to;
22 correct?
23         MR. KASSOF: Object to the    14:02:16
24 form.
25         THE WITNESS: I think, yes.    14:02:38

Page 797

1    Q    (By Mr. Billeck) I just want to    14:02:39
2 be sure. Your testimony -- when I referred to
3 "your testimony," your testimony in this
4 deposition regarding these documents was not
5 based on your personal knowledge but it was
6 instead based on you reading the selected
7 excerpts of the Exhibits Addison 13, 22 and 18
8 that Tronox's counsel pointed out to you?
9         MR. KASSOF: Object to the    14:03:04
10 form.
11         THE WITNESS: Yes. I    14:03:08
12 testified and I still believe I had never seen
13 these documents before.
14    Q    (By Mr. Billeck) And you have no    14:03:19
15 personal knowledge of whether or not Exhibits
16 18, 33 or 22 were ever provided to Kerr-McGee;
17 correct?
18    A    Okay. Hang on a second. 18?    14:03:33
19    Q    18, 13 and 22.    14:03:37
20    A    I thought you said 33.    14:03:39
21    Q    I may have.    14:03:39
22         You have no personal knowledge of    14:03:41
23 whether 18, 13 and 22 were ever provided to
24 Kerr-McGee; correct?
25    A    They all say drafts. Maybe they    14:03:49

Page 798

1 never got here. I don't know one way the other.
2    Q    You have no personal knowledge    14:03:51
3 whether or not anybody at Kerr-McGee ever
4 actually reviewed documents 18 -- Addison 18, 13
5 and 22; correct?
6    A    Yeah. I guess I do not.    14:04:05
7    Q    And you have -- as you mentioned,    14:04:06
8 each of these say draft. You have no personal
9 knowledge as to whether or not the statements
10 contained in Addison 18, 13 or 22 were final
11 work products that reached ultimate conclusions
12 or were working drafts; correct?
13    A    I guess that's correct.    14:04:27
14    Q    Okay. Let's look at Exhibit 30.    14:05:00
15         Do you have it?    14:05:02
16    A    Yes, I do.    14:05:02
17    Q    Do you recognize this to be an    14:05:05
18 unsigned -- it appears to be a letter of some
19 sort by B. J. Montgomery.
20    A    This appears to be an e-mail or    14:05:17
21 something from -- to Peter Nichols from B. J.
22 Montgomery.
23    Q    And prior to your deposition in    14:05:24
24 this lawsuit this week, you had never seen
25 Addison Exhibit 30; correct?

Page 799

1    A    Even though I was heavily    14:05:34
2 involved in the arbitration claim, which
3 relates, I don't recall ever having seen this
4 before this deposition.
5    Q    And you have no personal    14:05:40
6 knowledge of whether B. J. Montgomery actually
7 drafted this document or not?
8    A    No, I don't know that he did or    14:05:48
9 not.
10    Q    You have no personal knowledge as    14:05:50
11 to whether or not these were the opinions or
12 conclusions or beliefs held by B. J.
13 Montgomery; correct?
14    A    I don't think he ever confirmed    14:06:09
15 to it personally and I don't recall ever
16 speaking with him about this.
17    Q    So you have no personal knowledge    14:06:16
18 whether or not he held the opinions and
19 conclusions and beliefs; correct? Personal
20 knowledge.
21    A    I sat through a big arbitration    14:06:27
22 proceeding. I'm trying to think if some of this
23 might have been introduced then or something. I
24 just don't remember. I guess that wouldn't be
25 personal knowledge anyway if something like this

51  (Pages 796 to 799)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 800

1   -- these allegations had been mentioned in the
2   arbitration proceeding. So I don't remember
3   this. I really don't.
4        Q    So you do not have any personal          14:06:43
5   knowledge as to whether B. J. Montgomery holds
6   the opinions or conclusions contained in Addison
7   Exhibit 30, correct?
8        A    I'm going to say yes.                     14:06:58
9        Q    And you have no personal                  14:06:59
10  knowledge of whether or not this document was
11  actually ever sent to Peter Nichols; correct?
12       A    I don't remember Peter Nichols            14:07:16
13  ever telling me he got anything from B. J.
14  Montgomery so, yeah, I don't know.
15       Q    I have very few left and I'll try         14:07:25
16  to do it quickly.
17            Earlier you testified that you            14:07:29
18  did not know whether McKinney Stringer or its
19  lawyers provided certain types of advice to
20  Tronox in connection with the separation
21  agreement or what advice they provided; correct?
22            MR. KASSOF: Object to the                 14:07:41
23  form.
24       Q    (By Mr. Billeck) Let me state it          14:07:42
25  again.

Page 801

1        It's possible -- or you do not                 14:07:50
2   know whether Mr. Crumpley, Mr. Stringer or their
3   associates at the McKinney Stringer firm
4   provided advice or counsel to Tronox in
5   connection with the MSA or the dual track
6   process or the spin-off that was not provided to
7   you or to which you were not made aware of,
8   correct, meaning they could have provided -- let
9   me say it again.
10           McKinney Stringer and its lawyers          14:08:26
11  could have provided advice to Tom Adams or Mary
12  Mikkelson and not have copied you on it;
13  correct?
14       A    That's correct.                           14:08:43
15       Q    You also were asked some                  14:08:46
16  questions about a DEO report regarding Manville.
17       A    Yes.                                      14:08:52
18       Q    You never read that report;               14:08:53
19  correct?
20       A    I don't how they compare. I know          14:08:54
21  a gas report.
22       Q    So you have no idea what the              14:08:56
23  conclusions were or were not in that report;
24  correct?
25       A    No. We asked Terry Reid for help          14:09:03

Page 802

1   and I don't know if he was able to help.
2        Q    You also talked about the fact            14:09:08
3   that the assignment assumption and indemnity
4   agreement and the assignment agreement were
5   drafted in 2005; correct?
6        A    I feel extremely comfortable the          14:09:20
7   first time I saw them was in April or May of
8   2005.
9        Q    Fair point. The first time you            14:09:26
10  saw them was in May or April of 2005; correct?
11       A    At this deposition somebody told          14:09:32
12  me they had seen an earlier -- and I won't even
13  say that. The earliest I saw them was April or
14  May of 2005.
15       Q    Now, you know when they were              14:09:42
16  signed, they were dated effective December 31,
17  2002; correct?
18       A    Yes, year end 2002.                       14:09:54
19       Q    Did you view that as improper or          14:09:59
20  inappropriate to date the documents effective
21  December 31, 2002 in connection with your
22  drafting or preparation of these documents?
23       A    No. As I told you, I understood           14:10:14
24  it to be a clean-up document for a transaction
25  that was closed on December 31st, 2002. So a

