UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

IN RE:

TRONOX INCORPORATED, *et al.*,                              Bankr. Case No. 09-10156 (ALG)
                                                           (Jointly Administered)
                              Debtors.

-------------------------------------------------------------x

TRONOX INCORPORTATED, TRONOX                               Adversary Proceeding
WORLDWIDE LLC f/k/a Kerr-McGee Chemical                    No. 09-01198 (ALG)
Worldwide LLC, and TRONOX LLC f/k/a Kerr-
McGee Chemical LLC,

                              Plaintiffs,

          - against -

ANADARKO PETROLEUM CORPORATION,
KERR-MCGEE CORPORATION, KERR-
MCGEE CORPORATION, KERR-MCGEE OIL
& GAS CORPORATION, KERR-MCGEE
WORLDWIDE CORPORATION, KERR-               **POST-TRIAL MEMORANDUM**
MCGEE INVESTMENT CORPORATION,              **OF THE UNITED STATES OF**
KERR-MCGEE CREDIT LLC, KERR-MCGEE          **AMERICA**
SHARED SERVICES COMPANY LLC, and
KERR-MCGEE STORED POWER COMPANY
LLC,

                              Defendants.

-------------------------------------------------------------x

THE UNITED STATES OF AMERICA,

                              Plaintiff-Intervenor,

          - against -

TRONOX, INC., TRONOX WORLDWIDE LLC,
TRONOX LLC, KERR-MCGEE
CORPORATION, and ANADARKO
PETROLEUM CORPORATION,

                              Defendants.

-------------------------------------------------------------x

Plaintiff-Intervenor United States of America (the "United States" or the "Government") respectfully submits this memorandum in support of judgment for the plaintiffs in this matter.

## PRELIMINARY STATEMENT

By the early 2000s, the Kerr-McGee Corporation ("Kerr-McGee") found itself heavily burdened by environmental liabilities of discontinued businesses: uranium mining and processing, creosote wood treating, ammonium perchlorate manufacturing, thorium processing, and others. Not only did these liabilities reflect an enormous current and future cash expense, but they also left Kerr-McGee with a market overhang that prevented Kerr-McGee's oil and gas business from participating in M&A opportunities available to other companies in the industry. To escape both the cost and the overhang, Kerr-McGee devised and implemented a plan to off-load these liabilities onto its environmental and other creditors: It created a new company with the same name as the old company; transferred substantially all of its assets – including its crown jewel oil and gas businesses – to that new Kerr-McGee Corporation; and spun off the old business, renamed Tronox, as an insolvent entity that immediately hit financial distress and soon fell into bankruptcy. Although this plan was effective in encouraging the M&A activity that Kerr-McGee sought, with Anadarko purchasing Kerr-McGee for $19 billion only weeks after the spin-off, the evidence at trial has demonstrated that the transfer of assets was both actually and constructively fraudulent, to the great detriment of creditors, as well as a breach of fiduciary duty.

The Litigation Trust has explained in its brief that the legally required measure of damages is the return of the full value of the assets fraudulently conveyed from the entity that became Tronox, less any applicable offsets for value received by Tronox in the transactions. The United States submits this brief to explain that this measure of damages is not only legally

2

required but also the only *fair* remedy to award in this case.  It is the only remedy that fully

implements the agreements reached in the Plan of Reorganization ("Plan"), through which the

environmental creditors agreed to compromise their rights – including their administrative claims

and non-dischargeable regulatory interests – and to assume the risks of a loss of this case, in

exchange for the upside of a potential win; and it is also the only remedy that protects

environmental creditors from the risk of uncompensated environmental costs created by the

fraudulent conveyance.

Accordingly, the Court should enter a judgment for the full value of the assets

transferred, less any applicable offsets for value received, on the Litigation Trust's complaint.

As discussed below, to the extent the Court enters such a judgment, it should deem the

Government's separate claims under the Federal Debt Collection Procedures Act moot.

## ARGUMENT

### I.    Recovery of the Full Value of the Fraudulently Conveyed Assets Fairly Implements the Compromises Embodied in the Plan

The recovery of the full value of the assets, less any applicable offsets, is the fair remedy

because it implements the compromises reached in the Plan.[1]  Through the Environmental

Settlement Agreement,[2] which in turn was incorporated into the Plan, the federal, state, local,

and tribal environmental creditors agreed to compromise their claims and causes of action

against the debtors in exchange for an eighty-eight percent share of the recovery in this case, as

_____

[1] Dkt. No. 2196, Exh. A, Case No. 09-10156.

