UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| TRONOX INCORPORATED, *et al.*, | ) | Case No. 09-10156 (ALG) |
| | ) | Jointly Administered |
| Reorganized Debtors. | ) | |
| | ) | |

_____

| | | |
|---|---|---|
| | ) | |
| TRONOX INCORPORATED, | ) | |
| TRONOX WORLDWIDE LLC | ) | |
| f/k/a Kerr-McGee Chemical Worldwide LLC, | ) | |
| and TRONOX LLC f/k/a Kerr-McGee | ) | |
| Chemical LLC,[1] | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 09-01198 (ALG) |
| | ) | |
| KERR-McGEE CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

---

[1]    Pursuant to the Anadarko Litigation Trust Agreement, which was approved by the Court on February 14, 2011 (Dkt. No. 2812), the Anadarko Litigation Trust was appointed as the representative of each of the Plaintiff Debtors' estates, as that term is used in section 1123(b)(3)(B) of the Bankruptcy Code, with the power and right to prosecute this matter.  By the same agreement and Order, the Anadarko Litigation Trust was "deemed substituted" for the Debtor Plaintiffs in this matter "as the party in such litigation."

_____

|                                      |   |
|--------------------------------------|---|
| THE UNITED STATES OF AMERICA,        | ) |
|                                      | ) |
| Plaintiff-Intervenor,                | ) |
|                                      | ) |
| v.                                   | ) |
|                                      | ) |
| TRONOX, INC.,                        | ) |
| TRONOX WORLDWIDE LLC,                | ) |
| TRONOX LLC,                          | ) |
| KERR-MCGEE CORPORATION, and          | ) |
| ANADARKO PETROLEUM                   | ) |
| CORPORATION,                         | ) |
|                                      | ) |
| Defendants.                          | ) |

_____

## **PLAINTIFFS' POST-CLOSING BRIEF**

David J. Zott, P.C. (*admitted pro hac vice*)
Andrew A. Kassof, P.C.  (AK 7079)
Jeffrey J. Zeiger (*admitted pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel for the Anadarko Litigation Trust*

## TABLE OF CONTENTS

**Page**

**INTRODUCTION**................................................................................................................1

I.    Tronox Has Proven Triggering Creditors for Each Plaintiff under § 544(b).......................1

    A.    Plaintiffs Have Proven Numerous Triggering Creditors for Tronox Worldwide and Tronox LLC ................................................................................2

    B.    The United States Is a Proper Triggering Creditor ..................................................6

    C.    The Bondholders Are Triggering Creditors for Tronox Incorporated ....................8

II.    Defendants Misstate the Legal Standards for Plaintiffs' Actual Intent Claim...................10

    A.    Plaintiffs Do Not Need to Prove the Sole Purpose of the Transfers Was to Damage Creditors ................................................................................................10

    B.    The Presence of Badges of Fraud Still Gives Rise to a Presumption of Actual Intent That Defendants Failed to Rebut ....................................................15

        1.    Oklahoma Law Still Recognizes Presumptions of Fraud ..........................15

        2.    Defendants Failed to Rebut the Presumption of Fraud Here ....................16

III.    Tronox's Misleading Financial Statements Preclude Reliance on Market Evidence ........19

IV.    Defendants' Flawed Technical Arguments Do Not Preclude Plaintiffs from Recovering the Fraudulently Transferred Oil and Gas Assets...........................................20

    A.    Application of the Collapsing Doctrine Is Appropriate Here Under the Case Law and UFTA ..........................................................................................21

    B.    Claims for the Oil and Gas Assets Are Not Time-Barred Because the Transfers Were Not "Perfected" in 2002 ...............................................................23

    C.    Plaintiffs' Cash Flow Demonstrative Is Based on Admissible Evidence .............24

V.    Defendants' Ever-Changing Positions Do Not Negate Their Breach of Fiduciary Duties ................................................................................................................................25

    A.    Defendants Breached Their Fiduciary Duties to Tronox ......................................26

    B.    Plaintiffs' Breach of Fiduciary Duty Claim Is Timely .........................................28

VI.    Defendants' Unprecedented and Unprincipled Theories Do Not Reduce Plaintiffs' Damages of At Least $14 Billion........................................................................29

i

## TABLE OF CONTENTS (CONT'D)

**Page**

A.     *Bangor Punta* Does Not Limit Plaintiffs' Recovery Here ....................................31

B.     Defendants' § 502(h) Theories are Contrary to Law and Fact ............................35

    1.     Class 3 General Unsecured Creditors Did Not Receive More Than 100% of Their Claims ................................................................................36

    2.     Section 502(h) Does Not Incorporate Defendants' "Restorative Principle" ................................................................................................39

**CONCLUSION** .......................................................................................................41

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alan Drey Co., Inc. v. Generation, Inc.*,
    317 N.E.2d 673 (Ill. App. 1974) ........................................... 12

*Aptix Corp. v. Quickturn Design Sys., Inc.*,
    148 F. App'x. 924 (Fed. Cir. 2005) ....................................... 17

*ASARCO LLC v. Americas Mining Corp.*,
    396 B.R. 278 (S.D. Tex. 2008) ......................................... passim

*ASARCO LLC v. Americas Mining Corp.*,
    404 B.R. 150 (S.D. Tex. 2009) ............................................ 29

*Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.*,
    417 U.S. 703 (1974) ........................................... 31, 32, 33, 34

*Burton v. Exxon Corp.*,
    583 F. Supp. 405 (S.D.N.Y. 1984) ....................................... 27

*Chem. Bank v. Affiliated FM Ins. Co.*,
    169 F.3d 121 (2d Cir. 1999) ............................................... 8

*DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*,
    384 F.3d 338 (7th Cir. 2004) ........................................... 23, 24

*Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*,
    931 F.2d 196 (2d Cir. 1991) ........................................... 13, 14

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995) ............................................... 21

*HSBC Bank USA, Nat'l Ass'n v. Adelphia Commc'n Corp.*,
    2009 WL 385474 (W.D.N.Y. Feb. 12, 2009) .............................. 8, 9

*In re Acequia, Inc.*,
    34 F.3d 800 (9th Cir. 1994) ............................................... 39

*In re Actrade Fin. Techs. Ltd.*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) .................................... 10

*In re Adelphia Recovery Trust*,
    634 F.3d 678 (2d Cir. 2011) ............................................. 8, 9

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Allegheny Health, Educ. & Research Found.*,
253 B.R. 157 (W.D. Pa. 2000) .................................................................................... 35

*In re Allou Distribs., Inc.*,
392 B.R. 24 (Bankr. E.D.N.Y. 2008) ....................................................................... 2, 8

*In re ASARCO LLC*,
420 B.R. 314 (Bankr. S.D. Tex. 2009) ...................................................................... 29

*In re Best Prods. Co.*,
157 B.R. 222 (Bankr. S.D.N.Y. 1993) ....................................................................... 21

*In re Best Prods. Co.*,
168 B.R. 35 (Bankr. S.D.N.Y. 1994) .................................................................... 30, 40

*In re Blatstein*,
192 F.3d 88 (3d Cir. 1999) ........................................................................................ 10

*In re Calpine Corp.*,
377 B.R. 808 (Bankr. S.D.N.Y. 2007) ....................................................................... 40

*In re Carrozzella & Richardson*,
302 B.R. 415 (Bankr. D. Conn. 2003)........................................................................ 3

*In re Chateaugay*,
944 F.2d 997 (2d Cir. 1991)..................................................................................... 3, 4

*In re Checkmate Stereo & Elecs., Ltd.*,
9 B.R. 585 (Bankr. E.D.N.Y. 1981) .......................................................................... 11

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ....................................................................... 19

*In re Consol. Indus. Corp.*,
2006 WL 3136924 (N.D. Ind. Oct. 31, 2006) ............................................................ 3

*In re Dant & Russell, Inc.*,
853 F.2d 700 (9th Cir. 1988)....................................................................................... 4

*In re DLC*,
295 B.R. 593 (B.A.P. 8th Cir. 2003) ........................................................................... 3

*In re Dunn*,
2006 WL 6810930 (B.A.P. 9th Cir. Oct. 31, 2006) .................................................... 9

*In re Dwek*,
2011 WL 1300188 (Bankr. D.N.J. Apr. 4, 2011)...................................................... 15

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Equip. Acquisition Res., Inc.*,
   481 B.R. 422 (Bankr. N.D. Ill. 2012) ........................................................ 3

*In re Exide Techs.*,
   303 B.R. 48 (Bankr. D. Del. 2003) ........................................................ 39

*In re Gurley*,
   311 B.R. 910 (Bankr. M.D. Fla. 2001) ........................................................ 40

*In re Healthco Int'l, Inc.*,
   195 B.R. 971 (Bankr. D. Mass. 1996) ........................................................ 33

*In re Insilco Techs., Inc.*,
   309 B.R. 111 (Bankr. D. Del. 2004) ........................................................ 4

*In re Int'l Loan Network, Inc.*,
   160 B.R. 1 (Bankr. D.D.C. 1993) ........................................................ 3

*In re Jones*,
   403 B.R. 228 (Bankr. D. Conn. 2009) ........................................................ 3

*In re Jumer's Castle Lodge, Inc.*,
   329 B.R. 837 (Bankr. C.D. Ill. 2005) ........................................................ 22

*In re Kaiser Merger Litig.*,
   168 B.R. 991 (D. Co. 1994) ........................................................ 33

*In re Lexington Oil & Gas Ltd.*,
   423 B.R. 353 (Bankr. E.D. Okla. 2010) ........................................................ 16

*In re Maddalena*,
   176 B.R. 551 (Bankr. C.D. Cal. 1994) ........................................................ 30

*In re MarketXT Holdings Corp.*,
   376 B.R. 390 (Bankr. S.D.N.Y. 2007) ........................................................ 12, 14, 35

*In re Mirant Corp.*,
   675 F.3d 530 (5th Cir. 2012) ........................................................ 7

*In re Nat'l Forge Co.*,
   344 B.R. 340 (W.D. Pa. 2006) ........................................................ 22

*In re Pajaro Dunes Rental Agency, Inc.*,
   174 B.R. 557 (Bankr. N.D. Cal. 1994) ........................................................ 22

*In re Pardee*,
   218 B.R. 916 (9th Cir. B.A.P. 1998) ........................................................ 4

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Park S. Sec., LLC,*
    326 B.R. 505 (Bankr. S.D.N.Y. 2005) ...................................................................... 16

*In re Refco, Inc. Secs. Litig.,*
    2009 WL 7242548 (S.D.N.Y. Nov. 13, 2009) ...................................................... 2, 9

*In re Richardson,*
    268 B.R. 331 (Bankr. D. Conn. 2001)...................................................................... 3

*In re Seitz,*
    400 B.R. 707 (Bankr. E.D. Mo. 2008) ................................................................... 15

*In re Sentinel Mgmt. Grp. Inc.,*
    689 F.3d 855 (7th Cir. 2012)......................................................................... 11, 12

*In re Sharp Int'l Corp.,*
    302 B.R. 760 (E.D.N.Y. 2003).............................................................................. 10

*In re Sheffield Steel Corp.,*
    320 B.R. 423 (Bankr. N.D. Okla. 2004).................................................................. 22

*In re Sioux Redi-Mix, Inc.,*
    2007 WL 1114161 (Bankr. E.D. Okla. Jan. 11, 2007).............................................. 16

*In re Spearing Tool & Mfg. Co.,*
    171 B.R. 578 (Bankr. E.D. Mich. 1994) ................................................... 12, 13, 17, 18

*In re Tronox Inc.,*
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) ................................................................ 23, 28

*In re Tronox Inc.,*
    450 B.R. 432 (Bankr. S.D.N.Y. 2011) ...................................................... 25, 26, 27, 28

*In re Tronox Inc.,*
    464 B.R. 606 (Bankr. S.D.N.Y. 2012) ........................................................ 30, 33, 39

*In re W.R. Grace,*
    446 B.R. 96 (Bankr. D. Del. 2011) ....................................................................... 19

*In re Wills,*
    2008 WL 1840701 (Bankr. D. Kan. Apr. 23, 2008) ................................................. 2

*In re Yellowstone Mountain Club, LLC,*
    436 B.R. 598 (Bankr. D. Mont. 2010)..................................................................... 22

*Kelley v. Thomas Solvent Co.,*
    725 F. Supp. 1446 (W.D. Mich. 1988).............................................................. 10, 11

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*King v. Ionization Int'l, Inc.*,
    825 F.2d 1180 (7th Cir. 1987) ............................................................. 8, 12

*Kipperman v. Onex Corp.*,
    411 B.R. 805 (N.D. Ga. 2009) ............................................................ 22, 36

*Lippe v. Bairnco Corp.*,
    249 F. Supp. 2d 357 (S.D.N.Y. 2003) ..................................................... 13

*MC Asset Recovery, LLC v. Southern Co.*,
    2006 WL 5112612 (N.D. Ga. Dec. 11, 2006) ................................... 36, 37

*Mellon Bank, N.A. v. Dick Corp.*,
    351 F.3d 290 (7th Cir. 2003) ................................................................ 39

*Midland Food Servs., LLC v. Castle Hill Holdings V, LLC*,
    792 A.2d 920 (Del. Ch. 1999) .................................................. 32, 33, 34

*Orr v. Kinderhill Corp.*,
    991 F.2d 31 (2d Cir. 1993) .................................................................. 21

*Payne v. Gilmore*,
    382 P.2d 140 (Okla. 1963) .................................................................. 16

