UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TRONOX INCORPORATED, et al., | ) | Case No. 09-10156 (ALG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| TRONOX INCORPORATED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| KERR-MCGEE CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | Adv. Pro. No. 09-01198 (ALG) |
| | ) | |
| | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| v. | ) | |
| | ) | |
| TRONOX, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' POST-TRIAL REPLY BRIEF**

## Table of Contents

Page

ARGUMENT ............................................................................................................1

I.    The Transfers Were Not Made with Actual Intent to Hinder, Delay, or
Defraud Creditors........................................................................................1

    A.    An Intent to Separate Assets from Liabilities is Not Sufficient to Prove an
Actual Fraudulent Transfer Claim....................................................................1

    B.    Foreseeability is Not Relevant to an "Actual Intent" Inquiry.................5

    C.    Defendants Did Not Breach Any Legal Duty to Analyze Potential
Environmental Liabilities........................................................................5

    D.    Kerr-McGee Did Not Structure the Transfers in a Way that Supports a
Finding of Actual Fraudulent Intent ......................................................9

    E.    Kerr-McGee, Although Not Obligated to Do So, Considered How to
Apportion Liabilities in Connection With the IPO ...............................11

    F.    Kerr-McGee, Tronox, and Contemporaneous Market Participants
Analyzed Tronox's Capital Structure and Financial Condition at the Time
of the IPO ............................................................................................13

    G.    The Badges of Fraud Do Not Save Plaintiffs' Actual Intent Claims....................16

    H.    Plaintiffs Cannot Prove Actual Intent Through an Adverse Inference
Based on Spoliation Because They Failed to Prove the Requisite Elements ........17

II.   The Transfers Were Not Constructively Fraudulent..........................................18

    A.    The Market Evidence Controls Valuation of Contingent Liabilities, Just
Like Any Other Liabilities or Assets ....................................................18

    B.    The Market Evidence is, and Should Be, the Preferred Standard for
Business Valuation Notwithstanding the 2008 Financial Crisis...........................24

    C.    Plaintiffs' Attack on Professor Fischel's Use of Contemporaneous
Projections in His Solvency Analysis is Wrong on the Law and the Facts ...........25

    D.    Plaintiffs Were Solvent by Any Reasonable Measure ...........................27

        1.    Defendants' Environmental and Tort Experts' Valuations Are
Consistent with Contemporaneous Third-Party Estimates ........................29

        2.    Plaintiffs' Experts Failed to Identify and Value Liabilities by
Entity........................................................................................31

        3.    Plaintiffs Improperly Suggest that They Should Prevail Simply if
the Court Concludes that Dr. Ram is Partially Right...............................32

III.  Plaintiffs Cannot Rely on the United States as Their "Triggering Creditor"
to Prosecute a Fraudulent Transfer Claim Because the FDCPA is Not
Applicable Law Under 11 U.S.C. § 544(b) ......................................................34

IV.   The Statute of Limitations Bars Plaintiffs' and the United States'
Fraudulent Transfer Claims to Challenge the Project Focus Transfers ...........................36

## **Table of Contents**

**Page**

A.      Plaintiffs Cannot Rely upon 28 U.S.C. §§ 2415 or 2416 to Extend the Oklahoma UFTA Statute of Limitations and Revive Their Time-Barred Claims Challenging the Project Focus Transfers...................................................36

B.      Transfers Between Related Companies Do Not Permit an End Run Around the Statute of Limitations........................................................................................38

V.      The United States Failed to Prove the Essential Element of Its FDCPA Claim — That the Transferor Owes an Unpaid Debt to the United States.......................40

VI.     Even Assuming Liability, Plaintiffs' Requested Remedy Cannot Be Granted.....................................................................................................................42

A.      The Restorative Principle Applies to This Case ....................................................42

B.      If the Court Rejects the Restorative Principle, Defendants Are Entitled to a § 502(h) Offset Calculated in Accordance with the Terms of the Plan ................45

C.      Plaintiffs Ignore the Multiple Additional Bases that Limit Their Recovery .........48

CONCLUSION.....................................................................................................................49

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*718 Arch St. Assocs. v. Blatstein (In re Blatstein)*,
   192 F.3d 88 (3d Cir. 1999)............................................................................4

*8000 Md., LLC v. Huntleigh Fin. Servs., Inc.*,
   292 S.W.3d 439 (Mo. Ct. App. 2009)..........................................................39

*Adelphia Recovery Trust v. Bank of Am., N.A.*,
   390 B.R. 80 (S.D.N.Y. 2008).......................................................................48

*Akande v. Transamerica Airlines, Inc. (In re Transamerica Airlines, Inc.)*,
   No. 1039-N, 2006 WL 587846 (Del. Ch. Feb. 28, 2006) .............................39

*Aptix Corp. v. Quickturn Design Sys., Inc.*,
   148 F. App'x 924 (Fed. Cir. 2005) ..............................................................11

*ASARCO LLC v. Americas Mining Corp.*,
   396 B.R. 278 (S.D. Tex. 2008) .............................................................. *passim*

*ASARCO LLC v. Americas Mining Corp.*,
   404 B.R. 150 (S.D. Tex. 2009) ....................................................................44

*Ash v. McCall*,
   No. Civ. A 17132, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000) ..................8

*Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*,
   417 U.S. 703 (1974).....................................................................................43

*Chambers v. Bendetti (In re Bendetti)*,
   131 F. App'x 224 (11th Cir. 2005) ...............................................................35

*Chin v. Port Auth. of N.Y. & N.J.*,
   685 F.3d 135 (2d Cir. 2012).....................................................................17, 18

*Covey v. Commercial Nat'l Bank of Peoria*,
   960 F.2d 657 (7th Cir. 1992) .......................................................................33

*Crédit Agricole Corporate & Inv. Bank N.Y. Branch v. Am. Home Mortg. Holdings, Inc.
   (In re Am. Home Mortg. Holdings, Inc.)*,
   637 F.3d 246 (3d Cir. 2011)..........................................................................25

*Dean v. Davis*,
   242 U.S. 438 (1917).......................................................................................5

## TABLE OF AUTHORITIES

**Page(s)**

*Eck v. USA Prop. Co. (In re Dodd)*,
    97 B.R. 74 (Bankr. N.D. Okla. 1989) ..................................................................1

*Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*,
    609 F.3d 111 (2d Cir. 2010).............................................................................34

*Forsythe v. ESC Fund Mgmt. Co.*,
    No. 1091-VCL, 2007 WL 2982247 (Del. Ch. Oct. 9, 2007) ...................................8

*Fujitsu Ltd. v. Fed. Express Corp.*,
    247 F.3d 423, 436 (2d Cir. 2001)......................................................................18

*Furlong v. Shalala*,
    156 F.3d 384 (2d Cir. 1998).............................................................................44

*Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*,
    931 F.2d 196 (2d Cir. 1991)...............................................................................6

*Henderson v. Andrews (In re Perry Cnty. Foods, Inc.)*,
    313 B.R. 875 (Bankr. N.D. Ala. 2004) ..............................................................23

*In re Actrade Fin. Techs. Ltd.*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005)..................................................................3

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
    265 F.R.D. 157 (S.D.N.Y. 2010), *vacated
    and remanded* 689 F.3d 229 (2d Cir. 2012)........................................................25

*In re Boston Generating, LLC*,
    440 B.R. 302 (Bankr. S.D.N.Y. 2010)................................................................25

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996)............................................................................8

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132, 1200 (C.D. Cal. 2008) ....................................................25

*In re Exec. Telecard, Ltd. Sec. Litig.*,
    979 F. Supp. 1021 (S.D.N.Y. 1997)....................................................................2

*In re Granite Broad. Corp.*,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007)................................................................22

*In re Hall*,
    304 F.3d 743 (7th Cir. 2002) ...........................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

*In re MarketXT Holdings Corp.*,
376 B.R. 390 (Bankr. S.D.N.Y. 2007) .......................................................................4

*In re Old CarCo LLC*,
435 B.R. 169 (Bankr. S.D.N.Y. 2010) ......................................................1, 2, 3, 12

*In re Old CarCo LLC*,
454 B.R. 38 (Bankr. S.D.N.Y. 2011) .......................................................................25

*In re Polymedica Corp. Sec. Litig.*,
453 F. Supp. 2d 260 (D. Mass. 2006) ......................................................................25

*In re Pullman Constr. Indus., Inc.*,
103 B.R. 983 (Bankr. N.D. Ill. 1989) ......................................................................23

*In re REA Express, Inc. Private Treble Damage Antitrust Litig.*,
412 F. Supp. 1239 (E.D. Pa. 1976) ..........................................................................43

*In re Tronox Inc.*,
429 B.R. 73 (Bankr. S.D.N.Y. 2010) .......................................................................33

*In re W.R. Grace & Co.*,
281 B.R. 852 (Bankr. D. Del. 2002) ........................................................................24

*In re Wash. Mutual, Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ........................................................................46

*In re Xonics Photochemical, Inc.*,
841 F.2d 198 (7th Cir. 1988) ...................................................................................33

*Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC)*,
373 B.R. 283 (Bankr. S.D.N.Y. 2007) .............................................................. *passim*

*Kelley v. College of St. Benedict*,
No. 12-822, 2012 WL 5309501 (D. Minn. Oct. 26, 2012) .........................34, 35, 40

*Kelley v. Thomas Solvent Co.*,
725 F. Supp. 1446 (W.D. Mich. 1988) .......................................................................3

*Kipperman v. Onex Corp.*,
411 B.R. 805 (N.D. Ga. 2009) .................................................................................47

*Levinson v. Glidden*,
37 P.2d 924 (Okla. 1934) ............................................................................................1

*Lippe v. Bairnco Corp.*,
249 F. Supp. 2d 357 (S.D.N.Y. 2003), *aff'd,* 99 F. App'x 274 (2d Cir. 2004)............... *passim*

## TABLE OF AUTHORITIES

**Page(s)**

*Matter of Prince*,
85 F.3d 314 (7th Cir. 1996) ...........................................................................47

*MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.)*,
675 F.3d 530 (5th Cir. 2012) ....................................................................34, 35

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
910 F. Supp. 913 (S.D.N.Y. 1995) ........................................................3, 5, 26

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
971 F.2d 1056 (3d Cir. 1992)...........................................................................26

*Mt. McKinley Ins. Co. v. Lac D'Amiante du Quebec LTEE*,
No. 2:12-CV-00271, slip op. (S.D. Tex. Nov. 19, 2012).................................47

*Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*,
126 B.R. 370 (Bankr. D. Mass. 1991) .............................................................26

*Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*,
424 B.R. 95 (Bankr. S.D.N.Y. 2010)....................................................36, 38, 43

*Orbit One Commc'ns, Inc. v. Numerex Corp.*,
271 F.R.D. 429 (S.D.N.Y. 2010) .....................................................................17

*Paloian v. LaSalle Bank, N.A.*,
619 F.3d 688 (7th Cir. 2010) ...........................................................................20

*Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*,
226 F.3d 15 (1st Cir. 2000)...............................................................................24

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
685 F. Supp. 2d 456 (S.D.N.Y. 2010)..............................................................18

*Peterson v. McGladrey & Pullen, LLP*,
676 F.3d 594 (7th Cir. 2012) ...........................................................................44

*Ries v. Wintz Props., Inc. (In re Wintz Cos.)*,
230 B.R. 848 (B.A.P. 8th Cir. 1999).................................................................36

*Robinson v. T.I.M.E.-DC, Inc.*,
566 F. Supp. 1077 (N.D. Tex. 1983) ................................................................11

*SEC v. Haligiannis*,
608 F. Supp. 2d 444 (S.D.N.Y. 2009).................................................................4

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
No. 12 MC 115 (JSR), 2013 WL 67605 (S.D.N.Y. Jan. 4, 2013) ...................50

## TABLE OF AUTHORITIES

**Page(s)**

*Sheffield Steel Corp. v. HMK Enters., Inc. (In re Sheffield Steel Corp.)*,
   320 B.R. 423 (Bankr. N.D. Okla. 2004) ...............................................................43

*Six v. Henderson (In re Six)*,
   220 B.R. 479 (Bankr. M.D. Fla. 1994) ...............................................................23

*SMTC Mfg. of Tex. v. SMTC Corp. (In re SMTC Mfg. of Tex.)*,
   421 B.R. 251 (Bankr. W.D. Tex. 2009).............................................................16

*Solomon v. Scott P. Kirtley, Trustee (In re Solomon)*,
   299 B.R. 626 (B.A.P. 10th Cir. 2003).....................................................19, 33, 39

*Spearing Tool & Mfg. Co. v. Buccaneer Tool & Die Co. (In re Spearing Tool & Mfg.
   Co.)*, 171 B.R. 578 (Bankr. E.D. Mich. 1994) ...................................................3, 11

*Sure-Snap Corp. v. State St. Bank & Trust Co.*,
   948 F.2d 869 (2d Cir. 1991).............................................................................47

*Tri-Star Techs. Co. v. Pitocchelli (In re Tri-Star Techs. Co.)*,
   260 B.R. 319 (Bankr. D. Mass. 2001) ...............................................................36

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*,
   No. 3:10-CV-1842-G, 2013 WL 230329 (N.D. Tex. Jan. 22, 2013)....................19, 21, 25, 30

*United States v. Gelb*,
   783 F. Supp. 748 (E.D.N.Y. 1991) .............................................................34, 36, 37

*United States v. Gleneagles Inv. Co.*,
   565 F. Supp. 556 (M.D. Pa. 1983).....................................................................5

*United States v. Smith*,
   355 F.2d 807 (5th Cir. 1966) ...........................................................................23

*Van Slyke v. Teel Holdings, LLC*,
   No. 01-08-00600-CV, 2010 WL 2788876 (Tex. App. July 15, 2010) ...................16

*VFB LLC v. Campbell Soup Co.*,
   482 F.3d 624 (3d Cir. 2007)....................................................................... *passim*

*VFB LLC v. Campbell Soup Co.*,
   No. Civ. A. 02-137, 2005 WL 2234606 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624
   (3d Cir. 2007)................................................................................... *passim*

*Waste Mgmt. Inc. v. Danis Indus. Corp.*,
   No. 3:00cv256, 2009 WL 347773 (S.D. Ohio Feb. 10, 2009)...............................29

## TABLE OF AUTHORITIES

**Page(s)**

*Womack v. Eggebrecht (In re Demis)*,
191 B.R. 851 (Bankr. D. Mont. 1996) ...................................................................................39

*Wood v. Baum*,
953 A.2d 136 (Del. 2008) ....................................................................................................8

**STATUTES**

11 U.S.C. § 105 (2006) ....................................................................................................42, 43

11 U.S.C. § 119(A)(1) (2006) ................................................................................................48

11 U.S.C. § 120(B) (2006) ....................................................................................................48

11 U.S.C. § 502 (2006) ..........................................................................................45, 46, 47, 48

11 U.S.C. § 544(b) (2006) ................................................................................................ *passim*

11 U.S.C. § 548 (2006) ..........................................................................................35, 48, 49

11 U.S.C. § 550(a) (2006) ................................................................................................ *passim*

28 U.S.C. § 2415(a) (2006) ....................................................................................................36, 37

28 U.S.C. § 2416(c) (2006) ....................................................................................................36, 37

28 U.S.C. §§ 3001(a), 3304 (2006) ........................................................................................34

28 U.S.C. §§ 3002(3), 3307(b) (2006) ....................................................................................40

28 U.S.C. § 3003 (2006) ....................................................................................................35

28 U.S.C. § 3306(b) (2006) ............................................................................................37, 39, 40

Okla. Stat. tit. 12A, §§ 1-9-101, 1-9-109 (2012) ....................................................................39

Okla. Stat. tit. 24, § 114(A) (2012) ........................................................................................19, 24

Okla. Stat. tit. 24, § 121 (2012) ............................................................................................39, 40

Okla. Stat. tit. 24, § 122 (2012) ............................................................................................43

**OTHER AUTHORITIES**

Amanda P. Reeves & Maurice E. Stucke, <u>Behavioral Antitrust</u>, 86 Ind. L.J. 1527 (2011)...........25

<u>Restatement (Second) of Torts</u> § 8A (1965) ...........................................................................4

This Reply responds to the Court's questions at the closing argument on December 12, 2012 ("Closing") and related arguments in Plaintiffs' Post-Trial Brief [Dkt. No. 590] ("Pl. Br.") that were not fully addressed in Defendants' Post-Trial Brief [Dkt. No. 594] ("Def. Br.").[1]

## ARGUMENT

## I.    The Transfers Were Not Made with Actual Intent to Hinder, Delay, or Defraud Creditors

### A.    An Intent to Separate Assets from Liabilities is Not Sufficient to Prove an Actual Fraudulent Transfer Claim

The Court asked whether Plaintiffs can prove an actual fraudulent transfer claim by merely showing that Defendants "intend[ed] to separate [L]egacy [L]iabilities from other assets." Tr. 7851:15-21.  The answer is no.  *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 367, 381-83 (S.D.N.Y. 2003), *aff'd,* 99 F. App'x 274 (2d Cir. 2004); *In re Old CarCo LLC*, 435 B.R. 169, 178-81, 192-94 (Bankr. S.D.N.Y. 2010).  Although Plaintiffs built and tried their case upon this false premise, they appeared to concede at Closing that an intent to separate assets from liabilities is insufficient to satisfy their burden to prove an actual fraudulent intent.[2]  *See* Tr. 7850:13-7853:3; Pl. Br. 17.  Plaintiffs appeared to admit that, at the very least, they must prove Kerr-McGee knew, with a substantial certainty, that the transfers would hinder, delay, or defraud creditors.  *See* Tr. 7852:6-7853:14 (Plaintiffs' counsel stated "you just have to be substantially certain that creditors will be hindered or delayed or defrauded including just -- if you just make it

---

[1] Unless otherwise noted, all transcript cites herein are to the December 12, 2012 transcript.  All capitalized terms used but not defined herein have the meaning provided in Def. Br. and in Defendants' Proposed Findings of Fact [Dkt. No. 593] ("Def. FOF").

