UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re

                                                   Chapter 11

TRONOX INCORPORATED, et al.,

                                                   Case No. 09-10156 (ALG)
                                                   (Confirmed Cases)

                        Debtors.
-----------------------------------------------------------------x

TRONOX INCORPORATED, et al.,

                        Plaintiffs,

               - against -                       Adv. Proc. No. 09-1198 (ALG)

KERR MCGEE CORPORATION, et al.,

                        Defendants.
-----------------------------------------------------------------x

THE UNITED STATES OF AMERICA,

                        Plaintiff-Intervenor,
           - against –

TRONOX, INC., et al.

                        Defendants.
-----------------------------------------------------------------x

**MEMORANDUM OF OPINION, AFTER TRIAL**


A P P E A R A N C E S :

KIRKLAND & ELLIS LLP
*Counsel to the Anadarko Litigation Trust*
300 North LaSalle
Chicago, Illinois 60654
       By: David J. Zott, Esq.
          Andrew A. Kassof, Esq.
          Jeffrey J. Zeiger, Esq.

PREET BHARARA
UNITED STATES ATTORNEY
*Counsel for the United States of America*
86 Chambers Street
New York, New York 10007
      By:  Robert William Yalen, Esq.
         Joseph A. Pantoja, Esq.

WEIL, GOTSHAL & MANGES LLP
*Co-Counsel to Anadarko Petroleum Corporation and
the Kerr-McGee Corporation Defendants*
767 Fifth Avenue
New York, New York 10153
      By: Richard A. Rothman, Esq.
         Bruce S. Meyer, Esq.

BINGHAM McCUTCHEN LLP
*Co-Counsel to Anadarko Petroleum Corporation and
the Kerr-McGee Corporation Defendants*
2020 K Street, NW
Washington, DC 20006
      By:  Thomas R. Lotterman, Esq.
         Duke K. McCall III, Esq.
      -and-
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
      By:  James J. Dragna, Esq.

KLEE, TUCHIN, BOGDANOFF & STERN LLP
*Co-Counsel to Anadarko Petroleum Corporation and
the Kerr-McGee Corporation Defendants*
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
      By:  Kenneth N. Klee, Esq.
         David M Stern, Esq.

WINSTON & STRAWN LLP
*Co-Counsel to Anadarko Petroleum Corporation and
the Kerr-McGee Corporation Defendants*
1111 Louisiana Street, 25th Floor
Houston, TX 77002-5242
      By: Melaine Gray, Esq.
         Lydia Protopapas, Esq.
         Jason W. Billeck, Esq.

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

On January 12, 2009, Tronox Incorporated and 14 of its affiliates (the "Debtors") filed

for protection under chapter 11 of the Bankruptcy Code.  On November 30, 2010, they

confirmed a First Amended Joint Plan of Reorganization (the "Plan") which, among other things,

created the Anadarko Litigation Trust (the "Trust") to pursue certain claims that three of the

Debtors had brought against Anadarko Petroleum Corporation ("Anadarko") and several of

Anadarko's subsidiaries, including Kerr McGee Corporation (collectively, "Kerr McGee" or

"Defendants").  The beneficiaries of the Trust are public and private entities that have claims

against the Debtors for damages for environmental response costs and tort liabilities.  These

include the United States, eleven states, the Navajo Nation, four environmental response trusts,

and a trust for the benefit of tort plaintiffs.  The Trust beneficiaries have agreed on an allocation

of the recovery in this lawsuit, if there is a recovery.

The amended complaint (the "Complaint") was initially filed by three of the Debtors:

Tronox Incorporated, a holding company created in 2005 to hold the stock of the other members

of the group; Tronox Worldwide LLC, which is the successor to Kerr-McGee Corporation,

formed in 1929 and sometimes called hereafter "Old Kerr McGee;" and Tronox LLC, formerly

known as Kerr-McGee Chemical LLC, which is the successor to Old Kerr-McGee's chemical

business.[1]  The Complaint charges that these three entities were left with 70 years and billions of

dollars of legacy environmental and tort liabilities when the oil and gas assets of the group were

---

[1] In addition to the complaint pursued by the Trust, the United States filed a complaint-in-intervention against Kerr McGee in its own name under the Federal Debt Procedure Act ("FDCPA").  28 U.S.C. §§ 3304 and 3306.  Since the claims in both complaints are substantially identical, and since the United States is a plaintiff in the Trust's action and has agreed to a distribution of any proceeds recovered on the Trust's complaint, the FDCPA complaint will be referred to hereafter only where the rights of the United States may be materially different from those of the other Plaintiffs.  The term "Plaintiffs" will include the Trust, suing on behalf of the Debtors' estates and seeking a recovery on behalf of a subset of creditors, and the United States.

transferred out and spun off; that the transfer was designed to "hinder, delay or defraud" creditors; that it left the Debtors insolvent and undercapitalized; and that these creditors can recover from the defendants the value of the transferred oil and gas assets. These assets were acquired by Anadarko for $18 billion only a few months after they were spun off, and there is no dispute that they are worth billions more today.[2]

Not surprisingly, the litigation was hotly contested, consuming 34 trial days at which 28 witnesses testified, 14 of whom were qualified as experts. Over 6,100 exhibits and thousands of pages of the deposition testimony of 40 witnesses were also admitted into evidence.[3] As far as the Court is aware, the case raises issues of first impression regarding the application of the fraudulent conveyance laws in the face of substantial environmental and tort liability. For the reasons stated hereafter, the Court finds that the Defendants acted with intent to "hinder and delay" the Debtors' creditors when they transferred out and then spun off the oil and gas assets, and that the transaction, which left the Debtors insolvent and undercapitalized, was not made for reasonably equivalent value. It finds that the Defendants must respond in damages, but not at the level demanded by the Plaintiffs.

FACTS

**Background**

Kerr-McGee Corporation, which later changed its name and business structure to become Tronox Worldwide LLC (and which is one of the Plaintiff Debtors), was founded in 1929 as an

---

[2] Anadarko was originally a defendant but was dismissed on a motion for summary judgment in an oral decision by this Court on May 8, 2012, *see* Transcript of hearing on May 8, 2012, Docket no. 395 at 26:16 -30:23. As discussed below, notwithstanding their success on the motion, Defendants asserted that this Court could not dismiss any of the Defendants by a final order but could only propose findings and conclusions to the District Court. All parties nevertheless agreed that the Court should proceed with the long-scheduled trial against the remaining Defendants. In order to prevent multiple submissions to the District Court, on appeal or through findings and conclusions, an order of dismissal was not entered on Anadarko's behalf, and will be included at the conclusion of the case in this Court. The jurisdictional issue is discussed further at pp. 159-166, *infra*.

[3] This includes the additional deposition testimony of two videotaped witnesses.

oil and gas exploration company. For purposes of clarity, it will sometimes be called Old Kerr-McGee hereafter. Old Kerr-McGee purchased its first refinery in 1945 and in 1955 acquired the refining, pipeline and marketing operations of Deep Rock Oil Corp., including more than 800 retail oil and gas outlets in 16 states. In 1952, Old Kerr-McGee entered the uranium business and began mining and milling uranium in the Lukachukai Mountains on the Navajo Nation and elsewhere. In 1963, it acquired T.J. Moss Tie Co., which operated 15 wood-treating plants using the chemical creosote and was responsible for at least 18 other similar plants that had operated throughout the country.

In 1967, Old-Kerr McGee acquired American Potash & Chemical Corp. ("APC"), which owned (among other things) a facility in Henderson, Nevada that produced ammonium perchlorate for use in rocket fuel; a rare earth facility in West Chicago, Illinois that produced radioactive thorium; and a titanium dioxide pigment plant in Hamilton, Mississippi.[4] APC was initially merged into Old Kerr-McGee; some of its assets were later spun off into a wholly-owned subsidiary that was known at one time as Kerr-McGee Chemical LLC and was a predecessor to another of the Plaintiff Debtors, Tronox LLC.

By November 2005, which (as discussed below) is a key date in the case, Old Kerr-McGee had terminated all of its historical businesses except two – the oil and gas exploration and production ("E&P") business and the titanium dioxide business. By 2005, the E&P oil and gas business had become wholly dominant, producing operating profits that year of approximately $1.8 billion as compared to the 2005 operating profit of the titanium dioxide business of $106 million. (PX 1224 at 30; Tr. (Wohleber) 5/24/2012 at 1235:25 – 1236:5). During the five years prior to 2005, the E&P business had produced cumulative operating profits of $5.2 billion as compared to $312 million for the titanium dioxide business. (PX 1224 at 30).

---

[4] Titanium dioxide is an industrial pigment used to whiten products such as paints, paper and plastics.

Despite the success of its E&P business, Old Kerr-McGee was also burdened with enormous legacy environmental and tort liabilities.  Its portfolio of environmental sites numbered more than 2,700 in 47 states, including federal Superfund sites in Jacksonville, FL; Columbus, MS; Manville, NJ; Soda Spring, ID; West Chicago, IL; Milwaukee, WI; and Wilmington, NC.  It had incurred more than $1 billion in environmental response costs since 2000 and was spending an average of more than $160 million annually on remediation.  (DX 2227 at 238-45; JX 75 at 33-34; PX 915 at 84 (Kerr-McGee 10-K 2005 annual report)).   It employed more than 40 professionals in its Safety and Environmental Affairs ("S&EA") Group just to manage the active environmental sites.  Beyond the costs of environmental remediation and control, during the six-year period ending in 2005, Old Kerr-McGee had settled approximately 15,000 claims of creosote tort liability for $72 million (plus $26 million in defense costs), and it was faced with an additional 9,450 pending claims and trial lawyers intent on prosecuting a new wave of creosote claims.[5]

**Project Titan and Project Focus**

As early as 2000 Old Kerr-McGee began to plan the transactions that restructured the company's E&P and chemical businesses and that are at the heart of the issues in this case. Starting in 2000, one of the company's investment bankers, Lehman Brothers, made a series of presentations, first, to the top management of the company,[6] and later to the Board, regarding what came to be known as "Project Titan" and, later, "Project Focus."  These were names given to the corporate reorganization that included the transfer of the E&P business – oil and gas assets

---

[5] Creosote is a chemical that has been identified as a possible human carcinogen.  It was used as a preservative at the Kerr-McGee wood treatment facilities.

[6] Top management included the CEO, Luke Corbett; the CFO, Robert Wohleber; and the general counsel, Gregory Pilcher.  These three individuals were known within the company as "the inner circle."  (Tr. (Rauh) 8/9/2012 at 4999:11-19, 5000:8-12; Adams Dep., 6/9/2010 at 208:3-19).

– which were initially owned by subsidiaries of Old Kerr McGee, to a new holding company
known as Kerr-McGee Corporation that is called hereafter "New Kerr-McGee" and is one of the
defendants in this litigation. Since the E&P business was no longer owned by Old Kerr-McGee,
which was responsible for the legacy liabilities, New Kerr-McGee, which owned the billions of
dollars of equity in the E&P assets, was in a position to disclaim liability for the legacy
liabilities.

Plaintiffs contend that these steps were part of a general plan to split the E&P assets from
the remaining assets (the titanium dioxide business) that would be left behind in Old Kerr
McGee together with all of the legacy environmental and tort liabilities. Defendants insist that
the purpose of Project Titan and Project Focus was to rationalize the companies' two main
businesses by organizing them in separate corporate groups. They contend, reasonably, that
there were sound business reasons for the corporate reorganization and that they had concluded
that the E&P and chemical businesses would do better as independent players in their respective
markets than as a complex whole. In Defendants' words, "Lehman and Kerr-McGee believed
that Kerr-McGee's stock was trading at a discount because E&P analysts who covered Kerr-
McGee did not understand how to value the Chemical Business properly." (Watson Dep.,
6/13/2012 at 455:22-456:09; JX 15 at 4, JX 17 at 19; JX 43 at 15; DX 340 at 6; Tr. (L. Corbett)
5/16/2012 at 404:12-405:12). Defendants insist that when the ownership of the E&P business
was removed from Old Kerr-McGee, the company was not committed to a full separation and
that there remained a range of alternatives, including "maintaining the status quo, selling a
minority stake in the Chemical Business, or divesting it outright." (JX 14 at 7; JX 15 at 5, 7; JX
17 at 9-15; JX 22 at 14-17; JX 30 at 13-16; JX 33 at 16-20; JX 69 at 18-19; DX 1583; DX 620 at

2, 5, 11; JX 96 at 4; JX 123 at 9-11; JX 122 at 7-8; JX 131 at 5-7 (Lehman analysis of potential

alternatives)).

Yet it is obvious that maintenance of the status quo and retention of the chemical

business as a partially owned subsidiary of Old Kerr-McGee would still leave Kerr-McGee with

a depressed stock price as a complex conglomerate, rather than a "pure play" oil and gas

business.  There is no doubt on the record of this case that Defendants intended from the outset

of Project Titan and Project Focus to divest the chemical business as soon as the market would

permit it.  It is also clear that Kerr-McGee management intended from the outset to free the

valuable E&P assets from the legacy liabilities, especially as this burden precluded Kerr-McGee

from being an attractive merger candidate.  Management was well-aware of the consolidation of

the E&P business that was taking place and the fact that from 1990 to 2004, almost 80% of the

independent North American oil and gas firms had merged into larger companies.  (PX 1205 at

2).  The record contains evidence that Anadarko, which acquired the Kerr-McGee E&P business

in 2006 only a few weeks after Kerr-McGee had divested the legacy liabilities, had considered

the acquisition of Kerr-McGee in 2002 and performed due diligence on Kerr-McGee's

environmental liabilities.  The record is clear that in 2002 Anadarko had rejected an acquisition

of Kerr-McGee, concluding that Kerr-McGee had more than 500 active pollution sites, had

owned more than 1,000 such sites and that the annual cost of remediation "eats up most of [Kerr-

McGee's] free cash flow." (PX 391 at 1).  According to Anadarko's findings, Kerr-McGee's

future environmental liability was "$BILLIONS" and there was "no end in sight for at least 30

more years." (PX 391 at 1, 15, 18; Perkins Dep., 4/20/2011 at 191:24 – 192:23; 193:7-24; 194:6

– 195:2; PX 293 (D. Perkins e-mail, 8/2/2002); A. Richey Dep., 11/2/2010, at 54:3-6, 217:10-

14).  Defendants emphasize the limited nature of Anadarko's due diligence, but the foregoing is

cited only for the proposition that the legacy liabilities disqualified Kerr-McGee from a lucrative

merger with another E&P company and provided ample incentive for Defendants to make every

effort to free the oil and gas assets from their burden.

In any event, the written record makes it clear that a complete separation was the goal

from the outset of Project Titan in 2000.  In one of the initial Lehman presentations in the fall of

2000, Lehman advised that the chemical business, which had recently been augmented by

several acquisitions, had grown to "sufficient, critical mass" to separate from the E&P business

altogether.  (JX 15 at 16; Tr. (L. Corbett) 5/15/2012 at 179:18-23).  Defendants cite voluminous

testimony adduced on their behalf that the Kerr-McGee officers and employees who were

assigned to the chemical business after the separation believed that the chemical company was

sound.  (Adams Dep., 6/9/2010 at 51:14-20; 304:15-305:5; 436:6-16 ("we have a viable business

going forward"); Romano Dep., 8/17/2010 at 223:7-19 (Tronox had "a viable business"); Foster

Dep., 12/15/2010 at 103:8-18, ("a company . . . that . . . had longevity")).  Nevertheless, there is

no convincing testimony that once the separation process had begun, there was any likelihood

that the result would not be a complete separation of the two businesses, provided that economic

conditions were favorable for a divestiture.

The written record is also absolutely clear that freedom from Old Kerr-McGee's legacy

liabilities was a central consideration in the decision to split the two businesses and in the

structure that was devised.  In January 2001, Lehman advised that "[i]f KMG-E&P is spun-off,

potential exists to isolate E&P operations from historical Titan [Old Kerr-McGee] environmental

liabilities."  (Lehman 1/5/2001 presentation (Update on Project Titan) JX 17 at 13, 44).

Alternative transactions would not isolate environmental liabilities in the Titan operations –

would not leave the legacy liabilities behind and provide the "complete separation" that would

arguably rid the E&P business of this enormous burden.  (*Id.* at 13, 44; *see also* Lehman 5/8/2001 (Project Titan) Presentation to Board of Directors, JX 30 at 22, 34, 37).  In 2001, Old Kerr-McGee retained the New York law firm of Simpson Thacher & Bartlett in connection with Project Titan; its partner testified that Kerr-McGee had insisted that a transaction be devised that "would not have the E&P business bearing the legacy liabilities."  (Gordon Dep., 12/14/2010 at 152:8-14, 152:17-153:9).  Simpson Thacher advised Kerr-McGee that it could accomplish this goal – a spinoff would allow Old Kerr-McGee to "get[ ] out from under legacy liabilities."  (PX 3).

**The Separation of the Chemical Business from the E&P Business**

The next steps in the separation of the chemical business from the E&P business came to be known as Project Focus.  These were a series of 11 transactions that were approved by the Kerr McGee Board on September 10, 2002 and were deemed effective on December 31, 2002.  In substance, a new holding company was formed, owned by New Kerr-McGee, called Kerr-McGee Worldwide Corporation.  In step 8, the ownership interests in the E&P subsidiaries were transferred from Old Kerr-McGee to Kerr-McGee Worldwide Corporation.[7]  In step 10, Old Kerr-McGee formed a new wholly-owned subsidiary, Kerr-McGee Chemical Worldwide LLC, and merged into it.  Kerr-McGee Chemical Worldwide later became Tronox Worldwide LLC, one of the plaintiffs, and retained all of the legacy liabilities of Old Kerr-McGee.  The CEO of Kerr-McGee at the time confirmed that the result of Project Focus was that "all of the businesses

---

[7] Specifically in step 8, ownership interests in the following oil and gas subsidiaries were transferred out of Old Kerr-McGee and into Kerr-McGee Worldwide Corporation, the new holding company that was owned by New Kerr-McGee: Kerr-McGee Oil & Gas Corporation, Atlantic Exploration & Production, Ltd., Benedum-Trees Oil Company, Kerr-McGee (Thailand) Ltd., Kerr-McGee Americas Ltd., Kerr-McGee Anton Ltd., Kerr-McGee Astrid Ltd., Kerr-McGee Bahamas Ltd., Kerr-McGee Benin Ltd., Kerr-McGee du Maroc Ltd., Kerr-McGee Eire Exploration Ltd., Kerr-McGee Hazar Ltd., Kerr-McGee Natural Gas, Inc., Kerr-McGee Offshore Canada Ltd., Kerr-McGee Olonga Ltd., Kerr-McGee West Africa Investment Ltd., Kerr-McGee Yemen Ltd., Mediterranean Exploration Ltd., Oryx Crude Trading & Transportation Inc., Oryx Energy Payroll Company, Oryx Gas Marketing Company, Oryx Pipe Line Company, Oryx Services Company, Sun Offshore Gathering Company, and Sunningdale Abu Dhabi Ltd.

that were owned by the original Kerr-McGee were transferred out except for the chemical

business." (Tr. (L. Corbett) 5/15/2012 at 218:3-16). He also confirmed that the remaining

business was left with every legacy liability of every discontinued business that Kerr-McGee had

engaged in over the prior 75 years. (Tr. (L. Corbett) 5/17/2012 at 543:21-544:25).

The transfers of Project Focus were wholly controlled by Kerr-McGee, and since Kerr-

McGee's public financial statements were reported on a consolidated basis, they were not

meaningfully disclosed in the company's public financials. There was a brief but uninformative

reference in the Kerr-McGee Form 10-K annual report, dated March 27, 2003.[8] Moreover, after

the transfer of the E&P assets in 2002, Kerr-McGee continued to operate as a consolidated

entity. Until it finally spun off the E&P assets and the separation was complete, Kerr-McGee

continued to pay its creditors and fund all of its operations (including its legacy liability

expenses) out of its central cash management system without regard to the ability of the

subsidiaries to pay the expenses on their own. (Tr. (Rauh) 8/9/2012 at 5002:17-5003:3, 5011:23-

5012:7, 5013:12-17, 5016:4-13; Mikkelson Dep., 6/22/2010 at 599:8-12, 599:15-600:3; Adams

Dep., 6/9/2010 at 237:6-20; Tr. (Williams) 9/13/2012 at 7569:2-21).

It is noteworthy, however, that one group of creditors was contractually protected against

the transfer out of Old Kerr-McGee of the oil and gas assets – holders of approximately

$2 billion in bonds that Old Kerr-McGee or a predecessor in interest had issued pursuant to three

Indentures. (JX 23, JX 48). Old Kerr-McGee had covenanted with the bondholders in the

Indentures that it would not divest itself of substantial assets unless the transfer involved

"substantially all" of its assets and the recipient of those assets assumed its obligations under the

_____

[8] The Form 10-K, which represented the annual report for the period ending December 31, 2002, referred briefly and without elaboration to a reorganization that occurred at the end of 2002 "whereby among other changes, Kerr-McGee Operating Corporation distributed its investment in certain subsidiaries (primarily the oil and gas operating subsidiaries) to a newly formed intermediate holding company, Kerr-McGee Worldwide Corporation. Kerr-McGee Operating Corporation formed a new subsidiary, Kerr-McGee Chemical Worldwide LLC and merged into it."

bonds. In order to induce the indenture trustees of the bonds to accede to the transfer, Kerr-McGee represented that Old Kerr-McGee had "distributed substantially all of its assets to its parent" through Project Focus. (PX1; Tr. (Wohleber) 5/22/2012 at 757:18-759:16). This representation was backed up by an internal analysis showing that the assets transferred out accounted for 86.4 percent of Old Kerr-McGee's assets, 83.2 percent of its revenues and 112.6 percent of its net income as of December 2001. (JX 47 at 49).[9] The record contains evidence that it cost Kerr-McGee approximately $22 million in fees to the lenders and expenses to the professionals to accomplish the transfer, indicating that the transaction was obviously not taken for unimportant reasons. (DX 2824.12 at 200 (Kerr-McGee 2005 Form10-K)).

Although some of the transactions regarding the severance of the chemical and oil and gas assets of the group were initiated at the end of December 2002, the split of the chemical and E&P business was not complete until 2005. In 2005, New Kerr McGee and Old Kerr-McGee entered into a series of agreements that documented the terms of the separation, including several 2005 transactions.[10] (JX66) In an Assignment, Assumption & Indemnity Agreement ("A, A & I Agreement") and a related "Assignment Agreement," New Kerr-McGee and its wholly-owned subsidiary, then known as Kerr-McGee Chemical Worldwide LLC (later to become Tronox Worldwide LLC), agreed on a formal split of their properties. *Id.* Kerr Mc-Gee's deputy general counsel, John Reichenberger, testified that the purpose of the Assignment Agreement was to accomplish "the formal assignment of those assets." (Reichenberger Dep., 3/23/2011 at 217:2-

---

[9] It was Defendants' position throughout this case that the chemical business was worth in excess of $1 billion, and that Old Kerr-McGee was not rendered insolvent or undercapitalized by the transfer out of the E&P assets. If it is true that the chemical business was worth $1 billion or more, and Defendants proved that the chemical assets had value, Kerr-McGee's representation to the indenture trustees was false and bears on the Defendants' credibility with respect to many of the issues in this case.

[10] For example, between April and June 2005 the ownership of Kerr-McGee Canada Northwest, Kerr-McGee Australia Exploration, and Production Pty and P&P Land Co. was transferred out of Old Kerr-McGee and into New Kerr-McGee.

19).  The A, A & I Agreement also confirmed that the chemical company was solely responsible

for all of the legacy liabilities of the terminated businesses of the group, including those

associated closely with the oil and gas business (such as Kerr-McGee's historical "contract

drilling business" and "refining and petroleum product manufacturing and marketing

businesses").  (JX66).  The only liabilities assumed by the E&P business would be those directly

associated with the "currently conducted" E&P operations.  The A, A & I Agreement and the

Assignment Agreement were finalized and signed in 2005 but were backdated to December 31,

2002, which is the date Defendants proffer as the date of the "closing" of Project Focus.[11]

On November 28, 2005, Kerr-McGee, Tronox Worldwide,[12] and Tronox Incorporated[13]

also entered into a Master Separation Agreement ("MSA") containing additional terms of the

separation.  There is no dispute that the terms of the MSA as well as the separation were dictated

by Kerr-McGee; the MSA so states ("Parent will, in its sole and absolute discretion, determine

all terms of the Separation. . . .  Tronox shall cooperate with Parent in all respects to accomplish

the Separation and shall, at Parent's direction, promptly take any and all actions necessary or

desirable to effect the Separation.") (JX 329 at 19; Tr. (Wohleber) 5/22/2012 at 904:6-20; Adams

Dep., 6/9/2010 at 245:17-25; Adams Dep., 6/9/2010 at 239:2-21, 244:5-23).[14]  The MSA

---

[11] A few days before these agreements were finalized, Kerr-McGee had received a formal demand from the Federal
Environmental Protection Administration ("EPA") for $179 million in clean-up costs in connection with a Kerr-
McGee legacy site in Manville, New Jersey.  (JX 163).  The A, A & I Agreement was amended to include a clause
under which the chemical business (Tronox) was required to indemnify New Kerr-McGee for all legacy liabilities
that Tronox had been required to assume.  (PX 528 (4/18/2005 draft of agreement with indemnification clause);
*compare with* PX515 (4/6/2005 draft of agreement without provision for indemnification)).

[12] Tronox Worldwide LLC (formerly Kerr-McGee Chemical Worldwide LLC) was Old Kerr McGee and the parent
company of Tronox LLC, formerly known as Kerr-McGee Chemical LLC, successor to the Old-Kerr-McGee
chemical business.

[13] To effect the separation, Tronox Incorporated was formed as a new holding company to hold the limited liability
company membership interests in Tronox Worldwide LLC.

[14] At some point during the drafting of the documents, Kerr-McGee's associate general counsel, Roger Addison
(slated to become general counsel of the spun-off chemical business), expressed concern that he might have a

contained terms governing the separation as well as Tronox's future administration of the liabilities that it had been allocated. For example, Tronox was left with a mere $40 million in cash for its business; New Kerr-McGee took all of the rest. Tronox was forbidden for seven years from changing the policies that the company had followed with respect to environmental remediation and administration. (JX 329 at 10-12 (§ 2.5(d) and (f)). The MSA also contained an ostensible $100 million, seven-year indemnity running from New Kerr-McGee to Tronox for the legacy environmental liabilities; however, the evidence at trial established that the indemnity was illusory. It covered only 50% of Tronox's environmental remediation costs and in order to access it Tronox had to spend $200,000 more than the existing environmental reserve at each individual site. (JX 329 at 10). Tronox (which started its separate existence with a mere $40 million) never had enough cash to trigger the reimbursement obligation. (P. Corbett Dep., 12/16/2010 at 440:20-442:2). As of March, 2009, after the bankruptcy filing, it had received less than $5 million from Kerr-McGee under the MSA. (PX 1107 at TRX-ADV1143193).

In 2005, New Kerr-McGee also required Tronox to take responsibility for $442 million in pension obligations and $186 million in unfunded "other post-employment benefits" ("OPEB Benefits") pursuant to an Employee Benefits Agreement dated November 28, 2005. (JX 330 at 262-63; DX 368 at 49; JX 330 at 255,263; Williams Direct, 6/22/2012 at ¶ 41; Balcombe Direct, 8/31/2012 at ¶ 41).[15] The record is devoid of any explanation as to why these liabilities were assigned to Tronox (other than that Tronox was allocated all the other liabilities that New Kerr-McGee did not want).

conflict of interest representing only the interests of the parent. Toward the conclusion of the drafting of the documents a lawyer was retained to represent the interest of the chemical business, but there is no evidence that he had any substantial input or that any of the terms of the separation were revised to Tronox's benefit as a result of his efforts.

[15] The pension obligations were apparently fully funded at the time of the spinoff but subsequently became underfunded when Tronox proved unable to handle them. (Tr. (Gibney) 9/5/2012 at 6272:22-6273:21). The retirement benefits were unfunded.

**The Sale/Spin Alternative**

As indicated above, although a step in the separation was taken at the end of 2002 when the stock of the E&P subsidiaries was transferred, the terms of the separation were not set until 2005. In the intervening years, Defendants also created the structure for the split, which was considered a continuation of "Project Titan." Thus, in early 2003, only a few weeks after the stock of the E&P subsidiaries was transferred out of Old Kerr-McGee and into a new holding company, Kerr-McGee's management requested that Lehman Brothers update its analysis for "our Project Titan." (PX 335; Tr. (Wohleber) 5/22/2012 at 763:4-17). On February 25, 2003, Lehman sent CFO Wohleber an updated Project Titan analysis. Lehman confirmed that there were two principal ways to separate the chemical and E&P businesses – a spinoff and a sale. Lehman observed that a spinoff would "alleviate" the environmental "burden" on Kerr-McGee, while a sale might not result in the legacy liabilities being "completely separated." (JX 69 at 19, 25). Kerr-McGee's top management also consulted their lawyers at the firm of Simpson Thacher & Bartlett, who produced a checklist for "Project S" that was virtually identical to a Project Titan checklist that had been prepared in April 2001. (Compare PX 15 (Project S) with PX 13 (Project Titan Spin-Off); *see also* Gordon Dep., 12/14/2010 at 275:8-276:6). CEO Corbett admitted that Project S was "a continuation of Project Titan." (Tr. (L. Corbett) 5/15/2012 at 255:17-21; 261:11-17).

Notwithstanding the preparations for a possible split, economic conditions in 2003 and the first half of 2004 were not favorable for a spinoff or a sale of chemical. This changed in September, 2004, when Lehman advised CEO Corbett that there was a "window of opportunity" to separate the companies in light of a "hot" market for chemical companies and high demand and pricing for $TiO_2$. (JX 94 at 4; JX 96 at 4; PX 431). In a presentation on January 4, 2005,

Lehman advised that the company embark on a "dual-track [spin/sale] process" to "[c]apitalize on [the] open 'window' in [the] equity markets and chemicals sector." (JX 122 at 14). Lehman pointed out that a "100% Spin-Off/Split-Off" would permit Kerr-McGee to achieve the benefits of a "pure play" valuation of the businesses and a "cleaner separation of Titan liabilities." (*Id*. at 7). Once again Lehman warned that the "separation of [the] Titan liabilities" would have "to be negotiated" in a sale or leveraged buyout as opposed to a spinoff. (*Id*. at 8).

The proposal that the Company proceed with a dual-track spin/sale process was taken to the Kerr-McGee Board of Directors at a meeting on March 8, 2005 and approved. Although the record is replete with reference to the legacy liabilities in correspondence between Kerr-McGee's top management and Lehman, and although the draft presentation to the Kerr-McGee Board that Lehman prepared stated that a "benefit" of a spinoff would be a "clean separation" from the legacy liabilities, the final presentation given to the Board deleted reference to the legacy liabilities altogether. (*Compare* JX 136 at 12-13 *with* JX 150 at 14-15). A former Board member testified that he never knew that a "clean separation" of the legacy liabilities would be a benefit of a spinoff. (Tr. (L. Richie) 7/26/2012 at 4263:18-4264:14).

The Board was also initially unaware that top management had instructed counsel to research the bankruptcy implications of a sale or a spin. Beginning in February 2005 lawyers at Covington & Burling, Kerr-McGee's new environmental and litigation lawyers, spent time over 96 days researching fraudulent conveyance litigation in other failed spinoffs. (PX 21 at KM-TRX03393872, 879-81, 883-84, 904; Pilcher Dep., 1/19/2011 at 404:19-405:11). In July 2005 Lehman prepared a draft Board presentation that compared the advantages and disadvantages of a sale and a spin and concluded (i) an advantage of the spin would be a cleaner "[s]eparation from legacy liabilities" but (ii) this would be "Complicated under bankruptcy scenario." (PX 8

at p. TRX-ENVTL0822790).  Following a meeting with CEO Corbett and General Counsel
Pilcher, Wohleber instructed Lehman to make one change in the presentation and to delete the
words, "Complicated under bankruptcy scenario."  (*Compare* JX 219 at 5 (July 12, 2005) *with*
PX 8 at p. TRX-ENVTL0822790 (July 8, 2012)).  The Board was never told of this issue.  (Tr.
(Richie) 07/26/2012 at 4235:25-4236:9).  In their testimony, CEO Corbett, General Counsel
Pilcher and CFO Wohleber all professed to have no recollection of the reasons for this deletion
or even of much of an understanding of what the issue was all about.[16]

**The Sale Side**

    The record does not indicate that Kerr-McGee was ever seriously interested in the sale of
the chemical business to a third party.  Nevertheless, Lehman went forward with preparations for
a possible sale in early 2005 with the identification of 60 potential purchasers.  In March 2005
Lehman prepared a "teaser" that was distributed to 16 possible buyers; 13 executed
confidentiality agreements.  Several potential buyers, including BASF, Thomas H. Lee,
Kohlberg Kravis Roberts, and Koch Industries, dropped out because they "could not get
comfortable with assuming the legacy liabilities," with Kohlberg, Kravis Roberts being the
"[m]ost vocal about not assuming legacy liabilities."  (JX 183 at 5).  Ineos indicated that it would
bid $1.2 billion for the chemical business without the legacy liabilities but only $300 million
with them; it dropped out when it was made clear that Kerr-McGee would only accept a bid that
included assumption by the purchaser of all of the environmental and tort legacy liabilities.
After management presentations were made to potential buyers, in April 2005, Lehman narrowed
the field to four, Apollo Investors, Bain Capital, JP Morgan Partners, and Madison Dearborn
Partners.  All were experienced investors in the acquisition of businesses, and they all were given

---

[16] Corbett and Wohleber both testified at trial.  Pilcher's deposition testimony was introduced as he was unavailable
as a witness.

access to a virtual data room containing information on the business being sold, which included

not only the chemical business but included approximately 27,000 documents relating to

environmental liabilities at more than 300 sites.

Eventually, three of these four finalists dropped out, largely because of reasons relating to

the environmental liabilities.  Bain Capital concluded that the liabilities were too expensive to

diligence.  (JX271 at 8).[17]  JP Morgan Partners made a final bid that assumed "environmental

liabilities of current operating sites only."  (JX271 at 40).[18]  Madison Dearborn Partners made a

final bid "for an asset purchase only for assets that are used in the operation of the chemical

business."  (Id.)  Kerr-McGee rejected the conditional bids out of hand.

The fourth interested purchaser, Apollo, performed extensive due diligence on the

chemical business and on the legacy liabilities.  In June 2005 Apollo made a "final offer" to

purchase Kerr-McGee Chemical Worldwide, which provided for a purchase price of $1.6 billion

"plus the assumption of certain environmental liabilities [then valued according to a] 3/31/2005

balance sheet at approximately $225 million" but excluded certain liabilities, including all

"liabilities related to Wood Treatment facilities."  (JX 210 at 2-3).  These terms were

unacceptable to Kerr-McGee because it wanted a "cleaner" separation from the liabilities.  (Id. at

4).  On the eve of Kerr-McGee's launch of an alternative transaction altogether - - an IPO and

spinoff - - Apollo sent Kerr-McGee a revised "final version" of a Purchase and Sale Agreement,

dated November 20, 2005, which provided for a purchase price of $1.3 billion, as well as $300

---

[17] Lehman itself recognized that the environmental liabilities were extremely difficult to diligence.  (See PX6 at 2 (email from Watson, Lehman's director managing the transaction, to another Lehman  employee, asserting that while "'all chemical companies have environmental' … not like this they don't")).  Watson testified that "other chemical companies didn't have legacy liabilities of other businesses that were attached to a chemical business in addition to environmental liabilities which were attached to the business that were of the ongoing operations." (Watson Dep., 5/23/2012 at 309:22-311:5).

[18] One of the representatives of JP Morgan Partners told a future Tronox executive that, in his opinion, what Kerr-McGee's top management "is trying to do to you is criminal."  (Tr. (Gibney) 9/15/2012 at 6058:15-6059:2).

18

million in indemnities from New Kerr-McGee for the environmental liabilities being assumed

and an additional $200 million indemnity for breaches of representations and warranties.  (DX

542 at 127-128, 131, 134, 136).  The November 20, 2005 agreement was signed by a

representative of the special purpose vehicle that Apollo proposed to use for the purchase.  The

Defendants characterize this bid as unconditional and rely on it as "proof" that the "market"

(Apollo) viewed Tronox as having very substantial value even above the environmental

liabilities.  Since the facts relating to Apollo's "final" bid are important in judging the strength of

Defendants' market defense, they will be further analyzed at length below.  Suffice it to say at

this point that even though Apollo transmitted to Kerr-McGee a signed contract, it contained

several open items as well as terms that Kerr-McGee had previously rejected, there was never a

meeting of the minds, and it is unclear whether there ever would have been an agreement

between Kerr-McGee and Apollo or what the terms would have been.

**The Spin Side**

At the same time as prospective purchasers were performing their due diligence, Kerr-

McGee was proceeding with preparations for an alternative transaction which would involve a

spinoff and include an initial public offering (IPO) for Tronox.  It was this transaction that

eventually closed.  It entailed a number of steps, leading to the final spinoff of the E&P and

chemical businesses.  First, as discussed above, the documentation for the separation of the

chemical from the E&P business was completed, and top management of Kerr-McGee decided

who would be employed by the respective businesses.  Next, Kerr-McGee arranged for Tronox's

financing.  After considerable negotiation, Tronox became indebted for an advance of $200

million and a revolving line of credit of $250 million that was provided by a group of lenders on

a secured basis.  Tronox also issued unsecured notes of $350 million at an interest rate of 9.5 %

(increased from 7% initially contemplated).  The net cash proceeds were $537.1 million, after

expenses.  Eventually, Tronox was required to pay almost all of its cash over to New Kerr-

McGee, keeping only $40 million.[19]  (JX 329 at 9-10).

The final step in the spin was an initial public offering ("IPO") of Tronox's stock to the

public on November 28, 2005.   An S-1 prospectus was prepared; Lehman and JP Morgan were

the lead underwriters.[20]   In the IPO, Tronox issued 17.5 million shares of Class A common stock

at $14 per share, yielding net proceeds after expenses of $224.7 million.  (DX 1833 at 3 (Tronx

Inc's 2005 10-K)).  The results were disappointing to Kerr-McGee.  (PX 834, Tr. (L. Corbett)

5/16/12 at 289:12-17; Watson Dep., 5/23/2012 at 383:20-384:1).  Tronox had been marketed as a

specialty chemical company, but the market considered it a commodity business, and it traded at

a lower multiple as a result (4.5 times EBITDA rather than 6.25 times).  (PX885; Tr. (Wohleber)

5/23/2012 at 945:12-25; 948:13-949:22; JX 349 at 21; PX11 at KM-TRMX03184846; *compare*

PX 487 at 1 with PX 1305 at 3; Tr. (Gibney) 9/5/2012 at 6265:7-17; *see also* Newbery Dep.,

2/15/2011 at 245:21-22).  Kerr-McGee had also hoped for a price of $20.50 per share but the

final share price was only $14 per share, and the underwriters each had to retain 1.5 million

shares that could not be immediately sold to the public.  (Tr. (Wohleber) 5/23/2012 at 949:23-

951:5; Tr. (Gibney) 9/5/2012 at 6265:18-25; PX845; DX247; DX249).  In any event, the $224.7

---

[19]  Kerr-McGee deemed $40 million as adequate cash for the new company; the record is not clear as to how it
arrived at this amount.  The chemical company had previously possessed no cash of its own, as all cash in the Kerr-
McGee group of companies was held and administered by one of the group's subsidiaries and disbursed throughout
the group as necessary.  The Kerr-McGee employees who were slated for the chemical business initially sought
more than $40 million, but Kerr-McGee CFO Wohleber decided that $40 million was enough and his decision could
not be challenged.  Defendants rely on the fact that Tronox was able to draw down on its line of credit for cash and
on the statement of Tronox's future CFO Mary Mikkelson that even less than $40 million would have been enough
in view of the line of credit, but it does not appear that Ms. Mikkelson's statement was anything other than a flippant
comment.  In any event, the record does not contain any evidence of an analysis of the cash flow needs of the new
business, and Wohleber did not provide a rationale for the $40 million number when he testified at trial.

[20]  Morgan's head of North American mergers and acquisitions observed at the time of the IPO that Morgan
probably should "not support the IPO as the sale is a better option," but it could not "whiff on capital [commitment]
given what [Kerr-McGee has] paid us this year."  (PX 845; Elliott Dep., 2/14/2011 at 9:14-10:9; 38:12-39:23).

million in proceeds was paid over to Kerr-McGee, resulting in an aggregate transfer of $761.8

million to Kerr-McGee from the spin.  (DX 1833 at 3).

The Class A Tronox stock issued to the public, however, had only 11.3% of the

combined voting power of all outstanding issues.   Kerr-McGee still held all of Tronox's Class B

stock and 88.7 of the combined voting power.  (DX 368 at 10; JX 358 at 4).  Kerr-McGee CFO

Wohleber was still chairman of Tronox's Board, and there does not seem to be any dispute that

Kerr-McGee still had "control over [Tronox's] decisions to enter into significant transactions"

and the "ability to prevent any transactions it [did] not believe [were] in Kerr-McGee's best

interests."  (DX 368 at 29-30 (amendment to Tronox's Form S-1 filed 11/21/2005)).  Tronox

continued to be controlled by Kerr-McGee until March 30, 2006, when Kerr-McGee distributed

to its shareholders its holdings of Tronox's Class B stock, and Wohleber and the other New

Kerr-McGee executives resigned from the Tronox Board.  (Tr. (Wohleber) 983:10-17; JX 315;

Tr. (Gibney) 9/5/2012 at 6114:2-12)    The distribution of the Class B stock completed the

spinoff and established Tronox as an independent company.

**The Chemical Business**

The business that was left behind when the E&P assets were divested entailed the

manufacture and sale of titanium dioxide ($TiO_2$), an industrial chemical used to whiten paints,

paper, plastic and other products.  Until the late 1990's Kerr-McGee had owned one pigment

plant in Mississippi and interests in two others.   Starting in 1998 it acquired plants in Savannah,

Georgia, Bostik, Netherlands, Antwerp, Belgium and Uerdingen, Germany and eventually

became the second or third largest producer of $TiO_2$ after Dupont.  Plaintiffs charge that the

Savannah and European acquisitions turned out to be economic disasters, and that they were

pursued by Kerr-McGee's top management only for the purpose of bulking up the $TiO_2$ business

21

so that it could stand on its own once the E&P assets were divested.  There is no question on the record of this case that the Savannah and Bostik plants turned out to be poor investments soon after they were acquired, and that the due diligence performed by Kerr-McGee was uncharacteristically perfunctory.  The Savannah plant in particular was old and inefficient and burdened with environmental and occupational hazards; one witness testified that it was in a "deplorable condition" and "operating totally out of control."  (Montgomery Dep., 6/21/2011 at 51:9-52:13; 122:19-124:19; 125:4-9; 125:12-16: 125:19-20; PX 400 at TRX-ENVTL 0867944).[21]  Nevertheless, these acquisitions made Tronox one of the major players in the titanium dioxide market.  As Kerr McGee acknowledged at the time of the spinoff, "[t]he growth of our chemical business over the past seven years, to the world's third largest $TiO_2$ producer and marketer, has created the critical mass necessary" for a spinoff.  (JX 151 at TRX-350036; PX 600; Tr. (L. Corbett) 5/15/2012 at 154:6-24).

The parties hotly dispute whether the business that became Tronox was ever profitable after the acquisitions had taken place.  Plaintiffs point out that on a net income basis the chemical business lost approximately $435 million from 2000-2004 (DX 368 at 40); they quote CEO Corbett who testified that "on a net income basis there were difficulties."  (Tr. (L. Corbett) 5/17/2012 at 519:7-11; *see also*, Tr. (L Corbett) 5/17/2012 at 578:9-14 (agreeing that net income is an "important figure")).  Defendants counter with the claim that EBITDA (earnings before interest, taxes, depreciation and amortization) is a more meaningful number because it measures a company's ability to generate cash and excludes non-cash and non-operating expenses. (Defendant's Post-trial Brief, 11/20/2012 at 138-139).  Certainly, EBITDA is a metric on which financial analysts rely, and it is particularly important in determining the ability of a financially

---

[21] Part of the plant was shut down in 2004 and the rest was closed during the Tronox chapter 11 case.  In addition, the seller was successfully sued for failure to disclose material defects and substantial damages were recovered.

troubled company to generate cash flow.  Nevertheless, the S-1 filing that Kerr-McGee prepared

in connection with the spinoff warned the market that "EBITDA and adjusted EBITDA have

material limitations as performance measures because they exclude items that are necessary

elements of our costs and operations."  (DX368 at 41).   In any event, the cash flow of the

chemical business after the acquisitions described above was never robust; from January 1, 2002

to September 30, 2005, it was a negative $168 million.  (Tr. (Rauh) 8/9/2012 at 4975:11-

4983:7).[22]

The titanium dioxide business also had limited potential.  It was cyclical and dependent

on the strength of the U.S. housing market, and in the years after 2000 was faced with increasing

operating costs and stagnant prices, which resulted in thin margins at best.  (Fisher Direct,

5/28/2012 at ¶ 17-23; PX 998 at 2).  The possibility of Chinese competition became an

increasingly important factor.  (Fisher Direct, 5/28/2012 at ¶¶ 30-37 ; Tr. (Gibney) 9/5/2012 at

6258:22-6259:14; Tr. (Smith) 5/25/2012 at 1413:5-1414:12; PX673 at TRX-ADV0341950,

TRX-ADV0353723).  The Defendants' industry expert conceded that in the early 2000's the

$TiO_2$ industry was not covering its cost of capital.  (Tr. (Cianfichi) 8/10/2012 at 5341:19-

5344:14; 5345:17-5346:2; *see also* Fisher Direct, 5/28/2012 at ¶¶ 17-23).

**Tronox as an Independent Company**

Tronox began to struggle almost immediately after the March 30, 2006 spinoff.  (Tr.

(Smith) 5/25/2012 at 1424:21-1425:2).  It was essentially a one-product company, as $TiO_2$ sales

represented more than 90% of its revenues.  (Tr. (Wohleber) 644:20-645:6; Adams Dep.,

6/10/2010 at 443:13-19; JX 315 at 8).  Despite some hope in the year before the spin that better

---

[22] Defendants contend that Plaintiffs' demonstrative on cash flow, used in oral argument, was not based on admissible evidence.  (Tr. (Summation) 12/12/2012 at 8053:20-8054:10).  Plaintiffs have adequately tied the exhibit to Tronox's S-1, which was admitted into evidence.  (DX 368 at 65-66, 149, 199).  The numbers were not disputed by Kerr-McGee's controller at the time, Rauh.  (Tr. (Rauh) 8/9/12 at 4982:8-4975:11-4983:13).

23

times were ahead, industry performance was disappointing.  Inflation-adjusted TiO$_2$ pricing had declined approximately 1.2% per year from 1950 to 2004.  (Tr. (Cianfichi) 8/10/2012 at 5292:6-14).  The plants acquired from Bayer and Kemira, discussed above, were inefficient, high-cost and required substantial capital expenditures (estimated, for example, at $514 million from 2005-2009).  (JX 191 at 51; Tr. (Fischel) 8/8/2012 at 4940:8-15).  Tronox continued to be unprofitable on a net revenue basis after the spinoff, losing $199.7 million from November 2005 through the third quarter of 2008 and having only one profitable quarter (due to a litigation settlement).  (PX 941 at 4; PX 972 at 4; PX 994 at 4: PX 1017 at 66, 132; PX 1048 at 4; PX 1066 at 4; JX 429 at 72; PX 1113 at 4; PX 1137 at 4; JX 446 at 4; JX 428 at 122; JX 358 at 113).

As a consequence of Tronox's cash position, it began cutting costs almost immediately after the spinoff.  It developed 40 cost-cutting programs within six weeks, and by 2008 it had undertaken more than 280 cost-cutting initiatives.  (PX943 at TRX-ADV0921412-13; Tr. (Smith) 5/25/2012 at 1428:9-1431:14; Tr. (Williams) 9/13/2012 at 7574:24-7576:17; DX 18 at 5; Tr. (Gibney) 9/5/2012 at 6154:11-6155:2).  In June 2006, two months after Kerr-McGee distributed its Tronox stock to its shareholders, Tronox began drawing on its line of credit (PX949; PX 1092 at 4); although it was able to pay back the lenders from time to time, it continued to draw on the revolver until its bankruptcy filing, when more than $212.8 million was outstanding to the secured lenders.  *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.) ("Tronox III"),* 464 B.R. 606, 610 (Bankr. S.D.N.Y. 2012).  Tronox had anticipated that its financial position would be substantially bolstered by the sale of land in Henderson, Nevada, and its draft long-range plan in September 2006 recognized that it required "[a]ggressive land sales to provide incremental 'gap' income for survival."  JX 398 at 6  It anticipated selling its interest in the Henderson land to a company known as Centex that, at the time of the spin, had a contract to

24

purchase the Nevada property for $515 million. JX 98.  However, the land was a "kaleidoscope"
of ponds of ammonium perchlorate waste which, according to the State of Nevada, endangered
the Las Vegas water supply, and remediation had not even begun.  (Tr. (Gibney) 9/5/2012 at
6279:5-6280:3; PX 864 at 1).  Centex could in any event walk away from the contract for a mere
$2 million.  (JX 98 at 1, 21).  In January 2007 Centex terminated what is more accurately
described as an option to buy the land, leaving Tronox with no substantial cash proceeds and a
potential environmental liability.  (JX 403; Tr. (Gibney) 9/5/2012 at 6200:2-7, 6280:14-18).

At the same time as it was struggling with poor cash flow, Tronox was obligated to fund
the legacy liabilities that Kerr-McGee had left behind.  It was able to fund only approximately
$90 million per year, net of reimbursements, which was significantly less than Kerr-McGee had
been spending.  (Tr. (Gibney) 9/5/2012 at 6292:24-6293:7).  Defendants cite the reduction in
expenditure as evidence that the cost of the legacy liabilities was decreasing.  This issue is
further discussed below; suffice it to say at this point that the record demonstrates that Tronox
simply did not have the cash to spend any more.  (*Id.* at 6293:8-17; Tr. (Snyder) 7/12/2012 at
7208:6-7210:5;  Tr. (Smith) 5/25/2012 at 1448:11-24; 1449:17-1450:11;  P. Corbett Dep.,
12/17/2010 at 476:11-477:6, 477:11-18, 477:20-478:4, 478:18-479:21, 480:9-14).  The head of
Tronox's environmental remediation division referred to its deferral of environmental expenses
as a "classic 'kick the can down the road.'"  (P. Corbett Dep., 12/17/2010 at 484:12-485:6).
Nevertheless, even the reduced cost of the legacy liabilities amounted to 56% of Tronox's 2006
EBITDA and 95% of its 2007 EBITDA.  (PX 1285 at 11, 12 (of 31);  Tr. (Snyder) 9/12/2010 at
7208:6-7210:5).  Moreover, as Tronox CEO Adams recognized at the time, the legacy liabilities
were "one of the highest risks to … our Strategy & business plan."  (PX 1065).  In this
November 3, 2007 email concerning risk mitigation, Adams described the legacy liabilities as a

25

"reverse poison pill:  It is the obstacle that keeps companies from wanting to discuss with Tronox potential mergers, JVs or other business development opportunities." (*Id.*)  He listed the other impacts of the legacy liabilities as follows:  inhibiting sales and growth, as customers demonstrated doubts about Tronox's future; creating investor concern and limiting financial flexibility; in sum, affecting the "long term viability of the business." (*Id.*)

Tronox's cash position continued to deteriorate throughout 2006 and 2007.  In March 2007 and February and July 2008, it obtained waivers of the covenants in its secured loan agreements so as to avoid a default.  (Mikkelson Dep., 6/23/2010 at 566:7-23; PX 1017 at 135; JX 1016; JX 423; JS 437; PX 1143 at 3; PX 1286 at 58 (of 111); Haimes Dep., 1/27/2011 at 360:11-364:7).  In September 2007 it entered into an accounts receivable securitization facility, selling its receivables in return for immediate cash.  (Klvac Dep., 5/24/2011 at 72:2-73:15; Tr. (Smith) 5/25/2012 at 1440:21-1441:9).  In May 2008 it retained Rothschild Inc. as restructuring specialists, and shortly thereafter retained its current law firm, Kirkland & Ellis.  (Adams Dep., 6/10/2010 at 432:17-433:25; DX 549; Tr. (Gibney) 5/16/2012 at 6290:20-6291:8; DX 683 at 1-2).  It filed its chapter 11 petitions in January 2009.

**Tronox's Chapter 11 Case**

Tronox's chapter 11 filing took place during the time of a national financial collapse when it was impossible to obtain third-party debtor-in-possession financing.  Tronox was dependent on its secured lenders to provide liquidity, and as a condition to providing short-term financing, they demanded a sale of its assets to a third party on an abbreviated timetable.  Tronox as debtor in possession duly prepared such a sale to an Australian $TiO_2$ producer but at a price that would satisfy only the secured lenders and provide no recovery or a mere pittance to the

remaining creditors – both the commercial unsecured creditors and the holders of the legacy

liabilities.

In order to avoid the loss of all the assets at a highly disadvantageous price, Tronox was

able to convince certain holders of its unsecured notes to provide financing that would avoid an

immediate sale, pay off the secured lenders and provide a platform for a reorganization if it could

deal with the legacy liabilities.  Debtholders provided such financing when, after months of

negotiation, the environmental authorities and tort plaintiffs agreed to accept as their bankruptcy

distribution the proceeds of this lawsuit (which Tronox as debtor in possession had already

commenced) plus certain cash consideration for their claims. (*See* First Supplement to Plan

Supplement for the First Amended Joint Plan of Reorganization ("Plan Supplement"), Case No.

09–10156, Dkt. No. 2441).  The debtholders providing financing and other commercial creditors

took the stock of the reorganized company.  The disclosure statement for Tronox's plan of

reorganization estimated that the recovery of the commercial creditors would be 58-78% (78-

100% if they participated in a proposed rights offering).  (*See* Disclosure Statement, Case No.

09-10156, Dkt. No. 2196, Ex. B at 10 n.9).  There was no estimate as to the projected recovery

for the environmental and tort creditors.  Tronox's chapter 11 plan was confirmed on November

30, 2010 (*See* Findings of Fact and Conclusions of Law Confirming the First Amended Joint

Plan of Reorganization of Tronox Inc., et al. ("Confirmation Order"), Case No. 09–10156, Dkt.

No. 2567).  The Plan became effective on February 14, 2011.  *Tronox Inc. v. Anadarko*

*Petroleum Corp. (In re Tronox Inc.)* ("*Tronox II*"), 450 B.R. 432, 436 (Bankr. S.D.N.Y. 2011).[23]

---

[23] The Environmental Settlement Agreement was filed as a supplement to the Plan.  Plan Supplement, Case No. 09–10156, Dkt. No. 2441.

THE COMPLAINT AND PRETRIAL PROCEEDINGS

**The Complaint**

The Complaint in this case was filed on May 12, 2009.  It set forth eleven claims for

relief:  (1) actual fraudulent transfers under the Oklahoma Uniform Fraudulent Transfer Act (the

''Oklahoma UFTA''); (2) constructive fraudulent transfers under the Oklahoma UFTA;

(3) fraudulent transfers under §§ 548 and 550(a) of the Bankruptcy Code; (4) civil conspiracy;

(5) aiding and abetting a fraudulent conveyance; (6) breach of fiduciary duty as a promoter; (7)

unjust enrichment; (8) equitable subordination; (9) equitable disallowance of claims; (10)

disallowance of claims pursuant to § 502(d) of the Bankruptcy Code; and (11) disallowance of

contingent indemnity claims pursuant to § 502(e)(1)(B) of the Code.  Plaintiffs demanded

compensatory damages in an amount to be proven at trial, including interest, plus punitive

damages and costs and expenses, including attorneys and expert fees.

Defendants moved to dismiss on multiple grounds, and in a decision dated March 31,

2010 the Court held that they survived an *Iqbal-Twombly* challenge as "Defendants cannot

reasonably assert that the allegations are not plausible on their face."[24]  *Tronox Inc. v. Anadarko

Petroleum Corp. (In re Tronox Inc.)*, ("Tronox I") 429 B.R. 73, 90 (Bankr. S.D.N.Y. 2010).  It

held further that (1) the counts charging intentional fraudulent conveyance under Bankruptcy

Code § 548(a)(1) and the Oklahoma UFTA, made applicable by Bankruptcy Code  § 544(b),[25]

---

[24] See *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009).

[25] Bankruptcy Code § 544(b) provides that a trustee in a bankruptcy case, which includes a debtor in possession in a
chapter 11 proceeding, "may avoid any transfer of an interest of the debtor in property or any obligation incurred by
the debtor that is voidable under applicable law by a creditor holding an unsecured claim…."  There is no dispute
that the "applicable law" in this case includes the law of Oklahoma.  There is a dispute as to whether that law also
includes Federal law under the FDCPA, the act under which the United States has filed its complaint-in-
intervention.  That issue is relevant with regard to the statute of limitations defense raised by the Defendants and is
discussed below.  For purposes of the motion to dismiss, the provisions of the Oklahoma UFTA were deemed the
"applicable law."

28

were stated with sufficient particularity within the meaning of Fed. R. Civ. P. 9(b) and

Bankruptcy Rule 7009;  (2) the intentional fraudulent conveyance counts and the counts

asserting a constructive fraudulent conveyance under Bankruptcy Code § 548(a)(2) and the

Oklahoma UFTA adequately stated a claim for relief;  (3) on the well-pleaded allegations of the

Complaint, the fraudulent conveyance claims were not time-barred under applicable Oklahoma

law;[26]  (4) the counts seeking damages for civil conspiracy and aiding and abetting a fraudulent

conveyance would be dismissed without prejudice, primarily on the ground that avoidance of a

fraudulent conveyance under the Bankruptcy Code leads to the relief set forth in § 550 of the

Bankruptcy Code, not to an award of damages for conspiracy or aiding and abetting, and the

Plaintiffs had not otherwise stated a claim for actionable damages for either civil conspiracy or

aiding and abetting; (5) the count charging Defendants with breach of fiduciary duty as a

promoter were not adequately pleaded and would be dismissed without prejudice; (6) the count

claiming unjust enrichment would be dismissed, as Plaintiffs had relied on express contracts in

their complaint;  (7) the counts asserting that Defendants' proofs of claim should be equitably

subordinated or disallowed were premature and should be dismissed without prejudice, as

Defendants had not yet filed proofs of claim; (8) Anadarko would not be dismissed as a

defendant as the Complaint adequately pleaded that it was a subsequent transferee of the alleged

fraudulent conveyances; and (9) the punitive damage claim would be dismissed as beyond the

purview of relief in a fraudulent conveyance case under § 550 of the Bankruptcy Code. *See*

*Tronox I*, 429 B.R. 73.

---

[26] The statute of limitations issues are discussed below, as Defendants continue to seek dismissal on the ground that
the claims in the Complaint are time-barred under Oklahoma law.  There is no substantial dispute that Plaintiffs
must rely on either the Oklahoma UFTA or the FDCPA to survive a limitations defense, as the limitations period
under the Bankruptcy Code is only two years from the challenged transfer to the petition date, and only minor
transfers took place during the two years preceding the Debtors' filing under chapter 11 on January 12, 2009.

As noted above, Plaintiffs were given leave to replead several of the counts, they did so, and the Defendants moved to dismiss these counts.   On this motion the Court found that the Plaintiffs had adequately stated a claim that Defendants had breached their fiduciary duty as a promoter because during the period between the IPO and the distribution of Tronox's stock to Kerr-McGee's shareholders, Kerr-McGee was the parent of an allegedly insolvent subsidiary with minority shareholders, and that on the allegations of the amended complaint a breach took place within the applicable limitations period.  *Tronox* II, 450 B.R. at 439-442.  The Court further found that claims for (i) civil conspiracy and (ii) aiding and abetting a breach of fiduciary duty were not adequately repleaded and dismissed them.  *Tronox II*, 450 B.R. at 442-444.

**Pretrial Proceedings**

The Complaint was initially filed during the course of Tronox's chapter 11 proceedings. Defendants, acting through Anadarko, took an active role in Tronox's chapter 11 case.  They appeared at almost all hearings and filed proofs of claim which they amended.  They sought recovery from the Debtors on many grounds, including the Debtors' alleged breach of their obligations under the Master Separation Agreement and the costs they had incurred in defending this suit.  They also sought recovery based on the premise that if it or its Kerr-McGee subsidiaries were found liable to the Plaintiffs, they should be afforded a claim against the Debtors for the entire amount of any liability pursuant to general equitable principles as well as § 502(h) of the Bankruptcy Code.[27]  Since the Plaintiffs have consistently claimed that they are entitled to a recovery against Defendants measured in the billions of dollars, Defendants' claims

---

[27] Section 502(h) provides that "[a] claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition."  Section 550 is the provision of the Code that sets forth the remedies available to the plaintiff in an avoidance case, including a fraudulent conveyance action.

made them potentially the largest creditors in the case, albeit with unliquidated, contingent

claims.  It negotiated and agreed to the following treatment in Tronox's Plan of Reorganization.

Article III.D of the Plan provided that Defendants could pursue their claims against the Debtors,

if damages were awarded to Plaintiffs; however, Defendants agreed to pursue their claims

against the Debtors under § 502(h) or otherwise only as an offset to liability for damages.

Therefore, except for a stipulated order resolving Defendants' rejection damages claims (DX

2720, dated January 26, 2011), in which Defendants' § 502(h) claim was reserved, Defendants

would not participate in the initial distribution under the Plan, and the Plan could become

effective without a determination of this adversary proceeding.   The Confirmation Order also

provided that:

> [a]ll parties reserve the right to make any available arguments and assert any
> available claims and available defenses concerning the effect, if any, of the Plan
> Documents on the determination of liability or measure of damages (including, to the
> extent relevant, the value of the Tort Claims and the Environmental Claims) in the
> Anadarko Litigation, including under section 550 of the Bankruptcy Code.

Confirmation Order, Dkt. No. 2567 at ¶ 191.  As indicated above, the Debtors' Plan also

substituted a litigation trust for the Debtors as plaintiff and provided that any recovery would be

for the benefit of the beneficiaries of the Trust and for the benefit of the United States, including

any recovery for the United States under its separate complaint under FDCPA.

        During the course of Tronox's chapter 11 case, the parties to this litigation also began a

very extensive discovery process.  They agreed to a comprehensive pretrial order, leading up to a

contemplated trial date of May 15, 2012.  Prior to trial, the Defendants also filed two additional

motions.  First, they sought summary judgment dismissing Anadarko as a defendant on the

ground that there was no evidence that Anadarko was a subsequent transferee of any of the

allegedly fraudulent conveyances or that it had participated in any breach of fiduciary duty.  In

an oral decision read into the record on May 8, 2012, the Court found on the basis of the summary judgment record that there had been no material transfer of assets from the Kerr-McGee subsidiaries to Anadarko, that Anadarko's Kerr-McGee subsidiaries had been maintained as separate entities during the years subsequent to their acquisition by Anadarko, that Anadarko was accordingly not a "subsequent transferee" of material assets of the Kerr-McGee entities, and that Anadarko should be dismissed as a separate defendant.[28]

In a second motion, Defendants sought partial summary judgment limiting the Plaintiffs' claim for damages.  Defendants relied on a clause in § 550 of the Bankruptcy Code providing that after the avoidance of a transfer, the trustee "may recover *for the benefit of the estate*, the property transferred, or, if the court so orders, the value of such property…" (emphasis added).[29] Defendants argued that the Plaintiffs' recovery must be limited to the amount of environmental and tort claims that had been filed in the chapter 11 case and remained unpaid, as anything further would not constitute a recovery for the "benefit of the estate."  Citing an almost unbroken line of authority that holds that the clause in question should not be construed as narrowly as the Defendants proposed, the Court held that any damages in this case would not be limited to the aggregate claims filed by the beneficiaries of this lawsuit.  *Tronox III*, 464 B.R. at 614-615.  On the other hand, it also noted that in addition to the limitations on damages set forth in § 550 of the Bankruptcy Code, courts have in appropriate cases reduced damages or mitigated liability in a fraudulent conveyance case.  *Id*. at 618.[30]

---

[28] As noted above, an order of dismissal has not been entered but should be entered in connection with this Decision.

[29] There has never been a dispute in this case that if Plaintiffs are entitled to relief, such relief should be in the form of damages rather than a reconveyance of the property transferred.

[30] Damages are discussed extensively, *infra*.

DISCUSSION

**Fraudulent Conveyance**

Plaintiffs' principal claim is that the transactions that "liberated" what Defendants had

represented were "substantially all" of Old Kerr-McGee's assets from 85 years of legacy

liabilities constituted a fraudulent conveyance – either "actual" (made with intent to hinder, delay

or defraud creditors) or constructive (made for less than reasonably equivalent value at a time the

transferor was or was rendered insolvent or undercapitalized).   There is no dispute that the

applicable fraudulent conveyance law is the Uniform Fraudulent Transfer Act ("UFTA") as

adopted by Oklahoma, the State where Kerr-McGee's and Tronox's headquarters were located at

all relevant times.  Although the UFTA (like the Uniform Fraudulent Conveyance Act that

preceded it) is very similar in substance to the Bankruptcy Code's provisions regarding

fraudulent conveyances, codified principally at 11 U.S.C. §§ 548 and 550, Bankruptcy Code

§ 548(a)(1) provides for the avoidance of a conveyance only if it took place within two years

prior to the date of the filing of the bankruptcy petition.  A two-year statute would permit the

Plaintiffs only to avoid, at most, a very few conveyances that took place after January 12, 2007,

or two years before the filing of Tronox's chapter 11 petition.   In order to use the longer statutes

of limitations that are provided in State fraudulent conveyance laws, a debtor must rely on

§ 544(b) of the Bankruptcy Code, providing that "the trustee [including a debtor in possession

such as Tronox] may avoid any transfer of an interest of the debtor in property or any obligation

incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured

claim…"[31]

---

[31] Defendants have raised an issue as to whether Plaintiffs have identified a "creditor holding an unsecured
claim…." and this issue is dealt with below.  Assuming Plaintiffs have met this condition, there is no question that
the drafters of the Bankruptcy Code adopted the rule of *Moore v. Bay*, 284 U.S. 4 (1931), and that a debtor such as
Tronox can avoid the transaction on behalf of the estate and all of its creditors.  *Tronox III*, 464 B.R. at 616.

**Statute of Limitations**

The law of Oklahoma, which the parties agree is "applicable law" for purposes of 11 U.S.C. § 544(b), provides a four-year limitations period for claims of actual fraudulent conveyance and constructive fraudulent conveyance. OKLA. STAT. tit. 24, § 121(1)-(2).[32]  A four-year look-back period from the date of Tronox's chapter 11 petition in January 2009 would encompass the IPO in November 2005 and the final spinoff in March 2006, but not the 2002 transfers if they are considered as separate, complete transactions.[33]  Defendants argue that Plaintiffs were damaged by the transfer of the stock of the E&P subsidiaries from Old Kerr-McGee to a new holding company, New Kerr-McGee, which they assert was complete and perfected at the end of 2002.  After the 2002 transactions, they contend, the value and assets of the E&P subsidiaries were no longer available to creditors of Old Kerr-McGee, and any damage to the legacy creditors had been accomplished more than six years before Tronox's chapter 11 filing.  Defendants are wrong for a number of reasons.

First, the record in this case demonstrates that the transfer of the oil and gas assets was not complete and not viewed by Kerr-McGee itself as complete until 2005,  well within a four-year limitations period.  For example, it was not until 2005 that Kerr-McGee completed the agreements that finalized the transfers of assets.  (JX 66 at 1; PX 569 at TRX-ADV0905458; PX 572 at 1; Reichenberger Dep., 3/23/2011 at 212:13-217:19; JX 99; PX 20; DX 1276:  Addison Dep., 7/14/2010 at 323:17-324:19; PX 312 at TRX-ENVTL0759115-116; Addison Dep., 7/14/2010 at 329:10-332:3;  PX 579 at KM-TRX02855717, 719; PX 515; JX 163; PX 528;

---

[32] As noted above, Plaintiffs further contend that the statute of limitations is longer by virtue of the law that governs the cause of action of the United States under FDCPA.  That issue is discussed below.

[33] The look-back period under the Bankruptcy Code is based on the operation of § 108(a), which preserves for the benefit of the estate all claims that were not time-barred on the date of commencement of the bankruptcy case. Section 546(a) then gives a trustee or debtor in possession two years to commence the avoidance action.

Addison Dep., 7/14/2010 at 345:2-23). Although the Assignment Agreement and the

Assignment and Indemnity Agreement were both backdated to 2002, there is no dispute that they

were not finalized or executed until the spring of 2005, within four years of Tronox's January

2009 chapter 11 filing. (Addison Dep., 7/13/2010 at 214:23-215:8; JX 66 at 1, PX 645, DX

1276). Kerr-McGee's Deputy General Counsel Reichenberger recognized that the assignment

of the assets had not occurred until the Assignment Agreement was executed; he testified "that's

what [the Assignment Agreement] was accomplishing." (Reichenberger Dep., 3/23/2011 at

217:2-19).

Defendants assert that documents can properly be backdated to an earlier "as of" date

when they merely memorialize an agreement that was final and conclusive at the earlier date. It

is well-established that "parties to a contract cannot make it retroactively binding to the

detriment of third persons." *In re Tronox I*, 429 B.R. at 99, *citing Debreceni v. Outlet Co.*, 784

F.2d 13, 18-19 (1st Cir. 1986). Backdating cannot be used for an improper purpose, such as

violating a law, or if it has an improper effect, such as compromising the rights of third parties.

*SEC v. Solucorp Industries, Ltd.*, 197 F.Supp.2d 4, 11 (S.D.N.Y. 2002); *see also* Jeffrey Kwall &

Stuart Duhl, *Backdating*, 63 Bus. Law. 1153, 1159, 1169-1171 (2008). In any event, the

Assignment Agreement, which finalized the assignment out of assets, does not simply document

a prior agreement, as the terms of the separation were not set until 2005. For example, in 2005,

Kerr-McGee Canada Northwest and other companies were transferred from Old to New Kerr-

McGee. *See* n. 10, *supra*. In 2005, Tronox was forced to assume $186 million in unfunded

OPEB obligations to retirees and other employees, whether or not the employees had any prior

connection to the chemical business, as well as $442 million of pension obligations. (Williams

Direct, 6/22/2012 at ¶ 41, Balcombe Direct, 8/31/2012 at ¶ 41, DX 368 at 49). Under the Master

35

Separation Agreement, Tronox was not allowed to change the OPEB Benefits for a period of three years after the separation. (Tr. (Gibney) 9/5/2012 at 6272:22-6273:21, 6274:23-6275:6). There is not the slightest indication in the record that the parties decided in 2002 that Tronox would be required to take on these liabilities.

A second reason the statute of limitations did not start to run in 2002 is that Plaintiffs suffered no immediate injury from the stock transfers. As noted above, Defendants contend that after 2002 legacy liability creditors no longer had claims against the assets of the E&P subsidiaries. However, in order for a legacy creditor to have had recourse to the property transferred in 2002, the creditor would have had to obtain a judgment against Old Kerr-McGee, serve the judgment and have it be returned unsatisfied, and then execute on the stock of the subsidiaries.

This scenario would have been impossible until well within the four-year limitations period. There is no question on this record that Kerr-McGee continued to pay all the environmental expenses and claims out of its centralized cash management system until at least the date of the IPO in November 2005. The contention in Defendants' brief that "Plaintiffs [the Old Kerr-McGee entities] were responsible for and funded their own Legacy Liabilities both before and after Project Focus" [the 2002 transfers] [Def. Br. at 28-29] has no basis in the factual record. Many if not most of the legacy liabilities derived from discontinued businesses, and when a discontinued business could not pay for an expenditure, Kerr-McGee recorded the net payable as an equity contribution or advance from the parent. (Tr. (Rauh) 8/9/2012 at 5016:4-13). Controller Rauh admitted that "Kerr-McGee sometimes paid amounts from the central cash management system that it knew the subsidiaries couldn't repay." (Tr. (Rauh) 8/9/2012 at 5013:12-17). Until Tronox was finally removed from the Kerr-McGee group, it would have

36

been impossible for any legacy liability creditor to access any of the assets of any of the

subsidiaries because all environmental expenses were paid out of a common fund long before a

creditor could reach that point.  The Oklahoma UFTA recognizes that a fraudulent conveyance

takes effect when there is an actual effect on creditors and their rights.[34]

In any event, the law is clear that for statute of limitations purposes fraudulent

conveyances are examined for their substance, not their form.  As the Second Circuit has held:

"[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all

its composite implications."  *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (internal

quotations omitted).  In *In re HBE Leasing Corp.*, 48 F.3d 623, 638 (2d Cir. 1995) ("*HBE*

*Leasing I*"), the Circuit Court further held that the District Court had "correctly disregarded the

form of this transaction and looked instead to [the] substance."  It explained: "It is well

established that multilateral transactions may under appropriate circumstances be 'collapsed' and

treated as phases of a single transaction under the UFCA."[35]  As the Court continued, quoting *In*

*re Best Products*, 168 B.R. 35, 56-57 (Bankr. S.D.N.Y. 1994): "'In deciding whether to collapse

the transaction and impose liability on particular defendants, the courts have looked frequently to

the knowledge of the defendants of the structure of the entire transaction and to whether its

components were part of a single scheme.'"[36]  *HBE Leasing I*, 48 F.3d at 635-36; *see also Boyer*

*v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) ("fraudulent conveyance doctrine

… is a flexible principle that looks to substance, rather than form, and protects creditors from

---

[34] Section 118(1)(b) of the Oklahoma UFTA provides that a transfer of an asset that is not real property or a fixture
takes place when a creditor on a single contract can no longer acquire a judicial lien on that asset superior to the
interest of the transferee.  An obligation is incurred, if evidenced by a writing, "when the writing executed by the
obligor is delivered to or for the benefit of the obligee."  OKLA. STAT. tit. 24, § 118(5)(b).

[35] The Circuit Court was there construing the New York Uniform Fraudulent Conveyance Act ("UFCA"), but there
is no substantive difference from the subsequent UFTA for purposes of the "collapsing" doctrine.

[36] The *Best* Court was there quoting its own prior opinion in the same case, 157 B.R. 222, 229 (Bankr. S.D.N.Y.
1993).

any transactions the debtor engages in that have the effect of impairing their rights….") (citation omitted); *In re Sunbeam Corp.*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2011) ("Courts have 'collapsed' a series of transactions into one transaction when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the parties in the transaction"). Most recently, in its summary order affirming the lower court in *Buchwald Capital Advisors LLC v . JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 447 B.R. 170, 186 (Bankr.S.D.N.Y. 2011), *aff'd*, 480 B.R. 480 (S.D.N.Y. 2012), *aff'd*, ___ Fed. Appx. ___, 2013 WL 5614238 (2d Cir. Oct. 15, 2013) (summary order), the Second Circuit concluded that the collapsing doctrine may be applied, *inter alia*, based on the transferee's "actual . . . knowledge of the entire scheme."

There is no question on this record that Defendants devised, carried out and had complete knowledge that the "Project Focus" transfers in 2002 were part of "a single integrated scheme" to create a "pure play" E&P business free and clear of the legacy liabilities.  The facts that support this proposition are overwhelming.  Project Focus came on the heels of Kerr-McGee's identification of the legacy liabilities as an "impediment" to the acquisition of Kerr-McGee by a larger company.  (Tr. (L. Corbett) 5/15/2012 at191:24-192:12, 192-17-20).  Lehman was instructed to consider the legacy liabilities of the chemical and discontinued businesses as a "Structural Consideration" for the alternative restructuring possibilities.  (Tr. (L. Corbett) 5/15/2012 at 178:9-12, 188:5-12; Watson Dep., 2/8/2011 at 51:6-52:19; 59:23-60:2; Tr. (Wohleber) 5/22/2012 at 649:20-650:2, 651:15-25).  Lehman's presentation to management as early as January 5, 2001 proposed a spinoff as a solution to the legacy liability problem, advising that "[l]egacy environmental issues could possibly be left with Titan [Old Kerr-McGee, later

38

Tronox] should KMG choose to spin off KMG-E&P" and "[i]f KMG-E&P is spun-off, potential

exists to isolate E&P operations from historical Titan environmental liabilities." (JX17 at 13,

44). Alternatives would "not isolate environmental liabilities to the Titan operations." (*Id*. at

27).

In its April 2001 presentation on Project Titan to Kerr-McGee's top management,

Lehman again advised that Kerr-McGee could "spin [the E&P business] in order to leave Titan

'legacy liabilities' behind." (JX22 at 37). By April, the law firm of Simpson Thacher & Bartlett

had been retained and had been advised of the following condition imposed by Kerr-McGee on

the terms of any spinoff: that the "spinoff would not have the E&P business bearing the legacy

liabilities." (Gordon Dep., 12/14/2010 at 23:8-24:14, 34:7-20, 34:24-35:5; 152:8-14, 152:17-

153:9; PX 3; Pilcher Dep., 1/18/2011 at 133:11-135:9; 1/19/2011 at 389:22-390:6). Simpson

Thacher confirmed that a spinoff would allow Kerr-McGee to "get[] out from under legacy

liabilities." (PX 3). The inner circle had earlier, in March 2001, broached for the first time with

the Board the possibility of a separation of the chemical and E&P businesses.[37] Defendants

emphasize that in 2001 no decision had been made to spin off the E&P or the chemical business,

and that it remained possible that there would be no spinoff or that the chemical business could

have been sold to a third party. Yet the question for "collapsing" purposes is not whether

Defendants' "single integrated scheme" could have been aborted—in that case this lawsuit would

never have been brought. The question is whether Plaintiffs proved that the asset transfers in

2002 were part of a single integrated scheme, known to Defendants, that culminated only in the

years 2005-2006. Plaintiffs proved this by clear and convincing evidence.

---

[37] The inner circle, however, never told the Board at the time that a benefit of the separation and a later spinoff
would be that "E&P goes free of legacy liabilities." Lehman inserted this fact in its draft of the May 8, 2001, Board
presentation, but all references to the legacy liabilities had been deleted from the presentation by the time it was
given to the Board. (*Compare* JX 25 at 21 *with* JX27 at 21).

Defendants also argue that there were valid business reasons for segregating the chemical and E&P lines of business, and the record contains Simpson Thacher's advice that there had to be legitimate business reasons for the corporate reorganization – such as improved management "focus" and "incentives" -- if the transaction was to qualify as a tax-free spinoff. (JX 24 at 4; PX3; JX77). Even so, the 2002 transactions were merely one step in a process, and it was not until 2005 that the "rationalization" was effected. Before, then, Kerr-McGee had chemical and E&P assets located in multiple subsidiaries. (Tr. (L. Corbett) 5/15/2012 at 250:14-20).[38] In any event, rationalization of the corporate structure did not require that substantially all of the assets be cleansed of legacy liabilities and that all such liabilities be allocated to an insubstantial percentage of the assets. Plaintiffs are suing because Kerr-McGee (i) created a new holding company near the top of the corporate chain (and above the entities responsible for the legacy liabilities); (ii) transferred all of the valuable oil and gas assets to that entity – assets that Defendants represented were "substantially all" of their assets; (iii) left all of the legacy liabilities in the old company or transferred them in; and (iv) when the market permitted, completed the separation of the best assets from the liabilities.

In any event, the question for statute of limitations purposes is not whether good business reasons existed for splitting the chemical and E&P businesses. The question is whether there was a single integrated scheme that started in 2000. On this question, there is no credibility to the uniform testimony of the inner circle that isolation of the oil and gas assets from the chemical business had nothing to do with an effort to cleanse the E&P assets from the legacy liabilities. *See*, *e.g.*, former General Counsel Pilcher's testimony that the proposition that Kerr-McGee intended to isolate the E&P assets from the legacy liabilities had "absolutely no truth to it.

---

[38] CFO Wohleber referred to the structure as "our new 'octopus' corporate structure." (JX 54 at 4; Tr. (Wohleber) 5/22/2012 at 732:6-11).

40

Project Focus was motivated *solely* out of legitimate business needs."  (Pilcher Dep., 1/20/2011 at 588:10-24). (emphasis in Defendants' Br. at 38).   Neither Pilcher nor any of Defendants' 27 other witnesses undertook to explain why the good business reason of splitting the chemical and E&P business could be fulfilled only if 85 years of legacy liabilities were left for the chemical business to bear while "substantially all the assets" were cleansed of those liabilities.  The evidence is clear and convincing that the Defendants' good business reason was undertaken with the purpose of cleansing the E&P assets of all of the legacy liabilities, a scheme that included separation of the legacy liabilities in 2002 and was completed when the spinoff was finalized in 2005-2006.

The final and conclusive reason why the limitations period in this case cannot be measured from Defendants' internal reorganization in 2002 is one of policy.  The environmental laws of the United States and many of the States are founded on the principle of strict liability. *See United States v. Atlantic Res. Corp.*, 551 U.S. 128, 136 (2007), quoting *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 184 (2d Cir. 2003) ("CERCLA § 9607 [providing liability for the owner or operator of a facility] is a strict liability statute.").  An entity that has had or has assumed an obligation to clean up a site or to contribute to a remediation cannot avoid that obligation, except perhaps in its own bankruptcy case.  Defendants' view of the law would permit a shrewd and unscrupulous enterprise to divest itself of "substantially all of its assets," as Kerr-McGee represented it did, continue to satisfy environmental liabilities from the cash flow of the combined entity until the statute of limitations period had run and the divestiture was ready for completion, and then split the good assets from the bad.  If the architects of such a scheme could claim that the statute of limitations had already run by virtue of the first step in the scheme,

41

they would have free reign to hinder and delay creditors so long as they could do it in two steps

several years apart (at least four years under Oklahoma law).

Moreover, there would be no recourse whatsoever for legacy creditors if, as in this case,

there was minimal disclosure of the first phase of the internal corporate reorganization and no

disclosure whatsoever of its effect on creditors.  Defendants assert that the 2002 transfers were

disclosed in Kerr-McGee's 2002 Annual Report, published on March 27, 2003, but that report

only contained an opaque reference, noting that "[a]t the end of 2002, another reorganization

took place whereby among other changes, Kerr-McGee Operating Corporation distributed its

investment in certain subsidiaries (primarily the oil and gas operating subsidiaries) to a newly

formed intermediate holding company, Kerr-McGee Worldwide Corporation.  Kerr-McGee

Operating Corporation formed a new subsidiary, Kerr-McGee Chemical Worldwide LLC and

merged into it."  (JX75 at 3).  There was no disclosure that this "reorganization" diverted

substantially all of the assets of the parent to a new holding company that would eventually

disclaim liability for the legacy liabilities.  Indeed, it was impossible to determine the effect of

the distribution to "a newly formed intermediate holding company," and there was no disclosure

that Kerr-McGee had this "newly formed intermediate holding company" assume more than $2

billion in debt owed to the group's largest creditors because those creditors had the protection of

covenants in their loan agreements.  (Williams Direct, 6/22/2012 at ¶¶ 45, 58; table 4; JX 23, JX

48).[39]

**The Claims of the United States under FDCPA**

As noted above, the United States brought a complaint in intervention against the

Defendants under the Federal Debt Collection Practices Act ("FDCPA"), 28 U.S.C. § 3001 *et*

---

[39] Involuntary creditors such as environmental and tort claimants do not have such covenants and must rely, for the most part, on the protection of the fraudulent conveyance laws. *In re W.R. Grace & Co.*, 281 B.R. 852, 867 (D.Del. 2002).

*seq*., a fraudulent conveyance statute similar to the UFTA under which the United States can pursue its claims of a similar nature.  The United States has represented that it will accept a recovery as a creditor in the Liquidating Trustee's case and not seek a separate recovery under the rubric of its separate complaint, and since the Court concludes that the Plaintiffs' claims are timely and awards damages under the Liquidating Trustee's complaint, it does not appear that a separate determination of the government's damages is necessary.  It is necessary, however, to examine the government's claims under the FDCPA because even if Plaintiffs' claims are untimely under the Oklahoma four-year limitations period, the United States is not subject to a State statute of limitations[40] but can avail itself of the statute of limitations and tolling provisions contained in 28 U.S.C. §§ 2415(a) and 2416, which are the limitations provisions applicable to fraudulent conveyance suits brought by the United States.

The FDCPA was enacted to establish "a comprehensive statutory framework for the collection of debts owed to the United States government," with an effective date of May 29, 1991.  *United States v. Gelb*, 783 F.Supp. 748, 751 (E.D.N.Y. 1991), quoting H.R. Rep. No. 101-736, 101st Cong.2d Sess., reprinted in  1990 U.S.Code Cong. & Admin.News 6630, 6631.  The fraudulent conveyance provisions of the FDCPA are codified at 28 U.S.C. §§ 3301-3308. Section 3306(b) of the FDCPA provides, with certain exceptions, a six-year statute of limitations from the date of the challenged transfer for actual and constructive fraudulent transfer claims under the FDCPA.  Admittedly, if the transfers of the E&P subsidiaries took place for limitations purposes on December 31, 2002, Tronox's chapter 11 filing on January 12, 2009 was still six years and 13 days later and untimely under a six-year period.  Nevertheless, the United States and Kerr-McGee entered into a series of tolling agreements during the intervening period that

---

[40] The United States is not generally bound by a state statute of limitations.  *United States v. Moore*, 968 F.2d 1099, 1101 (11th Cir. 1992), citing *United States v. Summerlin*, 310 U.S. 414, 416 (1940).

tolled the FDCPA's statute of limitations through August 29, 2008, thereby extending the limitations period and making it a viable claim in January 2009 when the bankruptcy petitions were filed.  Therefore, even if the fraudulent conveyance action is governed by State law, the United States may avail itself of a longer limitation period, and there is no question that the claims of the United States under the FDCPA would not be barred.

**The FDCPA as "Applicable Law" under § 544(b) of the Bankruptcy Code**

As noted above, Plaintiffs' ability to assert claims under the Oklahoma UFTA derives from § 544(b) of the Bankruptcy Code, which permits a debtor to avoid transactions that are voidable under applicable law by a creditor holding an unsecured claim that is allowable under § 502 of the Bankruptcy Code or that is not allowable only under § 502(e) of the Code.    There is no dispute that the Oklahoma UFTA is "applicable law" within the meaning of § 544(b), but as discussed above, the Oklahoma UFTA has a four-year limitations period for certain fraudulent conveyance actions.  If a longer period were needed to reach back to the December 2002 transfers, Plaintiffs contend that they can rely on the six-year limitations period in the FDCPA as "applicable law," together with the tolling of that period agreed to by Kerr-McGee.

Defendants dispute the use of the FDCPA as "applicable law" within the meaning of § 544(b), relying almost exclusively on the recent decision in *MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.)*, 675 F.3d 530, 536 (5th Cir. 2012).  There the Fifth Circuit, citing § 3003(c) of the FDCPA, which provides that it "shall not be construed to supersede or modify the operation of . . . title 11," rejected a line of authority to the contrary and held that the FDCPA could not be applicable law for purposes of § 544(b).  *Id*.  While recognizing that the legislative history was "not dispositive" on the issue, the Fifth Circuit found support for its view in the statement of a committee chairman to the effect "that the Bankruptcy

44

Code should be read as if the FDCPA did not exist." *Id*. at 535-536 (citing, 136 Cong Rec.
H13288 (daily ed. Oct. 27, 1990)). The Court concluded that "treating the FDCPA as applicable
law under § 544(b) would impermissibly modify the operation of Title 11" and run afoul of
section 3003(c). *Id*. at 535.

As noted, the Fifth Circuit in *Mirant* rejected a line of cases that have held that the
FDCPA can be "applicable law" for purposes of § 544(b), thereby affording the trustee use of the
FDCPA statute of limitations. *See In re Pfister*, 2012 WL 1144540, at *5 (Bankr. D.S.C. Apr. 4,
2012) (holding transfers were avoidable pursuant to § 544(b)(1) and the FDCPA where the IRS
was a creditor); *In re Walter*, 462 B.R. 698, 704–06, 712 (Bankr. N.D. Iowa 2011) (holding
trustee sufficiently pled a claim under § 544(b)(1) and the FDCPA); *In re Porter*, 2009 WL
902662, at *20–21 (Bankr. D.S.D. Mar. 13, 2009) (holding that a trustee could step into the
shoes of the Small Business Administration and assert fraudulent conveyance claims under the
FDCPA and its six-year statute of limitations); *In re Gurley*, 222 B.R. 124, 132 (Bankr. W.D.
Tenn. 1998) (bankruptcy court applied FDCPA and its "reach-back period"). It is respectfully
suggested that these cases are consistent with the use of the term "applicable law" under the facts
of this case. Treating the FDCPA as "applicable law" does not "modify" or "supercede" the
operation of the Bankruptcy Code, and a holding that the Code "should be read as if the FDCPA
did not exist" gives too much weight to a comment in the legislative history.

It is recognized that other cases have found that the FDCPA is not "applicable law" under §
544(b) on the theory that only the United States can avail itself of the avoidance powers of the
FDCPA and solely for its own benefit. This was the conclusion of the Bankruptcy and District
Courts in *Mirant*, *see McAsset Recovery LLC v. Commerzbank AG (In re Mirant Corp)*, 2010
WL 8708772 at *11, *18 (Bankr. N.D. Tex. 2010), *aff'd on this issue*, *McAsset Recovery, LLC v.*

45

*Commerzbank AG*, 441 B.R. 791, 804 (N.D. Tex. 2010) ("the FDCPA does not contain a private

right of action . . [and] is a remedy for the exclusive use of the United States" ).  *See also*

*McAsset Recovery, LLC v. Southern Co.*, 2008 WL 8832805 (N.D. Ga. 2008).  These decisions

fail to give sufficient weight to the language and purpose of § 544(b) of the Bankruptcy Code.

The Oklahoma UFTA is also a remedy for the "exclusive use" of creditors who can sue under

that statute.  It is incorporated in Federal law because of the operation of § 544(b), not because of

anything contained in its own text, and there is no reason to treat the FDCPA any differently.

Moreover, those courts that have found the FDCPA not to be "applicable law" under

§ 544(b) have never found that the United States could not pursue its claims under State

fraudulent conveyance law.  Defendants have no support for their further argument that the

United States can only recover through the medium of a FDCPA action.[41]  Indeed, there is

authority that the United States cannot be barred from recovery in an action under a State

fraudulent conveyance law because of a State limitations period, and that the only limitations are

provided by 28 U.S.C. §§ 2415(a) and 2416(c), even when the United States is a plaintiff in such

a suit.[42]  Thus, the United States would have a timely claim under the facts of this case whether it

---

[41] Defendants assert (Br. 198-199) that the United States' exclusive remedy is an action under FDCPA, citing § 3001(a), which provides, "Except as provided in subsection (b), the [FDCPA] provides the exclusive civil procedures for the United States - - (1) to recover a judgment on a debt; or (2) to obtain, before judgment on a claim for a debt, a remedy in connection with such claim."  The United States does not here simply attempt to collect a judgment on a debt.  Defendants cite *Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111,116 (2d Cir. 2010), for the proposition that the FDCPA was enacted "'to create a comprehensive statutory framework for the collection of debts owed to the United States government' and 'to improve the efficiency and speed in collecting those debts.'" (citation omitted).  The fact that the FDCPA creates a uniform procedural framework for the benefit of the government and a "comprehensive statutory framework" does not establish that the United States cannot be a proper plaintiff or a triggering creditor for § 544(b) purposes.  Many cases hold that it can be. *Pfister*, 2012 WL 1144540, at *5; *Walter*, 462 B.R. at 704–06, 712; *Porter*, 2009 WL 902662, at *20–21; *Gurley*, 222 B.R. at 132.  In any event, Defendants argue directly to the contrary when they assert that the government's claims in the FDCPA case cannot be separately pled in a FDCPA complaint:  "Because the United States alleges an injury common to other creditors and its fraudulent transfer claims are 'so similar in object and purpose' to Plaintiffs' fraudulent transfer claims, the United States must yield its right to prosecute such claims to Plaintiffs, just as any other creditor must do.  Accordingly, the United States lacks standing to prosecute its fraudulent transfer claims against the FDCPA Defendants."  (Def. Post-Trial Brief Regarding the United States' FDCPA Claims at p. 12).

[42] 28 U.S.C. § 2415( a) provides:

brought a claim under the FDCPA or whether it was included in the general claims of all

pursuant to the Oklahoma UFTA, utilizing the limitations periods of §§ 2415(a) and 2416(c)

applicable to the United States.  *See United States v. Nemecek*, 79 F. Supp.2d 821, 825-27 (N.D.

Ohio 1999) (collecting cases, and concluding that "state statutes delineating the amount of time

in which an action may be brought, even those with extinguishment provisions, may not be

applied to preclude the federal government from litigating claims for fraudulent transfer.");

*United States v. Jepsen*, 131 F.2d 1076 (W.D. Ark. 2000) (concluding "that the United States is

not bound by the state's fraudulent conveyance statute of limitations simply because it looks to

state fraudulent conveyance law in seeking to set aside a transfer").  *See also United States v.

Moore*, 968 F.2d 1099, 1101 (11th Cir. 1992) (fraudulent conveyance action is a "quasi-

contractual claim, and therefore subject to the six-year statute of limitations set forth in

§ 2415(a)"); *United States v. Neidorf*, 522 F.2d 916, 917-18 (9th Cir. 1975) (same). [43]

---

Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every
action for money damages brought by the United States or an officer or agency thereof which is founded upon any
contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right
of action accrues or within one year after final decisions have been rendered in applicable administrative
proceedings required by contract or by law, whichever is later. . .

28 U.S.C. § 2416 (c) provides:
    For the purpose of computing the limitations periods established in section 2415, there shall be excluded all
periods during which—
    (c) facts material to the right of action are not known and reasonably could not be known by an official of
the United States charged with the responsibility to act in the circumstances.

[43] 28 U.S.C. § 2415(a) is expressly made "[s]ubject to the provisions of [§ 2416]", and § 2416(c) provides that the
limitations period is tolled while "facts material to the right of action are not known and reasonably could not be
known by an official of the United States charged with the responsibility to act in the circumstances."  28 U.S.C.
§ 2416(c).  The limitations period was thus tolled by virtue of the agreement entered into by Kerr-McGee in 2005.
*See supra*, pp. 43-44.  It was also tolled because a responsible official of the United States – or any third party –
could not have known anything about the 2002 corporate reorganization until –at the earliest – March 27, 2003,
when there was a brief reference to it in Kerr-McGee's published 2002 Report on Form 10-K.  We conclude above
that the disclosure in this document was insufficient to put a creditor on notice that the reorganization might affect
its rights.  In any case, even if the limitations period were measured from March 27, 2003, that date is within six
years of the filing of Tronox's chapter 11 case on January 12, 2009.

**The Triggering Creditor for Tronox, Inc.**

As mentioned above, § 544(b) of the Bankruptcy Code requires a "triggering creditor"

whose allowable, unsecured claim dates from the time of the challenged conveyance.

Defendants dispute the existence of a triggering creditor for one of the three Debtors, Tronox,

Inc.  They do not contend that there are no creditors dating from 2002-2005 who hold allowable

claims against Debtors Tronox Worldwide LLC or Tronox LLC.  Nor could they.  Tronox

Worldwide is the corporate successor-in-interest to the parent company that was Old Kerr-

McGee and the repository of many of the legacy liability claims.  It has multiple environmental

creditors holding allowable unsecured claims, such as Rio Algom Mining LLC, Claim No. 3617

(for liabilities going back to a December 1988 Purchase and Sale Agreement).  Tronox LLC is

the successor to some of the environmental liabilities of Kerr-McGee going back many years.

For example, the City of West Chicago filed an allowable proof of claim (No. 3536) for the costs

of remediation at a site that was historically one of the most expensive for Old Kerr-McGee;

Nevada filed one (No. 2422) for claims relating to an agreement to remediate the Henderson,

Nevada site that was central to Tronox's IPO cash flow projections.  The United States has

claims against both of these Debtors, such as claim no. 3535 against Tronox Worldwide for

environmental liabilities going back long before 2002 and claim 2385 for environmental costs at

former wood-treating sites in North Carolina, New Jersey and Wisconsin.[44]

Tronox Inc. was newly formed as a holding company in May 2005 to own interests in

Tronox Worldwide LLC and Tronox LLC.  Its direct creditors do not include any environmental

---

[44]Although it is not necessary to reach the issue, Defendants' contention that the United States cannot be a triggering
creditor is also without substance.  First, as discussed above, an action under the FDCPA is not the government's
exclusive remedy.  Second, if the United States as an unsecured creditor could not act as a triggering creditor, that
result would violate the mandate contained in the FDCPA that it "not be construed to supersede or modify the
operation of . . . title 11."  Prior to the enactment of the FDCPA, when the United States had an unsecured claim, it
served as a triggering creditor, *see e.g.*, *Cambridge Meridian Group, Inc. v. Connecticut Nat'l Bank (In re Erin Food
Services, Inc.)*, 117 B.R. 21, 25 (Bankr. D. Mass. 1990) (allowing the  IRS to serve as the triggering creditor).

or tort creditors whose claims predate the year of its formation.  Defendants insist that a

fraudulent conveyance analysis must be performed on an entity-by-entity basis and that Tronox

Inc. was the only entity that made any conveyances of property to any of the Defendants in

connection with the IPO and spinoff in 2005-2006.  Ergo, they claim, Plaintiffs lose their ability

to challenge any conveyance of the property of Tronox Inc.

Defendants' key assumptions are in error.  First, at the time of the filing of the chapter 11

petitions by the three Plaintiffs, there existed creditors of Tronox Inc. who were creditors holding

allowable unsecured claims, including holders of $ 350 million in unsecured bonds that were

issued in connection with the IPO in 2005.  Defendants assert that the bondholders ratified the

fraudulent conveyances, but the cases they cite disqualified parties as triggering creditors only if

they actually participated in structuring the transaction that damaged creditors.  See *Miller v.*

*CSFB (In re Refco, Inc. Securities Litigation)*, 2009 WL 7242548 (S.D.N.Y. Nov.13, 2009),

described by Defendants (Br. at 42) as holding that a "creditor that was found to have structured

the allegedly fraudulent transaction could not qualify as a triggering creditor".   The bondholders

did not structure the allegedly fraudulent transaction; they simply bought into it based on the

information available to them. "Ratification is the act of knowingly giving sanction or affirmance

to an act which would otherwise be unauthorized and not binding."  *In re Adelphia Recovery*

*Trust*, 634 F.3d 678, 691 (2d Cir. 2011).[45]   Defendants, who have the burden on this issue, did

not establish that the bondholders knowingly gave sanction to the fraudulent conveyances

complained of in this case.  *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 428 (S.D.

Tex. 2008).  If the decision to become a creditor of an entity constitutes a ratification sufficient

---

[45] *Adelphia Recovery Trust* reversed one of the cases that Defendants relied on for their ratification argument, *HSBC Bank USA, N.A. v. Adelphia Commc'n Corp.*, 2009 WL 385474 (W.D.N.Y. Feb. 12, 2009).  The Second Circuit held that defendants did "not point to anything in the record suggesting" that there was an intent to ratify.  *Adelphia Recovery Trust*, 634 F.3d at 694.

to bar that creditor from filing a fraudulent conveyance complaint – or having the status of a triggering creditor for § 544(b) purposes – few such actions could be brought, even though it is well accepted that they may have claims under the fraudulent conveyance laws.

More generally, as discussed above, fraudulent conveyance law looks at substance, not form. *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("an allegedly fraudulent conveyance must be evaluated in context"); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, 910 F.Supp. 913 (S.D.N.Y. 1995) (generally courts "look past the form of a transaction to its substance"). As further discussed below, Defendants cannot escape liability because they structured some of the challenged transactions to take place in a newly-created holding company.

**Actual or Constructive Fraudulent Conveyance**

We consider at this point the more fundamental question whether the transfers were actually or constructively fraudulent. The resolution of this question raises a basic issue that appears to be one of first impression, at least in the amounts in dispute in this litigation: under what circumstances can an enterprise rid itself of its legacy environmental and tort liabilities by spinning off substantially all of its assets[46] and leaving behind property incapable of supporting the liabilities. The question is important because of the limited circumstances under which the owner or operator of property can avoid ongoing remediation obligations imposed by Federal and State environmental laws.

---

[46] It will be recalled that Kerr-McGee represented to the Indenture trustees representing its major creditor group, bondholders with over $2 billion in debt, that the oil and gas properties being transferred constituted "substantially all" of its assets. Even if this was not true, counsel calculated that the assets constituted 86.4 percent of Old Kerr-McGee's assets and accounted for 83.2 percent of its revenue and 112.6 percent of its net income as of December 2001. (JX 47 at 49).

We first consider whether there was an actual fraudulent conveyance and then whether there was a constructive fraudulent conveyance.

**Actual Fraudulent Conveyance**

Plaintiffs allege that the transfers of property that culminated in the spinoff were made "with actual intent to hinder, delay, or defraud" a creditor within the meaning of § 548(a)(1)(A) of the Bankruptcy Code and the Oklahoma Uniform Fraudulent Conveyance Act, OKLA. STAT. tit. 24, § 116, made applicable in this bankruptcy case by § 544(b) of the Bankruptcy Code.[47] Although both the Bankruptcy Code and the Oklahoma UFTA use the same substantive language – actual intent to hinder, delay, or defraud – and although cases under the Bankruptcy Code are routinely used to construe the parallel provisions of the UFTA, Plaintiffs must rely on the Oklahoma statute because of its longer statute of limitations.

In the present case, for their assertion that there was an actual fraudulent conveyance, Plaintiffs rest their case primarily on the provisions of the Oklahoma UFTA that proscribe actual intent to "hinder and delay" creditors. Although there was no disclosure of the scheme in December 2002 and disclosure in March 2003 was minimal and ineffective, Defendants made it clear in the S-1 Registration Statement that Tronox was being left with all of the legacy liabilities. This fact was also clear to the potential purchasers of Tronox – as discussed above, it was the reason most of the purchasers refused to bid. *See supra* text at n. 16-17.

By 2005, Defendants' plan to impose the legacy liabilities on Tronox was also known to the United States environmental authorities. In April 2005, the Environmental Protection Agency sent a demand letter to Kerr-McGee with respect to remediation at the Manville, New

---

[47] Section 548(a)(1)(A) provides for the avoidance of a transfer if the debtor "voluntarily or involuntarily - - (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." The Oklahoma UFTA speaks of intent to hinder, delay or defraud "any creditor of the debtor." OKLA. STAT. tit. 24, § 116(A)(1).

51

Jersey site.  (JX 164).  Kerr-McGee took no steps in response other than to deny liability and to

insert a clause in the Assignment Agreement whereby Tronox was obligated to indemnify New

Kerr-McGee for any environmental expenses that Tronox failed to satisfy and that was imposed

on New Kerr-McGee.  (*See* PX 515 (4/6/2005 draft without indemnification clause); JX 163

(U.S. EPA demand letter to Kerr-McGee stamped received on 4/15/2005); PX 528 (4/18/2005

draft with indemnification clause); Addison Dep., 7/14/2010 at 345:2-23).  On March 28, 2006,

days before the final distribution of Tronox's stock and the resignation of Kerr-McGee's officers

from Tronox's Board, Kerr-McGee Corp., Kerr-McGee Worldwide Corp., the Plaintiffs and the

United States Department of Justice entered into an agreement tolling the government's

fraudulent transfer claims pursuant to FDCPA from March 28, 2006 through September 30,

2006.  (GPX 4.001 at 1).  Through subsequent amendments to the tolling agreement, the period

was extended to August 29, 2008.  (*See*, *e.g.*, GPX 4.001 at 1).  The United States has not

established that it was deceived at the time of the spinoff in 2005.

Obviously, Defendants did not disclose that Tronox would <u>not</u> be able to support the

legacy liabilities that were imposed on it; in any event, even if Plaintiffs cannot prove fraud,

disclosure of a scheme is no defense.  "The intent to defraud is something distinct from the mere

intent to delay or hinder"  *In re Braus*, 248 F. 55, 64 (2d Cir. 1917) (citation omitted); *see also*,

*In re Duncan & Forbes Dev., Inc.*, 368 B.R. 27, 34 (Bankr. C.D.Cal. 2006).  Liability is imposed

for an "intentional fraudulent conveyance" where the fact and purpose of a conveyance may have

been known to creditors in whole or in part, but the transferor intended to hinder or delay them.

As the Supreme Court stated in *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932), "A conveyance is

illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if

made with an intent to hinder and delay them."  The Supreme Court did not take issue with the

contention there that debtor believed he could satisfy all creditors if given more time, nor with

the fact that his scheme was widely disclosed, nor with the fact that most of his creditors went

along.  The Court concluded that the defendant's conveyance of assets to a corporation was made

"to divest the debtor of his title and put it in such a form and place that levies would be averted,"

287 U.S. at 353-354, and thus was avoidable as an actual fraudulent conveyance under the

Pennsylvania Uniform Fraudulent Conveyance Act (UFCA) (predecessor to the UFTA).

Similarly, in *Kelly v. Thomas Solvent Co.*, 725 F.Supp. 1446 (W.D.Mich.1988), the State

of Michigan and the United States, among others, challenged the consequences of a spinoff

where a company "reorganized its corporate structure and assets," reducing the assets and

retained earnings of the company that had serious environmental liabilities and transferring many

of the assets into separate corporations.  After the company with the legacy liabilities went into

bankruptcy and liquidated, paying virtually nothing to its creditors, the environmental authorities

sued under the Michigan UFTA, claiming that the corporate reorganization was an intentional

fraudulent conveyance.  The District Court agreed, stating, "Even if the company only intended

to hinder or delay creditors, these purposes satisfy the intent element… The Court concludes that

there is no factual dispute among the parties that one reason Thomas Solvent Company created

its spinoff corporations was to avoid potential liability related to existing groundwater

contamination in Battle Creek."  725 F. Supp. at 1455.

Again, in *In re Blatstein*, 192 F.3d 88, 97 (3d Cir. 1999), the Third Circuit, quoting *In re

Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986), stated that its inquiry under the Pennsylvania UFTA

was whether the debtor "intended to hinder or delay a creditor.  If he did, he had the intent

penalized by the statute notwithstanding any other motivation he may have had for the transfer."

See also, *SEC v. Haligiannis*, 608 F.Supp.2d 444, 450 (S.D.N.Y. 2009) (recorded transfer of

mortgage constituted an intentional fraudulent conveyance under the FDCPA where the debtor "at a minimum intended to 'hinder' and 'delay' other investors' attempts to recoup their investment."); *In re Spearing Tool & Mfg. Co., Inc.*, 171 B.R. 578, 583 (Bankr. E.D. Mich. 1994) ("An intent to delay or hinder creditors, standing alone, is sufficient to constitute a fraudulent conveyance" under [Michigan's version of the UFTA].)

The same principles have been recognized by the Oklahoma courts.  In *United States v. Spencer*, 2012 WL 4577927 (N.D. Okla Oct. 2, 2012), the defendant testified that he put funds in trust to delay his principal creditor and gain time so he could make enough money to pay the debt.  The District Court concluded that the dispute before it was the "rare case in which the debtor has admitted his intent to delay collection of the debt." *Id*. at *8.

Defendants contend, "Plaintiffs must also prove that 'the main or only purpose of the transfer' was defendant's 'actual intent' to damage a creditor by 'prevent[ing] [it] from collecting a debt."  (Def. Br. at 157)   But their principal citation for this proposition, *In re Sentinel Mgmt. Group*, 689 F.3d 855, 861-62 (7th Cir. 2012), was withdrawn, 704 F.3d 1009 (7th Cir. Nov. 30, 2012), and ultimately reversed by the Seventh Circuit, 728 F.3d 660, 667 (7th Cir. 2013).  In its authoritative decision, the Seventh Circuit concluded that the district court had "too narrowly construe[d] the concept of actual intent to hinder, delay, or defraud," and that even though "Sentinel's primary purpose may not have been to render the funds permanently unavailable to these [creditors]  . . . [it] certainly should have seen this result as a natural consequence of its actions . . . . [because one can be] 'presumed to intend the natural consequences of his acts.'"  *Id*. (citations omitted).  *See also*, *ASARCO LLC v. Americas Mining Corp*., 396 B.R. 278, 386 (S.D.Tex.2008), where the District Court observed that while a few courts have held that "the intent required must be an intent to harm creditors…Other courts have

54

held that a transfer may be made with fraudulent intent even though the debtor did not intend to harm creditors but knew that by entering the transaction, creditors would inevitably be hindered, delayed or defrauded." The Court in ASARCO went on to conclude that "Many fraudulent transfer cases cite to the Restatement (Second) of Torts for the definition of 'intent' under the UFTA…According to the Restatement, '[t]he word 'intent' is used…to denote that the actor desires to cause consequences of his act, or that that he believes that the consequences are substantially certain to result from it.'" 396 B.R. at 387, citing *In re Indep. Clearing House Co.*, 77 B.R. 843, 860 (D. Utah 1987); *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993). The *ASARCO* Court could also have cited *Shapiro v. Wilgus*, where the Supreme Court made it clear that the debtor's scheme did not have to be undertaken for nefarious or malicious purposes but merely with the purpose of hindering or delaying creditors. 287 U.S. at 354.[48]

In the present case, there can be no dispute that Kerr-McGee acted to free substantially all its assets – certainly its most valuable assets -- from 85 years of environmental and tort liabilities. The obvious consequence of this act was that the legacy creditors would not be able to claim against "substantially all of the Kerr-McGee assets," and with a minimal asset base against which to recover in the future, would accordingly be "hindered or delayed" as the direct consequence of the scheme. This was the clear and intended consequence of the act, substantially certain to result from it. Defendants assert in their Brief (p. 162), "Every Kerr-McGee witness also agreed that the Legacy Liabilities were not a driver behind the separation," but Defendants' principal witnesses found it impossible to sustain this position. Thus, CEO Corbett and CFO Wohleber initially testified that the legacy liabilities played no role whatsoever

---

[48] In support of their contention that Plaintiffs must prove an "intentional deception to frustrate legal rights," Defendants also cite *Golden Budha Corp. v. Canadian Land Co. of America, N.V.*, 931 F.2d 196, 201 (2d Cir. 1991). (See Def. Br. at 157) The cited case, however, was pleaded solely on the proposition that a fraud was perpetrated, and the Circuit Court never considered that part of the New York UFCA that imposes liability for actual intent to hinder or delay creditors.

in the separation of the chemical and E&P businesses. Corbett: "Q. What role did the legacy liabilities play in your decision as to whether to separate the chemical business? A. None." (Tr. (L. Corbett) 5/16/2012 at 453:19-22; *see also* Tr. (Wohleber) 5/22/2012 at 657:20-24). Both changed course, Corbett admitting, "Obviously, it was one of the elements we had to consider and we did so," and that it was "fair" to state that, "All things being equal … you would have liked to have gotten a - - as clean a separation as you could from the historic liabilities". (Tr. (L. Corbett) 5/16/2012 at 461: 9-21; *see also* Tr. (Wohleber) 5/22/2012 at 675:-676:19, 679:6-15; 5/23/2012 at 1004:19-1005:10). The record supports the finding that a principal goal of the separation of the E&P assets from the chemical business was to cleanse the E&P assets of every legacy liability resulting from the 85-year history of the company and to make the cleansed company more attractive as a target of an acquisition.

The records from Lehman's files make clear the centrality of the liability issues to the transactions undertaken and that the effect on creditors was well understood. Lehman recognized that the environmental liabilities being left with Tronox were unique. As Lehman's principal witness, Watson, testified, "other chemical companies didn't have legacy liabilities of other businesses that were attached to a chemical business in addition to environmental liabilities which were attached to … the ongoing operations." (Watson Dep., 2/9/2011 at 310:7-15; *See also* PX6, a Lehman e-mail sent by Watson concerning the IPO market and environmental liabilities, at 2 (observing that while "'all chemical companies have environmental' …not like this they don't"); JX 271 at 16 ("Legacy liabilities presented a difficult due diligence item for bidders with over 300 legacy liability sites and over 27,000 documents in the on-line data room.")). Lehman's documents disclose that the potential effect of the liabilities on Tronox and its creditors was also the subject of mordant humor. During the negotiations leading up to the

56

spinoff, Watson more than once drew a picture of a pot containing a flower (the Tronox TiO$_2$ business) and a weed (the legacy liabilities) strangling the flower. (Watson Dep., 2/8/2011 at 441:3-15). Watson explained that "the problem is, there is a weed at the base of this flower and it is going to choke off the company's ability to be prosperous."[49]

Did the goal of obtaining "as clean a separation as you could from the historic liabilities" hinder and delay creditors? Corbett and Wohleber both insisted that they never gave a moment's thought to the effect of the transactions on legacy creditors who had in recent years cost the company more than $1 billion and were currently imposing on Kerr-McGee costs of $160 million per year. CEO Corbett said he didn't recall even thinking about "the issue as to whether or not creditors would be harmed by the transaction," and he did not recall discussing "the issue with any member of" his team. (Tr. (L. Corbett) 5/17/2012 at 579:14-580:10, 592:11-593:5). CFO Wohleber had no recollection of doing anything to examine the effect of the transactions on Kerr-McGee's creditors. (Tr. (Wohleber) 5/24/2012 at 1319:7-25). However, the testimony that the effect on creditors was never considered is contradicted by the record, and by Defendants' efforts to cleanse the record. As one of many examples, Wohleber directed Lehman to delete a slide from a Board presentation that a spinoff would be "most advantageous" in dealing with the Titan liabilities. (*Compare* JX27 at 25 *with* JX 28; Tr. (Wohleber) 5/22/2012 at 688:4-690:19). On another occasion, Corbett and Wohleber ordered Lehman to delete from a

---

[49] The words are from the testimony of Robert Gibney (Tr. (Gibney) 9/5/12 at 6252:17-6253:17, 6254:8-11; *see also* Adams Dep., 6/10/2010 at 542:25-543:15, quoting Watson). Watson did not deny that he said words to this effect. Watson Dep., 2/10/2011 at 688:6-688:13, 689-:18-690:1). The treatment of the legacy liabilities was obviously troublesome to the investment bankers working on the transaction. One Lehman document survived, in the context of the proposed sale to Apollo, in which a Lehman banker emailed a colleague, stating that the deal to sell to Apollo appeared to have "cratered" because Kerr-McGee would not represent that it was not aware of any other material liabilities outside of the 27,000 documents in the data room. (PX 683; Watson Dep., 5/23/2012 at 327:04-329:06). In a further comment pointing out that Kerr-McGee seemed to be once again ensnared in an environmental morass similar to an earlier experience, the banker asserted that his colleague "should rent the movie 'Silkwood' this weekend and watch it with your wife." *Id.* The reference was to a popular film which asserted that a Kerr-McGee power plant technician had died in an automobile accident when she was allegedly on the way to disclose environmental liabilities to a journalist and union representative.

Board presentation the words "complicated under a bankruptcy scenario" and then initially

denied any recollection of the phrase or even what it meant.  (*Compare* PX8 at TRX-

ENVTL0822790 *with* JX219 at 5; Tr. (L. Corbett) 5/17/2012 at 566:21-570-7; Tr. (Wohleber)

5/22/2012 at 699:7-706:5; Pilcher Dep., 1/19/2011 at 426:16-427:21, 431:7-432:4).  A spinoff

would be "complicated under a bankruptcy scenario" only because of its effect on creditors.

     The credibility of the denials by the principal witnesses for the Defendants is further

undermined by the destruction of documents in violation of an agreement with the Justice

Department and their cavalier attitude toward the issue.  As noted above, in March 2006, after

the IPO but before the final spinoff, Kerr-McGee Corporation and Kerr-McGee Worldwide

Corp., who are defendants in this adversary proceeding, as well as the Debtors and the United

States Department of Justice, agreed to toll claims that the government might be able to bring

pursuant to FDCPA from March 28, 2006 through September 30, 2006; through subsequent

amendments the tolling was extended to August 29, 2008.  (GPX 4.001 at 1; GPX 4.007 at 1).

The Agreement required the "Cooperating Parties" to preserve and maintain all discoverable

documents relating to the "Tolled Claims," which included potential fraudulent transfer claims.

Corbett appears to have known about the tolling agreement.  Tr. 5/16/2012 329:21-331:3.[50]

Nevertheless, he directed his secretary to destroy all of his files when he retired later in 2006, a

few months after the tolling agreement was signed.  *Id*. at 321;12-322:15, 323:25-326:18,

330:17-331:12.[51]  He had no excuse, except at trial he said he was "totally satisfied" that his

secretary had worked with the Kerr-McGee "legal shop and kept all permanent records."  *Id*. at

---

[50] His testimony on this point varied from "I don't remember the tolling agreement…" to "I remember a tolling agreement."  (Tr. (L. Corbett) 330:3-331:3).

[51] Corbett retired soon after the Anadarko acquisition of Kerr-McGee in August 2006.  (Tr. (L. Corbett) 5/16/2012 at 323:7-10).  The acquisition netted him $60 million in stock price appreciation and options.  (Tr. (L. Corbett) 5/16/2012 at 319:15-320:22).

323:11-18.  Wohleber did not recall whether he had notice of the tolling agreement, but he too

retired in 2006 and directed that all his documents related to the spinoff, other than any formal

agreements, be destroyed.  (Tr. (Wohleber) 5/23/2012 at 1002:4-1003(2); 991:23-992:6).  His

instructions were carried out and his computer was wiped clean of all emails and electronic files.

(Tr. Wohleber 5/23/2012 at 991:23- 997:12; see also Tr. (Gibney) 9/5/2012 at 6276:5-10).

On the basis of the record as a whole, even without the badges of fraud which will be

considered next, Plaintiffs established by clear and convincing evidence[52] that Defendants acted

to hinder or delay creditors when they imposed all the legacy liabilities on Tronox.

**Badges of Fraud**

Proof of actual intent to "hinder, delay or defraud" creditors is not easy, and few

defendants acknowledge this as the goal of a transaction.  "Due to the difficulty of proving actual

intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to

support his case, *i.e.*, circumstances so commonly associated with fraudulent transfers that their

---

[52] There is a split among the States that have adopted the UFTA concerning the appropriate burden of proof to apply
to establish actual intent, with the standard varying in many cases depending on the State's pre-UFTA fraudulent
conveyance law.  *See  ASARCO LLC  v. Americas Mining Corp*., 396 B.R. 278, 365 (S.D. Tex. 2008) (after
concluding that Delaware law was unsettled, applying preponderance of the evidence standard); *see also*, *General
Trading, Inc. v. Yale Materials Handling Corp*., 119 F.3d 1485 (11th Cir. 1997) (applying preponderance of
evidence standard under Florida law);  *Epperson v. Entm't Exp., Inc.*, 159 Fed. Appx.  249,  252-52 (2d Cir. 2005)
(applying clear and convincing standard under Connecticut law).  *See also*, *ASARCO*, 396 B.R. at 365 n. 97 (listing
cases from additional jurisdictions).  The bankruptcy court in *In re Solomon*,  300 B.R. 57, 63 (Bankr. N.D. Okla.
2003), concluded that because "Oklahoma law is silent regarding the standard of proof required," and because
"many states" had determined that preponderance of the evidence was the proper standard, it was "reasonable to
presume that Oklahoma would follow their lead."  In *Scottsdale Ins. Co. v. Tolliver*, 2012 WL 1581109 at *11 (N.D.
Okla. 2012), while not specifying the applicable Oklahoma standard under the UFTA, the court required proof by
clear and convincing evidence out of an abundance of caution.   In taking that step, the *Tolliver* court referenced a
pre-UFTA case cited by the defendants for the proposition that the standard under Oklahoma law was clear and
convincing evidence.  That case -- *Levinson v. Glidden*, 37 P2d 924 (Okla. 1934) – actually said that the standard
was a preponderance of the evidence.  37 P.2d at 926.  There was some earlier language in the decision that fraud
"must be clearly established in the record by testimony and it must appear affirmatively to a reasonable certainty
that . . . the conveyance was made with intent in fact to defraud."  However, the *Levinson* court ultimately concluded
that under the authorities it had cited, "the burden of proof was upon the plaintiff in this case to establish by the
preponderance of the evidence that . . . the [conveyances] were fraudulent and made with intent to hinder and delay
her creditors."  *Id*.  Although the use of language such as "clearly established" and "to a reasonable certainty" are
present in the opinion, the *Levinson* court did not expressly adopt the clear and convincing evidence standard.  In
any event, Plaintiffs have satisfied the "clear and convincing" standard if such standard applies under Oklahoma
law.

presence gives rise to an inference of intent." *In re Sharp Int'l. Corp.*, 403 F.3d 43, 56 (2d Cir.

2005), quoting *Wall St. Assocs. v. Brodsky*, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247 (1st

Dept. 1999) (internal citations and quotation marks omitted);  see also *HBE Leasing I*, 48 F.3d at

639, also quoted in *Sharp*, where the Circuit Court said that actual fraudulent intent "may be

inferred from the circumstances surrounding the transaction," circumstances commonly called

"badges of fraud."  Badges of fraud are not conclusive, but they "help to 'focus the inquiry on

the circumstances that suggest a *conveyance* was made with fraudulent intent, viz. with the

purpose of placing a debtor's assets out of the reach of creditors.'"  *In re Actrade  Fin. Techs.*

*Ltd.*, 337 B.R. 791, 809  (Bankr. S.D.N.Y. 2005), quoting *In re Sharp Int'l. Corp.*, 302 B.R. 760,

784 (E.D.N.Y. 2003), *aff'd*, 403 F.3d 43 (2d Cir. 2005) (emphasis in original).

     Although the Circuit Court in both *Sharp* and *HBE Leasing I* construed the New York

UFCA, the law under the UFTA is no different, and in fact the UFTA identifies eleven specific

"badges of fraud."  UFTA § 116(B) (as adopted in Oklahoma) provides that "[i]n determining

actual intent pursuant to the provisions of paragraph 1 of subsection A of this section,

consideration may be given, among other factors," to eleven stated factors.  OKLA. STAT. tit. 24,

§ 116(B).  Four of the factors are not relevant in this case:  the debtor did not abscond (Factor 6);

the debtor did not conceal assets (Factor 7); the transfer did not occur shortly before or shortly

after a substantial debt was incurred (Factor 10); and the debtor did not transfer assets through

the medium of a third-party lienor (Factor 11).  *Id*.  Two of the UFTA statutory factors are

discussed below in connection with the charge that the transfers were constructive fraudulent

conveyances;  they are whether the consideration received by the debtor was reasonably

equivalent to the value of the property conveyed and whether the debtor was or became insolvent

as a consequence of the transfer (Factors 8 and 9).  *Id*.  The remaining five factors support the

conclusion that the Defendants acted with actual intent to hinder or delay creditors.

Factor 1.  "The transfer or obligation was to an insider."

The transfers complained of transferred substantially all of Kerr-McGee's assets to a

corporate affiliate in the 2002 transactions, and then transferred additional consideration to an

affiliate in the IPO.  Transfers to an affiliate are deemed transfers to insiders.  *Freeland v. Enodis*

*Corp.* 540 F.3d 721, 733 (7th Cir. 2008); *see also* § 113(7)(d) of the Oklahoma UFTA (an insider

is defined as including "an affiliate, or an insider of an affiliate as if the affiliate were the

debtor.")[53]

Factor 2.  "The debtor retained possession or control of the property transferred
after the transfer."

Kerr-McGee retained complete possession and control of the property after the year-end

2002 transfers. After the IPO in November 2005, Kerr-McGee had exclusive control over the

property transferred.  Kerr-McGee also effectively controlled Tronox until the final spinoff in

March 2006; even after that, Kerr-McGee had influence over the management it had installed to

run the chemical business, all of whom were long-time employees of Kerr-McGee who had spent

most or all of their careers with that company.

Factor 3.  "The transfer or obligation was disclosed or concealed."

Disclosure of the 2002 transfers was ineffective and insubstantial.  The 2005-2006

transfers were disclosed.

Factor 4.  "Before the transfer was made or obligation was incurred, the debtor had
been sued or threatened with suit."

---

[53] Section § 113 (a)(1), (c) and (d) of  the Oklahoma UFTA provides, in relevant part, that an affiliate means "a
person who directly or indirectly owns, controls or holds with power to vote, twenty percent (20%) or more of the
outstanding voting securities of the debtor, . . . a person substantially all of whose assets are controlled by the
debtor; or a person who . . . controls substantially all of the debtor's assets."

Kerr-McGee of course had been in litigation for years regarding its environmental and tort liabilities. As one example, in April 2005, as it was preparing for the 2005 IPO, it received a demand from the EPA for $179 million in remediation costs at Manville, New Jersey. (JX 164).

Factor 5. "The transfer was of substantially all of the debtor's assets."

As discussed above, Kerr-McGee represented that the property transferred in December 2002 represented substantially all of its assets. Even if this representation was false, the property represented more than 80% of the assets of the consolidated enterprise.

The Oklahoma courts have held that "Any one of these factors, which are called badges of fraud, may 'stamp the transaction as fraudulent.'" *U.S. v. Spencer*, 2012 WL 4577927 at *7 (N.D. Okla Oct. 2, 2012), quoting *Land O'Lakes v. Schaefer*, 3 Fed. Appx. 769, 772 (10th Cir. 2001). The Oklahoma courts are also clear that, contrary to Defendants' contention that the badges of fraud only create an inference of intent, a presumption is created that the defendant must rebut. Thus the Court in *U.S. v. Spencer* quoted the Tenth Circuit in *Land O'Lakes* as stating, "'A single [badge of fraud] may stamp the transaction as fraudulent and, when several are found in combination, strong and clear evidence on the part of the upholder of the transaction will be required to repel the conclusion of fraud.'" *U.S. v. Spencer*, 2012 WL 4577927 at *7, quoting *Land O'Lakes v. Schaefer*, 3 Fed. Appx. at 772. *See also U.S. v. Jackson*, 2012 WL 5292952 at *7 (W.D. Okla. Aug. 21, 2012), quoting *Hildebrand v. Harrison*, 361 P. 2d 498, 505 (Okla. 1961); *Miller v. Dow (In re Lexington Oil & Gas Ltd.)*, 423 B.R. 353, 372 (Bankr. E.D. Okla. 2010); *Mitchell v. Stringfellow (In re Sioux Redi-Mix, Inc.)*, 2007 WL 1114161, at *7 (Bankr. E.D. Okla. Jan. 11, 2007). In *U.S. v. Spencer* and *U. S. v. Jackson*, the Courts also quoted the following language from *In re Lexington Oil & Gas Ltd.*, 423 B.R. at 372: "When a plaintiff establishes the presence of sufficient badges of fraud, he or she 'is entitled to a

presumption of fraudulent intent.  Thereafter, the burden shifts to the transferee to show some

legitimate supervening purpose for the transfers.'" (quoting in turn *In re Honey Creek*

*Entertainment, Inc.*, 246 B.R. 671, 685 (E.D.Okla. 2000), *rev'd on other grounds*, 37 F. App'x.

442 (10th Cir. 2002)).

We found above on the basis of the record as a whole, that Plaintiffs established by clear

and convincing evidence that Defendants intended to hinder and delay the legacy creditors.  The

presence of "sufficient badges of fraud" supports this finding.  The next question is whether

Defendants were able to rebut this evidence and (using the words of at least three Oklahoma

courts) show a legitimate supervening purpose for the conveyances.  Defendants put forward the

following three "legitimate supervening purposes" as defenses to Plaintiffs' contention that they

acted with "actual intent to hinder or delay creditors" that is actionable under the UFTA.  First,

according to Defendants, "Plaintiffs have failed to show that Defendants intended or believed

anything other than that Tronox would be a successful standalone company, capable of paying its

creditors."  (Def. Br. at 157).  Second, they contend, even if Plaintiffs were able to prove or raise

an inference of intent, "The Purpose of the IPO and the Spinoff Was to Unlock the Value of the

Chemical and E&P Businesses – Not to Evade the Legacy Liabilities."  (Def. Br. at 158).  In

Defendants' view, this was a "legitimate supervening purpose" that wholly immunizes the

transfers from attack.  (Def. Br. at 191-92).   Third, Defendants assert that it was appropriate for

them to attempt to contain or limit the environmental exposure of the group.  (Def. Br. At 163-

64).

**Belief in Tronox's Future**

Defendants argue in their post-trial brief, "the record is replete with direct evidence from

Kerr-McGee and Tronox executives that Kerr-McGee intended and believed at all times that

Tronox was and would be solvent and able to pay its debts and a successful independent

company." (Def. Br. at 165). Every one of the witnesses called by the Defendants so testified.

Kerr-McGee CEO Luke Corbett stated his belief that Tronox would be a "premier company

capable of competing". (Tr. (L. Corbett) 5/16/2012 at 343:22-344:2). Defendants called one of

the independent Kerr-McGee directors at the time, Ms. Walters, who testified, "there was no plan

by anyone and there was no indication that the company [Tronox] was not going to be a big

success." (Tr. (Walters) 8/16/2012 at 6030:21-6031:23). General counsel Pilcher at his

deposition, introduced into evidence, asserted that Kerr-McGee's goal was to establish a business

that was "well capitalized, that was well staffed and that had a potential to be a substantial player

in the chemical business with excellent long term prospects." (Pilcher Dep., 1/20/2011 at 638:3-

15).

   If Defendants intention was to spin off a business that was "well capitalized … with

excellent long term prospects", the record does not so indicate. Defendants spun off Tronox with

a capital structure that included $550 million in debt, a mere $40 million in cash and

environmental liabilities that had cost Kerr-McGee more than $1 billion in the years prior to the

IPO. As further discussed below, Tronox's projected cash flow was inadequate to service its

debt without significant land sales that were not assured, and its prospects were clouded by a

down-turn in the business cycle of its one product. In any event, the question is not whether

Tronox was "doomed to fail," although Plaintiffs argue this point. Nor is the question whether

Defendants wanted Tronox to be a "big success." There is no reason to believe that the

Defendants wanted Tronox to fail and every reason to believe that they wanted it to survive, at

least until the statute of limitations on a fraudulent conveyance action had run. The real question

is whether Defendants had a good faith belief that Tronox would be able to support the environmental and other legacy liabilities that had been imposed on it.

The record on this point is extraordinary because it does not exist.  A document survives in which General Counsel Pilcher raised the question whether Kerr-McGee should prepare "a commercial analysis of/conclusion re: impact of Project Focus on position of each creditor."  JX 53 at 2.  However, if any such analysis was prepared, it has not been preserved.  (*See* Tr. (Walters) 8/16/2012 at 6029:9-6032:12 (noting that the board of directors neither saw nor knew of the existence of any such analysis)).  Thus, one of the most compelling facts in the enormous record of this case is the absence of any contemporaneous analysis of Tronox's ability to support the legacy liabilities being imposed on it.[54]

Defendants dispute this and assert that "Kerr-McGee and its advisors spent substantial time and effort and took multiple steps to ensure that Tronox would be a viable standalone and that creditors would not be adversely impacted by its separation."  (Def. Br. at 167).  They cite three specific examples, of which only two are contemporaneous.  First, Defendants claim, "Mr. Rauh, Kerr-McGee's Controller and Chief Accounting Officer, worked closely with E&Y [Ernst & Young, Kerr-McGee's accountants], analyzing cash-flow models prepared by Tronox's management that projected Tronox's cash flow through 2011."  (*Id.*)  The reference is to a meeting on November 21, 2005 between the Kerr-McGee Controller and Arlen Hechtner, the E&Y partner in charge of the audit in connection with Tronox's S-1 Registration Statement.  As Hechtner explained in his deposition, admitted into evidence, his concern was whether Tronox would survive for one year; if there were uncertainty on this point, it would have required disclosure in Ernst & Young's audit report.  Ernst & Young concluded that there was no substantial doubt that Tronox would survive for one year:  "Our conclusion was that an

---

[54]  This issue is considered further below in connection with the solvency of Tronox.

explanatory paragraph was not required in our report because we did not believe there was

substantial doubt as to the company's ability to continue as a going concern for one year from

the balance sheet date." (Hechtner Dep., 4/6/2011 at 163:1-4).[55]    Obviously, a year's survival

does not ensure that "Tronox would be a viable standalone and that creditors would not be

adversely impacted by its separation."

Defendants also rely on the cash flow analysis that was discussed with Hechtner and that,

according to Defendants, led Controller Rauh "to conclude that Tronox would have sufficient

cash flows and bank credit availability to sustain operations for the foreseeable future…"  (Def.

Finding of Fact ¶ 860 at p. 144, referencing JX 314, a four-page cash flow projection that

apparently survives only as a part of Ernst & Young's work papers).  This projection ostensibly

goes through 2011 but makes no pretense at being thorough.  For example, even though

"Provision for Environmental Remediation" was broken out on a *pro forma* basis for Tronox

prior to 2005, it was apparently included in "Other" expenses in the JX 314 projections, leading

to the absurd result of a zero "Other" expense in 2010 and 2011.   Suffice it to say that there is no

support in the record for the proposition that Tronox's environmental expenses would diminish

to zero in 2010.  Hechtner's cover memo to the audit files (p. 1 of JX 314) also states that he was

informed that "Kerr-McGee management believe … Tronox should experience a much

diminished level of environmental charges going forward, reducing the historical operating

losses related to the discontinued operations as well as the related cash flow requirements."  This

---

[55] This was reiterated in the next question and answer: "Q. It's my understanding that a going concern is a one-year look, is that right?  A. That's correct."  *Id.* at 163: 5-8.

was a common refrain on the part of Kerr-McGee at the time, but as discussed below, it was

anecdotal and not rooted in reality.[56]

The second contemporaneous piece of evidence on which Defendants rely for the

proposition that they took numerous steps to ensure that Tronox would be viable and creditors

would not be adversely affected was a "solvency opinion" obtained from the firm of Houlihan

Lokey Howard & Zukhin ("Houlihan").  (*See* Def. Brief at 167).  After four pages of caveats and

conditions, Houlihan's opinion was that "the fair value and present fair saleable value of the

Company's assets would exceed the Company's stated liabilities and identified contingent

liabilities." ( JX 322 at 5).  However, as to the critical issue in this case – the amount of Tronox's

contingent liabilities – Houlihan simply took Kerr-McGee's number and used it.  As stated in the

Houlihan "solvency opinion,"  "The term 'identified contingent liabilities" is defined to mean

"the stated amount of contingent liabilities identified to us and valued by responsible officers of

the Company, upon whom we have relied without independent verification;  no other  contingent

liabilities have been considered."  (*Id*. at 2).  Houlihan's managing director, Kevin P. Collins,

confirmed in his deposition that Houlihan used as Tronox's anticipated contingent  liabilities the

reserve in Tronox's financial statements.  (*See* Collins Dep., 12/15/2010 at 134:13 to 135:15,

referencing JX 316 at 2, ¶ 6).  As discussed below, there was no dispute at trial that a reserve for

contingent liabilities in a financial statement has no probative value in determining liabilities or

solvency for fraudulent conveyance purposes.

---

[56] It would have been more reasonable for Kerr-McGee to anticipate paying more for environmental expenditures in the future.  From 2002 to 2005, Kerr-McGee added more to environmental reserves than the amount spent in each of those years.  (Tr. (Christiansen) 7/25/2012 at 3962:23-3963:25).  The amount reserved for expected future expenses increased over 47% from 2001 to 2005.  (*Id*. at 3964:2-3966:10).  Hechtner's memo also says that Controller Rauh told him that "Kerr-McGee has agreed to support Tronox, related to these and other environmental matters with the 50% cost reimbursement provided over the next seven years."  (JX 314 at 1).  As discussed elsewhere, this reimbursement support was largely illusory.

Furthermore, there is no evidence that Houlihan was even aware of the importance of the legacy liabilities to Tronox's solvency.  In his deposition Collins confirmed that Houlihan's concern from a fraudulent conveyance perspective was related to the incurrence of debt in the IPO and dividending of the proceeds to the parent.  "Q What about the structure of the transaction could give rise to a fraudulent conveyance concern in connection with the Tronox spin-off? … A. The entity that was taking on - - Tronox Newco, the entity that was taking on the debt wasn't going to retain the proceeds from the debt issuance.  They were dividending the proceeds up to its parent, Kerr-McGee."  (Collins Dep., 12/15/2010 at 32:9-19).  This is the usual concern in a leveraged buy-out ("LBO").  *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556 (M.D. Pa. 1983) (applying Pennsylvanias fraudulent conveyance act to an LBO transaction); *aff'd.*, *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986) (affirming that district court properly applied Pennsylvania UFCA to an LBO in *Gleneagles*);  *MFS/Sun Life Trust-High Yield Series v. Van Dusen  MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 933 (S.D.N.Y. 1995) (concluding that "courts now uniformly hold that fraudulent conveyance laws apply to LBOs");  *see also*  Raymond J. Blackwood, APPLYING FRAUDULENT CONVEYANCE LAW TO LEVERAGED BUYOUTS, 42 Duke L.J. 340, 344 (1992).  In this case, however, as further discussed below, the real issue is the amount and effect of the legacy liabilities.

Defendants' third and final reason for their asserted belief in Tronox's future is that "Both Plaintiffs' and Defendants REV [reasonably equivalent value] and damages experts corroborated this projection [that Tronox would continue as a going concern], finding that Tronox would be cash-flow positive in all projected years, except for 2006 when Tronox would be less than $1 million cash flow negative." (Def. Br. at 168).  The cash flow projections of the

parties' respective experts are further discussed below; in any event, expert reports performed

after the fact are no substitute for the absence of any internal contemporaneous analysis of the

effect of the transfers on Kerr-McGee's legacy creditors.

      The lack of an internal analysis of this issue is particularly striking in light of the fact that

Kerr-McGee's sophisticated management gave the closest attention to divesting the liabilities,

and specifically to the fraudulent conveyance issue.[57]  As noted above, Kerr-McGee's outside

counsel spent many hours researching fraudulent conveyance litigation in failed spinoffs.  Even

the Board, which was unapprised of many matters relating to the spinoff, was given a

presentation by counsel on fraudulent conveyance issues.  Defendants admit that "The July 12,

2005 Lehman presentation to the Board did identify that one of the 'benefits/considerations' to

an IPO/Spinoff as compared to the Apollo bid was the '[s]eparation from the legacy liabilities.'"

(Def. Finding of Fact ¶ 438 citing, JX 219 at 5).  And further that "outside lawyers advised the

Board with respect to the Monsanto Solutia case," a fraudulent conveyance challenge to

Monsanto's spinoff of Solutia, which later declared bankruptcy.  (*Id*.)  Nevertheless, Defendants

can only muster vague, conclusory generalities in support of their position that Kerr-McGee

reasonably concluded at the time that the Tronox spinoff could not be challenged as a fraudulent

conveyance.  For example, Defendants propose the following Finding of Fact with respect to

Board review of the fraudulent conveyance issues raised by the spinoff:  "Mr. Richie [an outside

director and lawyer by profession] was still comfortable proceeding with the divestiture of the

Chemical Business after outside lawyers advised the Board with respect to the Monsanto Solutia

case," and "When Mr. Richie learned that the 'complicated under bankruptcy scenario' phrase

had been deleted from the final Board presentation, he was not concerned because a bankruptcy

---

[57]  "[M]anagement here is extremely sophisticated.  This sophistication colors interpretation of their actions."  *In re Sharon Steel Corp.*, 871 F.2d 1217, 1227 (3d Cir. 1989).

of the Chemical Business was not a 'realistic possibility.'"[58]  (JX 219 at 5;  Tr. (L. Richie)

7/26/2012 at 4241:12-19; 4236:10-4238:16; 4243:23-4244:9).  We do not know what the Board

was advised about the *Monsanto-Solutia* litigation, or the reasons why the Board was advised

that a bankruptcy of the Chemical Business was not a "realistic possibility."  We do know, on the

instant record, that neither the Board nor management ever reviewed a contemporaneous analysis

of the effect of the transactions on the legacy liability creditors, and there is no evidence that one

was ever prepared.

**The "Legitimate Supervening Purpose"**

Defendants' second principal defense to Plaintiffs' actual fraudulent conveyance claim is

that there was a "legitimate supervening purpose" for the separation of the E&P and chemical

businesses.  Defendants argue, "The clear and affirmative evidence at trial established that the

decision to move forward with the IPO and Spinoff was motivated by a legitimate supervening

purpose:  to unlock the value inherent in each of Kerr-McGee's businesses by creating two

successful standalone companies, and thereby maximize shareholder value."  (Def. Br. at 192).

They assert, correctly, that "'[A]ffirmative evidence' that the transferor's purpose for the transfer

was 'promoting its own legitimate business interests' has been found sufficient to rebut an

inference or a presumption of fraud created by the badges."  (Def. Br. at 191, citing *In re

Cushman Bakery*, 526 F.2d 23, 33 (1st Cir. 1975)).

Notwithstanding Defendants' identification of a legitimate purpose for the separation of

the two businesses, Defendants are not being sued because they made a business decision to spin

off chemical from E&P or E&P from chemical.  They are being sued because of their decision to

spin off  "substantially all the assets" of the enterprise (the E&P assets) and  impose 85 years of

---

[58] Richie learned of the deletion of the phrase in preparation for his deposition, not earlier. (Tr. (L. Richie) 7/26/2012 at 4268:18-4270:24).

70

the legacy liabilities on a fraction of the assets.  Obviously, some of the liabilities had a

relationship to the chemical business.  However, as Kerr-McGee's investment banker observed,

every chemical business has some environmental liabilities, but "not like this they don't."  PX6

at 2; Watson Dep., 5/23/2012 at 309:22-311; *see* fn. 16 above.  The liabilities imposed on Tronox

included those associated with every discontinued business that Kerr-McGee had ever engaged

in.  These businesses ranged from uranium mining (begun in 1952) to the treatment of wood with

creosote (a business acquired in 1963).  The liabilities imposed on Tronox even included those

associated with the discontinued aspects of the petroleum business, such as the more than 800

retail oil and gas outlets acquired in 1955, and  they included the OPEB retirement obligations to

most of Kerr-McGee's former officers and employees.

    In Lehman's April 6, 2001 presentation to Kerr-McGee's top management on a possible

split of the E&P and chemical businesses, it proposed to allocate the legacy liabilities in a

manner proportionate to the asset values of the two lines of business.  (Tr. (L. Corbett) 5/17/2012

at 241:7-13; Watson Dep., 2/10/2011 at 711:4-713:9; JX22 at 58, 68).  The inner circle rejected

this, and imposed every legacy liability on Tronox.  (Tr. (L. Corbett) 5/15/2012 at 237:20-238:8;

241:7-242:6).  To this day, notwithstanding post-trial briefs numbering more than 385 pages and

Findings of Fact numbering more than 451 pages, Defendants have never articulated a legitimate

business reason for imposing all of the legacy liabilities on Tronox.  The record does, however,

contain a reason.  Before the spinoff of chemical and the "clean separation" of the E&P business,

Kerr-McGee was an unattractive merger candidate.  For example, as noted above, Anadarko had,

prior to the spinoff, peremptorily rejected a merger with Kerr-McGee, concluding that Kerr-

McGee's future environmental liability was "$BILLIONS" and there was "no end in sight for at

least 30 more years."  (PX 391 at 1 (D. Perkins email, Jan. 31, 2004 re Kerr McGee Fact Sheet)).

After the divestiture, Anadarko acquired the E&P business for more than $18 billion.

In the *ASARCO* case, as here, the evidence of record of an intentional fraudulent

conveyance was sufficiently compelling as to place the burden on the Defendants to prove a

legitimate supervening purpose.  But the burden was not to prove whether there were some

legitimate business reason for the challenged transactions.  The burden was to prove a legitimate

supervening purpose for the "manner in which the transfer was structured."  *Asarco*, 396 B.R. at

392.  Defendants have failed to bear this burden in this case.

**Limitation of Liability**

Defendants' final defense is that they merely attempted to limit the overall environmental

liability of the group.  They equate conveyances that separated "substantially all" the assets of

Kerr-McGee from the burden of the legacy liabilities and ultimately imposed these liabilities on

Tronox as "simply" the management of  "one 'concern' out of many that Kerr McGee 'knew [it]

had to manage' – and it did so well, particularly after forming the S&EA group dedicated to this

function." [59]   (Def. Br. at 163-64, quoting testimony from CEO Luke Corbett).  Defendants

cannot claim they merely "managed" a liability.  If Defendants' conduct were simply

management of legacy liabilities, all enterprises with substantial existing environmental liability

would be encouraged to do exactly what Defendants did – manage the liabilities so as to leave

them attached to a fraction of the assets unable to bear them.

Defendants quote *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357 (S.D.N.Y. 2003), for the

proposition that "[E]ven assuming management's concern over [contingent liabilities] was a

motivating factor, there was nothing inappropriate about a company's management looking for

---

[59] The Safety and Environmental Affairs Group employed more than 40 professionals to manage the active
environmental sites.  *See* text at p. 6, *supra*.

lawful ways to reduce the adverse impact." (Def. Br. at 164). But the facts of *Lippe* point up the differences in that case. Thus, the *Lippe* Court found that the defendants there had presented extensive evidence, largely uncontradicted, that "defendants engaged in the transactions in good faith; the purchasing defendants paid substantial consideration that constituted fair value; they relied on the advice of lawyers, including ARKO [Anderson, Russell, Kill & Olick] and Debevoise [Plimpton, Lyons & Gates]; they did not go forward with a no-consideration transaction that could have been viewed as a fraudulent conveyance; they relied on fairness opinions provided by Kidder [Peabody & Co.]; they relied on the existence of $380 million and more of insurance coverage; and they could not have known until much later that some 100,000 asbestos claims would be filed against Keene." 249 F.Supp.2d at 381. On the basis of these findings, then District Judge Chin granted summary judgment dismissing challenges to Keene Corp.'s asset sales, approving a transaction where the consideration was paid to Keene and where "No effort was made to put that cash out of the reach of creditors; no assets were secreted away." 249 F.Supp.2d at 383.

Contrast the facts of this case. Substantially all of the assets of Kerr-McGee were placed out of the reach of the legacy liability creditors. No consideration was paid for the December 31, 2002 transfer of the stock of the E&P subsidiaries and, as discussed below, fair consideration or reasonably equivalent value was not paid in connection with the spinoff. Defendants' expert on reasonably equivalent value, Balcombe, conceded this. (Balcome Direct, 8/31/2012 at ¶ 6; Tr. (Balcombe) 9/6/2012 at 6373:5-23). Defendants were acutely aware of the legacy liabilities, and if they did not have a precise amount, the reason is they assiduously avoided performing the analysis necessary to obtain one. Defendants do not rely on fairness opinions; indeed Lehman's managing director Watson believed that the legacy liabilities would choke the flower that was

Tronox's TiO$_2$ business.  Defendants have carefully preserved the attorney-client privilege as to the legal advice they received; while no adverse implication can be drawn from the preservation of the privilege, Defendants obviously cannot rely on an advice-of-counsel defense, as could the defendants in *Lippe*.

As noted above, the Court in *Lippe* also observed that Keene "did not go forward with a no-consideration transaction that could have been viewed as a fraudulent conveyance." 249 F.Supp.2d at 381.  The reference is to a proposed transaction where Keene would spin off a division for no consideration.  Keene's lawyers at Debevoise concluded, as quoted by the District Court, "'Keene should not undertake the Spin-off' unless the board believed that enough assets would be 'left behind' to meet all liabilities of Keene, 'whenever and however incurred,' and Keene would not be rendered insolvent." 249 F.Supp.2d at 367.  The Keene board did not proceed with the spinoff.  Contrast the facts here, where Kerr-McGee proceeded with a no-consideration transfer of the E&P assets without any analysis (that has been preserved) as to whether the assets left behind would be sufficient to meet all liabilities, whenever and however incurred.  As the Court said in *In re W.R. Grace & Co.*, 281 B.R. 852, 868-69 (D.Del. 2002), another fraudulent conveyance challenge where the transferor had enormous legacy liabilities, "[I]t is not too much to expect that firms with well-established legacies of mass-tort liability should realize that transfers for less than equivalent value may harm their tort claimant-creditors should prognostications of future claims be inaccurate.  These firms are in a special position with respect to such creditors.  Transactions… must take the reality of the companies' existing liability and inherent difficulty in defining that liability's scope into consideration."

The facts of this matter resemble, if any other case, the *ASARCO* decision, despite Defendants' contention at closing argument that the facts in the *ASARCO* decision "could not be

further from the present case." (Tr. 12/12/2012 at 8077:24-8079:10). Certainly ASARCO was more obviously *in extremis* when the parent there transferred to itself its subsidiary's "crown jewel" assets and attempted to isolate them "from risk of exposure to the government and other creditors." *ASARCO*, 396 B.R. at 375. Nevertheless, as the District Court found in *ASARCO*, the parent had acted with actual fraudulent intent to hinder, delay or defraud creditors even though it had paid reasonably equivalent value for the transferred assets. Here, as further discussed below, reasonably equivalent value was not paid.

In sum, Plaintiffs have proved by clear and convincing evidence that Defendants acted with actual intent to hinder or delay creditors, and Defendants have wholly failed to rebut the evidence.

**Constructive Fraudulent Conveyance**

Plaintiffs also charge that Defendants are liable on a charge of constructive fraudulent conveyance. In order to prevail on such claim, a plaintiff must prove that (i) there was a conveyance of an interest in property or the incurrence of an obligation; (ii) receipt of less than reasonably equivalent value; and (iii) that the transferor was or was rendered by the conveyance insolvent, inadequately capitalized, or unable to pay its debts as they came due. OKLA. STAT. tit. 24, §§ 116(A)(2), 117(A). There is no dispute in this case that there was a conveyance of an interest in property. (Def. Br. at 45). There is also no dispute that the burden of proof is a preponderance of the evidence standard. *Id*. We consider, first, the question whether reasonably equivalent value was paid and then whether the result was insolvency, inadequate capitalization, or inability to pay debts as they came due.

## Reasonably Equivalent Value

There is limited dispute between the parties as to whether Tronox received reasonably equivalent value for the conveyance of the E&P assets and the other property distributed to Kerr-McGee in connection with the spinoff. We start by describing Plaintiffs' analysis of the issue and then the objections that Defendants raise.

Plaintiffs' expert on the issue of reasonably equivalent value ("REV") was Prof. Jack Williams.[60] He testified that Tronox conveyed property worth approximately $17 billion (including the E&P assets) and received in return $2.6 billion, a $14.5 billion reduction in value.[61] In order to obtain a market value for the E&P assets conveyed, Williams compared Kerr-McGee's oil and gas business to seven independent, comparable exploration and production companies and determined that the market value of the assets was approximately $12 billion as of the IPO. He then added a control premium of 30%, concluding that the value of the transferred oil and gas assets was approximately $15.8 billion as of the IPO. He validated his calculations by comparing them to valuation estimates by Lehman Brothers and Salomon Smith Barney and by considering Anadarko's acquisition of the assets for approximately $15.8 billion only a few months after the IPO date.[62] (See Williams Direct, 6/22/2012 at ¶¶ 2, 26-38).

---

[60] Williams is a professor at Georgia State Univ. College of Law, where he teaches (among other things) bankruptcy accounting and finance, and a national practice co-leader at Mesirow Financial Consulting LLC, a leading consultant on restructurings. He has twice been a scholar in residence at the American Bankruptcy Institute, has been appointed as an examiner in chapter 11 cases and as the financial advisor to an examiner, has testified frequently and has written numerous articles on subjects relevant to this litigation.

[61] These values are based on market values, which Williams said was the preferred approach. He also testified that on a book value approach, Plaintiffs transferred property valued at $7.5 billion and received $2.7 billion in return, for a diminution in value of $4.8 billion as of the IPO date. Defendants' expert on REV concurred that market value is the preferred valuation methodology. (Tr. (Balcombe) 9/6/2012 at 6504:14-6505:12; see also Williams Direct, 6/22/2012 at ¶ 64). The Court adopts it here.

[62] Anadarko actually acquired New Kerr-McGee for approximately $19 billion in May 2006, but the purchase included some properties other than the E&P assets at issue in this case. Williams subtracted the value of these assets in his calculations. Anadarko paid a control premium of 37.3-42% over the Kerr-McGee stock price at or near the date of the buyout, which compares to the 30% control premium that Williams used.

Williams then valued the property conveyed to New Kerr-McGee at the time of the IPO.

He testified that Tronox transferred approximately $799 million in cash to Kerr-McGee ($224.7

million in net proceeds from the IPO, $537.1 million in net proceeds from borrowings under the

term loan and unsecured notes, and approximately $37 million in operating cash).  In addition,

Tronox transferred out its interest in a chemical battery business (worth $78.9 million in

Defendants' calculations) and assumed approximately $186 million in unfunded OPEB (retiree)

benefits.  Williams then calculated that Plaintiffs received in connection with the IPO property of

a value of $2.6 billion.  This consisted of $285 million in $TiO_2$ assets in western Australia;

approximately $2 billion in debt from which they were released (this was the financial debt that

was assumed by New Kerr-McGee when Defendants' transferred out  "substantially all" of Kerr-

McGee's assets); $100 million in environmental reimbursement under the MSA (largely illusory,

as discussed above, but valued at face by Williams); approximately $140 million in pre-paid

insurance policies; and a $41 million indemnity for environmental liabilities of the E&P business

under the AA&I Agreement.  (Williams Direct, 6/22/2012 at ¶¶ 44-50; Tr. (Williams) 6/27/2012

at 3511:23-3512:4).

Defendants do not quarrel with any of the foregoing calculations and do not dispute that

Tronox transferred out billions more in value than it received.  They raise three objections to

Plaintiffs' claim that REV was not received.  First, they assert that Plaintiffs cannot include in

the REV analysis the transfer of the E&P assets that, Defendants argue, took place at the end of

2002.  That contention has been rejected above, where it is shown that the 2002 transaction was

merely the first step in a single plan.  Defendants' second point relates to an alleged addition to

the REV calculation.  Defendants' expert witness on REV and damages, Jeffrey Balcombe,

opined that an alleged conversion to equity of an intercompany account running from Old Kerr-

McGee (now named Tronox Worldwide) to "Kerr-McGee" must be valued at its face amount of

$377.9 million as a contribution by Kerr-McGee to Tronox.[63]  The conclusion that Kerr-McGee

contributed $378 million to Tronox by forgiving an intercompany account would not materially

change the REV analysis.  In any event, Defendants never provided sufficient evidence that there

was an outstanding debt from any of the Tronox companies to "Kerr-McGee," that Kerr-McGee

expected repayment of such debt, or that Tronox had the ability to repay it.  Tronox's *pro forma*

balance sheet as of September 30, 2005 (DX 368 at 46) used in connection with the IPO S-1

Registration Statement, did not show any such debt.  If it had, Tronox's stockholder's equity of

$285.2 million would have been wiped out, and Tronox would have been insolvent on a book

basis even before the IPO.  (Williams Direct, 6/22/2012 at ¶ 82; Tr. (Balcombe) 9/16/2012 at

6411:20-6415:17.)  Kerr-McGee's Controller testified that Kerr-McGee's policy was to convert

intercompany accounts to equity as a matter of practice when its subsidiaries were unable to

repay intercompany balances.  (Rauh Direct, 8/3/2012 at ¶ 58; Tr. (Rauh) 8/9/2012 at 5013:12-

5017:17).  It is appropriate to treat this intercompany balance, if it existed, as equity rather than

debt.

Defendants' only further contention on the subject of REV is that a REV and solvency

analysis must be performed on a strict entity-by-entity basis.  Defendants do not dispute that on

such a basis two of the Plaintiffs, Tronox Worldwide ("Old Kerr-McGee") and Tronox Inc. (the

newly-created holding company) did not receive REV.[64]  On the other hand, Plaintiffs

---

[63]  Balcombe is a young M.A. in Accounting and was testifying for the first time in a fraudulent conveyance suit.
He has no writings on the subject and no writings of any consequence on any subject.

[64]  There was no dispute that Tronox Worldwide did not receive REV.  Defendants REV expert, Balcombe, asserted
that the new holding company, Tronox Inc., received REV because its transfers out (including the proceeds of the
IPO and other borrowings in connection therewith) were smaller than the value of the stock of Tronox Worldwide
("Old Kerr-McGee") that it received in the spinoff.  However, Balcombe conceded that if Tronox Worldwide were
found to be insolvent, Tronox Inc. suffered a diminution in value of $984 million, the undisputed value of the
outbound IPO transfers.  (Balcombe Direct, 8/31/2012 at ¶¶ 40-41; Tr. (Balcombe) 9/6/2012 at 6375:21-6376:21,

themselves concede that Tronox LLC, which generally succeeded to the business of Kerr-McGee Chemical, received REV in connection with the IPO, as (roughly speaking) the principal property that Kerr-McGee transferred in (interests in an Australian TiO$_2$ plant) was worth more than the property transferred out (interests in a chemical battery business).

Defendants do not support their argument that a REV (and solvency) analysis must be performed or a strict entity-by-entity basis by any authority that is directly on point and cite only generalities holding that, ordinarily, "each separate individual or corporate entity must file a separate bankruptcy petition and …each entity [must be] treated separately unless grounds for substantive consolidation are demonstrated." (Def. Br. at 47, quoting this Court's decision in *Tower Auto. Mexico, S. de R.L. de C.V. v. Grupo Proeza, S.A. de C.V. (In re Tower Auto., Inc.)*, 356 B.R. 598, 603 (Bankr. S.D. N.Y. 2006).) The principal fraudulent conveyance case cited is the decision of the lower court in *In re TOUSA, Inc.*, 422 B.R. 783, 861 (Bankr. S.D.Fla. 2009), *rev'd. on other grounds*, 444 B.R. 613 (S.D. Fla. 2011), and then finally decided by the Eleventh Circuit, which reinstated the result in the bankruptcy court. 680 F.3d 1298 (11th Cir. 2012). In *TOUSA*, however, the key question concerned the receipt of reasonably equivalent value by subsidiaries that had incurred liability by granting liens on their property to secure debt owed by their parent. *Id.* at 1301, 1311. It is noteworthy that, in reversing the district court and affirming the bankruptcy court's ruling on the merits, the Eleventh Circuit considered the liability imposed on the subsidiaries jointly and did not allude to the effect on each subsidiary separately. *Id.* at 1312 (*e.g.*, noting that "[t]he bankruptcy court found that the benefits to the [subsidiaries] were not close to being reasonably equivalent in value to the $403 million of obligations that *they* incurred.") (emphasis added).

---

6377:20-6380:12. As shown below, Tronox Worldwide, like all of the Plaintiffs, was insolvent or rendered insolvent at the time.

In any event, there was no contention that any creditor of any of the three Tronox entities

that were Plaintiffs in this case relied on that entity's separate identity.   Like Kerr-McGee,

Tronox operated its business and handled its environmental liabilities on a consolidated basis.

Until the IPO in November, 2005, when a separate account for the newly independent Tronox

was established, Kerr-McGee funded legacy liabilities, like all other liabilities, out of a central

cash management system.  (Tr. (Rauh)  8/9/2012 at 5002:7-5003:3;  Mikkelson Dep., 6/22/2010

at 599:8-12, 599:15-600:3; Adams Dep., 6/9/2010 at 237:6-20, Tr. (Williams) 9/13/2012 at

7569:2-21).   Although Kerr-McGee tracked expenditures through intercompany balances for

operating businesses, the paid legacy liabilities of discontinued businesses that generated no

revenue and recorded them as an equity contribution by the parent.  (Tr. (Rauh) 8/9/2012

5008:13-25, 5011:23-5012:7, 5013:18-50150:13;  Rauh Direct, 8/3/2012 at ¶ 58)).   In addition,

Tronox was marketed as a consolidated entity in the IPO, and each of the Plaintiffs became liable

on the debt issued as either a borrower or a guarantor.  (Williams Direct, June 22, 2012 at ¶ 16;

JX 323 at 1, 36; J. Balcombe Direct, 8/31/2012 at ¶¶ 25, 56).  As further discussed below,

Defendants' principal contention on the issue of solvency is that the market deemed Tronox

solvent and that knowledgeable and sophisticated third parties were willing to purchase it or,

alternatively, invest millions of dollars in its future.  The "market" did not deal with the three

Tronox Plaintiffs or with their other affiliates as separate entities.  The "market" dealt with

"Tronox" on a consolidated basis.

Defendants also argue that the Oklahoma statute, like the Bankruptcy Code, speaks of

avoiding the interest of a "debtor" in property, and they conclude from this that the statute

commands that all fraudulent conveyance analysis proceed on a single-entity basis.  They forget

that Oklahoma law has a statute in relation to the meaning of terms and construction of statutes,

*see* OKLA. STAT. tit. 25, § 25, providing that "words used in the singular number include the plural, and the plural the singular, except where a contrary intention plainly appears."  Section 102(7) of the Bankruptcy Code is the same, and provides that "[i]n this title -- … the singular includes the plural."  *See Universal Church v. Geltzer*, 463 F.3d 218, 223 (2d Cir. 2006).  As the Circuit Court noted there, the Dictionary Act contains a similar provision.  See 1 U.S.C. § 1.  Obviously, as the Supreme Court has held, these provisions apply "where it is necessary to carry out the evident intent of the statute."  *First Natl. Bank in St. Louis v. Missouri*, 263 U.S. 640, 657 (1924).

In carrying out the intent of the fraudulent conveyance laws, courts disregard the form of a transaction and look "instead to its substance."  *In re HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir. 1995) (construing the New York's fraudulent conveyance statute); *see also*, *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 793 (7th Cir. 2009), quoted above.  Fraudulent conveyance law is "designed to protect creditors' rights" and looks at transactions from "the perspective of creditors".  *In re Crowthers McCall Pattern, Inc.*, 129 B.R. 992, 998 (S.D.N.Y. 1991).  As a matter of substance, from the creditors' perspective, Kerr-McGee prior to the IPO through its cash management system reserved for, managed and paid all environmental obligations of all of its constituent units.  After the IPO finally separated the E&P assets from the chemical assets, creditors could and did look only to the Debtors – consolidated "Tronox" – as the entity responsible for the legacy liabilities.  Plaintiffs satisfied their burden of proof when they demonstrated, easily and without substantial dispute, that Tronox as a consolidated entity received less than reasonably equivalent value when, at the conclusion of the IPO, $17 billion in

assets had been spun off and only $2.6 billion had been transferred in.[65]  (Williams Direct, 06/22/2012 at ¶¶2, 49, 51-52, and table 3).

The further and more hotly contested question is whether Plaintiffs satisfied their burden of showing that Tronox was, as a result of the transfers, insolvent, without sufficient capital or unable to pay its debts as they came due.  We start with the issue of insolvency.

**Insolvency**

The Oklahoma UFTA defines insolvency as follows for a non-partnership debtor:

A.  A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

B.  A debtor who is generally not paying his debts as they become due is presumed to be insolvent….

D.   Assets pursuant to the provisions of this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay or defraud creditors or that has been transferred in a manner making the transfer voidable pursuant to the provisions of the Uniform Fraudulent Transfer Act.  OKLA. STAT. tit. 24, §114.

Under the Oklahoma UFTA, "debt" means 'liability on a claim' and "claim" means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." OKLA. STAT. tit. 24, § 113 (5), (3).   Cases under the Federal Bankruptcy Code are frequently used in the construction of parallel UFTA provisions, and it is relevant that the Bankruptcy Code

---

[65] Nor did the parties litigate this case on an entity-by-entity basis.  Defendants contend, "Plaintiffs' [solvency] expert  Dr. Newton did not set forth any analysis of solvency on an entity by entity basis in his initial report, and then made only a rudimentary effort to backfill this analysis … For instance, he makes unfounded assumptions about allocations of environmental liabilities."  (Def. Br. at 45).  Moreover, Defendants did not raise their "entity by entity" argument until late in the day, and also that the parties found it impossible to allocate many of the environmental liabilities between Tronox Worldwide (Old Kerr-McGee) and Tronox LLC (old Tronox Chemical). Moreover, Defendants do not put forward any such allocation other than to call Dr. Newton's analysis a "rudimentary effort" based on "unfounded assumptions."  *Id*.  In any event, as further discussed below, their solvency defense is based primarily on a consolidated "market" argument.

definition of "insolvency" is almost identical to that of the UFTA.  The Bankruptcy Code in

§ 101(32) provides that "The term 'insolvent' means –

> (A) with reference to an entity other than a partnership and a municipality, financial
> condition such that the sum of such entity's debts is greater than all of such entity's
> property, at a fair valuation, exclusive of - -
> > (i)    property transferred, concealed, or removed with intent to hinder, delay, or
> > defraud such entity's creditors; and
> > (ii)   property that may be exempted from property of the estate under section
> > 522 of this title.

The definitions of "debt" and "claim" under the Bankruptcy Code are substantially identical to

those in the UFTA.  *Compare* OKLA. STAT. tit. 24, §§ 113(5), (3), *with* 11 U.S.C. §§ 101(12),

5(A).[66]

The analysis of solvency for fraudulent conveyance purposes is a "balance sheet test,"

examining whether debts in the aggregate are greater than assets in the aggregate.  *Universal*

*Church v. Geltzer*, 463 F.3d at 226.  Assets and debts must be determined "at a fair valuation."

*Mellon Bank v. Official Committee of Unsecured Creditors (In re R.M.L., Inc.)*, 92 F.3d 139,

154-55 (3d Cir. 1996); *In re Solomon*, 299 B.R. 626, 638 (10th Cir. B.A.P. 2003).  In this case,

like many others, these deceptively simple terms engendered days of testimony.  As in many

fraudulent conveyance cases, both parties relied on expert testimony, and both called witnesses

with sterling credentials.  Plaintiffs' principal expert witness on the subject of solvency was

Grant Newton, professor emeritus of accounting at Pepperdine University, executive director of

the Association of Insolvency and Restructuring Advisors (AIRA) and a man with more than 35

years of experience in insolvency accounting and restructuring activities.  Defendants' principal

witness on the subject of solvency was Daniel Fischel, professor emeritus at the University of

Chicago and former dean of the law school and director of the Law and Economics Program at

---

[66] The Bankruptcy Code also includes under the definition of "claim" the "right to an equitable remedy for breach of
performance if such breach gives rise to a right to payment. . . ." § 101(5)(B).

the University. He has testified on valuation and related issues 250-300 times and is currently

chairman of his own consulting company, Compass Lexicon.  Although Prof. Fischel is

particularly well-known for his view that "market prices typically are more reliable evidence of a

company's value than ex post analyses prepared by experts in the context of litigation" (DX

2800 at 7 (Fischel Expert Report)), he also prepared Defendants' only "ex post" solvency

analysis.[67]

We start with the evidence of solvency based on "the market" and then proceed to the

parties' so-called "ex post" analyses.

**Defendants' Market Defense**

Defendants' first line of defense is that "The Voluminous Market Evidence

Overwhelmingly Establishes that Each of the Tronox Plaintiffs Was Solvent at the Time of the

IPO and Spinoff and Not Rendered Insolvent By Reason of the IPO or Spinoff."  (Def. Br. at 47

(heading)).  Citing three recent decisions on use of the "market" to determine solvency in

fraudulent conveyance cases, Defendants assert, "In this trial, the enormous body of

contemporaneous market evidence of solvency was far stronger than in *VFB, Iridium and CarCo*

*– all* of which found for defendants on solvency."  (Def. Br. at 48, citing *VFB LLC v. Campbell*

*Soup Co.*, No. Civ. A 02-137, 2005 WL 2234606 at *31 (D. Del. Sept. 13, 2005), *aff'd* 482 F.3d

624, 632-34 (3d Cir. 2007) (plaintiffs failed to prove insolvency); *Iridium Operating LLC v.*

*Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 352 (Bankr. S.D.N.Y. 2007)

(same);  *In re Old CarCo LLC*, 454 B.R. 38, 59-60 (Bankr.S.D.N.Y. 2011) (granting motion to

dismiss where "the contemporaneous market information concerning the involvement of other

---

[67] Unlike Prof. Newton, who relied on the conclusions of Plaintiffs' other experts, Prof. Fischel relied in forming his opinion solely on what he calls objective contemporaneous evidence and avoided relying on any of the Defendants' other experts.  As he put it, "I wanted my opinion to be a completely self-contained analysis of what I consider to be the relevant economic evidence and I – my opinion does not depend or rely on any other of the defendants' expert witnesses."  (Tr. (Fischel) 8/7/2012 at 4349:17-4350:3).

sophisticated parties in the transaction" rendered constructive fraudulent conveyance implausible)).  Defendants continue:  "This is not simply a case built on the public market evidence of stock and bond prices –although those are key indicators of solvency and plainly demonstrate solvency here…The evidence at trial also established two critical bookends to the public market.  On the one hand is Apollo's signed, fully-financed offer to purchase the Chemical Business, based on six months and millions of dollars in diligence…On the other hand are the compelling, contemporaneous statements and actions of *Tronox's* own officers and managers, including statements subject to the securities laws – all of which consistent with the public market evidence of solvency."  *Id*. at 48-49.

We start with the evidence relating to the public market and then proceed to the so-called two "bookends" -- Apollo and the other bidders and Tronox's own personnel.

**The Public Market**

Defendants appeal to cases such as *VFB v. Campbell Soup Co*. (the "*Vlasic Pickle* case"), *Iridium* and *Old Car Co*. (formerly known as Chrysler) as if this were a typical case where a division or subsidiary was spun off, survived for several years, and then went into chapter 11, commencing a fraudulent conveyance case and claiming that the business was insolvent at the time of the spinoff.  In the *Vlasic Pickle* case, for example, the Third Circuit affirmed a district court decision that discounted the parties' expert opinions on solvency and relied almost exclusively on the "market."  The Circuit Court cited the district court's "meticulous and well-considered opinion," in which the trial court had concluded that the division spun off received reasonably equivalent value and was solvent at the time of the spin; the Circuit Court noted that the district court's primary reason for that conclusion was that "in light of VFI's $1.1 billion market capitalization nine months after the spin, the Division businesses were worth indeed far

85

more than $500 million." 482 F.3d at 631.  The Court of Appeals cautioned, "All agree that if the

market capitalization was inflated by Campbell's manipulations it was not good evidence of

value; the question is whether it was so inflated."  *Id*. at 632.  But it found that even if the

division's results had been inflated by manipulative activity in connection with the spin, the

market capitalization remained high even after disclosure of the manipulation, and it concluded,

"we do not think that the district court erred in choosing to rely on the objective evidence from

the public equity and debt markets."  *Id*. at 633.

In this case the Debtor also survived for several years after the spin, and it maintained an

ostensible market capitalization.  Under the facts of this case, however, Defendants' reliance on

the "market" and the fact that lenders loaned $450 million in senior secured debt and that Tronox

was also able to sell into the market $350 million in bonds and $224.7 million in stock is

unavailing.

At the outset, Defendants' reliance on Tronox's ability to issue $450 million in debt does

not deserve any weight in the solvency analysis. The debt that Tronox issued was secured by all

of the assets of all of the Tronox companies, and the sophisticated lenders who bought this debt

well knew they would come first in any bankruptcy or liquidation of the enterprise.[68]

Nevertheless, Tronox also issued unsecured bonds which would share in any liquidation on a par

with the legacy liability creditors, and it issued stock that would rank lower than the legacy

liabilities.  Admittedly, Kerr-McGee had difficulty selling the bonds and the stock, and the

proceeds were lower than anticipated.[69]  Admittedly, the sales took place at the height of a

---

[68] In fact, in Tronox's chapter 11 proceedings, the debt was paid in full prior to the receipt of proceeds by any other
creditor constituency.

[69] The record on this point is voluminous.  (JX 349 at 21 (smaller proceeds and fewer shares sold than expected); Tr.
(Gibney) 9/5/2010 at 6265:7-17 (IPO closed at $14 per share compared to Kerr-McGee's targeted $20-22 per share);
Compare PX 847 at 1 with PX 1305 at 3;  Tr. (Wohleber) 5/23/2012 at 948:13-16;  Newberry Dep., 2/15/2011
(markets weren't as "receptive" as had been hoped);  PX 834 (there was little institutional demand);  see also, Warm

market of "irrational exuberance" that crashed only a few years later.[70]  Nevertheless, Tronox's

ability to issue unsecured bond debt and stock in the IPO is Defendants' strongest indication of

solvency based on the market.

Plaintiffs attempted to overcome the evidence of Tronox's issuance of unsecured debt

and stock in connection with the IPO by demonstrating that the financial statements on which the

market relied were false and misleading.  On this issue, Prof. Newton convincingly demonstrated

that the projections on which the IPO was based were inflated, sell-side projections, and that key

numbers were imposed at the direction of Kerr-McGee's chief financial officer, Wohleber. (Tr.

(Gibney) 9/5/2012 at 6062:14-6063:12)  For example, Kerr-McGee had previously forecast $TiO_2$

pricing using a mean treadline based on more than 40 years of historical pricing data.  (Romano

Dep., 8/17/2010 at 74:15-75:3; Tr. (Smith) 5/25/2012 at 1381:4-17).  At Wohleber's direction,

Kerr-McGee abandoned its historical forecasting methodology, which had been used through

February 2005, with the result that the March 2005 forecast (from which the IPO numbers were

derived) increased dramatically; for instance, projected results increased by $99 million in 2008

(to a total of $228 million) and $128 million in 2009 (to a total of $325 million).[71]  (*Id*; *compare*

JX 133 at 4 *with* PX 469 at TRX-72161; Brown Dep., 5/11/2011 at 183:20-184:11, 196:24-

197:2; Tr. (Smith) 5/25/2012 at 1420:15-18; Tr. (Fischel) 8/8/2012 at 4793:23-4794:18).  The

use of "sell-side" projections for pricing in the November 2005 Registration Statement was

---

Dep., 2/15/2011 at 41:2-15, 45:15-46:4 (to generate demand, interest rate on unsecured bonds was increased from 7
to 9.5%); Newberry Dep., 2/15/2011 at 245:7-10; DX 76 at 2: JX 323 at 1;  see also PX 845; Tr. (Wohleber)
5/23/2012 at 949:23-951:5 (lead underwriters of IPO each held 1.5 million shares they could not sell and bought
shares in secondary market to stabilize price); Tr. (Gibney) 9/5/2012 at 6265:18-25 (Lehman was the largest trader
in Tronox stock)).

[70] *See e.g.*, *The Financial Crisis and the Role of Federal Regulators*:  Hearings Before the Comm. on Oversight and
Government Reform, 110th Cong., Second Sess. (2008) (statement of Alan Greenspan, former chairman of the
Federal Reserve Board) (available at https://house .resource.org/110/org.c-span.281958-1.pdf).

[71] Newton used the February 2005 numbers in his discounted cash flow analysis.  *See* pp. 115-116, *infra*.

particularly insupportable in that $TiO_2$ prices began to erode in April 2005, as admitted by

Defendants' industry expert, Gary Cianfichi. (Tr. (Cianfichi) 8/10/2012 at 5296:19-5297:3).

The result is that the IPO projections were unrealistic when compared with Tronox's historical

performance. The IPO forecasted an average of $315 million of EBITDA over the forecast

period. (Tr. (Fischel) 8/8/2012 at 4782:14-4784:11). These far exceeded Tronox's average

historical EBITDA of $168 million annually from 2000-2005. *Id*. They far exceeded even the

chemical business' "peak" and "very strong" years of 2000 ($231 million) and 2005 ($232

million). (JX 93 at 6; Tr. (Cianfichi) 8/10/2012 at 5449:3-17; see also Tr. (Balcombe) 9/6/2012 at

6427:6-6429:5; 6429:22-6433:7).[72]

The record is also clear that the financial statements omitted certain critical contingencies

and potential liabilities. One of the most important involved the Federal Superfund site at

Manville, New Jersey, a former wood-treating facility.[73] In April 2005, prior to the IPO, the

EPA sent Kerr-McGee a formal demand for reimbursement of the costs, less the EPA's

recoveries; as of the trial date, these costs had increased to approximately $350 million with the

accrual of statutory interest under 42 U.S.C. § 9607. (Puvogel Direct, 5/30/2012 at ¶ 69, n. 30;

PX 1363). The record contains extensive and hotly contested evidence as to whether Kerr-

---

[72] It is recognized that there was testimony that it was "conceivable" that Kerr-McGee Chemical (later Tronox) could have made the 2005 projected income number of $245 million. One witness put the probability at 15%; this possibility gave the future managers comfort that their projections were not false. (Tr. (Smith) 5/25/2012 at 1393:21-1394:4; 1390:23-1391:11).

[73] After operations closed in 1956 a developer had purchased the site and built 137 single-family homes, which were abandoned after a sinkhole developed and contaminants were identified consistent with creosote, a probable human carcinogen. (Ram Direct, 6/8/2012 at ¶¶ 66-69; Tr. (Shifrin) 9/10/2012 at 6949:4-7). Beginning in 1998 the U.S. Environmental Protection Administration had demanded that Kerr-McGee clean up the site, and when Kerr-McGee refused, spent $298 million itself in remediation. (Puvogel Direct, 5/30/2012 at ¶ 69; JX 10 at 2; PX208 at 2; DX 406 at 2; Tr. (Shifrin) 9/10/2012 at 6950:18-6951:2).

McGee had liability at the Manville site.[74]  The point for purposes of this case is that Kerr-McGee included no disclosure whatsoever of potential liability for the Manville Superfund site.[75]

Similarly, Kerr-McGee omitted any disclosure in the IPO Registration Statement of contingencies related to the contract for the sale of land in Henderson, Nevada.  At the time of the IPO, Centex Homes and the Landwell Company had an ostensible contract to purchase the Henderson site for a total of $515 million, $154 million of which would be payable to Tronox on account of its 30% interest in the property.  (JX 158 at 129).  The Henderson proceeds were included in Tronox's projections and were essential elements of its future cash flow.[76]  However, there was no disclosure of the risks relating to the land sale contract.  It was not disclosed that the land had previously been used as an industrial waste site; that it had to be remediated; and that "no action letters" had to be obtained from the Nevada Division of Environmental Protection for each of the four parcels being sold  (JX 98 at 5-6, 9; see also JX 236 at 1 (an August 2005 Lehman email warning that a leadership change within the Nevada agency would "definitely delay" and "possibly could kill" the deal)).  It was not disclosed that, by the time of the IPO, the first three of four closing dates for the contract had passed and been extended.  Most important, it

---

[74] Plaintiffs quote four legal memoranda from Kerr-McGee's counsel at Covington & Burling concluding that it was likely that Kerr-McGee had liability as the successor to American Creosoting Corp. (PX 306 at TRX-INVTL1167970; PX 336 at TRX-INVTL 1168043;  PX 344 at TRX-ENVTL 1168103-109).  Defendants quote auditors' letters and comments from the partner in charge at Covington that Kerr-McGee had "substantial defenses" to liability at Manville.  (DX 346 at 5).  The real "bone of contention" was that the 1959 Plan of Liquidation between the American Creosoting Company and a subsidiary, Federal Creosoting Company, was unsigned and whether the EPA would be able to prove an assumption of liabilities by the former.  (Reichenberger Dep., 44:13-21).

[75] Kerr-McGee's counsel also instructed its environmental experts who testified at trial to value Manville at zero, apparently on the same ground.

[76] Even under Kerr-McGee's inflated "sell-side" projections of future cash flow, Tronox was projected to lose $15.4 million in 2006, have cumulative losses of $33.7 million through 2007, and earn only $18.3 million total from 2005-2008 without the Henderson sale proceeds.  (Tr. (Williams) 9/13/2012 at 7531:8-7532:18; Mikkelson Dep., 6/23/2010 at 364:21-366:11;  Tr.(Wohleber) 5/22/2102 at 885:7-19; see also  Brown Dep., 5/11/2012 at 238:16-240:11 (the testimony of Kerr-McGee's vice president for strategic planning, who warned Wohleber and Pilcher that "there would probably be no IPO" if Tronox were not able to forecast receipt of the proceeds from the Nevada land sales).

was not disclosed that the contract was merely the economic equivalent of an option, in that it gave the purchasers the right to walk away for $2 million in liquidated damages (less than 1% of the purchase price).[77]

There is thus much evidence in the record regarding the insufficiencies of the Tronox financials used in the IPO.  Nevertheless, it is not necessary for Plaintiffs in this case to prove that the IPO financial statements were false and misleading.[78]  Plaintiffs have clearly overcome the assumption of market efficiency because this case is not about Tronox's earning power, or its ability to maintain its position as the world's third-largest $TiO_2$ producer.  If it were, Defendants' appeal to decisions such as *Vlasic Pickle*, *Iridium* and *Old Carco* might deserve greater weight. This case is about the legacy liabilities that Kerr-McGee imposed on Tronox and their impact on Tronox's solvency.  In this case, there was no contention that Tronox's financial statements issued in connection with the IPO reserved for or disclosed all of the legacy liabilities or calculated these liabilities in a manner that would be useful in determining Tronox's solvency. Nor was there a contention that general references in Tronox's financial statements about environmental risk or the note on "Contingencies" established solvency for fraudulent conveyance purposes.

Indeed, no party in the case even suggested that financial statements and the reserves taken for environmental and tort liabilities are useful in a determination of solvency under the

---

[77] In January 2007 the purchasers in fact terminated the contract and walked away, citing concerns that the polluted property "may not be remediated for several additional years." (JX 403; Tr. (Gibney) 9/5/2012 at 6200:2-7; JX 98 at 1).  At the time of trial in 2012, the Henderson land still had not been remediated or sold, and the required letters for three of the four parcels had not been obtained from the Nevada authorities.  (Tr. (Gibney) 9/5/2012 at 6278:12-6279:15-19; Tr. (Smith) 5/25/2012 at 1422:8-12).

[78] At the conclusion of the trial, there was still ongoing litigation in the District Court as to whether Tronox's Registration Statement was false and misleading and in violation of the securities laws. On November 26, 2012, a Final Judgment Approving Class Action Settlement was entered in all of the related class actions by the District Court resolving those lawsuits.  *See In re Tronox, Inc. Securities Litigation*, Case Nos. 09 Civ. 06220 (SAS); 09 Civ. 06490 (SAS); and 09 Civ. 07116 (SAS).  On September 19, 2013, the District Court entered an order approving the motion for distribution of a net settlement fund to authorized claimants, and the cases were closed.

UFTA.  Plaintiffs' expert submitted reports totaling over 2,600 pages to attempt to value the

environmental liabilities.  Defendants called two expert witnesses and adduced over 8,000 pages

of reports to dispute Plaintiffs' expert.  Separate experts and reports were relied on in connection

with the tort liabilities.  None of these experts suggested that financial statement reserves for the

liabilities were relevant to a determination of their size for solvency purposes.  Prof. Fischel,

whose career has been based on the principle of the supremacy of the market, admitted that

reserves are not "the final measure or even the most accurate contemporary measure of what

environmental liabilities are likely to be."  (Tr. (Fischel 8/7/2012 at 4433:8-4434:6).  He relied

for environmental liabilities on the study performed by Apollo, one of the suitors for Tronox, a

matter which is discussed below.

       A principal reason why financial statements are of little use in a solvency analysis is that

generally accepted accounting principles (GAAP) require reserves only for claims that are

"probable and reasonably estimable."  (*See* FAS 5; Rock Direct, 6/11/2012 at ¶ 70; Tr. (Riley)

8/14/2012 at 5557:12-15).  The record is replete with evidence that Kerr-McGee misapplied this

standard and thereby understated its liabilities for GAAP purposes.[79]  Although Defendants

made heroic efforts to adduce testimony that Kerr-McGee's personnel really meant "probable

and reasonably estimable," the record is plain that Kerr-McGee applied an inappropriate standard

and did not assess a potential environmental contingency at a site prior to receiving a demand or

complaint from a third party.  (Tr. (Christiansen) 7/25/2012 at 4014:15-21, 4128:3-8; Tr. (Riley)

8/14/2012 at 5504:14-5505:24; Tr. (Richie) 7/26/2012 at 4301:20-4302:2).  The head of Kerr-

---

[79] For example, the personnel in Kerr-McGee's S&EA Department, which was in charge of remediation, prepared
internal Sarbanes-Oxley certifications to document the controls in place to comply with reporting requirements,
including GAAP.  These certifications routinely covered only "known and reasonably estimable liabilities."  (Tr.
(Christiansen) 7/25/12 at 3996:24-3997:2).  The law department's control documentation similarly misstated the
standard, providing that reserves should be established "where a judgment or loss [was] considered probable and
measurable."  (JX 107 at 1; DX 444 at 1).

McGee's S&EA Department (environmental remediation), George D. Christiansen, admitted that

Kerr-McGee's assessment of its liability at a site would "invariably be started by a third-party

inquiry from the outside."  (Tr. (Christiansen) 7/25/2012 at 4123:8-4126:12).  This policy led to

the misapplication of GAAP accounting principles and understated reserves used for financial

statement purposes.[80]

In any event, without considering the adequacy of Kerr-McGee's reserves, financial

statement reserves for environmental liabilities are of no probative value in a solvency analysis

because GAAP itself only requires reporting a limited subclass of environmental and tort

liabilities.  Probable and reasonably estimable liabilities are those that are probable as to liability

and reasonably estimable as to amount.  (Tr. (Williams) 9/13/2012 at 7507:5 – 7508:22).  "An

environmental liability is considered probable when . . . 'it has been asserted (or it is probable

that it will be asserted) [and] the entity is responsible for participating in a remediation process

because of a past event,' and . . . 'it is probable that the outcome of such litigation, claim, or

assessment will be unfavorable.'"  (Rock Direct, 6/11/2012 at ¶ 24, quoting SOP 96-1).[81]  As

Plaintiffs' expert Prof. Williams testified, "the way the market might look at [these] legacy

liabilities, certainly the way GAAP looks at them is different than the determination of a claim

under … the Oklahoma UFTA."  (Tr. (Williams) 9/13/2012 at 7650:3-7652:18).  This testimony

---

[80] It will be recalled that the Master Separation Agreement required Tronox to continue to use Kerr-McGee's reserve setting methodology, and after the spinoff, Tronox continued to do so.  (P. Corbett Dep., 12/15/2010 at 191:24-192:3;  Logan Dep., 9/28/2010 at 103:13-104:6;  PX 1277 at 13).  As early as January 2007, Tronox's new controller and chief accounting officer raised concerns about the practice, carried over from Kerr-McGee, of reserving for environmental liabilities only after a demand was received from a third party.  (Klvac Dep., 5/24/2011 at 5:12-6:9, 18:6-19-7, 22:15-23:14).  Others raised similar questions.  (Brown Dep., 5/11/2011 at 290:23-291:9).  After a review of the 2008 reserves for 11 sites, Tronox concluded that the 2008 reserves were understated by $68.5 million (JX 455 at 2), and the financials were withdrawn.  In October 2011 Tronox issued revised financial statements for the years ended December 31, 2010, 2009 and 2008 and concluded that its $189 million environmental reserve was understated by $303.2 million.  (PX 1277 at 3; JX 425 at 6).

[81] Moreover, "when the first prong of this probability test is satisfied (i.e., a claim has been asserted or it is probable that it will be asserted) and the entity is or was associated with the environmental site at issue, there is a presumption that the second prong is also satisfied (i.e., the outcome will be unfavorable)."  Id. (emphasis in the original).

is consistent with applicable authority.  In *In re W.R. Grace & Co.*, 446 B.R. 96, 105-106 and n. 11 (Bankr. D.Del. 2011), a case involving the valuation of asbestos liabilities, the District Court rejected the argument that the debtor was solvent as a consequence of its substantial market capitalization in light of the large number of asbestos liabilities that had to be valued in order to determine solvency. In a subsequent decision in the same case, the Bankruptcy Court similarly rejected the argument of senior creditors, who cited the *Vlasic Pickle* decision and contended that "because Debtors' market capitalization is substantial and the Joint Plan proposes that equity retain an interest, Debtors are solvent…"  *In re W.R.Grace & Co.* 446 B.R. 96, 106, n.11 (Bankr.D.Del. 2011).  The Court noted that under *Vlasic Pickle* "market valuation of a company was strong evidence of its solvency." However, the Court continued, it was not conclusive, and the senior lenders' "arguments for a presumption of solvency are not supported in the record or by operation of law, under the circumstances before us." *Id.* at 106.

In the *W.R.Grace* case, the fulcrum issue relating to insolvency was the size of its asbestos liability.  In the instant case, it is the size of Tronox's environmental liability.  In both cases, the market as a whole, no matter how efficient or inefficient, cannot be relied on to determine solvency or insolvency.  In this case, as further discussed below, there is no substitute for a solvency analysis.

**The Allegedly Sophisticated Market Players**

Before considering the solvency analyses that both parties presented, it is necessary to consider Defendants' reliance on other players in the market.  Defendants rely on Apollo, which is described as a determinative "bookend" for the market because it performed its own environmental analysis.  Defendants also rely on the participants in the market who performed independent due diligence that extended well beyond public information.  However, these

"market participants" had interests which were unique and caused them to be hardly representative of "the market." Thus, at pp. 58-62 of their brief, Defendants list the other market participants on whose due diligence they rely as including: (i) JP Morgan, described by Defendants "as co-lead underwriter for the equity, and co-documentation agent for the Credit Facility, committing $50 million of its own funds to the Credit Facility, fully expecting to be repaid" (citing JX 326 at 3; JX 324 at 1; Haimes Dep., 1/27/20122 at 87:9-20, 122:3-22; JX 298 at 5, 48); (ii) Credit Suisse First Boston, described "as joint bookrunner for the Unsecured Notes, co-manager for the IPO and joint lead arranger for the Credit Facility, committing $60 million of its own funds to the Credit Facility, fully expecting to be repaid" (citing JX 326 at 3; JX 260 at 2; Newberry Dep., 1/17/2011 at 48:13-25, 85:17-86:3; JX 283 at 13); and (iii) Lehman Brothers, which, according to Defendants, "offered stapled financing to potential bidders in the sale process, acted as joint bookrunner for the Unsecured Notes, co-lead underwriter for the IPO, and joint lead arranger for the Credit Facility…Lehman committed $60 million of its own funds to the Credit Facility, fully expecting to be repaid." (citing JX 168 at 7; JX 270 at 4; JX 326 at 3; Sehgal Dep. 5/25/2011 at 209:4-18;  Watson Dep., 2/10/2011 at 620:5-14; Newberry Dep., 1/17/2011 at 49:2-4).

As Defendants admit in their description of the cash committed by these "market participants," Morgan, CSFB and Lehman provided credit to Tronox through the Credit Facility and had every reason to expect to be fully repaid because the Credit Facility was secured by all of Tronox's assets.  The Secured Lenders could be confident that they would be paid before any legacy liability claims – as was indeed the case in Tronox's bankruptcy.[82]  Moreover, these

---

[82] This is not to conclude that these entities had no interest whether Tronox's could repay them absent a bankruptcy or that they expected the Credit Facility to default.  On the other hand, there is ample evidence in the record that Morgan, CSFB and Lehman all took account of the obvious fact that if Tronox failed, whether because of the legacy liabilities or otherwise, their debt would be protected.  (PX 1286 at 42-43; Haimes Dep., 1/27/2011 at 213:22-214:4,

"market participants" received millions of dollars in fees from Kerr-McGee, an established

client, or anticipated receipt of such fees from financing Apollo.  (JX 326 at 3; PX 1286 at 46;

PX 616 at 17).  Further, none of these entities separately valued Tronox's environmental or tort

liabilities; if they relied on any data, they relied on Apollo, and Defendants never explain how

the diligence performed by these parties, and the information they obtained, gave them any

independent insight into the legacy liabilities.[83]

The one "market participant" who did separately value the legacy liabilities was Apollo,

and Defendants characterize "Apollo's Efforts and Final Bid to Acquire the Chemical Business,

After Thorough Due Diligence, [as] Unassailable Evidence of Solvency."  Def.  Br. at 51

(heading).   Defendants contend, "Apollo along with its advisors accessed the vast [virtual data

room] set up by Kerr-McGee more than *24,000* times, diligencing every aspect of the Chemical

Business . . . . As a result, Apollo and its advisors, who also had access to the [virtual data room],

became 'intimately familiar with the issues facing the Company' and were well aware of the full

extent of Tronox's environmental and tort liabilities (including the misnamed 'secret' sites), as

well as the Centex Contract for the Henderson Property, Tronox's financial performance and

---

217:6-16, 248:9-19, 264:16-265:16; Newberry Dep., 2/15/2011 at 213:23-214:9; 215:18 – 216:15; Tr. (Newton)
6/27/2012 at 3460:8-3463:11; Tr. (Fischel) 8/8/2012 at 4632:24-4633:13, 4694:12-19).  Defendants do not contend
that these entities bought Tronox unsecured debt or stock, and if they ended up with some of these securities, it was
because of their position as underwriters, where they earned enormous fees and agreed to take up those securities
that they could not sell to the general public.  (Tr. (Wohleber) 5/23/2012 at 949:23-951:5; Tr. (Gibney) 9/5/2012 at
6265:18-25; DX 247).

[83] If the market is defined as the group of sophisticated bidders who considered an acquisition of Tronox, it is worth
recalling that the "market," except for Apollo, refused to bid on Tronox with all of the legacy liabilities included in
the deal.  As noted above, Lehman identified 60 potential bidders, and contacted 16, and 13 signed confidentiality
agreements.  The field was narrowed to four final bidders, who were given access to a virtual data room to perform
due diligence.  Only Apollo was willing to accept the legacy liabilities.  Bain Capital, JP Morgan Partners and
Madison Dearborn Partners eventually dropped out.  Bain Capital chose not to make a final bid in part because of
the cost to diligence the legacy liabilities, JP Morgan made a bid only for the assets of the chemical business, and the
bid submitted by Madison Dearborn Partners excluded the assumption of any legacy liabilities.  (JX 271 at 8, 40; *see
also* Souleles Dep., 5/4/2011 at 51:16-52:5, 71:10-21, 72:6-73:3).  One potential bidder, Ineos, was willing to bid
$1,200,000,000 without the legacy liabilities and only $300 million with them, a $900 million swing.  (JX 271 at
50).

projections, and the TiO$_2$ industry's anticipated future performance." Defs Br at 52 (emphasis in original). Defendants conclude, "Apollo's valuation of the Chemical Business was ultimately and powerfully manifested in its November 20, 2005 fully-funded, signed offer for $1.3 billion, which the record shows was final and binding." Defs Br at 53.

Defendants overstate the nature and significance of the Apollo bid. Apollo did not make a "final and binding" offer for Tronox of $1.3 billion. JP Morgan, Kerr-McGee's investment banker on the deal, concluded that the Apollo bid contained open items and that critical parts of the contract remained to be negotiated. (*See* PX 840). Additional disclosures had to be made, triggering Apollo's rights of termination if they were inaccurate. (PX 840; DX 542 at 140; Tr. (Williams) 9/13/2012 at 7491:15-22). Moreover, Apollo's bid contained indemnities for environmental and tort liability totaling $504 million.[84] Kerr-McGee had previously rejected all indemnities and other guarantees relating to the legacy liabilities, as it would not result in the "clean break" that Kerr-McGee demanded. (PX 711 at 2; PX 7 at 1; PX 602 at 1; PX 577 at MDP004804; Addison Dep., 7/14/2010 at 338:6-16, 384:8-385:1; Adams Dep., 6/10/2010 at 544:21-545:14; Watson 2/9/2011 at 182:25-183:9, 323:2-326:2). This leads to the question whether Apollo was ever, in Kerr-McGee's mind, a serious bidder. This question is pointed up by the uncontested testimony that Kerr-McGee's management had already "lost faith in Apollo" in light of "the continued failures by Apollo to honor its commitments" by retrading deals and refusing to honor positions already taken. (Tr. (L. Corbett) 5/15/2012 at 276:4-277:3; Tr. (Wohleber) 5/22/2012 at 899:18-25; Pilcher Dep., 623:3-19).[85] In the words of Kerr-McGee's

---

[84] In addition, under the proposed transaction with Apollo, Kerr-McGee would be required to retain medical coverage for personnel who retired prior to the closing date of the transaction, a continued liability valued at $110 million; in the spinoff that cost was transferred to Tronox. (PX 1286 at 38).

[85] Kerr-McGee was wise to doubt Apollo's commitment even to a signed agreement. The record shows that after Kerr-McGee terminated its negotiations with Apollo, Apollo executed an agreement to purchase another TiO$_2$ business but then reneged. The other party sued and after years of litigation obtained a declaratory judgment that

chief executive officer, we were "convinced [we] didn't have a real opportunity there."  Tr. (L.

Corbett) 5/17/2012 at 538:3-21.  Kerr-McGee went forward with the IPO and did not even bring

the final Apollo bid to the attention of its Board.[86]

In any event, the record is inadequate to give Apollo's analysis of Tronox's

environmental and tort liabilities the weight that Defendants demand.  There is no dispute that

Apollo hired an environmental consulting firm, Environ, as well as lawyers from Morgan, Lewis

& Bockius as environmental counsel, and that they performed "'significant diligence assessing

the nature and potential cost implications of [the Chemical Business and its environmental]

liabilities.'"  (See Fischel Expert Report, DX 2800 at ¶ 22, quoting Confidential Apollo

Memorandum from Matthew Constantino to Interested Parties dated June 18, 2005 at 9-10. (JX

204)).  Prof. Fischel, Defendants' principal solvency expert, in fact built his analysis of Tronox's

solvency around Apollo's calculations as to the  legacy liabilities, asserting that the maximum

liability found by Apollo and its experts (on which he relied) was $556.1 million on an

undiscounted basis.  (DX 2800  ¶ 23, referencing Ex. F).[87]

Although Fischel's Ex. F purports to calculate the Chemical Business' undiscounted

environmental liability, it is unreliable. It consists of excerpts from other documents that do not

even purport to represent Environ's analysis of the Chemical Business' total environmental

---

any damages awarded would not be capped by the liquidated damages clause of the agreement.  The Delaware
Chancery court concluded that Apollo had followed "a carefully designed plan" to avoid closing and had engaged in
a "knowing and intentional breach" of contract.  Hexion Specialty Chem., Inc. v. Huntsman Corp., 965 A.2d 715,
722, 725, 746, 756-57 (Del. Ch. 2008).

[86] Courts give little weight to unaccepted offers, especially where they lack finality.  Expert testimony based on such
evidence is excluded as inadmissible to establish value.  See In re Perry County Foods, Inc., 313 B.R. 875, 915
(Bankr. N.D. Ala. 2004); In re Six, 220 B.R. 479, 484 (Bankr. M.D.Fla. 1994) ("such offers 'are too speculative to
form any solid determination of'" value); In re Pullman Const. Indus., Inc., 103 B.R. 983, 986-87 (Bankr. N.D. Ill.
1989).  As the Court said in United States v. Smith, 355 F.2d 807, 811 (5th Cir. 1966).  "It is well settled that a mere
offer, unaccepted, to buy or sell is inadmissible to establish market value."

[87] By the time Prof. Fischel testified he had updated Ex. 2800 as Ex. 2800.1.  Exhibit F attached to Ex. 2800.1 is
longer, with additional notes and material included, but it is not materially different for purposes of this Decision.

exposure.  Thus, the first of the three excerpts used in Ex. F is entitled "Per CSFB Presentation to

Investment Banking Committee dated 6-21-2005" and purports to calculate "Total

Environmental Remediation Liabilities" as $497.0 million.  However, the individual items that

supposedly add up to "Total Liabilities" are entitled, simply, "Known Non-Wood" treating sites

and "Known Wood" treating sites and hardly purport to be comprehensive.  The relationship of

CSFB (Credit Suisse First Boston) to Apollo or to Environ is not explained.[88]

     The second of the three excerpts in Fischel's Ex. F is headed "Per ENVIRON's Report

'Kerr-McGee Chemical – Environmental Reserve and Regulatory Compliance Summary'" and

references a UBS Memo on Project Blanco, Appendix A."  It is dated 8/11/05 and is also in

evidence as DX2132; a similar version dated 11/1/05 is DX8940.   It at least purports to

constitute some of the work product of Environ, Apollo's expert environmental consultants, and

the version Fischel initially used was apparently included as an appendix to a memorandum

prepared by UBS, which was a prospective lender to Apollo.  However, the seven-page list of

items does not purport to be a report or to be comprehensive.  On the contrary, it lists certain

environmental liabilities and by its own terms is limited to Kerr-McGee's "environmental

reserves" and "known site contamination issues," plus Manville, where the EPA had demanded

$189 million for remediation.  It adds up to an alleged "Total Environmental Remediation and

Tort Liabilities" of $556.1 million.

     The relationship of the third excerpt to Apollo is entirely unknown as it is headed,

simply, "Per Undated Document (CSMTRX-JPM00015452)."  Like the other documents

referenced, this "undated document" does not even pretend to be comprehensive, and although

some of the pages appear to have been produced by Environ, they are pages with names of sites

---

[88] We know from other evidence in the record that CSFB served as joint bookrunner for the Unsecured Notes, co-manager for the IPO, and joint lead arranger for the Credit Facility.  It also competed unsuccessfully to finance Apollo's acquisition of Kerr-McGee Chemical.

and numbers but without a grand total. All of the documents purport to analyze liability only at "known sites."

Prof. Fischel's excerpts from these miscellaneous documents, not shown to constitute a comprehensive analysis of Kerr-McGee's environmental liabilities, do not provide adequate support for Defendants' position that Apollo and its experts concluded after massive study that the legacy liabilities were fairly valued at $556.1 million. Indeed, not only do the documents listed on Prof. Fischel's Ex. F indicate that Apollo only considered "known environmental sites," where a claim had been made by a third party, but Prof. Fischel on cross-examination confirmed this. He testified that in his opinion Environ's analysis was limited to sites for which Kerr-McGee had existing reserves, plus Manville (where it had received a claim from the EPA), and that it did not study Kerr-McGee's total environmental footprint. (Tr. (Fischel) 8/8/2012 at 4867:11-4869:12). On the record we have, the Environ study – whatever it might have been – materially underestimated Kerr-McGee's total exposure for the purposes of a valid solvency analysis.

Moreover, although Apollo was subject to subpoena in New York, no party called an Apollo witness to the stand, and the record evidence on Apollo's bid is limited to the documents that Apollo produced, a few of which were admitted in evidence, and to the evidence of the Kerr-McGee officers who ultimately rejected the Apollo bid. The few Apollo documents in evidence do not support Defendants' contention that the Apollo bid is "unassailable" evidence of Tronox's solvency. For example, an Apollo Confidential Memorandum on which Prof. Fischel relied refers to "our investment horizon", but it does not disclose how long Apollo intended to hold on to the Chemical Business before disposing of it through an IPO or other transaction. (See JX 204 at p. 1, an Apollo Confidential Memorandum dated June 18, 2005). Indeed, we know from the

"Confidential Memorandum" that Apollo was confident it could "manage" the environmental

liabilities during the period of its ownership, something it believed Kerr-McGee had done

successfully.  The authors wrote:  "It is important to note that our advisors consider the

assumption of these liabilities as a project management exercise (where expected costs are well

banded) rather than a risk management undertaking.  This is due to the extensive work performed

by the Company to date and the collaborative nature of the relationship between the Company

and the environmental authorities."[89]  For UFTA purposes, Apollo's confidence that it could

manage the liabilities over the period of time it would own Tronox (its investment horizon) does

not constitute the basis for a solvency analysis, and on the record as a whole, its unaccepted bid

does not provide "unassailable" or even probative evidence of Tronox's solvency at the time of

the IPO.

        The other "bookend" that Defendants propound as evidence of Tronox's solvency is the

confidence of its officers and directors in its future.    All of the witnesses who were employed

by Tronox testified that at the time of the spinoff they believed Tronox was "solvent" and not

doomed to fail.   However, Plaintiffs do not have to prove that Tronox's management acted in

bad faith or failed to make reasonable efforts to achieve success.  They had no choice but to do

their best under the circumstances.  (Tr. (Gibney) 9/5/2012 at 6255:6-14; P. Corbett Dep.,

---

[89] The Confidential Memorandum also discloses Apollo's intentions regarding Tronox:  "we continue to believe it is
significantly under-managed and have identified over $100 million in annual cost savings and over $200 million in
working capital reduction opportunities . . . . Operated as an orphan business within the $15 billion TEV parent
company, Chemicals exhibits a stagnant, large corporation culture mostly populated by former executives that were
passed up in the succession ranks of the oil and gas business.  Over the course of our diligence we have become
comfortable that the room for cost saving opportunities and increased cash flow management efficiencies is large."
(JX 204 at pp. 1-2).  A subsequent Confidential Memorandum to Apollo CEO Leon Black, dated October 4, 2005,
recognized that the environmental liabilities had effectively eliminated competition for the Chemical Business.  The
authors wrote:  "The deal team views this investment as essentially 2 businesses: (1) an attractive, but
undermanaged $TiO_2$ business with good underlying industry fundamentals, and (2) an unrelated environmental
liability entity which requires significant management attention near term but over time can be significantly reduced
and eventually tucked in to the more prominent $TiO_2$ business.  The fact that the two are packaged together has
eliminated competition and afforded us an opportunity to buy $TiO_2$ at an attractive price provided we are
comfortable working through the complexity of the environmental liabilities."  (DX 7477GD at 1).

12/16/2010 at 378:13-379:4).  Moreover, while many in Tronox's management were "hopeful" about Tronox's prospects, others saw disaster on the horizon at a very early stage.  (Tr. (Gibney) 9/5/2012 at 6059:20-6060:2, 6079:13-21; P. Corbett Dep., 12/16/2010 at 378:21-379:4, 427:15-428:2, 492:16-498:6, 498:21-499:21; Brown Dep., 5/11/2011 at 271:8-274:13; Logan Dep., 9/28/2010 at 130:24-132:13; Lux Dep., 9/27/2010 at 115:4-116:1).  Within three weeks of the spinoff Tronox had developed a "gap closure plan" to address the shortfall between its budget and its deteriorating financial condition.  (PX 931 at 1; Brown Dep., 5/11/2011 at 251:18-22, 252:1-253:22).  Brown, Tronox's vice president of financial planning, testified that "the magnitude of what we needed to address warranted immediate action, and we didn't have a month to waste."  (Brown Dep., 5/11/2011 at 253:15-22).  Within six weeks of the spinoff, Tronox had developed a list of 40 different cost-cutting initiatives, some of which were termed "draconian" by its new CEO,  Adams.  (Adams Dep., 6/9/2010 at 387:25-388:4; 664:24-671:20; PX 22 at TRX-ADV0921412-13; Tr. (Smith) 5/25/2012 at 1428:17-1431:3).

The point is not that Tronox's need to cut costs is proof of balance sheet insolvency or that a cash crunch caused its insolvency.  The point is that in this case its management's good faith efforts to keep the enterprise going and their belief that this was possible do not constitute a "bookend" that proves or disproves Tronox's solvency.  As emphasized throughout this decision, if Tronox was insolvent, as defined in the UFTA, the principal cause was the legacy liabilities.  Some of the managers believed the liabilities would be fatal; shortly after the spinoff, Tronox's newly-appointed head of environmental remediation, Pat Corbett, began advocating that Tronox sue Kerr-McGee, a statement that he repeated frequently.  (P. Corbett Dep., 12/16/2010 at 452:4-453:23; Tr. (Gibney) 9/5/2012 at 6058:15-6059:2; Brown Dep., 5/11/2011 at 177:10-15;  Adams Dep., 6/10/2010 at 551:8-24).  All of Tronox's management attempted to manage the liabilities,

as Kerr-McGee had, and indeed they were bound under the Master Separation Agreement to maintain Kerr-McGee's policies for at least seven years.  (JX 329 at 10-12 (§ 2.5(d) and (f)).  There is no question that Tronox's cash-starved position made it increasingly difficult to pay any expenses relating to the liabilities (and also prevented Tronox from accessing the indemnification provided by Kerr-McGee in the Master Separation Agreement).  In any event, the optimism of some of Tronox's management is no better proof of solvency than the despair of others.

Thus, under the UFTA, there is no substitute for performing an analysis of Tronox's assets as at the date of the IPO and measuring them against its liabilities, both at a fair value.  Both parties presented extensive and detailed expert testimony analyzing Tronox's assets and liabilities as at the IPO date.  We start with their analysis of the liability side of the balance sheet because, as stated previously, this case is about environmental liabilities.  Even if we assume that Defendants are correct in their valuation of Tronox's assets, it was insolvent on Defendants' own numbers if Plaintiffs' valuation of the environmental liabilities is persuasive.  Thus, Prof. Fischel, who presented Defendants' solvency analysis, used $278.1 million as the present value of Tronox's "environmental/tort liabilities (post-tax)".  (DX 2800.1 at 9, 11).[90]  Using this number and his calculation of the value of Tronox's assets (which is further discussed below), he concluded that Tronox had, on the date of the IPO, an equity value of between $574 million and $797 million.  Plaintiffs' present value of the environmental liabilities as of the IPO date was

---

[90] These amounts were net of all reimbursements, such as insurance and claims against other "potentially responsible parties" under the environmental laws ("PRPs").  For example, he assumed that Kerr-McGee would reimburse Tronox for $61.8-65 million in costs under the Master Separation Agreement.  As noted above, he based this number on his view of Apollo's conclusions on the subject of environmental liability, and it is the lowest of any of the valuations in the record.

between $1.0 and $1.2 billion.[91]  If this valuation is persuasive, Tronox was insolvent even on

Defendants' valuation of the assets.  We turn to the issue of valuation next.

**Debts at the Date of the IPO "at a Fair Valuation"**

In order to perform a UFTA solvency analysis appropriate to the facts of this case, it is

necessary to determine the amount of Tronox's "debts" as at the date of the IPO.  As noted

above, the term "debt" is defined in the Oklahoma UFTA as "liability" on a claim, and "claim" is

in turn defined broadly to include those that are unmatured, contingent, and unliquidated.[92]

Under the Bankruptcy Code, the courts have noted that the term "claim" has been defined as

broadly as possible, *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 62, 91 (2d Cir. 1997).[93]

Cases under the UFTA has adopted this same principle.  *In re Fabbro*, 411 B.R. 407, 423

(Bankr. D. Utah 2009) (applying the Utah UFTA, which has the same definition of claim as

Oklahoma).

The parties did not differ materially as to the value of many of Tronox's liabilities, such

as its financial debt, tax liabilities, liabilities for discontinued operations, and unfunded retiree

liability.  Their substantial dispute was the amount of Tronox's environmental and tort liabilities

---

[91] Plaintiffs' valuation was actually between $1.499 and $1.684 billion but this amount is not comparable to Fischel's $278.1 million.  There is no dispute that the legacy liabilities were subject to reduction for recoveries against other potentially responsible parties, insurance proceeds and claims against the governments involved.  The parties applied these offsets at different points, with the result that Fischel's $278.1 million is net of certain reductions that Plaintiffs did not take or that Plaintiffs treated as contingent assets in their solvency analysis. Fischel's $278.1 million compares more fairly to Plaintiffs' $1.0 to $1.2 billion.

[92] Claim is defined in the Oklahoma UFTA as
        a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed,
        contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured.
Okla. Stat. tit. 24 § 113 (3).

[93] Section 101(5) of the Bankruptcy Code provides that "claim" means --
        (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,
        contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or
        (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment,
        whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured,
        unmatured, disputed, undisputed, secured, or unsecured.

– which, again, is what this case is all about.  We start with Tronox's environmental liability,
which is vastly larger.

**Environmental Liability**

Plaintiffs' expert witness on the subject of environmental liability was Neil Ram of Roux
Associates.  Ram has a PhD in Environmental Engineering, with more than 30 years of
experience in environmental engineering, site remediation and cost accounting, and although he
has testified frequently, most of  his work has been on remediating environmental cites,
including as a licensed site professional on more than 20 Superfund sites.  (Ram Direct, 6/8/2012
at ¶¶ 9-11).  Ram and his firm spent more than 40,000 hours preparing a comprehensive report
that was designed to calculate the cost of remediation at the 2,746 sites that were formerly
owned, operated or used for waste disposal by Kerr-McGee, or where Kerr-McGee was a
corporate successor to such an entity, and where the site was left with Tronox after the IPO.   In
his 2,042-page report and 580-page Rebuttal Report, Ram assigned costs to only 372 of the 2,746
sites.  214 of the sites he chose were being remediated in 2005 or the subject of existing Kerr-
McGee reserves, and therefore included on Schedule 2.5(a) of the Master Separation Agreement
between New Kerr-McGee and the entity that became Tronox.  Ram included 157 additional
sites on the ground that they were similar to the "listed" sites, in that toxic or carcinogenic
chemicals (such as uranium, creosote, perchloric or benzene) were likely to be present and
require remediation.

Ram concluded that the present value of the future response costs of environmental
remediation at the sites, as of November 2005, was between $1.499 billion and $1.684 billion.
In deriving this amount, Ram netted reimbursement from third parties, including the United
States and certain States, and he apportioned costs based on the number of PRPs, the duration

that Kerr-McGee or its predecessor had owned or operated the facility and, with respect to mining sites, the amount of ore mined relative to others. He did not reduce his estimates for insurance, reimbursement under the Master Separation Agreement (which was largely illusory), or an adjustment for the net tax impact because Newton had addressed these as contingent assets in his solvency analysis. These amounts total at most $484.4 million.[94] If these amounts were netted out, Ram's net environmental liability, comparable to the $278.1 million posited by Defendants through Fischel's testimony, would be $1 billion to $1.2 billion.

It is significant that Ram's analysis is the only comprehensive valuation in the vast record of this case of Tronox's environmental liabilities. As mentioned above, Kerr-McGee never performed such an analysis, either in connection with the IPO or otherwise, and there is no dispute that accounting reserves for environmental costs do not purport to be useful in a UFTA solvency analysis. As discussed above, Fischel relied on Environ, Apollo's expert, but the evidence he used demonstrates that Environ's analysis was certainly not comprehensive. Defendants also called their own expert witnesses on environmental costs, Neil Shifrin and Richard Lane White of Gnarus Advisors LLC., and the Court qualified them as experts and recognizes that Shifrin has spent a good part of his career in court testifying on environmental matters.[95] However, the report submitted by Shifrin and White, as well as their testimony, did

---

[94] The net adjustments totaling $484.4 million are derived from Newton's Direct. Although the figure would have to be further refined because the net adjustment of the tax impact includes an amount attributable to tort liabilities, the impact appears small as environmental liabilities vastly exceeded tort liabilities. (Newton Direct, 6/22/2012 at p. 21 (table)).

[95] Shifrin has testified more than 100 times, including at 28 trials. (Tr. (Shifrin) 9/7/2012 at 6792:23-6793:25). It is not surprising that during the course of his long career, some courts have accepted his opinions and others have rejected them. The vehemence with which some courts have spoken is, however, relevant. One questioned his opinions as "naked guesses" or "far too speculative" and having "no firm grounding in science." *Atlanta Gas Light Co. v. UGI Util., Inc.*, 2005 WL 5660476 at *19 (M.D. Fla. March 22, 2005); see also *City of Bangor v. Citizens Communications Co.*, 437 F.Supp.2d 180, 189 (D. Me. 2006); *S. Carolina Elec. & Gas Co v. UGI Util.*, 2012 WL 1432543 at *45 (D.S.C. April 11, 2012). Another judge rejected his responses in answer to the Court's questions as "rank speculation," concluding, "[t]here is simply no evidence to support [his] view," and rejected Shifrin's

not purport to be a comprehensive analysis of all of Tronox's environmental liabilities. (Tr. (Shifrin) 9/7/2012 at 6808:25-6909:10).  They prepared their 8,019-page report only as a rebuttal to what Ram had done.  They concluded in their initial report that the costs of environmental remediation that Ram had estimated at between $1 billion and $1.2 billion on a net basis were a mere $330.6 million on a similar basis.  (DX 2227 at 12).  Before trial they filed a supplemental report that increased their estimate to $376.2 million.  (Shifrin/White Direct, 9/4/2012 at ¶ 1).[96] Nevertheless, it bears emphasizing that Shifrin and White limited their efforts to a criticism of what Ram and his firm had done.  Defendants' failure, at any time, either before or after this case was filed, to come forward with a comprehensive analysis of the environmental liabilities that Kerr-McGee had imposed on Tronox, is a major failure of proof.[97]

In any event, the only conclusion on this record is that it is Defendants' position that the net present value of the remediation costs of Tronox as of November 2005 was $278.1 million or, at most, $376.2 million.  In comparing this amount  to Ram's $1.0 to $1.2 billion, it bears recalling that Kerr-McGee's environmental expenditures during the five years prior to the IPO had averaged $160 million per year, that it had spent $580 million just at the West Chicago site, that it had received a demand from the EPA for $179 million for cleanup at a Superfund site in Manville, New Jersey, and that Tronox succeeded to virtually all of the Kerr-McGee sites.  It was a common refrain of Defendants that Kerr-McGee's environmental costs were diminishing, but as discussed elsewhere, this contention is not supported by the record.  *See* n. 56, *supra*.  Defendants also denied that Kerr-McGee-Tronox had any liability for remediation at Manville,

---

"suppositions … as unfounded and lacking all credibility."  *Yankee Gas Servs. Co. v. UGI Util.*, Inc., 616 F. Supp. 2d  228, 252 (D. Conn. 2009).

[96] Shifrin and White each submitted individual written direct testimony and a combined written direct.  The citations are to the combined written direct.

[97] Fischel's number, comparable to the $376.2 million calculated by Shifrin, was $278.1 million.  As noted above, it was based on the analysis performed by Apollo's experts.

but that could not be assumed in 2005, and the issue was still unresolved at the time of trial.  The conclusion of Shifrin and White that Ram should have valued Tronox's future environmental liabilities as approximately the amount that Kerr-McGee had recently paid over a two-year period does not pass the common sense test.  *See Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*, 103 F.Supp.2d 268, 286 (S.D.N.Y. 2000) (noting that "(i)n assessing the reliability of an expert opinion, a resort to common sense is not inappropriate").

Nor does the Shifrin/White study withstand detailed analysis. Shifrin and White estimated the present value of  remediation at the sites that Ram had chosen by using what they termed a "conceptual probability" matrix, assigning a 10% probability to response actions that Shifrin deemed "unlikely but possible," a 30% probability to response actions that were "possible," a 50% probability to response actions that were "equally likely," a 70% probability to response actions that were "more likely than not", and a 90% probability to response actions that were highly likely.  (Shifrin/White Direct, 9/4/2012 at ¶ 60)  Such a matrix provides an aura of scientific precision but is of course dependent on the judgment of those who use it.  Plaintiffs established that Shifrin did not support his allocations of probabilities fairly. To take several examples, both parties adduced testimony regarding a former Kerr-McGee wood-treating facility in Wilmington, North Carolina, a Superfund site.  Shifrin claimed his choice of a remedy, *in situ* solidification, was the most likely approach and assigned it a conceptual probability of 50%.  (Tr. (Shifrin) 9/10/2012 at 7016:9-7017:10).  He claimed at trial that his decision was based on project documents, site-specific information, and site-specific technical analysis, but Plaintiffs established that at deposition he had testified to the contrary. (*Id*. at 7017:23-7020:25).  He conceded that *in situ* solidification had never been used at any other Kerr-McGee wood-treating site, and such assumption materially understated the reasonably anticipated remediation cost.

(*Id*. at 7021:-7022:20)   As another example, Shifrin assumed that remediation at the Riley Pass

uranium site would consist only of controls such as fences to restrict access to the contaminated

areas -- the lowest cost alternative for the site.  (DX 2227 at 1827;  PX 591 at FS053111).  By

mid-2005, however, regulators had already rejected this approach because it was "not fully

protective of human health"; the cost of the regulators' proposed remedy was $12 million as

compared to $340,000 for the approach chosen by Shifrin.  (PX 591 at FS053111; Tr. (Shifrin)

9/7/2012 at 6914:7-21).  The foregoing is not cited for the proposition that Tronox's costs of

remediation would be as high as the regulators might demand, but it does provide an indication

as to the results of Shifrin's methodology.

Both parties' experts recognized as authoritative and relied on the cost-estimating

principles in the Standard Guide for Disclosure of Environmental Liabilities published by ASTM

International, formerly the American Society for Testing and Materials.  The 2005 ASTM Guide,

in effect in November 2005, described four cost estimating approaches:  expected value; most

likely value; range of values; and known minimum values.  The "expected value" approach is a

probabilistic approach and, as Defendants assert, it was the "preferred methodology" for

estimating future environmental costs. (Shifrin/White Direct, 9/4/2012 at ¶¶ 24, 44;  PX 1281 at

pdf p. 3, § 5.2.2 fig. 1).  Defendants' principal criticism of Ram's study is that he should have

used a probabilistic approach, as they claim they did.  However, the ASTM Guide recognizes

that a probabilistic approach may not always provide the "'best' estimate for a given set of

circumstances" and that the choice of approach should be based on the "number of events and

quality of information available or obtainable."  (PX 1281 at pdf. pp. 3-4 §§ 5.5.5-5.2.3).  Ram

adequately explained that he did not use an expected value approach because he concluded that

sites were either sufficiently well-developed to conclude that one remedy was likely or

information was insufficient to assign reliable probabilities to remedial outcomes. (Ram Direct, 6/8/2012 at ¶ 27). Accordingly, Ram exercised his judgment and used another approach recognized as valid by the ASTM Guide, the "most likely value" approach.

Moreover, Shifrin/White did not adhere strictly to an "expected value" approach but used what they called a "conceptual probability" approach. They only included "several different response scenarios" rather than a "probability-weighted average over the range of all possible values." (JX 404 at 4, § 5.4.2.1; DX 2227 at 11). They could not identify any other case in which their "conceptual probability" approach has been used, and Shifrin also admitted he used a "pivotal element approach" to assign some of his probabilities. (Tr. (Shifrin) 9/7/2012 at 6832:7-6834:14). The "pivotal element approach" sounds very much like Ram's "most likely value" approach. There is no question that Defendants were able to challenge some of Ram's conclusions as to likely liability, such as the conclusion that there would be remediation required at a Wendy's restaurant in Los Angeles. On balance, however, it should be recalled that Ram assigned values only to 372 of 2746 possible sites, and that he took account of uncertainty regarding whether a claim would be made at every site costed.

Defendants finally contend that Ram's "most likely value" approach itself fails to address future uncertainty, particularly the question whether any environmental response action would be required at a site. (Shifrin/White Direct, 9/4/2012 at ¶ 24). They contend that Ram should have applied a "gating" analysis to determine the likelihood that Tronox would incur any cost at a site. (Id. ¶ 4(c)(v) and ¶ 46). However, the object of a solvency analysis is to assign a "fair valuation" to all debts, with the term "debt" defined as a liability on a claim, and "claim" defined in the "broadest possible sense" to include contingent, unmatured and unliquidated claims. The resulting solvency analysis is often used in connection with a bankruptcy filing, where all debts

109

are accelerated and debtors are obligated to send notice of the requirement of filing a proof of

claim to every known potential environmental creditor. *City of New York v. New York, N.H. &*

*H.R. Co.*, 344 U.S.293, 296-97 (1953) (known creditors must be given actual notice); *In re*

*Solutia, Inc.*, 379 B.R. 473, 485 (Bankr. S.D.N.Y. 2007) (noting that acceleration occurs

automatically on date of petition). Shifrin admitted that he had previously never used a

probabilistic analysis to estimate environmental costs in a fraudulent transfer case. (Tr. (Shifrin)

9/7/2012 at 6820:22-6821:17). His probabilistic analysis tends to assume that the environmental

claims at issue here are mere contingent claims that should be subject to a discount for the

probability they will never be pursued, whereas in fact environmental claims are claims that can

be brought (or filed in a bankruptcy case) without satisfaction of a contingency.

      In *In re W.R. Grace & Co.*, 281 B.R. 852 (Bankr. D. Del. 2002), District Judge Wolin

assessed the proper methodology to use in valuing asbestos claims held by creditors who had not

yet asserted them. The Court acknowledged that it is necessary to discount contingent claims by

the probability that the contingency will never occur, quoting Judge Posner, who wrote that the

contrary proposition "is absurd; it would mean that every individual or firm that had contingent

liabilities greater than his or its net assets was insolvent – something no one believes." *In re*

*Xonics Photochemical, Inc.*, 841 F.2d 198, 199 (7th Cir. 1988); *see also Covey v. Commercial*

*Natl Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992). Nevertheless, as Judge Wolin points out,

tort liability, like the environmental liability in this case, is not a contingent liability. *W.R.*

*Grace*, 281 B.R. at 862. The asbestos claims, like the environmental claims here, would be

accelerated by the bankruptcy filing, and the holders would be aware of the fact that they would

lose the claims forever if they did not file and pursue them. Ram's decision to assign

remediation costs to only 372 of Tronox's 2,746 sites amply accounted for the fact that some

potential remediation would never be pursued notwithstanding the fact that an insolvency case would accelerate them.

The final step in valuing the environmental liabilities as of the date of the IPO is to reduce the future costs to present value. Prof. Newton used a rate of 2.5% as a risk-free rate, based on the yields of U.S. treasury obligations and high-grade corporate bonds. Mr. Shifrin's colleague, Mr. White, advocated the use of a 5% discount rate on the ground there should be an element of risk built into the rate. There is no question that a risk element is built into an analysis of income to be received in the future, on the ground that the expected income may never be received. However, a valuation of environmental and similar liabilities does not take into account the possibility that the debtor may not be able to pay the obligation; it attempts to arrive at a "fair valuation" of the liability regardless of ability to pay. Accordingly, Newton's discount rate is appropriate, and Defendants 5% rate results in an unduly small present value.[98] Using Newton's discount rate, Ram calculated the fair value of Tronox's environmental liabilities as at the date of the IPO as between $1.499 billion and $1.684 billion, the midpoint of which is $1.592 billion. To account for a few sites where Ram may have been overly-aggressive, the Court will use Ram's lower figure, rounded to $1.5 billion. This nets to an environmental liability of approximately $1.5 billion.

**Tort Liabilities**

The parties also presented expert testimony on the tort liability that Tronox faced as of the date of the IPO, almost all of which involved damages from exposure to creosote, a chemical

---

[98] Defendants adduced the fact that Ram had used a 7% discount rate based on OMB guidance from 1992, which was subsequently adopted in an EPA publication. (PX 1284, App. B at 6-7). Defendants' expert White agreed that a 7% rate would not be appropriate based on economic conditions as of 2005. (Tr. (White) 9/17/2012 at 6758:14-6759:3). The EPA guidance also makes it clear that it is intended for "benefit-cost analyses of public investments and regulatory programs that provide benefits and costs to the general public" (PX 105 at 7-8) and not for the analysis of contingent liabilities. The EPA publication supports using a risk-free rate for analyses that involve only costs. (Id; PX 1284, App. B at 6-7; Tr. (Newton) 6/27/2012 at 3478:19-3480:3).

used in wood treatment.[99]   Creosote litigation had commenced in 1998 and in the six years

preceding the IPO, approximately 24,500 such claims had been filed against Kerr-McGee,

originating from five of its 36 former wood-treating sites.  During the same period Kerr-McGee

had paid $98 million in indemnity and defense costs to resolve approximately 15,000 of these

claims, leaving 9450 pending.   A substantial number of these claims were being actively

litigated by newly-retained personal injury counsel.

Plaintiffs' tort expert was Dr. Denise Martin of NERA Economic Consulting, who has

20-years' experience in preparing personal injury and property damage studies and is the co-

author of a text, "Estimating Future Claims: Case Studies from Mass Torts and Product

Liability."  (Martin Direct, 6/11/2012 at ¶¶ 28-30;  Tr. (Martin) 6/13/2012 at 2465:14-2446:20).

She studied the 31 wood treatment sites which were similar to the five sites from which claims

had been brought in that they had undergone remediation or had remedial activity planned, and

were at or near residential areas.  She concluded that 26 of the 31 remaining sites would be likely

targets for future claims, estimated the number of exposed individuals who lived within a two-

mile radius and determined a "propensity to sue" rate of 12.5% of the target population.  She

estimated the cost of future claims based on Kerr-McGee's historic cost of $5,110 per resolved

claim and added 37% for defense costs based on historic averages.  She allocated the expenses to

future years by using a so-called "Monte Carlo simulation" and concluded that the present value

(using a 2.5% discount rate) of Tronox's future creosote liability was approximately $356.7

million.

Defendants did not prepare a separate analysis of the tort liability; their expert, Dr.

Thomas Vasquez, limited his testimony to a critique of Dr. Martin's report.  He made some

---

[99] There was no dispute that there was about $10 million in asbestos and benzene-related claims pending against
Tronox at the time of the IPO, or that this amount is immaterial to the solvency analysis in this case.

telling points, demonstrating that many of the sites from which Plaintiffs projected liability had been closed for many years, much longer than the five sites from which claims had been asserted pre-IPO. His exclusion of sites that had been closed for 13 years or longer allowed him to lower Dr. Martin's forecast by $250 million. He concluded in his pre-trial expert testimony that a reasonable estimate of creosote liability at the time of the IPO, using Dr. Martin's methodology, was a negligible $13.7 million. At trial, he reduced this amount even further, testifying that at the IPO date, Tronox had no liability for future creosote claims, principally on the ground that creosote was not a "sustainable" or "mature" tort.

The Court's conclusions based on this diametrically opposite expert testimony are the following. Dr. Vazquez wholly undermined his credibility by testifying that as of November 2005 Tronox had no future creosote liability. There were at least 9450 claims pending at the time of the IPO – these obviously represented a liability. Nor was Vazquez' credibility rehabilitated by defense counsel's elicitation of testimony that relatively few new claims had been brought against Tronox during the period between the IPO and Tronox's bankruptcy. Personal injury counsel were well aware of Tronox's deteriorating financial condition; one had to garnish a Tronox bank account to recover an arbitration award. (Powell Dep., 8/15/2011 at 115:2-25) The more relevant testimony is that between the IPO date and the chapter 11 filing, the few awards that were made were far larger than those that had prevailed pre-IPO, averaging $26,000 per precancerous skin lesion claim and $117,000 per skin cancer claim. (Tr. (Martin) 6/13/2012 at 2654:13-2656:14). There is testimony in the record from personal injury counsel that notwithstanding Tronox's financial condition, counsel planned a new wave of creosote lawsuits in Avoca, Pennsylvania, Columbus, Mississippi and other sites. (Powell Dep.,

8/25/2011 at 116:18-23, 117:20-22; Tollison Dep., 9/13/2011 at 10:12-14; 16:13-22; 99:24-100:15).

Defendants established through the Vazquez testimony that some of Dr. Martin's analysis was flawed, in that she overestimated the likelihood of liability at certain locations. However, on the record as a whole, her conclusions as to liability were far more credible than those of Dr.Vazquez. Moreover, there was no dispute that 2.5% was an appropriate discount rate. The Court will reduce her estimate of a present value of the tort claims by $100 million to account for her overestimation of liability at some of the sites. This results in a present value of tort claims of $257 million as of the date of the IPO. Adding this liability to the lowest estimation of liability of Dr. Ram, Tronox's legacy liabilities from environmental and tort claims as of the IPO date totaled $1.757 billion, or $1.27 billion (rounded) net of reimbursements of $484.4 million.[100] Tronox's other liabilities, the value of which was not disputed, totaled approximately $803 million.[101] This brings the fair value of its liabilities to $2,073,000,000. Based on these findings as to the fair value of Tronox's liabilities, Tronox was insolvent as of the IPO date in that its liabilities at a fair valuation exceeded the value of its assets, even if we use Defendants' highest and most aggressive value for the assets. In any event, we turn now to the asset side of the insolvency analysis.

**Business Enterprise Value – Assets**

Plaintiffs' insolvency expert, Prof. Newton, determined Tronox's business enterprise value ("BEV") as of the date of the IPO, November 28, 2005, to be $1.03 billion. Prof. Fischel,

---

[100] See text at n. 94.

[101] There was little dispute about the size of Tronox's "Other Liabilities," which Fischel calculated as $803 million. These included the Term Loan and Senior Subordinated Notes ($550 million), Unfunded and Underfunded Pension and OPEB liabilities (Fischel used the amount of $185.5 million), and Tax, Restructuring Reserve and Workers Compensation and "Other" Liabilities (Fischel used a total of $67.5 million). Fischel Updated Report Ex 2800.1, Ex. M, p. 9 of 44.

Defendants' expert, used the same three valuation approaches to obtain a BEV of $1.7 billion. The three approaches are: (i) a discounted cash flow analysis; (ii) a comparable company analysis; and (iii) a comparable transaction analysis. These are standard approaches that have been used in many cases, and they follow certain well-trod paths. *In re Granite Broadcasting Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2010) citing, *inter alia*, Peter V. Pantaleo and Barry W. Ridings, *Reorganization Value*, 51 Bus. Law 419 (1996). We will first analyze the respective expert opinions, and then their conclusions.[102]

**Discounted Cash Flow Analysis**

The most commonly used approach is the discounted cash flow analysis, which determines BEV by examining the earning capacity of the enterprise over a reasonable period of time, adds a residual or terminal value to extend the analysis beyond the chosen period, and then discounts the result to present value. Unlike Fischel, Newton did not start his discounted cash flow analysis with the company's internal projections. He adjusted them downwards for several reasons well supported by the record. The record is clear that the financial projections in Tronox's S-1 were inflated "sell-side" projections based on overly optimistic assumptions, and that key numbers had been imposed at the direction of Kerr-McGee's chief financial officer, Wohleber. (Tr. (Gibney) 9/5/2012 at 6062:14-6063:12). As discussed above (*see* p. 87, *supra*), at Wohleber's direction, Kerr-McGee abandoned its historical forecasting methodology, used in a February 2005 forecast, with the result that the March 2005 forecast (from which the IPO numbers were derived) increased dramatically; for instance, projected results increased by $99 million in 2008 (to a total of $288 million) and $128 million in 2009 (to a total of $325 million).

---

[102] As will be seen hereafter, in addition to Prof. Fischel who was Defendants' principal expert witness on solvency, Defendants also relied on the expert testimony of Mr. Balcombe. Balcombe's testimony was principally in the area of REV but he also expressed opinions on other valuation issues.

The IPO projections were unrealistic when compared with Tronox's historical performance and far exceeded even the chemical business' "peak" and "very strong" years of 2000 ($231 million) and 2005 ($232 million).  (JX 93 at 6; Tr. (Cianfichi) 8/10/2012 at 5449:3-17; *see also* Tr. (Balcombe) 9/6/2012 at 6427:6-6429:5; 6429:22-6433:7).  They were particularly unreasonable on the basis of uncontroverted evidence in the record that Tronox $TiO_2$ business peaked early in 2005 and was on the downturn by the time of the IPO in November.[103]  Newton reasonably used the February rather than the March 2005 projections.

Fischel's calculation of BEV as $1.7 billion, based on discounted cash flow, was particularly unreasonable in that Fischel simply used the management projections discussed above without subjecting them to any analysis or considering the chemical business' historical performance.  (DX 2800 at ¶ 67; Tr. (Fischel) 8/8/2012 at 4776:12-4781:20).  Nor did he rehabilitate his BEV of $1.7 billion by comparing it to the BEV that would be calculated using the projections of future cash flow of  Apollo, CSFB, JPM, UBS and Citigroup, third parties "who were either potential bidders or banks that served as advisors and/or lenders" to such bidders.  Fischel Report (DX 2800) at ¶ 63.  Use of these third-party projections results in a BEV based on a discounted cash flow of $1.507 million, or almost $200 million lower than Fischel's number.  (Fischel Revised Report, DX  2800.1 Ex. Q,  p. 24 of 44).  In any event, there is no dispute that all of the third-party projections, except Apollo's, used Kerr-McGee's inflated IPO forecasts or outdated data as their starting point.[104]  Apollo's cash flow projections were based on projected overhead and operating costs savings of $30 million annually, and Fischel did not

---

[103] There is no dispute that, as a consequence, this decline in the price and market for $TiO_2$ caused Apollo to reduce its offer several times.

[104] (Newton Direct, 6/22/2012 at ¶ 22; Tr. (Fischel) 8/8/2012 at 4710:24-4711:5, 4792:5-14).  CSFB (Credit Suisse) and JPM (JP Morgan) simply adopted them without adjustment.  (Tr. (Fischel) 8/8/2012 at 4806:3-4808:7;  DX 2800 at 96-97).  UBS and Citigroup used outdated cost projections.  (DX 2800 at 96-97; Tr. (Fischel) 8/8/2012 at 4806:3-4808:7).

analyze whether Tronox could have achieved these savings as a stand-alone company.  (DX 2800 at 96-97;  Tr. (Fischel) 8/8/2012 at 4810:15-4812:21).  On the record, there is no basis to believe it could.[105]

The final steps in the discounted cash method are to discount the projections to present value and then extend them into the future beyond the projection period.  There was little dispute between the parties. Newton used 11% as an appropriate weighted average cost of capital as the discount rate.  Balcombe, one of Defendants' valuation experts, used the same rate, and Fischel's was only slightly lower (resulting in a higher BEV).  Newton then calculated terminal values using the Gordon Growth/perpetuity model and applying a constant growth rate in perpetuity of 2.5%.  This is the same method and rate Balcombe used; Fischel recognized it as an accepted methodology but used a slightly higher rate of 2.87% based, in his view, on a market approach. (Tr. (Fischel) 8/8/2012 at 4816:11-4817:6; DX 2800, Ex.AI (p. 178 of 246)).

Using the discounted cash flow method, Newton reasonably calculated Tronox's BEV as of the IPO to be $1.01 billion.  Fischel's comparable calculation of $1.7 billion was not persuasive.

**Comparable Company Analysis**

As noted above, in addition to a discounted cash flow analysis, both Newton and Fischel calculated BEV by a comparable company analysis.  The comparable company analysis attempts to determine value by reference to the value of companies in the same line of business.  Newton selected ten commodity chemical companies, calculated EBIT and EBITDA multiples for each and added a reasonable control premium of 5%; Balcombe used a similar 6.8% premium and Balcombe and Fischel both agreed that use of both EBIT and EBITDA multiples are acceptable.

---

[105] In fact, Tronox estimated at the time that as an independent entity, unable to rely on Kerr-McGee for many corporate and similar functions, its overhead costs would increase $20-25 million annually, resulting in an annual EBITDA $50 million lower than the Apollo projections.  (Tr. (Fischel) 8/8/2012 at 4812:22-4813:11).

(DX 2801 Appendix D at p. 136 (of 384); Tr. (Balcombe) 9/6/2012 at 6481:16-6486:8; Tr.

(Fischel) 8/8/2012 at 4831:20-25, 4832:7-4833:3).  Based on his comparable company analysis,

Newton concluded that Tronox's value as of the IPO was between $770 million and $1.23

billion, with a mid-point value of $1.0 billion.  (Newton Direct, 6/22/2012 at ¶ 37, Ex. 6;  PX

1263 Appendix E at p. 52-53 (of 136)).

    Fischel's comparable company analysis was flawed by his choice of companies for

comparative purposes.  He used 15 allegedly comparable companies based on whether potential

buyers or industry analysts considered the company comparable to Tronox, but he admitted that

he did not subject any of his choices to independent analysis.  (Tr. (Fischel) 8/8/2012 at 4818:22-

4821:8, 4841:21-4842:12).  As a result, his list of comparables included DuPont, vastly larger

and more diversified than Tronox; other diversified companies such as Cabot Corp. and Eastman

Chemical; and specialty chemical companies (such as Hercules) which typically trade at a higher

multiple than commodity chemical companies like Tronox.[106]  (Newton Direct, 6/22/2012 at ¶

38; Tr. (Newton) 6/27/2012 at 3449:9-3450:20; Tr. (Fischel) 8/8/2012 at 4724:8-11, 4729:5-19,

4731:13-4732:2, 4824:20-4829:11).  His selection process resulted in a LTM EBITDA[107]

multiple of 7.63 for comparable companies, significantly higher than Newton's at 6.2x and

Balcombe's at 6.3x.  His conclusion that Tronox's BEV based on the comparable company

analysis was of $1.48 to $1.6 billion was not persuasive.  (DX 2800.1 at 19-20; Tr. (Fischel)

8/7/2012 at 4484:9-4487:8).

---

[106] There was much testimony that Lehman attempted to market Tronox as a specialty chemical company but that
the market viewed it as a less valuable commodity chemical company.

[107] LTM EBITDA refers to the "last twelve months" of EBITDA.

**Comparable Transactions**

Finally, both Newton and Fischel valued Tronox based on comparable transactions in the marketplace, also an established approach.  Newton identified seven comparable transactions, derived EBITDA and EBIT multiples for each, and applied the resulting median to Tronox's adjusted LTM September 2005 operating results.  (PX 1263 at 54 (of 136)).  He concluded, based on this approach, that Tronox's BEV as of the IPO was between $960 million and $1.24 billion, with a mid-point of $1.1 billion.  (*Id*. at 55 (of 136)).  Fischel's analysis, again, purported to be market-based and neutral but led to less reliable results based on his failure to analyze the allegedly comparable transactions.  Thus, for his comparable companies, he used three data sources (Capital IQ,  FactSet and Thomson SDC) and included a transaction if it involved chemicals, took place during the three years prior to the IPO and had a value greater than $50 million.  (Tr. (Fischel) 8/8/2012 at 4839:16-4840:22).  This led to the inclusion of transactions involving an Indian fertilizer company, a Swiss company making waterproofing materials and parts for car manufacturers, and a company making foam-related products for diapers and adult incontinence products.  (Tr. (Fischel) 8/8/2012 at 4844:8-4847:24).  Fischel's resulting LTM EBITDA multiple was 8.0x, which was significantly higher than the corresponding multiples calculated by Newton (6.6x) and Balcombe (6.9x).  Fischel then applied these multiples to Tronox's projections of future performance in the IPO (overstated, as set forth above), resulting in a BEV of $1.7 billion.  As noted above, Fischel purported to confirm his results by using what he calculated as "third-party projections" of Tronox's future income instead of Tronox's internal projections, resulting in a BEV of $1.5 billion, but this analysis was flawed by weaknesses in the third parties' projections.  (See DX 2800 ¶ 67 and pp. 116-117, *supra*).

In conclusion, Newton averaged BEV calculated by the discounted cash flow method ($1.01 billion), the comparable company method ($1.0 billion) and the comparable transaction method ($1.1 billion) and concluded that Tronox's BEV was $1.03 billion. (Newton Direct, 6/22/2012 at ¶¶ 30, 37, 46 & 52).  There was no dispute that there should be added to BEV the value of Tronox's non-operating assets, the most significant of which was the Henderson, Nevada property discussed above.  Newton used a value for non-operating assets of $193 million, resulting in a value for all assets of $1,223,000,000.  Fischel's value for BEV of $1.7 billion and his reliance on "market participants" for the value of other assets, leading to a total asset value of approximately $1.81 billion, was not persuasive.[108]

Based on Newton's calculation of the value of Tronox's assets as $1,223,000,000 at the time of the IPO, and his valuation of its liabilities as $2,073,000,000 at the same date, Tronox was insolvent by $850,000,000.  Based on Newton's valuation of Tronox's assets, Tronox was insolvent by $55 million, even if its environmental liabilities were valued at the minimal amount calculated by Defendants' environmental expert, Dr. Shifrin, provided Shifrin's projected amounts are discounted by 2.5% rather than the 5% discount rate he and his colleague White used.  Newton Direct, 6/22/2012 at  ¶¶ 117-119; Tr. (Newton) 6/27/2012 at 3481:21-3482:25).  However, it is not reasonable, as discussed above, to use Shifrin's minimal liability of $376 million.  Using the far more reasonable expert testimony of Dr. Ram, and adding the tort liability in an amount reduced from Dr. Martin's analysis, Tronox's insolvency can be calculated as $850,000,000 as of the IPO.

---

[108] For example, Fischel discounted the value of the Henderson land contract only minimally in his updated report. (DX 2800.1, Ex. M at pp. 11-13; Tr. (Fischel) 8/8/2012 at 4892:9-4894:10).  Newton's discount of 25% (the same as Apollo's) was reasonable.  If anything, it was low, as subsequent events proved and as could have been anticipated. (Newton Direct, 6/22/2012 at  ¶ 55, JX 204 at 11).

It is recognized that the precise degree of insolvency remains uncertain.  In a fraudulent conveyance case of this nature, where insolvency is based on the value of unliquidated claims, the extent of insolvency need not be calculated to the dollar.  As the District Court said in *In re W.R.Grace & Co.*, 281 B.R. at 866, an asbestos case where the value of thousands of pending and future asbestos claims had to be determined,

> The Court need not determine the exact value of the post-1998 [unliquidated] claims. All that must be determined is whether they exceeded the debtor's assets. If the debtor is found to be insolvent, a post-judgment fluctuation in the claiming rate can only make the debtor more insolvent. . . .
>
> Defendants characterize the view adopted by the Court as a strict liability test, inequitable and unsettling to commercial expectations. In fact, the equities run the other way. The assumed facts in this Opinion picture W.R. Grace sitting in unwitting comfort on the surface at ground zero. The company has debts, very substantial debts, including debts that the company knows it can only estimate, but it reasonably believes it is solvent. The truth, however, is that a subterranean cavern of liability lies just beneath the company's feet. It is at this moment, so plaintiffs allege, that W.R. Grace chooses to transfer away its most profitable division for far less than the division was worth.
>
> This Court does not posit a regime in which any transaction is at the peril of the transferor's insolvency. The rule is that an entity with creditors gives away its assets for less than fair value at the peril that it may be insolvent. The fundamental inquiry in a constructive fraudulent conveyance action is whether the transfer diminished the transferor's estate. *In re Sunset Sales, Inc.*, 220 B.R. 1005, 1013 (10th Cir. BAP 1998). If the transferor is solvent, it may diminish its estate without interference from the law. If the transferor is not solvent, the diminishment unfairly harms the transferor's creditors. This is true regardless of the transferor's intent and regardless of whether the transferor knew or should have known of its insolvency.
>
> It is the purpose of the fraudulent conveyance statute to prevent this result. The settled commercial expectations that should be protected are those of the existing creditors, not those of less-than-full-value transferees. Creditors size up the financial responsibility of prospective debtors on the assumption that they will not simply give their assets away, or at least that there will be enough left over for the prospective debtor to satisfy prior

liabilities. These considerations have only more force with respect to tort creditors whose choice of debtor is involuntary.

***

Where later information is unknowable, plaintiffs argue that the burden of guessing wrong should be placed upon the debtor and its transferee. Defendants' response to this argument can be deduced from their established position. Defendants would contend that the more imponderable the complexities of future asbestos claims, the less likely it is that plaintiffs can sustain their burden of showing that the debtor's date-of-transfer estimate was unreasonable.

Accepting plaintiffs' argument would represent a holding in the alternative by this Court, but the thrust of this argument is consistent with what the Court has said already. Assuming for the moment that it matters that the future claiming rate is unknowable, it is still the case that these unknown post-transfer claims are existing "rights to payment" on the transfer date.

281 B.R. at 866-67.

## Unreasonably Small Capital

In addition to insolvency, the Oklahoma UFTA provides liability for a constructive fraudulent transfer where property is transferred for less than reasonably equivalent value and (i) the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." OKLA. STAT. tit. 24, § 116(A)(2)(a).  As Plaintiffs contend, cases under the UFTA define "unreasonably small capitalization" as "a general inability to generate enough cash flow to sustain operations."  *In re Sheffield Steel Corp.*, 320 B.R. 423, 445 (Bankr.N.D.Okla. 2004) (Oklahoma UFTA case), quoting *Pioneer Home Builders, Inc. v. Intl. Bank of Commerce (In re Pioneer Home Builders Inc.)*, 147 B.R. 889, 894 (Bankr.W.D.Tex. 1992); *see also*, *Moody v. Sec. Pac. Bus. Credit*, Inc., 971 F.2d 1056, 1070 (3d Cir. 1992).[109]  The Court there held that the

---

[109] *Moody* was decided under Pennsylvania law and the Uniform Fraudulent Conveyance Act, which was a predecessor to the UFTA; other cases cited herein have construed the UFTA of states other than Oklahoma. However, the *Moody* formulation has been adopted by many other courts construing the similar provisions of the UFTA and the Bankruptcy Code, and the parties have not cited any Oklahoma decisions on point.

"critical question is whether the parties' projections were reasonable," and that projections "must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses," and finally, whether there is a margin for error. *Id*. at 1073. On the other hand, the cases recognize that the unreasonably small capital test may be easier for a plaintiff to satisfy than insolvency because "unreasonably small capital" means "difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future." *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (D. Mass. 1989). The District Court in *ASARCO* termed it "a financial condition short of equitable insolvency" and said that the focus of the test is on transfers "that leave the transferor technically solvent but doomed to fail." *ASARCO*, 396 B.R. at 396, quoting *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 944 (S.D.N.Y. 1995); *see also Moody*, 971 F.2d at 1070 n. 22.

Prof. Newton, Plaintiffs' solvency expert, provided convincing evidence of its lack of adequate capital. He convincingly demonstrated that its projections of future results were unreasonable and based on sell-side optimism. He demonstrated that at the time of the IPO, Kerr-McGee caused Tronox to borrow $550 million in debt and to issue stock, and that Kerr-McGee upstreamed all of the proceeds and left behind a mere $40 million in cash. Kerr-McGee thrust Tronox into a declining market with poor plants, high ongoing capital expenditure requirements, and no comprehensive business plan. (*See* JX 325 at 36; JX 329 at1-2; Tr. (L Corbett) 5/17/2012 at 560:13-24;  Tr. (Wohleber) 5/22/2012 at 916:3-9; PX 767; PX 580; Adams Dep., 6/9/2010 at 265:2-21; Tr. (Gibney) 9/5/2012 at 6260:2-16; PX 693 at 1,4; PX 738 at pdf. 3; PX 1248 at 2; JX 182; JX 272 at 5; Tr. (Smith) 5/25/2012 at 1448:18-24). It was struggling almost immediately to cut costs and survive within its limited cash flow. See *supra*, p. 101.

Defendants rely on Prof. Fischel's capital adequacy analysis, which according to Defendants was "based on the downside and worst case projections prepared by independent third parties conducting due diligence of Tronox during the sale and IPO process." (Def. Br. at 130, citing *inter alia* Fischel's Report and Updated Report, DX 2800 at 38, DX 2800.1 at 32). Based on Fischel's analysis, Defendants assert, "Tronox would have been able to meet its environmental, tort and pension liabilities, pay off its $200 million Term Loan and generate $213 million in cash to pay off a portion of its $350 million Unsecured Notes…Because Tronox was undoubtedly solvent at the IPO and for a significant period thereafter, Tronox would have been able to refinance its debt under both the ability to pay and adequate capitalization tests…Moreover, Tronox could have been able to monetize its assets – specifically, its land assets and the Uerdingen plant – to generate additional cash." *Id.* Defendants' position is demonstrably wrong. First, as discussed above, the third-party analyses on which Fischel relied are based, *inter alia*, on Kerr-McGee's overly optimistic projections of cash flow. *See supra*, pp. 116-117. Hypothetical land sales in Nevada could not make up the difference. See *supra*, pp. 24-25; 89 n. 76 and text. Defendants cite no authority for the proposition that capital adequacy is shown by a debtor's ability to cannibalize itself and sell off assets piece by piece, until nothing is left.

Defendants contend, "For good reason, 'courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction,'" (Def. Br. at 130, quoting *In re Joy Recovery Tech Corp.*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002)). In support, they also cite, *inter alia*, *Moody*, 971 F.2d at 1074 ("no constructive fraudulent transfer where creditors were paid for 12 months after transaction"), and the *Vlasic Pickle* decision at the District Court level ("adequate capital found where the company's stocks

124

and bonds traded at or near the level of the spinoff for at least nine months"). *Id* at 130, n. 73.
However, although a court may consider "the length of time [the debtor] survived after the
challenged transfer and whether the deterioration of the enterprise was affected by unforeseeable
intervening events," it is only "[a]nother factor." *ASARCO*, 396 B.R. at 397. As the District
Court concluded there, even though ASARCO survived for more than two years after the
challenged transfer, it had "unreasonably small assets and was unable to generate sufficient cash
flow to sustain operations …" *Id*.[110]

In *ASARCO*, the debtor was, at the time of the alleged fraudulent conveyance, in far
worse immediate financial condition than Tronox. Defendants accordingly dismiss it as a
precedent. However, although ASARCO was in a worse cash squeeze at the time of the
fraudulent conveyance, Tronox was no better capitalized, as capital adequacy looks at the long-
term ability of an enterprise to sustain its liabilities. The weed that would ultimately choke
Tronox, as Watson, Lehman's managing director recognized, was its legacy liabilities. Tronox
doubtless could and did put off the day of reckoning by "managing the liabilities."[111]
Nevertheless, the record contains ample evidence that the legacy liabilities, in the end, suffocated
the flower because they prevented Tronox from accessing the capital markets or engaging in a

---

[110] The *ASARCO* Court distinguished cases such as *In re Joy Recovery Tech. Corp.*, 286 B.R. 54 (Bankr. N.D. Ill. 2002), relied on by Defendants. In *Joy Recovery*, the Court said that "courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction…" 286 B.R. at 76. However, as noted in *ASARCO*, all of the cases cited in *Joy Recovery* in support of this proposition involved companies that were paying its creditors in the interim. "*ASARCO*, in contrast, was cannibalizing itself and was, at best, limping along during the interim period and not paying many of its creditors." 396 B.R. at 398. The same was true for Tronox, except that the unpaid creditors were those holding the legacy liabilities.

[111]For example, Tronox needed to obtain covenant amendments from its lenders in 2008 in order to avoid default. The lead lender to Tronox recommended that the lending group accede to Tronox's request because, among other things, Tronox's net environmental expense for 2007 was even less that it had projected  when it made its first request for covenant relief.  (DX 322 at 32 (Jan. 24, 2008 Tronox Lenders' Presentation); *compare* DX 321 (March 2, 2007 communication from Mary Mikkelson, Tronox's chief financial officer)).  The record demonstrates that Tronox's environmental liabilities had not disappeared but that it did not have the cash to spend on necessary remediation and was able to manage the liabilities and "kick the can down the road."

capital transaction when its lack of capital caught up with it. [112]  (Tr. (Snyder) 9/12/2012 at

7225:3-7226:3; 7228:6-7229:2). Tronox's restructuring advisor, Todd Snyder of Rothschild, Inc.,

explained the impact of the legacy liabilities on Tronox's capital position in the difficult market

of 2008-2009:

> I described for you my view that the operating challenges link back
> to the legacy liabilities through the ability to reasonably respond to
> them. The fact that those responses are generally available and
> relatively reasonable I think is borne out by the fact that [Tronox's]
> competitors all worked their way through this period, all managed
> to achieve enough liquidity … when necessary and the like
> notwithstanding the same challenges in the market that Tronox
> faced. I think the significant difference was that [Tronox] had a
> millstone tied around [it] that kept [Tronox] from adequately
> addressing the rising tide of difficulties that did in fact I think
> affect [its] competitors … but they did not have the same millstone
> borne, I believe, of the spin-off transaction.

(Tr. (Snyder) 9/12/2012 at 7231:17-7232:17).

   Defendants quote at length the following testimony of Prof. Fischel and assert that he

explained why Tronox was "able to pay its debts and was adequately capitalized at the time it

was separated from Kerr-McGee."  (Def. Br. at 128):

> If you have a well-capitalized company, a company that is in no
> danger of becoming insolvent it would take the most extraordinary
> circumstances to conclude even though the company was balance
> sheet solvent there would be any issue with the other two solvency
> tests about ability to pay debts when they became due or adequate
> capitalization because a company that has a strong market
> capitalization has various ways of raising capital. You can access
> capital markets, it can sell assets, it can joint venture. You can
> attract private equity . . . and again obviously you can see from the
> actions for example of the lenders who themselves overcommitted,
> not just committed but overcommitted to participate in the
> company's $450 million credit facility, purchase the unsecured

---

[112] This is not to say that the legacy liabilities "caused" Tronox's bankruptcy.  There were numerous causes.
Defendants raise a red herring when they say, "Plaintiffs' experts also failed to prove that the Legacy Liabilities or
alleged misrepresentations to the market caused Tronox to fail."  (Def. Br. at 145).  Plaintiffs were under no
obligation to provide proof of causation of the bankruptcy.

> notes, by those actions as well as the company's actions in paying
> the dividends and not selling assets for cash when they had the
> opportunity, all of that market evidence, in my opinion, is not just
> relevant to the balance sheet test but also to the ability to pay debts
> when they became due test and the capital adequacy test.

(Def. Brief, pp. 128-129, quoting Tr. (Fischel) 8/7/2012 at 4389:5-4390:10).

In fact, Prof. Fischel confirms that Tronox was undercapitalized in light of the legacy liabilities.

Contrary to Prof. Fischel's testimony, the record establishes that Tronox did not have "various

ways of raising capital" because its legacy liabilities simply disqualified it from raising

additional capital.  It certainly could not merge with another entity.  It could not "joint venture."

It could not "attract private equity."  As events proved, it could not "access capital markets."  It

might be able to "sell assets," as Prof. Fischel asserted, but that is a losing game in the long run.

Admittedly, Tronox's bankruptcy took place in connection with a global financial crisis and a

sharp down-turn in the market for its principal product.  Nevertheless, all of Tronox's TiO$_2$

competitors were able to survive the challenging economic conditions.  (Tr. (Gibney) 9/5/2012 at

6292:21-6293:17; Tr. (Cianfichi) 8/10/2012 at 5382:14-21;  Adams Dep., 6/10/2010 at 440:2-

441:2).  It was not.  On the record as a whole, Tronox's capital was inadequate, burdened as it

was by the legacy liabilities.

**Inability to Pay Debts as They Come Due**

The second prong of § 116 of the Oklahoma UFTA is that the debtor "intended to incur,

or believed or reasonably should have believed that he would incur, debts beyond his ability to

pay as they became due."  OKLA. STAT. tit. 24, § 116(A)(2)(b).  This test has a subjective and

objective element, i.e., that the debtor was objectively unable to pay its debts or reasonably

should have come to that conclusion.  ASARCO, 396 B.R. at 399.  Prof. Newton testified that,

based on his adjusted projections, Tronox would have had insufficient liquidity to meet its debts

each year from 2007 to 2012 and would have had an expected cash deficit of $475 million by the

end of 2012.   J98 at 1; Newton Direct, 6/22/2012 at ¶ 72.  These conclusions were based on the

assumption that Tronox would have been able to draw down all of its revolver, despite covenants

that made this assumption improbable, and that it would have been able to access cash from

other sources (such as an accounts receivable securitization facility of the type it did enter into in

2007).  Newton Direct, 6/22/2012 at ¶¶ 75, 77.

Although these conclusions with respect to Tronox's cash deficiency are reasonable, it is

not clear that Plaintiffs  proved that Tronox had insufficient funds to pay its debts, at least in the

short run.  Although there is a dearth of authority, most of the cases on "ability to pay debts as

they come due" under both the UFTA and the similar provisions of the Bankruptcy Code  view

the objective test as more short-term than the "unreasonably small capital" test.  *See In re*

*Suburban Motor Freight, Inc.*, 124 B.R. 984, 1000 n. 14 (Bankr. S.D. Ohio 1990) (noting that

there are few rulings concerning the prong of § 548(b) dealing with inability to pay debts as they

come due); *ASARCO*, 396 B.R. at 399 n. 140 (noting that there is relatively little case law

concerning this test under the UFTA).  The *ASARCO* decision contains a thorough analysis, the

District Court finding that the debtor there had many unpaid debts at the time of the challenged

fraudulent transfer and continued to have tens of millions of dollars of unpaid debts and

extensive "hold lists" of unpaid creditors during the entire post-transfer period.  396 B.R. at 399-

401.  There is no evidence that Kerr-McGee left any trade creditors unpaid at the time of the

IPO, and thereafter for several years the principal unpaid creditors were those holding legacy

liability claims that were in large part unliquidated and kicked down the road.  The record does

not establish that Tronox could not pay its debts as they matured in the short run after the IPO.

On the other hand, Plaintiffs proved the subjective prong of this test, that Defendants "reasonably should have believed that the debtor would incur" debts beyond its ability to pay. As discussed above, Defendants never even performed an analysis of Tronox's ability to satisfy the legacy liabilities. They should have been aware that Tronox could not satisfy the legacy liabilities even if many could be "managed." Plaintiffs, therefore, satisfied their burden of proof that Defendants reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due.

**Breach of Fiduciary Duty**

Count IV of the Amended Complaint does not seek relief on account of an alleged fraudulent conveyance. It is predicated on allegations that Defendants breached their fiduciary duty to Tronox and its creditors. In its decision on Defendants' motion to dismiss the original complaint, the Court found that under applicable Delaware law (all the Kerr-McGee entities had been formed under Delaware law), the allegations of breach of fiduciary duty were insufficient, but it gave Plaintiffs leave to replead. 429 B.R. at 104-108. The amended complaint based its breach of fiduciary duty claim on three theories: (i) that Defendants owed a fiduciary duty to Tronox after it acquired minority shareholders in the IPO in November 2005 and until the spinoff was complete in March, 2006; (ii) that Defendants owed a fiduciary duty as the parent of an insolvent subsidiary; and (iii) that Defendants were liable as a promoter by acting as Tronox's sponsor, obtaining initial credit facilities, soliciting investors, arranging for the IPO, and distributing its ownership interest to shareholders. In a decision on Defendants' renewed motion to dismiss the breach of fiduciary duty count, the Court held that the allegations (assumed to be true) were sufficient to overcome Defendants' motion to dismiss for failure to state a claim and on statute of limitations grounds. 450 B.R. at 438-442.

129

Based on the facts proved at trial and the record as a whole, the Court finds that

Defendants have sustained their defense that certain of Plaintiffs' allegations of breach of

fiduciary duty are untimely and that Plaintiffs have not proved the narrow class of timely claims.

The first of Plaintiffs' theories is that Defendants breached a fiduciary duty owed to

Tronox at a time it had minority shareholders – after the IPO in November 2005 and prior to the

final spinoff in March 2006.  It is well accepted that under Delaware law a parent corporation

does not ordinarily owe fiduciary duties to a wholly-owned subsidiary.  *Trenwick Am. Litig.*

*Trust v. Ernst & Young*, 906 A.2d 168, 191-92 (Del. Ch. 2006), citing *Anadarko Petroleum*

*Corp.v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988).  Nevertheless, it is also well

established under Delaware law that a parent company owes fiduciary duties to a subsidiary that

has minority shareholders.  *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971); *Burton*

*v. Exxon Corp.*, 583 F. Supp. 405, 414 (S.D.N.Y. 1984) (Delaware law).  Plaintiffs attempt to

bring themselves within this latter rule by asserting a breach of duty between the IPO in

November 2005 and the distribution by New Kerr-McGee of its Tronox stock in March 2006,

when Defendants remained in a position of control of an entity with minority shareholders.  This

claim would also be concededly timely for breaches of duty after January 12, 2006, within three

years of Tronox's petition on January 12, 2009.[113]

Despite possible timeliness, there was a failure of proof that there was a breach of duty

during the four-month period between November 2005 and March 30, 2006 or within the period

between January 12, 2006 and March 30, 2006.  For one thing, there is little evidence in the

massive record of this case as to Tronox's governance immediately after the IPO.  Although it is

clear that Kerr-McGee still retained control over Tronox between the dates of the IPO and the

final distribution of Tronox shares held by Kerr-McGee in 2006 – for example, Kerr-McGee's

---

[113] As discussed below, the breach of fiduciary claims have, at most, a three-year limitations period.

CFO, Wohleber, was Tronox's Board chairman – there is no allegation that Wohleber breached

any duty by specific action or inaction during the post-IPO period. Tronox took on responsibility

during this period for some of the OPEB obligations, but Tronox's liability for these obligations

had been fixed in the Master Separation Agreement signed in 2005. (JX 330 at 262-63

(Employee Benefits Agreement, ancillary document to MSA); Williams Direct, 6/22/2012 at

¶ 41). Defendants completed the spinoff during the post-IPO period, and it is clear that they

could have chosen not to complete the transaction. But Plaintiffs do not seek to disturb the final

distribution of shares to the Kerr-McGee shareholders, and they did not assert that this

distribution, by itself, caused harm to Tronox. *See Sinclair*, 280 A.2d at 720; *Gabelli & Co.*, 479

A.2d at 281. Plaintiffs' case certainly was not based on the proposition that Tronox would have

been better off, for example, if Wohleber had continued to be chairman of its board.

Accordingly, Plaintiffs failed to identify a breach of fiduciary duty that caused damage to Tronox

or its minority shareholders during this brief interim period.

As to the statute of limitations, the Court's prior decisions on the motions to dismiss the

complaint and the amended complaint discuss at length Defendants' assertion that any breach of

fiduciary duty claims were barred by the statute of limitations. As discussed in the first opinion,

there is no dispute that the governing statute is that of Oklahoma, that Oklahoma has a three-year

statute of limitations that has been applied to breach of fiduciary claims, and a two-year statute

that is applied to such claims if they are based on fraud.[114] See discussion in the Court's

decision of March 31, 2010, *Tronox I*, 429 B.R. at 105-106, citing *inter alia Huffman v. Cohen*,

---

[114] The three-year statute is for "An action upon a contract express or implied not in writing; an action upon a liability created by statute other than a forfeiture or penalty," Okla Stat. tit. 12, § 95(A)(2). The two-year statute is for "injury to the rights of another, not arising on contract, and not hereinafter enumerated," provided that in actions "for relief on the ground of fraud the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud." Okla Stat. tit. 12, § 95(A)(3).

2009 WL 1227648, at *6 (N.D. Okla. April 29, 2009). A three-year statute would permit the Plaintiffs to challenge acts going back to January 2006, or three years before Tronox's chapter 11 filing on January 12, 2009.[115] However, as discussed above, Plaintiffs case was premised on the contention that the date of the IPO in 2005 was the critical date for liability purposes. Moreover, this Court's decision on Defendants' motion to dismiss the amended complaint found that Plaintiffs had adequately alleged that Defendants took "new and independent acts" of wrongdoing during the post-IPO period "[g]iven the Plaintiffs' detailed allegations that the conclusion of the spin-off caused further harm to Tronox and its shareholders…" 450 B.R. at 441. Plaintiffs' allegations were sufficient for pleading purposes, but they did not follow up with proof at trial. There was no evidence at trial that Kerr-McGee's dividend of Tronox stock to its shareholders had any adverse impact on Tronox or Tronox's minority shareholders at the time.

On the prior motions to dismiss, Plaintiffs also relied on the premise that the statute of limitations was tolled (i) due to Defendants' "adverse domination" of Tronox, (ii) fraudulent concealment of the facts by the Defendants, and (iii) under the rule recognized in Oklahoma that the statute of limitations for a fraud claim runs from discovery of the fraud. Although it was not necessary to reach these issues on the motion to dismiss the amended complaint, the facts at trial establish that Plaintiffs cannot use any of these doctrines to preserve their breach of fiduciary duty claims. Although the Oklahoma courts have recognized the principle that a limitations period can be tolled while a company is under "adverse domination," they only allow that theory where fraud is alleged. *Resolution Trust Corp.v.Greer*, 911 P.2d 257, 261-62 ((Okla 1995). A breach of fiduciary duty claim grounded in fraud would be governed by a two-year statute of limitations, and Tronox was free of Kerr-McGee's adverse domination for more than two years

---

[115] Under § 108(a)(2) of the Bankruptcy Code, a debtor can bring an action whose limitations period had not expired as of the petition date.

prior to January 2009.  As for the claim of fraudulent concealment and the rule that the

limitations period on a fraud claim runs from discovery of the fraud, there is no dispute that

Defendants' scheme was public more than two years before January 2009.  Based on the facts

proved at trial, Plaintiffs' claims of breach of fiduciary duty based on their theory of predicate

acts during the period Tronox had minority shareholders are barred by the applicable Oklahoma

statute of limitations.

 The same result prevails for Plaintiffs' breach of duty claims on their other two theories,

which encompass claims from the date of the IPO and earlier.  Delaware, whose law governs

Defendants' fiduciary duties, recognizes that an insolvent corporation can bring a claim for

breach of fiduciary duty on behalf of creditors.  *N. Am. Catholic Educ. Programming Found. Inc.*

*v. Gheewalla*, 930 A.2d 92, 101-102 (Del. 2007).   However, the claims in this case would be

barred by the Oklahoma limitations periods discussed above, as they all accrued more than three

years prior to Tronox's chapter 11 filing.

**Measure of Damages**

 We come to what may be the most complex issue in this case, the measure of damages on

the fraudulent conveyance counts.  Plaintiffs' damages expert, Prof. Williams, calculated the

value of the property that was transferred out of Old Kerr-McGee at the time of the transfer of

the E&P assets in 2002 and at the time of the IPO in 2005.   For the E&P properties he used a

fair market value approach and the so-called Guideline Publicly Traded Company Method to

calculate a value of approximately $6.6 billion as of the 2002 transfer and $12.5 billion as of the

IPO date in November, 2005, the increase being attributable to the growth in the value of the

assets in the interim.[116]  He then applied a 30% control premium to the 2005 value to account for

---

[116]  Under the Guideline Publicly Traded Company Method, Williams selected seven companies in the E&P
business comparable to New Kerr-McGee and calculated values based on these comparables.   Defendants' damages

the increase in value based on control of the properties, his analysis being based on similar premiums in the oil and gas industry. His conclusion was that the value of the transferred oil and gas interests was $15.9 billion as of the date of the IPO, when the conveyance actually took place. He validated this figure by reference to the fact that Anadarko acquired New Kerr-McGee for approximately $19 billion only a few months after the spinoff; there was no substantial dispute that this sum adjusts to $15.8 billion when only the E&P assets are considered.

Defendants' principal objections to Williams' calculations, introduced through their damages expert, Balcombe, center on the calculations that bring forward the 2002 value of the E&P assets on the basis of an "assumed appreciation rate" based on energy indices. According to Defendants, using Prof. Williams' "methodology, but correcting for his errors, results in a valuation of the E&P Equity Interests as of November 28, 2005 of $10.7 billion, not of $15.9 billion, assuming the Court finds that the Project Focus Transfers were effective on November 28, 2005, which it should not." Def. Br. at 256. They also contest the control premium Williams used. Yet Prof. Williams' bottom line, that the total value of the E&P transfers as of November 28, 2005 – the date both parties use for determining reasonably equivalent value – was $15.9 billion, is virtually identical to the amount Anadarko paid for the same assets, $15.8 billion. Unlike the proposed Apollo purchase of Tronox, which was never finalized, this was a completed transaction that serves to corroborate value. Plaintiffs have established the value of the E&P assets as of the date of the IPO.

There was relatively little dispute regarding the value of the other property transferred in and out of Tronox as of the IPO date. Defendants transferred out an interest in a battery company, and cash that derived, *inter alia*, from the stock and debt issued in connection with the

---

expert, Balcombe, did not dispute the use of a fair market value approach. (Tr. (Balcombe) 9/6/2012 at 6504:14-6505:12). He also did not provide an opinion regarding the value of the E&P assets to contradict this testimony. (Tr. (Balcombe) 9/13/2012 at 6337:22-6338:13).

IPO; and Tronox was required to take on the OPEB liabilities.[117]  This resulted in "outbound transfers" of $1.064 billion. Williams calculated the maximum value of what he called the "inbound consideration" received by Tronox to be $2.55 billion, consisting of $285 million in 2002 transfers from other parts of Kerr-McGee into Old Kerr-McGee, the assumption by New Kerr-McGee of approximately $2 billion in debt in 2002, the face amount of the maximum environmental reimbursement under the MSA ($100 million), approximately $140 million in pre-paid insurance policies, and $41 million in oil and gas environmental indemnities under the AA&I Agreement.  Based on the record as a whole, Plaintiffs established that the net value of the property transferred out was $14.459 billion, or stated differently, that Tronox on a consolidated basis suffered a diminution in value of $14.459 billion.[118]

Plaintiffs' position regarding damages, based on these numbers, is straightforward.  The Bankruptcy Code separately treats (i) the avoidance of a transfer (for example, as a preference under § 547, or a fraudulent conveyance under § 544(b) or § 548) and (ii) the liability of the transferee, which is governed by § 550.  Section 550(a) of the Bankruptcy Code provides that to the extent that a transfer is avoided under § 544 of the Code (among other sections), "the trustee may recover, for the benefit of the estate, the property transferred or, if the court so orders, the value of the property …"  There has never been any question that the Plaintiffs' remedy in this case would be recovery of the value of the property transferred, rather than a physical re-conveyance of the property itself.

In a motion for partial summary judgment, Defendants argued that the "for the benefit of the estate" clause in § 550(a) caps "Tronox's recovery on its fraudulent transfer claims at the

---

[117] The cash transfers included $224.7 million in net proceeds from the IPO, $537.1 million in net proceeds from the term loan and unsecured notes, and $37 million in operating cash.  The unfunded OPEB obligations totaled approximately $186 million.

[118] On a separate entity basis, virtually all of this loss was suffered by Tronox Worldwide LLC ($14.441 billion).

amount of 'unpaid creditor claims.'"  In a written decision, *In re Tronox, Inc.*, 464 B.R. 606, 609

(Bankr. S.D.N.Y. 2012), the Court rejected the proposed limitation, concluding that it had "not

been able to find any case that has accepted Anadarko's … limitation of avoidance liability to the

deficiency in payment."  464 B.R. at 617.  It cited a line of cases, including *In re Acequia, Inc.*,

34 F.3d 800, 811 (9th Cir. 1994), that have rejected the imposition of a flat ceiling.  464 B.R. at

614.  It concluded, among other things, that such a ceiling would unfairly value Plaintiffs'

agreement to give up their rights to a pro rata distribution of estate property and instead take

limited cash and an uncertain litigation recovery, and that, "Once some benefit to the estate is

established, the cases do not use the 'benefit of the estate clause' in § 550(a) to impose a cap on

recovery."  464 B.R. at 613-14.

      Nevertheless, although the Court's decision on limitation of damages rejected

Defendants' cap on damages based on the "for the benefit of the estate" clause in § 550(a), it did

suggest in *dicta* that a limitation on the scope of the damages in this case might possibly be

found in (i) other provisions of § 550, (ii) other sections of the Bankruptcy Code, or (iii) in the

Court's equitable powers.  464 B.R. at 617-18.  Defendants rely on all three bases to assert that

the recovery of $14.5 billion by Plaintiffs must be limited as a matter of law and equity and that

any recovery above the actual value of the legacy liability claims would constitute an

unconscionable windfall to Plaintiffs.

**Limitations on Liability**

      As to the first basis for a limitation on liability, Defendants can find little support for a

limitation on their liability in the provisions of § 550.  Section 550(e) provides that a "good faith

transferee" of a fraudulent conveyance has a lien on the property recovered to secure the lesser of

(i) any improvement made after the transfer, less any profit to the transferee from the property,

136

and (ii) any increase in value of the property resulting from the improvement. Putting aside the question whether Defendants are good faith transferees, there is no dispute in this case that this provision does not apply. Section 550(b) also provides certain defenses to subsequent transferees of a fraudulent conveyance that are not available to initial transferees, but the Defendants are initial transferees and cannot assert these defenses.[119]

As for the second of the three bases mentioned above for limiting Defendants' liability, other sections of the Bankruptcy Code or other applicable law, there are two that are potentially relevant. One is § 120(D) of the Oklahoma Uniform Fraudulent Conveyance Act, which is almost identical to § 548(c) of the Bankruptcy Code and gives a "good faith transferee or obligee" protection against fraudulent conveyance damages "to the extent of the value given to the debtor for the transfer or obligation." Okla Stat. tit. 24, § 120(D).[120] Putting aside again the question whether Defendants are good faith transferees, Plaintiffs' damages analysis gives Defendants full credit for the "value given to the debtor for the transfer or obligation," *i.e.*, the so-called inbound consideration. Section 120(D) and § 448(c) have been fully satisfied, to the extent they need be.

Two other sections of the Bankruptcy Code are potentially relevant. Section 502(d) provides that "the court shall disallow any claim" of the recipient of a fraudulent conveyance "unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable…" Such provision, of course, merely sets a bar to a transferee's claim, and does not create such a claim. As further discussed below, the parties

---

[119] As noted above, Plaintiffs asserted that Anadarko was liable as a subsequent transferee, but Anadarko's motion for summary judgment on this issue was granted prior to trial. The Court found, on the basis of the summary judgment record, that Anadarko was not a subsequent transferee because there was no conveyance to it of the material assets of its Kerr-McGee subsidiaries.

[120] The UFTA provides that the protection of the transferee or obligee can take the form of a "lien on or a right to retain any interest in the asset transferred"; "enforcement of any obligation incurred"; or "reduction in the amount of the liability on the judgment." The analogous provision under the Bankruptcy Code, § 548(c), is similar.

agreed in connection with Tronox's chapter 11 plan of reorganization that any recovery to which

Defendants would be entitled on their proof of claim would be granted as an offset to their

liability for damages as a consequence of this litigation. *See also* ¶ 196 of the Confirmation

Order, Dkt. No. 2567.

The second relevant provision is § 502(h) of the Code, which provides:

> A claim arising from the recovery of property under section 522,
> 550, or 553 of this title shall be determined, and shall be allowed
> under subsection (a), (b), or (c) of this section, or disallowed under
> subsection (d) or (e) of this section, the same as if such claim had
> arisen before the date of the filing of the petition.

Like § 502(d),  § 502(h) does not create a "claim arising from the recovery of property" under

§ 550 and merely provides that any such claim is a prepetition claim entitled to a share of

recovery from the estate on the same basis as all other prepetition claims. *In re Tronox*, 464 B.R.

at 611 n. 8, citing *In re Best Products Co.*, 168 B.R. 35, 58 (Bankr. S.D.N.Y. 1994).

Nevertheless, its language recognizes the existence of a possible claim against the estate "arising

from the recovery of property" under § 550.  It is applied routinely in connection with the

reinstatement of the claim of a creditor whose antecedent debt was paid and then avoided by the

debtor or trustee as a preference.  By definition, a preference involves a transfer on account of an

antecedent debt, and there is no question as to the reinstatement of the debt if there is a recovery

by the trustee or debtor.

There is much less authority regarding application of § 502(h) and its statutory

predecessor, § 57g of the Bankruptcy Act, in the context of the recovery of a fraudulent

conveyance.  In *Buffum v. Peter Barceloux Co.*, 289 U.S. 227 (1933), the Supreme Court

reinstated the finding of a District Court that a pledge of stock to the defendant was in fraud of

creditors under § 70e of the Bankruptcy Act.  It held that "The defendant may participate on the

138

same basis with other creditors in the distribution of the assets", 289 U.S. at 237; it did not

otherwise provide guidance as to the measure of the defendant's claim, except that it reversed the

decree of the District Court to the extent it had subordinated the defendant's claim to the claims

of all other creditors.   *Id*.   Many of the other cases construing § 502(h), as well as § 57g of the

former Bankruptcy Act, have concerned the question whether the transferee of an intentional

fraudulent conveyance can recover on a proof of claim, and they seem to have uniformly

answered this question in the affirmative.   *See*, *e.g.*, *Barber v. Coit*, 144 F. 381, 383 (6th Cir.

1906) (the primary consideration is not the parties' relative fault but whether the debtor's

creditors would be adequately protected); *First Trust & Deposit Co. v. Receiver of Salt Springs

Natl. Bank (In re Onondaga Litholite Co.)*, 218 F.2d 671, 673 (2d Cir.), *cert. denied*, 349 U.S.

944 (1955), where the Court held that § 57g of the former Bankruptcy Act,  predecessor to

§ 502(h), "was not designed to punish a creditor who had sought to withhold the debtor's assets

from the bankruptcy estate … If after adjudication he surrenders the assets thus acquired to the

court, he may share on a parity with other creditors.";  see also, *Max Sugarman Funeral Home,

Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1257 (1st Cir. 1991); *Misty Mgmt Corp. v. Lockwood*,

539 F.2d 1205, 1214 (9th Cir. 1976);  *In re Verco Industries*, 704 F.2d 1134, 1138 (9th Cir. 1983)

(avoidance of a bulk transfer); GLENN ON FRAUDULENT CONVEYANCES § 260a at 446-47.  In *In

re Best Products, Inc.*, 168 B.R. 35, 58 (Bankr. S.D.N.Y. 1994), Judge Brozman of this Court

concluded that it was an established principle that a "fraudulent grantee, once he had lost a suit

brought against him by the trustee in bankruptcy, was given leave to prove a claim as a creditor

in the bankruptcy of the debtor . . ." 168 B.R. at 58, quoting 1 G. Glenn, FRAUDULENT

CONVEYANCES AND PREFERENCES ("GLENN ON FRAUDULENT CONVEYANCES"), § 260a at 446-47

(1940) ("This rule, clearly established, applies regardless of whether the grantee was guilty of actual or constructive fraud.").

### Quantification of a § 502(h) Claim

The principal issue in the application of § 502(h) to the facts of this case is the measure of the claim Defendants can assert under that section. In virtually all of the § 502(h) cases under the Bankruptcy Code, the transferee of a fraudulent conveyance has been awarded a claim for the consideration it paid for the transferred property. *See*, *e.g.*, *In re Calpine Corp.*, 377 B.R. 808, 815 (Bankr. S.D.N.Y. 2007); *In re Best Products Co.*, 168 B.R. at 58. In *Gowan v. HSBC Mortgage Corp. (In re Dreier LLP)*, 2012 WL 4867376, at *3 (Bankr. S.D.N.Y. Oct. 12, 2012), the Court rejected the contention that a § 502(h) claim encompasses the totality of the avoided transfer and held that such a claim is limited to the consideration given for the transfer, stating, "If the transferee did not give any consideration for the fraudulent transfer, there is nothing to reinstate, and the return of the fraudulently transferred funds does not give rise to an allowable claim." It cited a leading text, 4 COLLIER ON BANKRUPTCY ¶ 502.09[2] at 502-72 (16th ed. 2012), which in turn cites *In re Best Prods.Co.* and states, "The amount of the claim allowable under this section is not the value of the property recovered but rather the value of the consideration paid by the transferee for the property recovered." *See also Onodaga Litholite*, cited above, where the claim under § 502(h) was for the consideration the defendant actually paid for the property, the fraudulent conveyance being based on the fact that the property was far more valuable than the amount paid.

Plaintiffs adopt this construction of § 502(h) and assert, correctly, that Prof. Williams' calculation of damages in the amount of $14.459 billion gives Defendants full value for the "inbound consideration" paid to Tronox in connection with the conveyances, including the value

of an Australian TiO$_2$ plant and the $2 billion in debt obligations assumed by New Kerr-McGee in 2002.    According to Plaintiffs, this is, if anything, overly favorable to Defendants – they receive a full offset for the "consideration paid," not just a prepetition claim under § 502(h).

Nevertheless, cases have construed § 502(h) more broadly than Plaintiffs concede and have recognized that a claim thereunder can include more than the consideration paid by the defendant for the transferred assets.    For example, in *Verco Industries* the claim under § 502(h) was for the loss the defendant suffered when the transfer (the purchase of a portion of the debtor's business operations) was set aside.    704 F.2d at 1138.    In *Misty Mgmt. Corp. v. Lockwood*, 539 F.2d at 1215, the majority measured damages by the consideration paid by the defendant for the fraudulently conveyed property but stated, more broadly, that the defendant "should be allowed to prove whatever claim it would have had in the absence of its fraudulent behavior."    In the *ASARCO* case, after the fraudulent conveyance there was avoided, the Court found that the defendant was entitled to an "offset" to the fraudulent conveyance judgment "representing the amount of consideration it ultimately paid for the stock."    404 B.R. at 181-82.

Applying these principles, Defendants reasonably argue that a claim under § 502(h) should not be limited to the consideration paid for the property conveyed.    They point out that Plaintiffs have asked the Court to use its equitable powers to collapse the 2002 and 2005 transactions, and they argue in essence that if the Court does so, the parties should be placed in their positions had the 2002 conveyances been avoided at that time – with the residual value after payment of all legacy liabilities available to the owner, New Kerr-McGee, and not to the Plaintiffs.    They call this the "restorative" principle and base it on the decision in *Bangor Punta Operations, Inc. v. Bangor & Arostook R.R. Co.*, 417 U.S. 703 (1974).    There, the Supreme Court ruled that shareholders who had bought into a corporation at what they conceded was a fair

141

price did not have standing to bring an action for corporate waste against the former shareholders

from whom they had acquired their shares.  The Court said, "This principle has been invoked

with substantial force where a shareholder purchases all or substantially all of the shares of a

corporation from a vendor at a fair price, and then seeks to have the corporation recover against

that vendor for prior corporate mismanagement." 417 U.S. at 710.  Defendants assert that the

"recovery limitation articulated in *Bangor Punta* applies to any recovery under § 550(a)" and

that such a bar should be applied here.  (Def. Br. at 260).   Alternatively, they state, the "Court

might apply the same economic principle under § 502(h)." Def. Br. at 265, n. 167.[121]

Plaintiffs dismiss "the restorative principle," claiming that it is simply another version of

Defendants' rejected argument that Plaintiffs' claims should be limited to the value of the legacy

liabilities.  No authority provides direct support for the proposition that the *Bangor Punta*

principle, which relates to shareholder standing to sue for corporate waste, limits damages in a

fraudulent conveyance action.   The Supreme Court majority in *Bangor Punta* recognized that

the action there had not been brought "on behalf of any creditors" and that "the financial health

of the railroad is excellent."  417 U.S. at 718, n. 15.  Subsequent cases have found *Bangor Punta*

not to be relevant in an action on behalf of creditors.  *In re Kaiser Merger Litig.*, 168 B.R. 991,

1004 (D. Colo. 1994); *In re Healthco Int'l. Inc.*, 195 B.R. 971, 986 (Bankr. D. Mass. 1996).  On

the other hand, several cases also recognize that § 502(h) and its predecessors are fundamentally

---

[121] The Court could *only* apply the economic principle under § 502(h).  A bankruptcy court's equitable powers "must and can only be exercised within the confines of the Bankruptcy Code."  *Northwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).  If there is to be a limitation of damages in this fraudulent conveyance case, it must be statutorily based and found in the application of § 502(h).  Damages cannot be limited in this case solely on the ground that it is "equitable" to do so, especially in light of those cases that find no limitation on damages in the plain words of the fraudulent conveyance statutes.  *See, e.g.*, *Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 720 (7th Cir. 2002), where the Seventh Circuit affirmed the grant of full recovery to the creditor, holding it irrelevant "that some or for that matter all of [the property conveyed] may later have seeped back to the debtor."  *See also*, *Stanley v. U.S. Bank, N.A. (In re TransTexas Gas Corp.*, 597 F.3d 298, 310 (5th Cir. 2010), where the Fifth Circuit said, "The parties have cited neither to a provision in the Code nor to precedent to support that making more than a reasonably equivalent exchange is fraudulent only for the excess amount."

based on a type of "restorative principle." Thus, the Court in *Best Products* stated that § 502(h) is based on the principle "that when a fraudulent transfer is avoided, the parties are restored to their previous positions." 168 B.R. at 57, quoting GLENN ON FRAUDULENT CONVEYANCES. The Court in *In re Dreier LLP*, discussed above, also recognized that "Section 502(h) is based on the principle of fraudulent transfer law that the return of a fraudulent transfer restores the parties to the *status quo*." 2012 WL 4867376 at *3. In this case, if the parties are to be restored to the positions they held before the transfers, Defendants would be entitled to the residual value of the E&P assets after their debts, including the legacy liabilities, were paid in full.

The measurement of damages under § 502(h), so as to provide Defendants with a claim for the value of the E&P assets to which they would have been entitled after payment of the legacy liabilities, is not an easy task. This is especially true because, as Plaintiffs argue, all distributions in a chapter 11 case are governed by the plan of reorganization and not by general principles of law or the principles that govern chapter 7 liquidations, such as two Seventh Circuit cases relied on by Defendants. *See Boyer v. Crown Distribution, Inc.*, 587 F.3d 787, 797 (7th Cir. 2009); *In re FBN Food Services, Inc.*, 82 F.3d 1387, 1396 (7th Cir. 1996). In chapter 11, even if there is a windfall after the confirmation of the plan, the plan provisions control. *Kipperman v. Onex Corp.*, 411 B.R. 805, 876 (N.D.Ga. 2009); *MC Asset Recovery, LLC v. Southern Co.*, 2006 WL 5112612 at *6 & n.12 (N.D. Ga. Dec.11, 2006). *See also*, *In re Rickel & Assocs., Inc.*, 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001) (court has no power to modify a consummated chapter 11 plan).[122] Plaintiffs also emphasize that the legacy liability creditors did not share in the distribution of the estate *pro rata* with all other general unsecured creditors. They gave up their

---

[122] The plan governed in the *ASARCO* chapter 11 bankruptcy, where the defendants in the fraudulent conveyance case ultimately contributed more than $2 billion to become the new equity owners of ASARCO. This was a consensual resolution that allowed the defendants to enjoy the residual value of the assets returned to the estate. *In re ASARCO LLC*, 420 B.R. 314, 325, 333 (Bankr. S.D. Tex. 2009).

143

rights to a *pro rata* distribution and received in exchange a relatively small amount of cash and one of the estate's assets – the proceeds of this litigation.   Plaintiffs claim there is nothing in the Tronox plan of reorganization that expressly limits their damages in this fraudulent conveyance case.

However, the Plan has several provisions that bear directly on Defendants' § 502(h) claim.  Tronox filed its initial Joint Plan of Reorganization and proposed Disclosure Statement on July 7, 2010.  Dkt. No. 1710.  Defendants objected to the Disclosure Statement, contending *inter alia* that Tronox had failed to disclose the value of Defendants' claims, including their potential § 502(h) claim, or the potential impact of these claims on distributions to unsecured creditors, in that there was a possibility that Tronox would have to reserve a very substantial percentage of its stock for possible distribution to Defendants.  After  negotiations, the Debtors and Defendants acknowledged that "any § 502(h) claim to which Anadarko may be entitled could be applied as a direct offset [to a judgment against Defendants] rather than an independent claim, and that agreement became part of Tronox's confirmed plan." *Tronox III*, 464 B.R. at 611 n. 8, citing Plan of Reorganization, at Art. III.D.   This principle was retained in Tronox's amended plan, which also recited that Defendants' agreement that their § 502(h) claim would be applied as a direct offset did not imply a waiver by defendants of their right to be treated in the same manner as other general unsecured creditors, and that Defendants reserved their rights with regard to the offset or recoupment of any of the other claims set forth in their proofs of claim.[123]

---

[123] There are a series of claims in Anadarko's  third amended proof of claim.  The largest liquidated amount is approximately $59 million for costs already incurred in defense of  this proceeding.  Most of the other claims are unliquidated in amount and include remediation and litigation costs at one location  ("Oryx costs" are said to be unliquidated but at least $199 million), Brine site contribution costs (unliquidated but said to be up to $24 million), claims for subrogation, and  claims under § 502(h).  All of the claims other than the contingent § 502(h) claim (and Tronox's § 502(d) defense) were resolved in a stipulation, dated January 26, 2011 (DX2720).  Therefore, on the record, the only remaining portion of Anadarko's proof of claim that must be liquidated and offset is its claim under § 502(h) of the Bankruptcy Code.

Thus, Defendants' § 502(h) claim, if any, must be treated as an offset against any judgment for

Plaintiffs but otherwise provide Defendants with a distribution that is comparable to that

received by unsecured creditors on confirmation of the Tronox chapter 11 plan.

The parties also agreed to the following provision contained in Article IV.C.5 of the Plan,

entitled "Creation of Anadarko Litigation Trust":

> Notwithstanding any contrary provision contained herein or in any
> documents executed in connection herewith (including the
> Anadarko Litigation Trust Agreement), if the Anadarko Section
> 502(h) Claim is Allowed, Anadarko[124] will be entitled to discount
> and/or otherwise reduce any judgment in the Anadarko Litigation
> by the amount of any Allowed Anadarko Section 502(h) Claim
> multiplied by the percentage recovery to Allowed Class 3 General
> Unsecured Claims (which percentage recovery may or may not be
> computed on a claims base including such Allowed Anadarko
> Section 502(h) Claim) and Anadarko shall be obligated to pay only
> the reduced amount of such judgment; provided, however, that the
> percentage by which any such Allowed Anadarko Section 502(h)
> Claim may be multiplied shall be determined by the Bankruptcy
> Court and the parties reserve their rights with respect to the extent
> of the dilutive effect of the Allowed Anadarko Section 502(h)
> Claim on Anadarko's ability to reduce any judgment in the
> Anadarko Litigation.  Anadarko has agreed that the foregoing
> discount or reduction in amount payable with respect to any
> judgment in the Anadarko Litigation shall be its sole and exclusive
> remedy on account of any Allowed Anadarko Section 502(h)
> Claim and that it shall have no recourse against Tronox or
> Reorganized Tronox on account of such Anadarko 502(h) Claim.
> (other footnotes omitted).

The parties thus agreed that if the "Anadarko Section 502(h) Claim is Allowed," (i) Defendants

would be entitled "to discount and/or otherwise reduce any judgment in the Anadarko Litigation

by the amount of any Allowed Anadarko Section 502(h) Claim multiplied by the percentage

recovery to Allowed Class 3 General Unsecured Claims";  (ii) the percentage recovery might or

might not be computed on a claims base including the Allowed Anadarko Section 502(h) Claim;

---

[124] For purposes of this plan provision, all references to "Anadarko" shall mean Anadarko Petroleum Corporation
and its affiliates and subsidiaries, including the entity now known as Kerr Mc-Gee Corporation, which was formed
in May 2001.

(iii) the percentage by which any Allowed Anadarko Section 502(h) Claim would be multiplied would be determined by the Bankruptcy Court; and (iv) the parties reserved "their rights with respect to the extent of the dilutive effect of the Allowed Anadarko Section 502(h) Claim on Anadarko's ability to reduce any judgment in the Anadarko Litigation."[125]   As further discussed below, defendants have reserved the right to file a § 502(h) claim in the event of an adverse result in this case.  (Tr. (Summation) 12/12/2012 at 8237:5-7).  They have a right to do so and to have their claim considered in due course.  Nevertheless, this decision has been long awaited, and the damages issues have been extensively briefed by the parties.  Accordingly, it would appear useful to provide the following provisional findings on the subject of damages.

Although the parties did not agree that Defendants would have a § 502(h) Claim, they did agree that any such Claim would be multiplied by "the percentage recovery" of an Allowed Class 3 General Unsecured Claim.  It follows that the Claim itself should be calculated in the same manner as if it were a claim allowed in the Plan.  At the time the Plan and Disclosure Statement were disseminated in 2010, it was Tronox's position that the legacy liabilities were estimated at a mid-point value of approximately $4 billion. As Plaintiffs state in their main brief in this case, citing Tronox's Disclosure Statement, "At confirmation of Tronox's plan, the environmental and tort creditors relinquished claims with an estimated mid-point value of $4 billion (Disc. Stmt. (Main Case Dkt. No. 2196, Ex. B) at 11) and received a *contingent* asset – the right to any recovery in this case."  Pl. Br. at 109 (emphasis in original), referencing the First Amended  Disclosure Statement, dated October 1, 2010.  If we accept Plaintiffs' valuation of the legacy liabilities for purposes of confirmation of the plan as $4 billion, the residual value of the

---

[125] A footnote reserved all parties' rights and defenses with respect to "any and all matters not expressly addressed herein, including, . . . Tronox's or the Litigation Trustee's ability to seek to subordinate or disallow the Anadarko Section 502(h) Claim."

E&P assets after satisfaction of the legacy liabilities was $10.459 billion ($14.459 billion less

the $4 billion value of the legacy liabilities).[126]  This is the sum which would have been available

to New Kerr-McGee as equity after payment of the legacy liabilities.  Reconstructing the state of

affairs as of confirmation, Defendants should provisionally have an allowed claim under

§ 502(h) in the amount of $10.459 billion.

    The next step to effectuate the parties' agreement as set forth in Tronox's Plan is to

determine the percentage recovery of such a claim under the Plan.  The parties expressly agreed

that this Court would determine the appropriate percentage, and the Court can do so based on the

Disclosure Statement.  The Tronox Disclosure Statement estimated the recovery of General

Unsecured Creditors in Class 3 who participated in the Rights Offering at between 78% and

100%.  Discl. St. at 10.   The estimate for creditors who did not participate was between 58-78%

of their claims.  *Id.* at n. 9.[127]  However, the Debtors also agreed that "Anadarko will be entitled

to receive the economic benefit on account of its Allowed Class 3 or Class 6 Claim as if it had

participated in the Rights Offering, notwithstanding anything in the Rights Offering Procedures

---

[126] The net value of the assets transferred out of Tronox ($14.459 billion) was calculated as of the date of the IPO in
November 2005.  The $4 billion value of the legacy liabilities was contained in Tronox's 2010 Disclosure
Statement, but Plaintiffs have not contended that it changed substantially from 2005 or that it is substantially
different  today.  It is recognized that Plaintiffs' position is that they calculated the 'inbound consideration" as an
offset to Defendants' liability rather than as a part of Defendants' § 502(h) claim, and that this is overly favorable to
Defendants. See Plaintiffs' Reply Br. at 35.  There is no reason to disturb this concession, however, as Plaintiffs did
not argue that Defendants were not entitled to an offset under § 120(D) of the Oklahoma UFTA for consideration
paid directly to Tronox.  Similarly, there is no occasion to revisit Defendants' concession in the analysis of their
expert on damages, Balcombe, that the obligation to pay OPEB benefits that Defendants imposed on Tronox is
properly considered as a part of the damages analysis, even though the payments were intended to be made to third
parties.  *See also In re Allegheny Health, Educ. & Research Found.*, 253 B.R. 157, 167 (Bankr. W.D. Pa. 2000).

[127] This percentage can be confirmed by the following calculation derived from the Disclosure Statement.  Class 3
general unsecured creditors held claims totaling $445.6 million (including the one-half of the Indirect Environmental
Claims who participated in Class 3 recoveries).  (DX 2522 at 10).  Under Tronox's plan, these creditors received
50.9 percent of Tronox's outstanding stock.  (Id. at 15)  In the Disclosure Statement the total enterprise value of the
reorganized company was estimated at $1.063 billion, less exit financing of $468 million, or a net value of $595
million. 50.9% of this value (allocated to general unsecured creditors) is $302,855,000.  Thus, the recovery of
general unsecured creditors is reasonably estimated at about 68 percent of their claims.  This is the representation in
the Disclosure Statement, which estimated Class 3 creditor recoveries for creditors who did not participate in the
rights offering at between 58% and 78% of their claims.  (DX 2522 at 82).

to the contrary." DX 2522, Discl. St. at 33.[128]  Therefore, the mean percentage recovery as

estimated in the Disclosure Statement for a general unsecured creditor entitled to participate in

the Rights Offering was 89%.  If Defendants' § 502(h) claim is valued at 89% of $10.459 billion,

Defendants would be entitled to offset $9,308,510,000 from Plaintiffs' recovery of

$14,459,000,000, resulting in a damages award to Plaintiffs, not including attorneys' fees or

costs, of $5,150,490,000.

        As noted above, the parties reserved the issue of "the extent of the dilutive effect of the

Allowed Anadarko Section 502(h) Claim on Anadarko's ability to reduce any judgment in the

Anadarko Litigation."  In other words, the parties recognized that the size of Defendants'

§ 502(h) claim might dwarf all other Allowed Claims against Tronox.  They did not provide any

principles to inform the Court's discretion on this particular question, and they have not

separately briefed the issue.  According to the Tronox Disclosure Statement, general unsecured

creditors held claims totaling $445.6 million (including the one-half of the Indirect

Environmental Claims who participated in Class 3 recoveries).  (DX 2522 at 10)  Adding this

amount to Defendants' § 502(h) Claim of $10.459 billion would bring the total of all general

unsecured claims to $10,904,600,000.  The value of the stock allocated to general unsecured

creditors was $302,855,000.  If all general unsecured claims, including Defendants' § 502(h)

claim, shared in this value, the recovery of a general unsecured creditor would be only 2.8 cents

on the dollar, and Defendants' § 502(h) claim would be worth only $292,852,000.  Offsetting

this against Plaintiffs' recovery would result in a damages award to Plaintiffs, not including

attorneys' fees or costs, of $14,166,148,000.

---

[128] Class 3 creditors were the General Unsecured Creditors.  Class 6 creditors were holders of Indirect
Environmental Claims, one half of whom participated in the general unsecured recovery.

As noted, the parties have not separately briefed the issue of the dilutive effect of Defendants' claim on the calculation of that claim under § 502(h), and Defendants have reserved the right to file a § 502(h) claim, if necessary, once a decision on liability was rendered by this Court. Accordingly, before making a final determination on damages, the Court will give Defendants the right to file a § 502(h) claim and to brief the issue of the dilutive effect of Defendants' claim, and give Plaintiffs the opportunity to respond. The issue is limited but the difference in damages is large – whether Defendants should be liable for damages in the amount of $14,166,148,000 or $5,150,490,000, plus attorneys' fees and costs to the extent appropriate.

Defendants nevertheless have one final contention on the subject of damages that can be dealt with on the present record. They argue that general unsecured creditors recovered 337% of their claims against Tronox and that their § 502(h) claim should be valued accordingly. They base this argument on excerpts from the post-confirmation record, such as the position Tronox took on certain tax issues post-confirmation. Whatever the merits of their contentions factually, these recoveries could not have been anticipated at the time of confirmation and were wholly inconsistent with the Plan itself. Although all classes of creditors voted in favor of the Plan, the equity class rejected it. Ultimately, the Plan was confirmed over the objection of the equity class under the provisions of the absolute priority rule (Bankruptcy Code § 1129(b)), on the ground there was no value for equity and creditors were not receiving more than 100% of the value of their claims.

It is well accepted, as a corollary to the absolute priority rule, that creditors cannot receive more than 100% of the value of their claims. *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007). The Confirmation Order finds that the Plan satisfies the cram-down requirements of Bankruptcy Code § 1129(b), and that Tronox's evidence in support was

reasonable and credible.  Confirmation Order, Nov. 30, 2010, Docket No. 2567, para. 67, 73-75.[129]  Thus, there is no basis for estimating the value of a General Unsecured Claim at more than the Disclosure Statement's projection, or 89% of a claim of a creditor with a right to participate in the rights offering.  In any event, as discussed above, in the words of the District Court in *Kipperman v. Onex Court*, 411 B.R. 805, 876 (N.D.Ga. 2009), the bankruptcy laws do "not require, or even suggest, a district court in a subsequent piece of litigation to go back and re-assess equity among the parties based on subsequent events."  *See also MC Asset Recovery LLC v. Southern Co.*, 2006 WL 5112612 (N.D. Ga. Dec. 11, 2006); *Rickel & Assocs,* 260 B.R. at 679.[130]

**Final Issues**

Two final issues must be dealt with.  First, years after this case was filed and as trial approached, Defendants attempted to add a new affirmative defense, asserting that § 546(e) of the Bankruptcy Code immunizes them from any liability.  Second, Defendants asserted that although this Court could hear the case, it could enter only findings of fact and conclusions of law for review by the District Court.  These issues will be dealt with *seriatim*.

---

[129]  There was an active and well-represented equity committee in the Tronox case, with the goal of obtaining a recovery for the Tronox stockholders.  One of their contentions, prior to confirmation, was that creditors were receiving more than 100% of their claims, but on the eve of confirmation they essentially gave up their pretentions and settled for the distribution of warrants that had been proposed in the plan.

[130] Valuation of a claim on the basis of subsequent information unknown at the time of confirmation of Tronox's plan would also appear inconsistent with the argument that Defendants' § 502(h) claim should be valued without inclusion of its claim included in the creditor base, or stated differently, that it should have the benefit of the facts known and relied on at the time of confirmation, and not as they developed subsequently.

**Section 546(e)**

Section 546(e) provides that notwithstanding § 544 and § 548(a)(1)(B) of the Bankruptcy Code, the trustee (or debtor in possession) may not avoid certain transactions.[131]  Defendants claim that it provides them with a complete defense because the conveyances at issue in this case were, within the meaning of § 546(e), either "settlement payments," or payments made by or to or for the benefit of a "financial participant" in connection with a "securities contract."[132]  Defendants purported to raise the issue years after they had filed their answer by mentioning it briefly in a motion for partial summary judgment on different grounds and then moving to amend their answer to assert the defense.  Plaintiffs responded by asserting that Defendants had waived the issue by failing to raise it in a timely manner, and the matter was taken under advisement without separate argument at the start of trial.  The Court now denies Defendants' motion to amend their answer and raise the issue on the ground of timeliness and waiver and on the ground that the amendment would in any event be futile.

---

[131] Inexplicably, although the section explicitly exempts intentional fraudulent conveyances under § 548(a)(1)(A) of the Bankruptcy Code, it does not exempt the same conveyance under State law, which can generally be avoided in a bankruptcy case only through application of § 544(b) of the Bankruptcy Code.

[132] Section 546(e) reads as follows:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101 , 741, or 761 of this title, or settlement payment as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

151

**Timeliness and Waiver**

This adversary proceeding was filed on May 12, 2009. After moving to dismiss and obtaining dismissal of several counts, *Tronox I*, 429 B.R. 73, Defendants answered the complaint on May 19, 2010, asserting 22 affirmative defenses but not § 546(e). After Plaintiffs filed an amended complaint, Defendants again moved to dismiss, and after this Court's decision, *Tronox II*, 450 B.R. 432, Defendants answered the second amended complaint, asserting substantially the same defenses, but not § 546(e). The parties proceeded under a Case Management Order, which was amended four times but ultimately provided that the deadline for seeking to amend a pleading was April 25, 2011, or 60 days prior to the completion of fact discovery. No amendments were sought, and the parties proceeded to spend tens of millions of dollars in preparation for trial.[133]

In the meantime, the United States had filed its complaint under FDCPA but had not pursued it; instead the United States participated in this adversary proceeding and agreed to take a proportionate share of any recovery herein. *See inter alia*, Order Approving Revised Stipulation and Order With Respect to Federal Debt Collection Procedures Act, dated August 20, 2009 (Adv. Pro. No. 09-1198, Dkt. No. 52). On November 30, 2010, Tronox's plan had been confirmed, and the legacy environmental and tort creditors, including the United States, had agreed to take a limited distribution from the estate and to take instead an uncertain recovery in this litigation.

On February 21, 2012, long after the foregoing developments, and two days before a conference on Defendants' proposed motions for summary judgment (which did not initially

---

[133] Defendants' proof of claim, discussed above, asserts a claim against each of the three Plaintiff debtors of $59,156,981 for "costs incurred in defending themselves from the Petition Date through July/August 2010 in connection with the Adversary Proceeding" plus a contingent claim of $47,568,991 for future costs. Amended Proof of Claim dated Sept. 10, 2010 and Ex. E thereto.

152

include any issue under § 546(e), Defendants raised for the first time the issue of a § 546(e)

defense.  The Court gave Defendants leave to proceed in an orderly fashion and to seek to amend

their answer, and the instant motion followed.  Defendants asserted, among other things, that

§ 546(e) is not an affirmative defense and that it had, in any event, been properly preserved

under Rule 12(h)(2) and by the fact that Defendants had asserted "failure to state a claim" as a

defense in their answer.

There is no merit whatsoever to these contentions.  Rule 8(c)(1) provides that a party

responding to a pleading must affirmatively state any avoidance or affirmative defense.    An

affirmative defense does not merely negate an element of a plaintiff's *prima facie* case; instead,

it intervenes to defeat the claim even if plaintiff proves every element of its case.  *See United

States v. Continental Ill. Natl Bank & Trust Co. of Chicago*, 889 F.2d 1248, 1253 (2d Cir. 1989).

As the Court said in *DeGirolamo v. Truck World, Inc. (In re Laurel Valley Oil Co.)*, No. 07-

6109, 2009 WL 1758741 at *3 (Bankr. N.D. Ohio June 16, 2009), § 546(e) is a classic

affirmative defense: even if the plaintiff successfully proves "the elements of a case in chief

under any of the enumerated avoidance provisions, § 546(e) intervenes to shield the transfer

from avoidance, except in cases where § 548(a)(1)(A) (actual fraud) applies."  Cases construing

§ 546(e) have uniformly treated it as an affirmative defense.  *In re Bernard L. Madoff  Inv. Sec.

LLC*, 2011 WL 3897970 at *12 (S.D.N.Y. Aug. 31, 2011); *Adelphia Commc'ns Corp.*, 452 B.R.

484, 488-89 (Bankr. S.D.N.Y. 2011).

An affirmative defense is not preserved by a general pleading of  "failure to state a claim

upon which relief may be granted" or by Rule 12(h)(2), which provides that such a defense may

be asserted "at trial."  "A general assertion that the plaintiff's complaint fails to state a claim is

insufficient to protect the plaintiff from being ambushed with an affirmative defense."  *Saks v.*

*Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003); see also 5C WRIGHT & MILLER, FED. PRAC. & PROC. § 1392 (3d ed. 2012) (under Rule 12(h)(2) "defenses cannot be interposed simply as a mechanism for relieving the movant from the consequences of a default.").

Since Defendants did not timely raise an issue under § 546(e), it was waived, *Alster v. Goord*, 745 F. Supp.2d 317, 332 (S.D.N.Y. 2010), unless Defendants can establish grounds to amend their answer and assert the issue. Defendants must also be able to establish "good cause" for the modification of the scheduling order entered in this case under Fed. R. Civ. P. 16(b)(4), made applicable by Bankruptcy Rule 7016. *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339-40 (2d Cir. 2000).[134]

**Motion to Amend**

A court may exercise its discretion to deny a motion to amend a pleading (i) if there has been undue delay, bad faith or a dilatory motive on the part of the movant; (ii) if there has been repeated failure to cure a deficient pleading; (iii) if there would be undue prejudice to the opposing party; or (iv) if the amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Three of these four elements are present in this case.

As discussed above, there has not only been undue delay on the part of the Defendants in raising the issue, but severe prejudice to Plaintiffs. Assuming *arguendo* that it is a real issue, and Defendants now assert that it is, the following transpired after Defendants' answer was interposed. Both parties spent millions of dollars preparing for trial (and a 34-day trial was held). No discovery was taken on the § 546(e) issue, and the 14 experts called by the parties, respectively, testified on every conceivable issue in the case other than those relevant to § 546(e). Plaintiffs proved their case under the rubric of the Second Amended Complaint, and the United States did not separately prove its right to relief and the amount of its damages under

---

[134] Rule 16(b)(4) provides that a "schedule may be modified only for good cause and with the judge's consent."

its FDCPA complaint, where § 546(e) is not an issue.  Moreover, it is accepted that § 546(e) applies only to transfers of property, not to the incurrence of obligations.  *In re MacMenamin's Grill Ltd.*, 450 B.R. 414, 431 (Bankr. S.D.N.Y. 2011); *In re Lehman Brothers Holdings Inc.*, 469 B.R. 415, 445-46 (Bankr. S.D.N.Y. 2012).  If § 546(e) had been timely raised as an issue, Plaintiffs would have been able to consider reformulating their complaint to characterize Defendants' actions as causing Tronox to take on the legacy liabilities as the sale obligor.

Defendants' only excuse for not having timely raised a § 546(e) defense, and their proffered "good cause" for the delay, is what they call "the Second Circuit's recent expansion of applicable law."  Brief for Defs. dated March 6, 2012 at p. 26, referring to *Enron Creditors Recovery Corp. v. Alfa S.A.B.de C.V.*, 651 F.3d 329 (2d Cir. 2011).  However, the Second Circuit's decision, which was issued eight months before Defendants first raised the § 546(e) issue, did not change the law.  It affirmed a District Court decision that was issued 18 months before Defendants filed their answer.  *See* 422 B.R. 423 (S.D.N.Y. 2009).  It was also hardly on point, although it did involve the "affirmative defense" of § 546(e).[135]  Even if Plaintiffs were unable to establish any prejudice from Defendants' tardy affirmative defense, Defendants' conduct was so lacking in diligence that their motion to amend should be denied.  *Oppenheimer & Co. v. Metal Mgmt.*, Inc., 2009 WL 2432729 at *2 (S.D.N.Y. July 21, 2009); *In re Adelphia Commc's Corp.*, 452 B.R. at 488.  They certainly have not shown the "good cause" required under Fed. R. Civ. P. 16(b)(4) to amend a scheduling order.

**Futility**

Despite the admittedly broad construction given to the term "settlement payment" in *Enron* and several other cases, Defendants were correct when they initially determined not to

---

[135] In *Enron*, the District and the Circuit Court majority held that redemption of commercial paper paid to hundreds of holders of Enron's stock was a settlement payment within the meaning of § 546(e), despite the absence of a financial intermediary that acted as other than a conduit.  *Enron*, 422 B.R. at 442; 651 F.3d at 335-39.

155

raise a § 546(e) defense, and their motion to amend should also be rejected on the fourth ground

cited by the Supreme Court in *Foman v. Davis*, that the proposed amendment would be futile.

The term "settlement payment" is defined  in § 714(8) of the Bankruptcy Code as "a preliminary

settlement payment, a partial settlement payment, an interim settlement payment, a settlement

payment on account, a final settlement payment, or any other similar payment commonly used in

the securities trade."  The cases recognize that this definition "defies plain meaning; to the

contrary…it is circular and cryptic."  *Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 675 (D.R.I.

1998).   However, the one clear condition is that the term must be viewed "in the context of the

securities trade."  *Enron*, 651 F.3d at 334; *see also*, *In re Kaiser Steel Corp*., 952 F.2d 1230,

1237 (10th Cir. 1991) ("we must interpret the term 'settlement payment' as it is plainly

understood within the securities industries."); *Zahn*, 218 B.R. at 675 (the only function of the

statutory definition is to point to "the common use of the term in the securities trade"  where

"parties use intermediaries to make trades of public stock, which are instantaneously credited,

but in which the actual exchange of stock and consideration therefor takes place at a later date.")

     There may have been a securities settlement in connection with the final distribution of

the Tronox stock by Kerr-McGee in March 2006.   However, Plaintiffs do not challenge that

transaction directly or indirectly.   Nor do Plaintiffs seek to disturb the distribution of Tronox's

stock or debt in the November 2005 IPO.   On the record of this case, the transfers in November

2005 of Tronox's cash in excess of $40 million was a simple intercompany transfer of cash.   The

managing director of Houlihan Lokey, who studied the transaction, called it a dividend in his

testimony (*See*, *supra* at p. 68, Collins Dep., 12/15/2010 at 32:9-19).   The *Enron* court explained

its decision by noting that other circuits had applied § 546(e) in the context of leveraged buyouts,

on the premise that "undoing long-settled leveraged buyouts would have a substantial impact on

the stability of the financial markets, even though only private securities were involved and no

financial intermediary took a beneficial interest in the exchanged securities during the course of

the transaction." 651 F.3d at 338 (footnote omitted). Judgment for Plaintiffs in this case would

not undue a long-settled leveraged buyout.[136]

Defendants also failed to adduce any evidence that the change of ownership of the stock

of the E&P subsidiaries from Old Kerr-McGee to New Kerr-McGee constituted a settlement

payment. Defendants themselves characterized this transaction in their financial statements as a

reorganization "whereby among other changes, Kerr-McGee Operating Corporation distributed

its investment in certain subsidiaries (primarily the oil and gas operating subsidiaries) to a newly

formed intermediate holding company, Kerr-McGee Operating Company." In any event, a "one-

way payment" is not a "settlement payment." *In re Appleseed's Intermediate Holdings, Inc.*, 470

B.R. 289, 302 (D. Del. 2012); *In re Integra Realty Res., Inc.*, 198 B.R. 352, 360 (Bankr. D. Colo.

1996).

Defendants' further claim that Kerr-McGee was a "financial participant" within the

meaning of §§ 546(e) and 101(22A)[137] of the Bankruptcy Code and that the transfers of

---

[136] If the November 2005 transfers of the proceeds of Tronox's initial stock and debt offerings were somehow deemed settlement payments immune from challenge in this lawsuit, the damages award against Defendants would be reduced by approximately $761.8 million. *See* n. 117, *supra*, and accompanying text. Defendants' ability to avoid liability for part of their wrongdoing would not immunize all elements of the transaction. *In re Appleseed's Intermediate Holdings, Inc.*, 470 B.R. 289, 302 (D. Del. 2012).

[137] The term "financial participant" is defined in § 101(22A) as

   (A) an entity that, at the time it enters into a securities contract, commodity contract, swap agreement, repurchase agreement, or forward contract, or at the time of the date of the filing of the petition, has one or more agreements or transactions described in paragraph (1), (2), (3), (4), (5), or (6) of section 561(a) with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at such time or on any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions with the debtor or any other entity (other than an affiliate) at such time or on any day during the 15-month period preceding the date of the filing of the petition; or
   (B) a clearing organization (as defined in section 402 of the Federal Deposit Insurance Corporation Improvement Act of 1991).

ownership were made in connection with a "securities contract," as defined in § 741(7) of the

Code,[138] is equally unavailing.  Defendants put in the record evidence that "Kerr-McGee" and

"Kerr-McGee Oil and Gas" at various times in 2005 entered into financial contracts, such as the

repurchase of $4 billion of its own stock in connection with a proxy contest with Carl Icahn and

the sale of assets in the North Sea.  Def. Findings of Fact 529-530, 533-534.  We need not reach

the question whether Kerr-McGee's size gives it a special exemption from fraudulent

conveyance law because Defendants in any event have failed to identify that the challenged

---

[138] Section 741(7) provides that a "securities contract"—

(A) means—

 (i) a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, any interest in a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein (including an interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option, and including any repurchase or reverse repurchase transaction on any such security, certificate of deposit, mortgage loan, interest, group or index, or option (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in section 101);

 (ii) any option entered into on a national securities exchange relating to foreign currencies;

 (iii) the guarantee (including by novation) by or to any securities clearing agency of a settlement of cash, securities, certificates of deposit, mortgage loans or interests therein, group or index of securities, or mortgage loans or interests therein (including any interest therein or based on the value thereof), or option on any of the foregoing, including an option to purchase or sell any such security, certificate of deposit, mortgage loan, interest, group or index, or option (whether or not such settlement is in connection with any agreement or transaction referred to in clauses (i) through (xi));

 (iv) any margin loan;

 (v) any extension of credit for the clearance or settlement of securities transactions;

 (vi) any loan transaction coupled with a securities collar transaction, any prepaid forward securities transaction, or any total return swap transaction coupled with a securities sale transaction;

 (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph;

 (viii) any combination of the agreements or transactions referred to in this subparagraph;

 (ix) any option to enter into any agreement or transaction referred to in this subparagraph;

 (x) a master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this subparagraph, except that such master agreement shall be considered to be a securities contract under this subparagraph only with respect to each agreement or transaction under such master agreement that is referred to in clause (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), or (ix); or

 (xi) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this subparagraph, including any guarantee or reimbursement obligation by or to a stockbroker, securities clearing agency, financial institution, or financial participant in connection with any agreement or transaction referred to in this subparagraph, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562; and

 (B) does not include any purchase, sale, or repurchase obligation under a participation in a commercial mortgage loan.

transfers were in connection with a "securities contract."  They never identified a "securities

contract" or "contract for the purchase, sale, or loan of a security …" within the meaning of

§ 741(7) of the Bankruptcy Code that Plaintiffs seek to avoid in this lawsuit.  The most

Defendants assert in this regard is that the Master Separation Agreement and the other

agreements entered into by the Kerr-McGee companies in 2005 were "securities contracts" to the

extent that they completed the transfer of the E&P interests – which Defendants assert took place

in 2002 in any event.  A plain reading of the Master Separation Agreement, the Assignment

Agreement and the Assignment, Assumption and Indemnity Agreement establishes that they

were not "contracts for the purchase, sale or loan of a security."  They were contracts that

confirmed the allocation of assets and liabilities between the subsidiaries of Kerr-McGee.  No

consideration was paid for the "purchase, sale or loan of a security."

### Stern v. Marshall

The final issue is "Defendants' Notification of Lack of Consent to Final Adjudication of

Fraudulent Transfer Claims and Motion for Leave Regarding Fiduciary Duty Claim."  In their

answer, Defendants had stated explicitly and without qualification that they "consent to the entry

of final orders or judgment by this Court pursuant to Rule 7012(b)."  Answer to Second

Amended Complaint, dated 6/10/11, ¶ 13 (Dkt. No. 235).[139]  Bankruptcy Rule 7012(b) provided

that "if the response [to a claim that a proceeding is core][140] is that a proceeding is non-core, [the

responsive pleading] shall include a statement that the party does or does not consent to the entry

of final orders or judgment by the bankruptcy judge."  Defendants first attempted to withdraw

their consent by a pleading filed March 2, 2012, eight months after filing their answer to the

Second Amended Complaint, long after the date for amending pleadings under the pre-trial

---

[139] Defendants' original Answer had the same consent.  (Answer, dated 5/19/10, ¶ 13 (Dkt. No. 130)).

[140] Generally, bankruptcy judges can only issue final orders and judgments in core matters.

order, and only about two months before trial was scheduled to begin in May 2012.  In their

pleading Defendants stated that they "(1) provide notification that they do not consent to the

Court issuing final orders and judgments on the fraudulent transfer claims asserted by

[Plaintiffs]; and (2) move for leave to (i) withdraw their consent to the Court issuing final orders

and judgments on Plaintiffs' 'non-core' fiduciary duty claim, and (ii) amend Defendants Answer

to Plaintiffs' Second Amended Complaint to reflect such lack of consent."  (Motion, p. 2).  The

Court took "Defendants' Notification" under advisement for decision in connection with a

decision on the merits.

Defendants' Notification and Motion was predicated on the assertion that prior to the

Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), "it was assumed that

bankruptcy courts had statutory *and constitutional* authority to finally adjudicate all 'core' claims

irrespective of consent."  (Motion, p.2) (emphasis in original)  Defendants claimed that since

Plaintiffs' fraudulent conveyance claims were statutorily core, under 28 U.S.C. §

157(b)(2)(H),[141] they had no occasion to contemplate "a new class of claims that, although

statutorily 'core,' were deemed to be outside the constitutional authority of a bankruptcy court to

adjudicate to a final determination – absent the consent of the parties."  (*Id*. at p. 3)  Therefore,

the argument continued, their consent was not "informed consent, and any presumed consent

pre-*Stern* is unavailing."  (*Id*.)

At the outset, it should be stressed that the issue of consent with regard to this Court's

resolution of the fraudulent conveyance claims is not a real issue in this case.  There is authority

that a fraudulent conveyance action against a party who did *not* file a claim against the estate is a

non-core proceeding that the bankruptcy court cannot decide by final judgment; Defendants

---

[141] 28 U.S.C. § 157(b)(2)(H) designates as "core" matters, "proceedings to determine, avoid, or recover fraudulent conveyances."

160

repeatedly cite one such case in the Southern District of New York, where the Court said, "Where a 'trustee has brought a fraudulent conveyance action against a third party non-creditor of the estate, in order to recover assets allegedly belonging to the estate,' that action 'lies beyond the final adjudicative power of the Bankruptcy Court.'"  Def. Motion to Amend, Notification of Lack of Consent, dated March 2, 2012 at 6, quoting *Dev. Specialists, Inc. v. Orrick, Herrington & Sutliffe*,  LLP, No. 11 Civ. 6337 CM, 2011WL 6780600 at *2-3 (S.D.N.Y. Dec. 23, 2011).

However, Defendants are hardly "third party non-creditors of the estate."  The Supreme Court stated in *Stern* that the counterclaim filed by the estate there was non-core because it was unrelated to the proof of claim that the creditor, Marshall, had filed.  By contrast, where it is "not possible … to rule on [the creditor's] proof of claim without first resolving the fraudulent-transfer issue," the estate's claim against the creditor is a core matter.  *Stern v. Marshall*, 131 S. Ct. at 2616;  see also, *Onkyo Europe Electronics GMBH v. Global Technovations Inc. (In re Global Technovations Inc.)*, 694 F.3d 705, 722 (6th Cir. 2012), where the Court held it was "crystal clear that the bankruptcy court had constitutional jurisdiction under *Stern* to adjudicate whether the sale of GTI was a fraudulent transfer."  As the Ninth Circuit commented in *Executive Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553, 562 n. 7 (9th Cir. 2012), *cert. granted sub nom. Executive Benefits Ins. Agency v. Arkison*, 133 S. Ct. 2880 (2013), "it was 'crystal clear'" because of the creditor's filing of a proof of claim.

The Supreme Court in *Stern* did not question the continuing validity of its decisions in *Katchen v.Landy*, 382 U.S. 323 (1966), and *Langenkamp v. Culp*, 498 U.S. 42 (1990).  It quoted its decision in *Katchen* as stating, "'he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that procedure.'" *Stern*, 131 S. Ct. at 2616, quoting [382 U.S.] at 333-34, n. 9, and continued, "In *Katchen* one of

161

those consequences was resolution of the preference issue as part of the process of allowing or

disallowing claims, and accordingly there was no basis for the creditor to insist that the issue be

resolved by an Article III court." *Id*. The *Stern* majority quoted the Court's opinion in

*Langencamp* as explaining that "a preferential transfer claim can be heard in bankruptcy when

the allegedly favored creditor has filed a claim, because *then* 'the ensuing preference action by

the trustee become[s] integral to the restructuring of the debtor-creditor relationship.'" *Stern*,

131 S. Ct. at 2617, quoting *Lagencamp*, 498 U.S., at 44."[142]

In the instant case Defendants filed proofs of claim against the Debtors for damages they

now value in the billions of dollars. Among other things, they sought damages for the Debtors'

failure to abide by the terms of the spinoff generally, and the Master Separation Agreement in

particular, such as failure to assume the defense of environmental litigation allocated to Tronox.

When the Debtors failed to take formal action regarding the MSA, Defendants filed a motion to

compel the Debtors to assume or reject the MSA by a date certain. See Motion dated June 29,

2010 (Case No. 09-10156, Dkt. No. 1676). Defendants also asserted in their proofs of claim a

right of recovery against the Debtors under § 502(h) of the Bankruptcy Code for the entirety of

any judgment against them and reserved the right to file a § 502(h) claim in the event of an

adverse decision. Defendants' right to any recovery on their claims against the Debtors was also

at all times subject to § 502(d) of the Bankruptcy Code, which disallows the claim of any entity

"from which property is recoverable" under § 550 "or that is a transferee of a transfer avoidable

under" §§ 544 or 548, unless the transferee "has paid the amount" of its liability. Although the

parties were eventually able to agree on a treatment of Defendants' claims (other than its

§ 502(h) claim) that permitted Tronox to confirm a plan of reorganization without first resolving

---

[142] *Katchen* and *Langencamp* involved preference claims by the estate representative. The Supreme Court has not
treated preference and fraudulent conveyance claims differently in its Article III decisions. *See, e.g.*,
*Grandfinanciera S.A. v. Nordberg*, 492 U.S. 33 (1989).

this adversary proceeding, there was no question that "the process of adjudicating" Defendants'

proofs of claim required resolution of Plaintiffs' fraudulent conveyance and other claims against

the Defendants.

In any event, there is no substance to Defendants' argument that they only consented to

bankruptcy court adjudication because they could not contemplate a class of claims that was

statutorily core but beyond the bankruptcy judges' constitutional power to finally resolve.  At the

time they filed their Answer in June, 2011, the Ninth Circuit had held that a counterclaim to a

proof of claim might not be a "core" matter, even though it was defined as core in 28 U.S.C.

§ 157(b)(2)(C), and that a bankruptcy judge could not enter final judgment on the counterclaim.

*In re Marshall*, 600 F.3d 1037, 1057 (9th Cir. 2010).  The Supreme Court had granted *certiorari*,

131 S. Ct. 63 (Sept. 28, 2010), and a decision was expected imminently, before the end of the

term in June, 2011.[143]   If Marshall's lawyers could have preserved an Article III adjudication

issue, Defendants could have preserved the issue, if in fact there ever was an issue.  The issue

was not new:  in 1995 the Fifth Circuit held, based on the Supreme Court's decision in

*Grandfinanciera S.A. v. Nordberg*, 492 U.S. 33 (1989), that, absent the parties' consent,

bankruptcy courts lack authority to enter final judgment in fraudulent conveyance actions against

third-parties who have not filed proofs of claim.  *In re Texas Gen. Petroleum Corp.*, 52 F.3d

1330, 1337 (5th Cir. 1995).

---

[143] The decision in *Stern v. Marshall* was in fact issued on June 23, 2011, only 11 days after Defendants' answer was filed and within the 21-day period for filing amended answers in Bankruptcy Rule 7015, incorporating Fed. R. Civ. P. 15.  Within a day after *Stern* was decided, one of Defendants' law firms issued an article on its "Bankruptcy Blog" website discussing the implications of the decision.  *See* Ex. B to Plaintiffs' 4/2/2012 Opposition to Defendants' Motion.  This Court, in a hearing on an adversary proceeding in the *Tronox* case unrelated to the instant matter, stated that it would await the decision in *Stern v. Marshall* before proceeding with that litigation.  *See Tronox, Inc. v TRI Hamilton (In re Tronox, Inc.)*, Adv. Pro. No. 11-1288, Transcript of Hearing at 16, April 14, 2011 (Dkt. No. 27).  The issue there was unrelated to the issues in this proceeding; the point is that the pendency of the decision was well-known.

The Court is well aware of the recent Circuit Court cases that have been broadly construed to hold that consent may be insufficient to empower a bankruptcy judge to enter a final judgment against an entity that has not filed a claim against the estate. *See Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012); *Wellness Int'l. Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013); *Frazin v. Haynes & Boone L.L.P. (In re Frazin)*, 732 F.3d 313 (5th Cir. 2013); *In re BP RE, L.P.*, 735 F.3d 279 (5th Cir. 2013). The Supreme Court has before it on *certiorari* the Ninth Circuit's decision in *In re Bellingham Ins. Agency, Inc.*, which held to the contrary, and the Supreme Court's ruling will presumably clarify this issue. However, it is worth noting that none of the above cases involved defendants who had filed proofs of claim, and all involved one form or another of implied consent, based on the defendant's participation in litigation, default, or other form of action or inaction. In any event, the leading authority on implied consent in this Circuit remains *In re Men's Sportswear, Inc.*, 834 F.2d 1134, 1138 (2d Cir. 1987), where the Court held that the defendant impliedly consented to the bankruptcy court's adjudication of allegedly non-core claims. The Supreme Court has also held that parties may consent to adjudication of non-core issues by the bankruptcy court, including in *Stern* itself, 131 S. Ct. at 2606, 2607, where the Court acknowledged that "parties may consent to entry of [a] final judgment by [a] bankruptcy judge in [a] non-core case." (citing 28 U.S.C. § 157(c)(2)); *see also*, *Commodity Futures Trading Comm'n. v. Schor*, 478 U.S. 833, 849 (1986) (Schor "effectively agreed to an adjudication by the [Commodity Futures Trading Commission] of the entire controversy"); *Roell v. Withrow*, 538 U.S. 580, 586-87 (2003) (implied consent to adjudication by a magistrate judge).

Moreover, the law on consent in the other circuits is not as clear as the Defendants would have it. On September 6, 2013, the Seventh Circuit issued its opinion in *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir. 2013). It held that a waiver of the right to a decision by an

164

Article III court was enforceable, and that the Court's decision in *Wellness Int'l.*, issued only about two weeks before, had involved the issue of "forfeiture" rather than "waiver" or "a belated objection rather than unanimous consent." 729 F.3d at 746-47. The Circuit Court also stated the following about the effect of the defendant's filing of a proof of claim:

> The current dispute comes within a bankruptcy judge's authority, notwithstanding *Stern*, because all of the defendants submitted proofs of claim as the Funds' creditors and thus subjected themselves to preference-recovery and fraudulent-conveyance claims by the Trustee. *See* 11 U.S.C. § 502(d). The Supreme Court held in [*Katchen v. Landy* and *Langenkamp v. Culp*] that Article III authorizes bankruptcy judges to handle avoidance actions against claimants. *Stern* stated that its outcome is consistent with those decisions. [*Wellness Int'l*] likewise observes . . . that there is no constitutional problem when a bankruptcy judge adjudicates a trustee's avoidance actions against creditors who have submitted claims. The bankruptcy judge thus acted within her authority. . . .

*Peterson*, 729 F.3d at 747 (citations omitted).

The only claim of the Plaintiffs which might not be fully adjudicated in connection with Defendants' proof of claim is the claim of breach of fiduciary duty, which the Court has dismissed in any event. However, the fiduciary duty claim was unquestionably non-core before *Stern*, and it remains non-core today. Defendants' answer constituted unconditional consent to the entry of a final order by the bankruptcy court on the non-core fiduciary duty claim as well as the fraudulent conveyance claims. Defendants have never adequately explained why they did not knowingly and validly consent to this Court's adjudication of the non-core fiduciary duty claim, as to which there could be no confusion.

The Court thus concludes that it has authority to enter a final judgment in this adversary proceeding. If an appellate court should disagree, it is respectfully requested that this decision be deemed proposed findings of fact and conclusions of law for final entry by the District Court.

See Amended Standing Order of Reference of Chief Judge Loretta A. Preska, dated January 31, 2012 (Order M-431).

CONCLUSION

Defendants may have 30 days from the entry of this Opinion to file a proof of claim under § 502(h) of the Bankruptcy Code together with any supporting materials, as well as to brief the one open issue, namely, the dilutive effect of the damages assessed against Defendants on their § 502(h) claim.  Plaintiffs may have 30 days to respond to Defendants' proofs of claim and papers on this issue, as well as to settle a proposed judgment consistent with their position on the issue.  The judgment should provide for the relief granted in this decision and should also provide for dismissal of the Anadarko defendants, in accordance with the Court's decision prior to trial granting the Anadarko defendants summary judgment.[144]  If Plaintiffs wish to pursue their demand for attorneys' fees and costs, as set forth in the Amended Complaint and mentioned in Plaintiffs' briefs, they should file an application therefor at the same time as they file their other pleadings, with appropriate support and detail.  Defendants may have 30 days to reply, to settle a proposed counter-form of judgment and to respond to any demand of the Plaintiffs for attorneys' fees and costs.  If the parties wish to schedule argument on any of the remaining issues, they are free to do so.

Dated:  New York, New York
        December 12, 2013

                          /s/ **ALLAN L. GROPPER**
                          UNITED STATES BANKRUPTCY JUDGE

---

[144] The parties have disputed whether the dismissal of Anadarko should be with or without prejudice, Plaintiffs taking the position that the dismissal should be without prejudice because it might be discovered that Kerr-McGee had transferred assets to Anadarko subsequent to Anadarko's summary judgment motion (in order to avoid the judgment provided for herein).  See letters dated May 21 and 24, 2012, respectively.  There is no reason to engage in this type of speculation to deny Anadarko dismissal of the claims against it with prejudice, as Plaintiffs would undoubtedly be entitled to relief if Defendants engaged in such tactics.