Melanie Gray (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)
Jason W. Billeck (*admitted pro hac vice*)
WINSTON & STRAWN LLP
1111 Louisiana Street, 25th Floor
Houston, TX 77002-5242
Telephone:     (713) 651-2600
Facsimile:     (713) 651-2700

Gregory Silbert (GS 0033)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone:     (212) 310-8000
Facsimile:     (212) 310-8007

P. Sabin Willett (*admitted pro hac vice*)
Thomas R. Lotterman (*admitted pro hac vice*)
James J. Dragna (*admitted pro hac vice*)
BINGHAM MCCUTCHEN LLP
One Federal Street
Boston, MA 02110-1726
Telephone:     (617) 951-8000
Facsimile:     (617) 951-8736

Kenneth N. Klee (KK 5910)
David M. Stern (*admitted pro hac vice*)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Telephone:     (310) 407-4000
Facsimile:     (310) 407-9090

*Counsel to Defendants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 09-10156 (ALG) |
| TRONOX INCORPORATED, et al., | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| TRONOX INCORPORATED, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| KERR-MCGEE CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | Adv. Pro. No. 09-01198 (ALG) |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | **DEFENDANTS' SUPPLE-** |
| | ) | **MENTAL MEMORANDUM** |
| Plaintiff-Intervenor, | ) | **ON THEIR 502(h) CLAIM** |
| v. | ) | **AND OFFSET** |
| | ) | |
| TRONOX, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.      THE COURT'S OWN REMEDIAL FRAMEWORK DEFINES THE
        CONTOURS OF DEFENDANTS' 502(H) CLAIM AND OFFSET .............................. 3

II.     DILUTING THE MULTIPLIER WOULD CONTRADICT THE PLAN AND BE
        LEGALLY IMPROPER ................................................................................................ 5

        A.      Article IV.C.5 Of The Plan Does Not Authorize The Court To Apply A
                Diluted Multiplier .............................................................................................. 5

        B.      No Other Provision Of The Plan Authorizes Dilution; In Fact, Dilution Is
                Contrary To The Plan As A Whole .................................................................... 7

        C.      Dilution Is Contrary To The Typical Approach To 502(h) Claims ...................... 8

        D.      Diluting The Multiplier Would Violate Governing Remedial Principles............. 10

III.    THE COURT SHOULD CORRECT TWO ELEMENTS OF THE PROPOSED
        OFFSET CALCULATION TO ENSURE CONSISTENCY WITH THE
        COURT'S REMEDIAL FRAMEWORK, LEGAL HOLDINGS, AND
        FINDINGS OF FACT ................................................................................................ 11

        A.      Use Of Plaintiffs' Unproved $4 Billion Estimate Is Inconsistent With The
                Court's Remedial Framework And Findings Of Fact ......................................... 11

        B.      The Terms Of The Plan Require Using The Actual "Percentage Recovery
                To Allowed Class 3 Claims" As A Multiplier, Not A Pre-Confirmation
                Estimate ........................................................................................................... 17

CONCLUSION .................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

*Awal Bank, BSC v. HSBC Bank USA* (*In re Awal Bank, BSC*),
  455 B.R. 73 (Bankr. S.D.N.Y. 2011)..................................................................................4

*Begier v. IRS*,
  496 U.S. 53 (1990)..........................................................................................................4

*Charter Asset Corp. v. Victory Mkts., Inc.* (*In re Victory Mkts., Inc.*),
  221 B.R. 298 (B.A.P. 2d Cir. 1998)..................................................................................5

*Duffy v. Futter* (*In re Futter Lumber Corp.*),
  Nos. 09-73291-478, ADV 11-9055-478, 2011 WL 5417094 (Bankr. E.D.N.Y. Nov. 8,
  2011) ...............................................................................................................................15

*First Trust & Deposit Co. v. Receiver of Salt Springs Nat'l Bank* (*In re Onondaga
  Litholite Co.*),
  218 F.2d 671 (2d Cir. 1955)..............................................................................................4

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*,
  547 U.S. 651 (2006)..........................................................................................................4

*In re Best Prods., Co.*,
  168 B.R. 35 (Bankr. S.D.N.Y. 1994).................................................................................3

*In re CNB Int'l, Inc.*,
  393 B.R. 306 (Bankr. W.D.N.Y. 2008) ...........................................................................16

*In re Dreier LLP*,
  No. 08-15051, 2012 WL 4867376 (Bankr. S.D.N.Y. Oct. 12, 2012) ..............................3

*In re Mid Atlantic Fund, Inc.*,
  60 B.R. 604 (Bankr. S.D.N.Y. 1986).................................................................................4

*In re SemCrude, L.P.*,
  399 B.R. 388 (Bankr. D. Del. 2009) .................................................................................4

*Keppel v. Tiffin Sav. Bank*,
  197 U.S. 356 (1905)...........................................................................................................3

*Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life
  Ins. Co.* (*In re Quebecor World (USA) Inc.*),
  453 B.R. 201 (Bankr. S.D.N.Y. 2011)..............................................................................9

*Page v. Rogers*,
  211 U.S. 575 (1909)...........................................................................................................9

*Tronox, Inc. v. Anadarko Petroleum Corp.* (*In re Tronox Inc.*),
    464 B.R. 606 (Bankr. S.D.N.Y. 2012) .................................................................................3

*Tronox, Inc. v. Kerr-McGee Corp.*,
    No. 09-1198, Slip Op. (Bankr. S.D.N.Y. Dec. 12, 2013) .........................................................1

*United Student Aid Funds, Inc. v. Espinosa*,
    559 U.S. 260 (2010).................................................................................................................5

