**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| TRONOX INCORPORATED, *et al.*, | ) | Case No. 09-10156 (ALG) |
| | ) | Jointly Administered |
| Reorganized Debtors. | ) | |
| | ) | |
| | ) | |
| TRONOX INCORPORATED, | ) | |
| TRONOX WORLDWIDE LLC | ) | |
| f/k/a Kerr-McGee Chemical Worldwide LLC, | ) | |
| and TRONOX LLC f/k/a Kerr-McGee | ) | |
| Chemical LLC,[1] | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 09-01198 (ALG) |
| | ) | |
| KERR-McGEE CORPORATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

[1]    Pursuant to the Anadarko Litigation Trust Agreement, which was approved by the Court on February 14, 2011 (Dkt. No. 2812), the Anadarko Litigation Trust was appointed as the representative of each of the Plaintiff Debtors' estates, as that term is used in section 1123(b)(3)(B) of the Bankruptcy Code, with the power and right to prosecute this matter.  By the same agreement and Order, the Anadarko Litigation Trust was "deemed substituted" for the Debtor Plaintiffs in this matter "as the party in such litigation."

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff-Intervenor, | ) |
|  | ) |
| v. | ) |
|  | ) |
| TRONOX, INC., | ) |
| TRONOX WORLDWIDE LLC, | ) |
| TRONOX LLC, | ) |
| KERR-MCGEE CORPORATION, and | ) |
| ANADARKO PETROLEUM | ) |
| CORPORATION, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## PLAINTIFFS' OBJECTION TO DEFENDANTS'
## 502(h) CLAIM AND SUPPLEMENTAL MEMORANDUM

David J. Zott, P.C. *(admitted pro hac vice)*
Andrew A. Kassof, P.C. (AK7079)
Jeffrey J. Zeiger *(admitted pro hac vice)*
James R.P. Hileman *(admitted pro hac vice)*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel for the Anadarko Litigation Trust*

# TABLE OF CONTENTS

I.      Plaintiffs' Recovery and Defendants' Potential § 502(h) Offset Are Governed By
        Well-Settled Bankruptcy and Common Law Principles. ..................................................... 2

II.     Tronox Objects To Kerr-McGee's § 502(h) Claim. ......................................................... 7

III.    If Kerr-McGee's § 502(h) Claim is Allowed, Kerr-McGee's Percentage Recovery
        Should Be Diluted By The Amount Of Its Claim. ............................................................ 12

IV.     Defendants Are Only Entitled To A Maximum 68% Recovery On Their § 502(h)
        Claim Under The Plan. .................................................................................................... 16

V.      Defendants' Other Arguments To Reduce The Judgment Are Wrong And Already
        Have Been Rejected By The Court. .................................................................................. 17

VI.     The Court Should Include Appreciation And Interest In Any Judgment. ........................ 22

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*ASARCO LLC v. Americas Mining Corp.*
   404 B.R. 150 (S.D. Tex. 2009)................................................................ 9

*Bangor Punta Operations, Inc. v. Bangor & Arostook R.R. Co.*
   417 U.S. 703 (1974) ................................................................ 8, 9

*Buechner v. Farbenfabriken Bayer*
   154 A.2d 684 (Del.1959)................................................................ 3, 8

*Butner v. United States*
   440 U.S. 48 (1979) ................................................................ 2

*Carrieri v. Jobs.com Inc.*
   393 F.3d 508 (5th Cir. 2004)................................................................ 7, 10

*Coactiv Capital Partners, Inc. v. Hudson Converting, Inc.*
   No. 1:09-CV-01206, 2010 WL 4316751 (N.D.N.Y. Oct. 26, 2010) ........................................ 8

*Dole Food Co. v. Patrickson*
   538 U.S. 468 (2003) ................................................................ 3

*F.D.I.C. v. Hinch*
   879 F. Supp. 1099 (N.D. Okla.1995) ................................................................ 24

*Geltzer v. Artists Mktg. Corp. (In re The Cassandra Group)*
   338 B.R. 583 (Bankr. S.D.N.Y. 2006) ................................................................ 23

*Gowan v. HSBC Mortgage Corp. (In re Dreier LLP)*
   2012 WL 4867376 (Bankr. S.D.N.Y. Oct. 12, 2012)................................................................ 9

*In re 1031 Tax Group, LLC*
   439 B.R. 84 (Bankr. S.D.N.Y. 2010) ................................................................ 23

*In re Acequia, Inc.*
   34 F.3d 800 (9th Cir. 1994)................................................................ 18, 19

*In re Am. Way Serv. Corp.*
   229 B.R. 496 (Bankr. S.D. Fla. 1999)................................................................ 22

*In re Apex Long Term Acute Care—Katy, L.P.*
   465 B.R. 452 (Bankr. S.D. Tex. 2011)................................................................ 8

*In re Arcapita Bank B.S.C.(c)*
   No. 12-11076 (SHL), Slip Copy, 2013 WL 6141616 (Bankr. S.D.N.Y. Nov. 21, 2013)......... 10

*In re Best Prods. Co.*
168 B.R. 35 (Bankr. S.D.N.Y. 1994) ................................................................. 9

*In re Blitstein*
105 B.R. at 137 ................................................................................................. 22

*In re Brun*
360 B.R. 669 (Bankr. C.D. Cal. 2007) .............................................................. 22

*In re Cahillane*
408 B.R. 175 (Bankr. N.D. Ind. 2009) .............................................................. 24

*In re Calpine Corp.*
377 B.R. 808 (Bankr. S.D.N.Y. 2007) ................................................................ 9

*In re Centennial Textiles, Inc.*
220 B.R. 165 (Bankr. S.D.N.Y. 1998) ................................................................ 4

*In re CNB Int'l, Inc.*
Case Nos. 99–11240 B, 08–CV–774A, Adv. No. 01–1193B, 2010 WL 3749079 (W.D.N.Y.
Sept. 20, 2010) ............................................................................................. 23, 24

*In re Dreier LLP*
452 B.R. 391 (Bankr. S.D.N.Y. 2011) .............................................................. 17

*In re First Financial Associates, Inc.*
371 B.R. 877 (Bankr. N.D. Ind. 2007) .............................................................. 24

*In re JTS Corp.*
617 F.3d 1102 (9th Cir. 2010) ............................................................................ 4

*In re McGrahan*
459 B.R. 869 (B.A.P. 1st Cir. 2011) ................................................................... 6

*In re Morris Commc'ns, N.C., Inc.*
75 B.R. 619 (Bankr. W.D.N.C. 1987) ............................................................... 22

*In re Motors Liquidation Co.*
Nos. 09-50026 (REG), 11 Civ. 8444(RJS), 2012 WL 1886755 (S.D.N.Y. May 21, 2012) . 3, 10

*In re Palermo*
739 F.3d 99 (2d Cir. 2014) ............................................................................... 23

*In re Patriot Seeds Inc.*
No. 03–84217, Adv. Nos. 03–8290, et. al., 2010 WL 381620 (Bankr. C.D. Ill. Jan. 20, 2010)24

*In re Pine Lake Vill. Apartment Co.*
21 B.R. 478 (Bankr. S.D.N.Y. 1982) ................................................................ 10

*In re Prince*
    85 F.3d 314 (7th Cir. 1996) ................................................................. 5, 19

*In re Ruiz*
    455 B.R. 745 (B.A.P. 10th Cir. 2011) ........................................................ 8

*In re Tronox Inc*
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) ....................................................... 24

*In re Tronox Inc.*
    464 B.R. 606 (Bankr. S.D.N.Y. 2012) ............................................ 2, 4, 18

*In re USA Commercial Mortg. Co. USA Capital Realty Advisors, LLC*
    377 B.R. 608 (B.A.P. 9th Cir. 2007) ....................................................... 10

