UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
IN RE:

TRONOX INCORPORATED, *et al.*,                     Bankr. Case No. 09-10156 (ALG)
                                                   (Jointly Administered)
             Reorganized Debtors.
------------------------------------------------------------x
TRONOX INCORPORATED, TRONOX                        Adversary Proceeding
WORLDWIDE LLC f/k/a Kerr-McGee Chemical            No. 09-01198 (ALG)
Worldwide LLC, and TRONOX LLC f/k/a Kerr-
McGee Chemical LLC,

             Plaintiffs,

   - against -

KERR-MCGEE CORPORATION, KERR-
MCGEE CORPORATION, KERR-MCGEE OIL
& GAS CORPORATION, KERR-MCGEE
WORLDWIDE CORPORATION, KERR-
MCGEE INVESTMENT CORPORATION,                      **MEMORANDUM OF THE**
KERR-MCGEE CREDIT LLC, KERR-MCGEE                  **UNITED STATES OF AMERICA**
SHARED SERVICES COMPANY LLC, and                   **REGARDING DEFENDANTS'**
KERR-MCGEE STORED POWER COMPANY                    **SECTION 502(h) CLAIM**
LLC,

             Defendants.


------------------------------------------------------------x
THE UNITED STATES OF AMERICA,

             Plaintiff-Intervenor,

   - against -

TRONOX, INC., TRONOX WORLDWIDE LLC,
TRONOX LLC, KERR-MCGEE
CORPORATION, and ANADARKO
PETROLEUM CORPORATION,

             Defendants.
------------------------------------------------------------x

Plaintiff-Intervenor United States of America (the "United States" or the "Government") respectfully submits this memorandum in response to the Supplemental Memorandum of defendant Kerr-McGee Corporation and its affiliates ("defendants") on the proper computation of any allowed Section 502(h) claim.

## PRELIMINARY STATEMENT

The United States and state, local and tribal environmental regulators compromised unsecured claims, administrative priority claims, and non-dischargeable causes of action in the Global Settlement underlying the Plan of Reorganization. In exchange, they – along with Tronox's tort creditors – received a contingent asset: the potential recovery on Tronox's (now the Litigation Trust's) fraudulent conveyance claims, whether that recovery turned out to be large, small, or nonexistent. The Plan does not impose any cap on this recovery, and none should be implied.

The United States joins the Litigation Trust's objection to defendants' Section 502(h) claim and further supports the Litigation Trust's contention that, if a Section 502(h) claim is allowed, the resulting offset against judgment should be calculated at 2.8% of the allowed amount of the claim, reflecting the recovery that Class 3 creditors would have received under the Plan if the amount of defendants' claim had been known at the time of confirmation.

The United States submits this separate brief, however, to respond to defendants' contention that the Court should, in calculating the offset, rely on testimony regarding known or knowable liabilities as of 2005 (Def. Mem. at 12) or on the "net creditor shortfall" derived from these known or knowable liabilities (Def. Mem. at 14). Using either of these amounts to calculate defendants' offset, along with defendants' request

2

that their claim be paid without dilution, would in effect create a "damages cap" inconsistent with the agreements reflected in the Plan of Reorganization and violate basic remedial principles by shifting the risk of unfunded environmental costs to the victims of the fraudulent transfers, including the United States and other regulators.

## ARGUMENT

I.  **The Agreements Underlying the Plan Preclude Reliance on Estimates of "Known or Knowable" Liabilities as of 2005 or "Net Creditor Shortfall"**

Defendants' effort to limit recovery in this case to Tronox's known or knowable environmental and tort liabilities as of 2005 or the amount of "net creditor shortfall" resulting from these liabilities is inconsistent with the Environmental Settlement Agreement and the Plan. Through these agreements, the United States, other environmental regulators, and Tronox's tort creditors compromised their claims and causes of action in exchange for an uncapped recovery in this case. *See* Memorandum of Opinion ("550 Decision"), dated Jan. 20, 2012, at 5-6 [Docket Entry 295]. Defendants' effort to rely on these liability estimates, and moreover to argue for their offset to be calculated without any dilution, amounts to an effort to achieve by other means the same cap on recovery that they previously sought and the Court rejected.

