BRYAN CAVE LEIGHTON PAISNER LLP
By:  Philip E. Karmel
     David M. Unseth
     Khaled Tarazi
1290 Avenue of the Americas
New York, NY 10104
Tel.: 212-541-2311
Fax: 212-541-1413
*Attorneys for Greenfield Environmental Multistate Trust LLC*
*in its capacity as Trustee of the Multistate Environmental Response Trust*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| In re | Chapter 11 |
| TRONOX INCORPORATED., et al., | Case No. 09-10156 (MEW) |
| Reorganized Debtors. | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| TRONOX INCORPORATED, et al., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 09-01198 |
| ANADARKO PETROLEUM CORPORATION, et al., | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**OBJECTION OF GREENFIELD ENVIRONMENTAL MULTISTATE TRUST LLC,
IN ITS CAPACITY AS TRUSTEE OF THE MULTISTATE ENVIRONMENTAL
RESPONSE TRUST, TO NAACP'S MOTION TO REOPEN THE CHAPTER 11 CASE
AND ADVERSARY PROCEEDING**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

PROCEDURAL HISTORY.................................................................................................... 4

I.    The Bankruptcy Case ................................................................................................ 4

    A.  The Bankruptcy Plan and Confirmation Order. ............................................... 4

    B.  Implementation of the Bankruptcy Plan. ......................................................... 5

    C.  Formation of the Environmental Response Trusts............................................ 7

    D.  Closure of Bankruptcy Case; Subsequent Tort Claims Filings. ...................... 9

II.   The Adversary Proceeding...................................................................................... 10

III.  The NAACP Motion ............................................................................................... 13

ARGUMENT ...................................................................................................................... 15

I.    The NAACP failed to provide sufficient notice of any request to reopen the Bankruptcy
    Case................................................................................................................................ 15

II.   The NAACP does not have standing to seek relief from this Court.................................. 16

    A.  The NAACP does not have constitutional standing to prosecute the Motion. .............. 16

    B.  The NAACP does not have prudential standing to prosecute the Motion..................... 18

III.  The NAACP is not a "party in interest" and therefore may not move to reopen the
    Bankruptcy Case or the Adversary Proceeding. ................................................................ 22

IV.   Even if the NAACP had standing and it were a party in interest, the Motion does not
    establish sufficient cause to reopen the Bankruptcy Case under Section 350 of the Bankruptcy Code and fails to
    establish any basis for the NAACP to intervene in the Bankruptcy Case or the Adversary
    Proceeding.................................................................................................................... 26

    A.  The Motion has not established cause to reopen the Bankruptcy Case under the criteria
    established by the caselaw. ............................................................................... 27

    B.  The NAACP cannot establish its right to intervene in the Bankruptcy Case. ............... 30

    C.  The NAACP cannot establish its right to intervene in the Adversary Proceeding. ....... 32

CONCLUSION................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

In re 1031 Tax Grp., LLC,
    420 B.R. 178 (Bankr. S.D.N.Y. 2009) ..................................................................16

In re Alpha Nat'l Res. Inc.,
    544 B.R. 848 (Bankr. E.D. Va. 2016) ..................................................................25

In re Arana,
    456 B.R. 161 (Bankr. E.D.N.Y. 2011) ............................................................26, 29

In re Bartlett,
    325 B.R. 436 (Bankr. N.D. Ind. 2005) ................................................................27

CCM Pathfinder Pompano Bay, LLC v. Compass Fin. Partners LLC,
    396 B.R. 602 (S.D.N.Y. 2008) ............................................................................31

In re City of Bridgeport,
    128 B.R. 30 (Bankr. D. Conn. 1991) ...................................................................25

In re Dicks,
    579 B.R. 704 (Bankr. E.D.N.Y. 2017) .................................................................28

Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.,
    675 F.3d 149 (2d Cir. 2012) ................................................................................32

In re Durango Georgia Paper Co.,
    336 B.R. 594 (Bankr. S.D. Ga. 2005) ..................................................................25

In re Easley-Brooks,
    487 B.R. 400 (Bankr. S.D.N.Y. 2013) .................................................................26

In re Emmerling,
    223 B.R. 860 (2d Cir. BAP 1997) .......................................................................26

In re Estate of McManus,
    47 N.Y.2d 717 (1979) .........................................................................................21

Farmland Dairies v. Comm'r of N.Y. State Dep't of Agric. & Mkts.,
    847 F.2d 1038 (2d Cir. 1988) ..............................................................................33

In re Finch,
    378 B.R. 241 (8th Cir. BAP 2007) ......................................................................27

In re Gen. Media, Inc.,
    335 B.R. 66 (Bankr. S.D.N.Y. 2005) .....................................................................31

In re Gianopolous,
    584 B.R. 598 (Bankr. S.D.N.Y. 2018) ...................................................................30

In re HBLS, L.P.,
    468 B.R. 634 (Bankr. S.D.N.Y. 2012) ...............................................27, 28, 29, 30

Highland Cap. Mgmt., L.P. v. Schneider,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) ...................................................................15

Hirsch v. Arthur Anderson & Co.,
    72 F.3d 1085 (2d Cir. 1995) ..................................................................................16

In re Innkeepers USA Tr.,
    448 B.R. 131 (Bankr. S.D.N.Y. 2011) ..................................................................23

In re Ionosphere Clubs, Inc.,
    101 B.R. 844 (Bankr. S.D.N.Y. 1989) .......................................................24, 25, 31

June Med. Servs. L.L.C. v. Russo,
    140 S. Ct. 2103 (2020) ..........................................................................................20

Kane v. Johns-Manville Corp.,
    843 F.2d 636 (2d Cir. 1988) ..................................................................................19

In re Kassover,
    448 B.R. 625 (S.D.N.Y. 2011) ..............................................................................26

In re Killmer,
    501 B.R. 208 (Bankr. S.D.N.Y. 2013) ............................................................15, 30

Kunz v. N.Y. State Comm'n on Judicial Misconduct,
    155 Fed. Appx. 21 (2d Cir. 2005) .........................................................................32

Le Bouteiller v. Bank of N.Y. Mellon,
    2015 WL 5334269 (S.D.N.Y. Sep. 11, 2015) .......................................................21

In re Lehman Bros. Holdings Inc.,
    2012 WL 1057952 (S.D.N.Y. March 26, 2012) ....................................................22

Levin v. Tiber Holding Corp.,
    277 F.3d 243 (2d Cir. 2002) ..................................................................................21

Lujan v. Defs. of Wildlife,
    504 U.S. 555 (1992) ...............................................................................................16

In re Martin Paint Stores,
    199 B.R. 258 (Bankr. S.D.N.Y. 1996) ................................................................24

In re MF Global Holdings Ltd.,
    469 B.R. 177 (Bankr. S.D.N.Y. 2012) ...............................................................16

In re Motors Liquidation Co.,
    430 B.R. 65 (S.D.N.Y. 2010) .............................................................................16

In re Motors Liquidation Co.,
    580 B.R. 319 (Bankr. S.D.N.Y. 2018) ........................................................ passim

Naversen v. Gaillard,
    38 A.D.3d 509 (2d Dep't 2007) .........................................................................21

In re Neil's Mazel, Inc.,
    492 B.R. 620 (Bankr. E.D.N.Y. 2013) ....................................................27, 28, 29

New York v. Ferber,
    458 U.S. 747 (1982) ...........................................................................................19

Newark Branch, NAACP v. Town of Harrison,
    907 F.2d 1408 (3d Cir. 1990) .............................................................................18

In re Old Carco LLC,
    500 B.R. 683 (Bankr. S.D.N.Y. 2013) ...............................................................16

Omega Eng'g, Inc. v. Omega, S.A.,
    432 F.3d 437 (2d Cir. 2005) ...............................................................................20

Patton Boggs LLP v. Chevron Corp.,
    No. 12-cv-9176 (LAK), 2016 WL 7156593 (S.D.N.Y. Dec. 7, 2016) ...............32

Penn-Star Ins. Co. v. Maint. Asset Mgmt. Inc.,
    2019 WL 4667714 (E.D.N.Y. Sept. 25, 2019), aff'd sub nom. 818 Fed. Appx.
    67 (2d Cir. 2020) ................................................................................................33

In re PlusFunds Grp., Inc.,
    492 B.R. 202 (Bankr. S.D.N.Y. 2013) ...............................................................26

In re Pub. Serv.,
    88 B.R. 546 (Bankr. D.N.H. 1988) .....................................................................31

In re Quigley,
    584 B.R. 820 (Bankr. W.D. Tex. 2017) ..............................................................29

Rajamin v. Deutsche Bank Nat. Trust Co.,
    757 F.3d 79 (2d Cir. 2014) ............................................................................20, 21

In re Refco,
    505 F.3d 109 (2d Cir. 2007)......................................................................24

Ritchie v. Gano,
    754 F. Supp. 2d 605 (S.D.N.Y. 2010)........................................................33