Page 803

1   clean-up document would obviously relate back to
2   the same closing date or be effective on that
3   date. That was the goal of it to make it
4   effective as of that date.
5             MR. BILLECK: Can we take                  14:10:37
6   five minutes?
7             MR. KASSOF: Of course.                    14:10:39
8             THE VIDEOGRAPHER: Going off       14:10:40
9   the record, the time is now 2:09 p.m.
10            (Short break)            14:25:01
11            THE VIDEOGRAPHER: Going             14:25:02
12  back on the record, the time is now 2:23 p.m.
13       Q    (By Mr. Billeck) Mr. Addison, as          14:25:09
14  we said each time after a break, you realize
15  you're still under oath?
16       A    Yes.                               14:25:13
17       Q    You remember the April 2005               14:25:15
18  management presentation that was marked as
19  Exhibit --
20            MR. KASSOF: Adams 37?             14:25:30
21            THE WITNESS: By               14:25:31
22  happenstance it's in front of me.
23       Q    (By Mr. Billeck) Let me see.              14:25:35
24  Exactly. Perfect. In that presentation you
25  remember Tronox's counsel showed you a couple of

52  (Pages 800 to 803)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 844

1  because I remember it very well.
2  When I was asked to visit with          15:19:03
3  your law firm on behalf of Tronox, on account of
4  this litigation, I was concerned I would be
5  asked questions prior to the IPO date of
6  November 28th, 2005 and I was concerned as I
7  have been here as my counsel made an opening
8  statement about attorney client privilege
9  matters and confidentiality. So I wanted to see
10  what Mr. Owens, what counsel for the other side
11  thought of privilege issues and also wanted to
12  alert him that I had been — they wanted to
13  question me.
14  And his response to me, "See if     15:19:45
15  they will meet with us jointly in the same room
16  at the same time so I only have to discuss this
17  once" which I relayed to Michael Foster, at
18  Tronox, the then general counsel, still general
19  counsel, and I believe he called back and said,
20  "I have checked with Kirkland -- Is that your
21  firm?
22  Q     Yeah.                          15:20:06
23  A     -- and that they would rather   15:20:06
24  speak with you alone without Kerr-McGee Anadarko
25  but we'll limit the conversation to matters

Page 845

1  happening after the IPO." On that basis, I said
2  I would attend the meeting. I also relayed that
3  premeeting conversation to Mr. Owens and said
4  after the meeting I would call him and let him
5  know generally what occurred.
6  Q     Did you tell Mr. Owens what      15:20:33
7  questions or things you talked about with Mr.
8  Zott and Mr. Zeiger?
9  A     Can I finish my first answer     15:20:38
10  first?
11  Q     I'm sorry. No. I thought you    15:20:40
12  were done.
13  A     No. I proceeded to meet with    15:20:45
14  Mr. Zott and Mr. Zeiger, I believe Lisa, the
15  paralegal, and Mike Foster were also there on
16  behalf of Tronox. We had our approximately four
17  hour discussion with them on various matters.
18  They said, "Fine. Let's get ready to go." And
19  I remember — Oh, I told David Owens I would
20  fill him in on the conversation. I wanted to be
21  open, honest, not taking sides so I knocked on
22  the door to tell Mr. Zeiger did he mind if I
23  would give -- if I would relay our discussions
24  of that day with Mr. Owens and he said -- he
25  thought a moment and he said, "No, go ahead",

Page 846

1  like it was no big deal.
2  Q     Okay.                          15:21:26
3  A     I decided I wouldn't call Dave   15:21:28
4  Owens and I never spoke with him since. I never
5  had another discussion except with these two
6  here six weeks ago.
7  Q     Fair enough. Give me a couple    15:21:40
8  minutes to see if I'm all done.
9  THE VIDEOGRAPHER: Going off      15:21:43
10  the record. The time is now 3:19.
11  (Short break)                    15:26:25
12  THE VIDEOGRAPHER: Going          15:26:26
13  back on the record, the time is now 3:25 PM.
14  Q     (By Mr. Kassof) Mr. Addison, do  15:26:33
15  you know who the financial adviser was for the
16  HS Resources deal on behalf of Kerr-McGee?
17  A     Oil and gas deal, summer of 2001.  15:27:05
18  Wilson Baxter was the law firm. We switched
19  from Credit Suisse to Lehman Brothers somewhere
20  in 2000 or 2001. I don't know if there was an
21  overlap or not. I don't remember.
22  Q     Either Lehman Brothers or Credit  15:27:16
23  Suisse would be to the best of your
24  recollection?
25  A     Yes.                          15:27:21

Page 847

1  MR. KASSOF: I have no            15:27:21
2  further questions. Thank you very much, sir.
3  MR. BILLECK: No further          15:27:24
4  questions.
5  MR. DONELSON: On behalf of       15:27:26
6  Mr. Addison, he is going to read and sign.
7  However he — to the extent he has any rights
8  which I don't know under any of the protective
9  orders that have been entered in this case, he
10  would request that his deposition be designated
11  as confidential and he would similarly make the
12  request to the extent he has no standing, that
13  the parties designate his deposition as
14  confidential.
15  MR. KASSOF: Okay. Thank          15:27:52
16  you.
17  THE VIDEOGRAPHER: Going off      15:27:5
18  the record, this concludes the deposition of
19  Roger Addison. The time is now 3:26 p.m.
20                                    15:28:00
21                                    15:28:00
22                                    15:28:00
23                                    15:28:00
24                                    15:28:00
25                                    15:28:00

63 (Pages 844 to 847)

TSG Reporting 877-702-9580

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 848

1    ERRATA SHEET
2    WITNESS: Roger Addison, Volume 3
3    CASE STYLE: In Re: Tronox
4    REPORTER: KIM GLOVER, CSR, RPR, RMR, CLR
5    PAGE LINE      CORRECTION AND REASON
6
7
8    ___ ___ _____
9    ___ ___ _____
10   ___ ___ _____
11   ___ ___ _____
12   ___ ___ _____
13   ___ ___ _____
14   ___ ___ _____
15   ___ ___ _____
16   ___ ___ _____
17   ___ ___ _____
18   ___ ___ _____
19   ___ ___ _____
20   ___ ___ _____
21   ___ ___ _____
22   ___ ___ _____
23   ___ ___ _____
24   ___ ___ _____
25   ___ ___ _____