[2] Dkt. No. 2692, Exh. 1, Case No. 09-10156, as amended by Dkt. No. 2810, Exh. 3, Case No. 09-10156.

3

well as certain cash and other consideration. *See* Memorandum of Opinion ("550 Decision"), [3] dated Jan. 20, 2012, at 5-6. The agreement of the environmental creditors was critical to the debtors' reorganization: For one thing, many of the environmental claims were administrative claims that the debtors were required to provide for fully before emerging, but for which the debtors were unable to obtain financing. *See* Disclosure Statement, [4] Section I-E, at 7. Further, many of the debtors' liabilities were non-dischargeable legal obligations that could not be eliminated without the federal, state, local, and tribal governments' consent and which, if they were not compromised, "would create an insurmountable obstacle to obtaining financing for the reorganized business." Disclosure Statement, at Section I-E, at 8; *see also In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991) (discussing non-dischargeable environmental obligations); *In re Mark IV Indus., Inc.*, 438 B.R. 460, 465-71 (Bankr. S.D.N.Y. 2010) (same), *aff'd*, 459 B.R. 173 (S.D.N.Y. 2011). In the absence of financing, debtors would be unable to propose a confirmable plan of reorganization, as any confirmable plan would need to provide for the debtors to comply with their ongoing environmental obligations. *See* 11 U.S.C. § 1129(a)(3) (prohibiting approval of plans "forbidden by law"); Collier on Bankruptcy § 1129.03[3][b][ii] (plan that would violate non-bankruptcy regulatory law would be "forbidden by law" and would preclude confirmation even if no provision of title 11 was violated); *In re Eagle Picher Holdings, Inc.*, 345 B.R. 860 (Bankr. S.D. Ohio 2006) (debtor has burden of proof to demonstrate that plan for addressing contaminated properties complied with non-bankruptcy law). The Environmental Settlement Agreement made the Plan possible.

—————————————

[3] Dkt. No. 295, Adv. Proc. 09-1198.

[4] Dkt. No. 2196, Exh. B, Case No. 09-10156.

In exchange for compromising their claims and interests, the governmental creditors agreed to take a contingent asset: an eighty-eight percent share of the potential recovery in this litigation. That contingent asset carried with it a potential downside of little or no recovery, along with a potential upside exceeding the amount of unpaid claims. The Court, in rejecting Anadarko's prior argument that recovery should be capped at the amount of unpaid claims, recognized that the availability of the upside is essential to induce creditors to accept a litigation risk so that estates can benefit from plans such as Tronox's: "[A] creditor who has taken a litigation risk [must be afforded] a prospect of a possible recovery beyond that creditor's individual damages." 550 Decision at 17. Without this potential premium, it would make no sense for a creditor to enter into such a bargain because the value of the contingent asset received at confirmation would be less than the value of the claims once the litigation probabilities of success and failure were considered.

For the same reason, the Court should reject defendants' related contentions that the Litigation Trust's recovery should be limited in the name of "equity" to prevent a "windfall": What equity requires is that creditors who take a litigation risk to support a Plan receive not only the downside risks of a litigation loss but also the full upside benefit of a litigation win; any limitation premised on a so-called "windfall" effectively undermines this benefit. Likewise, the Court should reject the so-called "creditor shortfall" limitation on recovery proposed by defendants, *see, e.g.*, Tr. (9/6/2012) at 6544:11-22 (Balcombe), which effectively limits recoveries to the amount necessary to "true up" an estimated as-of 2005 balance sheet. This "creditor shortfall" rule would eviscerate the remedy provided by Section 550 of the Bankruptcy Code – return of the value of the assets so long as they are "for the benefit of the estate" – and would rewrite the bargain embodied in the Plan.

5

The only fair remedy is the one that affords the Government, and the state, local, tribal and tort beneficiaries, the full benefit of the bargain that they struck in the Plan, which benefitted the entire estate:  The opportunity to recover eighty-eight percent of a recovery that is based on the measure of damages provided in the Bankruptcy Code, which is the full value of assets transferred less any applicable offsets for value received.