*Rock River Sav. & Loan Ass'n v. Am. States Ins. Co.*,
    594 F.2d 633 (7th Cir. 1979) .............................................................. 32

*Route 21 Assoc. of Belleville, Inc. v. MHC, Inc.*,
    2012 WL 6625280 (S.D.N.Y. Dec. 19, 2012) .......................................... 4

*S. Indus., Inc. v. Jeremias*,
    411 N.Y.S.2d 945 (Sup. Ct., App. Div. 1978) ....................................... 14

*SEC v. Haligiannis*,
    608 F. Supp. 2d 444 (S.D.N.Y. 2009) .............................................. 11, 18

*SEC v. ICP Asset Mgmt, LLC*,
    2012 WL 204098 (S.D.N.Y Jan. 24, 2012) ............................................. 7

*Shapiro v. Wilgus*,
    287 U.S. 348 (1932) ...................................................................... 12, 13

*Sinclair Oil Corp. v. Levien*,
    280 A.2d 717 (Del. 1971) .................................................................... 27

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*,
    2012 WL 3100778 (N.D. Tex. Jul. 31, 2012) .................................... 26, 27

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.,*
  479 B.R. 405 (N.D. Tex. 2012) ........................................................................... 9

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.,*
  No. 3:10-CV-1842-G (N.D. Tex. Jan. 22, 2013) .................................................. 20

*U.S. v. Byrum,*
  408 U.S. 125 (1972) ........................................................................................... 28

*U.S. v. Jackson,*
  2012 WL 5292952 (W.D. Okla. Aug. 21, 2012) ................................................. 16

*U.S. v. Spencer,*
  2012 WL 4577927 (N.D. Okla. Oct. 2, 2012) ..................................................... 16

*VFB LLC v. Campbell Soup Co.,*
  482 F.3d 624 (3d Cir. 2007) ................................................................... 20, 27, 28

### STATUTES

11 U.S.C. § 502(h) ................................................................................................. 40

11 U.S.C. § 544(b) ......................................................................................... 2, 7, 35

11 U.S.C. § 550 ...................................................................................... 29, 32, 33, 35

28 U.S.C. § 3304(b)(1) .................................................................................... 3, 10

Ark. Code Ann. § 4-59-204 ................................................................................. 16

N.C. Gen. Stat. § 39-23.4 .................................................................................... 16

Okla. Stat. tit. 12A, § 1-9-102(a)(49)................................................................... 24

Okla. Stat. tit. 12A, § 1-9-203(b)(1) .................................................................... 24

Okla. Stat. tit. 24, § 116 ................................................................................. 10, 11

Okla. Stat. tit. 24, § 118(1)(b) ............................................................................. 23

Okla. Stat. tit. 24, § 121 ...................................................................................... 23

Okla. Stat. tit. 24, § 122 ...................................................................................... 22

Okla. Stat. tit. 24, §§ 116(A) & 117(A) ................................................................. 3

Tenn. Code Ann. § 66-3-313 ............................................................................... 16

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

## OTHER AUTHORITIES

4 COLLIER ON BANKRUPTCY § 502.09[2] (15th ed. rev. 2007)...................................................... 39

## INTRODUCTION

Very little about this case remains unsaid.  Yet, at the conclusion of more than seven hours of closing arguments and after submitting a 297-page post-trial brief, 430 pages of single-spaced proposed findings, and hundreds of pages of additional pre-trial briefs, Defendants felt the need to say more before the Court enters final judgment.

In this final brief and consistent with the Court's order limiting it to legal issues, Plaintiffs address issues that the Court raised at closing and certain arguments Defendants concocted for the first time post-trial.  For example, following a two-year chapter 11 case in which hundreds of creditors asserted billions of dollars of claims, Defendants now claim that there are no creditors that could confer standing on Tronox to pursue these claims.  Defendants also seek to avoid liability by rewriting the applicable statutes on actual fraudulent intent, and shielding the fraudulently transferred oil and gas assets through a series of flawed technical defenses.  They further offer a kitchen sink of damages arguments that are unprecedented, irrelevant and unprincipled, and renege on a number of admissions they previously made to the Court.  While much of Defendants' ink appears spilled with an eye towards other courts, none of Defendants' arguments has merit regardless of venue.

## I.    Tronox Has Proven Triggering Creditors for Each Plaintiff under § 544(b)

Although Tronox resolved billions of dollars of claims asserted by the United States and hundreds of other creditors, Defendants claim in their post-trial brief that Plaintiffs failed to prove the existence of a single "triggering creditor" as required for standing under § 544(b). (Defs.' Br. at 41–44, 196–204)  Defendants argue that the United States cannot be a triggering creditor because it did not have an unsecured claim that was allowable under § 502 and, regardless, the Federal Debt Collection Procedures Act ("FDCPA") provides its exclusive remedy.  (*Id.* at 196–99)  Defendants also contend that Tronox Inc.'s bondholders cannot be

triggering creditors because they "ratified" the fraudulent transfers.  (*Id*. at 42–44)    Not surprisingly, there is no basis for these belated challenges as there are numerous triggering creditors for each Tronox plaintiff.  (Pls.' FOF ¶¶ 16–17)

A.    **Plaintiffs Have Proven Numerous Triggering Creditors for Tronox Worldwide and Tronox LLC**

Under § 544(b)(1), Plaintiffs "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title …."  11 U.S.C. § 544(b).  This "requirement … is not especially exacting":

> A single legitimate creditor is sufficient to 'trigger' standing. When a trustee establishes the existence of a triggering creditor, the trustee may seek to avoid a fraudulent transfer 'not only for the benefit of that creditor, but also for the benefit of all of the unsecured creditors of the estate.'  The amount of the triggering creditor's interest is irrelevant.

*In re Refco, Inc. Secs. Litig*., 2009 WL 7242548, at *9 (S.D.N.Y. Nov. 13, 2009) (internal citations omitted).

Section 544(b)(1) requires that a triggering creditor's claim be "allowable."  A claim can be "allowable" even if it has not been allowed.  *See In re Wills*, 2008 WL 1840701, at *2 (Bankr. D. Kan. Apr. 23, 2008) ("§ 544(b)(1) requires the trustee to show the existence of an unsecured creditor with a claim that is 'allowable' under § 502, not one with a claim that has actually been allowed.").  An allowed claim obviously is also "allowable."  *See, e.g., In re Allou Distribs., Inc.*, 392 B.R. 24, 31–32 (Bankr. E.D.N.Y. 2008) ("[A] creditor that files proof of an unsecured claim that is not objected to is deemed to have an allowed claim under Section 502 and may qualify as a triggering creditor who 'hold[s] an unsecured claim that is allowable under section 502 of this title' in accordance with Section 544.").  Thus, at a minimum, an unsecured claim is "allowable" where a creditor files a proof of claim that is not objected to because such claims are deemed

allowed under § 502(a).[2]  *Id.*; *In re Richardson*, 268 B.R. 331, 334 (Bankr. D. Conn. 2001) (holding that claim was "allowable" where it was deemed allowed); *In re Int'l Loan Network, Inc.*, 160 B.R. 1, 18 (Bankr. D.D.C. 1993) (trustee established triggering creditor based on proofs of claim that were not objected to because "a claim is allowed unless it has been objected to").

The existence of an allowable unsecured claim typically is determined as of the petition date.  *See, e.g., In re DLC*, 295 B.R. 593, 605 (B.A.P. 8th Cir. 2003).  Under the Oklahoma UFTA and FDCPA (which are both "applicable law" under § 544(b)), Plaintiffs also need to prove that a triggering creditor existed as of the November 2005 transfer date for their constructive fraud claim based on balance sheet insolvency.  Okla. Stat. tit. 24, §§ 116(A) & 117(A); 28 U.S.C. § 3304(b)(1); *see also In re Equip. Acquisition Res., Inc.*, 481 B.R. 422, 430 (Bankr. N.D. Ill. 2012) ("it is unnecessary for Plaintiff to identify a creditor whose claim existed at the time of the allegedly fraudulent transfer" where the applicable UFTA provision allows avoidance "whether the creditor's claim arose before or after the transfer was made").

Both Tronox Worldwide LLC and Tronox LLC had (i) creditors with allowable unsecured claims as of the January 2009 petition date that (ii) also had claims as of the November 2005 transfer date.  (Pls.' FOF ¶¶ 15–17)  With respect to Tronox Worldwide LLC, the United States filed a proof of claim for unsecured prepetition and future CERCLA response costs at the Riley Pass, SD site.[3]  (Proof of Claim ("POC") No. 3535 ¶¶ 7–9, 11)  This unsecured

---

[2]    Proofs of claim, of which the Court may take judicial notice, are competent evidence to establish the existence of a triggering creditor.  *In re Jones*, 403 B.R. 228, 233–34 (Bankr. D. Conn. 2009); *In re Consol. Indus. Corp.*, 2006 WL 3136924, at *7 (N.D. Ind. Oct. 31, 2006); *In re Carrozzella & Richardson*, 302 B.R. 415, 421 (Bankr. D. Conn. 2003); *In re Richardson*, 268 B.R. at 334; *In re Int'l Loan Network*, 160 B.R. at 18.  The claims cited herein are publicly available from Tronox's claims agent, Kurtzman Carson Consultants LLC, or Plaintiffs will provide copies upon request.

[3]    Defendants claim that "many of the United States' claims are either disputed or non-dischargeable administrative claims that are not 'allowable under section 502,' but rather may be allowable only under § 503." (Defs.' Br. at 197)  Claims for response costs are entitled to administrative priority, however, only where the costs (i) were incurred postpetition and (ii) relate to property currently owned by the debtor.  *See In re Chateaugay*, 944 F.2d 997, 1009–10 (2d Cir. 1991); *In re Dant & Russell, Inc.*, 853 F.2d 700, 709 (9th Cir.

claim was "allowable" as of the petition date because it (i) was not objected to and, therefore, was deemed allowed under § 502(a), and (ii) was allowed with the United States' other environmental claims under the First Amended Joint Plan of Reorganization ("Plan") and the Consent Decree and Environmental Settlement Agreement ("ESA").[4]  The United States also had an unsecured claim for Riley Pass as of the November 2005 transfer date because contamination at the site resulted from mining by Tronox Worldwide's predecessor in the 1960s.[5]  (POC No. 3535 ¶¶ 4–5; *see also In re Chateaugay Corp.*, 944 F.2d 997, 1004–05 (2d Cir. 1991) (a claim for response costs under CERCLA arises when the release of hazardous substances occurs even if response costs have not been incurred))

Tronox Worldwide has numerous other triggering creditors as well.  Rio Algom Mining LLC, for example, filed a proof of claim against Tronox Worldwide for clean-up costs at the Ambrosia Lake, NM site that Tronox Worldwide owed Rio Algom under CERCLA and a December 1988 Purchase and Sale Agreement.  (POC No. 3617; DX368 at 211)  Rio Algom's unsecured claim was "allowable" as of the petition date because it was allowed by stipulation for

---

1988); *Route 21 Assoc. of Belleville, Inc. v. MHC, Inc.*, 2012 WL 6625280, at *15 (S.D.N.Y. Dec. 19, 2012); *In re Insilco Techs., Inc.*, 309 B.R. 111, 115–17 (Bankr. D. Del. 2004).  None of the claims identified by Plaintiffs in this brief—including the claim for response costs at Riley Pass, which is owned by the U.S. Forest Service—qualifies as an administrative claim.

[4]    Under the Plan, an "Allowed" Claim is defined to include "(iii) a Claim that is Allowed (x) pursuant to the Plan, (y) in any stipulation that is approved by the Bankruptcy Court or (z) pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith…." (Plan (Case No. 09-10156, Dkt. No. 2567, Ex. A), Art. I.A, ¶ 4)  The Court approved the ESA, finding it was "fair, reasonable and meets the standard for approval of settlements…." (Confirmation Order ¶¶ 36–37, 40; Plan, Art. IV.C.2)  Under the ESA and Plan, governmental holders of environmental claims—either directly or as beneficiaries of environmental response trusts—received consideration, including 88% of the proceeds from this litigation. (Plan, Arts. III.B.5, IV.C)  These payments were "on account of allowed claims of the Governments and/or resolutions of causes of action of the Governments…." (ESA (Case No. 09-10156, Dkt. No. 2555) ¶ 123)  Thus, the United States' (and other governments') environmental claims were allowed pursuant to the Plan and the ESA.  *See also In re Pardee*, 218 B.R. 916, 922 (9th Cir. B.A.P. 1998) (noting "the general rule that only 'allowed claims' will be paid through the bankruptcy estate").