[2] Plaintiffs' burden of proof for their actual fraudulent transfer claim is clear and convincing evidence. Def. Br. 153-56.  Plaintiffs primarily rely on *Levinson v. Glidden*, 37 P.2d 924, 926 (Okla. 1934), for the contention that early Oklahoma case law applied a preponderance standard to fraudulent transfer claims. Pl. Br. 27.  *Levinson* stated, however, that "courts will not strike down conveyances upon presumption or suspicion of insolvency and fraud, but these facts must be clearly established in the record by substantial testimony and it must appear affirmatively to a reasonable certainty that the party at the time was insolvent or that the conveyance was made with intent in fact to defraud." 37 P.2d at 926.  Moreover, in *Eck v. USA Prop. Co. (In re Dodd)*, 97 B.R. 74, 75 n.2 (Bankr. N.D. Okla. 1989), the court stated that *Levinson* was "anything but clear" as to the standard of proof it was applying.

harder for creditors to collect and you do that knowingly that is sufficient"). Plaintiffs had no choice but to make this critical concession, because the law requires it. In *Lippe*, Judge Chin found, "[e]ven assuming management's concern over the asbestos cases was a motivating factor [for the transactions], there was nothing inappropriate about a company's management looking for lawful ways to reduce the adverse impact of asbestos litigation." 249 F. Supp. 2d at 383. The *Lippe* defendant's belief that its liabilities posed a "serious" problem "does not constitute evidence that [it] knew that someday it would be overwhelmed by" those liabilities. *Id.* at 381-83. There simply is no evidence to support a finding that Kerr-McGee knew Tronox would be overwhelmed by its liabilities, and, in fact, the voluminous evidence at trial, including Professor Fischel's event study, shows that Tronox was not overwhelmed by its alleged Legacy Liabilities.[3] Def. FOF ¶¶ 2475-2500.

Similarly, in *Old CarCo*, even though the "main motivating factor" behind Daimler's decision to sell its interest in certain subsidiaries "was the concern that it would be held responsible if certain other post-employment benefit . . . obligations of approximately $17.5 billion were not met," the court dismissed the actual fraudulent transfer claim because the plaintiffs had not adequately pled that "Daimler knew that CarCo would be unable to pay its creditors." 435 B.R. at 178, 194. Critically, *Old CarCo* explained that a claim for actual fraudulent transfer is implausible, even if assets are intentionally separated from liabilities, when the contemporaneous market participants' conduct shows that they perceived the company to be viable:

> [T]he contemporaneous market information shows how implausible the theory is that all of these participants would expose themselves to the financial risk of a company unable to sustain its operations. The actions of these third parties, in

---

[3] *See In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1025-27 (S.D.N.Y. 1997) (faulting expert for not conducting an event study and explaining "[u]se of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to [the company] which defendants allegedly have distorted").

investing and relying on the wherewithal of CarCo, show that they perceived CarCo to be a viable entity. Inasmuch as they were privy to the same financial information as Daimler, ***these actions do not support an inference that Daimler knew that CarCo would be unable to pay its creditors and, therefore, acted with fraudulent intent***.

*Id*. at 194 (emphasis added); *see also VFB LLC v. Campbell Soup Co.*, No. Civ. A. 02-137, 2005 WL 2234606, at *32 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007); *Lippe*, 249 F. Supp. 2d at 366-67, 381-82; *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995) (denying actual fraudulent transfer claim and noting "defendants sold a business that appeared at the time to be thriving"). *Lippe*, *Old CarCo*, *VFB*, and *MFS/Sun* are fatal to Plaintiffs' actual fraudulent transfer claim.

Plaintiffs misconstrue *Spearing Tool & Mfg. Co. v. Buccaneer Tool & Die Co. (In re Spearing Tool & Mfg. Co.)*, 171 B.R. 578 (Bankr. E.D. Mich. 1994), *Kelley v. Thomas Solvent Co.*, 725 F. Supp. 1446 (W.D. Mich. 1988), and *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791 (Bankr. S.D.N.Y. 2005), as supporting their contention that the intention to separate assets from liabilities is *per se* a fraudulent transfer. Tr. 7850:13-7852:5; Pl. Br. 11-12, 21. *Spearing Tool* found actual intent based on an affidavit by the debtor's president "attesting to his intentions, acting on behalf of Spearing, to delay and hinder creditors." 171 B.R. at 583. In *Kelley*, the defendants removed valuable assets from the debtor but provided the debtor with zero value in return (unlike this case, where Tronox indisputably received hundreds of millions of dollars in assets in the Spinoff) with an admitted motive of trying to "avoid potential liability" for groundwater contamination. 725 F. Supp. at 1450-55. In *Actrade*, a case that involved false invoices for fictitious sales, sham purchases, arson to "cover up . . . fraudulent activities," and attempted bribery of a New York City Fire Marshal, this Court noted that the "proper sphere" of fraudulent transfer law is where there is "a knowing intent . . . to damage creditors." 337 B.R. at

795-96, 809.[4]

Plaintiffs further argue that actual fraudulent transfer liability can be imposed on Defendants because actors intend the "natural consequences" of their actions. Plaintiffs cite *ASARCO LLC v. Americas Mining Corp.* and the Restatement as their support, *see* Pl. Br. 13, 17, but neither authority adopts this standard. Instead, both merely confirm that a party intends the consequences that it knows are "substantially certain" to result from its actions. *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 388 (S.D. Tex. 2008) ("AMC acted with intent to hinder, delay, or defraud ASARCO's creditors if it knew that proceeding with the transaction as structured was substantially certain to hinder, delay, or defraud ASARCO's creditors."); Restatement (Second) of Torts § 8A (1965) ("The word 'intent' . . . denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.").[5] As a result, Plaintiffs' argument regarding "natural consequences" does not water down their burden of proving *actual* intent, or knowledge to a substantial certainty, that the transfers would hinder, delay, or defraud creditors.

In any event, the conduct and actions of Kerr-McGee's management and Board, as well as those of numerous contemporaneous market participants, confirm their informed and good-faith beliefs that Tronox was solvent and had sufficient assets to cover its liabilities such that the

---

[4] Similarly, in *In re MarketXT Holdings Corp.*, 376 B.R. 390 (Bankr. S.D.N.Y. 2007), the defendant admitted in an affidavit that his intent was to delay creditors. 376 B.R. at 404-09. In *SEC v. Haligiannis*, 608 F. Supp. 2d 444 (S.D.N.Y. 2009), a Ponzi scheme case also relied on by Plaintiffs, Pl. Br. 12, 32, the debtor fled the country after granting a mortgage to his father-in-law: (i) while he knew he was either insolvent, or on the verge of insolvency; (ii) after he likely had been threatened with suit; and (iii) shortly before his Ponzi-scheme was about to be uncovered. 608 F. Supp. 2d at 450-51. In *718 Arch St. Assocs. v. Blatstein (In re Blatstein)*, 192 F.3d 88 (3d Cir. 1999), the court found that a debtor's transfer to his wife was actually fraudulent because he "was trying to keep the funds from being seized or frozen by the IRS . . . pursuant to a tax lien, in light of the personal income taxes which he owed to the IRS," and thereby intended to defraud the IRS. 192 F.3d at 97.

[5] Plaintiffs also assert that "actual intent" is established by proof of "calloused indifference," citing *ASARCO*. Pl. Br. 26-27; Tr. 7865:11-18, 7868:10-12. The "calloused indifference" identified in *ASARCO*, however, referred to defendant's knowledge that "payments to some creditors would be hindered and delayed as a result of the transaction." 396 B.R. at 386-88.

transfers would not harm creditors.  *See* Def. Br. 165-69; Def. FOF §§ XI-XIV.

### B.    Foreseeability is Not Relevant to an "Actual Intent" Inquiry

Plaintiffs rely on *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556 (M.D. Pa. 1983),

to argue that Kerr-McGee had an intent to hinder, delay, or defraud creditors because it

supposedly was "entirely foreseeable" that Tronox would "struggle to service and ultimately

satisfy the [L]egacy [L]iabilities."    Pl. Br. 27; *see also* Tr. 7865:11-7869:5.    Plaintiffs'

foreseeability argument was considered and rejected by the Southern District of New York:

> There is no indication that the courts of New York or the other relevant
> jurisdictions have imported the concept of foreseeability into an analysis of actual
> intent to defraud.  Such a standard, though appropriate where culpability is based
> on negligent conduct, is incompatible with the concept of actual fraud.

*MFS/Sun*, 910 F. Supp. at 936.  As a result, Plaintiffs' foreseeability argument is meritless.[6]

### C.    Defendants Did Not Breach Any Legal Duty to Analyze Potential Environmental Liabilities

The Court inquired whether Kerr-McGee performed "an analysis of all of the possible

environmental liabilities that might eventuate sometime in the future."  Tr. 8101:17-20.  While

Kerr-McGee's accountants, attorneys, and S&EA Group continually were engaged in

identifying, analyzing, remediating, and reporting on potential environmental liabilities, Kerr-

McGee did not perform the type of separate, formal investigation conducted by Dr. Shifrin and

Dr. Ram.  Def. FOF ¶¶ 56, 74, 1665-1734; *see also* Tr. 8101:25-8102:8; Def. Br. 75, 176-77.

---

[6] Moreover, despite *Gleneagles*'s single reference to foreseeability, 565 F. Supp. at 581, its actual intent finding was premised on the court's conclusion that both the transferor and transferee of challenged mortgages on the debtor's assets, respectively, "knew that he would be unable to pay the debts which would arise in the course of doing business," *id.* at 583, and "knew" that the debtor would be "unable to pay its debts as they matured," *id.* at 582. Similarly, nothing in *Dean v. Davis*, 242 U.S. 438 (1917), indicates that an actual intent finding may be based on mere foreseeability.  *Cf.* Pl. Br. 27.  In *Dean*, the debtor faced criminal prosecution for forged notes unless he paid them.  242 U.S. at 442.  His brother-in-law "'took up' the notes" in exchange for a mortgage on all of the debtor's assets.  *Id.*  At the time the debtor executed the mortgage, he "knew that he was insolvent" and "knew that he was making a preferential payment."  *Id.* at 445.  Consequently, *Dean* does nothing more than stand for the limited proposition, consistent with *ASARCO*, that a party intends those consequences that it *knows* will obviously and necessarily result from its actions.  *Id.*; *see also ASARCO*, 396 B.R. at 388.

Plaintiffs cite no authority for their position that Defendants were obligated to do so.  Plaintiffs'

*post-hoc* arguments about what Defendants might have learned if they performed an analysis like

the litigation experts' ignore the relevant question:  What was Defendants' actual "state[] of

mind" at the IPO?  *Golden Budha Corp. v. Canadian Land Co. of Am., N.V.*, 931 F.2d 196, 201-

02 (2d Cir. 1991) ("[A]ctual intent, consisting of intentional deception to frustrate legal rights,

must be established.").  It is what Kerr-McGee actually believed, "at the time of the transfers,

that controls, not analyses performed now with the benefit of hindsight."  *Lippe*, 249 F. Supp. 2d

at 381.  Like the debtor in *Lippe*, Kerr-McGee, as well as numerous contemporaneous market

participants, concluded and firmly believed at the time of the IPO that Tronox would be able to

satisfy its debts going forward.  *See id*. at 379-84; Def. Br. 165-69.  That evidence alone is fatal

to Plaintiffs' actual fraudulent transfer claim.  *See* Section I(A), *supra*.

Moreover, this is not a case where Defendants put their "head in the sand," as Plaintiffs

suggest.  Tr. 7969:2-12, 8002:15-8003:2; Pl. Br. 45.  As an initial matter, the suggestion that

Defendants were obligated to search for and root out unknown potential claims or liabilities is

commercially unrealistic, not required by law, and would impose extreme and onerous burdens

on operating and running a business.  Further, even though GAAP and SEC rules and regulations

do not require the investigation of every potential unasserted claim (or identification of unknown

liabilities), E&Y's audit engagement for Kerr-McGee from 2002 to 2006 included procedures to

identify potential unasserted claims, and Kerr-McGee affirmatively investigated certain potential

sites (including, among others, the uranium mines and creosote sites) before receiving an inquiry

or a demand from a third party.  Def. FOF ¶¶ 1656, 1683, 1718.  The work of Kerr-McGee's

S&EA Group, and accounting and legal departments, along with their historical knowledge of

the Legacy Liabilities, provided Kerr-McGee with a solid understanding of Tronox's actual

potential liabilities and allowed Kerr-McGee to conclude, correctly, that Tronox could manage those liabilities after the IPO. *See, e.g.*, Def. FOF ¶¶ 795, 822-37, 853, 1665–1707, 1715, §§ XI, XX.G.  Kerr-McGee performed these functions consistent with reasonably prudent business practices and in a manner that satisfied GAAP, Sarbanes-Oxley, and SEC rules and regulations.[7] Def. FOF ¶¶ 1654-1734, 1749-57; Def. Br. 74-77.

Further, in this case, the Court actually has the benefit of a contemporaneous, market-based investigation of the Legacy Liabilities.  Apollo spent about $10 million and at least six months with its first-rate engineers, consultants, and environmental lawyers performing this investigation and analysis.  Def. FOF ¶ 909, § XII.C.1.  Apollo's independent analyses included, among other things, an extensive review of the VDR, which contained information about 99.5% of the sites comprising Dr. Ram's estimate.   Def. FOF ¶¶ 548, 550, 905-07, 911-13, 945-49. Apollo's conclusions were then reviewed and considered by other contemporaneous third-party market participants, many of whom had their own environmental experts.  *See* Def. FOF ¶¶ 1099, 1100, 1102, 1109, 1116, 1122-30, 1162-74, 1182-92, 1246-53, 1267-69, 1316-18, 1330, 1333.

The fact that Kerr-McGee did not itself undertake a Dr. Shifrin-type analysis of potential unasserted claims prior to the IPO is insufficient to establish that it acted with an intent to hinder, delay, or defraud creditors.  *See* Section I(A), *supra*; Def. Br. 156-57.  Should the Court break new ground in the law governing actual fraudulent transfer claims by imposing a requirement that before a company can engage in an IPO, spinoff, LBO, or even issue a dividend, the

---

[7] Under GAAP and SEC rules and regulations, a company must take action on an unasserted claim if the company concludes that the claim probably will be asserted and that the company probably will suffer a loss.  *See* Tr. 5629:19-5631:13, Aug. 14, 2012; Def. FOF ¶ 1656.  Kerr-McGee fully satisfied these obligations.  *See* Tr. 5629:19-5630:12, Aug. 14, 2012; Def. FOF ¶¶ 1665-67.  Neither GAAP nor any other applicable disclosure guidelines contains a specific requirement to investigate an unasserted claim.  Tr. 5630:13-17, Aug. 14, 2012; Def. FOF ¶ 1656.  Furthermore, there is no obligation to conduct an investigation in order to identify unknown potential contingent liabilities.

company must first perform the type of investigation conducted by Drs. Shifrin and Ram, such a ruling would render everyday corporate governance alternatives practically and economically infeasible.  *See* Tr. 8128:4-14.