STATUTES

11 U.S.C. § 502(d) .................................................................................................................9

11 U.S.C. § 502(h) .............................................................................................................4, 15

OTHER AUTHORITIES

3 COLLIER ON BANKRUPTCY ¶ 57.19 (14th ed. 1977) ....................................................4

4 COLLIER ON BANKRUPTCY ¶ 502.09 § 502(h) (15th ed. 1996) ...................................4

G. Glenn, FRAUDULENT CONVEYANCES & PREFERENCES § 260(a) (1940)....................................4

## INTRODUCTION

In its December 12, 2013 Memorandum of Opinion, After Trial (the "Opinion") in this Adversary Proceeding, the Court concluded "that the Defendants must respond in damages, but not at the level demanded by the Plaintiffs." *Tronox, Inc. v. Kerr-McGee Corp.*, Adv. Proc. No. 09-1198, slip op. at 4 (Bankr. S.D.N.Y. Dec. 12, 2013) (the "Slip Op."). Defendants, the Court held, may file a claim under Section 502(h) of the Bankruptcy Code, which Article IV.C.5 of Tronox's confirmed Plan of Reorganization (the "Plan") treats as an offset against any judgment in this Adversary Proceeding. *See id.* at 137–138; *see also* DX 2568 at Art. IV.C.5.

The Court provisionally outlined three steps to calculate Defendants' 502(h) claim and offset. First, it started with the net value, as of November 2005, of the transferred oil and gas exploration and production assets—$14.459 billion, as the Court found Plaintiffs proved. *See id.* at 135. Second, the Court subtracted $4 billion, an estimate of the amount of legacy environmental and tort liabilities as of 2010, which was included in Tronox's 2010 Disclosure Statement. *See id.* at 146–147; *see also* DX 2522 at 79, 83 (the "Disclosure Statement"). The remaining $10.459 billion is, in the Court's view, the "residual value" to which Defendants are entitled under Section 502(h). *See* Slip Op. at 143, 146–147. Third, to calculate Defendants' offset, the Court noted that the Plan provides that Defendants' 502(h) claim must be multiplied by the "the percentage recovery to Allowed Class 3 General Unsecured Claims." *Id.* at 145. The Court suggested that the multiplier could be the mean estimated percentage recovery for Class 3 creditors participating in the rights offering (89%), or a hypothetical percentage recovery that swamps Class 3 with Defendants' 502(h) claim and thereby dilutes the multiplier to almost nothing (2.8%). *See id.* at 147–149.

The Court directed the parties to address its proposed calculation, particularly the multiplier. *See id.* at 166. While Defendants strenuously disagree with the majority of the Court's Opinion,

this supplemental memorandum does not seek reconsideration, review, or reversal of the Court's findings of fact and conclusions of law. Rather, for the limited purposes of this brief, Defendants accept the Court's findings and conclusions, and, in compliance with the Court's request for briefing, Defendants address the narrow issue of dilution and the amount of their Section 502(h) claim. Defendants expressly reserve and preserve *all* of their arguments and rights of review, as well as their ability to object to and appeal the Court's findings of fact and conclusions of law.

This supplemental memorandum explains how the Court's findings of fact and the principles inherent in the Court's remedial framework bear upon the calculation of Defendants' 502(h) claim and resulting offset. Part I of the memorandum briefly reviews four overarching remedial principles the Court adopted in its Opinion. Part II explains how those principles direct the Court to reject the diluted multiplier. By its plain meaning, Article IV.C.5 of the Plan does not require, authorize, or give discretion to the Court to dilute; indeed, dilution is fundamentally inconsistent with the Plan as a whole, the law, and all the governing remedial principles.

Finally, Part III addresses two aspects of the Court's proposed calculation that are inconsistent with the Court's findings of fact and the overarching remedial principles. First, in calculating Defendants' 502(h) claim, the Court should use its own findings of the actual amount of the liabilities of the Debtors (Tronox, Inc. and its affiliates) as of the time that the Court held the transfers occurred, rather than use Plaintiffs' post-petition $4 billion estimate of the legacy liabilities. Second, the plain meaning of Article IV.C.5 of the Plan requires multiplying Defendants' 502(h) claim by the actual percentage recovery of creditors with allowed Class 3 general unsecured claims, not by the 89% multiplier. The memorandum concludes with a table (Table 5) that, in summary, shows how to calculate Defendants' 502(h) claim and offset.

## ARGUMENT

**I.    THE COURT'S OWN REMEDIAL FRAMEWORK DEFINES THE CONTOURS OF DEFENDANTS' 502(h) CLAIM AND OFFSET.**

The remedial framework the Court adopted is built upon four interrelated legal and equitable principles.  They apply at each step of the analysis and calculation of Defendants' 502(h) claim and offset, including the question of whether to dilute the multiplier.

The first principle is restoration.  The primary goal of fraudulent-transfer law and Section 502(h), the Court explained, is to restore parties to the positions they occupied just before the transfer that is avoided.  *See* Slip Op. at 138–139, 142–143; *see also In re Dreier LLP*, No. 08-15051, 2012 WL 4867376, at *3 (Bankr. S.D.N.Y. Oct. 12, 2012) ("Section 502(h) is based on the principle of fraudulent transfer law that the return of a fraudulent transfer restores the parties to the *status quo*."); *In re Best Prods., Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994).  Section 502(h) is "based on a type of 'restorative principle,'" so "that when a fraudulent transfer is avoided, the parties are restored to their previous positions."  Slip Op. at 143 (citations and internal quotations omitted).  In this case, because the Court held that the transfers effectively occurred on November 28, 2005, *id.* at 120, 134, and because Defendants owned the Debtors at that time, *id.* at 81–82, 143, the Court ruled that, "if the parties are to be restored to the positions they held before the transfers, Defendants would be entitled to the residual value of the E&P assets after their debts, including the legacy liabilities, were paid in full," *id.* at 143.