*In re Verco Indus.*
    704 F.2d 1134 (9th Cir. 1983) ................................................................ 9

*Johnson v. Home State Bank*
    501 U.S. 78 (1991) ................................................................................ 7

*Kipperman v. Onex Corp.*
    411 B.R. 805 (N.D. Ga. 2009) ................................................ 5, 17, 18, 19

*Lore v. City of Syracuse*
    670 F.3d 127 (2d Cir. 2012) ................................................................. 17

*MC Asset Recovery LLC v. Southern Co.*
    2006 WL 5112612 (N.D. Ga. Dec. 11, 2006) ......................... 5, 17, 18, 19

*Misty Mgmt Corp. v. Lockwood*
    539 F.2d 1205 (9th Cir. 1976) ................................................................ 9

*Moore v. Bay*
    284 U.S. 4 (1931) ................................................................................ 18

*R.I. Hosp. Trust Co. v. Doughton*
    270 U.S. 69 (1926) ................................................................................ 3

*Raleigh v. Illinois Dept. of Revenue*
    530 U.S. 15 (2000) ................................................................................ 2

*Schipani v. McLeod*
    541 F.3d 158 (2d Cir. 2008) ................................................................. 24

*Travelers Cas. and Sur. Co. of Am. v. Pacific Gas & Elec. Co.*
    549 U.S. 443 (2007) ............................................................................... 2

iv

*United States v. Bennett*
  621 F.3d 1131 (9th Cir. 2010) .......................................................................................... 3, 8

**Statutes**

11 U.S.C. § 101(5)(A) ............................................................................................................ 7

11 U.S.C. § 101(5)(A)(B) ...................................................................................................... 3

11 U.S.C. § 105(5)(A) ............................................................................................................ 3

11 U.S.C. § 1141(b) ............................................................................................................ 11

11 U.S.C. § 501 (a) ............................................................................................................ 10

11 U.S.C. § 541(a)(3) ........................................................................................................ 11

11 U.S.C. § 550(a) ........................................................................................................ 4, 22

28 U.S.C. § 1961 .............................................................................................................. 24

Okl. St. Ann., tit. 15, § 266 .............................................................................................. 24

**Other Authorities**

1 G. Glenn, Fraudulent Conveyances & Preferences (1940) ............................................ 8, 9

4 Collier on Bankruptcy (16th ed. 2012) .......................................................................... 9

Restatement (Third) of Restitution § 3 ............................................................................ 21

Based on overwhelming evidence, this Court found that Defendants engaged in a multi-billion dollar fraudulent transfer scheme to hinder or delay Tronox's environmental and tort creditors.  The only remaining issue is "whether Defendants should be liable for damages in the amount of $14,166,148,000 or $5,150,490,000, plus attorneys' fees and costs to the extent appropriate."  Mem. of Op., After Trial (Dkt. No. 622) at 149 ("Op.").  Defendants purport to rely on four legal and equitable principles to reduce Plaintiffs' damages award to $850 million—an amount that would pay Tronox's environmental and tort creditors only a fraction of their losses for shouldering the enormous risk of prosecuting this case while other creditors have recovered nearly in full.  Not surprisingly, the law does not permit such an inequitable result and instead requires a recovery at or in excess of the high end of the Court's range.

Based on the Code's express terms, the Court should disallow Defendants' § 502(h) claim in its entirety because, among other reasons, it improperly seeks to convert an equity interest (which cannot be the basis for a § 502(h) claim) into a creditor claim.  Even if allowed, Defendants' offset should be calculated as if their § 502(h) claim were determined at the time of plan confirmation, which would have resulted in a recovery of 2.8%.  Once the Court determines Plaintiffs' recovery net of any allowed § 502(h) claim as of November 2005, that amount should be appreciated by at least 30.4% to account for the fact that Plaintiffs have been deprived of the fraudulently transferred assets, while the Defendants have benefitted from their use since November 2005.  As set forth on the proposed judgment, Plaintiffs respectfully request that the Court enter an award of $20,773,030,067 plus attorneys' fees and costs.[2]

---

[2]   Plaintiffs are seeking the attorneys' fees and costs they incurred prosecuting this action.  Defendants cannot credibly challenge the reasonableness of the amount requested *as they had spent more than that by November 2010.  See* 11/2/10 Resp. of Anadarko and Kerr-McGee to the Debtors' Obj. to their Am. Proof of Claim (Case No. 09-10156, Dkt. No. 2363), Ex. A (asserting liquidated claim for "Adversary Proceeding Costs" of $67,546,310).

I.    **Plaintiffs' Recovery and Defendants' Potential § 502(h) Offset Are Governed By Well-Settled Bankruptcy and Common Law Principles.**

Defendants argue that "four interrelated legal and equitable principles" allow them to reduce the damages they will pay to a fraction of the range provided by the Court. Defs.' Supp. Mem. On Their 502(h) Claim and Offset (Dkt. No. 623) ("Supp. Mem.") at 3. Defendants' brief misstates the principles and their application here.

*First*, § 502(h) does not create a claim and cannot transform an equity interest into a claim. As this Court recognized, "§ 502(h) does not create a 'claim arising from the recovery of property' under § 550." Op. at 138. Rather, it provides that "if a transferee of a fraudulent transfer has an unsecured claim against the estate after disgorging the transferred property or its value, the claim will be treated as a prepetition claim." *In re Tronox Inc.*, 464 B.R. 606, 611 n.8 (Bankr. S.D.N.Y. 2012). Because the Bankruptcy Code does not provide for a claim "arising from the recovery of property" under § 550, a creditor must look to the underlying substantive law to provide the basis for a § 502(h) claim. *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450–51 (2007) ("the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law") (internal citations omitted); *Raleigh v. Ill. Dept. of Revenue*, 530 U.S. 15, 20 (2000) ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code."); *Butner v. United States*, 440 U.S. 48, 55 (1979) ("[p]roperty interests are created and defined by state law," and "[u]nless some federal interest requires a different result, there is no reason why such interests should be

analyzed differently simply because an interested party is involved in a bankruptcy proceeding").[3]

A claim is defined as a "right to payment." 11 U.S.C. § 101(5)(A); *In re Motors Liquidation Co.*, Nos. 09-50026 (REG), 11 Civ. 8444(RJS), 2012 WL 1886755, at *4 (S.D.N.Y. May 21, 2012) ("As set forth in the Bankruptcy Code, a "claim" is a "right to payment" or "equitable remedy," 11 U.S.C. § 101(5)(A)(B), whereas an "equity security"—a specific type of "interest" separately defined—is, *inter alia*, a "share in a corporation ... or similar security," *id.* § 101(16)(A)."). New Kerr-McGee, however, held only an equity interest in Old Kerr-McGee (Tronox) before the transfers. Under the underlying substantive law, an equity holder has no right to payment. Indeed, it is black-letter corporate law that an equity holder like New Kerr-McGee has no right or interest in the corporation's assets. *See, e.g., Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) ("An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets . . . ."); *United States v. Bennett*, 621 F.3d 1131, 1136 (9th Cir. 2010) (quoting *R.I. Hosp. Trust Co. v. Doughton*, 270 U.S. 69, 81 (1926)) ("As early as 1926, the Supreme Court recognized that '[t]he owner of the shares of stock in a company is not the owner of the corporation's property.'"). Even a "parent company 'has no interest of any specific assets of the [wholly-owned subsidiary]' because '[t]he corporation is an entity, distinct from its stockholders even if the subsidiary's stock is wholly owned by one person or corporation.'" *Bennett*, 621 F.3d at 1136 (quoting *Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 686 (Del.1959)). Therefore, an equity interest cannot support a claim under § 502(h).