In entering into the Environmental Settlement Agreement, the governmental parties sacrificed not only claims but also their rights to enforce non-dischargeable environmental obligations against the reorganized company – rights that would have required contaminated sites to be cleaned up in the ordinary course of business, without a

need for the governments to rely on any particular estimate of future liabilities.[1] The governments also compromised administrative priority claims, which Tronox would have been required to provide for fully in a Plan. Most importantly, the United States and the States did not pursue an objection to confirmation of a plan on account of its treatment of environmental liabilities, allowing Tronox to reorganize and general unsecured creditors to be paid.[2] In its disclosure statement, Tronox explained that the non-dischargeable environmental obligations "would create an insurmountable obstacle to obtaining financing for the reorganized business," Disclosure Statement, at Section I-E, at 8, and that financing could not be obtained to provide fully for the administrative liabilities, *see* Disclosure Statement, Section I-E, at 7. Tronox's successful reorganization depended on this compromise.

As this Court has recognized, in exchange for compromising these claims and rights, the governmental parties, along with the tort creditors, received a contingent asset: the ultimate recovery in this litigation, which at confirmation was (and even today remains) unknown in amount, with the potential for a high, low, or even zero recovery. As the Court has explained:

---

[1] *See U.S v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997 (2d Cir. 1991) (discussing non-dischargeable environmental obligations); *Mark IV Indus. v. N.M. Env't Dep't. (In re Mark IV Indus., Inc.)*, 438 B.R. 460, 465-71 (Bankr. S.D.N.Y. 2010) (same), *aff'd*, 459 B.R. 173 (S.D.N.Y. 2011) (same).

[2] *See* 11 U.S.C. § 1129(a)(3) (prohibiting approval of plans "forbidden by law"); Collier on Bankruptcy § 1129.03[3][b][ii] (plan that would violate non-bankruptcy regulatory law would be "forbidden by law" and would preclude confirmation even if no provision of title 11 was violated); *In re Eagle Picher Holdings, Inc.*, 345 B.R. 860 (Bankr. S.D. Ohio 2006) (debtor has burden of proof to demonstrate that plan for addressing contaminated properties complied with non-bankruptcy law).

4

> The agreement of the environmental and tort plaintiffs to take the bulk of their possible recovery in the form of a lawsuit whose outcome was (and is) uncertain made it possible for the debtors to distribute to their other unsecured creditors . . . all of the stock of the reorganized companies, now cleansed of legacy liabilities.

550 Decision at 6. "It may be questioned whether Tronox would have been able to confirm a plan absent the settlement," *id.* at 14, and "[t]he liquidation analysis attached to the Disclosure Statement estimated that in a liquidation unsecured creditors would receive no recovery at all," *id.*

The Court has recognized that if parties such as the United States, the other environmental regulators, and the tort creditors are to accept such a contingent asset in resolution of their claims, those parties' claims must not be artificially capped if the case is successful, because they will bear the burden if the litigation is unsuccessful. The Court wrote:

> We have not been able to find any case that has accepted Anadarko's contention that in order for there to be any recovery in an avoidance proceeding, there must be a prior calculation of each creditor's claim in the case and a limitation of avoidance liability to the deficiency in payment. <u>Any such tie between avoidance recovery and plan distribution would impede a settlement of the type incorporated in Tronox's plan by refusing to afford a creditor who has taken a litigation risk a prospect of a possible recovery beyond that creditor's individual damages.</u>

550 Decision at 17-18 (emphasis added).

Of course, any party-in-interest could have objected at confirmation that the *expected value* of the litigation – considering the possible high, low, and zero recovery results – was greater than the value of the claims being settled, and insisted on an estimation hearing. No one objected on these grounds.