In re Saint Vincents Catholic Med. Ctrs. of New York,
    429 B.R. 139 (Bankr. S.D.N.Y. 2010)........................................................23

Sec'y of State of Md. v. Joseph H. Munson Co.,
    467 U.S. 947 (1984)...................................................................................19

In re Smith,
    645 F.3d 186 (2d Cir. 2011)......................................................................30

Spokeo, Inc. v. Robins,
    136 S. Ct. 1540 (2016)...............................................................................19

In re Taylor,
    216 B.R. 515 (Bankr. E.D. Pa. 1998) ........................................................15

In re Teligent,
    640 F.3d 53 (2d Cir. 2011)........................................................................23

United States v. Yonkers Bd. of Educ.,
    801 F.2d 593 (2d Cir. 1986)......................................................................33

Warth v. Seldin,
    422 U.S. 490 (1975)...................................................................................19

Whitmore v. Arkansas,
    495 U.S. 149 (1990)...................................................................................16

**Statutes**

11 U.S.C. § 350...............................................................................................22, 26

11 U.S.C. § 350(a) ..............................................................................................9

11 U.S.C. § 350(b) ....................................................................................9, 26, 30

11 U.S.C. § 1109...............................................................................................22

11 U.S.C. § 1109(b) ...................................................................................*passim*

42 U.S.C. § 6925(c)(3).......................................................................................18

42 U.S.C. § 9605...............................................................................................17

U.S. Code Title 11 ................................................................................................4, 8, 22, 26

**Regulations**

40 C.F.R. § 264.101(b) ...........................................................................................18

40 C.F.R. § 300.2 .....................................................................................................17

40 C.F.R. § 300.3 .....................................................................................................17

40 C.F.R. § 300.5 .....................................................................................................17

40 C.F.R. § 300.120 .................................................................................................17

40 C.F.R. § 300.120(f)(2) ........................................................................................17

40 C.F.R.§ 300.135(a) .............................................................................................17

40 C.F.R. § 300.155(a) .............................................................................................17

40 C.F.R. § 300.415(e)(9) ........................................................................................17

40 C.F.R. § 300.415(f) .............................................................................................18

40 C.F.R. § 300.430(b), (d) ......................................................................................17

40 C.F.R. § 300.430(d)(4) ........................................................................................17

40 C.F.R. § 300.435(b) .............................................................................................18

**Rules**

Fed. R. Bankr. P. 2002 ...............................................................................................4

Fed. R. Bankr. P. 2018 .........................................................................................30, 31

Fed. R. Bankr. P. 3022 ...............................................................................................9

Fed. R. Bankr. P. 5010 .........................................................................................22, 25

Fed. R. Bankr. P. 7004 .............................................................................................15

Fed. R. Bankr. P. 7024 .............................................................................................14

Fed. R. Civ. P. 24 ................................................................................................14, 32

Fed. R. Evid. 602 .....................................................................................................15

## INTRODUCTION

Greenfield Environmental Multistate Trust LLC in its capacity as trustee of the Multistate Environmental Response Trust (the "**Multistate Trust**") hereby objects to the NAACP's *Motion for an Order Re-Opening Chapter 11 Case and Adversary Proceeding to Permit the National Association of the Advancement of Colored People to File a Motion to Intervene as an Interested Party* (the "**Motion**").  Adv. Proc. Dkt. 686.[1]  The Motion's vague and conclusory factual allegations about the Multistate Trust are untrue.  But it is unnecessary for this Court to address these allegations to rule on the Motion, which should be denied based on the threshold legal objections presented below.

In 2010, this Court confirmed the Bankruptcy Plan in this Bankruptcy Case, which provided for treatment of certain claimants pursuant to a proposed settlement agreement (the "**Environmental Claims Settlement Agreement**").  The parties to the Environmental Claims Settlement Agreement were Tronox Incorporated and its debtor affiliates (collectively, "**Tronox**") and the United States (comprised of several settling federal agencies), the Navajo Nation, 22 states, and several municipalities (collectively, the "**Governmental Environmental Claimants**").  The Environmental Claims Settlement Agreement contemplated the creation of five trusts (the "**Environmental Response Trusts**") and provided for Tronox to pay $270 million and certain other consideration to the Governmental Environmental Claimants and Environmental Response Trusts for the benefit of the Governmental Environmental Claimants. Additionally, the Environmental Claims Settlement Agreement provided that Tronox would assign its rights in the Adversary Proceeding – a fraudulent conveyance lawsuit against its

---

[1]    The Motion potentially implicates the above-captioned bankruptcy cases, administratively consolidated under bankruptcy case no. 09-10156 (the "**Bankruptcy Case**"), and the above-captioned adversary proceeding case no. 09-01198 (the "**Adversary Proceeding**"), to which all docket references herein relate, as indicated.

former parent, Kerr-McGee Corporation ("**Kerr-McGee**"), and Anadarko Petroleum Corporation ("**Anadarko**"), which purchased Kerr-McGee – to a litigation trust that would pay 88% of its net recoveries to certain of the Governmental Environmental Claimants and the Environmental Response Trusts for the benefit of the Governmental Environmental Claimants. The Environmental Claims Settlement Agreement resolved the environmental liabilities of Tronox to the Governmental Environmental Claimants at almost 3,000 sites and facilities. The NAACP is not a party to the Environmental Claims Settlement Agreement.

On November 29, 2010, the United States published notice of the Environmental Claims Settlement Agreement in the Federal Register and requested that interested members of the public submit comments on the proposed settlement to the United States within 30 days. The NAACP did not submit any comments.[2]

In 2011, this Court approved the Environmental Claims Settlement Agreement and its related trust agreements. In 2015, after resolution of the Adversary Proceeding, this Court dismissed the Adversary Proceeding with prejudice. Thereafter, upon finding that: (i) all claims, motions, contested matters, and adversary proceedings pending during the Bankruptcy Case had been resolved; and (ii) the Bankruptcy Case had been fully administered and the Bankruptcy Plan had been consummated, this Court entered the Final Decree and closed the Bankruptcy Case.

The NAACP never filed a proof of claim in the Bankruptcy Case, and it did not object to this Court's approval of the Environmental Claims Settlement Agreement, dismissal of the

---

[2]    The comments the United States received are described in, and attached as exhibits to, the "*United States' Motion to Approve the Consent Decree and Environmental Settlement Agreement Among the Debtors, the Environmental Response Trust Trustees, the United States, and Certain State and Local Environmental Agencies*." Bankr. Dkt. No. 2692, pp. 16-18.

2

Adversary Proceeding with prejudice, or entry of the Final Decree. The NAACP was not and is not a creditor of Tronox. To the extent that any NAACP members are creditors of Tronox, their claims against Tronox are addressed under the Bankruptcy Plan. The Motion does not allege that creditor claims have not been properly addressed under the Bankruptcy Plan.

The NAACP never appeared in the Bankruptcy Case or the Adversary Proceeding. Neither the NAACP nor any of its members is a named beneficiary of the Environmental Response Trusts created by the Environmental Claims Settlement Agreement.

In its Motion, the NAACP now seeks to reopen these long-closed proceedings, and its stated purpose for doing so is to allow the NAACP to file unidentified claims relating to the administration of four of the Environmental Response Trusts.

The Motion does not include a proposed complaint and does not identify the legal claims that the NAACP would seek to plead if the Bankruptcy Case and/or Adversary Proceeding were reopened. Consequently, one can only speculate on the nature of the claims that the NAACP seeks to litigate. If the NAACP is seeking to challenge the Environmental Claims Settlement Agreement – which provides no role for the NAACP in overseeing the administration of the Environmental Response Trusts – the NAACP lacks standing to assert such a challenge and, even if the NAACP did possess the requisite standing, such challenge is without legal basis and untimely in the extreme, because the Environmental Claims Settlement Agreement was executed and approved more than 10 years ago, during the first term of President Barack Obama. Alternatively, if the NAACP is claiming that the actions or inactions of the Environmental Response Trusts have violated a civil rights statute or environmental law, the NAACP lacks standing to assert such claims and, even if the NAACP did possess the requisite standing, such non-bankruptcy claims – which would not seek relief against Tronox, Kerr-McGee or Anadarko

and would not be based on an alleged violation of a settlement document approved by this Court – are more appropriate for litigation in another forum.

Because the NAACP has failed to establish its standing or sufficient cause for the relief requested in its Motion, its Motion should be denied.

## PROCEDURAL HISTORY

I.    **The Bankruptcy Case**

A.    **The Bankruptcy Plan and Confirmation Order.**

On January 12, 2009, Tronox commenced the Bankruptcy Case.

On November 5, 2010, Tronox filed the *First Amended Joint Plan of Reorganization of Tronox Incorporated et al. Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Bankruptcy Plan**").  Bankr. Dkt. No. 2402.