Page 849

1    JURAT
2    I, Roger Addison, do hereby state under oath that I
3    have read the above and foregoing deposition in its
4    entirety and that the same is a full, true, and correct
5    transcription of my testimony so given at said time and
6    place, except for the corrections noted.
7
8
9    _____
10
11
12   Subscribed and sworn to before me, the undersigned
13   Notary Public in and for the State of Oklahoma, on this,
14   the _____ day of _____, 2010.
15
16
17
18   _____
     NOTARY PUBLIC
19
20
21
22   My Commission Expires: _____
23   My Commission Number: _____
24
25

Page 850

1    Reported by: KIM GLOVER, CSR, RPR, RMR, CLR
2            C E R T I F I C A T E
3    STATE OF OKLAHOMA )
4             ) SS:
5    COUNTY OF OKLAHOMA )
6
7        I, KIM GLOVER, a Certified Shorthand Reporter
8    for the State of Oklahoma, certify that Roger Addison was
9    by me sworn to testify the truth; that the deposition was
10   taken by me in stenotype and thereafter transcribed by
11   computer and is a true and correct transcript of the
12   testimony of the witness; that the deposition was taken by
13   me on July 14, 2010, at 100 Park Avenue,
14   Oklahoma City, Oklahoma; and that I am not an attorney for
15   or relative of either party or otherwise interested in this
16   action.
17       Witness my hand and seal of office on this 16th day
18   of July, 2010.
19
20
21   _____
     KIM GLOVER, CSR, RPR, RMR, CLR
22
23
24
25

64  (Pages 848 to 850)

TSG Reporting 877-702-9580

# EXHIBIT D

In the Matter of Arbitration No. 3439

**KERR-McGEE CHEMICAL WORLDWIDE LLC**
as a successor to Kerr-McGee Corporation
and **KERR-McGEE CHEMICAL LLC**
(hereafter jointly referred to as "Kerr-McGee"),

Claimants,

v.

**KEMIRA PIGMENTS OY and KEMIRA OYJ,**

Respondents.

# WITNESS STATEMENT OF W.P. "PETE" WOODWARD

ADDISON
**2**
Tronox v. Anadarko

TRX-ADV0088939

## A.    Personal Background.

My name is W.P. "Pete" Woodward.  I served as President of Kerr-McGee Chemical LLC and Kerr-McGee Chemical Worldwide LLC, and Senior Vice President of their parent company, Kerr-McGee Corporation, from 1997 through September 17, 2004, when I took voluntary retirement.  Kerr-McGee Corporation is a worldwide energy and inorganic chemical company with its headquarters in Oklahoma City, Oklahoma, United States.  Kerr-McGee Corporation's total annual sales, including its oil and gas operations, exceed $4 billion, and its total assets are more than $14 billion.  Kerr-McGee's chemicals businesses have annual sales of approximately $1.3 billion.

As President of Kerr-McGee Chemical LLC and Kerr-McGee Chemical Worldwide LLC I was in charge of Kerr-McGee's worldwide chemical operations, including all of its titanium dioxide facilities.  I was the senior-most executive directly involved in Kerr-McGee's purchase from Kemira of the Savannah, Georgia titanium dioxide facilities that are at issue in this arbitration.  I was also the senior-most executive directly involved in Kerr-McGee's purchase of three other titanium dioxide facilities--the Uerdingen, Germany and Antwerp, Belgium facilities purchased from Bayer in 1998, and the Botlek, Netherlands facility purchased from Kemira in 2000.

I am 55 years old.  I received a Bachelor of Science degree in chemistry from the University of Central Oklahoma in 1972, and went to work for Kerr-McGee that year.

My first jobs at the company were in its agricultural chemicals division, and included technical, sales and operating responsibilities.  My work for that division culminated in my service as a plant manager.  I then moved to the Company's industrial products division, holding a variety of positions in the Soda Products Division, and then the Electrolytic Products Group.

2

In 1990, I became Vice President of Quality for Kerr-McGee's chemical businesses, and was promoted to the Business Manager of the Company's titanium dioxide pigments business in 1993. Titanium dioxide is the world's preferred opacifier and whitening agent for paint, coatings, plastics, paper and numerous other consumer products.

At the time I became Business Manager, Kerr-McGee's pigments businesses included two titanium dioxide production facilities, one a wholly owned facility in Hamilton, Mississippi, and the other the Tiwest joint venture in western Australia. Kerr-McGee also owned a synthetic rutile facility in Mobile, Alabama, which produced feedstocks for the production of titanium dioxide.

In 1996 I was promoted to Vice President of Sales and Marketing for the pigments division. In 1997 I was appointed to my positions as President of worldwide chemical operations and Senior Vice President of Kerr-McGee Corporation.

As President of worldwide chemical operations and Senior Vice President of Kerr-McGee Corporation I was in charge of all of Kerr-McGee's chemical businesses including the titanium dioxide division, which currently includes production facilities in Hamilton, Mississippi; Savannah, Georgia; Uerdingen, Germany; Botlek, Netherlands; and the Tiwest joint venture plant outside of Perth in western Australia. In addition, as part of the Tiwest joint venture in Australia, Kerr-McGee has a 50% interest in a 500,000 tonne per year mineral sands mine, and a 200,000 tonne per year synthetic rutile plant. The Mobile and Antwerp facilities previously mentioned have been closed.

Kerr-McGee is currently the third largest titanium dioxide producer in the world. Kerr-McGee supplies titanium dioxide to customers in over 100 countries. As President of Kerr-

3

TRX-ADV0088941

McGee Chemical LLC and Kerr-McGee Chemical Worldwide LLC, I was also in charge of Kerr-McGee's electrolytic and specialty chemicals businesses.

**B.    The Two Kinds of Titanium Dioxide Plants.**

The Savannah facility consists of two different plants, one that makes titanium dioxide using the sulfate process, and the other using the chloride process. Although the two plants shared some common facilities (such as parts of the water supply system), they use different inputs and processes, and most of the physical equipment is completely separate. Titanium dioxide produced by the chloride method has optical properties generally preferred by the market place. About 60 percent of titanium dioxide produced around the world is produced through the chloride method.

The Savannah chloride plant is significantly newer than the sulfate plant. The lion's share of the value of the Savannah facilities is on the chloride side; I will give more detail about that as I proceed.

**C.    Contacts With Kemira Regarding The Possible Purchase Of The Savannah Facility.**

Kerr-McGee's first contact with Kemira regarding that company's possible interest in selling some or all of its titanium dioxide production facilities took place in March 1997. At that time, Kemira owned three facilities, one in Pori, Finland, one in Botlek, Netherlands, and the Savannah, Georgia facility. Joe Flake, then the Manager of Analysis and Evaluation for Kerr-McGee's chemicals business, David Ezell, the pigments business director, and I met briefly in Atlanta with Risto Keranen, President of Kemira Pigments Oy, and Risto Ojala, President of Kemira's Savannah facility, to discuss whether Kemira might be interested in selling the Savannah facility. Soon after that meeting, Mr. Keranen called and indicated that Kemira Pigments was not interested in a sale at that time.