## II.     Return of Full Value of the Fraudulent Conveyed Assets Fairly Protects Environmental Creditors – and the U.S. Taxpayer – from Risks Created by the Fraudulent Transactions

Even aside from the compromise embodied in the Plan, a full return of the assets is the only fair remedy because it protects the Government from the risk – created by defendants – of uncompensated environmental costs.  The remedies advocated by defendants – on a "windfall" theory or pursuant to Mr. Balcombe's proposed "creditor shortfall" limitation – would fail to protect the Government from the very real risk that assets will be unavailable to cover environmental costs in the likely event that they exceed the "known or knowable as-of-2005" estimates on which defendants premise their "windfall" and "creditor shortfall" arguments.  In contrast, a full recovery of assets (less offsets) puts the estate back in its prior financial position, and thereby protects the Government and other environmental creditors from having to bear the risk that the fraudulent transfers have left insufficient funds to complete environmental clean-up at the many sites contaminated by Kerr-McGee and its predecessors.

As an initial matter, the evidence at trial demonstrated the extraordinary scope of Kerr-McGee's legacy environmental liabilities, as well as the costs they impose on the federal, state, local, and tribal treasuries and the harm to which they subject individuals and communities throughout the nation.  The environmental contamination caused by Kerr-McGee and its predecessors is vast:

6

- Carcinogenic creosote contamination at more than thirty wood-treating facilities across the country, including Manville, New Jersey, where contamination was found below homes and clean-up cost $298 million; Columbus, Mississippi, which has been listed as a Superfund site and where contamination exists below a community's church and in the yards of residents; and Avoca, Pennsylvania, where historic contamination has led to significant personal injuries;

- Radioactive uranium waste from abandoned mines largely in the Navajo Nation, where the contaminated soil and water threatens the Tribe's health and cultural heritage, but also in non-Navajo locations such as the Riley Pass and Flat Top Mines in South Dakota;

- Radioactive thorium contamination in downtown Chicago and West Chicago, Illinois, for which Kerr-McGee had already spent over $500 million as of the IPO, and for which much additional clean-up was left to perform;

- Perchlorate contamination from Kerr-McGee's facility at Henderson, Nevada, which has resulted in extremely high concentrations of perchlorate in groundwater flowing out of Kerr-McGee's property into a stream, which in turn has affected the Colorado River, a source of drinking water for millions of people in communities as far away as Los Angeles; and

- Contamination from other mining, radiological, chemical, and oil and gas facilities throughout the country.

Dr. Neil Ram estimated, "based on information that was known or knowable as of November 28, 2005," that the cost of this liability was $1.499 billion to $1.684 billion. Ram Direct[5] ¶ 1. This range, despite including certain "contingencies" for uncertainties, simply "represents the *minimum* amount of future costs that likely will be incurred with respect to the Kerr-McGee Sites," PX 1266 (Ram Report, Section 1, at 1) (emphasis added), and, for various reasons discussed below, it is likely to materially understate the true cost of clean-up.

That Dr. Ram's estimate does not set a maximum or ceiling on potential costs is obvious from the very project he undertook: to determine a reasonable estimate of liabilities

---

[5] Docket No. 417, Case No. 09-1198.

7

that were "based on information that was known or knowable as of November 28, 2005." Ram

Direct ¶ 1; *see also id.* ¶¶ 2, 14. The methodology Dr. Ram implemented did not set maximum

potential costs, but rather applied a "most likely value," *id.* ¶ 28, or in some cases a "range of

values" based on "reasonable assumptions," *id.* ¶ 29, or a "known minimum value," *id.* at 30.

Moreover, Dr. Ram also incorporated numerous conservative assumptions into his analysis to

avoid any risk of overstating the liabilities. For example, he did not assign *any* environmental

costs to more than 1000 sites for which he did not have sufficient documentation, *see id.* ¶¶ 4,

20, 42, and he omitted the cost of replacement of major capital equipment where he lacked

documentation of the original cost of installation, *see id.* ¶¶ 42, 225, 298; PX 1266 (Ram Report,

Ch 2.1.3, at 3 and Ch. 2.5, at 47-50). On a site by site basis, as well, Dr. Ram took a

conservative approach, such as not including any costs for surface water or groundwater

remediation at the Lukachukai mines. *See* PX1266 (Ram Report, Ch. 5.4.1, at 120).[6] All of

these conservative approaches show that Dr. Ram's numbers are exceedingly reliable for the

purpose for which they were prepared – an estimate of known and knowable liabilities as of 2005

to be used in a solvency analysis. However, for the same reason, these numbers in no way point

to a ceiling or maximum for potential environmental costs. *See* Ram Direct ¶¶ 40, 41.