[5]    The site was mined by Kermac Nuclear Fuels Corporation, which was merged into Kerr-McGee Corporation, a predecessor to Tronox Worldwide.  (GPX1.150; PX48)  Defendants have stipulated that Tronox Worldwide was responsible as of November 2005 for any response costs incurred at the Riley Pass site.  (Am. Joint Fact Stipulations ("Stip.") (Dkt. No. 449) ¶ 53)

$17 million.  (Case No. 09-10156, Dkt. No. 2326)  Rio Algom also was a creditor as of the November 2005 transfer date because Tronox Worldwide's reimbursement obligations had arisen under the Purchase and Sale Agreement by 2000.  (DX368 at 211; *see also* Stip. ¶ 48 (stipulating that Tronox Worldwide was responsible for any cleanup costs at the Ambrosia Lake site as of November 28, 2005))

The Navajo Nation also submitted a proof of claim against Tronox Worldwide for unsecured response costs to remediate the Church Rock, NM site, which Tronox Worldwide's predecessor mined in the 1970s.  (POC No. 2159; Stip. ¶ 55)  Thus, the Navajo Nation was a creditor as of both the November 2005 transfer date and the January 2009 petition date.  The State of Oklahoma likewise submitted a proof of claim against Tronox Worldwide for natural resource damages arising from Tronox Worldwide's operations at the Cleveland and Cushing, OK refineries.  (POC No. 2625; *see also* Stip. ¶¶ 146–47 (stipulating that Tronox Worldwide was responsible for any costs at the Cleveland and Cushing sites as of November 28, 2005))  In addition to holding a claim as of the petition date, Oklahoma was a creditor as of the November 2005 transfer date because Kerr-McGee Corporation (n/k/a Tronox Worldwide) operated these refineries until 1972.  (DX1507 at 6; DX8238GD at 24)  The Navajo Nation and Oklahoma claims were allowable because they were not objected to and were allowed pursuant to the Plan and ESA.  (*Supra* at 2–3 & n.4)

Tronox LLC likewise has numerous triggering creditors.  For example, the United States' proof of claim against Tronox LLC sets forth unsecured claims for prepetition environmental response costs at various sites, including former wood-treating sites in Wilmington, NC; Manville, NJ; and Milwaukee, WI.   (POC No. 2385 ¶¶ 14, 32, 73)  These claims were "allowable" because the United States' proof of claim was not objected to and they were allowed

pursuant to the Plan and ESA. (*Supra* at 2–3 & n.4) In addition to having a claim as of the petition date, the United States was a creditor as of the November 2005 transfer date because the release of hazardous substances at these sites occurred before 2005. (POC No. 2385 ¶ 3 (Tronox LLC's predecessor operated the Manville wood-treating facility until 1956); *id*. ¶ 28 (Kerr-McGee Chemical Corporation (n/k/a Tronox LLC) operated Wilmington until 1974); *id*. ¶¶ 66–67 (Kerr-McGee Chemical Corporation closed Milwaukee in 1976))

The City of West Chicago also filed a proof of claim against Tronox LLC for unsecured costs of remediation at Kress Creek that Tronox LLC's predecessor agreed to perform in April 2005. (POC No. 3536) The Nevada Division of Environmental Protection similarly filed proof of an unsecured claim relating to Tronox LLC's predecessor's agreements prior to November 2005 to remediate the Henderson, NV site. (POC No. 2422) New York and New Jersey likewise filed proofs of claim for unsecured prepetition response costs incurred at the Manville, NJ and Rome, NY wood-treating sites, where Tronox LLC's predecessor ceased operations in the 1950s. (POC Nos. 1869 & 3514; JX91 at 16; Pls.' FOF ¶¶ 568–69) The West Chicago, NDEP, New York and New Jersey claims were allowable because they were not objected to and were allowed pursuant to the ESA. (*Supra* at 2–3 & n.4) American International Specialty Lines Insurance Company also filed a proof of claim for unsecured costs incurred before November 2005 to remediate radioactive contamination in downtown Chicago arising from Tronox LLC's predecessor's operations. (POC No. 2345) This claim was allowed by stipulation and agreed order. (Case No. 09-10156, Dkt. No. 249)

## B.    The United States Is a Proper Triggering Creditor

Despite having numerous allowable unsecured claims against Tronox Worldwide and Tronox LLC, Defendants argue that the United States cannot be a triggering creditor because (i) it could not have avoided the fraudulent transfers under the Oklahoma UFTA as the FDCPA

provides an exclusive remedy and (ii) the FDCPA is not "applicable law" under § 544(b).
(Defs.' Br. at 197–203)  Defendants' position that the FDCPA provides an exclusive remedy,
however, cannot be squared with the unanimous case law holding that the United States can
avoid fraudulent transfers under state UFTAs and serve as a triggering creditor on that basis.
(Pls.' Br. at 72–73)  The FDCPA also is applicable law under 11 U.S.C. § 544(b), and the few
cases to the contrary are unpersuasive.[6]    (*Id.* at 69–71)  Indeed, if Defendants' positions were
correct, it would create an untenable Catch-22 for the United States in chapter 11 cases.  Under
Defendants' view, the United States cannot be a triggering creditor under § 544(b) because it
cannot prosecute fraudulent transfer claims under state UFTAs and instead must proceed under
the FDCPA.  (Defs.' Br. at 197–99)  But they also argue that the United States lacks standing to
pursue an FDCPA claim in chapter 11 and the trustee cannot bring a claim on behalf of the
United States because the FDCPA is not applicable law under § 544(b).  (Defs.' Post-Trial Br.
Regarding the U.S. FDCPA Claims at 11–13; Defs.' Br. at 199–203)  The law obviously does
not leave the United States with no recourse in chapter 11 cases as Defendants contend.[7]

---

[6]    Defendants rely heavily on *In re Mirant Corp.*, 675 F.3d 530 (5th Cir. 2012).  While *Mirant* wrongly concluded
that the FDCPA is not "applicable law" (*see* Pls.' Br. at 70–71), it correctly rejected Defendants' argument that
Plaintiffs' recovery should be capped at the amount of unsecured creditors' claims.  675 F.3d at 534 ("[a]
bankruptcy trustee may still have standing to avoid a fraudulent transfer after the unsecured creditors are
satisfied in full."); *see also id.* ("The trustee may recover the full extent of the fraudulently transferred property
on the basis of one creditor's claim.  In other words, an entire transfer may be set aside even though the
creditor's claim is nominal.").

[7]    Defendants also argued at closing that the bulk of the environmental liabilities to which Plaintiffs'
environmental expert, Dr. Neil Ram, assigned costs are not debts to the United States under the FDCPA.
(12/12/12 Tr. at 8283:20–8284:5)  A debt under the FDCPA, however, includes contingent claims, and a
"claim" is defined "extremely broadly" under the FDCPA "just as it is in … the Bankruptcy Code."  *See SEC v.
ICP Asset Mgmt, LLC*, 2012 WL 204098, *3 (S.D.N.Y Jan. 24, 2012).  Moreover, the United States' proofs of
claim covered 364 of the 372 sites to which Dr. Ram assigned costs.  *See* USA Proof of Claim against Tronox
LLC (POC No. 2385); USA Proof of Claim against Tronox Inc. (POC No. 3528); USA Proof of Claim against
Tronox Worldwide LLC (POC No. 3535); Ram Direct Appx. 1.

### C.    The Bondholders Are Triggering Creditors for Tronox Incorporated

Plaintiffs also proved that Tronox Inc.'s bondholders are triggering creditors.  (Pls.' FOF ¶ 17)  Shortly before the IPO transfers, Tronox Inc. issued bonds to at least 65 unsecured bondholders.  (Defs.' FOF ¶¶ 1390–91)  These bonds were still outstanding at the petition date.[8] (Appointment of Comm. of Unsecured Creditors (Case No. 09-1056, Dkt. No. 76) at 2) As they were ultimately allowed, the bondholders' claims were "allowable" as of the transfer and petition dates.[9]  (*See* Plan at 16; *In re Allou*, 392 B.R. at 31–32)

Defendants claimed in their post-trial brief that the bondholders ratified the transfers and therefore cannot serve as triggering creditors.   (Defs.' Br. at 42–44)   Ratification requires "knowing intent."  *See HSBC Bank USA, Nat'l Ass'n v. Adelphia Commc'n Corp.*, 2009 WL 385474, at *6 (W.D.N.Y. Feb. 12, 2009); *In re Adelphia Recovery Trust*, 634 F.3d 678, 691 (2d Cir. 2011) ("Ratification is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized and not binding.").  The "intent required for ratification 'must be clearly established and may not be inferred from doubtful or equivocal acts or language.'"  *In re Adelphia*, 634 F.3d at 693 (quoting *Chem. Bank v. Affiliated FM Ins. Co.*, 169 F.3d 121, 128 (2d Cir. 1999)); *see also King v. Ionization Int'l, Inc.*, 825 F.2d 1180, 1187 (7th Cir. 1987) (finding that a creditor, whose agent accepted a note from the debtor, did not ratify the issuance of the notes because he did not understand the transaction and testified that "he had no intention of ratifying the transaction").

---

[8]    At least Aegon USA was a bondholder at both the IPO and petition dates.  (*See* Defs.' FOF ¶ 1392; Appointment of Comm. of Unsecured Creditors at 2)

[9]    Of course, Tronox Inc. had numerous other unsecured creditors with allowable claims at the time of its petition. (*See, e.g.*, Case No. 09-10156, Dkt. No. 1987 ¶ 2 (allowing POC No. 2173 as a general unsecured claim against Tronox Inc.); Case No. 09-10156, Dkt. No. 1927 ¶ 2 (allowing POC No. 1672 as a general unsecured claim against Tronox Inc.); Case No. 09-10156, Dkt. No. 1795 ¶ 2 (allowing POC No. 1789 as a general unsecured claim against Tronox Inc.))

Defendants failed to prove that any—much less all—of Tronox Inc.'s 65 bondholders had the knowing intent required to "giv[e] sanction or affirmance" to the fraudulent transfers.[10]  *In re Adelphia*, 634 F.3d at 691.   Nor could they.   Kerr-McGee failed to disclose information that would have been necessary for the bondholders to ratify the fraudulent transfers, including the total scope of the legacy liabilities, its GAAP violations in setting environmental reserves, Tronox's dependence on speculative land sales for survival, or the true prospects of the chemical business.  (*See* Pls.' FOF ¶¶ 708–63)  Without this information, Tronox Inc.'s bondholders could not have formed the intent to ratify required under the law.  *Cf. In re Adelphia*, 634 F.3d at 693–94 (when acquiescence in transaction "credibly appears to have resulted from the complexity of the situation rather than intent, ratification does not occur").

Defendants' ratification cases are inapposite.  For example, in *In re Dunn*, the creditor seeking to avoid the transaction also was part owner of the debtor and had designed, initiated, and approved the transfer.  2006 WL 6810930, at *10–11 (B.A.P. 9th Cir. Oct. 31, 2006).  In *In re Refco, Inc. Securities Litigation*, plaintiff similarly alleged that the fraudulent transfers were designed and orchestrated by the creditor.  2009 WL 7242548, at *1 (S.D.N.Y. 2009).  Tronox Inc.'s bondholders, in contrast, were innocent third-parties—not the architects of the fraudulent transfers who had sufficient knowledge to ratify.[11]

---

[10]   Defendants have the burden of proving ratification as an affirmative defense. *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 427–28 (S.D. Tex. 2008).

[11]   Another of Defendants' cases, *HSBC Bank*, was reversed by the Second Circuit.  *See In re Adelphia*, 634 F.3d at 693–94 (reversing district court's holding that debtor's acquiescence in sale of subsidiary's assets in bankruptcy ratified fraudulent transfers because defendants did "not point to anything in the record suggesting" debtor's intent to ratify).  Defendants' remaining case, *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 479 B.R. 405 (N.D. Tex. 2012), found ratification where banks and bondholders had "full knowledge" that the transfers occurred even though Plaintiffs alleged these creditors were "tricked" regarding the "nature of the spin-off." *Id.* at 411.  This holding is inconsistent with the law in the Second Circuit requiring knowing intent to ratify. (*Supra* at 8)  The case is also inapposite as Tronox's bondholders did not have "full knowledge" of the transfers. (*Supra* at 9)

## II.    Defendants Misstate the Legal Standards for Plaintiffs' Actual Intent Claim

Desperate to overcome the overwhelming evidence of fraudulent intent, Defendants try to raise the legal standards for actual fraud.   In their post-trial brief, Defendants argued that Plaintiffs must prove that "the main or only purpose of the transfer" was "'actual intent' to damage a creditor." (Defs.' Br. at 157)  They also claimed that the presence of badges of fraud no longer creates a presumption of fraudulent intent.  (*Id.* at 183–84)  Defendants' proposed standards would rewrite the relevant statutes and case law on actual intent claims.   None has merit.

### A.    Plaintiffs Do Not Need to Prove the Sole Purpose of the Transfers Was to Damage Creditors

The law is clear: Defendants are liable for actual fraudulent transfers if they intended to hinder, delay or defraud creditors.  Okla. Stat. tit. 24, § 116(A)(1); 28 U.S.C. § 3304(b)(1)(A). At closing argument, the Court asked whether intending to separate assets from liabilities is sufficient to meet this standard.  (12/12/12 Tr. at 7851:15–21)  It is.  (*Id.* at 7851:22–7852:5) Courts have concluded that actual fraudulent intent can be found when the defendant intended to place its assets "out of the reach of creditors."  *In re Sharp Int'l Corp.*, 302 B.R. 760, 784 (E.D.N.Y. 2003) (focus is on "the circumstances that suggest a *conveyance* was made with fraudulent intent, *viz.* with the purpose of placing a debtor's assets out of the reach of creditors"); *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005) (Gropper, J.) (citing *Sharp* standard); *Kelley v. Thomas Solvent Co.*, 725 F. Supp. 1446, 1455 (W.D. Mich. 1988) ("Certainly the company's deliberate effort to put assets out of the reach of creditors meets the standard of intent to defraud."); *In re Blatstein*, 192 F.3d 88, 97–98 (3d Cir. 1999) (finding debtor liable where it admitted that shielding assets from creditors "was a factor" in transfer).