Finally, Kerr-McGee's approach to unknown and unasserted claims complied fully with its fiduciary duties.  A fiduciary's duty of care requires a "good faith effort to be informed and exercise judgment."  *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 968 (Del. Ch. 1996).  When a system for bringing information to the fiduciaries' attention is not in place, that duty may be breached if fiduciaries ignore "'red flags' that actually come to their attention, warning of compliance problems."  *Forsythe v. ESC Fund Mgmt. Co.*, No. 1091-VCL, 2007 WL 2982247, at *7 (Del. Ch. Oct. 9, 2007); *see Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) ("Under Delaware law, red flags 'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.'").  Kerr-McGee had appropriate processes and procedures in place to identify potential environmental remediation liabilities and to gather information about sites (including anonymous reporting hotlines), and Kerr-McGee did not ignore red flags about any site.  Def. FOF ¶¶ 56, 828, 1656-57, 1665-68, 1671, 1683-84, 1694, 1701-02.  When there was an inquiry about a site, Kerr-McGee appropriately responded, and there is no evidence to support any other finding.  Def. FOF ¶¶ 828, 1687-88.  Kerr-McGee also received several countervailing "green flags" from "the accounting and financial experts who conducted due diligence reviews," which indicated that Tronox was solvent and could manage its potential liabilities as and when asserted, if ever.  *Ash v. McCall*, No. Civ. A 17132, 2000 WL 1370341, at *9 (Del. Ch. Sept. 15, 2000); *see generally* Def. Br. 51-77; Def. FOF §§ XI-XIII.

### D.    Kerr-McGee Did Not Structure the Transfers in a Way that Supports a Finding of Actual Fraudulent Intent

Project Focus and the IPO/Spinoff were done for legitimate business purposes.  Def. Br. 158-65, 207-11; Def. FOF ¶¶ 167-98, 485-526.  In particular, Project Focus, which was publicly disclosed and communicated to all Kerr-McGee employees worldwide, was intended to streamline operations, make Kerr-McGee's business more efficient, and reduce the confusion that had resulted from multiple transactions, including a complicated double dummy/top hat merger with HS Resources, in the period immediately preceding Project Focus.[8]  Tr. 8082:17-8091:17; *see also* Def. Br. 207-21; Def. FOF §§ V.A, V.C.  Similarly, the IPO/Spinoff was done for the legitimate purpose of reducing the sum-of-the-parts discount and creating value for Kerr-McGee's shareholders by increasing the value of both Kerr-McGee and Tronox as pure-play companies.  Def. Br. 158-65; Def. FOF § VIII.B.[9]

Faced with this overwhelming proof, Plaintiffs fall back on the assertion that "if you . . . structure [a transaction with a legitimate purpose] in a way that is basically not legitimate, that can't be justified[,] then that constitutes fraudulent intent."  Tr. 8261:3-6; *see also* Pl. Br. 22-23,

---

[8] Plaintiffs argue that the Project Focus Transfers did not have a legitimate purpose or structure because after Project Focus:  (i) Kerr-McGee continued to hold oil and gas assets in a non-E&P subsidiary, and certain pigment assets in a non-chemical subsidiary; and (ii) the corporate structure actually became "more complicated" after Project Focus. Pl. Br. 31.  These assertions disregard the voluminous evidence demonstrating that Project Focus was in fact undertaken and structured to address the organizational complexity, inefficiency, and confusion following the HS Resources merger.  *See* Def. Br. 207-21; Def. FOF § V.C.  The isolated, specific post-reorganization structural issues identified by Plaintiffs were merely a function of tax issues.  Def. FOF ¶¶ 187-88, 198, 215, 224, 227-33; Def. Br. 214.  And as Tronox's own former General Counsel admitted, while Project Focus was not a panacea, it certainly improved and better organized the corporate structure.  Def. FOF ¶ 196; Def. Br. 211.  There is no credible evidence that Project Focus was anything other than a legitimate corporate reorganization that was needed and undertaken to streamline the organization and thereby reduce confusion and increase efficiency.  *See* Def. FOF § V.

[9] Plaintiffs' arguments that the IPO Transfers did not have a legitimate purpose or structure also fail.  They claim that the Spinoff did not effectuate its purpose of unlocking shareholder value by creating pure-play businesses, because Kerr-McGee retained the Avestor Business and Tronox kept certain Legacy Liabilities unrelated to the pigment business.  Pl. Br. 31-32.  Plaintiffs' assertions ignore the contrary evidence establishing that (i) retention of Avestor would have harmed the Chemical Business and, indeed, that Tronox did not want Avestor, *see* Def. FOF ¶ 621; *see also* Section I(E), *infra*, and that (ii) Kerr-McGee structured the IPO Transfers in a manner it believed, after reasonable consideration, would avoid overburdening Tronox and would leave it adequately capitalized and able to pay its debts.  *See* Section I(E), *infra*.

32.    But Kerr-McGee's structuring of the transfers was legitimate, as underscored by *ASARCO* and the other cases on which Plaintiffs rely.  *See* Pl. Br. 22-23, 32.  In *ASARCO*, (i) the defendant created bank accounts solely to avoid garnishment of ASARCO's assets; (ii) the defendant knew ASARCO was insolvent and in a "liquidity crisis" prior to the transfer; (iii) many creditors had threatened to file suit or put ASARCO into involuntary bankruptcy; (iv) ASARCO owed numerous past-due obligations that it was unable to pay; (v) ASARCO had 900 "held" checks totaling over $20 million at the time of the transaction and the defendant knew there would be a "hole," or deficit, after the transfer; (vi) the defendant did not attempt to sell SPCC to a third party; (vii) Houlihan refused to provide a favorable solvency opinion; (viii) auditors refused to issue a "bring down opinion" for the transaction, concluded that the transaction would cause financial instability, and resigned; (ix) ASARCO's independent directors resigned and withdrew their consent days before the transaction closed; (x) the defendant's own counsel even advised that they could not articulate a legitimate business reason to proceed with the sale as structured; and (xi) the defendant "knew that proceeding with [the] transaction . . . would hinder and delay ASARCO's ability to pay other creditors."  396 B.R. at 377-86, 396; *see also* Def. Br. 186 n.104.

The facts of this case are totally different.  In fact, they are directly contrary to any notion that Kerr-McGee improperly structured the transfers:  (i) Kerr-McGee did not create sham bank accounts but instead ensured that Tronox had a $250 million Revolver, in addition to $40 million in cash on hand, hundreds of millions of dollars in insurance, including for environmental costs, and benefits from the MSA, including a $100 million environmental reimbursement program (Def. FOF ¶¶ 666-70, 676-89); (ii) instead of threats of involuntary bankruptcy, Tronox received loans for hundreds of millions of dollars from many sophisticated lenders, and investors

committed hundreds of millions of dollars to acquire an interest in Tronox (Def. FOF ¶¶ 1219, 1288, 1306, 1368, 1384-86, 1390-97); (iii) Kerr-McGee obtained a solvency opinion from Houlihan (Def. FOF ¶ 863); (iv) Kerr-McGee obtained a going-concern opinion from E&Y (Def. FOF ¶ 862); (v) following the IPO, a majority of Tronox's Board was independent of Kerr-McGee (Def. FOF ¶¶ 2212-15, 1637); (vi) Kerr-McGee believed Tronox was solvent and able to pay its debts, which it was (Def. FOF §§ XI.C, XII-XV, XVII); (vii) Kerr-McGee was not holding back checks and Tronox was not facing unpaid obligations it could not cover; (viii) the first-rate outside counsel for Kerr-McGee, the lenders, and the underwriters signed off on the structure and substance of the IPO (Def. FOF ¶¶ 1638-39); and (ix) Kerr-McGee's Chemical Business had been paying its own way for years both before and after Project Focus (Def. FOF ¶¶ 374-89). Thus, Kerr-McGee's conduct and considered belief in Tronox's viability stands in direct contrast to the defendant's conduct in *ASARCO*.[10] *See* p.10, *supra*.

### E.    Kerr-McGee, Although Not Obligated to Do So, Considered How to Apportion Liabilities in Connection With the IPO

The Court asked whether Kerr-McGee gave "five minutes of consideration" to what would be a "fair and reasonable split of liabilities" between itself and Tronox, other than leaving liabilities where they historically resided. Tr. 8097:18-8098:18. While the answer is yes, it did, the law did not obligate Kerr-McGee to transfer to itself any liabilities that were the responsibility of a Plaintiff. *See ASARCO*, 396 B.R. at 386 (finding "nothing improper" about the defendant's desire to keep ASARCO's "crown jewel" for itself or insistence on a payment structure that benefited itself); *Lippe*, 249 F. Supp. 2d at 367, 383; *see also Robinson v. T.I.M.E.-*

---

[10] The other cases cited by Plaintiffs on this point, such as *Spearing Tool*, and *Aptix Corp. v. Quickturn Design Sys., Inc.*, 148 F. App'x 924 (Fed. Cir. 2005), are inapposite and bear no resemblance to the good-faith legitimate business purposes of Project Focus and the IPO/Spinoff. *See* p.9, *supra*. In *Spearing Tool*, it was admitted that the transfer was made to delay and hinder creditors, such that there never was a legitimate business purpose for the transfers. 171 B.R. at 581. In *Aptix*, the court held that the transfer obviously was for the sham purpose of avoiding a judgment lien. 148 F. App'x at 926-27, 929-30.

*DC, Inc.*, 566 F. Supp. 1077, 1084 (N.D. Tex. 1983) (noting in breach of fiduciary duty case that
"[t]he mere fact that plaintiff might have received a greater financial benefit from a different
structuring of the spin-off transactions does not justify voiding the transactions, in the absence of
some showing of otherwise wrongful conduct"); *Old CarCo*, 435 B.R. at 178-80, 192; *VFB*,
2005 WL 2234606, at *4, *32 (finding that parent held most of the power and dictated terms of
separation, but also that the parent's conduct did not suggest actual fraudulent intent).

Nonetheless, the record shows that Kerr-McGee did take steps to prevent Plaintiffs from
becoming overburdened by liabilities. Among other things, Kerr-McGee: (i) transferred tens of
millions of dollars in E&P liabilities out of Tronox to itself through the AAIA; (ii) transferred to
Tronox hundreds of millions of dollars in assets to fund Tronox's Retirement Plan, causing Kerr-
McGee's own pension fund to become underfunded; (iii) provided Tronox with hundreds of
millions of dollars in insurance, including for environmental costs; and (iv) provided Tronox a
$100 million reimbursement for Legacy Liabilities that exceeded reserves. Def. FOF ¶¶ 326-34,
676-89, 754, 1456; *see generally* Def. FOF §§ X.A-L.[11] Tronox also retained $40 million in
cash, even though it only needed between $5 to 10 million according to its CFO. Def. FOF
¶¶ 668-70. Further, at Tronox's request, Kerr-McGee retained Avestor, the battery business that
would have been a financial detriment to the Chemical Business.[12] *See* Def. FOF ¶ 621. Kerr-
McGee also relied on its S&EA Group to correctly conclude that Tronox's major environmental

---

[11] In addition, Tronox's own 2011 Restatement showed that, for many sites for which Kerr-McGee concluded no
probability of liability existed, its conclusion remained true several years later. *See generally* Def. FOF ¶¶ 1758-67.
Thus, while reserve setting and estimation of contingent liabilities are discrete analyses, the evidence shows that the
reserves established for Tronox at the IPO were accurate and a legitimate proxy for validating Kerr-McGee's
analysis and understanding of Tronox's potential liabilities. Def. FOF ¶¶ 1645, 1649, 1665-67. Tronox sought
reimbursement of only $4-5 million in the three-plus years after the IPO – a relatively small amount by which the
expenditures exceeded the reserves set in the MSA. Def. FOF ¶ 1456. All of this was paid. Def. FOF ¶¶ 685, 1456.

[12] Avestor was a start-up business requiring significant cash investments into its struggling battery technology. Def.
FOF ¶ 621; T. Adams Dep. 258:7-259:16 [Dkt. No. 436]; Tr. 1018:7-1019:23, May 23, 2012. It ultimately went
into Canadian bankruptcy in 2006. Def. FOF ¶ 621.

spending was winding down, particularly at its biggest historical liability, West Chicago.  JX 290 at 44; Def. FOF ¶¶ 795, 833, 1692-97, 2495.  Accordingly, even though it was not legally obligated to do so, Kerr-McGee considered the apportionment of liabilities between itself and Tronox, and took reasonable measures to ensure that Tronox could service its liabilities, which the market overwhelmingly validated.  Def. FOF ¶¶ 853-55; *see also* Def. Br. 49-62; Def. FOF §§ XI.B, XII-XIV.

### F.  Kerr-McGee, Tronox, and Contemporaneous Market Participants Analyzed Tronox's Capital Structure and Financial Condition at the Time of the IPO

The Court commented regarding how it was determined that Tronox would retain $40 million in cash at the IPO.  Tr. 8188:23-8190:5.  The $40 million amount was determined, not through one single analysis, but through consideration of the Chemical Business's assets, liabilities, cash flow, historical data, and third-party analyses related to the Chemical Business.  Def. FOF ¶¶ 795-801, 832-35, 849-60, 878-89.  As Kerr-McGee's former CFO Mr. Wohleber testified,

> we would have looked historically at the levels of cash they needed to run the businesses.  There was some cyclicality in building inventories, receivables, so we knew certain levels just on our history of the company so from day one at that point in November.  I think we would have looked out six, nine months and felt that the $40 million would have gotten them started day one to pay their employees and other bills without having to draw on the revolver . . . .  Forty million just seemed to be a level of knowing this business and their cash needs . . . . [W]e thought that was going to be adequate for their needs.

Tr. 1336:16-1338:6, May 24, 2012.

Ms. Mikkelson (Tronox's former CFO) and Mr. Adams (Tronox's former CEO) agreed that $40 million was adequate for Tronox's needs.  Def. FOF ¶¶ 668-70; *see also* Def. Br. 127-33.  Indeed, Ms. Mikkelson specifically stated that she believed Tronox needed only $5 to 10 million in cash.  Def. FOF ¶ 668.  And Tronox did need very little cash on hand to be able to pay its debts because, among other reasons, it had strong cash flow and access to a $250 million

Revolver.  Def. FOF ¶¶ 626-40, 666-70, 853-62, 1864.  In fact, Apollo intended to leave Tronox with zero cash on hand because it believed Tronox would have significant excess cash due to its "strong free cash flows."  DX 667 at 8, 24; *see also* Tr. 3294:24-3297:19, June 26, 2012.  The record further shows that Tronox *had* adequate cash after the IPO because Tronox, among other things, prepaid its debts, issued more than $18 million in cash dividends, and, for over fifteen months after the IPO, made no long-term draws on its Revolver.  Def. FOF ¶¶ 2330-46.  Plaintiffs' own senior executive, Mr. Gibney, testified before this Court that Tronox was able to and did pay its debts as they came due for years after the IPO.  Tr. 6219:11-15, Sept. 5, 2012 ("Q.  Now, isn't it true that the company was able to meet its debts as they came due for a period of several years after the IPO?  A. Yes."); *see also* Def. FOF ¶¶ 2340-46.

The Court also inquired whether "anyone at Kerr-McGee ever [did] a solvency analysis themselves."  Tr. 8101:6-11.  While Kerr-McGee employees did not prepare a specific document titled as such, Kerr-McGee specifically analyzed Tronox's solvency based on (i) Houlihan's Solvency Opinion, which Kerr-McGee's Board reviewed and relied upon before approving Tronox's IPO, and (ii) a going-concern opinion from E&Y.  *See* Def. FOF ¶¶ 849-85.  Mr. Wohleber testified that he also considered and relied on his extensive knowledge and understanding of Tronox's cash flow, forecasts, obligations, and assets to determine that Tronox was solvent and able to service its debts.  Tr. 1249:19-1250:16, May 24, 2012; Def. FOF ¶ 832; *see also* Def. FOF § XI.  Further, Mr. Wohleber reviewed analyses and valuations conducted by multiple third-party advisors and market participants, and this information gave him further comfort that Tronox was solvent, adequately capitalized, and able to pay its debts.  Def. FOF ¶ 889.  Like Mr. Wohleber, Ms. Walters testified that the Board looked carefully at the Tronox IPO projections and believed Tronox would thrive.  Def. FOF ¶¶ 822-32.  Moreover, Tronox

14

prepared its own analysis of its ability to pay its debts, which was included in the November 2005 Lenders Presentation.  JX 291 at 63; Def. FOF ¶ 835.