The second principle is a corollary to restoration:  bankruptcy courts restoring the status quo may not inflict penalties not imposed by the law.  *See Keppel v. Tiffin Sav. Bank*, 197 U.S. 356, 363 (1905).  "[T]he purpose of fraudulent conveyance law is remedial rather than punitive." *Tronox, Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 464 B.R. 606, 618 (Bankr.

S.D.N.Y. 2012); *see* G. Glenn, FRAUDULENT CONVEYANCES & PREFERENCES § 260(a), at 446–447 (1940).  Section 502(h) is not punitive.  *See First Trust & Deposit Co. v. Receiver of Salt Springs Nat'l Bank* (*In re Onondaga Litholite Co.*), 218 F.2d 671, 673 (2d Cir. 1955); 4 COLLIER ON BANKRUPTCY ¶ 502.09 (15th ed. 1996)  As the Court held, even a defendant who commits an intentional fraudulent transfer may bring a 502(h) claim, and the claim is evaluated independent of the conduct leading to the avoidance.  *See* Slip Op. at 139–140.

The third principle is equal treatment of similarly situated creditors.  It is "[o]ne of the primary goals—if not *the* primary goal—of the Code."  *In re SemCrude, L.P.*, 399 B.R. 388, 399 (Bankr. D. Del. 2009) (emphasis added); *see Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006); *Begier v. IRS*, 496 U.S. 53, 58 (1990).  "[E]quality of distribution" is the "purpose of avoidance actions."  *Awal Bank, BSC v. HSBC Bank USA* (*In re Awal Bank, BSC*), 455 B.R. 73, 90 (Bankr. S.D.N.Y. 2011) (citing *Begier*, 496 U.S. at 54).  And the principle of equality undergirds Section 502(h) as well.  No matter when a fraudulent transfer is avoided, Section 502(h) requires treating a claim "arising from the recovery of property" as if the claim arose before the bankruptcy petition was filed.  *See* 11 U.S.C. § 502(h); *see also* 4 COLLIER ON BANKRUPTCY ¶ 502.09.  Section 502(h) facilitates equal treatment among *all* similarly situated creditors—the fraudulent-transfer defendant with a belated claim against the estate as well as those who took recoveries before the adjudication of the fraudulent-transfer claim.  A fraudulent-transfer defendant's right to bring a 502(h) claim would be hollow if he or she could not partake in the estate to the same extent as others.  *See generally In re Mid Atlantic Fund, Inc.*, 60 B.R. 604, 609 (Bankr. S.D.N.Y. 1986) ("The Act evidences a natural desire to restore the equality of a distribution disturbed by the illicit preference, transfer, etc.") (quotations and citations omitted) (quoting 3 COLLIER ON BANKRUPTCY ¶ 57.19 (14th ed. 1977)).

Finally, the fourth principle the Court noted is that the plain meaning of a confirmed plan controls.  *See* Slip Op. at 143; *see also United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010); *Charter Asset Corp. v. Victory Mkts., Inc.* (*In re Victory Mkts., Inc.*), 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998) ("As with any contract, the starting point for review of a plan is its plain language.").  Where an inequitable result is *not* compelled by the plain meaning of a confirmed plan, the Court must not interpret the plan or exercise discretion to reach an inequitable result.  Instead, the Court must adhere to the background principles—restoring the status quo, treating similar creditors equally, and not punishing parties.

## II.    DILUTING THE MULTIPLIER WOULD CONTRADICT THE PLAN AND BE LEGALLY IMPROPER.

Article IV.C.5 of the Plan gives Defendants an offset in this Adversary Proceeding equal to the amount of their 502(h) claim "multiplied by the percentage recovery to Allowed Class 3 General Unsecured Claims," subject to the reserved issue of whether that percentage recovery may be diluted by the inclusion of Defendants' 502(h) Claim in the Class 3 claims pool. DX 2568 at Art. IV.C.5.  For the following reasons, dilution is legally improper.

### A.    Article IV.C.5 Of The Plan Does Not Authorize The Court To Apply A Diluted Multiplier.

Defendants first address a threshold matter concerning the proper interpretation of the Plan.  Article IV.C.5, which memorializes the parties' agreement with respect to Defendants' 502(h) claim, provides as follows:

> Notwithstanding any contrary provision contained herein or in any documents executed in connection herewith (including the Anadarko Litigation Trust Agreement), if the Anadarko Section 502(h) Claim is Allowed, Anadarko will be entitled to discount and/or otherwise reduce any judgment in the Anadarko Litigation by the amount of any Allowed Anadarko Section 502(h) Claim multiplied by the percentage recovery to Allowed Class 3 General Unsecured Claims (which percentage recovery may or may not be computed on a claims base including such Allowed Anadarko Section 502(h) Claim) and Anadarko shall be obligated to pay only

the reduced amount of such judgment, provided, however, that the per-centage by which any such Allowed Anadarko Section 502(h) Claim may be multiplied shall be determined by the Bankruptcy Court and the parties reserve their rights with respect to the extent of the dilutive effect of the Allowed Anadarko Section 502(h) Claim on Anadarko's ability to reduce any judgment in the Anadarko Litigation. Anadarko has agreed that the foregoing discount or reduction in amount payable with respect to any judgment in the Anadarko Litigation shall be its sole and exclusive reme-dy on account of any Allowed Anadarko Section 502(h) Claim and that it shall have no recourse against Tronox or Reorganized Tronox on account of such Anadarko 502(h) Claim.