---

[3]    Defendants previously have acknowledged that courts "apply governing state or federal law" to "determine the validity and enforceability of a claim in bankruptcy." 9/30/11 Defs.' Cross-Mot. for Summ. J. (Dkt. No. 268) at 31 & n.121.

***Second***, the applicable "restorative principle" requires restoring the assets that were fraudulently transferred back to the estate for the benefit of all creditors while allowing the transferee to assert a pre-petition claim for any consideration it provided in the avoided transactions. *See* 11 U.S.C. § 550(a) ("to the extent that a transfer is avoided under § 544 . . . the trustee may recover, for the benefit of the estate, the property transferred. . ."); *In re JTS Corp.*, 617 F.3d 1102, 1116 (9th Cir. 2010) ("the intent of § 550 [is] to restore the bankrupt estate to the financial condition it enjoyed prior to the transfer"); *In re Centennial Textiles, Inc.*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred."); *see also In re Tronox Inc.*, 464 B.R. at 614 (recognizing § 550's underlying purpose of restoring the estate to its position prior to the transfer).

This is the only way to truly restore the estate to its pre-transfer condition.  But for the fraudulent transfers, Tronox Worldwide LLC (*i.e.,* Old Kerr-McGee) would have continued to own the billions of dollars of oil and gas assets, and the profits generated from those assets, as it had for decades prior to the transfers. *See* Op. at 4–5.  Those assets and their cash flows would have been available to fund legacy environmental and tort liabilities as they arose in whatever amount they ultimately proved to be—just as they had been prior to the transfers.  *Id*. at 36–37 (finding Kerr-McGee paid "all the environmental expenses and claims out of its centralized cash management system").  New Kerr-McGee likewise would have retained the $2.55 billion of consideration it provided in the challenged transactions.  Op. at 135.

***Third***, this Court and many other courts have recognized that estate assets and creditor claims must be valued at the time of confirmation.  *See* Op. at 149–50 ("there is no basis for estimating the value of a General Unsecured Claim at more than the Disclosure Statement's

4

projection"); *see also, e.g., Kipperman v. Onex Corp.*, 411 B.R. 805, 876 (N.D. Ga. 2009) (stating that plan assets for purposes of the absolute priority rule are "based on the valuation of the assets under the plan at the time of confirmation"); *In re Prince*, 85 F.3d 314, 321 (7th Cir. 1996) (a bankruptcy court must "determine the value of the stock on the day the bankruptcy reorganization plan was confirmed").  It necessarily follows that the value of the estate assets— and claims—must be based on information *known* at confirmation.  *See* Op. at 149–50; *see also Kipperman*, 411 B.R. at 876 (rejecting request to "re-assess equity among the parties" based on changes in asset values after confirmation); *MC Asset Recovery LLC v. S. Co.*, Civ. Action No. 1:06-CV-0417-BBM, 2006 WL 5112612, at *5–6 (N.D. Ga. Dec. 11, 2006) (rejecting request to cap fraudulent transfer recovery based on a post-bankruptcy increase in the debtors' stock value).

Of course, at the time of confirmation, Tronox's estates did not have the oil and gas assets or a claim to them valued at more than $14 billion.  As this Court has recognized, Tronox had a contingent and unliquidated claim that was subject to numerous risks and obstacles to a recovery.  Op. at 136 (noting that a damages "ceiling would unfairly value Plaintiffs' agreement to give up their rights to a pro rata distribution of estate property and instead take limited cash and an uncertain litigation recovery").  Plaintiffs believe that claim is worth more than $14 billion.  But a court could hold otherwise.  That was true at confirmation.  It remains true today. Although the contingent claim was not valued at confirmation, environmental and tort creditors in an arm's-length transaction traded claims with a disclosure statement midpoint estimate of $4 billion and non-dischargeable rights to compel Tronox to conduct work at contaminated sites.  In return, they received the contingent claim, $282.5 million in cash to fund certain remediation efforts and partially compensate tort victims, the value (if any) of certain polluted properties across the country, certain limited insurance assets, and all of the proceeds from this litigation.

5

First Am. Plan of Reorg. (Case No. 09-10156, Dkt. No. 2567, Ex. A) ("Plan") at 21–22.  Thus, in this heavily-negotiated arm's-length transaction, this contingent litigation claim was traded for less than $4 billion in value.  Defendants have maintained—and continue to maintain—that it is worth far less. *Infra* at § V.

**Fourth**, both parties agree that the terms of Tronox's Plan of Reorganization controls. Supp. Mem. at 5; *see also* Op. at 143.  As a result, Kerr-McGee's interests are "defined within the boundaries of the plan" and their potential recovery, if any, is limited to recoveries permitted by the Plan language. *In re McGrahan*, 459 B.R. 869, 874 (B.A.P. 1st Cir. 2011) ("once a plan is confirmed, a creditor's rights and interests are defined within the boundaries of the plan, and proceedings that are inconsistent with the confirmed plan are improper").  Following months of hard-fought negotiations, Tronox and its stakeholders reached a global settlement that this Court found was "the cornerstone of the Plan."  Confirmation Order (Case No. 09-10156, Dkt. No. 2567) ¶ 37.  Tronox's environmental and tort creditors agreed to trade billions of dollars in claims for a contingent recovery in this lawsuit.[4] *See* Plan at 21–22.

Based on these core principles, Defendants' § 502(h) claim should be disallowed in its entirety or, at best, diluted so their offset is no more than 2.8% of the allowed amount.

---

[4]    This included approximately $300 to $500 million in environmental liabilities that were either entitled to administrative expense priority or were non-dischargeable liabilities that would have survived confirmation. Disc. Stmt. at 11 n.10.  The environmental creditors chose to trade these liabilities for the potential recovery in this case even though it eliminated the possibility of requiring Tronox to remediate these sites in the future regardless of the cost.  This deal was critical to Tronox's reorganization efforts.  Indeed, absent a settlement with Tronox's environmental creditors, Tronox could not have emerged from bankruptcy because of these liabilities. *See* Decl. of Dennis L. Wanlass in Supp. of Confirmation of 1st Am. J. Plan (Case No. 09-10156, Dkt. 2500) ¶¶ 43, 44.

## II.        Tronox Objects To Kerr-McGee's § 502(h) Claim.

Defendants are only entitled to an offset to the judgment if their § 502(h) claim is allowed.[5]  *See* Plan at Art. IV.C.5 ("[I]f the Anadarko Section 502(h) Claim is Allowed, Anadarko will be entitled to discount and/or otherwise reduce any judgment…"); *see also* Op. at 146 (Defendants have the right to file a § 502(h) claim "and to have their claim considered in due course"); *id.* at 145 ("Defendants' § 502(h) claims, if any, …").  Plaintiffs object to Defendants' 502(h) claim.  It should be disallowed in its entirety because it violates the Bankruptcy Code, the Plan, general common law, and the fundamental principles discussed above.

*First*, Defendants' § 502(h) claim should be disallowed because there is no legal basis for a claim based on Kerr-McGee's equity ownership of Plaintiffs as of the transfer date.  Under the Bankruptcy Code, a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  As noted, "[t]he touchstone of any 'claim' is that there is an 'enforceable obligation' of the debtor or an enforceable 'right to payment' from the debtor."  *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 524 (5th Cir. 2004) (citing *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)).