5

Defendants' effort to limit recovery to the amount of environmental and tort liabilities, or the related net creditor shortfall, should be rejected as simply a repackaging of their prior – rejected – efforts to "cap" recovery at the amount of unpaid claims. Such a cap is inconsistent with the Plan. It would not only deprive the United States, the other environmental regulators, and the tort creditors of the benefit of their bargain in this case, but also would deprive future debtors of the ability to reorganize as Tronox did.

## II.   Basic Remedial Principles Preclude Calculating the Offset Based on the 2005 "Known and Knowable" Liabilities and Net Creditor Shortfall.

Beyond seeking to revive the cap that was previously rejected, the Court should reject defendants' proposed use of conservative, as-of-2005 liability estimates, and the related net creditor shortfall, to determine any offset. These estimates, although properly relied on by the Court for the purpose of reaching a determination of Tronox's solvency as of 2005, understate the potential liabilities that Tronox resolved through transfer of the litigation interest under the Plan and therefore should not be used in calculating an offset.

Dr. Neil Ram's estimate of environmental liabilities was limited to "information that was known or knowable as of November 28, 2005." Ram Direct ¶ 1. Moreover, beyond that temporal limitation, Dr. Ram's conclusions reflect his effort to determine "the *minimum* amount of future costs that likely will be incurred with respect to the Kerr-McGee Sites." PX 1266 (Ram Report, Section 1, at 1) (emphasis added). Dr. Ram incorporated numerous conservative assumptions into his analysis for solvency purposes. For example, he did not assign *any* environmental costs to a vast number of sites for which he did not have sufficient documentation, *see id.* ¶¶ 4, 20, 42, and he omitted the cost of replacement of major capital equipment where he lacked documentation of the

6

original cost of installation, *see id.* ¶¶ 42, 225, 298; PX 1266 (Ram Report, Ch 2.1.3, at 3 and Ch. 2.5, at 47-50).  Moreover, on a site by site basis, Dr. Ram took a conservative approach, such as not including any costs for surface water or groundwater remediation at the Lukachukai mines.  *See* PX1266 (Ram Report, Ch. 5.4.1, at 120).  Although this conservatism shows the reliability of Dr. Ram's numbers for solvency purposes – where, as the Court has held, all that need be shown is that liabilities exceeded assets, not *how much* of a differential exists between liabilities and assets, *see* Memorandum Opinion, After Trial, at 121-22 [Dkt. Entry 622] – the same conservatism demonstrates that Dr. Ram's analysis has set a floor rather than a ceiling for future environmental costs.[3]

Indeed, the evidence at trial showed that unexpected increases in environmental costs are the rule, not the exception.  As Dr. Ram has explained, both site-specific technical issues and broader regulatory changes can drive such increases and lead to his estimates being too low.  *See* Ram Direct ¶¶ 41, 42.  Even Dr. Neil Shifrin, defendants' expert, acknowledged at trial that it is "often true" that environmental cost estimates increase over time.  Tr. (9/10/2012) at 7149 (Shifrin).  Technical cost increases can occur when "actual volumes, operational durations, and the extent of remedial actions" turn out to be greater than estimated.  Ram Direct ¶ 41; *see also id.* ¶ 42.  Often, for example, actual costs exceed estimates because more soil than originally anticipated needs to be treated as part of a site clean-up, something that Dr. Shifrin recognized to be routine

---

[3] Dr. Ram's numerous conservative assumptions – both general and site specific – are reviewed in detail in his expert report, which is in evidence, *see, e.g.*, PX 1266 (Ram Report, Ch. 2.1.6, at 4-5; Ch. 2.2.3, at 21, 23; Ch. 2.5 at 47-50), and many are discussed in his written testimony, *see* Ram Direct ¶¶ 4, 20, 39, 42, 48, 70.

because "the full limit of contamination exceeding cleanup levels usually cannot be defined by up front studies data." Tr. (9/10/2012) at 7008 (Shifrin). Additional significant increases in clean-up costs can be driven by changes in federal, state, or tribal regulatory standards. "[M]ost environmental regulations have become more stringent over time, which typically increases costs." Ram Direct ¶ 42.