On November 17, 2010, this Court held a hearing to consider confirmation of the Bankruptcy Plan (the "**Confirmation Hearing**").  Tronox provided notice of the Confirmation Hearing, together with all deadlines for voting on or objecting to the Bankruptcy Plan and with respect to its confirmation, to: (i) all known holders of Claims or Equity Interests (as defined in the Bankruptcy Plan); and (ii) all parties that requested notice in the Bankruptcy Case in accordance with Bankruptcy Rule 2002.  See Confirmation Order (defined below), p. 8.

Additionally, Tronox published notice of the Confirmation Hearing in the national edition of *The Wall Street Journal* in accordance with the notice and solicitation procedures approved by this Court.  Id.  Accordingly, this Court found that Tronox had given due, adequate, and sufficient notice of the Bankruptcy Plan and the Confirmation Hearing.  Id.

On November 30, 2010, this Court entered the *Findings of Fact, Conclusions of Law and Order Confirming the First Amended Joint Plan of Reorganization of Tronox Incorporated et al. Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Confirmation Order**").  Bankr. Dkt.

4

2567. On December 1, 2010, Tronox served copies of the Confirmation Order. Bankr. Dkt. No. 2601. The Confirmation Order was not appealed.

Pursuant to Paragraph KK of the Confirmation Order, the Bankruptcy Court retained exclusive jurisdiction over, among other things: (i) all matters arising out of, or related to, the Bankruptcy Case and the Bankruptcy Plan; (ii) entry and implementation of such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Bankruptcy Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Bankruptcy Plan; (iii) resolving any cases, controversies, suits, disputes or "Causes of Action" that may arise in connection with the consummation, interpretation or enforcement of the Bankruptcy Plan or any entity's obligations incurred in connection with the Bankruptcy Plan; and (iv) hearing and determining disputes arising in connection with the interpretation, implementation or enforcement of the Bankruptcy Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Bankruptcy Plan.

**B.    Implementation of the Bankruptcy Plan.**

The Bankruptcy Plan classified all "Tort Claims" against Tronox in Class 4. The Bankruptcy Plan defines "Tort Claims" as non-governmental claims against Tronox for death, bodily injury, sickness, disease, medical monitoring or other personal physical injuries or damage to property to the extent caused by any product or toxin manufactured or disposed of, or other property owned, operated or used for disposal by, Tronox. Class 4 provides that: (i) each holder of a "Tort Claim" will receive distributions from the "Tort Claims Trust" in accordance with the "Tort Claims Distribution Procedures"; and (ii) the "Tort Claims Trust" will be established and funded with, among other things, 12% of the proceeds of the Adversary Proceeding.

The Bankruptcy Plan classified all "Environmental Claims" against Tronox in Class 5. The Bankruptcy Plan defines "Environmental Claims" as civil claims asserted by any "Government Environmental Entity" against Tronox with respect to certain sites, relating to or arising under CERCLA, RCRA, or any other environmental law. Class 5 provides that: (i) each holder of an "Environmental Claim" will be entitled to treatment of its claim and will receive such consideration as provided in the Environmental Claims Settlement Agreement; and (ii) the Environmental Response Trusts will be established and funded with, among other things, 88% of the proceeds of the Adversary Proceeding (less a specified portion of such proceeds paid directly to certain of the Governmental Environmental Claimants as provided in the Environmental Claims Settlement Agreement).

Article IV of the Bankruptcy Plan sets forth the means for its implementation, including the terms for the establishment of the Anadarko Litigation Trust (the "**Litigation Trust**"), the Tort Claims Trust, and the Environmental Response Trusts. Specifically, Article IV(C)(5) of the Bankruptcy Plan provided for the establishment of the Litigation Trust pursuant to the Anadarko Litigation Trust Agreement (the "**Litigation Trust Agreement**"), to which Tronox would contribute its rights to the claims at issue in the Adversary Proceeding. The Litigation Trust was to pursue the Adversary Proceeding and distribute any net recoveries thereof as follows: (i) 12% to the holders of Tort Claims by delivery to the Tort Claims Trust; and (ii) 88% to certain of the Governmental Environmental Claimants and the Environmental Response Trusts in accordance with the Environmental Claims Settlement Agreement and the trust agreement governing each Environmental Response Trust (the "**Environmental Trust Agreements**").

Article IV(C)(4) of the Bankruptcy Plan provided for the establishment of the Tort Claims Trust to be funded with, among other things, the right to 12% of the proceeds of the

6

Adversary Proceeding, with the Tort Claims Trust to be governed by the "Tort Claims Trust Agreement" and administered by the "Tort Claims Trustee."

Article IV(C)(1) and (2) of the Bankruptcy Plan provide for the establishment of the Environmental Response Trusts that are: (i) to be governed by the terms of the Environmental Claims Settlement Agreement and Environmental Trust Agreements; (ii) to be funded with, among other things, the right to 88% of the proceeds of the Adversary Proceeding (less a specified portion of such proceeds paid directly to certain of the Governmental Environmental Claimants); and (iii) to receive the "Owned Sites" (substantially all of the domestic real property owned by Tronox) free and clear of all liens, claims and encumbrances with specified exceptions.

### C.    Formation of the Environmental Response Trusts.

On January 13, 2011, after publication of the Federal Register notice discussed in the Introduction above, the United States filed a motion seeking this Court's approval of the Environmental Claims Settlement Agreement.  Bankr. Dkt. No. 2692.  The NAACP is not a party to the Environmental Claims Settlement Agreement.

The Environmental Claims Settlement Agreement provided for the establishment of the five Environmental Response Trusts (including the Multistate Trust) pursuant to separate Environmental Trust Agreements, the forms of which were attached as exhibits to the Environmental Claims Settlement Agreement.

Pursuant to paragraph 168 of the Environmental Claims Settlement Agreement, this Court retained jurisdiction over both the subject matter of the Environmental Claims Settlement Agreement and the parties thereto, for the duration of the performance of the terms and provisions of the agreement for the purpose of enabling the parties thereto to make application to the Court for such further order, direction and relief as may be necessary or appropriate for the

construction or interpretation of the Environmental Claims Settlement Agreement, or to effectuate or enforce compliance with its terms.

On January 26, 2011, this Court entered an order approving the Environmental Claims Settlement Agreement.  Bankr. Dkt. No. 2747.

On February 14, 2011, this Court entered an order approving the Environmental Trust Agreements and Litigation Trust Agreement (the "**Trust Approval Order**"), thereby approving the formation of the trusts in accordance with the Bankruptcy Plan.  Bankr. Dkt. No. 2812.

Among other things, the Multistate Environmental Trust Agreement [Bankr. Dkt. No. 2812] contains the following relevant terms:

a.      Section 1.1.6 defines "Beneficiary" as the United States and certain affected State governments;

b.      Section 2.2.2. states that the "Multistate Trust is established … for the sole purpose of resolving claims asserting environmental liabilities of Settlors";

c.      Section 5.1 provides that the beneficial interest in the Multistate Trust are held by each of the Beneficiaries;

d.      Section 5.3 titled "Non-Beneficiaries" expressly provides that the "States and the United States shall be the sole beneficiaries of the Multistate Trust Accounts [the accounts holding the assets of the Multistate Trust]";

e.      Section 4.1.1 provides for the appointment of the trustee of the Multistate Trustee;

f.      Section 4.11 expressly reserves the power to select a proposed successor trustee to the United States and the States; and

g.      Section 7.4 provides that the situs of the Multistate Trust is New York, and, except to the extent the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under the Multistate Trust Agreement "shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of law thereof."

The Multistate Trust Agreement gives the United States government and the beneficiary State governments the authority to monitor the administration of the Multistate Trust.  For

8

example, as beneficiaries, the governments may inspect the books and records of the trust.  See

Multistate Trust Agreement § 2.9.  In addition, beneficiaries approve proposed work plans and

environmental contractors, as well as detailed budgets for all trust expenses, see id. §§ 3.2, 3.2.2,

3.2.4, including the compensation paid to the trustee.  See id. § 4.7.

### D.    Closure of Bankruptcy Case; Subsequent Tort Claims Filings.

On September 30, 2015 (following resolution and closing of the Adversary Proceeding,

described below), this Court entered the Final Decree closing the Bankruptcy Case.  Bankr. Dkt.

No. 3053.  Among other things, the Final Decree provides:

a.    "The Confirmation Order is a final order";

b.    "Tronox's chapter 11 cases are fully administered";

c.    "Pursuant to section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022, the Court hereby enters this Final Decree and orders that case 09-10156 be closed";

d.    "Entry of this Final Decree is without prejudice to the rights of Tronox or any other party in interest to seek to reopen these cases for good cause shown pursuant to section 350(b) of the Bankruptcy Code";

e.    The Court retains jurisdiction over the Bankruptcy Case to the extent permitted under, among other things, the Bankruptcy Plan, the Environmental Claims Settlement Agreement, the Environmental Trust Agreements, and the Tort Claims Trust Agreement.