4

CONFIDENTIAL

TRX-ADV0088942

However, in June 1999, newspaper reports quoted Heimo Karinen, the chief executive of the parent company, Kemira Oyj, to the effect that he foresaw changes in Kemira's corporate strategy as a result of his impending retirement and replacement by the head of Kemira's agricultural chemicals business. He stated that Kemira intended to focus on "core businesses."

Mr. Flake and I interpreted this public disclosure to suggest that Kemira might be shifting its strategy and that it might now be interested in selling some or all of its titanium dioxide facilities. I therefore arranged a meeting with the incoming President of Kemira Oyj, Tauno Pihlava, to coincide with my late September 1999 trip to our European facilities.

I had a preliminary meeting with Mr. Pihlava and Kemira Executive Vice President Essa Tirkkonen in Helsinki on or about September 27, 1999. Mr. Pihlava indicated that Kemira was indeed considering the possibility of selling some or all of its titanium dioxide facilities. He agreed to provide some financial information regarding those businesses, and we agreed to meet again after Kerr-McGee had had the chance to review this data.

**D.      The Limitations Imposed By Kemira On The Due Diligence Process.**

Prior to that second meeting, Kerr-McGee and Kemira entered into a "Secrecy Agreement" that was drafted by Kemira. (Exh. 465). The Agreement stated that the companies would be meeting to discuss, among other possibilities, the sale of production units or businesses. (Paragraph 1). The Agreement provided that "neither Party nor its advisers shall, regarding the transaction, contact or communicate with any officers, employees, consultants, advisers, customers or suppliers [of the other party] without the prior written consent of the other Party." (Paragraph 3).

As I will be discussing in this Statement, Kemira continued to insist on these kinds of restriction on contacts with Kemira personnel throughout the transaction regarding the

5

TRX-ADV0088943

Savannah facility, up to and including the April 6, 2000 closing. While such restrictions are not unusual in the business world, they do inhibit a purchaser's ability to develop its own insights into the business that is being purchased. These kinds of restrictions force the buyer to rely on the accuracy of the sellers' information and therefore require that strong contractual warranties, representations and indemnifications be included in the purchase agreement.

The second meeting between Kerr-McGee and Kemira took place in Finland on or about October 8, 1999. Attending for Kerr-McGee were Mr. Flake, Assistant General Counsel Roger Addison, and I. Attending for Kemira were Mr. Pihlava and Mr. Tirkkonen, and perhaps one or two others as well. At the October 8, 1999 meeting, Kemira indicated an interest in selling all three of its titanium dioxide plants.

In late October and into November 1999, Kemira and Kerr-McGee corresponded regarding the possible sales transaction, and I provided Kerr-McGee's preliminary valuation of the facilities in question. (Exh. 466). In that letter, I sought Kemira's agreement to a 60-day period during which Kerr-McGee would be the exclusive party bargaining with Kemira.

However, through its investment bankers, Salomon Smith Barney, Kemira in a letter to me dated November 15, 1999, declined Kerr-McGee's request. Salomon Smith Barney stated that Kemira instead had decided to engage in an "auction" process in which several unnamed potential buyers other than Kerr-McGee would participate. (Exh. 7). Kemira also indicated it had decided not to sell the Pori facility.

Solomon Smith Barney's subsequent November 22, 1999 letter to me stated that it would provide a draft purchase agreement on November 26, 1999, and that Kerr-McGee's binding offer, indicating the purchase price as well as any necessary changes to this draft

6

CONFIDENTIAL                                                           TRX-ADV0088944

agreement, would be due by January 10, 2000 (a deadline later extended to January 26, 2000). (Exh. 460; Exh. 470).

In both the November 15, 1999 and November 22, 1999 letters, Salomon Smith Barney, acting on behalf of Kemira, set forth the restrictions that would be placed on Kerr-McGee's access to the Savannah Plant, plant personnel, and relevant documentation during the "due diligence" process leading up to the signing of a binding contract. In the November 15, 1999 letter, Salomon Smith Barney instructed: "Please do not contact Kemira management directly under [any] circumstance for matters relating to this process." Salomon Smith Barney indicated that it would instead arrange for a Plant visit, and would place certain written materials into a "data room" that Kerr-McGee would be able to review.

Both then and later, Kemira justified these restrictions on the ground that Kerr-McGee could not be given any advantages over the other bidders: thus, Kerr-McGee's access to "senior management and data room would be on equal basis vis-a vis the other parties selected to proceed."

The limitations on Kerr-McGee's due diligence were further spelled out in Salomon Smith Barney's November 22, 1999 letter to me. The letter stated: "You are reminded not to contact (with regard to this transaction) (i) the Seller and its personnel; (ii) Salomon Smith Barney (other than individuals listed in the Contact Sheet attached herewith); or (iii) any other interested third parties (e.g. without limitation, suppliers or customer). All communications or enquiries relating to the transaction involving the Companies should be directed only to the Salomon Smith Barney employees listed in the Contact Sheet."

**The November 22, 1999 letter also provided all due diligence would have to be completed prior to Kerr-McGee's submission of its offer:** "Your obligation to consummate

7

the transaction must not be contingent upon obtaining financing, additional corporate approvals **or additional due diligence. You must have completed all due diligence prior to the submission of your offer."** (Paragraph vi). As noted above, this offer was due on January 26, 2000.

This kind of investment banker-driven and controlled process for the sale of a facility or business is not unique to this transaction. In fact, Bayer had used a similar process in connection with its January 1998 sale to Kerr-McGee of the Uerdingen and Antwerp facilities. But when a seller imposes these kinds of heavy restrictions on the prospective buyer, it becomes essential that the buyer obtain strong contractual representations as a substitute for conducting its own extensive due diligence.

Kemira and Salomon Smith Barney enforced the restrictions they had imposed on Kerr-McGee. At one point I placed a telephone call to Kemira Oyj Chief Executive Officer Tauno Pihlava in an effort to discuss an aspect of the proposed transaction. We typically like to deal with the company principals in a deal, in that they are typically "subject matter experts"; investment bankers typically are not. Unfortunately, he referred me back to the bankers.

Of course, Kerr-McGee did not intend to rely entirely on Kemira's contractual representations. On November 17, 1999, I sent Salomon Smith Barney a seven-page list of materials Kerr-McGee wanted to see in the data room. (Exh. 467). Among the materials Kerr-McGee requested were the following:

--"Provide additional detail for all pending and threatened litigation, claims or assessments;

--Asbestos surveys (1994 through present);

--Detail of any OSHA (or other agency) citations, reports or notices of violation."