Even beyond Dr. Ram's conservatism, unexpected increases in environmental costs are

the rule, not the exception, leaving Dr. Ram's estimate inevitably low. As Dr. Ram has

explained, both site-specific technical issues and broader regulatory changes can drive such

---

[6] Dr. Ram's numerous conservative assumptions – both general and site specific – are reviewed
in detail in his expert report, which is in evidence, *see, e.g.*, PX 1266 (Ram Report, Ch. 2.1.6, at
4-5; Ch. 2.2.3, at 21, 23; Ch. 2.5 at 47-50), and many are discussed in his written testimony, *see*
Ram Direct ¶¶ 4, 20, 39, 42, 48, 70.

increases and lead to his estimates' being too low. *See* Ram Direct ¶¶ 41, 42. Even Dr. Neil

Shifrin, defendants' expert, acknowledged at trial that environmental cost estimates, in general,

must often be increased over time:

> Q. Now, is it also true as Dr. Ram suggests that cost estimates can only go up over time given the conditions at the site?
>
> A. *It -- it is often true*. I don't know if you can really guarantee that.

Tr. (9/10/2012) at 7149:3-7 (Shifrin) (emphasis added).

Thus, as Dr. Ram explained, actual costs could well exceed his estimates for technical

reasons such as the potential that "actual volumes, operational durations, and the extent of

remedial actions" turn out to be "greater than those in [Dr. Ram's] higher-end estimate." *Id.*

¶ 41; *see also id.* ¶ 42 (noting that "even with the best estimates, project costs can often exceed

those budgeted due to unforeseen circumstances and unanticipated field conditions, particularly

if very conservative contingencies are included in the original estimate"). Often, for example,

actual costs exceed estimates because a larger than anticipated volume of soil needs to be

treated as part of a site clean-up. Indeed, defendants' expert Dr. Shifrin recognized that such

increases are routine: He explained that because "the full limit of contamination exceeding

cleanup levels usually cannot be defined by up front studies data[,] . . . field decisions on final

soil volumes are common," Tr. (9/10/2012) at 7008:1-6 (Shifrin), and "[i]t is extremely common

[--] almost universal [--] for Superfund excavations to dig more soil than initially expected," *id.*

at 7007:20-24. The Federal Creosote site at Manville, New Jersey, proves this point. It is

undisputed that the need to remediate unexpectedly large volumes of contaminated soil led to a

material increase in costs at Manville. *See* PX 1266 (Ram Report Ch. 4.6.21.2 at 14) (noting the

effect of increased soil volumes requiring remediation on the cost of the remedy); JX 461 (GAO

report noting that at Manville "a greater-than-expected amount of contamination was discovered during the site cleanup effort, which increased costs").

Beyond site-specific factors such as soil volumes, major increases in clean-up costs can be driven by changes in federal, state, or tribal regulatory standards. As Dr. Ram has explained, "most environmental regulations have become more stringent over time, which typically increases costs." Ram Direct ¶ 42. One notable example here is that of ammonium perchlorate, which is the major contaminant at Kerr-McGee's former Henderson, Nevada, site, among others. Perchlorate in drinking water did not become a major public health concern until the late 1990s and early 2000s, when "more and more contamination was identified as more sensitive analytical methods became available." PX 1266 (Ram Report, Ch. 4.4.3, at 28). Clean-up efforts at Henderson have been governed by Nevada's "provisional action level" of 18 micrograms per liter (18 μg/L). *See* PX 1266 (Ram Report, Ch. 4.4.3, at 26). However, EPA has announced that it will set a national perchlorate standard for drinking water. *See Drinking Water: Regulatory Determination on Perchlorate*, 76 Fed. Reg. 7762-01 (Feb. 11, 2011); PX 1266 (Ram Report, Ch. 4.4.3, at 25-26) (noting future EPA action, as well as current non-binding EPA "Interim Drinking Water Health Advisory" level of 15 μg/L and the State of California mandatory drinking water standard of 6 μg/L). As Kerr-McGee admitted in its 10-K for 2005, "The establishment of drinking water standards *could materially affect the scope, duration and cost of the long-term groundwater remediation* that Tronox LLC is required to perform." DX 2824.12, at 225 (emphasis added).