Other courts have found actual intent where a defendant made a transfer with knowledge of facts that made it substantially certain that the transfer would hinder, delay or defraud creditors. (*See* 12/12/12 Tr. at 7852:6–7856:10; Pls.' Br. at 13, 17)  Knowledge to a substantial certainty is intent. *ASARCO, LLC v. Americas Mining Corp.*, 396 B.R. 278, 387–88 (S.D. Tex. 2008); *see also In re Checkmate Stereo & Elecs., Ltd.*, 9 B.R. 585, 613 (Bankr. E.D.N.Y. 1981) ("A transfer, the intent (or obviously necessary effect) of which is to deprive creditors of the benefits sought to be secured by the Bankruptcy Act 'hinders, delays or defrauds creditors' within the meaning of § 67e."); *SEC v. Haligiannis*, 608 F. Supp. 2d 444, 451 (S.D.N.Y. 2009) (finding intent because the "natural consequences" of the debtor's actions were to hinder or delay creditors); Defs.' Br. at 157 (acknowledging that courts apply a "substantially certain" standard in finding intent).

Defendants argue for an even higher standard and claim that Plaintiffs must prove that "the main or only purpose of the transfer" was "'actual intent' to damage a creditor." (Defs.' Br. at 157 (quoting *In re Sentinel Mgmt. Grp. Inc.*, 689 F.3d 855, 861–62 (7th Cir. 2012))  But that is not the law.  Plaintiffs do not need to prove that the "main or only purpose" of the transfers was unlawful.  Rather, Defendants are liable so long as *a* purpose of the transfers was to hinder, delay or defraud creditors.[12]  (Pls.' Br. at 12; *Haligiannis*, 608 F. Supp. 2d at 451 & n.3)  The opinion Defendants cite in support of their standard—*In re Sentinel*—has since been withdrawn.  (*See* 12/19/12 M. Gray Ltr. (Dkt. No. 606) at 1)  And there was no support for that court's conclusion

---

[12]    Apart from being fully supported by the case law, this standard is also consistent with (i) the plain language of the governing statute, *Haligiannis*, 608 F. Supp. 2d at 451 n.3 ("The trend in modern cases … to hold that a transfer is voidable if the debtor is only partially motivated by fraudulent intent … is well supported by the text of [the operative statute], which refers simply to 'actual intent to hinder, delay, or defraud a creditor'"); (ii) the way intent is generally construed under the law, *Thomas Solvent*, 725 F. Supp. at 1455 n.4 ("The law, whether in intentional tort, murder, burglary, or otherwise has seldom if ever required the intent material to the claim to be the sole intent."); and (iii) the statutory badges of fraud that give rise to an inference of intent, none of which suggest the heightened "main or only purpose" standard advocated by Defendants, Okla. Stat. tit. 24, § 116(B).

in the first place. *In re Sentinel* relied on a prior Seventh Circuit opinion, *King v. Ionization Int'l,*

*Inc.*, 825 F.2d 1180 (7th Cir. 1987), to conclude that a plaintiff must show that "the main or only

purpose of the transfer was to prevent a lawful creditor from collecting a debt." *In re Sentinel*,

689 F.3d at 861–62. The case the *King* court cited for that standard actually held the exact

opposite:

> [W]here the conclusion necessarily follows that the particular
> conveyance was made with the fraudulent intent to delay, hinder or
> defraud creditors, it can make no difference that, with such purpose
> existing, there were combined other motives at the time of making
> the conveyance.

*Alan Drey Co., Inc. v. Generation, Inc.*, 317 N.E.2d 673, 679 (Ill. App. 1974) (cited in *King*, 825

F.2d at 1186). Thus, the case at the foundation of Defendants' "sole purpose" standard confirms

that Plaintiffs need only show that *a* purpose of the transfers was to hinder, delay or defraud

creditors.

Nor do Plaintiffs need to show that Defendants intended to "damage" creditors. Such a

standard would strike "hinder" and "delay" out of the statute. *In re MarketXT Holdings Corp.*,

376 B.R. 390, 403 (Bankr. S.D.N.Y. 2007) (Gropper, J.) ("[I]t is well accepted that intent to

hinder or delay creditors is sufficient, and intent to defraud need not be proven."). Defendants'

standard also cannot be reconciled with cases holding that even a debtor that has an honest

intention to repay creditors and makes a transfer merely to "weather the storm" can be liable on

an actual intent claim. *See, e.g., Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932) ("A conveyance is

illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if

made with an intent to hinder and delay them."); *see also* Pls.' Br. at 11. For example, in *In re*

*Spearing Tool & Mfg. Co.*, the debtor entered into an out-of-court restructuring in "good-faith"

to attempt to avoid bankruptcy until it could repay creditors. 171 B.R. 578, 580–81 (Bankr. E.D.

Mich. 1994). Despite the debtor's good intentions, the court found the debtor liable on an actual

intent claim: "The fact that the agreement was entered into in good faith does not negate [the debtor's] actual intent to delay and hinder creditors from pursuing collection." *Id*. at 583–84.

Defendants' other cases lend no support.  Defendants repeatedly cite *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003), as a spin-off case where the court found no intent to delay, hinder or defraud creditors.  (*See, e.g.*, Defs.' Br. at 158, 163–65)  But *Lippe* simply highlights the fraudulent nature of the spin-off here.  In *Lippe*, the defendant declined to spin-off certain divisions for no consideration after its attorneys warned that it could be a fraudulent conveyance.  249 F. Supp. 2d  at 367.  Instead, the defendant paid fair value for all of the asset transfers, and there was no diminution of the debtor's estate.  *Id*. at 375–78.  Defendants here, in contrast, stripped Tronox of substantially all its assets, including its "crown jewels," for *no* consideration at all.   Indeed, Defendants concede that Tronox did not receive reasonably equivalent value for the oil and gas assets.  (Pls.' Br. at 34; Pls.' FOF ¶ 400)  In *Lippe*, the debtor also experienced increasing net worth, sales and cash flows after the transfers.  249 F. Supp. 2d at 379, 383.  Here, Tronox was struggling and hemorrhaging cash flow from day one.  (Pls.' FOF ¶¶ 282–355)  Finally, the plaintiffs in *Lippe* had no direct evidence of fraudulent intent.  249 F. Supp. 2d at 381–82.  This case, however, is rife with direct evidence of Kerr-McGee's fraudulent intent in contemporaneous documents and sworn admissions.  (Pls.' Br. at 13–27; Pls.' FOF ¶¶ 356–98)

Defendants also cite *Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*, 931 F.2d 196 (2d Cir. 1991), for the proposition that Plaintiffs must prove an "intentional deception to frustrate legal rights."  (Defs.' Br. at 157)  But long-standing Supreme Court precedent makes clear that "intentional deception" is *not* required to prove an actual intent claim.  *See Shapiro*, 287 U.S. at 352–54.  Indeed, the case *Golden Budha* relies on makes clear that only "actual

intent to *defraud* consists of deception intentionally practiced to frustrate the legal rights of another." *S. Indus., Inc. v. Jeremias*, 411 N.Y.S.2d 945, 948 (Sup. Ct., App. Div. 1978) (emphasis added) (cited in *Golden Budha*, 931 F.2d at 201). *Golden Budha* says nothing about actual intent to hinder or delay. And, in any event, that standard is easily met here because putting "property out of the reach of creditors" while retaining use of it frustrates legal rights. *S. Indus.*, 411 N.Y.S.2d at 948.

Defendants also went to great lengths to argue that *ASARCO* "could not be further from the present case." (12/12/12 Tr. at 8077:24–8079:10) Of course, every fraudulent transfer case must turn on its own facts. But the parallels are many. Like Kerr-McGee, ASARCO faced massive environmental and asbestos liabilities. *ASARCO*, 396 B.R. at 373–74. To keep its crown jewel assets away from creditors, ASARCO's parent company, like Kerr-McGee, acquired them in an internal transaction. *Id.* at 313. The *ASARCO* court found that ASARCO's parent had a "**strong desire to transfer**" the "crown jewel" assets to itself. *ASARCO*, 396 B.R. at 375. Kerr-McGee likewise had a "[s]trong desire … to transfer environmental liabilities" away from its "crown jewel" oil and gas assets. (Pls.' FOF ¶ 367) After learning about the "staggering liabilities burdening" its subsidiary, ASARCO's parent expressed a "desire to isolate [its crown jewel assets] from risk of exposure to the government and other creditors." *ASARCO*, 396 B.R. at 375. Similarly, this case is replete with evidence establishing Kerr-McGee's desire to "isolate" the oil and gas assets from the legacy liabilities. (Pls.' FOF ¶ 88–90, 368) Defendants also argued at closing that "there was no question that [ASARCO] was insolvent at the time of the transfer" because certain facts were more egregious than in this case. (12/12/12 Tr. at 8078:8–8079:10) Of course, insolvency is not an element of actual fraudulent transfer claims. *In re MarketXT*, 376 B.R. at 402; Defs.' Br. at 153. In any event, aspects of this case are

also more egregious than *ASARCO*.  For example, while the *ASARCO* court found that ASARCO's parent paid reasonably equivalent value for the "crown jewel assets," Defendants concede that Old Kerr-McGee (now Tronox) did not receive reasonably equivalent value for its crown jewel oil and gas assets.  (396 B.R. at 364; Pls.' FOF ¶ 400)  Moreover, the evidence here showed that Kerr-McGee's "principal deal goal" of the transfers was "insulat[ing] the oil and gas assets from the legacy liabilities" while the *ASARCO* court found the company had a legitimate business purpose for the transfer.  (Pls.' FOF ¶ 377; 396 B.R. at 392–94)  *ASARCO*, in short, is highly instructive.

### B.    The Presence of Badges of Fraud Still Gives Rise to a Presumption of Actual Intent That Defendants Failed to Rebut

Defendants also argue that badges of fraud "do not create any 'presumption of fraudulent intent.'"  (Defs.' Br. at 183–84)  Of course, the Court does not need to reach issues related to badges of fraud because Plaintiffs proved Defendants' fraudulent intent through direct evidence. (*See* Pls.' Br. at 27; *see also In re Dwek*, 2011 WL 1300188, at *5 (Bankr. D.N.J. Apr. 4, 2011) ("The Trustee has cited cases for the proposition that in the rare instance where there is direct evidence of a debtor's intent to defraud there is no need to resort to circumstantial evidence …. That is true …."); *In re Seitz*, 400 B.R. 707, 713 (Bankr. E.D. Mo. 2008) (finding defendant liable based on direct evidence alone))  But Plaintiffs also proved at least eight statutory badges of fraud and compelling non-statutory badges that give rise to a presumption of fraudulent intent. (Pls.' Br. at 27–30)

### 1.  Oklahoma Law Still Recognizes Presumptions of Fraud

Defendants argue that the presence of these badges no longer gives rise to a "presumption" of fraud because the comments to the UFTA eliminated such presumptions. (Defs.' Br. at 183–84)  They claim, "[a]t most, the badges of fraud may support an *inference* of

fraudulent intent." (*Id*. at 183 (emphasis added))  To the extent this distinction is at all material to this case, Defendants are wrong.  Defendants do not cite any Oklahoma cases to support their argument that the UFTA "extinguishes" the use of presumptions.  Instead, their cases are all from jurisdictions that—unlike Oklahoma—enacted the comments in their UFTA statutes.  *See, e.g.*, Tenn. Code Ann. § 66-3-313 ("In any dispute as to the proper construction of one or more sections of this part, the official comments pertaining to the corresponding sections of the Uniform Fraudulent Transfers Act …. shall constitute evidence of the purposes and policies underlying such sections …"); N.C. Gen. Stat. § 39-23.4 (comments adopted with actual fraud section of UFTA); Ark. Code Ann. § 4-59-204 (same).  Because Oklahoma decided not to enact them, the UFTA comments are not evidence of legislative intent and cannot extinguish the use of presumptions in Oklahoma.  In fact, since Oklahoma's enactment of the UFTA, federal courts in Oklahoma—including two in the last six months—have continued to recognize that the presence of badges gives rise to a presumption of fraud.  *See U.S. v. Spencer*, 2012 WL 4577927, at *7 (N.D. Okla. Oct. 2, 2012); *U.S. v. Jackson*, 2012 WL 5292952, at *6–7 (W.D. Okla. Aug. 21, 2012); *In re Lexington Oil & Gas Ltd.*, 423 B.R. 353, 372 (Bankr. E.D. Okla. 2010); *In re Sioux Redi-Mix, Inc.*, 2007 WL 1114161, at *8 (Bankr. E.D. Okla. Jan. 11, 2007).