Plaintiffs disparage E&Y's contemporaneous going-concern analysis as "not worth anything" because E&Y "spent a total of 30 minutes to an hour" on the task.  Tr. 7875:6-16. Plaintiffs refer only to the length of the face-to-face meeting between Mr. Rauh and E&Y partner Mr. Hechtner, but ignore the substantial work conducted by experienced Tronox and Kerr-McGee employees that went into preparing the underlying cash flow analysis.  *See* Def. FOF § XI.D; Tr. 5082:12-5083:2, Aug. 9, 2012.  The cash flow model included projections both with and without proceeds from the sale of the Henderson Property as well as draws on the Revolver, and was reviewed by Mr. Rauh and other knowledgeable Tronox and Kerr-McGee executives, along with E&Y, before E&Y reached its conclusion.  Def. FOF ¶¶ 849-62.  Plaintiffs also ignore E&Y's deep understanding of the Chemical Business and its operations based on years of auditing and analyzing its environmental sites, financials, and historical performance.  Def. FOF ¶ 852, Appx. A ¶ 53.

While Plaintiffs similarly deride the Houlihan Solvency Opinion, *see* Plaintiffs' Revised Post-Trial Proposed Findings of Fact [Dkt. No. 598] ("Pl. FOF") ¶ 673, the standard disclaimers in the Solvency Opinion are not a basis to disregard it given that Houlihan:  (i) *did* conduct independent analyses of the $TiO_2$ industry, comparable companies, and comparable transactions, and performed several solvency tests; (ii) held multiple meetings with Tronox managers (many more than Dr. Newton did), including Ms. Mikkelson who provided Houlihan with cash flow projections and certified that such financial information was accurate; (iii) accessed the VDR and some of Apollo's diligence; and (iv) added 50% of the Manville Demand to its calculations of liabilities over the objections of Tronox's own management, who did not believe Tronox was

liable for Manville.  Def. FOF ¶¶ 864-85; JX 316 at 1-2.

The Court noted that Professor Fischel did not rely on the Houlihan Solvency Opinion. Tr. 8190:8-10.  Professor Fischel, as he testified, focused on third-party market participants who put their money at risk based on their valuation of Plaintiffs' assets and liabilities.  Def. Br. 90-92; Def. FOF ¶¶ 1815, 1820, 1825-33, 1836, 1838, 1854, 1862.  Houlihan did not fall into that category.  Tr. 5172:7-5173:6, Aug. 9, 2012.  This, however, does not negate the significance of Houlihan's Solvency Opinion or the diligence Houlihan conducted in rendering it.  Moreover, obtaining this Solvency Opinion was another significant step Kerr-McGee took that confirms the lack of actual fraudulent intent.  This is highly significant given that in *ASARCO*, Houlihan refused to give a solvency opinion.  396 B.R. at 380; *see* Def. Br. 186 n.104.  Disregarding the Houlihan Solvency Opinion would call into doubt the ability of executives and directors to rely on third-party solvency opinions when exercising their fiduciary duties.

### G.    The Badges of Fraud Do Not Save Plaintiffs' Actual Intent Claims

The Court inquired about representations made in 2002 regarding whether Project Focus transferred "substantially all" of Kerr-McGee Operating Corp.'s assets.  Tr. 7882:6-17, 8044:18-8045:15.  The definition of "substantially all" on which the loan documents rely is unique to the Delaware Corporations Law, *see* Def. Br. 217-18, and courts find the "substantially all" badge inapplicable when the debtor continues to operate and has substantial assets post-transfer.  *See SMTC Mfg. of Tex. v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, 421 B.R. 251, 304 (Bankr. W.D. Tex. 2009); *Van Slyke v. Teel Holdings, LLC*, No. 01-08-00600-CV, 2010 WL 2788876, at *5 (Tex. App. July 15, 2010); Def. Br. 218-19.  Indeed, *ASARCO* held that even the transfer of a company's "crown jewel" will not suffice to establish the "substantially all" badge of fraud.  396 B.R. at 373; Def. Br. 219.

### H.    Plaintiffs Cannot Prove Actual Intent Through an Adverse Inference Based on Spoliation Because They Failed to Prove the Requisite Elements

Plaintiffs suggest that the Court could employ an adverse inference to find direct evidence of actual intent and to support a badge of fraud based on "[t]he inner circle's destruction of relevant documents."  Pl. Br. 24; *see also id.* at 29-30, 60; Tr. 7863:23-7865:10. Their suggestion is legally groundless.  First, Plaintiffs did not move for spoliation sanctions.[13] Second, Plaintiffs have not established the requisite elements to obtain an adverse inference. *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012); *see* Def. FOF ¶¶ 2609-23; Def. Opp'n to Pl. Mot. in Limine 5-9, Apr. 6, 2012 [Dkt. No. 335].  Plaintiffs point to no evidence, but rely solely on pure speculation, *see* Pl. Br. 24, that Messrs. Corbett or Wohleber discarded unique copies of any document "relevant to [Plaintiffs'] claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."[14]  *Chin*, 685 F.3d at 162; *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010); Tr. 8114:12-21, 8115:6-13.   Defendants produced millions of pages of documents, including documents from Messrs. Corbett and Wohleber, and Plaintiffs offer nothing but baseless conjecture to suggest that either discarded any unique, relevant documents.  The record, in fact, is to the contrary.  Def. FOF ¶¶ 2609-23.

Likewise, Plaintiffs failed to prove that any "records were destroyed with a culpable state of mind." *Chin*, 685 F.3d at 162; Tr. 8115:2-5.  The very testimony Plaintiffs cite, *see* Pl. FOF ¶¶ 275, 277, shows that Messrs. Corbett and Wohleber were simply cleaning out their offices upon retirement and that Mr. Wohleber asked the IT department to remove company information

---

[13] If Plaintiffs make such a motion, Defendants will show it to be meritless on the overwhelming law and facts, which in all likelihood accounts for Plaintiffs' failure to make the motion.

[14] The *only* document Plaintiffs have identified as not produced is Mr. Corbett's calendar, Pl. FOF ¶ 276, but Plaintiffs have not proven it was relevant to this action and would support their claims under *Chin*.

from his laptop so that he could retain it for personal use.  Tr. 324:13-18, May 16, 2012; Tr. 995:3-15, 996:16-21, May 23, 2012.  Both Messrs. Corbett and Wohleber believed, based on experience, that the Legal Department had retained any documents, well before they retired, that the company was obligated to hold.  Def. FOF ¶¶ 2610-14.  This refutes Plaintiffs' suggestion that they acted even with negligence, much less with a bad-faith intent to spoliate.  Moreover, even if negligence had been proven – which it was not – the single case cited by Plaintiffs, *see* Pl. Br. 24, confirms that where, as here, Plaintiffs "have gathered an enormous amount of discovery – both from documents and witnesses," Plaintiffs must "show through extrinsic evidence that the loss of the documents has prejudiced their ability to [prosecute] the case, [or] a lesser sanction than a spoliation charge is sufficient to address any lapse in the discovery efforts of the negligent [defendant]."  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 479 (S.D.N.Y. 2010), *abrogated on other grounds by Chin*, 685 F.3d at 162.[15]  Plaintiffs made no showing that the loss of any document has prejudiced their ability to prosecute this case.

## II.    The Transfers Were Not Constructively Fraudulent

### A.    The Market Evidence Controls Valuation of Contingent Liabilities, Just Like Any Other Liabilities or Assets

The Court inquired whether Tronox's environmental liabilities create an exception to the rule, articulated in *VFB* and *Iridium*, that contemporaneous market evidence is the best indicator of a company's value and solvency.  Tr. 8121:24-8122:12.  They do not, and no precedent

---

[15] Moreover, the principle for which Plaintiffs cite *Pension Committee*, that destruction of documents "entitles Plaintiffs to an [adverse] inference," Pl. Br. 24, is contrary to the court's recognition that "'an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis.'" 685 F. Supp. 2d at 469 (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).  Further, to the extent that Plaintiffs rely on *Pension Committee*'s holding that the failure to adopt best litigation hold practices constitutes negligence *per se*, *see* 685 F. Supp. 2d at 464-65, that holding was expressly abrogated by the Second Circuit in *Chin*, which holds that such a failure is simply "one factor" "to consider" in "determin[ing] whether discovery sanctions should issue." 685 F.3d at 162.

supports such an exception. Courts overwhelmingly embrace contemporaneous market evidence as the most reliable measure of business value in judicial proceedings. *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007); *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns, Inc.*, No. 3:10-CV-1842-G, 2013 WL 230329, at *8, *11, *22 (N.D. Tex. Jan. 22, 2013); *Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 291, 295 (Bankr. S.D.N.Y. 2007). Determining a business's value requires assessment of its assets *and* liabilities, Okla. Stat. tit. 24, § 114(A) (2012), and the market analyzes both – *including contingent liabilities*.[16] That is what the public and private market participants did here. Def. Br. 68-71; Def. FOF §§ XII.C, XIII.A.1, XIII.B.1-2, XIII.C.3, XVI.B-C. And there is no doubt that the objective, contemporaneous market evidence dooms Plaintiffs' attempts to prove insolvency, inadequate capitalization, and inability to pay debts.[17]

*Iridium's* rationale speaks directly to this issue. The valuation dispute in *Iridium* centered on a business that relied on a commercially unproven technology and faced a highly uncertain and contingent future. 373 B.R. at 291-93, 296-98, 308-14. Nonetheless, *Iridium* clearly held that the best indicator of value for this highly contingent asset was the contemporaneous market evidence. *Id.* at 292-93. No economic or financial basis exists for distinguishing between the market's ability to value a contingency merely because it sits on the asset, as opposed to the

---

[16] Similarly, the Court inquired whether, in a corporate separation, the UFTA permits one of two entities to be "load[ed] [with] as many liabilities as possible" as long as both entities "have one dollar of positive net worth . . . ." Tr. 8099:5-19. The answer is yes with respect to the balance sheet solvency test. *See* Okla. Stat. tit. 24, § 114(A) (a debtor is "insolvent" if "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation"); *see also Solomon v. Scott P. Kirtley, Trustee (In re Solomon)*, 299 B.R. 626, 638 (B.A.P. 10th Cir. 2003). But while one dollar of positive value may satisfy the balance sheet test for solvency under the UFTA, it might not meet the corollary requirements for adequate capitalization and ability to pay debts. Here, the overwhelming evidence shows that Plaintiffs were solvent by hundreds of millions of dollars *and* were adequately capitalized and able to pay their debts as they came due at and after the IPO. Def. Br. 127-46.

[17] Plaintiffs conceded in their Brief that if the Project Focus Transfers were effective in 2002, which they were, *see* Def. Br. 24-41, Plaintiffs have no evidence of insolvency as of 2002 and no claim for constructive fraudulent transfer based on Project Focus. Pl. Br. 69 ("there is no need to prove insolvency as of December 31, 2002"); *see also* Def. Br. 205-07. If successful, the constructive fraudulent transfer would relate solely to the IPO Transfers.

liability, side of the ledger.  The public and private markets make this clear every day when they value insurance companies, whose assets are comprised primarily of cash and liquid investments, while their liabilities are comprised predominately of contingent and uncertain liabilities related to everything from potential environmental liabilities to liabilities for natural disasters.

Thus, in assessing contingent liabilities, the Court is faced with the same choice presented in *VFB* and *Iridium* between the valuations of knowledgeable third-party market participants with their own money on the line versus the opinions of litigation experts who have none of their own wealth at stake.  Tr. 8121:24-8122:23, 8124:9-8126:23.  Plaintiffs provide no reason why the market's valuation of contingent liabilities, which is comprised of a projected long-term stream of uncertain cash *out*, is any less reliable than its valuation of assets, which is comprised of a projected long-term stream of uncertain cash *in*.  Just as market capitalization is "based on expectations (projections) of future income," anchored in the information "available 'when the projection is made,'" *VFB*, 482 F.3d at 631, so too is market valuation of a "contingent liability" properly based on "the *expected* value of this liability as of [the time of the transfers], *not* the actual value as of [some later date]."  *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693 (7th Cir. 2010) (emphasis added).

Further, the market's valuation of a company with contingent liabilities is "a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses," for the very reasons set forth in *VFB* and *Iridium*.  *VFB*, 482 F.3d at 633.  As with other liabilities and assets, contemporaneous market evidence concerning contingent liabilities has the critical "advantage of being untainted by hindsight or post-hoc litigation interests" that infiltrate many expert opinions.  *VFB*, 2005 WL 2234606, at *13, *22, *26-27, *31; *see also Iridium*, 373 B.R. at 346.

20

Plaintiffs' experts, such as TiO$_2$ industry expert Mr. Fisher, exhibit the very biases that courts uniformly reject. Def. Br. 104-07. Mr. Fisher's litigation expert opinions in this case substantially contradict the contemporaneous advice he gave to his paying client Apollo, to Apollo's banks, and to the market in 2005. Def. FOF ¶¶ 975, 977-83, 995, 1000-01, 1516, 1541-45, 1555, 1558, 1562, 1564-70. Dr. Newton then used and relied on Mr. Fisher's "litigation opinions" to build "adjusted" projections that were materially lower than the contemporaneous projections relied upon by market participants. Def. FOF ¶¶ 1818, 1822. This is the classic, poster-child example of why courts insist that contemporaneous market evidence trumps after-the-fact litigation opinions. *Iridium*, 373 B.R. at 301 ("The creation of a revised set of projections for purposes of performing a discounted cash flow analysis supporting the conclusion that Iridium was insolvent looks like second-guessing by financial experts who are doing precisely what they were hired to do -- doing everything that needs to be done in order to justify giving an insolvency opinion."); *see also U.S. Bank*, 2013 WL 230329, at *8, *11, *22 (rejecting plaintiff's expert's solvency testimony as unpersuasive where DCF analysis was an "outlier," projections utilized an unreliable "base case," and expert gave no weight to stock price). Where, as here, litigation experts invent speculative values for the purported "real" projections, and the "real" amount of liabilities that to this day *remain hotly disputed and contingent* as to both legal liability and value, their opinions must be rejected as they "fly in the face of what everyone . . . believed at that time." *Iridium*, 373 B.R. at 352 (quoting *VFB*, 2005 WL 2234606, at *29 n.71).

Further, *VFB* and *Iridium* cannot be distinguished as cases in which the courts preferred market evidence because they were "uneasy using certain expert testimony, particularly where the testimony of solvency and value depends upon WACC calculations and small, very small differences in the manner of discounting and the like." Tr. 8125:23-8126:4. The basis for

rejecting expert evidence in those cases was not that the experts used formulas to determine solvency or value. Rather, "VFB validate[d] the use of market data for purposes of valuing a public company for fraudulent conveyance purposes" because "public markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed after the fact and from an advocate's point of view." *Iridum*, 373 B.R. at 291.

No legal precedent supports rejecting the abundance of market evidence in this case, including ENVIRON's real-time analysis of the value of the Legacy Liabilities, in favor of the opinions of Dr. Ram, who was hired because he was willing to testify and whose valuations assume 100% probability of liability. ENVIRON and Dr. Ram conducted their analyses with radically different incentives and circumstances. Dr. Ram's valuation of each of the alleged environmental liabilities, based upon his assumptions that every site would require cleanup and that at least one or more of the Plaintiffs is legally liable for each of those sites, should be given little or no credence, especially in light of the fact that Tronox has never spent a single penny, or received a demand, to remediate many of those sites. Def. Br. 111-12; Tr. 8127:4-8129:3.

In contrast, ENVIRON was hired by Apollo to uncover potentially problematic liabilities before Apollo decided whether to proceed with a massive investment. Def. FOF ¶¶ 896, 901, 914-15. Apollo's and ENVIRON's incentives perfectly align with the market reliance rationale that those who "must back their beliefs with their purses" are more likely to assess value "accurately than are people who simply seek to make an argument." *In re Granite Broad. Corp.*, 369 B.R. 120, 140-41 (Bankr. S.D.N.Y. 2007).