In short, Article IV.C.5 provides that the parties agreed that Anadarko's claim would be entitled to the same percentage recovery as claims of Allowed Class 3 creditors, "(which per-centage recovery may or may not be computed on a claims base including such…Claim)" and which percentage "shall be determined by the Bankruptcy Court and the parties reserve their rights with respect [there]to." While the Opinion refers to "discretion on this particular question," Slip Op. at 148, and suggests that the Court might elect to calculate "the percentage recovery" either with or without Defendants' 502(h) claim added to the Class 3 "claims base," the Plan does not permit the Court to exercise discretion contrary to clear legal authority.

Defendants did not authorize the Court to dilute the multiplier and did not agree that dilu-tion ever would be appropriate. Rather, the parenthetical clause and the reservation of rights in Article IV.C.5 together reflect the parties' disagreement over dilution. Some thought it may be legally appropriate to dilute the multiplier; others (namely, Defendants) thought it may not be legally appropriate to dilute the multiplier, and both sides reserved their rights with respect to the issue. The fact that the parties noted their opposing viewpoints in one portion of a sentence and then "reserv[ed] their rights" to later argue about those opposing viewpoints in an ensuing "pro-vided however" clause of the sentence, does not suggest that they either agreed to dilution or agreed to permit the Court to make the dilution determination unbounded by legal authority.

Any other construction would contradict the plain language of the Plan and the principle that all determinations made by the Court must be made by reference to applicable law.

Article IV.C.5 cannot be read as conferring authority on the Court to select between the actual percentage recovery of Class 3 and the entirely hypothetical dilutive option. The only option the parties agreed upon in Article IV.C.5 was that the multiplier would be "*the* percentage recovery" for Class 3. Whether that multiplier could be diluted was reserved and is addressed below.

**B.    No Other Provision Of The Plan Authorizes Dilution; In Fact, Dilution Is Contrary To The Plan As A Whole.**

Resolving the reserved dispute over dilution is a straightforward task of interpreting and applying the Plan and governing legal and remedial principles. Defendants' 502(h) claim cannot be included in the Class 3 general unsecured creditors' "claims base"—even hypothetically— because the Plan expressly excludes the claim from Class 3. As defined by the Plan, Class 3 "consists of all General Unsecured Claims." DX 2568 at 111. The Plan, in turn, defines "General Unsecured Claims" as "any Unsecured Claim (including the Unsecured Notes Claim) *that is not … the Anadarko Section 502(h) Claim*." *Id.* at 99 (emphasis added). In accordance with the plain language of the Plan, "the percentage recovery" that Class 3 creditors actually received cannot be calculated by adding Defendants' 502(h) claim to the Class 3 claims base. A class's "percentage recovery" cannot logically or reasonably be calculated by reference to a claim that is not part of that class.

This result accords with the Plan's history. In 2010, it was clear that this Adversary Proceeding would not be resolved before Plan confirmation. Creditor constituencies wanted to separate the legacy liabilities from the enterprise value of reorganized Tronox's titanium dioxide business, so they assigned the recovery from the Adversary Proceeding to environmental and tort

creditors (Classes 4 and 5) and the reorganized business to the general unsecured creditors (Class 3). If Defendants' 502(h) claim had been classified as a general unsecured claim, a huge portion of Class 3's equity in the business would have to have been reserved to await the end of the Adversary Proceeding and Defendants' resulting 502(h) claim. None of the other creditors wanted that; they wanted their recovery in reorganized Tronox's shares that they could convert to cash immediately. So the parties—including Defendants and environmental and tort creditors—compromised. The 502(h) claim was excluded from Class 3, and Classes 4 and 5 received the benefits *and burdens* of the Adversary Proceeding. However, to ensure that Defendants fared no better and no worse than Class 3 creditors, the Plan weighted Defendants' offset right by "the percentage recovery" of Class 3. This, too, was logical because "the percentage recovery" of Class 3 certainly would be known upon the Plan's Effective Date. Applying Class 3's percentage recovery therefore gave predictability and certainty and achieved equality among similarly situated creditors.

Equality between Defendants and Class 3 general unsecured creditors is the manifest purpose of weighting Defendants' 502(h) claim by Class 3's "percentage recovery." Yet, diluting the multiplier makes equality impossible. Before the Plan's Effective Date, the Debtors estimated that Class 3 general unsecured creditors participating in the rights offering would receive anywhere from 78% to 100% of their claims. On the Plan's Effective Date, they actually received far more because Tronox's stock proved to be worth far more than the estimates the Debtors gave the Court. Interpreting the Plan to authorize the Court to dilute the multiplier and award Defendants just 2.8% of their 502(h) claim would result in a massive inequality.

### C.    Dilution Is Contrary To The Typical Approach To 502(h) Claims.

Like a horse and cart, an avoidance judgment and a 502(h) claim arising from it normally travel together. A defendant who pays an avoidance judgment normally gets a 502(h) claim

against the same pool of assets as similarly situated creditors, and that pool normally includes what is recovered as a result of the judgment. The cart follows the horse. *See Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 453 B.R. 201, 204 (Bankr. S.D.N.Y. 2011); *see also Page v. Rogers*, 211 U.S. 575, 581 (1909) (granting an offset to an avoidance defendant because he was entitled to share in the recovery); *cf.* 11 U.S.C. § 502(d) (a fraudulent-transfer defendant may participate in the estate upon surrendering the transferred assets). The avoidance judgment goes into the numerator along with other assets available to the class, and the 502(h) claim goes into the denominator along with the claims of creditors participating in the class. The "percentage recovery" normally is the product of that calculation.