Section 502(h) does not create a claim for residual value or anything else.  *See supra* § I. Nor does any other provision of the Code create a "right to payment" for residual equity value. Therefore, Defendants must find a basis for their claim or "right to payment" outside of § 502(h). Here, that leaves the common law.  In other circumstances, it can provide a basis for a § 502(h) claim.  For example, when a fraudulent transfer is made to pay an antecedent debt and the

---

[5]     Tronox recognizes that the Court granted Kerr-McGee leave to file its amended proof of claim and does not dispute the timeliness of the claim.  Because a claim is deemed allowed absent objection, Tronox objects to that claim for the reasons set forth herein.

transfer is later avoided, a claim "arises" for the debt that existed before the transfer. *See In re Apex Long Term Acute Care—Katy, L.P.*, 465 B.R. 452, 465 (Bankr. S.D. Tex. 2011) (stating that when transferred property is recovered for the bankruptcy estate, the transferee has a claim for an unpaid antecedent debt); *In re Ruiz*, 455 B.R. 745, 752 n.23 (B.A.P. 10th Cir. 2011) ("the holder of the note secured by the mortgage, for example, would be entitled to a claim under § 502(h) for the amount it was required to return to the Trustee"); *see also* 1 G. Glenn, Fraudulent Conveyances & Preferences, § 260a at 446–47 (1940).    Similarly, when a transferee returns fraudulently transferred property, it has a claim for the consideration paid for the fraudulently transferred assets under the common law like any purchaser that does not receive goods promised in a transaction. *See Coactiv Capital Partners, Inc. v. Hudson Converting, Inc.*, No. 1:09-CV-01206, 2010 WL 4316751, at *6, 8–9 (N.D.N.Y. Oct. 26, 2010) (finding defendant liable for conversion and unjust enrichment when it accepted payment for "machinery which Defendants did not manufacture or deliver[] as previously agreed").

But, as discussed above, neither the common law nor any other substantive law entitles an equity holder to a "right to payment" or creates an "enforceable obligation" from the corporation to the holder. *See supra* § I.    Even as a "parent corporation," Kerr-McGee had "no interest of any specific assets of the [wholly-owned subsidiary]" and no right to payment from Tronox's assets at the transfer date. *Bennett*, 621 F.3d at 1136 (quoting *Buechner*, 154 A.2d at 686).    Therefore, its equity interest cannot form the basis for a "claim" under the Bankruptcy Code.

Defendants' reliance on *Bangor Punta Operations, Inc. v. Bangor & Arostook R.R. Co.* does not help them.  417 U.S. 703 (1974).  The Court already correctly has noted the problems with Defendants' reliance on that case. *See* Op. at 142 ("[n]o authority provides direct support

8

for the proposition that the *Bangor Punta* principle . . . limits damages in a fraudulent conveyance action" and "[s]ubsequent cases have found *Bangor Punta* not to be relevant in an action on behalf of creditors"). Even cases that suggested an expansive view of § 502(h) have limited those claims to the consideration paid by the defendants for the transferred assets. *See In re Verco Indus.*, 704 F.2d 1134, 1137 (9th Cir. 1983) (finding that defendant had a "right of set-off for the consideration it paid on the goods"); *Misty Mgmt. Corp. v. Lockwood*, 539 F.2d 1205, 1215 (9th Cir. 1976) (awarding a claim for the amount of consideration paid); *ASARCO LLC v. Ams. Mining Corp.*, 404 B.R. 150, 181–82 (S.D. Tex. 2009) (awarding an offset for "the amount of consideration [Defendants] ultimately paid for the" fraudulently transferred property); *see also* 1 G. Glenn, Fraudulent Conveyances & Preferences, § 260a (noting that a defendant's claim will be restored when "payment" on a debt is avoided as a fraudulent transfer).

Without a "right to payment" arising from some other source of law, a fraudulent transferee is simply entitled to a pre-petition claim for the consideration it provided in the avoided transaction, which Plaintiffs already have credited here. *See* Op. at 140. As this Court's opinion recognized, numerous decisions have so held. *Id.*; *see Gowan v. HSBC Mortg. Corp. (In re Dreier LLP)*, Adv. No. 10-5456 (SMB), 2012 WL 4867376, at *3 (Bankr. S.D.N.Y. Oct. 12, 2012) ("[I]f the transferee did not give any consideration for the fraudulent transfer, there is nothing to reinstate, and the return of the fraudulently transferred funds does not give rise to an allowable claim."); 4 Collier on Bankruptcy ¶ 502.09[2] at 502-72 (16th ed. 2012) ("The amount of the claim allowable under this section is not the value of the property recovered but rather the value of the consideration paid by the transferee for the property recovered."); *In re Calpine Corp.*, 377 B.R. 808, 815 (Bankr. S.D.N.Y. 2007); *In re Best Prods. Co.*, 168 B.R. 35, 58 (Bankr. S.D.N.Y. 1994). Conversely, Plaintiffs are aware of no case—and none has been

9

cited—permitting a recovery of an asserted residual equity interest under § 502(h).  This Court should not be the first.  Any claim in excess of the amount of consideration Kerr-McGee gave has no basis in law and should be disallowed.

*Second*, Defendants' § 502(h) claim should be disallowed because it is procedurally deficient.  "It is axiomatic that an allowed proof of claim requires something more than mere equity ownership."  *In re USA Commercial Mortg. Co. USA Capital Realty Advisors, LLC*, 377 B.R. 608, 615 (B.A.P. 9th Cir. 2007); *cf.* 11 U.S.C. § 501 (a) ("A creditor or an indenture trustee may file a proof of claim.  An equity security holder may file a proof of interest.").   But Defendants' proof of claim is simply based on Kerr-McGee's status as "ultimate shareholder of the transferors at the time the transfer was made."  *See* 1/14/14 Anadarko Petroleum Corp. POC # 2, ¶ 8(b).   Because Defendants' claim is based on an equity interest, it is fundamentally deficient and should be disallowed.  *See Carrieri*, 393 F.3d 519–27 (disallowing proof of claim because they were "equity securities" and not claims under the Code); *In re Motors Liquidation*, 2012 WL 1886755, at *4 ("'[s]imply put, an equity interest is not a claim against the debtor for which the equity holder may assert a right to payment' by filing a proof of claim") (quoting *In re Pine Lake Vill. Apartment Co.*, 21 B.R. 478, 480 (Bankr. S.D.N.Y. 1982)); *In re Arcapita Bank B.S.C.(c)*, No. 12-11076 (SHL), Slip Copy, 2013 WL 6141616, at *4 n.7 (Bankr. S.D.N.Y. Nov. 21, 2013) ("an equity interest in a debtor is not a claim against the debtor for which the equity holder may assert a right to payment by filing a proof of claim." (internal citations omitted)).

*Third*, Defendants' §502(h) claim should not be allowed because it violates the plain terms of Tronox's Plan of Reorganization.  As Kerr-McGee recognizes, "the plain meaning of a confirmed plan controls."  Supp. Mem. at 5.  The Plan defines "claim" the same as the Code—a "right to payment."  Plan at Art. I.A.26.  It then states that "[a] Claim or Equity Interest is

classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes." Art.III.A. As set forth above, Defendants' §502(h) claim is based solely on an equity interest. Therefore, it cannot be an allowed claim under the Plan and instead is classified as an equity interest.

*Fourth*, Kerr-McGee's amended proof of claim is inconsistent with the Code's distribution provisions. Nothing in the Code provides a *former* equity holder with the right to receive a distribution from the estate. After all debts of the estate are paid, any additional amounts in the estate remain with the debtor. *See* 11 U.S.C. § 1141(b) ("Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."); 11 U.S.C. § 541(a)(3) (defining recoveries under § 550 as property of the estate); *cf.* 11 U.S.C. § 726 (surplus to the debtor in a chapter 7 case). And, as the "cornerstone" of its Plan, Tronox agreed to transfer the entire contingent recovery in this case—including any value in excess of some measure of the amount of creditors' claims that would otherwise have remained with reorganized Tronox—to certain creditors, allowing for plan confirmation and emergence before resolution of this action. Kerr-McGee's requested relief would upend this agreement. A former equity holder like Kerr-McGee, which intentionally relinquished its ownership interests in the debtor, cannot now seek to participate in the distribution of estate assets as a purported creditor.