Because of the risk of unknown increases in environmental costs, in a typical CERCLA case the district court awards the Government a declaration that the defendant is liable for response costs incurred by the Government in the future, with the ultimate amount of those costs unknown. *See, e.g.*, CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2) (providing that "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages"). Moreover, in those cases where the Government does voluntarily agree to assume the risk of future uncertainty in a settlement, the Government often requires that the settling defendants pay a premium to compensate the Government for assuming this risk, and courts have upheld such premiums. *See, e.g.*, *U.S. v. Charter Intern. Oil Co.*, 83 F.3d 510, 522 n.17 (1st Cir. 1996); *U.S. v. Cannons Eng'g Corp.*, 899 F.2d 79, 88 (1st Cir. 1990); *U.S. v. Borough of Lemoyne*, No. CV-93-0667, 1994 U.S. Dist. Lexis 21533, at *10, *33-*34 (M.D. Pa. Nov. 17, 1994).

Ultimately, "[e]lemental notions of fairness dictate that one who causes a loss should bear the loss." *Owen v. City of Independence*, 445 U.S. 622, 654 (1980). Where the amount of loss is itself uncertain, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946); *see*

8

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 739 F. Supp. 2d 576, 614 (S.D.N.Y. 2010) (holding that because "there is no sure way to estimate how likely [costly] emergencies are to occur," "it is appropriate that the wrongdoer . . . rather than the innocent party . . . should bear the risk that these emergencies will occur frequently"). This rule is "remedial rather than punitive." *N.L.R.B. v. Staten Island Hotel Ltd. P'ship*, 101 F.3d 858, 862 (2d Cir. 1996).

Calculating an offset based on conservative estimates setting the floor for liabilities that were "known or knowable" as of 2005 (or the net creditor shortfall derived from such estimates) causes the injured parties – the environmental creditors – to bear the burden of the uncertainty and inevitable increases in those numbers. That is contrary to basic remedial principles. *See Bigelow*, 327 U.S. at 265 (principle that wrongdoers should bear "the risk of the uncertainty which [their] own wrong has created"); *Owen*, 445 U.S. at 654 ("[e]lemental notion[] of fairness" places responsibility on the party that injures another); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 739 F. Supp. 2d at 614 (finding it "appropriate that the wrongdoer . . . rather than the innocent party" bear the risks); *Grace*, 281 B.R. at 867-68 ("There is no unfairness to a debtor or to a less-than-fair-value transferee in placing the burden of a wrong solvency estimate upon them where there exists a historically unknowable mass tort liability that may impair the debtor's ability to meet its obligations."); *see also Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 812 (9th Cir. 1994) (holding that the estate "has a greater equitable claim to the transferred funds than does" a party to the fraudulent transaction).

Because any reliance on the conservative, as-of-2005 estimate of "known and knowable" liabilities wrongly places the risk of cost increases on the injured parties, the

9

Court should reject defendants' effort to base their Section 502(h) claim on that estimate or the net creditor shortfall derived therefrom.

## CONCLUSION

For the reasons stated herein, the United States respectfully requests that the Court reject defendants' invitation to apply the "known-and-knowable" as-of-2005 environmental and tort estimates, and the related "net creditor shortfall," in calculating the amount of any allowed claim pursuant to Section 502(h).

The United States additionally joins the Litigation Trust's request for disallowance of the 502(h) claim or, in the alternative, for proper dilution of that claim in calculation of any offset. The United States respectfully requests that the Court enter a final judgment of $20.77 billion as set forth in the Litigation Trust's objection and Proposed Final Judgment.

Dated: New York, New York
February 12, 2014

        PREET BHARARA
        United States Attorney
        *Attorney for the United States of America*

By:   Robert William Yalen
      ROBERT WILLIAM YALEN
      Assistant United States Attorney
      Telephone: (212) 637-2722
      Facsimile: (212) 637-2686
      E-mail: robert.yalen@usdoj.gov