Approximately nine months after entry of the Final Decree, on June 30, 2016, the Tort

Claims Trustee filed a motion with this Court seeking instructions and clarifications regarding

treatment of certain "Future Tort Claims" as defined in the Bankruptcy Plan (the "**Clarification**

**Motion**").  Bankr. Dkt. No. 3069.  On January 19, 2017, this Court entered an order regarding

the Clarification Motion establishing procedures for a claimant to: (i) challenge the Tort Claims

Trustee's determination to disallow a Future Tort Claim; (ii) assert that his or her failure to file a

proof of claim in the Bankruptcy Case was the result of excusable neglect; or (iii) assert that the

purported discharge of a claim was a violation of due process.  Any such claimants were to file related determination motions with this Court.

According to the Tort Claims Trustee's April 30, 2020 annual report [Bankr. Dkt. No. 9461], as of December 31, 2017, more than 4,300 Future Tort Claims submissions had been filed with the Court.  On April 25, 2018, the Tort Claims Trustee filed an omnibus objection to such claims, which appears to be still pending before this Court.

With few exceptions, the thousands of filings in the Bankruptcy Case following entry of the Final Decree relate to allowance or disallowance of Future Tort Claims.  In more than five years since entry of the Final Decree, none of the filings in the Bankruptcy Case address the administration of the Environmental Response Trusts.

## II.    The Adversary Proceeding

On May 12, 2009, Tronox commenced the Adversary Proceeding by filing a complaint against Kerr-McGee and Anadarko asserting fraudulent transfer claims related to the spin-off of Tronox from Kerr-McGee.  Adv. Dkt. No. 1.

On May 21, 2009, the United States moved to intervene in the Adversary Proceeding, asserting claims under the Federal Debt Collection Procedures Act.  Adv. Dkt. No. 5.

On February 14, 2011, by entry of the Trust Approval Order, this Court substituted the Litigation Trust for Tronox in the Adversary Proceeding.  Bankr. Dkt. No. 2812.

On December 12, 2013, following a 34-day trial, this Court issued a 166-page opinion finding Kerr-McGee and Anadarko liable for fraudulent transfers and making provisional findings regarding damages.  Adv. Dkt. No. 622.

Following the issuance of this opinion, the parties agreed to settle the Adversary Proceeding and entered into a Settlement Agreement dated April 3, 2014 (the "**Anadarko Settlement Agreement**").  Pursuant to the Anadarko Settlement Agreement, Anadarko agreed to

pay the Litigation Trust $5.15 billion and the United States and Anadarko agreed not to sue each other or assert claims related to certain environmental sites.  Adv. Dkt. No. 637.

On April 9, 2014, the parties filed a motion in the Adversary Proceeding (the "**Recommendation Motion**"), seeking a report and recommendation from this Court advising the District Court to enter a final order approving the Anadarko Settlement Agreement and to permanently enjoin certain parties from asserting certain related claims.  Adv. Dkt. No. 638.

On April 12, 2014, the claims and noticing agent in the Bankruptcy Case served more than 66,000 copies of the Recommendation Motion and the Anadarko Settlement Agreement on potentially interested parties.  Adv. Dkt. Nos. 640, 653.

During April and May 2014, the parties also published notice of the Recommendation Motion and the Anadarko Settlement Agreement in 86 newspapers across the United States.  The parties also created a website that provided information regarding the Recommendation Motion and Anadarko Settlement Agreement.  Adv. Dkt. Nos. 651, 653.

Five objections to the Recommendation Motion were filed.  Adv. Dkt. No. 643-648, 650; Bankr. Dkt. Nos. 2991-95.  The NAACP did not file any objections.

On April 14, 2014, the United States published notice of the Anadarko Settlement Agreement in the Federal Register, commencing a public comment period that ran through May 21, 2014.  See Report and Recommendation (defined below), p. 16.  The United States received 326 timely comments and 32 untimely comments.  Id.  The NAACP did not file any comments. On May 5, 2014, the United States held a public meeting in Columbus, Mississippi.  Id.  The NAACP did not present any oral comments at this meeting.

After considering the written comments it received and the transcript of the public meeting in Columbus, Mississippi, the United States decided to support the Anadarko Settlement Agreement.  Adv. Dkt. Nos. 656, 657.

On May 28, 2014, this Court held a hearing on the Recommendation Motion and subsequently issued its *Findings of Fact and Conclusions of Law on Joint Motion for a Report and Recommendation to the District Court Recommending Approval of Settlement Agreement Resolving the Adversary Proceeding and Issuance of an Injunction in Support Thereof* (the "**Report and Recommendation**").  Adv. Dkt. No. 658, 661.

On November 10, 2014, the District Court issued its *Opinion and Order* (the "**District Court Order**").  Adv. Dkt. No. 682.  Pursuant to the District Court Order, the District Court: (i) overruled all objections to the Recommendation Motion and Settlement Agreement; (ii) adopted this Court's findings of fact and conclusions of law set forth in the Report and Recommendation; (iii) approved the Settlement Agreement; and (iv) issued the requested permanent injunction.  On December 5, 2014, this Court entered the District Court Order on the Adversary Proceeding docket.

On March 12, 2015, this Court entered its *Order of Dismissal of Adversary Proceeding* [Adv. Dkt. No. 685], pursuant to which this Court: (i) dismissed the Adversary Proceeding with prejudice; and (ii) retained jurisdiction "to resolve (or recommend resolution to the extent that the Bankruptcy Court does not have final order authority) disputes in connection with, and to enforce, the Settlement Agreement … [and] any and all disputes arising under other otherwise related to the Opinion and Order."  Id.

On March 16, 2015, this Court closed the Adversary Proceeding.

12

### III.    The NAACP Motion

As a threshold matter, the Motion contains notable deficiencies that hamper the parties' ability to effectively respond.

First, it is unclear from the Motion whether the NAACP is requesting that this Court reopen the Adversary Proceeding and the Bankruptcy Case.  Although the Motion includes a number of references to reopening both the Bankruptcy Case and the Adversary Proceeding, the NAACP filed the Motion in the Adversary Proceeding (not in the Bankruptcy Case) and the proposed Order submitted with the Motion would reopen the Adversary Proceeding only.

Second, it is unclear from the Motion whether the NAACP would be seeking leave to intervene in the Adversary Proceeding and the Bankruptcy Case.  The NAACP's proposed motion to intervene (attached as Exhibit B to the Motion, the "**Proposed Intervention Motion**") relates to the Adversary Proceeding (not the Bankruptcy Case).

Third, it is unclear from the Motion the specific claims that the NAACP would plead if it were granted leave to intervene.  The Proposed Intervention Motion asserts that the NAACP seeks to intervene for the following purposes:

a.    "to assure full, fair and effective implementation of the [District Court Order] approving the settlement of claims against Kerr-Mcgee Corporation and Anadarko Petroleum Corporation;"

b.    "to assure that funds from the settlement redress harm caused by Kerr-McGee to communities of color … ;"

c.    "to place limitations to the fullest extent allowed by law and within this Court's authority and discretion to ensure these settlement funds reach the communities of color damaged by Kerr-McGee and to assure the funds are spent for the intended purposes;"

d.    "to protect historically underserved communities;"

e.    "to obtain detailed information of the expenditure of funds so as to determine whether funds are being properly spent on remediation of the communities in question;"

Noticeably lacking are any specifics regarding the legal claims of the NAACP that would entitle the NAACP to such relief.  The Proposed Intervention Motion provides neither the specific legal claims that the NAACP proposes to plead nor the factual bases of such claims.  It is for this reason that Rule 24 of the Federal Rules of Civil Procedure – made applicable to the Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7024 – requires that a motion to intervene "must … be accompanied by a pleading that sets out the claim or defense for which intervention is being sought."  Fed. R. Civ. P. 24(c).  No such pleading was attached to the Proposed Intervention Motion, forcing this Court and all other parties to guess the specific claims that the NAACP proposes to plead.

The NAACP makes no allegation that the Environmental Response Trusts are violating (or have violated) any civil rights statute or environmental law.  The NAACP also makes no allegation that individuals living in the relevant communities have suffered any environmental harm resulting from any alleged action or inaction of the Environmental Response Trusts.  Nevertheless, from what can be gleaned from its Proposed Intervention Motion, the claims that the NAACP seeks to litigate if this Court were to reopen the Bankruptcy Case and/or Adversary Proceeding would seem to fall into two possible categories: (i) claims against the trustees for mismanagement of trust assets; or (ii) claims against the Environmental Response Trusts for violation of unidentified civil rights statutes or environmental laws.  The NAACP also seeks to obtain non-public information regarding management of the Environmental Response Trusts.

Fourth, the Motion is supported only by a one paragraph declaration of Rev. Steve Jamison.  The declaration is not made on personal knowledge and is inadmissible as evidence.  See Fed. R. Evid. 602; Highland Cap. Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005).