8

TRX-ADV0088946

These specific requests all relate to issues that have now given rise to several of Kerr-McGee's claims asserted against Kemira in this arbitration. As I will describe further in this statement, the responses Kemira provided to these requests, and to Kerr-McGee's follow-up inquiries, were false and misleading.

Salomon Smith Barney scheduled for December 9-11, 1999, a review of the documents in the data room, and a one-day visit to the Savannah Plant on December 9, 1999. (Exh. 461). As reflected in the written schedule prepared by Salomon Smith Barney, the morning of the December 9, 1999 Savannah visit was limited to an introduction and safety video, followed by an oral management presentation and lunch. The actual Plant visit did not begin until 1:30 in the afternoon, and ended that same day.

Salomon Smith Barney also instructed that "participants will be permitted to interview Kemira personnel only if scheduled in advance." (Exh. 464).

The review of the data room, and Plant visit, proceeded as scheduled. I am aware that Kemira has suggested that Kerr-McGee did, or should have, discovered the multitude of Plant defects that underlie this arbitration during that visit. This is not true. The Savannah facility is very large, covering approximately 1,600 acres (650 hectares) on an approximately three-quarter-mile (1.2 kilometer) stretch of the southern bank of the Savannah River in Savannah, Georgia. The facility includes four large, primary operational buildings, and several dozen support buildings and structures. The size of the Plant, and limited time for a visit, made a detailed physical inspection impossible. I know this because I personally participated in the tour.

After Kerr-McGee took over the Plant, I was shown an internal memorandum by Kemira personnel that carefully outlines, step by step, the route that Kemira personnel were instructed to take when escorting Kerr-McGee personnel on the tour. (Exh. 463).

9

TRX-ADV0088947

There is no way that anyone could gain more than a superficial impression of the facility during a brief, guided tour. This is especially true given the matters on which Kerr-McGee was concentrating its efforts during the Plant visit.

Kerr-McGee was particularly concerned about the environmental legacies it would be inheriting were it to purchase the Plant. The Plant utilizes large settling ponds to handle waste material, which were nearly full and presented significant potential environmental concerns. In addition, an undeveloped part of the Plant property contained a former municipal landfill, which had been the subject of extensive government investigations. These and other environmental issues were among the focal points of attention during the visit.

We were also keenly interested during the Plant visit in assessing the technology being used by the Savannah Plant. As I have mentioned, there are two different plants at Savannah, the older sulfate plant and the newer chloride plant chloride plant. While we anticipated a profitable operation of the sulfate plant, the real "value" of the Savannah facility lay mostly in the chloride plant. In fact, Kerr-McGee's internal financial analyses placed almost 75% of the total value on the chloride plant. (Exhibit 325 line 56; Exhibit 326 line 48; Exhibit 327, line 47).

While our plans were to operate the older sulfate plant at approximately status quo output levels, our plans were to expand significantly the output of the newer chloride plant. The ability to ramp up production rates at the chloride plant quickly therefore lay at the heart of Kerr-McGee's purchase decision. Thus, the technological status quo of the chloride plant, and its potential, was a primary area of interest to Kerr-McGee during the tour.

The Savannah Plant had licensed its chloride technology from Kerr-McGee during the 1960s. Kerr-McGee needed to learn what changes Kemira had made in that

10

CONFIDENTIAL

technology in the ensuing decades, in order to understand how Kerr-McGee could go about increasing production capacity through the installation of additional and improved process equipment.

I have a particularly negative reaction to Kemira's suggestion that Kerr-McGee's limited due diligence should have been directed at finding out whether the Savannah Plant was operating in a lawful manner. Any chemical plant operating in the United States, and especially one like Savannah that handles hazardous materials, is presumed to be operating within legal limits with respect to its operating permits, and to be in conformity with legal requirements such as the Process Safety Management ("PSM") rules established by the U.S. Occupational Safety and Health Administration, and the Risk Management Program ("RMP") for the site as required by the U.S. Environmental Protection Agency.

Prior to encountering the problems we later identified at the Savannah Plant, I would never have believed that the U.S. operations of a major international company could have been conducted with such a blatant disregard for U.S. law. It was certainly not our attitude during the December 9 Plant tour, or thereafter, that we needed to dedicate ourselves to making an independent determination that Kemira was in compliance with its basic and important legal and ethical obligations.

As a result, I was not aware then, or at any time prior to Closing, of the falsity of any of the representations that Kemira later made in the Stock Purchase Agreement.

Kerr-McGee's December 1999 review of materials in the data room generated two lists of follow up requests for documents and information. (Exh. 468, Exh. 469). Kerr-McGee pressed for additional information regarding any asbestos at the Plant. (Exh. 469, p. 3). Nothing in the responses provided by Kemira to these requests suggested the presence of friable

11

asbestos at the Plant, or hinted at the falsity of any of the representations that Kemira later made in the Stock Purchase Agreement regarding asbestos and other matters.

During the negotiations with Kemira, Kerr-McGee adjusted its valuation of the Savannah Plant to reflect its continual updating of its forecasts of the profitability of the Plant under its planned expansion of the chloride plant. These changes were based on continuing refinements of the estimated capital necessary to increase capacity in line with our plan. While we incorporated some expenditures in our planning for plant maintenance, we never received information that caused us to anticipate the tens of millions of dollars of expenditure that are now reflected in Kerr-McGee's claims in this case.

E.    **The Negotiations Of Kemira's Representations And Warranties.**

While Kerr-McGee was preparing for the Plant tour and its review of the materials in the data room, it was also reviewing the draft of the stock purchase agreement that Kemira had provided on December 2, 1999. (Exh. 474, transmitting Exh. 10). Kerr-McGee was in the process of preparing its counter proposal.

Kerr-McGee General Counsel Greg Pilcher and Assistant General Counsel Roger Addison were involved in the details of the negotiation of the Stock Purchase Agreement, and will testify in greater detail as to those matters. From my perspective as a businessman, what were essential was that the contract contain appropriate representations and warranties on the following subjects:

**1. Lawful and permitted operations.**    The agreement had to include a representation by Kemira that the Plant had, and was in compliance with, all necessary permits, and that the Plant and its operations were in compliance with all laws. It would make no sense for Kerr-McGee to step into a situation in which it was operating an unlawful plant on day one.