Indeed, because of the risk of unknown increases in environmental costs, in a typical CERCLA case the district court, rather than attempting to estimate future costs, awards the Government a declaration that the defendant is liable for any recoverable costs incurred by the

Government in the future, however much they may be. *See, e.g.*, CERCLA § 113(g)(2), 42

U.S.C. § 9613(g)(2) (providing that "the court shall enter a declaratory judgment on liability for

response costs or damages that will be binding on any subsequent action or actions to recover

further response costs or damages"). Similarly, when it settles cases, EPA typically will not give

a defendant a covenant not to sue that protects the defendant from future liability prior to the

clean-up work's being completed, *see* CERCLA § 122(f)(3), 42 U.S.C. § 9622(f)(3), and even

then the covenant not to sue typically will not cover liability for future clean-up that "arises out

of conditions which are unknown at the time" the clean-up was completed, *see* CERCLA

§ 122(f)(6)(A), 42 U.S.C. § 9622(f)(6)(A). In those cases where the Government does

voluntarily agree to assume this risk of future uncertainty in a settlement, the Government often

requires that the settling defendants pay a premium to compensate the Government for assuming

this risk, and courts have upheld such premiums. *See, e.g.*, *U.S. v. Charter Intern. Oil Co.*, 83

F.3d 510, 522 n.17 (1st Cir. 1996); *U.S. v. Cannons Eng'g Corp.*, 899 F.2d 79, 88 (1st Cir.

1990); *U.S. v. Borough of Lemoyne*, No. CV-93-0667, 1994 U.S. Dist. Lexis 21533, at *10, *33-

*34 (M.D. Pa. Nov. 17, 1994).

At the end of the day, "[e]lemental notions of fairness dictate that one who causes a loss

should bear the loss." *Owen v. City of Independence*, 445 U.S. 622, 654 (1980). Where the

amount of loss is itself uncertain, "[t]he most elementary conceptions of justice and public policy

require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has

created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946); *see In re Methyl Tertiary

Butyl Ether (MTBE) Prods. Liab. Litig.*, 739 F. Supp. 2d 576, 614 (S.D.N.Y. 2010) (holding that

because "there is no sure way to estimate how likely [costly] emergencies are to occur," "it is

appropriate that the wrongdoer . . . rather than the innocent party . . . should bear the risk that

11

these emergencies will occur frequently").  This rule is "remedial rather than punitive," *N.L.R.B.*

*v. Staten Island Hotel Ltd. P'ship*, 101 F.3d 858, 862 (2d Cir. 1996), and, indeed, it is a matter of

simple justice that burdens created by a fraudulent transfer should be borne by the parties to the

transaction:  "An entity with creditors gives away its assets for less than fair value at the peril

that it may be insolvent. . . . This is true regardless of whether the transferor knew or should have

known of its insolvency."  *Official Comm. of Asbestos Person. Injury Claimants v. Sealed Air

Corp. (In re W.R. Grace)*, 281 B.R. 852, 867 (D. Del. Bankr. 2002) ("*Grace*").

 Here, far from a "windfall," it is only by restoring the full value of the assets to the estate

that the risks created by defendants are removed from the environmental creditors, making them

whole.  *See Bigelow*, 327 U.S. at 265 (principle that wrongdoers should bear "the risk of the

uncertainty which [their] own wrong has created"); *Owen*, 445 U.S. at 654 ("[e]lemental notion[]

of fairness" that a party that injures another is responsible for making the injured party whole); *In

re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 739 F. Supp. 2d at 614 (finding it

"appropriate that the wrongdoer . . . rather than the innocent party" bear the risks); *Grace*, 281

B.R. at 867-68 ("There is no unfairness to a debtor or to a less-than-fair-value transferee in

placing the burden of a wrong solvency estimate upon them where there exists a historically

unknowable mass tort liability that may impair the debtor's ability to meet its obligations.").

Moreover, defendants' suggestion that "equity" requires a limitation on recovery and that a

"creditor shortfall" limitation should be imposed would unjustly allow defendants to retain the

benefits of their fraud while imposing the risks of increase clean-up costs on the Government.

*See Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 812 (9th Cir. 1994) (holding that

the estate "has a greater equitable claim to the transferred funds than does" a party to the

fraudulent transaction); *see* Tr. (9/6/2012) at 6562:13-20 (Balcombe) (acknowledging that the

creditor shortfall theory would cause environmental creditors to bear the risks of increased clean-up costs).  As one court has explained in the context of mass-tort liability:

> [I]t is not too much to expect that firms with well-established legacies of mass-tort liability should realize that transfers for less than equivalent value may harm their tort claimant-creditors should prognostications of future claims be inaccurate.  These firms are in a special position with respect to such creditors.  Transactions . . . must take the reality of the companies' existing liability and the inherent difficulty in defining that liability's scope into consideration.