### 2.  Defendants Failed to Rebut the Presumption of Fraud Here

Assuming this were a purely circumstantial case where burden shifting would matter, Defendants concede that they must present "significantly clear" evidence of a legitimate supervening purpose to rebut any presumption or inference of fraudulent intent established by badges of fraud.  (Defs.' Br. at 190–91 (quoting *In re Park S. Sec., LLC*, 326 B.R. 505, 518 (Bankr. S.D.N.Y. 2005); *see also Payne v. Gilmore*, 382 P.2d 140, 143 (Okla. 1963) (cited in Defs.' Br. at 183) (requiring "strong and clear evidence … to repel the conclusion of fraud" based on badges of fraud))  In addition to proving a legitimate purpose for the transfers

16

themselves, Defendants' own cases establish that they must prove a legitimate purpose for the *structure* of the transfers. *See, e.g.*, *Aptix Corp. v. Quickturn Design Sys., Inc.*, 148 F. App'x. 924, 929 (Fed. Cir. 2005) (cited in Defs.' Br. at 191); *ASARCO*, 396 B.R. at 392 (cited in Defs.' Br. at 186). For example, in *Aptix*, the defendant caused Aptix to grant him a security interest in its assets in exchange for funds he loaned to the business. 148 F. App'x at 927. The district court relied on three badges of fraud to find that the security interest was granted with actual intent to defraud. *Id*. at 928. On appeal, the defendant "attempt[ed] to rebut the presumption of fraudulent intent by focusing on the reason that Aptix needed to borrow money from" the defendant. *Id*. at 929. The court, however, rejected defendant's explanation because it failed to justify the structure of the transaction: "Although [the defendant's] argument may explain why Aptix entered into the loan arrangement with [the defendant], it does not explain why it was necessary for Aptix to grant [the defendant] a security interest in substantially all of its assets when [the defendant] had never required such an interest for his past loans." *Id*. Likewise, in *ASARCO*, the court concluded that the defendant had a legitimate business purpose for engaging in the challenged transfers. 396 B.R. at 392. But the court found the defendant liable on an actual intent claim because a legitimate business purpose that does not "negate complaints about the manner in which the transfer was structured" is insufficient to rebut the presumption. *Id*.; *see also In re Spearing Tool*, 171 B.R. at 583–84 ("The fact that the [restructuring] agreement was entered into in good faith does not negate [debtor's] actual intent to delay and hinder creditors from pursuing collection.").

In their post-trial brief and at closing argument, Defendants attempted to provide non-fraudulent reasons for engaging in the challenged transactions. (Defs.' Br. at 190–93) These post-hoc explanations do not withstand scrutiny. (Pls.' Br. at 31–33) Beyond that, Defendants

have *never* provided a legitimate purpose for the *structure* of the transactions.[13]  That is not surprising.  There can be no legitimate business purpose for removing substantially all of Tronox's assets and leaving behind a small, cyclical business with *all* of the combined businesses' historical legacy liabilities.  (*See* Pls.' Br. at 32–33)  Even Lehman Brothers proposed allocating historical debt between Kerr-McGee and Tronox in proportion to their respective asset bases when separating the businesses.  (Pls.' FOF ¶ 129)  Yet, at closing argument, Defendants' counsel was unable to identify any analysis regarding "a fair and reasonable split of liabilities."  (12/12/12 Tr. at 8097:18–8102:24)  Plaintiffs are still waiting for Defendants to identify *any* legitimate purpose for the structure of these transactions.  There is none.

In any event, even if Defendants could identify *any* legitimate business purpose, it would only serve to rebut the presumption or inference raised by the circumstantial badges of fraud.  It does nothing to negate the direct evidence of actual fraudulent intent.  *In re Spearing Tool*, 171 B.R. at 583; *ASARCO*, 396 B.R. at 392 (finding defendant liable for actual fraudulent transfer despite "legitimate business purpose"); *Haligiannis*, 608 F. Supp. 2d at 451 & n.3 (holding that defendants that act with "mixed motives" are liable for actual fraudulent transfers).  As long as the transfer was motivated in part by a desire to hinder, delay or defraud creditors, Defendants are liable for actual fraudulent transfer.  (Pls.' Br. at 12–13)  That standard is easily met here.  (*See id*. at 13–27; Pls.' FOF ¶¶ 356–98)

---

[13]  Defendants' post-trial brief perfunctorily states that the evidence "established legitimate supervening purposes for the actual structure of the IPO and Spinoff."  (Defs.' Br. at 192)  But the paragraph that follows that bare assertion provides *no* purpose or explanation.  Rather, it simply repeats Defendants' vague and unsupported claims that the IPO and Spinoff were "carefully structured."  (*Id*.)

**III.    Tronox's Misleading Financial Statements Preclude Reliance on Market Evidence**

Defendants' principal defense to Plaintiffs' constructive fraudulent transfer claims remains that market evidence shows Tronox was solvent.  (Defs.' Br. at 65)  Defendants, however, concede as they must that market evidence is reliable only "absent some reason to distrust it."  (*Id.*)  Here, Plaintiffs have established numerous reasons to distrust Defendants' market evidence, including that Kerr-McGee's financial statements failed to state its environmental liabilities in accordance with GAAP.  (Pls.' Br. at 77–80; *see also id.* at 75–76 (marketplace ill-suited to correctly evaluate large, long-tail, unquantified liabilities); *In re W.R. Grace*, 446 B.R. 96, 105–06 & n.11 (Bankr. D. Del. 2011) (rejecting argument that debtor was solvent given its substantial market capitalization because the debtor had large, unquantified liabilities); Pls.' Br. at 80–82 (Kerr-McGee failed to disclose key risk to Tronox's viability and misrepresented Tronox's financial prospects))  Defendants' own accounting expert and various market participants in this case confirmed that market participants necessarily relied on representations that Tronox's financial statements complied with GAAP in deciding to invest in Tronox's IPO.  (Pls.' FOF ¶¶ 710, 788; 8/14/12 Tr. (Riley) at 5501:24–5503:12; *see also In re Chemtura Corp.*, 439 B.R. 561, 586 n.106 (Bankr. S.D.N.Y. 2010) (stating that market evidence is not always the best indicator of value because "financial accounting techniques … or fraud can give the marketplace a distorted impression of a company's worth"; market evidence is not reliable where there is "a suggestion that a company's financials or projections are inflated or misleading"))

Despite having cited more than 325 cases in their post-trial brief, Defendants have not identified (and Plaintiffs are not aware of) a single case in which a court has credited the market defense when a company's financial statements were materially misleading in violation of GAAP.  Indeed, one of Defendants' leading cases confirms that these GAAP violations alone

19

defeat Defendants' market defense.  In *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir.

2007), the court expressly declined to rely on market evidence from the period that the

company's financial statements were misleading.  *Id.* at 627–29, 632.  Here, Tronox's financial

statements continued to materially understate Tronox's environmental liabilities until they were

restated, well after Tronox filed for bankruptcy.[14] (Pls.' FOF ¶¶ 339–55)

## IV.    Defendants' Flawed Technical Arguments Do Not Preclude Plaintiffs from Recovering the Fraudulently Transferred Oil and Gas Assets

At trial, Plaintiffs established multiple independent paths that allow them to recover the

oil and gas assets: (i) as a matter of economic substance, the transfers were made as of the IPO;

(ii) the oil and gas transfers and the IPO transfers should be collapsed as components of a single,

integrated scheme; (iii) Plaintiffs can step into the shoes of the United States and use the

FDCPA's statute of limitations and the United States' tolling agreements to assert timely claims;

and (iv) an action by the United States under the Oklahoma UFTA would not be subject to the

UFTA's statute of limitations and therefore Plaintiffs' claims are timely because they stand in the

United States' shoes.  (*See* Pls.' Br. at 60–73)  In response, Defendants launched a number of

---

[14]    The recent valuation decision in *U.S. Bank National Association v. Verizon Commc'ns, Inc.*, No. 3:10-CV-1842-G (N.D. Tex. Jan. 22, 2013), does nothing to resurrect Defendants' market defense.  Fraudulent transfer cases are fact intensive, and each turns on its own facts.  (Pls.' Br. at 83)  Like the other cases on which Defendants stake their market defense (*Iridium, VFB* and *Old CarCo*), *Verizon* is wholly distinguishable because (1) the market participants in *Verizon* were not misled, (2) *Verizon* did not involve the removal of substantially all the transferor's assets while leaving behind massive, unliquidated environmental and tort liabilities, (3) *Verizon* did not involve transfers that were indisputably for lack of reasonably equivalent value, and (4) there was no evidence that *Verizon* intended to delay, hinder or defraud creditors by placing "crown jewel" assets beyond the reach of its creditors.  (*Id.* at 83–84; *Verizon* Slip. Op. (attached to Defs.' 1/28/13 Ltr. to Court (Dkt. No. 609)) at 2, 5, 6, 23, 24)  Thus, unlike Kerr-McGee, Verizon did not use the spin-off to jettison environmental and tort liabilities.  *See* Slip. Op. at 23 (spin-off's liabilities were $9.115 billion in debt).  Verizon is inapposite for numerous additional reasons.  *Compare, e.g.,* Slip. Op. at 31 (interest rate for debt lower than Verizon expected due to "significant demand" from investors) *with* Pls.' FOF ¶ 255 (Kerr-McGee had to increase interest rate from 7% to 9.5% to generate sufficient investor demand for Tronox bonds); Slip Op. at 32 (Verizon management forecasts "did not reflect substantial increases in revenue or free cash flow") *with* Pls. FOF ¶¶ 441-42 (Kerr-McGee used inflated sell-side projections for IPO that were designed to hit pre-determined EBITDA targets); Slip. Op. at 39, 41, 63 (Verizon executives, including CEO Ivan Seidenberg, testified credibly) *with* Pls. FOF ¶¶ 242–43, 384–86, 389–92 (Kerr-McGee CEO Corbett and CFO Wohleber were not credible).

flawed technical attacks following trial. None prevents Plaintiffs from recovering the oil and gas assets Defendants illegally transferred from Old Kerr-McGee (now Tronox).

### A. Application of the Collapsing Doctrine Is Appropriate Here Under the Case Law and UFTA

In their post-trial brief and at closing argument, Defendants argued that the collapsing doctrine is limited to narrow circumstances. (*See, e.g.*, 12/12/12 Tr. at 8057:16–8058:10 (collapsing only applies to "reconveyances" and not "transfer dates")) Defendants' argument for a narrow, technical construction of the collapsing doctrine is contrary to its origin and purpose. The doctrine is based on the well-accepted principle that substance trumps form in fraudulent transfer actions and is intended to protect creditors by treating transactions in accordance with their overall intent. *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("In equity, 'substance will not give way to form, [and] technical considerations will not prevent substantial justice from being done.' Thus, an alleged fraudulent conveyance must be evaluated in context; '[w]here a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications.'") (internal citations omitted); *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635–36 (2d Cir. 1995) ("The case law has been aptly summarized in the following terms: 'In deciding whether to collapse the transaction and impose liability on particular defendants, the courts have looked frequently to the knowledge of the defendants of the structure of the entire transaction and to whether its components were part of a single scheme.'"); *In re Best Prods. Co.*, 157 B.R. 222, 229 (Bankr. S.D.N.Y. 1993) ("In reality, collapsing transactions is little more than an effort on the part of the court to focus not on the formal structure of a transaction, but rather on the knowledge or intent of the parties involved.").

Here, the evidence shows that Kerr-McGee's internal separation of the oil and gas assets in Project Focus and complete separation of those assets from the legacy liabilities through the

IPO were part of Kerr-McGee's single, integrated scheme. (Pls.' Br. at 65–68) Accordingly, consistent with the broad, equitable purpose of the collapsing doctrine, the oil and gas transfers and IPO transfers should be considered as a single transaction for purposes of the fraudulent transfer laws, including the statute of limitations.

Defendants also asserted for the first time at closing argument that application of the collapsing doctrine would violate § 122 of the Oklahoma UFTA. (12/12/12 Tr. at 8059:4–20) If anything, § 122 *supports* application of the collapsing doctrine here. It states:

> Unless displaced by the provisions of the Uniform Fraudulent Transfer Act, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement the provisions of the Uniform Fraudulent Transfer Act.

Okla. Stat. tit. 24, § 122.

Section 122 does not preclude application of the collapsing doctrine here because no provision of the UFTA references—much less expressly "displaces"—collapsing. *See In re Sheffield Steel Corp.*, 320 B.R. 423, 454 (Bankr. N.D. Okla. 2004) (holding that the defense of estoppel applies in actions under the Oklahoma UFTA where "[n]o provision in the [statute] expressly 'displaces' or negates the use of estoppel as a defense"). Thus, under § 122, the collapsing doctrine supplements the UFTA and is applicable in this case. Indeed, Defendants' position conflicts with numerous decisions applying the collapsing doctrine despite the presence of identical provisions in the relevant UFTAs. *See, e.g., In re Yellowstone Mountain Club, LLC*, 436 B.R. 598, 655 (Bankr. D. Mont. 2010); *Kipperman v. Onex Corp.*, 411 B.R. 805, 837–38 (N.D. Ga. 2009); *In re Nat'l Forge Co.*, 344 B.R. 340, 350–51 (W.D. Pa. 2006); *In re Jumer's Castle Lodge, Inc.*, 329 B.R. 837, 847 (Bankr. C.D. Ill. 2005); *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 584–85 (Bankr. N.D. Cal. 1994).

**B.      Claims for the Oil and Gas Assets Are Not Time-Barred Because the Transfers Were Not "Perfected" in 2002**

In their post-trial brief, Defendants also argue that Plaintiffs' claims for the oil and gas assets are time-barred because these transfers were "perfected" under Article 8 of the U.C.C. as of December 31, 2002.  (Defs.' Br. at 15, 25–26)  As this Court already has recognized, "it is unrealistic to speak of the 'perfection' of a transfer of assets between two subsidiaries of the same corporation."[15]  *In re Tronox*, 429 B.R. at 100.  Thus, as a matter of economic substance, these transfers occurred at Tronox's IPO.  (Pls.' Br. at 61–63)  In any event, Defendants' argument is fatally flawed because Article 9 of the U.C.C.—not Article 8—governs perfection.

Under the Oklahoma UFTA, a cause of action must be brought "within 4 years after the transfer was made …."  Okla. Stat. tit. 24, § 121(1).  With respect to the timing of a transfer, the UFTA provides: "[a] transfer is made with respect to an asset that is not real property or that is a fixture, when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than [under this chapter] that is superior to the interest of the transferee."  Okla. Stat. tit. 24, § 118(1)(b).