Plaintiffs attempt to discredit Apollo's offer as evidence of Tronox's value because ENVIRON employed a 10-year horizon to project environmental costs.[18,19] Pl. Br. 75-76. Their

---

[18] Plaintiffs argue that Apollo had a "short-term investment horizon" because it planned to take Tronox public "relatively soon after acquiring it," and therefore had no interest in determining the amount of the "long tail

criticism is misplaced, however, as ENVIRON's 10-year analysis of the contingent liabilities was far less speculative than that created by Plaintiffs' expert witness in this case. In fact, Pilko & Associates, the environmental experts Plaintiffs chose not to hire because they were unwilling to testify, advised Tronox that "[f]orecasting significant remedial actions beyond 10 years become[s] increasingly speculative," and that "uncertainty increases significantly" for analyses beyond that horizon. Def. FOF ¶ 2555; DX 612 at 2. Despite this warning, Plaintiffs embraced Dr. Ram, who was willing to speculate as to the value of these allegedly contingent liabilities going out over a 100-year horizon. *See* PX 1266; PX 1289 at 84. As in *Iridium*, market evidence must be preferred to Plaintiffs' expert opinions of "uncertain reliability and of doubtful credibility." 373 B.R. at 296-97.[20]

---

liabilities." Pl. Br. 5, 75-76, 87; Tr. 7994:4-11. Plaintiffs' logic is faulty. A plan to take Tronox public would incentivize Apollo and ENVIRON to determine the full value of *all* contingent liabilities. Otherwise, Apollo would lose money when it later tried to sell a business laden with liabilities. Plaintiffs also claim that the Apollo offer was not a reliable indicator of value because Apollo stood to receive $610 million in financial support. Pl. FOF ¶ 781. The $610 million figure is misleading because, among other things, $303,750,000 in indemnities was for environmental remediation related to only the Manville and Wood Treatment Sites' remediation costs. The record showed Kerr-McGee believed the likelihood of having to pay out such indemnities was very low, a belief borne out by Tronox's actual environmental spending. Def. FOF ¶¶ 586, 2497-98, 2539; DX 542 at 127. Former Tronox General Counsel Roger Addison believed that Tronox would not need to seek indemnity coverage because Apollo would never expend the minimal deductible needed to invoke the indemnity. Def. FOF ¶ 586; R. Addison Dep. 191:5-9, 191:19-192:6, 192:22-193:2, 193:17-195:9 [Dkt. No. 424]. Another $200 million of Plaintiffs' $610 million figure is a customary indemnity for a breach of a representation or warranty. DX 542 at 131. Finally, with respect to retiree medical expenses, the record showed those ultimately cost Tronox only around $22 million over three years, with the total booked obligation reduced by two thirds in 2008. Def. FOF ¶¶ 758-61.

[19] In their Brief and at Closing, Plaintiffs also argued that the Apollo offer is not evidence of Tronox's value because courts are "reluctant to rely on unaccepted offers." Pl. Br. § IV.D; Tr. 7992:2-15. This argument fails because, in addition to the reasons discussed in Defendants' Closing and earlier briefing, *see* Def. Br. 54-58; Def. FOF ¶¶ 575-88, 1061-82; Tr. 8132:22-8137:10, the cases Plaintiffs cite do not stand for this broad proposition. *Six v. Henderson (In re Six)*, 220 B.R. 479, 484 (Bankr. M.D. Fla. 1994), and *United States v. Smith*, 355 F.2d 807, 811 (5th Cir. 1966), declined to use unaccepted "offers" on real property as *comparables* for a real estate appraisal. *Smith*, 355 F.2d at 810-13; *In re Six*, 220 B.R. at 484. Moreover, the offers rejected as comparables in *Smith* were true "option contracts" to purchase specific land at some future date, unlike the binding Apollo offer. 355 F.2d at 811; *see also Henderson v. Andrews (In re Perry Cnty. Foods, Inc.)*, 313 B.R. 875, 885, 890-91, 914 (Bankr. N.D. Ala. 2004) (involving only a "tentative[] agree[ment]"); *In re Pullman Constr. Indus., Inc.*, 103 B.R. 983, 983-85 (Bankr. N.D. Ill. 1989) (denying motion to amend exhibit list to include a post-bankruptcy "conditional offer" to purchase assets for purposes of valuation, but noting that lack of final contract was not determinative of court's decision).

[20] At Closing, Plaintiffs once more argued that the market evidence must be ignored because Kerr-McGee withheld material information about the sale of the Henderson Property. Tr. 7979:13-7981:7. Plaintiffs' argument fails for a number of reasons, including because the record is clear that the market was well informed about the Henderson land sale — as well as the other matters that Plaintiffs have claimed were concealed (*e.g.*, the allegedly "secret

Finally, Plaintiffs rely on *W.R. Grace* in arguing that market evidence of Tronox's value is not probative because it did not account for the "ultimate amount" of all contingent liabilities. Pl. Br. 75-76 (citing *In re W.R. Grace & Co.*, 281 B.R. 852, 862 (Bankr. D. Del. 2002)). *W.R. Grace*, however, did not involve a choice between market evidence, which was not presented or at issue in that case, and litigation-driven expert assessments. Further, after *W.R. Grace* was decided, the choice between market evidence and hindsight-based expert opinions *was* presented to the Third Circuit in *VFB*. *VFB* was clear that between those two alternatives, the market evidence controls. 482 F.3d at 633. *W.R. Grace* should not be read in a manner that undermines the impact of the Third Circuit's subsequent controlling *VFB* precedent on market evidence. *Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 22 n.9 (1st Cir. 2000) (rejecting the petitioners' reliance on a district court opinion when "its reasoning is inconsistent with the Second Circuit's subsequent (and more closely analogous) decision").

**B.      The Market Evidence is, and Should Be, the Preferred Standard for Business Valuation Notwithstanding the 2008 Financial Crisis**

Plaintiffs suggest that the market-based standard for business valuation upheld by *VFB* and *Iridium* no longer applies because the "market defense has come under increasing criticism" following the financial crisis. Pl. Br. 74-75; Tr. 7962:25-7963:20. This argument is meritless. The UFTA solvency analysis rests on a company's net worth "at a fair valuation," Okla. Stat. tit. 24, § 114(A), which courts have long held is "the price a willing buyer would pay a willing seller." *See ASARCO*, 396 B.R. at 411. For this reason, *VFB* and *Iridium* rejected similar arguments that the "market was suffering from some 'irrational exuberance,'" or that the market operated under the "[technology] 'bubble' mentality that produced so many high-tech and

---

sites," Manville, the ag-chem sites, and the prospect that the cost of the environmental liabilities could exceed reserves). Def. FOF §§ XVI.D, XVI.B-C; Def. Br. 68-82.

telecom corporate disasters." *VFB*, 482 F.3d at 629-30; *Iridium*, 373 B.R. at 304. *Iridium* even

acknowledged that the market was "terribly wrong about the company's actual prospects." 373

B.R. at 293. But the relevant inquiry is whether there is anything better than the market

evidence, and *Iridium* explained, particularly in light of the evils associated with hired litigation

experts, there is not. For this reason, the recession has not altered that fact that courts remain

bound by the market evidence as the best indicator of value. *See*, *e.g.*, *Crédit Agricole*

*Corporate & Inv. Bank N.Y. Branch v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg.*

*Holdings, Inc.)*, 637 F.3d 246, 257 (3d Cir. 2011); *U.S. Bank*, 2013 WL 230329, at *8, *20-22;

*In re Old CarCo LLC*, 454 B.R. 38, 59-60 (Bankr. S.D.N.Y. 2011); *In re Boston Generating,*

*LLC*, 440 B.R. 302, 325-26 (Bankr. S.D.N.Y. 2010).[21]

C.    **Plaintiffs' Attack on Professor Fischel's Use of Contemporaneous Projections in His Solvency Analysis is Wrong on the Law and the Facts**

Plaintiffs challenge Professor Fischel's solvency analysis for relying on management

projections because allegedly "he never even considered how they compared with Tronox's

historical performance." Pl. Br. 39-40; *see also* Tr. 7901:20-24. This critique is factually

inaccurate and legally unsound. First, Professor Fischel's solvency analysis relied on the

average of both contemporaneous third-party projections and Tronox management's November

---

[21] The articles and cases Plaintiffs cite are inapposite and do not undermine, limit, or overrule *VFB*, *Iridium*, and similar precedents. For instance, the *Behavioral Antitrust* article says nothing about the appropriate way to value a company in a solvency analysis under fraudulent transfer law. Amanda P. Reeves & Maurice E. Stucke, Behavioral Antitrust, 86 Ind. L.J. 1527 (2011). The vacated *In re Am. Int'l Grp., Inc. Sec. Litig.* decision inappositely noted, under an entirely different legal regime, that the Second Circuit has not adopted the lower courts' *Cammer* factors for the efficient-market prerequisite to applying the fraud-on-the-market presumption in securities class actions. 265 F.R.D. 157, 176 & n.12 (S.D.N.Y. 2010), *vacated and remanded*, 689 F.3d 229 (2d Cir. 2012). Similarly, *In re Polymedica Corp. Sec. Litig.* simply found that plaintiffs failed to meet the *Cammer* factors and denied class certification. 453 F. Supp. 2d 260, 276 (D. Mass. 2006). Finally, *In re Countrywide Fin. Corp. Sec. Litig.*, another securities class action decision, simply found that loss causation may be adequately pleaded even where the market does not immediately correct upon a company's corrective disclosure because "sometimes the market is not perfectly efficient." 588 F. Supp. 2d 1132, 1200 (C.D. Cal. 2008).

2005 projections.[22]    Def. FOF ¶¶ 1815, 1820, 1854, 1862.    Plaintiffs ignore that Tronox personnel analyzed the company's historical performance in creating the November 2005 projections, as Mr. Brown confirmed, and that the third parties on which Professor Fischel relied made their projections with access to Tronox's historical information.    Def. FOF ¶¶ 1472, 2182. Professor Fischel even specifically tested the reliability of Tronox's projections by comparing them to those of third parties.[23]    Def. FOF ¶ 2182.    Because the projections used by Professor Fischel thereby considered historical information, *In re O'Day*'s criticism of projections that fail to consider historical performance is inapposite.    *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 405 (Bankr. D. Mass. 1991); *cf.* Pl. Br. 40.

Second, as the district court recognized in *MFS/Sun*, management projections are reasonable where, among other things, management relies on "the expertise of its operating personnel" and where "[i]ndustry experts agreed with [] management."    *MFS/Sun*, 910 F. Supp. at 939-40; *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1076 (3d Cir. 1992) (projections were reasonable, including where they involved multiple types of analyses).    The November 2005 projections were reasonable because the Chemical Business's management believed in, was responsible for, and signed off on them, Def. FOF ¶¶ 783-94, 1489-1500, 1536; Def. Br. 96-100, and because they were consistent with the contemporaneous views of the third-party market participants and industry experts, including Plaintiffs' expert Mr. Fisher.    Def. FOF ¶¶ 962-1015, 1193-1200, 1278-82, 1539-70; Def. Br. 100-07.    Moreover, Tronox's actual

---

[22] Professor Fischel did not rely in his analysis on the March 2005 projections, which exceeded the November 2005 projections and which Plaintiffs criticized as overly optimistic.    Def. FOF ¶¶ 1468-69; *see also* Pl. Closing Slides 88-89.    In any event, industry experts, including Mr. Fisher's publishing partner Reg Adams, expressed extreme optimism about $TiO_2$ pricing between the February 2005 and March 2005 forecasts, validating Tronox's price increases.    *See* Def. FOF ¶¶ 1510-16, 1526-27.    Mr. Fisher admitted that industry experts were optimistic at this time, and he himself was projecting high capacity utilization rates throughout 2005.    Def. FOF ¶¶ 1514, 1565.

[23] At Closing, Plaintiffs stated that Tronox's average actual Adjusted EBITDA from 2006 to 2011 amounted to $137 million.    Pl. Closing Slide 94.    This is incorrect.    Plaintiffs' calculation omits the 2010 and 2011 numbers, in which Tronox's actual Adjusted EBITDA was over $200 million per year.    *See* DX 8968 at 18.

EBITDA for 2005 exceeded the November 2005 projection.  Def. FOF ¶ 1532.

### D.    Plaintiffs Were Solvent by Any Reasonable Measure

The Court asked, "assuming we look at the merits of the expert testimony . . . don't I have to make some kind of a judgment as to the respective opinions of the experts?"  Tr. 8126:13-20.  The answer is that if the Court rejects the market evidence, it must then analyze and compare the bases for the environmental and tort litigation experts' valuations and opinions, including their methodologies, and decide for each site which valuation and conclusion is more reliable.  While they each did a bottom-up analysis, the differences between Plaintiffs' and Defendants' experts are stark.[24]

Dr. Shifrin and Mr. White assiduously avoided post-IPO information and valued the environmental liabilities using the Expected Value methodology, preferred by ASTM E2137-01 and the court in *ASARCO*.  Def. FOF ¶¶ 1964-65; Def. Br. 118, Ex. A.  Through the Expected Value methodology, Dr. Shifrin and Mr. White accounted for the inherent uncertainty in estimating future remediation costs by identifying multiple potential remediation scenarios (when more than one scenario was possible, as was the case with most sites) and assigning probabilities to each.  Def. Br. 115-16.  Plaintiffs attack only minor elements of Dr. Shifrin's and Mr. White's analysis; they contend that "Dr. Shifrin literally generated this 'probabilistic' methodology for this litigation," citing his use of "pivotal elements" and "standard probability distributions."  Pl. Br. 45.  It is immaterial that ASTM does not prescribe those elements

---

[24] The Court commented regarding whether Defendants' experts performed their "own bottom up or top down analysis of the environmental liabilities at issue."  Tr. 8103:5-10.  They did.  Logging approximately 54,000 hours, Dr. Shifrin, Mr. White, and their team valued each of the 372 sites valued by Dr. Ram and, at some of those sites, concluded that his cleanup estimate was too low.  N. Shifrin & R. White Direct Test. [Dkt. No. 511] ¶¶ 5, 6.  There was no basis for Dr. Shifrin and Mr. White to value any other sites because Dr. Ram found no evidence that any Tronox entity would incur any environmental costs at any site other than the 372 sites.  Def. FOF ¶ 1962.  Dr. Vasquez likewise did not limit his opinion to a mere critique of Dr. Martin's calculations.  He corrected Dr. Martin's errors, analyzed several assumptions she did not, and opined that a credible and reliable forecast for all pending and future creosote, asbestos, and benzene claims would be no more than $20.3 to 22.5 million.  T. Vasquez Direct Test. [Dkt. No. 491] ¶ 22; Def. FOF ¶¶ 1884-88; *see, e.g.*, Def. FOF ¶¶ 1916-17.

specifically, as ASTM does not address how to implement the Expected Value methodology for a large portfolio of sites.  Mr. White testified at length that those elements (and the overall approach) were appropriate to systematize Dr. Shifrin's analysis, and there is no basis to discredit his judgments.  Def. FOF ¶ 1965.[25]

By contrast, Dr. Ram made no effort to avoid hindsight bias (other than his "time machine") and valued the liabilities using a variant of the inferior Most Likely Value methodology.  Def. Br. 116-19, Ex. A.  He applied his methodology in a manner designed to exaggerate the sites' liabilities and estimated values.  Def. Br. 116-21.  For example, even though most sites he evaluated had no guaranteed remediation scenario, Dr. Ram treated the cleanup scenario he deemed "most likely" as *100% certain*.  N. Shifrin & R. White Direct Test. [Dkt. No. 511] ¶ 25.  Dr. Ram's approach resulted in extreme errors.  He estimated the cleanup costs for the Manville site would be borne 100% by Plaintiffs — even though Plaintiffs disclaimed liability for the site.  *See* Def. FOF ¶¶ 2017, 2084-87; *see also* Tr. 2146:15-2147:2, June 1, 2012 (United States' acknowledgment that the United States and/or one of its alleged predecessors may be responsible for some Manville costs); *cf. In re Hall*, 304 F.3d 743, 748 (7th Cir. 2002) (characterizing lawsuit a creditor previously maintained was "entirely without merit" as having zero value).  Dr. Ram also estimated that 100% of the Lukachukai Mountains and Tse Tah Region sites would require additional remediation and that Plaintiffs would bear 100% of that cost — even though: (i) the Navajo Nation EPA previously concluded that only two mines (approximately 5%) needed a referral for remedial action; (ii) a third-party lessee actually abandoned the mines at issue; and (iii) the United States agreed to pay 33% of the costs to be incurred to clean up a similar uranium mine on Navajo Nation land.  *See* Def. FOF ¶¶ 2009-13;

---

[25] Plaintiffs attempt to marginalize Mr. White as a "discount rate" expert.  Pl. Br. 54.  However, Mr. White also offered opinions on probabilistic modeling, cost allocation, natural resource damages, sensitivity analyses, and certain financial issues, as he did in *ASARCO*.  N. Shifrin & R. White Direct Test. [Dkt. No. 511] ¶¶ 10, 22.

P. Charley Dep. 120:15-121:9 [Dkt. No. 411]; *see also* DX 2391 at 12 (consent decree in which United States agreed to a 33% allocated share of cleanup costs at the Northeast Church Rock Mine site). These and other material errors inflated Dr. Ram's estimate by many tens of millions of dollars and render his conclusions unreliable. *See, e.g.*, Def. FOF ¶¶ 2012-15.