Diluting the multiplier would separate the cart from the horse, sending the entire avoidance judgment to Classes 4 and 5 and the 502(h) claim to Class 3. The result would be perverse: As the 502(h) claim *increases*, the multiplier *decreases*, leaving Defendants with smaller and smaller portions of their 502(h) claim. The Court should not impose this atypical approach to 502(h) claims or the unfairness and inequality it would generate. Accordingly, the typical approach should prevail if, contrary to Defendants' arguments, the Court hypothetically treated Defendants' 502(h) claim as a Class 3 claim: The Court would have to add the value of the 502(h) claim to the hypothetical denominator and add the avoidance judgment to the hypothetical numerator. Using the Court's numbers for the Class 3 creditors who did not participate in the rights offering, *see* Slip Op. at 147 n. 127, the multiplier would not *reduce* Defendants' 502(h) claim, but *increase* it. *See* Table 1.[1]

---

[1] Defendants, the Court held, are "entitled to receive the economic benefit" as if they had participated in the offering. Slip Op. at 147–148.



**D.      Diluting The Multiplier Would Violate Governing Remedial Principles.**

Even if Article IV.C.5 enabled the Court to dilute the multiplier, the Court would clearly

err and abuse its discretion by diluting the multiplier to 2.8% and awarding Plaintiffs over $14

billion.  As the Court stressed, creditors should not "receive[] more than 100% of the value of

their claims," particularly when the excess comes out of other creditors' pockets.  Slip. Op. at

149.  Plaintiffs would be substantially overpaid with either judgment the Court suggested ($5.1

billion or $14.4 billion); even their own unproven estimate of legacy liabilities as of 2010 was $4

billion.[2]

Diluting the multiplier and awarding Plaintiffs an unprecedented overpayment would be

contrary to the Court's own remedial principles.  For Defendants to retain the amounts above

what is necessary to satisfy Plaintiffs' liabilities would restore the pre-transfer status quo.  To

dilute the multiplier and give that sum to Plaintiffs would punish Defendants and provide a wind-

---

[2] It is unclear from the language of the Disclosure Statement whether Plaintiffs valued the legacy liabilities as of 2009 or 2010.  It suggests Plaintiffs valued the legacy liabilities as of 2010, which Defendants assume for purposes of this brief.  *See* DX 2522 at 79 n. 7, 83 nn. 10, 11 (basing evaluations on tort claims "to date" and on "future clean-up costs from 2010").

-10-

fall to Plaintiffs. Defendants know of no authority for using Section 502(h) to accomplish a result so profoundly unjust.

III.    **THE COURT SHOULD CORRECT TWO ELEMENTS OF THE PROPOSED OFFSET CALCULATION TO ENSURE CONSISTENCY WITH THE COURT'S REMEDIAL FRAMEWORK, LEGAL HOLDINGS, AND FINDINGS OF FACT.**

Two aspects of the proposed calculation of Defendants' 502(h) claim and offset are inconsistent with the Court's findings and holdings. While Defendants' broader challenges to the Opinion are for another day, the Court can and now should adjust those two aspects of the proposal to bring them in line with its own remedial framework, legal holdings, and findings of fact.

A.    **Use Of Plaintiffs' Unproved $4 Billion Estimate Is Inconsistent With The Court's Remedial Framework And Findings Of Fact.**

To restore the pre-transfer status quo, the Court accepted that it must place the parties in the positions they would have been in had the transfers never happened. *See* Slip Op. at 141, 143. The E&P Assets, therefore, would have remained with the Debtors and been used to pay off their debts. The value above what the Debtors needed to pay their debts would have flowed back to Defendants because they owned the Debtors at the time of the transfers. As the Court put it, Defendants would have been "entitled to the residual value of the E&P assets after their debts, including the legacy liabilities, were paid in full." *Id*. at 143. The Court held that Defendants' 502(h) claim should equal that "residual value." *Id.*

The Court held that the transfers occurred on November 28, 2005 and adopted Plaintiffs' expert evidence that the Debtors transferred $14.459 billion of E&P Assets as of that date. *See* Slip Op. at 81–82, 134–135. $14.459 billion, under the Court's findings, is the amount that would have remained with the Debtors had the transfers never happened. From that amount, the Court proposed subtracting $4 billion, on the assumption that $4 billion was the value of the legacy liabilities at the time of the 2005 transfers. *See id.* at 146–147. Although $4 billion was the

midpoint of Plaintiffs' own post-petition estimates of the legacy liabilities as of 2010, the Court

reasoned that Plaintiffs had "not contended that it changed substantially from 2005." *Id.* at 147

n. 126. Table 2 sets out the Court's calculation.

| Table 2 | |
| --- | --- |
| **Calculation of 502(h) Claim Using Disclosure Statement Estimates** | |
| Principal judgment amount (net value of property transferred in 2002 and 2005) | $14.459 billion |
| *Less* estimated 2010 value of legacy liabilities | $4 billion |
| **Value of 502(h) claim** | **$10.459 billion** |

Using the post-petition estimate as a proxy for the actual amount of the 2005 legacy lia-

bilities contradicts the Court's own findings of fact. The Court found that the net present value

of the legacy liabilities on November 28, 2005 was $1.757 billion. *See* Slip Op. at 111; *see also*

*id.* at 114 (valuing net legacy liabilities, after insurance rights and other related assets, at $1.27

billion). That is less than half of the post-petition estimate. If the Court were to reconcile its

proposed calculation of Defendants' 502(h) claim with the Court's findings of fact, Defendants'

502(h) claim should be quantified at $12.702 billion, which is $14.459 billion less $1.757 billion.