For these reasons, the Court should disallow Kerr-McGee's §502(h) claim.[6]

---

[6] To the extent that Kerr-McGee's § 502(h) claim is allowed, it should be equitably subordinated or equitably disallowed for the reasons stated in Tronox's Post-Trial Brief. Dkt. No. 590 at 105 & n.38.

### III.    If Kerr-McGee's § 502(h) Claim is Allowed, Kerr-McGee's Percentage Recovery Should Be Diluted By The Amount Of Its Claim.

If the Court allows Kerr-McGee's § 502(h) claim, its percentage recovery on that claim should be calculated using a claims base that includes the value of the § 502(h) claim.  The Court found that the § 502(h) claim "should be calculated in the same manner as if it were a claim allowed in the Plan."  Op. at 146.  Indeed, Defendants acknowledge that the § 502(h) claim was merely deferred so that confirmation could proceed and Tronox's other creditors could receive their entire recoveries.  Supp. Mem. at 8.  This timing accommodation does not give Defendants greater rights than they would have had at confirmation.  Thus, it is necessary to "[r]econstruct[] the state of affairs as of confirmation" to determine how to treat Defendants' § 502(h) claim.  Op. at 147.

At the time of confirmation, the parties were in the middle of discovery and trial of this adversary proceeding was more than a year away.  Defendants objected to the Disclosure Statement on the grounds that Tronox failed to disclose the potential impact that the § 502(h) claim could have on distributions to unsecured creditors, claiming Tronox may have to reserve a substantial percentage of its stock for distribution to Defendants.  Op. at 144.  To enable the plan process to move forward, the parties agreed that "if the Anadarko Section 502(h) Claim is Allowed, Anadarko will be entitled to discount and/or otherwise reduce any judgment in the Anadarko Litigation by the amount of any Allowed Anadarko Section 502(h) Claim multiplied by the percentage recovery to Allowed Class 3 General Unsecured Claims."  Plan at Art.IV.C.5.  The parties left open whether that percentage recovery would "be computed on a claims base including such Allowed Anadarko Section 502(h) Claim."  *Id.*; Op. at 147–48.

The answer to that question is mandated by the terms of the Plan and the core principles discussed above.  There is no dispute that Defendants' claim should be calculated "as if it were a

claim allowed in the Plan." Op. at 146. If the §502(h) claim had been allowed in the Plan, it would have been grouped with other Class 3 General Unsecured Claims at the time of confirmation (absent the agreement to defer the claim). Disc. Stmt. at 32–33. Therefore, calculating the Class 3 percentage recovery "in the same manner as if" Defendants' § 502(h) claim was allowed in the Plan requires including that claim in the Class 3 General Unsecured Claims base. Op. at 146. Defendants' efforts to ignore their §502(h) claim when calculating the Class 3 percentage recovery improperly calculates the amount of the claim *today*, instead of "in the same manner as if it were a claim allowed in the Plan." *Id*. As the Court already has found, including the § 502(h) claim in the Class 3 claims base results in a percentage recovery of 2.8%. Op. at 148.

Defendants raise numerous arguments to attempt to increase the percentage recovery on their § 502(h) claim. None has merit. Kerr-McGee argues that its potential § 502(h) claim was excluded from the definition of "General Unsecured Claim" in the Plan and, therefore, cannot be included in the pool of general unsecured claims. Supp. Mem. at 7. But that simply reflects the fact that the parties agreed that the § 502(h) claim should be deferred until after the litigation concluded and not impact the timing of distributions to Class 3 creditors. To the extent it is a valid claim at all, this accommodation does not change the nature of that claim and the parties expressly reserved their rights regarding how to calculate a recovery on that claim. Moreover, Defendants' current position is inconsistent with their prior arguments that assumed their § 502(h) claim would be treated as a general unsecured claim. For example, Defendants objected to the Disclosure Statement on the grounds that their § 502(h) claim would swamp the unsecured creditor pool and require a massive escrow. 9/14/10 Obj. of Anadarko Petroleum Corp. and Kerr-McGee Corp. to the Disc. Stmt. (Dkt. No. 2018) ¶ 26–27. They likewise contend in their

supplemental brief that their § 502(h) claim must be treated equally with other "similarly situated" general unsecured creditors.  Supp. Mem. at 8.

Defendants further argue that the "cart" and "horse"—Plaintiffs' recovery and Defendants' § 502(h) claim—should "travel together."  Supp. Mem. at 8.  Whatever its merits as a principle of transportation, it does not help Kerr-McGee here.  At the time of confirmation, the ultimate recovery in this litigation was not known.  It is still not known today.  Therefore, "reconstructing the state of affairs as of confirmation," it would be inappropriate to include the full recovery in the "numerator" as Kerr-McGee requests.  *See* Op. at 147; Supp. Mem. at 10.  Moreover, Kerr-McGee's cart-and-horse damages theory violates the plain terms of the Plan.  The Plan allocates the recovery in this case to Classes 4 and 5 (environmental and tort creditors)—not Class 3.  Plan at 20–22.  In contrast, Defendants' chart illustrating their cart-and-horse theory allocates the entire recovery from this litigation to Class 3, leaving nothing for the environmental and tort creditors.  Supp. Mem. at Table 1.  There is nothing inequitable about rejecting Kerr-McGee's proposed treatment either.  Defendants repeatedly mocked Plaintiffs' claims as "unsubstantiated," "baseless" and "specious."  *See, e.g.,* Dkt. No. 217 ¶ 2.  Anadarko had not taken a reserve for them at the time of confirmation and eliminated a $525 million reserve midway through trial on the grounds that a loss was no longer probable.[7]  Exhibit B, Anadarko Second Quarter 2012 Form 10-Q at 19.  Defendants should be held to their statements to the market (which were subject to the federal securities laws when made):  there was no "value" to put in the numerator.

---

[7]    On February 3, 2014, while stating that it "strongly disagrees" with this Court's Opinion, Anadarko finally conceded a loss was probable and booked a loss accrual for $850 million.  But it refused to acknowledge the possibility of a $14 billion plus judgment and instead concluded that the range of potential damages "after all appellate processes" was $850 million to $5.15 billion.  Exhibit C, Anadarko Press Release Dated February 3, 2014.

Finally, awarding an offset in the amount of 2.8% of their § 502(h) claim does not violate any of the "principles" Defendants say underlie the Court's remedial framework, Supp. Mem. at 3–5:

- <u>"Restoration" Principle</u>.  Sections 502(h) and 550 are designed to restore the "estate" to its position before the fraudulent transfers—not an individual creditor (or former equity holder like Kerr-McGee).  *See supra* § I.  Also, assuming Defendants were entitled to a restoration claim, their § 502(h) claim satisfies this principle regardless of the percent recovery on that claim.

- <u>Remedial Not Punitive</u>.  Diluting Defendants' claim would not be punitive.  Rather, Defendants *agreed* that their claim would be diluted by the percent recovery of Class 3 General Unsecured Claims.  Plan at Art. IV.C.5.  Calculating that recovery as if the claim were allowed at confirmation is equitable—not punitive.