14

## **ARGUMENT**

**I.      The NAACP failed to provide sufficient notice of any request to reopen the Bankruptcy Case.**

As noted above, it is unclear whether the NAACP is seeking to reopen both the Adversary Proceeding and the Bankruptcy Case.  Regardless, one thing is clear: the NAACP only filed the Motion in the Adversary Proceeding.  Because the NAACP has not filed a certificate of service for the Motion, it would appear that only the 22 parties that appeared in the Adversary Proceeding received notice of the Motion via this Court's ECF system.

Courts usually require notice to all interested parties before reopening a bankruptcy case. See, e.g., In re Taylor, 216 B.R. 515, 522 (Bankr. E.D. Pa. 1998) ("Usually, it is required that a closed case be reopened after notice to all interested parties before a bankruptcy court will decide a matter in that case, in order that all interested parties are notified of the matter at issue.").  In fact, when evaluating whether service of a motion to reopen was sufficient, this Court has noted:

> Some courts have required service pursuant to Federal Rule of Bankruptcy Procedure 7004.  This District's Local Rules require that '[i]n addition to all entities otherwise entitled to receive notice, notice of a motion shall be given to any entity believed to have or be claiming an interest in the subject matter of the proposed order or who, it is believed, otherwise would be affected by the proposed order'.

In re Killmer, 501 B.R. 208, 211 (Bankr. S.D.N.Y. 2013) (citations omitted).

To the extent that the NAACP is requesting that this Court reopen the Bankruptcy Case, the NAACP failed to provide notice of this request to the hundreds of parties that appeared in the Bankruptcy Case, depriving them of the opportunity to be heard with respect to the Motion. More specifically, the NAACP failed to provide notice to each of the Governmental Environmental Claimants who are the beneficiaries of the Environmental Response Trusts, other than those beneficiaries (such as the United States) that are included on the ECF service list for the Adversary Proceeding.

II.     **The NAACP does not have standing to seek relief from this Court.**

A party must satisfy three separate standing requirements to be heard in a Chapter 11 bankruptcy case: (i) constitutional standing; (ii) prudential standing; and (iii) party-in-interest standing.  See In re Motors Liquidation Co., 580 B.R. 319, 340 (Bankr. S.D.N.Y. 2018); In re Old Carco LLC, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013); In re Motors Liquidation Co., 430 B.R. 65, 92 (S.D.N.Y. 2010) ("[S]ection 1109(b) of the Bankruptcy Code does not satisfy or replace the constitutional and prudential limitations on standing.  Rather, a party must establish both.").  The burden to demonstrate standing remains with the party asserting that standing exists.  See In re 1031 Tax Grp., LLC, 420 B.R. 178, 192-93 (Bankr. S.D.N.Y. 2009) (citing Hirsch v. Arthur Anderson & Co., 72 F.3d 1085, 1092 (2d Cir. 1995)).

Accordingly, the NAACP bears the burden of establishing its standing to seek relief from this Court.  The Motion fails to meet that burden and must be denied for that reason alone.

A.     **The NAACP does not have constitutional standing to prosecute the Motion.**

The Supreme Court has identified three aspects of Article III constitutional standing: "(1) an 'injury in fact,' which is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  In re MF Global Holdings Ltd., 469 B.R. 177, 188 (Bankr. S.D.N.Y. 2012 (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)); see also Whitmore v. Arkansas, 495 U.S. 149, 158 (1990) (the threatened injury must be "certainly impending").

The Motion does not identify any "concrete and particularized" or "actual or imminent" injury that the NAACP has suffered as a result of the alleged malfeasance or misfeasance of the trustees of the Environmental Response Trusts.  The Motion fails to acknowledge that it is the

lead agency (typically either the U.S. Environmental Protection Agency or a State environmental agency) that reviews and approves the schedules and scope of environmental investigation and cleanup activities at the contaminated sites owned and managed by the Environmental Response Trusts.  For example, the National Oil and Hazardous Substances Pollution Contingency Plan (the "**NCP**")[3] provides for the "lead agency" (40 C.F.R. § 300.5) to designate an agency employee as the on-scene coordinator ("**OSC**") or remedial project manager ("**RPM**") to direct all efforts to respond to a discharge of oil or release of a hazardous substance, pollutant or contaminant at a facility.  40 C.F.R. § 300.120.  It is the "OSC/RPM [that are required to] direct response efforts and coordinate all other efforts at the scene of a discharge [of oil] or release [of a hazardous substance, pollutant, or contaminant]."  Id. § 300.135(a); see also id. § 300.120(f)(2) (the RPM "coordinates, directs, and reviews the work of other agencies, responsible parties, and contractors to assure compliance with the NCP … and lead agency-approved plans applicable to the response").  It is the lead agency's OSC/RPM and "community relations personnel" that must "ensure that all appropriate public and private interests are kept informed and that their concerns are considered throughout a response."  Id. § 300.155(a).  It is the "lead agency" that: (i) determines the scope of the required environmental studies (see id. § 300.430(b), (d)); (ii) identifies risks to human health (see id. § 300.430(d)(4)); (iii) evaluates cleanup alternatives using prescribed criteria (see id. § 300.415(e)(9)); and (iv) selects the cleanup remedy after soliciting and reviewing public comments (see id. § 300.415(f)).  Thereafter, the design and performance of the remedy must be done in conformance with the cleanup remedy selected by the lead agency.  Id. § 300.435(b).  Similar rules putting the federal or State lead agency in the

---

[3]     The NCP is applicable to sites being addressed under the Comprehensive Environmental Response, Compensation, and Liability Act, see 42 U.S.C. § 9605, or section 311(d) of the Clean Water Act.  See 40 C.F.R. §§ 300.2, 300.3.

driver's seat on all important site decisions exist under other statutory programs, such as permitting and cleanup under the Resource Conservation and Recovery Act.  See 42 U.S.C. § 6925(c)(3); 40 C.F.R. § 264.101(b).

The Motion does not allege that the Environmental Response Trusts have failed to heed any directive of the relevant lead agency as to the scope or schedule of any required environmental study or cleanup action at any of the sites being managed by the trusts.  Similarly, the Motion does not allege that the Environmental Response Trusts have incurred expenses not included in the detailed budgets approved by the trust beneficiaries.

The Motion does not allege any specific action or inaction of the Environmental Response Trusts that has resulted in (or is imminently threatening) any alleged concrete and particularized injury to the NAACP or any of its members.  To be sure, the NAACP is a critically important civil rights organization with a storied history and necessary purpose.  But its stature does not give the organization standing to assert civil rights claims without establishing constitutional standing.  See, e.g., Newark Branch, NAACP v. Town of Harrison, 907 F.2d 1408 (3d Cir. 1990) (affirming dismissal of NAACP's employment discrimination claim for lack of standing because NAACP failed to establish any of its members would have standing to bring the claim against the defendant).

In addition to failing to allege the requisite injury required for Article III standing, the Motion fails to allege that any hypothetical injury would be redressed by any relief that the NAACP would seek from this Court.  Accordingly, the Motion fails to establish the Article III constitutional standing of the NAACP to seek any relief from this Court and must be denied.

> **B.**      **The NAACP does not have prudential standing to prosecute the Motion.**

The "prudential standing rule ... normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves."  Warth v. Seldin, 422 U.S.

490, 509 (1975). "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Id. at 499. Thus, a "party seeking to appear in federal court must demonstrate prudential standing.… The doctrine, self-imposed by federal courts, bars litigants from asserting the constitutional and statutory rights of others in an effort to obtain relief for injury to themselves." Motors Liquidation, 580 B.R. at 340 (citation and quotations omitted). Prudential standing limitations are relevant in bankruptcy cases, where parties often seek to assert rights and claims of third parties. See Kane v. Johns-Manville Corp., 843 F.2d 636, 644 (2d Cir. 1988) ("The prudential concerns limiting third-party standing are particularly relevant in the bankruptcy context. Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that other party is present in the proceedings and is capable of representing himself.").[4]

To the extent that the NAACP seeks to plead that the Environmental Response Trusts are violating a civil rights statute or an environmental law, that unpleaded claim has nothing to do

---

[4]    The rule against third-party standing is "closely related to Art[icle] III concerns," Warth v. Seldin, 422 U.S. at 500, and "is not completely separable from Art[icle] III's requirement that a plaintiff have a sufficiently concrete interest in the outcome of [the] suit to make it a case or controversy." Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 955, n.5 (1984) (internal quotation marks omitted); see also Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (whether a plaintiff "alleges that [the defendant] violated his statutory rights" rather than the "statutory rights of other people" is a component of the required "particularization" of an Article III injury); New York v. Ferber, 458 U.S. 747, 767 n.20 (1982) (rule against third-party standing is "grounded in Art[icle] III limits on the jurisdiction of federal courts to actual cases and controversies"). Accordingly, the third-party standing principles briefed herein as a component of "prudential standing" may alternatively be viewed as a component of Article III standing. Compare June Med. Servs. L.L.C. v. Russo, 140 S. Ct. 2103, 2117 (2020) (plurality opinion) (rule against third-party standing is "prudential") with id. at 2144 (Thomas, J., dissenting) ("Article III's case-or-controversy requirement [includes the] rule against third-party standing … [as] an element of Article III standing").

with Tronox, Kerr McGee, Anadarko, the Bankruptcy Case, or the Adversary Proceeding and

would provide no basis to reopen the Bankruptcy Case or the Adversary Proceeding.