CONFIDENTIAL                                                                                    TRX-ADV0088950

**2. Maintenance of the Plant in good physical condition.** For obvious reasons, we wanted Kemira to represent that the Plant was in a well-maintained, operable state and without material defect. Kemira would also have to commit to continue to perform maintenance to the Plant to ensure sound, operable conditions between the date the contract was signed and the date of closing, when Kerr-McGee took physical possession of the Plant.

**3. No friable asbestos.** For many decades, asbestos was widely used in insulation in plants, offices and other buildings. But asbestos that is friable (*i.e.*, that is easily broken into small pieces or reduced to powder) has since been proven to be a potentially deadly carcinogen. Asbestos claims by those injured, or allegedly injured, as a result of exposure to asbestos in the workplace have led to tens of thousands of personal injury lawsuits in the United States. Companies have paid billions of dollars of court judgments and settlements, and a large number have been driven into bankruptcy.

Anyone involved in the chemical business in the United States is acutely aware of the risks involving the disposal of hazardous materials, especially asbestos. Plants that had friable asbestos have undertaken substantial asbestos abatement programs in remedy this issue. Kerr-McGee has done so at its own plants. Because of the state of asbestos litigation in the United States, Kerr-McGee was and is acutely aware of the potential liability represented by friable asbestos. Kerr-McGee has walked away from potential transactions over the years because of liability concerns over hazardous materials and would not have knowingly taken on the enormous burden of potential asbestos claims and litigation.

Given this history, we asked that the stock purchase agreement include a representation that the Plant did not contain any friable asbestos.

13

CONFIDENTIAL    TRX-ADV0088951

4. **No hazardous materials exposure.**    While asbestos has been the most notorious industrial workplace hazardous material, others, such as lead, have also led to significant litigation and claims payouts.    It was therefore critical to me that the purchase agreement include a representation that no hazardous materials had been disposed at or by the Plant in a manner that could give rise to a future liability.    Simply stated, Kerr-McGee was not going to take on the kind of exposure that these substances represent.

5. **Clear and manageable exposure to other environmental liabilities.**    The agreement had to include a full disclosure of all other environmental liabilities, and indemnification for any undisclosed items.    Kerr-McGee knew that the Savannah Plant faced environmental issues, such as those surrounding its settling ponds.    Kerr-McGee needed to be sure that Kemira had fully disclosed all such matters, so that Kerr-McGee could assess its potential financial liabilities.    Of course, all of these representations had to be backed up by Kemira's written promise to indemnify Kerr-McGee for any expense Kerr-McGee incurred if any representation proved not to be true.

These environmental matters were sufficiently significant to cause Kerr-McGee personnel to meet with the relevant environmental state enforcement officials prior to signing the contract.    (Exh. 473).    Kerr-McGee did so in order to gain further insights into its potential liabilities and clean up obligations.    This meeting did not reveal the problems with asbestos, vanadium or dioxins that have given rise to the environmental claims that Kerr-McGee has asserted in this arbitration (along with many non-environmental claims).

Through the counterproposal that Kerr-McGee submitted to Kemira on January 26, 2000, and the negotiations that followed in London, Kerr-McGee in fact did secure in the

14

TRX-ADV0088952

final Stock Purchase Agreement the representations it needed with respect to each of the items I

have discussed above:

1. **Lawful and permitted operations.** The initial draft stock purchase agreement

drafted by Kemira contained a representation that the Savannah Plant was in material compliance

with applicable laws "to the knowledge of Seller." (Exh. 10, Section 3.13). I specifically recall

thinking that these were "weasel words," and I personally told Kemira and its lawyers that this

representation would not be enough. I explained that either the Savannah Plant was in

compliance with all applicable laws, or it was not, and that Kemira could not rely upon lack of

knowledge as a defense to a claim for indemnification if the Plant were not in compliance with

all applicable laws.

Kemira ultimately acceded to my position, and provided a blanket representation

that the Plant was in compliance with all laws. (Exh. 9, Section 3.13(a)). At my insistence,

Kemira also agreed to add a specific representation that it possessed, and was in compliance

with, all necessary permits. (Exh. 9, Section 3.13(b)).

2. **Maintenance of the Plant in good physical condition.** Kemira in its own

draft agreement included a representation that the improvements on the real property were free

from any material structural defects. (Exh. 10, Section 3.8(a)(iv). At Kerr-McGee's behest, this

representation was expanded, to cover all of the plants, buildings, structures, and improvements

on the property, as we were prevented from a detailed examination of the plant premise. (Exh. 9,

Section 3.8(a)(iv)(D)). At Kerr-McGee's insistence, Kemira also agreed to maintain the Plant in

good condition during the period between the date the contract was signed and the date of

closing. (Exh. 9, Section 5.1(a), (l)). With this language, Kerr-McGee would be assured that as

15

                                                                    TRX-ADV0088953

of the time it took control of the Plant, there would be no major or substantial physical defects in the structure of the Plant, including any of its buildings and equipment.

Deteriorated and unsafe structures and platforms, leaking equipment, structurally unsound pipe racks, and corroded roofing would be material structural defects under any reasonable definition of the term.

**3. No friable asbestos.** Our concerns over asbestos were fully satisfied by the written report provided by Kemira's environmental consultants, Dames and Moore. That report was explicitly incorporated into the agreement by reference as one of Kemira's representations. (Exh. 9, Schedule 3.18, item 1). The report stated that Dames and Moore had been informed by Kemira that all insulation on piping and in the support building site was asbestos free, except for asbestos contained in transite, a concrete-like material used for walls or flooring.

Asbestos in transite is not friable and therefore is not in a physical form that presents a risk of inhalation, except in the event of building demolition. The statements contained in the Dames and Moore report therefore meant to me that the Plant was free of friable asbestos.

I am aware that Kemira claims that the presence of asbestos "would have been apparent" to Kerr-McGee. But the fact that the Plant contained asbestos was not "apparent" to Kemira's own environmental experts, Dames & Moore, which reported that insulation "was asbestos free" (Exh. 12). Visual inspection cannot distinguish asbestos-containing insulation from non-asbestos-containing insulation.

Kemira also mentions that Kerr-McGee's environmental consultant, Arthur D. Little, Inc., urged Kerr-McGee to conduct an asbestos survey. But the Arthur D. Little report explicitly relied on and quoted the "asbestos free" language of the Dames & Moore report. (Exh.

16

TRX-ADV0088954

361 at 3-16.) The Arthur D. Little report in fact stated that an asbestos survey would be needed to quantify with precision the cost of asbestos abatement *in the event of "construction, demolition, or renovation."* (Exh. 361 at E-5. (emphasis added).) Arthur D. Little was thus focusing on the potential impact of asbestos-containing transite in the event of major building renovation or demolition. This was the asbestos that Kemira had properly disclosed through the Dames and Moore report, not the other, dangerous friable asbestos whose presence was concealed from Kerr-McGee.