*Grace*, 281 B.R. at 868-69.

Basic fairness supports a full recovery, net of any applicable offsets, which is the only measure of damages that prevents Kerr-McGee from improperly transferring risks to involuntary environmental creditors, and ultimately to the public and the U.S. taxpayer.

## III.    The FDCPA Claim Is Likely Moot

Under almost any scenario presented in this case, the separate claim brought by the Government pursuant to the Federal Debt Collection Procedures Act ("FDCPA") will be rendered moot by the Court's decision on the Litigation Trust's claims.  The substantive elements of the FDCPA are the same as the elements of the Oklahoma statute that the Litigation Trust is principally relying on as "applicable law" pursuant to section 544 of the Bankruptcy Code.  *Compare* 24 Okla. St. Ann. tit. 24 § 116, *with* 28 U.S.C. § 3304(b); *compare* 24 Okla. St. Ann. tit. 24 § 117, with 28 U.S.C. § 3304(a).  Moreover, pursuant to the Litigation Trust Agreement, approved by this Court pursuant to the Plan, any recovery on the FDCPA claim is effectively subordinated to the Litigation Trust's recovery.  *See* Litigation Trust Agreement ¶ 13(c) (providing that "the proceeds of any . . .  resolution of [the FDCPA claims] shall be treated as if they were funds obtained in the Anadarko Litigation by the Litigation Trust, and

13

shall be distributed as such to the Beneficiaries in accordance with the terms of this Litigation").

Accordingly, a judgment awarding the Litigation Trust its recovery in this case will likely render

the separate FDCPA claim moot, as would a judgment holding that the Litigation Trust had

failed to prove a fraudulent conveyance.

In order for the FDCPA claim not to be moot, it would be necessary for the Court to

reject the Litigation Trust's claim on a technical legal defense inapplicable to the FDCPA.[7]  In

that case, complicated issues might need to be addressed regarding the FDCPA as a free-standing

claim.  In the interest of efficiency – and in light of the many hundreds of pages of filings being

submitted on other issues in this post-trial briefing – the Government respectfully requests leave

to submit a supplemental brief addressing these issues in the unlikely event that the Court finds a

technical defense applicable to the Litigation Trust's complaint that is not applicable to the

Government's separate claim.  Additionally, in the unlikely event that the FDCPA is not

rendered moot by the Court's decision, the Government respectfully requests that the Court enter

an order confirming that each of the parties that has appeared as a defendant at trial is a party

defendant on the FDCPA claim and, to the extent necessary, conforming the pleadings to the

evidence to so indicate.  *See* Fed. R. Civ. P. 15(b)(2), made applicable by Fed. R. Bankr. P. 7015;

*see also* Dkt No. 370 (Defendant's April 23, 2012 answer to the complaint-in-intervention,

noting possibility that Kerr-McGee Oil & Gas Corporation, Kerr-McGee Worldwide

Corporation, Kerr-McGee Investment Corporation, Kerr-McGee Shared Services Company

---

[7] This might occur only in highly unlikely scenarios, such as if the Court were to accept
defendants' (waived) defense as to a portion of the Litigation Trust's claims under the safe
harbor provisions of 11 U.S.C. § 546(e), or were to rule that the estate's claims were barred by
the statute of limitations on some basis that would not bar the Government's standalone claim.

LLC, and Kerr-McGee Stored Power Company LLC are defendants on the FDCPA claim, as

well as Anadarko Petroleum Corporation and Kerr-McGee Corporation, but reserving the right to

argue to the contrary).

## CONCLUSION

For the foregoing reasons, and the reasons stated in the post-trial memorandum of the

Litigation Trust, the United States respectfully seeks judgment on behalf of the plaintiffs.

Dated: New York, New York
      November 20, 2012

                PREET BHARARA
                United States Attorney
                *Attorney for the United States of America*

By:     Robert William Yalen
                ROBERT WILLIAM YALEN
                JOSEPH A. PANTOJA
                Assistant United States Attorneys
                Telephone: (212) 637-2722
                Facsimile:  (212) 637-2686
                E-mail: robert.yalen@usdoj.gov