Article 9 of the U.C.C. governs when perfection occurs under the UFTA.  *See* Uniform Fraudulent Transfer Act § 6 cmt. 1 (citing Article 9 of the U.C.C. for determination of when perfection is effected); *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 344 n.4 (7th Cir. 2004) (applying Article 9 of the U.C.C. to determine when transfers were perfected and therefore "made" for purposes of accrual of a cause of action under the UFTA).  Further, Article 9 of the U.C.C. provides for the perfection of stock transfers like the

---

[15]    As the Court observed at closing argument, under Defendants' view of the law, a parent could transfer its subsidiary's assets internally and wait until the UFTA's statute of limitations had run before separating the subsidiary as an insolvent company, thereby leaving the subsidiary's creditors without recourse.  (12/12/12 Tr. at 8059:21–8060:12)  Defendants responded that creditors might still be able to use the discovery rule to bring suit.  (*Id.* at 8062:7–15)  The discovery rule, however, does not apply to constructive fraud claims.  Okla. Stat. tit. 24, § 121(2).

oil and gas assets here.  Okla. Stat. tit. 12A, § 1-9-102(a)(49) (listing a security as one type of "investment property"); *id*. § 1-9-305 (indicating that investment property can be perfected). Among other things, perfection of a security interest under Article 9 of the U.C.C. requires that it has "attached," and attachment occurs only if "value has been given."  Okla. Stat. tit. 12A, § 1-9-203(b)(1); *id*. § 1-9-308(a).  Old Kerr-McGee, however, did not receive value for the oil and gas assets transferred in Project Focus; indeed, the documents Defendants rely on to evidence the transfers expressly provide that they were made "FOR NO VALUE RECEIVED."  (Pls.' FOF at 50 n.12)  Accordingly, contrary to Defendants' position, the oil and gas transfers were not "made" under Oklahoma UFTA § 118 on December 31, 2002, and the statute of limitations on Plaintiffs' cause of action did not begin to run on that date.

At closing argument, Defendants did not dispute that the oil and gas assets were transferred for no value, but instead argued that Article 8—and not Article 9—of the U.C.C. governs when the transfers were made.  (12/12/12 Tr. at 8049:7–25)  Article 8, however, does not address "perfection."   By focusing only on Article 8, Defendants erroneously read the UFTA's requirement of "perfection" out of the statute.  *Cf. DFS*, 384 F.3d at 344 n.4 (noting that perfection as determined by Article 9 governed when a cause of action accrues under the UFTA, not when the transfer of legal rights occurred).

### C.    Plaintiffs' Cash Flow Demonstrative Is Based on Admissible Evidence

Defendants also suggested at closing argument that PDX152-11—a demonstrative showing that Tronox had a negative cash flow of $168.4 million on a stand-alone basis from 2002 through the IPO—was not based on admissible evidence.[16]  (12/12/12 Tr. at 8053:17–8054:10)  That is false.  *First*, the numbers in the demonstrative were taken directly from

---

[16]    Plaintiffs showed this demonstrative to the Court at closing argument as slide 23.

Tronox's S-1, which has been admitted into evidence. (DX368 at 65–66, 149, 199) *Second*, former Kerr-McGee Controller Mike Rauh did not dispute any of the numbers presented in the demonstrative. (8/9/12 Tr. (Rauh) at 4982:8–4983:13) In any event, if Tronox was actually generating positive cash flow, it would not have accumulated a negative $377.9 million intercompany balance as of the IPO. (Pls.' FOF ¶ 285) Defendants' newfound theory—offered after the close of evidence and not based on anything in the record—that this huge negative intercompany balance resulted from loans for unnamed capital assets is sheer speculation. (Defs.' Br. at 32 (suggesting the negative intercompany balance was "historical financing for valuable, income-generating capital assets"); 12/12/12 Tr. at 8057:6–9 (suggesting that the negative intercompany balance "likely was created by capital acquisition")) Indeed, they concede as much in their proposed findings of facts. (Defs.' FOF ¶ 389 (admitting there is "no evidence to show whether the intercompany balance … was created as a result of the prior acquisitions and transfer of such capital assets …."))  Put simply, money is fungible. Defendants' own business records establish that Tronox was a cash loser—not a cash cow.

## V.    Defendants' Ever-Changing Positions Do Not Negate Their Breach of Fiduciary Duties

Before trial, Defendants conceded that they owed fiduciary duties to Tronox as a promoter pre-IPO and as a majority shareholder post-IPO. *In re Tronox Inc.*, 450 B.R. 432, 440 (Bankr. S.D.N.Y. 2011); Defs.' Br. at 243. In their post-trial brief, Defendants reverse course and now claim that they did not owe any fiduciary duties to Tronox pre-IPO. They also challenge this Court's prior ruling that Plaintiffs' fiduciary duty claims are subject to a three-year statute of limitations. (Defs.' Br. at 236–37) This backpedaling does not change the fact that Defendants owed and breached their fiduciary duties to Tronox.

### A.    Defendants Breached Their Fiduciary Duties to Tronox

In their post-trial brief, Plaintiffs showed that Kerr-McGee owed fiduciary duties to Tronox before and after the IPO and breached those duties.  (*See* Pls.' Br. at 90–96)  Defendants, however, now claim that they owed *no* duties to Tronox before the IPO because parent companies cannot owe promoter duties to wholly owned subsidiaries.  (Defs.' Br. at 238–40)  This is a complete about-face from their prior concession that they owed promoter duties to Tronox before the IPO:

> [W]ith respect to the duties of New Kerr-McGee as a promoter of Tronox, the *Defendants do not dispute* that New Kerr-McGee owed such duties during at least some period, but they assert that all activities relating to promotion of the Tronox entities were concluded on the date of the IPO ….

*In re Tronox*, 450 B.R. at 440 (emphasis added).

Regardless, this Court already has held that "even when a subsidiary is wholly-owned, a parent corporation may owe fiduciary duties as a promoter when it is engaged in a plan or scheme of promotion, until the scheme has been concluded."  *Id.* at 439.  Other courts have agreed.[17]  *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 2012 WL 3100778, at *13 (N.D. Tex. Jul. 31, 2012) ("Nevertheless, 'even when a subsidiary is wholly-owned, a parent corporation may owe fiduciary duties as a promoter when it is engaged in a plan or scheme of promotion, until the scheme has been concluded.'") (quoting *In re Tronox*, 450 B.R. at 439).

Nor are promoter fiduciary duties as narrow as Defendants now claim.  Defendants argue that promoter duties only require "a full and fair disclosure of the material facts."  (Defs.' Br. at 242)  But courts apply the "intrinsic fairness" standard whenever "stockholders or directors, who

---

[17]    Defendants' argument—that a parent company cannot owe promoter duties to its wholly-owned subsidiary—proves too much as it would eliminate virtually all promoter liability.  Generally, when a promoter incorporates a company, it initially holds all shares of the new entity.  If ownership of all of the shares precluded promoter liability, promoters always could evade promoter liability by ensuring that they, initially, hold all shares before distribution or sale.

control the making of a transaction and its terms, are on both sides." *Burton v. Exxon Corp.*, 583

F. Supp. 405, 415 (S.D.N.Y. 1984); *see also Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720

(Del. 1971) (the intrinsic fairness standard "will be applied only when the fiduciary duty is

accompanied by self-dealing—the situation when a parent is on both sides of a transaction with

its subsidiary"). That standard does not change based on the circumstances that gave rise to the

fiduciary relationship. In fact, citing the same cases that Defendants rely on here, the *U.S. Bank*

defendants likewise argued that promoter duties are narrow and satisfied by full disclosure of

facts. 2012 WL 3100778, at *14. The court, however, rejected the argument. *Id.* In any event,

Plaintiffs proved at trial that Kerr-McGee failed to make "a full and fair disclosure of the

material facts," including violations of GAAP, the riskiness of critical cash flows, and the future

prospects for the business. (Pls.' FOF ¶¶ 709–63) For this independent reason, Plaintiffs proved

that Defendants breached their fiduciary duties as a promoter even under Defendants' unduly

narrow standard.

Moreover, Defendants owed fiduciary duties to Tronox as the parent of an insolvent

subsidiary. This Court already has so held. *In re Tronox*, 450 B.R. at 438–39 ("The Delaware

Supreme Court has also recognized that a parent owes fiduciary duties to a subsidiary when that

subsidiary is insolvent, and that the creditors of the subsidiary have standing to enforce such

duties."). The Third Circuit agrees:

> A duty of loyalty against the parent should arise whenever the
> subsidiary represents some minority interest in addition to the
> parent. That could happen if the subsidiary were not wholly-owned
> …. It could also happen if the subsidiary were insolvent.

*VFB LLC*, 482 F.3d at 635.

Insolvency does not create a new fiduciary duty. "A majority shareholder has a fiduciary

duty not to misuse his power by promoting his personal interests at the expense of corporate

interests." *U.S. v. Byrum*, 408 U.S. 125, 137 (1972). When the majority shareholder is the *sole* shareholder, the shareholder's interests are the corporate interests. But when the subsidiary has minority shareholders or is insolvent, the corporation and shareholder interests diverge and fiduciary duties run to the corporation. *VFB*, 482 F.3d at 635. Therefore, Kerr-McGee owed Tronox fiduciary duties when it was insolvent.[18]

Finally, Defendants still concede that they owed duties to Tronox as a majority shareholder after the IPO. (Defs.' Br. at 243) As explained in Plaintiffs' post-trial brief, Kerr-McGee breached its post-IPO duties when it transferred additional liabilities to Tronox and completed the spin-off, locking in its illegal profits. (Pls.' Br. at 95–96)

### B.    Plaintiffs' Breach of Fiduciary Duty Claim Is Timely

In their post-trial brief, Defendants also contend that Plaintiffs' fiduciary duty claim is premised on fraud and, therefore, a two-year limitations period applies. (Defs.' Br. at 236–37) Their argument ignores this Court's previous holding to the contrary and mischaracterizes Plaintiffs' fiduciary duty claim.

Defendants concede that a three-year limitations period applies to a fiduciary duty claim not grounded in fraud. (Defs.' Br. at 237; *see also In re Tronox Inc.*, 429 B.R. 73, 106 (Bankr. S.D.N.Y. 2010)) And this Court already has found that Plaintiffs' fiduciary duty claim is not based in fraud. *In re Tronox*, 450 B.R. at 440 ("The parties agree that a three-year statute of limitations applies to the amended claims of breach of fiduciary duty to the extent they are not based in fraud. Since none of the allegations in Count IV of the Amended Complaint is grounded in fraud, the Court applies a three-year statute of limitations."). Rather, Plaintiffs have

---

[18]    Admittedly, the *ASARCO* court concluded that a parent did not owe a fiduciary duty to its insolvent subsidiary under New Jersey law. *ASARCO*, 396 B.R. at 415. The court's analysis ignored cases like *VFB*, which explain that insolvency does not *create* new fiduciary duties but merely alters their beneficiaries because of divergent corporate interests. Regardless, the *ASARCO* court did not need that theory as it still found the parent liable for aiding and abetting a breach of fiduciary duty by the directors of an insolvent subsidiary. *Id.*

established that Kerr-McGee breached its duty of loyalty by stripping substantially all of

Tronox's assets and leaving it with massive legacy liabilities, thereby enriching itself at the

expense of its fiduciary. (*See* Pls.' Br. at 92–95)  This claim does not rely on Kerr-McGee's

intent to defraud, but instead is based on Kerr-McGee's engaging in a self-dealing transaction

with Tronox that lacked fair price and fair dealing.  (*Id*.)  Accordingly, a three-year statute of

limitations applies to Plaintiffs' fiduciary duty claim.[19]

## VI.    Defendants' Unprecedented and Unprincipled Theories Do Not Reduce Plaintiffs' Damages of At Least $14 Billion

Defendants concede that damages in this action are governed by § 550 of the Bankruptcy

Code and that "the market value of the property at the time of the transfer, less the consideration

received, is the proper measure of recovery under § 550." (Defs.' Br. at 253)  They further agree

that a court cannot rewrite Bankruptcy Code provisions—such as § 550—in the name of equity.