These flaws highlight a global weakness in Plaintiffs' defense of Dr. Ram. Sidestepping his many site-specific errors, Plaintiffs contend that the Court can find insolvency simply by finding that Dr. Ram's methodology is reliable (even though it is not). A comparison of experts requires more than comparing their methods. The Court also must compare the application of those methods *at each site* and the experts' opinions *for each site. See, e.g.*, *Waste Mgmt. Inc. v. Danis Indus. Corp.*, No. 3:00cv256, 2009 WL 347773, at *15-16 (S.D. Ohio Feb. 10, 2009) (analyzing valuations of environmental liabilities at landfills on a site by site basis). Any shortcut that avoids site-specific comparisons would implicitly and inappropriately give credit to Dr. Ram's serious site-specific errors and faulty assumptions. *See* Def. Br. 116-21.

## 1.    Defendants' Environmental and Tort Experts' Valuations Are Consistent with Contemporaneous Third-Party Estimates

The Court asked whether, before accepting the market evidence, it needed to compare what ENVIRON did in 2005 with what Dr. Ram (and/or other litigation experts) did in 2012. Tr. 8127:17-22. The answer is no; case law dictates that contemporaneous market evidence of valuation and solvency trumps litigation expert opinions because market evidence is driven by the motive of correctly estimating value and is "untainted by hindsight or post-hoc litigation interests." *VFB*, 2005 WL 2234606, at *13, *22, *26-27, *31; *Iridium*, 373 B.R. at 291; *see also* Section II(A), *supra*. Any question concerning ENVIRON's valuation is limited to whether Plaintiffs have proved that ENVIRON, in preparing its market-based valuation, was not "reasonably well informed" as to the value of the environmental liabilities. *Iridium*, 373 B.R. at

293, 347; *see generally VFB*, 482 F.3d at 633.  Plaintiffs have not met that burden.

ENVIRON's valuations – considered conservative, worst-case estimates at the time, Def. FOF ¶ 1123 – are consistent with the valuations of Defendants' experts and show Plaintiffs' experts' valuations to be outliers.  As for the environmental liabilities of the Chemical Business, ENVIRON's estimate was $593.9 million; Dr. Shifrin's and Mr. White's estimate was $376.2 million; but Dr. Ram's estimate was 3 to 4 times more.  Def. FOF ¶ 960; Def. Br. 117; Pl. FOF ¶ 514.  As for the creosote tort liabilities, Apollo's advisors' estimate was between $10 and 20 million; Dr. Vasquez's estimate was approximately $14 million; but Dr. Martin's estimate was 17 to 35 times higher.  PX 611 at KM-TRX00668992; Def. FOF ¶¶ 930, 1884; Pl. FOF ¶ 646.  Drs. Ram's and Martin's valuations lack credibility because they are outliers and "fly in the face of what everyone . . . believed at th[e] time" of the transfers.  *Iridium*, 373 B.R. at 352 (internal citations omitted); *see also U.S. Bank*, 2013 WL 230329, at *19-22, *39.

ENVIRON and Apollo had every incentive to ferret out potential liabilities and correctly estimate, and certainly not to underestimate, Tronox's liabilities because Apollo was putting its own money on the line.  *See* Section II(A), *supra*; Def. Br. 51.  To that end, ENVIRON spent months working to understand the scope and nature of the environmental liabilities and became familiar with the specific liabilities facing the company.  Def. FOF ¶¶ 937-38, 958-61.  ENVIRON visited the Chemical Business's operating facilities as well as certain historical facilities, such as creosote sites and more than thirty ag-chem sites.  DX 1607 at 4; DX 3234 at 3; DX 8910 at 18.  Apollo, ENVIRON, and Apollo's other advisors used the VDR established by Kerr-McGee to review information about 370 of the 372 sites analyzed by Dr. Ram (about 99.5%).  Def. FOF ¶¶ 905, 913, 947, 1623.  ENVIRON met with S&EA employees, and also met with individuals from Landwell/BMI, Lehman, and Kerr-McGee about the Henderson

Property.  Def. FOF ¶¶ 920, 937, 947, 958, 1032, 1623.  ENVIRON was in position to fully

evaluate Tronox's potential liabilities and had a perfectly aligned market-based motive to fully

value the liabilities.  In such a circumstance, the market evidence controls and the after-the-fact

litigation expert testimony is of no utility.  *See VFB*, 2005 WL 223460, at *13, *22, *26-27, *31;

*Iridium*, 373 B.R. at 291.

### 2.    Plaintiffs' Experts Failed to Identify and Value Liabilities by Entity

Another fatal flaw in Plaintiffs' approach is their failure to prove insolvency for each

Plaintiff.  Plaintiffs' counsel stated that the parties "actually stipulated" to the environmental

liabilities of each Plaintiff.  Tr. 8264:25-8265:2.  This is incorrect.  The parties' stipulations do

not identify, value, or prove the existence of any environmental liability of any Plaintiff; in fact,

Plaintiffs admitted that each Plaintiff is not responsible for each of the 372 sites.  *See* Am. Stip.

[Dkt. No. 449]; *see also* JX 495 at 1 (Joint Rule 1006 Summary Regarding Site Responsibility)

("Joint Rule 1006 Summary").  The stipulations identify which Plaintiff *might* be responsible for

costs, *if any*, that:  (i) had been or may be incurred at particular sites; and (ii) were or arguably

may be allocable to any Tronox entity.  *See* Am. Stip. [Dkt No. 449]; JX 495 (Joint Rule 1006

Summary).  There is nothing in the stipulations that:  (i) states whether any Plaintiff is actually

liable for any amount at any individual site; (ii) specifies an amount incurred or to be incurred at

any individual site; or (iii) identifies an amount for which any Plaintiff is liable.[26]  It was

Plaintiffs' burden to prove a specific Plaintiff's legal liability for each specific site and the

present value of that contingent liability as of the date of the particular transfer being challenged.

---

[26] Neither Plaintiffs' nor Defendants' environmental experts allocated potential liabilities by Plaintiff.  Dr. Ram
admitted that he did not.  Tr. 2473:22-2476:14, June 12, 2012.  Mr. White and Dr. Shifrin included a disclaimer in
their expert report stating that they have no opinion on cost allocation among Tronox entities.  *See* N. Shifrin & R.
White Direct Test. [Dkt. No. 511] n.3; DX 2227.1 at 11 n.2.

*See* Def. Br. 45-47.  Plaintiffs failed to even attempt to meet that burden.[27]

### 3.    Plaintiffs Improperly Suggest that They Should Prevail Simply if the Court Concludes that Dr. Ram is Partially Right

Plaintiffs contend that the Court "need only conclude that Dr. Ram was right on 13 cents of each disputed dollar of environmental liabilities . . . to find that Tronox was insolvent at the IPO."  Pl. Br. 45; Tr. 7904:7-15.  Plaintiffs also contend that Tronox would be insolvent if the Court simply accepts Dr. Ram's estimate for the Lukachukai Mountains or Manville.  Tr. 7904:12-15.  These contentions are incorrect for at least three reasons.

First, Plaintiffs' math requires the Court to accept Dr. Newton's analysis, including, for example, the flawed calculation of Business Enterprise Value ("BEV") used in his balance sheet test, which is based on spurious "adjusted" projections.  Def. Br. 93, 107-09; Def. FOF ¶¶ 1593-94, 1818, 1822, 1866-68.  Those assumptions and others were discredited at trial.  Def. Br. § II.B.5; Def. FOF §§ XVII, XVIII.A.[28]  A more realistic solvency analysis for "Tronox Consolidated," which corrects Dr. Newton's faulty assumptions, shows that Plaintiffs had a significant buffer against insolvency.  For instance, accepting just the midpoint of Professor Fischel's proposed BEV range, along with Defendants' experts' environmental and tort valuations, Tronox Consolidated would be solvent by $651 million — which is very similar to what the contemporaneous equity markets concluded.  *See* Def. FOF ¶¶ 1394, 1400, 1434, 1849-

---

[27] At Closing, Plaintiffs' counsel also asserted that Tronox Worldwide is solely responsible for at least one third of the environmental liabilities at issue and jointly and severally liable for another third.  Tr. 8265:3-18.  This is incorrect.  Only 19.5% of Plaintiffs' environmental liability estimate could potentially be allocated to the eighteen sites for which Tronox Worldwide arguably could be the sole responsible Tronox entity, according to the parties' stipulations.  *See* Am. Stip. [Dkt. No. 449]; JX 495 (Joint Rule 1006 Summary); PX 1266.  Moreover, Plaintiffs have not proved that Tronox Worldwide is actually liable for any costs that may be incurred at these sites or the amount of any liability it may bear.

[28] In particular, to accept Dr. Newton's BEV, the Court must:  (i) reject Professor Fischel's BEV calculations, which are based on contemporaneous market evidence; (ii) accept Mr. Fisher's pricing projections and ignore the contemporaneous projections of sophisticated market participants; (iii) reject Professor Fischel's DCF exit multiple of 6.5x EBITDA and accept Dr. Newton's 4.5x EBITDA based on his perpetuity growth calculation; and (iv) accept Dr. Newton's comparable company approach of using LTM EBIT multiples.  *See* Def. Br. 90-96.

50 (Tronox's market capitalization (equity value) was $549 million at the IPO and over $701.5 million at the Spinoff).

Second, Plaintiffs' position requires the Court to conclude either that Dr. Ram's estimates for Manville and Lukachukai are 100% correct, or that his estimates for some other combination of disputed sites are 100% correct. N. Shifrin & R. White Direct Test. [Dkt. No. 511] at 1-2. As shown above, Dr. Ram's assumptions and errors cast doubt on his estimates, and his estimates cannot be taken at full value because they must be discounted where liability after the IPO was not certain. *See Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657 (7th Cir. 1992) ("To disregard the probability that the firm will not be called on to pay is to regard all firms as insolvent all of the time, for all firms face some (remote) contingencies exceeding the value of their assets. . . . The probability of such occurrences is low, however, and it therefore makes sense to treat the firms as solvent."); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200-01 (7th Cir. 1988) (court must discount value of contingent liability by probability that contingency would occur and liability would become real); *In re Tronox Inc.*, 429 B.R. 73, 98, n.15. (Bankr. S.D.N.Y. 2010) ("As [*In re Solomon*, 299 B.R. at 639, n.55 (Oklahoma UFTA case)] notes, contingent liabilities such as those for environmental obligations 'must be reduced to present value for determining whether debtor is insolvent' and the trier of fact must 'determine the likelihood that the contingency will occur.'").

Finally, as noted above, even if the Court were to accept Dr. Newton's flawed calculations and Dr. Ram's inflated estimates, Plaintiffs still bear the burden of proving that a particular Plaintiff actually is liable for any costs that may be incurred at a particular site, and the amount of any such costs that a particular Plaintiff would bear. Plaintiffs have not carried that burden.

III.   **Plaintiffs Cannot Rely on the United States as Their "Triggering Creditor" to Prosecute a Fraudulent Transfer Claim Because the FDCPA is Not Applicable Law Under 11 U.S.C. § 544(b)**

In their Brief, Plaintiffs identify the United States as their purported triggering creditor and assert that they "can step into the shoes of the United States" to establish standing to prosecute their UFTA fraudulent transfer claims for the Project Focus Transfers.  Pl. Br. 69-71; *see id.* at 70-71.  But the United States cannot serve as Plaintiffs' triggering creditor because its claims are controlled by the FDCPA, and the FDCPA is not applicable law under 11 U.S.C. § 544(b) (2006).  Additionally, even if the FDCPA were applicable law, as discussed in Section V, *infra*, the United States has proved up no claim upon which to avoid either the Project Focus or IPO Transfers.  *See* Def. Br. 199-203.  Any other potential triggering creditor's fraudulent transfer claim is time-barred, so Plaintiffs lack standing to bring fraudulent transfer claims to challenge the Project Focus Transfers.  *Id.* at 203-04; *see generally id.* at 193-204.

The United States — at least for those claims it purports to have here — can proceed solely under the FDCPA, the exclusive civil procedure through which the United States can assert a claim to avoid the Project Focus and IPO Transfers.  *See* Def. Br. 198-99; 28 U.S.C. §§ 3001(a), 3304 (2006); *United States v. Gelb*, 783 F. Supp. 748, 752, 758 (E.D.N.Y. 1991) (ordering the United States – over its objection – to amend its complaint to assert its fraudulent conveyance claims under the FDCPA); *see also Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 116 (2d Cir. 2010) ("The FDCPA 'provides the exclusive civil procedures for the United States to recover a judgment on a debt.'"); *Kelley v. College of St. Benedict*, No. 12-822 (RHK/LIB), 2012 WL 5309501, at *5 (D. Minn. Oct. 26, 2012) (same). As a result, for the United States to serve as Plaintiffs' triggering creditor under § 544(b), Plaintiffs would have had to assert their fraudulent transfer claims under the FDCPA, which they did not and could not do.  *MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.)*,

675 F.3d 530, 535-36 (5th Cir. 2012); *see also Kelley*, 2012 WL 5309501, at *5.

Plaintiffs failed to plead their § 544(b) fraudulent transfer claims under the FDCPA. *See* Def. Br. 199.[29]  And, importantly, the law prohibits Plaintiffs from asserting an FDCPA claim under § 544(b).  *In re Mirant Corp.*, 675 F.3d at 535-36; *see also Chambers v. Bendetti (In re Bendetti)*, 131 F. App'x 224, 226 (11th Cir. 2005); *Kelley*, 2012 WL 5309501, at *5.  Plaintiffs' attempt to avoid the impact of the express holding of the Fifth Circuit in *Mirant*, that the United States cannot serve as the § 544(b) triggering creditor because the FDCPA is not applicable law under § 544(b), is unavailing.  675 F.3d at 535-36.  The cases Plaintiffs rely on in arguing that the United States can be a triggering creditor under § 544(b) are limited to lower court cases that (i) predate *Mirant* and/or (ii) fail to expressly consider and decide whether the FDCPA constitutes applicable law for purposes of § 544(b).  *See* Pl. Br. 70.

Plaintiffs' attack on the Fifth Circuit's analysis in *Mirant* is similarly flawed.  *See* Pl. Br. 70-71.  *Mirant* comports with both the language of the FDCPA and its legislative history, *see* Def. Br. 200-01, and nothing in Plaintiffs' cited cases undermines this conclusion.  Indeed, the FDCPA expressly states that the statute "shall not be construed to *supersede or modify* the operation of – (1) title 11," *In re Mirant*, 675 F.3d at 535 (citing 28 U.S.C. § 3003 (2006)) (emphasis in original), and the legislative history expressly states that Bankruptcy Code provisions that reference non-bankruptcy law – such as § 544(b) – must be read as if the FDCPA does not exist.  *Id.* at 535-36.  The Court would have to disregard the FDCPA's express mandate, its legislative history, and the Fifth Circuit's holding in *Mirant* if it were to adopt Plaintiffs' position and construe the FDCPA as applicable law under which Plaintiffs may challenge the

---

[29] The FDCPA is never mentioned in Plaintiffs' Complaint.  In fact, the Government itself filed its own FDCPA claim in its separate complaint.  Def. FOF ¶ 2807.  The only laws Plaintiffs identified for their fraudulent transfer claims were the Oklahoma UFTA and Bankruptcy Code Section 548.  *See* 2d Am. Compl. ¶¶ 149, 160, 168; *see also* Tr. 7826:3-7.  Having adduced no evidence for their § 548 claim (Count III), Plaintiffs declined to mention it in their Brief and did not contest Defendants' assertion at Closing that the § 548 claim "is abandoned."  Tr. 8037:19-8038:2.

Project Focus Transfers.  There is no credible basis for doing so.  Therefore, because Plaintiffs cannot rely on the United States as their "triggering creditor" to prosecute the Project Focus Transfers and because any other potential triggering creditor's fraudulent transfer claim is time-barred, *see* Def. Br. 193-204, Plaintiffs lack standing to challenge the Project Focus Transfers.[30]

## IV. The Statute of Limitations Bars Plaintiffs' and the United States' Fraudulent Transfer Claims to Challenge the Project Focus Transfers

### A. Plaintiffs Cannot Rely upon 28 U.S.C. §§ 2415 or 2416 to Extend the Oklahoma UFTA Statute of Limitations and Revive Their Time-Barred Claims Challenging the Project Focus Transfers

Plaintiffs argue that their fraudulent transfer claims are not subject to the Oklahoma UFTA four-year statute of limitations because the federal government is one of Tronox's creditors.  *See* Pl. Br. 72-73.  Plaintiffs assert that the Oklahoma UFTA statute of limitations expands and is co-extensive with the statute of limitations in 28 U.S.C. § 2415(a) (2006) (a statute other than the FDCPA) and the tolling provision contained in 28 U.S.C. § 2416(c) (2006).[31]  *See* Pl. Br. 72-73.  Plaintiffs are incorrect.  Because the United States may pursue a fraudulent transfer claim for the Project Focus Transfers only under the FDCPA, *see* Def. Br. 198-99, its statute of limitations governs the deadline for the federal government to file a fraudulent transfer claim.  *See Gelb*, 783 F. Supp. at 755 (noting statute of limitations applicable to an FDCPA claim is the six-year statute of limitations contained in the FDCPA).  Because federal government creditors are limited to the statute of limitations in the FDCPA for

---

[30] Plaintiffs also lack standing to prosecute fraudulent transfer claims related to the IPO because they failed to prove the existence of a triggering creditor for Tronox Inc., the only transferor in the IPO.  *See* Def. Br. 41-44; *Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 424 B.R. 95, 102 (Bankr. S.D.N.Y. 2010) (recognizing that standing to bring a § 544(b) fraudulent transfer claim is derivative of the existence of an actual unsecured creditor of the transferor who could have avoided the transfers); *Ries v. Wintz Props., Inc. (In re Wintz Cos.)*, 230 B.R. 848, 859 (B.A.P. 8th Cir. 1999) (noting that the trustee's standing depends on that of the triggering creditor); *Tri-Star Techs. Co. v. Pitocchelli (In re Tri-Star Techs. Co.)*, 260 B.R. 319, 328-29 & n.10 (Bankr. D. Mass. 2001).