*See* Table 3.

| Table 3 | |
| --- | --- |
| **Calculation of 502(h) Claim**<br>**Using Court's Findings of Gross Legacy Liability Value** | |
| Principal judgment amount<br>(net value of property transferred in 2002 and 2005) | $14.459 billion |
| *Less* value of legacy liabilities | $1.757 billion |
| **Value of 502(h) claim** | **$12.702 billion** |

Yet that reconciliation would not, by itself, bring the Court's calculation of Defendants'
502(h) claim fully in line with the Court's remedial framework.  The Court correctly noted that
Defendants' 502(h) claim is for the 2005 "residual value of the E&P assets *after their debts, in-
cluding the legacy liabilities*, were paid in full."  Slip Op. at 143 (emphasis added).  Defendants'
502(h) claim, then, is not simply the difference between the value of the E&P Assets and the leg-
acy liabilities, all measured as of 2005.  Instead, to calculate the "residual value" to which De-
fendants are entitled, the Court must consider all of the 2005 debts (not just the legacy liabilities),
as well as all of the assets that were available to pay off the debts.

The Court found those facts as well.  It found that, just before the transfers in 2005, the
Debtors had $1.223 billion in assets on hand.  *See* Slip Op. at 120.  Those assets were mainly
comprised of Tronox's titanium dioxide business, but included other assets as well.  *See id.* at
114, 120.  Upon avoidance of the transfers under the Court's Opinion, E&P Assets worth
$14.459 billion would be restored to the Debtors and added to that $1.223 billion, for assets to-
taling $15.682 billion as of 2005.  Defendants' 502(h) claim, then, is for the portion of that

$15.682 billion that would have flowed to them as the Debtors' ultimate shareholders after satis-fying all of the 2005 debts. *See id.* at 143. Those debts included more than the legacy liabilities: The Court found that the net present value of the Debtors' liabilities totaled $2.073 billion in 2005, $1.757 billion of which was the legacy liabilities. *See id.* at 120. At the time of the trans-fers, then, the difference between *all* of the assets and *all* of the liabilities was $850 million, ac-cording to the Court. *Id.* $850 million would have satisfied all of the Debtors' creditors in 2005; $850 million was, in other words, the net creditor shortfall.

To be true to the Court's remedial framework and restore the parties to their pre-transfer positions, Defendants have a claim for the excess after the E&P Assets and the Debtors' other assets together are applied to all liabilities, including, but not limited to, the legacy liabilities—all measured as of 2005. Upon restoration, all value above $850 million (the "residual value") would have gone to Defendants. Using the facts found by the Court, Defendants' 502(h) claim should be calculated as $14.459 billion less $850 million, or $13.609 billion. *See* Table 4.

### Table 4

| Calculation of 502(h) Claim Using Court's Findings of Net Creditor Shortfall | |
| --- | --- |
| Principal judgment amount (net value of property transferred in 2002 and 2005) | $14.459 billion |
| *Less* net creditor shortfall | $850 million |
| **Value of 502(h) claim** | **$13.609 billion** |

Plaintiffs might embrace mismatching the $14.459 billion finding with their own $4 billion unproven, post-petition estimate.  But fraudulent-transfer law and the restoration principle require matching both values as of the date of the transfers.  So does Section 502(h), which reflects the governing remedial principles and requires the Court to treat Defendants' 502(h) claim "as if such claim had arisen before the date of the filing of the petition."  11 U.S.C. § 502(h).  Because post-petition values are, by definition, not from "before the date of the filing of the petition," they have no bearing here.  Just as the Court's proposed calculation uses the 2005 value of the E&P Assets that the Court found Plaintiffs proved at trial, the Court should use the 2005 value of the legacy liabilities that the Court found Plaintiffs proved at trial.

There are compelling reasons not to use the midpoint of Plaintiffs' post-petition estimates to calculate Defendants' 502(h) claim.  *Cf.* Slip Op. at 146 ("*If we accept* Plaintiffs' valuation of the legacy liabilities for purposes of confirmation of the plan as $4 billion ….") (emphasis added).  Plaintiffs never offered to prove their estimates at trial, and unproved assertions in a disclosure statement are not binding in adversary proceedings.  *See Duffy v. Futter* (*In re Futter Lumber Corp.*), Nos. 09-73291-478, ADV 11-9055-478, 2011 WL 5417094, at *6 (Bankr. E.D.N.Y. Nov. 8, 2011).  Defendants expressly objected to the Disclosure Statement, including the estimates.  *See, e.g.*, Objection of Anadarko Petroleum Corporation and Kerr-McGee Corporation to the Disclosure Statement Regarding the Joint Plan of Reorganization of Tronox Incorporated, et al. (Docket No. 1822) at ¶¶ 3, 34.  In fact, the estimates themselves are replete with disclaimers.  *See* DX 2522 at 79, 82–83 & nn. 7, 10, & 11 (noting the estimates are not binding on any party and are subject to change).  Had the parties intended that Defendants' 502(h) claim and their offset be calculated using Plaintiffs' unproved estimates, the Plan would have been drafted differ-

ently; Article IV.C.5 would have mentioned a specific estimated percentage recovery, since the estimates existed at that time.

Plaintiffs may contend that a judgment of $850 million or $1.757 billion will under-compensate them, speculating that their claims are worth more than either figure. But Plaintiffs, too, are governed by the Plan. The Plan gave Plaintiffs $270 million in cash, as well as other assets and a fraudulent-transfer claim subject to an offset. *See* DX 2522 at 83. The latter is based on principles of fraudulent-transfer law and values as of the transfers' effective date, not the estimated amount of their creditor claims. Any argument against using the Court's findings for the value of legacy liabilities as of 2005 ($1.757 billion) or the net creditor shortfall ($850 million) would violate the principle of restoring the pre-transfer status quo.