- <u>Equal Treatment of Similarly Situated Creditors</u>.  Defendants' § 502(h) claim is simply an equity interest.  *See supra* § 1.  Thus, there is no inequality in diluting the § 502(h) claim to a 2.8% recovery while paying creditors with claims for valid debts at 58–100% of their claim value.  Indeed, the Plan expressly requires that result. Art.III(A) (classifying claim or equity interest in a class only to the extent it qualifies). If anything, a nearly $300 million recovery at 2.8% is generous based on the fact that other holders of equity interests only received warrants.[8]  *See* Op. at 150 n.129.  This is especially true given that the contemplated §502(h) claim elevates an interest held by a former equity holder that dumped its shares as part of a fraudulent transaction over Tronox's innocent shareholders that were wiped out in the resulting bankruptcy. In contrast, Defendants' preferred damages outcome ($850 million) would result in environmental and tort creditors receiving less than 25 cents on the dollar based on their estimated claims at confirmation while other unsecured creditors recovered 58-100%.  Supp. Mem. at 14 & Table 4.

- <u>Plan Terms</u>.  Diluting Defendants' recovery to 2.8% of any § 502(h) claim does not violate any applicable provisions of Tronox's Plan of Reorganization.  Instead, it implements them fairly.  As set forth above, it is entirely consistent with the de minimis recovery that Tronox's shareholders obtained under the Plan.

For these reasons, if Defendants' § 502(h) claim is allowed, it should be calculated based on a 2.8% recovery.  This results in an offset of $292,852,000.

---

[8]    Even if Kerr-McGee had a "claim," as that term is defined in the Code, the "equal treatment" principle is not violated.  Rather, diluting Kerr-McGee's recovery ensures that it does not receive special treatment and its claim is calculated as if it were allowed at the time of confirmation.

**IV.    Defendants Are Only Entitled To A Maximum 68% Recovery On Their § 502(h) Claim Under The Plan.**

If the Court allows Defendants' § 502(h) claim and declines to dilute it to a 2.8% recovery, it should use a 68% recovery instead of 89%, resulting in a damages award of $7.347 billion as of the transfer date. The Court's provisional damages discussion utilized a percentage recovery of 89% on the grounds that "the Debtors agreed that 'Anadarko will be entitled to receive the economic benefit on account of its Allowed Class 3 or Class 6 Claim as if it had participated in the Rights Offering, notwithstanding anything in the Rights Offering Procedures to the contrary." Op. at 147–48 (quoting Disc. Stmt. at 33). But that is not the case. That agreement, which does not appear in the confirmed Plan, referred to Anadarko's rejection damages claim—not its § 502(h) claim. *See* Disc. Stmt. at 33. And, by its own terms, the agreement applied only "[t]o the extent Anadarko has a finally Allowed Class 3 Claim." *Id.* at 32. Defendants, however, have conceded that the § 502(h) claim is not an Allowed Class 3 Claim. *See* Supp. Mem. at 7 ("the Plan expressly excludes [Defendants' 502(h)] claim from Class 3"). Therefore, neither the Plan nor the Disclosure Statement requires the Court to include value from the Rights Offering when calculating Kerr-McGee's recovery.

Without that agreement, Defendants are only entitled to the same percentage recovery as Class 3 general unsecured creditors. And Class 3 general unsecured creditors recovered 68% *on account of their claims*—without including other value some unsecured creditors recovered by participating in the Rights Offering. Op. at 147 n.127. Thus, that is the most Defendants should recover on their claim.[9]

---

[9]    As a result, Kerr-McGee only would be entitled to an offset of $7.112 billion ($10.459 billion x 68%).

**V.    Defendants' Other Arguments To Reduce The Judgment Are Wrong And Already Have Been Rejected By The Court.**

Defendants ask the Court to reconsider other aspects of its opinion in an effort to further reduce their damages to $850 million. Supp. Mem. at 11–19. These arguments are contrary to fundamental bankruptcy principles and Tronox's Plan of Reorganization. They also underscore the myriad problems with Defendants' residual value principle.

First, Defendants assert that the Court erred in using the $4 billion estimate of the environmental and tort claims in the Disclosure Statement to calculate their § 502(h) claim. Defendants argue that the Court instead should have calculated their claim based on its December 2013 post-trial findings regarding the amount of the environmental and tort claims known or knowable as of November 2005 or the overall creditor shortfall. Supp. Mem. at 12–16. While Tronox objects to the allowance of a "residual value" claim in any amount, the Court did not err by using $4 billion to determine the amount of any such claim.

The Court's calculation reflects the fundamental principle that estate assets and creditor claims must be valued at the time of confirmation. *See supra* § I. Thus, the Court correctly sought to determine the amount of Kerr-McGee's claim "in the same manner as if it were a claim allowed in the Plan." Op. at 146. Defendants ask the Court to reject the contemporaneous estimate of the legacy liabilities and impermissibly rely on unforeseeable, *post-confirmation* determinations. *Kipperman*, 411 B.R. at 876; *see also MC Asset*, 2006 WL 5112612, at *5–6. To the extent Defendants wanted their offset calculated on a different basis, they failed to provide proof regarding the value of the liabilities as of confirmation. *Lore v. City of Syracuse*, 670 F.3d 127, 149 (2d Cir. 2012) (noting defendants bear the burden of proof on affirmative defenses); *cf. In re Dreier LLP*, 452 B.R. 391, 434 (Bankr. S.D.N.Y. 2011) (defendant bears burden of proof on bona fide purchaser exception because it is an affirmative defense).

17

Moreover, Defendants' argument is nothing more than a final attempt to impose the "cap" on fraudulent transfer recoveries that the Court previously rejected. Courts have uniformly held that a plaintiff's recovery is not capped at the amount of outstanding creditor claims under § 550. *See, e.g.*, *In re Acequia, Inc.*, 34 F.3d 800, 811 (9th Cir. 1994) (reversing magistrate judge for capping recovery under § 544 and § 550 at the amount of unsecured creditors' claims); *Kipperman*, 411 B.R. at 878 ("Section 550 does not 'cap' Plaintiff's recovery."). This Court has also so held: "We have not been able to find any case that has accepted Anadarko's contention that in order for there to be any recovery in an avoidance proceeding, there must be a prior calculation of each creditor's claim in the case and a limitation of avoidance liability to the deficiency in payment." *In re Tronox Inc.*, 464 B.R. at 617. But that is *exactly* what Kerr-McGee's proposed "adjustments" seek to do—calculate "each creditor's claim" and limit "avoidance liability to the deficiency in payment."

Rather, since the Supreme Court decided *Moore v. Bay* in 1931, it has been black-letter law that fraudulent transfer recoveries are returned to the estate for the "benefit of the estate," regardless of the size of outstanding creditor claims or "net creditor shortfall." 284 U.S. 4, 5 (1931); *see also In re Acequia*, 34 F.3d at 811; *MC Asset*, 2006 WL 5112612, at *5 ("several cases decided since Moore v. Bay have addressed that very question, and all have found that a trustee who brings an action to avoid and recover a fraudulent transfer may avoid and recover it in its entirety, even when the value of the transfer exceeds the value of all allowed claims by unsecured creditors"). In rejecting Defendants' efforts to cap Plaintiffs' claim, the Court correctly concluded that "such a ceiling would unfairly value Plaintiffs' agreement to give up their rights to a pro rata distribution of estate property and instead take limited cash and an

uncertain litigation recovery."  Op. at 136.  The Court should decline Kerr-McGee's invitation to do so now. [10]

Second, the Court properly rejected the Defendants' argument that they should recover 100% of their § 502(h) claim because, they claim, Class 3 general unsecured creditors recovered more than 100% of the value of their claims.  Supp. Mem. at 17–18; Op. at 149 ("Whatever the merits of their contentions factually, these recoveries could not have been anticipated at the time of confirmation and were wholly inconsistent with the Plan itself.").  The Court's conclusion was based on the settled principle, discussed above, that courts should not "in a subsequent piece of litigation go back and re-assess equity among the parties based on subsequent events." *Kipperman*, 411 B.R. at 876; *In re Prince*, 85 F.3d at 321 (noting that a bankruptcy court must "determine the value of the stock on the day the bankruptcy reorganization plan was confirmed"). Moreover, even if Defendants had a claim (rather than a mere equity interest), they are only entitled to the same 68% estimated recovery that other Class 3 creditors received at confirmation. *See supra* § IV.