More likely, to litigate a claim in this Court, it appears that the NAACP will seek to

allege that the Environmental Response Trusts are violating the terms of the Environmental

Claims Settlement Agreement or the Environmental Trust Agreements approved by this Court

and over which this Court retained jurisdiction for certain, identified purposes. The NAACP

does not have prudential standing to assert such claims.

"An agreement to settle litigation [such as the Environmental Claims Settlement

Agreement] is a 'contract.'" Motors Liquidation, 580 B.R. at 343 (quoting Omega Eng'g, Inc. v.

Omega, S.A., 432 F.3d 437, 444 (2d Cir. 2005)). It is well established that "the terms of a

contract may be enforced only by contracting parties or intended third-party beneficiaries of the

contract." Rajamin v. Deutsche Bank Nat. Trust Co., 757 F.3d 79, 86 (2d Cir. 2014) (citation

omitted). Accordingly, "mere incidental beneficiaries of a contract are not allowed to maintain a

suit for breach of the contract." Id. Thus, an incidental beneficiary does not have prudential

standing to prosecute a claim alleging breach of a contract to which it is not a party. Id.

As this Court has held:

> In the context of a contract dispute, only parties to the contract and intended third-party beneficiaries of the contract have prudential standing to appear and enforce agreements.… Put differently, a non-party to a contract that does not contain unambiguous language manifesting an intent to make the non-party a beneficiary of that contract lacks prudential standing to litigate issues related to that contract.

Motors Liquidation, 580 B.R. at 340 (citations and quotations omitted). See also Levin v. Tiber

Holding Corp., 277 F.3d 243, 248-49 (2d Cir. 2002) ("Under New York law, a third party is an

intended (as opposed to incidental) beneficiary of a contract if recognition of a right to

performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the

beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.") (citations omitted).

The same standards apply in the context of actions for breach of an agreement such as the Multistate Environmental Trust Agreement, which is generally governed by New York law. *See supra* at 8. Only the intended beneficiaries of a trust have standing to enforce its terms. See Rajamin, 757 F.3d at 88 (persons who are not beneficially interested in trust lack standing to challenge the actions of its trustee); Naversen v. Gaillard, 38 A.D.3d 509 (2d Dep't 2007); Le Bouteiller v. Bank of N.Y. Mellon, 2015 WL 5334269, at *7 (S.D.N.Y. Sep. 11, 2015) ("Where the challengers to a trustee's actions are not beneficiaries, and hence lack standing, the court 'need not decide whether the conduct of the trustee comported with the terms of the trust.'") (quoting In re Estate of McManus, 47 N.Y.2d 717, 719 (1979)).

Here, each of the Environmental Trust Agreements [Bankr. Dkt. 2812] identify specific Governmental Environmental Claimants as the sole beneficiaries of each Environmental Response Trust. See Multistate Environmental Trust Agreement §§ 1.1.6, 5.3; Nevada Environmental Trust Agreement §§ 1.1.6, 5.3; West Chicago Environmental Trust Agreement §§ 1.1.7, 2.1.8, 5.3; Savannah Environmental Trust Agreement §§ 1.1.6, 5.3; Cimarron Environmental Trust Agreement §§ 1.1.6, 5.3. Because neither the NAACP nor any of its members is a beneficiary of the Environmental Trust Agreements, neither the NAACP nor any of its members can assert breach-of-trust claims. See Motors Liquidation, 580 B.R. at 341 ("Similarly, under both federal common law and New York law, third party non-beneficiaries cannot adjudicate contractual issues even when that third party's financial interest is arguably at stake. Importantly to this case, a showing that the party was an 'incidental beneficiary' of a

contract is insufficient, even if the party stands to suffer 'economic loss.'" (citations and quotations omitted)).

Because the relief requested in the Motion is predicated on the NAACP pursuing claims that it has no legal right to pursue, the NAACP does not satisfy the prudential standing requirement necessary to prosecute the Motion. The Multistate Trust rejects each and every allegation of malfeasance or misfeasance set forth in the Motion. If the NAACP is permitted to intervene, its unsubstantiated allegations will be vigorously contested. But it would be contrary to the public interest to consume judicial resources and trust assets in such litigation where the NAACP has no standing to plead any claims under the Environmental Claims Settlement Agreement or Environmental Trust Agreements.

### III.    The NAACP is not a "party in interest" and therefore may not move to reopen the Bankruptcy Case or the Adversary Proceeding.

Section 1109(b) of the Bankruptcy Code only permits a "party in interest" to appear and be heard in a Chapter 11 bankruptcy case. 11 U.S.C. § 1109(b). In addition, Bankruptcy Rule 5010 only permits a debtor or other "party in interest" to move to reopen under Section 350 of the Bankruptcy Code. Fed. R. Bankr. P. 5010.

The party in interest requirement is in addition to the constitutional and prudential standing requirements related to any specific matter. See Motors Liquidation, 580 B.R. at 342 ("Lastly, if both prudential and constitutional standing are met, the Bankruptcy Code separately requires 'party in interest' standing under section 1109."); In re Lehman Bros. Holdings Inc., 2012 WL 1057952, at *3 (S.D.N.Y. March 26, 2012) ("Section 1109(b) creates an independent standing hurdle for parties wishing to appear or be heard in bankruptcy proceedings.").

Because bankruptcy courts are courts of limited jurisdiction, the party in interest requirement ensures that only parties "holding a direct financial stake in the outcome of the case

should have an opportunity … to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest." In re Teligent, 640 F.3d 53, 60 (2d Cir. 2011) (citations omitted); see also In re Saint Vincents Catholic Med. Ctrs. of New York, 429 B.R. 139, 151 (Bankr. S.D.N.Y. 2010) ("Bankruptcy courts do not have the general jurisdiction of state courts and are meant as a 'forum where creditors and debtors can settle their disputes with each other.'").

In order to establish party in interest standing, "a proposed participant must either be a party enumerated in the statute or: (1) have a 'direct' stake in the proceeding and (2) 'be a creditor of a debtor … or be able to assert an equitable claim against the estate.'" Motors Liquidation, 580 B.R. at 342 (citation omitted); see also Saint Vincents, 429 B.R. at 149 ("The 'real party in interest' is the one who under the applicable substantive law, has the legal right which is sought to be enforced or is the party entitled to bring suit. Since 'party in interest' is not defined by the Bankruptcy Code, the Second Circuit looks to the underlying purpose of the Code which is '*to provide a forum where creditors and debtors could settle their disputes and thereby effectuate the objectives of the statute.*'" (emphasis added)). The NAACP is not a party in interest because it is neither a creditor nor a debtor, and it seeks to prosecute its claim against the Environmental Response Trusts (which are also neither creditors nor debtors).

This Court routinely denies party in interest status to parties that lack a "direct stake" in the bankruptcy case. See In re Innkeepers USA Tr., 448 B.R. 131, 141 (Bankr. S.D.N.Y. 2011) ("Courts in this District, while generally interpreting section 1109(b) broadly, have limited 'party in interest' standing where a party's interest in the proceeding is not a direct one."); In re Martin Paint Stores, 199 B.R. 258, 264 (Bankr. S.D.N.Y. 1996) ("[T]he term ['party in interest'] does

23

not encompass a person who is merely 'concerned' with the results of the proceeding.") (citation omitted).

In particular, courts are reluctant to grant party in interest status to a party that seeks to assert claims on behalf of third parties.  In re Refco Inc., 505 F.3d 109, 117 n.10 (2d Cir. 2007) ("party-in-interest standing under § 1109(b) does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding").

The following are representative cases in which courts have denied party in interest status to an entity whose claims were derivative of another party's rights:

**Consumer advocacy group.**  A consumer advocacy group was held not to be a party in interest for purposes of filing a motion to approve certain ticket refund procedures.  In re Ionosphere Clubs, Inc., 101 B.R. 844 (Bankr. S.D.N.Y. 1989).  The consumer advocacy group claimed that it acted on behalf of certain specified individuals, its members and subscribers, and other "similarly situated" individuals.  The consumer advocacy group also claimed that the creditors' committee inadequately protected consumer rights.  The Court rejected these arguments and held that:

> if a party is not affected by the reorganization process it should not be considered a party in interest.  Only those parties sufficiently affected by a Chapter 11 proceeding should be able to appear before it and be heard … This Court is not persuaded by [the consumer advocacy group's] assertion that due to its [self-proclaimed] status as protector of consumers, it has the unique power to step into the shoes of the consumer ticket holders, and receive their status as a party in interest.  The real party in interest is the party that has the legal right which is sought to be enforced or is the party entitled to bring suit.