4. **No hazardous materials exposure.** Kerr-McGee required a greatly strengthened representation from Kemira regarding hazardous materials. Kemira's initial draft had merely provided that Kemira was not subject to any *pending* claim, investigation or proceeding relating to hazardous materials. (Exh. 10, Section 3.18(b)). This provision was extensively re-written, to include broad representations that no hazardous materials existed at the Plant, or had been generated or disposed of at or from the Plant, that could reasonably be expected to give rise to a material liability. (Exh. 9, Sec. 3.18(a)(iv), (v)).

5. **Clear and manageable exposure to other environmental liabilities.**

Kemira's initial draft agreement only contained a representation that the Plant was "currently" in material compliance with all environmental laws. (Exh. 10, Section 3.18(a)). Kerr-McGee insisted upon, and obtained, a representation that Kemira was currently, *and at all relevant times since July 1, 1985 had been,* in material compliance with all environmental laws.

These changes were secured through extensive negotiations, which were conducted virtually non-stop for seven days in London (followed by the separate negotiations with respect to the Botlek plant). The negotiations were extremely hard fought. But in the end,

17

                                        TRX-ADV0088955

Kerr-McGee secured the representations and indemnifications it needed in light of the limited due diligence that Kemira had afforded.

To drive home the limited nature of the due diligence that had taken place, Kerr-McGee insisted that Kemira's proposed contractual language--stating that Kerr-McGee had been given "access to the personnel, properties, premises and records of" Kemira (Exh. 10, Section 5.12)--was changed to state, accurately, that Kerr-McGee had only been given "**limited** access to the personnel, properties, premises and records" of Kemira. (Exh. 9, 3.8(a)(iv)).

No contract negotiations took place regarding what has turned out to be one of the biggest sources of Kerr-McGee's claims against Kemira--the OSHA Complaint. As I have already mentioned, Kerr-McGee had specifically insisted that documentation regarding any OSHA report, citation or notice of violation be placed in the data room.

The data room materials had revealed that a large number of hazardous conditions at the Savannah Plant had been identified in OSHA Complaint Number 20080410. Kemira's initial response to the OSHA Complaint, including hundreds of pages of attachments describing numerous essential equipment repairs and replacements, was also included in the data room materials. However, in the draft Schedules to the Stock Purchase Agreement that Kemira provided to Kerr-McGee on January 19, 2000, Kemira represented as follows: "OSHA Complaint Number 200894210 regarding potential violations. Process instituted to fully address hazardous conditions with final abatement date of January 31, 2000." (Exh. 34, p. 11 of 43).

I understood this language in the only way possible--as Kemira's representation that the hazardous conditions identified in the OSHA complaint would be fully eliminated by January 31, 2000. From my perspective, that meant that the majority of the issues in the complaint had already been addressed and abated, and the rest soon would be. This meant that

18

CONFIDENTIAL                                    TRX-ADV0088956

we could forget about the OSHA issues and move on to other things.  The language Kemira had

drafted therefore was included in the final Stock Purchase Agreement without change.  (Exh. 9,

Schedule 3.12).

Because Kemira had promised in the draft Schedules that it was almost finished

with the final abatement of the hazards identified in the OSHA Complaint, I saw no reason to

have anyone from Kerr-McGee meet with OSHA prior to the Closing.  Contrary to what Kemira

has said in some of its papers, I am not aware of any Kerr-McGee employees or representative

who met or talked with OSHA regarding the Savannah facility prior to the April 6, 2000 closing.

I was not aware that, both before and after the Stock Purchase Agreement was

signed, Kemira was engaged in correspondence with OSHA that clearly indicated that the

hazardous conditions were not close to being fully abated and that Kemira was requesting from

OSHA additional time merely to come up with a schedule for final abatement.

F.     **The Period Between The Signing Of The Stock Purchase Agreement And
        The Closing.**

Kemira has suggested that Kerr-McGee did, or should have, learned of the falsity

of its representations during the seven and a half week period between the signing of the Stock

Purchase Agreement on February 13, 2000 and the closing of the transaction on April 6, 2000.

But as I have already discussed, Kemira had made it an explicit condition of the transaction that

all due diligence be completed *before* Kerr-McGee made its purchase offer on January 26, 2000.

And in fact, Kerr-McGee did not see the need to conduct further due diligence after the

Agreement was signed on February 13, 2000, relying instead on the representations made by

Kemira.

Kerr-McGee was fully occupied with other things during this short time period.

Kerr-McGee witness Joe Flake was in charge of Kerr-McGee's pre-closing efforts and will

19

                                                    TRX-ADV0088957

discuss them in detail in his testimony. But as should be clear to anyone, seven and a half weeks

is barely enough time to perform the transitional steps essential to taking possession of a massive

facility like the Savannah Plant.

Among the dozens of tasks faced by Kerr-McGee, the company had to decide

which of its own employees to bring to Savannah, and in what capacities; decide which Kemira

employees to retain; decide what kind of severance packages to offer those Kemira employees

whom Kerr-McGee would not be retaining; review all major contracts and arrange for the

transition from Kemira to Kerr-McGee; develop ore supply strategies; and work out a game plan

for addressing environmental issues.

Kerr-McGee's hands were especially full during this seven and a half week period

because it was also busy completing the negotiation of the purchase agreement with Kemira for

the Botlek plant, which was also signed on February 13, 2000, and preparing for its takeover of

that plant.

As I have already noted, Kemira had insisted that Kerr-McGee not use this post

contract period to conduct further due diligence. Kerr-McGee had no reason to believe Kemira

had engaged in massive misrepresentations that it needed to try to uncover.

**G.    Kerr-McGee's Plans For The Savannah Plant.**

Kemira has claimed that the numerous physical and operational defects at the

Plant do not matter because Kerr-McGee supposedly intended to tear down the Plant anyway and

build a new plant. That is simply not true. Indeed, the very idea is absurd. Why would Kerr-

McGee spend $282 million for a plant it was going to tear down? If Kerr-McGee had wanted to

build a new plant, it would have expended a modest sum to buy open land in some rural location

and started from scratch.

20

CONFIDENTIAL                                                    TRX-ADV0088958

Kerr-McGee did plan to invest significant amounts of money at the chloride Plant in order to put into place technological process upgrades and, in some cases, more advanced processing equipment. Kerr-McGee's decision to purchase the Plant and its associated market share, and the amount it paid, were based upon detailed financial analyses of the higher production, and cost savings, that could be achieved through these chloride Plant upgrades. These analyses were called the "Project Apollo" financials, after the code name used by Kerr-McGee for the proposed Savannah Plant acquisition.