(*Id.* at 285)  Based on these undisputed principles, Plaintiffs' damages are at least $14 billion

after all potential offsets and before post-transfer appreciation.[20] (Pls.' Br. at 102–05)  Although

---

[19]    The fiduciary duty claim is also timely because Defendants committed acts in furtherance of the breach within the limitations period. (Pls.' Br. at 96–97)  Moreover, the statute of limitations was tolled from the IPO until at least January 12, 2006 under the doctrine of adverse domination.  (*Id.* at 98–100)  Defendants claim that the doctrine does not apply on the ground that the majority of Tronox's directors were "disinterested." (Defs.' Br. at 238 n.138)  The disinterested majority rule may apply to a fiduciary duty claim brought against directors because a majority of the board could initiate suit against culpable directors.  Plaintiffs, however, are suing Kerr-McGee—not Tronox's directors.  Tronox could not have initiated suit against Kerr-McGee even with a majority of disinterested directors when Kerr-McGee had the "ability to prevent any transactions it [did] not believe [were] in Kerr-McGee's best interests." (Pls.' FOF ¶ 252)

[20]    At closing argument, the Court asked whether the district court's damages opinion in *ASARCO* was consistent with Plaintiffs' approach here.  (12/12/12 Tr. at 8017:8–23)  As Plaintiffs explained at argument, the answer is yes.  (*Id.* at 8275:18–8277:18)  The district court rendered its opinion before a plan was confirmed in ASARCO's bankruptcy.  *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 161 (S.D. Tex. 2009).  It avoided the transfers in full and ordered that the fraudulently transferred stock, the value of the post-transfer dividends, and pre-judgment interest be returned to the estate.  *Id.* at 163, 183.  The district court then left it to the bankruptcy court to distribute the recovery according to a plan of reorganization. *Id.* at 163.  Ultimately, the bankruptcy court confirmed a plan under which the defendants contributed more than $2 billion to become the new equity owner of ASARCO, which allowed them to enjoy the residual value of the assets returned to the estate.  *In re ASARCO LLC*, 420 B.R. 314, 325, 333 (Bankr. S.D. Tex. 2009).  Here, Plaintiffs are also asking the Court to avoid the fraudulent transfers in their entirety and return the value of the transfers to the estate.  Unlike ASARCO, this case will be decided after Tronox has emerged from chapter 11.  Because Defendants did not make an investment in Tronox's reorganization like ASARCO's parent did, Tronox and its creditors had to

29

Plaintiffs' damages claim is fully corroborated by Anadarko's arm's-length acquisition of essentially the same assets shortly after the spin-off, Defendants' damages expert has proposed various adjustments that reduce Plaintiffs' $14.4 billion claim to $9.2 billion after applying all offsets and before post-transfer appreciation. (*Id.* at 105–06) But that is as low as he could get based on purported valuation principles, forcing Defendants to cobble together novel legal theories to drive any damages award as close to $0 as possible.

Near the end of trial, Defendants' expert presented a new, previously undisclosed alternative damages figure of $1.3 billion that he testified represented Tronox's "net insolvency" and was based on the Bankruptcy Code's "restorative principle." (Pls.' Br. at 111) Plaintiffs addressed in their post-trial brief why this new damages measure was contrary to § 550, violated this Court's summary judgment ruling and would grossly undercompensate Tronox's estate. (*Id.* at 111–15) Tellingly, although Defendants cited more than 325 cases in their post-trial brief, they still have not identified a single case in which a court applied this "restorative principle" to award damages based on the debtors' "net insolvency" as Defendants seek to do here.[21] (*See also* 9/13/12 Tr. at 7558:25–7559:16 (Professor Jack Williams testifying that Defendants' "net insolvency" theory is "unprecedented" in his experience))

---

create a plan around a contingent asset—this litigation—which was assigned to Tronox's environmental and tort creditors as compensation for their claims.

[21] In support of their "restorative principle," Defendants further argue in their post-trial brief that a damages award should "restore *all* parties to the positions they occupied prior the transfer." (Defs.' Br. at 252–53) As this Court already has recognized, however, the purpose of § 550 is to "restor[e] *the estate*"—not *all* parties—"to *its* position prior to the transfer." *In re Tronox*, 464 B.R. at 614 (emphasis added). The cases Defendants cite do not hold otherwise. Instead, they generically reference restoring "parties" to their pre-transfer positions while discussing offsets for consideration that the transferee provided for the fraudulently transferred assets. *See In re Best Prods. Co.*, 168 B.R. 35, 57–58 (Bankr. S.D.N.Y. 1994) (consistent with § 502(h), lenders would have a claim for consideration provided to the debtor after they satisfy the fraudulent transfer judgment); *In re Maddalena*, 176 B.R. 551, 556–57 (Bankr. C.D. Cal. 1994) (defendant was entitled to good faith offset under § 548(c) for money he paid for promissory note). Of course, Plaintiffs' damages expert, Professor Jack Williams, already gave Defendants full credit for these offsets in his damages estimate of $14.459 billion before post-transfer appreciation. (Pls.' Br. at 105)

In their post-trial brief, Defendants assert various other theories to attempt to further decrease Plaintiffs' damages award. For example, Defendants claim that any damages in excess of the amount of Tronox's insolvency would violate the equitable principles set forth in *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.*, 417 U.S. 703 (1974). But the *Bangor Punta* doctrine does not apply here and, in fact, has never been applied in a § 550 case in nearly 40 years since the Supreme Court decided the case. Defendants also assert for the first time in their post-trial brief that they are entitled to a damages offset in the amount of 337% of the value of their § 502(h) claim. That position is not only inconsistent with Defendants' prior argument to the Court that a creditor cannot recover more than the value of its claim, but also lacks any basis in law or fact.[22]

### A.    *Bangor Punta* Does Not Limit Plaintiffs' Recovery Here

In their post-trial brief, Defendants argue that Plaintiffs cannot recover the full value of the oil and gas assets based on equitable principles set forth in *Bangor Punta*. In *Bangor Punta*, two corporations sued their former majority shareholders for corporate waste and mismanagement under the antitrust and securities laws. 417 U.S. at 705. Plaintiffs' majority shareholder at the time of the lawsuit had acquired control of plaintiffs from defendants (the former majority shareholders) after the alleged wrongs occurred. *Id.* Plaintiffs did not allege that their new majority shareholder failed to receive full value for its purchase price or that the

---

[22]    Defendants' entire case has been plagued by unprincipled and inconsistent positions. For example, Defendants' primary defense is that the market is the best indicator of value. (Defs.' Br. at 65) But they try to legitimize the IPO/spin-off on the grounds that the market failed to accurately value Kerr-McGee and Tronox. (*Id.* at 174–75) Defendants also argue that hindsight must be ignored when valuing the legacy liabilities even though they elicited hindsight testimony from their own tort expert to attempt to resuscitate his opinions. (*Id.* at 63–65, 119–20; 8/15/12 Tr. (Vasquez) at 5886:12–5887:20) Defendants likewise flip-flop on the appropriate role of equity, arguing that equitable powers cannot "contravene" the Bankruptcy Code but then urging the Court to use "equitable doctrines" to rewrite § 550. (Defs.' Br. at 257–58, 285) Moreover, Defendants have been inconsistent on the issue of consolidation. They argue that insolvency and damages must be proven on an entity-by-entity basis but then present insolvency and damages calculations on a consolidated basis. (*Id.* at 45–47, 90–96; *see also id.* at 267 (combining entities to determine net damages))

acquisition was tainted by fraud. *Id.* at 710. The Supreme Court's five-to-four decision held that plaintiffs could not pursue the lawsuit because their new majority shareholder would be the primary beneficiary and it had not been injured by defendants' pre-acquisition conduct. *Id.* at 711–12, 718. The Supreme Court found the suit violated the equitable principle "that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the allegedly wrongful transactions." *Id.* at 710.

    *Bangor Punta* is irrelevant to this case. *First, Bangor Punta* is a shareholder standing case. It does not address recovery for fraudulent transfers under § 550. Although it has been nearly 40 years since the Supreme Court decided *Bangor Punta,* it has never been used by a court to limit a fraudulent transfer recovery under § 550. In fact, the factual predicates necessary to apply the *Bangor Punta* doctrine are missing here. As Defendants' own cases make clear, *Bangor Punta* applies where "(1) the *plaintiff is a shareholder* who has acquired his shares at a fair price from those who 'participated or acquiesced' in earlier acts of alleged corporate mismanagement; and (2) the claim for relief seeks damages for those same acts of alleged corporate mismanagement." *Rock River Sav. & Loan Ass'n v. Am. States Ins. Co.*, 594 F.2d 633, 635 (7th Cir. 1979) (emphasis added) (doctrine prevents the new shareholder from "reap[ing] a profit for wrongs done to others") (cited in Defs.' Br. at 261); *see also Midland Food Servs., LLC v. Castle Hill Holdings V, LLC*, 792 A.2d 920, 930 (Del. Ch. 1999) (the purpose of the *Bangor Punta* doctrine "is to *prevent persons from being able to re-trade arms-length transactions* by using the corporation to sue the parties from whom they obtained their shares") (emphasis added) (cited in Defs.' Br. at 261). Because this is not a case brought by a shareholder plaintiff following an arm's-length transaction that challenges the former owner's pre-acquisition conduct, the *Bangor Punta* doctrine simply does not apply.

*Second*, the Supreme Court's majority opinion made clear that the claim in *Bangor Punta*—unlike this case—was not brought on behalf of the company's creditors:

> [I]t appears that the dissent has sought to redraft respondents' complaint.  As the District Court noted, respondents have not brought this action on behalf of any creditors ….  Indeed, they have never so contended.  Moreover, respondents have conceded that the financial health of the railroad is excellent.

417 U.S. at 718 n.15.  Thus, while the primary beneficiary of the lawsuit in *Bangor Punta* had not been injured because it bought the company's stock after the alleged wrongs occurred, the Supreme Court recognized that a case brought on behalf of creditors would not raise the same equitable concerns.  Other courts likewise have refused to extend the *Bangor Punta* doctrine to cases such as this one that are brought by debtors on behalf of their creditors.[23]  *See, e.g., In re Healthco Int'l, Inc.*, 195 B.R. 971, 986 (Bankr. D. Mass. 1996) ("The doctrine of *Bangor Punta* has no relevance ….  That is not our case.  Healthco's creditors will be the beneficiaries of the [fiduciary duty claims].  The *Bangor Punta* doctrine applies only to prevent … [the] post-LBO stockholders from benefitting."); *In re Kaiser Merger Litig.*, 168 B.R. 991, 1004 (D. Co. 1994) (distinguishing *Bangor Punta* on the grounds that it "did not involve bankruptcy proceedings"); *cf. In re Midland Food Servs.*, 792 A.2d at 933 (dismissing claims based on *Bangor Punta* where "the ultimate end sought is not health for the creditors") (cited in Defs.' Br. at 261).  Here, there is no dispute that Plaintiffs' claims were brought on behalf of Tronox's environmental and tort claimants and that they would be the beneficiaries of any recovery.

---

[23] Defendants' representation that *Bangor Punta* "is right in the bankruptcy code" is baseless.  (12/12/12 Tr. at 8232:23–24)  As support, Defendants contend that under Oklahoma law, general equitable principles supplement the Oklahoma UFTA "except to the extent specifically cut out by the Oklahoma statute."  (*Id.* at 8233:9–15)  But this Court already has held that Plaintiffs' recovery here is governed § 550—not Oklahoma law.  *In re Tronox Inc.*, 464 B.R. 606, 616 (Bankr. S.D.N.Y. 2012).  Defendants even concede that "550 supplants the remedy provision" of the Oklahoma UFTA.  (12/12/12 Tr. at 8233:6)  The result under § 550 is clear: the fraudulently transferred property must be returned to the estate.  11 U.S.C. § 550(a).

*Third*, the plaintiffs in *Bangor Punta* did not challenge the underlying transaction.  As the Supreme Court explained, the new shareholder "does not contend that the purchase transaction was tainted by fraud or deceit, or that it received less than full value for its money."  417 U.S. at 711.  In stark contrast, Tronox is indeed challenging the so-called "purchase transaction" as actual and constructive fraudulent transfers.  As Defendants' own cases recognize, *Bangor Punta* does not prevent a party from challenging the underlying transaction for fraud.  *In re Midland Food Servs.*, 792 A.2d at 933 ("the *Bangor Punta* Doctrine does not prevent a party who obtained control of a corporation from a seller from asserting a claim that the sales agreement should be rescinded because the seller defrauded or otherwise wrongfully induced the purchaser to execute the agreement.").

Defendants' *Bangor Punta* argument is also unprincipled.  While Defendants advocate a general *Bangor Punta* doctrine for fraudulent transfer cases, they are forced to create various unprincipled exceptions to try to make the doctrine work here.  For example, Defendants argue that the *Bangor Punta* doctrine would not apply if the Court were to limit damages to IPO-specific transfers because "calculating damages is rather straightforward for the IPO Transfers." (Defs.' Br. at 262 n.162)  Not surprisingly, Defendants cite no authority for this purported "straightforward damages calculation" exception to the *Bangor Punta* doctrine.  Defendants likewise do not identify a single case to support their "same shareholder avoidance" exception: "If avoidance benefits the same shareholder that existed before and after the time of the transfer, then the doctrine does not apply." (*Id.* at 261)  And Defendants claim that if Tronox Worldwide was solvent, Plaintiffs could not recover the oil and gas assets. (*Id.* at 262)  But their theory would preclude recovery of the oil and gas assets on Plaintiffs' actual intent claim, which does

not turn on solvency.  *See* 11 U.S.C. §§ 544(b), 550; *see also In re MarketXT*, 376 B.R. at 402

(insolvency is not an element of an actual intent claim).

In short, Defendants' *Bangor Punta* theory is a Hail Mary that exposes (and underscores)

the weakness of their damages case.[24]

### B.    Defendants' § 502(h) Theories are Contrary to Law and Fact

In their damage calculations, Plaintiffs reduced their requested damages by 100% of the

maximum offset that Defendants could receive on their § 502(h) claim.  (*See* Pls.' Br. at 105;

12/12/12 Tr. at 8280:2–6)  This was generous.  Tronox's Plan requires that Defendants' § 502(h)

claim be "multiplied by the percentage recovery to Allowed Class 3 General Unsecured Claims."

(Plan, Art. IV.C.5)  Based on the plain language of § 502(h), Defendants' claim also must be

added to the pool of allowed Class 3 general unsecured claims before determining the percentage

recovery used to value the offset.  (*See* Pls.' Br. at 105 n.39)  Although either of these would

dilute Defendants' claim, Plaintiffs reduced their damages estimate by the full value of any

potential § 502(h) claim.