[31] By its express terms, the statute of limitations in 28 U.S.C. § 2415(a) is a catch-all provision for actions for money damages brought by the United States that is "founded upon any contract express or implied in law or fact," and applies "except as otherwise provided by Congress."  28 U.S.C. § 2415(a).

challenging the Project Focus Transfers, the statute of limitations in § 2415(a), and the tolling provision in § 2416(c), are inapplicable to Plaintiffs' Oklahoma fraudulent transfer claims. *See Gelb*, 783 F. Supp. at 755-56 (stating that the limitations period in § 2415 and the tolling provision in § 2416(c) are inapplicable to an FDCPA action).

While both the FDCPA and 28 U.S.C. § 2415(a) statutes of limitations are six years, the tolling provisions of the two statutes are very different. *Gelb*, 783 F. Supp. at 755 (stating "[t]he FDCPA has no tolling provision similar to that in 28 U.S.C. § 2416(c)"). The FDCPA's statute of limitations provides that an actual fraudulent transfer claim must be brought within six years of the transfer or within two years of when the transfer was, or could reasonably have been, discovered. 28 U.S.C. § 3306(b) (2006). The Project Focus Transfers were made in December 2002, and the FDCPA's six-year statute of limitations expired in December 2008. *See* Def. FOF ¶¶ 242-55, 2788; Def. Br. 23-28; *see also id.* at 28-34. The FDCPA's two-year discovery rule does not salvage Plaintiffs' actual fraudulent transfer claim because it is beyond dispute that the United States was well-aware of the 2002 transfers no later than 2003 and could have brought an FDCPA claim within the original six-year limitations period. *See* Def. FOF ¶¶ 247, 250. Accordingly, the applicable statute of limitations in the FDCPA bars a fraudulent transfer claim by a federal government creditor to recover the Project Focus Transfers.

The Manville tolling agreement is of no consequence with respect to the Project Focus Transfers, *cf.* Pl. Br. 69, 71, because: (i) it is limited to fraudulent transfer claims for a recovery for Manville and the statute of limitations for claims related to all other sites have thereby expired; and (ii) there was no proof that the United States legally is entitled to recover from any Plaintiff-transferor for Manville. The Agreement, entitled "FEDERAL CREOSOTE SUPERFUND SITE TOLLING AGREEMENT," is limited to claims against Tronox Worldwide

37

and Tronox LLC *arising from the "Federal Creosote Superfund Site ('Site') located in Manville, Somerset County, New Jersey."*[32]  GPX 4.001 at US5581196 ("Manville Tolling Agreement" or "Agreement") (definition of "Tolled Claims" refers only to Manville, New Jersey site).[33]  The Agreement further confirms that "the Parties enter into this Tolling Agreement to facilitate settlement negotiations between the Parties . . .  and wish to defer any litigation or claims concerning the incurrence of response costs by the United States at the *Site . . . ." Id.* (emphasis added).  The Agreement leaves no doubt that it is limited to claims related to Manville.

Accordingly, the statute of limitations has expired and bars all fraudulent transfer claims of Plaintiffs and the United States to challenge the Project Focus Transfers, other than for Manville.  Having failed to prove a viable claim of liability for Manville, no viable fraudulent transfer claim survives.  *See In re Musicland Holding Corp.*, 424 B.R. at 102 (recognizing that standing to bring a § 544(b) fraudulent transfer claim is derivative of the existence of an actual unsecured creditor of the transferor who could have avoided the transfers).

## B.    Transfers Between Related Companies Do Not Permit an End Run Around the Statute of Limitations

The Court stated that hypothetically under Defendants' position, if the Project Focus Transfers are time-barred, a company could "transfer property among corporate subsidiaries in a blatant fraudulent conveyance, . . . retain control for four years, let the statute run and . . . all adversely affected creditors . . . would have absolutely no recourse whatsoever."  Tr. 8059:21-

---

[32]  The Manville Tolling Agreement includes Kerr-McGee Corp. and Kerr-McGee Worldwide as parties to the agreement, *see* GPX 4.001 at US5581196, but this is irrelevant because the United States has acknowledged that they are not potentially responsible parties.  *See* JX 335 at 2 (Letter, dated Dec. 15, 2005, from EPA to Covington & Burling stating the United States' position that Tronox LLC, not Tronox Worldwide, is the entity responsible for the Manville site).

[33]  *See also* PX 922 at TRX-ADV0572835 (Cover Letter from DOJ to Covington & Burling, dated Mar. 28, 2006, with executed Manville Tolling Agreement for "Manville NJ" site); GPX 4.007 (Fifth (most recent) Amendment to Manville Tolling Agreement refers only to Manville, New Jersey site); DX 1925; JX 357 at 5.

8060:12. To be clear, these are not the facts before the Court.[34] Regardless, the answer is no. A creditor, including the United States under the FDCPA, has the right to bring a fraudulent transfer claim at the moment the fraudulent transfer occurs. Okla. Stat. tit. 24, §§ 121(1), (2) (2012) (a fraudulent transfer claim accrues at the time a transfer is made); *In re Solomon*, 299 B.R. at 632 n.21; *Womack v. Eggebrecht (In re Demis)*, 191 B.R. 851, 858 (Bankr. D. Mont. 1996); *see also* 28 U.S.C. § 3306(b) (2006) (an FDCPA fraudulent transfer claim accrues, and the limitations period begins to run, when the transfer is made).[35]

The fact that the transferor and transferee are affiliates does not change the law or its application. Indeed, creditors can, and routinely do, assert fraudulent transfer claims to recover assets fraudulently transferred among affiliates. *See, e.g.*, *ASARCO*, 396 B.R. at 297-98, 302, 315-16 (§ 544(b) fraudulent transfer claim brought under the Delaware UFTA against debtor's corporate parent); *Akande v. Transamerica Airlines, Inc. (In re Transamerica Airlines, Inc.)*, No. 1039-N, 2006 WL 587846, at *4-6 (Del. Ch. Feb. 28, 2006) (plaintiff claimed subsidiary fraudulently conveyed substantially all of its assets to its parent); *8000 Md., LLC v. Huntleigh Fin. Servs., Inc.*, 292 S.W.3d 439, 443-44 (Mo. Ct. App. 2009) (upholding trial court's decision in favor of landlord plaintiff to set aside fraudulent transfer of tenant's subsidiaries to tenant's corporate parent). This point is highlighted by the fact that the Manville Tolling Agreement was entered into shortly after the IPO, but before the Spinoff. GPX 4.001 at US5581196.

Furthermore, even if transfers among affiliates were concealed from creditors and could

---

[34] The Tronox IPO occurred more than a year *before* the expiration of the Oklahoma UFTA's four-year statute of limitations for the Project Focus Transfers, Def. FOF Appx. A ¶ 63, demonstrating that Kerr-McGee did not hold on to Tronox until the statute of limitations expired to prevent creditors from bringing fraudulent transfer claims.

[35] Plaintiffs rely on Article 9 of Oklahoma's U.C.C. as support for their argument that the Project Focus Transfers were not effective in 2002. Pl. Br. 63 n.11. This is incorrect. Article 9 governs secured transactions and the perfection and priority of security interests in collateral. *See* Okla. Stat. tit. 12A, §§ 1-9-101, 1-9-109 (2012). The Project Focus Transfers involved the transfer of stock certificates. Def. FOF ¶¶ 201-14, 216, 235, 242, 244. Article 8 of the U.C.C. governs the effective date of the transfer of stock certificates. *See* Def. Br. 24-28. Therefore, the Project Focus Transfers factually occurred and were legally effective in December 2002.

not be discovered until after the limitations period expired, the Oklahoma UFTA and the FDCPA allow creditors, in certain circumstances not applicable here, to assert claims outside the limitations period.  *See* 28 U.S.C. § 3306(b)(1); Okla. Stat. tit. 24, § 121(1) (discovery rule for actual fraudulent transfers).  The transfers in this case, however, were not concealed from creditors, nor were creditors prevented from reasonably discovering them when they occurred.  *See* Def. FOF ¶¶ 247-55, 282-83; Def. Br. 195-96.  As sophisticated governmental agencies purporting to hold claims worth billions of dollars, the environmental creditors were on notice, at the latest, as of the March 2003 Consolidated Kerr-McGee 10-K.  Def. FOF ¶ 427; Def. Br. 195 & n.114.  The United States further received a transfer-by-transfer detailed description of Project Focus on September 15, 2003.  DX 2040 at 3, 110-11, 203-07; *see also* Def. FOF ¶ 250.

## V.    The United States Failed to Prove the Essential Element of Its FDCPA Claim — That the Transferor Owes an Unpaid Debt to the United States

The Court asked the United States:  "How do I separately value the claim of the United States on your separate complaint under the FDCPA?"  Tr. 8239:20-22.  Counsel for the United States responded that the United States "would put that number at at least $1.8 billion" and that this "number starts with Neil Ram's estimates which are as of 2005, up to $1.7 billion but that is expressly described by him as not a ceiling, not a maximum, and, in fact, we know that at the Manville site the costs came in at $119 million higher than Neil Ram's estimate."  Tr. 8240:11-12, 15-22.  The United States is incorrect.

Any recovery to be had under the FDCPA would be limited to the amount of an unpaid debt to the United States, which is the "amount that is owing to the United States on account of [certain costs] incurred by the United States."  28 U.S.C. §§ 3002(3), 3306(a), 3307(b); *see College of St. Benedict*, 2012 WL 5309501, at *5-6.  The United States failed to prove this essential element of its FDCPA claim — that it is owed an unpaid debt from any Plaintiff-

transferor of the allegedly fraudulent transfers — and, therefore, its claim fails as a matter of law. Defendants' Post-Trial Brief Regarding the United States' FDCPA Claims [Dkt. No. 595] ("Defendants' FDCPA Brief") 5-6.

Dr. Ram did not testify as to the existence or amount of any unpaid debts to the United States as of the date of trial. He opined on the present value in 2005 of alleged contingent liabilities at 372 sites. Def. FOF ¶ 1961; N. Ram Direct Test. [Dkt. No. 417] ¶¶ 1, 4. He did not testify as to what portion of these alleged liabilities, if any, is an unpaid debt owed to the United States. Def. FOF ¶ 2815. Indeed, Dr. Ram's opinions include valuations for scores of alleged sites and liabilities purportedly owed to state agencies (*e.g.*, the Henderson site) rather than to the United States. *See, e.g.*, DX 2630 (judicial notice); DX 2227.2 at 10-26, 48; PX 1266 at 6. These contingent liabilities certainly are not unpaid debts owed to the United States. Additionally, Dr. Ram's estimation of the present value in 2005 of the alleged sites and liabilities has no bearing on how much remains owing to the United States, if anything, as of the date of trial. Certain Plaintiffs, as well as numerous third parties, have paid millions to remediate certain sites since 2005.[36] Def. FOF ¶ 2498. Any debts owed to the United States in 2005 that have since been satisfied do not constitute an unpaid debt to the United States.[37] Moreover, the United States was paid over $100 million in distributions under the Plan, and the United States did not offer any evidence to show that after it received these substantial amounts, any debt owed to it by a Plaintiff-transferor remains unpaid. Def. FOF ¶ 2815.

Equally important, Dr. Ram's opinions did not prove that a Plaintiff-transferor was liable

---

[36] For example, Dr. Ram's opinion includes costs to remediate the Church Rock uranium site on the Navajo Nation, but Kerr-McGee sold its interest in that site to Rio Algom Mining Company in 1988. Def. FOF ¶ 1996. In 2010, Rio Algom entered into a Consent Order to conduct remediation activities at the site. PX 1266 at 496.

[37] Further, through the Plan, Tronox assumed various liabilities to the United States for certain alleged sites and is paying those amounts. *See* DX 2568 ¶ 179 (Confirmation Order); *id.* Ex. A at 26 (Disclosure Statement); Environmental Claims Settlement Agreement ¶ 157 [Main Case Dkt. No. 2692 Ex. 1]. These liabilities do not constitute unpaid debts to the United States.

to the United States for a debt on the alleged sites.  In fact, Dr. Ram expressly admitted that he did not opine on whether any Plaintiff was liable for Manville, but assumed this to be the case because he was instructed to do so by Plaintiffs' counsel.  Def. FOF ¶ 2017.  The United States even admitted that no court or tribunal has ever found that it is owed a debt from any Plaintiff (or Defendant) for Manville.  Def. FOF ¶ 2049.  All the United States did was reiterate its position, which both Tronox itself and Kerr-McGee strongly disputed, that Tronox LLC was liable for the Manville remediation.  Tr. 7781:8-22, Sept. 13, 2012.  Such naked assertions fall far short of the United States meeting its burden to prove it is owed an unpaid debt from the Plaintiff-transferor of the challenged transfers.[38]  As a result, the United States' FDCPA claim fails as a matter of law.

## VI.    Even Assuming Liability, Plaintiffs' Requested Remedy Cannot Be Granted

### A.    The Restorative Principle Applies to This Case

Plaintiffs argue that Defendants rely on § 105 to import the Restorative Principle into this case, and that the principle contravenes the Bankruptcy Code and ignores the Court's prior ruling that 11 U.S.C. § 550(a) (2006) does not limit Plaintiffs' recovery to the amount of unpaid creditor claims.  *See* Pl. Br. 108-15; *see also* Tr. 8010:12-8011:12, 8277:19-8279:18.  Plaintiffs are incorrect.  General equitable principles, including the Restorative Principle, apply to this case

---

[38] Further, the United States' proofs of claim are not evidence, for purposes of this case, that any Plaintiff owes the United States an unpaid debt.  For one, the United States never introduced its proofs of claim into evidence and did not include them in the stipulated list of exhibits.  *See* Notice of Filing Amended Final List of Admitted Exhibits, Ex. A [Dkt. No. 610]; *cf.* Submission of Trial Exhibits for Judicial Notice [Dkt. No. 552]; Tr. 7448:2-7451:5, Sept. 12, 2012.  Even if the United States had introduced them, they would not prove the existence of an unpaid debt because they merely recite *estimates of potential* remediation for which certain Plaintiffs *might* be liable.  Moreover, the Confirmation Order and Stipulated Order reserved Defendants' right to contest proofs of claim.  *See* DX 2568 ¶¶ 190-91 (Confirmation Order) ("All parties reserve the right to make any available arguments, and assert any available claims and available defenses . . . in the Anadarko litigation . . . ."); DX 2720 ¶ 8 (Stipulated Order Resolving the Rejection Damages Claims of Anadarko Petroleum Corporation and Kerr-McGee Corporation and Related Relief) ("Stipulated Order") ("all parties in interest reserve all rights and defenses with respect to the Anadarko Litigation").  Therefore, even if the United States now attempted to introduce its proofs of claim, that would, at best, lead to additional litigation regarding the validity of the amounts set forth therein.

not through § 105(a), but as a matter of substantive state and bankruptcy law, and as a core

damages principle generally applicable in federal litigation.  The principle is separate and distinct

from § 550(a) and addresses different questions:  (i) If the Court avoids the transfers, to whom

should the value be restored? and (ii) How should a court implement a remedy meant to

accomplish equitable purposes to avoid inequitable effects, including a windfall?