It also would ignore other relief Plaintiffs might seek. For instance, Defendants expect Plaintiffs to seek prejudgment interest in this case. In an appropriate case, a judgment might be expanded by prejudgment interest, which takes into account the time value of money. *See In re CNB Int'l, Inc.*, 393 B.R. 306, 335–336 (Bankr. W.D.N.Y. 2008). The Court should not shrink Defendants' offset to address concerns that other doctrines of law address more directly.

There is no admissible evidence in the record on the amount of the legacy liabilities on any date other than the transfer date found by the Court. Plaintiffs did not offer evidence of the liabilities' amount as of 2010. If the Court concluded that the 2010 amount of the legacy liabilities were legally relevant to calculating the 2005 "residual value" upon which Defendants' 502(h) claim is founded, fairness would require that Defendants be afforded an evidentiary hearing—likely costly and long—to address that question. Fortunately, the Court's remedial framework is focused on the 2005 pre-transfer status quo, and the Court specifically found the 2005 amount of the liabilities, as well as the net creditor shortfall at that time.

**B.    The Terms Of The Plan Require Using The <u>Actual</u> "Percentage Recovery To Allowed Class 3 Claims" As A Multiplier, Not A Pre-Confirmation Estimate.**

The Court's proposed calculation of Defendants' offset multiplies Defendants' 502(h) claim by 89%. Slip Op. at 148. The Court derived that multiplier from the Disclosure Statement, where Plaintiffs projected a range of recoveries between 78% and 100% for Class 3 general unsecured creditors participating in the rights offering. *See* DX 2522 at 82. Resting on that projection, the Court posited that the "percentage recovery" mentioned in Article IV.C.5 is the "mean percentage recovery" projected in the Disclosure Statement—that is, the midpoint of the estimated range. Slip Op. at 148.

Using the Disclosure Statement's estimate here would contradict the text of the Plan. Article IV.C.5 does not say that Defendants are entitled to an *estimated* "percentage recovery," nor does it even refer to the Disclosure Statement. It directs that the Defendants' 502(h) claim be multiplied by "*the* percentage recovery." Use of the singular definite article "the" can mean only the *actual* recovery realized by Class 3 general unsecured creditors. At the time of the Disclosure Statement, the confirmation hearing, and the Court's confirmation order, no single percentage recovery had occurred, and the Disclosure Statement predicted a range of recoveries. Some Class 3 general unsecured creditors might have anticipated recovering at the low end of the range; others might have anticipated more. But whatever they might have believed before the Plan's Effective Date, they all received identical pro rata shares on the Effective Date. Only then did they all receive a single, uniform "percentage recovery." *See* DX 2568 at 111. That actual percentage recovery is "*the* percentage recovery" mentioned in the Plan.

Since the estimates were known when Article IV.C.5 was drafted, the parties could have mentioned the Disclosure Statement, its estimated range, or any value from the range in Article IV.C.5 had they wanted an estimate to be binding. But they did not. "The percentage recovery"

-17-

was not identified by number in the Plan, nor could it have been.  The Plan necessarily was drafted before its Effective Date, and because the distribution was to be in new equity, the value of the distribution and the resultant "percentage recovery" could not be known until the Effective Date.  The parties understood this, so they agreed that the Court would "determine" the percentage recovery later on, when and if Plaintiffs prevailed and Defendants sought their offset, assuming the parties then disagreed about what Class 3 general unsecured creditors actually obtained on the Plan's Effective Date.

The Court expressed concern that using Class 3's actual percentage would be tantamount to revising the Plan in light of later events, *see* Slip Op. at 150, but applying the Plan according to its terms does not revise it.  Class 3's percentage recovery on the Effective Date is not "subsequent information," *id.* at 150 n. 130, and calculating "the percentage recovery" as of the Effective Date is not the same thing as calculating it as of days, weeks, months, or years later.  The distribution to Class 3 occurred at the instant the Plan became effective and could be valued for the first time only upon the Effective Date.  Indeed, the Plan was not legally effective before then.  The Plan provides that it is "null and void" before the Effective Date and that nothing in the Plan or the Disclosure Statement shall "constitute an admission, acknowledgment, offer or undertaking by Tronox, any Holders or any other Entity in any respect" until the Effective Date.  DX 2568 at Art.IX.D.

On the Effective Date, the total actual percentage recovery for holders of allowed Class 3 general unsecured creditors was 337%.  *See* Def. FOF ¶¶ 2775–2779 (calculating Class 3's percentage recovery in light of the S-1's numbers); *see also* Tronox Ltd. Form S-1 Registration Statement (DX 8968) at 338 (noting that Tronox common stock had a weighted-average fair value of $122.50 per share on the Effective Date).  The Court rejected this figure in its Opinion,

-18-

writing that "these recoveries could not have been anticipated at the *time of confirmation*." Slip Op. at 149 (emphasis added). The textual question under Article IV.C.5, however, is not what could have been anticipated when the Court confirmed the Plan, but what "the percentage recovery" actually was. That recovery occurred only on the Effective Date.

Other difficulties arise from using the midpoint of the Disclosure Statement range as the multiplier. The Disclosure Statement does not suggest that all points along the range are equally likely—some might be more likely than others—so the midpoint is not even logically or mathematically the most likely. There is no factual or mathematical reason to prefer 89% over 100%, which also was included in the estimated range. In reality, no Class 3 creditor actually received 89% recovery. They all received far more. Setting the multiplier at 89% thus would violate the manifest goal of the Plan and the Bankruptcy Code of treating Defendants equally and providing them with the same percentage recovery as Class 3 general unsecured creditors.