Defendants' arguments expose the flaws in their residual value principle and highlight why the law has never recognized such a theory.  Tronox's environmental and tort creditors took an enormous risk when they traded billions of dollars in claims for a relatively small amount of

---

[10]    Courts also repeatedly have held that any "surplus" recovery over the amount of creditor claims should be awarded to the estate for the benefit of creditors—not to the wrongdoer.  As the Ninth Circuit aptly put it in *Acequia*: "Moreover, even if the recovery did constitute a 'windfall,' Acequia has a greater equitable claim to the transferred funds than does [transferee] Clinton, the wrongdoer.  We think it better to err on Acequia's side." 34 F.3d at 812; *accord MC Asset Recovery*, 2006 WL 5112612, at *6 (rejecting windfall argument and holding that "equity does not favor protecting [transferee defendant] Southern Co. from these creditors"); *Kipperman*, 411 B.R. at 875-76 (potential recovery in excess of creditor claims would not violate the "fair and equitable" requirement or absolute priority rule for a cram down plan).  The equities are even stronger here.  The environmental and tort claimants released their claims against Tronox for the recovery in this action—whatever it turns out to be.  Whether the total cost to remediate the legacy sites, and to compensate tort claimants for their injuries, will ultimately prove to be more or less than the litigation recovery here will not be known for many years.  If history is a guide, those costs likely will be higher than anyone, including Tronox's experts in this case, anticipates today.

cash and a contingent recovery in this litigation that Defendants still claim ultimately will have no value. Under any of Defendants' scenarios, these involuntary creditors' recoveries are still being capped (either in the amount estimated at confirmation or based on hindsight as Kerr-McGee now proposes). Thus, under its "restorative" theory, even in the face of an egregious fraudulent transfer, a transferee like Kerr-McGee keeps all of the upside of its fraudulent conduct. Having run the gauntlet and overcome an army of Kerr-McGee lawyers and high-priced experts, multiple motions to dismiss and for summary judgment, and months of trial, Kerr-McGee seeks to cap the environmental and tort creditors at the amount of their claims. Indeed, under Defendants' preferred damages scenario ($850 million), these creditors would recover a fraction of Tronox's estimate of the value of those claims at confirmation. Kerr-McGee, meanwhile, would pay less than 6% of the value of the assets it fraudulently stole.

No rational unsecured creditor would leave non-contingent assets to other creditors and accept the risk of a contingent recovery if the best it could do is receive the same as (or perhaps significantly less than) other similarly situated unsecured creditors—especially when it held all of the cards in the bankruptcy like the environmental creditors did here. *See* Disc. Stmt. at 7 ("absent a settlement [with Tronox's environmental creditors], Tronox could not secure financing to pay the [environmental creditors'] administrative claims in full to emerge from bankruptcy."). Indeed, it was precisely because the environmental and tort creditors were willing to accept the risk of a contingent asset that Tronox's other creditors could obtain a 58–100% recovery. Kerr-McGee's efforts to cap these creditors' recoveries are contrary to 70 years of law, the purpose of fraudulent transfer law and core bankruptcy policies that encourage settlements to foster plans.

20

Moreover, Kerr-McGee's proposed adjustments would create perverse incentives for other corporations. The Court found that Kerr-McGee failed to conduct "any contemporaneous analysis of Tronox's ability to support the legacy liabilities being imposed on it." Op. at 65. That was "one of the most compelling facts" supporting Kerr-McGee's liability for an actual fraudulent transfer. *Id*. But under Kerr-McGee's proposed damages approaches, future corporations similarly will have no incentive to perform such an analysis or to refrain from similar fraudulent transactions. If a parent company engaging in a spin-off of a severely undercapitalized, liability-laden subsidiary is only required to pay the amount of the "net creditor shortfall," it will be incentivized to engage in such transactions just like Kerr-McGee did. At worst, if its fraud is discovered and successfully prosecuted after years of litigation, it only will have to pay the debts that it already owes or make up the net creditor shortfall. More than likely, it will never pay anything. Indeed, Kerr-McGee's proposed treatment of its § 502(h) claim would create a new set of rules that would only apply to corporate spinoffs. As noted, a § 502(h) claim has always been limited to consideration the transferee provided in exchange for the fraudulently transferred assets. But under Kerr-McGee's proposed treatment, in a spin-off (which is by definition not an arm's-length transaction and already prone to abuse), the parent could assert a § 502(h) claim for any consideration it provided as well as any residual equity value in the former subsidiary above the amount necessary to make the creditors whole. This rule—the more you steal, the more you keep—is bad law and worse policy.[11]

---

[11] *Cf.* RESTATEMENT (THIRD) OF RESTITUTION § 3, cmt. c ("If a conscious wrongdoer were able to make profitable, unauthorized use of the claimant's property, then pay only the objective value of the assets taken or the harm inflicted, the anomalous result would be to legitimate a kind of private eminent domain (in favor of a wrongdoer) and to subject the claimant to a forced exchange.").

**VI.     The Court Should Include Appreciation And Interest In Any Judgment.**

The Court requested that each party propose a judgment for this adversary proceeding. Plaintiffs' proposed judgment is attached as Exhibit A to this brief.  As set forth in the judgment, once the Court determines the amount of damages net of Defendants' § 502(h) claim, if any, as of November 2005, the Court should increase that amount to reflect appreciation as well as award pre-judgment and post-judgment interest.

Section 550(a) of the Bankruptcy Code allows the trustee to recover "the property transferred, or, if the court so orders, the value of such property…."  11 U.S.C. § 550(a).  When awarding the value of the property, courts include any post-transfer appreciation to compensate the estate for the value it would have enjoyed if the fraudulent transfer had not occurred.  *In re Am. Way Serv. Corp.*, 229 B.R. 496, 530–31 (Bankr. S.D. Fla. 1999) ("[W]hen the property has appreciated, the trustee is entitled to recover the property itself, or the value of the property at the time of judgment"); *In re Brun*, 360 B.R. 669, 675 (Bankr. C.D. Cal. 2007) ("Section 550(e) demonstrates the intent of Congress that any appreciation not attributable to the actions of a good faith transferee inure to the benefit of the estate."); *In re Morris Commc'ns, N.C., Inc.*, 75 B.R. 619, 629 (Bankr. W.D.N.C. 1987), *rev'd on other grounds* 914 F.2d 458 (4th Cir. 1990) ("The Trustee argues that the remedy should be the avoidance of the fraudulent transfer.  This would give the post-transfer appreciation to the Trustee.  …Based on the language of Sections 548(c) and 550(d) of the Code, this Court agrees with the Trustee."); *In re Blitstein*, 105 B.R. at 137 ("Finally, it is clear that should [Defendant] retain this property, the Trustee is entitled to at least a money judgment in the amount of the greater of the value at the time of the transfer; or the value at the time of recovery less the value of improvements made.").

Awarding post-transfer appreciation is required by the very "restorative principle" that Defendants tout.  Only in this way can the estate be returned to its pre-transfer position.