Ionosphere, 101 B.R. at 849 (internal citations omitted).  The Court held that its reasoning was further supported by the fact that the bankruptcy case did not affect any vital interest of the consumer advocacy group and that the consumer advocacy group did not have any direct

financial relationship with the debtor or hold a legal or equitable claim against the debtor.  Id. at 850.

**Environmental advocacy groups.**  Environmental advocacy groups were held not to be parties in interest for purposes of objecting to a settlement agreement that addressed environmental issues.  In re Alpha Nat'l Res. Inc., 544 B.R. 848 (Bankr. E.D. Va. 2016).  In this case, the court held that none of the environmental groups was a party in interest because they had no "pecuniary interest at stake" that would be "directly affected" by the bankruptcy case. Alpha Nat'l Res., Inc., 544 B.R. at 855-56.  In particular, the court noted that the environmental groups failed to plead any "concrete and particularized injury in fact" to the environmental groups that would result from approval of the settlement agreement.  Id. at 854.

**Consortium of public interest/environmental groups.**  A consortium of public interest groups and environmental groups was held not to have standing to file an objection to a sale of the debtor's property.  In re Durango Georgia Paper Co., 336 B.R. 594, 596-97 (Bankr. S.D. Ga. 2005).

**Association of municipalities.**  An association of municipalities was held not to be a "party in interest" for purposes of objecting to a debtor's Chapter 9 bankruptcy petition.  In re City of Bridgeport, 128 B.R. 30 (Bankr. D. Conn. 1991).

Similar to the parties in the foregoing cases, the NAACP has not demonstrated that it is a party in interest.  At most, the claims that the NAACP wishes to assert are completely derivative of third party rights.  As such, the NAACP is not a party in interest and, by operation of Section 1109(b) of the Bankruptcy Code and Bankruptcy Rule 5010, is not permitted to seek the relief contained in the Motion.

IV.    **Even if the NAACP had standing and it were a party in interest, the Motion does not establish sufficient cause to reopen under Section 350 of the Bankruptcy Code and fails to establish any basis for the NAACP to intervene in the Bankruptcy Case or the Adversary Proceeding.**

Section 350(b) of the Bankruptcy Code provides that "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). Because the NAACP is neither seeking to administer assets of Tronox's bankruptcy estate nor to accord relief to Tronox, the NAACP must prove "other cause" to reopen under Section 350(b) of the Bankruptcy Code. The NAACP has not established sufficient "other cause" to reopen.

Upon the motion of a party in interest with standing, a Bankruptcy Court has broad discretion in deciding whether to reopen a closed case. In re Emmerling, 223 B.R. 860, 864 (2d Cir. BAP 1997); In re PlusFunds Grp., Inc., 492 B.R. 202, 209 (Bankr. S.D.N.Y. 2013); In re Kassover, 448 B.R. 625, 631 (S.D.N.Y. 2011) ("[T]he decision to reopen bankruptcy proceedings is committed to the sound discretion of the bankruptcy court and such decisions are overturned only upon a finding that the bankruptcy court abused its discretion."). The NAACP bears the burden to demonstrate cause to reopen. In re Easley-Brooks, 487 B.R. 400, 406 (Bankr. S.D.N.Y. 2013); PlusFunds, 492 B.R. at 209; In re Arana, 456 B.R. 161, 172 (Bankr. E.D.N.Y. 2011).

The Bankruptcy Code does not establish what constitutes "cause" to reopen a case. Easley-Brooks, 487 B.R. at 406; PlusFunds, 492 B.R. at 209. In deciding whether cause exists, courts "may consider numerous factors including equitable concerns.…" Emmerling, 223 B.R. at 864; see also Easley-Brooks, 487 B.R. at 406-07; PlusFunds, 492 B.R. at 209.

A.     **The Motion has not established cause to reopen the Bankruptcy Case under the criteria established by the caselaw.**

A court should not reopen a case to give a party the opportunity to enforce rights that did not exist at the time the case was closed. See In re Finch, 378 B.R. 241, 246 (8th Cir. BAP 2007) ("[Reopening a case] is usually done in order to take care of some detail that was overlooked or left unfinished at the time the case was closed. It was not designed as an opportunity to create, and then enforce, rights that did not exist at the time the case was originally closed." (citing In re Bartlett, 325 B.R. 436, 438 (Bankr. N.D. Ind. 2005)). Accordingly, the Motion should be denied because it does not establish that any claims that the NAACP seeks to litigate existed prior to the closure of the Bankruptcy Case.

Courts have denied motions to reopen where the basis for the reopening is the resolution of a dispute between two non-debtor parties. See, e.g., In re HBLS, L.P., 468 B.R. 634, 639 (Bankr. S.D.N.Y. 2012) (Court found "no equitable basis" to reopen a closed case where the basis for reopening the case revolves around a dispute between two non-debtor entities); In re Neil's Mazel, Inc., 492 B.R. 620, 628-29 (Bankr. E.D.N.Y. 2013) (Court denied motion to reopen bankruptcy case where "disputes at the heart of [movant's] various motions are almost entirely between [movant] and other entities, none of whom is a debtor in any open bankruptcy case. The Debtor's peripheral involvement here is almost an afterthought; much of the force of [movant's] arguments is directed against [non-debtors]."). Accordingly, the Motion should be denied because the NAACP seeks to reopen in order to litigate disputes involving non-debtor entities; based upon the content of the Motion, none of the claims the NAACP would conceivably raise involves a dispute between the NAACP and Tronox or a dispute between the NAACP and the Adversary Proceeding defendants (Kerr McGee and Anadarko).

Similarly, courts have denied a motion to reopen where the debtor's assets were fully administered or the reopening would have no effect on administration of the debtor's estate.  See, e.g., HBLS, 468 B.R. at 639 (Court found "no equitable basis" to reopen a closed case where debtor's assets were fully administered more than a decade ago and "this dispute's outcome would not have any effect on [the debtor's] twice-closed (fully administered) estate."); Neil's Mazel, 492 B.R. at 628 ("A motion to reopen may also be denied if reopening would have no effect on the administration of a bankruptcy case …"); In re Dicks, 579 B.R. 704, 707-08 (Bankr. E.D.N.Y. 2017) (Court only has duty to reopen a case where "there is proof that it has not been fully administered" or "to determine whether additional assets may be available for creditor of the estate.").  These cases warrant denial of the Motion because all of Tronox's assets were fully administered under the Bankruptcy Plan and, consequently, reopening would have no effect on the Tronox bankruptcy estate.  In this regard, it should be noted that, contrary to the premise of the Motion, none of the assets of the Environmental Response Trusts constitute either Tronox's assets or property of the Tronox bankruptcy estate.  Section 2.2.1 of each of the Environmental Trust Agreements states that the debtors "shall retain no ownership or other residual interest whatsoever with respect to the [Environmental Response] Trust."  Bankr. Dkt. 2812.  Having been distributed to the Environmental Response Trusts for the benefit of the Governmental Environmental Claimants, the assets now held by the Environmental Response Trusts are no longer part of the bankruptcy estate.[5]

---

[5]    See Bankr. Dkt. No. 2567 (Confirmation Order ¶¶ 81, 82, providing that "the Environmental Trust Assets . . . shall … vest in the applicable Environmental Response Trusts as provided in the Environmental Claims Settlement Agreement" and that the "Retained Assets" to be transferred to the Reorganized Tronox shall include all of the debtors' assets other than the Environmental Trust Assets).

Courts have also denied a motion to reopen where the reopening would not benefit the debtor's estate or creditors.  See, e.g., HBLS, 468 B.R. at 639 (Court found "no equitable basis" to reopen a closed case where reopening the case to consider the dispute would not benefit the debtor's estate or creditors, reasoning that "courts typically examine the benefit to the debtor, the prejudice to the [movant], and the benefit to the creditors."); Arana, 456 B.R. at 173 ("Where the chance of any substantial recovery for creditors appears too remote to make the effort worth the risk, a trial court does not abuse its discretion in denying a motion to reopen.").  These cases warrant denial of the Motion because reopening would not enhance recovery to creditors under the Bankruptcy Plan.

Courts recognize the need for finality in bankruptcy cases.  See, e.g., In re Quigley, 584 B.R. 820 (Bankr. W.D. Tex. 2017) (Court denied motion to reopen in recognition of "need for finality in bankruptcy cases and the need for debtors to rely on the conclusiveness of bankruptcy proceedings as they move beyond bankruptcy."); Neil's Mazel, 492 B.R. at 628 (Court denied motion to reopen case that was closed over 4½ years ago and bankruptcy plan was confirmed over 7½ years ago, holding that "[t]he longer the case has been closed, the more compelling is the justification needed in order to warrant reopening the case" and "[movant] bore a heavy burden of persuasion in seeking to reopen the case."); Arana, 456 B.R. at 174 ("[S]ome courts have found that as the time between closing of a bankruptcy case and its reopening increases, so must the cause for reopening increase in weight.").  The concern for finality weighs in favor of denying the Motion because the Bankruptcy Case was closed over 6 years ago and the Adversary Proceeding was dismissed with prejudice and closed over 5½ years ago.