The technological upgrades were intended to build upon the existing infrastructure, which Kemira had (falsely) represented to be in good working and physical condition. Kerr-McGee's expenditures for technological upgrades have nothing to do with Kerr-McGee's independent and wholly unexpected need to spend tens of millions of dollars to fix the Plant conditions that were inconsistent with the representations Kemira had made in the Stock Purchase Agreement.

**H. Kemira's Fraud.**

The Savannah Plant turned out to be much different than Kemira's representations. Other witnesses, including Plant Manager Dick Dean, and Engineering Manager David Ferraro, will testify in detail regarding the many ways in which the Plant fell short. The list is nearly endless--numerous hazards identified in the OSHA complaint had not been "fully," or even partially, abated. OSHA inspectors found that the Plant was out of compliance with more than a dozen bedrock PSM requirements. Many legally required facilities were non-functioning: the warning system was inoperable, the drinking water was contaminated by process water, and the fire water system did not work. The Plant suffered from numerous material structural defects.

21

TRX-ADV0088959

I disagree completely with Kemira's notion that the age of the Savannah Plant provides an excuse for its condition. None of the laws and regulations applicable to a titanium dioxide plant varies depending upon its age, and Kemira represented that the Plant was in full compliance with those laws and regulations. The age of the Plant also has nothing to do with the specific representations made by Kemira regarding the final abatement of the OSHA Complaint, or the absence of non-transite asbestos. Nor does a well-maintained plant suffer from material structural defects.

Finally, Kemira exaggerates the relative age of the Savannah Plant. The chloride process side of the Plant was built relatively recently, in 1970, and the sulfate process side of the Plant is of the same approximate vintage as many other such titanium dioxide plants around the world, including Millennium's Thann, France, plant, built in 1923; Kronos's Leverkusen, Germany, plant, rebuilt in 1950 after World War II; Ishihara's Yokkaichi, Japan, plant, built in 1954; Kerr-McGee's Uerdingen, Germany, plant, built (by Bayer) in 1957; Millennium's LeHavre, France, plant, also built in 1957; and Kemira's Pori, Finland, plant, built in 1961.

Upon taking possession, Kerr-McGee was forced to make immediate infrastructure improvements, and to devote enormous efforts and expenditures to get the Plant and its personnel up to minimum standards from a safety and operational perspective. I understand that the quantification of Kerr-McGee's damages will be addressed in a later phase of the arbitration, so I will not describe in detail here all of the losses Kerr-McGee has suffered.

But I will point out that if the Plant's true conditions had been known, Kerr-McGee would have recognized that that the Plant posed major safety hazards that would have to be addressed in the first years following acquisition. Kerr-McGee would also have known that it would inherit a work force that lacked adequate training, including training in compliance with

22

TRX-ADV0088960

regulatory requirements for programs such as PSM and RMP. Kerr-McGee would have recognized that it would have to spend additional time, money and effort for several years to correct the numerous material structural defects and unlawful conditions found throughout the Plant.

If these facts had been known, Kerr-McGee would have realized that the Plant would not be in the position upon acquisition to achieve the rapid chloride plant production increases that underlay the Project Apollo financial modeling. Kerr-McGee would have known that it would take a number of years and millions of dollars before the chloride plant would achieve significant production increases. Project Apollo modeling would have reflected those years of delay, and would have calculated a much lower purchase price for the Savannah facility. Kerr-McGee ended up overpaying for the Savannah facility by tens of millions of dollars based on the false representations made by Kemira.

The falsity of Kemira's representations has definitely had a material adverse effect on the assets, operating results and businesses of the Kerr-McGee subsidiary that owns the Savannah Plant. (That subsidiary is named Kerr-McGee Pigments (Savannah), Inc., and was formerly known as Kemira Pigments, Inc.) This is true both in general and with respect to the specific representation that the hazards identified in the OSHA complaint had been fully abated. The falsity of that specific representation has not only caused Kerr-McGee to incur more than $4 million of repair costs, but has greatly impeded Kerr-McGee's plans to make important Plant improvement in a timely fashion.

While it was clear early on that the Plant was in violation of numerous contractual representations, I had no reason to believe that Kerr-McGee and Kemira would not be able to work out their differences. This has always been Kerr-McGee's experience with respect to other

23

TRX-ADV0088961

transactions. Kerr-McGee did not have to initiate arbitrations or lawsuits with respect to any of the other acquisitions with which I have been involved in my thirty plus years with the company. We did not do so with respect to Uerdingen, or Antwerp, or Botlek. With minor exceptions, those plants lived up to the representations that had been made by the sellers.

In September 2001, Kerr-McGee put Kemira on notice that the Plant did not meet the representations Kemira had made. There then ensued a rather drawn out process during which the parties exchanged correspondence, jointly interviewed a few key witnesses, and Kerr-McGee responded to Kemira's requests for additional documentation.

It was not until late in the game that I became convinced that Kemira had engaged in actual fraud. In the first week of March 2003, Kerr-McGee and Kemira arranged to have high-level executives meet in London to try to see whether they could settle the disputes that had arisen as a result of the condition of the Plant. Kerr-McGee's general counsel Greg Pilcher and I met with Kemira's general counsel Juhani Kari and Kemira Pigments Oy President Risto Keranen.

During the meeting I referred to the representations Kemira had made that had proven false. Greg Pilcher specifically referenced by way of example Kemira's representation that the Plant was asbestos free except for transite. I said that I thought Kemira had misled Kerr-McGee on these and other matters.

Mr. Keranen's response was: "You shouldn't have believed what we said."

Needless to say, I was dumbfounded. All major business transactions are conducted through written representations. A selling company will always know more about its own business than the counterparty with which it is dealing can find out on its own. Without contractual representations, and the right to rely on them, business transactions would be

24

TRX-ADV0088962

severely inhibited. Kerr-McGee had a right to rely on the representations Kemira had made to it, just like Kemira had the right to rely on Kerr-McGee's representations.

Given this attitude by Kemira, I directed that a full-blown investigation be conducted to determine whether a basis for asserting fraud existed. An exhaustive review of Kemira internal documents and witness interviews then took place.

I was told that, based on these inquiries, a valid fraud claim did exist. As soon as that answer was provided, I gave the go ahead to bring the claim.

CONFIDENTIAL                    TRX-ADV0088963

The contents of this statement are true to the best of my information and belief.

_8/24/2004_
Date

W.P. "Pete" Woodward

CONFIDENTIAL

TRX-ADV0088964