Defendants now ask for more.  In their post-trial brief and at closing argument,

Defendants presented multiple unprincipled arguments in a desperate attempt to artificially

inflate their § 502(h) claim and decrease Plaintiffs' damages award.  For example, Defendants

---

[24]    Further highlighting their unprincipled "march to $0" mentality, Defendants also claim that Plaintiffs cannot
recover $185.5 million for unfunded retiree obligations that Kerr-McGee dumped on Tronox at the spin-off.  Of
course, this assertion is contrary to the sworn trial testimony of their expert, who included the $185.5 million in
his analysis of reasonably equivalent value and damages.  (Balcombe Direct p. 12 Table 3, ¶ 58; *see also*
12/12/12 Tr. at 8214:21–23 (acknowledging this new position results in "a different number than you heard at
trial"))  Defendants now erroneously claim that this amount is not recoverable because "§ 550(a) does not
provide for the recovery of avoided obligations." (Defs.' Br. at 254 n.153)  When obligations run to third parties
and the incurrence of those obligations by the debtor benefitted the transferee, courts "recast the same as
transfers of value to [the transferee] which are potentially avoidable and recoverable from [the transferee] under
11 U.S.C. § 550(a)(1)."  *In re Allegheny Health, Educ. & Research Found.*, 253 B.R. 157, 167 (W.D. Pa. 2000).
Here, there is no dispute that the retiree liabilities run to third parties and Tronox's assumption of those
liabilities benefitted Kerr-McGee.  (Balcombe Direct ¶ 41)  Accordingly, these obligations are treated as
transfers that can be recovered under § 550.  *In re Allegheny*, 253 B.R. at 167.

argue that their § 502(h) claim should be *increased* by 337% because Tronox's Class 3 general unsecured creditors recovered 337% of their claims. (Defs.' Br. at 273–75) Not surprisingly, there is no legal or factual basis for Defendants' novel treble damages argument. First, Defendants improperly value Class 3 recoveries at *emergence* rather than at confirmation as is required under the law. When valued properly at the time of confirmation, Class 3 creditors did not recover more than the value of their claims. Second, regardless of other creditors' recoveries, Defendants as individual creditors cannot recover more than 100% of the value of their claim.

### 1. Class 3 General Unsecured Creditors Did Not Receive More Than 100% of Their Claims

In their post-trial brief, Defendants concede that they are valuing the consideration that Tronox's creditors received on the "Effective Date," *i.e.* at emergence. (Defs.' Br. at 273) But the law is clear that such consideration must be valued as of confirmation to determine creditor recoveries. In *Kipperman v. Onex Corp.*, the court held that value must be determined at plan confirmation and the absolute priority rule does "not require, or even suggest, a district court in a subsequent piece of litigation to go back and re-assess equity among the parties based on subsequent events." 411 B.R. 805, 876 (N.D. Ga. 2009). *Kipperman* discussed the exact situation here: "[w]hen a plan distributes stock and the stock appreciates or depreciates in value, section 1129(b) does not compel the bankruptcy court to reassess whether the party receiving the stock has received too much or not enough value." *Id. MC Asset Recovery, LLC v. Southern Co.* likewise forecloses Defendants' attempt to increase their offset based on Tronox's post-confirmation stock price. 2006 WL 5112612 (N.D. Ga. Dec. 11, 2006). In *MC Asset*, defendants sought dismissal of an avoidance action because creditors had been "satisfied in full" based on a

36

post-confirmation increase in stock price.  *Id*. at *6.  The court rejected this argument because "whether creditors have now been 'satisfied in full' post-confirmation is irrelevant."  *Id*.

Before their post-trial brief, Defendants also agreed that plan assets—including *stock*—should be valued at confirmation:

> Despite this, Plaintiffs seek to further their contention by citing two cases which merely state that: (i) "for purposes of the absolute priority rule" plan assets must be valued "at the time of confirmation;" and (ii) when stock is being distributed under a plan, the court must determine the value of the stock as of the confirmation date.  *These unremarkable holdings* are entirely irrelevant to whether Plaintiffs' recovery is capped under § 550(a).  *While Plan assets may be valued at the time of confirmation for purposes of the absolute priority rule*, Defendants are not seeking to value plan assets or to apply the absolute priority rule.

(Defs.' Mot. Summ. J. (Dkt. No. 268) ¶ 77 (emphasis added) (internal citations omitted))

Defendants' argument is also wrong factually.[25]  Contrary to Defendants' representation to the Court at closing argument, their calculation of a 337% recovery improperly *includes* benefits received by creditors for participating in Tronox's rights offering.  (12/12/12 Tr. at 8230:13–8231:10)  To calculate a 337% recovery, Defendants included *all* shares distributed to creditors—*i.e.* shares distributed on account of creditor claims *and* shares distributed for participating in the rights offering—and then subtracted the value of the money contributed by participants in the rights offering.  (Defs.' Br. at 273 & n.185)  This calculation is incorrect and inflates creditor recoveries.  Defendants simply should have divided the value of the shares "issued outright to General Unsecured Creditors" (50.9% of Tronox's equity) by the value of Class 3 claims to obtain the percentage recovery by those creditors on account of their claims.

---

[25]    Although the post-closing brief is supposed to be limited to legal issues, Plaintiffs briefly have addressed the facts underlying Defendants' creditor recovery theory, which was first raised in their post-trial brief, because the Court asked the parties during argument to address that issue in the final brief.  (12/12/12 Tr. at 8230:6–24)

When valued as of confirmation and without including shares issued through the rights offering, Class 3 general unsecured creditors recovered less than 100% of their claims. Unsecured creditors entitled to receive shares in reorganized Tronox held claims totaling $470.6 million. (DX2522 at 82, 84) Under Tronox's Plan, those creditors received 50.9% of Tronox's outstanding stock. (*Id*. at 15) Using the total enterprise value in the disclosure statement of $1.063 billion, less Tronox's exit financing of $468 million, the shares received by Class 3 General Unsecured Creditors were worth approximately 64% of their claims at confirmation.[26] (*Id.* at 14, 191)

Tronox's chapter 11 proceedings confirm these calculations. If Tronox's creditors were receiving more than the value of their claims, Tronox's Equity Committee would have pursued its objection to the plan. Instead, even after Tronox stipulated to a higher enterprise value for mediation before Judge Drain, the Equity Committee reached a settlement and withdrew its objection. This result is completely inconsistent with Defendants' claim that Tronox's creditors received more than the amount of their claims.

Defendants' argument that Tronox's Class 3 creditors received 337% recoveries is also inconsistent with Defendants' earlier position in this case. Defendants argued that Class 3 had recovered 100% of the value of their claims in the § 550 summary judgment briefing. (Defs.' Mot. Summ. J. (Dkt. No. 268) ¶ 13) Defendants' position is also contrary to this Court's ruling that Class 3 general unsecured creditors were *not* paid more than 100% of the value of their claims. In the Confirmation Order, the Court found that the Plan satisfied the absolute priority rule in § 1129. (Confirmation Order (Case No. 09–10156, Dkt. No. 2567) ¶ 73) To satisfy the

---

[26] In the disclosure statement, Tronox estimated Class 3 Creditor recoveries of between 58%–78% for creditors that did not participate in the rights offering. (*See* DX2522 at 82)

absolute priority rule, no creditor can be paid more than in full.  *See In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003).

Apart from the actual value of Class 3 recoveries, Defendants' argument that they are entitled to 337% of the value of their claim is yet another example of their flip-flopping advocacy.   Contrary to their current position, Defendants argued repeatedly and strenuously at summary judgment that a "fundamental precept of bankruptcy law" is "that creditors cannot receive more than what they are owed" and that the Bankruptcy Code "affirmatively and unambiguously prohibits creditors from retaining funds in excess of the value of their claims."[27] (Defs.' Mot. Summ. J. (Dkt. No. 268) ¶ 14; *see also id.* ¶ 25)  Moreover, Defendants' claim that the 337% recovery "was expressly agreed to by the parties, including the Plaintiffs themselves" is not only wrong factually but once again directly contrary to what they told the Court at summary judgment.   (Defs.' Br. at 274)   There, Defendants argued that *no* agreement or "bargain" can "override § 502(b)," which "limits creditor recoveries to the value of their respective claims."  (Defs.' Mot. Summ. J. (Dkt. No. 268) ¶ 71)

## 2. Section 502(h) Does Not Incorporate Defendants' "Restorative Principle"

Defendants are inconsistent about the value of their § 502(h) claim too.  In their post-trial brief, Defendants assert that their § 502(h) claim is for the amount of consideration transferred from Kerr-McGee to Tronox in connection with the fraudulent transfers.  (Defs.' Br. at 270–72) At closing argument, however, Defendants added that their § 502(h) claim could include any

---

[27]    As this Court already has held, the principles governing individual creditor recoveries are entirely distinct from whether (i) a bankruptcy estate under § 550 can recover the full value of fraudulently transferred assets for "the benefit of the estate" even if the value exceeds all creditor claims; and (ii) whether the estate can, as here, use the prospect of recovering a large contingent asset to forge a plan by awarding the contingent right of recovery to a creditor group in exchange for the surrender of their claims.  *See In re Tronox Inc.*, 464 B.R. 606, 613–17 (Bankr. S.D.N.Y. 2012); *In re Acequia, Inc.*, 34 F.3d 800, 809–11 (9th Cir. 1994); *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 293 (7th Cir. 2003).

amounts awarded to Plaintiffs in excess of the "creditor shortfall." (12/12/12 Tr. at 8235:19–8236:13) This is nothing more than an attempt to resurrect the claims cap this Court already rejected under § 550(a). It does not exist under § 502(h) either.

Section 502(h) does not provide Defendants with a new claim. *See* 11 U.S.C. § 502(h); *In re Gurley*, 311 B.R. 910, 919 (Bankr. M.D. Fla. 2001). Rather, it states that any claim "arising from the recovery of property under section … 550" shall be treated as a pre-petition claim. 11 U.S.C. § 502(h). Claims under § 502(h) are typically asserted to (i) reinstate a *pre-existing* claim of a prepetition creditor that had been satisfied by the fraudulent transfer, or (ii) allow a fraudulent transferee to assert a claim for the consideration it provided for the fraudulent transfer. *In re Gurley*, 311 B.R. at 919; *In re Best Prods. Co.*, 168 B.R. 35, 58 (Bankr. S.D.N.Y. 1994). Defendants did not have a pre-existing claim against Tronox—especially not for the difference between the value of the transferred assets and the creditor shortfall. Therefore, the only claim Defendants could assert "arising from the recovery of property" under § 550 is for the consideration they provided in exchange for that property. And that claim "is not [for] the value of the property recovered but rather [for] the *value of the consideration paid by the transferee* for the property recovered." 4 COLLIER ON BANKRUPTCY § 502.09[2] (15th ed. rev. 2007) (emphasis added); *In re Calpine Corp.*, 377 B.R. 808, 815 (Bankr. S.D.N.Y. 2007) (holding that the amount of a claim allowable under § 502(h) is the value of the consideration paid by the transferee for the property recovered); *In re Best Prods.*, 168 B.R. at 58 (noting that "if the transferee gave no consideration for the transfer, there is no underlying debt" for a Section 502(h) claim). Defendants cannot jam their "restorative principle" into § 502(h).[28] Section 502(h) only entitles

---

[28] The weakness of Defendants' position is confirmed by the proofs of claim that they filed in Tronox's chapter 11 cases. Although Defendants filed numerous versions of their original and amended proofs of claims that run dozens of pages each, they never even hinted that § 502(h) could provide the creditor cap they so desperately

Defendants to a claim for the consideration paid, and Plaintiffs' damages calculations already have given them full credit for that consideration.

## <u>CONCLUSION</u>

The record is now closed.  The day of reckoning is at hand.  (*See* 2d Am. Compl. ¶ 140 ("As Lehman warned New Kerr-McGee nearly four years ago, 'Separation from legacy liabilities' would be '[c]omplicated under [a] bankruptcy scenario.'  The inevitable day of reckoning is here."))  For the reasons stated herein, in their other post-trial submissions, and at closing argument, Plaintiffs respectfully request that the Court enter final judgment for Plaintiffs on counts I-IV of the Second Amended Complaint, award damages of at least $14 billion plus attorneys' fees and costs, and grant such other relief as this Court deems appropriate.


Dated:  January 31, 2013                    Respectfully submitted,

                                            */s/ David J. Zott, P.C.*
                                            _____
                                            KIRKLAND & ELLIS LLP
                                            David J. Zott, P.C. (*admitted pro hac vice*)
                                            Andrew A. Kassof, P.C. (AK 7079)
                                            Jeffrey J. Zeiger (*admitted pro hac vice*)
                                            300 North LaSalle
                                            Chicago, Illinois  60654-3406
                                            Telephone:    (312) 862-2000
                                            Facsimile:    (312) 862-2200

                                            *Counsel for the Anadarko Litigation Trust*

---

seek.  As the Court requested at closing argument, Plaintiffs have attached a copy of Defendants' proofs of claim as Exhibits A–C.

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey J. Zeiger, hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746,

that on this 31st day of January 2013, I caused a true and correct copy of the foregoing Plaintiffs'

Post-Closing Brief to be served upon the following:

**Via Overnight Mail and Electronic Mail**

Melanie Gray
Jason W. Billeck
Weil, Gotshal & Manges LLP
700 Louisiana, Suite 1600
Houston, Texas 77002

*Counsel for Defendants*

**Via Electronic Mail**

Robert William Yalen
Assistant United States Attorney
86 Chambers Street
New York, New York 10007

*Counsel for the United States of America*

*/s/ Jeffrey J. Zeiger*