Under § 544(b), all of the Oklahoma UFTA, except those provisions expressly preempted

by the Bankruptcy Code, is made applicable to this case.  Because nothing in the Oklahoma

UFTA displaces equitable principles, including equity's abhorrence of windfalls, those principles

are applied through § 544(b).  Okla. Stat. tit. 24, § 122 (2012) ("Unless displaced by the

provisions of the [UFTA], the *principles of law and equity*, including . . . the law relating to

principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake,

insolvency, or other validating or invalidating cause, supplement the provisions of the [UFTA]")

(emphasis added); *In re Musicland Holding Corp.*, 424 B.R. at 102-03 (holding in a § 544(b)

action under the Minnesota UFTA that defendants may raise all defenses available in a state

fraudulent conveyance action); *Sheffield Steel Corp. v. HMK Enters., Inc. (In re Sheffield Steel

Corp.)*, 320 B.R. 423, 453-54 (Bankr. N.D. Okla. 2004) (holding that § 122 of the Oklahoma

UFTA allows a defendant to invoke equitable defenses against fraudulent transfer claims).[39]

The Restorative Principle broadly applies in federal suits seeking to inequitably enrich a

successor shareholder.  "Changing the statutory context out of which a windfall recovery arises

does not change the fact that it is a windfall."  *In re REA Express, Inc. Private Treble Damage

Antitrust Litig.*, 412 F. Supp. 1239, 1253 (E.D. Pa. 1976).  Other courts endorse the equitable

---

[39] *Sheffield Steel* is particularly instructive because the court held that § 122 preserves equitable defenses, which in that case was equitable estoppel, in suits brought under the Oklahoma UFTA.  320 B.R. at 453-54.  The court also held that § 122 could be invoked defensively.  *Id.* at 454.  The Restorative Principle is similar to equitable estoppel and is equally well founded in law and equity.  *See* Def. Br. 259-60 (discussing *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703 (1974) and related cases).

principle that the equity holder *at the time that the transfer was made* stands to receive any avoidance recovery remaining after creditor claims are satisfied. Def. Br. 260-61; *see also ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 163, 175 (S.D. Tex. 2009) (noting that if creditor claims exceed the value of the recovered stock, ASARCO's sole shareholder at the time of the stock transfer may be entitled to recover some portions of the judgment and agreeing with the broad legal proposition that "creditors cannot receive more than what they are owed").

Plaintiffs argue that the Plan's assignment of litigation rights precludes Defendants' equitable defenses. Tr. 8019:8-24. A Chapter 11 debtor's assignment of a litigation claim cannot strip defenses that the defendant would otherwise enjoy, regardless of what the assignor may have traded away. *See Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 598-99 (7th Cir. 2012) (holding that a defendant sued by a bankruptcy trustee may assert defenses "if the jurisdiction whose law creates the claim permits such a defense outside of bankruptcy"); *see also* Def. Br. 258 n.158. Nor does the assignment of litigation claims allow the Litigation Trust to assert greater rights than the debtors had in the claims. *Furlong v. Shalala*, 156 F.3d 384, 392 (2d Cir. 1998) ("Under common law, an assignee steps into the assignor's shoes and acquires whatever rights the latter had."); *see also* Def. Br. 258 n.158; Cross-Mot. n.88, 49-50 (Def. FOF ¶ 2841); Reply 40 (Def. FOF ¶ 2843). Assignment of a claim changes only the identity of the beneficiary; it neither enhances the strengths of the claim nor impairs any defenses that can be raised against it. Def. Br. 258 n.158. Thus, the Oklahoma UFTA permits Defendants to assert the Restorative Principle, and the Plan's assignment of litigation rights does not change this conclusion.

The Court asked how the Restorative Principle would work in a constructive fraudulent transfer case premised on insolvency, rather than actual fraudulent intent, and how the

environmental liabilities would be accounted for under this scenario.   Tr. 8217:20-8219:14.
Even if the Court were to avoid the Project Focus Transfers, it would have to presume that the
transferor (Tronox Worldwide) was solvent because there is no evidence of insolvency in 2002,
*see* Def. Br. 205-07, and there is no basis for treating the Project Focus Transfers as effective at
the time of, or collapsing them with, the IPO Transfers.   *See* Def. Br. 34-41.   As a result, all of
the restored value would have been for Kerr-McGee Worldwide.   Def. Br. 262-63.

Nevertheless, Defendants detail how the principle would operate if one (i) accepts
Plaintiffs' effort to collapse or treat the 2002 transfers as effective in 2005 in connection with the
IPO, and (ii) adopts Professor Newton's valuation opinions, including his acceptance of Dr.
Ram's and Dr. Martin's valuation of the Legacy Liabilities.   Def. Br. 264-67.   Dr. Newton's
calculations show that after Project Focus and immediately prior to the IPO, the total alleged
creditor shortfall was $624.2 million.   Tr. 8220:17-8221:5.   Any portion of the value of the
Project Focus Transfers above $624.2 million would flow to Kerr-McGee Worldwide.   Tr.
8221:6-25.   With respect to the IPO Transfers, Defendants' Brief explains that Plaintiffs' best
case damages scenario is $517.5 million.   Def. Br. 254, 267; *see also* Tr. 8214:4-8215:17.
Accordingly, Plaintiffs' best-case recovery, as of Nov. 28, 2005, is the total of these two
numbers ($1.142 billion).   *See* Def. Br. 262-67.

### B.    If the Court Rejects the Restorative Principle, Defendants Are Entitled to a § 502(h) Offset Calculated in Accordance with the Terms of the Plan

If the Court rejects the Restorative Principle, Defendants are entitled to a § 502(h) offset.
Def. Br. 267-79.   The amount of the § 502(h) claim must be determined by valuing the
consideration Defendants gave to Plaintiffs in exchange for any avoided transfer.[40]   Def. Br. 268-

---

[40] At Closing, the Court requested a copy of Defendants' § 502(h) proof of claim.   *See* Tr. 8236:15-8237:14.   In
accordance with the Court's request, a copy of Defendants' proof of claim has been filed concurrently herewith.
Regardless of such proof of claim, however, Defendants have the right, memorialized in the Plan itself, to assert a

69. This amount will vary depending on whether the Court avoids the IPO Transfers, the Project Focus Transfers, or both. Def. Br. 269-72. This amount must then be multiplied by the percentage recovery realized by Allowed Class 3 General Unsecured Creditors on the effective date (*i.e.*, 336.9%). Def. Br. 269, 272-79. Depending on what the Court determines to be the value of the various inbound and outbound transfers, Defendants would be entitled to an offset of between $946.7 million and $4.447 billion if the IPO Transfers are avoided, $7.746 billion if the Project Focus Transfers are avoided, and between $8.693 billion and $12.193 billion if both the IPO and Project Focus Transfers are avoided. Def. Br. 270-72, 274.

The Court asked whether the General Unsecured Creditors' 336.9% recovery includes the value of distributions made pursuant to the Rights Offering. Tr. 8230:13-24. Such recovery calculation does include the value of the aggregate consideration disbursed to all General Unsecured Creditors (including stock distributed under the Rights Offering) less the $185 million paid by creditors to participate in the rights offering. *See* Def. Br. 272-74. Because the right to participate in the Rights Offering constituted a valuable right granted to Class 3 creditors under the Plan, the value of that right must be included in calculating the percentage recovery to such creditors. *See In re Wash. Mutual, Inc.*, 442 B.R. 314, 360 (Bankr. D. Del. 2011) (creditors' recovery includes the value of stock distributed in a rights offering, less the amount paid by participants for that stock). The 336.9% recovery therefore accurately reflects the amounts distributed to all General Unsecured Creditors as a class, including those who participated in the Rights Offering, rather than any specific creditor in Class 3. This result comports with the Plan's

---

§ 502(h) claim after entry of any adverse judgment. *See* DX 2568 Ex. A at 24 (the Plan) (providing that "[t]he Anadarko Section 502(h) Claim, if and when Allowed, will be satisfied through a discount or reduction against any judgment against it in the Anadarko Litigation in accordance with the terms set forth in Article IV.C.5 hereof."); Def. FOF ¶ 2760. Even absent the Plan provision, a § 502(h) claim arises "from the recovery of property under section . . . 550," 11 U.S.C. § 502(h) (2006), and thus Defendants may file a § 502(h) claim following entry of any judgment.

requirement that Defendants receive the same percentage recovery as all other Class 3 creditors, not a subset of Class 3 creditors.  Def. Br.  275-79; *see also* DX 2568 Ex. A at 28-29 (the Plan) (noting Defendants would be entitled to an offset in "the amount of any Allowed Anadarko Section 502(h) Claim multiplied by the percentage recovery to Allowed Class 3 General Unsecured Claims").

Plaintiffs argue that the Court should ignore the General Unsecured Creditors' 336.9% recovery, claiming that their actual percentage was fixed at confirmation.  Tr. 8280:9-13. Contrary to this contention, Plaintiffs have in fact conceded that the percentage recoveries were not fixed at confirmation, but were instead only estimated (and grossly *under*estimated at that). Tr. 8280:17-22 ("[A]t the time of plan confirmation . . . the estimates were that the general unsecured creditors . . . would get 78 to 100 percent of the value of their claim.").  As the Plan itself provides, the percentage recovery was not determined at confirmation but, instead, "shall be determined by the Bankruptcy Court and the parties reserve[d] their rights" to make arguments regarding the value of that recovery.  DX 2568 Ex. A at 29 (the Plan).[41]  Because the consideration distributed to General Unsecured Creditors was liquid stock, its value was established on the day that the stock was distributed, and that value is easily determined.  The principle of equitable distribution requires that Defendants receive the same value distributed to the class of General Unsecured Creditors (*i.e.*, 336.9% of the value of their claims).  Def. Br. 275-79.  Nothing in Plaintiffs' cited cases changes this principle.[42]

---

[41] Plaintiffs may not now challenge the plain language and effect of their confirmed Plan.  *See, e.g.*, *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991) (a confirmed plan binds "its debtors and creditors as to *all* the plan's provisions" (emphasis in original)).

[42] While Plaintiffs rely on *Matter of Prince*, the case in fact supports Defendants' position because it holds that the confirmation date value of stock distributed under a plan may be determined post-confirmation.  85 F.3d 314, 316, 318-20 (7th Cir. 1996).  Plaintiffs' two other cases are entirely beside the point.  *Mt. McKinley Ins. Co. v. Lac D'Amiante du Quebec LTEE*, No. 2:12-CV-00271, slip op. at 11–12 (S.D. Tex. Nov. 19, 2012) (noting that the Tronox court concluded that a benefit to the estate under § 550(a) may be satisfied at the time of confirmation); *Kipperman v. Onex Corp.*, 411 B.R. 805, 876-78 (N.D. Ga. 2009) (same).

C.      **Plaintiffs Ignore the Multiple Additional Bases that Limit Their Recovery**

Plaintiffs erroneously argue that Defendants have not identified any statutory provisions other than §§ 550, 550(e), and 502(h) that limit their recovery in this case.  Pl. Br. 108.  While the Court ruled on Defendants' § 550(a) "benefit of the estate" argument, it has not ruled on Defendants' other damage-related arguments contained in the summary judgment briefing on damages.  *See generally* Cross-Mot. and Reply; *see also* Def. Br. n.157.  Defendants hereby incorporate and reassert those arguments, and respectfully request that they be considered by the Court.  Those arguments include, among others, the following:

a)      Even if § 550(a) does not limit Plaintiffs' recovery to the amount of unpaid creditor claims, §§ 544 and 548 do because courts in this jurisdiction limit avoidance itself to the amount of unpaid creditor claims (Cross-Mot. 15-22; Reply 6-8);

b)      The Bankruptcy Code's fraudulent transfer provisions do not displace § 119(A)(1) of the Oklahoma UFTA, which limits avoidance to the extent necessary to satisfy creditor claims; and, unless there is a clear and manifest federal bankruptcy interest that conflicts with it, the Bankruptcy Code does not displace § 120(B) of the Oklahoma UFTA, which also limits recovery to the extent necessary to satisfy creditor claims (Cross-Mot. 8-9; Reply 14-18);

c)      The Bankruptcy Code's fraudulent transfer provisions do not displace non-bankruptcy laws incorporated into the Bankruptcy Code under § 502(b), which prevent tort and environmental creditors from recovering more than the value of their claims (Cross-Mot. 31-36; Reply 22-24);

d)      As explained in *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 93-97 (S.D.N.Y. 2008) the constitutional standing requirement that there must be a harm for which a remedy is sought prevents avoidance and recovery once creditors have been paid in full, irrespective of whether their claims are paid before, during, or after the initiation of a fraudulent transfer action (Cross-Mot. 19-20; Reply 7-8);

e)      Bankruptcy law prohibits Plaintiffs from distributing any recovery to non-creditors (*i.e.*, Superfund) in the form of a charitable contribution and environmental laws similarly limit amounts properly payable to Superfund (Cross-Mot. 20-21, 33-36);

f)      The Supreme Court and Second Circuit prohibit use of bankruptcy laws to permit a windfall recovery based on the happenstance of bankruptcy, particularly when

such result could not have been achieved outside of bankruptcy (Reply 14-18, 31-32);

g)   Rules of statutory construction require the Bankruptcy Code's fraudulent transfer provisions to be construed consistently with both their remedial purpose and other Bankruptcy Code provisions that individually and collectively prohibit creditors from recovering more than the value of their claims (Cross-Mot. 10-15; Reply 18-24);

h)   Plaintiffs are judicially and equitably estopped from asserting that tort and environmental creditors may now recover more than the value of their claims, particularly in light of their prior sworn representations to the contrary, which representations were relied upon by the Court at confirmation (and have now been contradicted by Plaintiffs' 2011 financial statements) (Cross-Mot. 41-46; Reply 43-47; Def. Br. 273);

i)   The limitations imposed by §§ 544, 548, and 550 cannot be eliminated by transferring litigation under a plan, particularly when that plan expressly reserved Defendants' rights to assert the legal limitations of such provisions (Cross-Mot. 23-25, 36-41; Reply 37-39);

j)   Whether Plaintiffs' recovery will "benefit the estate" under § 550(a) must be determined when the existence and amount of that recovery is actually at issue, not at plan confirmation when the issue was not before the Court, no party understood it to be, and the parties in fact expressly reserved their rights on the issue at that time (Cross-Mot. 51-55; Reply 32-35, 37-39);

k)   Plaintiffs and the tort and environmental creditors may not unilaterally "bargain" to (i) increase Defendants' liability beyond the legal limits, (ii) eliminate Defendants' legal rights, (iii) recover more than the value of their claims in contravention to multiple governing laws, and/or (iv) permit payments to non-creditors in contravention to bankruptcy and non-bankruptcy laws (Cross-Mot. 46-51; Reply 40-43); and

l)   As the Court noted in its § 550(a) opinion, governing state law (*i.e.*, the Oklahoma UFTA) permits the Court to use its equitable powers to adjust the recovery "as the equities may require" (Mem. of Op. 11, 19).

## CONCLUSION

For the foregoing reasons as well as the reasons set forth in Defendants' Brief, Defendants' FDCPA Brief, and at Closing, Defendants respectfully request that the Court

recommend judgment be entered for Defendants on all claims.[43]

---

[43] There is an "emerging consensus" within the Southern District of New York that "although the Bankruptcy Court may not ordinarily enter final judgment on avoidance claims, it may nonetheless hear the case in the first instance and recommend proposed findings of fact and conclusions of law." *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12 MC 115 (JSR), 2013 WL 67605, at *1 (S.D.N.Y. Jan. 4, 2013).

Houston, TX
Dated: January 31, 2013

Richard A. Rothman (RR 0507)
Bruce S. Meyer (BM 3506)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:     (212) 310-8000
Facsimile:     (212) 310-8007

Thomas R. Lotterman (*admitted pro hac vice*)
Duke K. McCall, III (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
Telephone:     (202) 373-6000
Facsimile:     (202) 373-6001

/s/ Jason W. Billeck
Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas  77002
Telephone:     (713) 546-5000
Facsimile:     (713) 224-9511

James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California  90071
Telephone:     (213) 680-6400
Facsimile:     (213) 680-6499

Kenneth N. Klee (KK 5910)
David M. Stern *(admitted pro hac vice)*
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Telephone:     (310) 407-4000
Facsimile:     (310) 407-9090

*Counsel to Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Defendants' Post-Trial Reply Brief was served on the following counsel of record on January 31, 2013, as indicated below:

*Via email jonathan.henes@kirkland.com*
Jonathan S. Henes
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022

*Via email jeffrey.zeiger@kirkland.com*
Jeffrey J. Zeiger
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654

*Via email joseph.pantoja@usdoj.gov
and robert.yalen@usdoj.gov*
Joseph Pantoja
Robert Yalen
Assistant U.S. Attorney
SOUTHERN DISTRICT OF NEW YORK
86 Chambers Street
New York, New York 10007

*Via email david.zott@kirkland.com*
David J. Zott
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654

Houston, Texas
Dated: January 31, 2013

*/s/ Melinda Jackson*
Melinda Jackson