Defendants believe that the Plan and bankruptcy policy require setting the multiplier at 337%. Even so, Defendants recognize that the Court has held that it cannot award a creditor greater than 100% recovery. *See* Slip Op. at 149. If the Court holds that the multiplier cannot be higher than 100%, the Court should at least set the multiplier at 100%. It is the value in the range closest to Class 3's actual percentage recovery; and, within the parameters set by the Court, it harmonizes the Court's goal of not overpaying any creditor with the principle of treating similarly situated creditors equally.

## CONCLUSION

The Court should reject the heavily diluted multiplier because it is inconsistent with the plain meaning of the Plan, applicable legal doctrines, and the remedial principles that the Court held govern Section 502(h). The Court should reject the 89% multiplier for essentially the same reasons; using that estimate contradicts the plain meaning of the Plan and counters the restorative,

remedial, and equality principles.  The multiplier should be at least 100%—not 89% and certainly not 2.8%.  That multiplier should be applied to a 502(h) claim derived from asset and liability values that are measured as of the same date in 2005 and that reflect the Court's findings of the full extent of the Debtors' assets and liabilities on that date.

Table 5 summarizes Defendants' positions.  It lists three ways of calculating Defendants' 502(h) claim: using the Court's own finding of $850 million as the net creditor shortfall as of 2005 (Scenario A); using the Court's own finding of $1.757 billion as the amount of the legacy liabilities as of 2005 (Scenario B); and using Plaintiffs' post-petition $4 billion estimate of the legacy liabilities as of 2010 (Scenario C).  For each scenario, Table 5 calculates Defendants' off-set by applying Defendants' 100% multiplier.  Scenario C contradicts both the Opinion's legal rationale and the Court's findings of fact.  Scenario B contradicts the legal rationale in the same way as Scenario C, but uses the Court's finding of fact as to the total amount of legacy liabilities on the relevant date.  Only Scenario A is faithful both to the Opinion's legal rationale and the Court's findings of fact.  Accordingly, the principal amount of Defendants' 502(h) claim should be $13.609 billion, with a principal net judgment of $850 million.

| SCENARIO A: 502(h) Claim Valued at $13.609 Billion | |
| --- | --- |
| | 100% Recovery |
| Principal Judgment | $14.459 billion |
| *Less* Recovery on 502(h) Claim | $13.609 billion |
| SCENARIO A NET JUDGMENT | $850 million |
| SCENARIO B: 502(h) Claim Valued at $12.702 Billion | |
| | 100% Recovery |
| Principal Judgment | $14.459 billion |
| *Less* Recovery on 502(h) Claim | $12.702 billion |
| SCENARIO B NET JUDGMENT | $1.757 billion |
| SCENARIO C: 502(h) Claim Valued at $10.459 Billion | |
| | 100% Recovery |
| Principal Judgment | $14.459 billion |
| *Less* Recovery on 502(h) Claim | $10.459 billion |
| SCENARIO C NET JUDGMENT | $4 billion |

January 13, 2014                                    Respectfully submitted,

 

                                                 */s/   P. Sabin Willett*

Melanie Gray (*admitted pro hac vice*)                P. Sabin Willett (*admitted pro hac vice*)
Lydia Protopapas (LP 8089)                          Thomas R. Lotterman (*admitted pro hac vice*)
Jason W. Billeck (*admitted pro hac vice*)          James J. Dragna (*admitted pro hac vice*)
WINSTON & STRAWN LLP                              BINGHAM MCCUTCHEN LLP
1111 Louisiana Street, 25th Floor                    One Federal Street
Houston, TX 77002-5242                             Boston, MA 02110-1726
Telephone:      (713) 651-2600                      Telephone:      (617) 951-8000
Facsimile:      (713) 651-2700                      Facsimile:      (617) 951-8736

Gregory Silbert (GS 0033)                           Kenneth N. Klee (KK 5910)
WEIL, GOTSHAL & MANGES LLP                        David M. Stern (*admitted pro hac vice*)
767 Fifth Avenue                                   KLEE, TUCHIN, BOGDANOFF & STERN LLP
New York, NY 10153                                1999 Avenue of the Stars, 39th Floor
Telephone:      (212) 310-8000                      Los Angeles, CA 90067
Facsimile:      (212) 310-8007                      Telephone:      (310) 407-4000
                                                   Facsimile:      (310) 407-9090

*Counsel to Defendants*

CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Defendants' Supplemental Memorandum on Their 502(h) Claim and Offset** was served on the following counsel of record on January 13, 2014, as indicated below:

| | |
|---|---|
| ***Via email jonathan.henes@kirkland.com***<br>Jonathan S. Henes<br>KIRKLAND & ELLIS LLP<br>601 Lexington Avenue<br>New York, New York 10022 | ***Via email jeffrey.zeiger@kirkland.com***<br>Jeffrey J. Zeiger<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654 |
| ***Via email joseph.pantoja@usdoj.gov and robert.yalen@usdoj.gov***<br>Joseph Pantoja<br>Robert Yalen<br>Assistant U.S. Attorney<br>SOUTHERN DISTRICT OF NEW YORK<br>86 Chambers Street<br>New York, New York 10007 | ***Via email david.zott@kirkland.com***<br>David J. Zott<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654 |

New York, New York                     _/s/  Stephen Scotch-Marmo_
Dated: January 13, 2014                          Stephen Scotch-Marmo