22

Accordingly, Plaintiffs' expert, Professor Jack Williams, testified that the fraudulently transferred assets appreciated by 30.4% from the November 28, 2005 IPO date through June 15, 2012 (shortly before Professor Williams testified at trial). Williams Direct ¶ 70; *see also* Pls.' FOF (Dkt. No. 591) ¶ 811. Professor Williams determined the post-transfer appreciation rate by using the same approach and based on the same energy indices that this Court found appropriate to determine the value of the oil and gas assets as of November 2005. Op. at 133-34 & n.116. Therefore, regardless of the 2005 damage and offset calculation that the Court adopts, Plaintiffs' damage award should be appreciated by at least 30.4%.[12]

In addition, the Court should award pre-judgment interest from June 15, 2012 (the end of Professor Williams' appreciation period) until the date of the judgment.[13] *In re 1031 Tax Group, LLC*, 439 B.R. 84, 88 (Bankr. S.D.N.Y. 2010) ("Courts in the Second Circuit and in [the Southern District of New York] have recognized that the award of prejudgment interest is discretionary, and absent a sound reason to deny prejudgment interest, such interest should be awarded."); *see also In re Palermo*, 739 F.3d 99, 106–08 & n.5 (2d Cir. 2014) (a court has discretion to award prejudgment interest under state law incorporated through § 544(b) or federal law under § 550); *In re CNB Int'l, Inc*., Case Nos. 99–11240 B, 08–CV–774A, Adv. No. 01–1193B, 2010 WL 3749079, at *9–10 (W.D.N.Y. Sept. 20, 2010) (upholding bankruptcy court decision to award prejudgment interest). The appropriate pre-judgment interest rate should be determined by the relevant state law. *Geltzer v. Artists Mktg. Corp. (In re The Cassandra Group)*, 338 B.R. 583, 600 (Bankr. S.D.N.Y. 2006) (concluding that because avoidance of a

---

[12]  Defendants had ample opportunity to present alternative measures of appreciation and chose not to do so.

[13]  Defendants appear to acknowledge that Plaintiffs are entitled to prejudgment interest and asked the Court to "not shrink Defendants' offset to address concerns that other doctrines of law [*i.e.* prejudgment interest] address more directly." Supp. Mem. at 16.

fraudulent transfer under § 544(b) is predicated on state substantive law, state law determines rate of prejudgment interest). Here, Plaintiffs' § 544(b) claim incorporated Oklahoma law. Op. at 51. Applying Oklahoma law, the Court should apply a prejudgment interest rate of 6%.[14] *See* OKL. ST. ANN., tit. 15, § 266 (1970) ("The legal rate of interest shall be six percent (6%) in the absence of any contract as to the rate of interest. . . .").[15]

Plaintiffs also ask that the Court award post-judgment interest in the proposed judgment, which is mandatory. *See, e.g., Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008) ("…we have consistently held that an award of post-judgment interest [under 28 U.S.C. § 1961(a)] is mandatory").[16] The following chart summarizes the various damages scenarios discussed above:

---

[14]   The Court previously has held that "Oklahoma authority" analyzes fraudulent transfer claims as "contract actions" for certain purposes. *In re Tronox Inc.*, 429 B.R. 73, 111–12 (Bankr. S.D.N.Y. 2010) (citing *F.D.I.C. v. Hinch*, 879 F. Supp. 1099, 1108–09 (N.D. Okla.1995)).

[15]   Alternatively, an "award of prejudgment interest based on federal law . . . afford[s]" the Court "discretion as to the rate and interval." *In re Palermo*, 739 F.3d at 107 n.5. Accordingly, some courts have awarded prejudgment interest for fraudulent transfer awards based on the federal rate in 28 U.S.C. § 1961, s*ee, e.g.*, *In re CNB Int'l, Inc.*, Case Nos. 99–11240 B, 08–CV–774A, Adv. No. 01–1193B, 2010 WL 3749079, at *9–10 (W.D.N.Y. Sept. 20, 2010) (affirming bankruptcy court decision to award prejudgment interest at federal rate), or the prevailing market or prime rate, *see, e.g.*, *In re Patriot Seeds Inc.*, No. 03–84217, Adv. Nos. 03–8290, et. al., 2010 WL 381620, at *26 (Bankr. C.D. Ill. Jan. 20, 2010); *In re Cahillane*, 408 B.R. 175, 214 (Bankr. N.D. Ind. 2009); *In re First Fin. Assocs., Inc.*, 371 B.R. 877, 922 (Bankr. N.D. Ind. 2007).

[16]   As noted, separately, Plaintiffs are seeking to recover attorneys' fees and costs.

|  | Kerr-McGee's § 502(h) Claim is Disallowed | Kerr-McGee's § 502(h) Claim is Allowed at 2.8% Recovery | Kerr-McGee's § 502(h) Claim is Allowed at 68% Recovery | Kerr-McGee's § 502(h) Claim is Allowed at 89% Recovery |
|---|---|---|---|---|
| **Damages as of Nov. 28, 2005** | $14,459,000,000 | $14,459,000,000 | $14,459,000,000 | $14,459,000,000 |
| **- Kerr-McGee's § 502(h) Claim** | $0 | ($292,852,000) | ($7,112,120,000) | ($9,308,510,000) |
| **Net Damages as of Nov. 28, 2005** | $14,459,000,000 | $14,166,148,000 | $7,346,880,000 | $5,150,490,000 |
| **+ Appreciation at 30.4% to June 15, 2012** | $4,395,536,000 | $4,306,508,992 | $2,233,451,520 | $1,565,749,960 |
| **Net Damages as of June 15, 2012** | $18,854,536,000 | $18,472,656,992 | $9,580,331,520 | $6,716,238,960 |
| **+ Prejudgment Interest at 6% to Feb, 12, 2014[17]** | $1,918,494,067 | $1,879,636,966 | $974,821,612 | $683,393,354 |
| **Net Damages as of Feb. 12, 2014** | $20,773,030,067 | $20,352,293,958 | $10,555,153,132 | $7,399,632,314 |

## CONCLUSION

Defendants embarked on a fraudulent scheme to cleanse their valuable oil and gas assets of massive environmental and tort liabilities.  The victims of that scheme were Tronox's involuntary environmental and tort creditors.  Following years of litigation, months of trial and a

---

[17]    Prejudgment interest was calculated with a 6% interest rate, compounded annually.

166-page opinion from the Court, Defendants have been found liable for their conduct. The Court should now enter a final judgment in the amount of $20,773,030,067. Plaintiffs respectfully submit that the law and core bankruptcy principles require no less.

Dated:  February 12, 2014                    Respectfully submitted,

                                   /s/ *David J. Zott, P.C.*
                                   KIRKLAND & ELLIS LLP
                                   David J. Zott, P.C. (*pro hac vice*)
                                   Andrew A. Kassof, P.C. (AK 7079)
                                   Jeffrey J. Zeiger (*pro hac vice*)
                                   James R.P. Hileman (*pro hac vice*)
                                   300 North LaSalle
                                   Chicago, Illinois  60654-3406
                                   Telephone:    (312) 862-2000
                                   Facsimile:    (312) 862-2200

                                   *Counsel for the Anadarko Litigation Trust*

26

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey J. Zeiger, hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746,

that on this 12th day of February 2014, I caused a true and correct copy of the foregoing

Plaintiffs' Objection to Defendants' 502(h) Claim and Supplemental Memorandum to be served

upon the following:

**Via Overnight Mail and Electronic Mail**

Melanie Gray
Jason W. Billeck
Winston & Strawn LLP
1111 Louisiana Street, 25th Floor
Houston, TX 77002-5242

Sabin P. Willet
Bingham McCutchen LLP
One Federal Street
Boston, MA 02110

*Counsel for Defendants*

**Via Electronic Mail**

Robert William Yalen
Assistant United States Attorney
86 Chambers Street
New York, New York 10007

*Counsel for the United States of America*

                                   */s/ Jeffrey J. Zeiger*
                    _____