As a matter of law, a bankruptcy court may also deny a motion to reopen where it is clear at the outset that no relief would be forthcoming by granting the motion to reopen – where "the

29

ultimate cause of action movant seeks to bring is futile." In re Killmer, 501 B.R. 208, 211

(Bankr. S.D.N.Y. 2013); see also In re Smith, 645 F.3d 186, 189-90 (2d Cir. 2011) (concluding

that bankruptcy court properly exercised discretion to deny motion to reopen where the only

purpose of granting the motion to reopen would have been to allow debtor to pursue meritless

claims); HBLS, 468 B.R. at 639 ("In determining whether 'cause' exists to reopen a bankruptcy

case, it is appropriate for a bankruptcy court to consider the merits of the underlying claim.

Specifically, 'where the underlying claim is certain to fail upon a reopening of the proceedings, a

bankruptcy court may properly deny the motion.'") (internal citations omitted); In re

Gianopolous, 584 B.R. 598, 608 (Bankr. S.D.N.Y. 2018) ("[C]ourts deny § 350(b) motions

where it would be a wasted exercise to grant them. Thus, if the underlying claim is certain to fail

upon a reopening of the proceedings, a bankruptcy court may properly deny the motion.").

In this case, the ultimate relief that the NAACP is seeking in connection with its request

to reopen is the prosecution of its unidentified claims in this Court. However, in order to

prosecute such claims in this Court, the NAACP must first establish that: (i) the NAACP has

standing and the right to intervene in the Bankruptcy Case and/or the Adversary Proceeding in

order to file such claims; and (ii) this Court has subject matter jurisdiction to adjudicate such

claims. As discussed below, the NAACP cannot establish either its right to intervene or this

Court's jurisdiction over its unidentified claims against the Environmental Response Trusts.

**B.      The NAACP cannot establish its right to intervene in the Bankruptcy Case.**

As discussed above, the NAACP has not established that it constitutes a "party in

interest." Therefore, at a minimum, the NAACP would need to establish its right to intervene in

the Bankruptcy Case pursuant to Bankruptcy Rule 2018, which allows an "interested entity" to

intervene in a bankruptcy case "for cause." This Court has construed the "for cause"

requirement to mean that a party must have a direct economic interest in the bankruptcy case.

See, e.g., Ionosphere, 101 B.R. at 853; In re Pub. Serv. of New Hampshire, 88 B.R. 546, 551 (Bankr. D.N.H. 1988) ("The cause is an economic or similar interest in the case or one of its aspects.").

The NAACP has no "direct economic interest" in the Bankruptcy Case.  The NAACP is not a creditor of Tronox and has not established its standing to prosecute its unidentified claims. Accordingly, the NAACP cannot establish cause to intervene in the Bankruptcy Case under Bankruptcy Rule 2018.

In evaluating the NAACP's right to intervene in the Bankruptcy Case, this Court should also consider whether it would have subject matter jurisdiction over the NAACP's unidentified claims.   Confirmation of a debtor's bankruptcy plan limits a bankruptcy court's post-confirmation subject matter jurisdiction.  See In re Gen. Media, Inc., 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) ("[A]ll courts that have addressed the question have ruled that once confirmation occurs, the bankruptcy court's jurisdiction shrinks."); CCM Pathfinder Pompano Bay, LLC v. Compass Fin. Partners LLC, 396 B.R. 602, 605 (S.D.N.Y. 2008) ("[I]n determining whether a bankruptcy court has retained post-confirmation jurisdiction, courts look to whether (1) the matter has a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution or administration of the confirmed plan; and (2) the bankruptcy plan provides for the retention of jurisdiction over the dispute." (internal quotations omitted)).  It seems unlikely that any of the NAACP's unidentified claims would require this Court to interpret, implement, consummate, execute, or administer the Bankruptcy Plan. See General Media, 335 B.R. at 74-75 (Court held that claims lacked a "close nexus" to the bankruptcy plan where "[n]one of the claims arise under the Plan or require the Court to interpret it" and "[a] bankruptcy court cannot hear a post-confirmation dispute simply

31

because it might conceivably increase the recovery to creditors, because the rationale could

'endlessly stretch a bankruptcy court's jurisdiction'") (citation omitted).

### C.    The NAACP cannot establish its right to intervene in the Adversary Proceeding.

The NAACP's ability to intervene in the Adversary Proceeding must be analyzed under

the particular facts of this case, namely, that the Adversary Proceeding is no longer a pending

action – it was dismissed with prejudice over 5½ years ago.  As a general matter, courts in the

Second Circuit are in accord that intervention into a dismissed lawsuit is not appropriate:

> Intervention is a procedural means for entering an existing federal action.  The
> Federal Rules of Civil Procedure do not extend or limit the jurisdiction of the
> district courts.  That is, Rule 24 does not itself provide a basis for jurisdiction.
> Accordingly, since intervention contemplates an existing suit in a court of
> competent jurisdiction and because intervention is ancillary to the main cause of
> action, intervention will not be permitted to breathe life into a nonexistent law
> suit.  Indeed, this rule is so deeply entrenched in our jurisprudence that it is an
> axiomatic principle of federal jurisdiction in every circuit to have addressed
> the question.

Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc., 675 F.3d 149, 160-61

(2d Cir. 2012) (collecting Circuit Court cases) (quotations and citations omitted); see also Kunz

v. N.Y.S. Comm'n on Judicial Misconduct, 155 Fed. Appx. 21, 22 (2d Cir. 2005) (Summary

Order) ("where the action in which a litigant seeks to intervene has been discontinued, the

motion to intervene is rendered moot"); Patton Boggs LLP v. Chevron Corp., No. 12-cv-9176

(LAK), 2016 WL 7156593, at *10 (S.D.N.Y. Dec. 7, 2016) (denying motion to intervene by non-

party even where order dismissing lawsuit retained jurisdiction for limited purpose of enforcing

settlement agreement, because no request to enforce or decide any claim of breach of settlement

agreement had ever been made by a party thereto.  Thus, "nothing is pending before this Court

into which movants may intervene.").

Even if the Adversary Proceeding were still pending, "[t]he Second Circuit has cautioned against allowing intervention in a matter that has been otherwise resolved." Penn-Star Ins. Co. v. Maint. Asset Mgmt. Inc., 2019 WL 4667714, at *5 (E.D.N.Y. Sept. 25, 2019), aff'd sub. nom. 818 Fed. Appx. 67 (2d Cir. 2020).

A voluntary dismissal with prejudice is "tantamount to a judgment on the merits." Ritchie v. Gano, 754 F. Supp. 2d 605, 608 (S.D.N.Y. 2010).  In the Second Circuit, post-judgment intervention "is generally disfavored because it usually creates delay and prejudice to existing parties and undermines the orderly administration of justice." United States v. Yonkers Bd. of Educ., 801 F.2d 593, 596 (2d Cir. 1986) (internal citations omitted).  See also Farmland Dairies v. Comm'r of N.Y. State Dep't of Agric. & Mkts., 847 F.2d 1038, 1044 (2d Cir. 1988) ("post-judgment intervention is generally disfavored because it fosters delay and prejudice to existing parties"); Penn-Star Ins., 2019 WL 4667714, at *5 (collecting cases where the Second Circuit affirmed denials of post-settlement and post-judgment intervention).

In Yonkers, the District Court entered a housing remedy order to address discriminatory development of subsidized multi-family public housing.  After entry of this order (and three months after the remedy proceedings had begun), certain homeowners moved to intervene to assert issues related to the location of the public housing. The District Court denied the homeowner's motion to intervene as untimely.  The Second Circuit affirmed this ruling, holding that permitting the homeowners to intervene after entry of judgment

> would make the achievement of a final remedy nearly impossible. In the interest of finality, there must come a time, once all affected parties' opportunities to protect their interests have passed, when the remedy, if otherwise lawful, must be allowed to proceed.

United States v. Yonkers Bd. of Educ., 801 F.2d at 596.

## **CONCLUSION**

For the foregoing reasons, the Motion should be denied.

Dated:  New York, New York
        December 8, 2020

Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

By:  _____
        Philip E. Karmel
1290 Avenue of the Americas
New York, NY 10104
Tel.: 212 541 2311
Fax: 212 541 1413
Email: pekarmel@bclplaw.com

David M. Unseth (not admitted in New York)
BRYAN CAVE LEIGHTON PAISNER LLP
211 N Broadway
St. Louis, MO 63102
Email: dmunseth@bclplaw.com

Khaled Tarazi (not admitted in New York)
BRYAN CAVE LEIGHTON PAISNER LLP
Two North Central Avenue, Suite 2100
Phoenix, AZ
Email: Khaled.Tarazi@bclplaw.com

*Attorneys for Greenfield Environmental Multistate Trust LLC in its capacity as Trustee of the Multistate Environmental Response Trust*

34